```
              UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF TEXAS (HOUSTON)


IN RE:                      .   Case No. 22-90273
                            .   (Jointly Administered)
                            .   Chapter 11
COMPUTE NORTH HOLDINGS,     .
INC. and CN MINING, LLC,    .   515 Rusk Street
                            .   Houston, TX  77002
                            .
                            .   Friday, September 23, 2022
                 Debtors.   .   7:29 a.m.
. . . . . . . . . . . . . .


                 TRANSCRIPT OF FIRST-DAY HEARING
               BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:


For the Debtors:           Paul Hastings LLP
                           By:  JAMES TILLMAN GROGAN, III, ESQ.
                           600 Travis Street, 58th Floor
                           Houston, TX 77002
                           (713) 860-7300

                           Paul Hastings LLP
                           By:  SAYAN BHATTACHARYYA, ESQ.
                                LUC A. DESPINS, ESQ.
                                DANIEL GINSBERG, ESQ.
                                COLE HARLAN, ESQ.
                           200 Park Avenue
                           New York, NY 10166
                           (212) 318-6000

APPEARANCES CONTINUED.

Audio Operator:            Court ECRO Personnel


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

TELEPHONIC APPEARANCES (Continued):                                    2

```
For the Debtors:         Paul Hastings LLP
                         By:  ANGELIKA S. GLOGOWSKI, ESQ.
                              MICHAEL JONES, ESQ.
                              MATTHEW MICHELI, ESQ.
                         71 South Wacker Drive, Suite 4500
                         Chicago, IL 60606
                         (312) 499-6000

For CN Borrower LLC:     ArentFox Schiff LLP
                         By:  JEFFREY R. GLEIT, ESQ.
                         1301 Avenue of the Americas
                         42nd Floor
                         New York, NY 10019
                         (212) 457-5427

For Generate Lending,    Kirkland & Ellis LLP
LLC:                     By:  ELIZABETH JONES, ESQ.
                              CHRISTOPHER MARCUS, ESQ.
                         601 Lexington Avenue
                         New York, NY 10022
                         (212) 446-4800

                         Kirkland & Ellis LLP
                         By:  ANNA G. ROTMAN, ESQ.
                         609 Main Street
                         Houston, TX 77002
                         (713) 836-3750

                         Hunton Andrews Kurth LLP
                         By:  JOSEPH W. BUONI, ESQ.
                         600 Travis Street, Suite 4200
                         Houston, TX 77002
                         (713) 220-4168

For the United States    Office of the United States Trustee
Trustee:                 By:  JAYSON B. RUFF, ESQ.
                              JANA SMITH WHITWORTH, ESQ.
                         515 Rusk Street, Suite 3516
                         Houston, TX 77002
                         (713) 718-4650

Also Present:            BARRY COULBY, CFO and Treasurer
                         DRAKE HARVEY, President
                         DAVE MOVIUS, General Counsel
                         JASON STOKES, Chief Legal Officer
                         Compute North Holdings, Inc.

                         SHARON SINGLETON
                         Sigma (media)
```



1          (Proceedings commence at 7:29 a.m.)

2          THE COURT:  All right.  Good morning.  We are here in
3 the <u>Compute North Holdings</u> first-day hearings.  It's 22-90273.
4 Apologize for waking everybody up so early this morning.  I am
5 out of town in Washington, not in my courtroom, and wanted to
6 get the first-day hearings going so that I'd be able to do them
7 without interruption today.

8          So if we can go ahead and start with Mr. Grogan and
9 get a report on where we are and how you would like to proceed
10 today.  If you wish to speak today, please be sure and press
11 "five star" on your phone.  Otherwise, your electronic
12 appearance is all that's required.

13          Mr. Grogan.

14          MR. GROGAN:  Thank you, Your Honor.  Thank you very
15 much for (audio interference) especially when you're out of
16 town.  We also appreciate the court staff helping us coordinate
17 this hearing.

18          Your Honor, we will have a brief opening presentation
19 to go through background of what the company does and why
20 they're here.  When we get to that point, I would ask that we
21 able to share the screen.  I think Mr. Micheli, Matt Micheli,
22 has the presentation on his computer.  And then we'll proceed
23 from that to the first-day motions.

24          THE COURT:  All right.  Mr. Ruff, good morning.

25          MR. RUFF:  Yes.  Good morning, Your Honor.  Jayson

1  Ruff with the U.S. Trustee's Office.

2          THE COURT:  Thank you.  Do you have any objection to

3  proceeding as Mr. Grogan has outlined?

4          MR. RUFF:  I do not, Your Honor.

5          THE COURT:  Thank you.

6          Ms. Glogowski.

7          MS. GLOGOWSKI:  Good morning, Your Honor.  I'm going

8  to be speaking on behalf of the debtors.  Angelika Glogowski.

9          THE COURT:  Good morning.

10          MS. GLOGOWSKI:  Good morning.

11          THE COURT:  Mr. Buoni.

12          MR. BUONI:  Good morning, Judge.  Joe Buoni with

13  Hunton Andrews Kurth.  I'm here on behalf of Generate Lending,

14  along with some folks with Kirkland & Ellis including

15  Christopher Marcus.

16          THE COURT:  Thank you.  Good morning.

17          From (713) 502-0189, who do we have?

18          MR. HARLAN:  Good morning, Your Honor.  Cole Harlan

19  from Paul Hastings, here on behalf of the debtors.

20          THE COURT:  Good morning.

21          From (512) 695-9505.

22          MR. HARVEY:  Good morning, Your Honor.  Drake Harvey,

23  President (audio interference) --

24          THE COURT:  Whoever that was, I couldn't hear.

25          MR. HARVEY:  Good morning, Your Honor.  Drake Harvey,

1 President of Compute North.

2          THE COURT:  Can I get you to pick up your phone?  I'm

3 just having trouble hearing you.

4          MR. HARVEY:  Good morning, Your Honor.  Drake Harvey,

5 President of Compute North.

6          THE COURT:  Mr. Harvey, good morning.

7          From (347) 907-3011.

8          MR. BHATTACHARYYA:  Good morning, Your Honor.  Sayan

9 Bhattacharyya, Paul Hastings, here on behalf of Compute North.

10          THE COURT:  And what was your last name, please?

11          MR. BHATTACHARYYA:  It's Bhattacharyya.

12          THE COURT:  I don't know how to spell that.  You want

13 to help me?

14          MR. BHATTACHARYYA:  Sure.  It's -- first name is

15 S-A-Y-A-N and the last name is B-H-A-T-T-A-C-H-A-R-Y-Y-A.

16          THE COURT:  Thank you, sir.

17          All right.  And if the party that wants to make the

18 presentation will turn your camera on so that I can find you

19 pretty easily.

20          MR. GROGAN:  It should be Mr. Micheli.

21          THE COURT:  I've got him here.  And he is now the

22 presenter and we can let you proceed with your first-days.

23          MR. GROGAN:  All right.  Well, thank you, Your Honor,

24 again.  Your Honor, so -- again, James Grogan from Paul

25 Hastings on behalf of Compute North and its debtor affiliates

1   in these cases.  Your Honor, later today you'll also be hearing

2   from a few of my colleagues.  With me today in the courtroom

3   from Paul Hastings is Mr. Luc Despins, Mr. Sayan Bhattacharyya,

4   Ms. Angelika Glogowski, Mr. Cole Harlan, Mr. Michael Jones, and

5   Mr. Matthew Micheli.  Your Honor --

6           Matt, why don't we go to the -- go a couple of pages

7   into the presentation.

8           So, Your Honor, at this -- this page shows you who

9   our management team is.  You heard earlier from Mr. Drake

10  Harvey.  Mr. Harvey is the president of Compute North.  Also

11  with us today and our first-day declarant is Mr. Barry Coulby,

12  and then we also have at the hearing today Mr. Jason Stokes,

13  our chief legal officer.

14          The debtors operate a very unique business.  It's

15  very specialized.  They're in the -- their core business is

16  building out, developing data centers which are used for

17  blockchain mining, very expensive computer equipment, which is

18  relatively energy intensive.  The facilities themselves are

19  typically installed close to power centers, like wind farms,

20  for example.  The company's business model is focused on

21  developing these data centers in areas of the country that have

22  easy access to power, and also primarily renewable energy,

23  whether it's wind farms or solar.

24          Let's go to our second page -- or third page, I

25  should say.

1          Also, Your Honor, we're -- I don't think we'll be
2    hearing from any of these firms today, but I did want to alert
3    you that we do have other advisory firms that are representing
4    the debtors.  Our investment bankers are (audio interference)
5    and that team is led by Chris Yonan, Y-O-N-A-N, Jeff Finger
6    (phonetic), and Brian Hamilton (phonetic).
7          The financial advisor for the debtors is Portage
8    (audio interference) Partners, and that team is led by Adam
9    Chonich, C-H-O-N-I-C-H, and Ryan Mersch, M-E-R-S-C-H.
10         And then our claims and noticing agent is Epiq.
11         We can go to the next page, Matt.
12         So, Your Honor, as we go to Page 4, the company is
13    relatively young.  In this respect, it's still in its growth
14    phase.  Founded originally in 2017.  The company went through a
15    (audio interference) large expansion effort in 2020 when it
16    tapped the capital markets to bring in new investments in a
17    series of capital raises, preferred equity, and a different
18    series of common equity.  The company also, you know, began the
19    process of expanding to new markets with its data centers.
20         Today they have 84 bitcoin mining customers.  They
21    have over (audio interference) modular data center containers
22    which house over $700 million worth of customer cryptocurrency
23    mining equipment.  There are currently three fully operational
24    data centers, and these are spread all over the United States,
25    as we'll see on a map in a little bit.  But there's three

1  facilities that are complete.  And that -- those come with 135

2  megawatt capacity for bitcoin mining.  There are two partially

3  operational facilities that have an additional 124 megawatts of

4  capacity.  And then there are two facilities that are still in

5  the development phase of being built out, but that if we could

6  complete them with additional liquidity, that would bring

7  online 335 megawatts of additional capacity.

8              Why don't we go to Page 5.

9              So, Your Honor, Page 5 shows you a geographic map of

10  the different facilities that we currently owe and operate.  We

11  have -- the ones that are currently -- or fully operational are

12  Kearney in Nebraska, Sioux City in South Dakota, Big Spring in

13  Texas, and then the King Mountain, which is the one in McCamey,

14  Texas.  That is a JV with NextEra Energy.  So we own 50 percent

15  of that particular location.

16              The ones that we are still in the process of getting

17  finished and there's construction activity around would be

18  Corpus Christi -- that's the Bootstrap facility; and then

19  Granbury, Texas, the Wolf Hollow facility.  And the Wolf Hollow

20  (audio interference) important for the Court to know that two

21  of these facilities are subject to secured lender security

22  interests, and that would be Kearney, Nebraska and Wolf Hollow.

23              Generate Capital is the lender that has secured liens

24  on those two facilities.  They are owned by non-debtor

25  affiliates.  Prior to the bankruptcy (audio interference)

1  Generate did exercise some remedies.  It installed independent

2  managers at the board level of the affiliate that own the

3  Kearney and Wolf Hollow facilities.  Those entities are not

4  part of the Chapter 11 case.  Also, we do still own the equity

5  (indiscernible).  If we go to --

6          THE COURT:  I'd understood from the first-day

7  declaration that you own most of the equity, but that Generate

8  has some sort of equity interest that it got.  Is that

9  incorrect?  Did I misunderstand that?

10         MR. GROGAN:  It's slightly different, Your Honor.  So

11  Generate has a pledge of the equity in those particular

12  affiliates, but it has not foreclosed on that equity.  So it

13  still (indiscernible) equity in that it's owned by the debtor.

14  However, they also have (indiscernible) voting rights.  And so

15  what they did when they exercised remedies was they took their

16  voting rights and used those to make a modification to the LLC

17  agreement.  And then within their amended LLC agreement, they

18  (audio interference) two new independent managers who now

19  govern the affiliates that own Kearney and Wolf Hollow.  And so

20  our board that (audio interference) control over those two

21  affiliates, but we do have the residual equity interest.

22         THE COURT:  All right.  Thank you.

23         MR. GROGAN:  Matt, let's go to Page 6.

24         So this goes through a little bit (indiscernible) of

25  our business plan.  Compute North is modeled and built around

1  (indiscernible) data centers.  You'll see photos of how we
2  build out these facilities in a slide or two.  But basically
3  they're designed to be (audio interference) and have anywhere
4  from ten modular data centers and they expand out to 50 or 60
5  if demand requires it.
6          Thank you, Matt.
7          So, Your Honor, this shows you an example of how
8  these things are actually constructed.  So the photo that's at
9  the top left shows the containers that house the bitcoin mining
10 equipment.  You can see here that this particular facility -- I
11 think this is NextEra JV facility, which is referred to by us
12 as "King Mountain."  NextEra has a wind farm which -- and you
13 can see the windmills kind of on the hill there.  The power is
14 sourced straight from the wind farm.  Ahead of it going out to
15 the ERCOT system.  And then inside each of these modular
16 containers you can see photos of the individual data mining
17 equipment and the (audio interference) space that house those
18 miners.
19         Let's go back to the prior slide, Matt.
20         So by doing this the way that we do it, they get very
21 close to the power source, have direct access to the power
22 source, we create energy efficiency.  We also, by using these
23 modular design concepts, are able to develop the project at a
24 lower cost than it would take if you were building out, you
25 know, traditional data center facilities.

1        And you know, we believe that the business model that

2   we have is very attractive.  In fact, as we mentioned in our

3   first-day declaration, we have been exploring sale

4   opportunities, and there is strong interest in acquiring some

5   of our excess because of these efficiencies and cost savings

6   that we can bring to market.

7        Matt, let's go ahead and go to Page 8.

8        So we have three basic business (audio interference)

9   revenue streams.  We do primarily cryptocurrency mining hosting

10  services.  Essentially, the way that this works, we enter into

11  a customer contract.  The customer will deliver mining

12  equipment to us, which then goes into one of our modular

13  containers.  At that point, we can either operate the mining

14  equipment directly for them.  It's a full suite of services.

15  We run the mining equipment and just deliver the -- whatever

16  bitcoin is mined back to the customer.  Or they can actually do

17  it themselves, and all we're providing is the infrastructure.

18  And then they have remote access to the mining equipment.

19       We also engage in some (audio interference) sales, so

20  we will source mining equipment from third-party vendors and

21  then sell it to our customers.  And we also have some company-

22  owned mining equipment, which produces bitcoin that we, in

23  turn, sell in the market to generate (audio interference).  We

24  do not keep bitcoin on our balance sheet.  We are a U.S.

25  dollar-based business.  But we do mine the coin, and then it is

1   essentially immediately converted to cash and deposited into

2   bank accounts.

3            Let's go to Page 9.

4            Okay.  So we'll talk a little bit about the (audio

5   interference).  We've covered some of this before, but the

6   (indiscernible) operating facilities the company owns and still

7   has control of are Big Spring and Sioux City, South Dakota,

8   with about (audio interference) megawatts of total capacity.

9   As I mentioned before, we have Bootstrap, which is the Corpus

10  Christi asset, which is still in the buildout phase.  And then

11  we also have a facility, a smaller facility, in Minden,

12  Nebraska, which will have 35 megawatts of capacity once it's

13  completed.

14           The other thing I'll point out, the debtor that

15  actually mines the bitcoin is CN Mining LLC.  I mention that

16  because there is a secured equipment financing facility that is

17  on that particular entity.  The lender -- the equipment

18  financing lender is Foundry.

19           THE COURT:  Let me interrupt you.  Let me interrupt

20  you.

21           MR. GROGAN:  Yes.

22           THE COURT:  The folks whose phones that I've

23  activated, if you would go ahead and mute your microphones,

24  please.  At least if your dog is barking, if you would --

25           MR. GROGAN:  You know, Your Honor, I apologize.  I

1  think I'm the offender on the barking dog.  I'm not sure --

2           THE COURT:  Well, there's not much I can do about

3  that.  Well, then, we'll just put up with the barking.  It's

4  okay.

5           MR. GROGAN:  I apologize.  I suspect that another dog

6  is walking by, and hopefully they (audio interference) quickly.

7           THE COURT:  It's okay.  I didn't want to be the one

8  that forced you to have to put up with it, so --

9           MR. GROGAN:  I'll deal with my own situation.

10          Your Honor, I think we can move on to Page 11 at this

11 point.

12          All right.  So we talked about this a little bit, but

13 Generate does have a secured facility.  This was a loan that we

14 entered into in -- actually, earlier this year.  It was

15 effective (audio interference) 2022.  Really, we needed the

16 financing as we already had developed the Kearney facility, but

17 it was much smaller and we needed financing to make it -- to

18 add capacity and also add facilities around that for storage,

19 office space.  Kearney actually has a -- it's staffed with on-

20 site employees.  And so the financing was used in part to

21 finish Kearney, which we consider to be the crown jewel of our

22 asset class.  It is fully operational, cash flow positive, and

23 has been operating since 2019.

24          Wolf Hollow is the other facility.  When that becomes

25 completed -- and it is largely complete.  It is in the final

14

1   stage at this point  of buildout.  It is partially operational.

2   There is nothing (audio interference) there are mining --

3   there's mining equipment that's actually on-site and

4   operational.  It has not been fully developed in the sense that

5   customers (indiscernible) to be delivered to Wolf Hollow and

6   were to use the available infrastructure.

7          That will be a (audio interference) will be

8   negotiated with Generate Capital over the coming weeks, I'm

9   sure, because we have a project management group with Wolf

10  Hollow.  And so we're in a situation where we manage -- we have

11  to -- we are the sales force.  We are the employee provider for

12  these facilities.  But we're in this awkward situation where

13  our equity interest in those facilities has been affected by

14  the exercise of remedies by Generate; and so we are hopefully

15  going to work through that situation to come up with a

16  consensual resolution that will, you know, allow us to maximize

17  the value of those two facilities, which we do think have

18  considerable value, and come up with a solution that will allow

19  us and Generate to essentially part ways as friends.

20          Let's go to Page 12.

21          The NextEra joint venture is also (audio

22  interference) operational facility.  We own 50 percent of this.

23  We manage it.  We operate it.  We will be coming back to you on

24  this one because there is a unique (audio interference)

25  structure there where NextEra had financed the facility.  The

1  JV pays 100 percent of the loan payments to NextEra, 50 percent

2  of which are on -- are on behalf of debtor Computer North

3  Member LLC.  We will be reaching out to NextEra today or over

4  the weekend (audio interference) with that situation because

5  the way it's structured currently creates a situation where the

6  cash flow -- and there's no immediate -- no immediate (audio

7  interference) for at least, you know, a couple of weeks.  But

8  we need to make sure that we are not paying NextEra's loan with

9  property of the estate.  And so we will be back to you to

10 hopefully address that situation in an appropriate manner in

11 the near term.

12        Let's go to Page 13.

13        So, Your Honor, here we have an organizational chart.

14 The company (audio interference) if you break it down the way

15 we have here, we really have three silos.  So we have the

16 unencumbered assets that we own and control.  And other than

17 that piece of the equipment financing on CN Mining LLC, there's

18 no secured debt on these assets.  We have unencumbered cash

19 from these entities, and those are most debtors.

20        Then we have really two other debtors who are

21 associated with secured financing transactions.  There's

22 CN Pledgor LLC, which is an equity owner in the Generate

23 related entities, Wolf Hollow and Kearney.  And that loan is

24 secured by the equity of -- CN Pledgor LLC's equity

25 (indiscernible) CN Borrower, which is a non-debtor.  And then

1  we have CN -- Compute North Member LLC, which is the 50 percent

2  owner of the NextEra joint venture.

3          Unless Your Honor has any questions about that, I'll

4  go to the next page.

5          THE COURT:  That's fine.

6          MR. GROGAN:  Okay.  Let's go to 15, Matt.

7          All right.  So how did we get here?  Most -- a lot of

8  the problems that we've had really have to do with the long

9  lead time that's associated with developing the project.  The

10 company (audio interference) -- as I mentioned earlier the

11 (audio interference) capital markets a couple of years ago in

12 order to raise a substantial amount of equity capital.

13          Unfortunately, a lot of that equity capital was

14 invested in the containers, the equipment, the project

15 development costs, contractors, who would have to actually

16 build out the facilities that we're talking about.  And the

17 cash outlay was well in advance of what we were able to

18 actually bring these projects online.  So, due to that delay,

19 the company has spent a significant amount of (audio

20 interference) without having the benefit of the revenue stream

21 that would come from the completed project.  And really (audio

22 interference) substantial contributing factor to the depletion

23 of cash over the last two years, and we just haven't gotten to

24 the point where we can become cash flow positive on several of

25 these facilities we've invested huge amounts of money to build.

1          At the same time, you know, (audio interference) cash
2  liquidity became tight.  The capital markets began to dry up.
3  We've been working aggressively to (audio interference) you
4  know, other sources of liquidity, whether it's through secured
5  lending or capital investments, and it's been very difficult
6  over the past several months.

7          At the same time, energy prices have been going way
8  up, which increases the cost of the operations that we do have,
9  but it decreases our gross margin.  And so, you know, that has
10  further strained liquidity.

11          We also have seen a huge decrease in our revenue from
12  bitcoin mining that we do, as bitcoin has dropped by about 75
13  percent over the past several months.

14          So all of these factors together (audio interference)
15  just created a peak liquidity crisis where we didn't have the
16  money to finish the project we started and we weren't able to
17  raise additional money from third parties.

18          Let's go to the next page, Matt.

19          In the face of these challenges, we've been exploring
20  all the options we can as we've been engaged in lengthy and
21  extensive negotiations with Generate.  We've also gone to other
22  current stakeholders who own equity or have other relationships
23  with the company to see if they would be willing to put new
24  money in to buy some of these projects which are not yet
25  complete.  You know, we've explored a number of options.  We

1   just -- and we've gotten very far along, you know, both with

2   Generate and with another stakeholder (audio interference).

3            I'm cautiously optimistic that we might be able to

4   get to a path forward that will allow us to successfully emerge

5   in a relatively short time frame, but it's really going to take

6   a lot of effort from all the parties involved to work

7   collaboratively to get a deal done that will solve the

8   liquidity problems and allow Compute North to complete the

9   development of some of these key projects like Wolf Hollow and

10  Bootstrap in particular, that really are the keys to making the

11  company economically profitable.

12           Let's go to the next page, Matt.  Next page, please.

13  18.

14           So (audio interference) take advantage of the

15  Chapter 11 opportunities that we have, we will be doing this on

16  a relatively aggressive time line.  I will be filing a

17  Section 363 motion hopefully later today or perhaps over the

18  weekend.  But we will be proposing a process to complete some

19  of these sale transactions that we've been negotiating already

20  with the goal of (audio interference) sales ideally within the

21  next 45 days.  So we'll have to --

22           THE COURT:  When will you need a hearing on that 363

23  motion?

24           MR. GROGAN:  Your Honor, I would prefer to have a

25  hearing on that probably about 14 days, if we can, (audio

1 interference) to establish the bid procedures.

2          THE COURT:  Let me see what I have right now so that

3 everybody can be working on a similar time frame and respond to

4 that, if they think that this does make sense.  So you want

5 something the end of the week of the 3rd or do you want

6 something the week of the 10th?

7          MR. GROGAN:  End of the week of the 3rd would be

8 wonderful, Your Honor, but we -- you know, if that doesn't

9 work, we'll take what we can get.  But we need something in

10 about two weeks.  If we could get the 7th, that would work for

11 me, and I think it will work for all the debtors'

12 professionals.

13          THE COURT:  So the problem with the 7th -- and I can

14 give you a hearing on the 7th -- is that CM/ECF will be shut

15 down on that day.  So everything will be done on an old paper

16 docketing system.  If that doesn't bother you, you can have

17 your hearing on the 7th.  If you want to avoid that day, you

18 can, and I can give you a hearing the next -- let me just look.

19 I think I can give you a hearing on the 11th of October.  I'll

20 need to check with Ms. Do about that.

21          MR. GROGAN:  Your Honor, we can work with the 11th.

22 Why don't we just do the 11th since it sounds like that would

23 be more convenient for the Court.

24          THE COURT:  It's not so much convenience for me.  It

25 makes it really hard on you to file things when it's done the

1  old paper way and nobody is set up to do that.  So --

2         MR. GROGAN:  Yeah, I understand.

3         THE COURT:  Ms. Do, would you text me as to whether I

4  can do a hearing on the 11th at nine o'clock in the morning?

5         We'll tentatively say that it's going to be on

6  October 11th at 9.  She'll let me know.

7         Go ahead.  Sorry to interrupt you.

8         MR. GROGAN:  Oh.  No worries at all, Your Honor.

9         Matt, why don't we go to the next page.  Okay.  Next

10  page.

11         I think, actually, that concludes my opening remarks.

12  This page outlines the items that we have on the docket.

13  Mr. Jones, Michael Jones from Paul Hastings, will be leading

14  off our presentation of first-day motions.  Unless Your Honor

15  has any other questions, I'll hand the microphone over to

16  Mr. Jones.

17         THE COURT:  I'll let you do that.  But before we hear

18  from Mr. Jones, I want to see if anybody else wishes to make

19  any kind of an opening statement.

20         MR. GROGAN:  Thank you, Your Honor.

21         THE COURT:  So, if your line is already active, you

22  can speak now.  And if I haven't activated your line, press

23  "five star."

24         Have you bullied everybody into silence?  Is that

25  what's occurred?

1          MR. GROGAN:  Your Honor --

2          THE COURT:  (Audio interference) hold on.  Hold on

3   just a minute.

4          From (212) 446-4878, who do we have?

5          MR. MARCUS:  Your Honor, this is Christopher Marcus

6   from Kirkland & Ellis on behalf of Generate.

7          THE COURT:  Mr. Marcus --

8          MR. MARCUS:  Can you hear me okay?

9          THE COURT:  I can hear you fine.

10          MR. MARCUS:  Great.  Good morning, Your Honor.  I did

11   want to make just a quick opening statement, Your Honor.  And I

12   would say that, you know, in addition to ongoing and I guess I

13   would say constructive dialogue between Generate and the

14   debtors, and I don't want to change that tone, and I don't

15   think the first-day affidavit does either, but there are some

16   facts in here we disagree with, and it sort of paints a little

17   bit of a different picture than what we believe the events

18   leading up to the Chapter 11 case were.  And I just wanted to

19   give Your Honor a flavor for sort of the other side of the

20   story.  I don't want to take us too far off track, but just a

21   few points, Your Honor.

22          THE COURT:  Of course.

23          MR. MARCUS:  So I would start by saying, Your Honor,

24   that Paragraph 12 of the first-day declaration says there were

25   some technical (audio interference) defaults and that the

1  company rebutted many of them.  I mean, this paragraph says

2  they were in default.

3          So there was a default.  But our view is that

4  Generate was a patient counterparty, and we did try to work on

5  a forbearance agreement, which is also suggested in the first-

6  day affidavit.  And there were efforts to get to something that

7  would have been different to the exercise -- the limited

8  exercise of remedies, which was really just to replace the

9  board at the project level company.

10          And I think, you know, during that process, there

11  were really a couple of factors that led us to where we are,

12  one of which was the need for a lot more financial information,

13  which we just were unable to get, and unable to get comfortable

14  with.  And Mr. Grogan mentioned this in his opening

15  presentation, that there were funding needs for -- probably for

16  a lot of the projects, but certainly there were funding needs

17  for Wolf Hollow, which were not going to be met, and which

18  Generate very much wanted to make sure were paid on the Wolf

19  Hollow project to -- you know, preserve the value of that

20  project, but were uncomfortable simply funding into a situation

21  where there was not full visibility into governance and/or

22  financial information.

23          And so we took the steps that we took, including

24  putting in the independent directors at the project level

25  company, to preserve value.  You know, I really do want to

23

1  emphasize that, because Generate's view is we did what we did

2  absolutely to preserve value of those project-level entities.

3        We did put in additional funding.  We did require

4  some additional documentation, which we couldn't get done with

5  the debtors, but there is a statement in the first-day

6  affidavit that says -- I think it says Compute -- I think it's

7  Paragraph 61 or 65 says Compute North received no consideration

8  pursuant to those changes.  Obviously, we would disagree with

9  that.  We believe that the preservation of the value of the

10  assets was important for everybody.  The preservation of

11  whatever rights they have under the property management

12  agreement is obviously important for Compute North.  And so we

13  believe there was significant consideration for what Generate

14  did.

15        But again, Your Honor, Generate's view is we took the

16  limited actions we took in order to preserve value.  There also

17  is another statement in the first-day declaration, it's in

18  Paragraph 15, that says due to these actions -- which relates

19  to a couple paragraphs before that talk about what Generate did

20  -- the company had insufficient liquidity.

21        Again, we disagree with the notion that we're here

22  because of what Generate did.  We're here because of -- and

23  again, Mr. Grogan in his first-day declaration had a list of

24  four factors on, you know, "how we got here" page.  Those are

25  fine.  None of those said that -- the actions that Generate

1  took.  And I just want to make sure that it's clear and that

2  we're painting the right picture here of a lender who was

3  patient, a lender who took action to be protective of its

4  collateral, and therefore -- everybody else who may have an

5  interest in that collateral, as well, and a lender who's been

6  patient prefiling and trying to get to something consensual.

7          So, unless Your Honor has any questions for me,

8  that's all I have to say.  I think that's all I have to say

9  for --

10         THE COURT:  Let me ask a question to you and

11  Mr. Grogan together.  By the way, I noticed all of those

12  statements that you're talking about.  I don't think that any

13  of them go to the merits or lack of merits of any of the actual

14  first-day relief that is being sought.  So what I am inclined

15  to do, when I get offered the declaration -- which hasn't been

16  offered yet -- is to admit the declaration in full except for

17  those portions that describe Generate, and not admit those on

18  the grounds of relevance.  That way, you won't need to respond

19  to them or cross-examine on them.  And I don't think -- I do

20  think they were appropriate to put in there to sort of give me

21  a flavor for what's going on, just like what you're saying is

22  appropriate.  But I just don't think any of them are needed for

23  the motions that are not exotic motions that we're taking up at

24  the first-day hearings.

25         So let me see if that works for you and Mr. Grogan.

1           MR. MARCUS:  Yes, Your Honor.  I guess two things,

2  and then I'll turn it over to Mr. Grogan.  I'm glad you raised

3  that, Your Honor.  I was thinking actually that I'd have to say

4  something very similar when the declaration was offered.

5  That's obviously acceptable to Generate.  We don't have any

6  objections to the rest of the first-day relief; and even if we

7  did, I don't think we would object on a first-day basis anyway,

8  so we would do something on the second-day hearing.  But I

9  actually don't believe we have any objections.  And so that

10  would be acceptable to us.

11           And just real quick before I turn it to Mr. Grogan.

12  I meant to say this at the outset.  Your Honor asked a question

13  of Mr. Grogan at the beginning about -- you read something in

14  there that Generate has an equity interest as well.  So I want

15  to add to Mr. Grogan's statements.  Generate actually does own

16  a bit of preferred equity at the parent company, which is a

17  debtor.  And so they are an equity holder up top -- a preferred

18  equity holder up top --

19           THE COURT:  Got it.

20           MR. MARCUS:  -- of the debtor case.

21           THE COURT:  Got it.  Okay.  I thought there was some

22  preferred somewhere, and -- it was drinking from a water hose,

23  obviously.

24           Mr. Grogan, with respect to the admission of the

25  first-day declaration, can you live with what I'm suggesting?

1          MR. GROGAN:  Yes, Your Honor.  That's acceptable to

2   Compute North.  And I suppose with that, you know, I would move

3   to admit the first-day declaration into evidence minus the

4   paragraphs that Your Honor has identified for exclusion.

5          THE COURT:  Well, it's not really the paragraphs.

6   It's anything having to do with Generate, we'll exclude, just

7   so that don't open that can of worms today.  I'm really pleased

8   to hear both you and Mr. Marcus say that you're having

9   productive discussions.  I'm going to refrain from saying

10  anything about my views of that situation, because it could

11  only get in the way of productivity, and -- just try and

12  exclude it from today's hearings.  Because I don't think it

13  matters today.  I understand it may matter a lot as we move

14  ahead in the case.

15         Is there any objection to the admission of the

16  first-day declaration, except for those matters that refer to

17  the Generate disputes?

18         All right.  The declaration is admitted.

19    (ECF Number 22 admitted into evidence)

20         MR. GROGAN:  Thank you, Your Honor.

21         THE COURT:  So now does anybody else have an opening

22  statement they wish to make?

23         Let me -- I'm not sure -- hold on just a second, if

24  you would.

25         (Pause)

1          THE COURT:  I am not sure if my phone controller is

2   working right.  I'm going to -- this will not interrupt your

3   call, so I'm just going to restart that to be sure that if

4   anybody does want to speak I'm hearing from them.

5       (Pause)

6          THE COURT:  All right.  The declaration is admitted.

7   How did you want to proceed?  Who's going to take the first of

8   the agenda?

9          MR. GROGAN:  Your Honor, I'll hand that off to

10  Mr. Jones.  I think he's got the first motion on the agenda.

11         THE COURT:  All right.  Mr. Jones.  Mr. Jones, if you

12  haven't yet pressed "five star" on your phone, you're going to

13  need to do that so that I can activate your line.

14         There we go.  Mr. Jones, good morning.

15         MR. JONES:  Thank you, Your Honor.  Mike Jones of

16  Paul Hastings on behalf of the debtors.  Are you able to hear

17  me all right now?

18         THE COURT:  I can hear you great.  Thank you.

19         MR. JONES:  Thank you, Your Honor.  The next item on

20  the agenda was a joint administration motion.  I saw, just as

21  the hearing was getting underway, that that order hit the

22  docket at Docket Number 41.  So we thank Your Honor for

23  entering that.

24         And I would move to the next item on the agenda,

25  which is Item Number 3, our consolidated creditor matrix

1  motion.  This was filed at Docket Number 13.

2          THE COURT:  All right.

3          MR. JONES:  Through this motion debtors request --

4  I'm sorry.  I thought you were speaking.

5          THE COURT:  I just said "all right."  I'm sorry.

6          MR. JONES:  I may have a delay on the audio.  I

7  apologize.  In this motion, the debtors are seeking

8  authorization to file a consolidated creditor matrix, a

9  consolidated list of the debtors' 30 largest unsecured

10  creditors, to redact certain individual and customer

11  confidential information.  We're also seeking approval of the

12  form and manner of notifying creditors and parties in interest

13  of the commencement of these cases.  And we are asking to

14  establish bar dates for filing proofs of claim and

15  Section 503(b)(9) requests and related procedures including the

16  former and manner of publication notice.  Given the large

17  number of creditors (audio interference) filing the

18  consolidated matrix and Top 30 (audio interference) will

19  alleviate a significant administrative burden.

20          With respect to the redaction of individual and

21  customer confidential information, the information for

22  individuals on the matrix, we ask that address information be

23  redacted for current and former employees, directors, equity

24  holders, and creditors to the extent applicable; and we believe

25  this is necessary to avoid giving public disclosure that could

1  be used to perpetrate identity theft, and we believe this

2  relief is authorized by Section 107 of the Bankruptcy Code.

3          Similarly, with respect to the debtors' customers, as

4  we explained in the motion, the debtors expect to provide

5  notices to the entities on their customer list, including

6  notice of the commencement.  However, the name and address of

7  the customers is confidential commercial information, as

8  protected by Section 107 of the Bankruptcy Code.  And

9  disclosure of that information would provide unfair advantage

10 to the debtors' competitors and would harm the debtors' estates

11 if that information were made public.

12         The debtors are proposing to provide unredacted

13 copies of the matrix and the customer list to the Court and the

14 UST and any committee that's appointed.  With these

15 protections, we believe the redaction of the individual

16 customer information as requested in their motion is

17 appropriate to be approved.

18         With respect to the bar dates, we have asked to

19 establish a general bar date that is 60 days after the petition

20 date, a government bar date 180 days after the petition date,

21 and a bar date for Section -- I'm sorry, 502(b)(9)

22 administrative request that's also 60 days after the bar date.

23         And we're seeking this relief for really two reasons.

24 One, to provide the maximum amount of notice to those creditors

25 and any other parties in interest of those bar dates, and then

1  also to capture some administrative efficiencies for the

2  debtors' estates in filing and publishing a single publication

3  notice that will provide all of this information to parties.

4        And finally in this motion, Your Honor, we're seeking

5  approval of certain forms of notices and the form of proof of

6  claim, which are attached as Exhibits 1 through 4 to the

7  proposed order.

8        We have worked with the UST's office and I would take

9  a moment here briefly just to acknowledge Mr. Ruff and his

10 colleagues at the United States Trustee's Office and our

11 appreciation for the open communication that we've had with

12 them, and their assistance in getting us to this point at the

13 first-day hearing.  And we've incorporated the comments

14 received from the U.S. Trustee's order.  We also -- I'm sorry,

15 from the U.S. Trustee's Office, and also had some follow-up

16 communications with them, particularly regarding the redaction

17 of the individual and customer information and setting the bar

18 dates.

19        We provided a revised draft to them yesterday.  We

20 haven't received comments back, although I know with the

21 limited amount of time heading into this hearing, obviously, if

22 Mr. Ruff or his colleagues have comments, we would be happy to

23 address them.

24        Otherwise, if -- we did not receive any other

25 comments or questions from other parties.  And unless

1  Your Honor has questions, the debtors would ask that the motion
2  be (audio interference).

3          THE COURT:  All right.  Let me hear from others on
4  the motion.

5          MR. RUFF:  Good morning, Your Honor.  Jayson Ruff for
6  the U.S. Trustee's Office.  We generally don't have any
7  objection to the relief that is being requested here, but we do
8  have some limited objections.  The first one would be with
9  respect to the request to redact the customer names.  We don't
10 think that the listing of the names and entities is the
11 releasing of confidential or even proprietary commercial
12 information that 107(b)(1) is intended to protect.

13         This is not like a -- there's nothing on a matrix
14 list that even identifies these entities, who they were, and
15 what the nature of their interest is in the debtors.  This is
16 not a consolidated list of customers put out there for all the
17 world to see.  It's -- no research or special information
18 related to those customers.

19         So, for that reason, we would think that it doesn't
20 necessarily meet the requirements of 107(b)(1) and what it was
21 intended to protect, and still falls within the -- you know,
22 open records under the requirement under 107(a).  And then just
23 on --

24         THE COURT:  So there's a limited number of people out
25 there that do data mining, according to the first-day

1  declaration.  And if you tell the world that ABC does data

2  mining through us, and it's not widely known that ABC does data

3  mining, don't you then by its very nature give competitors

4  public information (indiscernible) the debtor?  Is that really

5  what we want to do?  Or is there some alternative to doing

6  that?

7           MR. RUFF:  Well, Your Honor, I don't -- I don't know

8  that having them on a list of creditors or parties in interest

9  necessarily tells people what the nature of the relationship is

10 with the debtors.

11          THE COURT:  I thought they were going to -- they're

12 not owed money directly, right?  They are customers that have

13 bilateral contracts with the debtor.  So aren't they going to

14 go on a list of counterparties to executory contracts and have

15 to describe the nature of the executory contracts?  Or how

16 would they go -- you're not suggesting they don't need to list

17 customers that they owe money to, right?  This is any customer

18 that would be required to be listed by the schedules and

19 statements.

20          MR. RUFF:  No.  That is correct, Your Honor.  I

21 understand that the relief requested here is with respect to

22 the matrix itself.  If the debtors at some point see a need to

23 redact more sensitive information when it comes time to

24 actually publishing their schedules, which Your Honor I think

25 is alluding to, I think that's a separate matter from what is

1  actually being proposed here today.

2          THE COURT:  What's the benefit of the public list of

3  the customers are, even on a matrix, as opposed to giving that

4  to Epiq and going through the process that we normally go

5  through with that kind of a relationship where any party that

6  needs it for a legitimate bankruptcy purpose can cause the

7  service to occur either through Epiq, and then no one knows who

8  it is, or they can get a list of it, but there's then a process

9  by which they get the list?  But I'm pretty nervous in this

10 limited world (audio interference) giving out the actual names

11 of these folks.

12         MR. RUFF:  Understood, Your Honor.  I would just say

13 that the purpose is -- I would switch it around.  The general

14 assumption is that the information is public, and that there

15 has to be certain factors that have to be met in order to

16 protect it.  And again, it's a limited objection, Your Honor,

17 and I just raise it for your -- and I really -- there's nothing

18 more I think I really have to say on it.

19         If Your Honor is not persuaded, I accept that.  But I

20 did want to at least raise the issue and just point out that I

21 don't think we have any evidence here of what the proprietary

22 or -- I mean, we're talking about names.  I don't know that

23 there's ever a situation where names and addresses themselves

24 are confidential or proprietary.  Your Honor, I get mailings --

25 my name is out there.  I get mailings all the time unsolicited

1  in the mail.

2          THE COURT:  Well, but there's another part of the

3  debtor list, which I'm going to ask them about, which is I

4  don't understand why if I just have a vendor that happens to be

5  an individual versus a corporation, why we wouldn't give that

6  name and address?  I mean, my name and address is confidential.

7  But no one's name and address in the ordinary course is

8  confidential.  We have a few people in the country that way,

9  but it's pretty rare.  And why wouldn't we give out the names

10 and addresses of individuals?  Not necessarily the employees.

11 I don't think that that's where the objection's coming in, but

12 regular vendors and individuals.  I don't understand why the

13 debtor needs this.

14          Let me ask the debtor to address that question.

15          MR. JONES:  Sure, Your Honor.  So actually that

16 language that includes individuals who are creditors within

17 this redaction provision was part of the comments that we

18 received from the UST.  And I think it was just a comment meant

19 to focus exactly what the redaction was intended to cover.

20 There was nothing specific, I think, in the debtors' view as to

21 why we would include a creditor among the redactions

22 specifically.  Our concerns primarily were for the others

23 (audio interference) employees and such.

24          THE COURT:  Mr. Jones, part of what you're telling me

25 was you don't need to file a proof of claim if Your Honor

1  schedules as non-contingent on -- and liquidated, et cetera.

2  But you're not going to file your schedules, if I grant your

3  other motion, until late October, and then you're going to

4  reserve the right to take additional -- to file additional

5  motions for further extensions.

6          I don't have a problem with the 60-day bar date.  But

7  how do we do a 60-day bar date that tells people to reference

8  the schedules and the schedules aren't there?  What are you --

9  how is that mechanically going to work?

10          MR. JONES:  So the way that the timing is set up

11  under the relief we're currently requesting, the schedules

12  would be filed, as Your Honor noted, on October 28th, with the

13  general bar date and the 502(b)(9) bar date on November 20th.

14  So 22 days after the schedules and statements.  And I think the

15  schedules and statements likely are going to get filed sooner.

16  We just want -- given the time line that Mr. Grogan described

17  for this case, we just didn't want to be in a bind where we

18  didn't have enough time.  But we believe that 22 days between

19  the filing of the schedules and statements and the bar date was

20  adequate for parties in interest.

21          THE COURT:  So if I'm a vendor in Kearney, Nebraska,

22  and I want to know whether I need to file a proof of claim,

23  tell me what I'm supposed to physically do to figure that out.

24          MR. JONES:  There were instructions in the proof of

25  claim form and the bar date notice that referenced the filing

1   of the schedules, how to access them through Epiq.

2           THE COURT:  But they're not going to be there.

3   Right?

4           MR. JONES:  If it would alleviate the concern,

5   perhaps what we could do is to add them to that notice where

6   appropriate, the specific date that the debtors -- presuming

7   that Your Honor would enter the order -- schedules and

8   statements motion, the October 28th date, when -- by which

9   those statements and schedules would be filed.

10          THE COURT:  I mean, I may get some objection to it,

11  but I'm not going to have a problem with the October 28th date.

12  I just want to coordinate it here.  Are you thinking that

13  you'll do personalized notices to people, telling them the

14  amount of their claim?  Because probably for 95 percent of the

15  recipients of the notice you'll already -- you know their claim

16  today.  Or are you thinking that will go later?

17          MR. JONES:  I do not have that information yet.  I

18  imagine that -- well, I don't want to speak on something that

19  I'm not sure about here, but I would suspect that we would

20  include that information in the notices, but we have not

21  coordinated that process yet.

22          THE COURT:  I also have an issue where you're

23  requiring people to include supporting documentation.  It's my

24  understanding of the rules the absence of supporting

25  documentation may make a claim not prima facie, but your notice

1  and my order would disallow a claim for absence of supporting

2  documentation.  Is that what you're proposing?

3          MR. JONES:  I am looking at that section of the order

4  now.  I see where you're referring to, Your Honor, and I think

5  that we would be okay striking that language, and then we would

6  -- if a claim did not have sufficient documentation, we could

7  file an objection to it.

8          THE COURT:  All right.  Why don't we do this?  Look,

9  I want you to be able to talk to the U.S. Trustee about this,

10 but I will tell you my preliminary view is that under the

11 (audio interference) evidence that we have in the declaration,

12 that the names of your customers are very proprietary, should

13 not be made public, but you need to find a way that if somebody

14 wants to come in and file something and serve it, those folks

15 could get served.  And I've seen a lot of different proposals.

16 I want you to work with getting a reasonable proposal out

17 there.  With respect to individuals that are ordinary

18 creditors, I don't see the need to redact their information.

19 And then I want to coordinate how we're going to really let

20 people know whether they need to file a proof of claim or not.

21         We can come in really next week, as soon as you're

22 ready, on Monday, Wednesday, something like that, and let you

23 continue this particular (audio interference) need to get the

24 notice out and you need to do it promptly.  How long do you

25 think it's going to take to get that done?

1          MR. JONES:  I do not believe that should take very

2     long.  These seem like pretty discrete issues that we could

3     resolve --

4          THE COURT:  I agree.  How about Monday at 4?  Will

5     that work for you?

6          MR. JONES:  It certainly works for the (audio

7     interference) --

8          UNIDENTIFIED:  (Audio interference) --

9          THE COURT:  Anyone object to Monday at 4?

10         Okay.  I'm going to go ahead and carry this one till

11    Monday at 4.  Thank you all for agreeing to work on this.  I

12    don't think it's going to be hard.  I just want to get it right

13    on this notice.

14         MR. RUFF:  Your Honor, thank you very much.  And I do

15    appreciate that -- you actually addressed my second limited

16    concern with the relief that was being be requested on a first-

17    day basis.  So we really do appreciate that.

18         THE COURT:  Thank you.  All right.  Let's move ahead,

19    Mr. Jones.

20         MR. JONES:  Yes, Your Honor.  The next item on

21    today's agenda is Item Number 4, which we addressed briefly

22    (indiscernible) already, the schedules and statements motion,

23    which was filed at Docket Number 21.  As we've touched on, the

24    debtors are seeking an extension to file their schedules and

25    statements through and including October 28th, which is an

1  additional 22 days, total of 36 days from the petition date.

2          In this motion, debtors are also requesting an

3  extension of the time to file their Rule 2015.3 financial

4  reports.  Again, we request that be extended through

5  October 28th.  I think we've already touched on why we think

6  this is relevant.  Primarily gives the debtors time to

7  coordinate this in a time frame, but it also fits within what

8  we expect will be an expedited process in Chapter 11.

9          We did receive one comment from the United States

10  Trustee's Office on this, and that was in Paragraph 6, which is

11  a new paragraph we added, providing that a separate claims

12  registry will be maintained by each debtor.  We didn't receive

13  any other comments from other parties.  And unless Your Honor

14  has questions, the debtors request that the Court enter the

15  proposed order (audio interference) motion.

16          THE COURT:  I'm sorry.  This is schedules and

17  statements you're talking about?

18          MR. JONES:  Yes, Your Honor.

19          THE COURT:  My Paragraph 6 -- I don't have what

20  you're talking about with the separate claims register.  That's

21  in the --

22          MR. JONES:  I may have crossed my wires, and that was

23  the joint administration motion.

24          THE COURT:  I think I did that on -- I think that is

25  in the joint admin motion that I signed.  Is that right?

1          MR. JONES:  Let me confirm.  I believe I had my wires

2  crossed.  I believe that --

3          THE COURT:  Okay.

4          MR. JONES:  -- I did.  (Indiscernible) just a second.

5          THE COURT:  Is there anyone that has any objection to

6  the schedules and statements motion?

7          So I had made two minor changes to it, when I

8  reviewed it.  Let me just be sure these are okay with you.  The

9  first -- they're the same change, basically, in two different

10  paragraphs.  In Paragraphs 1 and 2, you give a calculation and

11  a date.  And I've been in a situation where somebody missed

12  this by one day and it was like $100 million error.  So I am

13  living only with the date and not putting down how we got to

14  that date.  There is no benefit in saying how we got to the

15  date.  There's only a detriment.  I've taken that out.  I

16  assume you're okay with that, but let me know if you have a

17  problem.

18          MR. JONES:  The debtors are fine with that, and I do

19  recall you referencing this point on another case, and we'll

20  make sure to heed that going forward.  And I appreciate it.

21  Thank you.

22          THE COURT:  That's just a good idea, I think.  But

23  that's fine.  I've signed the order and I've sent it to

24  docketing.  It will be docketed today.  Where do you want to go

25  now?

1          MR. JONES:  Thank you, Your Honor.  Next item on the

2  agenda is Item Number 5.  This is our taxes motion, which was

3  filed at Docket Number 14.

4          THE COURT:  All right.

5          MR. JONES:  In this motion, the debtors are seeking

6  -- I'm sorry.  In this motion, the debtors are seeking

7  authority to pay their various local, state, and federal taxing

8  and regulatory authorities on taxes debtor owed before the

9  petition date, and to continue making those payments in the

10 ordinary course.

11         The debtors estimate approximately $165,000 in taxes

12 relating to the prepetition period that either are or will

13 become due after the petition date in the ordinary course.

14 Debtors believe that any amount accrued on account of these

15 taxes should be paid and is in the best interest of the estates

16 to be paid, and in fact some of these taxes that are owed by

17 the debtors (indiscernible) sales taxes, may not even be

18 property of the estate.  Others may be entitled to secured or

19 priority status, and the payment of them is simply a matter of

20 timing.

21         THE COURT:  Do we have any --

22         MR. JONES:  Your Honor, we didn't receive --

23         THE COURT:  I'm sorry.  Go ahead.

24         MR. JONES:  You were ahead of me, as usual, but I was

25 just going to say that we didn't receive any comments on this

42

1 motion from the U.S. Trustee or others.  And unless Your Honor

2 has questions, we would request that the proposed order

3 (indiscernible).

4          THE COURT:  Is there anyone who believes this is

5 inappropriate either today or for first-day relief?

6          All right.  I'm going to grant the motion.  I have

7 signed the order and I have sent it to docketing.  It will be

8 docketed this morning.  Where do you want to go next?

9          MR. JONES:  Thank you, Your Honor.  That does it for

10 me.  With this, I will cede the virtual podium to my colleague,

11 Cole Harlan.

12          THE COURT:  All right.  Mr. Harlan, good morning

13 again.

14          MR. HARLAN:  Good morning, Your Honor.  Cole Harlan

15 from Paul Hastings on behalf of the debtors again.

16          THE COURT:  Yes, sir.  (Indiscernible) --

17          MR. HARLAN:  The next item that we -- the next item

18 on the agenda is Item Number 6, the employee wages motion filed

19 with the Court at Docket Number 18.  Your Honor, by this motion

20 the debtors are seeking authority to pay certain prepetition

21 amounts related to employee wages or benefit programs, to

22 continue such programs in the ordinary course on a postpetition

23 basis.

24          Currently, the debtors employ approximately 148

25 employees.  You know, the debtors' workforce is the heartbeat

1  of the company and we believe that their continued employment

2  is imperative to ensure that the debtor is able to restructure

3  as a going concern and avoid irreparable and immediate harm.

4         As we state in the motion, a vast majority of the

5  debtors' employees rely exclusively on their compensation and

6  benefits, and we are seeking authority here today to just pay

7  their living expenses and support their families.  Therefore,

8  any delay or interruption in this payment could result in value

9  destructive attrition for the debtors.

10        Part of this motion we believe we have a standard

11  kind of slew of wages and benefit obligations that we're

12  seeking approval of, including wages, payroll taxes,

13  withholding obligations, reimbursement of expenses, as well as

14  retirement plans.  We are not currently seeking to pay any

15  individuals amounts over the statutory cap.  And to the extent

16  that we would need to, we will of course seek court approval at

17  a later date.  We are also not seeking authority to pay any

18  insiders any bonuses or severances by this motion.

19        We -- prior to petition date, we shared this motion

20  and order with the U.S. Trustee for their review.  The proposed

21  order reflects certain comments received from the U.S. Trustee

22  as well as other certain clarifying information.  We have not

23  received any other comments or objections to the motion.  And

24  unless Your Honor has any further questions, we would request

25  that the Court enter the order submitted today with the motion.

44

1          THE COURT:  Is there any objection to the wages and

2 compensation motion?

3          When I reviewed this motion, it not only seemed

4 appropriate, I thought the debtors had put in sufficient

5 restrictions that there wouldn't be any opportunity for insider

6 type abuses or other abuses, none that have been indicated that

7 occurred in the past, and this doesn't allow for them to occur

8 in the future.

9          So I'm fine signing this order today.  Is there any

10 objection at all?

11          All right.  It's signed and sent to docketing.  I

12 sent that to docketing.

13          MR. HARLAN:  Thank you, Your Honor.  With that, I'll

14 cede the podium to my colleague, Angelika, to handle the

15 remaining first-day motions.

16          THE COURT:  All right.  Good morning again.

17          MS. GLOGOWSKI:  Good morning, Your Honor.  My name is

18 Angelika Glogowski of Paul Hastings on behalf of debtors.  The

19 next item on the agenda is Item Number 7, the insurance motion,

20 which can be found at Docket Number 16.  In this, the debtors

21 are seeking the following (audio interference) --

22          THE COURT:  Let me interrupt you for a minute.  Your

23 phone connection isn't very good.  Can I get you to either pick

24 up your phone or get closer to it.  I'm not sure what's going

25 on.

1          MS. GLOGOWSKI:  Sure.  How is this, Your Honor?

2          THE COURT:  Perfect.

3          MS. GLOGOWSKI:  So the debtors are seeking to

4   authorize -- authorization to continue and maintain and perform

5   under their insurance program and to pay obligations with

6   respect to said program.  Currently, the debtors maintain that

7   insurance program that has approximately 20 policies with

8   multiple carriers.  Among them include general liability,

9   business, auto, commercial property coverage, equipment

10  breakdown, ocean cargo marine coverage, builders risk,

11  management liability, employment practice liability, crime

12  coverage, and cyber coverage.

13         The total annual insurance premiums and payments

14  associated with these policies are approximately $3,582,000 and

15  some change.  And the debtors don't believe any of the premiums

16  are due and outstanding but not yet paid as of the petition

17  date, but they seek authority to continue paying the insurance

18  premiums in the ordinary course of business.

19         In connection with these policies, the debtors also

20  have a brokerage service from Aon Risk Services Central, Inc.

21  The annual brokerage fees is approximately $300,000, which is

22  included in that total annual amount I cited earlier.  The

23  continuation of this is necessary for their ability to be on

24  advantageous terms and competitive rates, and we ask authority

25  to continue paying these brokerage fees in the ordinary course

1 of business, as well.

2       The debtors also have three premium financing

3 agreements with Aon Premium Finance to finance premiums under

4 the management liability, crime and cyber insurance policies.

5 For these, the debtors pay approximately 1.2 million annually.

6 And as of the petition date, there's an outstanding amount of

7 $692,989 for the remaining part of this year, and those

8 payments are made monthly.  The debtors anticipate to renew

9 this premium financing agreement and similar terms with this.

10 This renewal will take place in late April next year, and

11 debtors seek authority to continue paying these financing

12 agreements in the ordinary course of business.

13       We received no comments from the U.S. Trustee on the

14 insurance motion.  There are no further comments or other

15 objections received.  And unless Your Honor has any questions,

16 we request the Court to enter an order approving the insurance

17 motion.

18       THE COURT:  So, Ms. Glogowski, I am nervous approving

19 the deductibles portion of it on a first-day basis.  Can you

20 explain to me why we would need to deal with that now?  It

21 seems to me to expose the debtors to a weakened negotiating

22 position.  It might draw opposition.  And I don't see an

23 emergency on it, and I would like to limit these first-days to

24 what has to occur now.  Having insurance has to occur now.

25 Having an order that you are authorized to pay deductibles I

don't think does have to occur now.

MS. GLOGOWSKI:  We understand that, Your Honor, and we'd like to note that at the moment we do not anticipate any prepetition deductible to exist.  But if Your Honor would like to limit that, and we can go back to that at another time, I believe that the debtors would be comfortable with that.

THE COURT:  So let me tell you my concern is I assume that a number of these deductibles may be for events that occurred prepetition that you don't know about yet.  And so if there is a deductible or a self-insured retention, they may be prepetition with you not knowing of the claim until postpetition.

I just think, as long as you're comfortable with it, and it sounds like you are, let me get you to upload a revised form of order.  You can choose in there to carry this portion of the motion to second-day hearings on October 24th at 1:30, or you can simply eliminate the provision dealing with any deductibles and SIRs, and I can do a final order.

Let me see if anyone objects to either of those alternatives, and then I'll allow Ms. Glogowski to talk to her client about which one is better.

You can always put into the final order, if that's the option you take, that you can come back later and request that relief if it's appropriate.  So I'm not terribly worried about it.

1          Does anybody have any problem?

2          All right.  Are you okay with that, Ms. Glogowski?

3          MS. GLOGOWSKI:  Let me just get confirmation.  I

4  believe we're okay carrying that over.

5          THE COURT:  Well, you can take your pick on having it

6  heard or not heard at all until you need it.  So I'll let you

7  talk to your client later about which is the most economically

8  efficient for your client.  I'm just not comfortable doing it

9  on a first-day basis.

10          MS. GLOGOWSKI:  Yes.  We're comfortable with that

11  relief.

12          THE COURT:  All right.  If you'll just upload an

13  order, I'll get it signed either later today or Monday.

14          MS. GLOGOWSKI:  Sounds great.  We'll upload that

15  order.

16          THE COURT:  Thank you.  Where do you want to go next?

17          MS. GLOGOWSKI:  So moving on to the next agenda item,

18  which is -- let me get my -- the utilities motion.  This was

19  Item Number 8 on the agenda.  It's filed at Docket Number 20.

20  So in this motion, the debtors are seeking the following:  To

21  determine the proposed adequate assurance provided to the

22  utility providers within the meaning of Section 366 of the

23  Bankruptcy Code; to prohibit utility providers from altering,

24  refusing, or discontinuing its services; and to approve

25  procedures for resolving any disputes concerning adequate

1  assurance in the event that a utility provider is not satisfied

2  with the proposed adequate assurance.

3          So, in connection with the operation of their

4  business, the debtors historically obtain water, internet,

5  trash removal, and power for high-volume data centers and other

6  similar services.  Historically, the debtors paid on average

7  $654,150 each month for utilities.  This is expected to

8  decrease to approximately $229,158 per month as the debtors are

9  in the process of winding down an entity serviced by one

10  provider and do not anticipate requiring that provider's

11  services in the near future.

12          Therefore, the debtors are proposing adequate

13  assurance procedures that provide for a deposit of

14  approximately the (indiscernible) of $114,579.  This deposit

15  will be in a segregated account held at BMO Harris Bank, N.A.,

16  and we believe that the proposed order follows the standard

17  utility order in this jurisdiction and includes typical

18  adequate assurance procedures that would be expected in a

19  Chapter 11 case of this size.

20          We did receive some comments from the U.S. Trustee's

21  office regarding why we utilized a three-month lookback period,

22  and that shortened look-back period was used so that the

23  monthly costs for the utility payments would not be

24  artificially low since a few sites had just recently gone

25  online, so we wanted to make sure we were calling for those new

1  sites.

2         Other than that, there were no further comments or

3  objections received.  So, unless you have any questions,

4  Your Honor, we'd request that the Court enter the order

5  approving the utilities motion.

6         THE COURT:  Is there anyone that has any objection to

7  the utilities motion?

8         Ms. Glogowski, this is the first time I've ever seen

9  one that works.  Thank you for taking the trouble to make it

10  work.  I have one very --

11         MS. GLOGOWSKI:  We're very appreciative, Your Honor.

12         THE COURT:  I can tell you put a lot of work into --

13         MS. GLOGOWSKI:  Sure.

14         THE COURT:  -- making this (indiscernible) deal with

15  all the objections I normally raise with these.

16         On Paragraph F on Page 4, is there any objection to

17  the --

18         MS. GLOGOWSKI:  I'm looking.

19         THE COURT:  This is one where if there is an

20  objection, that the money will be held pending resolution of

21  the dispute.

22         MS. GLOGOWSKI:  Let me just grab that paragraph real

23  quickly to confirm.  But whatever change you'd like to make, I

24  believe we're comfortable with.

25         THE COURT:  What I'm going to do is just -- I was a

1  little nervous not having a utility, if there was a dispute,

2  being able to get a prompt hearing.  And I just want to say, if

3  a dispute arises, an emergency hearing may be requested.

4          MS. GLOGOWSKI:  Absolutely.  We agree with that

5  change, Your Honor.

6          THE COURT:  Thank you for all the hard work on this.

7  Let me get this signed.

8          MS. GLOGOWSKI:  Thank you, Your Honor.

9          THE COURT:  I've signed it and I've sent it to

10  docketing.

11          MS. GLOGOWSKI:  Thank you.

12          THE COURT:  Where do you want to go next?

13          MS. GLOGOWSKI:  With that, I'm going to move to the

14  last item on the agenda, Number 9, which is the cash management

15  motion, docketed at Number 19.  In this motion, the debtors are

16  seeking the following:  To continue operating their cash

17  management system, maintain their existing bank accounts and

18  business forms, pay related prepetition obligations, and

19  continue to provide intercompany transactions.

20          A little background on this.  The debtors' cash

21  management system is composed of 12 bank accounts, 10 of which

22  are at BMO Harris Bank, N.A., and two of which are at Fidelity

23  Bank, which is a local bank in Minnesota.  The amounts in both

24  accounts are all below the FDIC limits and they're FDIC

25  insured.

1        The current cash in all accounts is approximately
2  $9.5 million, of which 8.7 million is unencumbered.  And the
3  accounts are broken up thusly.  There's a disbursement account,
4  which is a zero balance account used for payroll for all
5  employees, nine operating accounts where -- one of which is a
6  master operating account where -- which receives customer
7  payments from the respective business segments and operations.
8  And then the remaining operating accounts are site operating
9  accounts which are utilized as disbursement accounts for
10 operations.  Excess funds from the site accounts are swept into
11 the master operating account.  And then there's one account of
12 Holdings, which is historically inactive, which is listed.
13       One account serves as a cash collateral, which is --
14 it's the CN Minden LLC account.  There's a letter of credit for
15 $813,000 and some change in favor of the Nebraska Public Power
16 District.  This letter of credit is issued by BMO, and there's
17 a security on the letter of credit.  So the deposit actually
18 required is 102 percent (indiscernible) collateral or $829,726.
19       Basically, this is just security required for a
20 buildout and network upgrade of the transition services by the
21 Nebraska Public Power District at the Minden facility.  So
22 that's what that account is being used for.
23       And the debtors request that they're permitted to
24 continue operating these accounts in the ordinary course.
25 Associated with these accounts are bank fees which average

1  approximately $6,000 a month depending on transaction volume,
2  and these fees are routinely paid from the primary operating
3  account.  Debtors seek permission to pay bank fees in the
4  ordinary course, in accordance with past practices.

5          The debtors have historically engaged in ordinary
6  course intercompany transactions with their businesses.  In the
7  ordinary course, debtors settle these transactions in cash or
8  journal entry receivables and payables.  And they're primarily
9  to reimburse the primary operating account for various expenses
10 associated with site operations as needed.  And these are
11 reconciled each month.

12          So these intercompany transactions are an essential
13 component of the debtors' operations.  Any interruptions in
14 them would disrupt operations and harm the debtors' estates and
15 stakeholders, so the debtors are seeking to continue
16 intercompany transactions in the ordinary course of business on
17 a postpetition basis in a manner (indiscernible) consistent
18 with their prepetition practice in regards to these
19 transactions.

20          THE COURT:  What kind of --

21          MS. GLOGOWSKI:  There's one more point I want to
22 touch upon --

23          THE COURT:  What kind of intercompany transactions
24 are there with non-debtors?

25          MS. GLOGOWSKI:  I'm not sure, Your Honor.  So -- so

54

1  most of the contractual -- most of the transactions related to

2  non-debtors are subject to the contractual agreements that the

3  debtors are in with their non-debtors.  And currently the

4  debtors are in process of evaluating such contracts to

5  determine whether rejection would be beneficial to the estate.

6          THE COURT:  Let me just tell you that I am nervous,

7  very nervous, given the circumstance with Generate, but nervous

8  generally anytime we're dealing with a blanket authorization to

9  engage in intercompany transactions that includes non-debtors.

10 And I need to know more about this.

11          And if you're not prepared on that right now, I'm

12 happy to carry this till 9/28 at four o'clock, but to go ahead

13 and orally authorize everything other than intercompany

14 transactions, or to authorize it in an order if you need it,

15 but to wait and get pretty full information on what you're

16 asking for in intercompany transactions.  If you know it now,

17 that's fine, but I really don't want speculation about this.

18          MS. GLOGOWSKI:  Understood, Your Honor.

19          MR. GROGAN:  Your Honor, James Grogan.  Can I be

20 heard for a second on this?

21          THE COURT:  Of course.

22          MR. GROGAN:  Thank you, Your Honor.  Your Honor, so

23 this is -- when we talk about intercompany transactions here,

24 this is not a situation -- for purposes of cash management, we

25 are not -- we are not transferring cash from a debtor to a non-

1  debtor directly under this motion.  We do have a number of

2  intercompany contracts, project management agreements.  Those

3  would apply primarily to Kearney, Wolf Hollow, and the NextEra

4  JV (audio interference) King Mountain facility where we are

5  operator.

6        Those are very similar really to third-party

7  arrangements where we're providing services to those entities

8  in the form of our employees manage equipment there.  We get

9  paid a fee in exchange for those services.  Those, you know,

10  contracts, as Ms. Glogowski mentioned, will be under review

11  during the case (audio interference) economical (indiscernible)

12  but we're not talking about a situation where the debtors are

13  funding the non-debtors here.

14        For example, the Generate entities, you know, sitting

15  on tens of millions of dollars cash in their own account.  So

16  those are -- that's restricted cash.  But there -- you know,

17  the money that they pay for their own -- the money that they

18  use to pay us under the project management agreement comes from

19  those accounts to us.

20        THE COURT:  Give me an example of an intercompany

21  transaction with a non-debtor that you're asking me to approve

22  here.  Between a debtor and a non-debtor, what am I being asked

23  to approve?

24        MR. GROGAN:  I actually -- you know, I -- we may have

25  been too broad on that.  I am not aware that we actually need

1 approval to transfer cash to a non-debtor.

2         THE COURT:  You want an opportunity to talk to your

3 client about that?  Tell me how you want to handle that.  If we

4 include --

5         MR. GROGAN:  Yeah, I think --

6         THE COURT:  -- a provision that says that, I'm happy,

7 but I don't want to hamper the business.

8         MR. GROGAN:  Yeah.  I think we should -- let's carry

9 this one to -- what was the other date we had?  Monday?

10         THE COURT:  Monday at 4, yeah.

11         MR. GROGAN:  If we can carry this one, I'll confer

12 internally.  I actually do not believe we -- I think we might

13 be able to narrow that relief, and we'll figure that out by

14 Monday and just confirm that.

15         THE COURT:  Okay.

16         MR. GROGAN:  And if so, we can submit a slightly

17 revised order that clarifies that, you know, from a cash

18 management perspective, you know, we're not funding non-

19 debtors.

20         THE COURT:  Does anyone else have any issue on the

21 cash management motion?

22         So we're going to make a docket entry.  And hopefully

23 your banks are listening right now; but if not, you tell me if

24 this works.  The docket entry will be entered this morning that

25 says that the debtors are authorized to operate all of their

1 accounts in accordance with the proposed cash management order

2 except with respect to non-debtor -- transfers of cash to a

3 non-debtor.  Will that work for a docket entry today?

4          MR. GROGAN:  I think that's acceptable, Your Honor.

5 Thank you very much.

6          THE COURT:  All right.  Thank you.  And then we'll

7 carry the actual entry of an order till Monday at four o'clock.

8          Ms. Glogowski, what do you have next?

9          MS. GLOGOWSKI:  I believe that that was the last item

10 on the agenda.  So, Your Honor, unless anyone has anything else

11 to say, we just wanted to thank you again so much for

12 accommodating us today, and thank you to the U.S. Trustee's

13 office for working with us.  Thank you to all the court staff

14 for working late hours to get this hearing done on such short

15 notice.  And we really greatly appreciate the efforts that

16 enabled all this to happen.

17          THE COURT:  Well, thank you.  That's only because I

18 have the best staff in the world.

19          I have somebody from Chicago that wanted to speak.

20 Let me get your line active.  (312) 802-9606.  Who do we have?

21 (312) 802-9606.

22          MR. GROGAN:  I apologize, Your Honor.  I believe I

23 entered that in error.

24          THE COURT:  Oh, no problem.

25          Anyone else have anything they need to say or do

1  today?

2          So, first of all, thank you all for all the hard work

3  that went into this.  And I could tell how thoughtful all of

4  the motions and proposed orders were.  And it was very

5  meaningful that you all had done all of that work.

6          I wanted to take a moment at the end of the hearing

7  to express my ignorance about the industry, and to ask a

8  particular question, which may never become relevant.  But if

9  it does become relevant, I want y'all to know how much I need

10  to know about it and how little I do know.

11          So it is my understanding, which may be wrong, that

12  the value of bitcoin could be driven by several factors, two of

13  which I want to talk about.  One is for use as a currency,

14  similar to the use of dollars as a currency.  And the other is

15  for what I will call industrial security uses, meaning that it

16  is a safer form of a transfer of any currency to be able to use

17  blockchain technology.  There may be other uses for this, as

18  well, which I would need to know about potentially in the case.

19          It strikes me that if what we're talking about is a

20  currency substitute, that a lot of the price is -- could be

21  driven by speculation; but that if it is being driven more by

22  security concerns, if I've described that right, that that is

23  not as speculative of a price driver.

24          If I am going to be called upon -- and I may not be,

25  which is fine -- to worry about the future pricing of bitcoin,

1  in thinking about what I should or shouldn't approve in the

2  case, I wanted to tell y'all up front how little I know, and if

3  I need to make that decision, how much I would need to know.

4  And it's kind of a dangerous thing to talk about, because I may

5  have just gotten all of that wrong.  But if I have even my

6  question wrong, hopefully that will explain the level of the

7  ignorance that you need to cure.

8          So I wanted to go ahead and be brave and confess the

9  ignorance today so that you can minimize the chances of a bad

10  decision in the future if it comes up.

11          That's about it.  I just want to thank everybody and

12  we'll see y'all on Monday.  Is there anything else that anybody

13  wants to comment on?

14          All right.  You're going to get an educator ready for

15  me, Mr. Grogan?

16          MR. GROGAN:  Absolutely.  We've got some of the best

17  minds in the industry for you, so we'll be ready if the time

18  comes.

19          THE COURT:  All right.  And you don't need to educate

20  me unless it comes up, by the way.  I'm not just looking for a

21  general education.  You can if you want, but I'm telling you

22  now because it is such a confusing thing in my mind as to how

23  to think through that; that if it does come up, you need to

24  start from square one to educate me.  All right.

25          MR. GROGAN:  I understand.

1              THE COURT:  Thank you all.

2              MR. GROGAN:  Thank you, Your Honor.

3              THE COURT:  We are in recess.

4              MR. GROGAN:  Thank you.

5              COUNSEL:  Thank you, Your Honor.

6              THE COURT:  Thank you.

7          (Proceedings concluded at 9:05 a.m.)

8                        *  *  *  *  *

9

10

11

12

13

14

15             **C E R T I F I C A T I O N**

16

17     I, Michelle Costantino, court-approved transcriber, hereby

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22

23  _Michelle Costantino_____

24  MICHELLE COSTANTINO, AAERT NO. 589    DATE:  September 27, 2022

25  ACCESS TRANSCRIPTS, LLC