UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-90273 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DECLARATION OF RYAN HAMILTON
## IN SUPPORT OF DEBTORS' BIDDING PROCEDURES MOTION

I, Ryan Hamilton, hereby declare under penalty of perjury that, to the best of my knowledge and belief, and after reasonable inquiry, the following is true and correct:

1. I am a Senior Vice President at Jefferies LLC ("Jefferies"), a global investment banking firm listed on the New York Stock Exchange with its principal offices at 520 Madison Avenue, 6th Floor, New York, New York 10022.

2. I submit this Declaration (this "Declaration") in support of the Bidding Procedures Motion[2] filed by the above-captioned debtors and debtors in possession in these proceedings

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238).  The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

[2] "Bidding Procedures Motion" means that certain *Debtors' Emergency Motion for Entry of (I) an Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Certain Bidding Procedures, Assumption, Assignment, and Rejection Procedures, and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter into Asset Purchase Agreements with Stalking Horse Bidders; and (D) Scheduling Hearing on the Approval of the Sale of the Debtors' Assets Free and Clear of All Encumbrances as well as the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of the Debtors' Assets Free and Clear of All Encumbrances, (B) Approving Asset Purchase Agreements, (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Waiving Stay Provisions Pursuant to Bankruptcy Rules 6004(h) and 6006(d)* [Docket No. 91]. Capitalized terms used in this Declaration and not otherwise defined herein have the meanings given to such terms in the Bidding Procedures Motion.

(collectively, the "Debtors") seeking, among other things, the approval of certain procedures and deadlines, as set forth in the Bidding Procedures Motion (the "Bidding Procedures"), in connection with the sale of all or substantially all of the Debtors' assets, including any subset thereof (a "Sale").

3. Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Boston Stock Exchange, the International Stock Exchange, the Financial Industry Regulatory Authority, the Pacific Stock Exchange, the Philadelphia Stock Exchange, and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has approximately 4,000 employees located in more than 45 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Since 2007, Jefferies has been involved in more than 250 restructurings representing more than $550 billion in restructured liabilities.

4. Jefferies has extensive experience in reorganization cases and has an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors, creditors, and creditors' committees throughout the United States. Jefferies has advised on the following chapter 11 cases, among others: *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Sept. 19, 2022*); In re Vewd Software USA, LLC*, Case No. 21-12065 (MEW) (Bankr. S.D.N.Y. Dec. 15, 2021); *In re Limetree Bay Services, LLC*, Case No. 21-32351 (DRJ) (Bankr. S.D. Tex. Sep. 10, 2021); *In re Hospitality Investors Trust*, Case No. 21-10831 (CTG) (Bankr. D. Del. May 20, 2021); *In re CarbonLite Holdings LLC*, Case No. 21-10527 (JTD) (Bankr. D. Del.

Apr. 7, 2021); *In re Gulfport Energy Corporation*, Case No. 20-35562 (DRJ) (Bankr. S.D. Tex. Jan. 21, 2021); *In re Mallinckrodt plc*, Case No. 20-12522 (JTD) (Bankr. D. Del. Jan. 13, 2021); *In re Bouchard Transportation Co., Inc.*, Case No. 20-34682 (DRJ) (Bankr. S.D. Tex. Jan. 14, 2021); *In re Valaris plc*, Case No. 20-34114 (MI) (Bankr. S.D. Tex. Nov. 04, 2020); *In re GenCanna Global USA, Inc.*, Case No. 20-50133 (GRS) (Bankr. E.D. Ky. April 17, 2020); *In re Foresight Energy LP*, Case No. 20-41308-659 (Bankr. E.D. Mo. Apr. 7. 2020); *In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (LSS) (Bankr. D. Del. Feb. 7, 2020); *In re EP Energy Corp.*, Case No. 19-35654 (MI) (Bankr. S.D. Tex. Jan. 8, 2020); *In re Dura Auto. Sys., LLC*, Case No. 19-12378 (KBO) (Bankr. D. Del. Dec. 3, 2019); *In re Synergy Pharm. Inc.*, Case No. 18-14010 (JLG) (Bankr. S.D.N.Y. Mar. 7, 2019); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex. Dec. 6, 2018); *In re Mission Coal Co., LLC*, Case No. 18-04177-TOM11 (Bankr. N.D. Ala. Nov. 30, 2018); *In re Claire's Stores, Inc.* Case No. 18-10584 (MFW) (Bankr. D. Del. Aug. 3, 2018).

5.  I have advised both companies and creditors in financial restructurings and distressed mergers and acquisitions, raised capital for troubled companies, and represented debtors and creditor constituencies in bankruptcy proceedings. Before joining Jefferies in 2017, I was a vice president in the restructuring and finance group of Barclays Capital, Inc., which I joined in 2009. I have an MBA from the University of Chicago Booth School of Business, a JD from the University of Chicago Law School, and a BA from Emory University.

6.  As a professional proposed to be retained by the Debtors in these chapter 11 cases, Jefferies is charging for services provided in this matter, but I am not being specifically compensated for providing this Declaration or testimony. I am authorized to submit this Declaration on behalf of the Debtors.

7. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with other members of the Jefferies team, the Debtors' management team, and the Debtors' other advisors, my review of information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and my views based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## THE BIDDING PROCEDURES

### I. Background

8. The Debtors entered these chapter 11 cases with very limited liquidity and have developed the Bidding Procedures to maximize the value of their assets in an efficient and expeditious manner. The Debtors are a leader in the data center space and develop, own, and manage data centers across the United States with approximately 250MW of capacity currently operating across five different locations. The Debtors also have development assets representing an additional 335MW of capacity, plus a future development pipeline. In addition to their operating and in-development data center projects, the Debtors also have excess inventory and equipment that is available for sale, including modular data centers, pad mount transformers, and main power transformers. The proposed Bidding Procedures should provide the Debtors with sufficient flexibility to effectively market each of these various asset classes, or any other combination of the Debtors' assets, in a manner that should maximize the value of the Debtors' estates.

### II. The Marketing Process

9. On August 16, 2021, the Debtors engaged Jefferies as their investment banker under an engagement letter to explore mergers and acquisitions and capital markets financing alternatives. On July 1, 2022, the scope of Jefferies engagement with the Debtors was expanded

to include exploring restructuring alternatives. As a result, Jefferies is familiar with the Debtors' corporate and capital structure, management, business operations, and potential investor universe. In addition, in its capacity as the Debtors' investment banker, members of the Jefferies team and I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and in the development of the Bidding Procedures and the Debtors' proposed marketing and sale process.

10. At the direction of the Debtors, Jefferies began a formal marketing process in September 2022 with respect to a potential Sale. As of the date of this Declaration, the Debtors, with the assistance of Jefferies, are soliciting indications of interest for both potential buyers and parties interested in providing financing to the Debtors. The initial response to this outreach has revealed interest in a potential Sale. Numerous parties have executed non-disclosure agreements and are being provided access to a dataroom containing confidential information regarding the Debtors and their business and assets.

11. Jefferies has administered and will continue administering a postpetition marketing process on behalf of the Debtors consistent with the proposed Bidding Procedures. Based on my experience with similarly situated companies and as further described below, I believe that the terms of the proposed Bidding Procedures are appropriate for postpetition marketing processes of this type given the Debtors' limited liquidity, and should facilitate an orderly sale process that is calibrated to elicit the highest or otherwise best bid.

### III. Proposed Timeline

12. The Debtors have designed the Bidding Procedures to promote a competitive bidding process and, thus, to maximize value for the Debtors' estates and creditors under the unique circumstances and time pressures of these cases. Based on my experience managing in- and out-of-court marketing processes, I believe that the various dates and deadlines set forth in the proposed Bidding Procedures are appropriately designed to maximize the value of the Debtors'

estates in light of the Debtors' very limited liquidity and should be sufficient to afford interested buyers a full opportunity to compete for a potential transaction. In particular, given the Debtors' limited liquidity, I believe the 35-day period between the Petition Date and the proposed Bid Deadline should afford potential bidders sufficient opportunity to complete due diligence, engage with management, and finish formulating a bid.

**IV.  Stalking Horse Procedures**

13.  As part of the proposed Bidding Procedures, the Debtors are seeking the authority to designate one or more Stalking Horse Purchasers to set a floor price for the applicable assets and to promote further bidding. In my experience, if the Debtors are able to identify a viable Stalking Horse Purchaser, they will likely need to offer that party Bid Protections and the Debtors have requested the authority to do so pursuant to the Bidding Procedures Motion. Specifically, the Debtors seek authority to negotiate a Break-Up Fee of up to three percent (3.0%) and an Expense Reimbursement of up to the greater of $50,000 and one percent (1%) of the cash purchase price for any Stalking Horse Purchaser. Based upon my experience, I believe that these amounts are reasonable in this type of transaction and consistent with bid procedures in other distressed M&A processes. Importantly, payment of the Bid Protections should not diminish the Debtors' estates, as the Debtors would not incur the obligation to pay the Break-Up Fee unless a higher and better bid is accepted and such transaction closes.

14.  Without the ability to provide the Bid Protections, the Debtors could lose a potential Stalking Horse Purchaser and thus may lose the opportunity to obtain the best offer for their assets, as it is unlikely, in my experience, that any potential bidder would agree to act as a stalking horse absent the Bid Protections. Indeed, the Bid Protections should enable the Debtors to secure an adequate floor price for their assets, thereby ensuring that competing bids would be materially higher or otherwise better than the bids reflected in any Stalking Horse Agreement(s).

V.  **Other Aspects of the Bidding Procedures**

15. Finally, I am familiar with the other material terms of the proposed Bidding Procedures and, based on my experience, I believe that such terms, both individually and as a whole, should promote an orderly and competitive bidding process and should elicit the highest or otherwise best offer for the Debtors' assets. The Bidding Procedures should allow the Debtors to conduct an auction in a controlled and open fashion that should encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the applicable assets. Furthermore, I believe that the Bidding Procedures should provide an appropriate framework for the Debtors to review, analyze, and compare any bids received to determine which bids maximize value for the Debtors' estates and creditors.

16. In sum, based on my familiarity with the Debtors' marketing process and the potential buyers, I believe that the Bidding Procedures in their totality should provide for an orderly, value-maximizing sale process.

## DE MINIMIS ASSET SALE PROCEDURES

17. In addition to the Bidding Procedures addressed above, the Bidding Procedures Motion also seeks approval of the De Minimis Asset Sale Procedures to allow the Debtors to efficiently sell certain discreet assets with an aggregate selling price equal to or less than $1,000,000 (the "De Minimis Assets"). The Debtors anticipate that the De Minimis Assets to be sold pursuant to the De Minimis Asset Procedures would include excess inventory such as modular data center containers and power transformers, as well as fixtures and equipment, spare parts, and other miscellaneous assets.

18. I understand that the De Minimis Assets are not currently needed for the Debtors' operations whereas the liquidity from the De Minimis Asset sales could provide a meaningful

benefit to the Debtors' estates. Certain of the De Minimis Assets were originally purchased at a cost of several hundred thousand dollars and the Debtors do not anticipate selling the De Minimis Assets at a significant discount as the Debtors believe that they are generally in pristine condition. Accordingly, the $1,000,000 threshold for the De Minimis Asset sales is appropriate to allow the Debtors to sell the De Minimis Assets without incurring the additional administrative expenses associated with noticing each sale under a separate sale motion. For example, the Debtors modular data centers cost approximately $325,000, and the Debtors believe that the proposed $1,000,000 threshold is needed to efficiently pursue transactions with interested parties that are likely to purchase multiple De Minimis Assets.

19. In sum, the De Minimis Asset Sale Procedures are an important compliment to the Bidding Procedures and together they should provide the Debtors with the needed flexibility to maximize the value of all of their assets for the benefit of their estates. In addition, I believe that the $1,000,000 threshold for sales of De Minimis Assets is appropriate to allow the Debtors to effectuate sales of excess equipment and other unused inventory in manner that is cost-efficient and value-maximizing.

[*Remainder of Page Intentionally Left Blank*]

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 6, 2022
       New York, New York

Respectfully submitted,

*/s/ Ryan Hamilton*
Ryan Hamilton
Senior Vice President
Jefferies LLC