IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90273-11 |
| | § | HOUSTON, TEXAS |
| COMPUTE NORTH HOLDINGS, INC., | § | TUESDAY, |
| ET AL, | § | OCTOBER 11, 2022 |
| DEBTORS. | § | 9:00 A.M. TO 9:58 A.M. |

## MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

(Recorded via CourtSpeak; no log notes.)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

HYBRID APPEARANCES:

FOR THE DEBTOR:                    PAUL HASTINGS, LLP
                                   James T. Grogan, III, Esq.
                                   Matthew Micheli, Esq.
                                   600 Travis Street, 58th Fl.
                                   Houston, TX  77002
                                   713-860-7300


FOR TZ HOLDINGS:                   HAYNES AND BOONE, LLP
                                   Stephen M. Pezanosky, Esq.
                                   201 Main St., Ste. 2200
                                   Ft. Worth, TX  76102
                                   817-347-6600


FOR THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS:            MCDERMOTT WILL & EMERY, LLP
                                   Charles R. Gibbs, Esq.
                                   2501 North Harwood St.
                                   Suite 1900
                                   Dallas, TX  75201
                                   214-295-8063


FOR GENERATE LENDING, LLC:         HUNTON ANDREWS KURTH, LLP
                                   Joseph W. Buoni, Esq.
                                   600 Travis, Ste. 4200
                                   Houston, TX  77002
                                   713-220-4168


(Please also see Electronic Appearances.)

1        **HOUSTON, TEXAS; TUESDAY, OCTOBER 11, 2022; 9:00 A.M.**

2                THE COURT:  On the 9:00 o'clock docket, we have

3        Compute North Holdings, Inc.  Let's give people a couple of

4        minutes to clear out of the courtroom and then we'll take

5        appearances in court, followed by any on the phone in the

6        Compute North case, Case Number 22-90273.

7                (Pause in proceedings)

8                THE COURT:  All right.  Let's go ahead and take the

9        appearances in court.  Actual appearances have already been

10       made electronically; these will be the parties that wish to

11       speak at today's hearing.

12               If I can get the other parties to please clear the

13       courtroom.  Mr. Kelly?

14               MR. KELLY:  We're here for this one, too.

15               THE COURT:  Then I'll -- unless you're --

16               MR. KELLY:  We're here for this one, too.

17               THE COURT:  Well, then quit talking.

18               (Laughter)

19               THE COURT:  All right.  Go ahead, please,

20       Mr. Grogan.

21               MR. GROGAN:  Good morning, Your Honor.  James Grogan

22       from Paul Hastings on behalf of Compute North and its Debtor

23       affiliates.

24               THE COURT:  Mr. Grogan, good morning.

25               MR. TRAUSCH:  Good morning, Your Honor.  Steve

1       Pezanosky and David Trausch with Haynes and Boone on behalf of

2       TZ Holding Company, which is an affiliate of NextEra.

3                   THE COURT:  Thank you, Mr. Trausch.

4                   MR. GIBBS:  Good morning, Your Honor.  Chuck

5       Gibbs --

6                   THE COURT:  Good morning --

7                   MR. GIBBS:  -- with McDermott --

8                   THE COURT:  -- Mr. Gibbs.

9                   MR. GIBBS:  -- Will & Emery, counsel -- proposed

10      counsel for the Official Unsecured Creditors Committee.  I

11      believe appearing by video are my colleagues, Darren Azman and

12      Kristin Going.

13                  THE COURT:  Thank you, Mr. Gibbs.

14                  MR. BUONI:  Good morning, Your Honor.

15                  THE COURT:  Good morning, Mr. Bouni.

16                  MR. BUONI:  Joe Buoni with Hunton Andrews Kurth,

17      here on behalf of Generate Lending, LLC.  And I believe

18      virtually appearing are my co-counsel from Kirkland & Ellis.

19      It should be Chris Marcus, Anna Rotman, and Elizabeth Jones.

20                  THE COURT:  Thank you.

21                  So, Mr. Micheli, I've got you wanting to appear.

22      Good morning.

23          (No audible response.)

24                  THE COURT:  Let me try that again.  Hold on.

25                  Mr. Micheli, good morning.

1          MR. MICHELI:  Good morning, Your Honor.  Matt

2  Micheli on behalf of Compute North and its affiliated Debtors.

3          THE COURT:  Thank you.

4          Mr. Marcus?

5          MR. MARCUS:  Good morning, Your Honor.  Christopher

6  Marcus from Kirkland & Ellis on behalf of Generate Lending.

7          THE COURT:  Good morning.

8          From 214-855-7528?

9          MR. VASEK:  Good morning, Your Honor.  Julian Vasek

10  from Munsch, Hardt, Kopf & Harr on behalf of Atlas Technology

11  Group, LLC.

12          THE COURT:  Good morning.

13          Mr. Ruff?

14          MR. RUFF:  Yes, good morning.  Jason Ruff for the

15  U.S. Trustee's Office.

16          THE COURT:  Good morning.

17          From 212-326-0824.

18          MR. SILVERMAN:  Good morning, Your Honor.  This is

19  Matthew Silverman from Pryor Cashman on behalf of Sphere 3D

20  Corp.

21          THE COURT:  Good morning.

22          All right.  I show those are all the folks that have

23  asked to speak at this morning's hearing.  If you still wish

24  to speak and something comes up, please feel free to press

25  five star on your phone.

1      How did you want to proceed this morning,

2  Mr. Grogan?

3      MR. GROGAN:  Thank you, Your Honor.  Again, James

4  Grogan from Paul Hastings, proposed counsel to the Debtors.

5      Your Honor, first on our Agenda -- we filed an

6  Amended Agenda at Docket Number 174.  We have our bid

7  procedures hearing on today.  Mr. Micheli is going to handle

8  that.  We did draw quite a few objections, responses,

9  including one from the Committee.  We've resolved many of

10  those.  But Mr. Micheli will take you through the current

11  status.

12      THE COURT:  Thank you.

13      All right.  Does anyone object to letting

14  Mr. Micheli give a status report before we get into any

15  evidentiary hearing, if needed?

16    (No verbal response)

17      THE COURT:  All right.  Mr. Micheli, the floor is

18  all yours.

19      MR. MICHELI:  Thank you, Your Honor.  And I'll be

20  brief on the background, you know, without kind of burying the

21  lead.

22      I think the punch line here is we were able to

23  reach, late last night and early this morning, a resolution

24  with the Committee which precipitated a number of filings this

25  morning.  I'll get into the specifics of that.

1          But just to kind of reset, we were here on the first

2     day.  You know, Mr. Grogan explained that, you know, the

3     liquidity in these cases is tight and we would need to move on

4     an expedited timeline.  In that regard, you know, almost

5     immediately after filing, the Debtors put forth their sale and

6     bid procedures motion, which appears at Docket Number 91,

7     which is the first item on our Agenda today.

8          Following up on that, the Debtors and their

9     professionals, you know, began the sale and marketing process.

10    They populated a data room, prepared marketing materials,

11    initiated contact with potentially interested parties.  And

12    you know, it's encouraging and I can tell you that, as of

13    yesterday, the Debtors' investment banker Jefferies contacted

14    over 80 parties, 77 NDAs have been sent out, 30 NDAs have been

15    executed, and 20 -- and 23 NDAs are in process.

16         You know, as indicated, we received a number of both

17    informal and formal comments and objections to the procedures

18    and the Debtors spent the last several days trying to work

19    through those issues.  Some of them were resolved; some of

20    them may still need to be addressed today.

21         But I'll kick off with the Committee issues.  As you

22    know, the Committee was appointed on October 6th, just the end

23    of last week.  They retained counsel over the weekend and we

24    were able to begin, you know, substantive discussions with

25    them yesterday, even though they're not up-to-speed on the

1    case.

2         The crux of the issue, I think, is set forth in

3    their objection, if you've had a chance to look, with the

4    timing.  The Committee was looking for additional time.  Given

5    the Debtors' liquidity position, that is something that would

6    have strained both the processes -- the properties -- excuse

7    me -- the processes that are laid out in our bid procedures.

8    And so we were able to negotiate with the Committee a

9    resolution which we think is beneficial to both parties and

10   also allows us, you know, most importantly, to keep the

11   timeline set in the cases.

12        As a high-level summary, Your Honor, that

13   resolution, you know, is proposing to bifurcate the procedures

14   order.  So we would ask -- and this appears -- we filed an

15   amended order here this morning which appears at Docket

16   No. 173.  That order would approve certain relief today;

17   specifically:

18        The *de minimis* asset sale procedures would be

19   approved today.

20        A portion of the assumption notice procedures would

21   be approved today, so that the Debtors can commence the

22   process of noticing potential contract counterparties and not

23   lose time and/or the importance of notice with respect to --

24   with respect to sending out those notices to contract

25   counterparties.

1        And then, finally, the order would approve the

2    stalking horse procedures, allowing the Debtors, to the extent

3    a stalking horse materializes, to enter into a stalking horse

4    agreement.

5        The other part of the relief that we're requesting

6    in that order, Your Honor, would be to carry all other aspects

7    of the procedures to a hearing which we would request from the

8    Court on October 21st, subject obviously to your availability.

9    And the -- any objections that weren't otherwise addressed

10    today or overruled would be carried to that hearing.  And the

11    Committee would reserve its right to, obviously, object by

12    October 20th.

13        As I indicated, Your Honor, we think this is a very

14    good result.  It allows the Debtors to maintain their

15    timelines, which are critical in these cases, but also allows

16    for the Committee to get up-to-speed here.

17        With that background as -- that should resolve any

18    issues that the Committee has and it resolves a number of

19    other potential -- it either resolves a number of other

20    potential objections that we received or carries those over to

21    the hearing that would be as proposed for October 21st.

22        I do believe that there are a few issues that will

23    still need to be addressed today, given the relief that we

24    would request goes forward and gets approved today.  But with

25    that, I think it may make sense to -- you know, as a little

1    bit of background and opening.  I'm happy to answer any

2    questions you have or let others speak to any issues they have

3    or that may be continuing as of today.

4            THE COURT:  So, on the 21st, first of all, I could

5    start the hearing at 1:30.  I'm speaking to the Lone Star

6    Legal Aid Society at 3:00, that's for an hour.  So, if you

7    take awhile, we'll have to come back after a fairly long

8    break.  If that doesn't work, I can do it on another day, but

9    I'm trying to accommodate what you've asked me to do here.

10           MR. MICHELI:  Your Honor, thank you for that.  And I

11   would request that we schedule that for 1:30.  You know,

12   hopefully, we can spend the next ten days working with the

13   Committee to reach a consensual resolution and resolve any

14   other outstanding objections, and hopefully get that done in

15   less than an hour.

16           THE COURT:  All right.  So let me hear from anybody

17   else that wants to ... Mr. Gibbs.

18           MR. GIBBS:  Good morning again, Your Honor.  Chuck

19   Gibbs on behalf of the -- proposed counsel on behalf of the

20   Unsecured Creditors Committee.

21           As I think you just heard, we were retained a little

22   after lunchtime yesterday and -- or I'm sorry, Sunday, and

23   have been working fairly feverishly to try to get as far up-

24   to-speed as we can.  There's a large hill to still climb in

25   this case for us to be fully prepared to adequately protect

1    the interests of the unsecured creditors.

2         We have negotiated, I think in good faith and

3    productively, with Debtors' counsel and reached the agreement

4    that you just heard described real late last night, or

5    actually early this morning.  I think it does two things:

6         It allows the Debtor to keep the timeline -- part of

7    the timelines they had proposed in the bid procedures.

8         It allows them to get their notice of assumptions

9    out on the 18th, which was important to them, and also to

10   maintain the deadline of October 18 for the designation of a

11   stalking horse.

12        We did not find anything problematic with the

13   proposed bid protections -- or stalking horse protections,

14   rather, that they were suggesting.  We think they're entirely

15   within market, so we did not oppose that and we are fine with

16   them being able to offer that to any potential stalking horse

17   bidder.

18        What we have significant heartburn over is the bid

19   deadline and the auction deadline.  We just -- we think it's

20   too compressed.  We think it could end up in a fire sale of

21   the Debtors' assets and a very minimal recovery to the

22   creditors.  And we are cognizant of the liquidity constraints

23   that the Debtor has advised the Court of, but we simply need

24   to test that.

25        We are going to be interviewing financial advisors

1    this afternoon, and they need some time to get in and get

2    under the hood and be able to ascertain whether there are

3    other levers that can be pulled that might expand that time

4    horizon and ease their liquidity constraints, and thus, give

5    the Debtor more time to try to market the assets more fully

6    and hopefully obtain a better recovery if a sale process is

7    the path they want to go on.

8              So we strove to try to preserve the ability to

9    convince the Court that we need more time with respect bid

10   deadlines and the auction.  And the hearing on the 21st will

11   give us ten days to see whether we can live with what are

12   proposed or try to convince your court -- Your Honor that we

13   need more time for the bid deadline, so --

14             THE COURT:  So you're okay with the 21st, though --

15             MR. GIBBS:  Yeah.

16             THE COURT:  -- for that --

17             MR. GIBBS:  It was at --

18             THE COURT:  -- continued hearing?

19             MR. GIBBS:  -- my suggestion and it was, frankly, to

20   accommodate some conflicts I had on the 20th and 19th, so --

21             THE COURT:  So you're okay with the fact we may have

22   a long interruption in the middle of the afternoon.

23             MR. GIBBS:  I'm totally fine.

24             THE COURT:  I just don't have much choice about

25   that.

1           MR. GIBBS:  I can get home to Dallas late Friday

2     night or early Saturday morning, that's fine.

3           THE COURT:  All right.  Thank you.

4           From area code 404, 404-495-4485, who do we have on

5     the phone?

6           MR. ELLIS:  Good afternoon, Your Honor.  This is

7     Greg Ellis and I represent Marathon Digital Holdings, Inc.,

8     and they have a substantial claim in the case, probably the

9     largest unsecured creditor in the case, Your Honor.

10           I think the resolution that Committee counsel

11     negotiated is, for the most part, very consistent with the

12     discussion I had with Debtors' counsel last night and does

13     allow us more time to work through the issues in our

14     objection.

15           The only, you know, clarification I have for today

16     is our client would want to be one of the notice parties for

17     the *de minimis* procedures -- notice procedures and receive

18     notice of those sales, just so there's no confusion, as we do

19     have an interest in several of those facilities as a joint

20     venture partner.

21           With that one comment, I think the solution that has

22     been announced at the hearing by the Debtors' counsel and

23     Committee counsel makes sense and the case can proceed

24     (indiscernible) and get matters worked out.  That would be in

25     paragraph one in the proposed order we received this morning.

1    But that's my only immediate comment, Your Honor.

2            THE COURT:  Thank you.  And again, Mister -- it's

3    Mr. Ellis, right?

4            MR. ELLIS:  Yes, Your Honor.

5            THE COURT:  Just so you know, the camera is pointed

6    to the back of your head, so that you can figure out what

7    you're doing about that.

8            MR. ELLIS:   I will --

9            THE COURT:  It's okay.  I just wanted you to know.

10           MR. ELLIS:  (Indiscernible).

11           THE COURT:  No way of knowing unless somebody is

12   going to tell you.

13           So we had one objection come in -- and Mr. Ellis, I

14   may have confused yours with somebody else's, so please just

15   correct me if I'm wrong -- that alleged that there was a

16   conflict with Jefferies.  And I want to deal with that pretty

17   quickly because it seems to me they are probably important in

18   this process.

19           Was that your client or a different client?

20           MR. ELLIS:  Oh, yes, Your Honor, it is our client

21   and I think that we, last night (indiscernible) several, you

22   know, time frames between (indiscernible) application

23   (indiscernible) and my client and I are still investigating

24   facts of some other assets that our client that were, you

25   know, in full timely investigation in this case.  But an

1    objection was filed material role with our clients as --

2              THE COURT:  So --

3              MR. ELLIS:  -- I'm offering --

4              THE COURT:  What I would need to figure out is I

5    don't want all of the time invested by somebody that then gets

6    disqualified, where we've wasted the time and have to start

7    over.  So are you -- do you have a problem with Jefferies

8    staying in the case until we can have a hearing, and then we

9    do a hearing next week on whether Jefferies should be

10   employed?  But as I -- I don't know if you're actually

11   asserting a conflict or if this turns out to be a

12   disinterestedness question.  But either way, I think, given

13   what got filed, I've got to hold the Jefferies hearing.

14             Mr. Grogan, do you think I'm missing anything on

15   that or --

16             MR. GROGAN:  Your Honor, thank you.  James Grogan.

17             We -- I think there's a misunderstanding here.  We

18   did speak with Jefferies briefly about this objection as soon

19   as it got filed.  Jefferies says that they were never retained

20   by Marathon, there's no engagement letter.  Obviously,

21   throughout this process, they've had a number of discussions

22   with Marathon because of Marathon's large stake in the

23   company, but we don't think there's any conflict.  But we can

24   deal --

25             THE COURT:  I got it.

1           MR. GROGAN:  -- with that at the --

2           THE COURT:  I just --

3           MR. GROGAN:  -- at the retention hearing, you know,

4      I --

5           THE COURT:  But they are integral to the process.

6           MR. GROGAN:  They are, they are.  I --

7           THE COURT:  So when is the first time they're going

8      to be doing heavy lifting -- I'm not -- and Mr. Ellis, correct

9      me if I'm wrong.  I doubt Mr. Ellis has a problem if they're

10     working on the *de minimis* asset side of it.

11          MR. GROGAN:  Yeah.

12          THE COURT:  But on the bigger side of it, when is

13     the first time they're going to be doing material work?

14          MR. GROGAN:  That's really underway already.  I

15     mean, we're --

16          THE COURT:  Okay.

17          MR. GROGAN:  Like Mr. Micheli pointed out, we've

18     already got NDAs flying in and out.  We've got -- you know,

19     we're trying to set up site visits with one party.  So there's

20     a lot of work going on.

21          THE COURT:  What would you think of having a hearing

22     on Monday the 17th on whether Jefferies should be employed or

23     not?  Cross these -- at some point --

24          MR. GROGAN:  Yeah, I --

25          THE COURT:  -- we've got to cross them.

1          MR. GROGAN:  That would be fine.  I guess my only

2    question is my -- I -- we did discuss this issue with

3    Mr. Ellis.  I -- before we alter that, I'd like to make sure

4    that he's going to press that objection or if he has

5    essentially realized that it may be erroneous.

6          THE COURT:  Mr. Ellis?

7          MR. ELLIS:  Well, Your Honor, you know, I -- there's

8    still time to find (indiscernible) was when I spoke to

9    Debtors' counsel that they want to retain.  But I do have an

10   objection to the manager on our client's bond offering

11   (indiscernible) my client did seek confidential information

12   and due diligence to that connection so irrespective of any

13   issue (indiscernible) disinterested question.  I'm not in a

14   position today to weigh their acknowledgment oat issue on

15   (indiscernible).

16         Right now, NDA agreement, the objection -- and we

17   put it off and I hope it works out, but (indiscernible) claims

18   against Jefferies as conditions becoming -- participating in

19   the bidding process, and that's low reaching and is

20   substantially more.  So we've got issues (indiscernible) there

21   and (indiscernible) and I think setting those for the 17th

22   makes sense because our client, you know, has (indiscernible)

23   process and the conditions at play, that the Court may ask,

24   (indiscernible) if we can't resolve them among the parties.

25   So --

1           THE COURT:  All right.

2           MR. ELLIS:  -- to the extent (indiscernible) --

3           THE COURT:  I know this is all coming up kind of at

4      the -- quickly.  Why don't we just set it --

5           MR. GROGAN:  Yeah.

6           THE COURT:  -- for the 17th at 4:00 o'clock.  If

7      it's resolved, it's resolved.

8           MR. GROGAN:  Yeah.

9           THE COURT:  And if it isn't resolved, it isn't

10     resolved.

11          MR. GROGAN:  That works for us.  We'll talk -- you

12     know, we'll get Jefferies lined up and --

13          THE COURT:  Okay.  I --

14          MR. GROGAN:  -- deal with that.

15          THE COURT:  I'm not worried that Jefferies isn't

16     going to be working their butts off between now and then, it's

17     just not very fair to them if it's going to turn out to be a

18     problem, so --

19          MR. GROGAN:  I understand, Your Honor.

20          THE COURT:  -- October 17th at 4:00 will be the

21     application to employ Jefferies.

22          MR. GROGAN:  Thank you, Your Honor.

23          THE COURT:  Mr. Pezanosky, did you have anything on

24     this issue?  I know you have something on Issue Number 2.

25          MR. PEZANOSKY:  I do, Your Honor, but Mr. Gibbs

1      wanted to say something.

2              THE COURT:  All right.  Mr. Gibbs?

3              MR. GIBBS:  Your Honor, I neglected to mention one

4      thing and you just raised it, that's the *de minimis* asset

5      sale.  And I'm sure you've seen from the proposed revised

6      order --

7              THE COURT:  I have --

8              MR. GIBBS:  -- that we --

9              THE COURT:  -- not seen the proposed revised order.

10             MR. GIBBS:  Then I'm not sure you've seen it.  But

11     we have consented to that portion of the motion that requested

12     approval of the procedures for *de minimis* asset sales.  We

13     frankly think our interests are aligned, to the extent they

14     confine quick sales of any small assets or extraneous assets

15     that will help the liquidity situation.  So I wanted the Court

16     to know our thinking behind it and that we're fine with that

17     portion of the order.  I just forgot to mention it.

18             THE COURT:  Thank you.

19             Mr. Pezanosky.

20             MR. PEZANOSKY:  Thank you, Your Honor.

21             As the Court, I think, probably has read, my client

22     TZ Holding Company, which is an affiliate of NextEra, is a

23     50 percent owner, equity owner, in another entity called

24     "TZRC," which the Debtors have called "King Mountain."  The

25     Debtors have an entity, a CN Member, that owns the other

1      50 percent membership interest in that entity.  This King

2      Mountain entity is not in front of the Court, it's not a

3      Debtor in bankruptcy.

4              My client is owed about $100 million on a loan, a

5      secured loan made to CN Member.  That debt is secured by the

6      Debtors' membership interest, 50 percent membership interest,

7      in the King Mountain entity.  It's also secured by a pledge of

8      the King Mountain entity's bank accounts.  And we'll -- I'm

9      sure we'll talk about that in more detail here on the next

10     hearing -- or the next matter.

11             So what the Debtors -- I guess part of the pot of

12     assets that the Debtors propose to sell includes the Debtors'

13     50 percent membership interest --

14             THE COURT:  Right.

15             MR. PEZANOSKY:  -- in King -- the King Mountain

16     entity, which is fine.  And we have a lien and we want to

17     obviously preserve our credit bid rights.  And I think -- I

18     don't think the Debtors necessarily dispute that.

19             We have not -- we did file our objection yesterday.

20     We haven't heard anything from the Debtor about our objection

21     of -- we did get -- well, we got up at 3:15 to catch a flight

22     to Houston and did get to see the motion they filed with

23     respect to a stay violation, but haven't heard anything,

24     haven't read the proposed order.  I'm sure it's probably okay.

25             But there are three issues that I just want the

1    Court to know that we are concerned with in connection with

2    the sale process.  I mean, it's probably all fine, in terms of

3    kicking these.

4         The first is we have consent rights in -- under the

5    LLC agreement to the assignment of the Debtors' membership

6    interest.  We think the case law is going to be pretty clear

7    that those consent rights are enforceable.  And we just want

8    to make sure that nothing in bid procedures order would in any

9    way impair those consent rights, understanding we're not

10   asking the Court to rule at the bid procedures stage whether

11   or not those consent rights are enforceable or not.  We'll

12   save that for the sale hearing, if necessary.  And I assume

13   that this proposed order doesn't do anything to impair that, I

14   just haven't had a chance to look at it, Your Honor.

15        Second is all of the Debtors' documents, materials,

16   information, et cetera, relating to the King Mountain facility

17   and operation are confidential and -- by virtue of the terms

18   of the LLC agreement between the parties.  We need to make

19   sure that the Debtors maintain that confidentiality.  We don't

20   have an objection to it being part of the data room, but we

21   need to make sure that any party that signs a nondisclosure

22   agreement and gets access to that data room and sees that

23   information is bound to the same confidentiality provisions

24   that we are and that the Debtor is, as members of that LLC

25   agreement.

1          Unfortunately, that cat may be already out of the

2     bag.  We've seen a copy of the nondisclosure agreement that

3     the Debtors are using.  Presumably, it's been signed.

4     Presumably, parties have had access to the data room already.

5     It appears to be just an NDA that they've pulled off the

6     shelf.  There's nothing in there that -- it doesn't appear,

7     that would require a counterparty to maintain the same

8     confidentiality with respect to the information that relates

9     to the King Mountain facility.

10          That's an objection we have, that we just want to

11    make sure the Debtors do whatever they have to under the -- in

12    terms of their contractual obligations under that LLC

13    agreement, to maintain the confidentiality of that information

14    -- again, giving full effect to the fact that they need to be

15    able to shop this asset around to third parties.  We totally

16    get that and that's fine.  So we just want to make sure that

17    our confidentiality rights are not somehow impaired in this

18    process.

19          And then the last is -- you know, our last

20    objection, which, again, I think can be kicked, is we just

21    want to make sure that nothing in the bid procedures order is

22    going to, in any way, give the Debtors, you know, permission

23    effectively to violate their agreements with us, breach their

24    confidentiality rights, et cetera, et cetera.

25          So, with all of that being said, Your Honor, that's

1       the -- those are kind of the gist of the objections that we

2       filed with respect to the bid procedures.  If the Debtors

3       will, you know, do whatever they have to do to maintain

4       confidentiality, as we described, I'm sure everything else

5       getting kicked over to the 21st hearing is probably fine --

6                  THE COURT:  Thank you.

7                  MR. PEZANOSKY:  -- subject to our review of the

8       proposed order.

9                  THE COURT:  Thank you.

10                 MR. PEZANOSKY:  Thank you, Your Honor.

11                 THE COURT:  Anybody else?  Let's see.

12                 Mr. Silverman, go ahead, please.

13                 MR. SILVERMAN:  Thank you, Your Honor.  Can you hear

14      me okay?

15                 THE COURT:  Yes, sir.

16                 MR. SILVERMAN:  Thank you.  Your Honor, Matthew

17      Silverman, Pryor Cashman, on behalf of Sphere 3D Corp.

18                 Sphere 3D is a crypto currency (indiscernible) and a

19      customer of the Debtors.  They're a party to a master

20      agreement with Compute North, LLC, pursuant to which it's

21      crypto currency mining equipment that they own to the Debtors

22      (indiscernible) facility, where the Debtors provide

23      (indiscernible) electricity, network connectivity

24      (indiscernible).

25                 So Sphere 3D doesn't object to the bid procedures,

1        per se.  We have filed a reservation of rights to ensure any

2        (indiscernible) or sale order (indiscernible) states that the

3        Sphere 3D equipment, whether located at the (indiscernible)

4        facility or another one of the Debtors' facilities is last

5        owned by the Debtor and may not be sold as part of any asset

6        sale.

7                    THE COURT:  Thank you, Mr. Silverman.

8                    MR. MARCUS:  Your Honor, this is Christopher Marcus

9        from Kirkland & Ellis.  May I be heard?

10                   THE COURT:  Yes, sir, Mr. Marcus.  Go ahead.

11                   MR. MARCUS:  Thank you, Your Honor.  So as I

12       reminder, I represent Generate Capital.  Generate is a secured

13       lender to the Wolf Hollow project and the (indiscernible)

14       project, which are non-Debtors.  The Debtor CN Pledgor owns

15       the equity of a company called -- well, we'll call them

16       "borrower."  And borrower owns -- borrower is also not a

17       Debtor.  Borrower owns the equity in the two projects.

18                   So, in addition to being a secured creditor at the

19       project level and borrower entity, Generate is secured by CN

20       Pledgor's equity in borrower, which that is obviously

21       (indiscernible) Debtor.  We also have a guarantee claim

22       against the parent, so at least on an unliquidated basis right

23       now, we're one of the largest unsecured creditors up at the

24       holding company, as well.

25                   So there is -- while the assets are outside of

1       bankruptcy, there is some overlap and some automatic stay

2       issues.  We filed the -- a statement -- and we do have a

3       couple of objections, which I'll go through.  But the

4       statement really to just put everyone on notice that all we --

5       we don't want to get in the way of the currently proposed sale

6       process.  We're sort of taking a -- trying to take an

7       operative approach and allow the Debtors to run that process.

8               But I just want to make sure that Your Honor

9       understands, the Debtors and the Committee understand that,

10      should that process change, there are other avenues that we

11      can and may pursue, to the extent that we will -- if there's

12      any negative impact of those project-level entities.  From the

13      beginning, we've been focused on, obviously, protecting that

14      value, I believe to the benefit of everybody.  So this was

15      more of a -- our failure to object to the process now is not

16      an acquiescence to whatever process takes over going forward.

17              With respect to the bid procedures, I think it might

18      be that we only have one outstanding issue left, but let me

19      just run through -- let me just run through the issues.

20              Similar to NextEra, we have a concern about the

21      sharing of our confidential information.  I'm not a hundred

22      percent sure that it's impacted by this version of the order.

23      We just got the order and haven't been through it yet, Your

24      Honor.  But I thought that their ability to share confidential

25      information, notwithstanding their obligations under other

1    confidentiality agreements, was in connection with designating

2    qualified bidders.  Maybe the Debtors can confirm if this is

3    still an issue that's live today.

4          Our second issue was that we bought into the

5    (indiscernible) qualified bidder.  I believe -- again, I don't

6    think that's an issue that is any longer being addressed by

7    this order.  But I do believe that we've been able to resolve

8    this or we may be able to resolve this with the Debtors.  I

9    think the only open issue is a separate nondisclosure

10   agreement that the Debtors have asked us to sign, which, if

11   not done, is pretty close to done.  So I want to put that on

12   the Record, that that's not an issue.

13         The third issue that we raised in our objection was

14   to ensure that there were -- we will provide notice of any

15   attempts to sell collateral.  I think there was a note in the

16   motion itself that the Debtors' property that is not located

17   at the Debtor.  It's just not clear what they're referring to

18   here (indiscernible) view the revised order and make sure that

19   our comments are included, but my understanding is they

20   actually were.  So I guess, for now, we can hope -- we can --

21   subject to reviewing the order, we can consider this one

22   resolved.

23         The last one I believe is still an open issue,

24   Judge.  This order allows the Debtors to name a stalking horse

25   bidder without notice or an opportunity to object to anyone.

1      If that's so, the first bidder agrees to a breakup fee of less

2      than three percent and expense reimbursement (indiscernible)

3      percent or $50,000, and that stalking horse is not an insider.

4              Obviously, Judge, we will be concerned with any

5      stalking horse designation relates to the (indiscernible) and

6      candidly, I'm not sure what the basis would be to not provide

7      a secured lender with notice of an opportunity with respect to

8      the designation of a stalking horse with respect to the

9      secured creditor's asset.

10             Obviously, in order to be designated a stalking

11     horse, it needs to -- the (indiscernible) needs to provide an

12     actual and necessary benefit to the estate.  That's why we

13     designate stalking horses because they are going to assist in

14     the overall sale process.  That's the Debtor's burden to

15     demonstrate.  That's Your Honor's decision to make.  And here,

16     without any demonstration of benefit, just a mere

17     demonstration that someone is willing to accept a three

18     percent breakup fee and a one percent expense reimbursement,

19     which doesn't bear at all on what the benefit may be, the

20     Debtor is looking to -- is looking to designate.

21             So, while we're not looking to overly complicate the

22     timeline or extend the timeline, I think, at the bare minimum,

23     a couple days' notice of the designation of a stalking horse

24     and an opportunity for folks to be heard, especially Generate,

25     when we're talking about Generate's collateral, is appropriate

1     under the circumstances, Judge.

2               THE COURT:  Thank you.

3               MR. MARCUS:  And that's all I have.

4               THE COURT:  Thank you.

5               I had a concern -- and I think this applies directly

6     to your client -- that certain bidders were going to be both

7     consultation parties and eligible to bid, and we're not doing

8     that.  So, if somebody is going to get information not

9     available to other bidders, they can't bid; or they can get

10    information only that's available to other bidders and then

11    they can bid.  But the bidding process is going to be on a

12    level playing field.

13              And I think that your client fell into that group of

14    concern.  I'll leave it up to each of those parties that might

15    have that un-level playing field to elect which side of it

16    they want to be on, they just can't be on both, and it will be

17    up to them.

18              So, Mr. Micheli --

19              MR. MICHELI:  And Your Honor?

20              THE COURT:  I'm sorry.  Go ahead.

21              MR. MICHELI:  So, on that point, there is -- it has

22    now fallen out of this version of the order.  But there is a

23    provision in the bidding procedures themselves and I believe

24    in the order that a party who elects to be a bidder no longer

25    maintains its rights as a consultation party.

1          THE COURT:  Other way.

2          MR. MICHELI:  (Indiscernible) --

3          THE COURT:  Other way.  No, no, no.  They can't get

4     the inside information and then decide to bid.  They get no

5     information until they decide not to bid, or else they can use

6     the inside information to bid.  You can't do it in that order.

7          MR. MICHELI:  I will pull that -- thank you.  I'll

8     pull that language.  I -- we don't disagree with that and

9     we're happy to clarify that in the order.

10          THE COURT:  Any why wouldn't you give people a

11     couple of days' notice of an emergency hearing?  And I'll give

12     you an emergency hearing on two days' notice to designate

13     somebody as a stalking horse.

14          Does that cause any heartburn?

15          MR. MICHELI:  Your Honor, we -- obviously, the

16     timeline is very tight.  And in order to try to make those

17     work, we were hoping to be able to -- given that no one has

18     actually objected to the amount of the bid protections, you

19     know, we thought that the timing itself would be better.

20          We do understand the concern.  I think that, you

21     know, we could still maintain the timeline if the Court wants

22     us to come in if someone objects.  I think it would still

23     maintain the timeline if the objection was filed within two

24     business days of notice of the designation of the stalking

25     horse bidder.

1          THE COURT:  Yeah.  I'm thinking of making it easier

2     on you than that, which is, when you file it, I'll give you a

3     hearing on two days' notice.  That way, you won't get an

4     objection and maybe another hearing three days later, which is

5     five.  So, in two days, people can show up and object if they

6     want to, either way.

7          I can go either way, I -- but I'm trying to make it

8     faster for you.  But I think that he's right --

9          MR. MICHELI:  No, no, that --

10          THE COURT:  -- that folks have a chance to object.

11          MR. MICHELI:  I appreciate that.  And that is

12     actually -- the point to give us a better timing result, so I

13     appreciate the comment, Your Honor, and that's something we

14     can add to the order.

15          THE COURT:  So is this order now ready for review or

16     do you all need to do more work with the parties and then

17     submit the order?

18          MR. PEZANOSKY:  Your Honor?

19          THE COURT:  Mr. Pezanosky.

20          MR. PEZANOSKY:  Again, Steve Pezanosky.

21          For my part, we would like to have a chance to at

22     least review the order before it's submitted to the -- to Your

23     Honor.

24          THE COURT:  All right.  Well, I'm thinking we can

25     all read through it right now or we can --

1    MR. PEZANOSKY:  Yeah.

2    THE COURT:  If he's trying to negotiate some more

3    stuff, which it sounds like we need some changes, maybe just

4    upload an order with the parties that have spoken about it

5    today signing off on it, Mr. Micheli and -- does that work?

6    MR. MICHELI:  We can do that, Your Honor.  You know,

7    we believe that the order is in good shape.  I think the

8    issues that have been raised (indiscernible) carried as the

9    parties have mentioned, or we've addressed the concern with

10   language in the order.  And so I recognize that people haven't

11   had an opportunity to review it in detail, so I'm confident

12   that we can get that resolved, you know, over the next couple

13   of hours.

14   THE COURT:  Sounds good to me.  We'll just call for

15   an order to be uploaded.

16   Does anybody want to introduce any proof with

17   respect to whether we should be having these bidding

18   procedures at all?

19   MR. MICHELI:  Your Honor, the Debtors would move two

20   declarations into evidence in support of the bidding

21   procedures:

22   The first declaration on behalf of Mr. Coulby, the

23   Chief Financial Officer and Treasurer of the Debtors.  That

24   was filed in support of the first-day motions and appears at

25   Docket Number 22.

1          And the Debtors would also move the declaration of

2    Mr. Ryan Hamilton of Jefferies in support of the Debtors'

3    bidding procedures motion, which appears at Docket Number 125.

4          Both Mr. Coulby and Mr. Hamilton are available in

5    court today, and we would request that those be entered into

6    evidence.

7          THE COURT:  Is there any objection to the admission

8    of both Mr. Coulby and Mr. Hamilton's declarations as

9    substantive evidence at today's hearing?

10         (No verbal response)

11         THE COURT:  All right.  They're both admitted.

12         (Coulby First-Day Declaration received in evidence)

13         (Hamilton Declaration received in evidence)

14         THE COURT:  Does anyone have any cross-examination

15    for either Mr. Coulby or Mr. Hamilton?

16         (No verbal response)

17         THE COURT:  All right.  I am approving, based on

18    those declarations, the revised arrangement that was announced

19    on the Record today, subject to the parties working out the

20    exact wording of a final order.  If there's a problem, just

21    submit competing language or whatever you all want to do.  I

22    don't really anticipate a problem with it.  And otherwise,

23    we'll see you all when we come back for the hearing on the

24    21st -- and you can go ahead and include that in there -- at

25    1:30.

1             All right.  Let's go to the --

2             MR. MICHELI:  Thank you, Your Honor.

3             THE COURT:  -- to the stay violation motion.

4             Mr. Grogan.

5          (Pause in proceedings)

6             MR. GROGAN:  Thank you, Your Honor.

7             Your Honor, this matter, which is reflected in the

8    emergency motion for enforcement of the automatic stay against

9    NextEra Energy and certain of its affiliates, came as somewhat

10   of a surprise to the Debtors at the end of last week, when all

11   of the cash at the King Mountain facility had been swept and

12   removed to a bank account held by one of -- another NextEra

13   affiliate based in Juno, Florida.

14            The crux of the dispute -- I'll just get right to

15   the point -- is, given the fact that the joint venture, TZRC,

16   is a non-Debtor, does that mean that NextEra can basically do

17   whatever it wants to the JV?

18            Our position is that we have rights that are

19   protected by the automatic stay with respect to the joint

20   venture.  As the -- you know, and we cited a case from the

21   Fifth Circuit.  I mean, granted, it's a relatively old case

22   from 1975, but it's still good law, *In Re Fontainebleau*, which

23   provides that the -- when the Debtor has a right of use of

24   something, that is tantamount to possession of the property.

25            We had a contractual right as the manager and

1    operator of the joint venture to use the bank account.  The

2    Debtor, which is in this case CN Member, LLC, is the operator

3    of the project, King Mountain.  It pays the bills, it's

4    responsible for making sure that the lights stay on.  Just

5    yesterday, we had a crisis where there's no money to pay for

6    diesel fuel.  The bank account is empty.  And the project is

7    basically at risk of shutting down if we are unable to make

8    these routine payments to the suppliers and vendors that keep

9    the facility operational.

10            Also, they basically, you know, rendered our

11   contractual right as operator useless.  We also have monetary

12   interests in the account, which have been stripped away.  We

13   have a contractual right to the available cash, which is

14   basically the profit share after payment of expenses, which

15   now is at a bank account in Florida.  We cannot reimburse our

16   own expenses.  We cannot pay our management fees.

17            So all of these rights were bundled up into having

18   access to that account, using that account to pay these

19   ordinary course expenses.  And our view is that it is a -- it

20   is a right that is protected by the automatic stay, it's part

21   of the -- that use of the account was property of the estate

22   and we think it was a violation of the stay for them just to

23   take the cash, which, by the way, is on account of the pre-

24   petition debt owed to NextEra.

25            So they're repaying their pre-petition claim against

1    the Debtor by stripping the cash that we had -- that we would

2    otherwise have a right to use.  That's what the crux of the

3    dispute is all about.

4            THE COURT:  So let me ask Mr. Pezanosky:  Who is the

5    manager as of 9:45 a.m. on October 11?

6            MR. PEZANOSKY:  Manager of?

7            THE COURT:  The property.

8            MR. PEZANOSKY:  Of the -- well, the --

9            THE COURT:  The non-Debtor.

10            MR. PEZANOSKY:  So CN Member manages the facility

11   pursuant to an operating agreement -- not an LLC operating

12   agreement, I'm sorry -- pursuant to a management agreement.

13            THE COURT:  Right.  And is that management agreement

14   being honored by the entity now that you've taken control over

15   it?

16            MR. PEZANOSKY:  Is it being honored by CN Member or

17   being -- or --

18            THE COURT:  No.  Is it being honored by the non-

19   Debtor.  CN Member is a Debtor, right?

20            MR. PEZANOSKY:  CN Member is a Debtor.

21            THE COURT:  Is it being honored by the non-Debtor

22   that you have taken control of?

23            MR. PEZANOSKY:  There's nothing in that management

24   agreement that prohibited --

25            THE COURT:  Not my --

1        MR. PEZANOSKY:  -- NextEra --

2        THE COURT:  -- question.

3        MR. PEZANOSKY:  Okay.

4        THE COURT:  Is it being honored by the non-Debtor?

5        MR. PEZANOSKY:  Which non-Debtor?  Not NextEra,

6   you're talking about the JV that --

7        THE COURT:  The entity that you're now exercising

8   control over.

9        MR. PEZANOSKY:  Okay.  So we're not -- well, Your

10  Honor, to answer your question, I don't know the answer to

11  that.  I assume the non-Debtor, which is King Mountain,

12  collect -- you know, sort of colloquially known as "King

13  Mountain," I assume it's honoring its obligations to CN

14  Member.

15       THE COURT:  But you're in charge --

16       MR. PEZANOSKY:  We don't control --

17       THE COURT:  Aren't you in charge of King Mountain

18  now --

19       MR. PEZANOSKY:  We are not.

20       THE COURT:  -- from what you --

21       MR. PEZANOSKY:  We are not.

22       THE COURT:  So who's in charge of King Mountain

23  right now?

24       MR. PEZANOSKY:  It's interesting.  It's jointly

25  controlled by the 50/50 members

1          THE COURT:  But if you took the bank account that

2     precludes the Debtor from performing under its contract and

3     you're now controlling it and you're one of the members of

4     that, how can you do that without violating the stay?

5          MR. PEZANOSKY:  Well, Your Honor, understand, the

6     accounts are not property of the estate.

7          THE COURT:  The account is not property of the

8     estate --

9          MR. PEZANOSKY:  And we exercised --

10          THE COURT:  The contract --

11          MR. PEZANOSKY:  We --

12          THE COURT:  The contractual rights are property of

13     the estate.

14          MR. PEZANOSKY:  The --

15          THE COURT:  And if you're stopping them from

16     effectively exercising their contractual rights, you have a

17     problem.

18          MR. PEZANOSKY:  Well, fair enough, Your Honor.  But

19     if I may?

20          THE COURT:  Yeah.

21          MR. PEZANOSKY:  If I may?  The accounts are not

22     property of the estate.  We have a pledge of those accounts to

23     secure our debt.  Okay?  We have a pledge by the joint

24     venture, King Mountain, the entity, under a security

25     agreement, a deposit agreement.

1      THE COURT:  Uh-huh.

2      MR. PEZANOSKY:  We have a pledge of that interest

3  and that security interest is perfected by a DACA.  Okay?  And

4  we have contractual rights with the non-Debtor entity to

5  exercise control over those accounts, separate and apart from

6  the management agreement, separate and apart from the LLC

7  agreement.

8      THE COURT:  But you're --

9      MR. PEZANOSKY:  We have a --

10     THE COURT:  -- also in control of the entity, half-

11  control, right?  Their half-control --

12     MR. PEZANOSKY:  That's correct.

13     THE COURT:  Their half-control is going to vote to

14  give them the money under the contract.

15     MR. PEZANOSKY:  That's correct.

16     THE COURT:  Your half-control is going to respect

17  what you did as a lender in your other shoe and not give them

18  money over the account and we're not going to get the bills

19  paid.  How are we going to get the bills paid?

20     MR. PEZANOSKY:  Well, we're trying to get the bills

21  paid, Your Honor.

22     THE COURT:  How are we going to get the bills paid?

23     MR. PEZANOSKY:  And if I -- you know, and if I may,

24  we are trying to get the bills paid.  We swept -- we froze the

25  -- if I --

1           THE COURT:  Don't tell me you're trying.  How are we
2     getting the bills paid?  They are the manager.
3           MR. PEZANOSKY:  We are --
4           THE COURT:  They need --
5           MR. PEZANOSKY:  We are current --
6           THE COURT:  -- the money to pay the bills.  How are
7     they getting --
8           MR. PEZANOSKY:  Absolutely.
9           THE COURT:  -- the bills paid.
10          MR. PEZANOSKY:  What we wanted to do --
11          THE COURT:  All the bills paid.
12          MR. PEZANOSKY:  Understand.
13          THE COURT:  You don't get to pick and choose.
14          MR. PEZANOSKY:  Understand, understand.
15          What we wanted to do is to be able to pay those --
16    to exercise our DACA and be able to pay the bills out of the
17    existing accounts; however, the lender would not allow us to
18    do that.  They said, either it's frozen, or it's open without
19    any controls.
20          THE COURT:  The lender or the bank?
21          MR. PEZANOSKY:  The bank.  I'm sorry.  The bank.
22          THE COURT:  Okay.  So put it in a different account.
23          MR. PEZANOSKY:  That's what we're doing.  We're
24    opening a --
25          THE COURT:  And the --

1          MR. PEZANOSKY:  -- separate account --

2          THE COURT:  And the manager will have control over

3     the account.

4          MR. PEZANOSKY:  That's correct, Your Honor.  And

5     what we're -- we're trying to open a separate account.  We

6     couldn't do it yesterday because it was a bank holiday.  We're

7     opening a separate account at BMO, which is the lender -- I'm

8     sorry -- is the bank, is the depository institution.  We would

9     transfer funds -- and by the way, we have not -- we have not

10    applied those funds to payment of our debt.  We just froze the

11    account.

12         THE COURT:  Right.

13         MR. PEZANOSKY:  We would transfer funds into the

14    account to --

15         THE COURT:  Into the --

16         MR. PEZANOSKY:  -- be able --

17         THE COURT:  -- new --

18         MR. PEZANOSKY:  -- to pay --

19         THE COURT:  -- operating account.

20         MR. PEZANOSKY:  -- into a new operating account to

21    pay debts, budgeted expenses, et cetera, including, if there

22    are operating fees payable to the Debtors that they're

23    entitled to, those would get paid.  But -- however, however,

24    again, we couldn't get an account opened yesterday.

25    Presumably, we'll get it opened today and we should be able to

1    press forward.

2            What we dispute, however, Your Honor, is their claim

3    that somehow their contractual right in the LLC agreement to a

4    distribution is somehow impacted by what we've done.

5            THE COURT:  I'm not as worried about that as the

6    operational side.

7            MR. PEZANOSKY:  That's total -- Your Honor --

8            THE COURT:  If you're --

9            MR. PEZANOSKY:  -- we want --

10            THE COURT:  -- telling me that --

11            MR. PEZANOSKY:  -- the bills to --

12            THE COURT:  -- by the end of --

13            MR. PEZANOSKY:  -- get paid --

14            THE COURT:  -- by the end --

15            MR. PEZANOSKY:  -- and we want --

16            THE COURT:  -- of the day --

17            MR. PEZANOSKY:  -- and we want --

18            THE COURT:  -- today --

19            MR. PEZANOSKY:  -- operations to occur.

20            THE COURT:  Okay.  Because everything on your

21    distribution side is going to flow through you back to pay

22    down the debt anyway, right?  That's now literal cash flow to

23    the Debtor.

24            MR. PEZANOSKY:  Well, it's different than that even,

25    Your Honor, because, under the operating agreement, if there

1    are payments made to them that are distributions, they're

2    required to hold it in trust for our benefit, so it's not even

3    property of the estate.

4            THE COURT:  Well --

5            MR. GROGAN:  I have --

6            THE COURT:  -- I'm not going to -- it may very well

7    be property of the estate because the estate includes all

8    legal and equitable interests.

9            But the pressing issue is getting the bills paid,

10   right?

11           MR. PEZANOSKY:  Totally agree, Your Honor.  And we

12   have been trying to get that done.  We couldn't get an account

13   opened yesterday --

14           THE COURT:  You know what?

15           MR. PEZANOSKY:  -- because it was a bank holiday.

16           THE COURT:  You know what?  You do that before you

17   had froze the account, that it was going to cause problems,

18   and this could have been arranged before you froze the

19   account.

20           Mr. Grogan, if they can get the operations going

21   again today, what's then your emergency?  And I'm not asking

22   you to waive your claims.

23           MR. GROGAN:  No.

24           THE COURT:  What's your emergency?

25           MR. GROGAN:  Your Honor, that -- if we can actually

1    pay ordinary course expenses at the facility, you know, I --

2    we can deal with the, you know, sanctions or anything else on

3    a more normal timeline.  That really is the -- you know, the

4    thing that prompted me to file this in less than 24 hours, is

5    we don't even have the money to pay for diesel fuel.

6              THE COURT:  So --

7              MR. GROGAN:  If I have money --

8              THE COURT:  The payment --

9              MR. GROGAN:  -- available to pay the bills, we

10   can --

11             THE COURT:  The --

12             MR. GROGAN:  -- we can put this --

13             THE COURT:  The management contract is what can't be

14   interfered with, the management contract will be performed by

15   both parties, including the entire world is ordered to be sure

16   that the entity that is the counterparty to the Debtors'

17   management contract, funds amounts into the manager that are

18   required to pay things that are authorized by the management

19   contract.

20             Does that work for everybody?

21             MR. PEZANOSKY:  Your Honor, I think, generally, yes.

22             THE COURT:  Okay.

23             MR. PEZANOSKY:  The one thing that I'm concerned

24   about and I want to make sure, as we're sitting here today --

25             THE COURT:  Right.

1              MR. PEZANOSKY:  -- that the Court is not making any

2       finding that we have violated the automatic stay.

3              THE COURT:  I am not.

4              MR. PEZANOSKY:  Certainly --

5              THE COURT:  I am not.

6              MR. PEZANOSKY:  Certainly, there's no evidentiary

7       support for that.  And if we -- and if we have --

8              THE COURT:  I am making --

9              MR. PEZANOSKY:  -- to come back --

10             THE COURT:  I am making --

11             MR. PEZANOSKY:  -- and do that --

12             THE COURT:  -- no finding --

13             MR. PEZANOSKY:  -- we will.

14             THE COURT:  -- that you violated the --

15             MR. PEZANOSKY:  Thank you --

16             THE COURT:  -- automatic stay.

17             MR. PEZANOSKY:  -- Your Honor.

18             THE COURT:  I want to be sure that the damage that

19      has been caused by this -- which may not impose any liability

20      and it may impose liability, we don't know right now -- is

21      going to stop, so that I don't have an emergency.  And you're

22      telling me you're stopping it already, before I said anything.

23             MR. PEZANOSKY:  Absolutely, Your Honor.

24             THE COURT:  So.

25             MR. PEZANOSKY:  And the only thing I would quibble

1          with, with what Your Honor says, we don't think any damage has

2          been caused.

3                    THE COURT:  Well, there's been --

4                    MR. PEZANOSKY:  Okay?

5                    THE COURT:  There has been damage caused when you

6          stop them from being able to control that money illegally and

7          there has been damaged caused if you stopped them from doing

8          it legally.  It hurts the business.  It may be a nominal

9          amount and you may have had every right to do it.  But we're

10         going to fix the problem by now I'm hearing an agreement of

11         the parties.  Let me know if we don't get it fixed.

12                   But that account gets -- a new account is just fine

13         with me, which lets them exercise their DACA rights, and then

14         the money will flow into the other account to pay the bills.

15         I want the bills paid.

16                   MR. PEZANOSKY:  And totally agree, Your Honor.  And

17         we are --

18                   THE COURT:  Okay.

19                   MR. PEZANOSKY:  We're going to do that.  And as I

20         said, we were trying to do that yesterday, but there was a

21         bank holiday.

22                   The one thing again, Your Honor, that I just want to

23         make sure, that, if there's any implication here that NextEra

24         has done anything that it was not contractually allowed to do,

25         permitted to do, pursuant with its agreements with a non-

1    Debtor entity, that we're not making any findings today that

2    that occurred.

3              If that's an issue that the Debtor wants to press,

4    then I -- what I would urge is that we have to come back in

5    front of the Court and have a full-blown --

6              THE COURT:  I am --

7              MR. PEZANOSKY:  -- evidentiary hearing --

8              THE COURT:  I am not --

9              MR. PEZANOSKY:  -- for that.

10             THE COURT:  -- making those findings today, but I'm

11   also not accepting your statement.

12             MR. PEZANOSKY:  Totally understand that, Your Honor.

13   Totally understand that.

14             THE COURT:  So I'm not --

15             MR. PEZANOSKY:  That's not evidence.

16             THE COURT:  -- going --

17             MR. PEZANOSKY:  That's just --

18             THE COURT:  I'm not --

19             MR. PEZANOSKY:  -- me arguing.

20             THE COURT:  -- going --

21             MR. PEZANOSKY:  I get that --

22             THE COURT:  -- either way.

23             MR. PEZANOSKY:  -- Your Honor.

24             THE COURT:  But I am requiring that operations be

25   restored.  And the reason I'm requiring it is to avoid the

1          necessity for an emergency hearing.

2                    MR. PEZANOSKY:  Absolutely.  Absolutely.  And we

3          have no problems with that, Your Honor.

4                    THE COURT:  Mr. Gibbs.

5                    MR. GIBBS:  We would ask that it be clear that the

6          restoration of the operation of the management agreement

7          include the ability of the appropriate Debtor entity to pay

8          itself for the fees that they're entitled to.

9                    THE COURT:  Mr. Pezanosky said that he's including

10         that; as long it's part of the budgeted expenses --

11                   MR. PEZANOSKY:  Yeah.

12                   THE COURT:  -- they're okay with it.

13                   MR. PEZANOSKY:  We have no issue with that, Your

14         Honor.

15                   THE COURT:  Yeah.

16                   MR. GIBBS:  All right.  Thank you.

17                   THE COURT:  We okay?

18                   MR. GROGAN:  Yes, I'm okay.  But could we set this

19         on a -- you know --

20                   THE COURT:  We'll set it --

21                   MR. GROGAN:  -- more normal notice --

22                   THE COURT:  -- on a --

23                   MR. GROGAN:  You know --

24                   THE COURT:  -- normal schedule.

25                   MR. GROGAN:  -- and we might -- you know, peace

1    might break out, but -- and just in case, I think it would be

2    helpful to have a hearing date --

3              THE COURT:  Yeah, I'll be here.

4              MR. GROGAN:  -- you know 20-something days out.

5              THE COURT:  Would you all check your calendars, and

6    look at the first week of November?

7              MR. PEZANOSKY:  Your Honor, I hate to -- I hate to

8    do this, but --

9              THE COURT:  Is that a bad week?

10             MR. PEZANOSKY:  We're -- my wife and I are actually

11   hosting a wedding on November 5th and we're obligated to do a

12   lot of stuff that week leading up to that.  The following week

13   is wide open, however.

14             THE COURT:  How about -- if I schedule it for

15   November 7th, your wife will have to do all the cleanup

16   without you.  Do you want that day?

17             MR. PEZANOSKY:  That's maybe better for me.

18        (Laughter)

19             MR. GROGAN:  Your Honor, November 7th is fine with

20   us.

21             THE COURT:  All right.  We're going to set the --

22   let me do this.  I'm going to set at 9:00 o'clock a status

23   conference, basically the preliminary hearing on the motion

24   for relief from the stay.  Don't bring your witnesses.  I got

25   plenty of time that week.

1          MR. GROGAN:  Great.

2          THE COURT:  If we need a hearing, we'll schedule it.

3     But that way, we can do a pretty short hearing and then figure

4     out where we need to go.

5          MR. PEZANOSKY:  Fair enough, Your Honor.  Deadline

6     for us to respond?

7          THE COURT:  Why don't you respond not later than

8     October 31, which is seven days before the hearing.

9          MR. PEZANOSKY:  Fair enough.

10          THE COURT:  Does that work?

11          MR. PEZANOSKY:  Yes.

12          THE COURT:  Hold on.  I got somebody on the phone

13     that wants to participate.  I apologize.  From 312-914-9187,

14     who do we have?

15          MS. KORKIS:  Good morning, Your Honor.  This is

16     (indiscernible) I am a (indiscernible) and I apologize, I was

17     not expecting to speak this morning, but (indiscernible) just

18     wanted to say that we -- I also heard the Debtor say that they

19     have a liquidity situation, opening new accounts and

20     (indiscernible) obviously is not going to help that, but I was

21     just -- and it also is not (indiscernible) the process, so I

22     would ask that the Debtors and NextEra work on, perhaps,

23     (indiscernible) has to be open.  There are several operating

24     accounts that (indiscernible) other arrangement that can be

25     agreed to (indiscernible) Debtor's money.

1          THE COURT:  Could you tell me your name again,

2     please?

3          MS. KORKIS:  I'm sorry.  My first name is Candice,

4     C-a-n-d-i-c-e, and the last name is Korkis, K-o-r-k-i-s.

5          THE COURT:  First of all, thank you, Ms. Korkis, for

6     intervening.

7          Can you give a number where there can be a

8     conference call immediately after this hearing between you and

9     Mr. Grogan and Mr. Pezanosky to discuss the best way to get

10    this done?

11         MS. KORKIS:  Yes, I will reach out to Mr. Grogan, if

12    that works for everybody?

13         THE COURT:  If -- only that it needs to happen --

14    can you set a time for it?  Because I don't want to let the

15    day go by.  Can you do it at 11:00 --

16         MS. KORKIS:  Sure.

17         THE COURT:  -- o'clock Central Time, one hour from

18    now?

19         MS. KORKIS:  Yes.

20         THE COURT:  All right.

21         MS. KORKIS:  I can do that.

22         THE COURT:  All right.  And Mr. Grogan, where can

23    she reach you?  And then you can conference in Mr. Pezanosky.

24         MR. GROGAN:  Sure.  My phone number is 713-860-7338.

25         THE COURT:  All right.  Thank you for assisting on

1       this.

2               All right.  Anything else that we should --

3               MS. KORKIS:  (Indiscernible) thank you.

4               THE COURT:  -- that we should be doing today in

5       Compute North?

6               MR. GROGAN:  Your Honor, I think that's all I have.

7       I don't --

8               THE COURT:  Anyone else have anything?

9               MR. GIBBS:  No, Your Honor.

10              THE COURT:  So, Mr. Gibbs, for three hours, you got

11      pretty up-to-speed.

12          (Laughter.)

13              THE COURT:  We'll see you next time.

14              MR. GIBBS:  I have a lot of help, obviously, Judge.

15              THE COURT:  I know.

16              MR. GIBBS:  Thank you.

17              THE COURT:  Alrighty.  Thank you.

18              We'll go ahead and recess this 9:00 o'clock hearing

19      and we'll go to our 10:00 o'clock hearing.

20          (Proceedings adjourned at 9:58 a.m.)

21

22

23

24

25                          * * * * *

1          *I certify that the foregoing is a correct transcript*

2     *to the best of my ability produced from the electronic sound*

3     *recording of the proceedings in the above-entitled matter.*

4        /S./  *MARY D. HENRY*

5     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

6     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

7     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

8     *JTT TRANSCRIPT #66432*

9     *DATE FILED:  OCTOBER 14, 2022*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25