**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-90273 (MI) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**TZ CAPITAL HOLDINGS, LLC'S OBJECTION TO THE DEBTORS'**
**EMERGENCY MOTION FOR ENTRY OF AN ORDER PURSUANT TO**
**SECTIONS 105(a), 362, AND 542 OF THE BANKRUPTCY CODE**
**ENFORCING THE AUTOMATIC STAY, COMPELLING TURNOVER OF**
**PROPERTY OF THE ESTATE, AND SANCTIONING NEXTERA ENERGY**
**AND ITS AFFILIATES FOR VIOLATION OF THE AUTOMATIC STAY**
**Ref. Doc. No. 91**

TZ Capital Holdings, LLC ("TZCH") respectfully files this objection (this "Objection") to

the *Debtors' Emergency Motion for Entry of an Order Pursuant to Sections 105(a), 362, and 542*

*of the Bankruptcy Code Enforcing the Automatic Stay, Compelling Turnover of Property of the*

*Estate, and Sanctioning NextEra Energy and Its Affiliates for Violations of the Automatic Stay* (the

"Motion") filed by Compute North Holdings, Inc. (the "Debtor Parent") and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors").    In support of the Objection, TZCH

respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Holdings, Inc. (4534); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238). The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

## I.    Preliminary Statement[2]

1.    The Debtors' Motion is based on the false premise that the automatic stay in these Chapter 11 cases prevents TZCH[3] from exercising remedies against a non-debtor and its property -- a fact that is highlighted by the Debtors' request for an order under 11 U.S.C. § 542 compelling turnover to a ***non-debtor*** of property that is not property of the estate.  Put simply, there was no stay violation.

2.    TZCH and Compute North Member LLC (the "Debtor Member")[4] are each 50% owners of TZRC LLC (the "JV"), a joint venture that operates a computer data center located on a 29-acre wind farm in McCamey, Texas with approximately 280MW capacity.  TZCH financed the Debtor Member's financial obligations in the JV.  TZCH's claim of approximately $100 million is secured by, among other things: (1) a perfected lien on CN Member's equity interest in the JV, and (2) perfected liens on the JV's accounts.  The JV is not a debtor in bankruptcy, and its accounts are not property of the Debtors' estates.

3.    The Debtor Member is contractually ***obligated*** to manage the JV's facility under the terms of that certain Modular Data Center Property Management Agreement dated as of March 8, 2022 (the "PMA").  In consideration for Debtor Member's fulfillment of those management obligations, it has the contractual ***right*** to payment of fees from the JV.  In their Motion, however, the Debtors conflate the Debtor Member's service ***obligations*** under the PMA with its contractual

---

[2] Capitalized terms used but not immediately defined shall have the meanings ascribed to them below.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the JV LLC Agreement, the Loan Documents, or the PMA, as applicable.

[3] The Debtors' Motion is directed at "NextEra," but TZCH is the entity that actually has a contractual relationship with the Debtors.

[4] The Debtor Member and the Debtor Parent are collectively the "Debtor Obligors."

*rights* to payment for those services.[5]  The Debtors contractual ***obligations*** are not property of the Debtors' estates -- obligations are burdens, not benefits.

4.     Debtor Member's contractual rights to payments from the JV have not been impaired.  There is no evidence that TZCH has prevented the JV from paying any of its expenses, including fees or expenses that may have been owed to the Debtor Member under the PMA. Indeed, TZCH (which has invested over $200 million in debt and equity into the JV) has every incentive to ensure that the JV continues to successfully operate.  In that regard, the record is clear that TZCH has consistently maintained its willingness to cooperate with Debtor Member to make sure that the JV's expenses are paid in the ordinary course of business.

5.     TZCH took no actions to obtain possession of, or exercise control over, property of the Debtors' estates.  Accordingly, the Motion should be denied.

## II.     Relevant Background

### A.  *TZCH's Relationship with the Debtors*

6.     TZCH and the Debtor Member are parties to that certain *Limited Liability Company Agreement of TZRC LLC* dated as of November 24, 2021 (as amended, the "JV LLC Agreement"), pursuant to which TZCH and the Debtor Member formed the JV.  While the Debtor Member owns 50% of the membership interests in the JV, the JV itself is not is not a debtor in any bankruptcy proceeding, and the JV's assets and contracts are not property of the Debtors' estates.  In fact, the JV LLC Agreement specifically states that the JV's property shall **not** be deemed to be owned by any member individually.  JV LLC Agreement § 4.04.  Pursuant to the terms of the JV LLC Agreement, the JV is effectively jointly managed by TZCH and the Debtor Member.

---

[5] See Motion at ¶ 3 ("[TZCH's actions] made it impossible for CN Member to exercise its contractual right to manage the Project as Operator.").

7.      The Debtor Member, TZCH, and TZRC King Mountain LLC (a non-debtor entity and wholly owned subsidiary of the JV) (the "Owner") are also parties to the PMA.[6]  *See also* First Day Declaration ¶ 28.  The Owner is a wholly-owned subsidiary of the JV and is also not a debtor in any bankruptcy proceeding.  Pursuant to the terms of the PMA, the Debtor Member has the contractual obligation to manage the JV's facility.

8.      TZCH financed the Debtor Member's financial obligations under the JV LLC Agreement (the "Loan") when the Debtor Member failed to timely make its Additional Capital Contributions under the JV LLC Agreement.  *See* JV LLC Agreement § 3.02.  On or about April 8, 2022, the Debtor Member executed and delivered that certain Secured Promissory Note in the principal sum of ninety-eight million five hundred eight thousand nine hundred twenty and no/100 dollars ($98,508,920.00) evidencing the Loan (as amended, the "Note").  *See also* First Day Declaration ¶ 49.  The Loan is secured by, among other things, a perfected, first priority security interest in the Debtor Member's membership interests in the JV and a guaranty (the "Guaranty") from the Debtor Parent.  *See* Note, §§ 5.1, 5.2; UCC Financing Statement filed April 22, 2022; Guaranty Agreement dated as of April 8, 2022; *see also* First Day Declaration ¶ 49.  The Loan is in default and has been automatically accelerated.  See Note §§ 10.1, 10.2; JV LLC Agreement § 3.02(b)(i)(K)(3).

9.      The Loan is also secured by a perfected security interest on, among other things, the JV's bank accounts (the "JV Accounts").  Specifically, the JV and TZCH executed certain Security Agreements for each of the JV's accounts (as amended, supplemented, or otherwise modified from time to time, the "SADAs"), which granted liens on those accounts to secure the

---

[6] A copy of the PMA is referenced as being attached as Exhibit D to the Motion, but the Debtors submitted it for in camera review.

Loan; those liens were perfected by execution of certain Deposit Account Control Agreements for each of the JV Accounts (the "<u>DACAs</u>" and together with the Note, the Guaranty, the SADAs, and other documents and agreements related to the Loan all as may be amended, supplemented, or modified from time to time, the "<u>Loan Documents</u>").  No Debtor is a party to the SADAs or the DACAs because they have no property rights in or to the JV Accounts or any funds therein (the "<u>JV's Funds</u>").

### B. The Chapter 11 Cases

10.     On September 22, 2021 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing the above-captioned jointly administered chapter 11 cases (the "<u>Chapter 11 Cases</u>").

11.     On the Petition Date, the Debtors filed, among other things, the *Declaration of Harold Coulby, Chief Financial Officer and Treasurer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* [Doc. No. 22] (the "<u>First Day Declaration</u>").

12.     On the Petition Date, the Debtors also filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System; (B) Maintain Their Existing Bank Accounts and Business Forms; (C) Pay Prepetition Obligations; and (D) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief* [Doc. No. 19] (the "<u>Cash Management Motion</u>").

13.     On October 28, 2022, the Debtors filed their bankruptcy schedules.  The Debtor Member's Schedule A/B states that it has no cash, no bank accounts, no accounts receivable, and its only asset is its 50% membership interest in the JV.  Doc. No. 323, p.13–19 of 29.

### C.  TZCH exercises remedies against the JV Accounts and the JV Funds.

14.     In early October 2022, TZCH exercised its rights over the JV Accounts and the JV Funds in accordance with Section 9 of the SADAs and Section 2 of the DACAs.  TZCH provided notice of those actions to the JV by a written notice dated October 3, 2022, a copy of which is attached hereto as **Exhibit 1**.

15.     At approximately 2:40 PM prevailing Central Time on Friday, October 7, 2022 (four days after having been notified that TZCH had exercised its right to take control of the JV Accounts), the Debtors sent TZCH a demand letter (the "Demand Letter") accusing TZCH of violating the automatic stay and demanding the JV Funds be returned to the JV Accounts by noon prevailing Central Time on Monday, October 10, 2022.  Since the Demand Letter was received late on Friday afternoon before a 3-day banking holiday weekend, the Demand Letter effectively insisted that TZCH return non-debtor funds to non-debtor bank accounts on less than two hours' notice.  Notably, the Demand Letter did not assert that (i) any fees or reimbursements under the PMA had not been paid to Debtor Member, (ii) any requests for valid, undisputed payments for JV expenses had been denied by the JV or TZCH, or (iii) any imminent threat to the JV's operations or the Debtors' estates existed.  A redacted copy of the Demand Letter is attached hereto as **Exhibit 2**.

16.     TZCH immediately communicated to the Debtor Member that TZCH would cooperate to ensure that all valid JV expenses would be paid.  Consistent with that position, the JV Funds from the JV Accounts were never applied to pay down the Loan.  Business representatives from both the Debtors and TZCH discussed a process to ensure that that the JV's expenses would be paid in the ordinary course.  Specifically, the parties' intended that the JV would open a new bank account, which would be funded with JV Funds, and expenses would be paid from that account.  Brett Sorensen, Vice President / General Manager – Asset Optimization for the Debtors,

confirmed the fourth bank account process in an email less than an hour before the Debtors' arbitrary deadline and more than 12 hours before the Debtors filed the Motion.  A copy of that email chain is attached hereto as **Exhibit 3**.

17.    TZCH sent a response letter (the "**Response Letter**") to the Debtors just before the Debtors' Noon deadline on the banking holiday.  In the Response Letter, TZCH explained that: (i) its actions were solely against non-debtor property, (ii) the Debtors did not assert that any "Fee" and/or "Business Debt Distributions" under the PMA had not been made when due, (iii) any "Available Cash" (as that term is defined in the JV LLC Agreement) that the Debtor Member might demand would necessarily be held in trust for the benefit of TZCH, and (iv) reassured the Debtors again that TZCH was committed to cooperating with the JV to ensure that the JV had funding to continue to operate and pay its expenses including, without limitation, the Fees and Business Debt Distributions.  A redacted copy of the Response Letter is attached hereto as **Exhibit 4**.[7]

18.    Later that afternoon, David Movius, the Debtors' Vice President of Legal Affairs, sent a letter to the Owner (care of the JV with a copy to TZCH) purporting to give notice that the Debtor Member lacked access to sufficient funds to pay JV expenses under the PMA (the "**Notice Letter**").  The Debtor Member asserted that operations would cease by the end of the same day based on current levels of fuel and water unless additional funds were provided immediately.  A copy of the Notice Letter is attached to the Motion as Exhibit E.

19.    TZCH promptly requested supporting documentation for the Debtor Member's assertions that funds were *immediately* necessary to maintain fuel and water for the JV's operations to continue.  Exhibit 3.  In response, Ahsan Faiz, Vice President of PEC for the Debtors

---

[7] The top portion of Exhibit 4 is redacted for privilege as it is a communication between TZCH and its counsel.

admitted that fuel and water were ***paid for with a credit card***, not directly from the JV Accounts, which obviated the crisis that the Debtor Member claimed.  Exhibit 3.  The Debtor Member's asserted dire need for ***immediate*** funding for fuel and water appears to have been false and designed to fabricate an emergency to support the Motion.

### D.  The Motion

20.    At approximately 1:30 am on October 11, 2022, the Debtors filed the Motion. While the Court briefly addressed the Motion on October 11, 2022, no evidentiary hearing was held and no findings were made regarding any alleged stay violation.  The Court set a preliminary hearing for the Motion for November 7, 2022, during which an evidentiary hearing will subsequently be scheduled if necessary.  The Court also set October 31, 2022, as TZCH's deadline to respond to the Motion.

### E.  TZCH continued to cooperate with the Debtors and the Debtor Member to ensure that the JV's expenses were paid in the ordinary course of business.

21.    Immediately after the hearing on October 11, 2022, representatives from the Debtors, TZCH, and BMO Harris Bank engaged in communications (both teleconferences and emails) to work towards a quick solution to ensure that JV Funds would be available to pay the JV's expenses in the ordinary course of business.  A redacted email chain reflecting some of these communications is attached hereto as **Exhibit 5**.  Since that time, the parties have cooperated in this process, and all JV Funds have been made available to pay all valid JV expenses (including any fees and expenses owed to Debtor Member under the PMA).

### III.    Arguments and Authorities

22.    The Court should deny the Motion. TZCH never violated the automatic stay because its actions were lawfully exercised against a ***non-debtor*** and a ***non-debtor's property***.  The Debtors' conflation of its contractual management ***obligations*** with its contractual ***rights*** to

payment for those services is flatly wrong. Acceptance of the Debtors' assertions of property interests here would expand the scope of the automatic stay to an undefinable extent. Indeed, under the Debtors' theory, any secured lender that exercises remedies against a non-debtor that owes money to a bankrupt debtor would violate the automatic stay because that lender of a non-debtor would be impeding the debtor's ability to be paid. Nothing in the Bankruptcy Code or section 1334 of Title 28 of the United States Code requires or permits such an expansive reach.

23.      The alleged potential stay violations are also not ripe for adjudication. *See, e.g.*, *Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017) (explaining that "litigation must be ripe for decision, meaning that it must not be premature or speculative") (quotations and citations omitted). Even if the Debtors' allegations could be construed to allege that TZCH interfered with the Debtor Member's contractual rights with a non-debtor, such argument fails as a matter of law because there is no evidence that the Debtor Member's contractual rights were ever impaired. In any event, the Bankruptcy Code does not transform such claims into stay violations.

24.      Further, the Debtors have not been harmed by any of TZCH's actions. TZCH has consistently stated its commitment to work with the Debtor Member to ensure that JV Funds are available to pay the JV's expenses, which necessarily includes the Debtor Member's fees and appropriate reimbursements under the PMA. TZCH's actions have been, and continue to be, consistent with such assertions.

25.      Even if the Court were to determine that a stay violation occurred (there was none), the alleged violations do not rise to the level necessary to hold TZCH in civil contempt. The Debtors cannot sustain their burden of proving civil contempt by clear and convincing evidence. *See, e.g.*, *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). At a minimum, there is

at least a reasonable doubt as to whether TZCH's actions had any relation to any property of the Debtors' bankruptcy estates.  Such actions are certainly not the egregious types of behavior for which contempt power is reserved.  This is particularly true here, where TZCH has always made sure that JV Funds are available to pay the JV's expenses.  Any imposition of a monetary penalty here (where the Debtors have not been damaged) would impermissibly rewrite agreements — between non-debtor parties no less.

**A.  *The Motion fails to accurately describe the applicable legal structure and property ownership.***

26.     The Motion obfuscates the true, legal structure and property ownership in an apparent attempt to create a stay violation.  The following chart illustrates many of the Motion's factual inaccuracies and the associated corrections, along with  additional information that was omitted from the Motion:

| Motion | Inaccurate / Misleading Assertions | Corrected Facts |
|--------|-----------------------------------|-----------------|
| ¶ 1 | The Debtor Member and TZCH ***jointly own the King Mountain project*** near McCamey, Texas. | The Debtor Member and TZCH ***jointly own the JV, which is a Delaware limited liability company*** that in turn owns and operates the project referred to as "King Mountain" near McCamey, Texas.  *See also* Motion ¶ 12. |
| ¶¶ 1, 3, 22 | The Debtor Member has a ***contractual right*** to manage and operate the JV. | The Debtor Member has ***contractual obligations and/or duties*** to provide services to the JV.  *See also* Motion ¶ 15 (describing "responsibilities" for the JV, not rights); ¶ 19 (referring to "***its duties as Operator***") (emphasis added); ¶ 23 ("satisfy its ***obligations*** as Operator") (emphasis added).  The Debtor Member's ***contractual rights*** under the PMA are to payment for those services. |

| **Motion** | **Inaccurate / Misleading Assertions** | **Corrected Facts** |
|---|---|---|
| ¶¶ 2, 21 | TZCH unilaterally exercised remedies against the ***Debtor Member.*** <br><br> TZCH exercised ***control over estate property.*** | TZCH did not exercise any remedies against Debtor Member.  TZCH lawfully exercised its contractual collateral rights against ***the JV and the JV Accounts***. |
| ¶¶ 2, 3, 24 | The JV's bank account included amounts owed to the Debtor Member. <br><br> TZCH deprived the Debtor Member of its ability to collect fees and other reimbursable amounts. <br><br> By sweeping cash from the JV bank account, TZCH exercised dominion and control over property of the Debtor Member's bankruptcy estate. | Debtor Member has no ownership interest (legal or equitable) in the JV Accounts or the JV Funds.  ***No funds in the JV Accounts are allocated, earmarked, or otherwise legally restricted for the benefit of the Debtor Member.***  The Debtor Member's right to payments from the JV is merely the Debtor Member's ***contractual right against the JV***.  Such contractual rights to payment do not transform cash in the JV Accounts into estate property. |
| ¶¶ 3, 24 | TZCH deprived the Debtor Member of its ability to collect its distributable share of equity proceeds, which is property of the Debtor Member's bankruptcy estate | Neither the Debtor Member nor TZCH is currently entitled to an equity distribution because the JV does not have any "Available Cash." <br><br> Moreover, the Debtor Member is not entitled to any share of equity proceeds under the JV LLC Agreement so long as the Loan is outstanding.  To the extent that such proceeds are distributed to the Debtor Member, such funds "***shall be held in trust for [TZCH] and shall be delivered immediately to [TZCH]***."  (§ 3.02(b)(i)(F) (emphasis added)). |
| ¶¶ 16, 25 | TZCH has no right to a distribution of the Debtor Member's share of Available Cash during the bankruptcy. | Even if TZCH is not actually paid such funds during the bankruptcy, the Debtor Member is ***required to hold such funds in trust for the benefit of TZCH*** under the JV LLC Agreement. ((§ 3.02(b)(i)(F)). |

**B. *TZCH did not violate the automatic stay because it did not take possession of, or exercise control over, any property of the Debtors' estates.***

27.     The Motion makes only passing references to TZCH's alleged exercise of control over estate property and deprivation of contractual rights.  Motion ¶¶ 2–3, 21–24.  The Debtors appear to be relying on section 362(a)(3) of the Bankruptcy Code for their alleged stay violation.  But a stay violation under section 362(a)(3) requires that a party take possession of, or exercise control over, estate property.  TZCH clearly did not take any such action.  While the Debtor Member's actual income from (and its right to future payments for) services it provides to the JV are property of its estate, TZCH did not take possession of, or exercise any control over, either of those.  TZCH did not take possession of, or exercise control over, any of the Debtors' funds, and the Debtors have no property rights in or to any of the JV Accounts or the JV Funds.  Taking control over bank accounts holding non-debtor funds that are not held as special deposits earmarked for any particular person or purpose is not taking possession of, or exercising control over, a debtor's contractual right to future payments.[8]  The below annotated excerpt of the Debtors' organizational chart from the First Day Declaration further illustrates the inapplicability of the automatic stay to the non-debtor property at issue.

---

[8] It remains unclear how anyone can take possession of, or exercise control over, an intangible contractual right to future payments.  Even if a party was unable to fulfill its contractual payment obligation because its secured lender exercised its lawful remedies against that party's bank accounts and cash, that contractual right to be paid remains unaffected.



28.     As demonstrated in the chart above, TZCH's exercise of remedies related solely to non-debtor property, which the Debtors seemingly concede are **not** property of their estates.  *See* Motion ¶¶ 2–3, 19 (referring to the JV's bank accounts, not Debtors' bank accounts); *see also* Cash Management Motion ¶¶ 10–11, Ex. B (describing and listing the Debtors' bank accounts, which do not include the JV Accounts); Debtor Member's Schedule A/B, Doc. No. 323, p.13–19 of 29. None of the JV Funds are held specifically for the Debtor Member; the Debtor Member, therefore, has no property right in or to the JV Funds.  TZCH plainly did not violate the automatic stay because it did not take possession of, or exercise control over, any property of the Debtors' estates.

*See, e.g.*, *Freeman v. Cal. Franchise Tax Bd.*, No. 18-cv-04501-CRB, 2019 WL 3412938, at *7 (N.D. Cal. July 29, 2019) ("The automatic stay cannot 'create' a right to freeze assets that [a debtor] did not have when [it] filed for bankruptcy.").

      1.   *The Debtor Member's duties and obligations as Operator of the JV are not property of its bankruptcy estate.*

29.    In an attempt to create a stay violation, the Debtors assert that TZCH's actions somehow infringed on the Debtor Member's contractual ***rights***. Motion ¶¶ 3, 21–23. The Motion, however, only describes the Debtor Member's contractual ***obligations*** related to the services it is ***obligated*** to provide to the JV under the PMA. The Debtor Member's contractual ***obligations*** are not property of the Debtors' estates; obligations are burdens, not benefits. Creative wordsmithing to create the illusion that a contractual ***obligation*** is actually a contractual ***right*** does not transform such ***obligation*** into a ***right***.[9]

30.    The Debtors' attempt to recharacterize the Debtor Member's contractual ***obligations*** as contractual ***rights*** cannot support their claim of a stay violation. The automatic stay "cannot require that every party who acts in resistance to the debtor's view of its rights violates § 362(a) if found in error by the bankruptcy court." *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1473 (D.C. Cir. 1991). The Debtors did not—and cannot—cite any authority establishing property rights in or to contractual ***obligations*** because there are none. The authorities cited in the Motion that stand for the proposition that a debtor's contractual ***rights*** are property of the estate are wholly irrelevant to this set of facts. Notably, the case that the Debtors seem to rely upon most, *In re Fontainebleau Hotel Corp.*, 508 F.2d 1056 (5th Cir. 1975), is not only irrelevant, but was decided

---

[9] The Debtors could not even maintain their conflation of contractual ***rights*** with contractual ***obligations*** throughout the entire Motion. *Compare* Motion ¶¶ 1, 3, 22 (asserting the Debtor Member has a *contractual **right*** to manage and operate the JV) *with* Motion ¶ 15 (describing "responsibilities" for the JV, not rights); Motion ¶ 19 (referring to "its ***duties*** as Operator") (emphasis added); *and* Motion ¶ 23 ("satisfy its ***obligations*** as Operator") (emphasis added); *see also* PMA §§ 2.1, 3.1–3.8 (describing some of the Debtor Member's duties and obligations under the PMA).

under the Bankruptcy Act of 1898. 508 F.2d at 1058–59. Section 541's definition of property of the estate differs from that in the old Bankruptcy Act. *See, e.g.,* 11 U.S.C. § 541(d) (providing that property held in trust by the debtor at the time of the bankruptcy filing is not included in a debtor's estate regardless of any possessory interest the debtor has on the petition date). The Debtors' argument that its contractual ***obligations*** become property of the estate on the Petition Date is contrary to the vast body of case law holding that a debtor's bankruptcy "estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1662–63 (2019).[10] No matter how the Debtors characterize the Debtor Member's ***obligations*** under the PMA, they remain its ***obligations***, **not** property ***rights.***

2. *The Available Cash is not property of the Debtors' bankruptcy estates.*

31.     The Debtors alternatively argue that "the proceeds of [the Debtor Member's] equity in the" JV is somehow affected by TZCH's exercise of remedies against the JV's property. Motion ¶ 24. The Debtors point to the Debtor Member's right to equity distributions of "Available Cash" under the JV LLC Agreement. Motion ¶¶ 1, 16; JV LLC Agreement §§ 3.02(b)(i)(D), 6.01. As an initial matter, the record will reflect that the JV does not have any "Available Cash" to distribute. Beyond that, the Debtors fail to fully explain the limitations on the Debtor Member's rights to distributions of Available Cash. The Debtors omitted the most important provision that unquestionably removes such right from being property of the estate: any property or cash proceeds received by the Debtor Member in contravention of the JV LLC Agreement ***shall be held in trust for the benefit of TZCH***. JV LLC Agreement § 3.02(b)(i)(F). It is undisputed that the Debtor Member is not contractually entitled to receive any Available Cash so long as the Loan is

---

[10] *See also, e.g.*, H.R. Rep. No. 95 595, 95th Cong., 1st Sess. 367–68 (1977) (Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case.").

outstanding.  As such, any receipt of Available Cash would necessarily be in contravention of the JV LLC Agreement, and none of the Available Cash could ever become property of the Debtors' estates, as those funds would be held in trust for TZCH.

32.    None of the authorities cited by the Debtors address property held in trust for the benefit of a non-debtor.  And there are no authorities that treat property held in trust for a non-debtor as property of a debtor's bankruptcy estate.  Section 541(d) of the Bankruptcy Code provides the exact opposite — that property held in trust by a debtor for a non-debtor is excluded from the debtor's estate.  11 U.S.C. § 541(d); *see also, e.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) (explaining that filing bankruptcy "simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankruptcy must be recognized and respected in bankruptcy").  Courts have consistently interpreted section 541(d) such that when a debtor holds property in trust for the benefit of a non-debtor, the debtor "should convey the property to its rightful owner."  *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (citations omitted).  Accordingly, even if the Debtor Member receives any Available Cash, that Available Cash would not be property of its estate because it would be merely holding such funds in trust for the benefit of TZCH.  *See, e.g.*, *Begier v. Internal Revenue Service*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate).

*3.    None of the Debtors owned or possessed any of the JV Funds.*

33.    The Debtors assert that fees and reimbursements "that are currently due and payable" are property of the debtors' estates.  Motion ¶ 24.  As an initial matter, there is no

evidence that JV Funds have not been made available to pay any fees or reimbursements that may come due to the Debtor Member under the PMA. Regardless, the Debtors fail altogether to explain how such contractual right to payment gives the Debtor Member a direct interest in the JV Funds and/or the JV Accounts. The JV LLC Agreement specifically prohibits any JV property from being deemed to be owned by any Member individually. JV LLC Agreement § 4.04. The JV Accounts are **<u>not</u>** property of the Debtors' estates, as the Debtors concede. *See* Motion ¶¶ 2–3, 19 (referring to the JV's bank accounts, not Debtors' bank accounts); *see also* Cash Management Motion ¶¶ 10–11, Ex. B (describing and listing the Debtors' bank accounts, which do not include the JV Accounts); Debtor Member's Schedule A/B, Doc. No. 323, p.13–19 of 29.

34.    Similarly, the JV Funds are **<u>not</u>** property of the Debtors' estates. The Debtors did not (and do not) own or possess any of the JV Funds in the JV Accounts.[11] There are two types of bank deposits in Texas: general and special. *Hudnall v. Tyler Bank & Trust Co.*, 458 S.W.2d 183, 186 (Tex. 1970); *Hodge v. Northern Trust Bank of Texas, N.A.*, 54 S.W.3d 518, 522 (Tex. App.— Eastland 2001, *pet. denied*). Ordinarily, funds deposited with a bank become a general deposit and such funds are ***owned by the bank***. *Hudnall*, 458 S.W.2d at 186; *Carson Energy, Inc. v. Riverway Bank*, 100 S.W.3d 591, 598–99 (Tex. App.—Texarkana 2003, *pet. denied*). Such general deposit creates a "debtor-creditor relationship between ***a bank and a customer***." *Compass Bank v. Calleja-Ahedo*, 569 S.W.3d 104, 109 (Tex. 2019) (quoting *FDIC v. Lenk*, 361 S.W.3d 602, 606 (Tex. 2012)) (emphasis added); *Hudnall*, 458 S.W.2d at 186. To be a special deposit, the deposit must be accompanied by an agreement that the identical deposit will be returned or paid out for a special purpose. *Hudnall*, 458 S.W.2d at 186. No such agreement existed regarding the

---

[11] The Debtors asserted that the JV Accounts "include[d] amounts owed to" the Debtor Member, but the Debtors never alleged that they owned or possessed any of the JV Funds. Motion ¶ 2. The Debtors cannot allege that they owned or possessed any of the JV Funds because they did not.

Account.  Even if such an agreement existed, any claim to the funds being released to any party except the Debtor Member would be a claim against the bank under that agreement, not TZCH. Accordingly, any action taken against the JV Funds is not taking possession of or exercising control over property of the Debtors' estates.

### C. *TZCH lawfully exercised its contractual remedies against a non-debtor and non-debtor property to which it had superior rights.*

35.    TZCH acted lawfully within its rights against the JV Accounts and the JV Funds therein, which are not property of the Debtors' estates.  The Debtors' grievances amount to allegations that when TZCH exercised its rights against a non-debtor, the non-debtor ***might not*** be able to fulfill its payment obligations to the Debtor Member.  *See* Motion ¶ 3 (alleging that TZCH deprived the Debtor Member of "its ***ability to collect***" funds it believes it is owed) (emphasis added) and ¶ 23 (alleging it "has no way to satisfy its obligations as Operator").  The Debtors' have not cited any authority that would prohibit TZCH's absolute right to exercise its contractual rights over a non-debtor and non-debtor collateral.

36.    Filing bankruptcy does not elevate a debtor's claims for fees against a non-debtor contract counterparty such that it primes that counterparty's secured lender's existing first priority security rights in the counterparty's accounts.  To the contrary, the Debtors "cannot possess anything more than [they] did outside bankruptcy." *Mission Prod. Holdings, Inc.*, 139 S. Ct. 1652, 1662–63 (2019).[12]

---

[12] *See also, e.g.*, H.R. Rep. No. 95 595, 95th Cong., 1st Sess. 367–68 (1977) (Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case.").

### D. The future potential alleged stay violations are procedurally and substantively wrong.

37.    The Debtors' allegations of future potential stay violations should be dismissed as not ripe for adjudication.  *See, e.g.*, *Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017) (explaining that "litigation must be ripe for decision, meaning that it must not be premature or speculative") (quotations and citations omitted).  Specifically, the Debtors' complaints regarding Available Cash contemplate a potential future issue because there is no evidence that the JV has any Available Cash.  The Debtors' concerns over potential JV equity distributions are simply not ripe for adjudication because the potential events described by the Debtors have not occurred.

38.    Even if the allegations of future potential stay violations were ripe for adjudication, such allegations should be dismissed because they substantively fail as a matter of law.  At best, the Debtors misunderstand the provisions of the JV LLC Agreement.  Specifically, the Debtors assert that a ***distribution*** of the Debtor Member's 50% of Available Cash to TZCH "is prohibited under the Bankruptcy Code," and therefore, "such a ***distribution*** is not permissible under" the JV LLC Agreement.  Motion ¶ 24 (emphasis added).  As described above, the Debtors failed to explain that any property or funds received by the Debtor Member in contravention of the JV LLC Agreement (including any proceeds thereof) "***shall be held in trust for [TZCH] and shall be delivered immediately to [TZCH]***."  JV LLC Agreement § 3.02(b)(i)(F) (emphasis added).  The Debtors' future potential alleged stay violations should be dismissed as procedurally and substantively deficient.

### E. The Debtors are not entitled to turnover of property that is not property of their estates.

39.    The Debtors request for "turnover of all amounts due" to the Debtor Member is also procedurally deficient.  Motion ¶¶ 5, 20, 28.  Presumably, the Debtors request such relief pursuant to section 542(b) of the Bankruptcy Code.  *See, e.g.*, *Fulton*, 141 S. Ct. at 590 (explaining

that section 542 "expressly governs the turnover of estate property"). Such relief, however, must be requested in an adversary proceeding. Bankruptcy Rule 7001. Accordingly, the Debtors' request for turnover should be denied as procedurally improper.

40. The Debtors request for turnover is also substantively defective. The JV Accounts and JV Funds are not property of the estate. Moreover, the Motion was directed to TZCH, not the JV. TZCH is not "an entity that owes a debt that is property of the estate." 11 U.S.C. § 542(b). Article 4 of the PMA contemplates that the Debtor Member delivers an invoice for Fees to the JV and provides a process in the event the JV disputes any portion of such an invoice. PMA § 4.1–4.2. Nothing in these provisions obligates TZCH to pay the Debtor Member anything. In any event, the record is clear that TZCH has ensured that JV Funds are available to pay the Debtor Member any amounts that it is owed for its services provided to the JV under the PMA. Even if the Debtors brought such claim against the JV, they cannot use section 542(b) to liquidate any disputed amounts they alleged are owed. *See, e.g.*, *Flagship Hotel, Ltd. v. City of Galveston (In re Flagship Hotel, Ltd.)*, No. 04-81356–G3–11, Adv. No. 05-8042, at * (Bankr. S.D. Tex. Feb. 16, 2007) ("Courts construing subsection (b) [of section 542] have concluded that to recover money, a defendant's liability must be undisputed."). The Debtors request for turnover is procedurally and substantively improper and should be denied.

### F. The Debtors were not harmed by TZCH's actions.

41. The Debtors' broad assertion that "[t]he Debtors and their estates have a critical need for cash" and unsubstantiated assertion that the JV's operations were "at risk" and facing "imminent and irreparable harm" fail to establish any harm whatsoever. Motion ¶¶ 26, 29. In reality, the Debtors suffered no harm resulting from TZCH's exercise of remedies against the JV Accounts and the JV Funds therein. In fact, the Debtors only asserted an imminent threat to the JV's operations *after* receiving the Response Letter explaining how there was no violation of the

automatic stay.  *Compare* Exhibit 2 *with* Exhibit E to the Motion.  Even then, the Debtors' responses to requests for details and documentation of such imminent need for cash proved that no such imminent need existed.  Exhibit 3.

42.     The Debtors need for cash (critical or otherwise) is irrelevant to the Debtor Member's ability to access the JV Account.  The JV Accounts do not belong to the Debtors, and the Debtors cannot use the JV Funds for their own purposes.  The evidence will show that there was never any risk to the JV's operations.  As explained above, TZCH was cooperating (and continues to cooperate) to ensure that JV Funds were, and are, made available to pay the JV's expenses (including the Debtor Member's fees and reimbursements) so that the JV continues operating.  To do otherwise would be contrary to TZCH's interest and risk its substantial investment in the JV.  Any allegation that TZCH refused to allow the JV's expenses to be paid is noticeably absent in the Motion because that never happened.[13]  When asked for the documentation of expenses due that allegedly could not be paid and would force a shutdown of the JV's operations, the Debtors sent documentation that showed there was no such threat.  The expenses allegedly due immediately were being ***paid for with a credit card***, not directly from the JV Accounts.  Exhibit 3.

43.     Nevertheless, TZCH began working with the Debtors immediately upon notice of a possible issue to ensure that the JV continued operating and the JV's expenses were paid in the ordinary course of business.  Exhibit 3.  The Debtors' business representatives were involved and aware that TZCH acting as quickly as possible.  Exhibit 3.  Given the banking holiday, there was no way for TZCH to take action any quicker.

---

[13] The Debtors only asserted that the August fee "has been finalized and invoiced," but do not assert that the JV or TZCH ever refused to allow such fee to be paid.  Motion n.9.  The Debtors conceded that "the September amounts are ***still being reconciled***."  *Id.* (emphasis added).

44.     In light of these circumstances, the only harm that the Debtors could possibly have incurred is self-inflicted – the incurrence of unnecessary professional fees for filing the Motion as an emergency when it was baseless.  The Debtors knew that there was no stay violation and that the business representatives had made arrangements to ensure the JV's expenses would be paid. Exhibit 3; Exhibit 4.  The Debtors should not be rewarded for filing the Motion to artificially create an emergency and "harm" where none existed.

### G.   *Even if the Court finds that TZCH violated the automatic stay, contempt is inappropriate.*

45.     The Debtors only basis for their contempt request is section 105 of the Bankruptcy Code.[14]  Motion, ¶¶ 5, 20, 27–28.  The Debtors must prove all elements of civil contempt by clear and convincing evidence.  *See, e.g.*, *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013).

46.     A bankruptcy court can only hold a party in civil contempt pursuant to section 105 of the Bankruptcy Code "if there is no fair ground of doubt as to whether the order barred the creditor's conduct." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019).[15]  The *Taggart* standard "reflects the fact that civil contempt is a severe remedy and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* at 1802 (citations omitted).[16]  Although *Taggart* concerned holding a creditor in contempt for violating a discharge order, courts have applied the *Taggart* standard to civil

---

[14] The Debtors cannot obtain damages (if they had any) under section 362(k) of the Bankruptcy Code because that provision only applies to individuals.  11 U.S.C. § 362(k); *see, e.g.*, *West v. Peterson (In re Noram Res., Inc.)*, Nos. 08-38222, 11-03598, 2015 WL 5965654, at *4 (Bankr. S.D. Tex. Oct. 9, 2015) (Isgur, J.).

[15] Importantly, all of the cases that the Debtors cite to support their request for contempt and sanctions were decided before *Taggart*.  Motion ¶ 27.

[16] To support contempt, an order—here, the automatic stay—must leave "no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden." *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989) (citations omitted).

contempt actions under section 105 of the Bankruptcy Code for automatic stay violations.  *See, e.g., In re Windstream Holdings, Inc.*, No. 21-CV-4552 (CS), 2022 WL 5245633, at *9–12 (holding that even if the defendant had violated the automatic stay, the bankruptcy court abused its discretion by holding the defendant in contempt under the determine whether a creditor should be held in contempt under the *Taggart* "fair ground of doubt" standard); *In re GYPC, Inc.*, 634 B.R. 983, 991 (Bankr. S.D. Ohio 2021) (applying the *Taggart* standard and holding that "corporate debtors cannot pursue stay violations under the willful 'akin to strict liability' stay violation standard because it is inconsistent with" *Taggart*).

47.    "[C]lose questions of interpretation [of an injunction] are resolved in the defendant's favor." *Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995). Similarly, courts have held that close calls on violations of the automatic stay do not merit contempt.  *See, e.g.*, *In re Windstream Holdings, Inc.*, 2022 WL 5245633, at *11–12 (explaining that the bankruptcy court's conclusions were "highly debatable" because "[t]he plain language of the automatic stay does not clearly proscribe the conduct here").  Simply put, the Debtors cannot satisfy their high burden for contempt here.

48.    **First**, as explained above, TZCH did not violate the automatic stay.  TZCH lawfully exercised remedies against a non-debtor and non-debtor property.  TZCH should not be held in contempt, and no sanctions should be imposed.  *In re Walton*, 158 B.R. 943 (Bankr. N.D. Ohio 1993) (denying motion for contempt regarding property in which the debtor had no interest and finding the debtors' allegations of a stay violation meritless); *Freeman*, 2019 WL 3412938, at *7 ("The automatic stay cannot 'create' a right to freeze assets that [a debtor] did not have when [it] filed for bankruptcy.").

49.     **Second**, even if the Court finds that TZCH violated the automatic stay, there was a fair ground of doubt as to whether such actions against a non-debtor and non-debtor property were barred by the automatic stay.  *Taggart*, 139 S. Ct. at 1799.  "Even if [this Court] were to accept the theory of the stay violation here … it is not an objectively obvious reading of the statute or the caselaw."  *In re Windstream Holdings, Inc.*, 2022 WL 5245633, at *11.

50.     **Third**, TZCH was not required to first prove in this Court its good-faith, logical interpretation of the relevant agreements prior to acting in accordance with its view, because "there is no requirement that the would-be violator move to lift the stay prior to acting."  *Id.* (citing *Taggart*, 139 S. Ct. at 1803).

51.     **Finally**, the Debtors were not harmed, and TZCH at all times has worked to ensure that JV Funds are available to pay the JV's expenses, including the fees and reimbursements to the Debtor Member.

52.     The Debtors seek to unfairly weaponize the automatic stay by attempting to characterize the Debtor Member's ***obligations*** as property ***rights*** and omitting key provisions of the controlling agreements that negate the Debtors' claim of stay violations.  *See In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015) ("The [automatic] stay is not meant . . .  to be used by a debtor to pursue it creditors, as more litigation is hardly consistent with the concept of a breathing spell for the debtor.  Instead, the stay is a shield, not a sword.") (quotations and citations omitted).  The Debtors should not be rewarded for taking such approach.  *See, e.g.*, *In re Walton*, 158 B.R. at 947 (explaining that "[t]he unnecessary consumption of judicial resources in administering Debtors' case will not be condoned" after finding the debtors' allegations of a stay violation meritless).  TZCH should not be held in contempt, and the Motion should be denied.

## IV.    **Conclusion**

53.     For all of the reasons explained above, TZCH requests the Court deny the Motion in total and grant such other and further relief as the Court deems just and appropriate.


Dated: October 31, 2022                         Respectfully submitted,


                                                */s/  Stephen M. Pezanosky*
                                                Stephen M. Pezanosky
                                                State Bar No. 15881850
                                                **HAYNES AND BOONE, LLP**
                                                301 Commerce Street, Suite 2600
                                                Fort Worth, TX 76102
                                                Telephone: 817.347.6600
                                                Facsimile:  817.347.6650
                                                Email: stephen.pezanosky@haynesboone.com

                                                and

                                                David Trausch
                                                State Bar No. 24113513
                                                **HAYNES AND BOONE, LLP**
                                                1221 McKinney Street, Suite 4000
                                                Houston, TX 77010
                                                Telephone: 713.547.2000
                                                Facsimile:  713.547.2600
                                                Email: david.trausch@haynesboone.com

                                                *Counsel for TZ Capital Holdings LLC*


### **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 31, 2022, true and correct copies of the foregoing were served via electronic mail upon the parties that receive electronic notices in these cases pursuant to the Court's ECF filing system.

                                                */s/  Stephen M. Pezanosky*
                                                Stephen M. Pezanosky