**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-90273 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 91, 256, & 331** |

**NOTICE OF REVISED ASSET PURCHASE AGREEMENT
RELATING TO SUCCESSFUL BIDDER FOR CN PLEDGOR ASSETS**

**PLEASE TAKE NOTICE THAT:**

1.        On September 26, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a motion [Docket No. 91] (the "Sale Motion")[2] seeking, among other things, approval of the sale of all or substantially all or any subset of the Debtors' assets.

2.        On October 24, 2022, the Court entered an order [Docket No. 256] (the "Bidding Procedures Order") approving certain bidding procedures in connection with the proposed sale of the Debtors' assets pursuant to the Sale Motion.

3.        At the Bid Deadline, the Debtors had received only one Qualifying Bid for the 100 percent equity interests owned by Debtor CN Pledgor LLC ("CN Pledgor") in non-Debtor

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238).  The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

CN Borrower LLC (together with any related executory contracts or unexpired leases to be designated by the Purchaser (defined below), if any, the "CN Pledgor Assets").

4.　　On October 28, 2022, the Debtors filed the *Notice of Successful Bidder for CN Pledgor Assets* [Docket No. 331] (the "Successful Bidder Notice"), notifying parties in interest that, pursuant to the Bidding Procedures Order, the Debtors have designated Generate Lending, LLC or its designee, including an affiliate formed for purposes of taking title to the CN Pledgor Assets, (the "Purchaser") as the Successful Bidder for the CN Pledgor Assets.

5.　　A copy of the *Purchase and Sale Agreement* between CN Pledgor and the Purchaser for the sale of the CN Pledgor Assets, in substantially final form, was attached to the Successful Bidder Notice as Exhibit A (the "Initial Purchase Agreement").

6.　　The Debtors hereby file the executed version of the *Purchase and Sale Agreement* between CN Pledgor and the Purchaser for the sale of the CN Pledgor Asset, attached hereto as **Exhibit A** (the "Revised Purchase Agreement"), which incorporates certain changes agreed upon by the parties.  For the convenience of the Court and parties in interest, a redline of the Revised Purchase Agreement marked against the Initial Purchase Agreement is attached hereto as **Exhibit B**.

[*Remainder of Page Intentionally Left Blank*]

Dated: October 31, 2022
    Houston, Texas

/s/ *James T. Grogan III*

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Luc Despins (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Daniel Ginsberg  (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email:  lucdespins@paulhastings.com
       sayanbhattacharyya@paulhastings.com
       danielginsberg@paulhastings.com

-and-

Matthew Micheli (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100
Email:  mattmicheli@paulhastings.com
       michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on October 31, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ James T. Grogan III*
James T. Grogan III

## Exhibit A

**Revised Purchase Agreement**

[Execution Copy]

**PURCHASE AND SALE AGREEMENT**

**BY AND BETWEEN**

**GC Data Center Equity Holdings, LLC,**

**as Purchaser,**

**and**

**CN Pledgor LLC,**

**as Seller**

**Dated as of October 31, 2022**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF ACQUIRED INTERESTS; ASSUMPTION OF LIABILITIES ................................................................................................ 1

Section 1.1     Purchase and Sale of Acquired Interests ............................................ 1
Section 1.2     Assigned Contracts ............................................................................ 1

ARTICLE II CONSIDERATION ................................................................................... 3

Section 2.1     Consideration ...................................................................................... 3
Section 2.2     Payment of Cash Purchase Price ........................................................ 3
Section 2.3     Allocation of Purchase Price .............................................................. 3

ARTICLE III CLOSING AND TERMINATION .......................................................... 4

Section 3.1     Closing ................................................................................................ 4
Section 3.2     Closing Deliveries by the Seller ........................................................ 4
Section 3.3     Closing Deliveries by the Purchaser ................................................... 5
Section 3.4     Termination of Agreement ................................................................. 5
Section 3.5     Effect of Termination ......................................................................... 6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ........... 7

Section 4.1     Organization and Qualification .......................................................... 7
Section 4.2     Authority Relative to This Agreement ............................................... 7
Section 4.3     Conflicts; Consents and Approvals .................................................... 8
Section 4.4     Title .................................................................................................... 9
Section 4.5     Capitalization ..................................................................................... 9
Section 4.6     Financial Statements .......................................................................... 9
Section 4.7     Undisclosed Liabilities ....................................................................... 9
Section 4.8     Absence of Changes ........................................................................... 9
Section 4.9     Litigation ............................................................................................ 9
Section 4.10    Intellectual Property; IT Assets ...................................................... 10
Section 4.11    Material Contracts; Assigned Contracts .......................................... 11
Section 4.12    Wolf Hollow .................................................................................... 12
Section 4.13    Kearney ........................................................................................... 12
Section 4.14    Permits ............................................................................................ 12
Section 4.15    Brokers and Finders ........................................................................ 13
Section 4.16    Real Property ................................................................................... 13
Section 4.17    Tax Returns; Taxes ......................................................................... 13
Section 4.18    Insurance Policies ........................................................................... 15
Section 4.19    Environmental Matters .................................................................... 15
Section 4.20    Affiliate Arrangements; Seller Credit Support ............................... 16
Section 4.21    Condition of Assets ......................................................................... 16
Section 4.22    Books and Records .......................................................................... 16
Section 4.23    Employees Matters .......................................................................... 16
Section 4.24    NO OTHER REPRESENTATIONS ................................................ 17

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ... 17

Section 5.1     Organization and Qualification ........................................................ 17
Section 5.2     Authority Relative to This Agreement ............................................. 17
Section 5.3     Conflicts; Consents and Approvals .................................................. 17

Section 5.4     Financial Capacity ..................................................................................... 18
Section 5.5     Brokers and Finders ................................................................................... 18
Section 5.6     Qualification ............................................................................................... 18
Section 5.7     Independent Investigation; Reliance By the Purchaser ............................. 18
Section 5.8     RELIANCE/ACKNOWLEDGMENT ......................................................... 19
Section 5.9     NO OTHER REPRESENTATIONS ............................................................ 19

ARTICLE VI COVENANTS AND AGREEMENTS ........................................................... 20

Section 6.1     Conduct of Seller ....................................................................................... 20
Section 6.2     Taxes .......................................................................................................... 22
Section 6.3     Insurance .................................................................................................... 23
Section 6.4     Access ......................................................................................................... 23
Section 6.5     Confidentiality; Non-Solicitation .............................................................. 24
Section 6.6     Publicity ..................................................................................................... 24
Section 6.7     Wrong Pocket ............................................................................................. 24
Section 6.8     Use of Excluded Names ............................................................................. 25
Section 6.9     Access and Preservation of Records .......................................................... 25
Section 6.10    Further Assurances ..................................................................................... 26
Section 6.11    Interconnection Process ............................................................................. 26
Section 6.12    Minden Assignment ................................................................................... 26
Section 6.13    Employee Matters ...................................................................................... 27
Section 6.14    Specified Bond GIA ................................................................................... 27
Section 6.15    Wolf Hollow; Kearney ............................................................................... 27
Section 6.16    Removal of Certain Equipment .................................................................. 28
Section 6.17    Atlas ........................................................................................................... 28

ARTICLE VII CONDITIONS TO CLOSING ................................................................... 28

Section 7.1     Conditions Precedent to the Obligations of the Purchaser and the Seller ........ 28
Section 7.2     Conditions Precedent to the Obligations of the Seller ............................... 29
Section 7.3     Conditions Precedent to the Obligations of the Purchaser ........................ 29

ARTICLE VIII ADDITIONAL DEFINITIONS ................................................................ 30

Section 8.1     Certain Definitions ..................................................................................... 30
Section 8.2     Additional Defined Terms .......................................................................... 38

ARTICLE IX MISCELLANEOUS ..................................................................................... 40

Section 9.1     Payment of Expenses .................................................................................. 40
Section 9.2     Survival of Representations, Warranties; and Covenants ........................... 40
Section 9.3     Entire Agreement; Amendments and Waivers ........................................... 40
Section 9.4     Counterparts ............................................................................................... 41
Section 9.5     Governing Law ........................................................................................... 41
Section 9.6     Jurisdiction, Waiver of Jury Trial .............................................................. 41
Section 9.7     Notices ........................................................................................................ 42
Section 9.8     Binding Effect; Assignment ....................................................................... 43
Section 9.9     Severability ................................................................................................. 43
Section 9.10    Injunctive Relief ......................................................................................... 43
Section 9.11    Third Party Beneficiaries ............................................................................ 43
Section 9.12    Non-Recourse ............................................................................................. 44
Section 9.13    Time of the Essence .................................................................................... 44
Section 9.14    Disclosure ................................................................................................... 44
Section 9.15    Certain Interpretations ................................................................................ 44

**Exhibits**

Exhibit A                    Form of Release


**Schedules**

Schedule 1.2(a)        Assigned Contracts
Schedule 3.2(d)        Business Employees
Schedule 4.5           Capitalization
Schedule 4.10          Intellectual Property
Schedule 4.12          Wolf Hollow
Schedule 4.13          Kearney
Schedule 4.16          Real Property
Schedule 4.18          Insurance Policies
Schedule 4.20          Affiliate Contracts
Schedule 6.17          Removal of Certain Equipment

## PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of October 31, 2022 (the "Execution Date"), by and between (a) CN Pledgor LLC, a Delaware limited liability company (the "Seller"), and (b) GC Data Center Equity Holdings, LLC, a Delaware limited liability company (the "Purchaser"). Article VIII contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, the Seller and certain of its Affiliates have filed voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"); and

WHEREAS, the Seller desires to sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept from the Seller, all of the Seller's right, title and interest in and to 100% of the equity interests in CN Borrower LLC (the "Company") that are owned by the Seller (such equity interests, the "Acquired Interests") in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ACQUIRED INTERESTS; ASSUMPTION OF LIABILITIES

Section 1.1    Purchase and Sale of Acquired Interests. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances (other than Encumbrances arising under applicable securities Laws and Encumbrances created by the Purchaser), all of the Seller's right, title and interest in and to the Acquired Interests.

Section 1.2    Assigned Contracts.

(a)    Schedule 1.2(a) sets forth each executory Contract to which the Seller or any of its Affiliates (other than the Acquired Companies) is a party and primarily related to the Business or which is a Customer Contract that Seller or its Affiliates have proposed to assign (including partially assign) to one or more of the Acquired Companies (collectively, the "Additional Business Contracts") and Seller's good faith estimate of the Cure Costs applicable to each such Additional Business Contract. At any time prior to the Designation Deadline, Purchaser shall have the right to provide written notice to Seller of any Additional Business Contract it desires to acquire (such written notice, an "Inclusion Notice" and any such Additional Business Contract identified in an Inclusion Notice, an "Assigned Contract"). The Seller shall, or the Seller shall cause its applicable Affiliate to, take all reasonable actions required to assume and assign any such Assigned Contract to the applicable Acquired Company identified by Purchaser in the Inclusion Notice

(other than payment of the Cure Costs, which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain an Order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Assigned Contracts to the applicable Acquired Company satisfies all applicable requirements of section 365 of the Bankruptcy Code (an "Assumption Order"). The Purchaser shall, prior to the hearing before the Bankruptcy Court seeking entry of an Assumption Order, provide all such information or documentation reasonably requested to satisfy all requirements under section 365 of the Bankruptcy Code necessary to assume and assign to the applicable Acquired Company the Assigned Contracts (including, without limitation, by providing "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code)).

(b)     Subject to Section 1.2(d), promptly following the date on which the Bankruptcy Court enters an Assumption Order with respect to any Assigned Contract (but in no event later than one Business Day following such date), (i) the Seller shall, or the Seller shall cause its applicable Affiliate to, pursuant to such Assumption Order and an Assigned Contracts Assignment, assume and assign to the applicable Acquired Company such Assigned Contract (subject to the payment by the Purchaser of the Cure Costs in respect of such Assigned Contract) and (ii) the Purchaser shall pay or cause to be paid (and shall reimburse or cause to be reimbursed to the Seller or its Affiliates any amounts paid prior to the Closing Date in respect of) all Cure Costs (if any) in connection with such assumption and assignment and the Purchaser shall cause the applicable Acquired Company to assume and agree to perform and discharge all obligations and Liabilities under such Assigned Contract, regardless of whether arising before or after the Closing Date (such obligations and Liabilities, together with such Cure Costs, with respect to all Assigned Contracts, the "Assumed Liabilities"), pursuant to such Assumption Order and such Assignment and Assumption Agreement.  For the avoidance of doubt, more than one Assigned Contract can be assumed and assigned to an Acquired Company pursuant to one Assigned Contracts Assignment.

(c)     To the extent that the assignment to an Acquired Company of any Assigned Contract pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained or overridden or canceled by an Assumption Order or other Order of the Bankruptcy Court (such Assigned Contracts, the "Nonassignable Assets"), then such Nonassignable Assets will not be assumed and assigned to the applicable Acquired Company and such failure to assume and assign shall not constitute a breach of this Agreement.

(d)     If any such consent, waiver, confirmation or other approval or waiver of such prohibition is not obtained in respect of a Nonassignable Asset, then the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, solely to the extent not prohibited under applicable Law (including, without limitation, the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Seller shall reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser with the benefits and obligations of such Nonassignable Asset (an "Interim Arrangement"); provided, however, that (i) no Interim Arrangement shall terminate later than the earlier of (A) 180 days after the Closing Date, and (B) the closing of the Chapter 11 Cases (or the date on which the Seller is liquidated or dissolved, if earlier), and (ii) neither the Seller nor any of its Affiliates shall be required to do any of the following in connection with, as part of, or as required by any Interim Arrangement: (A) make any payments, (B) incur, assume, become liable in respect of or suffer to exist any Liabilities, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that would reasonably be likely to result in Liabilities to the Seller or any of its Affiliates, or (C) commence any lawsuit, arbitration or other Action against any Person. The applicable Acquired Company shall be responsible for performing, and the Purchaser shall cause such Acquired Company to perform, all obligations under each such Nonassignable Asset required to be performed by the Seller or its applicable Affiliate after the date on which the Bankruptcy Court enters the

first Assumption Order to the extent that if such Nonassignable Asset were transferred and assigned to such Acquired Company as of such date, the obligations thereunder would have constituted Assumed Liabilities. All Interim Arrangements shall be at the Purchaser's sole cost and expense. If any such consent, waiver, confirmation or other approval or waiver of such prohibition with respect to any Nonassignable Asset is obtained prior to the termination of the applicable Interim Arrangement, then such Nonassignable Asset shall promptly be transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the applicable Assumption Order and the Bankruptcy Code. The Purchaser acknowledges that no adjustment to the Purchase Price shall be made for any Nonassignable Assets. The Seller or its applicable Affiliate shall be permitted to reject any Nonassignable Asset upon the termination of an Interim Arrangement if such Nonassignable Asset has not been assumed and assigned to the applicable Acquired Company prior to the date of such termination.

## ARTICLE II

## CONSIDERATION

Section 2.1    Consideration. The aggregate consideration to be paid by the Purchaser to the Seller for the purchase of the Acquired Interests and the Assigned Contracts shall be as follows:

(a)    cash in the amount of $5,000,000 (the "Cash Purchase Price"); *plus*

(b)    the assumption by the applicable Acquired Company of the Assumed Liabilities (together with the Cash Purchase Price, collectively, the "Purchase Price").

Section 2.2    Payment of Cash Purchase Price. On the Closing Date, the Purchaser shall pay, or cause to be paid, the Cash Purchase Price to the Seller by wire transfer of immediately available funds to the account or accounts of the Seller in accordance with written instructions delivered by the Seller to the Purchaser no less than one Business Day prior to the Closing Date.

Section 2.3    Allocation of Purchase Price. The Purchaser shall, not later than 120 days after the Closing Date, prepare and deliver to the Seller a schedule allocating the Purchase Price (including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes) among the assets of the Acquired Companies in accordance with Section 1060 of the Code and U.S. Treasury Regulations thereunder (such schedule, the "Allocation Schedule"). If the Seller raises any objection to the Allocation Schedule within 30 days after the receipt thereof, the Seller and the Purchaser will negotiate in good faith to resolve such objection(s). If the Seller and the Purchaser are unable to reach an agreement on the Allocation Schedule within 20 days after the Seller first raises any objection to the Allocation Schedule, the Seller and the Purchaser shall each be entitled to report consistently with their own determination. If the Seller does not raise any objection to the Allocation Schedule within 30 days after the receipt thereof, the Seller shall be deemed to have conclusively accepted and agreed to the Allocation Schedule proposed by the Purchaser, and the Seller and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and Form 8594 consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other Action) except as required by a final determination as defined in Section 1313 of the Code; provided, however, that nothing contained herein shall prevent the Seller or the Purchaser from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation Schedule, and neither the Seller nor the Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation Schedule. The Purchaser and the Seller shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation Schedule. The Purchaser and the Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Action challenging

the Allocation Schedule. The parties hereto have been advised that in connection with the Closing, and conditioned on the consummation of the Closing, at the Closing, the parties to the Generate Credit Agreement intend to execute and deliver a payoff and release agreement (the "Payoff and Release Agreement") which will provide that the Generate Payoff Amount shall be deemed paid in full at the Closing and that the Generate Debt Termination Date has occurred. In such case, the parties agree that the Generate Payoff Amount will be treated and deemed as consideration and part of the purchase price for Tax and accounting purposes.

## ARTICLE III

## CLOSING AND TERMINATION

Section 3.1   Closing. Upon the terms and subject to the conditions contained in this Agreement, the closing of the sale of the Acquired Interests contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of electronic documents and signatures by electronic mail at 10:00 a.m. (New York time) on a date that is no later than the first Business Day following the date on which all of the conditions set forth in Article VII are satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction of any such condition at the Closing), or at such other place, date and/or time as the Purchaser and the Seller may mutually agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date." Upon the completion of all actions required to be taken at the Closing, all such actions shall be deemed to have occurred simultaneously at 12:01 am New York time on the Closing Date.

Section 3.2   Closing Deliveries by the Seller. At or prior to the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser:

(a)   an assignment of the Acquired Interests in a form reasonably acceptable to Purchaser and Seller (the "Assignment and Assumption Agreement"), duly executed by the Seller;

(b)   [Intentionally Deleted]

(c)   a transition services agreement in a form acceptable to Purchaser and Seller (the "TSA"), duly executed by Compute North;

(d)   a waiver of the terms and conditions set forth in (i) Section 4 of the Confidentiality Agreement with respect to the non-solicitation obligations of Generate Lending, LLC as it relates to any person set forth on Schedule 3.2(d) attached hereto (such persons, the "Business Employees") following the TSA Expiration Date and (ii) Section 1, Section 2, Section 3, Section 8 and Section 9 of the Confidentiality Agreement with respect to the Confidential Information of the Acquired Companies ("Acquired Company Information"), in a form reasonably acceptable to the Purchaser and Seller and duly executed by Compute Holdings;

(e)   a termination and release agreement, in a form reasonably acceptable to Purchaser and Seller, pursuant to which the Kearney PMA is terminated and all rights, obligations and claims (excluding claims that are carved out from the release set forth on Exhibit B) arising thereunder (including any rejection damage claim) are released and waived (the "Kearney PMA Termination Agreement"), duly executed by Compute North;

(f)   a termination and release agreement, in a form reasonably acceptable to Purchaser and Seller, pursuant to which the WH PMA is terminated and all rights, obligations and claims (excluding

4

claims that are carved out from the release set forth on <u>Exhibit B</u>) arising thereunder (including any rejection damage claim) are released and waived (the "<u>WH PMA Termination Agreement</u>"), duly executed by Compute North;

(g)    an assignment and assumption agreement, in a form reasonably acceptable to Purchaser and Seller, pursuant to which Kearney assigns all of its right, title and interest in, to and under the Property Purchase Agreement to CN Minden (the "<u>Property Assignment Agreement</u>"), duly executed by CN Minden;

(h)    a duly executed non-foreign person affidavit of the Seller dated as of the Closing Date, sworn under penalty of perjury, and in the form provided at Treasury Regulations § 1.1445-2(b)(2)(iv)(B) or in the form of an IRS Form W-9 as described in Treasury Regulations § 1.1445-2(b)(2)(v); and

(i)    the certificates required to be delivered pursuant to <u>Sections 7.3(a)</u>, <u>7.3(b)</u> and <u>7.3(c)</u>.

Section 3.3    <u>Closing Deliveries by the Purchaser</u>. At or prior to the Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Seller:

(a)    the Cash Purchase Price in accordance with <u>Section 2.2</u>;

(b)    the Assignment and Assumption Agreement, duly executed by the Purchaser;

(c)    the TSA, duly executed by the Purchaser;

(d)    the Kearney PMA Termination Agreement, duly executed by Kearney;

(e)    the WH PMA Termination Agreement, duly executed by Wolf Hollow;

(f)    a termination and release agreement, in a form acceptable to Seller, pursuant to which the Generate Guaranty (including, for the avoidance of doubt, the right of exclusivity and the right of first offer contained therein) and the Generate Pledge Agreement are terminated and all rights, obligations and claims arising thereunder are released and waived, duly executed by the administrative agent, the collateral agent and the lenders under the Generate Credit Agreement; and

(g)    the Property Assignment Agreement, duly executed by Kearney;

(h)    the certificates required to be delivered pursuant to <u>Sections 7.2(a)</u> and <u>7.2(b)</u>.

Section 3.4    <u>Termination of Agreement</u>.

This Agreement may be terminated at any time prior to the Closing as follows:

(a)    by the mutual written consent of the Seller and the Purchaser at any time prior to the Closing;

(b)    by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if the Closing shall not have been consummated on or prior to November 1, 2022 (the "<u>Outside Date</u>"); <u>provided</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the

Seller, as applicable, is then in material breach or violation of any of its representations, warranties, covenants or agreements set forth this Agreement;

(c)    by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if any Governmental Body, including the Bankruptcy Court, shall have enacted, issued, promulgated, enforced or entered any Law (including any Order) that permanently enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement (any such Law, a "Legal Restraint") and such Legal Restraint has become final and nonappealable; provided, that the right to terminate this Agreement under this Section 3.4(c) shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of this Agreement and such breach or violation is the cause of the Legal Restraint;

(d)    by the written notice of the Purchaser to the Seller, if (i) the Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) 30 days after written notice of such breach, failure or occurrence is given to the Seller by the Purchaser; provided, that, at the time of such termination, the Purchaser is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement;

(e)    by the written notice of the Seller to the Purchaser, if (i) the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) 30 days after written notice of such breach, failure or occurrence is given to the Purchaser by the Seller; provided, that, at the time of such termination, the Seller is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement; and

(f)    by written notice of the Seller to the Purchaser, if (i) all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived, (ii) the Seller delivers a written confirmation, duly executed by an authorized representative of the Seller, stating (A) the Seller's desire to close, (B) that all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing and that will be met as of the Closing) or waived and (C) that Seller is ready, willing and able to close and (iii) the Purchaser fails to consummate the Closing on or prior to the first Business Day following delivery of such written confirmation; provided, that during such one Business Day period, the Purchaser shall not be entitled to terminate this Agreement pursuant to Section 3.4(b).

Section 3.5    Effect of Termination.  In the event of the valid termination of this Agreement pursuant to Section 3.4, this Agreement shall terminate and become null and void and of no further force or effect, the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto and there shall be no Liability hereunder on the part of the Seller or any of the other Seller Parties, or the Purchaser or any of the other Purchaser Parties; provided, that (i) the provisions of Section 3.4, this Section 3.5 and Article IX, and any defined terms used in any such Section or Article, shall remain in full force and effect and shall survive the termination of this Agreement; and (ii) no such termination shall relieve any party hereto from Liability for any breach of this Agreement that occurred prior to such

termination (including, without limitation, the Purchaser's failure to consummate the Closing upon satisfaction (or deemed satisfaction) or waiver of the conditions to Closing set forth in <u>Sections 7.1</u> and <u>7.3</u> (other than those conditions which are to be satisfied only on the Closing Date, but subject to the ability of such conditions to be satisfied at the Closing)).  Any termination of this Agreement pursuant to <u>Section 3.4</u> shall be effective on the date that written notice of such termination is given by the terminating party to the other party hereto in accordance with <u>Section 9.7</u>; <u>provided</u>, that in the case of any termination of this Agreement pursuant to <u>Section 3.4(a)</u>, the date of termination shall be the date of termination set forth in the writing signed by the Purchaser and the Seller.  Nothing in this <u>Section 3.5</u> or elsewhere in this Agreement shall be deemed to impair the right of any party hereto to bring any action or actions for specific performance, injunctive and/or other equitable relief (including the right of any party hereto to compel specific performance by another party hereto of its obligations under this Agreement) pursuant to <u>Section 9.10</u> prior to the valid termination of this Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except (x) as set forth in the Seller Disclosure Schedules or (y) with respect to any representation or warranty relating to any of the Acquired Companies, any exception arising as a direct result of (A) any action (or inaction) taken (or omitted to be taken) (1) with the approval of the board of managers of the Company on or after August 12, 2022, (2) by any Person pursuant to a grant of authority (either specific or general) provided by the board of managers of the Company on or after August 12, 2022 or (3) by the Purchaser, any Affiliates of the Purchaser or any of their respective Representatives (any of the foregoing, "<u>Generate Approved Matters</u>"), or (B) any fact, matter, occurrence, event or circumstance that arises, occurs or happens on or after August 12, 2022 of which a member of the board of managers of the Company that was appointed by Purchaser or an Affiliate of Purchaser has been informed of in writing and which is not known by the Seller as of the Execution Date, the Seller hereby makes the representations and warranties in this <u>Article IV</u> to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 4.1    <u>Organization and Qualification</u>.

(a)     The Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller, Seller (i) has all requisite organizational power and authority to own, operate and lease its assets and conduct its business, in each case, as currently conducted and (ii) is duly qualified to do business in, and is in good standing in, each jurisdiction in which such qualification is required by applicable Laws.

(b)     Each Acquired Company (i) is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and (b) has requisite organizational power and authority to own, lease and operate its assets and to conduct its business, in each case, as currently conducted.  Each Acquired Company is duly qualified to do business and in good standing in each jurisdiction in which such qualification is required by applicable Laws, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. On or prior to the Execution Date, Seller has made available to Purchaser true and complete copies of the Organizational Documents of each of the Acquired Companies in effect as of the Execution Date.

Section 4.2    <u>Authority Relative to This Agreement</u>. Subject to entry of the Sale Order by the Bankruptcy Court, the Seller has all requisite limited liability company power and authority to (a) execute

and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements, (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Seller Ancillary Agreements. Subject to entry of the Sale Order by the Bankruptcy Court, the execution and delivery by the Seller of this Agreement and each of the Seller Ancillary Agreements, the performance by the Seller of its obligations hereunder and thereunder, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of the Seller. Subject to entry of the Sale Order by the Bankruptcy Court, (i) this Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by the Seller and (ii) assuming the due authorization, execution and delivery by the other parties hereto and to the Seller Ancillary Agreements, this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered by the Seller will constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in an Action at Law or in equity) (the "Bankruptcy Exceptions").

Section 4.3     Conflicts; Consents and Approvals.

(a)     Subject to the entry of the Sale Order by the Bankruptcy Court, none of the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements when executed and delivered, the consummation by the Seller of the transactions contemplated hereby or thereby, or the performance by the Seller of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Seller, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any of any Contract to which it is party, or (iii) violate any Law applicable to the Seller or by which any of its properties or assets are bound or affected other than, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller.

(b)     Subject to the entry of the Sale Order by the Bankruptcy Court, none of the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements when executed and delivered, the consummation by the Seller of the transactions contemplated hereby or thereby, or the performance by the Seller of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of any Acquired Company, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Material Contract, or (iii) violate any Law applicable to the Seller or by which any of its properties or assets are bound or affected other than, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

(c)     Assuming the accuracy of the representations and warranties of the Purchaser in Section 5.3(b), no approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Seller or any Acquired Company in connection with the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements, the performance by the Seller of any of its obligations hereunder or thereunder, or the consummation by the Seller of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court and (ii) such other approvals, Orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain, give or make would not,

individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller or a Material Adverse Effect on the Acquired Companies.

Section 4.4    <u>Title</u>. The Seller is the sole legal and beneficial owner of all of the issued and outstanding Equity Interests of the Company, free and clear of all Encumbrances (other than Encumbrances arising under applicable securities Laws).

Section 4.5    <u>Capitalization</u>. Section 4.5 of Seller Disclosure Schedules sets forth a true and complete list of the Acquired Companies and, with respect to each Acquired Company, (a) its name and jurisdiction of organization, (b) its form of organization and (c) the issued and outstanding Equity Interests thereof directly owned by Seller or any other Acquired Company.  No Acquired Company owns, directly or indirectly, any Equity Interests in any Person other than as set forth in Section 4.5 of the Seller Disclosure Schedules.  The Equity Interests of the Acquired Companies reflected as directly owned by Seller or the Acquired Companies, in each case, in Section 4.5 of the Seller Disclosure Schedules, have been duly authorized and validly issued in compliance with applicable Laws and the Organizational Documents of the applicable Acquired Company.  Except for this Agreement, the Generate Credit Agreement and the other Loan Documents (as defined in the Generate Credit Agreement), there are no Rights to which Seller or any Acquired Company is a party or by which it is bound (i) obligating it to issue, sell, transfer or otherwise dispose of, or cause to be issued, sold, transferred or otherwise disposed of, any Equity Interests in any Acquired Company or (ii) obligating such Acquired Company to issue or grant such Right.

Section 4.6    <u>Financial Statements</u>.  The Seller has delivered to the Purchaser the unaudited consolidated balance sheet for the Company and its subsidiaries as of August 31, 2022 (the "<u>Balance Sheet Date</u>"), and the related statements of operations, for the 8-month period then-ended (collectively, the "<u>Financial Statements</u>").  The Financial Statements have been prepared from the applicable books and records of the applicable Acquired Companies in accordance with GAAP (except for the absence of footnotes and normal recurring year-end adjustments) and fairly present, in all material respects, the consolidated financial position and results of operations of the Company and its subsidiaries as of the Balance Sheet Date and for the period covered thereby.

Section 4.7    <u>Undisclosed Liabilities</u>.  The Acquired Companies have no Liabilities except for (a) Liabilities set forth in, reflected in, reserved against or disclosed in the Financial Statements, (b) Liabilities incurred in the ordinary course of business since the Balance Sheet Date, (c) Liabilities under Contracts of any of the Acquired Companies (other than as a result of any breach thereof or default thereunder by Seller or such Acquired Company) or (d) other Liabilities that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

Section 4.8    <u>Absence of Changes</u>.  Except as contemplated by this Agreement, from the Balance Sheet Date to the Execution Date, (a) each Acquired Company has operated in the ordinary course of business in all material respects and (b) no event, or series of events taken in the aggregate, have occurred that have had, or would reasonably be expected to have, a Material Adverse Effect on the Acquired Companies.

Section 4.9    <u>Litigation</u>.  Except as set forth in Section 4.9 of the Seller Disclosure Schedules:

(a)    except for the Chapter 11 Cases and any Order entered in the Chapter 11 Cases, there (i) is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "<u>Actions</u>"), pending, or to the Knowledge of the Seller, threatened against Seller or affecting any of its assets or (ii) Orders by which Seller or any of its assets is bound, in either case, that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller; and

9

(b)        there are no (i) Actions pending or, to the Knowledge of the Seller, threatened against any Acquired Company or affecting any of its assets or (ii) Orders by which any Acquired Company or any of its assets is bound, in the case of each of clauses (i) and (ii), that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

Section 4.10    Intellectual Property; IT Assets.

(a)        Except as set forth in Section 4.10 of the Seller Disclosure Schedules or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, (i) the Acquired Companies own all right, title and interest in and to, or have a valid license to use in the manner in which it is currently being used by the Acquired Companies, any Intellectual Property that is used by the Acquired Companies and is material to the operation of the Business, free and clear of any Encumbrances (other than Permitted Encumbrances), (ii) no Action is pending or, to the Knowledge of the Seller, threatened challenging any Acquired Company's ownership in, or rights to, any such Intellectual Property or any Acquired Company's use of any such Intellectual Property, and (iii) such Intellectual Property is not subject to any outstanding Order restricting the use thereof.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent or approval of any other Person in respect of, the Acquired Companies' right to own or use any of the Intellectual Property used by the Acquired Companies in the conduct of the Business as of the Execution Date.

(b)        (i) All Registered IP that is registered or issued is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies and (ii) the Seller or one or more of its Affiliates (including the Acquired Companies) has paid all renewal, maintenance, and other fees when due as required to maintain each and every Registered IP in full force and effect. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, the Acquired Companies have valid and enforceable rights to use the Licensed Intellectual Property as used in the conduct of the business of the Acquired Companies, free and clear of any Encumbrances (other than Permitted Encumbrances), pursuant to a valid written license, sublicense or other written Contract between an Acquired Company and the owner or licensor of such Licensed Intellectual Property.

(c)        Except as set forth in Section 4.10 of the Seller Disclosure Schedules or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, (i) the use of Intellectual Property in the ordinary course of business by the Acquired Companies does not infringe Intellectual Property rights of any other Person, and (ii) within the past three years, no Person has alleged in writing that the Acquired Companies' use of Intellectual Property infringes on any Intellectual Property rights of such Person. To the Knowledge of the Seller, no other Person is infringing any Owned Intellectual Property.

(d)        The IT Assets are adequate in all material respects for their intended use and are in good working condition (normal wear and tear excepted). There has not been any material malfunction with respect to any of the IT Assets that has not been remedied or replaced in all material respects. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent of any Person in respect of, the Purchaser's right to own or use any of the IT Assets as owned or used by the Acquired Companies in the conduct of its business prior to the Closing.

10

Section 4.11     Material Contracts; Assigned Contracts.

(a)     For purposes of this Agreement, the term "Material Contracts" means the following Contracts to which any Acquired Company is party as of the Execution Date:

(i)     any Engineering, Procurement and Construction Contracts, Construction Services Agreements and all other construction Contracts ("Construction Contracts");

(ii)     any equipment supply agreement ("Equipment Supply Agreements");

(iii)     any customer contract ("Customer Contract"), agreement providing for accommodations to lenders with respect to customer equipment ("Accommodation Agreement") or profit sharing agreement for a Customer Contract ("Profit Sharing Agreement");

(iv)     Contracts for the purchase, sale, exchange, storage, transmission or delivery of electric power. including, without limitation, any rate agreement, demand-response resource agreement, power optimization agreement, curtailment agreement or ancillary services agreement;

(v)     Contracts for the operation, maintenance and management of the assets of the Acquired Companies that are material to the operation of the Business;

(vi)     interconnection Contracts;

(vii)     Hedging Arrangements;

(viii)     Contracts containing any covenant that materially limits the conduct of the business of the Acquired Companies as currently conducted;

(ix)     Contracts providing for aggregate future payments to or from any Acquired Company in excess of $250,000 in any calendar year, other than such Contracts that can be terminated without material penalty by any such Acquired Company upon 90 days' notice or less;

(x)     other than any such Contracts that will be terminated at or prior to the Closing and the Generate Credit Agreement and the other Loan Documents (as defined in the Generate Credit Agreement), Contracts under which any Acquired Company has (A) created, incurred, assumed or guaranteed, directly or indirectly, any outstanding Indebtedness, (B) granted an Encumbrance on its assets to secure such Indebtedness or (C) extended credit to any Person, in the case of each of clauses (A) - (C), in excess of $250,000;

(xi)     Contracts providing for the acquisition or disposition of any business or division of any business (whether by merger, purchase or sale of Equity Interests or assets or otherwise) that (A) have not yet closed or (B) have already closed;

(xii)     any joint venture, partnership, or other Contract involving a sharing of profits, losses, costs, or liabilities of the business of any other Person (other than any Acquired Company) or relating to the ownership of any Equity Interest in any Acquired Company (other than the Organizational Documents of any Acquired Company);

(xiii)   any Contract pursuant to which Seller or any Affiliate thereof (included any Acquired Company) assigned all or a portion of a customer contract to the Acquired Companies (the "Partial Assignment Agreements");

(xiv)   the Additional Assigned Contracts; and

(xv)   Contracts providing for the sale of any material assets of the Acquired Companies (other than in the ordinary course of business) or the grant of any preferential rights to purchase any such material assets.

(b)   All Material Contracts are in full force and effect and are enforceable in accordance with their terms with respect to each Acquired Company party thereto and, to the Knowledge of the Seller, the other parties thereto, except (i) to the extent that such enforcement may be affected by the Bankruptcy Exceptions and (ii) to the extent that any such Material Contracts have expired or terminated pursuant to and in accordance with their terms. No Acquired Company and, to the Knowledge of the Seller, no other party thereto, is in material breach of or material default under, and to the Knowledge of the Seller, no event has occurred that, with or without notice or lapse of time, or both would constitute a material breach of or material default under, or give rise to a right of termination, cancellation or acceleration of any material obligation under any Material Contract, except (A) solely with respect to Additional Assigned Contracts, for breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases and those breaches or defaults that will be cured as a result of the payment of the applicable Cure Costs, and (B) those breaches and defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. Prior to the Execution Date, complete and correct copies of all written Material Contracts have been made available to the Purchaser.

(c)   None of the Acquired Companies is a party to any Contract described in clause (viii), (xi)(A) or clause (xii) of Section 4.11(a).

Section 4.12   Wolf Hollow.

(a)   Section 4.12(a) of the Seller Disclosure Schedules sets forth a true, correct, complete and accurate list of the DealID number, customer, and the number and model numbers of the customer equipment located at the Wolf Hollow Project.

(b)   Section 4.12(b) of the Seller Disclosure Schedules sets forth the Construction Budget and Schedule for the Wolf Hollow Project (the "Construction Budget and Schedule"). The Construction Budget and Schedule was prepared in good faith and represents a reasonable estimate of the construction budget and schedule for constructing and completing the Wolf Hollow Project.

Section 4.13   Kearney. Section 4.13 of the Seller Disclosure Schedules sets forth a true, correct, complete and accurate list of the DealID number, customer, and the number and model numbers of the customer equipment located at the Kearney Project.

Section 4.14   Permits. Each Acquired Company has all material Permits required to conduct its business and operations as currently conducted, except, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. Each such Permit is in full force and effect, and each Acquired Company is in compliance with all its obligations under such Permits, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. There are no Actions pending or, to the Knowledge of the Seller, threatened against any of the Acquired Companies that would reasonably be expected to result in the revocation, cancellation, non-renewal or termination of such Permit.

Section 4.15    Brokers and Finders. Neither the Seller nor any of its Affiliates (including the Acquired Companies) have engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or any of the transactions contemplated hereby for which the Purchaser or any Affiliate thereof is or will become liable (including through its acquisition of the Acquired Companies).

Section 4.16    Real Property.

(a)    Section 4.16 of the Seller Disclosure Schedule contains a true and complete list, as of the Execution Date, of all material real property owned by any Acquired Company (the "Owned Real Property") and all material real property that an Acquired Company has an interest or use right pursuant to any lease, leasehold, license, easement, right-of-way or similar Contract (the "Leased Real Property" and together with the Owned Real Property, the "Real Property").  The Real Property includes all real property interests that are necessary for the operation and maintenance of the Business in all material respects in the ordinary course of business, and the Real Property Documents provide all necessary rights to access and use such Real Property for such purposes.

(b)    True, correct and complete copies of all documents granting, conveying or assigning any interest in or to any Leased Real Property (the "Real Property Documents") have been delivered to Purchaser. Each Real Property Document is in full force and effect and constitutes a valid and binding obligation of the applicable Acquired Company and, to the Knowledge of the Seller, each other party thereto, except as limited by the Bankruptcy Exceptions. The Acquired Companies have valid leasehold title to the Leased Real Property subject to a Real Property Document, free and clear of any Encumbrances (other than Permitted Encumbrances). There are no matters, restrictions or Encumbrances affecting the Real Property that would reasonably be expected to materially interfere with or adversely affect in any material respect the continued use and occupancy by the Acquired Companies of the Real Property.

(c)    Each Acquired Company and, to the Knowledge of the Seller, each of the other parties, as applicable, to a Real Property Document have performed in all material respects all material obligations required to be performed by such Person under such Real Property Document, and there does not exist any event, condition or omission that would constitute a material default or material breach (whether by lapse of time or notice or both) under any Real Property Document by an Acquired Company, or, to the Knowledge of the Seller, any other party thereto. None of the Seller or any of its Affiliates (including the Acquired Companies) have received any written notice of any condemnation or eminent domain proceedings pending or threatened that affect any Real Property. None of the Seller nor any of its Affiliates (including the Acquired Companies) have received any written notice of any zoning, ordinance, building, fire or health code or other legal violation affecting any Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

(d)    The Real Property has been maintained in all material respects by the Seller or one or more of its Affiliates (including the Acquired Companies) in accordance with the applicable Real Property Documents. To the Knowledge of the Seller, there are no material defects in, material mechanical failure of or material damage to any Real Property.

Section 4.17    Tax Returns; Taxes.

(a)    All income and other material Tax Returns required to have been filed with respect to the Acquired Companies and their respective assets have been duly filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns are true, correct and complete.

All income and other material Taxes due and owing with respect to the Acquired Companies and their respective assets (whether or not shown on any Tax Return) have been paid.  No Acquired Company is currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Acquired Companies do not file Tax Returns that any Acquired Company is or may be subject to taxation by that jurisdiction.

(b)     All Taxes that have become due and payable prior to the Closing Date have been paid.  The Seller and the Acquired Companies have withheld and paid all material Taxes required to be withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(c)     There are no pending or, to the Knowledge of the Seller, threatened federal, state, local, or non-U.S. tax audits or administrative or judicial tax proceedings for the assessment or collection of income or other material Taxes owed or owing by the Seller in respect of any Acquired Company.

(d)     Neither Seller nor any Acquired Company has executed or filed with any Governmental Body any agreement extending the period for assessment or collection of any income or other material Taxes in respect of any Acquired Company or its assets.

(e)     The Seller and the Acquired Companies have not waived any statute of limitation in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f)     Neither the Seller nor any Acquired Company is subject to any Tax ruling with respect to any Acquired Company. There are no Encumbrances on any of the assets owned by any Acquired Company that secure the payment of Taxes (other than Permitted Encumbrances).

(g)     Since the Balance Sheet Date, the Acquired Companies have not incurred any liability for Taxes arising from extraordinary gains or losses, as that term is used in GAAP, outside the ordinary course of business consistent with past custom and practice.

(h)     The Acquired Companies will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)    use of an improper method of accounting for a taxable period ending on or prior to the Closing Date;

(iii)   "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local, or non-U.S. income Tax law) executed on or prior to the Closing Date;

(iv)    intercompany transaction or excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local, or non-U.S. income Tax law);

(v)     installment sale or open transaction disposition made on or prior to the Closing Date; or

14

(vi)    prepaid amount received on or prior to the Closing Date.

(i)    The Acquired Companies have not been a party to any "listed transaction," as defined in Code §6707A(c)(1) and Reg. §1.6011-4(b).

(j)    No Acquired Company has a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise has an office or fixed place of business in a country other than the country in which it is organized.

(k)    No letter ruling from the Internal Revenue Service (or any comparable ruling from any other taxing authority) has been received in respect of any Acquired Company (or assets owned by an Acquired Company).

(l)    The Acquired Companies have (i) properly complied with all applicable law in order to defer the amount of the employer's share of any "applicable employment taxes" under Section 2302 of the CARES Act and (ii) to the extent applicable, properly complied with all applicable law and duly accounted for any available Tax credits under Sections 7001 through 7005 of the Families First Coronavirus Response Act and Section 2301 of the CARES Act.

(m)    Each of the Acquired Companies has been a disregarded entity for U.S. federal income tax purposes since its formation.

(n)    None of the Acquired Companies is party to any tax sharing, allocation, indemnification, power of attorney, closing or similar agreement with respect to Taxes (other than any agreement entered into in the ordinary course of business the primary purpose of which is not the sharing, allocation or indemnification of any Tax liability or compliance with any Tax obligation).

Section 4.18    <u>Insurance Policies</u>. <u>Section 4.18</u> of the Seller Disclosure Schedules sets forth a true and complete list, as of the Execution Date, of all material insurance policies covering the Acquired Companies or the Business (the "<u>Insurance Policies</u>"). All Insurance Policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and no written notice of cancellation or termination (or any other threatened termination) has been received by the Seller or any Affiliate thereof (including any Acquired Company) with respect to any such Insurance Policy. No claim with respect to any Acquired Company has been made or remains outstanding under any Insurance Policy, and no Acquired Company has suffered any losses that would reasonably be expected to give rise to such claims.

Section 4.19    <u>Environmental Matters</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies:

(a)    each Acquired Company has obtained all Permits required under any Environmental Law for the operation of the Business as currently conducted (the "<u>Environmental Permits</u>");

(b)    each Acquired Company is operating the Business in compliance with all Environmental Laws and its Environmental Permits;

(c)    no Acquired Company has released any Hazardous Materials on, under, or at the Real Property in violation of any Environmental Law, which release is currently subject to any investigation, remediation or monitoring and would reasonably be expected to result in a Liability to any Acquired Company pursuant to Environmental Laws;

(d)        no Acquired Company has received any written notice of any violation of any Environmental Law during the past three years, the subject of which is unresolved;

(e)        there are not any (i) outstanding Orders arising under Environmental Laws by which any Acquired Company or any of its assets is bound or (ii) Actions arising under Environmental Laws pending or, to the Knowledge of the Seller, threatened against any Acquired Company; and

(f)        Seller has delivered to Purchaser all material, non-privileged environmental site assessments prepared in the past three years relating to the operation of the Business that are in Seller's or any Acquired Company's possession.

Section 4.20    Affiliate Arrangements; Seller Credit Support.  Except as set forth in Section 4.20 of the Seller Disclosure Schedules and except for the Specified Bond GIA, the Partial Assignment Agreements (on customary terms and conditions), the Kearney PMA, the WH PMA, the Stipulation (as defined in Exhibit A attached hereto) and the limited liability company agreement of the Company, there are no Affiliate Contracts in effect as of the Execution Date. Except for the Generate Guaranty, the Generate Pledge Agreement and the Specified Bond GIA, there are no letters of credit, guarantees, bonds and other credit assurances of a comparable nature made or issued by or on behalf of Seller or any of its Affiliates (other than an Acquired Company) for the benefit of any Acquired Company.

Section 4.21    Condition of Assets. Each Acquired Company has good title to, or valid leasehold interest in, all material tangible assets of the Acquired Companies used or leased for use in connection with its business as currently conducted, free and clear of all Encumbrances, other than Permitted Encumbrances, and such tangible personal property is in reasonably good operating condition and repair for the purposes for which such assets are used in the business of the Acquired Companies (normal wear and tear excepted), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

Section 4.22    Books and Records.  As of the Closing, Seller has delivered to, or has maintained at, the Acquired Companies (whether in electronic format or otherwise) true, complete and accurate copies of all of the books and records of the Acquired Companies.  The books and records are materially complete, reflect the business of the Acquired Companies in all material respects accurately, fairly and in reasonable detail and have been maintained in accordance with document management practices as would reasonably be expected to be utilized by a reasonable and prudent manager of a business comparable to the business of the Acquired Companies.

Section 4.23    Employees Matters.

(a)        The Acquired Companies do not have, and have never had, any employees.  The Acquired Companies are, and at all times have been, in compliance with all applicable Laws relating to employment, social security, employee classification, employee benefits and employee matters except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

(b)        No Acquired Company sponsors, maintains, contributes to or has, or has ever sponsored, maintained, contributed to or had, any obligation to maintain or contribute to, any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) or any other plan, program, arrangement or agreement that is subject to ERISA.  No Acquired Company has any Liability or has ever had any Liability under Title IV of ERISA, including on account of at any time being considered a single employer under Section 414 of the Code with any other Person.

16

Section 4.24     NO OTHER REPRESENTATIONS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS ARTICLE IV, NEITHER THE SELLER, ANY AFFILIATES OF THE SELLER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER, THE ACQUIRED COMPANIES, THE ACQUIRED INTERESTS, THE ADDITIONAL BUSINESS CONTRACTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE SELLER, ANY AFFILIATE OF THE SELLER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS ARTICLE IV, THE SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES BY ANY MANAGER, OFFICER, DIRECTOR, STOCKHOLDER, MEMBER, PARTNER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF THE SELLER OR ANY OF ITS AFFILIATES).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article V to the Seller as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 5.1     Organization and Qualification. The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

Section 5.2     Authority Relative to This Agreement. The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Purchaser Ancillary Agreements. The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, the performance by the Purchaser of its obligations hereunder and thereunder, and the consummation by the Purchaser of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

Section 5.3     Conflicts; Consents and Approvals.

(a)     None of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation by the Purchaser of the transactions contemplated

hereby or thereby, or the performance by the Purchaser of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Purchaser, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound or (iii) assuming that all approvals, orders, Permits, consents, registrations, declarations, notifications and filings described in <u>Section 5.3(b)</u> have been made, given or obtained, as applicable, violate any Law applicable to the Purchaser or by which any of its properties or assets are bound, other than, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser.

(b)     No approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, the performance by the Purchaser of any of its obligations hereunder or thereunder, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court, and (ii) such approvals, Orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain, give or make would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser.

Section 5.4     <u>Financial Capacity</u>. The Purchaser (a) has access to, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and (b) has access to, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Purchaser Ancillary Agreements.

Section 5.5     <u>Brokers and Finders</u>. Except as set forth on <u>Schedule 5.5</u>, the Purchaser has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby for which the Seller or any of its Affiliates or Representatives will become liable.

Section 5.6     <u>Qualification</u>.

(a)     As of the Closing, the Purchaser will be capable of satisfying the conditions contained in sections 365(b)(l)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

(b)     To the knowledge of the Purchaser, there exist no facts or circumstances that would cause, or be reasonably expected to cause, the Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

Section 5.7     <u>Independent Investigation; Reliance By the Purchaser</u>. The Purchaser (directly or through its Affiliates or Representatives) is an informed and sophisticated purchaser, and has engaged expert advisors that are experienced in the evaluation and acquisition of companies such as the Acquired Companies. The Purchaser (directly or through its Affiliates or Representatives) has undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby or thereby. The Purchaser confirms that the Seller has provided the Purchaser with the opportunity to ask questions of the officers and

employees of the Seller and its Affiliates and to acquire additional information about the Acquired Companies.

Section 5.8      RELIANCE/ACKNOWLEDGMENT.   NOTWITHSTANDING   ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS TO THE CONTRARY, THE PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN ARTICLE IV OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES): (I) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON IS MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE SELLER, THE ACQUIRED COMPANIES, THE ACQUIRED INTERESTS, THE ADDITIONAL BUSINESS CONTRACTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE ASSETS OF THE ACQUIRED COMPANIES; (II) THE PURCHASER HAS NOT EXECUTED OR AUTHORIZED THE EXECUTION OF THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR ENTERED INTO THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN RELIANCE UPON, AND HEREBY SPECIFICALLY DISCLAIMS RELIANCE UPON, ANY PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY WHATSOEVER MADE OR OMITTED TO BE MADE TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES, INCLUDING ANY SUCH PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY AS TO THE CONDITION, VALUE, QUALITY OR PROSPECTS OF ANY OF THE ACQUIRED COMPANIES, ANY OF THE ASSETS OR LIABILITIES OF ANY OF THE ACQUIRED COMPANIES, ANY OF THE ACQUIRED INTERESTS, ANY OF THE ADDITIONAL BUSINESS CONTRACTS, OR ANY PART OF ANY OF THE FOREGOING; (III) THE ACQUIRED COMPANIES AND THE ASSIGNED CONTRACTS ARE BEING TRANSFERRED "AS IS", "WHERE IS" AND "WITH ALL FAULTS"; AND (IV) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, AS TO THE ACCURACY OR COMPLETENESS OF ANY PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY OF THE FOREGOING MADE IN RESPONSE TO ANY DUE DILIGENCE REQUEST LIST OR MADE DURING ANY DUE DILIGENCE TELEPHONIC OR IN-PERSON MEETINGS), AND NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY TO THE PURCHASER OR ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF, OR ANY SUCH PERSON'S USE OF OR RELIANCE ON, ANY SUCH PROJECTION, FORECAST, STATEMENT OR INFORMATION OR ANY ERRORS THEREIN OR OMISSIONS THEREFROM.

Section 5.9      NO OTHER REPRESENTATIONS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE PURCHASER IN THIS ARTICLE V, NEITHER THE PURCHASER, ANY AFFILIATES OF THE PURCHASER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASER OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, AND THE PURCHASER HEREBY EXPRESSLY DISCLAIMS

19

ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE PURCHASER, ANY AFFILIATE OF THE PURCHASER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

Section 6.1      Conduct of Seller.

(a)      During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date (the "Interim Period"), except (x) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, or (y) with the prior written consent of the Purchaser, the Seller shall use commercially reasonable efforts (taking into account that Seller does not control the Acquired Companies and that the board of managers of the Company makes all decisions and takes all actions for the Company) to (i) cause each Acquired Company to conduct its business in the ordinary course of business and (ii) preserve intact for the benefit of Purchaser the respective business of each Acquired Company and the goodwill of its respective customers, suppliers and others having business relations with them; provided that in no event shall any action (or inaction) of an Acquired Company be deemed a breach of this Section 6.1 if such action (or inaction) is taken at the written instruction of Purchaser or is a Generate Approved Matter. Except as consented to in writing by Purchaser or as required by applicable Law, the Seller shall not affirmatively cause any of the Acquired Companies to, and, solely with respect to clause (ix)(A) as applied to Additional Business Contracts, the Seller shall not and shall cause its Affiliates not to, take any of the following actions:

(i)      amend the Organizational Documents of any Acquired Company;

(ii)      effect any recapitalization, reorganization, liquidation, dissolution or winding up of any Acquired Company;

(iii)      declare, make or pay any dividend or other distribution in respect of the Acquired Interests to Seller or any other Person;

(iv)      issue, sell, transfer or otherwise dispose of, pledge or otherwise encumber any Equity Interests of any Acquired Company, or issue or grant any Rights with respect to any Acquired Company;

(v)      amend, modify or otherwise supplement any existing Affiliate Contract or enter into any new Affiliate Contract;

(vi)      amend any income or material Tax Returns with respect to any Acquired Company or the assets of any Acquired Company, make or change any material Tax election or adopt or change any material Tax accounting method, in each case, to the extent that such action could reasonably be expected to increase any Tax Liability of or with respect to any Acquired Company for a Tax period (or portion thereof) beginning after the Closing Date; waive any right for a refund or credit of any Tax with respect to any Acquired Company or the assets of any Acquired Company; consent to any extension of any statute of limitation, or request an extension of any filing period, with respect to any Tax Return of any Acquired Company or with respect to the assets of any Acquired Company;

20

(vii)     purchase or acquire (whether by merger, consolidation, combination or otherwise) any business, line of business or any assets (including Equity Interests) of any Person (other than any Acquired Company) (excluding purchases or acquisitions of assets in the ordinary course of business) having a value that does not exceed $250,000 individually or $500,000 in the aggregate;

(viii)    sell, assign, transfer, lease, license or otherwise dispose of, or grant or impose any Encumbrances (other than Permitted Encumbrances) on, any assets of the Acquired Companies to any Person (other than any Acquired Company), having a value in excess of $250,000 individually or $500,000 in the aggregate, except for sales of obsolete, damaged or broken equipment that has a book value of $0, has been replaced, or has been reflected in the working capital, in each case, in the ordinary course of business;

(ix)     (A) amend, modify or otherwise supplement in any material respect any Material Contract or any Real Property Document, (B) terminate any Material Contract or any Real Property Document (other than any expiration thereof in accordance with its terms), (C) enter into any Contract that, if in existence on the Execution Date would have been a Material Contract, or (D) enter into any Contract that, if in existence on the Execution Date, would have been a Real Property Document;

(x)      change any accounting or auditing practices unless required by GAAP;

(xi)     amend or modify any material Permit (including any Environmental Permit);

(xii)    agree to make any capital expenditure other than as set forth in the Construction Budget and Schedule for the Wolf Hollow Project;

(xiii)   incur any Indebtedness or become contingently liable for any contingency or liability of others;

(xiv)    cancel any third party Indebtedness owed to an Acquired Company;

(xv)     enter into any new line of business;

(xvi)    fail to maintain in full force and effect the Insurance Policies in the form and amounts consistent with past practice except to the extent that such Insurance Policies are replaced by policies with comparable coverage prior to the date of any cancellation or termination thereof, take or fail to take any action that would entitle any insurer to terminate or cancel any Insurance Policies, or amend, commute, terminate, buy-out, extinguish liability under or otherwise modify any Insurance Policies in any manner that adversely affects Purchaser's or the Acquired Companies' ability to assert or continue to prosecute claims with respect to incidents occurring prior to or after the Closing;

(xvii)   hire any personnel or create any compensation or "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) or any other plan, program, arrangement or agreement that is subject to ERISA;

(xviii)  make any material loans, advances or capital contributions to or investments in any Person (other than any Acquired Company), other than pursuant to existing

21

contracts or commitments that have been disclosed to Purchaser or in the ordinary course of business;

(xix)    initiate, settle or compromise any claims against any Acquired Company or any other Person with a settlement or compromise amount reasonably anticipated to be in excess of $250,000 individually or $500,000 in the aggregate;

(xx)    deposit or permit the deposit of funds received from any Person for the benefit of any Acquired Company in any account other than the appropriate operating account of such Acquired Company for which the funds were supposed to benefit;

(xxi)    fail to execute and deliver the Payoff and Release Agreement; or

(xxii)    authorize or agree to take any of the foregoing actions.

(b)    [Intentionally Deleted]

Section 6.2    Taxes.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, recording or other similar Taxes that arise from the sale of the Acquired Interests or the Assigned Contracts or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes"), as well as any related Tax Return preparation and filing costs, shall be borne and timely paid by the Purchaser. Each Tax Return with respect to such Transfer Taxes will be prepared and timely filed by the Purchaser. In the event that any such Tax Return requires execution by the Seller, the Seller shall promptly execute such Tax Return after receipt thereof from the Purchaser and deliver it to the Purchaser so long as such Tax Return was prepared in compliance with applicable Law.

(b)    The Seller shall be allocated and bear (1) all property Taxes and similar ad valorem obligations (excluding, for the avoidance of doubt, income Taxes and Transfer Taxes) levied based upon or measured by the ownership or operation of the assets of the Acquired Companies (collectively, the "Asset Taxes") and (2) any other Tax obligation owed by any Acquired Company (including Taxes payable by any Acquired Company based on or measured by income, receipts, payments or payroll of any Acquired Company, but excluding Transfer Taxes), in each case, for (i) any period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date; provided, however, that the Seller shall not be liable for or be required to pay any Taxes resulting from any act, omission or transaction taken by the Purchaser or any of its Affiliates after the Closing, or any Tax election made by the Purchaser or any of its Affiliates that would be effective on or before the Closing Date. The Purchaser shall be allocated and bear all Asset Taxes or other Taxes owed by any Acquired Company (A) that are described in the proviso of the immediately preceding sentence, (B) for any period that begins on or after the Closing Date, and (C) the portion of any Straddle Period beginning after the Closing Date, including any such Taxes that were paid or prepaid by the Seller at or prior to the Closing.  For purposes of this Section 6.2(b), Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period ending on and including the Closing Date, on the one hand, and the number of days in such Straddle Period that occur after the Closing Date, on the other hand, and all other Asset Taxes (if any) based upon sales, purchases or receipts shall be allocated upon a hypothetical closing of the taxable year on the Closing Date. Any other Tax pertaining to a Straddle Period shall be allocated on an "interim closing of the books" basis.  The party hereto responsible under applicable Law for paying a Tax shall be responsible for preparing

and filing the Tax Return for such Tax and for paying such Tax shown to be due on such Tax Return. The Seller, on the one hand, or the Purchaser, on the other hand, as the case may be, shall promptly (but in no event later than twenty (20) days after receipt of notice from the party hereto making such payment) provide reimbursement for any Tax paid by the other party, all or a portion of which is the responsibility of such party in accordance with the terms of this Section 6.2(b).

(c)    To the extent permitted by Law, the parties agree to elect with the relevant taxing authority to treat for all Tax purposes the Closing Date as the last day of a taxable period.

(d)    The preparation and filing of any Tax Return of the Company that is due after the Closing shall be exclusively within the control of the Purchaser (excluding any and all Tax Returns required by Law to be filed by the Seller).

(e)    Neither the Seller nor any of its Affiliates (other than the Acquired Companies) shall take any action, at any time, that would result in a change in the tax classification of any Acquired Company.

Section 6.3    Insurance. The Purchaser hereby acknowledges and agrees that, effective upon the Closing, all policies of, and binders evidencing, any form or type of insurance that are owned or maintained by the Seller or any of its Affiliates (excluding the Acquired Companies) that cover or relate to the Seller or any of its assets, liabilities, employees, businesses or operations (such policies and binders, the "Seller Insurance Coverage") may be terminated or modified by the Seller or any of its Affiliates (excluding the Acquired Companies) to exclude coverage of the Acquired Companies and their assets, liabilities, employees, businesses or operations, and neither the Seller nor any of its Affiliates (including the Acquired Companies) will be purchasing or otherwise acquiring any "tail" policy or other additional or substitute coverage for the foregoing. Any refund, rebate, credit or other amount paid, distributed or returned by any insurance provider or other Person in respect of, or relating to, the Seller's or any of its Affiliates' termination or modification of any Seller Insurance Coverage shall be the property of the Seller or such applicable Affiliate (excluding the Acquired Companies).

Section 6.4    Access.    During the Interim Period, Seller shall use commercially reasonable efforts to provide Purchaser, its Affiliates and its and their respective Representatives (at Purchaser's sole cost and expense) with reasonable access during normal business hours and upon reasonable advance written notice to the books and records of the Acquired Companies as may be reasonably requested by Purchaser from time to time solely for a purpose reasonably related to the consummation of the transactions contemplated by this Agreement; *provided* that such access does not unreasonably disrupt the personnel, or unreasonably interfere with the operations, of Seller or any of its Affiliates (including any Acquired Company), and Purchaser, its Affiliates and its and their respective Representatives shall use commercially reasonable efforts to conduct all communications with personnel and all on-site investigations in an expeditious manner.  Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to provide such access to the extent that it (i) would reasonably be expected to jeopardize any attorney-client privilege, attorney work-product protection or other legal privilege or (ii) would reasonably be expected to contravene any applicable Law or Contract.  Any Confidential Information provided pursuant to this Section 6.4 shall be subject to the applicable terms and conditions of the Confidentiality Agreement.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall be permitted to conduct visual environmental investigations, but no invasive or subsurface sampling or testing of any environmental media on any of the premises of any Acquired Company without the prior written consent of Seller, but at the sole cost and expense of the Purchaser.

23

Section 6.5    Confidentiality; Non-Solicitation.

(a)    During the one (1) year period following the Closing Date, the Seller agrees that it will not, and the Seller will cause its Affiliates not to, divulge or disclose to any third party (other than to (x) the Seller's Representatives, and (y) the Purchaser, the Acquired Companies or any Representative of the Purchaser) or use any Acquired Company Information, unless (i) such information was or becomes generally available to the public or the participants in the industries in which the Acquired Companies conduct the Business other than as a result of a disclosure by the Seller in breach of this Section 6.5(a) or (ii) such information was or becomes available to the Seller on a non-confidential basis from a source other than the Purchaser or any of its Affiliates and such source is not known to the Seller to be bound by a confidentiality obligation to the Purchaser or any of its Affiliates; provided, however, that the provisions of this Section 6.5(a) will not prohibit any disclosure of any Acquired Company Information (A) as required by any Law or requested by any Governmental Body so long as, to the extent practicable, reasonable prior notice is given to the Purchaser of such disclosure and a reasonable opportunity is afforded the Purchaser to contest the same, (B) as is reasonably necessary in connection with the performance, enforcement, exercise or assertion of any right, remedy or defense relating to this Agreement or any Ancillary Agreement or the transactions contemplated hereby or thereby, (C) as may be necessary in connection with the Chapter 11 Cases and/or the administration of the Seller's and/or its Affiliates' chapter 11 estates, or (D) that is necessary and proper in conjunction with the filing of any Tax Return or other document required to be filed with any Governmental Body under applicable Law.

(b)    During the one (1) year period following the Closing Date, without the prior written consent of Purchaser, Seller will not, and will cause each of its Affiliates not to, directly or indirectly (i) hire, employ, engage, retain, recruit or solicit (or attempt or offer to do any of the foregoing) any person who is an officer or employee of any Acquired Company at the time any such action is taken (or who had been an officer or employee of an Acquired Company within the 12 month period prior to any such action being taken) or (ii) cause, induce, encourage, entice or persuade (or attempt to do any of the foregoing) any person who is an officer or employee of an Acquired Company to leave or terminate his or her position of employment with such Acquired Company, except as the result of the use of a general solicitation (such as an advertisement) not specifically directed to such officer or employee. For the avoidance of doubt, nothing in this Section 6.4 shall be construed or deemed to prohibit the continued employment of any person that is currently employed by a Seller or any Affiliate thereof (excluding the Acquired Companies).

Section 6.6    Publicity. Unless otherwise required by or reasonably necessary to comply with applicable Law or Bankruptcy Court requirements, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices made with the Bankruptcy Court related thereto, each of the Seller and the Purchaser agree that it (a) shall communicate and consult with each other prior to making any public disclosure or statements with respect to this Agreement or the transactions contemplated hereby and (b) shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party. Nothing in this Agreement shall restrict or prohibit the Seller, Purchaser or their respective Affiliates from communicating with their respective employees, customers, suppliers, other business relations or other direct or indirect financing sources (including direct and indirect equityholders).

Section 6.7    Wrong Pocket.

(a)    The Seller shall (i) promptly deliver to the Purchaser any mail or other communication relating to any of the Acquired Companies or their assets received by the Seller or any Affiliate thereof (excluding, for the avoidance of doubt, the Acquired Companies) on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or

deposits received by the Seller or any Affiliate thereof (excluding, for the avoidance of doubt, the Acquired Companies) on or after the Closing Date to the extent that such cash, electronic credits or deposits were intended to be transferred or made to an Acquired Company in connection with the Business and (iii) promptly forward to the Purchaser any checks or other instruments of payment that the Seller or any Affiliate thereof (excluding, for the avoidance of doubt, the Acquired Companies) receives on or after the Closing Date to the extent that such checks or other instruments were intended to be sent to an Acquired Company in connection with the Business.

(b)     The Purchaser shall (i) promptly deliver to the Seller any mail or other communication not relating to the Acquired Companies and received by the Purchaser or any of its Affiliates (including, for the avoidance of doubt, the Acquired Companies) on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Seller any cash, electronic credits or deposits received by the Purchaser or any of its Affiliates (including, for the avoidance of doubt, the Acquired Companies) to the extent that such cash, electronic credits or deposits were intended to be transferred or made to Seller or an Affiliate of Seller (excluding, for the avoidance of doubt, any Acquired Company) and (iii) promptly forward to the Seller any checks or other instruments of payment that the Purchaser or any of its Affiliates (including, for the avoidance of doubt, the Acquired Companies) receives on or after the Closing Date to the extent that such checks or other instruments were intended to be sent to Seller or any Affiliate of Seller (excluding, for the avoidance of doubt, any Acquired Company).

(c)     For the avoidance of doubt, all miners, equipment or other property of (i) any customer of the Wolf Hollow Project or the Kearney Project (solely with respect to miners, equipment or other property of such customer for which Wolf Hollow or Kearney is contractually obligated to provide services to such customer at the Wolf Hollow Project or the Kearney Project, as applicable) or (ii) the Acquired Companies, in either case that is stored, held, located or used at a location other than the Wolf Hollow Project site or Kearney Project site is property of the applicable customers or Acquired Companies and, following the Closing, neither the Seller nor any of its Affiliates shall have any right or interest in such property; and nothing herein shall prevent the Purchaser, Wolf Hollow, or Kearney from asserting that such miners, equipment, or other property belong to the Wolf Hollow Project or the Kearney Project, as applicable, and taking any efforts to restore such miners, equipment, or other property to the Wolf Hollow Project site or the Kearney Project site, as applicable.

Section 6.8     Use of Excluded Names. It is expressly acknowledged and agreed that the Purchaser is not acquiring (on its own behalf or on behalf of any of its Affiliates) any right, title or interest in, or any right to use, the name "Compute North" or the identifier "CN" (including in any trademarks, service marks, trade dress, trade names, domain names, logos, identifying symbols, signs or corporate names), any variation or derivative thereof, or any names, identifiers or marks confusingly similar thereto (any of the foregoing, the "Excluded Names").  After the Closing Date, the Purchaser shall cause each Acquired Company to promptly (but in any event within 30 days after the Closing Date) legally change their business and corporate names to new names that do not include any of the Excluded Names.  As soon as reasonably practicable following the Closing and in any event within 180 days following the Closing Date, Purchaser shall remove from the property of the Acquired Companies and cease using, and shall cause the Acquired Companies to cease using, all Excluded Names.

Section 6.9     Access and Preservation of Records. The Purchaser agrees that it shall cause the Acquired Companies to preserve and keep the books and records (whether in documentary or data form) held by the Acquired Companies as of the Closing and shall make such books and records available upon reasonable advance request during normal business hours (and solely to the extent providing such access is not materially disruptive to the business of the Acquired Companies) to the Seller and the Seller's auditors, attorneys, agents and other Representatives in connection with, and until the end of, the administration and/or closing of the Chapter 11 Cases (or the date on which the Seller is liquidated or dissolved, if earlier).

25

Section 6.10    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with Section 3.4, the Seller and the Purchaser shall use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to ensure that the conditions precedent to the other party's obligations hereunder to consummate the transactions contemplated hereby set forth in Article VII are satisfied and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable, but in any event on or prior to the Outside Date, including using its reasonable best efforts to obtain all necessary waivers, consents, approvals and Orders (including entry of the Sale Order by the Bankruptcy Court) and effecting all necessary registrations and filings to consummate and make effective the transactions contemplated hereby.

(b)    Subject to the terms and conditions of this Agreement, neither the Seller nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Seller or the Purchaser to consummate the transactions contemplated by this Agreement (including taking any action or refraining from taking any action the effect of which is intended or would reasonably be expected to result in any of the conditions to any party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied) unless taking such action or refraining from taking such action is required by applicable Law.

(c)    Without limiting the generality of the other provisions of this Section 6.10, to the extent any filing is required under the HSR Act or any other Antitrust Law, the Purchaser and the Seller shall, or shall cause its "ultimate parent entity" (as such term is defined by the rules to the HSR Act, "UPE"), if any, to promptly prepare and file all necessary documentation and effect all applications that are required thereunder with respect to the transactions contemplated under this Agreement. Each of the Purchaser and the Seller shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act or any other Antitrust Law. The Seller and the Purchaser shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the United States Federal Trade Commission, the United States Department of Justice or any other Governmental Body. If such a filing is made, the Purchaser and the Seller shall or shall cause its UPE, if any, to use its reasonable best efforts to obtain as promptly as possible any clearance required for the consummation of the transactions contemplated under this Agreement.

Section 6.11    Interconnection Process.  Seller and Purchaser shall work together in good faith to complete the interconnection process with ERCOT, Oncor Electric Delivery Company, Constellation Energy Generation, LLC and any other parties necessary to finalize the interconnection arrangements to support 300 megawatts of electricity demand from the Wolf Hollow Project (including, without limitation and as appropriate, Constellation NewEnergy, Inc. and Wolf Hollow II Power LLC) during the Interim Period (the "Interconnection Process").  If such Interconnection Process is not complete prior to the Closing, then Seller shall reasonably cooperate with Purchaser to complete such Interconnection Process as promptly as practicable following the Closing, at the sole cost and expense of Purchaser; provided, that the obligations of the Seller under this Section 6.11 shall terminate upon the closing of the Chapter 11 Cases (or the date on which the Seller is liquidated or dissolved, if earlier).

Section 6.12    Minden Assignment.  Within five Business Days of Closing, Purchaser shall cause Kearney to give notice to the Southern Public Power District ("SPPD") and Nebraska Public Power District ("NPPD") of its intent to transfer the Agreement for EDR Electric Service between Kearney and SPPD and NPPD, dated October 1, 2021 (as amended, restated, assigned or otherwise modified, the "Minden

Agreement"), pursuant to, and in accordance with, Article 2, Section 4 of the Minden Agreement. Upon the third Business Day after the expiration of the applicable 30 days' notice period, Purchaser shall cause Kearney to assign the Minden Agreement to Seller or an Affiliate thereof (the "Minden Agreement Assignee") for no additional consideration.  Purchaser agrees to cause Kearney to use commercially reasonable efforts to (a) execute and deliver such other agreements or documents to show such transfer (or effectiveness of transfer) has occurred as reasonably requested by Seller, and (b) execute and deliver such other agreements or documents to permit the allocation, by The Nebraska Department of Economic Development and the Economic Development Council of Buffalo County, Inc., to CN Minden, for purposes of construction at a data center project proposed to be developed by CN Minden in Minden, Nebraska, of a portion of a Site and Building Development Fund award previously provided by The Nebraska Department of Economic Development to the Economic Development Council of Buffalo County, Inc. for construction of new buildings at the Kearney Project; provided, that the Purchaser shall not be required to cause Kearney to execute and deliver any such agreements or documents that would require Kearney to make any payments or incur, assume, become liable in respect of or suffer to exist any liabilities.

Section 6.13    Employee Matters.  Upon the request of the Purchaser, the Seller shall cause its applicable Affiliate to waive any non-competition or similar restrictive covenant that such Business Employee has entered into with such Affiliate if the Purchaser desires to offer employment to such Business Employee after the TSA Expiration Date.

Section 6.14    Specified Bond GIA.  As soon as practicable after the Closing Date, the Purchaser shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to cause Compute Holdings, Compute North and any other "Indemnitors" under the Specified Bond GIA (excluding Kearney) (collectively, the "GIA Indemnitors") to be released from all Liabilities and other obligations under the Specified Bond GIA.  The Purchaser shall indemnify and hold harmless the GIA Indemnitors from and against any Liabilities paid, incurred or suffered by any of the GIA Indemnitors after the Closing Date arising out of, or resulting from, the Specified Bond GIA or the Specified Bond.

Section 6.15    Wolf Hollow; Kearney.

(a)    During the Interim Period, Seller will use reasonable best efforts to provide Purchaser with schedules setting forth the following:

(i)    a schedule of transformers and containers to which Wolf Hollow has title, together with any Encumbrances thereon, and the serial numbers for each such transformer and container;

(ii)    (A) any amounts currently due and payable under any Equipment Supply Agreement for the Wolf Hollow Project, (B) any equipment purchased for or to be used in connection with the Wolf Hollow Project that has been delivered to Compute North or one or more of its Affiliates and is not located at the project site for the Wolf Hollow Project and (C) any amendments, change orders or waivers entered into or that are pending with respect to any of the Equipment Supply Agreements for the Wolf Hollow Project; and

(iii)    a list of each Customer Contract assigned to Wolf Hollow, including the DealID number, customer, date of the master agreement and order form.

(b)    Prior to the Closing, Seller shall provide Purchaser with an estimated consolidated balance sheet of the Company and its subsidiaries as of October 31, 2022.

27

Section 6.16   <u>Removal of Certain Equipment</u>.  Following the Closing, the Purchaser shall cause Wolf Hollow to provide the Seller and its Affiliates with access to the premises of the Wolf Hollow Project to allow Seller and its Affiliates to remove all containers and other equipment that are not used or contemplated to be used, including under applicable operating plans, in the conduct of the Business (as conducted on the Execution Date) which, to the Knowledge of the Seller, is more specifically scheduled on <u>Schedule 6.16</u> attached hereto.

Section 6.17   <u>Atlas</u>.

(a)   From the Closing Date until the earlier of (i) the receipt by Purchaser or an Affiliate thereof (including an Acquired Company) of the Atlas Waiver (whether delivered by Atlas or Seller or received from a court of competent jurisdiction) and (ii) the first anniversary of the Closing Date, Purchaser shall, and Purchaser shall cause the Acquired Companies to, reasonably cooperate with the Seller and its Affiliates and use commercially reasonable efforts to obtain the Atlas Waiver.  Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall (A) require Purchaser or any Affiliate thereof (including any Acquired Company) to incur any liability or make any expenditure or payment, other than of *de minimis* amounts, in fulfillment of its obligations in this <u>Section 6.17</u> and (B) prevent, prohibit or impair the ability of Purchaser or any of its Affiliates (including the Acquired Companies) from engaging in conversations with, or negotiating for, the Atlas Waiver directly with Atlas (and without the inclusion of Seller or any Affiliate thereof in such conversations and negotiations) or executing and delivering any other settlement agreement with Atlas that includes the Atlas Waiver.

(b)   At or following Closing, upon receipt of either (x) full waiver and release in favor of the Acquired Companies from Atlas and duly executed by Atlas on terms and conditions acceptable to Purchaser with respect to all claims Atlas may have or may ever have under, or with respect to, the Atlas Contract (any such claims, the "<u>Atlas Claims</u>") or (y) a final, binding, nonappealable order of the Bankruptcy Court or other court of competent jurisdiction releasing the Acquired Companies from any Atlas Claims (either (x) or (y), the "<u>Atlas Waiver</u>"), Purchaser shall promptly cause each Acquired Company to transfer, assign, convey and deliver to the Seller, and the Seller shall acquire and accept from each Acquired Company, all of such Acquired Company's right, title and interest in, to and under (i) all claims, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses that may be asserted by such Acquired Company against Atlas, if any, under, the Atlas Contract (collectively, the "<u>Acquired Company Claims</u>"), and (ii) all miners and other equipment acquired or to be acquired by, or ordered by or on behalf of, Atlas. Following any such assignment, the Purchaser shall not, and the Purchaser shall cause its Affiliates (including the Acquired Companies) not to, (A) prosecute or pursue any of the Acquired Company Claims or (B) impede, oppose or interfere with the prosecution or pursuit of the Acquired Company Claims by the Seller or any of its Affiliates.

**ARTICLE VII**

**CONDITIONS TO CLOSING**

Section 7.1   <u>Conditions Precedent to the Obligations of the Purchaser and the Seller</u>. The respective obligations of the Seller and the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted by applicable Law, joint written waiver by the Purchaser and the Seller, of each of the following conditions:

28

(a)      no Law (including any Order) (whether temporary, preliminary or permanent) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated hereby shall be in effect; and

(b)      (i) the Bankruptcy Court shall have entered the Sale Order, and (ii) the Sale Order shall be a Final Order; provided, that if the Sale Order entered by the Bankruptcy Court includes a waiver of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, then the condition set forth in clause (ii) of this Section 7.1(b) shall be deemed satisfied.

Section 7.2      Conditions Precedent to the Obligations of the Seller. The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Seller, in whole or in part, to the extent permitted by applicable Law):

(a)      the representations and warranties of the Purchaser contained in Article V shall be true and correct in all material respects (without giving effect to any limitation or qualification as to materiality set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(b)      the Purchaser shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing; and

(c)      the Purchaser shall have delivered, or caused to be delivered, to the Seller (or at the direction of the Seller) all of the items set forth in Section 3.3.

Section 7.3      Conditions Precedent to the Obligations of the Purchaser. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)      (i) the Fundamental Representations shall be true and correct in all respects as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all respects only as of such specified date), (ii) the representations and warranties of the Seller contained in Article IV (other than Fundamental Representations) that are qualified by a "materiality" or "Material Adverse Effect" limitation or qualification shall be true and correct in all respects as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all respects only as of such specified date), and (iii) the representations and warranties of the Seller contained in Article IV (other than Fundamental Representations) that are not qualified by a "materiality" or "Material Adverse Effect" limitation or qualification shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the foregoing;

(b)      the Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by the

Seller on or prior to the Closing Date, and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the forgoing;

(c)     no Material Adverse Effect on the Acquired Companies shall have occurred since the Balance Sheet Date and be continuing and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the foregoing; and

(d)     the Purchaser shall have received all of the items set forth in <u>Section 3.2</u>.

## ARTICLE VIII

## ADDITIONAL DEFINITIONS

Section 8.1     <u>Certain Definitions</u>. As used herein:

(a)     "<u>Acquired Companies</u>" means, collectively, the Company and its and their respective subsidiaries.

(b)     "<u>Affiliate</u>" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include, in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person. The term "<u>control</u>" (including, with its correlative meanings, "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by Contract or otherwise).

(c)     "<u>Affiliate Contracts</u>" means any Contract between (i) any Acquired Company, on the one hand, and (ii) (x) Seller or any of its Affiliates (other than the Acquired Companies) or (y) any director, manager or officer of Seller or any of its Affiliates (other than the Acquired Companies after August 12, 2022), on the other hand.

(d)     "<u>Ancillary Agreements</u>" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(e)     "<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and any other applicable federal, state and foreign antitrust, merger control, competition or trade regulation Laws of any Governmental Body or Laws issued by any Governmental Body that are otherwise designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition.

(f)     "<u>Assigned Contracts Assignment</u>" means, with respect to any Assigned Contract, an assignment and assumption agreement, in a form reasonably acceptable to the Purchaser and the Seller, duly executed by the Seller and/or its applicable Affiliates, and the applicable Acquired Company, pursuant to which, on the date of such assignment and assumption agreement, such Assigned Contract is assigned to the applicable Acquired Company and the applicable Acquired Company assumes the Assumed Liabilities relating to such Assigned Contract.

(g)     "<u>Atlas</u>" means Atlas Technology Group LLC and its Affiliates.

(h)      "Atlas Contract" means, collectively, (i) the Master Agreement, dated September 2, 2021, by and between Compute North and Atlas Technology Group LLC, and (ii) the Partial Assignment and Assumption Agreement, dated April 27, 2022, by and between Compute North and Wolf Hollow (solely to the extent such Partial Assignment and Assumption Agreement relates to Atlas), as any of the foregoing has been amended, supplemented or otherwise modified from time to time.

(i)      "Business" means the business of the Acquired Companies, including the construction, development, operation and maintenance of the Wolf Hollow Project and the Kearney Project.

(j)      "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(k)      "CARES Act" means (a) the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136), and (b) Division N – Additional Coronavirus Response and Relief of the Consolidated Appropriations Act, 2021 (H.R. 133), in each case, together with all rules and regulations and guidance issued by any Governmental Body with respect thereto.

(l)      "CN Minden" means CN Minden LLC, a Delaware limited liability company.

(m)      "Code" means the Internal Revenue Code of 1986, as amended.

(n)      "Compute Holdings" means Compute North Holdings, Inc., a Delaware corporation.

(o)      "Compute North" means Compute North LLC, a Delaware limited liability company.

(p)      "Confidential Information" has the meaning set forth in the Confidentiality Agreement.

(q)      "Confidentiality Agreement" means the Confidentiality Agreement, dated as of October 12, 2022, by and between Compute Holdings and Generate Lending, LLC, as amended, supplemented or otherwise modified from time to time.

(r)      "Contract" means any contract, indenture, note, bond, lease, license, commitment or other legally enforceable agreement, instrument or arrangement.

(s)      "Cure Costs" means the amounts that must be paid in connection with the assumption and/or assignment of each Additional Business Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(t)      "Designation Deadline" means 12:00 p.m. (New York time) on November 3, 2022.

(u)      "Encumbrance" means any encumbrance, charge, restrictive covenant or condition, easement, encroachment, servitude, pledge, security interest, mortgage, lease, deed of trust, option, right of use, first offer or refusal, hypothecation or lien (statutory or otherwise) or similar restriction, whether imposed by Contract or Law.

(v)      "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources, human health (as any such Laws relate to exposure to any Hazardous Material) or the environment (including air, water, soil and natural resources), or the generation, use,

treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.), and other similar federal, state, provincial and local statutes.

(w)     "Equity Interests" means, with respect to any entity, any corporate stock, shares, partnership interests, limited liability company interests, membership interests or units, or any other equity interests of, or other equity participation in, such entity that confers on any other Person the right to receive a share of the profits and losses of, or distribution of the assets of, such Person.

(x)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(y)     "Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(z)     "Final Order" means an Order of the Bankruptcy Court (or other court of competent jurisdiction having jurisdiction over the Chapter 11 Cases) entered by the Clerk of the Bankruptcy Court on the docket in any of the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is and remains in full force and effect, (ii) has not been modified, amended, reversed, vacated or stayed, (iii) as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending, and (iv) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such Order shall not cause such Order not to be a Final Order.

(aa)     "Fundamental Representations" means those representations and warranties set forth in Sections 4.1, 4.2, 4.3(a)(i), 4.3(a)(ii), 4.4, 4.5 and 4.15.

(bb)     "GAAP" means generally accepted accounting principles in the U.S., consistently applied throughout the specified period.

(cc)     "Generate Credit Agreement" means that certain Credit and Guaranty Agreement, dated as of February 7, 2022, by and among the Company, as borrower, Wolf Hollow and Kearney, as subsidiary guarantors, Generate Lending, LLC, as administrative agent and collateral agent, and the lenders from time to time party thereto, as such Credit and Guaranty Agreement may have been amended, supplemented or otherwise modified from time to time.

(dd)     "Generate Debt Obligations" has the meaning ascribed to the term "Obligations" in the Generate Credit Agreement.

32

(ee)    "<u>Generate Debt Termination Date</u>" has the meaning ascribed to the term "Debt Termination Date" in the Generate Credit Agreement.

(ff)    "<u>Generate Guaranty</u>" means that certain Guaranty Agreement, dated as of February 7, 2022, made and entered into by Compute North and Compute Holdings in favor of Generate Lending, LLC, in its capacity as Administrative Agent under the Generate Credit Agreement, as amended, supplemented or otherwise modified from time to time.

(gg)    "<u>Generate Payoff Amount</u>" means all outstanding Generate Debt Obligations as of immediately prior to the Closing.

(hh)    "<u>Generate Pledge Agreement</u>" means that certain Pledge Agreement, dated as of February 7, 2022, made by the Seller in favor of Generate Lending, LLC, in its capacity as Collateral Agent under the Generate Credit Agreement, as amended, supplemented or otherwise modified from time to time.

(ii)    "<u>Governmental Body</u>" means any applicable federal, state, provincial, local, municipal, or foreign government or any agency, bureau, board, commission, court, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof.

(jj)    "<u>Hazardous Materials</u>" means petroleum and all derivatives thereof or synthetic substitutes thereof, asbestos and asbestos containing materials, polychlorinated biphenyls, per- and polyfluoroalkyl substances, radon gas and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "industrial waste," "contaminant," "pollutant," "radioactive," or "toxic" (or words of similar meaning) under or pursuant to any Environmental Law, including any regulations adopted by a Governmental Body pursuant thereto.

(kk)    "<u>Hedging Arrangement</u>" means any forward, future, swap, collar, put, call, floor, cap, option or other similar Contract the purpose of which is to benefit from, or reduce the risk of, fluctuations in interest rates or the price of any commodity, excluding, for the avoidance of doubt, any power purchase agreements to which an Acquired Company is a party.

(ll)    "<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

(mm)    "<u>Indebtedness</u>" means (without duplication) the following obligations: (a) any indebtedness for borrowed money, (b) any obligations evidenced by bonds, debentures, notes or other similar instruments, (c) any obligations for the deferred purchase price of property, Equity Interests, goods or services (other than current trade payables incurred in the ordinary course of business), (d) any reimbursement obligations with respect to draws under outstanding letters of credit, surety bonds or similar instruments, (e) any Hedging Arrangements, (f) any obligations required to be classified and accounted for as capital lease obligations on a balance sheet in accordance with GAAP, <u>provided</u>, that "Indebtedness" shall not include any obligations under leases or other Contracts required to be reported as liabilities as a result of FASB Accounting Standards Update No. 2016-02, Leases (Topic 842), (g) obligations arising from deferred compensation arrangements or outstanding severance obligations, and any unpaid payroll, bonus (including any unpaid discretionary annual bonuses in respect of the 2022 fiscal year) or commission obligations, together with the employer's portion of any employment or payroll Taxes related thereto (without regard to any deferral available under the CARES Act), (h) all unpaid income Taxes of any Acquired Company in respect of any period ending on or prior to the Closing Date, which amount shall not include any offsets or reductions with respect to Tax refunds or overpayments of Tax or other Tax assets, (i) all unpaid payroll Taxes deferred pursuant to the CARES Act, (j) self-insured liabilities for workers'

compensation, health and welfare obligations or other similar matters, (k) all liabilities to current or former equity holders in respect of dividends or other distributions declared prior to Closing, (l) any guaranty of any of the obligations described in clauses (a) - (k), and (m) any obligations in the nature of accrued fees, interest, premiums, breakage or make-whole payments or penalties with respect to any of the foregoing.

(nn)    "Intellectual Property" means any and all of the following: (i) patents, (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, and (v) trade secrets and confidential information or know-how (including, research and development, formulas, manufacturing and production processes and techniques, technical data and designs).

(oo)    "IT Assets" means all computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements that are owned, leased or licensed by the Acquired Companies.

(pp)    "Kearney" means Compute North NE05, LLC, a Delaware limited liability company.

(qq)    "Kearney PMA" means that certain Property Management Agreement, dated as of February 7, 2022, as amended from time to time, by and between Kearney and Compute North.

(rr)    "Kearney Project" means the data center project owned by Kearney.

(ss)    "Knowledge of the Seller" means the actual knowledge of the Drake Harvey and Barry Coulby (after reasonable inquiry with the general counsel of the Seller).

(tt)    "Laws" means all (i) federal, state, provincial, local, municipal, foreign or other laws, statutes, legislations, constitutions, common law, resolutions, rules, edicts, codes, regulations, restrictions, ordinances, proclamations, treaties, conventions and requirements of, or issued, promulgated, enforced or entered by, any Governmental Body, and (ii) Orders.

(uu)    "Liability" means, as to any Person, any claim, debt, adverse claim, lien, liability, duty, responsibility, obligation, commitment, assessment, cost, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense), loss, damage, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, ascertained or ascertainable, fixed, absolute or contingent, matured or unmatured, direct or indirect, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, due or to become due, executory, determined, determinable, in contract, tort, strict liability, or otherwise, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(vv)    "Licensed Intellectual Property" means all Intellectual Property that is licensed to an Acquired Company.

(ww)    "Material Adverse Effect" means any circumstance, change, fact, event, effect, occurrence or development that, alone, or together with any other circumstance, change, fact, event, effect, occurrence or development, has had or is reasonably expected to have, a material adverse effect on (a) with respect to Seller, the ability of Seller to consummate the transactions contemplated by this Agreement by the Outside Date; (b) with respect to Purchaser, the ability of Purchaser to consummate the transactions contemplated by this Agreement by the Outside Date and (c) with respect to the Acquired Companies, the

34

business, assets, liabilities, financial condition or results of operations of Wolf Hollow or Kearney; provided that, in the case of this clause (c), none of the following shall, for any purposes hereof, constitute or be deemed to contribute to a "Material Adverse Effect" or shall otherwise be taken into account in determining whether a "Material Adverse Effect" has occurred or would reasonably be expected to occur: (i) changes generally affecting the industries in which any of the Acquired Companies operate, whether international, national, regional, state, provincial or local, (ii) changes in international, national, regional, state, provincial or local markets for or costs of commodities, raw materials or other supplies, products or services used or generated by any of the Acquired Companies, (iii) changes in general regulatory, political or geopolitical conditions, including any acts of war, whether or not declared, armed hostilities, sabotage or terrorist activities (including any electronic or digital attack by any Person on any electric generating, transmission or distribution infrastructure), or any escalation or worsening thereof, and any governmental instability, government shutdown, failure to raise the borrowing limit of any Governmental Body or the results of any elections for government office or the appointment of any Person to any Governmental Body, (iv) changes in international, national, regional, state, provincial or local electric transmission or distribution systems, generally, (v) earthquakes, hurricanes, floods, acts of God or other effects of weather, meteorological events or natural disasters, (vi) changes in Law or regulatory policy or the interpretation or enforcement thereof, (vii) changes or adverse conditions in the currency, financial, banking or securities markets, in each case, including any disruption thereof and any decline in the price of any security or any market index, including devaluations of currency or any changes in the exchange rate of any currency as measured against any other currency, (viii) the announcement, negotiation, pendency, execution or delivery of this Agreement or the consummation of the transactions contemplated hereby, including the identity of, or the effect of any fact or circumstance relating to, Purchaser or any of its Affiliates or any communication by Purchaser or any of its Affiliates regarding its plans, proposals or projections with respect to any Acquired Company (including any impact on the relationship of any Acquired Company, contractual or otherwise, with its customers, suppliers, service providers, contractors, lenders, partners, directors, managers, officers, employees or other agents), (ix) changes in accounting requirements or principles, including any changes in GAAP, (x) labor strikes, requests for representation, organizing campaigns, work stoppages, slowdowns or other labor disputes, (xi) new generating facilities and their effect on pricing or transmission, (xii) actions or omissions expressly required to be taken or not taken by Seller, any of the Acquired Companies or any of its or their respective Affiliates in accordance with this Agreement or any other Ancillary Agreement to which it is a party or consented to in writing by Purchaser or any of its Affiliates, (xiii) any breach by Purchaser or any of its Affiliates of any provision of this Agreement or any other Ancillary Agreement to which it is a party, (xiv) any failure of Seller or any Acquired Company to meet any projections, forecasts or estimates of revenues, earnings or any other financial performance or results of operations of all or any portion of any Acquired Company (it being understood that this clause (xiv) shall not exclude any circumstance, change, fact, event, occurrence or development giving rise to such failure to the extent any such circumstance, change, fact, event, effect, occurrence or development is not otherwise excluded from clause (c) of this definition of Material Adverse Effect), (xv) changes in or effects on the assets of any Acquired Company that are cured (including by the payment of money) by Seller or any Acquired Company prior to the Closing, (xvi) any global, regional or local health conditions (including any epidemic, pandemic, or other outbreak of illness, or any actions by a Governmental Body related to the foregoing), (xvii) the commencement and existence of the Chapter 11 Cases, and (xviii) any Generate Approved Matters.

(xx)     "Order" means any order, writ, judgment, injunction, decree, ruling, directive, determination or award made, issued or entered by any Governmental Body, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order).

(yy)     "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which

relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

(zz)    "Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

(aaa)    "Permits" means all permits, approvals, concessions, grants, franchises, licenses, clearances, registrations, variances, certifications, exemptions, endorsements, waivers and other authorizations issued by any Governmental Body.

(bbb)    "Permitted Encumbrances" means (i) Encumbrances for utilities or Taxes that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings, (ii) easements, rights of way, restrictive covenants, encroachments and other similar Encumbrances against any assets of the Acquired Companies that do not, individually or in the aggregate, adversely affect the operation of the business of the Acquired Companies in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) any Encumbrances created by this Agreement or any of the Ancillary Agreements or created by the actions of the Purchaser or its Affiliates, (v) any Encumbrances that are removed or released by operation of the Sale Order, (v) mechanics', carriers', workers', repairers', landlords' and similar Encumbrances arising or incurred in the ordinary course of business for amounts that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings or the payment or enforcement of which is stayed under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court, (vi) other Encumbrances that would not, individually or in the aggregate, reasonably be expected to materially impair the ability of the Acquired Companies (taken as a whole) to operate in the ordinary course of business, (vii) all matters shown in any lien, pending suits and judgment searches or in any title reports or title policies made available to, or obtained by, the Purchaser, (viii) all pledges, deposits or other liens securing obligations under or with respect to utilities, (ix) Encumbrances in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution; and (x) Encumbrances created under the Generate Credit Agreement or the other Loan Documents (as defined in the Generate Credit Agreement).

(ccc)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(ddd)    "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Person that is an individual.

(eee)    "Property Purchase Agreement" means the Purchase Agreement, effective as of December 1, 2021, made and entered into by and between Gary A. Frith and Ruth K. Frith, Trustees of the Firth Living Trust, and Kearney, as amended, supplemented, extended or otherwise modified from time to time.

(fff)    "Purchaser Ancillary Agreements" means, collectively, the Assignment and Assumption Agreement, the TSA, and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement.

(ggg)    "Purchaser Parties" means, collectively, (i) the Purchaser, (ii) each of the current or former Affiliates of the Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors,

36

predecessors, successors and assigns of any of the Persons described in <u>clause (i)</u> or <u>clause (ii)</u> of this definition, and each of the Affiliates of any of the Persons described in this <u>clause (iii)</u>.

(hhh)    "<u>Registered IP</u>" means all Owned Intellectual Property that is registered or issued as a patent, trademark or copyright or filed as an application to register or issue as a patent, trademark or copyright.

(iii)    "<u>Related Person</u>" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren (by blood, adoption or marriage).

(jjj)    "<u>Release</u>" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(kkk)    "<u>Representatives</u>" means, with respect to any Person, the officers, directors, managers, employees, auditors, counsel, professionals, advisors, accountants, agents, contractors and other representatives of (i) such Person or (ii) any of the Affiliates of such Person.

(lll)    "<u>Right</u>" means any option, warrant, convertible or exchangeable security or other right to subscribe for, purchase or otherwise acquire any Equity Interest or other security of any class, with or without payment of consideration, either immediately or upon the occurrence of a specified date or specified event or the satisfaction of any other condition.

(mmm)    "<u>Sale Order</u>" means an Order of the Bankruptcy Court, in form and substance acceptable to the Purchaser in its sole discretion and reasonably acceptable to the Seller, which shall, among other things, approve (i) the sale and assignment of the Acquired Interests by the Seller to the Purchaser pursuant to this Agreement, and (ii) the releases as set forth in <u>Exhibit A</u>. In the event of any inconsistencies between the Sale Order and this Agreement, the Sale Order shall control.  The form and substance of the order attached to the *Notice of Proposed Order (I) Approving the Sale of Debtor CN Pledgor LLC's Equity Interests in CN Borrower LLC Free and Clear of All Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related Relief* [Dkt. No. 332] (or attached to any other notice or filing submitted with the Bankruptcy Court that is approved by Purchaser and Seller) shall be deemed acceptable to the Purchaser and the Seller.

(nnn)    "<u>Seller Ancillary Agreements</u>" means, collectively, the Assignment and Assumption Agreement, the TSA, and each other certificate, agreement or document (other than this Agreement) that the Seller is required to execute and/or deliver pursuant to the terms of this Agreement.

(ooo)    "<u>Seller Disclosure Schedules</u>" means the Schedules to this Agreement that relate solely to the representations and warranties of the Seller set forth in <u>Article IV</u>.

(ppp)    "<u>Seller Parties</u>" means, collectively, (i) the Seller, (ii) each of the current or former Affiliates of the Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in <u>clause (i)</u> or <u>clause (ii)</u> of this definition, and each of the Affiliates of any of the Persons described in this <u>clause (iii)</u>.

(qqq)    "<u>Specified Bond</u>" means that certain Transmission Facilities Payment Bond (No. PB00563200001) issued by Philadelphia Indemnity Insurance Company, as "Surety", and Kearney, as

37

"Principal", for the benefit of Nebraska Public Power District, as "Obligee", in the original maximum penal sum of $4,000,000, as amended, supplemented or otherwise modified from time to time.

(rrr)    "Specified Bond GIA" means that certain General Indemnity Agreement, executed February 16, 2022, by Compute Holdings, Compute North, Kearney and the other "Indemnitors" named therein in favor of Philadelphia Indemnity Insurance Company, as amended, supplemented or otherwise modified from time to time.

(sss)    "Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

(ttt)    "Tax" and "Taxes" means any foreign or U.S. federal, state, county, or local income, transfer, sales, use, excise, franchise, profits, real and personal property, gross receipt, value added, stamp, license, capital gains, capital stock, production, business and occupation, disability, employment, escheat or unclaimed property, payroll, severance, occupation, premium, windfall profits, environmental, customs duties, social security (or similar), unemployment, disability, use, transfer, registration, alternative or add-on minimum, estimated withholding or other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including all interest, additions, surcharges, fees or penalties related thereto.

(uuu)    "Tax Return" means any return, report, information return, declaration, claim for refund or other information or document (including any schedule or related or supporting information) filed or provided, or required to be filed or provided, with or to any Governmental Body with respect to Taxes (including in connection with the determination, assessment or collection of Taxes or the administration of any Law with respect to Taxes), including amendments thereto.

(vvv)    "TSA Expiration Date" means the date on which the TSA expires or is terminated.

(www)   "WH PMA" means that certain Property Management Agreement, dated as of April 28, 2022, as amended from time to time, by and between Wolf Hollow and Compute North.

(xxx)    "Wolf Hollow" means CN Wolf Hollow LLC, a Delaware limited liability company.

(yyy)    "Wolf Hollow Project" means the data center project owned by Wolf Hollow.

Section 8.2    Additional Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
| --- | --- |
| Actions | 4.9(a) |
| Accommodation Agreement | 4.11(a)(iii) |
| Additional Business Contracts | 1.2(a) |
| Agreement | Preamble |
| Allocation Schedule | 2.3 |
| Acquired Interests | Recitals |
| Asset Taxes | 6.2(b) |
| Assigned Contract | 1.2(a) |
| Assigned Contracts Assignment | 3.2(b) |
| Assignment and Assumption Agreement | 3.2(a) |

| **Defined Term** | **Location** |
|---|---|
| Balance Sheet Date | 4.6 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | 4.2 |
| Cash Purchase Price | 2.1(a) |
| Chapter 11 Cases | Recitals |
| Closing | 3.1 |
| Closing Date | 3.1 |
| Company | Recitals |
| Construction Contracts | 4.11(a)(i) |
| Construction Budget and Schedule | 4.12(b) |
| Contracting Party | 9.12 |
| Customer Contract | 4.11(a)(iii) |
| e-mail | 9.7 |
| Environmental Permits | 4.19(a) |
| Equipment Supply Agreements | 4.11(a)(ii) |
| Excluded Names | 6.8 |
| Execution Date | Preamble |
| Financial Statements | 4.6 |
| Generate Approved Matter | Article 4 |
| Inclusion Notice | 1.2(a) |
| Insurance Policies | 4.18 |
| Interconnection Process | 6.11(a) |
| Interim Arrangement | 1.3(d) |
| Interim Period | 6.1(a) |
| Leased Real Property | 4.16(a) |
| Legal Restraint | 3.4(c) |
| Material Contracts | 4.11(a) |
| Minden Agreement | 6.13 |
| Nonassignable Assets | 1.3(c) |
| Non-Recourse Party | 9.12 |
| Outside Date | 3.4(b) |
| Owned Real Property | 4.16(a) |
| Partial Assignment Agreements | 4.11(a)(xiii) |
| Payoff and Release Agreement | 3.2(g) |
| Post-Closing Covenants | 9.2 |
| Profit Sharing Agreement | 4.11(a)(iii) |
| Purchase Price | 2.1(d) |
| Purchaser | Preamble |
| Real Property | 4.16(a) |
| Real Property Documents | 4.16(b) |
| Seller | Preamble |
| Seller Insurance Coverage | 6.3 |
| Transfer Taxes | 6.2(a) |
| TSA | 3.2(c) |
| UPE | 6.10(c) |

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Payment of Expenses. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto will bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; provided, that all (a) Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto), and (b) filing fees in connection with any filings, applications or submissions under the HSR Act or any other Antitrust Law shall be borne solely by the Purchaser.

Section 9.2    Survival of Representations, Warranties; and Covenants. None of the representations, warranties, covenants or agreements in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, including any rights arising out of any breach or violation of any such representations, warranties, covenants or other agreements, will survive the Closing, and all such representations, warranties, covenants and other agreements shall terminate and expire upon the occurrence of the Closing; provided, that each of the covenants and agreements set forth in this Agreement and/or any of the Ancillary Agreements which by their express terms are to be performed or complied with subsequent to the Closing Date (collectively, the "Post-Closing Covenants") and rights arising out of any breach or violation of any such Post-Closing Covenants shall survive the Closing in accordance with their terms. In furtherance of the foregoing, each of the Seller and the Purchaser hereby waives, to the fullest extent permitted under applicable Law, any and all rights, claims, remedies and causes of action it may have against the other party hereto (including any rights, claims, remedies and causes of action arising under or based upon any federal, state, local or foreign statute, ordinance, rule, regulation or other Law) for any breach of any representation, warranty, covenant or obligation set forth in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, except with respect to the Post-Closing Covenants. At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Seller, on the other hand, have any recourse against (i) the Seller or any of the Seller Parties, or (ii) the Purchaser or any of the Purchaser Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Seller or the Purchaser, as applicable, in this Agreement or any of the Ancillary Agreements, except with respect to claims for breaches of Post-Closing Covenants.

Section 9.3    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement and the Ancillary Agreements constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings between the parties hereto with respect thereto. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the Purchaser and the Seller, or in the case of a waiver, by the party against whom the waiver is to be effective. The waiver by any party hereto of any provision of this Agreement or any breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any other or subsequent breach of any provision of this Agreement. No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 9.4    Counterparts. For the convenience of the parties hereto, this Agreement and the Ancillary Agreements, and any amendments hereto or thereto, may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement, and to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any Ancillary Agreement shall raise the use of electronic signature, a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 9.5    Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

Section 9.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL ACTIONS, CLAIMS, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR ANY COURT EXERCISING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT) IN RESPECT OF ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING AND AGREES THAT IT WILL NOT BRING ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING IN ANY OTHER COURT; PROVIDED, HOWEVER, THAT IF THE CHAPTER 11 CASES ARE DISMISSED OR IF THE BANKRUPTCY COURT IS UNABLE TO HEAR ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, IN ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE) WILL HAVE SOLE JURISDICTION OVER ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT AS A DEFENSE, COUNTERCLAIM OR OTHERWISE, IN ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, (A) ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE NAMED COURTS FOR ANY REASON OTHER THAN THE FAILURE TO SERVE PROCESS IN ACCORDANCE WITH SECTION 9.7, (B) ANY CLAIM THAT IT OR ITS PROPERTY IS EXEMPT OR IMMUNE FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS COMMENCED IN ANY SUCH COURT (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF JUDGMENT, EXECUTION OF JUDGMENT OR OTHERWISE) AND (C) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) THE ACTION, CLAIM, SUIT OR PROCEEDING IN SUCH COURT IS BROUGHT IN AN INCONVENIENT FORUM, (II) THE VENUE OF SUCH ACTION, CLAIM, SUIT OR PROCEEDING IS IMPROPER OR (III) THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR ENTERED INTO IN CONNECTION HEREWITH, OR THE SUBJECT MATTER HEREOF OR

THEREOF, MAY NOT BE ENFORCED IN OR BY ANY SUCH COURT. EACH PARTY HERETO AGREES THAT NOTICE OR THE SERVICE OF PROCESS IN ANY ACTION, CLAIM, SUIT OR PROCEEDING ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, SHALL BE PROPERLY SERVED OR DELIVERED IF DELIVERED IN THE MANNER CONTEMPLATED BY <u>SECTION 9.7</u>.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 9.7     <u>Notices</u>. Except as otherwise expressly provided in this Agreement, all notices, requests, demands, consents, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when sent by electronic mail ("<u>e-mail</u>"), (b) when delivered personally, (c) one (1) Business Day after deposit with an overnight courier service, or (d) three (3) Business Days after the date of mailing by certified or registered mail, return receipt requested, with postage prepaid, in any such case to the parties hereto at the following addresses or e-mail addresses (or at such other address or e-mail address for a party hereto as shall be specified by like notice to the other party hereto):

If to the Seller:

> c/o Compute North Holdings, Inc.
> 7575 Corporate Way
> Eden Prairie, MN 55344
> Attn: Barry Coulby, Jason Stokes
> Email: barry.coulby@computenorth.com; jason.stokes@computenorth.com

with a copy (which shall not constitute effective notice) to:

> Paul Hastings LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: Matthew Schwartz; Sayan Bhattacharyya
> Email: mattschwartz@paulhastings.com; sayanbhattacharyya@paulhastings.com

If to the Purchaser:

> GC Data Center Equity Holdings, LLC
> 560 Davis Street, Suite 250
> San Francisco, CA 94111
> Attn: Daryl Carbonaro; Mateo Aceves
> Email: notices@generatecapital.com

with a copy (which shall not constitute effective notice) to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY  10022
> Attn: Christopher Marcus, P.C.; Brian Greene, P.C.; Allan Kirk
> Email: christopher.marcus@kirkland.com; brian.greene@kirkland.com;
> allan.kirk@kirkland.com

Section 9.8    Binding Effect; Assignment. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns, including, in the case of the Seller, any trustee or estate representative appointed in the Chapter 11 Cases. No assignment of this Agreement or any rights, interests or obligations hereunder may be made by any party hereto (by operation of Law or otherwise) without the prior written consent of the other party hereto, and any attempted assignment without the required consents shall be void.

Section 9.9    Severability. If any term, condition or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party hereto. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 9.10    Injunctive Relief. The parties hereto acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) an award of money damages would not be adequate to compensate the non-breaching party. Accordingly, each of the parties hereto shall be entitled, in addition to any other rights and remedies existing in its favor at law or in equity, to equitable relief, an injunction or injunctions or Orders for specific performance to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder, without the necessity of proving the inadequacy of money damages as a remedy. The right to equitable relief, including specific performance and injunctive relief, shall exist in addition to and notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the parties hereto hereby irrevocably waives any defense that a remedy at law is adequate and any requirement to obtain, furnish or post any bond, security or other instrument in connection with or as a condition to any actions instituted for injunctive relief, specific performance or other equitable remedies. Each of the parties hereto hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties hereto would have entered into this Agreement.

Section 9.11    Third Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable benefit, claim, cause of action, remedy or right of any kind hereunder, except that each of the Seller Parties, Purchaser

Parties, GIA Indemnitors and Non-Recourse Parties shall be a third party beneficiary of <u>Sections 3.5(a)</u>, <u>6.14</u>, <u>9.2</u> and <u>9.12</u>, as applicable.

Section 9.12    <u>Non-Recourse</u>. All causes of action or Actions (whether in contract or in tort, in equity or at Law, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, connected with, or relate in any manner to this Agreement, or the negotiation, preparation, execution, delivery, performance or breach of this Agreement, may be brought only against the Persons that are expressly identified as parties to this Agreement in the preamble of this Agreement (each, a "<u>Contracting Party</u>").  No Person who is not a Contracting Party, including any past, present or future direct or indirect equity holder, Affiliate or Representative of such Contracting Party or any Affiliate or Representative of any of the foregoing (the "<u>Non-Recourse Party</u>"), shall have any Liability or other obligation (whether in contract or in tort, in equity or at Law, or granted by statute) for any cause of action or Action arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, preparation, execution, delivery, performance, or breach; and, to the maximum extent permitted by applicable Law, each Contracting Party hereby waives and releases all such causes of action and Actions against any such Non-Recourse Party.  Without limiting the generality of the foregoing, to the maximum extent permitted by applicable Law, (a) each Contracting Party hereby waives and releases any and all causes of action or Actions that may otherwise be brought in equity or at Law, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability or other obligation of any Contracting Party on any Non-Recourse Party, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Recourse Party with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 9.13    <u>Time of the Essence</u>. Time is of the essence in the performance of each of the obligations of the parties hereto and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

Section 9.14    <u>Disclosure</u>. Any exception, qualification or other disclosure set forth on the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Agreement shall be deemed to be an exception, qualification or other disclosure with respect to all other representations or warranties contained in this Agreement to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such exception, qualification or disclosure is applicable to such other representations or warranties whether or not such exception, qualification or disclosure makes reference to such other representations or warranties or any of their Section references.

Section 9.15    <u>Certain Interpretations</u>.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits of or to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized

terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The table of contents and Article, Section and paragraph captions herein are for convenience of reference only, and shall not be deemed to limit or otherwise affect the meaning or interpretation of any of the provisions hereof.

(iv)    The words "include," "includes" and "including" and words of similar import, when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Any reference to "days" means calendar days unless Business Days are expressly specified.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words "herein," "hereinafter," "hereof" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not merely to a subdivision or particular provision in which such words appear unless the context otherwise requires.

(ix)    The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(x)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(xi)    The term "or" is disjunctive and not exclusive.

(xii)    The phrases "delivered" or "made available" and words of similar import, when used in this Agreement in reference to information or materials delivered or made available to the Purchaser, shall include information or materials that have been made available by the Seller or any of its Affiliates to the Purchaser at any time prior to 12:00 p.m. (New York time) on the Execution Date, including in any "data room" (virtual or otherwise) to which the Purchaser has access (whether or not the Purchaser accesses such information or materials).

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)    Prior drafts of this Agreement or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be construed in favor of or against any party on account of its participation in the negotiations and/or drafting of such prior drafts or be used

as an aid of construction or otherwise constitute evidence of the intent of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such prior drafts.

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>:

**CN PLEDGOR LLC**

By: _Drake Harvey_
　　DocuSigned by:
　　75158D9531594BE...
Name:　Drake Harvey
Title:　President

**<u>PURCHASER</u>**:

GC Data Century Equity Holdings, LLC

By:

Name: Andrew Marino

Title: Manager

**Exhibit A**

**Form of Release**

For good and valuable consideration on behalf of the Purchaser, the adequacy of which is hereby confirmed, on and after the Closing, each of the Debtors[1] (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries (other than the Acquired Companies), and each such entity's and its current and former direct and indirect subsidiaries' (other than the Acquired Companies) current and former officers, members, managers, directors, principals, employees, agents, independent contractors, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), representatives, predecessors, and successors and assigns, in each case to the extent permitted by applicable law and solely in such parties' capacity as such) (collectively, the "Debtor Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the Purchaser, the Purchaser's current and former direct and indirect subsidiaries, and the Purchaser's and the Purchaser's current and former direct and indirect subsidiaries' directors, officers, managers, members, equityholders (regardless of whether such interests are held directly or indirectly), principals, employees, agents, independent contractors, attorneys, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), predecessors, successors, and assigns, and the attorneys and current directors of CN Borrower, LLC, CN Wolf Hollow LLC, and Compute North NE05, LLC (collectively, the "Purchaser Released Parties") and their respective property and assets from any and all acts and omissions of the Purchaser Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Debtor Releasing Parties now have, may claim to have or may come to have against the Purchaser Released Parties through the Closing, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, (c) any and all claims and causes of action based on or relating to or in any manner arising from in whole or in part, any Purchaser Released Party's efforts related to the PSA, intercompany transactions, the formulation, preparation, dissemination, negotiation, modification, amendment, entry into, or filing of the (i) PSA, (ii) that certain Credit and Guaranty Agreement, dated as of February 7, 2022, as amended by that certain Consent and Amendment No. 1 to Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement, dated as of April 28, 2022, that certain Consent and Amendment No. 2 to Credit and Guaranty Agreement, dated as of June 17, 2022, that certain Amendment No. 3 to Credit and Guaranty Agreement, dated as of August 23, 2022, and that certain Amendment No. 4 to Credit and Guaranty Agreement, dated as of September 16, 2022, and as the same may be further amended, amended and restated, restated, modified or supplemented and in effect from time to time prior to the date of entry of this Order, by and among CN Borrower LLC, certain subsidiary guarantors from time

---

[1]   The "Debtors" are the following entities: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871) (also the Seller); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238). The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

to time party thereto, Generate Lending, LLC, as administrative agent and collateral agent, and the lenders from time to time party thereto (the "Credit Agreement"), (iii) that certain Guaranty Agreement, dated as of February 7, 2022, entered into by Compute North LLC and Compute North Holdings, Inc. ("CN Holdings"), as the sponsors, in favor of Generate Lending, LLC as Administrative Agent (the "Guaranty Agreement"), (iv) that certain Pledge Agreement, dated as of February 7, 2022, entered into by CN Pledgor LLC, as Pledgor, and Generate Lending, LLC, as Collateral Agent (the "Pledge Agreement"), (v) that certain Voting Agreement, dated as of February 2, 2022, by and among CN Holdings and each holder of the preferred stock of CN Holdings party thereto (the "Voting Agreement"), (vi) that certain Letter Agreement, dated as of October 18, 2022, by and among Mercuria Energy America, LLC, CN Wolf Hollow LLC and Generate Lending, LLC (the "Letter Agreement") or (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with the PSA, Credit Agreement, Guaranty Agreement, Pledge Agreement, Voting Agreement, or Letter Agreement or upon any other act or omission, transaction, agreement, event, or other occurrence related to the foregoing taking place on or before the Closing, (d) any actions taken by or on behalf of any of the Purchaser Released Parties in connection with the ownership of the preferred stock of Compute North Holdings or their participation on the Board of Directors of CN Holdings, and (e) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement or recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction; provided that this paragraph shall not release any Purchaser Released Party (including, for these purposes, CN Wolf Hollow LLC, and Compute North NE05, LLC) from any claims, obligations or liabilities (1) arising after Closing under the Sale Order, the PSA or the TSA or (2) for fees payable in exchange for services provided under, and reimbursement of costs and expenses incurred in connection with services provided under, the Kearney PMA (as defined in the PSA) or the WH PMA (as defined in the PSA), each as amended and supplemented by that certain *Stipulation and Agreed Order by and among Compute North LLC, Compute North NE05 LLC, CN Wolf Hollow LLC, and Generate Lending, LLC Concerning Certain Project Management Agreement* [Dkt. No. 266] (the "Stipulation"), as required thereunder.

On and after the Closing, the Purchaser (in its own right, on behalf of its current and former direct and indirect subsidiaries (including the Acquired Companies), and the Purchaser's and its current and former direct and indirect subsidiaries' current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, employees, agents, independent contractors, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), representatives, predecessors, and successors and assigns, in each case to the extent permitted by applicable law and solely in such parties' capacity as such) (collectively, the "Purchaser Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the Debtors, the Debtors' current and former direct and indirect subsidiaries (other than the Acquired Companies), and any of the Debtors' and the Debtors' current and former direct and indirect subsidiaries' (other than the Acquired Companies) current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, employees, agents, independent contractors, attorneys, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), predecessors, and successors and assigns (collectively, the "Debtor Released Parties") and their respective property and assets from any and all acts and omissions of the Debtor Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands,

controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Purchaser, or the Purchaser's successors or assigns, whether individually or collectively), which the Purchaser Releasing Parties now have, may claim to have or may come to have against the Debtor Released Parties through the Closing, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, (b) any and all claims and causes of action based on or relating to or in any manner arising from in whole or in part, any Debtor Released Party's efforts related to the PSA, intercompany transactions, the formulation, preparation, dissemination, negotiation, modification, amendment, entry into, or filing of the (i) PSA, (ii) the Credit Agreement, (iii) the Guaranty Agreement, (iv) the Pledge Agreement, (v) the Voting Agreement, (vi) the Letter Agreement or (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with the PSA, Credit Agreement, Guaranty Agreement, Pledge Agreement, Voting Agreement, or Letter Agreement or upon any other act or omission, transaction, agreement, event, or other occurrence related to the foregoing taking place on or before the Closing, and (d) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any claim or cause of action arising under or pursuant to the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction; provided that this paragraph shall not release any Debtor Released Party from any claims, obligations or liabilities arising under the Stipulation or after Closing under the Sale Order, the PSA, or the TSA.

These paragraphs are in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Debtor Releasing Parties in favor of the Purchaser Released Parties or by the Purchaser Releasing Parties in favor of the Debtor Released Parties.

**<u>Exhibit B</u>**

**Redline**

[Execution Copy]

**PURCHASE AND SALE**

**AGREEMENT BY AND BETWEEN**

**GC Data Center Equity Holdings, LLC,**

**as Purchaser, and**

**CN Pledgor LLC, as Seller**

**Dated as of October ~~28~~31, 2022**

**TABLE OF CONTENTS**

**Page**

ARTICLE I PURCHASE AND SALE OF ACQUIRED INTERESTS; ASSUMPTION OF LIABILITIES ........................................................................................................................................ 1

Section 1.1     Purchase and Sale of Acquired Interests .................................................. 1
Section 1.2     Assigned Contracts ................................................................................. 1

ARTICLE II CONSIDERATION ....................................................................................... 3

Section 2.1     Consideration ......................................................................................... 3
Section 2.2     Payment of Cash Purchase Price ........................................................... 3
Section 2.3     Allocation of Purchase Price .................................................................. 3

ARTICLE III CLOSING AND TERMINATION ............................................................. 4

Section 3.1     Closing ................................................................................................... 4
Section 3.2     Closing Deliveries by the Seller ........................................................... 4
Section 3.3     Closing Deliveries by the Purchaser ..................................................... 5
Section 3.4     Termination of Agreement .................................................................... 5
Section 3.5     Effect of Termination ............................................................................ 6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ............. 7

Section 4.1     Organization and Qualification .............................................................. 7
Section 4.2     Authority Relative to This Agreement ................................................... 7
Section 4.3     Conflicts; Consents and Approvals ........................................................ 8
Section 4.4     Title ....................................................................................................... 9
Section 4.5     Capitalization ......................................................................................... 9
Section 4.6     Financial Statements .............................................................................. 9
Section 4.7     Undisclosed Liabilities .......................................................................... 9
Section 4.8     Absence of Changes ............................................................................... 9
Section 4.9     Litigation ................................................................................................ 9
Section 4.10    Intellectual Property; IT Assets ............................................................ 10
Section 4.11    Material Contracts; Assigned Contracts ................................................ 11
Section 4.12    Wolf Hollow ......................................................................................... 12
Section 4.13    Kearney ................................................................................................. 12
Section 4.14    Permits .................................................................................................. 12
Section 4.15    Brokers and Finders .............................................................................. 13
Section 4.16    Real Property ......................................................................................... 13
Section 4.17    Tax Returns; Taxes
              ~~14~~13
Section 4.18    Insurance Policies ................................................................................. 15
Section 4.19    Environmental Matters ......................................................................... 15
Section 4.20    Affiliate Arrangements; Seller Credit Support ..................................... 16
Section 4.21    Condition of Assets ............................................................................... 16
Section 4.22    Books and Records ................................................................................ 16
Section 4.23    Employees Matters ................................................................................ 16
Section 4.24    NO OTHER REPRESENTATIONS ...................................................... 17

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..... 17

Section 5.1     Organization and Qualification ............................................................ 17
Section 5.2     Authority Relative to This Agreement ................................................. 17

Section 5.3        Conflicts; Consents and Approvals                                  ~~18~~17

Section 5.4        Financial Capacity                                                           18
Section 5.5        Brokers and Finders                                                          18
Section 5.6        Qualification                                                                18
Section 5.7        Independent Investigation; Reliance By the Purchaser                         18
Section 5.8        RELIANCE/ACKNOWLEDGMENT                                                       19
Section 5.9        NO OTHER REPRESENTATIONS                                              ~~20~~19

ARTICLE VI COVENANTS AND AGREEMENTS                                                             20

Section 6.1        Conduct of Seller                                                            20
Section 6.2        Taxes                                                                        22
Section 6.3        Insurance                                                                    23
Section 6.4        Access                                                                       23
Section 6.5        Confidentiality; Non-Solicitation                                            24
Section 6.6        Publicity                                                                    24
Section 6.7        Wrong Pocket                                                          ~~25~~24
Section 6.8        Use of Excluded Names                                                        25
Section 6.9        Access and Preservation of Records                                           25
Section 6.10       Further Assurances                                                    ~~25~~26
Section 6.11       Interconnection Process                                                      26
Section 6.12       Minden Assignment                                                            26
Section 6.13       Employee Matters                                                             27
Section 6.14       Specified Bond GIA                                                           27
Section 6.15       Wolf Hollow; Kearney                                                         27
Section 6.16       Removal of Certain Equipment                                          ~~27~~28
Section 6.17       Atlas                                                                 ~~27~~28

ARTICLE VII CONDITIONS TO CLOSING                                                               28

Section 7.1        Conditions Precedent to the Obligations of the Purchaser and the Seller      28
Section 7.2        Conditions Precedent to the Obligations of the Seller                 ~~28~~29
Section 7.3        Conditions Precedent to the Obligations of the Purchaser                     29

ARTICLE VIII ADDITIONAL DEFINITIONS                                                             30

Section 8.1        Certain Definitions                                                          30
Section 8.2        Additional Defined Terms                                                     38

ARTICLE IX MISCELLANEOUS                                                                 ~~39~~40

Section 9.1        Payment of Expenses                                                   ~~39~~40
Section 9.2        Survival of Representations, Warranties; and Covenants                ~~39~~40
Section 9.3        Entire Agreement; Amendments and Waivers.                                    40
Section 9.4        Counterparts                                                          ~~40~~41
Section 9.5        Governing Law                                                         ~~40~~41
Section 9.6        Jurisdiction, Waiver of Jury Trial                                    ~~40~~41
Section 9.7        Notices                                                               ~~41~~42
Section 9.8        Binding Effect; Assignment                                            ~~42~~43
Section 9.9        Severability                                                          ~~42~~43
Section 9.10       Injunctive Relief                                                            43
Section 9.11       Third Party Beneficiaries                                                    43
Section 9.12       Non-Recourse                                                          ~~43~~44
Section 9.13       Time of the Essence                                                          44
Section 9.14       Disclosure                                                                   44

Section 9.15    Certain Interpretations .................................................................... 44

**Exhibits**

Exhibit A             Form of Release

**Schedules**[1]

Schedule 1.2(a)       Assigned Contracts
Schedule 3.2(d)       Business
Employees Schedule 4.5  Capitalization
Schedule 4.10         Intellectual Property
Schedule 4.12         Wolf Hollow
Schedule 4.13         Kearney
Schedule 4.16         Real Property
Schedule 4.18         Insurance Policies
Schedule 4.20         Affiliate Contracts
Schedule 6.17         Removal of Certain Equipment

---

[1] **Note to Draft**: Subject to ongoing Purchaser review and confirmation.

iii

## PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of October 2831, 2022 (the "Execution Date"), by and between (a) CN Pledgor LLC, a Delaware limited liability company (the "Seller"), and (b) GC Data Center Equity Holdings, LLC, a Delaware limited liability company (the "Purchaser"). Article VIII contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

### RECITALS

WHEREAS, the Seller and certain of its Affiliates have filed voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"); and

WHEREAS, the Seller desires to sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept from the Seller, all of the Seller's right, title and interest in and to 100% of the equity interests in CN Borrower LLC (the "Company") that are owned by the Seller (such equity interests, the "Acquired Interests") in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF ACQUIRED INTERESTS; ASSUMPTION OF LIABILITIES

Section 1.1 Purchase and Sale of Acquired Interests. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances (other than Encumbrances arising under applicable securities Laws and Encumbrances created by the Purchaser), all of the Seller's right, title and interest in and to the Acquired Interests.

Section 1.2    Assigned Contracts.

(a)    Schedule 1.2(a) sets forth each executory Contract to which the Seller or any of its Affiliates (other than the Acquired Companies) is a party and primarily related to the Business or which is a Customer Contract that Seller or its Affiliates have proposed to assign (including partially assign) to one or more of the Acquired Companies (collectively, the "Additional Business Contracts") and Seller's good faith estimate of the Cure Costs applicable to each such Additional Business Contract. At any time prior to the Designation Deadline, Purchaser shall have the right to provide written notice to Seller of any Additional Business Contract it desires to acquire (such written notice, an "Inclusion Notice" and any such Additional Business Contract identified in an Inclusion Notice, an "Assigned Contract"). The Seller shall, or the Seller shall cause its applicable Affiliate to, take all reasonable actions required to assume and assign any such Assigned Contract to the applicable Acquired Company identified by Purchaser in the Inclusion Notice

(other than payment of the Cure Costs, which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain an Order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Assigned Contracts to the applicable Acquired Company satisfies all applicable requirements of section 365 of the Bankruptcy Code (an "Assumption Order"). The Purchaser shall, prior to the hearing before the Bankruptcy Court seeking entry of an Assumption Order, provide all such information or documentation reasonably requested to satisfy all requirements under section 365 of the Bankruptcy Code necessary to assume and assign to the applicable Acquired Company the Assigned Contracts (including, without limitation, by providing "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code)).

(b)        Subject to Section 1.2(d), promptly following the date on which the Bankruptcy Court enters an Assumption Order with respect to any Assigned Contract (but in no event later than one Business Day following such date), (i) the Seller shall, or the Seller shall cause its applicable Affiliate to, pursuant to such Assumption Order and an Assigned Contracts Assignment, assume and assign to the applicable Acquired Company such Assigned Contract (subject to the payment by the Purchaser of the Cure Costs in respect of such Assigned Contract) and (ii) the Purchaser shall pay or cause to be paid (and shall reimburse or cause to be reimbursed to the Seller or its Affiliates any amounts paid prior to the Closing Date in respect of) all Cure Costs (if any) in connection with such assumption and assignment and the Purchaser shall cause the applicable Acquired Company to assume and agree to perform and discharge all obligations and Liabilities under such Assigned Contract, regardless of whether arising before or after the Closing Date (such obligations and Liabilities, together with such Cure Costs, with respect to all Assigned Contracts, the "Assumed Liabilities"), pursuant to such Assumption Order and such Assignment and Assumption Agreement. For the avoidance of doubt, more than one Assigned Contract can be assumed and assigned to an Acquired Company pursuant to one Assigned Contracts Assignment.

(c)        To the extent that the assignment to an Acquired Company of any Assigned Contract pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained or overridden or canceled by an Assumption Order or other Order of the Bankruptcy Court (such Assigned Contracts, the "Nonassignable Assets"), then such Nonassignable Assets will not be assumed and assigned to the applicable Acquired Company and such failure to assume and assign shall not constitute a breach of this Agreement.

(d)        If any such consent, waiver, confirmation or other approval or waiver of such prohibition is not obtained in respect of a Nonassignable Asset, then the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, solely to the extent not prohibited under applicable Law (including, without limitation, the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Seller shall reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser with the benefits and obligations of such Nonassignable Asset (an "Interim Arrangement"); provided, however, that (i) no Interim Arrangement shall terminate later than the earlier of (A) 180 days after the Closing Date, and (B) the closing of the Chapter 11 Cases (or the date on which the Seller is liquidated or dissolved, if earlier), and (ii) neither the Seller nor any of its Affiliates shall be required to do any of the following in connection with, as part of, or as required by any Interim Arrangement: (A) make any payments, (B) incur, assume, become liable in respect of or suffer to exist any Liabilities, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that would reasonably be likely to result in Liabilities to the Seller or any of its Affiliates, or (C) commence any lawsuit, arbitration or other Action against any Person. The applicable Acquired Company shall be responsible for performing, and the Purchaser shall cause such Acquired Company to perform, all obligations under each such Nonassignable Asset required to be performed by the Seller or its applicable Affiliate after the date

on which the Bankruptcy Court enters the

first Assumption Order to the extent that if such Nonassignable Asset were transferred and assigned to such Acquired Company as of such date, the obligations thereunder would have constituted Assumed Liabilities. All Interim Arrangements shall be at the Purchaser's sole cost and expense. If any such consent, waiver, confirmation or other approval or waiver of such prohibition with respect to any Nonassignable Asset is obtained prior to the termination of the applicable Interim Arrangement, then such Nonassignable Asset shall promptly be transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the applicable Assumption Order and the Bankruptcy Code. The Purchaser acknowledges that no adjustment to the Purchase Price shall be made for any Nonassignable Assets. The Seller or its applicable Affiliate shall be permitted to reject any Nonassignable Asset upon the termination of an Interim Arrangement if such Nonassignable Asset has not been assumed and assigned to the applicable Acquired Company prior to the date of such termination.

## ARTICLE II

## CONSIDERATIO

## N

Section 2.1    Consideration. The aggregate consideration to be paid by the Purchaser to the Seller for the purchase of the Acquired Interests and the Assigned Contracts shall be as follows:

(a)    cash in the amount of $5,000,000 (the "Cash Purchase Price"); *plus*

(b)    the assumption by the applicable Acquired Company of the Assumed Liabilities (together with the Cash Purchase Price, collectively, the "Purchase Price").

Section 2.2 Payment of Cash Purchase Price. On the Closing Date, the Purchaser shall pay, or cause to be paid, the Cash Purchase Price to the Seller by wire transfer of immediately available funds to the account or accounts of the Seller in accordance with written instructions delivered by the Seller to the Purchaser no less than one Business Day prior to the Closing Date.

Section 2.3 Allocation of Purchase Price. The Purchaser shall, not later than 120 days after the Closing Date, prepare and deliver to the Seller a schedule allocating the Purchase Price (including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes) among the assets of the Acquired Companies in accordance with Section 1060 of the Code and U.S. Treasury Regulations thereunder (such schedule, the "Allocation Schedule"). If the Seller raises any objection to the Allocation Schedule within 30 days after the receipt thereof, the Seller and the Purchaser will negotiate in good faith to resolve such objection(s). If the Seller and the Purchaser are unable to reach an agreement on the Allocation Schedule within 20 days after the Seller first raises any objection to the Allocation Schedule, the Seller and the Purchaser shall each be entitled to report consistently with their own determination. If the Seller does not raise any objection to the Allocation Schedule within 30 days after the receipt thereof, the Seller shall be deemed to have conclusively accepted and agreed to the Allocation Schedule proposed by the Purchaser, and the Seller and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and Form 8594 consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other Action) except as required by a final determination as defined in Section 1313 of the Code; provided, however, that nothing contained herein shall prevent the Seller or the Purchaser from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation Schedule, and neither the Seller nor the Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation Schedule.

The Purchaser and the Seller shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation Schedule. The Purchaser and the Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Action challenging the Allocation Schedule. The parties hereto have been advised that in connection with the Closing, and conditioned on the consummation of the Closing, at the Closing, the parties to the Generate Credit Agreement intend to execute and deliver a payoff and release agreement (the "Payoff and Release Agreement") which will provide that the Generate Payoff Amount shall be deemed paid in full at the Closing and that the Generate Debt Termination Date has occurred. In such case, the parties agree that the Generate Payoff Amount will be treated and deemed as consideration and part of the purchase price for Tax and accounting purposes.

### ARTICLE III

### CLOSING AND TERMINATION

Section 3.1 Closing. Upon the terms and subject to the conditions contained in this Agreement, the closing of the sale of the Acquired Interests contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of electronic documents and signatures by electronic mail at 10:00 a.m. (New York ~~Time~~time) on a date that is no later than the first Business Day following the date on which all of the conditions set forth in Article VII are satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction of any such condition at the Closing), or at such other place, date and/or time as the Purchaser and the Seller may mutually agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date." Upon the completion of all actions required to be taken at the Closing, all such actions shall be deemed to have occurred simultaneously at 12:01 am New York ~~Time~~time on the Closing Date.

Section 3.2    Closing Deliveries by the Seller. At or prior to the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser:

(a)    an assignment of the Acquired Interests in a form reasonably acceptable to Purchaser and Seller (the "Assignment and Assumption Agreement"), duly executed by the Seller;

(b)    [Intentionally Deleted]

(c)    a transition services agreement in a form acceptable to Purchaser and Seller (the "TSA"), duly executed by Compute North;

(d)    a waiver of the terms and conditions set forth in (i) Section 4 of the Confidentiality Agreement with respect to the non-solicitation obligations of Generate Lending, LLC as it relates to any person set forth on Schedule 3.2(d) attached hereto (such persons, the "Business Employees") following the TSA Expiration Date and (ii) Section 1, Section 2, Section 3, Section 8 and Section 9 of the Confidentiality Agreement with respect to the Confidential Information of the Acquired Companies ("Acquired Company Information"), in a form reasonably acceptable to the Purchaser and Seller and duly executed by Compute Holdings;

(e)    a termination and release agreement, in a form reasonably acceptable to Purchaser and Seller, pursuant to which the Kearney PMA is terminated and all rights, obligations and claims (excluding claims that are carved out from the release set forth on Exhibit B) arising thereunder (including any rejection damage claim) are released and waived (the "Kearney PMA Termination Agreement"), duly executed by Compute North;

4

(f)     a termination and release agreement, in a form reasonably acceptable to Purchaser and Seller, pursuant to which the WH PMA is terminated and all rights, obligations and claims (excluding

claims that are carved out from the release set forth on Exhibit B) arising thereunder (including any rejection damage claim) are released and waived (the "WH PMA Termination Agreement"), duly executed by Compute North;

(g)     an assignment and assumption agreement, in a form reasonably acceptable to Purchaser and Seller, pursuant to which Kearney assigns all of its right, title and interest in, to and under the Property Purchase Agreement to CN Minden (the "Property Assignment Agreement"), duly executed by CN Minden;

(h)     (g) a duly executed non-foreign person affidavit of the Seller dated as of the Closing Date, sworn under penalty of perjury, and in the form provided at Treasury Regulations § 1.1445- 2(b)(2)(iv)(B) or in the form of an IRS Form W-9 as described in Treasury Regulations § 1.1445-2(b)(2)(v); and

(i)     (h) the certificates required to be delivered pursuant to Sections 7.3(a), 7.3(b) and 7.3(c).

Section 3.3     Closing Deliveries by the Purchaser. At or prior to the Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Seller:

(a)     the Cash Purchase Price in accordance with Section 2.2;

(b)     the Assignment and Assumption Agreement, duly executed by the Purchaser;

(c)     the TSA, duly executed by the Purchaser;

(d)     the Kearney PMA Termination Agreement, duly executed by Kearney;

(e)     the WH PMA Termination Agreement, duly executed by Wolf Hollow;

(f)     a termination and release agreement, in a form acceptable to Seller, pursuant to which the Generate Guaranty (including, for the avoidance of doubt, the right of exclusivity and the right of first offer contained therein) and the Generate Pledge Agreement are terminated (including an acknowledgment that the Generate Debt Termination Date has occurred) and all rights, obligations and claims arising thereunder are released and waived, duly executed by the administrative agent, the collateral agent and the lenders under the Generate Credit Agreement; and

(g)     the Property Assignment Agreement, duly executed by Kearney;

(h)     (g) the certificates required to be delivered pursuant to Sections 7.2(a) and 7.2(b).

Section 3.4     Termination of Agreement.

This Agreement may be terminated at any time prior to the Closing as follows:

(a)     by the mutual written consent of the Seller and the Purchaser at any time prior to the Closing;

(b)     by the written notice of the Purchaser to the Seller, or by the written notice of the

5

Seller to the Purchaser, in either case, if the Closing shall not have been consummated on or prior to November 1, 2022 (the "Outside Date"); provided, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of any of its representations, warranties, covenants or agreements set forth this Agreement;

(c)      by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if any Governmental Body, including the Bankruptcy Court, shall have enacted, issued, promulgated, enforced or entered any Law (including any Order) that permanently enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement (any such Law, a "Legal Restraint") and such Legal Restraint has become final and nonappealable; provided, that the right to terminate this Agreement under this Section 3.4(c) shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of this Agreement and such breach or violation is the cause of the Legal Restraint;

(d)      by the written notice of the Purchaser to the Seller, if (i) the Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) 30 days after written notice of such breach, failure or occurrence is given to the Seller by the Purchaser; provided, that, at the time of such termination, the Purchaser is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement;

(e)      by the written notice of the Seller to the Purchaser, if (i) the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) 30 days after written notice of such breach, failure or occurrence is given to the Purchaser by the Seller; provided, that, at the time of such termination, the Seller is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement; and

(f)      by written notice of the Seller to the Purchaser, if (i) all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived, (ii) the Seller delivers a written confirmation, duly executed by an authorized representative of the Seller, stating (A) the Seller's desire to close, (B) that all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing and that will be met as of the Closing) or waived and (C) that Seller is ready, willing and able to close and (iii) the Purchaser fails to consummate the Closing on or prior to the first Business Day following delivery of such written confirmation; provided, that during such one Business Day period, the Purchaser shall not be entitled to terminate this Agreement pursuant to Section 3.4(b).

Section 3.5  Effect of Termination. In the event of the valid termination of this Agreement pursuant to Section 3.4, this Agreement shall terminate and become null and void and of no further force or effect, the transactions contemplated by this Agreement shall be abandoned without further action of

the parties hereto and there shall be no Liability hereunder on the part of the Seller or any of the other Seller Parties, or the Purchaser or any of the other Purchaser Parties; provided, that (i) the provisions of Section 3.4, this Section 3.5 and Article IX, and any defined terms used in any such Section or Article, shall remain in full force and effect and shall survive the termination of this Agreement; and (ii) no such termination shall relieve any party hereto from Liability for any breach of this Agreement that occurred prior to such termination (including, without limitation, the Purchaser's failure to consummate the Closing upon satisfaction (or deemed satisfaction) or waiver of the conditions to Closing set forth in Sections 7.1 and 7.3 (other than those conditions which are to be satisfied only on the Closing Date, but subject to the ability of such conditions to be satisfied at the Closing)). Any termination of this Agreement pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other party hereto in accordance with Section 9.7; provided, that in the case of any termination of this Agreement pursuant to Section 3.4(a), the date of termination shall be the date of termination set forth in the writing signed by the Purchaser and the Seller. Nothing in this Section 3.5 or elsewhere in this Agreement shall be deemed to impair the right of any party hereto to bring any action or actions for specific performance, injunctive and/or other equitable relief (including the right of any party hereto to compel specific performance by another party hereto of its obligations under this Agreement) pursuant to Section 9.10 prior to the valid termination of this Agreement.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE SELLER[2]**

Except as (x) set forth in the Seller Disclosure Schedules or (y) with respect to any representation or warranty relating to any of the Acquired Companies, any exception arising as a direct result of (A) any action (or inaction) taken (or omitted to be taken) (1) with the approval of the board of managers of the Company on or after August 12, 2022, (2) by any Person pursuant to a grant of authority (either specific or general) provided by the board of managers of the Company on or after August 12, 2022 or (3) by the Purchaser, any Affiliates of the Purchaser or any of their respective Representatives (any of the foregoing, "Generate Approved Matters"), or (B) any fact, matter, occurrence, event or circumstance that arises, occurs or happens on or after August 12, 2022 of which a member of the board of managers of the Company has been informed of in writing that was appointed by Purchaser or an Affiliate of Purchaser has been informed of in writing and which is not known by the Seller as of the Execution Date, the Seller hereby makes the representations and warranties in this Article IV to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 4.1    Organization and Qualification.

(a)    The Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller, Seller (i) has all requisite organizational power and authority to own, operate and lease its assets and conduct its business, in each case, as currently conducted and (ii) is duly qualified to do business in, and is in good standing in, each jurisdiction in which such qualification is required by applicable Laws.

(b)    Each Acquired Company (i) is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and (b) has requisite organizational power and authority to own, lease and operate its assets and to conduct its business, in each case, as currently conducted. Each Acquired Company is duly qualified to do business and in good standing in each jurisdiction in which such qualification is required by applicable Laws, except as would not,

---

[2] **Note to Draft:** Representations and warranties subject to ongoing review by the Seller.

individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. On or prior to the Execution Date, Seller has made available to Purchaser true and complete copies of the Organizational Documents of each of the Acquired Companies in effect as of the Execution Date.

Section 4.2    Authority Relative to This Agreement. Subject to entry of the Sale Order by the Bankruptcy Court, the Seller has all requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements, (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Seller Ancillary Agreements. Subject to entry of the Sale Order by the Bankruptcy Court, the execution and delivery by the Seller of this Agreement and each of the Seller Ancillary Agreements, the performance by the Seller of its obligations hereunder and thereunder, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of the Seller. Subject to entry of the Sale Order by the Bankruptcy Court, (i) this Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by the Seller and (ii) assuming the due authorization, execution and delivery by the other parties hereto and to the Seller Ancillary Agreements, this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered by the Seller will constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in an Action at Law or in equity) (the "Bankruptcy Exceptions").

Section 4.3    Conflicts; Consents and Approvals.

(a)    Subject to the entry of the Sale Order by the Bankruptcy Court, none of the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements when executed and delivered, the consummation by the Seller of the transactions contemplated hereby or thereby, or the performance by the Seller of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Seller, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any of any Contract to which it is party, or (iii) violate any Law applicable to the Seller or by which any of its properties or assets are bound or affected other than, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller.

(b)    Subject to the entry of the Sale Order by the Bankruptcy Court, none of the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements when executed and delivered, the consummation by the Seller of the transactions contemplated hereby or thereby, or the performance by the Seller of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of any Acquired Company, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Material Contract, or (iii) violate any Law applicable to the Seller or by which any of its properties or assets are bound or affected other than, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

(c) Assuming the accuracy of the representations and warranties of the Purchaser in Section 5.3(b), no approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Seller or any Acquired Company in connection with the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements, the performance by the Seller of any of its obligations hereunder or thereunder, or the consummation by the Seller of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court and (ii) such other approvals, Orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain, give or make would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller or a Material Adverse Effect on the Acquired Companies.

Section 4.4 <u>Title</u>. The Seller is the sole legal and beneficial owner of all of the issued and outstanding Equity Interests of the Company, free and clear of all Encumbrances (other than Encumbrances arising under applicable securities Laws).

Section 4.5 <u>Capitalization</u>. Section 4.5 of Seller Disclosure Schedules sets forth a true and complete list of the Acquired Companies and, with respect to each Acquired Company, (a) its name and jurisdiction of organization, (b) its form of organization and (c) the issued and outstanding Equity Interests thereof directly owned by Seller or any other Acquired Company. No Acquired Company owns, directly or indirectly, any Equity Interests in any Person other than as set forth in Section 4.5 of the Seller Disclosure Schedules. The Equity Interests of the Acquired Companies reflected as directly owned by Seller or the Acquired Companies, in each case, in Section 4.5 of the Seller Disclosure Schedules, have been duly authorized and validly issued in compliance with applicable Laws and the Organizational Documents of the applicable Acquired Company. Except for this Agreement, the Generate Credit Agreement and the other Loan Documents (as defined in the Generate Credit Agreement), there are no Rights to which Seller or any Acquired Company is a party or by which it is bound (i) obligating it to issue, sell, transfer or otherwise dispose of, or cause to be issued, sold, transferred or otherwise disposed of, any Equity Interests in any Acquired Company or (ii) obligating such Acquired Company to issue or grant such Right.

Section 4.6 <u>Financial Statements</u>. The Seller has delivered to the Purchaser the unaudited consolidated balance sheet for the Company and its subsidiaries as of August 31, 2022 (the "<u>Balance Sheet Date</u>"), and the related statements of operations, for the 8-month period then-ended (collectively, the "<u>Financial Statements</u>").[3] The Financial Statements have been prepared from the applicable books and records of the applicable Acquired Companies in accordance with GAAP (except for the absence of footnotes and normal recurring year-end adjustments) and fairly present, in all material respects, the consolidated financial position and results of operations of the Company and its subsidiaries as of the Balance Sheet Date and for the ~~respective~~ period covered thereby.

Section 4.7 <u>Undisclosed Liabilities</u>. The Acquired Companies have no Liabilities except for (a) Liabilities set forth in, reflected in, reserved against or disclosed in the Financial Statements, (b) Liabilities incurred in the ordinary course of business since the Balance Sheet Date, (c) Liabilities under Contracts of any of the Acquired Companies (other than as a result of any breach thereof or default thereunder by Seller or such Acquired Company) or (d) other Liabilities that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

Section 4.8 <u>Absence of Changes</u>. Except as contemplated by this Agreement, from the Balance Sheet Date to the Execution Date, (a) each Acquired Company has operated in the ordinary course of business in all material respects and (b) no event, or series of events taken in the aggregate, have occurred that have had, or would reasonably be expected to have, a Material Adverse Effect on the Acquired Companies.

---

[3] **Note to Draft**: Subject to confirmation.

Section 4.9 <u>Litigation</u>. Except as set forth in Section 4.9 of the Seller Disclosure Schedules:

(a)      except for the Chapter 11 Cases and any Order entered in the Chapter 11 Cases, there (i) is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "<u>Actions</u>"), pending, or to the Knowledge of the Seller, threatened against Seller or affecting any of its assets or (ii) Orders by which Seller or any of its assets is bound, in either case, that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller; and

(b)      there are no (i) Actions pending or, to the Knowledge of the Seller, threatened against any Acquired Company or affecting any of its assets or (ii) Orders by which any Acquired Company or any of its assets is bound, in the case of each of clauses (i) and (ii), that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

Section 4.10      <u>Intellectual Property; IT Assets</u>.

(a)      Except as set forth in <u>Section 4.10</u> of the Seller Disclosure Schedules or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, (i) the Acquired Companies own all right, title and interest in and to, or have a valid license to use in the manner in which it is currently being used by the Acquired Companies, any Intellectual Property that is used by the Acquired Companies and is material to the operation of the Business, free and clear of any Encumbrances (other than Permitted Encumbrances), (ii) no Action is pending or, to the Knowledge of the Seller, threatened challenging any Acquired Company's ownership in, or rights to, any such Intellectual Property or any Acquired Company's use of any such Intellectual Property, and (iii) such Intellectual Property is not subject to any outstanding Order restricting the use thereof. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent or approval of any other Person in respect of, the Acquired Companies' right to own or use any of the Intellectual Property used by the Acquired Companies in the conduct of the Business as of the Execution Date.

(b)      (i) All Registered IP that is registered or issued is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies and (ii) the Seller or one or more of its Affiliates (including the Acquired Companies) has paid all renewal, maintenance, and other fees when due as required to maintain each and every Registered IP in full force and effect. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, the Acquired Companies have valid and enforceable rights to use the Licensed Intellectual Property as used in the conduct of the business of the Acquired Companies, free and clear of any Encumbrances (other than Permitted Encumbrances), pursuant to a valid written license, sublicense or other written Contract between an Acquired Company and the owner or licensor of such Licensed Intellectual Property.

(c)      Except as set forth in <u>Section 4.10</u> of the Seller Disclosure Schedules or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, (i) the use of Intellectual Property in the ordinary course of business by the Acquired Companies does not infringe Intellectual Property rights of any other Person, and (ii) within the past three years, no Person has alleged in writing that the Acquired Companies' use of Intellectual Property infringes on any Intellectual Property rights of such Person. To the Knowledge of the Seller, no

10

other Person is infringing any Owned Intellectual Property.

(d)     The IT Assets are adequate in all material respects for their intended use and are in good working condition (normal wear and tear excepted). There has not been any material malfunction with respect to any of the IT Assets that has not been remedied or replaced in all material respects. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent of any other Person in respect of, the Purchaser's right to own or use any of the IT Assets as owned or used by the Acquired Companies in the conduct of its business prior to the Closing.

Section 4.11     <u>Material Contracts; Assigned Contracts</u>.

(a)     For purposes of this Agreement, the term "<u>Material Contracts</u>" means the following Contracts to which any Acquired Company is party as of the Execution Date:

(i)     any Engineering, Procurement and Construction Contracts, Construction Services Agreements and all other construction Contracts ("<u>Construction Contracts</u>");

(ii)     any equipment supply agreement ("<u>Equipment Supply Agreements</u>");

(iii)     any customer contract ("<u>Customer Contract</u>"), agreement providing for accommodations to lenders with respect to customer equipment ("<u>Accommodation Agreement</u>") or profit sharing agreement for a Customer Contract ("<u>Profit Sharing Agreement</u>");

(iv)     Contracts for the purchase, sale, exchange, storage, transmission or delivery of electric power. including, without limitation, any rate agreement, demand-response resource agreement, power optimization agreement, curtailment agreement or ancillary services agreement;

(v)     Contracts for the operation, maintenance and management of the assets of the Acquired Companies that are material to the operation of the Business;

(vi)     interconnection Contracts;

(vii)     Hedging Arrangements;

(viii)     Contracts containing any covenant that materially limits the conduct of the business of the Acquired Companies as currently conducted;

(ix)     Contracts providing for aggregate future payments to or from any Acquired Company in excess of $250,000 in any calendar year, other than such Contracts that can be terminated without material penalty by any such Acquired Company upon 90 days' notice or less;

(x)     other than any such Contracts that will be terminated at or prior to the Closing and the Generate Credit Agreement and the other Loan Documents (as defined in the Generate Credit Agreement), Contracts under which any Acquired Company has (A) created, incurred, assumed or guaranteed, directly or indirectly, any outstanding Indebtedness, (B) granted an Encumbrance on its assets to secure such Indebtedness or (C) extended credit to any Person, in the case of each of clauses (A) - (C), in excess of $250,000;

(xi)     Contracts providing for the acquisition or disposition of any business or

11

division of any business (whether by merger, purchase or sale of Equity Interests or assets or otherwise) that (A) have not yet closed or (B) have already closed;

(xii)     any joint venture, partnership, or other Contract involving a sharing of profits, losses, costs, or liabilities of the business of any other Person (other than any Acquired Company) or relating to the ownership of any Equity Interest in any Acquired Company (other than the Organizational Documents of any Acquired Company);

(xiii)     any Contract pursuant to which Seller or any Affiliate thereof (included any Acquired Company) assigned all or a portion of a customer contract to the Acquired Companies (the "Partial Assignment Agreements");

(xiv)     the Additional Assigned Contracts; and

(xv)     Contracts providing for the sale of any material assets of the Acquired Companies (other than in the ordinary course of business) or the grant of any preferential rights to purchase any such material assets.

(b)     All Material Contracts are in full force and effect and are enforceable in accordance with their terms with respect to each Acquired Company party thereto and, to the Knowledge of the Seller, the other parties thereto, except (i) to the extent that such enforcement may be affected by the Bankruptcy Exceptions and (ii) to the extent that any such Material Contracts have expired or terminated pursuant to and in accordance with their terms. No Acquired Company and, to the Knowledge of the Seller, no other party thereto, is in material breach of or material default under, and to the Knowledge of the Seller, no event has occurred that, with or without notice or lapse of time, or both would constitute a material breach of or material default under, or give rise to a right of termination, cancellation or acceleration of any material obligation under any Material Contract, except (A) solely with respect to Additional Assigned Contracts, for breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases and those breaches or defaults that will be cured as a result of the payment of the applicable Cure Costs, and (B) those breaches and defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. Prior to the Execution Date, complete and correct copies of all written Material Contracts have been made available to the Purchaser.

(c)     [None of the Acquired Companies is a party to any Contract described in clause (viii), (xi)(A) or clause (xii) of Section 4.11(a).][4]

Section 4.12     Wolf Hollow.

(a)     Section 4.12(a) of the Seller Disclosure Schedules sets forth a true, correct, complete and accurate list of the DealID number, customer, and the number and model numbers of the customer equipment located at the Wolf Hollow Project.

(b)     Section 4.12(b) of the Seller Disclosure Schedules sets forth the Construction Budget and Schedule for the Wolf Hollow Project (the "Construction Budget and Schedule"). The Construction Budget and Schedule was prepared in good faith and represents a reasonable estimate of the construction budget and schedule for constructing and completing the Wolf Hollow Project.

Section 4.13 Kearney. Section 4.13 of the Seller Disclosure Schedules sets forth a true, correct, complete and accurate list of the DealID number, customer, and the number and model numbers of the customer equipment located at the Kearney Project.

---

[4] Note to Draft: Subject to confirmation with Seller.

Section 4.14 <u>Permits</u>. Each Acquired Company has all material Permits required to conduct its business and operations as currently conducted, except, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. Each such Permit is in full force and effect, and each Acquired Company is in compliance with all its obligations under such Permits, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies. There are no Actions pending or, to the Knowledge of the Seller, threatened against any of the Acquired Companies that would reasonably be expected to result in the revocation, cancellation, non-renewal or termination of such Permit.

Section 4.15 <u>Brokers and Finders</u>. Neither the Seller nor any of its Affiliates (including the Acquired Companies) have engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or any of the transactions contemplated hereby for which the Purchaser or any Affiliate thereof is or will become liable (including through its acquisition of the Acquired Companies).

Section 4.16    <u>Real Property</u>.

(a)    <u>Section 4.16</u> of the Seller Disclosure Schedule contains a true and complete list, as of the Execution Date, of all material real property owned by any Acquired Company (the "<u>Owned Real Property</u>") and all material real property that an Acquired Company has an interest or use right pursuant to any lease, leasehold, license, easement, right-of-way or similar Contract (the "<u>Leased Real Property</u>" and together with the Owned Real Property, the "<u>Real Property</u>"). The Real Property includes all real property interests that are necessary for the operation and maintenance of the Business in all material respects in the ordinary course of business, and the Real Property Documents provide all necessary rights to access and use such Real Property for such purposes.

(b)    True, correct and complete copies of all documents granting, conveying or assigning any interest in or to any Leased Real Property (the "<u>Real Property Documents</u>") have been delivered to Purchaser. Each Real Property Document is in full force and effect and constitutes a valid and binding obligation of the applicable Acquired Company and, to the Knowledge of the Seller, each other party thereto, except as limited by the Bankruptcy Exceptions. The Acquired Companies have valid leasehold title to the Leased Real Property subject to a Real Property Document, free and clear of any Encumbrances (other than Permitted Encumbrances). There are no matters, restrictions or Encumbrances affecting the Real Property that would reasonably be expected to materially interfere with or adversely affect in any material respect the continued use and occupancy by the Acquired Companies of the Real Property.

(c)    Each Acquired Company and, to the Knowledge of the Seller, each of the other parties, as applicable, to a Real Property Document have performed in all material respects all material obligations required to be performed by such Person under such Real Property Document, and there does not exist any event, condition or omission that would constitute a material default or material breach (whether by lapse of time or notice or both) under any Real Property Document by an Acquired Company, or, to the Knowledge of the Seller, any other party thereto. None of the Seller or any of its Affiliates (including the Acquired Companies) have received any written notice of any condemnation or eminent domain proceedings pending or threatened that affect any Real Property. None of the Seller nor any of its Affiliates (including the Acquired Companies) have received any written notice of any zoning, ordinance, building, fire or health code or other legal violation affecting any Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

(d)    The Real Property has been maintained in all material respects by the Seller or one or more of its Affiliates (including the Acquired Companies) in accordance with the applicable Real Property Documents. To the Knowledge of the Seller, there are no material defects in, material

mechanical failure of or material damage to any Real Property.

Section 4.17    Tax Returns; Taxes.

(a)    All income and other material Tax Returns required to have been filed with respect to the Acquired Companies and their respective assets have been duly filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns are true, correct and complete.
All income and other material Taxes due and owing with respect to the Acquired Companies and their respective assets (whether or not shown on any Tax Return) have been paid. No Acquired Company is currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Acquired Companies do not file Tax Returns that any Acquired Company is or may be subject to taxation by that jurisdiction.

(b)    All Taxes that have become due and payable prior to the Closing Date have been paid. The Seller and the Acquired Companies have withheld and paid all material Taxes required to be withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(c)    There are no pending or, to the Knowledge of the Seller, threatened federal, state, local, or non-U.S. tax audits or administrative or judicial tax proceedings for the assessment or collection of income or other material Taxes owed or owing by the Seller in respect of any Acquired Company.

(d)    Neither Seller nor any Acquired Company has executed or filed with any Governmental Body any agreement extending the period for assessment or collection of any income or other material Taxes in respect of any Acquired Company or its assets.

(e)    The Seller and the Acquired Companies have not waived any statute of limitation in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f)    Neither the Seller nor any Acquired Company is subject to any Tax ruling with respect to any Acquired Company. There are no Encumbrances on any of the assets owned by any Acquired Company that secure the payment of Taxes (other than Permitted Encumbrances).

(g)    Since the Balance Sheet Date, the Acquired Companies have not incurred any liability for Taxes arising from extraordinary gains or losses, as that term is used in GAAP, outside the ordinary course of business consistent with past custom and practice.

(h)    The Acquired Companies will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)    change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)    use of an improper method of accounting for a taxable period ending on or prior to the Closing Date;

(iii)    "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local, or non-U.S. income Tax law) executed on or prior to the Closing Date;

14

(iv)    intercompany transaction or excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local, or non-U.S. income Tax law);

(v)    installment sale or open transaction disposition made on or prior to the Closing Date; or

(vi)    prepaid amount received on or prior to the Closing Date.

(i)    The Acquired Companies have not been a party to any "listed transaction," as defined in Code §6707A(c)(1) and Reg. §1.6011-4(b).

(j)    No Acquired Company has a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise has an office or fixed place of business in a country other than the country in which it is organized.

(k)    No letter ruling from the Internal Revenue Service (or any comparable ruling from any other taxing authority) has been received in respect of any Acquired Company (or assets owned by an Acquired Company).

(l)    The Acquired Companies have (i) properly complied with all applicable law in order to defer the amount of the employer's share of any "applicable employment taxes" under Section 2302 of the CARES Act and (ii) to the extent applicable, properly complied with all applicable law and duly accounted for any available Tax credits under Sections 7001 through 7005 of the Families First Coronavirus Response Act and Section 2301 of the CARES Act.

(m)    Each of the Acquired Companies has been a disregarded entity for U.S. federal income tax purposes since its formation.

(n)    None of the Acquired Companies is party to any tax sharing, allocation, indemnification, power of attorney, closing or similar agreement with respect to Taxes (other than any agreement entered into in the ordinary course of business the primary purpose of which is not the sharing, allocation or indemnification of any Tax liability or compliance with any Tax obligation).

Section 4.18 Insurance Policies. Section 4.18 of the Seller Disclosure Schedules sets forth a true and complete list, as of the Execution Date, of all material insurance policies covering the Acquired Companies or the Business (the "Insurance Policies"). All Insurance Policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and no written notice of cancellation or termination (or any other threatened termination) has been received by the Seller or any Affiliate thereof (including any Acquired Company) with respect to any such Insurance Policy. No claim with respect to any Acquired Company has been made or remains outstanding under any Insurance Policy, and no Acquired Company has suffered any losses that would reasonably be expected to give rise to such claims.

Section 4.19 Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies:

(a)    each Acquired Company has obtained all Permits required under any Environmental Law for the operation of the Business as currently conducted (the "Environmental Permits");

(b)    each Acquired Company is operating the Business in compliance with all

Environmental Laws and its Environmental Permits;

(c)     no Acquired Company has released any ~~hazardous substances~~Hazardous Materials on, under, or at the Real Property in violation of any Environmental Law, which release is currently subject to any investigation, remediation or monitoring and would reasonably be expected to result in a Liability to any Acquired Company pursuant to Environmental Laws;

(d)     no Acquired Company has received any written notice of any violation of any Environmental Law during the past three years, the subject of which is unresolved;

(e)     there are not any (i) outstanding Orders arising under Environmental Laws by which any Acquired Company or any of its assets is bound or (ii) Actions arising under Environmental Laws pending or, to the Knowledge of the Seller, threatened against any Acquired Company; and

(f)     Seller has delivered to Purchaser all material, non-privileged environmental site assessments prepared in the past three years relating to the operation of the Business that are in Seller's or any Acquired Company's possession.

Section 4.20 <u>Affiliate Arrangements; Seller Credit Support</u>. Except as set forth in <u>Section 4.20</u> of the Seller Disclosure Schedules and except for the Specified Bond GIA, the Partial Assignment Agreements (on customary terms and conditions), the Kearney PMA ~~and the WH PMA~~, the WH PMA, the Stipulation (as defined in Exhibit A attached hereto) and the limited liability company agreement of the Company, there are no Affiliate Contracts in effect as of the Execution Date. Except for the Generate Guaranty, the Generate Pledge Agreement and the Specified Bond GIA, there are no letters of credit, guarantees, bonds and other credit assurances of a comparable nature made or issued by or on behalf of Seller or any of its Affiliates (other than an Acquired Company) for the benefit of any Acquired Company.

Section 4.21 <u>Condition of Assets</u>. Each Acquired Company has good title to, or valid leasehold interest in, all material tangible assets of the Acquired Companies used or leased for use in connection with its business as currently conducted, free and clear of all Encumbrances, other than Permitted Encumbrances, and such tangible personal property is in reasonably good operating condition and repair for the purposes for which such assets are used in the business of the Acquired Companies (normal wear and tear excepted), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

Section 4.22 <u>Books and Records</u>. As of the Closing, Seller has delivered to, or has maintained at, the Acquired Companies (whether in electronic format or otherwise) true, complete and accurate copies of all of the books and records of the Acquired Companies. The books and records are materially complete, reflect the business of the Acquired Companies in all material respects accurately, fairly and in reasonable detail and have been maintained in accordance with document management practices as would reasonably be expected to be utilized by a reasonable and prudent manager of a business comparable to the business of the Acquired Companies.

Section 4.23     <u>Employees Matters</u>.

(a)     The Acquired Companies do not have, and have never had, any employees. The Acquired Companies are, and at all times have been, in compliance with all applicable Laws relating to employment, social security, employee classification, employee benefits and employee matters except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Companies.

(b)     No Acquired Company sponsors, maintains, contributes to or has, or has ever

sponsored, maintained, contributed to or had, any obligation to maintain or contribute to, any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) or any other plan, program, arrangement or agreement that is subject to ERISA. No Acquired Company has any Liability or has ever had any Liability under Title IV of ERISA, including on account of at any time being considered a single employer under Section 414 of the Code with any other Person.

Section 4.24 <u>NO OTHER REPRESENTATIONS</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS <u>ARTICLE IV</u>, NEITHER THE SELLER, ANY AFFILIATES OF THE SELLER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER, THE ACQUIRED COMPANIES, THE ACQUIRED INTERESTS, THE ADDITIONAL BUSINESS CONTRACTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE SELLER, ANY AFFILIATE OF THE SELLER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS <u>ARTICLE IV</u>, THE SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES BY ANY MANAGER, OFFICER, DIRECTOR, STOCKHOLDER, MEMBER, PARTNER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF THE SELLER OR ANY OF ITS AFFILIATES).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this <u>Article V</u> to the Seller as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 5.1 <u>Organization and Qualification</u>. The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

Section 5.2 <u>Authority Relative to This Agreement</u>. The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Purchaser Ancillary Agreements. The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, the performance by the Purchaser of its obligations hereunder and thereunder, and the consummation by the Purchaser of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

Section 5.3    <u>Conflicts; Consents and Approvals</u>.

(a)    None of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation by the Purchaser of the transactions contemplated

hereby or thereby, or the performance by the Purchaser of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Purchaser, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound or (iii) assuming that all approvals, orders, Permits, consents, registrations, declarations, notifications and filings described in <u>Section 5.3(b)</u> have been made, given or obtained, as applicable, violate any Law applicable to the Purchaser or by which any of its properties or assets are bound, other than, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser.

(b)    No approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, the performance by the Purchaser of any of its obligations hereunder or thereunder, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court, and (ii) such approvals, Orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain, give or make would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser.

Section 5.4 <u>Financial Capacity</u>. The Purchaser (a) has access to, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and (b) has access to, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Purchaser Ancillary Agreements.

Section 5.5 <u>Brokers and Finders</u>. Except as set forth on <u>Schedule 5.5</u>, the Purchaser has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby for which the Seller or any of its Affiliates or Representatives will become liable.

Section 5.6    <u>Qualification</u>.

(a)    As of the Closing, the Purchaser will be capable of satisfying the conditions contained in sections 365(b)(l)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

(b)    To the knowledge of the Purchaser, there exist no facts or circumstances that would cause, or be reasonably expected to cause, the Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

Section 5.7    <u>Independent Investigation; Reliance By the Purchaser</u>. The Purchaser (directly or through its Affiliates or Representatives) is an informed and sophisticated purchaser, and has engaged expert advisors that are experienced in the evaluation and acquisition of companies such as the Acquired Companies. The Purchaser (directly or through its Affiliates or Representatives) has undertaken such

investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby or thereby. The Purchaser confirms that the Seller has provided the Purchaser with the opportunity to ask questions of the officers and employees of the Seller and its Affiliates and to acquire additional information about the Acquired Companies.

Section   5.8   <u>RELIANCE/ACKNOWLEDGMENT</u>.   NOTWITHSTANDING   ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS TO THE CONTRARY, THE PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN <u>ARTICLE IV</u> OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES): (I) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON IS MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE SELLER, THE ACQUIRED COMPANIES, THE ACQUIRED INTERESTS, THE ADDITIONAL BUSINESS CONTRACTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE ASSETS OF THE ACQUIRED COMPANIES; (II) THE PURCHASER HAS NOT EXECUTED OR AUTHORIZED THE EXECUTION OF THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR ENTERED INTO THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN RELIANCE UPON, AND HEREBY SPECIFICALLY DISCLAIMS RELIANCE UPON, ANY PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY WHATSOEVER MADE OR OMITTED TO BE MADE TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES, INCLUDING ANY SUCH PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY AS TO THE CONDITION, VALUE, QUALITY OR PROSPECTS OF ANY OF THE ACQUIRED COMPANIES, ANY OF THE ASSETS OR LIABILITIES OF ANY OF THE ACQUIRED COMPANIES, ANY OF THE ACQUIRED INTERESTS, ANY OF THE ADDITIONAL BUSINESS CONTRACTS, OR ANY PART OF ANY OF THE FOREGOING; (III) THE ACQUIRED COMPANIES AND THE ASSIGNED CONTRACTS ARE BEING TRANSFERRED "AS IS", "WHERE IS" AND "WITH ALL FAULTS"; AND (IV) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, AS TO THE ACCURACY OR COMPLETENESS OF ANY PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY OF THE FOREGOING MADE IN RESPONSE TO ANY DUE DILIGENCE REQUEST LIST OR MADE DURING ANY DUE DILIGENCE TELEPHONIC OR IN-PERSON MEETINGS), AND NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY TO THE PURCHASER OR ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF, OR ANY SUCH PERSON'S USE OF OR RELIANCE ON, ANY SUCH PROJECTION, FORECAST, STATEMENT OR INFORMATION OR ANY ERRORS THEREIN OR OMISSIONS THEREFROM.

Section 5.9 <u>NO OTHER REPRESENTATIONS</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE PURCHASER IN THIS <u>ARTICLE V</u>, NEITHER THE PURCHASER, ANY AFFILIATES OF THE PURCHASER NOR ANY OTHER PERSON

MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASER OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, AND THE PURCHASER HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE PURCHASER, ANY AFFILIATE OF THE PURCHASER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES.

**ARTICLE               VI**

**COVENANTS AND AGREEMENTS**

Section 6.1     Conduct of Seller.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date (the "Interim Period"), except (x) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, or (y) with the prior written consent of the Purchaser, the Seller shall use commercially reasonable efforts (taking into account that Seller does not control the Acquired Companies and that the board of managers of the Company makes all decisions and takes all actions for the Company) to (i) cause each Acquired Company to conduct its business in the ordinary course of business and (ii) preserve intact for the benefit of Purchaser the respective business of each Acquired Company and the goodwill of its respective customers, suppliers and others having business relations with them; provided that in no event shall any action (or inaction) of an Acquired Company be deemed a breach of this Section 6.1 if such action (or inaction) is taken at the written instruction of Purchaser or is a Generate Approved Matter. Except as consented to in writing by Purchaser or as required by applicable Law, the Seller shall not affirmatively cause any of the Acquired Companies to, and, solely with respect to clause (ix)(A) as applied to Additional Business Contracts, the Seller shall not and shall cause its Affiliates not to, take any of the following actions:

(i)     amend the Organizational Documents of any Acquired Company;

(ii)     effect any recapitalization, reorganization, liquidation, dissolution or winding up of any Acquired Company;

(iii)     declare, make or pay any dividend or other distribution in respect of the Acquired Interests to Seller or any other Person;

(iv)     issue, sell, transfer or otherwise dispose of, pledge or otherwise encumber any Equity Interests of any Acquired Company, or issue or grant any Rights with respect to any Acquired Company;

(v)     amend, modify or otherwise supplement any existing Affiliate Contract or enter into any new Affiliate Contract;

(vi)     amend any income or material Tax Returns with respect to any Acquired Company or the assets of any Acquired Company, make or change any material Tax election or adopt or change any material Tax accounting method, in each case, to the extent that such action could reasonably be expected to increase any Tax Liability of or with respect to any Acquired Company for a Tax period (or portion thereof) beginning after the Closing Date; waive any right for a refund or credit of any Tax with respect to any Acquired Company or the assets of any Acquired Company; consent to any extension of any statute of limitation, or request an extension

20

of any filing period, with respect to any Tax Return of any Acquired Company or with respect to the assets of any Acquired Company;

(vii)   purchase or acquire (whether by merger, consolidation, combination or otherwise) any business, line of business or any assets (including Equity Interests) of any Person (other than any Acquired Company) (excluding purchases or acquisitions of assets in the ordinary course of business) having a value that does not exceed $250,000 individually or $500,000 in the aggregate;

(viii)   sell, assign, transfer, lease, license or otherwise dispose of, or grant or impose any Encumbrances (other than Permitted Encumbrances) on, any assets of the Acquired Companies to any Person (other than any Acquired Company), having a value in excess of $250,000 individually or $500,000 in the aggregate, except for sales of obsolete, damaged or broken equipment that has a book value of $0, has been replaced, or has been reflected in the working capital, in each case, in the ordinary course of business;

(ix)   (A) amend, modify or otherwise supplement in any material respect any Material Contract or any Real Property Document, (B) terminate any Material Contract or any Real Property Document (other than any expiration thereof in accordance with its terms), (C) enter into any Contract that, if in existence on the Execution Date would have been a Material Contract, or
(D) enter into any Contract that, if in existence on the Execution Date, would have been a Real Property Document;

(x)   change any accounting or auditing practices unless required by GAAP;

(xi)   amend or modify any material Permit (including any Environmental Permit);

(xii)   agree to make any capital expenditure other than as set forth in the Construction Budget and Schedule for the Wolf Hollow Project;

(xiii)   incur any Indebtedness or become contingently liable for any contingency or liability of others;

(xiv)   cancel any third party Indebtedness owed to an Acquired Company;

(xv)   enter into any new line of business;

(xvi)   fail to maintain in full force and effect the Insurance Policies in the form and amounts consistent with past practice except to the extent that such Insurance Policies are replaced by policies with comparable coverage prior to the date of any cancellation or termination thereof, take or fail to take any action that would entitle any insurer to terminate or cancel any Insurance Policies, or amend, commute, terminate, buy-out, extinguish liability under or otherwise modify any Insurance Policies in any manner that adversely affects Purchaser's or the Acquired Companies' ability to assert or continue to prosecute claims with respect to incidents occurring prior to or after the Closing;

(xvii)   hire any personnel or create any compensation or "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) or any other plan, program, arrangement or agreement that is subject to ERISA;

(xviii)   make any material loans, advances or capital contributions to or

21

investments in any Person (other than any Acquired Company), other than pursuant to existing contracts or commitments that have been disclosed to Purchaser or in the ordinary course of business;

(xix)    initiate, settle or compromise any claims against any Acquired Company or any other Person with a settlement or compromise amount reasonably anticipated to be in excess of $250,000 individually or $500,000 in the aggregate;

(xx)    deposit or permit the deposit of funds received from any Person for the benefit of any Acquired Company in any account other than the appropriate operating account of such Acquired Company for which the funds were supposed to benefit;

(xxi)    fail to execute and deliver the Payoff and Release Agreement; or

(xxii)   authorize or agree to take any of the foregoing actions.

(b)      [Intentionally Deleted]

Section 6.2      Taxes.

(a)      Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, recording or other similar Taxes that arise from the sale of the Acquired Interests or the Assigned Contracts or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes"), as well as any related Tax Return preparation and filing costs, shall be borne and timely paid by the Purchaser. Each Tax Return with respect to such Transfer Taxes will be prepared and timely filed by the Purchaser. In the event that any such Tax Return requires execution by the Seller, the Seller shall promptly execute such Tax Return after receipt thereof from the Purchaser and deliver it to the Purchaser so long as such Tax Return was prepared in compliance with applicable Law.

(b)      The Seller shall be allocated and bear (1) all property Taxes and similar ad valorem obligations (excluding, for the avoidance of doubt, income Taxes and Transfer Taxes) levied based upon or measured by the ownership or operation of the assets of the Acquired Companies (collectively, the "Asset Taxes") and (2) any other Tax obligation owed by any Acquired Company (including Taxes payable by any Acquired Company based on or measured by income, receipts, payments or payroll of any Acquired Company, but excluding Transfer Taxes), in each case, for (i) any period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date; provided, however, that the Seller shall not be liable for or be required to pay any Taxes resulting from any act, omission or transaction taken by the Purchaser or any of its Affiliates after the Closing, or any Tax election made by the Purchaser or any of its Affiliates that would be effective on or before the Closing Date. The Purchaser shall be allocated and bear all Asset Taxes or other Taxes owed by any Acquired Company (A) that are described in the proviso of the immediately preceding sentence, (B) for any period that begins on or after the Closing Date, and (C) the portion of any Straddle Period beginning after the Closing Date, including any such Taxes that were paid or prepaid by the Seller at or prior to the Closing. For purposes of this Section 6.2(b), Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period ending on and including the Closing Date, on the one hand, and the number of days in such Straddle Period that occur after the Closing Date, on the other hand, and all other Asset Taxes (if any) based upon sales, purchases or receipts shall be allocated upon a hypothetical closing of the taxable year on the Closing Date. Any other Tax pertaining to a Straddle Period shall be allocated on an "interim closing of the books" basis.

22

The party hereto responsible under applicable Law for paying a Tax shall be responsible for preparing and filing the Tax Return for such Tax and for paying such Tax shown to be due on such Tax Return. The Seller, on the one hand, or the Purchaser, on the other hand, as the case may be, shall promptly (but in no event later than twenty (20) days after receipt of notice from the party hereto making such payment) provide reimbursement for any Tax paid by the other party, all or a portion of which is the responsibility of such party in accordance with the terms of this Section 6.2(b).

(c)     To the extent permitted by Law, the parties agree to elect with the relevant taxing authority to treat for all Tax purposes the Closing Date as the last day of a taxable period.

(d)     The preparation and filing of any Tax Return of the Company that is due after the Closing shall be exclusively within the control of the Purchaser (excluding any and all Tax Returns required by Law to be filed by the Seller).

(e)     Neither the Seller nor any of its Affiliates (other than the Acquired Companies) shall take any action, at any time, that would result in a change in the tax classification of any Acquired Company.

Section 6.3 Insurance. The Purchaser hereby acknowledges and agrees that, effective upon the Closing, all policies of, and binders evidencing, any form or type of insurance that are owned or maintained by the Seller or any of its Affiliates (excluding the Acquired Companies) that cover or relate to the Seller or any of its assets, liabilities, employees, businesses or operations (such policies and binders, the "Seller Insurance Coverage") may be terminated or modified by the Seller or any of its Affiliates (excluding the Acquired Companies) to exclude coverage of the Acquired Companies and their assets, liabilities, employees, businesses or operations, and neither the Seller nor any of its Affiliates (including the Acquired Companies) will be purchasing or otherwise acquiring any "tail" policy or other additional or substitute coverage for the foregoing. Any refund, rebate, credit or other amount paid, distributed or returned by any insurance provider or other Person in respect of, or relating to, the Seller's or any of its Affiliates' termination or modification of any Seller Insurance Coverage shall be the property of the Seller or such applicable Affiliate (excluding the Acquired Companies).

Section 6.4 Access. During the Interim Period, Seller shall use commercially reasonable efforts to provide Purchaser, its Affiliates and its and their respective Representatives (at Purchaser's sole cost and expense) with reasonable access during normal business hours and upon reasonable advance written notice to the books and records of the Acquired Companies as may be reasonably requested by Purchaser from time to time solely for a purpose reasonably related to the consummation of the transactions contemplated by this Agreement; provided that such access does not unreasonably disrupt the personnel, or unreasonably interfere with the operations, of Seller or any of its Affiliates (including any Acquired Company), and Purchaser, its Affiliates and its and their respective Representatives shall use commercially reasonable efforts to conduct all communications with personnel and all on-site investigations in an expeditious manner. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to provide such access to the extent that it (i) would reasonably be expected to jeopardize any attorney-client privilege, attorney work-product protection or other legal privilege or (ii) would reasonably be expected to contravene any applicable Law or Contract. Any Confidential Information provided pursuant to this Section 6.4 shall be subject to the applicable terms and conditions of the Confidentiality Agreement. Notwithstanding anything to the contrary in this Agreement, Purchaser shall be permitted to conduct visual environmental investigations, but no invasive or subsurface sampling or testing of any environmental media on any of the premises of any Acquired Company without the prior written consent of Seller, but at the sole cost and expense of the Purchaser.

Section 6.5     Confidentiality; Non-Solicitation.

(a)     During the one (1) year period following the Closing Date, the Seller agrees that

it will not, and the Seller will cause its Affiliates not to, divulge or disclose to any third party (other than to

(x)        the Seller's Representatives, and (y) the Purchaser, the Acquired Companies or any Representative of the Purchaser) or use any Acquired Company Information, unless (i) such information was or becomes generally available to the public or the participants in the industries in which the Acquired Companies conduct the Business other than as a result of a disclosure by the Seller in breach of this Section 6.5(a) or

(ii)        such information was or becomes available to the Seller on a non-confidential basis from a source other than the Purchaser or any of its Affiliates and such source is not known to the Seller to be bound by a confidentiality obligation to the Purchaser or any of its Affiliates; provided, however, that the provisions of this Section 6.5(a) will not prohibit any disclosure of any Acquired Company Information (A) as required by any Law or requested by any Governmental Body so long as, to the extent practicable, reasonable prior notice is given to the Purchaser of such disclosure and a reasonable opportunity is afforded the Purchaser to contest the same, (B) as is reasonably necessary in connection with the performance, enforcement, exercise or assertion of any right, remedy or defense relating to this Agreement or any Ancillary Agreement or the transactions contemplated hereby or thereby, (C) as may be necessary in connection with the Chapter 11 Cases and/or the administration of the Seller's and/or its Affiliates' chapter 11 estates, or (D) that is necessary and proper in conjunction with the filing of any Tax Return or other document required to be filed with any Governmental Body under applicable Law.

(b)        During the one (1) year period following the Closing Date, without the prior written consent of Purchaser, Seller will not, and will cause each of its Affiliates not to, directly or indirectly

(i) hire, employ, engage, retain, recruit or solicit (or attempt or offer to do any of the foregoing) any person who is an officer or employee of any Acquired Company at the time any such action is taken (or who had been an officer or employee of an Acquired Company within the 12 month period prior to any such action being taken) or (ii) cause, induce, encourage, entice or persuade (or attempt to do any of the foregoing) any person who is an officer or employee of an Acquired Company to leave or terminate his or her position of employment with such Acquired Company, except as the result of the use of a general solicitation (such as an advertisement) not specifically directed to such officer or employee. For the avoidance of doubt, nothing in this Section 6.4 shall be construed or deemed to prohibit the continued employment of any person that is currently employed by a Seller or any Affiliate thereof (excluding the Acquired Companies).

Section 6.6 Publicity. Unless otherwise required by or reasonably necessary to comply with applicable Law or Bankruptcy Court requirements, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices made with the Bankruptcy Court related thereto, each of the Seller and the Purchaser agree that it (a) shall communicate and consult with each other prior to making any public disclosure or statements with respect to this Agreement or the transactions contemplated hereby and (b) shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party. Nothing in this Agreement shall restrict or prohibit the Seller, Purchaser or their respective Affiliates from communicating with their respective employees, customers, suppliers, other business relations or other direct or indirect financing sources (including direct and indirect equityholders).

Section 6.7        Wrong Pocket.

(a)        The Seller shall (i) promptly deliver to the Purchaser any mail or other communication relating to any of the Acquired Companies or their assets received by the Seller or any Affiliate thereof (excluding, for the avoidance of doubt, the Acquired Companies) on or after the Closing

24

Date, (ii) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by the Seller or any Affiliate thereof (excluding, for the avoidance of doubt, the Acquired Companies) on or after the Closing Date to the extent that such cash, electronic credits or deposits were intended to be transferred or made to an Acquired Company in connection with the Business and (iii) promptly forward to the Purchaser any checks or other instruments of payment that the Seller or any Affiliate thereof (excluding, for the avoidance of doubt, the Acquired Companies) receives on or after the Closing Date to the extent that such checks or other instruments were intended to be sent to an Acquired Company in connection with the Business.

(b)　The Purchaser shall (i) promptly deliver to the Seller any mail or other communication not relating to the Acquired Companies and received by the Purchaser or any of its Affiliates (including, for the avoidance of doubt, the Acquired Companies) on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Seller any cash, electronic credits or deposits received by the Purchaser or any of its Affiliates (including, for the avoidance of doubt, the Acquired Companies) to the extent that such cash, electronic credits or deposits were intended to be transferred or made to Seller or an Affiliate of Seller (excluding, for the avoidance of doubt, any Acquired Company) and (iii) promptly forward to the Seller any checks or other instruments of payment that the Purchaser or any of its Affiliates (including, for the avoidance of doubt, the Acquired Companies) receives on or after the Closing Date to the extent that such checks or other instruments were intended to be sent to Seller or any Affiliate of Seller (excluding, for the avoidance of doubt, any Acquired Company).

(c)　For the avoidance of doubt, all miners, equipment or other property of (i) any customer of the Wolf Hollow Project or the Kearney Project (solely with respect to miners, equipment or other property of such customer for which Wolf Hollow or Kearney is contractually obligated to provide services to such customer at the Wolf Hollow Project or the Kearney Project, as applicable) or (ii) the Acquired Companies, in either case that is stored, held, located or used at a location other than the Wolf Hollow Project site or Kearney Project site is property of the applicable customers or Acquired Companies and, following the Closing, neither the Seller nor any of its Affiliates shall have any right or interest in such property; and nothing herein shall prevent the Purchaser, Wolf Hollow, or Kearney from asserting that such miners, equipment, or other property belong to the Wolf Hollow Project or the Kearney Project, as applicable, and taking any efforts to restore such miners, equipment, or other property to the Wolf Hollow Project site or the Kearney Project site, as applicable.

Section 6.8 Use of Excluded Names. It is expressly acknowledged and agreed that the Purchaser is not acquiring (on its own behalf or on behalf of any of its Affiliates) any right, title or interest in, or any right to use, the name "Compute North" or the identifier "CN" (including in any trademarks, service marks, trade dress, trade names, domain names, logos, identifying symbols, signs or corporate names), any variation or derivative thereof, or any names, identifiers or marks confusingly similar thereto (any of the foregoing, the "Excluded Names"). After the Closing Date, the Purchaser shall cause each Acquired Company to promptly (but in any event within 30 days after the Closing Date) legally change their business and corporate names to new names that do not include any of the Excluded Names. As soon as reasonably practicable following the Closing and in any event within 180 days following the Closing Date, Purchaser shall remove from the property of the Acquired Companies and cease using, and shall cause the Acquired Companies to cease using, all Excluded Names.

Section 6.9 Access and Preservation of Records. The Purchaser agrees that it shall cause the Acquired Companies to preserve and keep the books and records (whether in documentary or data form) held by the Acquired Companies as of the Closing and shall make such books and records available upon reasonable advance request during normal business hours (and solely to the extent providing such access is not materially disruptive to the business of the Acquired Companies) to the Seller and the Seller's auditors, attorneys, agents and other Representatives in connection with, and until the end of, the

administration and/or closing of the Chapter 11 Cases (or the date on which the Seller is liquidated or dissolved, if earlier).

Section 6.10    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with Section 3.4, the Seller and the Purchaser shall use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to ensure that the conditions precedent to the other party's obligations hereunder to consummate the transactions contemplated hereby set forth in Article VII are satisfied and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable, but in any event on or prior to the Outside Date, including using its reasonable best efforts to obtain all necessary waivers, consents, approvals and Orders (including entry of the Sale Order by the Bankruptcy Court) and effecting all necessary registrations and filings to consummate and make effective the transactions contemplated hereby.

(b)    Subject to the terms and conditions of this Agreement, neither the Seller nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Seller or the Purchaser to consummate the transactions contemplated by this Agreement (including taking any action or refraining from taking any action the effect of which is intended or would reasonably be expected to result in any of the conditions to any party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied) unless taking such action or refraining from taking such action is required by applicable Law.

(c)    Without limiting the generality of the other provisions of this Section 6.10, to the extent any filing is required under the HSR Act or any other Antitrust Law, the Purchaser and the Seller shall, or shall cause its "ultimate parent entity" (as such term is defined by the rules to the HSR Act, "UPE"), if any, to promptly prepare and file all necessary documentation and effect all applications that are required thereunder with respect to the transactions contemplated under this Agreement. Each of the Purchaser and the Seller shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act or any other Antitrust Law. The Seller and the Purchaser shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the United States Federal Trade Commission, the United States Department of Justice or any other Governmental Body. If such a filing is made, the Purchaser and the Seller shall or shall cause its UPE, if any, to use its reasonable best efforts to obtain as promptly as possible any clearance required for the consummation of the transactions contemplated under this Agreement.

Section 6.11 Interconnection Process. Seller and Purchaser shall work together in good faith to complete the interconnection process with ERCOT, Oncor Electric Delivery Company, Constellation Energy Generation, LLC and any other parties necessary to finalize the interconnection arrangements to support 300 megawatts of electricity demand from the Wolf Hollow Project (including, without limitation and as appropriate, Constellation NewEnergy, Inc. and Wolf Hollow II Power LLC) during the Interim Period (the "Interconnection Process"). If such Interconnection Process is not complete prior to the Closing, then Seller shall reasonably cooperate with Purchaser to complete such Interconnection Process as promptly as practicable following the Closing, at the sole cost and expense of Purchaser; provided, that the obligations of the Seller under this Section 6.11 shall terminate upon the closing of the Chapter 11 Cases (or the date on which the Seller is liquidated or dissolved, if earlier).

Section 6.12 Minden Assignment. Within five Business Days of Closing, Purchaser shall cause Kearney to give notice to the Southern Public Power District ("SPPD") and Nebraska Public Power District ("NPPD") of its intent to transfer the Agreement for EDR Electric Service between Kearney and

SPPD and NPPD, dated October 1, 2021 (as amended, restated, assigned or otherwise modified, the "Minden Agreement"), pursuant to, and in accordance with, Article 2, Section 4 of the Minden Agreement. Upon the third Business Day after the expiration of the applicable 30 days' notice period, Purchaser shall cause Kearney to assign the Minden Agreement to Seller or an Affiliate thereof (the "Minden Agreement Assignee") for no additional consideration. Purchaser agrees to cause Kearney to use commercially reasonable efforts to (a) ~~cooperate in providing NPPD with satisfactory proof of the transfer of the Minden Agreement with the state or any political subdivision in a form that is acceptable to NPPD within 90 days of the transfer of the Minden Agreement to the Minden Agreement Assignee and (b)~~ execute and deliver such other agreements or documents to show such transfer (or effectiveness of transfer) has occurred as reasonably requested by Seller, and (b) execute and deliver such other agreements or documents to permit the allocation, by The Nebraska Department of Economic Development and the Economic Development Council of Buffalo County, Inc., to CN Minden, for purposes of construction at a data center project proposed to be developed by CN Minden in Minden, Nebraska, of a portion of a Site and Building Development Fund award previously provided by The Nebraska Department of Economic Development to the Economic Development Council of Buffalo County, Inc. for construction of new buildings at the Kearney Project; provided, that the Purchaser shall not be required to cause Kearney to execute and deliver any such agreements or documents that would require Kearney to make any payments or incur, assume, become liable in respect of or suffer to exist any liabilities.

Section 6.13 Employee Matters. Upon the request of the Purchaser, the Seller shall cause its applicable Affiliate to waive any non-competition or similar restrictive covenant that such Business Employee has entered into with such Affiliate if the Purchaser desires to offer employment to such Business Employee after the TSA Expiration Date.

Section 6.14 Specified Bond GIA. As soon as practicable after the Closing Date, the Purchaser shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to cause Compute Holdings, Compute North and any other "Indemnitors" under the Specified Bond GIA (excluding Kearney) (collectively, the "GIA Indemnitors") to be released from all Liabilities and other obligations under the Specified Bond GIA. The Purchaser shall indemnify and hold harmless the GIA Indemnitors from and against any Liabilities paid, incurred or suffered by any of the GIA Indemnitors after the Closing Date arising out of, or resulting from, the Specified Bond GIA or the Specified Bond.

Section 6.15    Wolf Hollow; Kearney.

(a)    During the Interim Period, Seller will use reasonable best efforts to provide Purchaser with schedules setting forth the following:

(i)    a schedule of transformers and containers to which Wolf Hollow has title, together with any Encumbrances thereon, and the serial numbers for each such transformer and container;

(ii)    (A) any amounts currently due and payable under any Equipment Supply Agreement for the Wolf Hollow Project, (B) any equipment purchased for or to be used in connection with the Wolf Hollow Project that has been delivered to Compute North or one or more of its Affiliates and is not located at the project site for the Wolf Hollow Project and (C) any amendments, change orders or waivers entered into or that are pending with respect to any of the Equipment Supply Agreements for the Wolf Hollow Project; and

(iii)    a list of each Customer Contract assigned to Wolf Hollow, including the DealID number, customer, date of the master agreement and order form.

(b)      Prior to the Closing, Seller shall provide Purchaser with an estimated consolidated balance sheet of the Company and its subsidiaries as of October 31, 2022.

Section 6.16 <u>Removal of Certain Equipment</u>. Following the Closing, the Purchaser shall cause Wolf Hollow to provide the Seller and its Affiliates with access to the premises of the Wolf Hollow Project to allow Seller and its Affiliates to remove all containers and other equipment <u>that are not used or contemplated to be used, including under applicable operating plans, in the conduct of the Business (as conducted on the Execution Date) which, to the Knowledge of the Seller, is more specifically scheduled</u> on <u>Schedule</u> ~~6.17~~<u>6.16</u> attached hereto.

Section 6.17      <u>Atlas</u>.

(a)      From the ~~date hereof and~~<u>Closing Date</u> until the earlier of (i) the receipt by Purchaser or an Affiliate <u>thereof</u> (including an Acquired Company) ~~thereof~~ of the Atlas Waiver (whether delivered by Atlas or Seller or received from a court of competent jurisdiction) and (ii) the first anniversary of the Closing Date, Purchaser shall, and <u>Purchaser</u> shall cause the Acquired Companies to<u>,</u> reasonably cooperate with the Seller and its Affiliates and use commercially reasonable efforts to obtain ~~the Atlas Waiver, including (to the extent within the control of the Acquired Companies) offering to return to Atlas all miners and other equipment Atlas delivered to the Acquired Companies under, or in connection with, the obligations of Atlas under Atlas Contract (with such return being made at the sole cost and expense of Seller) in consideration for Atlas providing~~ the Atlas Waiver. Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall (~~i~~<u>A</u>) require Purchaser or any Affiliate thereof (including any Acquired Company) to incur any liability or make any expenditure or payment, other than of *de minimis* amounts, in fulfillment of its obligations in this <u>Section 6.17</u> and (~~ii~~<u>B</u>) prevent, prohibit or impair the ability of Purchaser or any of its Affiliates (including the Acquired Companies) from engaging in conversations with, or negotiating for, the Atlas Waiver directly with Atlas (and without the inclusion of Seller or any Affiliate thereof in such conversations and negotiations) or executing and delivering any other settlement agreement with Atlas that includes the Atlas Waiver.

(b)      At or following Closing, upon receipt of either (x) full waiver and release in favor of the Acquired Companies from Atlas and duly executed by Atlas on terms and conditions acceptable to Purchaser with respect to all claims Atlas may have or may ever have under, or with respect to, the [Atlas ~~Contracts]~~<u>Contract</u> (any such ~~claim~~<u>claims</u>, the "<u>Atlas Claims</u>") or (y) a final, binding, nonappealable order of ~~a~~<u>the Bankruptcy Court or other</u> court of competent jurisdiction releasing the Acquired Companies from any Atlas Claims (either (x) or (y), the "<u>Atlas Waiver</u>"), Purchaser shall promptly cause each Acquired Company to transfer, assign, convey and deliver to the Seller, and the Seller <u>shall</u> acquire and accept from each Acquired Company, all of such Acquired Company's right, title and interest in, to and under <u>(i)</u> all claims, causes of action, chosen in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses that may be asserted by such Acquired Company against Atlas, if any, under, the [Atlas ~~Contracts]~~<u>Contract</u> (collectively, the "~~Atlas~~<u>Acquired Company</u> Claims")<u>, and (ii) all miners and other equipment acquired or to be acquired by, or ordered by or on behalf of, Atlas</u>. Following any such assignment, the Purchaser shall not, and the Purchaser shall cause its Affiliates (including the Acquired Companies) not to, (~~i~~<u>A</u>) prosecute or pursue any of the ~~Atlas~~<u>Acquired Company</u> Claims or (~~ii~~<u>B</u>) impede, oppose or interfere with the prosecution or pursuit of the ~~Atlas~~<u>Acquired Company</u> Claims by the Seller or any of its Affiliates.

**ARTICLE VII**

**CONDITIONS TO CLOSING**

28

Section 7.1 <u>Conditions Precedent to the Obligations of the Purchaser and the Seller</u>. The respective obligations of the Seller and the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted by applicable Law, joint written waiver by the Purchaser and the Seller, of each of the following conditions:

(a)   no Law (including any Order) (whether temporary, preliminary or permanent) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated hereby shall be in effect; and

(b)   (i) the Bankruptcy Court shall have entered the Sale Order, and (ii) the Sale Order shall be a Final Order; <u>provided</u>, that if the Sale Order entered by the Bankruptcy Court includes a waiver of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, then the condition set forth in clause (ii) of this Section 7.1(b) shall be deemed satisfied.

Section 7.2 <u>Conditions Precedent to the Obligations of the Seller</u>. The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Seller, in whole or in part, to the extent permitted by applicable Law):

(a)   the representations and warranties of the Purchaser contained in <u>Article V</u> shall be true and correct in all material respects (without giving effect to any limitation or qualification as to materiality set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(b)   the Purchaser shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing; and

(c)   the Purchaser shall have delivered, or caused to be delivered, to the Seller (or at the direction of the Seller) all of the items set forth in <u>Section 3.3</u>.

Section 7.3 <u>Conditions Precedent to the Obligations of the Purchaser</u>. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)   (i) the Fundamental Representations shall be true and correct in all respects as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all respects only as of such specified date), (ii) the representations and warranties of the Seller contained in <u>Article IV</u> (other than Fundamental Representations) that are qualified by a "materiality" or "Material Adverse Effect" limitation or qualification shall be true and correct in all respects as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all respects only as of such specified date), and (iii) the representations and warranties of the Seller contained in <u>Article IV</u> (other than Fundamental Representations) that are not qualified by a "materiality" or "Material Adverse Effect" limitation or qualification shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Purchaser shall have received a certificate duly signed by an

authorized person of the Seller, dated the Closing Date, certifying the foregoing;

(b)    the Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by the

Seller on or prior to the Closing Date, and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the forgoing;

(c)    no Material Adverse Effect on the Acquired Companies shall have occurred since the Balance Sheet Date and be continuing and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the foregoing; and

(d)    the Purchaser shall have received all of the items set forth in <u>Section 3.2</u>.

## ARTICLE VIII

## ADDITIONAL DEFINITIONS

Section 8.1    <u>Certain Definitions</u>. As used herein:

(a)    "<u>Acquired Companies</u>" means, collectively, the Company and its and their respective subsidiaries.

(b)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include, in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person. The term "<u>control</u>" (including, with its correlative meanings, "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by Contract or otherwise).

(c)    "<u>Affiliate Contracts</u>" means any Contract between (i) any Acquired Company, on the one hand, and (ii) (x) Seller or any of its Affiliates (other than the Acquired Companies) or (y) any director, manager or officer of Seller or any of its Affiliates (other than the Acquired Companies after August 12, 2022), on the other hand.

(d)    "<u>Ancillary Agreements</u>" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(e)    "<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and any other applicable federal, state and foreign antitrust, merger control, competition or trade regulation Laws of any Governmental Body or Laws issued by any Governmental Body that are otherwise designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition.

(f)    "<u>Assigned Contracts Assignment</u>" means, with respect to any Assigned Contract, an assignment and assumption agreement, in a form reasonably acceptable to the Purchaser and the Seller, duly executed by the Seller and/or its applicable Affiliates, and the applicable Acquired Company, pursuant to which, on the date of such assignment and assumption agreement, such Assigned Contract is assigned to the applicable Acquired Company and the applicable Acquired Company assumes the

Assumed Liabilities relating to such Assigned Contract.

(g)    "Atlas" means Atlas Technology Group LLC and its Affiliates.

(h)    ~~"Atlas Contracts" means [●].~~ "Atlas Contract" means, collectively, (i) the Master Agreement, dated September 2, 2021, by and between Compute North and Atlas Technology Group LLC, and (ii) the Partial Assignment and Assumption Agreement, dated April 27, 2022, by and between Compute North and Wolf Hollow (solely to the extent such Partial Assignment and Assumption Agreement relates to Atlas), as any of the foregoing has been amended, supplemented or otherwise modified from time to time.

(i)    "Business" means the business of the Acquired Companies, including the construction, development, operation and maintenance of the Wolf Hollow Project and the ~~Kearny~~Kearney Project.

(j)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(k)    "CARES Act" means (a) the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136), and (b) Division N – Additional Coronavirus Response and Relief of the Consolidated Appropriations Act, 2021 (H.R. 133), in each case, together with all rules and regulations and guidance issued by any Governmental Body with respect thereto.

(l)    "CN Minden" means CN Minden LLC, a Delaware limited liability company.

(m)    ~~(l)~~"Code" means the Internal Revenue Code of 1986, as amended.

(n)    ~~(m)~~"Compute Holdings" means Compute North Holdings, Inc., a Delaware corporation.

(o)    ~~(n)~~"Compute North" means Compute North LLC, a Delaware limited liability company.

(p)    ~~(o)~~"Confidential Information" has the meaning set forth in the Confidentiality Agreement.

(q)    ~~(p)~~"Confidentiality Agreement" means the Confidentiality Agreement, dated as of October 12, 2022, by and between Compute Holdings and Generate Lending, LLC, as amended, supplemented or otherwise modified from time to time.

(r)    ~~(q)~~"Contract" means any contract, indenture, note, bond, lease, license, commitment or other legally enforceable agreement, instrument or arrangement.

(s)    ~~(r)~~"Cure Costs" means the amounts that must be paid in connection with the assumption and/or assignment of each Additional Business Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(t)    ~~(s)~~"Designation Deadline" means 12:00 p.m. (New York time) on November 3, 2022.

(u)    ~~(t)~~"Encumbrance" means any encumbrance, charge, restrictive covenant or condition, easement, encroachment, servitude, pledge, security interest, mortgage, lease, deed of trust, option, right of use, first offer or refusal, hypothecation or lien (statutory or otherwise) or similar

31

restriction, whether imposed by Contract or Law.

(v)    (u)"Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources, human health (as any such Laws relate to exposure to any Hazardous Material) or the environment (including air, water, soil and natural resources), or the generation, use,

treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.), and other similar federal, state, provincial and local statutes.

(w)    (v)"Equity Interests" means, with respect to any entity, any corporate stock, shares, partnership interests, limited liability company interests, membership interests or units, or any other equity interests of, or other equity participation in, such entity that confers on any other Person the right to receive a share of the profits and losses of, or distribution of the assets of, such Person.

(x)    (w)"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(y)    (x)"Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(z)    (y)"Final Order" means an Order of the Bankruptcy Court (or other court of competent jurisdiction having jurisdiction over the Chapter 11 Cases) entered by the Clerk of the Bankruptcy Court on the docket in any of the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is and remains in full force and effect, (ii) has not been modified, amended, reversed, vacated or stayed, (iii) as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending, and (iv) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such Order shall not cause such Order not to be a Final Order.

(aa)    (z)"Fundamental Representations" means those representations and warranties set forth in Sections 4.1, 4.2, 4.3(a)(i), 4.3(a)(ii), 4.4, 4.5 and 4.15.

(bb)    (aa) "GAAP" means generally accepted accounting principles in the U.S., consistently applied throughout the specified period.

(cc)    (bb) "Generate Credit Agreement" means that certain Credit and Guaranty Agreement, dated as of February 7, 2022, by and among the Company, as borrower, Wolf Hollow and Kearney, as subsidiary guarantors, Generate Lending, LLC, as administrative agent and collateral agent,

and the lenders from time to time party thereto, as such Credit and Guaranty Agreement may have been amended, supplemented or otherwise modified from time to time.

(dd) ~~(cc)~~ "Generate Debt Obligations" has the meaning ascribed to the term "Obligations" in the Generate Credit Agreement.

(ee) ~~(dd)~~ "Generate Debt Termination Date" has the meaning ascribed to the term "Debt Termination Date" in the Generate Credit Agreement.

(ff) ~~(ee)~~ "Generate Guaranty" means that certain Guaranty Agreement, dated as of February 7, 2022, made and entered into by Compute North and Compute Holdings in favor of Generate Lending, LLC, in its capacity as Administrative Agent under the Generate Credit Agreement, as amended, supplemented or otherwise modified from time to time.

(gg) ~~(ff)~~ "Generate Payoff Amount" means all outstanding Generate Debt Obligations as of immediately prior to the Closing.

(hh) ~~(gg)~~ "Generate Pledge Agreement" means that certain Pledge Agreement, dated as of February 7, 2022, made by the Seller in favor of Generate Lending, LLC, in its capacity as Collateral Agent under the Generate Credit Agreement, as amended, supplemented or otherwise modified from time to time.

(ii) ~~(hh)~~ "Governmental Body" means any applicable federal, state, provincial, local, municipal, or foreign government or any agency, bureau, board, commission, court, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof.

(jj) ~~(ii)~~ "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes thereof, asbestos and asbestos containing materials, polychlorinated biphenyls, per- and polyfluoroalkyl substances, radon gas and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "industrial waste," "contaminant," "pollutant," "radioactive," or "toxic" (or words of similar meaning) under or pursuant to any Environmental Law, including any regulations adopted by a Governmental Body pursuant thereto.

(kk) ~~(jj)~~ "Hedging Arrangement" means any forward, future, swap, collar, put, call, floor, cap, option or other similar Contract the purpose of which is to benefit from, or reduce the risk of, fluctuations in interest rates or the price of any commodity, excluding, for the avoidance of doubt, any power purchase agreements to which an Acquired Company is a party.

(ll) ~~(kk)~~ "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

(mm) ~~(ll)~~ "Indebtedness" means (without duplication) the following obligations: (a) any indebtedness for borrowed money, (b) any obligations evidenced by bonds, debentures, notes or other similar instruments, (c) any obligations for the deferred purchase price of property, Equity Interests, goods or services (other than current trade payables incurred in the ordinary course of business), (d) any reimbursement obligations with respect to draws under outstanding letters of credit, surety bonds or similar instruments, (e) any Hedging Arrangements, (f) any obligations required to be classified and accounted for as capital lease obligations on a balance sheet in accordance with GAAP, provided, that "Indebtedness" shall not include any obligations under leases or other Contracts required to be reported as liabilities as a result of FASB Accounting Standards Update No. 2016-02, Leases (Topic 842), (g) obligations arising from deferred compensation arrangements or outstanding severance obligations, and

any unpaid payroll, bonus (including any unpaid discretionary annual bonuses in respect of the 2022 fiscal year) or commission obligations, together with the employer's portion of any employment or payroll Taxes related thereto (without regard to any deferral available under the CARES Act), (h) all unpaid income Taxes of any Acquired Company in respect of any period ending on or prior to the Closing Date, which amount shall not include any offsets or reductions with respect to Tax refunds or overpayments of Tax or other Tax assets,

(i) all unpaid payroll Taxes deferred pursuant to the CARES Act, (j) self-insured liabilities for workers' compensation, health and welfare obligations or other similar matters, (k) all liabilities to current or former equity holders in respect of dividends or other distributions declared prior to Closing, (l) any guaranty of any of the obligations described in clauses (a) - (k), and (m) any obligations in the nature of accrued fees, interest, premiums, breakage or make-whole payments or penalties with respect to any of the foregoing.

(nn) ~~(mm)~~ "Intellectual Property" means any and all of the following: (i) patents, (ii) trademarks, service marks, trade names, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, and (v) trade secrets and confidential information or know-how (including, research and development, formulas, manufacturing and production processes and techniques, technical data and designs).

(oo) ~~(nn)~~ "IT Assets" means all computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements that are owned, leased or licensed by the Acquired Companies.

(pp) ~~(oo)~~ "Kearney" means Compute North NE05, LLC, a Delaware limited liability company.

(qq) ~~(pp)~~ "Kearney PMA" means that certain Property Management Agreement, dated as of February 7, 2022, as amended from time to time, by and between Kearney and Compute North.

(rr) ~~(qq) "Kearny~~ "Kearney Project" means the data center project owned by Kearney.

(ss) ~~(rr)~~ "Knowledge of the Seller" means the actual knowledge of the Drake Harvey and Barry Coulby (after reasonable inquiry with the general counsel of the Seller).

(tt) ~~(ss)~~ "Laws" means all (i) federal, state, provincial, local, municipal, foreign or other laws, statutes, legislations, constitutions, common law, resolutions, rules, edicts, codes, regulations, restrictions, ordinances, proclamations, treaties, conventions and requirements of, or issued, promulgated, enforced or entered by, any Governmental Body, and (ii) Orders.

(uu) ~~(tt)~~ "Liability" means, as to any Person, any claim, debt, adverse claim, lien, liability, duty, responsibility, obligation, commitment, assessment, cost, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense), loss, damage, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, ascertained or ascertainable, fixed, absolute or contingent, matured or unmatured, direct or indirect, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, due or to become due, executory, determined, determinable, in contract, tort, strict liability, or otherwise, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(vv) ~~(uu)~~ "Licensed Intellectual Property" means all Intellectual Property that is licensed to an Acquired Company.

(ww)    ~~(vv)~~ "Material Adverse Effect" means any circumstance, change, fact, event, effect, occurrence or development that, alone, or together with any other circumstance, change, fact, event, effect, occurrence or development, has had or is reasonably expected to have, a material adverse effect on (a) with respect to Seller, the ability of Seller to consummate the transactions contemplated by this Agreement by the Outside Date; (b) with respect to Purchaser, the ability of Purchaser to consummate the transactions contemplated by this Agreement by the Outside Date and (c) with respect to the Acquired Companies, the

business, assets, liabilities, financial condition or results of operations of Wolf Hollow or Kearney; provided that, in the case of this clause (c), none of the following shall, for any purposes hereof, constitute or be deemed to contribute to a "Material Adverse Effect" or shall otherwise be taken into account in determining whether a "Material Adverse Effect" has occurred or would reasonably be expected to occur: (i) changes generally affecting the industries in which any of the Acquired Companies operate, whether international, national, regional, state, provincial or local, (ii) changes in international, national, regional, state, provincial or local markets for or costs of commodities, raw materials or other supplies, products or services used or generated by any of the Acquired Companies, (iii) changes in general regulatory, political or geopolitical conditions, including any acts of war, whether or not declared, armed hostilities, sabotage or terrorist activities (including any electronic or digital attack by any Person on any electric generating, transmission or distribution infrastructure), or any escalation or worsening thereof, and any governmental instability, government shutdown, failure to raise the borrowing limit of any Governmental Body or the results of any elections for government office or the appointment of any Person to any Governmental Body, (iv) changes in international, national, regional, state, provincial or local electric transmission or distribution systems, generally, (v) earthquakes, hurricanes, floods, acts of God or other effects of weather, meteorological events or natural disasters, (vi) changes in Law or regulatory policy or the interpretation or enforcement thereof,

(vii)    changes or adverse conditions in the currency, financial, banking or securities markets, in each case, including any disruption thereof and any decline in the price of any security or any market index, including devaluations of currency or any changes in the exchange rate of any currency as measured against any other currency, (viii) the announcement, negotiation, pendency, execution or delivery of this Agreement or the consummation of the transactions contemplated hereby, including the identity of, or the effect of any fact or circumstance relating to, Purchaser or any of its Affiliates or any communication by Purchaser or any of its Affiliates regarding its plans, proposals or projections with respect to any Acquired Company (including any impact on the relationship of any Acquired Company, contractual or otherwise, with its customers, suppliers, service providers, contractors, lenders, partners, directors, managers, officers, employees or other agents), (ix) changes in accounting requirements or principles, including any changes in GAAP, (x) labor strikes, requests for representation, organizing campaigns, work stoppages, slowdowns or other labor disputes, (xi) new generating facilities and their effect on pricing or transmission, (xii) actions or omissions expressly required to be taken or not taken by Seller, any of the Acquired Companies or any of its or their respective Affiliates in accordance with this Agreement or any other Ancillary Agreement to which it is a party or consented to in writing by Purchaser or any of its Affiliates, (xiii) any breach by Purchaser or any of its Affiliates of any provision of this Agreement or any other Ancillary Agreement to which it is a party,

(xiv)    any failure of Seller or any Acquired Company to meet any projections, forecasts or estimates of revenues, earnings or any other financial performance or results of operations of all or any portion of any Acquired Company (it being understood that this clause (xiv) shall not exclude any circumstance, change, fact, event, occurrence or development giving rise to such failure to the extent any such circumstance, change, fact, event, effect, occurrence or development is not otherwise excluded from clause (c) of this definition of Material Adverse Effect), (xv) changes in or effects on the assets of any Acquired Company that are cured (including by the payment of money) by Seller or any Acquired Company prior to the Closing,

(xvi)    any global, regional or local health conditions (including any epidemic, pandemic, or other outbreak of illness, or any actions by a Governmental Body related to the foregoing), (xvii) the

commencement and existence of the Chapter 11 Cases, and (xviii) any Generate Approved Matters.

(xx) (ww) "Order" means any order, writ, judgment, injunction, decree, ruling, directive, determination or award made, issued or entered by any Governmental Body, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order).

(yy) (xx) "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

(zz) (yy) "Owned Intellectual Property" means all Intellectual Property owned by an Acquired Company.

(aaa) (zz) "Permits" means all permits, approvals, concessions, grants, franchises, licenses, clearances, registrations, variances, certifications, exemptions, endorsements, waivers and other authorizations issued by any Governmental Body.

(bbb) (aaa) "Permitted Encumbrances" means (i) Encumbrances for utilities or Taxes that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings, (ii) easements, rights of way, restrictive covenants, encroachments and other similar Encumbrances against any assets of the Acquired Companies that do not, individually or in the aggregate, adversely affect the operation of the business of the Acquired Companies in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) any Encumbrances created by this Agreement or any of the Ancillary Agreements or created by the actions of the Purchaser or its Affiliates, (v) any Encumbrances that are removed or released by operation of the Sale Order, (v) mechanics', carriers', workers', repairers', landlords' and similar Encumbrances arising or incurred in the ordinary course of business for amounts that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings or the payment or enforcement of which is stayed under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court, (vi) other Encumbrances that would not, individually or in the aggregate, reasonably be expected to materially impair the ability of the Acquired Companies (taken as a whole) to operate in the ordinary course of business, (vii) all matters shown in any lien, pending suits and judgment searches or in any title reports or title policies made available to, or obtained by, the Purchaser, (viii) all pledges, deposits or other liens securing obligations under or with respect to utilities, (ix) Encumbrances in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution; and (x) Encumbrances created under the Generate Credit Agreement or the other Loan Documents (as defined in the Generate Credit Agreement).

(ccc) (bbb) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(ddd) (ccc) "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Person that is an individual.

(eee)    "Property Purchase Agreement" means the Purchase Agreement, effective as of December 1, 2021, made and entered into by and between Gary A. Frith and Ruth K. Frith, Trustees of the Firth Living Trust, and Kearney, as amended, supplemented, extended or otherwise modified from time to time.

(fff)    (ddd) "Purchaser Ancillary Agreements" means, collectively, the Assignment and Assumption Agreement, the TSA, and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement.

(ggg)    (eee) "Purchaser Parties" means, collectively, (i) the Purchaser, (ii) each of the current or former Affiliates of the Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors,
predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

(hhh)    (fff) "Registered IP" means all Owned Intellectual Property that is registered or issued as a patent, trademark or copyright or filed as an application to register or issue as a patent, trademark or copyright.

(iii)    (ggg) "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren (by blood, adoption or marriage).

(jjj)    (hhh) "Release" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(kkk)    (iii)"Representatives" means, with respect to any Person, the officers, directors, managers, employees, auditors, counsel, professionals, advisors, accountants, agents, contractors and other representatives of (i) such Person or (ii) any of the Affiliates of such Person.

(lll)    (jjj) "Right" means any option, warrant, convertible or exchangeable security or other right to subscribe for, purchase or otherwise acquire any Equity Interest or other security of any class, with or without payment of consideration, either immediately or upon the occurrence of a specified date or specified event or the satisfaction of any other condition.

(mmm)    (kkk) "Sale Order" means an Order of the Bankruptcy Court, in form and substance acceptable to the Purchaser in its sole discretion and reasonably acceptable to the Seller, which shall, among other things, approve (i) the sale and assignment of the Acquired Interests by the Seller to the Purchaser pursuant to this Agreement, and (ii) the releases as set forth in Exhibit A. In the event of any inconsistencies between the Sale Order and this Agreement, the Sale Order shall control. Subject to changing circumstances, theThe form and substance of the Sale Orderorder attached towith the *Notice of Proposed Order (I) Approving the Sale of Debtor CN Pledgor LLC's Equity Interests in CN Borrower LLC Free and Clear of All Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related Relief* [Dkt. No. 332] (or attached to any other notice or filing submitted by the Seller towith the Bankruptcy Court on the Execution Date seeking entry of the Sale Orderthat is approved by Purchaser and Seller) shall be deemed acceptable to the Purchaser and the Seller.

(nnn)    ~~(lll)~~ "Seller Ancillary Agreements" means, collectively, the Assignment and Assumption Agreement, the TSA, and each other certificate, agreement or document (other than this Agreement) that the Seller is required to execute and/or deliver pursuant to the terms of this Agreement.

(ooo)    ~~(mmm)~~ "Seller Disclosure Schedules" means the Schedules to this Agreement that relate solely to the representations and warranties of the Seller set forth in Article IV.

(ppp)    ~~(nnn)~~ "Seller Parties" means, collectively, (i) the Seller, (ii) each of the current or former Affiliates of the Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

(qqq)    ~~(ooo)~~ "Specified Bond" means that certain Transmission Facilities Payment Bond (No. PB00563200001) issued by Philadelphia Indemnity Insurance Company, as "Surety", and Kearney, as

"Principal", for the benefit of Nebraska Public Power District, as "Obligee", in the original maximum penal sum of $4,000,000, as amended, supplemented or otherwise modified from time to time.

(rrr)    ~~(ppp)~~ "Specified Bond GIA" means that certain General Indemnity Agreement, executed February 16, 2022, by Compute Holdings, Compute North, Kearney and the other "Indemnitors" named therein in favor of Philadelphia Indemnity Insurance Company, as amended, supplemented or otherwise modified from time to time.

(sss)    ~~(qqq)~~ "Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

(ttt)    ~~(rrr)~~ "Tax" and "Taxes" means any foreign or U.S. federal, state, county, or local income, transfer, sales, use, excise, franchise, profits, real and personal property, gross receipt, value added, stamp, license, capital gains, capital stock, production, business and occupation, disability, employment, escheat or unclaimed property, payroll, severance, occupation, premium, windfall profits, environmental, customs duties, social security (or similar), unemployment, disability, use, transfer, registration, alternative or add-on minimum, estimated withholding or other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including all interest, additions, surcharges, fees or penalties related thereto.

(uuu)    ~~(sss)~~ "Tax Return" means any return, report, information return, declaration, claim for refund or other information or document (including any schedule or related or supporting information) filed or provided, or required to be filed or provided, with or to any Governmental Body with respect to Taxes (including in connection with the determination, assessment or collection of Taxes or the administration of any Law with respect to Taxes), including amendments thereto.

(vvv)    ~~(ttt)~~ "TSA Expiration Date" means the date on which the TSA expires or is terminated.

(www)    ~~(uuu)~~ "WH PMA" means that certain Property Management Agreement, dated as of April 28, 2022, as amended from time to time, by and between Wolf Hollow and Compute North.

(xxx)    ~~(vvv)~~ "Wolf Hollow" means CN Wolf Hollow LLC, a Delaware limited liability company.

(yyy)   (www) "Wolf Hollow Project" means the data center project owned by Wolf Hollow.

Section 8.2    Additional Defined Terms. The following terms have the meanings set forth in the Sections set forth below:[5]

| Defined Term | Location |
|---|---|
| Actions | 4.9(a) |
| Accommodation Agreement | 4.11(a)(iii) |
| Additional Business Contracts | 1.2(a) |
| Agreement | Preamble |
| Allocation Schedule | 2.3 |
| Acquired Interests | Recitals |
| Asset Taxes | 6.2(b) |
| Assigned Contract | 1.2(a) |
| Assigned Contracts Assignment | 3.2(b) |
| Assignment and Assumption Agreement | 3.2(a) |
| Balance Sheet Date | 4.6 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | 4.2 |
| Cash Purchase Price | 2.1(a) |
| Chapter 11 Cases | Recitals |
| Closing | 3.1 |
| Closing Date | 3.1 |
| Company | Recitals |
| Construction Contracts | 4.11(a)(i) |
| Construction Budget and Schedule | 4.12(b) |
| Contracting Party | 9.12 |
| Customer Contract | 4.11(a)(iii) |
| e-mail | 9.7 |
| Environmental Permits | 4.19(a) |
| Equipment Supply Agreements | 4.11(a)(ii) |
| Excluded Names | 6.8 |
| Execution Date | Preamble |
| Financial Statements | 4.6 |
| Generate Approved Matter | Article 4 |
| Inclusion Notice | 1.2(a) |

| Defined Term | Location |
|---|---|
| Balance Sheet Date | 4.6 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | 4.2 |
| Cash Purchase Price | 2.1(a) |
| Chapter 11 Cases | Recitals |
| Closing | 3.1 |
| Closing Date | 3.1 |
| Company | Recitals |
| Construction Contracts | 4.11(a)(i) |
| Construction Budget and Schedule | 4.12(b) |

---

[5]  Note to Draft: To be updated.

| | |
|---|---|
| Contracting Party | 9.12 |
| Customer Contract | 4.11(a)(iii) |
| e-mail | 9.7 |
| Environmental Permits | 4.19(a) |
| Equipment Supply Agreements | 4.11(a)(ii) |
| Excluded Names | 6.8 |
| Execution Date | Preamble |
| Financial Statements | 4.6 |
| Generate Approved Matter | Article 4 |
| Inclusion Notice | 1.2(a) |
| Insurance Policies | 4.18 |
| Interconnection Process | 6.11(a) |
| Interim Arrangement | 1.3(d) |
| Interim Period | 6.1(a) |
| Leased Real Property | 4.16(a) |
| Legal Restraint | 3.4(c) |
| Material Contracts | 4.11(a) |
| Minden Agreement | 6.13 |
| Nonassignable Assets | 1.3(c) |
| Non-Recourse Party | 9.12 |
| Outside Date | 3.4(b) |
| Owned Real Property | 4.16(a) |
| Partial Assignment Agreements | 4.11(a)(xiii) |
| Payoff and Release Agreement | 3.2(g) |
| Post-Closing Covenants | 9.2 |
| Profit Sharing Agreement | 4.11(a)(iii) |
| Purchase Price | 2.1(d) |
| Purchaser | Preamble |
| Real Property | 4.16(a) |
| Real Property Documents | 4.16(b) |
| Seller | Preamble |
| Seller Insurance Coverage | 6.3 |
| Transfer Taxes | 6.2(a) |
| TSA | 3.2(c) |
| UPE | 6.10(c) |

**ARTICLE IX**

**MISCELLANEOUS**

Section 9.1 <u>Payment of Expenses</u>. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto will bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; <u>provided</u>, that all (a) Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto), and (b) filing fees in connection with any filings, applications or submissions under the HSR Act or any other Antitrust Law shall be borne solely by the Purchaser.

Section 9.2 <u>Survival of Representations, Warranties; and Covenants</u>. None of the representations, warranties, covenants or agreements in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, including any rights arising out of any breach or violation of any such representations, warranties, covenants or other agreements, will survive the

Closing, and all such representations, warranties, covenants and other agreements shall terminate and expire upon the occurrence of the Closing; provided, that each of the covenants and agreements set forth in this Agreement and/or any of the Ancillary Agreements which by their express terms are to be performed or complied with subsequent to the Closing Date (collectively, the "Post-Closing Covenants") and rights arising out of any breach or violation of any such Post-Closing Covenants shall survive the Closing in accordance with their terms. In furtherance of the foregoing, each of the Seller and the Purchaser hereby waives, to the fullest extent permitted under applicable Law, any and all rights, claims, remedies and causes of action it may have against the other party hereto (including any rights, claims, remedies and causes of action arising under or based upon any federal, state, local or foreign statute, ordinance, rule, regulation or other Law) for any breach of any representation, warranty, covenant or obligation set forth in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, except with respect to the Post-Closing Covenants. At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Seller, on the other hand, have any recourse against (i) the Seller or any of the Seller Parties, or (ii) the Purchaser or any of the Purchaser Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Seller or the Purchaser, as applicable, in this Agreement or any of the Ancillary Agreements, except with respect to claims for breaches of Post-Closing Covenants.

Section 9.3 Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the Confidentiality Agreement and the Ancillary Agreements constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings between the parties hereto with respect thereto. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the Purchaser and the Seller, or in the case of a waiver, by the party against whom the waiver is to be effective. The waiver by any party hereto of any provision of this Agreement or any breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any other or subsequent breach of any provision of this Agreement. No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 9.4 Counterparts. For the convenience of the parties hereto, this Agreement and the Ancillary Agreements, and any amendments hereto or thereto, may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement, and to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any Ancillary Agreement shall raise the use of electronic signature, a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 9.5 Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

Section 9.6      Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL ACTIONS, CLAIMS, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR ANY COURT EXERCISING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT) IN RESPECT OF ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING AND AGREES THAT IT WILL NOT BRING ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING IN ANY OTHER COURT; PROVIDED, HOWEVER, THAT IF THE CHAPTER 11 CASES ARE DISMISSED OR IF THE BANKRUPTCY COURT IS UNABLE TO HEAR ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, IN ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE) WILL HAVE SOLE JURISDICTION OVER ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT AS A DEFENSE, COUNTERCLAIM OR OTHERWISE, IN ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, (A) ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE NAMED COURTS FOR ANY REASON OTHER THAN THE FAILURE TO SERVE PROCESS IN ACCORDANCE WITH SECTION 9.7, (B) ANY CLAIM THAT IT OR ITS PROPERTY IS EXEMPT OR IMMUNE FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS COMMENCED IN ANY SUCH COURT (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF JUDGMENT, EXECUTION OF JUDGMENT OR OTHERWISE) AND (C) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) THE ACTION, CLAIM, SUIT OR PROCEEDING IN SUCH COURT IS BROUGHT IN AN INCONVENIENT FORUM,

(II)    THE VENUE OF SUCH ACTION, CLAIM, SUIT OR PROCEEDING IS IMPROPER OR (III) THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR ENTERED INTO IN CONNECTION HEREWITH, OR THE SUBJECT MATTER HEREOF OR

THEREOF, MAY NOT BE ENFORCED IN OR BY ANY SUCH COURT. EACH PARTY HERETO AGREES THAT NOTICE OR THE SERVICE OF PROCESS IN ANY ACTION, CLAIM, SUIT OR PROCEEDING ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, SHALL BE PROPERLY SERVED OR DELIVERED IF DELIVERED IN THE MANNER CONTEMPLATED BY SECTION 9.7.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 9.7 Notices. Except as otherwise expressly provided in this Agreement, all notices, requests, demands, consents, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when sent by electronic mail ("e-mail"), (b) when delivered personally, (c) one (1) Business Day after deposit with an overnight courier service, or (d) three (3) Business Days after the date of mailing by certified or

registered mail, return receipt requested, with postage prepaid, in any such case to the parties hereto at the following addresses or e-mail addresses (or at such other address or e-mail address for a party hereto as shall be specified by like notice to the other party hereto):

If to the Seller:

> c/o Compute North Holdings, Inc.
> 7575 Corporate Way
> Eden Prairie, MN 55344 Attn: Barry Coulby, Jason Stokes
> Email: barry.coulby@computenorth.com; jason.stokes@computenorth.com

with a copy (which shall not constitute effective notice) to:

> Paul Hastings LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: Matthew Schwartz; Sayan Bhattacharyya
> Email: mattschwartz@paulhastings.com;

sayanbhattacharyya@paulhastings.com If to the Purchaser:

> GC Data Center Equity Holdings, LLC
> 560 Davis Street, Suite 250
> San Francisco, CA 94111 Attn: Daryl Carbonaro; Mateo Aceves Email: notices@generatecapital.com

with a copy (which shall not constitute effective notice) to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attn: Christopher Marcus, P.C.; Brian Greene, P.C.; Allan Kirk Email: christopher.marcus@kirkland.com; brian.greene@kirkland.com; allan.kirk@kirkland.com

Section 9.8 <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns, including, in the case of the Seller, any trustee or estate representative appointed in the Chapter 11 Cases. No assignment of this Agreement or any rights, interests or obligations hereunder may be made by any party hereto (by operation of Law or otherwise) without the prior written consent of the other party hereto, and any attempted assignment without the required consents shall be void.

Section 9.9 <u>Severability</u>. If any term, condition or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party hereto. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

43

Section 9.10 <u>Injunctive Relief</u>. The parties hereto acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) an award of money damages would not be adequate to compensate the non-breaching party. Accordingly, each of the parties hereto shall be entitled, in addition to any other rights and remedies existing in its favor at law or in equity, to equitable relief, an injunction or injunctions or Orders for specific performance to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder, without the necessity of proving the inadequacy of money damages as a remedy. The right to equitable relief, including specific performance and injunctive relief, shall exist in addition to and notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the parties hereto hereby irrevocably waives any defense that a remedy at law is adequate and any requirement to obtain, furnish or post any bond, security or other instrument in connection with or as a condition to any actions instituted for injunctive relief, specific performance or other equitable remedies. Each of the parties hereto hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties hereto would have entered into this Agreement.

Section 9.11 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable benefit, claim, cause of action, remedy or right of any kind hereunder, except that each of the Seller Parties, Purchaser Parties, GIA Indemnitors and Non-Recourse Parties shall be a third party beneficiary of <u>Sections 3.5(a)</u>, <u>6.14</u>, <u>9.2</u> and <u>9.12</u>, as applicable.

Section 9.12 <u>Non-Recourse</u>. All causes of action or Actions (whether in contract or in tort, in equity or at Law, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, connected with, or relate in any manner to this Agreement, or the negotiation, preparation, execution, delivery, performance or breach of this Agreement, may be brought only against the Persons that are expressly identified as parties to this Agreement in the preamble of this Agreement (each, a "<u>Contracting Party</u>"). No Person who is not a Contracting Party, including any past, present or future direct or indirect equity holder, Affiliate or Representative of such Contracting Party or any Affiliate or Representative of any of the foregoing (the "<u>Non-Recourse Party</u>"), shall have any Liability or other obligation (whether in contract or in tort, in equity or at Law, or granted by statute) for any cause of action or Action arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, preparation, execution, delivery, performance, or breach; and, to the maximum extent permitted by applicable Law, each Contracting Party hereby waives and releases all such causes of action and Actions against any such Non-Recourse Party. Without limiting the generality of the foregoing, to the maximum extent permitted by applicable Law, (a) each Contracting Party hereby waives and releases any and all causes of action or Actions that may otherwise be brought in equity or at Law, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability or other obligation of any Contracting Party on any Non-Recourse Party, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Recourse Party with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 9.13 <u>Time of the Essence</u>. Time is of the essence in the performance of each of the obligations of the parties hereto and with respect to all covenants and conditions to be satisfied by the

44

parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

Section 9.14 <u>Disclosure</u>. Any exception, qualification or other disclosure set forth on the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Agreement shall be deemed to be an exception, qualification or other disclosure with respect to all other representations or warranties contained in this Agreement to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such exception, qualification or disclosure is applicable to such other representations or warranties whether or not such exception, qualification or disclosure makes reference to such other representations or warranties or any of their Section references.

Section 9.15    <u>Certain Interpretations</u>.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits of or to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized

terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The table of contents and Article, Section and paragraph captions herein are for convenience of reference only, and shall not be deemed to limit or otherwise affect the meaning or interpretation of any of the provisions hereof.

(iv)    The words "include," "includes" and "including" and words of similar import, when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Any reference to "days" means calendar days unless Business Days are expressly specified.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words "herein," "hereinafter," "hereof" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not merely to a subdivision or particular provision in which such words appear unless the context otherwise requires.

(ix)     The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(x)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(xi)     The term "or" is disjunctive and not exclusive.

(xii)     The phrases "delivered" or "made available" and words of similar import, when used in this Agreement in reference to information or materials delivered or made available to the Purchaser, shall include information or materials that have been made available by the Seller or any of its Affiliates to the Purchaser at any time prior to 12:00 p.m. (New York time) on the Execution Date, including in any "data room" (virtual or otherwise) to which the Purchaser has access (whether or not the Purchaser accesses such information or materials).

(b)     The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)     Prior drafts of this Agreement or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be construed in favor of or against any party on account of its participation in the negotiations and/or drafting of such prior drafts or be used

as an aid of construction or otherwise constitute evidence of the intent of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such prior drafts.

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER**:

**CN** ~~Pledgor~~ **PLEDGOR** LLC

By: _____

Name: Drake Harvey

Title:     President

**PURCHASER**:

GC Data Century Equity Holdings, LLC

By: _____

Name: Andrew Marino  Title: Manager

**Exhibit A**

**Form of Release**

For good and valuable consideration on behalf of the Purchaser, the adequacy of which is hereby confirmed, on and after the Closing, each of the Debtors[61] (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries (other than the Acquired Companies), and each such entity's and its current and former direct and indirect subsidiaries' (other than the Acquired Companies) current and former officers, members, managers, directors, principals, employees, agents, independent contractors, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), representatives, predecessors, and successors and assigns, in each case to the extent permitted by applicable law and solely in such parties' capacity as such) (collectively, the "Debtor Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the Purchaser, the Purchaser's current and former direct and indirect subsidiaries, and the Purchaser's and the Purchaser's current and former direct and indirect subsidiaries' directors, officers, managers, members, equityholders (regardless of whether such interests are held directly or indirectly), principals, employees, agents, independent contractors, attorneys, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), predecessors, successors, and assigns, and the attorneys and current directors of CN Borrower, LLC, CN Wolf Hollow LLC, and Compute North NE05, LLC (collectively, the "Purchaser Released Parties") and their respective property and assets from any and all acts and omissions of the Purchaser Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Debtor Releasing Parties now have, may claim to have or may come to have against the Purchaser Released Parties through the Closing, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, (c) any and all claims and causes of action based on or relating to or in any manner arising from in whole or in part, any Purchaser Released Party's efforts related to the PSA, intercompany transactions, the formulation, preparation, dissemination, negotiation, modification, amendment, entry into, or filing of the (i) PSA, (ii) that certain Credit and Guaranty Agreement, dated as of February 7, 2022, as amended by that certain Consent and Amendment No. 1 to Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement, dated as of April 28, 2022, that certain Consent and Amendment No. 2 to Credit and Guaranty Agreement, dated as of June 17, 2022, that certain Amendment No. 3 to Credit and Guaranty Agreement, dated as of August 23, 2022, and that certain Amendment No. 4 to Credit and Guaranty Agreement, dated as of September 16, 2022, and as the same may be further amended, amended and restated, restated, modified or supplemented and in effect from time to time prior to the date of entry of this Order, by and among CN Borrower LLC, certain subsidiary guarantors from time

---

[61] The "Debtors" are the following entities: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871) (also the Seller); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238). The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

to time party thereto, Generate Lending, LLC, as administrative agent and collateral agent, and the lenders from time to time party thereto (the "Credit Agreement"), (iii) that certain Guaranty Agreement, dated as of February 7, 2022, entered into by Compute North LLC and Compute North Holdings, Inc. ("CN Holdings"), as the sponsors, in favor of Generate Lending, LLC as Administrative Agent (the "Guaranty Agreement"), (iv) that certain Pledge Agreement, dated as of February 7, 2022, entered into by CN Pledgor LLC, as Pledgor, and Generate Lending, LLC, as Collateral Agent (the "Pledge Agreement"), (v) that certain Voting Agreement, dated as of February 2, 2022, by and among CN Holdings and each holder of the preferred stock of CN Holdings party thereto (the "Voting Agreement"), (vi) that certain Letter Agreement, dated as of October 18, 2022, by and among Mercuria Energy America, LLC, CN Wolf Hollow LLC and Generate Lending, LLC (the "Letter Agreement") or (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with the PSA, Credit Agreement, Guaranty Agreement, Pledge Agreement, Voting Agreement, or [Letter Agreement] or upon any other act or omission, transaction, agreement, event, or other occurrence related to the foregoing taking place on or before the Closing, (d) any actions taken by or on behalf of any of the Purchaser Released Parties in connection with the ownership of the preferred stock of Compute North Holdings or their participation on the Board of Directors of CN Holdings, and (e) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement or recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction; provided that this paragraph shall not release any Purchaser Released Party (including, for these purposes, CN Wolf Hollow LLC, and Compute North NE05, LLC) from any claims, obligations or liabilities (1) arising (1) after Closing under the Sale Order, the PSA or the TSA or (2) under~~for~~ fees payable in ~~the ordinary course~~exchange for services provided under, and reimbursement of costs and expenses incurred in connection with services provided under, the Kearney PMA (as defined in the PSA) or the WH PMA (as defined in the PSA), each as amended and supplemented by that certain *Stipulation and Agreed Order by and among Compute North LLC, Compute North NE05 LLC, CN Wolf Hollow LLC, and Generate Lending, LLC Concerning Certain Project Management Agreement* [Dkt. No. 266] (the "Stipulation") ~~for any payable fees or other amounts accrued or owed by such Purchaser Released Party to Compute North LLC~~, as required thereunder.

On and after the Closing, the Purchaser (in its own right, on behalf of its current and former direct and indirect subsidiaries (including the Acquired Companies), and the Purchaser's and its current and former direct and indirect subsidiaries' current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, employees, agents, independent contractors, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), representatives, predecessors, and successors and assigns, in each case to the extent permitted by applicable law and solely in such parties' capacity as such) (collectively, the "Purchaser Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the Debtors, the Debtors' current and former direct and indirect subsidiaries (other than the Acquired Companies), and any of the Debtors' and the Debtors' current and former direct and indirect subsidiaries' (other than the Acquired Companies) current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, employees, agents, independent contractors, attorneys, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), predecessors, and successors and assigns (collectively, the "Debtor Released Parties") and their respective property and assets from any and all acts and omissions of the Debtor Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims,

defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Purchaser, or the Purchaser's successors or assigns, whether individually or collectively), which the Purchaser Releasing Parties now have, may claim to have or may come to have against the Debtor Released Parties through the Closing, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, (b) any and all claims and causes of action based on or relating to or in any manner arising from in whole or in part, any Debtor Released Party's efforts related to the PSA, intercompany transactions, the formulation, preparation, dissemination, negotiation, modification, amendment, entry into, or filing of the (i) PSA, (ii) the Credit Agreement, (iii) the Guaranty Agreement,

(iv) the Pledge Agreement, (v) the Voting Agreement, (vi) the Letter Agreement or (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with the PSA, Credit Agreement, Guaranty Agreement, Pledge Agreement, Voting Agreement, [or Letter Agreement] or upon any other act or omission, transaction, agreement, event, or other occurrence related to the foregoing taking place on or before the Closing, and (d) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any claim or cause of action arising under or pursuant to the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction; provided that this paragraph shall not release any Debtor Released Party from any claims, obligations or liabilities arising under the Stipulation or after Closing under the Sale Order, the PSA, or the TSA.

These paragraphs are in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Debtor Releasing Parties in favor of the Purchaser Released Parties or by the Purchaser Releasing Parties in favor of the Debtor Released Parties.