# EXHIBIT 1

## MASTER SALE, RENTAL AND SERVICE AGREEMENT

This **MASTER SALE, RENTAL AND SERVICE AGREEMENT** (the "**Agreement**") by and among Compute North, LLC (the "**Company**"), Solomon Corporation (the "**Contractor**"), and, solely for the purpose of Section 2(b), Solomon Transformers, LLC ("**Parent**"), is entered into and made effective this 20th day of December, 2021 (the "**Effective Date**").  Company, Contractor, and, where applicable, Parent, are referred to collectively herein as the "**Parties**" and each individually as a "**Party**."

In consideration of the mutual covenants and agreements set forth herein, Company and Contractor agree as follows:

**1.**     **Definitions.**  As used in this Agreement, the following terms shall have the meanings set forth below:

(a)     "**Affected Party**" has the meaning ascribed to it in Section 16.

(b)     "**Affiliate**" means, with respect to a Party, any individual, partnership, corporation or other entity directly or indirectly controlling, controlled by or under common control with the Party.

(c)     "**Applicable Law**" means any and all laws, regulations, rules, ordinances, codes, orders and decrees by federal, state, local or tribal governmental authorities affecting this Agreement, an Order, Sale, Rental and/or or the Work.

(d)     "**Change Order**" has the meaning ascribed to it in Section 4(c).

(e)     "**Claims**" means any and all liabilities, judgments, costs (including court costs, reasonable attorney's fees and costs of investigation), fines, penalties, expenses, damages, claims, causes of action, suits and demands, whether based in tort, contract, strict liability, or otherwise, and whether or not there be any basis in law or in fact.

(f)     "**Company Group**" means Company, Company's joint venturers, partners, Affiliates (including after-acquired companies), contractors (other than "Contractor Group" as defined herein) and subcontractors, and each of their respective directors, officers, employees, representatives, agents, invitees and guests.

(g)     "**Confidential Information**" means Disclosing Party's non-public information, written or oral and whether or not it is marked as such, that is confidential or proprietary (or which a reasonable person would believe to be confidential or proprietary) business or technical information and any notes, analyses, studies and other documents prepared by the Receiving Party or members of its Group that contain or otherwise reflect such information.

(h)     "**Contractor Group**" means Contractor, Contractor's joint venturers, partners, Affiliates (including after-acquired companies), contractors and subcontractors, and each of their respective directors, officers, employees, representatives, agents, invitees and guests.

(i)     "**Covered Employees**" has the meaning ascribed to it in Section 23.

(j)     "**Delivery Point**" has the meaning ascribed to it in Section 7.

1

(k) **"Disclosing Party"** means the Party disclosing Confidential Information to the Receiving Party.

(l) **"Dispute"** means any dispute arising out of or relating to this Agreement, an Order or a breach of either.

(m) **"Equipment"** means any equipment, goods, and parts sold or rented by Contractor to Company.

(n) **"Equipment Warranty Period"** means: (i) for new Equipment, eighteen (18) months from the date of shipment of the Equipment to Company or twelve (12) months from the date of energization of the Equipment, whichever occurs first; and (ii) for reconditioned Equipment, thirty-six (36) months from the date of shipment of the Equipment to Company.  If Company is purchasing the Equipment to rent to or sell to its customers or to third parties other than Company, the warranty period shall be for twelve (12) months from the date of shipment of the Equipment by Contractor.

(o) "**Force Majeure Events**" has the meaning ascribed to it in <u>Section 16</u>.

(p) "**Non-solicitation Period**" has the meaning ascribed to it in <u>Section 23</u>.

(q) "**Order**" means any oral or written request for a Work by Company and shall include work orders, purchase orders, delivery tickets, invoices or other oral or written agreements between the Parties relating to Work to be performed by Contractor for Company as well as Change Orders that add to, delete from, modify or otherwise amend the Work.  Each Order shall include and be subject to the terms and conditions attached hereto as <u>Exhibit B</u> (the "**Order Terms**").

(r) **"Person"** means an individual, corporation, limited liability company, partnership, joint venture, unincorporated organization or any other legal entity.

(s) **"Receiving Party"** means the Party receiving Confidential Information from the Disclosing Party.

(t) "**Rental**" means the rental of Contractor Equipment to Company.

(u) "**Sale**" means the sale of Contractor Equipment to Company.

(v) "**Services**" means services set forth in an Order to be performed by Contractor or any of its Subcontractors under this Agreement, including all materials, equipment, and personnel required to provide such services.

(w) "**Services Warranty Period**" means the period commencing the date Contractor completes such Services and ending twelve (12) months thereafter, whether or not such Services are performed by Contractor on Company's premises or Contractor's premises. If the purpose of the Order is for Contractor to repair goods that are owned by Company in Contractor's shop (and is not warranty repair work), such Services will be guaranteed for a period of thirty-six (36) months from the date of the completion of such Services.

(x) "**Site**" means the facilities and/or location where the Services are provided by Contractor and/or its Subcontractors.

2

(y)    "**Subcontractor**" means any Person Contractor engages to perform all or a portion of the Work.

(z)    "**Third Party**" means any person or entity that is not a member of Company Group or Contractor Group.

(aa)    "**Work**" means the Services, Sales and/or Rentals Contractor is to provide to Company pursuant to the applicable Order.

## 2.    <u>Nature of Base Agreement for Sales and Rentals of Equipment and for Services</u>.

(a)    <u>Base Agreement</u>.  This Agreement shall act as a base agreement under which the Parties can enter into multiple specific transactions by executing an Order for Work at the prices set forth in the Order.  The Parties have agreed in advance that the terms of this Agreement will be applicable if and when such Order is issued and accepted.  Accordingly, this Agreement shall control and govern all Work performed by Contractor or one of its Affiliates for Company pursuant to an Order and shall supersede any such previous agreements from the Effective Date until the Agreement is cancelled in writing by either Party pursuant to <u>Section 3</u> or <u>Section 17</u>, anything to the contrary in any such agreement notwithstanding.  Any conflict or inconsistency between the terms and conditions of this Agreement and an Order shall be resolved in the following order of precedence, with item (1) having the highest precedence: (1) the face of an Order (as long as both Parties have agreed to the face of the Order); (2) the Order Terms; and (3) the body of this Agreement (including <u>Exhibit A</u> hereto, but excluding <u>Exhibit B</u>).  This Agreement does not obligate Company to issue any Orders, nor does it obligate Contractor or any of its Affiliates to accept any such Orders.

(b)    <u>No Joint and Several Liabilities for Contractor Affiliates</u>.  For avoidance of misunderstanding, each Party understands and agrees that each separate Order inures to the benefit of and is enforceable against only Contractor or Affiliate of Contractor and the Company that is the direct signatory (or signatories, as may be the case) to the Order creating such agreement (or in the case of an oral Order, the Affiliate that agreed to the provision of Work).  Contractor enters into this Agreement, for itself if it becomes a "Contractor" and, when it is not "Contractor", as agent for each of its Affiliates that become a "Contractor", simply as a matter of administrative efficiency.  Notwithstanding anything else in any Order or in any other communication between Company and Contractor or any of its Affiliates, there shall be no joint and several liability between or amongst Contractor and any of its Affiliates, or between or amongst any such Affiliates (unless, Contractor and an Affiliate(s) or several Affiliates, collectively, constitute a "Contractor" under an Order), and no action by any of them will create any such joint and several liability, for any purpose whatsoever under any Order(s) entered into by any of them.  Notwithstanding the foregoing, Parent hereby irrevocably and unconditionally guarantees to and for the benefit of Company, as primary obligor and not merely as a surety, the prompt and full payment and performance, if, as and when due, by Contractor of all of Contractor's obligations under this Agreement and any Orders.

(c)    <u>Preferred Pricing</u>.  For the term of this Agreement, Contractor agrees that the price it quotes in an Order will be a better price than it is quoting to other of Contractor's customers for the same transformer, and that the price quoted will be locked in and not increased by any market changes, including commodity price increases.  In consideration of such right of first refusal, Company agrees that Contractor will be Company's preferred vendor for transformers.

## 3.    <u>Term</u>.  This Agreement shall be for a term of one (1) year from the Effective Date and from year-to-year thereafter until terminated by either Party, without cause, upon thirty (30) days' prior written notice to the other Party.  Termination for cause shall be governed by the provisions of <u>Section 17(b)</u>.

3

4.    **Compensation; Change Orders.**

(a)    <u>Treatment of Taxes</u>.  Contractor shall be fully responsible for reporting and discharging all local, state and federal income or profit taxes or taxes imposed in lieu of an income or profit tax, franchise tax, pension benefits, payroll taxes including social security taxes, employment, disability and other customary insurance and for any other taxes (except sales, use, excise, gross receipts and other taxes addressed after this first sentence) or payments, together with any interest and penalties, additions to tax, or additional amounts with respect thereto, which may be due and owing by Contractor or which are the result of fees or amounts paid by Company to Contractor under this Agreement.  Unless otherwise stated in an Order, all prices are exclusive of any present or future sales, revenue, or excise tax, value added tax, turnover tax, import or export duty, or any other tax applicable to the manufacture and sale of any Equipment or the providing of any Services; such taxes shall be paid by Company.  Both Contractor and Company agree to provide each other with the necessary information to determine the taxability of the charges incurred pursuant to this Agreement, which may include providing support for the breakout of materials from labor where requested.

(b)    <u>Invoicing and Payment</u>.  Contractor shall invoice Company on or before the fifteenth (15th) day of each month for Services performed by Contractor during the prior month, or for Equipment, on or after delivery of the Equipment.  All invoices shall include sufficient line-item detail and supporting documents for Company to reasonably verify the basis of the charges, including quantities and pricing.  Payment terms are net thirty (30) days from the date the invoice is received unless otherwise agreed between the Parties.  In the event of a dispute or question regarding any invoice submitted by Contractor: (i) all amounts not disputed or in question shall be promptly paid as and when required by this <u>Section 4(b)</u>; (ii) Company shall promptly transmit to Contractor an explanation of the dispute or question; (iii) Company and Contractor shall immediately seek to resolve the dispute or question; and (iv) payment of any remaining amount shall be made within thirty (30) days of when the dispute or question is resolved.  Contractor may charge and accrue interest on any past due amounts (other than disputed amounts or amounts in question as described herein) at the lesser of one percent (1%) per month or the maximum rate permitted by law.  During the term of the dispute, in no event shall Contractor stop or suspend the Work as long as Company is paying undisputed invoice amounts in accordance with this <u>Section 4(b)</u>.

(c)    <u>Change Orders</u>.  If either Party desires to change the scope or performance of the Work, it shall submit details of the requested change to the other in writing.  Contractor shall, within a reasonable time after such request, provide a written estimate to the Company of: (i) the likely time required to implement the change; (ii) any necessary variations to the fees and other charges for the Work arising from the change; (iii) the likely effect of the change on the Work; and (iv) any other impact the change might have on the performance of this Agreement.  Promptly after receipt of the written estimate, the Parties shall negotiate in good faith and agree in writing on the terms of such change (a "**Change Order**").  Neither Party shall be bound by any Change Order unless mutually agreed upon in writing.  In the event that the Parties do not come into agreement on the Change Order and Company cancels the Order, the provisions of <u>Section 17(c)</u> shall apply.

5.    **Contractor's Responsibilities.**  Contractor shall:

(a)    Perform the Work with due diligence and in a good, safe and workmanlike manner to completion.

(b)    Furnish the services of all personnel and supervisors required to complete the Work.

(c)      Abide by all valid rules and regulations prescribed or promulgated by any governmental body having jurisdiction in the premises, remedy any violation by Contractor of such rules and regulations within a reasonable time, and pay and discharge all charges, penalties and fines imposed or levied upon Company as a result of such violations, specifically including any such costs of defense, fines, levies or penalties assessed as a result of any federal, tribal, state or local governmental or private health and safety act.

(d)      Furnish any and all necessary labor, machinery, equipment, tools, transportation and whatever else may be necessary in the performance and completion of the Work, unless Company otherwise agrees in writing to furnish any such item(s).

(e)      Obtain and furnish any and all licenses, approvals, permits, registrations, certificates or other governmental authorizations that may be required to perform the Work.

(f)      Provide all necessary safeguards, as are dictated by current industry standards, for the protection of all aspects of the Work and all Persons involved in the Work.

(g)      Notify, provide appropriate safety equipment for and train Contractor's employees and the employees of any Subcontractor with regard to Site exposure to hazardous substances.

(h)      Implement and monitor safety programs addressing hazardous substances on the Site, including reasonably implementing those such programs of Company which have been shared by Company in writing with Contractor.

(i)      Require that all personnel wear proper safety equipment on the Site at all times, including any equipment that may be necessary when the Work contemplates exposure to hazard substances.

(j)      Upon completion of the Work, remove Contractor's materials and equipment from the Site and leave the Site premises in a good, safe and workmanlike manner.

(k)      Maintain at all times during the term of this Agreement a sufficient inventory of Contractor Equipment for Sale to Company to meet Company's demand for such Contractor Equipment based on Company's historical demand together with any non-binding projections or forecasts provided by Company in good faith to Contractor.

(l)      Comply with all of Company's site safety requirements and guidelines at all times that any Contractor personnel is at a Company location.

**6.**      **Company's Responsibilities.**  Company shall:

(a)      Conduct its operations at the Site as a reasonably prudent operator.

(b)      Furnish, with due diligence and in a good workmanlike manner, such labor, machinery, equipment, tools, transportation and other items as Company specifically agrees in writing to furnish.

(c)      Provide Contractor and Contractor's employees, agents and Subcontractors reasonable access to the Site.

(d)     Inspect the Equipment within five (5) days of receipt and inspect the Services within five (5) days of Contractor's completion of the Services, or Company will be deemed to have accepted the Equipment and Services unless it notifies Contractor in writing of any nonconformity within this five (5) day period.

7.     **Title, Risk of Loss and Delivery.**  All domestic and international deliveries shall be DDP (Incoterms 2020) Company's location or such other facility designated by Contractor in the applicable Order ("**Delivery Point**").  Such other facility may be designated as a domestic port for international delivery.  The Party responsible international delivery shall comply with all Applicable Laws including those relating to the import, export, packaging, and labeling of the Equipment, and shall indemnify and defend the other Party for any breaches of such Applicable Laws.  Company shall be responsible for arranging further transportation of the Equipment from the Delivery Point.  Risk of loss to all Equipment furnished by Contractor shall pass directly to Company at the Delivery Point, subject to the provisions of Section 9 for Rental Equipment.  Unless otherwise stated in the applicable Order, the price quoted for each Order shall include the cost of the applicable Equipment and the cost to transport (and insure during transit) such Equipment DDP (Incoterms 2020) to the Delivery Point, and the Company shall not be subject to separate charges for transportation or insurance.  If the Delivery Point is Contractor's location and Company fails to accept delivery of any of the Equipment within five (5) days after Contractor's notice that the Equipment has been made available at the Delivery Point, Contractor, at its option, may store the Equipment until Company picks them up, and Company shall be liable for all related costs and expenses (including, without limitation, storage and insurance).  Title to the Sale Equipment shall pass to Company upon Company's payment to Contractor for the Equipment; Contactor shall retain title in all Rental Equipment at all times.  If Contractor fails to deliver Equipment to Company by the applicable delivery date specified in the Order, Contractor shall owe Company, as liquidated damages and not as a penalty, an amount equal to 1% of the Order price for each day that the Order is late, not to exceed 10% of the Order price.

8.     **Contractor's Warranties.**

(a)     General Warranty.  Contractor warrants that it and its Subcontractors are qualified to perform the Work and fully qualified and trained to follow, and will comply with, any and all Applicable Laws.

(b)     Services Warranty.  For Services provided, Contractor warrants for the Services Warranty Period that: (i) Contractor and its Subcontractors will perform all Services in a good, safe and workmanlike manner in accordance with generally accepted industry practices applicable to the Work being performed, (ii) the Services are in accordance with the specifications set forth in the applicable Order, and (iii) the Services will be free from defects in materials and workmanship.

(c)     Equipment Warranty.  For the Equipment Warranty Period, Contractor warrants the following regarding Sale Equipment manufactured by Contractor and Rental Equipment: (i) merchantable title to such Equipment; (ii) that they substantially comply with Company's specifications as set forth in the applicable Order; (iii) that they are guaranteed to operate in accordance with its nameplate when operated under normal load, usage, conditions and with proper care, installation and supervision; and (iv) that they will be free from defects in material and workmanship.

(d)     Exclusions from Warranties.  Contractor does not warrant: (i) any Equipment, not manufactured by Contractor; (ii) that the specifications provided by the Company are accurate, or fit for a particular use; (iii) damage caused by improper installation of the Equipment (unless performed by someone in the Contractor Group); (iv) damage caused by improper operations of the Equipment, voltage surges, negligence of others, accidents, natural forces (including fire, flood, wind and lightning), and operations beyond rated capacities, or misuse; (v) damage caused by use for purposes other than those for which it

6

was designed; (vi) damage caused by unauthorized attachments or modification; (vii) damage caused by vandalism; or (viii) that the Equipment will meet or comply with the requirements of any safety code or regulation of any state, municipality, or other jurisdiction.

       (e)    <u>Notice of Warranty Breach</u>.  Company shall provide timely, written notice to Contractor of warranty defects.

       (f)    <u>Remedies</u>.  Contractor shall promptly cure all valid Service Warranty defects described in such notices by reperforming the Services at Contractor's cost.  Any Sale Equipment or Rental Equipment provided by Contractor which breaches this warranty shall promptly and at Contractor's sole option, be repaired or replaced by Contractor at Contractor's cost, except as otherwise provided in this <u>Section 8</u>.  Contractor shall repair at the Site all Equipment for which field repair is feasible.  Should the Equipment require repair at Contractor's plant, Contractor shall arrange and pay freight to and from the Site anywhere in the continental U.S.  Under no circumstances is Contractor responsible for any in/out charges associated with the connection reconnection, disassembly or rigging of the Equipment being serviced under this warranty.  Contractor shall not be responsible for repairs or replacement made by Third Parties without the Contractor's written consent.  If Contractor fails to cure a defect within ten (10) days after receiving written notice of such defect, Company may cure such defect directly or through a Third Party.  In such case, Contractor shall reimburse Company for the reasonable and documented costs incurred by Company for curing the defect within thirty (30) days after receipt of a written invoice from Company.  Any Services or Equipment cured shall have a Service Warranty Period or Equipment Warranty Period for the longer of the remainder of the original warranty period or six (6) months from the completion of the warranty cure.

       (g)    <u>Warranty Limitation</u>.  Contractor's obligation under these warranties shall not, in any event, exceed the amount paid for the Equipment or Services pursuant to the applicable Order, provided that such limitation shall not apply to any of Contractor's obligations under <u>Sections 14(a), 14(c), 14(d), or 14(e)</u>.  If the costs of the reperformance, repair or replacement would exceed the original Order price, Contractor's obligations under this warranty shall be satisfied by a return of the Order price.

       (h)    <u>Third-Party Warranties</u>.  In the event that all or a portion of the Sale Equipment purchased are manufactured by others, the Company's warranty is with the original manufacturer of those Equipment and subject to the warranty terms and conditions of that manufacturer. Contractor, as a seller of Equipment manufactured by others, will assist Company in remediation of warranty claims, but in no circumstance is liable to fulfill the warranty obligation of those manufacturers or to cover expenses that are not covered by original manufacturers' warranty.

       (i)    The foregoing provisions of this <u>Section 8</u> are expressly in lieu of all other warranties whatsoever, express, implied and statutory.  **FURTHER, THE WARRANTY REMEDIES SET FORTH HEREIN ARE THE SOLE WARRANTY REMEDIES AVAILABLE TO COMPANY FOR A BREACH OF WARRANTY CLAIM.**

      **9.**    **<u>Items Particular to Rental Equipment</u>.**

       (a)    <u>Rental Charges</u>.  The minimum Rental charge for any individual unit is two (2) weeks.  Thereafter, monthly Rentals are billed on a month-to-month basis at the beginning of the Rental period.  The Rental fee will begin upon shipment of Rental unit(s) and will terminate upon return receipt of Rental Equipment at one of Contractor's locations.  Except as Company and Contractor may otherwise agree, Company is responsible for freight charges both to and from Company's Site.  Rental charged is NOT applicable to the purchase price of the Rental Equipment nor are any Rentals prorated.  Individual terms of Rental and Rental charges are discrete to each Rental as agreed between Contractor and Company.

(b)     <u>Return of Rental Equipment</u>.  Company shall be liable for the return of the Rental Equipment to Contractor's warehouse in the same condition the Rental Equipment was in at the time the Rental Equipment was received by Company, ordinary wear excepted.  As specified by Contractor, certain Rental Equipment shall be tarped when hauled to Company's location and when returned to Contractor.  If Company fails to comply with this tarping requirement, Contractor reserves the right to charge Company for any resulting damage.   Should Company rent Rental Equipment from Contractor, the following provisions apply: (i) in the event that any of Contractor's Rental Equipment is lost or damaged, Company shall continue to pay rent on the Rental Equipment until a) the Rental Equipment is returned, and Company pays Contractor the full cost to repair the Rental Equipment or b) Company pays Contractor the full replacement cost (i.e. the retail cost) of the Rental Equipment; and (ii) Company shall be responsible for any loss or damage to Contractor's Rental Equipment either transported by Company or by conveyance arranged for by Company.

(c)     <u>Insurance on Rental Equipment</u>.  Company agrees to purchase (prior to the shipment of any Rental Equipment under this Agreement) and maintain such insurance as shall protect Contractor from any and all claims which may arise out of or be in any manner connected with the use, misuse, installation, removal or storage of the Rental Equipment hereunder.  Within ten (10) days of shipment, Company agrees to provide a certificate of insurance which includes the following wording:

> Sunbelt Transformer, Ltd and all subsidiaries are named "Additional Insured" on Property, Automobile, General and Umbrella Liability policies.  Such policies will not be canceled or nonrenewed without notice by the insurance company to Sunbelt Transformer, Ltd. Lessee's policies are Primary with respect to transformers rented from Sunbelt. Subrogation against Sunbelt Transformer, Ltd., its agents and employees is waived on all policies.

**10.     Independent Contractor.**  Contractor is an independent contractor, and neither Contractor nor its Subcontractors, or their respective officers, employees and/or agents, shall be deemed Company's agent, representative and/or employee.  Contractor and its Subcontractors are free and clear of any dominion or control by Company in the manner in which the Work is to be performed, and have sole and complete control over and responsibility for their respective employees.  Contractor agrees that neither Contractor nor Contractor's employees, agents or Subcontractors will be covered by Company's workers' compensation coverage.  No fiduciary duty is created between the Parties as a result of this Agreement or the activities contemplated by it.

**11.     Taxes and Liens.**  Contractor agrees to promptly pay and discharge all valid taxes, lien claims, charges and/or other impositions imposed and/or to be imposed by law on Contractor, arising out of, in connection with or resulting from performance of the Work.  Contractor agrees to indemnify, defend and protect Company against any liability for any such taxes, lien claims, charges or impositions.  If, upon the completion of any particular portion of the Work, Company shall have cause to believe that there are unsatisfied claims for labor, materials or injuries to third persons or property, it may request in writing, and Contractor shall furnish, proof satisfactory to Company that such claims are satisfied or discharged.

**12.     Records and Audits.**  Contractor shall maintain a true and correct set of records pertaining to the Work.  Contractor shall retain all records pertaining to the Work for the applicable statute of limitations period for the particular jurisdiction in which the Work was performed, but in no event for less than two (2) years.  Company may, upon request, audit any and all of Contractor's nonconfidential records relating to the Work only to the extent reasonably necessary to verify the accuracy of any of Contractor's invoices hereunder, such as any invoices for Work performed by Contractor on a cost, cost plus, allowance or time and materials basis.  This right to examine and audit shall not be available with respect to any

information not directly relevant to this Agreement and may only be exercised once per calendar year. For avoidance of doubt, in no event shall Company have any right to review or audit Contractor's records as to costs incurred in connection with Work performed by Contractor on a fixed fee, lump sum or similar pricing basis. All invoices and billings shall be conclusively presumed final and accurate, and all associated claims for under- or over-payments shall be deemed waived, unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within twelve (12) months after the receipt of such invoice or billing by Company.

13. **Insurance.** At all times during the term of this Agreement or an Order, Contractor agrees to maintain and keep in force and effect, at its own expense, the insurance coverages and minimum amounts set forth on Exhibit A attached hereto and incorporated herein. Contractor shall be solely responsible for the satisfaction of any deductibles, self-insured retentions, or retrospective premiums associated with the insurance coverages required hereunder. The general liability, automobile liability and umbrella/excess liability coverage and cargo liability coverage, if applicable, Contractor is to maintain and keep in force and effect, to the extent of the risks and liabilities specifically assumed by Contractor pursuant to this Agreement, shall: (a) be primary and non-contributory to any other insurance policy providing coverage to Company or any member of Company Group; and (b) include a waiver of subrogation in favor of Company and Company Group; further, Contractor shall name Company as an additional insured on all policies except workers' compensation. The commercial general liability policy shall contain contractual liability coverage supporting the indemnity provisions in this Agreement, which will qualify as an insured contract. All such insurance policies required of Contractor shall provide for thirty (30) days' advance written notice to Company of the cancellation or material change to Contractor's coverage and shall be acquired from companies lawfully authorized to do business in the jurisdictions where the Work is being performed, and which carry an A.M. Best Rating of "A-" or better and a financial category of "X" or higher. Such insurance coverages do not limit Contractor's liability herein to Company (or its Group) for any damages. It is understood and agreed that Contractor's furnishing of such policies of insurance and Company's acceptance thereof is not intended to, and shall not limit, affect or modify the obligations or responsibilities Contractor otherwise assumed or owed. Within thirty (30) days from a request by Company, Contractor shall furnish Company with a Certificate of Insurance issued by Contractor's insurance carrier's agent evidencing Contractor's compliance with the provisions herein.

14. **Indemnity and Limitations of Liability.**

(a)     Contractor's Indemnity Obligation. **CONTRACTOR SHALL BE LIABLE FOR AND SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF COMPANY GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF, RELATING TO, OR CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE THEREOF AND BROUGHT BY OR ON BEHALF OF ANY PERSON ALLEGING BODILY INJURY, PERSONAL INJURY, ILLNESS, OR DEATH OR DAMAGE TO, LOSS OF, OR LOSS OF USE OF ANY PROPERTY TO THE EXTENT OF THE BREACH OF ANY OF CONTRACTOR'S WARRANTIES IN THIS AGREEMENT, THE FAILURE OF CONTRACTOR OR ANY MEMBER OF THE CONTRACTOR GROUP TO COMPLY WITH ANY APPLICABLE LAW, OR THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR OR ANY MEMBER OF THE CONTRACTOR GROUP.** Contractor's indemnity herein shall be effective to the maximum extent permitted under Applicable Law, shall be without regard to and without any right to contribution from any insurance maintained by Company, and shall apply even if the employee is determined to be a statutory or borrowed employee of Company or any member of Company Group.

(b)     Company's Indemnity Obligation. **COMPANY SHALL BE LIABLE FOR AND SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF**

**CONTRACTOR GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS BROUGHT BY OR ON BEHALF OF ANY PERSON ALLEGING BODILY INJURY, PERSONAL INJURY, ILLNESS, OR DEATH OR DAMAGE TO, LOSS OF, OR LOSS OF USE OF ANY PROPERTY TO THE EXTENT OF THE NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR ANY MEMBER OF THE COMPANY GROUP.** Company's indemnity herein shall be effective to the maximum extent permitted under Applicable Law, and shall be without regard to and without any right to contribution from any insurance maintained by Contractor.

(c)      Pollution and Contamination.      **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, CONTRACTOR SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF COMPANY GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF, RELATING TO, OR CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE THEREOF FOR POLLUTION, OIL LEAKS, OR OTHER FORMS OF CONTAMINATION (INCLUDING CONTROL AND REMOVAL THEREOF) WHICH ORIGINATES OR EMANATES FROM THE EQUIPMENT, ANY OTHER CONTRACTOR GROUP PROPERTY, OR ANY OTHER PROPERTY WHICH IS IN THE POSSESSION, CARE, CUSTODY, OR CONTROL OF CONTRACTOR GROUP, EXCEPT TO THE EXTENT CAUSED BY THE NEGLIGIENCE OR MISCONDUCT OF COMPANY OR ANY MEMBER OF COMPANY GROUP.**

(d)      Breach of Applicable Law.      **EACH PARTY AGREES TO INDEMNIFY THE OTHER PARTY FOR ANY AND ALL CLAIMS ARISING OUT OF OR RESULTING FROM AN ASSERTED OR ESTABLISHED VIOLATION OF SUCH APPLICABLE LAW BY THAT PARTY OR ANY MEMBER OF ITS GROUP.**

(e)      Intellectual Property.      Contractor warrants that the Work will not infringe on any copyright, patent, or trade secret.  **CONTRACTOR SHALL FULLY INDEMNIFY, DEFEND AND HOLD THE COMPANY GROUP HARMLESS FOR, FROM AND AGAINST ALL CLAIMS FOR ANY PATENT, COPYRIGHT OR TRADEMARK INFRINGEMENT OR MISAPPROPRIATION OF A TRADE SECRET, ARISING OUT OF OR RESULTING FROM CONTRACTOR'S OR ITS SUBCONTRACTORS' PERFORMANCE OF THE WORK, INCLUDING COMPANY'S USE OF ANY DESIGNS OR OTHER WORK PRODUCT DEVELOPED BY CONTRACTOR, AND CONTRACTOR SHALL REIMBURSE THE COMPANY GROUP FULLY FOR ANY ROYALTIES, DAMAGES OR OTHER PAYMENTS THAT A COMPANY GROUP SHALL BE OBLIGATED TO PAY.**  In the event Company's use of any Work developed by Contractor is interrupted as a result of such a claim, then Contractor shall either: (i) procure for Company, at no cost to Company, the right to continue using the infringing work product as though it were non-infringing; or (ii) replace or modify the infringing work product with a work product that is non-infringing and that does not violate the property rights of others.  The Company Group shall have the right to be present and represented by counsel, at its own expense, at all times during litigation or other discussions relating to claims under this provision.

(f)      Right to Defend or Assist in Defense.      If a potentially indemnifiable Claim is asserted against a Party (or any member of Company Group or Contractor Group, as applicable), the potentially indemnified Party (or the potential indemnitee against whom the claim is first asserted) must notify the potential indemnitor in writing and give the potential indemnitor the right to defend or assist in the defense of the Claim.  A Party's failure to provide timely notice of a Claim for indemnity shall not affect the validity or enforceability of such Claim unless such failure to provide timely notice has prejudiced the rights of the potential indemnifying Party.

(g)      Limitation of Damages.  **EXCEPT FOR CONTRACTOR'S OBLIGATIONS UNDER SECTIONS 14(a), 14(c), 14(d), AND 14(e), IN NO EVENT SHALL EITHER PARTY BE**

**LIABLE TO THE OTHER FOR ANY EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL, SPECIAL, LIQUIDATED, CONSEQUENTIAL, CONTINGENT, CIRCUMSTANTIAL OR ENHANCED DAMAGES INCLUDING, BUT NOT LIMITED TO, DAMAGE FOR DELAY, LOSS OF PRODUCT, LOSS OF USE, LOSS OF REVENUE, LOSS OF PROFITS AND LOSS OF GOOD WILL REGARDLESS OF (i) WHETHER SUCH DAMAGES WERE FORESEEABLE; (ii) WHETHER OR NOT A PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; (iii) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED; AND (iv) THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.**

(h)     Further Limitations of Liability.  For warranty claims, the limitations in Section 8(g) shall apply.  For breach of contract claims where Company terminates an Order, Contractor's obligations will not exceed the price of the specific Equipment sold or rented or the Services provided, and Contractor's liability shall be satisfied by returning the price of that specific Equipment sold or rented or the Services provided in such case.

(i)     Compliance with Applicable Laws.  The indemnities in this Agreement are limited to the extent necessary to comply with all Applicable Laws and each indemnity provision is deemed to be amended so as to comply with Applicable Laws but shall be interpreted to give the fullest effect not inconsistent with Applicable Laws.

(j)     Survival.  The provisions of this Section 14 shall expressly survive the termination of this Agreement.

## 15.     **Proprietary Rights**.

(a) Contractor Equipment.  Company acknowledges and agrees that Contractor's Equipment is protected by copyright, trademark, patent, or other proprietary rights of Contractor and its Affiliates, and Contractor retains all such intellectual property rights.  Company agrees not to modify or alter any of the intellectual property made available by Contractor in connection with the Equipment.  Company further agrees not to build, manufacture, fabricate, adapt, translate, modify, decompile, disassemble, or reverse engineer the Equipment or any software used in connection therewith.

(b) No Work for Hire.  No Equipment shall be considered *work for hire* unless an Order specifically orders or commissions Contractor to fabricate or manufacture the Equipment in a new or unique manner to Contractor's specifications, and not in the manner typically fabricated or manufactured by Contractor.

## 16.     **Force Majeure.**  Neither Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement or an Order, for any failure or delay in fulfilling or performing any term of this Agreement or an Order when and to the extent such failure or delay is caused by or results from the following force majeure events ("**Force Majeure Events**"), which include but are not limited to: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (d) government order or law; (e) actions, embargoes or blockades in effect on or after the date of this Order; (f) action by any governmental authority; (g) epidemic, pandemic, or other national or regional emergency (including without limitation any localized or widespread occurrence of an infectious virus, disease, pathogen or other harmful agent); (h) strikes, labor stoppages or slowdowns (except by a Party's own employees) or other industrial disturbances; and, (i) other events beyond the reasonable control of the Party impacted by the Force Majeure Event (the "**Affected Party**").  The Parties hereby acknowledge and agree that as of the Effective Date there is an ongoing event related to a coronavirus (commonly referred to as COVID-19) and that,

notwithstanding any occurrence of such event prior to the Effective Date, such event or expansion thereof may be a Force Majeure Event provided that such event otherwise qualifies as a Force Majeure Event in accordance with the terms of this Order.  The Affected Party shall give prompt written notice of the Force Majeure Event to the other Party, stating the period of time the occurrence is expected to continue. The Affected Party shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized.  To the extent possible, the Affected Party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause.

17.     **Termination.**

(a)     Termination of Agreement Without Cause.  As noted in Section 3, either Party may terminate the Agreement, without cause, upon thirty (30) days' prior written notice.  In the event that the Agreement is terminated without cause, Company shall have the option of requiring Contractor to complete any Orders in progress at the time of termination.

(b)     Termination of Agreement for Cause.  Company may terminate the Agreement for cause upon five (5) days' prior written notice for the reasons set forth in subsections (i) through (iv) below (taking into account the cure periods in subsections (iii) and (iv)).  If Company terminates the Agreement for cause, Company may either complete any outstanding Orders itself or hire a Third Party to satisfy the Orders.  In such an event, Contractor shall be paid the full contract price of the Order less the reasonable and verified cost of completion.  Contractor shall be entitled to any positive balance and shall be obligated to Company for any negative balance.  Contractor may be terminated for cause if any of the following shall occur:

(i)     Contractor becomes insolvent, or insolvency, receivership or bankruptcy proceedings are commenced by or against Contractor.

(ii)     Contractor materially violates Applicable Laws relating to the Work or disregards Company's reasonable instructions (provided that such instructions comply with Applicable Laws and the terms of this Agreement and the applicable Order).

(iii)     Except as provided in Section 16, Contractor breaches any material provision of this Agreement and fails to cure the breach within thirty (30) days after receiving written notice of such breach.

(iv)     Contractor allows any workmen, materialmen or Subcontractors to place a lien against the Work or the Site which is not removed pursuant to Section 11.

(c)     Termination of Work.  Company may terminate any Work or Order at any time, without cause, upon written notice to Contractor. In such event, Contractor shall immediately cancel orders and commitments to its suppliers and Subcontractors, and cause all of its suppliers or Subcontractors to cease all work related to the Agreement.  In the event of such termination, Company shall pay Contractor for and all Work performed prior to termination (including all Equipment manufactured) and shall reimburse Contractor for all documented direct expenses reasonably and necessarily incurred by Contractor in the demobilization of Contractor's equipment and/or personnel and closing out the Work.  If Equipment has been manufactured but not yet delivered to Company, Company shall have the choice of having Contractor deliver the Equipment according to the terms and conditions set forth in this Agreement or cancel the delivery.  If Customer decides to cancel the delivery, Contractor will try to sell the Equipment, and Customer will pay Contractor the difference in the price if Contractor has to sell the Equipment at a lower price.  If the Equipment is manufactured by Contractor and if Contractor is unable to sell the Equipment to any Third Party, Company will pay Contractor termination charges equal to the cost of

materials and labor incurred (and not otherwise mitigated) on ordered Equipment or Services prior to the date of Company's termination notice, provided Contractor takes all steps reasonably necessary to mitigate such costs. If the Equipment is manufactured by a Third Party with Contractor acting as distributor and Contractor is unable to sell the Equipment to any Third Party, Company will pay Contractor termination charges equal to such Third Party's policies.  For the avoidance of doubt, this Section 17(c) shall not apply to any terminated or cancelled Order in the event the applicable Order Terms include one or more provisions addressing Company's responsibility for cancelling or terminating such Order.

(d)     Survival of Rights, Obligations and Liabilities.  Termination shall have no effect upon the Parties' rights as they pertain to prior or existing Orders and any obligations or liabilities or injuries/damage arising thereunder.

18.     **Notices**.  All notices and communications required or permitted under this Agreement shall be in writing and addressed as set forth herein.  Any communication or delivery hereunder shall be deemed to have been duly made and the receiving Party charged with notice: (a) if personally delivered, when received; (b) if sent by telecopy or facsimile transmission or by email, on the first business day on or after which such facsimile is successfully transmitted and received; (c) if mailed, five (5) business days after mailing, certified mail, return receipt requested; or (d) if sent by overnight courier, the first business day on or after such notice is sent by overnight courier.  All applicable notices shall be addressed as follows:

| If to Company: | If to Contractor: |
|---|---|
| Attn: Jeff Jackson, VP of Development | Attn: Jamie Hypes, CFO |
| Address: 7575 Corporate Way | Address: 1922. S. MLK Jr. Drive |
| Eden Prairie, MN 55344 | Temple, TX 76504 |
| Telephone: (612) 900-5927 | Telephone: 254-227-5791 |
| Email: jeff.jackson@computenorth.com | Email: Jamie.hypes@sunbeltsolomon.com |

With a copy to:

7575 Corporate Way
Eden Prairie, MN 55344
Attention: Legal Department
Email: legal@computenorth.com

Any Party may, by written notice so delivered to the other Party, change the address or individual to which delivery shall thereafter be made.

19.     **Confidentiality; Publicity.**

(a)     Confidential information.  In order for Contractor to provide Work under this Agreement, it may be necessary for Disclosing Party to disclose Confidential Information to the Receiving Party.  For a period of three (3) years after the completion or termination of Work under an Order, Receiving Party shall receive and maintain in strictest confidence the Confidential Information and will not disclose the Confidential Information to others, except as otherwise permitted under the terms of this Section 19 (however, if the Confidential Information is the intellectual property of a Party, such Confidential Information shall never be disclosed by the Receiving Party).  Receiving Party will not use Confidential Information for any purpose other than the performance of the Work and will disclose the Confidential Information only to those members of its Group whom Receiving Party considers to have the need to know the Confidential Information for purposes of providing or receiving the Work, each of whom shall be informed of the confidential nature of the Confidential Information and agree to comply with the terms of

this <u>Section 19</u>, and Receiving Party agrees to be responsible for any breach of this <u>Section 19</u> by such members of its Group.

   (b) <u>Exceptions to Confidential Information</u>.  The provisions of this <u>Section 19</u> shall not apply to any portion of the Confidential Information that:  (i) was developed by Receiving Party and in Receiving Party's possession prior to Receiving Party's first receipt thereof directly or indirectly from Disclosing Party; (ii) is now or hereafter becomes through no act or failure to act on Receiving Party's or any of Receiving Party's Representative's part generally available on a non-confidential basis to the public; (iii) was heretofore or hereafter furnished to Receiving Party by a source other than Disclosing Party as a matter of right without restriction on disclosure; or (iv) is required by law to be publicly disclosed by Receiving Party; <u>provided however</u>, that Receiving Party, to the extent legally permissible, timely notifies Disclosing Party of any such requirement in order to provide Disclosing Party a reasonable opportunity to seek an appropriate protective order, and, in the event such protective order or other remedy is not obtained, Receiving Party agrees to furnish only that portion of the Confidential Information that Receiving Party is legally required to furnish.

   (c) <u>Return of Confidential Information</u>.  Receiving Party shall, upon Disclosing Party's request, return the Confidential Information to Disclosing Party within thirty (30) days following receipt of Disclosing Party's request, or certify in writing by an officer or authorized agent of Receiving Party that the Confidential Information has been destroyed.  The Parties recognize that it may not be possible to destroy separately or completely Confidential Information that has been stored or transmitted electronically within the above thirty (30) day time period, and that destruction of that Confidential Information shall be made to the extent practicable and in accordance with Receiving Party's ongoing records-retention procedures.  Furthermore, Receiving Group shall be entitled to keep a copy of Confidential Information that is retained as part of Receiving Group's normal archiving and backup procedures and is not readily accessible on Receiving Group's information systems.  Any Confidential Information that is not returned or destroyed shall remain subject to the confidentiality obligations set forth in this Agreement, notwithstanding any expiration or termination of this Agreement.  This <u>Section 19</u> shall survive the termination of this Agreement.

   (d) <u>Remedy for Breach</u>.  Receiving Party recognizes that Disclosing Party may not have an adequate remedy at law in the event that Receiving Party breaches the confidentiality provisions of this Agreement and that, in such event, Disclosing Party may suffer irreparable damages or injury.  Therefore, Disclosing Party shall be entitled to equitable relief, including temporary or permanent injunctive relief against Receiving Party in the event of a breach of the confidentiality provisions of this Agreement.  Such permanent or injunctive relief shall in no way limit other remedies that Disclosing Party may have against Receiving Party for any breach of the terms of these provisions.

   (e) <u>Cyber Security</u>.  The Receiving Party shall have the duty to immediately notify the Disclosing Party in writing if the Receiving Party suspects or becomes aware of any security or data breaches relating to the Disclosing Party's Confidential Information held or stored by Receiving Party, including Disclosing Party's tax IDs, pricing, manufacturing processes and procedures, employee names, SSNs, etc.  In such case, Receiving Party shall fully cooperate with Disclosing Party at Receiving Party's expense to prevent or stop such data breach.

   (f) <u>Public Communications and Photos</u>.  Neither Party nor its Group shall, without the prior written consent of the other Party:  (i) make or issue any public announcement or statement with respect to this Agreement and the Work performed hereunder; (ii) supply to the press, any news media, or publish via any social networking media any information, photographs, or data regarding this Agreement, the Work performed hereunder, or any generalities or details about Company's or its Affiliates' facilities or business plans; (iii) use the other Party's name, trademarks, or logos in any public communication or in

any of the other Party's materials, including, but not limited to, advertisements, websites, calendars, brochures, publications, and presentations; or (iv) in the case of Contractor, take photographs or otherwise record the Site or the Work or any other site owned by Company or its Affiliates.

20.   **Cumulative, but Exclusive Remedies.**   The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any Party shall not preclude or waive its right to use any or all other remedies provided for in this Agreement.  However, the remedies of the Parties set forth in this Agreement are the exclusive remedies available to the Parties.

21.   **Governing Law; Jurisdiction and Venue.**   This Agreement shall be governed and construed in accordance with the laws of the State of Minnesota, and any and all disputes hereunder shall be resolved in accordance with the laws of the State of Minnesota, except for any such law that would direct the application of the law of a different jurisdiction.  The Parties consent to personal jurisdiction in any action brought in any court, federal or state, within Hennepin County, Minnesota, having personal and subject matter jurisdiction arising under this Agreement and with respect to any such claim the Parties irrevocably waive, to the fullest extent permitted by law, any claim, or any objection they may now or hereafter have, that venue is not proper with respect to any such suit, action, or proceeding brought in such a court in Hennepin County, Minnesota, including any claim that such suit, action, or proceeding brought in such court has been brought in an inconvenient forum and any claim that a Party is not subject to personal jurisdiction or service of process in such Hennepin County forum.  **BOTH CONTRACTOR AND COMPANY EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES AND FOREVER RELINQUISHES ANY AND ALL CLAIMS OR RIGHTS THAT SUCH PARTY MAY HAVE TO ANY TRIAL BY JURY ON ANY ISSUE ARISING OUT OF ANY LITIGATION OR DISPUTES OR CLAIMS UNDER THIS AGREEMENT OR IN ANY WAY ASSOCIATED THEREWITH, SUCH PARTIES INTENDING TO WAIVE AND FOREVER RELINQUISH ANY RIGHT UNDER THE SEVENTH AMENDMENT OF THE UNITED STATES CONSTITUTION TO TRIAL BY JURY AND ANY CLAIMS OR RIGHTS TO A TRIAL BY JURY UNDER THE CONSTITUTION OF THE STATE OF MINNESOTA OR ANY OTHER CONSTITUTIONAL, STATUTORY OR OTHERWISE APPLICABLE LAW PROVIDING FOR A RIGHT OF TRIAL BY JURY.**  If either Party commences or is made a party to an action or proceeding to enforce or interpret this Agreement or an Order, the prevailing Party in such action or proceeding shall be entitled to recover from the other Party all reasonable attorneys' fees, costs and expenses incurred in connection with such action or proceeding or any appeal or enforcement of any judgment obtained in any such action or proceeding.  Neither this Agreement nor any Order will be covered by nor construed in accordance with the terms of the United Nations Convention on Agreements for the International Sale of Goods.

22.   **Dispute Resolution.**   The Parties shall endeavor to resolve amicably any Dispute in the ordinary course of business between the Parties' representatives.  If the Parties' representatives are unable to resolve the Dispute within thirty (30) days of a Party's written notice to the other Party, then the Dispute shall be referred to the Parties' senior management for resolution.  If the Parties' senior management cannot resolve the Dispute within thirty (30) days of a Party's written notice to the other Party that such Dispute should be taken to the Parties' senior management, then either Party may initiate litigation.  Pending resolution of any Dispute, under this <u>Section 22</u>, Contractor and Company shall proceed with the performance of its undisputed obligations consistent with its respective position in the Dispute, including but not limited to payment of undisputed amounts.  Company and Contractor acknowledge and agree that the dispute resolution mechanism set forth in this <u>Section 22</u> shall not preclude a Party from immediately filing an application for emergency, temporary or preliminary injunctive relief (including temporary restraining orders) by either Party.

23.     **Non-solicitation.**  The Company and Contractor each understands and acknowledges that the other has expended and continues to expend significant time and expense in recruiting and training its employees, and that the loss of employees would cause significant and irreparable harm.  Each of the Company and Contractor therefore agrees and covenants that during the term (or if Contractor is still performing Work, until the final completion of the Work) and for six (6) months thereafter ("**Non-solicitation Period**"), it will not directly or indirectly solicit, recruit or hire, or attempt to solicit, recruit or hire an employee of the other who has been involved in the performance of this Agreement (collectively, the "**Covered Employees**"); provided, however, that Company and Contractor shall not be prohibited from: (a) soliciting, recruiting or hiring any Covered Employees whose employment was terminated six (6) months or more prior to the date the applicable Party first solicits or recruits such Covered Employee; or (b) making general solicitations through the media or an independent executive search firm or similar personnel search firm, in each case not directly targeted at Covered Employees.  If any part or portion of this provision is held to be partially or completely contrary to law and/or unenforceable by a court of competent jurisdiction, this provision shall be deemed to be amended to partially or completely modify such provision or portion thereof, to the minimum extent necessary to make it enforceable, or, if necessary, this provision shall be deemed to be amended to delete the unenforceable provision or portion thereof.

24.     **Survival.**   The provisions of this Agreement shall survive the termination of this Agreement if they are expressly stated to survive, which by their nature should reasonably be expected to survive termination, or are otherwise required by their context to survive the termination of this Agreement, including without limitation Section 4(b) (Invoicing and Payment), Section 8 (Contractor's Warranties), Section 9(b) (Return of Rental Equipment), Section 10 (Independent Contractor), Section 11 (Taxes and Liens), Section 12 (Records and Audits), Section 14 (Indemnity), Section 15 (Proprietary Rights), Section 18 (Notices), Section 19 (Confidentiality; Publicity), Section 21 (Governing Law; Jurisdiction and Venue), Section 23 (Non-solicitation), and Section 30 (Severability).

25.     **Assignment.**   Neither Party shall assign all or any part of its respective right or duties hereunder without the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, either Party may assign this Agreement with written notice to the other Party to an Affiliate or in connection with a merger, reorganization, acquisition, or other transfer of all or substantially all of such Party's assets, equity or voting securities.

26.     **No Waiver.**  No waiver by either Party of the performance of any provision, condition or requirement of this Agreement shall be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition or requirement of this Agreement; nor shall it be deemed to be a waiver of, or in any manner release the other Party from future performance of the same provision, condition, or requirement; nor shall any delay or omission of a Party in exercising any right hereunder in any manner impair the exercise of any such right or any like right accruing to it thereafter, and no waiver shall be effective unless made in writing and signed by the Party to be charged with such waiver.

27.     **Headings.**  The section headings hereof are for convenience only and shall not control or affect the meaning or construction or limit the scope or intent of any of the provisions of this Agreement.

28.     **Binding Effect.**  This Agreement shall be binding upon, and shall inure to the benefit of the Parties hereto and their respective permitted successors and assigns.

29.     **No Third Party Beneficiaries.**  This Agreement is intended to benefit only the Parties hereto and their respective permitted successors and assigns.

30.     **Severability.**  If any provision of this Agreement is held to be illegal, invalid, or unenforceable and such invalidity or unenforceability does not have a material and substantial negative

impact on the rights, duties and obligations of either Party hereto:  (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore: (i) in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and as may be legal, valid, and enforceable;  and (ii) such illegality, invalidity or unenforceability shall not affect the validity or enforceability in that jurisdiction of any other provision of this Agreement nor the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

31.   **Amendments.**   This Agreement may not be altered or amended except by a written agreement executed by both Parties.

32.   **Entire Agreement.**   This Agreement, together with any Order (including the Order Terms) entered into hereunder, constitutes the entire understanding among the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and prior agreements and understandings relating to such subject matter.  Further, no oral statements about the Equipment or Services not in writing in this Agreement or an Order shall be binding on a Party.

33.   **Counterparts.**   This Agreement may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or by electronic image scan transmission in .pdf format shall constitute effective execution and delivery of this Agreement.

*[signature page to follow]*

The Parties have executed this Master Sale, Rental and Service Agreement to be effective upon the Effective Date.

**COMPANY:**

Compute North, LLC

By: _____

Name: Jeff Jackson

Title: VP of Site Development

**CONTRACTOR:**

Solomon Corporation

By: _____

Name:  Sean Shaub

Title:  Interim Controller

**PARENT:**

Solomon Transformers, LLC

By: _____

Name: Sean Shaub

Title: Interim Controller

**Exhibit A**

**Insurance**

The insurance coverage described in this Exhibit A shall include a waiver of subrogation in favor of Company Group on all policies including Contractor's property insurance. The insurance policies under Subsections 2, 3, 4 and 5 of this Exhibit A shall include Company Group as additional insured and state that this insurance is primary and non-contributory as respects any other insurance carried by the Company Group.  As noted in Section 13 of the Agreement, Company reserves the right to request that Contractor maintain and keep in full force and effect additional insurance beyond those types set forth below based upon the activities in which Contractor will be engaged in performing the Work.

Attached to and for all purposes made a part of that certain Master Sale, Rental and Service Agreement by and among Compute North, LLC, Solomon Corporation, and Solomon Transformers, LLC.

1. Workers' Compensation and Employer's Liability Insurance
   Coverage A – Statutory for states of operations.
   Coverage B – Employer's Liability
   - $1,000,000 Bodily Injury Per Accident
   - $1,000,000 Bodily Injury by Disease – Each Employee

2. Comprehensive General Liability Coverage
   $1,000,000 Occurrence / $2,000,000 Aggregate Limits
   Sudden and Accidental Pollution Included
   Unamended Contractual Liability Coverage
   Contractor's policy is primary and non-contributory

3. Automobile Liability
   $1,000,000 Combined Single Limit
   Owned, Non-Owned and Hired Automobiles Included
   Contractor's policy is primary and non-contributory

4. Umbrella/Excess Liability
   $4,000,000
   Follows form of underlying policies

5. Cargo Liability
   If Contractor is transporting the Equipment other than via Ex Works ("EXW") (Incoterms 2020) Contractor's location, Contractor must maintain cargo liability insurance, including loading/unloading and rigging coverage, in an amount no less than the replacement cost of the goods and/or materials being hauled and/or transported.

**Exhibit B**

Order Terms

**Compute North, LLC.**
**Purchase Order – Standard Terms and Conditions**

1. **THE ORDER** - Furnish the material or services specified in full accordance with conditions printed on the face and back hereof, and any other attachments made a part of this order.  As used herein, "Vendor" means the seller or provider of such materials or services.
2. **TERMS OF SALE** -  DDP (Incoterms 2020) Compute North's location unless otherwise provided on the Purchase Order.
3. **IDENTIFICATION OF ORDER** - The Purchase Order Number must appear on all invoices, correspondence containers, shipping papers, and packing lists.
4. **CORRESPONDENCE** - All correspondence pertaining to this order must be addressed as follows: Compute North, LLC, Attn: Accounts Payable, 7575 Corporate Way, Eden Prairie, MN 55344.
5. **BILLING INSTRUCTIONS** - Electronic invoice, within five (5) days after shipment of equipment or material addressed as follows: ap@computenorth.com.
   a. Send SEPARATE invoices for EACH AND EVERY shipment.
6. **TAXES** – Prices quoted on Purchase Order do not indicate applicable Sales Taxes. Vendor shall include applicable Sales Taxes on invoices.
7. **PAYMENT TERMS** - The net amount due shall be paid in full within thirty (30) days of the invoice date, granted invoice date does not precede delivery date. If partial shipments are made, payments shall become due in accordance with the designated terms upon submission of invoices.
8. **CONTRACTUAL REMEDIES** - Compute North shall be bound by the warranty remedies set forth in Section 8 of the Master Sale, Rental and Service Agreement that it entered into with Vendor.
9. **MATERIALS/EQUIPMENT** - Compute North shall be bound by the warranty provisions set forth in Section 8 of the Master Sale, Rental and Service Agreement that it entered into with Vendor.
10. **PACKING LIST** - A detailed packing list showing the purchase order must accompany all shipments.
11. **INSPECTION** - All supplies purchased hereunder are subject to inspection and rejection within five (5) days of receipt by Compute North and rejected supplies will be returned at the Vendor's expense. Transportation charges paid by Compute North in returning rejected supplies shall be reimbursed by the Vendor. Compute North's count shall be final and conclusive on all shipments not accompanied by a packing list. In addition to the right to return rejected supplies, in the event of delivery of supplies not in accordance with the requirements of this order, Compute North may notify the Vendor of such damages or deficiencies and if not repaired or corrected by the Vendor within ten (10) days after receipt of such notice, or such additional time as may be mutually agreed to by Compute North and the Vendor, Compute North shall have the right to correct any damages, defects, insufficiencies or improprieties therein and do any other work necessary to put the supplies in condition for the use intended and the reasonable and documented cost of such correction shall be deducted from the monies due the Vendor under this order.
12. **CHANGES** - Compute North may at any time by written instructions make changes, within the general scope of this order, in any one or more of the following: a. Quantity or specifications; b. Method of shipment or packing; and c. Place of delivery. If any such change causes any increase or decrease in the cost of, or time required for, performance of this order, any equitable adjustment shall be made in the order price or delivery schedule, or both and the order shall be modified in writing accordingly. Any claim by the Vendor for adjustment under this paragraph must be asserted

within thirty (30) days from date of receipt by the Vendor of the notification of change, provided however, that Compute North may receive and act upon such claim asserted at any time prior to final payment under this order.

13. **CANCELLATION OF ORDER** - This purchase order or any part thereof may be canceled by Compute North with the giving of thirty (30) days' notice of intent to cancel for any reason or no reason.  If Compute North cancels this purchase order, Compute North will pay Vendor, as its sole liability and Vendor's sole remedy for such cancellation, a cancellation charge equal to: (a) 10% of the selling price of the order if notice of cancellation is provided before factory release; (b) 30% of the selling price of the order if notice of cancellation is provided after factory release but not more than 1 week after factory release; (c) 50% of the selling price of the order if notice of cancellation is provided more than 1 week after factory release but not more than 2 weeks after factory release; (d) 70% of the selling price of the order if notice of cancellation is provided more than 2 weeks after factory release but not more than 3 weeks after factory release; and (e) 100% of the costs incurred by Vendor in connection with such the order if notice of cancellation is provided more than 3 weeks after factory release.  In lieu of such termination charges, Vendor may elect to buy back from Compute North at cost the inventory of goods included in any such order.

14. **ERRORS** - In case of error in calculation or typing, the quoted unit price will be used as the basis for correction of this order.

15. **NONDISCRIMINATION** - The parties agree to comply with Title VI and VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, Americans with Disabilities Act of 1990, Executive Order 11,246 and the related regulations to each. Each party assures that it will not discriminate against any individual including, but not limited to, employees or applicants for employment and/or students because of race, religion, creed, color, gender, age, disability, veteran status or national origin. The parties also agree to take affirmative action to ensure that applicants are employed and that employees are treated during the employment without regard to their race, religion, creed, color, gender, age, disability, veteran status or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection available to employees and applicants for employment.

16. **COMPLIANCE WITH FEDERAL AND STATE LAWS** - The Vendor shall comply with all applicable Federal and State Laws and regulations in the performance of the Contract. The Contract shall be governed by and subject to the laws of the State of Minnesota.

17. **MATERIAL SAFETY DATA SHEETS** - An up-to-date Material Safety Data Sheet MMSDS) must accompany all goods requiring one in accordance with current State of Tennessee and Federal laws, rules and regulations.

18. **COPYRIGHTED/LICENSED PRODUCTS** - Vendor must be an authorized dealer for selling copyrighted/licensed products under this purchase order. Notwithstanding this, Vendor assumes responsibility for any and all liabilities associated with the selling of these products or services upon acceptance of purchase order.

19. **ACCEPTANCE OF TERMS**
    a. The goods and/or services shall be furnished by the Vendor subject to and in accordance with this order. Vendor's acceptance of this order shall constitute agreement to be bound by and comply with all terms and conditions set forth herein. Written acceptance or shipment of all or any portion of the goods or the performance of all or any portion of the services covered by this order by the Vendor shall constitute unqualified acceptance of all its terms and conditions.
    b. Any additional or different terms and conditions shall not become part of the order, despite

21

Compute North's receipt thereof unless Compute North specifically agrees in writing to the inclusion. The Vendor's quotation, if any, is incorporated and made a part of this Purchase Order only to the extent of specifying the nature and description of the goods or services ordered, warranty terms, and then only to the extent that such items are consistent with the other terms of this Purchase Order and/or Compute North's Request for Quotation.

20. **SIGNATURE** - Only Compute North Purchase Orders with authorized electronic Signatures may contractually bind Compute North.

21. **AUDIT** - The Vendor shall maintain documentation for all time and materials charges against Compute North and payment made by Compute North under this Contract. The books, records and documents of the Vendor, insofar as they relate to work performed or money received under this Contract on a time and materials basis, shall be maintained for a period of three (3) full years from the date of final payment. These documents shall be subject to audit at any time and upon reasonable notice, by Compute North or its duly appointed representatives. The Vendor's financial statements shall be prepared in accordance with generally accepted accounting principles.

22. **ILLEGAL IMMIGRANTS** - By acceptance of this purchase order, the vendor is attesting that the vendor will not knowingly utilize the services of illegal immigrants and will not knowingly utilize the services of any subcontractor that does so in delivery of the goods/ services under this order. If the vendor is discovered to have breached this attestation, the vendor shall be prohibited from supplying goods/services to any state institution/state entity for a period of one (1) year from the date of discovery of the breach.

23. **DEBARRMENT CERTIFICATION** - By acceptance of this Purchase Order, the vendor certifies that no principals are presently disbarred, suspended, proposed for disbarment, declared ineligible or voluntarily excluded from participation in this transaction by any State or Federal department or agency.