IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90273-11 |
| | § | HOUSTON, TEXAS |
| COMPUTE NORTH HOLDINGS, INC., | § | MONDAY, |
| ET AL, | § | OCTOBER 31, 2022 |
| DEBTORS. | § | 5:09 P.M. TO 6:05 P.M. |

**<u>HEARING ON ASSET SALE</u>**

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

**(Recorded via CourtSpeak; no log notes.)**
**(Audio distortion in some appearances via Zoom)**

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

FOR THE DEBTOR:                          PAUL HASTINGS, LLP
                                         James T. Grogan, III, Esq.
                                         Matt Micheli, Esq.
                                         600 Travis Street, 58th Floor
                                         Houston, TX  77002
                                         713-860-7300


FOR MARATHON DIGITAL
HOLDINGS, INC.:                          WEIL GOTSHAL & MANGES, LLP
                                         Alfredo R. Perez, Esq.
                                         700 Louisiana, Ste. 1700
                                         Houston, TX  77002
                                         713-546-5040


FOR GENERATE CAPITAL:                    HUNTON ANDREWS KURTH, LLP
                                         Joseph W. Buoni, Esq.
                                         600 Travis, Ste. 4200
                                         Houston, TX  77002
                                         713-220-4168

                                         KIRKLAND & ELLIS, LLP
                                         Christopher Marcus, PC
                                         601 Lexington Avenue
                                         New York, NY  10022
                                         212-446-4800


FOR THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS:                  MCDERMOTT WILL & EMERY, LLP
                                         Charles R. Gibbs, Esq.
                                         2501 North Harwood St.
                                         Suite 1900
                                         Dallas, TX  75201
                                         214-295-8063


FOR DECIMAL DIGITAL
CURRENCY I, LLC:                         PRYOR CASHMAN, LLP
                                         Matthew W. Silverman, Esq.
                                         7 Times Square
                                         New York, NY  10035-6569

<u>APPEARANCES (CONT'D)</u>:


FOR TZ CAPITAL HOLDINGS,
LLC:                              HAYNES AND BOONE, LLP
                                  David Trausch, Esq.
                                  201 Main St., Ste. 2200
                                  Ft. Worth, TX  76102
                                  817-347-6600


FOR CONSTELLATION:                MCGUIRE WOODS, LLP
                                  Mark Freedlander, Esq.
                                  845 Texas Ave., 24th Fl.
                                  Houston, TX  77002
                                  713-571-9191


FOR THE US TRUSTEE:               OFFICE OF THE US TRUSTEE
                                  Jayson B. Ruff, Esq.
                                  515 Rusk, Ste. 3516
                                  Houston, TX  77002
                                  713-718-4650


FOR FOUNDRY DIGITAL, LLC:         MILBANK
                                  Edward Linden, Esq.
                                  55 Hudson Yards
                                  New York, NY  10001-2163
                                  212-530-5000


(Please also see Electronic Appearances.)

1          **HOUSTON, TEXAS; MONDAY, OCTOBER 31, 2022; 5:09 P.M.**

2                    THE COURT:  All right.  On the 5:00 o'clock docket,

3          we have the Compute North Holdings case, it's 22-90273.

4                    We're going to take appearances in court.  If I can

5          ask that you all sort of quietly exit from the -- excuse me --

6          from the Talen case, and then we'll take appearances on the

7          phone in the Compute North case.

8                    (Pause in proceedings)

9                    MR. GROGAN:  Good afternoon, Your Honor.  James

10         Grogan from Paul Hastings, here for the Debtors in Compute

11         North.

12                   THE COURT:  Good afternoon, Mr. Grogan.

13                   Are there any other in-court appearances?

14                   Mr. Perez.

15                   MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

16         Perez, along with Jessica Liou, who is on the phone, for

17         Marathon.

18                   THE COURT:  Thank you.

19                   Mr. Gibbs.

20                   MR. GIBBS:  Good afternoon, Your Honor.  Chuck Gibbs

21         with McDermott, Will & Emery, along with my partner Kristin

22         Going, here as proposed counsel for the Official Unsecured

23         Creditors Committee.

24                   THE COURT:  Thank you.

25                   Mr. Buoni.

1          MR. BUONI:  Your Honor, Joe Buoni with Hunton
2    Andrews Kurth, here on behalf of Generate Lending, along with
3    my co-counsel from Kirkland & Ellis that I'm sure will be
4    making an appearance.
5          THE COURT:  Thank you.
6          All right.  On the phone, Mr. Trausch.
7          MR. TRAUSCH:  Good evening, Your Honor.  David
8    Trausch from Haynes and Boone on behalf of TZ Capital
9    Holdings, LLC.
10          THE COURT:  Thank you.
11          Mr. Marcus.
12          MR. MARCUS:  Good evening, Your Honor.  Christopher
13    Marcus from Kirkland & Ellis on behalf of Generate Capital.
14          THE COURT:  Good evening.
15          Mr. Micheli.
16          MR. MICHELI:  Good evening, Your Honor.  Matt
17    Micheli from Paul Hastings on behalf of Compute North Holdings
18    and its affiliated Debtors.
19          THE COURT:  Thank you.  From 412-559-0108.
20          MR. FREEDLANDER:  Yes, Your Honor.  Good afternoon.
21    Mark Freedlander, McGuireWoods, on behalf of the Constellation
22    entities.
23          THE COURT:  I missed your name.  Can I get you to
24    repeat it for me?  I heard your client.
25          MR. FREEDLANDER:  Yes, Judge.  Mark Freedlander,

1    F-r-e-e-d-l-a-n-d-e-r.

2                THE COURT:  All right.  Thank you, Mr. Freedlander.

3                MR. FREEDLANDER:  Thank you, Your Honor.

4                THE COURT:  Mr. Harvey.

5           (No verbal response)

6                THE COURT:  Mr. Harvey, I think you may be on the

7    phone, muted.

8                MR. HARVEY:  Thank you, Your Honor.  Drake Harvey

9    with Compute North.

10               THE COURT:  Who's your client again?

11               MR. HARVEY:  I'm Drake Harvey, I'm the President of

12   Compute North.

13               THE COURT:  Ah, thank you, Mr. Harvey.

14               Mr. Ruff.

15               MR. RUFF:  Yes.  Good evening, Your Honor.  Jayson

16   Ruff for the U.S. Trustee.  Can you hear me okay at this time?

17               THE COURT:  I can hear you fine.  Thank you.

18               MR. RUFF:  All right.  Thank you, Your Honor.

19               THE COURT:  Mr. Silverman.

20               MR. SILVERMAN:  Good evening, Your Honor.  Matthew

21   Silverman, Pryor Cashman, LLP.

22               THE COURT:  Thank you, Mr. Silverman.

23               All right.  Tell me what we have, Mr. Grogan.

24               MR. GROGAN:  Thank you, Your Honor.

25               Your Honor, we're here today on one asset sale.

1     This falls under our bidding procedures process, which the

2     Court set in motion a few weeks ago.  And since then, we've

3     been soliciting bids.  We've had a -- we've had an active

4     marketing process.  The bidding has been robust across the

5     various Debtor entities.  We have multiple bids on multiple

6     sets of assets.

7           We had a single bid, however, on the equity that the

8     estate holds in compute -- in CN Borrower, LLC, which is the

9     direct owner of the entities that own the Kearney and Wolf

10    Hollow bitcoin mining projects.  That bidder was Generate.

11    And so we're here today to approve -- seeking approval of the

12    sale of that equity interest to Generate.

13          Just as a high-level overview, the equity would be

14    sold for $5 million.  We are aiming to close this transaction

15    tomorrow.  Really, the only things that stand in the way of

16    that objective would be getting the Court's approval and an

17    order entered and also executing a transition services

18    agreement, which we anticipate will be done tomorrow and which

19    would provide for interim services by Compute North and the

20    Kearney and Wolf Hollow sites for 30 days, in exchange for

21    continued payments to be made under the TSA.

22          Your Honor, the buyer would then have a short period

23    post-closing until November 3rd, to make a decision on any

24    contracts which are housed up at Compute North, LLC, and which

25    the buyer would like us to assume and assign down to the

1     projects.

2           If those contracts has associated cure costs, the

3     buyer will be responsible for paying the cure.  The buyer does

4     not have any obligation to take contracts, however.

5           Your Honor, also, the buyer is not committing to

6     hire employees; however, we did agree that, as part of the

7     overall structure, the seller would be waiving any non-compete

8     or non-solicitation provisions for the employees who are

9     currently working onsite at Kearney and Wolf Hollow, basically

10    paving the way for offers of employment to be made after the

11    expiration of the TSA period.

12          And lastly, there is -- at a high level, there is a

13    mutual -- global mutual release against Generate, claims

14    against Generate, and a release of claims by Generate, Wolf

15    Hollow, and Kearney of the Debtors and representatives.

16          We do have two witnesses who would testify in

17    support of this, and I -- if the Court would like me to

18    introduce my evidence at this point --

19          THE COURT:  Let me see --

20          MR. GROGAN:  -- I can or --

21          THE COURT:  I want to hear from the committee --

22          MR. GROGAN:  Yeah.

23          THE COURT:  -- and then I want to hear if there's

24    any opposition to your motion, so that I know the context in

25    which I'm hearing the evidence.

1          MR. GROGAN:  Absolutely.

2          THE COURT:  Thank you.

3          Mr. Gibbs.

4          MR. GIBBS:  I'll shortly say good evening, Your

5     Honor.

6          THE COURT:  Good evening.

7          MR. GIBBS:  I'm happy to just give you the bottom

8     line or a little bit more color, at your preference.

9          THE COURT:  Whatever you want.

10          MR. GIBBS:  The spoiler alert is that the committee

11     supports this motion and would ask Your Honor to enter the

12     order that the Debtor is tendering up.  But I would like the

13     Court to know -- and the creditors present by video or any

14     other interested party -- that the reasons why we came to the

15     position that we are supporting this motion.

16          We were engaged by the committee three weeks ago

17     today; and, immediately thereafter, we started working pretty

18     feverishly to obtain as much information and as many documents

19     from the Debtors and their advisors as possible.

20          One of the first requests we made was for all

21     documents regarding the Generate loan that was owed by the

22     nonDebtor affiliates that actually owned the facility that are

23     guaranteed by Debtor entities.  The face amount of that note,

24     prior to modification, was over $100 million.  We wanted all

25     documentation relating especially to the exercise of the

1    pledge of the equity interest that was accomplished by
2    Generate pre-petition.
3            In one of our early meetings with Debtors' counsel,
4    they told us they were negotiating for the sale of the equity
5    interests in the nonDebtor borrowers to Generate in order to
6    provide much needed liquidity to the estate and to address
7    concerns with the existing project management agreements that
8    were in existence between the Debtor and the Kearney and Wolf
9    Hollow entities on which the Debtor was losing money on a
10   daily basis.
11           We immediately began an investigation into whether
12   the exercise of the equity pledge was done correctly; whether
13   there were any holes in the Generate lien perfection or any
14   other flaws in the documentation regarding the loan; and
15   three, if there were any viable causes of action against
16   Generate for exercising those remedies in August of 2022,
17   including exercising the equity pledge, taking control of the
18   Wolf Hollow bank account, which had in excess of $23 million,
19   and also when they amended the loan documents to increase the
20   interest rate and to revise the make-whole provision.
21           We provided the committee the results of our
22   investigations on Friday.  And without waiving privilege, I
23   can tell the Court that our conclusions were that the exercise
24   of the pledge was done correctly, that there were no viable
25   arguments that we could find that Compute North could exercise

1    control over the nonDebtor borrowers in which they had an

2    equity interest because of the valid pre-petition exercised by

3    Generate of their pledge.

4         We've also concluded the Generate loan is properly

5    documented and perfected and that there were no defects in

6    their security agreements, the UCC filings, or the mortgages.

7         We also concluded that no Debtor entity had an

8    interest in any of the $23 million that was in the Wolf Hollow

9    bank account that was swept or taken control of.

10        We did conclude that there were facially valid

11   arguments that the amendments to the credit agreement were

12   voidable as either a preference or fraudulent conveyance.  The

13   primary result of those amendments was an increase in the

14   interest rate and the addition -- or modifications to the

15   make-whole, which result in the amount of the debt being owed

16   rising to $130 million, approximately, rather than the $100

17   million before the amendment.

18        As I indicated, the original Generate loan was in --

19   slightly in excess of $100 million, and that loan is

20   guaranteed by two Debtor entities.  The consideration that the

21   committee focused on in evaluating this proposed sale was that

22   the purchase and sale agreement that's on before the Court

23   today includes a full release and payoff of the Generate loan,

24   including the unsecured guarantees made by the two Debtor

25   entities.

1          The Debtor entities are also receiving, as you

2     heard, $5 million cash, which they are in fairly desperate

3     need of, and the commitment to enter into the transition

4     services agreement that Mr. Grogan also mentioned that allows

5     the Debtors entity -- Debtor entities to be properly

6     compensated for the work that they'll continue to do to

7     operate Kearney and Wolf Hollow until the conclusion of the

8     transition services agreement.

9          And there's also a reassignment of the portion of

10    the Atlas master agreement back to Compute North.  And

11    Mr. Grogan, I think, has said he would explain that in more

12    detail, to the extent the Court has questions.

13         To the negative, the purchase and sale agreement

14    does include very broad releases for Generate.  The committee

15    was concerned about those at this stage of the case because

16    the committee, frankly, had not had enough time to fully

17    investigate through depositions or informal meetings that we

18    would have liked.  But we dealt with the time line that we had

19    to deal with.

20         That said, the analysis that we were able to do,

21    based on the loan documentation and the exercise of the

22    pledge, led us to conclude that there were no valid arguments

23    to challenges I indicated, the assertion that $101 million was

24    due and owing on the Generate loan and that the -- and that

25    Compute North and Compute North, LLC have unsecured guarantee

1    obligations.  Therefore, the release of those guarantee

2    obligations significantly lowers the total claim pool in this

3    case, much to the benefit of the other creditors in this case,

4    and that those reductions in claims outweigh the benefit of

5    trying to retain for further investigation potential claims

6    against Generate, given our conclusion that the loan was

7    properly documented, the pledge was properly accomplished,

8    that the Debtors had no interest in the cash that was taken

9    control of, et cetera.

10           So, for those reasons, the committee evaluated those

11    -- the options and concluded that they were in support of and

12    would not oppose this motion today.

13           THE COURT:  I think I heard you say this.  I just

14    want to be sure that I wasn't being rosy in my listening, that

15    you have a potential claim that might affect whether the loan

16    is $101 million or a hundred and thirty ish million dollars,

17    that the outcome of the release moots any disadvantage of

18    having potentially engaged to a hundred and thirty because

19    that spread is all being released as part of this anyway.  Is

20    that --

21           MR. GIBBS:  Let me --

22           THE COURT:  -- what you told me or did you tell me

23    something different than that.

24           MR. GIBBS:  Let me make sure I'm understanding what

25    you're asking me whether I told you.

1          THE COURT:  Let me try again.

2          I think that what you told me was, is that there was

3     a potential problem with the amendments that may have driven

4     the amount of the loan claim from roughly a hundred plus

5     million to around 130 million.

6          MR. GIBBS:  Uh-huh.

7          THE COURT:  But that, because of the release, that

8     would fully restore the parties back as if that had never

9     occurred; and, therefore, there would be no remaining damages

10    to sue for, even if there was a problem with those amendments

11    as having been preferential.

12         MR. GIBBS:  That is correct.  That is our

13    conclusion.

14         THE COURT:  Okay.  That's what I thought I heard.  I

15    just wanted to be really clear that that's what I did hear.

16    Okay.

17         MR. GIBBS:  Thank you.

18         THE COURT:  Thank you.

19         MR. GIBBS:  Uh-huh.

20         THE COURT:  Is there any party, besides the

21    committee, that wishes to make any statement in favor of the

22    deal?  And then I'm going to hear anyone who believes that

23    it's inappropriate to approve the deal and then we're going to

24    open the evidentiary record.

25         So parties that have already been recognized, you

1    can speak up if you want to speak for or against the deal.

2    Let's start with in favor of it and then we'll go to opposing

3    it.  All right.

4            MR. MARCUS:  Your Honor?  I'm sorry.

5            THE COURT:  No, go ahead, Mr. Marcus.

6            MR. MARCUS:  Yes.  Thank you, Your Honor.

7    Christopher Marcus from Kirkland & Ellis on behalf of

8    Generate.

9            Your Honor, I don't have much to say.  I wanted to

10   just -- we're obviously in favor of the deal.

11           I did want to point out that, in addition to the

12   waiver of the guarantee claim, Generate has also agreed to

13   waive the rejection damage claim, as well, adding more value.

14           I don't want to -- I don't need to say more, Your

15   Honor.  I just wanted to get up here in case there are any

16   questions.  I'm happy to answer any questions Your Honor has

17   about the transaction.

18           THE COURT:  So, Mr. Marcus, I -- given that there's

19   no stated opposition and I'm assuming that the evidence is

20   going to support doing this, could I ask you and Mr. Grogan a

21   question just to try and get this thing closed in the morning?

22           If I order that the Debtor will provide transition

23   services on reasonable terms, where, if you all can't agree on

24   it, we'll then impose the reasonable terms for those, will

25   that allow an earlier closing of the deal?  So you'd come back

1    to me, for example, if you couldn't reach the details of an

2    agreement -- or will that impair somebody's rights?  Which I'm

3    not trying to do that.  I'm trying to get you all to a closing

4    tomorrow, if that's helpful, and I'm sort of willing to just

5    order it to be on reasonable terms and assume that you all

6    will get there, but if you can't, come back here if you want

7    to close without a deal.  What do you all want to do?

8              MR. MARCUS:  Well, Your Honor, from my perspective,

9    that's certainly helpful.  I don't want to get out over my

10   (indiscernible) I'm not sure if there are other kind of

11   corporate matters that need to be tidied up before the actual

12   closing.  But from the perspective of the transition services,

13   obviously, Your Honor's input there was very helpful, and of

14   course we'll try and push it (indiscernible)

15             THE COURT:  Mr. Grogan?

16             MR. GROGAN:  Your Honor, we're fine with that, as

17   well.

18             THE COURT:  So why don't I do this?  We'll -- we're

19   going to make a docket entry that the parties may either enter

20   into a transition services agreement that is mutually

21   acceptable to them or may close with an agreement that the

22   Court will determine the terms of the transition services

23   agreement, which will be imposed on market rates for 30 days.

24             And if you all -- you know, talk to your client.

25   Your clients may not want to close with the risk that I do

1      something crazy, and that's fine.  But I wanted to give you

2      all that option to do it that way.

3                 MR. GROGAN:  Okay.  Thank you, Your Honor.

4                 MR. GIBBS:  Your Honor?

5                 THE COURT:  Mr. Gibbs.  You're very concerned I'm

6      going to do something crazy and want the chance to review it.

7                 MR. GIBBS:  No, Your Honor, I'm not at all.  I'm

8      concerned that I skipped over a page of my notes.

9                 And I wanted the record to reflect and the Court to

10     know that part of our decision was influenced by the fact that

11     it did not appear that there would be any higher and better

12     offer for these assets that are being acquired under this

13     agreement.  This is even before you took into account the

14     release of the guaranteed claims.  And it was really that, in

15     addition to the other factors, that drove the committee's

16     decision.

17                THE COURT:  Thank you, Mr. Gibbs.

18                MR. GIBBS:  Uh-huh.

19                THE COURT:  All right.  Let's -- I'm sorry.

20     Mr. Perez.

21                MR. PEREZ:  No, I'm against it, Your Honor, the

22     second time you've ruled before I had the chance to speak

23     today.  But let's just hope that doesn't continue to happen.

24                THE COURT:  You didn't say that.  Come on up.

25                MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

1    Perez.

2           Your Honor, I represent Marathon Holdings and we did

3    file an objection at Docket Number 337.  And in that, in

4    Docket Number 337, we set forth -- well, it's a long

5    objection, it's about 12 pages.  It sets forth a lot of the

6    things.  And we included proposed language -- and to the

7    extent I mess something up, Ms. Liou will correct me.

8           THE COURT:  Let me just interrupt you.  I've been

9    out here pretty much all day.

10          MR. PEREZ:  I understand.

11          THE COURT:  And I have not read your objection.  And

12   I think it's not fair to make you proceed without me taking a

13   minute just to read it.

14          MR. PEREZ:  Perfect.

15          THE COURT:  So let me take some time to read it.

16          MR. PEREZ:  And --

17          THE COURT:  And for the record, what I ruled earlier

18   today without giving you a chance to speak, I ruled for you,

19   so ...

20       (Laughter)

21          MR. PEREZ:  It's still a bad precedent, Your Honor.

22          MR. GROGAN:  I would note that -- and I don't think

23   you've had a chance to read our revised form of order, but we

24   did add --

25          THE COURT:  That's right.

1           MR. GROGAN:  We did add a paragraph or two.
2     Mr. Micheli will cover that in more detail.
3           But to address -- we actually got three, I think,
4     contract-related objections.  And essentially, we were trying
5     to preserve all of those issues.  Since the designation would
6     not occur until November 3rd, to the extent we had any non-
7     consensual assumptions and assignments, we would come back on
8     November 7th and deal with that subsequently.
9           THE COURT:  Thank you.
10          (Pause in proceedings at 5:30 p.m.)
11          (At 5:36 p.m.)
12          THE COURT:  Mr. Grogan and probably Mr. Marcus, if
13    you look at Paragraph 28 of the objection, on the bottom of
14    Page 11 -- if it's helpful, I can put it up on the screen.
15          MR. MARCUS:  Your Honor, that would be very helpful.
16    Thank you.
17          MR. PEREZ:  Your Honor, if I may.  They did try to
18    address it in their form of order.  I don't think they quite
19    did it, but they did try to address those three things --
20          THE COURT:  Okay.
21          MR. PEREZ:  -- in their form of order.
22          THE COURT:  So maybe I should look at the form of
23    order because it seems to me that your objection makes a huge
24    amount of sense.  Some of the language that you're using here
25    may determine that you have certain rights.  And I don't want

1    to, today, determine that you have rights.  I want to try and

2    determine that you're not giving up any rights today.  So let

3    me look at that language then and see --

4              MR. PEREZ:  I think it's on 350-2, Page 23 of 25.

5              THE COURT:  Thank you.

6              UNIDENTIFIED:  That's right, Your Honor.  It's

7    Paragraphs 30 and 31.

8              THE COURT:  And for those of you that have been

9    listening today, I apologize I haven't read this stuff before

10   I got here, but I have been out here pretty much all day.

11        (Pause in proceedings)

12             THE COURT:  So I think he deserves more than what's

13   in 30 and 31, but not everything that he put in his motion.

14   Can I just go back to his motion and sort of look at his

15   language and tell you where I think things go too far and you

16   all tell me if you think you can work that out, or do you all

17   want to do this some other way?

18             MR. GROGAN:  Your Honor, that's fine with us.

19             THE COURT:  So ...

20        (Pause in proceedings)

21             THE COURT:  I think that, at the bottom of Page 11,

22   I would leave the first part alone.  And then, after the

23   comma, I would say:

24             Marathon's right to assert setoff, recoupment, and

25   common law or statutory rights and -- under similar doctrines,

1     whether arising out of state law or bankruptcy law, shall be

2     expressly preserved, notwithstanding any such assumption,

3     assignment, purchase, or transfer.

4           And I would take out "shall be expressly preserved,"

5     take out this language right here, taking out the

6     "notwithstanding" language and inserting in its place:

7           And all of the Debtors' and Generate's responses are

8     summarily preserved.

9           So he can assert, you all can respond, and no rights

10    are taken away.

11          With respect to the paragraph at the top of Page 12,

12    I don't see anything wrong with his language.  I don't think

13    that it's much different than your language.

14          And with respect to the final paragraph, I would

15    simply add at the end and all responses and objections to his

16    objections are similarly preserved.

17          Does that -- am I missing something or is that all

18    that we need to do to get this resolved?

19          MR. GROGAN:  Your Honor, that's fine with us.  We --

20    you know, our apologies.  We were trying to craft a little bit

21    of a one-size-fits-all, rather than craft something that was

22    specific for Marathon, but --

23          THE COURT:  Right.

24          MR. GROGAN:  But yeah --

25          MR. PEREZ:  And Your Honor.

1          THE COURT:  If you don't have any -- if you don't

2     have any problem with that resolution, it's sometimes easier

3     to do them separately then to figure out a global solution.

4          But does that cause heartburn to anyone?

5          MR. GROGAN:  The only question I have is the form of

6     order needs to be acceptable to Generate.

7          THE COURT:  All right.

8          MR. GROGAN:  So I need --

9          THE COURT:  Mr. Marcus?

10          MR. GROGAN:  -- Mr. Marcus to say --

11          MR. MARCUS:  Well, I was trying to follow along with

12     Your Honor.  It doesn't sound to me like those would be

13     problematic.  I just -- I would like to be able to just see it

14     (indiscernible)

15          THE COURT:  Sure.  Ms. Liou, are you there on the

16     phone there?

17          MS. LIOU:  Yes, Your Honor.  Jessica Liou from Weil

18     on behalf of Marathon.

19          I just wanted to add on the middle paragraph,

20     regarding assets that belong to Marathon, the Debtors have now

21     proposed Paragraph 31, which I think is good.  We just want to

22     make a slight revision to it.  It says they're not authorized

23     for sale (indiscernible) assignment or transfer of assets that

24     are owned by nonDebtor third parties.  And then I think the

25     rest of your suggestion works from our perspective.

1           THE COURT:  Thank you.

2           Let me ask who has the master copy of the order that

3      was filed at 350-1.  Is that controlled by Mr. Micheli?

4           MR. MICHELI:  It would --

5           MR. GROGAN:  Mr. Micheli is --

6           MR. MICHELI:  Yes, Your Honor, I have that.

7           THE COURT:  Mr. Micheli, with respect to the changes

8      that I tried to read into the record, are those things that

9      you can incorporate, so that we can still get an order entered

10     tonight?

11          MR. MICHELI:  Yes, Your Honor.  We can put

12     (indiscernible) and incorporate those.

13          MR. TRAUSCH:  Your Honor --

14          THE COURT:  If I can -- if I can get you to

15     incorporate the -- we'll come back to whoever else that was.

16     If I can get you to incorporate those, send it to Mr. Marcus,

17     send it to Mr. Perez, and let you all work through that

18     language.  I -- actually, don't send it to Mr. Perez; send it

19     to Ms. Liou because she's in a position to receive it and read

20     it.

21          Yes.  And who else was that speaking?

22          MR. TRAUSCH:  Thank you, Your Honor.  I'm sorry.  I

23     was -- this is David Trausch from Haynes and Boone on behalf

24     of TZ Capital Holdings.

25          We had something -- I -- my client has -- would like

1     some clarification.  We're not necessarily opposed.  We

2     understand the need for speed (indiscernible) even in the

3     proposed agreement.  But you know, the 2002 period, we have

4     (indiscernible) is not going to be helpful here.  So we're not

5     asking to close things down, but what we want is some

6     clarification.  There's some ambiguity in the document.

7            And so (indiscernible) example is the seller is CN

8     Borrower, LLC.  And according to 4.23 of the PSA, it has no

9     employees.

10           Now I heard Mr. Grogan say that the deal was -- or I

11    think I heard him say earlier that the deal was that they

12    would -- that the other nonDebtors that are not the sellers

13    would waive non-compete and non-solicitation (indiscernible)

14    at the Wolf Hollow and Kearney facilities.  But Section 6.13,

15    which is where that provision comes from, is not limited in

16    any way, it's -- with regard to any of the Debtors'

17    facilities.

18           And so, if that clarification confirms as to the

19    employees, that it's limited to the ones currently onsite at

20    the Wolf Hollow and Kearney facilities, that it does not

21    affect (indiscernible) that my client has an interest in and

22    that would potentially resolve that issue.

23           The other part relates to contracts, as well.  And

24    that is, again (indiscernible) that somehow, even though

25    they're not parties to the PSA, any of the affiliated Debtors

1    can assign contracts.  And you know, we're going to find out

2    on November 3rd, after they're asking you to enter this order.

3    And quite frankly, we still have the sale process going on, on

4    -- related to the King Mountain (indiscernible) and so we're

5    not -- we'd just like clarification that nothing that's being

6    contemplated by this transaction impacts (indiscernible) my

7    client's rights, or King Mountain contracts or employees.

8              THE COURT:  So --

9              MR. TRAUSCH:  And --

10             THE COURT:  I'm sorry.  I'm just --

11             MR. TRAUSCH:  No, those are the clarifications.

12             THE COURT:  So --

13             MR. TRAUSCH:  And there's one --

14             THE COURT:  If you look at 350-1, what language

15   would you insert where to be certain that your client's rights

16   are preserved?

17             MR. TRAUSCH:  Well, I was looking at the

18   (indiscernible) that got filed about 45 minutes, maybe less,

19   before the hearing.  And I think it probably goes at the end

20   somewhere, that -- I mean (indiscernible) my client, to be

21   frank, is it's going to be (indiscernible) the bidding on the

22   King Mountain assets because we aren't going to know in time -

23   - it's already been submitted that they don't know that

24   there's -- whether those contracts are going to still be there

25   or not (indiscernible) affiliates and requested contracts.

1          THE COURT:  Yeah.  So let's assume --

2          MR. TRAUSCH:  And --

3          THE COURT:  Let's assume just for a moment that the

4     Debtors agree that they should make the clarification you

5     want.  I'm just trying to figure out, mechanically, what

6     should be written down.  And then we'll see whether they agree

7     with it or not.

8          MR. TRAUSCH:  You know, if we defined the King

9     Mountain project to be the -- I think (indiscernible) LLC, the

10    joint venture, the King Mountain project, and then we say

11    that, notwithstanding anything to the contrary in the order,

12    that nothing in (indiscernible) contemplates a -- you know

13    (indiscernible) assumption or assignment of any contracts

14    related to the King Mountain project or any employees used for

15    the King Mountain project, I think that covers the issues.

16         THE COURT:  Okay.  Mr. Grogan, Mr. Marcus, is that

17    something that works for you or does not work for you?

18         MR. GROGAN:  Your Honor, unfortunately, I think this

19    is -- this really is getting in the way of what is already a

20    very complicated sale process.  We are trying to maximize

21    value.  We're selling separate assets.

22         Kearney and Wolf Hollow are hundreds, if not

23    thousands, of miles away from King Mountain.  And Mr. Trausch

24    represents a secured lender in an entirely different facility.

25    We're running a sale process for his facility.

1          THE COURT:  So --

2          MR. GROGAN:  I'm trying --

3          THE COURT:  So what's --

4          MR. GROGAN:  I've got --

5          THE COURT:  -- wrong with --

6          MR. GROGAN:  I've got active bids.

7          THE COURT:  What's wrong with the language he's

8    asked for then?

9          MR. GROGAN:  We need -- the Debtors can't be

10   constrained by -- his client is not even bidding for assets.

11   So I -- really, I don't need a secured lender -- another -- a

12   secured lender on different collateral telling me what I can

13   or can't do on somebody else's collateral.

14         THE COURT:  No.  What he's asking for -- and maybe I

15   misunderstood him -- is something in this order that says that

16   your authority to assume and assign contracts to Generate does

17   not include the authority to assume and assign any contracts

18   related to King Mountain, your authority to release employment

19   agreements and non-competes doesn't extend to King Mountain.

20   That's what he's asking for.  If they're a thousand miles away

21   --

22         MR. GROGAN:  Well --

23         THE COURT:  -- I don't see why that hurts you.

24         MR. GROGAN:  Yeah, and -- I don't -- it's -- you

25   know, I -- it's my problem to figure out how to service both

1      sets of assets.  I just -- I don't see -- you know, NextEra is

2      not running the Debtors and they shouldn't have any say over

3      our staffing, and it's as simple as that.

4                  THE COURT:  Well --

5                  MR. GROGAN:  On the contract --

6                  THE COURT:  This order --

7                  MR. GROGAN:  On the --

8                  THE COURT:  -- author --

9                  MR. GROGAN:  -- contract issue --

10                 THE COURT:  This order may authorize it, is what

11     he's saying, so ...

12                 I'm going to sustain the objection and require that

13     the parties agree on language, not that you can't do that, but

14     that you can't do that without further court approval.  So

15     this -- today's authorization isn't going to authorize you to

16     do anything at King Mountain that you're not previously

17     authorized to do.

18                 If you need to assume and assign a contract to

19     Mr. Marcus that deals with King Mountain, which you're telling

20     me isn't really going to happen --

21                 MR. GROGAN:  That's not --

22                 THE COURT:  -- then you got --

23                 MR. GROGAN:  -- going to happen.

24                 THE COURT:  -- to come back.

25                 MR. GROGAN:  I'm --

1          THE COURT:  Yeah.

2          MR. GROGAN:  I'm more concerned about the employees.

3     But you know, there may be --

4          THE COURT:  Well --

5          MR. GROGAN:  -- somebody who works on Kearney who --

6          THE COURT:  If you have the right to -- all that I'm

7     saying is this order isn't going to authorize it.  If they're

8     -- if you already have the right to do it, then you already

9     have the right to do it.  If you don't have the right to do it

10    --

11         MR. GROGAN:  Oh --

12         THE COURT:  -- I'm not giving the right to --

13         MR. GROGAN:  It -- that's fine, Your Honor.

14         THE COURT:  Okay.

15         MR. GROGAN:  I am okay with that because we -- this

16    order actually does not commit Generate to hire any employees,

17    so, if we --

18         THE COURT:  Right.

19         MR. GROGAN:  If we ever get to that point, you know,

20    I'm fine --

21         THE COURT:  Certainly.

22         MR. GROGAN:  -- having a second process.

23         THE COURT:  Mr. Marcus, I assume you're okay with

24    that.  Is that right?

25         MR. MARCUS:  Yes, Your Honor.  Subject to seeing the

1          language, I don't think we have a problem with it.

2                    THE COURT:  Mr. Micheli, if you would include that

3          your redraft of the language, as well.  Thank you.

4                    MR. MICHELI:  (Indiscernible) thank you.

5                    THE COURT:  Yes, sir.

6                    MR. TRAUSCH:  (Indiscernible) in the proposed order

7          -- and I appreciate the attempt by the Debtors' counsel to

8          make some changes at the end, but I actually wanted to point

9          out that (indiscernible) it shouldn't be -- I don't think it

10         -- well, on the very first page (indiscernible) the part

11         that's confusing to me are the -- I think it's the fourth line

12         down, third line down.  The definition of "acquired interest"

13         is (indiscernible) the Debtors' equity interest in nonDebtor

14         CN Borrower, LLC and its direct or indirect subsidiaries.  And

15         it's different from the definition of "acquired interest" in

16         the PSA.  And we're (indiscernible) that the finding that

17         they're asking the Court to make in Paragraph F, that the

18         acquired interests are property of the estate, and that's a

19         little bit concerning.

20                    THE COURT:  Mr. Micheli?

21                    MR. MICHELI:  Yes, Your Honor.  I'm (indiscernible)

22         the definition of "acquired interests" meaning (indiscernible)

23         I believe that's where it originally came from, but I will

24         confirm that.

25                    THE COURT:  Thank you.

1          MR. MICHELI:  Thank you.

2          THE COURT:  Let me hear -- and I think Mr. Perez had

3     something, another issue to raise.

4          MR. PEREZ:  Yeah.

5          THE COURT:  Is that right?

6          MR. PEREZ:  Well, Your Honor, just two points:

7          I want to, in essence, request that the Court

8     incorporate the record of this hearing in connection with the

9     order because there's lots of places in the order that says

10    they're selling things free and clear of liens, they're

11    assigning things.  And then we have the "notwithstanding"

12    language in the back.  So I just want to make sure the whole

13    record of the hearing is considered at the time.

14         Second, Your Honor, just on a procedural note, the -

15    - they don't have to tell us until the 3rd what contracts

16    they're assuming.  But on the 1st, we have to object to the

17    cure amount and the assumption or assignment of the contract,

18    so that may create a procedural problem because you're kind of

19    putting the cart before the horse.

20         THE COURT:  Where is that?

21         MR. GROGAN:  I thought we were fixing that.

22    Mr. Micheli, weren't we -- since we're going to have the

23    hearing on contract cures and assumptions on the 7th, weren't

24    we changing -- I -- and I think that actually --

25         MR. MICHELI:  (Indiscernible).

1          MR. GROGAN:  Yeah.

2          MR. MICHELI:  So we made clear -- so the

3    (indiscernible) addressed the object.  The designation of

4    contracts will happen on November 3rd, in accordance with the

5    bidding procedures order that was approved.  And parties will

6    then have an opportunity to object.

7          Some of those parties will have (indiscernible)

8    object to cure already because they received the original cure

9    notice.  But each of the parties will have the opportunity to

10   object to adequate assurance and other contract assumption

11   issues at or before the hearing on November 7th, Your Honor.

12   And that appears in the added language in Paragraph 32 of

13   Docket Number 350-2.

14         MR. PEREZ:  Maybe I'm being dense, Your Honor, but

15   the way that I read 32, it says any objections or responses to

16   the applicable cure amount or the Debtors' ability to assume

17   or assign the applicable contract have to be filed no later

18   than November 1st.

19         MR. MICHELI:  That's correct, Your Honor.

20         And then, if you read the following, that the

21   Debtors' ability -- and then objections -- (b) deals with --

22   (b) deals with additional objections -- I'm sorry -- (y) --

23   excuse me, sorry.  (b) deals with the ability to assume and

24   assign the contract, some of which, Your Honor -- those

25   contracts were noticed for assumption prior to November 3rd,

1        so the objection deadline will be November 1st.  And for other

2        contracts, which we term as "additional contracts," those

3        would be effectively November 7th at 7 a.m.

4                And we tried to track the language of the bid

5        procedures order, Your Honor, which, admittedly, given the

6        timing of this sale, in connection with the overall timing,

7        was a bit -- was a bit (indiscernible) and this language

8        (indiscernible) directly from the bid procedures order

9        (indiscernible)

10               THE COURT:  So the definition of "additional

11       contracts" is where?

12               MR. MICHELI:  It appears in the bidding procedures

13       order, in Paragraph 22, and the bid procedures order, Your

14       Honor, in -- which can be found at Docket Number 236.

15               And Your Honor, I guess I should short-circuit this

16       a little bit.  Because we have not identified -- and we can

17       (indiscernible) because we haven't actually identified those

18       contracts yet, I believe that all contracts related to this

19       sale would be noticed for assumption on November 3rd.  And

20       that would make the objection deadline for those contracts

21       November 7th at 7 a.m.

22               THE COURT:  Well, that makes it easier.  Let's just

23       take out the first option of the November 1 objection deadline

24       and make it all November 7th, and then we won't have any

25       ambiguity.  Thank you for that clarification.

1           MR. MICHELI:  Okay.

2           THE COURT:  Ms. Liou, go ahead.

3           MS. LIOU:  Yes, Your Honor.  I think that's a

4     helpful clarification because (indiscernible) the very last

5     sentence in that redline required objection or (indiscernible)

6     to adequate assurance of future performance by a successful

7     bidder on or before 8 a.m. central time on November 7th.  But

8     the auction for other assets is actually scheduled for

9     November 8th, and so I think there's ambiguity there, as well.

10          In addition to that, I think there are a couple of

11    other provisions in the order that actually presupposed that

12    adequate assurance has already been provided and will be

13    provided by the buyer.  And I just don't think that we can say

14    that, as well.

15          THE COURT:  I need specific language that you have a

16    problem with on that.

17          MS. LIOU:  I'm happy to flip through it.

18          MR. MICHELI:  And Your Honor this would be

19    (indiscernible) our language (indiscernible) in Paragraph 38.

20    To be clear, notwithstanding the provisions of this order, we

21    are not seeking to impact parties' rights with respect to the

22    assumption and assignment of executory contracts or cure

23    amounts.

24          And so, you know, we understand this order, you know

25    needs to be a sale order that's going to -- that the purchaser

1    is going to be able to rely on.  We also -- or (indiscernible)

2    those contracts are not before this Court today, nor are we

3    trying to impact Marathon's rights or any other party's rights

4    with respect to those contracts until we actually notice those

5    for assumption and give those parties an opportunity to

6    object.

7              THE COURT:  Ms. Liou, is there anything specific you

8    want to identify.

9              MS. LIOU:  (Indiscernible) Your Honor.  There are

10   actually several provisions in here that I think create

11   ambiguity because they say something different than what the

12   language of the (indiscernible) order says.  I understand the

13   clarification that the Debtors are trying to make

14   (indiscernible) notwithstanding anything, you know, in this

15   order, et cetera (indiscernible)

16             But I do think having the opportunity to clean up a

17   couple of their provisions would make a lot of sense

18   (indiscernible) we're already doing that with respect to other

19   provisions in the order.

20             So, for example, you have the first sentence of

21   Paragraph (m), as in Mary, which says that the (indiscernible)

22   including any assigned contracts, can be (indiscernible)

23   purchase and sale agreement.  Clearly, that is not currently

24   the case.

25             Paragraph (n), as in Nancy, also says that the

1    purchaser has provided or will provide (indiscernible) cure

2    dispute, adequate assurance (indiscernible) Section 365.

3    "Cure dispute" is defined now to not include adequate

4    assurance issues (indiscernible) ambiguity there, as well.

5         THE COURT:  Okay.  Thank you.  I know you may have

6    more, but I'll resolve that in a minute.

7         From area code 212-530-5226, who do we have?

8         MR. LINDEN:  Hi.  Good afternoon.  This is Edward

9    Linden from Milbank on behalf of Foundry Digital, LLC.  Good

10   afternoon, Your Honor, and thank you very much.

11        We heard just a moment ago from counsel for Marathon

12   (indiscernible) proposed be included in a revised order.

13   We're supportive of that language.  I think that there are a

14   number of customers like Marathon (indiscernible) which is

15   inclusive of our client Foundry, that would like

16   (indiscernible) language, so (indiscernible) specifically

17   (indiscernible) that language, we would ask that, you know,

18   the order include Foundry, as well (indiscernible) language.

19        THE COURT:  Thank you.

20        Mr. Marcus, Mr. Grogan, and the objecting parties,

21   can you all meet with all parties that have form objections to

22   the order, which is what we're down to, roughly commencing in

23   one hour?  And then you can present an agreed order, either

24   tomorrow morning -- early tomorrow morning, midmorning,

25   tomorrow afternoon?  And we'll get it entered, so that you can

1      close tomorrow.  And Mr. Micheli would be in charge of

2      arranging that meeting that would start in an hour to work

3      through language.  Anybody have any problem with that?

4              MR. MARCUS:  Your Honor, this is Chris Marcus for

5      the record.  That works for us.

6              THE COURT:  Thank you.

7              Mr. Silverman?

8              MR. SILVERMAN:  That works for me, as, Your Honor.

9      Thank you.

10             THE COURT:  Thank you.

11             Mr. Micheli, since it's your evening during the

12     World Series that I'm taking, does it work for you?

13             MR. MICHELI:  That does, Your Honor.  Thank you.

14             THE COURT:  All right.  Mr. Grogan, what time would

15     you like to come back tomorrow?  I will try and fit you in.

16     But if you'll tell me your -- like, if you want to do it at 8

17     a.m., I can do that very easily.  If you want to give yourself

18     a little more time in the morning and you can get your ducks

19     in a row, I can do it later in the morning, for example.

20             MR. GROGAN:  I'm --

21             THE COURT:  I don't want to delay you, so that you -

22     -

23             MR. GROGAN:  Yeah, I --

24             THE COURT:  -- can get your --

25             MR. GROGAN:  I --

1       THE COURT:  -- closing done tomorrow.

2       MR. GROGAN:  I think 8 a.m. would be great.

3       THE COURT:  8 a.m.

4       MR. GROGAN:  Yeah.

5       THE COURT:  All right.  If -- Mr. Micheli, frankly,

6   I'm not going to look at anything before 5:00 in the morning.

7   So can you file the revised order by 5:00 a.m.?

8       MR. MICHELI:  Yes, Your Honor.

9       THE COURT:  Great.  The hearing is at 8 a.m.

10      You wanted to introduce some evidence today.  What

11  is that evidence that you wanted to introduce?

12      MR. GROGAN:  I did.  Your Honor, we had two

13  declarations in support of the sale of these assets.  So the

14  first was the declaration of Mr. Drake Harvey, which was filed

15  on the Court's docket at Docket Number 349.  And I would --

16      THE COURT:  Is there any objection to the admission

17  of Mr. Harvey's declaration filed at ECF 349?

18      (No verbal response)

19      THE COURT:  It is admitted.

20      (Harvey Declaration at ECF 349 received in evidence)

21      THE COURT:  Are there any questions for Mr. Harvey?

22      (No verbal response)

23      THE COURT:  All right.  What's your next piece of

24  evidence?

25      MR. GROGAN:  Your Honor, the next is the declaration

1   of Ryan Hamilton of Jefferies.  That was filed at Docket
2   Number 348.
3               THE COURT:  Is there any objection to the admission
4   of Mr. Hamilton's declaration at 348?
5       (No verbal response)
6               THE COURT:  It is admitted.
7       (Hamilton Declaration at ECF 348 received in evidence)
8               THE COURT:  Is there any examination of
9   Mr. Hamilton?
10      (No verbal response)
11              THE COURT:  There is none.
12              MR. GROGAN:  And that is it for our evidentiary
13  support.
14              THE COURT:  All right.  Is there anything else we
15  ought to do tonight?  I'm not trying to rush you all.
16              MR. GROGAN:  No.
17              THE COURT:  But I think, you know, dealing with the
18  particular language is -- that's something Mr. Micheli is just
19  going to have to overcome during the course of the evening,
20  I'm afraid.
21              MR. GROGAN:  Yes.  That works for us.  And we'll see
22  you tomorrow morning at 8:00 o'clock with a hopefully
23  consensual order.
24              THE COURT:  I hope it's a consensual order, but you
25  know, if not, we'll deal with the remaining objections.  But I

1     think we're down to the point --

2              MR. GROGAN:  Yeah.

3              THE COURT:  -- where, realistically, we're into a

4     drafting --

5              MR. GROGAN:  Wordsmithing.

6              THE COURT:  -- question.

7              MR. GROGAN:  Yeah.

8              THE COURT:  So thank you.

9              I did think some of the stuff that Ms. Liou was

10    including about me making findings, you know, probably isn't

11    appropriate.  The findings should be that anything that we

12    approve the transfer of meets those requirements in the event

13    of a challenge.  So you've got some real drafting to do,

14    Mr. Micheli, but I suspect that -- I know that you're up to

15    the task.  And we'll see you at 8:00 o'clock in the morning.

16             THE COURT:  Thank you.

17             MR. GROGAN:  Thank you.

18             THE COURT:  We're in recess.

19             MR. GROGAN:  Thank you.

20             MR. PEREZ:  Thank you, Your Honor.

21             MS. LIOU:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             UNIDENTIFIED:  Thank you.

24             THE COURT:  Thank you.

25        (Proceedings concluded at 6:05 p.m.)

*  *  *  *  *

        I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.

*/S./  MARY D. HENRY*

CERTIFIED BY THE AMERICAN ASSOCIATION OF

ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JTT TRANSCRIPT #66501

DATE FILED:  NOVEMBER 3, 2022