# EXHIBIT 1

<p style="text-align:center; color:red;">CONFIDENTIAL</p>

## TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT
## AT NPPD'S MINDEN SUBSTATION

THIS TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT AT NPPD'S MINDEN SUBSTATION ("**Agreement**") is made and entered into as of the 17th day of February , 2022, between CN Minden, LLC, a limited liability company organized under the laws of the State of Delaware (hereinafter referred to as "Customer"), and NEBRASKA PUBLIC POWER DISTRICT, a public corporation and political subdivision of the State of Nebraska (hereinafter referred to as the "**NPPD**").

**WHEREAS,** Customer intends to own and operate the Customer Facility and wishes to enable the Customer Facility to obtain service from the Retail Service Provider by means of the Transmission System;

**WHEREAS,** NPPD is willing to construct the NPPD Transmission Facilities, and any necessary NPPD Network Upgrades, which will be used to provide transmission service to the Retail Service Provider that will serve the Customer Facility;

**AND WHEREAS,** the Parties enter into this Agreement to establish the rights and obligations of each Party for construction and payment for the NPPD Transmission Facilities for the Customer Facility.

**NOW THEREFORE,** in consideration of, and subject to the mutual covenants contained herein, the Parties agree as follows:

## ARTICLE 1 - DEFINITIONS AND INCORPORATED APPENDICES

**1.1**     **Defined Terms.** Unless otherwise specified in this Agreement, the following terms shall, for the purposes of this Agreement, have the following meanings:

"**Affiliate**" shall mean , in relation to a Party, any company or corporation which (i) directly or indirectly controls such Party; (ii) is directly or indirectly controlled by such Party; or (iii) is directly or indirectly controlled by a company or corporation which directly or indirectly controls such Party; where "controls", "controlled by" and "under common control with" mean the possession directly, or indirectly through one or more intermediaries, of more than fifty percent (50%) of the outstanding voting stock or ownership of the company in question, or the power to direct or cause the direction of management policies of, any person, whether through ownership of stock, as a general partner or trustee, by contract or otherwise. Affiliate includes, but is not limited by, the meaning given to that term in the Business Corporation Act of Nebraska.

"**A.M. Best**" shall mean A.M. Best Company, Inc. or any successor thereto.

"**Business Day**" means any day on which banks in Nebraska are open for business, beginning at 8:00 a.m. and ending at 5:00 p.m. local time in Columbus, Nebraska.

"**Confidential Information**" means any non-public information (including, without limitation, any scientific, engineering, technical, commercial, financial, process, personnel or economic data or information, information about project-related costs, operating and maintenance history, and business and other plans) disclosed by or on behalf of either party to the other party, either directly or indirectly, in written, oral, graphic, electronic or other form, pursuant to this Agreement, that: (a) is marked or identified as "confidential" or "proprietary" at the time of disclosure, (b) is provided under circumstances reasonably indicating its confidentiality, and confirmed in writing within five (5) Business Days, (c) the definition of Stranded Cost Estimate and Full Build Out

CONFIDENTIAL

Conditions, (d) each date contained in the definition of In-Service Date, Section 3.3, Section 3.5, or Section 4.4, or elsewhere in this Agreement. Confidential Information does not, however, include any information that (i) is now, or later becomes, publicly known and made generally available to the Receiving Party through no action or inaction of the Receiving Party; (ii) is already in the possession of the Receiving Party at the time of disclosure by the Disclosing Party; (iii) is obtained by the Receiving Party from a third party without a breach of such third party's obligations of confidentiality to the Disclosing Party; or (iv) is independently developed by the Receiving Party without use of or reference to the Disclosing Party's Confidential Information.

"**Construction Commencement Date**" shall have the meaning set forth in Section 4.7.

"**Construction Costs**" shall mean any costs and expenses incurred by NPPD including for NPPD's consultants and contracted suppliers and service providers, to design, engineer, procure, construct, install, and test the NPPD Transmission Facilities.

"**Contribution in Aid of Construction or (CAIOC)**" shall mean a portion of the Construction Costs that are nonrefundable funds to be paid for by Customer, in accordance with Section 4.1.

"**Cost Estimate**" shall have the meaning set forth in Section 3.2.

"**Credit Rating**" means the rating then assigned to an entity's senior, unsecured long-term debt obligations (not supported by third party credit enhancements) or if such entity does not have a rating for its senior, unsecured long-term debt, then the rating assigned to such entity as an issuer rating by Fitch, S&P, Moody's or any other rating agency agreed to by the Parties.

"**Customer Facility**" shall mean the additional hosting and colocation facilities to be located at an address to be determined near Minden, NE, in Parcel ID 0003303.01, with a legal description of Lot 1, Section 32, Township 7, Range 14 W, whose load is shown in Appendix B.

"**Disclosing Party**" means either Party to this Agreement, when disclosing Confidential Information to the other Party hereto.

"**Effective Date**" shall have the meaning given in Section 2.1.

"**Fitch**" shall mean Fitch Ratings, Inc., or any successor thereto, or in the event that there is no such successor, a nationally recognized credit rating agency.

"**Force Majeure**" shall mean any cause beyond the control of the Party affected, including but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightning, epidemic, war, riot, civil disturbance or disobedience, labor dispute, nonresponsive or unacceptable bids by contractors and vendors, sabotage, acts of public enemy, acts of terrorism, explosions, orders, regulations or restrictions imposed by any Governmental Authority, or cancellation or revocation of any Regulatory Approval for reasons other than the affected Party's failure to comply with the terms thereof, which, in any of the foregoing cases, by exercise of due diligence such Party could not reasonably have been expected to avoid, and which, by the exercise of due diligence, it has been unable to overcome, but does not include any cause arising out of a Party's act of negligence or intentional wrongdoing nor mere economic hardship of a Party.

**Formula Contribution in Aid of Construction (FCAIOC)** shall mean a portion of the Construction Costs that are nonrefundable funds to be paid for by Customer, in accordance with Section 4.2.

CONFIDENTIAL

"**Full Build Out Conditions**" shall mean when the Customer Facility has received delivery from its Retail Service Provider at least 551,880 Megawatt hours of electrical energy (based on 730 days times 24 hours per day times the minimum guaranteed load as stated in **Appendix B**), which were consumed after the In-Service Date, and that occurred over a consecutive period of no more than 730 days. This required amount of consumption shall be based on the metering used to determine billing from NPPD to Retail Service Provider.

"**Good Utility Practices**" shall mean, at any particular time, any of the practices, methods and acts engaged in or approved by a significant portion of the electric utilities located in the United States during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time a decision is made, could be expected to produce the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.  Good Utility Practices are not intended to be limited to the optimum practices, methods or acts to the exclusion of all others, but rather to be a range of acceptable practices, methods or acts.

"**Governmental Authority**" shall mean any federal, state, local governmental, regulatory, or administrative agency, court, commission, administration, department, board, governmental subdivision, or authority, or any person acting as a delegate or agent of any of the foregoing having jurisdiction over the subject matter and Party.  Notwithstanding the foregoing, neither the Retail Service Provider nor NPPD shall be considered a Governmental Authority.

"**Governmental Charges**" shall mean any present or future tax, levy, impost, duty charge, assessment, or fee of any nature (including interest, penalties, and additions thereto) that is imposed by any Governmental Authority in respect of any payment under this Agreement.

 "**In-Service Date**" shall mean the day that both of the following have occurred: (a) NPPD Transmission Facilities and NPPD Network Upgrades have been completed and energized, and (b) Customer has confirmed in writing to the Retail Service Provider and NPPD it is prepared to receive the supply of power from the Retail Service Provider, via the NPPD Transmission Facilities, at a load no less than the minimum guaranteed load and no greater than the maximum load as stated in Appendix B.  A targeted In-Service Date will be provided in a written notification to Customer from NPPD after NPPD Network Upgrades are determined by NPPD.

 "**Laws**" shall mean all federal, state or local laws, codes, rules, regulations, and orders of any Governmental Authority applicable to the Party and matter at issue.

"**Letter of Credit**" shall mean a letter of credit issued by a Qualified Issuer either (a) in the form of the letter of credit attached hereto as Appendix C, or (b) otherwise in form and substance satisfactory to NPPD at NPPD's discretion.

"**Loss**" shall have the meaning given in Section 8.1.

"**Moody's**" shall mean Moody's Investor Service, Inc. or any successor thereto, or in the event that there is no such successor, a nationally recognized credit rating agency

 MVA" means mega-volt-amps (million volt-amps)

"**National Electric Safety Code**" shall mean the National Electrical Safety Code, as published by The Institute of Electrical and Electronics Engineers, Incorporated.

CONFIDENTIAL

"**NPPD Transmission Facilities**" shall mean all facilities and equipment, including upgrades to the Transmission System, owned, operated and maintained by NPPD, as located and described in Appendix A.

"**NPPD Network Upgrades**" shall mean all facilities and equipment, including upgrades to the Transmission System, owned, operated and maintained by NPPD, that are part of the transmission network and are needed to serve the load defined in Appendix B, but are not considered part of the NPPD Transmission Facilities. NPPD shall design, engineer, procure, construct, install, test, own, operate, and maintain the NPPD Network Upgrades as described in a Notice to Construct ("NTC") from the Southwest Power Pool ("SPP"). NPPD shall complete the NPPD Network Upgrades in accordance with NPPD's applicable standards for the procurement, engineering, and construction of facilities in its electrical transmission and distribution system, the project plan, the applicable SPP Requirements, all requirements of applicable electric industry safety and/or engineering codes and standards, including the National Electric Safety Code and those of NPPD, Good Utility Practices, and all applicable Laws. NPPD shall commence and continue performance of the NPPD Network Upgrades upon receipt and acceptance of a written NTC. Customer is not under any financial obligations associated with the NPPD Network Upgrades but acknowledges that these must be completed prior to taking any service as determined by NPPD.

"**NTP**" shall have the meaning given in Section 3.1.

"**NTP Date**" shall mean the date on which the NTP is issued under Section 3.2.

"**Party**" shall mean either Customer or NPPD and "**Parties**" shall mean both Customer and NPPD.

"**Point of Interconnection**" shall mean the location of NPPD facility ownership demarcation to serve the Retail Service Provider for the Customer, as depicted in Appendix A.

"**Qualified Guarantor**" shall mean an entity incorporated, doing business and having an office in the United States (a) with assets in the amount of One Billion Dollars ($1,000,000,000) in the United States and an Investment Grade Credit Rating or (b) that has otherwise been approved in writing by NPPD, as shown by NPPD's signing the acceptance of the Guaranty Agreement.

"**Qualified Issuer**" shall mean a U.S. commercial bank either organized under the laws of the United States or a state therein, in each case, having a Credit Rating equivalent to "A-" or better as determined by S&P or Fitch and "A3" or better as determined by Moody's, provided, that if the Credit Ratings by S&P, Fitch and Moody's are not equivalent, then the highest of the Credit Ratings shall control for purposes of determining whether the entity's Credit Rating meets the requirements for a Qualified Issuer. For a surety bond it shall mean an insurance company with an "aaa" issuer credit rating by A.M. Best or a financial strength rating of "A++" by A.M. Best.

"**Receiving Party**" means either Party to this Agreement, when receiving Confidential Information from the other Party hereto.

"**Records**" shall have the meaning given in Section 3.6.

"**Regulatory Approvals**" shall have the meaning given in Section 10.8.

"**Retail Service Provider**" shall mean the Southern Public Power District.

CONFIDENTIAL

"**S&P**" shall mean Standard & Poor's or any successor thereto, or in the event that there is no such successor, a nationally recognized credit rating agency.

"**Security**" shall have the meaning given in Article 4.

"**Stranded Cost Estimate**" shall mean $813,457.

"**Transmission System**" shall mean the electric transmission facilities of NPPD.

"**Term**" shall have the meaning given in Section 2.2.

"**Termination Payments**" shall mean the payments due to NPPD from Customer upon the termination of this Agreement, as set out in Section 6.3.

"**Work**" shall have the meaning given in Section 3.1.

1.2    **Attachments and Appendices**.
The following appendices are incorporated into and shall be part of this Agreement:

| | |
|---|---|
| Appendix A | Depiction of NPPD Transmission Facilities, Point of Interconnection, Retail Service Provider Facilities and Customer Facility |
| Appendix B | Customer Facility Service Requirements |
| Appendix C | Form of Letter of Credit |
| Appendix D | Form of Escrow Agreement |
| Appendix E | Form of Surety Bond |

## ARTICLE 2 - TERM OF AGREEMENT

2.1    **Effective Date.**   This Agreement shall become effective on the date first written above (the "**Effective Date**").

2.2    **Term.**  This Agreement shall continue in full force and effect from the Effective Date until the date that NPPD returns any remaining Security to Customer under Section 4.2, unless Customer terminates this Agreement before such date pursuant to Section 6.2 (the "**Term**").

2.3    **Survival.**  The applicable provisions of this Agreement shall continue in effect after termination hereof to the extent necessary to provide for final billings, billing adjustments, the determination and enforcement of liability and indemnification obligations arising from acts or events that occurred while this Agreement was in effect and for the enforcement of obligations that continue beyond the term of this Agreement as specifically provided herein.

## ARTICLE 3 - CONSTRUCTION OF NPPD TRANSMISSION FACILITIES

3.1    **NPPD Transmission Facilities.**  NPPD shall design, engineer, procure, construct, install, test, own, operate, and maintain the NPPD Transmission Facilities as described in Appendix A (the "**Work**"). NPPD shall perform the Work in accordance with NPPD's applicable standards for the procurement,

CONFIDENTIAL

engineering, and construction of facilities in its electrical transmission and distribution system, the project plan, the Customer Service Requirements, all requirements of applicable electric industry safety and/or engineering codes and standards, including the National Electric Safety Code and those of NPPD, Good Utility Practices, and all applicable Laws. NPPD shall commence and continue performance of the Work upon receipt of a written notice to proceed ("**NTP**") and Security under Section 4.3 from Customer. NPPD may, at its sole discretion, proceed with constructing the NPPD Transmission Facilities with or without a NTP. NPPD Transmission Facilities may be limited in capacity until completion of the NPPD Network Upgrades, where NPPD, in its sole discretion, determines such availability.

**3.2     NPPD Notice to Proceed "NTP".** Execution of this Agreement will be deemed as meaning Customer has provided written authorization to proceed with the Work, and the date Customer issues such **NTP** shall be the NTP Date (**"NTP Date"**).

**3.3     Customer Facility Layout.** Customer shall submit the legal description and a plot plan for the Customer Facility to NPPD for review prior to commencement of construction of the Customer Facility. NPPD shall review and provide any comment on such plot plan which it deems necessary and advisable. NPPD shall then perform the Work in accordance with Section 3.1.

**3.4     NPPD Completion Obligations and Project Schedule.** NPPD shall use all reasonable efforts and Good Utility Practices to (a) perform the Work in accordance with the project schedule, which schedule may be revised from time to time by mutual agreement of the Parties, and (b) in any event, to complete the Work on or before a targeted date that will be provided in a written notification to Customer from NPPD after NPPD Network Upgrades are determined by NPPD. NPPD shall, at Customer's request and expense, use reasonable efforts to accelerate the Work under this Agreement in order to meet any deadlines requested by Customer that are earlier than those set forth in the project schedule, provided that Customer authorizes such actions and the Construction Costs associated therewith in advance.

**3.5     Land Rights and Access.** Upon reasonable notice and supervision by NPPD, Customer shall provide at no cost to NPPD any necessary access for ingress and egress across lands owned or controlled by Customer and/or its Affiliates for the construction, operation and maintenance of necessary lines, switches, and other equipment to interconnect the NPPD Transmission Facilities and the Point of Interconnection. NPPD shall obtain transmission line easements from third parties to the extent required for the NPPD Transmission Facilities in form and substance reasonably satisfactory to NPPD.

**3.6     Records and Audit Rights.** NPPD shall maintain all reports, documents, data, correspondence, books, and records created in connection with the performance of the Work and the incurrence of the Construction Costs (the "**Records**") and make the Records available to Customer and its representatives for review and audit during NPPD's normal business hours upon at least twenty-four (24) hours' notice. If applicable, NPPD shall maintain the Records in accordance with generally accepted accounting principles. NPPD shall maintain all Records throughout the Term and for a period of three (3) years thereafter or for such longer period as may be required by Law or Good Utility Practices.

**3.7     Customer Status Reports.** Customer shall inform NPPD in writing, within 30 days, of any time that it determines there is a delay in the construction and commissioning of the Customer Facility that impacts the In-Service Date.

### ARTICLE 4 - CONTRIBUTION IN AID OF CONSTRUCTION AND CREDIT SUPPORT

**4.1     Contribution in Aid of Construction.** Within thirty (30) days of the NTP Date, Customer shall pay zero dollars and zero cents ($0.00)  to NPPD prior to the start of construction. Such nonrefundable payment(s) are to be used by NPPD to cover approximately 50% of the costs associated with installing a

CONFIDENTIAL

second transformer as part of the NPPD Transmission Facilities, as requested by Customer. NPPD does not include these costs in its determination of the Stranded Cost Estimate.

**4.2     Formula Contribution in Aid of Construction**. In addition to the Contribution in Aid of Construction in Section 4.1 above, within thirty (30) days of the NTP Date, Customer shall also pay zero dollars and zero cents ($0.00) to NPPD prior to the start of construction. Such nonrefundable payment(s) are to be used by NPPD to cover a portion of the Construction Costs that, in NPPD's sole discretion, are costs associated with the NPPD Transmission Facilities that are at risk of not be recovered during the operation of the Customer Facility at the minimum guaranteed load as stated in **Appendix B**.

**4.3     Financial Assurances.** In accordance with the schedule below, Customer shall obtain and provide to NPPD one or more standby Letters of Credit, cash to be held in an interest-bearing escrow account pursuant to an escrow agreement with a Qualified Issuer in the form attached hereto as Appendix D (with interest accruing to the benefit of Customer) and/or surety bonds from a Qualified Issuer in form attached hereto as Appendix E, upon which Letter(s) of Credit, escrow agreement for cash or surety bonds (or any such combination of the foregoing) are in a form and substance acceptable to NPPD issued by Qualified Issuers, can be drawn, and shall be in the aggregate amount of the Stranded Cost Estimate less the Formula Contribution in Aid of Construction (the "**Security**") listed in the table of this Section 4.3 below.  NPPD's obligations under this Agreement are conditional upon receipt and maintenance of the Security.  This Security will remain in force until (i) drawn on by NPPD under the terms of this Agreement, (ii) reduced under Section 4.4, or (iii) released under Section 4.5. Customer may substitute one form of Security for another of such forms upon sixty (60) days written notice to NPPD. Customer may substitute one Letter of Credit for another Letter of Credit upon thirty (30) days notice if such notice identifies the Qualified Issuer and provides evidence of the credit rating of the issuer satisfactory to NPPD, and the substitute Letter of Credit is in a form and substance acceptable to NPPD.

| Security Due Date | Associated Work Being Secured | Security Required for Stranded Cost Estimate |
|---|---|---|
| Due by March 15, 2022.  If Security is not provided to NPPD by March 15, 2022, NPPD will consider the Customer to have provided a notice to terminate this Agreement in accordance with Section 6.2. | Initial Engineering Long Lead Time Equipment Award Substation Construction Commission | $813,457 |

**4.4     Paying Down Security.**  Following the In-Service Date, and for a period of up to 3 years from such date, Customer may, at their option, lower their amount of required Security on a calendar quarterly basis, based upon a $1 for $1 ratio of the transmission charges (T-line and T-sub) on their paid electrical bills after the In-Service Date for Customer Facility loads metered from the NPPD Minden substation. At the end of each calendar quarter, Customer may lower its Security by the total calendar quarterly amount that was paid for transmission electrical service in that calendar quarterly period.

**4.5     Release of Security.**  NPPD shall return any remaining Security or confirm release of the standby Letter of Credit not drawn by NPPD to Customer promptly after the date that is three (3) years following the In-Service Date; provided, however, that if Customer has not accomplished the Full Build Out Conditions by such date, the Security shall remain in place until Customer has accomplished the Full Build Out Conditions. Customer shall be entitled to, but shall not have any obligation to, replenish any portion of the Security drawn by NPPD.

CONFIDENTIAL

**4.6    Draws on Security.**  NPPD may draw on the Security upon Customer's failure to pay amounts due under Article 6.

**4.7    Conditions Subsequent**.  This Agreement is predicated upon Customer's plan to construct up to the Full Build Out Conditions.  In the event Customer does not commence such construction by the Construction Commencement Date, NPPD may terminate this Agreement and proceed under Section 6.3. The "**Construction Commencement Date**" will be _____7/1/2022_____.  In the event Customer does not accomplish the Full Build Out Conditions by the third anniversary of the In-Service Date, NPPD may terminate this Agreement at its own discretion and proceed under Section 6.3.

**4.8    Failure of Customer to provide the Security as required shall result in loss of all service to the Customer Facility**. Within 2 business days of such failure to provide Security, NPPD is obligated to open any switches/breakers as needed to remove electric service to the Customer Facility.

**4.9    Further Security Adjustments For Other Users.**  The following process will be used if other users are allocated any capacity from the NPPD Transmission Facility prior to the In-Service Date: Customer 's allocated percentage of the Security Required for Stranded Cost Estimate in Section 4.3 shall be based on the projected peak use of the NPPD Transmission Facilities by Customer and any other users to have interconnection at the new NPPD Transmission Facilities pursuant to such other user(s) having a written agreement with NPPD entered into prior to the In-Service Date.

**4.10    Payment.**  For any amount payable by Customer to NPPD pursuant to Article 4 of this Agreement, NPPD shall render an invoice by electronic mail and regular mail to Customer, with return receipt requested, to the address of a person designated by Customer.  Customer shall pay all undisputed amounts to NPPD by electronic funds transfer within 30 days from the date Customer receives the invoice.  If the 30th day falls on a non-business day, payment shall be due on the immediately succeeding business day

## ARTICLE 5 - FORCE MAJEURE

**5.1    Notice.**  The Party unable to carry out an obligation imposed on it by this Agreement due to Force Majeure shall notify the other Party in writing or by telephone, followed up in writing, within a reasonable time after the occurrence of the cause relied on.

**5.2    Duration of Force Majeure.**  Except as set forth in Section 5.3, no Party shall be considered in breach or default as to any obligation under this Agreement to the extent such Party is delayed or prevented from fulfilling the obligation due to an event of Force Majeure, whether occurring on the Transmission System, the Customer Facility, the NPPD Transmission Facilities, or any connecting electric generating, transmission or distribution system affecting the Party's operations.  A Party shall be excused from whatever performance is affected only for the duration of the Force Majeure and while the Party exercises reasonable efforts to alleviate such situation.  As soon as the non-performing Party is able to resume performance of its obligations excused as a result of the occurrence of Force Majeure, such Party shall give prompt notice thereof to the other Party and shall recommence performance.

**5.3    Obligation to Make Payments.**  Any Party's obligation to make payments under this Agreement shall not be suspended by Force Majeure.

## ARTICLE 6 - SUSPENSION OF WORK; TERMINATION AND PAYMENT OF COSTS

**6.1    Suspension.**  Once NPPD has commenced performance of the Work in accordance with Section 3.1, any suspension of the Work shall be at NPPD's discretion.

CONFIDENTIAL

**6.2     Termination for Convenience.**  Customer may terminate this Agreement for any reason whatsoever before the third anniversary of the In-Service Date by providing a minimum of three (3) Business Days written notice of termination to NPPD.  Such termination shall be effective upon Customer's satisfaction of all Termination Payments as set out in Section 6.3.

**6.3     Termination Payments**. If this Agreement is terminated by NPPD pursuant to Section 4.7, Customer shall pay to NPPD the value of the remaining Security (if any) and NPPD will retain all Contribution in Aid of Construction and Formula Contribution in Aid of Construction payments received as detailed in Sections 4.1, 4.2 and 4.3.  If this Agreement is terminated by Customer per Section 6.2 **and** such notice to terminate is provided more than thirty (30) days following NPPD's written notification (for Work completion target date) provided in accordance with Section 3.4, Customer shall pay to NPPD the value of the remaining Security (if any) and NPPD will retain all Contribution in Aid of Construction and Formula Contribution in Aid of Construction payments received as detailed in Sections 4.1, 4.2 and 4.3.  If this Agreement is terminated by Customer per Section 6.2 **and** such notice to terminate is provided within thirty (30) days following NPPD's written notification (for Work completion target date) provided in accordance with Section 3.4, NPPD will retain all Contribution in Aid of Construction and Formula Contribution in Aid of Construction payments received as detailed in Sections 4.1and 4.2 and Customer shall pay to NPPD the lesser of (x) the Stranded Cost Estimate, or (y) the following amount (the "**Stranded Cost Amount**"):

**(a)**     the sum of:

     (i)     actual Construction Costs incurred by NPPD;

     (ii)     any reasonable costs incurred in winding up the Work;

     (iii)     any reasonable costs incurred in removing NPPD Transmission Facilities already installed;

     (iv)     any reasonable costs incurred to demobilize personnel, equipment and materials;

     (v)     any amounts relating to commitments for future work, materials or labor contracts in respect of the NPPD Transmission Facilities for which NPPD is obligated or liable to any contractors, vendors or other parties; and

     (vi)     charges assessed, if any, by the bulk transmission system operator related to the NPPD Transmission Facilities which are payable by NPPD,

*minus*

**(b)**     any amounts which NPPD is able to recover through its reasonable efforts to sell or reuse any equipment or facilities.

NPPD shall use reasonable efforts to mitigate and minimize each of the costs and expenses set forth in clause (a), items (i)-(vi) above.  Customer's payment of the Stranded Cost Estimate or Stranded Cost Amount (as applicable) shall be Customer's sole and exclusive liability, and NPPD's sole and exclusive remedy (except for NPPD's rights to draw on the Security if needed to recover such amount), for Customer's termination of this Agreement.

**6.4     Payment.**  For any amount payable by Customer to NPPD pursuant to Section 6.3 of this Agreement, NPPD shall render an invoice by electronic mail and regular mail to Customer, with return receipt requested, to the address of a person designated by Customer.  Customer shall pay all undisputed

CONFIDENTIAL

amounts to NPPD by electronic funds transfer within 30 days from the date Customer receives the invoice. If the 30th day falls on a non-business day, payment shall be due on the immediately succeeding business day.  If Customer disputes any amounts included in the invoice delivered under this Section 6.4, Customer shall deliver notice thereof to NPPD prior to the date such invoice would otherwise be due.  Upon receipt of such notice, NPPD shall provide all documentation and evidence of NPPD's disputed amounts as may be reasonably requested by Customer, and the Parties shall use commercially reasonable efforts to promptly resolve the dispute.  Failure of the Parties to settle the dispute shall not negate NPPD's right to draw on the Security.

**6.5     Termination for Cause.**  Customer may terminate this Agreement and exercise all other rights and remedies available at law or in equity if NPPD breaches this Agreement and fails to cure such breach within thirty (30) days thereafter.  Customer shall not be liable for the payments set forth in Section 6.3 following a termination pursuant to this Section 6.5.

## ARTICLE 7 - ASSIGNMENT

**7.1     General Provision**.  Neither Party may assign any of its rights or transfer or purport to transfer any of its obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed, except (a) to an Affiliate of the assigning Party, or (b) in the case of Customer as assigning Party, to (i) any entity providing security or financing for the construction of the Customer Facility as collateral security (and in connection therewith, NPPD shall execute and deliver to such financing parties such consents and other agreements and documents in a form acceptable to NPPD as may be requested by such financing parties), (ii) a purchaser of all or substantially all of the assets of Customer, or (iii) a purchaser of the Customer Facility or any interest therein; provided that in all cases, the assigning Party provides prior notice of such assignment and the assignee agrees in writing to be bound by the terms of this Agreement.

## ARTICLE 8 - INDEMNITY

**8.1     General.**  Each Party shall indemnify and hold harmless the other Party, the other Party's Affiliates, and its and their respective officers, shareholders, stakeholders, managers, representatives, directors, agents and employees, from and against any and all loss, liability, damage, cost or expense, for liability for bodily injury to or death of persons, or damage to property of persons (including reasonable legal fees and expenses, litigation costs, consultant fees, investigation fees and sums paid in settlements of claims and any such fees and expenses incurred in enforcing this indemnity or collecting any sums due hereunder) (collectively, "**Loss**") to the extent arising out of, in connection with, or resulting from (i) the indemnifying Party's breach of any terms or conditions of this Agreement, or failure to perform any of its obligations under, this Agreement; or (ii) the negligence or willful misconduct of the indemnifying Party, its Affiliates, or its or their contractors and regardless whether arising under law or otherwise; provided, however, that no Party shall have any indemnification obligations under this Section 8.1 with respect to any Loss to the extent the Loss results from the gross negligence or willful misconduct of the Party seeking indemnity.

**8.2     Amount Owing.**  If an indemnifying Party is obligated to indemnify and hold any indemnified person harmless under this Article 8, the amount owing to the indemnified person shall be the amount of such indemnified person's actual Loss, not of any insurance or other recovery.

**8.3     Defense of Claim.**  Promptly after receipt by a Party of any claim or notice of the commencement of any action, administrative, or legal proceeding, or investigation as to which the indemnity provided for in this Article 8 may apply, the indemnified Party shall notify the indemnifying Party in writing of such fact.    The indemnifying Party shall assume the defense thereof with counsel designated by such indemnifying Party and satisfactory to the indemnified Party, provided, however, that if the defendants in

CONFIDENTIAL

any such action include both the indemnifying Party and the indemnifying Party and the indemnified Party and the indemnifying Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to, or inconsistent with, those available to the indemnifying Party, the indemnified Party shall have the right to select and be represented by separate counsel, at the indemnifying Party's expense.

**8.4** **Failure to Defend.** If the indemnifying Party fails to assume the defense of a claim meriting indemnification, the indemnified Party may, at the sole expense of the indemnifying Party, contest, settle, or pay such claim; provided, however, that settlement or full payment of any such claim may be made only following consent of the indemnifying Party or, absent such consent, written opinion of the indemnified Party's counsel that such claim is meritorious or warrants settlement.

**8.5** **Consequential Losses**. Neither Party shall be liable for any incidental, indirect or consequential economic, exemplary or punitive damages, costs or expenses, loss of profits, loss of revenue, or lost opportunity howsoever characterized suffered by an indemnified Party which arises due to the indemnifying Party's breach of or failure to perform its obligations under this Agreement

## ARTICLE 9 - NOTICE

**9.1** **General.** Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "**Notice**") shall be in writing (regardless of whether the applicable provision expressly requires a writing) and delivered personally, mailed by certified mail, postage prepaid and return receipt requested, sent by nationally recognized overnight courier, or sent by email, as follows:

To NPPD:
Arthur R. Wiese
Vice President, Energy Delivery
Nebraska Public Power District
1414 15th Street
P.O. Box 499
Columbus, NE  68602-0499
Telephone – (402) 563-5203
Email address  arwiese@nppd.com

Copy To:
Harold L. Hadland
Office of the General Counsel
Nebraska Public Power District
1414 15th Street
P.O. Box 499
Columbus, NE  68602-0499
Telephone – (402) 563-5046
Email address  hlhadla@nppd.com

To Customer:
Tad Piper
Chief Financial Officer
Compute North
7575 Corporate Way
Eden Prairie, MN  55344
Email: tad.piper@computenorth.com

Copy To:

Attn: Finance Department
Compute North
7575 Corporate Way
Eden Prairie, MN  55344
Email: ap@computenorth.com

Notice given by personal delivery, mail, or courier shall be effective upon actual receipt or rejection, as identified in the return receipt (in the case of mail) or on the tracking report (in the case of courier). Notice given by email shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. Any Party hereto may change any address to which Notice is to be given to it by giving notice of such change of address as provided above.

CONFIDENTIAL

## ARTICLE 10 - MISCELLANEOUS

**10.1    Mutual Representation.**  Each Party represents and warrants to the other that the execution and delivery of this Agreement (a) has been duly authorized by all necessary procedures, (b) does not violate any provision of the Party's governing documents or Laws applicable to the Party, and (c) does not result in the breach of any agreement by which such Party is bound.

**10.2    Confidentiality.**

**(a)**     The Receiving Party shall not to use any Confidential Information of the Disclosing Party for any purpose other than performance of the Receiving Party's obligations under this Agreement. The Receiving Party shall not to disclose any Confidential Information of the Disclosing Party to any party other than the Receiving Party's Affiliates and its directors, officers, employees, consultants, agents, and advisors (including financial and technical advisors, legal counsel and accountants) (collectively, "**Representatives**") who are required to have the information in order to carry out the Receiving Party's obligations hereunder; provided, however, that the Receiving Party may disclose Confidential Information required to be disclosed by applicable Laws but must first give the Disclosing Party reasonable advance written notice of such requirement (to the extent reasonably practicable) prior to such disclosure in order to enable the Disclosing Party to seek an order protecting the Confidential Information from public disclosure. The Receiving Party will not (and will not attempt to) reverse engineer, disassemble or decompile any prototypes, software or other tangible objects that embody the Disclosing Party's Confidential Information and that are provided to the Receiving Party under this Agreement. The Receiving Party will notify the Disclosing Party immediately upon learning of any unauthorized use or disclosure of Confidential Information and will cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party prevent further unauthorized disclosure or misuse.

**(b)**     The Receiving Party will take reasonable measures to protect the secrecy of and avoid unauthorized disclosure and use of the Confidential Information of the Disclosing Party. Without limiting the foregoing, the Receiving Party will take at least those measures that it takes to protect its own similar confidential information to protect the Disclosing Party's Confidential Information and will ensure that its Representatives who have access to the Disclosing Party's Confidential Information are under obligations with respect to use and disclosure of the Confidential Information at least as protective of the Disclosing Party as this Agreement, prior to any disclosure of Confidential Information to such Representatives. Each party will be fully responsible to the other for any breach of this Agreement by its Representatives. The Receiving Party will only make copies of the Disclosing Party's Confidential Information as reasonably necessary in order to carry out the Purpose. The Receiving Party will reproduce the Disclosing Party's proprietary rights notices on any copies it makes of the Disclosing Party's Confidential Information, in the same manner in which such notices were set forth in or on the original.

**(c)**     Upon any termination or expiration of this Agreement, the Receiving Party's obligations with respect to each item of Confidential Information disclosed prior to such expiration or termination will survive for five (5) years after the date of its disclosure.

**(d)**     If either Party violates, or threatens to violate, any of the provisions of this Section 10.2, the other Party shall be entitled to immediate and permanent injunctive relief (without the necessity of posting of a bond as a pre-condition to the issuance of the relief sought), it being agreed that the damages which the non-breaching Party would sustain upon such violation are difficult or impossible to ascertain in advance.

**10.3    Waiver.**  Any waiver at any time by a Party of its rights with respect to a default under this Agreement, or with respect to any other matters arising in connection with this Agreement, shall not be deemed a waiver or continuing waiver with respect to any subsequent default or other matter.  Except as

CONFIDENTIAL

provided in Article 6, the remedies of the Parties hereunder are cumulative and in addition to all rights and remedies at law and in equity.

**10.4     Governing Law; Venue.**  The validity, interpretation and performance of this Agreement and each of its provisions shall be governed by the Laws of the State of Nebraska, without regard to the conflicts of law provisions.  Any legal or equitable action arising out of or in any way connected with this Agreement shall be instituted only in the District Court of Platte County, Nebraska.

**10.5     Amendments.**  This Agreement may be amended by and only by a written instrument duly executed by the Parties.  Upon satisfaction of all applicable Laws, an amendment to this Agreement shall become effective and a part of this Agreement.

**10.6     Entire Agreement.**  This Agreement constitutes the entire agreement among the Parties hereto with reference to the subject matter hereof and supersedes all prior oral and written communications pertaining hereto, except as specifically incorporated herein.  In the event of a conflict between the body of this Agreement and any Appendix hereto, the terms and provisions of the body of this Agreement shall prevail and be deemed to be the final intent of the Parties.

**10.7     Binding Effect.**  This Agreement and the rights and obligations hereof, shall be binding upon and shall inure to the benefit of the successors and assigns of the Parties hereto.

**10.8     Regulatory Requirements**.  Each Party shall use commercially reasonable efforts to (a) seek any necessary regulatory approvals, permits, and certificates for which such Party is responsible ("**Regulatory Approvals**"), and (b) maintain such Regulatory Approvals for so long as such Regulatory Approvals are required for the continued performance of such Party's obligations hereunder.

**10.9     No Partnership Created.**  Nothing contained in this Agreement shall be construed as constituting a joint venture or partnership between the NPPD and Customer.

**10.10    No Third Party Beneficiaries.**  This Agreement and all rights hereunder are intended for the sole benefit of the Parties and shall not imply or create any rights on the part of, or obligations to, any other person.

**10.11    Severability.**  In the event all or part of any of the terms, covenants or conditions of this Agreement, or the application of any such terms, covenants or conditions, shall be held invalid, illegal or unenforceable by any court having jurisdiction, all other terms, covenants and conditions of this Agreement and their application not adversely affected thereby shall remain in force and effect; *provided, however,* that the remaining valid and enforceable provisions materially retain the essence of the Parties' original bargain.

**10.12    Captions.**  The captions contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope of intent of this Agreement or the intent of any provision contained herein.

**10.13    Further Assurances**.  Each of the Parties hereto shall from time to time and at all times from and after the date hereof, without further consideration do all such further acts and execute and deliver all further agreements and other documents and instruments as may be reasonably necessary to give effect to this Agreement or to otherwise give effect to the provision of this Agreement.

CONFIDENTIAL

**10.14   Counterparts.** This Agreement may be executed in any number of counterparts, and each executed counterpart shall have the same force and effect as an original instrument.  A signature page in "PDF" format or an electronic signature to this Agreement shall be deemed an original and binding upon the party against which enforcement is sought.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers or agents on the day and year below written.

**CN MINDEN, LLC**

By: _____*Tad Piper*_____

Name: ___Tad Piper___

Title: ___Chief Financial Officer___

Date: ___Feb 14, 2022___

**NEBRASKA PUBLIC POWER DISTRICT**

By: _____Arthur R. Wiese_____

Name: ___Arthur R. Wiese___

Title: ___Vice President Energy Delivery___

Date: ___February 17, 2022___

<p style="text-align:center"><span style="color:red">CONFIDENTIAL</span></p>

**APPENDIX A**
**to**
**Transmission Facilities Construction Agreement**
**dated** <u>Febraury 17</u> **, 2022**
**between**
**CN Minden, LLC**
**and**
**Nebraska Public Power District**

**Description of the NPPD Transmission Facilities,**
**Retail Service Provider Facilities, and Point of Interconnection to Customer Facility**

The Transmission Facilities to be constructed for Customer Facility, and of which will require securitization is as follows:

Construct 115/34.5 kV facilities (See Figure 1 – NPPD Minden Substation One Line Diagram will be replaced with NPPD Minden Substation General Arrangement in a superseded Appendix A).

CONFIDENTIAL



Figure 1 – NPPD Minden Substation One Line Diagram

<div align="center">

CONFIDENTIAL

**APPENDIX B**
**to**
**Transmission Facilities Construction Agreement**
**dated** <u>February 17</u>**, 2022**
**between**
**CN Minden, LLC**
**and**
**Nebraska Public Power District**

**Customer Facility Service Requirements**

</div>

The Customer Facility shall meet all Facility Connection Requirements posted on NPPD.com as of the Effective Date, currently posted at
https://docs.nppd.com/FacilityConnectionRequirements.pdf

Customer Facility Service Requirements shall include:

- All service shall be at 34.5 kV
- Maximum load of the Customer Facility shall be 35 MW at a minimum of 95% power factor (36.9 MVA).
- Minimum guaranteed load of the Customer Facility shall be 31.5 MW.
- The Customer Facility shall be designed and installed to accommodate any metering needs as specified by NPPD and as may be further agreed to in a separate agreement between the Parties for metering equipment, which shall be limited to that metering needed for the applicable rates desired by Customer.
  1. Customer shall provide NPPD with access to their facilities, as required by NPPD, for such metering.
  2. Instrument transformers installed on Customer's facilities at metering points required by rate shall meet NPPD accuracy requirements.  Said instrument transformers shall be installed, owned and maintained by Customer and be used solely for connection to revenue meters.
  3. Meters installed in Customer's facilities at metering points required by the applicable rate shall be provided, installed, owned and maintained by NPPD at Customer's expense and according to NPPD standards.

Desired location of the Point of Interconnection at the voltage indicated above is to be located at NPPD's Minden Substation.

<div align="center">

**CONFIDENTIAL**
**APPENDIX C**
to
**Transmission Facilities Construction Agreement**
dated <u>February 17</u>**, 2022**
between
**CN Minden, LLC**
**and.**
**Nebraska Public Power District**


**Form of Letter of Credit**

</div>

[Issuer Letterhead]

Approved: _____

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

DATE: _____

BENEFICIARY:  NEBRASKA PUBLIC POWER DISTRICT

ADDRESS:         Nebraska Public Power District
                 1414 15th Street
                 P.O. Box 499
                 Columbus, NE  68602-0499
                 Attn:  Vice President & Chief Financial Officer
                 Telephone Number:  (402) 563-5459
                 Facsimile Number:   (402) 563-5528

APPLICANT:      CN Minden, LLC
ADDRESS:        _____
                _____
                Attn: _____
                Telephone Number: _____
                Facsimile Number:  _____

WE, _____, N.A., ("BANK"), ISSUE THIS IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER _____ ("LETTER OF CREDIT") IN FAVOR OF NEBRASKA PUBLIC POWER DISTRICT ("BENEFICIARY") FOR THE ACCOUNT OF CN MINDEN, LLC ("CUSTOMER") AS ACCOUNT PARTY IN THE AMOUNT OF US $_____ UNITED STATES DOLLARS) AND AUTHORIZE THE BENEFICIARY TO DRAW AT SIGHT ON _____BANK.

WE ARE INFORMED BY CUSTOMER THAT THIS LETTER OF CREDIT IS ISSUED PURSUANT TO SECTION 4.3 OF THE TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT DATED AS OF _____, ("AGREEMENT") BETWEEN CUSTOMER AND BENEFICIARY. THIS LETTER OF CREDIT IS AVAILABLE FOR PAYMENT AGAINST YOUR SIGHT DRAFT(S)

CONFIDENTIAL

DRAWN ON BANK MARKED "DRAWN UNDER BANK'S IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____", AT SIGHT WHEN ACCOMPANIED BY A LETTER ON THE BENEFICIARY'S LETTERHEAD CONTAINING THE FOLLOWING STATEMENTS DATED AND PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF BENEFICIARY (SIGNED AS SUCH):

"THE UNDERSIGNED HEREBY CERTIFIES THAT (I) I AM DULY AUTHORIZED TO EXECUTE THIS DOCUMENT ON BEHALF OF NEBRASKA PUBLIC POWER DISTRICT ("BENEFICIARY"), (II) THE AMOUNT OF THE DRAFT ACCOMPANYING THIS CERTIFICATE IS DUE AND OWING, OR OTHERWISE MAY BE DRAWN PURSUANT TO THE AGREEMENT BETWEEN  CUSTOMER AND BENEFICIARY (WHICH DRAWING CONDITIONS INCLUDE THE RIGHT TO DRAW UPON THIS LETTER OF CREDIT IN FULL UPON AN EVENT AS DEFINED IN THE TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT), AND (III) ALL REQUIRED NOTICES, IF ANY HAVE BEEN PROVIDED TO CUSTOMER."

IF A DEMAND FOR PAYMENT MADE BY YOU HEREUNDER DOES NOT, IN ANY INSTANCE, CONFORM TO THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT, WE SHALL GIVE YOU PROMPT NOTICE THAT THE PURPORTED DEMAND WAS NOT EFFECTED IN ACCORDANCE WITH THIS LETTER OF CREDIT, STATING THE REASONS THEREFOR AND THAT WE ARE RETURNING THE DOCUMENTS TO YOU, AS WE MAY ELECT.  UPON BEING NOTIFIED THAT THE PURPORTED DEMAND WAS NOT EFFECTED IN CONFORMITY WITH THIS LETTER OF CREDIT, YOU MAY ATTEMPT TO CORRECT ANY SUCH NONCONFORMING DEMAND FOR PAYMENT.

THIS LETTER OF CREDIT EXPIRES ON _____ OR IF SUCH DATE IS EXTENDED PURSUANT TO THE TERMS HEREOF, THE DATE AS SO EXTENDED ("EXPIRATION DATE").

SPECIAL CONDITIONS:

THIS LETTER OF CREDIT MAY NOT BE AMENDED, CHANGED OR MODIFIED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BENEFICIARY AND THE LETTER OF CREDIT ISSUER; PROVIDED, HOWEVER, THE AMOUNT AVAILABLE FOR DRAWING UNDER THIS LETTER OF CREDIT MAY BE REDUCED AUTOMATICALLY, WITHOUT AMENDMENT, FROM TIME TO TIME UPON OUR RECEIPT OF REDUCTION CERTIFICATE STATING THE AMOUNT OF REDUCTION AND AVAILABLE AMOUNT AFTER SUCH REDUCTION, EXECUTED AND PURPORTEDLY SIGNED BY BOTH APPLICANT AND BENEFICIARY.

PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED, AND THE AMOUNT OF THIS LETTER OF CREDIT WILL BE REDUCED BY THE AMOUNT OF EACH DRAWING HONORED BY US.

WE HEREBY AGREE WITH YOU THAT DOCUMENTS PRESENTED UNDER AND IN CONFORMITY WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED ON PRESENTATION IF PRESENTED ON OR BEFORE THE EXPIRATION DATE OF THIS LETTER OF CREDIT AT _____ BANK, N.A., C/O _____ USA.

IF A COMPLYING PRESENTATION IS MADE PRIOR TO 12:00 P.M. (NEW YORK TIME) ON A BUSINESS DAY THEN LETTER OF CREDIT ISSUER SHALL, PRIOR TO CLOSE OF BUSINESS ON THE SECOND FOLLOWING BUSINESS DAY, MAKE PAYMENT IN IMMEDIATELY AVAILABLE FUNDS.  IF A COMPLYING PRESENTATION IS MADE AT OR AFTER 12:00 P.M. (NEW YORK TIME) ON A BUSINESS DAY, THEN LETTER OF CREDIT ISSUER SHALL, PRIOR

<p style="text-align:center; color:red">CONFIDENTIAL</p>

TO CLOSE OF BUSINESS ON THE THIRD FOLLOWING BUSINESS DAY, MAKE PAYMENT IN IMMEDIATELY AVAILABLE FUNDS.  AS USED IN THIS LETTER OF CREDIT, THE TERM "BUSINESS DAY" SHALL MEAN A DAY OTHER THAN SATURDAY OR SUNDAY OR ANY OTHER DAY IN WHICH BANKING INSTITUTIONS IN THE STATE OF NEW YORK ARE AUTHORIZED OR REQUIRED BY LAW TO CLOSE.

PAYMENTS OF DRAWINGS UNDER THIS LETTER OF CREDIT SHALL BE MADE FROM FUNDS OF THE LETTER OF CREDIT ISSUER AND NOT ANY MONEYS PROVIDED TO THE LETTER OF CREDIT ISSUER BY THE APPLICANT.

ALL LETTER OF CREDIT ISSUER CHARGES ARE FOR THE ACCOUNT OF THE APPLICANT.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR ADDITIONAL PERIOD(S) OF ONE YEAR FROM THE EXPIRATION DATE HEREOF, OR ANY FUTURE EXPIRATION DATE UNLESS AT LEAST 90 (NINETY) DAYS PRIOR TO THE EXPIRATION DATE WE SEND YOU NOTICE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) OR OVERNIGHT COURIER THAT WE ELECT NOT TO CONSIDER EXPIRATION DATE OF THIS LETTER OF CREDIT EXTENDED FOR ANY SUCH ADDITIONAL PERIOD.  UPON RECEIPT OF SUCH NOTICE, YOU MAY DRAW ON THIS LETTER OF CREDIT BY PRESENTING YOUR ONE SIGHT DRAFT TO US FOR AN AMOUNT UP TO THE UNUSED BALANCE OF THIS LETTER OF CREDIT AT ANY TIME WITHIN 30 DAYS OF THE THEN RELEVANT EXPIRATION DATE.

UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS IRREVOCABLE STANDBY LETTER OF CREDIT IS ISSUED SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, 2007 REVISION, INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 600 (THE "UCP600") AND AS TO MATTERS NOT ADDRESSED BY UCP600 SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE TO THE LAWS OF THE STATE OF NEW YORK.  IN THE EVENT OF CONFLICT, THE UCP600 WILL CONTROL.

PLEASE ADDRESS ALL CORRESPONDENCE REGARDING THIS LETTER OF CREDIT TO _____ BANK, N.A., VIA COURIER TO: _____ BANK, C/O,_____USA INCLUDING THE LETTER OF CREDIT NUMBER MENTIONED ABOVE.

_____, N.A.
THE LETTER OF CREDIT ISSUER


_____
AUTHORIZED SIGNATURE

CONFIDENTIAL

**APPENDIX D**
to
**Transmission Facilities Construction Agreement**
dated February 17**, 2022**
between
**CN Minden, LLC**
**and.**
**Nebraska Public Power District**

**Form of Escrow Agreement**

**ESCROW AGREEMENT**

This Escrow Agreement ("Agreement") is made and effective this _____ day of _____, 2022 ("Effective Date"),

| | |
|---|---|
| **BETWEEN:** | CN Minden, LLC, a Delaware limited liability company ("Customer") |
| **AND:** | NEBRASKA PUBLIC POWER DISTRICT, a public corporation and political subdivision of the State of Nebraska ("NPPD") |
| **AND:** | ("Escrow Agent"), a _____ with its head office located: |

**RECITALS**

WHEREAS, NPPD and Customer entered into that certain Transmission Facilities Construction Agreement dated _____, 2022 (the "Construction Agreement"), pursuant to which NPPD has agreed to construct transmission facilities which will be used to provide electric service to Customer's data center facility, and which electric service will be provided through a retail service provider affiliated with NPPD.

WHEREAS, In connection with the construction of such transmission facilities and pursuant to Section 4.3 of the Construction Agreement, Customer agrees to place in escrow certain funds to provide security to NPPD with respect to Customer's obligations under the Construction Agreement, and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

WHEREAS, Customer agrees to deposit certain funds in escrow with the Escrow Agent, on the terms and conditions more particularly described herein.

WHEREAS, Terms used but not defined herein shall have the meanings assigned to such terms under the Construction Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated herein by this reference, and the premises and mutual covenants herein contained, the parties hereto intending to be legally bound, agree as follows:

CONFIDENTIAL

1.      **Establishment of Fund.** Customer has caused to be deposited with the Escrow Agent the sum of $_____ in immediately available cash (such sum, or the balance thereof remaining from time to time being referred to herein as the "Fund").

2.      **Treatment of Fund.** Those monies, and subsequent monies deposited therein, constituting the Fund shall be deposited in a segregated, interest-bearing account pursuant to the terms of this Escrow Agreement.  Such account shall be titled the "CN Minden, LLC Electric Facilities Escrow Account" and held in the name of Customer.  The parties agree that, for tax reporting purposes, all interest and other income from investment of the Fund shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by Customer, whether or not such income was disbursed during such calendar year.  Prior to the Effective Date, Customer shall provide the Escrow Agent with its certified tax identification number by furnishing a form W-9, and Customer and NPPD shall provide such other forms and documents that the Escrow Agent may reasonably request.   The parties understand that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code, as may be amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Fund.

3.      **Investment of Fund.** The Fund will be kept in a money market account with the Escrow Agent.  The Fund will not be kept in any other investment account without the written consent of the parties.  Escrow Agent will provide regular statements to Customer, including periodic statements reflecting transactions executed on behalf of the Fund.  Any investment income earned by the Fund, to the extent it exceeds the amount stated in Section 1, shall not become part of the Fund and shall be disbursed to Customer upon termination of this Escrow Agreement in accordance with Section 4(c) of the Construction Agreement.

4.      **Escrow Procedure and Payment Instruction.** The Fund shall be held and disbursed in accordance with the terms of this Escrow Agreement as set out in this Section 4.

        (a)      If NPPD claims a right to payment (a "Payment Claim") pursuant to either Article 4 or Article 6 of the Construction Agreement, then pursuant to the terms of this Section 4, NPPD may request a disbursement of the portion of the Fund equal to the Payment Claim (up to the amount of the Fund remaining) by providing notice to the Escrow Agent and Customer, in the form of Exhibit A, along with a certificate signed by an authorized representative of NPPD, stating the basis for such Payment Claim.  The Escrow Agent shall deliver to NPPD within two (2) Business Days the amount of money specified in the Payment Claim, up to the amount remaining in the Fund.

        (b)      At any time during the term of this Escrow Agreement, and upon termination of Customer's obligations to post Security under the Construction Agreement, upon receipt of a joint disbursement request in the form of Exhibit B signed by both Customer and NPPD, the Escrow Agent shall deliver to the party specified in such joint disbursement request

CONFIDENTIAL

the amount of money specified in the joint disbursement request, up to the amount remaining in the Fund.

(c)     The parties each acknowledge that Escrow Agent is authorized to use the funds transfer instructions provided below to disburse funds without a verifying the call-back person set forth in Section 12 so long as the form of Exhibit A or Exhibit B is used to request the disbursement and the proceeds are wired to one of the recipient accounts designated below. The form of Exhibit A or Exhibit B may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The form of Exhibit A or Exhibit B may be executed and accepted by facsimile or portable data file (PDF) and any such signature shall be of the same force and effect as an original signature.

If to Customer to:

> Bank Name:   Wells Fargo Bank, N.A.
> Bank Address: 420 Montgomery
> San Francisco, CA 94104
> ABA #:
> Bank Account Name:
> Bank Account #:

If to NPPD to:

> Bank Name:        Wells Fargo Bank, N.A
> Bank Address:     420 Montgomery
> San Francisco, CA 94104
>
> ABA Number:        _____
> Account Name:      _____
> Account Number:    _____

5.     **Termination.**  This Escrow Agreement shall terminate upon the disbursement of the balance of the Fund in accordance with the provisions of Section 4 hereof.

6.     **Limitation of Escrow Agent's Capacity.**

A.     This Escrow Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations shall be read into this Escrow Agreement against Escrow Agent.  This Escrow Agreement constitutes the entire agreement between the Escrow Agent and the other parties hereto in connection with the subject matter of this escrow, and no other agreement entered into between the parties, or any of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be referred to herein or deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof,

CONFIDENTIAL

and the Escrow Agent's rights and responsibilities shall be governed solely by this Escrow Agreement.

B.       Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or for the form of execution thereof, or for the identity or authority of any person executing or depositing such subject matter.  Escrow Agent shall be under no duty to investigate or inquire as to the validity or accuracy of any document, agreement, instruction or request furnished to it hereunder believed by it to be genuine and the Escrow Agent may rely and act upon, and shall not be liable for acting or not acting upon, any such document, agreement, instruction or request.  Escrow Agent shall in no way be responsible for notifying, nor shall it be its duty to notify, any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited herewith.

7.       **Authority to Act.**

A.       Escrow Agent is hereby authorized and directed by the undersigned to deliver the subject matter of this Escrow Agreement only in accordance with the provisions of this Escrow Agreement.

B.       Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing the investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement.

C.       Escrow Agent may consult with legal counsel at the cost and expense of Customer in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting in accordance with the advice of such counsel.

8.       **Compensation.**  Escrow Agent shall be entitled to reasonable compensation as well as reimbursement for its reasonable costs (equal to $30.00 per check issued) and expenses incurred in connection with the performance by it of service under this Escrow Agreement (including reasonable fees and expenses of Escrow Agent's counsel) and Customer agrees to so pay Escrow Agent reasonable compensation and reimburse Escrow Agent for reasonable costs and expenses.  The parties hereto agree that escrow fees shall be due and payable in the amount of $500.00 for the initial setup of the first two escrow accounts and $250.00 for the setup of any subsequent accounts and such fees will be paid by Customer upon the commencement of the escrow and exclusive of amount in the Fund.

CONFIDENTIAL

9.    **Indemnification.**   Customer agrees to indemnify and hold Escrow Agent, its affiliates and their officers, employees, successors, assigns, attorneys and agents (each an "Indemnified Party") harmless from all losses, costs, claims, demands, expenses, damages, penalties and attorney's fees suffered or incurred by any Indemnified Party or Escrow Agent as a result of anything which it may do or refrain from doing in connection with this Escrow Agreement or any litigation or cause of action arising from or in conjunction with this Escrow Agreement or involving the subject matter hereof or the Fund or monies deposited hereunder or for any interest upon any such monies, including, without limitation arising out of, the negligence of Escrow Agent; provided that the foregoing indemnification shall not extend to the gross negligence or willful misconduct of Escrow Agent.

10.    **Miscellaneous.**

A.    Escrow Agent shall make no disbursement, investment or other use of Fund until and unless it has collected funds for the Fund.  Escrow Agent shall not be liable for collection items until the proceeds of the same in actual cash have been received or the Federal Reserve has given Escrow Agent credit for the funds.

B.    Escrow Agent may resign at any time by giving written notice to the parties hereto, whereupon the parties hereto will immediately appoint a successor Escrow Agent.  Until a successor Escrow Agent has been named and accepts its appointment or until another disposition of the subject matter of this Escrow Agreement has been agreed upon by all parties hereto, Escrow Agent shall be discharged of all of its duties hereunder, save to keep the Fund whole.

C.    All representations, covenants, and indemnifications contained in this Escrow Agreement shall survive the termination of this Escrow Agreement.

D.    Escrow Agent shall provide monthly statements of the account to NPPD and Customer.

11.    **Discharge of Escrow Agent.** Upon the delivery or return of all of the Fund pursuant to the terms of this Escrow Agreement, the duties of Escrow Agent shall terminate and Escrow Agent shall be discharged from any further obligation hereunder.

12.    **Escrow Instructions.**  Attached hereto as Schedule 1 (the "Security Schedule") is a list of authorized signatories (with signature identification) and authorized call-back persons for each of the parties to this Agreement (other than the Escrow Agent).  In the event funds transfer instructions are given which differ from the funds transfer instructions to disburse funds as set out in Section 4(c), the Escrow Agent shall seek confirmation of such instructions or directions by making a successful telephone call to the person or persons designated on the Security Schedule, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The authorized signatures and the persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow

CONFIDENTIAL

Agent, and in the case of an addition of an authorized signatory, the writing must be accompanied by an incumbency certificate with signature identification certified by an existing authorized signatory.  If the Escrow Agent is unable to contact any of the authorized representatives identified in the Security Schedule for call-back confirmation, the Escrow Agent is hereby authorized to seek confirmation of such instructions by a successful telephone call-back to any one or more of the party's officers.  Such officer shall deliver to the Escrow Agent a fully executed incumbency certificate certified by an existing authorized signatory, and the Escrow Agent may rely upon the confirmation of anyone purporting to be such officer.

13.     **Notice.** Any payment, notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when personally delivered to the party hereunder specified or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

If to Escrow Agent:

If to Customer:

　　　　With a copy to:

If to NPPD:

　　　　Nebraska Public Power District
　　　　Attn: Arthur R. Wiese
　　　　Vice President Energy Delivery
　　　　1414 15th Street
　　　　P.O. Box 499
　　　　Columbus, NE  68602-0499
　　　　Telephone: (402) 563-5575
　　　　Email: arwiese@nppd.com

　　　　With a Copy to:

　　　　Nebraska Public Power District
　　　　Attn: Harold L. Hadland
　　　　Office of the General Counsel
　　　　1414 15th Street
　　　　P.O. Box 499
　　　　Columbus, NE  68602-0499

CONFIDENTIAL

Telephone: (402) 563-5046
Email: hlhadla@nppd.com


Any party may unilaterally designate a different address by giving notice of each such change in the manner specified above to each other party.  Notwithstanding the foregoing, no notice to the Escrow Agent shall be deemed given to or received by the Escrow Agent unless actually delivered to an officer of the Escrow Agent having responsibility under this Escrow Agreement.

14.     **Governing Law.**  This Escrow Agreement is being made in and is intended to be construed according to the laws of the State of Nebraska.  It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns.  Any legal or equitable action arising out of or in any way connected with this Escrow Agreement shall be instituted only in the District Court of Lancaster County, Nebraska, or the United States District Court for the District of Nebraska sitting in Lincoln, Nebraska.

15.     **Construction.**  Words used in the singular number may include the plural and the plural may include the singular.  The section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Escrow Agreement.

16.     **Amendment.**  The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by Customer, NPPD, and Escrow Agent.

17.     **Force Majeure.**  Escrow Agent shall not be liable to the undersigned for any loss or damage arising out of any acts of God, strikes, equipment or transmission failure, war, terrorism, or any other act or circumstance beyond the reasonable control of Escrow Agent.

18.     **Written Agreement.**  This Escrow Agreement represents the final agreement between the parties, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

19.     **Publication; Disclosure.**  By executing this Escrow Agreement, Customer, NPPD, and the Escrow Agent acknowledge that the exhibits, schedules, and signatures to this Escrow Agreement (including related attachments) contain certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement.  The parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement,

CONFIDENTIAL

or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If a party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other parties of the legal requirement to do so.  If any party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that party shall promptly notify in writing the other parties.

20.    **Counterparts.** This Agreement may be executed in any number of counterparts, and each executed counterpart shall have the same force and effect as an original instrument. A signature page in "PDF" format or an electronic signature to this Agreement shall be deemed an original and binding upon the party against which enforcement is sought.

This Escrow Agreement has been executed by the parties effective as of the Effective Date set forth above.

CN MINDEN, LLC

Date:_____              By: _____
                                   Name: _____
                                   Title: _____

NEBRASKA PUBLIC POWER DISTRICT

Date:_____              By: _____
                                   Name: _____
                                   Title: _____

(Bank name), Escrow Agent, hereby accepts its appointment as Escrow Agent as described in the foregoing Escrow Agreement, subject to the terms and conditions set forth therein.

(Bank Name)

Date:_____              By:_____
                                   Name: _____
                                   Title: _____

Date:_____              By:_____
                                   Name: _____
                                   Title: _____

CONFIDENTIAL

**EXHIBIT A**

**PAYMENT CLAIM**

       Pursuant to that certain Escrow Agreement dated effective _____among CN Minden, LLC, NEBRASKA PUBLIC POWER DISTRICT ("NPPD"), and (Bank Name), NPPD hereby requests disbursement of funds pursuant to Section 4(a) in the amount and manner described below from account number _____ titled "CN Minden, LLC Electric Facilities Escrow Account" Escrow Account.

Please disburse to:   Nebraska Public Power District

Amount to disburse:  $_____

Form of disbursement:        Money Wire

Attached to this Disbursement Request is a certificate signed by an authorized representative of NPPD stating the basis for such claim payment.

       IN WITNESS WHEREOF:  NPPD has executed this Disbursement Request effective as of the date first written above.

Nebraska Public Power District

_____
Name: _____
Title:  _____
Date:  _____

CONFIDENTIAL

**EXHIBIT B**


**JOINT DISBURSEMENT REQUEST**


Pursuant to that certain Escrow Agreement dated effective _____among CN MINDEN, LLC ("Customer"), NEBRASKA PUBLIC POWER DISTRICT ("NPPD"), and (Bank name), Customer and NPPD hereby jointly request disbursement of funds in the amount and manner described below from account number _____ titled "CN MINDEN, LLC Electric Facilities Escrow Account" Escrow Account.

Please disburse to:

_____

Amount to disburse:  $_____

Form of disbursement:       Money Wire

IN WITNESS WHEREOF:  the parties hereto have executed this Joint Disbursement Request in multiple counterparts, each of which is and shall be considered an original for all intents and purposes, effective as of the date first written above.


CN Minden, LLC                              Nebraska Public Power District


_____           _____
Name: _____           Name: _____
Title:  _____           Title:  _____
Date:  _____           Date:  _____

<p style="text-align:center"><span style="color:red">CONFIDENTIAL</span></p>

<p style="text-align:center">**Schedule 1**</p>

<p style="text-align:center">**SECURITY SCHEDULE**</p>

Telephone Number(s) for Call-Backs and Person(s) Designated to Confirm Funds Transfer Instructions and Execute Instructions, and Other Documents in Connection with this Escrow Agreement

CN Minden, LLC Contact Information:

| Name/Title | Telephone Number | Signature Identification |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

CONFIDENTIAL

NPPD Contact Information:

| Name | Telephone Number | Signature Identification |
|------|------------------|--------------------------|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

Escrow Agent will attempt to contact the contacts in the order they appear on this Security Schedule.  Verification is needed from one contact for the party receiving the disbursement and the contact must be separate from the person who signed the Disbursement Request for dual control purposes.

**CONFIDENTIAL**

**APPENDIX E**
**to**
**Transmission Facilities Construction Agreement**
**dated** <u>February 17</u>**, 2022**
**between**
**CN Minden, LLC**
**and.**
**Nebraska Public Power District**

**Form of Surety Bond**

TRANSMISSION FACILITIES CONSTRUCTION
AGREEMENT PAYMENT BOND

Bond No._____

KNOW ALL MEN BY THESE PRESENTS, that we,_____(hereinafter called "Principal"), as Principal, and

_____(hereinafter called "Surety"), as Surety, are held and firmly bound unto_____, a public corporation and political subdivision of the State of Nebraska (hereinafter called "Obligee"), as Obligee, in the maximum penal sum of _____($_____) for the payment of which the said Principal and Surety bind themselves, jointly and severally, firmly by these presents.

WHEREAS**,** Principal intends to own and operate a facility located at_____(the "__"), and wishes to enable the_____to obtain service from the_____(the "Retail Service Provider) by means of the electric transmission facilities of the Obligee (the "Transmission System");

WHEREAS**,** Obligee is willing to construct certain transmission facilities (the "_____"), which will be used to provide transmission service to the Retail Service Provider that will serve the_____, and the Principal is willing to use and pay for transmission service it receives from the_____via the_____;

WHEREAS**,** the Principal and Obligee have entered into a Transmission Facilities Construction Agreement (the "Agreement") on _____, 2022 to establish the rights and obligations of the Principal and Obligee for construction and payment for the_____that will be used to provide transmission service to the Retail Service Provider that will serve the_____; and

WHEREAS, Section 4.3 of the aforementioned Agreement between Principal and Obligee requires that the Principal obtain and provide security for its payment obligations under the Agreement, which may be in the form of one or more surety bonds acceptable to the Obligee, and shall be in the aggregate amount of the Stranded Cost Estimate less the Formula Contribution in Aid of Construction as defined in the Agreement as____($_____) (this "Bond").

<p style="text-align:center; color:red">CONFIDENTIAL</p>

NOW, THEREFORE, the condition of this obligation is such that if the Principal shall well and truly accomplish its Full Build Out Conditions under said Agreement, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

**PROVIDED**, **HOWEVER**, that this Bond is subject to the following terms and conditions:

1.  No parties other than the named Obligee may make a claim on this Bond, and no suit, action or proceeding in law or equity shall be brought or maintained by anyone other than the Obligee named herein.

2.  In the event of any claim made under this Bond by the Obligee, the Surety shall have fifteen (15) calendar days to conduct an investigation and the Obligee shall provide such documentation or evidence as may be reasonably requested by the Principal and Surety.

3.  The penal sum of this Bond shall be reduced by and to the extent of any payments made hereunder from the Surety to the Obligee.

4.  Pursuant to Section 4.4 of the Agreement, the penal sum of this Bond shall be automatically reduced, on a quarterly basis, by the amount that the Obligee and the Principal mutually agree was paid for transmission electrical service in that quarterly period. This decrease in penal sum shall occur regardless of whether the Surety issues a decrease rider to this Bond.

5.  The Obligee agrees that it will release this Bond pursuant to Section 4.3 of the Agreement upon the Principal having accomplished the Full Build Out Conditions.  Until such release this Bond shall remain in full force and effect for the penal sum of this Bond stated in Section 4.3 of the Agreement and in the Whereas above.

6.  Regardless of the number of years this Bond shall continue in force and the number of premiums which shall be payable or paid by Principal; the liability of the Surety shall not be cumulative from year to year nor period to period.

CONFIDENTIAL

7.  In no event shall the liability of the Surety exceed the penal sum of this Bond, as it may be decreased from time to time.


This Bond is governed by the laws of the state of Nebraska and the state courts located therein shall have exclusion jurisdiction and venue of any suit, action or proceeding in law or equity on this Bond


Signed and sealed this___day of_____, 20____.


By: _____          By: _____
_____              _____
Print Name & Title                              Print Name & Title

[SEAL]