## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-90273 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 91 & 256** |

### NOTICE OF SUCCESSFUL BIDDER FOR CERTAIN ASSETS

**PLEASE TAKE NOTICE** that on September 26, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") filed with the United States Bankruptcy Court for the Southern District of Texas (the "Court") a motion [Docket No. 91] (the "Motion")[2] seeking entry of an order (the "Bidding Procedures Order"), approving Bidding Procedures, scheduling an auction of the Assets (the "Auction"), and granting other related relief.

**PLEASE TAKE FURTHER NOTICE** that on October 24, 2022, the Court entered the Bidding Procedures Order [Docket No. 256]. At the Bid Deadline established pursuant to the Bidding Procedures Order, the Debtors received multiple bids across their various pools of assets, including a bid from Foundry Digital LLC ("Foundry" or the "Purchaser") for the assets identified in the Purchase Agreement. The assets being acquired by Foundry pursuant to the Purchase Agreement (the "Purchased Assets"), include, but are not limited to: (a) all assets related to the Debtors' facilities located in (i) Big Spring, Texas, (ii) North Sioux City, South Dakota, and (iii) Minden, Nebraska; (b) all assets of Debtor CN Mining LLC; (c) all mining equipment of Compute North LLC, Compute North SD, LLC, Compute North Texas LLC, CN Mining LLC, and CN Minden LLC; (c) certain modular data center containers and padmount transformers; and (d) all collateral under that certain *Equipment Finance and Security Agreement* by and between Foundry, as lender, and Compute North, LLC, as borrower, dated December 31, 2020, pursuant to which Foundry provided equipment financing for certain digital currency mining equipment.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238). The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement (defined below), as applicable.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors, in consultation with the Consultation Parties, have declared the Purchaser as the Successful Bidder for the Purchased Assets.  A copy of the purchase agreement, dated as of November 19, 2022, between the Debtors and the Purchaser is attached hereto as **<u>Exhibit A</u>** (the "<u>Purchase Agreement</u>").  The Debtors have not designated a Back-Up Bidder for the Purchased Assets.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Purchase Agreement and the transactions contemplated thereunder (the "<u>Foundry Sale</u>") at a hearing (the "<u>Sale Hearing</u>"), scheduled to commence on **November 22, 2022 at 2:00 p.m. (prevailing Central Time)**, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 4th Floor, 515 Rusk Street, Houston, Texas 77002.  The Sale Hearing may be adjourned or rescheduled by the Debtors, in consultation with the Consultation Parties, in accordance with the Bidding Procedures Order and the Bidding Procedures, including as stated orally at the Sale Hearing.

      **PLEASE TAKE FURTHER NOTICE** that, on November 19, 2022, the Debtors served a notice of selected target contracts (the "<u>Selected Target Contracts</u>") proposed to be assumed and assigned to the Purchaser, as assignee, in connection with the Foundry Sale, subject to the Purchaser's right to amend the list of the Selected Target Contracts through and including the Closing in accordance with Section 1.1 of the Purchase Agreement, upon the counterparties to such Selected Target Contracts, and filed a notice of the same with the Court [Docket No. 510].

      **PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and all other documents filed in these Chapter 11 Cases are available (a) free of charge by accessing the website maintained by the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/case/computenorthholdings/info or (b) for a fee by accessing the PACER system on the Court's website at https://ecf.txs.uscourts.gov.

[<em>Remainder of Page Intentionally Left Blank</em>]

Dated:  November 19, 2022
Houston, Texas

/s/ *James T. Grogan III*

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Luc Despins (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Daniel Ginsberg  (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email:  lucdespins@paulhastings.com
          sayanbhattacharyya@paulhastings.com
          danielginsberg@paulhastings.com

-and-

Matthew Micheli (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100
Email:  mattmicheli@paulhastings.com
          michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on November 19, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ James T. Grogan III*
James T. Grogan III

## Exhibit A

**Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**Foundry Digital LLC,**

**as Purchaser,**

**and**

**Compute North LLC,**

**Compute North SD, LLC,**

**Compute North Texas LLC,**

**CN Mining LLC, and**

**CN Minden LLC**

**collectively as Seller,**

**Dated as of November 19, 2022**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .......................... 1

Section 1.1    Purchase and Sale of Assets .............................................................................. 1
Section 1.2    Assumption of Liabilities .................................................................................. 2
Section 1.3    Assigned Contracts; Non-Assignable Assets ..................................................... 2

ARTICLE II CONSIDERATION; DEPOSIT ............................................................................... 4

Section 2.1    Consideration ................................................................................................... 4
Section 2.2    Deposit ............................................................................................................. 5
Section 2.3    Payment of Cash Purchase Price ...................................................................... 5
Section 2.4    Allocation of Purchase Price ............................................................................ 5

ARTICLE III CLOSING AND TERMINATION .......................................................................... 6

Section 3.1    Closing ............................................................................................................. 6
Section 3.2    Closing Deliveries by the Seller ....................................................................... 6
Section 3.3    Closing Deliveries by the Purchaser ................................................................. 7
Section 3.4    Private Sale ...................................................................................................... 7
Section 3.5    Termination of Agreement ................................................................................ 7
Section 3.6    Effect of Termination ....................................................................................... 9
Section 3.7    Minden Closing .............................................................................................. 10

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ................................. 11

Section 4.1    Organization and Qualification ...................................................................... 11
Section 4.2    Authority Relative to This Agreement ............................................................ 11
Section 4.3    Conflicts; Consents and Approvals ................................................................ 11
Section 4.4    Financial Statements ...................................................................................... 12
Section 4.5    Title and Condition of Purchased Assets; Sufficiency ..................................... 12
Section 4.6    Absence of Certain Changes .......................................................................... 12
Section 4.7    Litigation ....................................................................................................... 13
Section 4.8    Intellectual Property; IT Assets and Privacy ................................................... 13
Section 4.9    Contracts ....................................................................................................... 15
Section 4.10   Compliance with Law .................................................................................... 15
Section 4.11   Permits .......................................................................................................... 16
Section 4.12   Assets Schedule ............................................................................................. 16
Section 4.13   Real Property ................................................................................................. 16
Section 4.14   Tax Returns; Taxes ........................................................................................ 17
Section 4.15   Affiliate Transactions .................................................................................... 18
Section 4.16   Insurance Policies .......................................................................................... 18
Section 4.17   Environmental Matters ................................................................................... 19
Section 4.18   Brokers and Finders ....................................................................................... 19
Section 4.19   Books and Records ......................................................................................... 19
Section 4.20   NO OTHER REPRESENTATIONS ................................................................. 20

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............................ 20

Section 5.1    Organization and Qualification ...................................................................... 20
Section 5.2    Authority Relative to This Agreement ............................................................ 20
Section 5.3    Conflicts; Consents and Approvals ................................................................ 21

i

Section 5.4    Financial Capacity .................................................................................. 21
Section 5.5    Brokers and Finders ................................................................................ 22
Section 5.6    Qualification ........................................................................................... 22
Section 5.7    Independent Investigation; Reliance By the Purchaser........................... 22
Section 5.8    RELIANCE/ACKNOWLEDGMENT........................................................ 22
Section 5.9    NO OTHER REPRESENTATIONS ......................................................... 23

ARTICLE VI COVENANTS AND AGREEMENTS ........................................................... 23

Section 6.1    Conduct of Seller .................................................................................... 23
Section 6.2    Taxes ...................................................................................................... 24
Section 6.3    Insurance ................................................................................................ 25
Section 6.4    Access .................................................................................................... 25
Section 6.5    Confidentiality ........................................................................................ 26
Section 6.6    Publicity .................................................................................................. 27
Section 6.7    Wrong Pocket .......................................................................................... 27
Section 6.8    Use of Acquired Names .......................................................................... 28
Section 6.9    Access and Preservation of Records ........................................................ 28
Section 6.10   Further Assurances .................................................................................. 28
Section 6.11   Employees ............................................................................................... 29
Section 6.12   Bankruptcy Actions ................................................................................. 30
Section 6.13   Sale Order ............................................................................................... 31
Section 6.14   Bankruptcy Process ................................................................................. 32
Section 6.15   Acquisition Proposals .............................................................................. 32
Section 6.16   Minden Assignment ................................................................................. 32
Section 6.17   Acquired Projects .................................................................................... 32
Section 6.18   Waiver ..................................................................................................... 33
Section 6.19   Waiver of Non-Solicitation Obligations ................................................... 33
Section 6.20   Replacement of Minden LC ..................................................................... 33
Section 6.21   License of IT Assets ................................................................................ 33

ARTICLE VII CONDITIONS TO CLOSING ..................................................................... 34

Section 7.1    Conditions Precedent to the Obligations of the Purchaser and the Seller........................ 34
Section 7.2    Conditions Precedent to the Obligations of the Seller .............................. 34
Section 7.3    Conditions Precedent to the Obligations of the Purchaser ......................... 35

ARTICLE VIII ADDITIONAL DEFINITIONS ................................................................... 35

Section 8.1    Certain Definitions ................................................................................... 35
Section 8.2    Additional Defined Terms ........................................................................ 46

ARTICLE IX MISCELLANEOUS ..................................................................................... 48

Section 9.1    Payment of Expenses ............................................................................... 48
Section 9.2    Survival of Representations, Warranties; and Covenants ........................... 48
Section 9.3    No Successor Liability ............................................................................. 49
Section 9.4    Sale Free and Clear ................................................................................. 49
Section 9.5    Entire Agreement; Amendments and Waivers ........................................... 49
Section 9.6    Counterparts ............................................................................................ 49
Section 9.7    Governing Law ........................................................................................ 50
Section 9.8    Jurisdiction, Waiver of Jury Trial ............................................................. 50
Section 9.9    Notices .................................................................................................... 51
Section 9.10   Binding Effect; Assignment ..................................................................... 52
Section 9.11   Severability ............................................................................................. 52

Section 9.12    Injunctive Relief ................................................................................................ 52
Section 9.13    Third Party Beneficiaries ................................................................................... 53
Section 9.14    Non-Recourse .................................................................................................... 53
Section 9.15    Time of the Essence ........................................................................................... 53
Section 9.16    Disclosure .......................................................................................................... 53
Section 9.17    Bulk Transfer Laws ........................................................................................... 53
Section 9.18    Certain Interpretations ....................................................................................... 53

## **EXHIBITS**

Exhibit A          Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B          Form of IP Assignment
Exhibit C          Seller Disclosure Schedules
Exhibit D          Form of Transition Services Agreement
Exhibit E          Escrow Agreement


## **SCHEDULES**

Schedule 1.1              Purchased Assets
Schedule 1.2(a)           Assumed Liabilities
Schedule 1.2(b)           Excluded Liabilities
Schedule 6.11(a)          Employees
Schedule 6.21             Licensed IT Assets
Schedule 8.1(f)           Assigned Contracts

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of November 19, 2022 (the "Execution Date"), by and between Compute North LLC, Compute North SD, LLC, Compute North Texas LLC, CN Mining LLC, and CN Minden LLC, each a Delaware limited liability company (collectively, the "Seller") and Foundry Digital LLC, a Delaware limited liability company (the "Purchaser").   Article VIII contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, the Seller and certain of its Affiliates (collectively, the "Debtors" each of which is a "Debtor") have filed voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"); and

WHEREAS, the Seller desires to sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept from the Seller, all of the Seller's right, title and interest in and to the Purchased Assets in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1    Purchase and Sale of Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the Seller's right, title and interest in, to and under all of the assets, properties, rights and interests expressly set forth on Schedule 1.1, as the same shall exist at the Closing (together with the Assigned Contracts, collectively, the "Purchased Assets"); provided, that at any time through and including the Closing, the Purchaser may amend Schedule 1.1 and/or Schedule 8.1(f) to remove any of the Seller's assets, properties, rights and interests from such Schedule 1.1 and/or Schedule 8.1(f), and the Seller's right, title and interest in, to and under all of the assets, properties, rights and interests expressly set forth on such Schedule 1.1 and/or Schedule

8.1(f), as amended, shall constitute the "Purchased Assets"; provided further, that any such amendment to Schedule 1.1 and/or Schedule 8.1(f), pursuant to this Section 1.1, shall not reduce the Cash Purchase Price.  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall the Seller be deemed to sell, transfer, assign, convey or deliver to the Purchaser, and the Seller shall retain all right, title and interest to, in and under, any and all assets, properties, rights and interests of the Seller (including any Contract which is not an Assigned Contract), other than the Purchased Assets.

Section 1.2    Assumption of Liabilities.

(a)    On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, the Purchaser shall assume from the Seller, and shall become solely and exclusively liable for, only those Liabilities set forth on Schedule 1.2(a) (collectively, the "Assumed Liabilities").

(b)    Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, the Purchaser shall not assume and will be deemed not to have assumed, or become liable for the payment or performance of, any Liabilities of or against the Seller or any of its Affiliates of any kind or nature whatsoever except for the Assumed Liabilities, and the Seller and/or its Affiliates (as applicable) shall remain liable with respect to any Liabilities of the Seller and/or its Affiliates, other than the Assumed Liabilities, including, without limitation, those Liabilities that may result from any claims (as defined in Section 101(5) of the Bankruptcy Code) or causes of action asserted by a Governmental Body against any Person based on the Debtors' and/or their Affiliates' business operations or the use, operation, possession or ownership of the Purchased Assets by the Seller, other Debtors, and/or any of their predecessors or Affiliates prior to Closing and those specific Liabilities set forth on Schedule 1.2(b) attached hereto (all such Liabilities, the "Excluded Liabilities").

Section 1.3    Assigned Contracts; Non-Assignable Assets.

(a)    Notwithstanding anything to the contrary herein, from the Execution Date through and including the Closing Date, the Purchaser may elect to include in, or exclude from, the Purchased Assets any Contract of the Seller that was or was not previously included in the Purchased Assets; provided that no such change to the "Purchased Assets" shall reduce the amount of the Cash Purchase Price. To exercise its rights under this Section 1.3(a) to include any Contract in, or exclude any Contract from, the Purchased Assets, the Purchaser shall deliver one or more written notices (each, a "Designation Notice") to the Seller specifying the Contract(s) that it does not wish to assume or Contract(s) that the Purchaser wishes to add as an Assigned Contract. Any such previously considered Assigned Contract that the Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts without any adjustment to the Cash Purchase Price, and any such previously considered Contract that the Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, and assumed by the Seller to sell and assign to the Purchaser, without any adjustment to the Cash Purchase Price. Pursuant to this Section 1.3(a), Schedule 8.1(f) and Schedule 1.1, each attached hereto, shall be deemed automatically updated upon the Purchaser's delivery of a Designation Notice to reflect the addition of any Contract to, or the exclusion of any Contract from, the Purchased Assets.  If as of the later of the Closing Date

and the date of delivery of the Designation Notice, any Assigned Contract is the subject of an objection as to the amount of the Cure Costs required for the Seller to assume and assign such Contract to the Purchaser, or other objection as to the assumption and assignability of such Contract, the Purchaser shall have until the Determination Date to decide whether to remove such Contract from the Schedules related to Assigned Contracts; provided that no such removal shall reduce the amount of the Cash Purchase Price.  For purposes of this Section 1.3(a), "Determination Date" shall mean the date that is the earlier of (i) the date on which the Purchaser decides (in its sole discretion) to remove such Contract from the Schedules related to Assigned Contracts, (ii) the date on which such dispute has been resolved to the satisfaction of the Purchaser in its sole discretion, (iii) one hundred and twenty (120) days following the Closing, (iv) the date on which such contract is deemed rejected by operation of Section 365(d)(4) of the Bankruptcy Code, and (v) a date established by Order of the Bankruptcy Court.  If any Contract is not expressly assumed by the Purchaser, then such Contract shall not be considered assumed and assigned to the Purchaser (and shall not be a Purchased Asset).

(b)    The Seller shall take all reasonable actions required to assume and assign the Assigned Contracts to the Purchaser at the Closing (other than payment of the Cure Costs (if any), which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain an Order of the Bankruptcy Court in form and substance satisfactory to the Purchaser in its sole discretion containing a finding that the proposed assumption and assignment of the Assigned Contracts to the Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.  The Purchaser shall, at or prior to the Closing, provide all such information or documentation to satisfy all applicable requirements under section 365 of the Bankruptcy Code necessary to assume and assign to the Purchaser the Assigned Contracts (including, without limitation, by providing "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable).

(c)    Subject to Section 1.3(d), at the Closing, (i) the Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assume and assign to the Purchaser (the consideration for which is included in the Purchase Price) each of the Assigned Contracts (subject to, if applicable, (x) the provision of "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the Purchaser and (y) the payment by the Purchaser of the Cure Costs (if any) in respect of the Assigned Contracts) and (ii) the Purchaser shall pay or cause to be paid (and shall reimburse or cause to be reimbursed to the Seller any amounts paid prior to the Closing Date in respect of) all Cure Costs (if any) in connection with such assumption and assignment and assume and agree to perform and discharge the Assumed Liabilities (if any) under the Assigned Contracts pursuant to the Sale Order and the Assignment and Assumption Agreement.

(d)    To the extent that the assignment to the Purchaser of any Assigned Contract, Assigned Permits or other Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Sale Order or other Order of the Bankruptcy Court (such Purchased Assets, the "Nonassignable Assets"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such

3

consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law on terms satisfactory to the Purchaser in its sole discretion; provided that no Liability attendant to any Nonassignable Asset shall become an Assumed Liability until such Nonassignable Asset becomes a Purchased Asset.  If any such consent, waiver, confirmation or other approval or waiver of such prohibition is not obtained prior to the Closing Date in respect of a Nonassignable Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to the Purchaser as the Purchaser may reasonably request, then, the Closing shall nonetheless take place (except as it relates to the Assigned Permits related to or issued for the Big Spring Project and the Minden Project, which, if not assignable without the consent, waiver, confirmation or other approval of a third party or because such assignment is prohibited by applicable Law, the Closing or the Minden Closing, as applicable, shall occur at the election of the Purchaser) subject to the terms and conditions set forth herein and, thereafter, solely to the extent not prohibited under applicable Law (including, without limitation, the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Seller shall reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser with the benefits and obligations of such Nonassignable Asset (an "Interim Arrangement"), and until the date of the closing of the Chapter 11 Cases, the Seller will reasonably seek to enforce, at the reasonable request and sole expense, and for the account, of the Purchaser, any rights of the Seller arising from any such Nonassignable Asset against any third Person; provided, however, that (i) no Interim Arrangement shall terminate later than the earlier of (A) 180 days after the Closing Date and (B) the closing of the Chapter 11 Cases, and (ii) neither the Seller nor any of its Affiliates shall be required to do any of the following in connection with, as part of, or as required by any Interim Arrangement: (A) make any payments, (B) incur, assume, become liable in respect of or suffer to exist any Liabilities, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that would reasonably be likely to result in Liabilities to the Seller or any of its Affiliates, or (C) commence any lawsuit, arbitration or other proceeding against any Person. The Purchaser shall be responsible for performing all obligations with respect to each such Nonassignable Asset solely to the extent agreed to pursuant to the Interim Arrangement.  If any such consent, waiver, confirmation or other approval or waiver of such prohibition with respect to any Nonassignable Asset is obtained after the Closing Date and prior to the termination of the applicable Interim Arrangement, then such Nonassignable Asset shall promptly be transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code. The Purchaser acknowledges that no adjustment to the Purchase Price shall be made for any Nonassignable Assets that are not assigned.

## ARTICLE II

## CONSIDERATION; DEPOSIT

Section 2.1    Consideration.  The aggregate consideration to be paid by the Purchaser to the Seller for the purchase of the Purchased Assets shall be as follows:

(a)    cash in the amount of $5,170,000 (the "Cash Purchase Price") payable as follows:

(i)    $4,000,000 at Closing (the "Closing Cash Portion"); and

4

(ii)    $1,170,000 at Minden Closing, if any (the "<u>Minden Cash Portion</u>");

(b)    a credit bid pursuant to Section 363(k) of the Bankruptcy Code for the full amount of the Purchaser's secured claim, which consists of $8,969,845 in outstanding principal and accrued and unpaid interest, fees, costs, and expenses as of the Petition Date plus any other amounts and obligations under the Foundry Finance Agreement (the "<u>Credit Bid</u>"); and

(c)    the assumption by the Purchaser of the Assumed Liabilities (together with the Cash Purchase Price and the Credit Bid, collectively, the "<u>Purchase Price</u>").

Section 2.2    <u>Deposit</u>. On October 27, 2022, the Purchaser deposited $500,000 (the "<u>Deposit</u>") by wire transfer of immediately available funds with the Debtors' disbursing agent, Epiq (the "<u>Escrow Agent</u>"), which Deposit the Escrow Agent shall hold in a noninterest-bearing account (the "<u>Escrow Account</u>") pursuant to the terms of an escrow agreement (as amended, supplemented, amended and restated or otherwise modified from time to time, in form and substance acceptable to the Purchaser, the "<u>Escrow Agreement</u>"), attached hereto as Exhibit E.  At the Closing, the Seller and the Purchaser shall instruct the Escrow Agent to deliver the Deposit to the Seller by wire transfer of immediately available funds into an account designated by the Seller, which Deposit shall be treated as a partial payment of the Cash Purchase Price pursuant to <u>Section 2.1(a)</u> of this Agreement.  If this Agreement is validly terminated prior to the Closing, the Deposit shall be released and distributed to the Purchaser or the Seller in accordance with the terms set forth in <u>Section 3.6(b)</u>, <u>Section 3.6(c)</u> and/or <u>Section 3.6(d)</u>, as applicable.

Section 2.3    <u>Payment of Cash Purchase Price</u>.  On the Closing Date, the Purchaser shall pay, or cause to be paid, the Cash Purchase Price <u>minus</u> the Deposit to the Seller by wire transfer of immediately available funds to the account or accounts of the Seller in accordance with written instructions delivered by the Seller to the Purchaser no less than one (1) Business Day prior to the Closing Date.

Section 2.4    <u>Allocation of Purchase Price</u>.  The Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to the Seller a schedule allocating the Purchase Price (including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and U.S. Treasury Regulations thereunder (such schedule, the "<u>Allocation Schedule</u>").  If the Seller raises any objection to the Allocation Schedule within thirty (30) days after the receipt thereof, the Seller and the Purchaser will negotiate in good faith to resolve such objection(s).  If the Seller and the Purchaser are unable to reach an agreement on the Allocation Schedule within twenty (20) days after the Seller first raises any objection to the Allocation Schedule, the Seller and the Purchaser shall submit to the Neutral Accountant a notice setting forth in reasonable detail their proposed allocations.  The Neutral Accountant shall determine only the unresolved items with respect to the Allocation Schedule.  The Neutral Accountant shall be instructed to determine its best estimate of the Allocation Schedule based on the unresolved items and provide a written description of the basis for its determination of the Allocation Schedule within twenty (20) days after the matter has been submitted to the Neutral Accountant, which written determination shall be final and binding and shall become the Allocation Schedule.  The fees and expenses of the Neutral Accountant shall be split equally between the Seller, on the one hand, and the Purchaser, on the other hand.  If the Seller does not

raise any objection to the Allocation Schedule within thirty (30) days after the receipt thereof, the Seller shall be deemed to have conclusively accepted and agreed to the Allocation Schedule proposed by the Purchaser.  The Seller and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and Form 8594 consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding) except as required by a final determination as defined in Section 1313 of the Code; provided, however, that nothing contained herein shall prevent the Seller or the Purchaser from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation Schedule, and neither the Seller nor the Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation Schedule.  The Purchaser and the Seller shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation Schedule.  The Purchaser and the Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Action challenging the Allocation Schedule.

## ARTICLE III

## CLOSING AND TERMINATION

Section 3.1    Closing.  Upon the terms and subject to the conditions contained in this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of electronic documents and signatures by electronic mail at 10:00 a.m. (New York Time) on a date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in Article VII are satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing), or at such other place, date and/or time as the Purchaser and the Seller may mutually agree in writing.  The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 3.2    Closing Deliveries by the Seller.  At or prior to the Closing and, as applicable, the Minden Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser:

(a)    joint written instructions, duly executed by the Seller, in the form delivered to the Escrow Agent, authorizing release of the Deposit to the Seller (the "Escrow Instructions") as partial payment of the Cash Purchase Price pursuant to Section 2.1(a);

(b)    a bill of sale and assignment and assumption agreement, in the form attached hereto as Exhibit A (the "Bill of Sale and Assignment and Assumption Agreement"), duly executed by the Seller;

(c)    an intellectual property assignment agreement, in the form attached hereto as Exhibit B (the "IP Assignment"), duly executed by the Seller;

(d)    Seller Disclosure Schedules in form and substance acceptable to the Purchaser and attached hereto as Exhibit C;

6

(e)      if requested by the Purchaser, a transition services agreement in form and substance satisfactory to the Purchaser and reasonably acceptable to the Seller and substantially in the form attached hereto as Exhibit D (the "Transition Services Agreement"), duly executed by Compute North LLC;

(f)      [Intentionally Omitted];

(g)      [Intentionally Omitted];

(h)      a duly executed non-foreign person affidavit of the Seller dated as of the Closing Date, sworn under penalty of perjury, and in the form provided at Treasury Regulations § 1.1445-2(b)(2)(iv)(B) or in the form of an IRS Form W-9 as described in Treasury Regulations § 1.1445-2(b)(2)(v);

(i)      the certificates required to be delivered pursuant to Section 7.3(a) and Section 7.3(b); and

(j)      a counterpart of each of the other Seller Ancillary Agreements required by this Agreement to be executed and delivered by the Seller at or prior to the Closing, duly executed by the Seller.

Section 3.3      Closing Deliveries by the Purchaser.  At or prior to the Closing and, as applicable, the Minden Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Seller:

(a)      the Escrow Instructions, duly executed by the Purchaser;

(b)      the Closing Cash Portion minus the Deposit;

(c)      the Bill of Sale and Assignment and Assumption Agreement and the IP Assignment, each duly executed by the Purchaser;

(d)      the certificates required to be delivered pursuant to Section 7.2(a) and Section 7.2(b);

(e)      if requested by the Purchaser, the Transition Services Agreement, duly executed by the Purchaser; and

(f)      a counterpart of each of the other Purchaser Ancillary Agreements required by this Agreement to be executed and delivered by the Purchaser at or prior to the Closing, duly executed by the Purchaser.

Section 3.4      Private Sale. The Seller shall use its reasonable best efforts to cause the Bankruptcy Court to approve a private sale of the Purchased Assets, and the assignment and assumption of the Assigned Contracts, to the Purchaser on the terms and subject to the conditions set forth in this Agreement.

Section 3.5      Termination of Agreement.

7

This Agreement may be terminated at any time prior to the Closing as follows:

(a)        by the mutual written consent of the Seller and the Purchaser at any time prior to the Closing;

(b)        by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if the Closing shall not have been consummated on or prior to December 31, 2022 (the "Outside Date"); provided, that the right to terminate this Agreement under this Section 3.5(b) shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of any of its representations, warranties, covenants or agreements set forth this Agreement;

(c)        by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if any Governmental Body, including the Bankruptcy Court, shall have enacted, issued, promulgated, enforced or entered any Law (including any Order) that permanently enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof (any such Law, a "Legal Restraint") and such Legal Restraint has become final and nonappealable; provided, that the right to terminate this Agreement under this Section 3.5(c) shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of this Agreement and such breach or violation is the cause of the Legal Restraint;

(d)        by the written notice of the Purchaser to the Seller, (i) if the Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) thirty (30) days after written notice of such breach, failure or occurrence is given to the Seller by the Purchaser; provided, that, at the time of such termination, the Purchaser is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement;

(e)        by the written notice of the Seller to the Purchaser, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) thirty (30) days after written notice of such breach, failure or occurrence is given to the Purchaser by the Seller; provided, that, at the time of such termination, the Seller is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement;

(f)        by written notice of the Seller to the Purchaser, if all of the conditions set forth in Section 7.1 and Section 7.3 have been satisfied (other than conditions that by their nature

are to be satisfied at the Closing) or waived and the Purchaser fails to consummate the Closing on or prior to the date on which the Closing is required to have occurred pursuant to Section 3.1; provided, that, at the time of such termination, the Seller is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement;

(g)     by written notice of the Purchaser to the Seller, if all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Seller fails to consummate the Closing on or prior to the date on which the Closing is required to have occurred pursuant to Section 3.1;

(h)     by written notice of the Purchaser to the Seller, if the Sale Order is not entered by November 24, 2022;

(i)     by written notice of the Purchaser to the Seller, in the event the Seller enters into any agreement with respect to an Alternative Transaction; and

(j)     by written notice of the Purchaser to the Seller, if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the Chapter 11 Cases.

Section 3.6     Effect of Termination.

(a)     In the event of the valid termination of this Agreement pursuant to Section 3.5, this Agreement shall terminate and become null and void and of no further force or effect, the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto and there shall be no Liability hereunder on the part of the Seller or any of the other Seller Parties, or the Purchaser or any of the other Purchaser Parties; provided, that (i) the provisions of Section 3.5, this Section 3.6 and Article IX, and any defined terms used in any such Section or Article, shall remain in full force and effect and shall survive the termination of this Agreement; and (ii) no such termination shall relieve any party hereto from Liability for any breach of this Agreement that occurred prior to such termination (including, without limitation, the Purchaser's failure to consummate the Closing upon satisfaction  (or deemed satisfaction) or waiver of the conditions to Closing set forth in Section 7.1 and Section 7.3 (other than those conditions which are to be satisfied only on the Closing Date)); provided, further that upon such termination, each of the provisions of the Confidentiality Agreement shall survive and remain in full force and effect for the longer of (A) the remainder of the term of survival applicable to such provision as set forth in the Confidentiality Agreement and (B) one (1) year following the date of such termination.  Any termination of this Agreement pursuant to Section 3.5 shall be effective on the date that written notice of such termination is given by the terminating party to the other party hereto in accordance with Section 9.9; provided, that in the case of any termination of this Agreement pursuant to Section 3.5(a), the date of termination shall be the date of termination set forth in the writing signed by the Purchaser and the Seller.

(b)     If the Seller terminates this Agreement pursuant to Section 3.5(e) or Section 3.5(f), then the Seller shall be entitled to disbursement of the Deposit from the Escrow Account as liquidated damages as its sole and exclusive remedy.  Nothing in this Section 3.6(b) or elsewhere in this Agreement shall be deemed to impair the right of any party hereto to bring any action or

actions for specific performance, injunctive and/or other equitable relief (including the right of any party hereto to compel specific performance by another party hereto of its obligations under this Agreement) pursuant to Section 9.12 prior to the valid termination of this Agreement.

(c)     In the event of a termination of this Agreement, other than a termination by the Seller pursuant to Section 3.5(e) or Section 3.5(f), the Purchaser shall be entitled to disbursement of the Deposit from the Escrow Account.

(d)     In the event that this Agreement is terminated pursuant to Section 3.5 and the Seller or the Purchaser are entitled to receive the Deposit, then the Seller or the Purchaser may deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay to the Seller or the Purchaser, as applicable, the Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

Section 3.7     Minden Closing.

(a)     Notwithstanding anything in this Agreement to the contrary, the Purchaser, by written notice to the Seller, may defer the purchase of the Minden Purchased Assets, and the assumption of the Minden Assumed Liabilities ("Minden Closing") until March 31, 2023 or, if later, the effective date of the Debtors' plan of liquidation or reorganization in the Chapter 11 Cases (the "Minden Outside Date"). The Minden Closing, if any, shall take place in the manner set forth in Section 3.1 on such date determined by the Purchaser in its sole discretion. At the Minden Closing, if any, the Purchaser shall pay to the Seller the Minden Cash Portion and the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances (other than the Minden Assumed Liabilities and Permitted Encumbrances related to the Minden Purchased Assets), all of the Seller's right, title and interest in, to and under all of the assets, properties, rights and interests constituting the Minden Purchased Assets. At any time on or prior to the Minden Outside Date, the Purchaser, by written notice to the Seller, may elect to not acquire the Minden Purchased Assets, in which event, the Minden Purchased Assets shall not constitute Purchased Assets, the Minden Assumed Liabilities shall not constitute Assumed Liabilities, the Minden Assumed Liabilities shall constitute Excluded Liabilities, and the Purchaser shall have no obligation to pay the Minden Cash Portion.

(b)     At the Minden Closing, if any, the Seller shall deliver all agreements, documents, certificates, instruments of conveyance and assignments related to the Minden Purchased Assets, as the Purchaser may reasonably request in order to effectuate the transfer of the Minden Purchased Assets pursuant to this Section 3.7, including, without limitation the Memorandum of Understanding, the EDR Agreement, and the Transmission Agreement, duly executed by each applicable counterparty thereto, each in form and substance satisfactory to the Purchaser. All references in this Agreement to the Closing and the Closing Date shall apply *mutatis mutandis* to the Minden Closing to the extent applicable or as the context may require, and all rights of Purchaser hereunder with respect to the Minden Purchased Assets shall be enforceable by the Purchaser through the Minden Closing to the same extent such rights would have been enforceable through the Closing, without giving effect to the deferral contemplated by this Section 3.7.

10

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Each Seller hereby jointly and severally makes the representations and warranties in this Article IV to the Purchaser as of the Execution Date, the Closing Date and, as applicable, the Minden Closing Date (with respect to the representations and warranties relating to CN Minden LLC, the Minden Purchased Assets, the Minden Assumed Liabilities, the Minden Project and the Minden Closing) (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 4.1    Organization and Qualification.  Each Seller (i) is an entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, (ii) has all requisite organizational power and authority to own, operate and lease its assets and conduct its business, in each case, as currently conducted and (iii) is duly qualified to do business in, and is in good standing in, each jurisdiction in which such qualification is required by applicable Laws.

Section 4.2    Authority Relative to This Agreement.  Subject to entry of the Sale Order by the Bankruptcy Court, each Seller has all requisite organizational power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements, (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Seller Ancillary Agreements.  Subject to entry of the Sale Order by the Bankruptcy Court, the execution and delivery by the Seller of this Agreement and each of the Seller Ancillary Agreements, the performance by the Seller of its obligations hereunder and thereunder, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of the Seller.  Subject to entry of the Sale Order by the Bankruptcy Court, (i) this Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by the Seller and (ii) assuming the due authorization, execution and delivery by the other parties hereto and to the Seller Ancillary Agreements, this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered by the Seller will constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms. The Seller represents and warrants that the Purchase Price paid by the Purchaser to the Seller constitutes value that is substantially comparable to the value of the Purchased Assets.

Section 4.3    Conflicts; Consents and Approvals.

(a)    Subject to the entry of the Sale Order by the Bankruptcy Court, none of the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation by the Seller of the transactions contemplated hereby or thereby, or the performance by the Seller of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Seller, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any of the Assigned Contracts, (iii) violate any Law applicable to the Seller or by

11

which any Purchased Asset is bound or affected, or (iv) result in the imposition or creation of any Encumbrance on any of the Purchased Assets.

(b)     Assuming the accuracy of the representations and warranties of the Purchaser in Section 5.3(b), no approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Seller in connection with the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements, the performance by the Seller of any of its obligations hereunder or thereunder, or the consummation by the Seller of the transactions contemplated hereby or thereby, except for the entry of the Sale Order by the Bankruptcy Court.

Section 4.4     Financial Statements.  Section 4.4 of the Seller Disclosure Schedules sets forth the unaudited consolidated balance sheet for the Company and its subsidiaries as of August 31, 2022 (the "Balance Sheet Date"), and the related statements of operations, for the 8-month period then-ended (collectively, the "Financial Statements").  The Financial Statements have been prepared from the applicable books and records of the applicable Acquired Companies in accordance with GAAP (except for the absence of footnotes and normal recurring year-end adjustments) and fairly present, in all material respects, the consolidated financial position and results of operations of the Company and its subsidiaries as of the Balance Sheet Date and for the period covered thereby.

Section 4.5     Title and Condition of Purchased Assets; Sufficiency.  The Seller has good and valid title to (or, in the case of leased tangible Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), all of the Purchased Assets.  Upon the entry of the Sale Order by the Bankruptcy Court, the Seller will have the power and right to sell, assign, transfer, convey and deliver to the Purchaser good and valid title to (or, in the case of leased tangible Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the Purchased Assets, and at the Closing, the Seller will assign, transfer, convey, and deliver to the Purchaser good and marketable title, to, or in the case of personal property leased by the Seller, a valid leasehold interest in, and/or all rights to use, the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).  The tangible Purchased Assets are in reasonably good operating condition and repair for the purposes for which such Purchased Assets are used in the business of the Seller (normal wear and tear excepted).  The Purchased Assets constitute all of the assets owned by the Seller and/or its Affiliates necessary and sufficient to operate the Seller's business related to the Purchased Assets in the ordinary course of business in the manner in which the Purchased Assets were operated prior to the commencement of the Chapter 11 Cases, as of the Execution Date, and as of the Closing.

Section 4.6     Absence of Certain Changes.  Since the Balance Sheet Date, (i) except for the commencement of the Chapter 11 Cases, the Seller and the other Debtors have operated their businesses relating to the Purchased Assets in the ordinary course of business, (ii) except for executory contracts and unexpired leases rejected by the Debtors in the Chapter 11 Cases with the consent of the Purchaser, the Seller and other Debtors have not (1) terminated, modified, or amended any contract, lease or agreement or (2) disposed of any asset, in each case, related to the ordinary course operation of the Purchased Assets, and (iii) no event, or series of events taken in

the aggregate, have occurred that do, or would reasonably be expected to, materially and adversely affect the Seller or the Purchased Assets.

Section 4.7    Litigation.  Except for the Chapter 11 Cases and any Order entered in the Chapter 11 Cases or as set forth on Section 4.7 of the Seller Disclosure Schedules, there is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "Actions"), pending or, to the Knowledge of the Seller, threatened against the Seller which would, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets.  Except with respect to Orders issued in the Chapter 11 Cases, the Seller is not subject to any Order that relates to the Purchased Assets.

Section 4.8    Intellectual Property; IT Assets and Privacy.

(a)    (i) The Seller or its Affiliates exclusively own all right, title and interest in and to the Owned Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances), (ii) no Action is pending or, to the Knowledge of the Seller, threatened challenging the Seller's or any of its Affiliates' ownership, or the validity or enforceability of any Owned Intellectual Property or the Seller's or any of its Affiliates' right to use any Licensed Intellectual Property, and (iii) the Owned Intellectual Property is not subject to any outstanding Order restricting the use thereof and the Licensed Intellectual Property is not subject to any outstanding Order restricting the Seller's or any of its Affiliates' use thereof.  The consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent or approval of any other Person in respect of, the Purchaser's right to own or use any of the Purchased Intellectual Property, other than commercially available off-the-shelf software.

(b)    (i) All Seller Registered IP that is registered or issued has not been adjudged invalid or unenforceable, in whole or in part, and to the Knowledge of the Seller, is valid and enforceable, and (ii) the Seller has paid all renewal, maintenance, and other fees when due as required to maintain each and every Seller Registered IP in full force and effect.  The Seller and its Affiliates have valid and enforceable rights to use the Licensed Intellectual Property as used in the conduct of the Seller's business, free and clear of any Encumbrances (other than Permitted Encumbrances), pursuant to a valid written license, sublicense or other written Contract between the Seller and the owner or licensor of such Licensed Intellectual Property.

(c)    To the Knowledge of the Seller (i) the operation of the business of the Seller relating to the Purchased Assets, including the use of the Purchased Assets, as currently used by the Seller does not infringe upon, misappropriate or otherwise violate the Intellectual Property rights of any other Person, and (ii) no Person has initiated or threatened any claim against the Seller alleging any of the foregoing.  To the Knowledge of the Seller, no other Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property.

(d)    All Owned Intellectual Property were created, developed or reduced to practice solely or jointly with others by either (i) all former or present employees of the Seller or its Affiliates acting within the scope of their employment who have assigned all of their rights, including Intellectual Property therein, to the Seller or one of its Affiliates, or (ii) other Persons

13

who have assigned (including, under the "work-for-hire" doctrine) all of their rights therein, including Intellectual Property, to the Seller or one of its Affiliates, in each case with respect to clauses (i) and (ii) pursuant to legally enforceable agreements in writing or by operation of Law.

(e)     The incorporation, linking, calling, distribution or other use in, by or with any of its Computer Software of any Open Source Materials, does not obligate the Seller to disclose, distribute, make available, offer or deliver to any third party any portion of its Computer Software other than the applicable Open Source Materials or have imposed or purports to impose any other obligations or immunities regarding the Intellectual Property rights in such Computer Software other than the applicable Open Source Materials.  To the Knowledge of Seller, the Seller has not breached or is in violation of any licenses of such Open Source Materials or has obligated the Seller to disclose, distribute, make available, offer or deliver any source code of its Computer Software arising from the incorporation, lining, calling distribution or use of such Open Source Materials. To the Knowledge of Seller, there has been no unauthorized access, use or disclosure of any source code of its Computer Software by or to any Person.

(f)     The Purchased IT Assets are adequate for their intended use and are in good working condition (normal wear and tear excepted).  There has not been any material malfunction with respect to any of the Purchased IT Assets that has not been remedied or replaced in all material respects.  The consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent of any other Person in respect of, the Purchaser's right to own or use any of the Purchased IT Assets as owned or used by the Seller in the conduct of its business prior to the Closing.

(g)     The Seller and its Affiliates have taken reasonable measures to protect the trade secrets and other Confidential Information that are material to the operation of the Seller's business.

(h)     The Purchased Assets and the Seller's operation of its business are in compliance in all material respects with (i) all applicable Privacy Laws, (ii) the Seller's Privacy Policy and (iii) contractual requirements with respect to the Processing of Personal Information in connection with the Seller's business, including the acquisition of consents and providing notice to individual and data subjects, as applicable.

(i)     To the Knowledge of the Seller, no Person has gained unauthorized access to, used or engaged in unauthorized Processing of any Personal Information and Seller Data related to the Seller's business and held by or on behalf of the Seller where such unauthorized access and/or processing has given rise to a duty of the Seller to notify any individual, data subject or Governmental Body regarding any incident, breach or suspected incident or breach regarding such unauthorized access, use or Processing (each such incident, a Security Breach).

(j)     The Seller and its Affiliates have not received written notice of any claim of any alleged violation of any Privacy Law, Privacy Policies or contractual requirements or obligations regarding the Processing of Personal Information or Seller Data in connection with the Seller's business.

(k)     The Seller and its Affiliates have maintained in place in connection with their respective businesses reasonable security measures, controls, technologies, polices and safeguards and certifications sufficient to adequately protect Personal Information and Seller Data from a Security Breach and to comply with Privacy Laws.  No un-remediated material weakness, deficiencies or loss of certifications have been found under such tests, audits or assessments.

Section 4.9     Contracts.

(a)     Section 4.9(a) of the Seller Disclosure Schedule sets forth (x) a true, correct and complete list of each Contract (i) relating to the Purchased Assets, and (ii) to which the Seller is a party which is necessary to use, develop and/or operate the Purchased Assets in the ordinary course of business in the manner in which the business related to the Purchased Assets were operated prior to the commencement of the Chapter 11 Cases, in each case including, without limitation, any Contract with any customer of the Seller and any Contract related to the Seller's and/or its Affiliates' Purchased Intellectual Property, and (y) the Seller's good faith estimate of any cure amounts ("Cure Estimate") that must be paid pursuant to Section 365(b)(2)(A) and Section 365(b)(1)(B) of the Bankruptcy Code in connection with the assumption and/or assignment of each Contract set forth on Section 4.9(a) of the Seller Disclosure Schedule.  Prior to the Execution Date, true, correct and complete copies of each Contract set forth on Section 4.9(a) of the Seller Disclosure Schedules have been provided to the Purchaser.

(b)     Subject to the entry of the Sale Order, (i) each Assigned Contract (A) constitutes a valid and binding obligation of the Seller and, to the Knowledge of the Seller, each other party thereto and (B) assuming such Assigned Contract is binding and enforceable against such other parties thereto, is in full force and effect, except in the preceding clause (B) as limited by the Bankruptcy Exceptions with respect to the obligation of the counterparty to perform thereunder, (ii) the Seller is not in breach or default under any Assigned Contract, except for breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases and those breaches or defaults that will be cured as a result of the payment of the applicable Cure Costs, (iii) to the Knowledge of the Seller, no counterparty to any Assigned Contract, is in breach or default under such Assigned Contract, and (iv) assuming the entry of the Sale Order by the Bankruptcy Court, upon the Closing, each Assigned Contract shall continue in full force and effect without amendment or modification.

(c)     Section 4.9(c) of the Seller Disclosure Schedule sets forth each Contract which has been partially assigned by the Seller or its Affiliates (a "Master Contract") to another purchaser or party with respect to the Purchased Assets.  Upon the Closing, the Purchaser shall be deemed a party to an assignment with respect to, and entitled to enforce each and every provision of, a Master Contract related to the Purchased Assets, in each case, to the extent set forth on Section 4.9(c) of the disclosure schedule to be delivered by the Purchaser to the Seller not later than one (1) Business Day prior to the Closing, to the same extent as if the Purchaser was a direct assignee of the Master Contract with respect to the Purchased Assets.

Section 4.10    Compliance with Law.  The Seller is, and has been at all times, in compliance with all applicable Laws, including Anti-Money Laundering Laws and Sanctions Laws, including with respect to its ownership or use of the Purchased Assets.  No investigations, inquiries or reviews by any Governmental Body have been commenced nor, to the Knowledge of

15

the Seller, threatened that would impose any Liability on the Seller with respect to its ownership or use of the Purchased Assets. To the Knowledge of the Seller, none of the Purchased Assets have been used directly or indirectly to violate Anti-Money Laundering Laws or Sanctions Laws. The Seller has not had any transactions or dealings with, or for the benefit of, any Restricted Person, and, to the Knowledge of the Seller, none of the Seller's customers or users of the Purchased Assets are Restricted Persons. The Seller has owned and used the Purchased Assets in compliance with Anti-Money Laundering Laws and Sanctions Laws.

Section 4.11   Permits. Section 4.11 of the Seller Disclosure Schedules sets forth a true, correct and complete list of all Permits that are necessary for the ownership, use and/or operation of the Purchased Assets.  Each Assigned Permit is in full force and effect, and the Seller is in compliance with its obligations under each of the Assigned Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Assigned Permit.  There is no Action against the Seller relating to any of the Assigned Permits pending or, to the Knowledge of the Seller, threatened in writing.  Assuming the entry of the Sale Order by the Bankruptcy Court, upon the Closing, each Assigned Permit shall continue in full force and effect, without amendment or modification, in the name and for the benefit of the Purchaser.

Section 4.12   Assets Schedule.

(a)   Section 4.12(a) of the Seller Disclosure Schedules sets forth a true, correct, and complete list for each of the Big Spring Project, North Sioux City Project, and Minden Project (listed by Acquired Project) of (i) all DealID numbers, customers, and the number and model numbers of customer equipment located at such Acquired Project, and (ii) all assets (both tangible and intangible), including, but not limited to, containers, electrical infrastructure equipment, transformers, computer equipment, miners, vehicles, and tools, located at, owned by or relating to such Acquired Project and/or the Seller, in each case, listed by Acquired Project and Seller; *provided* that as it relates to Compute North LLC, all Purchased Assets thereof.

(b)   Section 4.12(b) of the Seller Disclosure Schedules sets forth a true, correct and complete list of all assets included within the Purchased Assets that are not set forth on Section 4.12(a) of the Seller Disclosure Schedules, including, without limitation, all properties and assets of CN Mining LLC or any other Affiliate of the Seller.

(c)   Section 4.12(c) of the Seller Disclosure Schedules sets forth a detailed construction budget and schedule for the Minden Project (the "Construction Budget and Schedule"). The Construction Budget and Schedule was prepared in good faith and represents a reasonable estimate of the construction budget and schedule for constructing and completing the Minden Project.

Section 4.13   Real Property.

(a)   The Seller does not own any Real Property in connection with any of the Purchased Assets. Each lease, sublease, license or other occupancy agreement to which the Seller is a party and leases or otherwise occupies any Purchased Leased Real Property (collectively, together with all amendments, supplements and modifications thereto, the "Real Property Leases") is in full force and effect and constitutes a valid, binding and enforceable obligation of the Seller

and, to the Knowledge of the Seller, each other party thereto, except as limited by the Bankruptcy Exceptions. The Seller has valid leasehold title to the Purchased Leased Real Property subject to a Real Property Lease, free and clear of any Encumbrances (other than Permitted Encumbrances). To the Knowledge of the Seller, there are no matters or restrictions affecting the Real Property Leases that would reasonably be expected to interfere with or adversely affect in any material respect the continued use and occupancy by the Seller or the Purchaser of the applicable Purchased Leased Real Property. The Seller has made available to the Purchaser true, correct and complete copies of all Real Property Leases.

(b)     Except solely as a result of the filing of the Chapter 11 Cases, the Seller and, to the Knowledge of the Seller, each of the other parties to a Real Property Lease have performed in all material respects all obligations required to be performed by such Person under such Real Property Lease, and, to the Knowledge of the Seller, there does not exist any event, condition or omission that would constitute a default or breach (whether by lapse of time or notice or both) by the Seller under any Real Property Lease, and the Seller has not received any written notices of default under any Real Property Lease. The Seller has not received any written notice of any condemnation or eminent domain proceedings pending or threatened that affect any Purchased Leased Real Property. The Seller has not received any written notice of any zoning, ordinance, building, fire or health code or other legal violation affecting any Purchased Leased Real Property.

(c)     Each Purchased Leased Real Property has been maintained in all material respects by the Seller in accordance with the applicable Real Property Lease. To the Knowledge of the Seller, there are no material defects in, material mechanical failure of or material damage to any Purchased Leased Real Property, and the Purchased Leased Real Property are in good operating condition and repair, subject to ordinary wear and tear and not in need of material maintenance except for ordinary routine maintenance and repair.

Section 4.14   <u>Tax Returns; Taxes</u>.

(a)     All Tax Returns required to have been filed by the Seller with respect to the Purchased Assets and the business have been duly filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns are true, correct and complete.

(b)     All Taxes of the Seller that have become due and payable, whether or not shown to be payable on any Tax Return prior to the Closing Date have been duly and timely paid.

(c)     As of the Execution Date, there are no pending or, to the Knowledge of the Seller, threatened Actions for the assessment or collection of Taxes owed or owing by the Seller in respect of any of the Purchased Assets or the business.

(d)     The Seller has not executed or filed with any Governmental Body any agreement extending the period for assessment or collection of any Taxes in respect of any of the Purchased Assets.

(e)     The Seller is not subject to any Tax ruling, allocation, sharing, indemnification, power of attorney, closing or similar agreement with respect to any of the Purchased Assets.

17

(f)      The Seller is not a party to any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) or any other agreement with any Governmental Body with respect to Taxes relating to the business or the Purchased Assets. The Seller does not have any outstanding requests for a private letter ruling, technical advice memoranda or similar rulings with any Governmental Body, and no such rulings are in effect, with respect to Taxes relating to the business or the Purchased Assets.

(g)      As of the date hereof, the Seller is not in default under, nor does there exist any condition which, with the giving of notice or passage of time, would constitute a default by the Seller under any agreement with any Governmental Body that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the business or the Purchased Assets.

(h)      The Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party (in each case, to the extent related to the business or the Purchased Assets) and all IRS Forms W-2 and Forms 1099 (or any other applicable Tax forms) required with respect thereto have been properly and timely distributed.

(i)      No claim has been made in writing by any Governmental Body in a jurisdiction where the Seller does not file Tax Returns that the Seller is or may be subject to taxation by that jurisdiction with respect to the business or Purchased Assets.

(j)      No power of attorney with respect to Taxes relating to the business or the Purchased Assets has been executed or filed with any Governmental Body by or on behalf of the Seller will remain in effect after the Closing Date.

(k)      The Seller has, with respect to the business and the Purchased Assets, properly (i) collected and remitted sales and similar Taxes with respect to sales made to its customers, and (ii) for all sales that are exempt from sales and similar Taxes that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

(l)      There are no Encumbrances on any of the Purchased Assets that secure the payment of Taxes (other than Permitted Encumbrances).

Section 4.15   <u>Affiliate Transactions</u>.  No Affiliate of the Seller, or any officer or director of the Seller, (a) is a party to any agreement that constitutes a Purchased Asset or (b) has any interest in any Purchased Asset. Except as set forth on <u>Section 4.15</u> of the Seller Disclosure Schedules, there are no letters of credit, guarantees, bonds, or other credit agreements made or issued by or on behalf of the Seller or any of its Affiliates made for the benefit of the Seller or any of its Affiliates related to the Purchased Assets.

Section 4.16   <u>Insurance Policies</u>.  <u>Section 4.16</u> of the Seller Disclosure Schedules sets forth a true, correct and complete list of the insurance policies owned or held by the Seller or otherwise applicable to the Purchased Assets or the Assumed Liabilities (the "<u>Insurance Policies</u>"), including the name of the insurer, named insured, policy number, policy period, deductible and limit of liability.  All of the Insurance Policies are in full force and effect, all premiums with respect

18

thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and no written notice of cancellation or termination (or any other threatened termination) has been received by the Seller with respect to any such Insurance Policy.  There are no claims pending under any of the Insurance Policies related to the Purchased Assets or any owners of the Purchased Assets related to the Purchased Assets and no disputes with insurers with respect thereto.  The Seller has made available to the Purchaser true, correct and complete copies of all Insurance Policies.

Section 4.17    Environmental Matters.

(a)    The Seller is in compliance with all Environmental Laws as such Environmental Laws relate to the Purchased Assets.

(b)    The Seller has obtained and is in material compliance with all Permits required under Environmental Laws with respect to the Purchased Assets.

(c)    The Seller has not received written notice of any Action pending against the Seller with respect to any of the Purchased Assets arising under or relating to any Environmental Laws and, to the Knowledge of the Seller, no such Action is threatened.

(d)    No Hazardous Materials have been treated, stored, disposed of or Released in violation of, or so as to create a Liability under, Environmental Law by the Seller at any of the Purchased Leased Real Property.

(e)    The Seller has not received any written notice from any Governmental Body regarding, or entered into any settlement agreement or consent decree involving, the Seller's responsibilities for uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws with respect to the Purchased Assets.

(f)    The Seller has made available to the Purchaser true, correct and complete copies of all written studies, reports, data and assessments or investigations, including Phase I Environmental Site Assessment and Phase II Environmental Site Assessment reports, which have been performed by or on behalf of the Seller or are in the Seller's possession and relate to the environmental condition or compliance status of any Purchased Leased Real Property.

Section 4.18    Brokers and Finders.  The Seller has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or any of the transactions contemplated hereby for which the Purchaser or its Affiliates is or will become liable.

Section 4.19    Books and Records.  The Seller has made available to the Purchaser true, correct and complete copies of all books and records of the Seller relating to the Purchased Assets. Such books and records are materially complete and reflect the business and operations of the Seller with respect to the Purchased Assets in all material respects. Such books and records accurately, fairly and in reasonable detail reflect the business and operations of the Seller with respect to the Purchased Assets and have been maintained in accordance with document

management practices as would reasonably be expected to be utilized by a reasonable and prudent manager of a business comparable to the business of the Seller.

Section 4.20  <u>NO OTHER REPRESENTATIONS</u>.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS <u>ARTICLE IV</u>, NEITHER THE SELLER, ANY AFFILIATES OF THE SELLER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE SELLER, ANY AFFILIATE OF THE SELLER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS <u>ARTICLE IV</u>, THE SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES BY ANY MANAGER, OFFICER, DIRECTOR, STOCKHOLDER, MEMBER, PARTNER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF THE SELLER OR ANY OF ITS AFFILIATES).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this <u>Article V</u> to the Seller as of the Execution Date, the Closing Date and, as applicable, the Minden Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 5.1  <u>Organization and Qualification</u>.  The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

Section 5.2  <u>Authority Relative to This Agreement</u>.  The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Purchaser Ancillary Agreements.  The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, the performance by the Purchaser of its obligations hereunder and thereunder, and the consummation by the Purchaser of the transactions contemplated hereby and thereby, have

20

been duly authorized by all requisite action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

Section 5.3    Conflicts; Consents and Approvals.

(a)    None of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation by the Purchaser of the transactions contemplated hereby or thereby, or the performance by the Purchaser of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Purchaser, (ii) result in a material violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound, (iii) assuming that all approvals, orders, Permits, consents, registrations, declarations, notifications and filings described in Section 5.3(b) have been made, given or obtained, as applicable, violate any Law applicable to the Purchaser or by which any of its properties or assets are bound or (iv) result in the imposition or creation of any Encumbrance on any property or asset of the Purchaser, other than, in the case of clauses (ii), (iii) and (iv), such violations, defaults, unobtained consents, terminations, cancellations, accelerations, losses or Encumbrances that would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    No approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, the performance by the Purchaser of any of its obligations hereunder or thereunder, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court, and (ii) such approvals, Orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain, give or make would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 5.4    Financial Capacity. The Purchaser (a) has, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the Ancillary Agreements, (b) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Purchaser Ancillary Agreements, and (c) has not incurred any obligation, commitment, restriction or Liability of any kind that would impair or adversely affect such funds, resources and capabilities.

21

Section 5.5    Brokers and Finders.   The Purchaser has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby for which the Seller or any of its Affiliates or Representatives will become liable.

Section 5.6    Qualification.

(a)    As of the Closing, the Purchaser will be capable of satisfying the conditions contained in sections 365(b)(l)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

(b)    To the knowledge of the Purchaser, there exist no facts or circumstances that would cause, or be reasonably expected to cause, the Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

Section 5.7    Independent Investigation; Reliance By the Purchaser.   The Purchaser (directly or through its Affiliates or Representatives) is an informed and sophisticated purchaser, and has engaged expert advisors that are experienced in the evaluation and acquisition of assets and liabilities such as the Purchased Assets and the Assumed Liabilities, as contemplated hereunder.  The Purchaser (directly or through its Affiliates or Representatives) has undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby or thereby.  The Purchaser confirms that the Seller has provided the Purchaser with the opportunity to ask questions of the officers and employees of the Seller and its Affiliates and to acquire additional information about the Purchased Assets and the Assumed Liabilities.

Section 5.8    RELIANCE/ACKNOWLEDGMENT.          NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS TO THE CONTRARY, THE PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN ARTICLE IV OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES): (I) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON IS MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE SELLER, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR ANY PART THEREOF; (II) THE PURCHASER HAS NOT EXECUTED OR AUTHORIZED THE EXECUTION OF THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR ENTERED INTO THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN RELIANCE UPON, AND HEREBY SPECIFICALLY DISCLAIMS RELIANCE UPON, ANY PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY WHATSOEVER MADE

OR OMITTED TO BE MADE TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES, INCLUDING ANY SUCH PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY AS TO THE CONDITION, VALUE, QUALITY OR PROSPECTS OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR ANY PART THEREOF; (III) SUBJECT TO THE ACCURACY OF THE REPRESENTATIONS CONTAINED IN <u>ARTICLE IV</u> OF THIS AGREEMENT, THE PURCHASED ASSETS ARE BEING TRANSFERRED "AS IS", "WHERE IS" AND "WITH ALL FAULTS"; AND (IV) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, AS TO THE ACCURACY OR COMPLETENESS OF ANY PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY OF THE FOREGOING MADE IN RESPONSE TO ANY DUE DILIGENCE REQUEST LIST OR MADE DURING ANY DUE DILIGENCE TELEPHONIC OR IN-PERSON MEETINGS), AND NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY TO THE PURCHASER OR ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF, OR ANY SUCH PERSON'S USE OF OR RELIANCE ON, ANY SUCH PROJECTION, FORECAST, STATEMENT OR INFORMATION OR ANY ERRORS THEREIN OR OMISSIONS THEREFROM.

Section 5.9    <u>NO OTHER REPRESENTATIONS</u>.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE PURCHASER IN THIS ARTICLE V, NEITHER THE PURCHASER, ANY AFFILIATES OF THE PURCHASER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASER OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS AND THE PURCHASER HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE PURCHASER, ANY AFFILIATE OF THE PURCHASER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES.

**ARTICLE VI**

**COVENANTS AND AGREEMENTS**

Section 6.1    <u>Conduct of Seller</u>.    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with <u>Section 3.5</u> and the Closing Date, except (a) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, or (b) with the prior written consent of the Purchaser, the Seller shall:  (i) use commercially reasonable efforts to (A) operate and/or maintain the Purchased Assets in the

23

ordinary course of business and in compliance with applicable Laws in all material respects, and (B) maintain and keep the tangible Purchased Assets in reasonably good operating condition and repair for the purposes for which such Purchased Assets are used in the business of the Seller (subject to normal wear and tear), (ii) use commercially reasonable efforts to preserve and maintain all of the Assigned Permits, (iii) not terminate, cancel or amend in any material respect any of the Assigned Contracts or Assigned Permits, or release, assign or waive any material rights thereunder, (iv) not cancel, forgive or compromise any material debt or claim that would have constituted a Purchased Asset if not so cancelled, forgiven or compromised, (v) not transfer or convey, offer to transfer or convey, abandon or allow to lapse or dedicate to the public any rights in any Purchased Intellectual Property, or terminate or allow to expire any Contract governing any Licensed Intellectual Property, or disclose or allow to be disclosed any Confidential Information to any third party without appropriate confidentiality or non-disclosure requirements on such third party, (vi) not cancel or terminate any material Insurance Policy without obtaining comparable substitute insurance coverage or fail to report known claims to any insurance carrier in a timely manner in accordance with the terms of the Insurance Policies, (vii) not voluntarily permit any of the Purchased Assets to become subject to any Encumbrance, except for Permitted Encumbrances which do not involve monetary liability, and (viii) not sell, assign, license, transfer, convey, lease, surrender, relinquish, terminate or otherwise dispose of the Purchased Assets. During the period from the Execution Date and continuing through and including the date of the termination of the Transition Services Agreement, the Seller shall not, and shall cause its Affiliates not to, destroy, delete, modify or transfer any Seller Data. From and after the Execution Date, the Seller shall not, and shall cause its Affiliates not to, publicly disclose any portion of the Seller Data.

Section 6.2   <u>Taxes</u>.

(a)     Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, recording or other similar Taxes that arise from the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "<u>Transfer Taxes</u>"), as well as any related Tax Return preparation and filing costs, shall be borne and timely paid by the Purchaser. Each Tax Return with respect to such Transfer Taxes will be prepared and timely filed by the Purchaser. In the event that any such Tax Return requires execution by the Seller, the Seller shall promptly execute such Tax Return after receipt thereof from the Purchaser and deliver it to the Purchaser so long as such Tax Return was prepared in compliance with applicable Law.

(b)     The Seller shall be allocated and bear all property Taxes and similar ad valorem obligations levied based upon or measured by the ownership or operation of the Purchased Assets (collectively, the "<u>Asset Taxes</u>") for (i) any period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date; <u>provided</u>, <u>however</u>, that the Seller shall not be liable for or be required to pay any Taxes resulting from any act taken by the Purchaser or any of its Affiliates after the Closing, or any Tax election made by the Purchaser or any of its Affiliates that would be effective on or before the Closing Date to the extent that any such act or election is inconsistent with prior practice of the Seller with respect to the business of the Seller or Purchased Assets. The Purchaser shall be allocated and bear all Asset Taxes (A) that are described in the proviso of the immediately preceding sentence, (B) for any period that begins on or after the Closing Date, and (C) the portion of any Straddle Period beginning after the Closing Date, including any such Asset Taxes that were paid or prepaid by the Seller at or prior to the

24

Closing.  For purposes of this <u>Section 6.2(b)</u>, Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period ending on and including the Closing Date, on the one hand, and the number of days in such Straddle Period that occur after the Closing Date, on the other hand, and all other Asset Taxes (if any) based upon sales, purchases or receipts shall be allocated upon a hypothetical closing of the taxable year on the Closing Date.  The party hereto responsible under applicable Law for paying an Asset Tax shall be responsible for preparing and filing the Tax Return for such Asset Tax and for paying such Asset Tax shown to be due on such Tax Return.  The Seller, on the one hand, or the Purchaser, on the other hand, as the case may be, shall promptly (but in no event later than twenty (20) days after receipt of notice from the party hereto making such payment) provide reimbursement for any Asset Tax paid by the other party, all or a portion of which is the responsibility of such party in accordance with the terms of this <u>Section 6.2(b)</u>.  For the avoidance of doubt, the Seller shall be solely liable for any income Taxes relating to the Purchased Assets or the business as it relates to any period prior to the Closing Date.

Section 6.3   <u>Insurance</u>.  The Purchaser hereby acknowledges and agrees that, effective upon the Closing, all policies of, and binders evidencing, any form or type of insurance that are owned or maintained by the Seller or any of its Affiliates that cover or relate to the Seller or any of its assets, liabilities, employees, businesses or operations (such policies and binders, the "<u>Seller Insurance Coverage</u>") shall cease to provide coverage for losses related to Purchased Assets and the Assumed Liabilities with respect to events and occurrences that take place after the Closing Date, and neither the Seller nor any of its Affiliates will be purchasing or otherwise acquiring any "tail" policy or other additional or substitute coverage for the foregoing.  Any refund, rebate, credit or other amount paid, distributed or returned by any insurance provider or other Person in respect of, or relating to, the Seller's or any of its Affiliates' termination or modification of any Seller Insurance Coverage with respect to events and occurrences that take place after the Closing Date shall be the property of the Seller or such Affiliate. Notwithstanding the foregoing, from and after the Closing Date, the Purchaser shall be entitled to the benefits of the Insurance Policies with respect to claims for loss arising out of events or occurrences that take place prior to the Closing Date, without regard to retentions or deductibles but subject to the terms and conditions of the Insurance Policies, with respect to the Purchased Assets.  For so long as the Seller shall exist following the Closing, the Seller shall cooperate and provide access to the Insurance Policies to the Purchaser with respect to such claims, including in connection with the filing of insurance claims and the collection of insurance proceeds.  The Seller shall assign to the Purchaser, to the extent assignable, the right, power and authority to submit claims directly to the applicable insurers pursuant to the terms of the Insurance Policies and to pursue and recover proceeds under the Insurance Policies.  Any party receiving notice with respect to any such claim shall promptly notify the other Parties hereto.

Section 6.4   <u>Access</u>.  Prior to the Closing, the Seller shall use commercially reasonable efforts to provide the Purchaser, its Affiliates, and its and their respective Representatives with reasonable access during normal business hours and upon reasonable advance written notice to the facilities, employees, Seller Data (including the Seller Data archived and/or in the cloud), and books and records of the Seller relating to the Purchased Assets and related properties, operations and business, as may be reasonably requested by the Purchaser from time to time; <u>provided</u> that

such access does not unreasonably disrupt the personnel, or unreasonably interfere with the operations, of the Seller or any of its Affiliates, and the Purchaser, its Affiliates and its and their respective Representatives shall use commercially reasonable efforts to conduct all communications with personnel and all on-site investigations in a commercially reasonable manner. Notwithstanding anything to the contrary in this Agreement, the Seller shall not be required to provide such access to the extent that it (i) would reasonably be expected to jeopardize any attorney-client privilege, attorney work-product protection or other legal privilege or (ii) would reasonably be expected to contravene any applicable Law or contract. Any Confidential Information provided pursuant to this Section 6.4 shall be subject to the applicable terms and conditions of the Confidentiality Agreement.  From and after the Closing, the Seller shall reasonably cooperate with the Purchaser, and shall provide assistance to the Purchaser, to enable the Purchaser to use the Purchased Intellectual Property, including the ability to access and use all Seller Data (including Seller Data archived and/or in the cloud).

Section 6.5    Confidentiality.

(a)    Following the Closing, the Seller shall not and shall cause its Affiliates not to divulge or disclose to any third party (other than to (x) the Seller's Representatives, and (y) the Purchaser or any Representatives of the Purchaser) or use any Confidential Information, unless (i) such information was or becomes generally available to the public or the participants in the industries to which the Purchased Assets are related other than as a result of a disclosure by the Seller in breach of this Section 6.5(a) or (ii) such information was or becomes available to the Seller on a non-confidential basis from a source other than the Purchaser or any of its Affiliates and such source is not known to the Seller to be bound by a confidentiality obligation to the Purchaser or any of its Affiliates; provided, however, that the provisions of this Section 6.5(a) will not prohibit any disclosure of any Confidential Information (A) as required by Law or requested by any Governmental Body so long as, to the extent practicable, reasonable prior notice if given to the Purchaser of such disclosure and a reasonable opportunity is afforded the Purchaser to contest the same, (B) as is reasonably necessary in connection with the performance, enforcement, exercise or assertion of any right, remedy or defense relating to this Agreement or any Ancillary Agreement or the transactions contemplated hereby or thereby, (C) as may be necessary in connection with the Chapter 11 Cases and/or the administration of the Seller's and/or its Affiliates' chapter 11 estates, or (D) that is necessary and proper in conjunction with the filing of any Tax Return or other document required to be filed with any Governmental Body under applicable Law.

(b)    The Purchaser shall, and the Purchaser shall cause its Representatives (as such term is defined in the Confidentiality Agreement) to, treat all nonpublic information obtained in connection with this Agreement and the transactions contemplated hereby as confidential in accordance with the terms of the Confidentiality Agreement.

(c)    Except as contemplated by Section 6.6, the Seller and the Purchaser will not, and the Seller and the Purchaser will cause their respective Affiliates and Representatives not to, disclose to any Person any information with respect to the legal, financial or other terms or conditions of this Agreement or any Ancillary Agreement or any of the transactions contemplated hereby and thereby.  The foregoing does not restrict the right of any party hereto or any of its Affiliates or Representatives to disclose such information (i) to its Affiliates and Representatives, (ii) as required by any Law or requested by any Governmental Body (including the Bankruptcy

26

Court), (iii) as is necessary and proper in conjunction with the filing of any Tax Return with any Governmental Body, (iv) as is reasonably necessary in connection with the enforcement, exercise or assertion of any right, remedy or defense relating to this Agreement or any Ancillary Agreement or the transactions contemplated hereby or thereby, and (v) in the case of the Seller and its Affiliates and Representatives, as may be necessary in connection with the Chapter 11 Cases and/or the administration of the Seller's and/or its Affiliates' chapter 11 estates.  Each party will advise its Affiliates and Representatives with respect to the confidentiality obligations under this Section 6.5(c) and will be responsible for any breach or violation of such obligations by any such Persons.

Section 6.6    Publicity.  Unless otherwise required by or reasonably necessary to comply with applicable Law or Bankruptcy Court requirements, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices made with the Bankruptcy Court related thereto, each of the Seller and the Purchaser agree that it (a) shall communicate and consult with each other prior to making any public disclosure or statements with respect to this Agreement or the transactions contemplated hereby and (b) shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party.  Nothing in this Agreement shall restrict or prohibit the Seller, Purchaser or their respective Affiliates from communicating with their respective employees, customers, suppliers or other business relations or other direct or indirect financing sources (including direct and indirect equityholders).

Section 6.7    Wrong Pocket.

(a)    The Seller and its Affiliates shall (i) promptly deliver to the Purchaser any mail or other communication relating to any of the Purchased Assets or any of the Assumed Liabilities and received by the Seller or its Affiliates on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by the Seller or its Affiliates on or after the Closing Date to the extent that such cash, electronic credits or deposits are Purchased Assets and (iii) promptly forward to the Purchaser any checks or other instruments of payment that the Seller or any of its Affiliates receives on or after the Closing Date to the extent that such checks or other instruments are Purchased Assets.

(b)    The Purchaser shall (i) promptly deliver to the Seller any mail or other communication not relating to the Purchased Assets or the Assumed Liabilities and received by the Purchaser on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Seller any cash, electronic credits or deposits received by the Purchaser to the extent that such cash, electronic credits or deposits are not Purchased Assets and (iii) promptly forward to the Seller any checks or other instruments of payment that it receives on or after the Closing Date to the extent that such checks or other instruments are not Purchased Assets.

(c)    For the avoidance of doubt, all Purchased Assets, including, but not limited to, miners, equipment or other property that are stored, held, located or used at a location other than the Acquired Projects are property of the Seller and, as of and following the Closing, neither the Seller nor any of its Affiliates shall have any right or interest in such property; and nothing herein shall prevent the Purchaser from (i) asserting that such Purchased Assets including, but not

limited to, miners, equipment, or other property belong to the Purchaser as of and after the Closing and (ii) taking any efforts to restore such miners, equipment, or other property to the Acquired Projects.

Section 6.8    Use of Acquired Names.  It is expressly acknowledged and agreed that the Purchaser is acquiring (on its own behalf or on behalf of any of its Affiliates) all right, title or interest in, and all rights to use, the name "Compute North" or the identifier "CN" (including in any trademarks, service marks, trade dress, trade names, domain names, logos, identifying symbols, signs or corporate names), all variations or derivatives thereof, and all names, identifiers or marks confusingly similar thereto (any of the foregoing, the "Acquired Names").  From and after the Closing Date, and for a period ending on December 31, 2022 (the "Acquired Name Use Deadline"), the Purchaser agrees that the Seller has a non-transferable, non-exclusive, non-sublicenseable, limited permission to use the Acquired Names and the domain name "computenorth.com" solely for the purpose of winding down the use of the Acquired Names on a transitional basis in connection with the Seller's administration of the Chapter 11 Cases. Following the Acquired Name Use Deadline, the Seller shall not use, and shall cause all of its Affiliates following the Closing not to use, the Acquired Names.  Promptly following the Closing, but in no event later than the Acquired Name Use Deadline, the Seller shall, and shall cause its Affiliates to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by the Seller or its Affiliates) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Compute North" or the identifier "CN" without the prior written consent of the Purchaser, and the Seller shall cause the names of each Debtor in the caption of the Chapter 11 Cases to be changed to the new names of each Debtor as determined in consultation with the Purchaser.  Within sixty (60) days following the Closing, the Debtors shall file all necessary organizational amendments with the applicable Secretary of State of each Debtor's jurisdiction of formation and in each State in which each such Debtor is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

Section 6.9    Access and Preservation of Records.  Until the earlier of the date (x) of the closing of the Chapter 11 Cases and (y) on which the Seller is liquidated or dissolved, the Purchaser agrees that it shall preserve and keep the books and records (whether in documentary or data form) held by it or its Affiliates relating to the Purchased Assets and the Assumed Liabilities after the Closing and shall make such books and records available upon reasonable advance request during normal business hours (and solely to the extent providing such access is not materially disruptive to the business of the Purchaser or the use or operation of the Purchased Assets) to the Seller, Seller's successor in interest, including any post-confirmation trust, and the Seller's auditors, attorneys, agents and other Representatives in connection with the administration and/or closing of the Chapter 11 Cases.

Section 6.10    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with Section 3.5, (x) the Seller shall (and shall cause its Affiliates and its and their respective Representatives to), and (y) the Purchaser shall (and shall cause its Representatives to), use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to ensure that the

conditions precedent to the other party's obligations hereunder to consummate the transactions contemplated hereby set forth in Article VII are satisfied and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable, but in any event on or prior to the Outside Date, including using its commercially reasonable efforts to obtain all necessary waivers, consents, approvals and Orders (including entry of the Sale Order by the Bankruptcy Court) and effecting all necessary registrations and filings to consummate and make effective the transactions contemplated hereby.

(b)     Subject to the terms and conditions of this Agreement, neither the Seller nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Seller or the Purchaser to consummate the transactions contemplated by this Agreement (including taking any action or refraining from taking any action the effect of which is intended or would reasonably be expected to result in any of the conditions to any party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied) unless taking such action or refraining from taking such action is required by applicable Law.

Section 6.11    Employees.

(a)     From and after the date hereof, with respect to any Employee who remains employed by the Seller or its Affiliates and performs services in respect of the Purchased Assets, the Purchaser, in its sole and absolute discretion, may:  (i) communicate with and regarding possible employment with the Purchaser or its Affiliates after the Closing Date; and/or (ii) offer employment to any of the Employees to be effective on a date specified by the Purchaser.  The Purchaser shall have the right but not the obligation to hire, or cause its Affiliate to hire, any or all of such Employees. The Seller shall take no action, and shall cause its Affiliate not to take any action, including the offering of employment with the Seller or any of its Affiliates, to induce such employees not to accept employment with the Purchaser or any of its Affiliates.  Those Employees that accept the offer of employment from the Purchaser or any of its Affiliate shall be terminated by the Seller and its Affiliates, as applicable, and shall become employed by the Purchaser or one or more of its Affiliates, as applicable, on the Closing Date or such other later date as specified by the Purchaser.  The Seller agrees that, with respect to each Employee that accepts the offer of employment from the Purchaser or its Affiliates, the Seller shall, and shall cause its applicable Affiliate to, waive and not enforce any non-competition or similar restrictive covenant binding on such Employee to the extent such non-competition or restrictive covenant would prevent such Employee from entering into and continuing employment with the Purchaser or its Affiliates or engaging in any activity with respect thereto. Schedule 6.11(a) sets forth a true, correct and complete list of the names, titles and business locations of all employees of the Seller or any of its Affiliates who perform services related to the Purchased Assets or services contemplated to be performed pursuant to the Transition Services Agreement, if any.

(b)     The Seller or its Affiliates shall be responsible for COBRA Coverage and all other legally mandated continuation of health care coverage for all M&A Qualified Beneficiaries and any other Employee, and any of their covered dependents, who become eligible for such coverage on or prior to the Closing Date.  For the maximum period that any M&A Qualified Beneficiary is eligible for COBRA Coverage, the Seller shall maintain, or cause its ERISA Affiliates to maintain, a "group health plan," within the meaning of Section 5500 of the

29

Code, to provide COBRA Coverage to each such M&A Qualified Beneficiary in accordance with Section 4980B of the Code and Sections 601 through 608 of ERISA.  The Seller shall provide a revised COBRA Schedule that is updated as of the Closing.

(c)     Without limiting the generality of <u>Section 1.2</u>, the Purchaser shall not assume any Liability, contingent or otherwise for any of the following: (i) any payments or entitlements owed on behalf of or to any Employee, including wages, other remuneration, holiday or vacation pay, bonus, severance pay (statutory or otherwise), commissions, post-employment medical or life obligations, pension contributions, insurance premiums or employment or payroll Taxes; (ii) any Liabilities with respect to, or payment or entitlements to, any Employee arising after the Closing; (iii) any Liability, payment or obligations related to any Employee, including under, or with respect to, the Worker Adjustment and Retraining Notification Act (or any similar provision of any applicable federal, state, regional, foreign or local Law), COBRA Coverage, actions under any labor or similar Laws, including any such Liabilities arising under a Seller Benefit Plan, in each case, that is incurred, accrued or arising prior to the Closing; (iv) any Liability or expense of the Seller or any of their respective ERISA Affiliates which arises under or relates to any Seller Benefit Plan or other employee benefit plan, including Liability to any such plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, Liability with respect to COBRA Coverage or Liability under any other statute or regulation that imposes Liability on a "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of the Purchaser being deemed an ERISA successor to the Seller or any of its ERISA Affiliates; (v) any Liabilities, payments, costs and disbursements incurred in connection with the termination of employment of any Employee, regardless of whether or not such Employee becomes a Purchaser Employee, arising under any Seller Benefit Plan, employment or similar agreement of the Seller or any of its ERISA Affiliates addressed to any Employee, or other severance policy or agreement or under any applicable Law or otherwise; (vi) any Liabilities (including successor obligations) that arise under or relate to any and all collective bargaining agreements.  For purposes of this definition, the definition of "Employees" shall also include temporary employees, independent contractors and any other Person who provides services to the Seller.

Section 6.12   <u>Bankruptcy Actions</u>.

(a)     Promptly upon the execution of this Agreement, the Seller shall file with the Bankruptcy Court (x) a notice of successful bidder declaring the Purchaser as the successful bidder for the Purchased Assets and (y) the proposed Sale Order authorizing and approving, among other things, (i) for the Seller to enter into this Agreement and the Ancillary Agreements and (ii) transactions contemplated in this Agreement and the Ancillary Agreements on the terms and conditions set forth herein and therein, including the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts, to the Purchaser free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), each in a form and substance acceptable to Purchaser in its sole discretion.  The Seller shall provide to the Purchaser drafts (I) of the pleadings and documents in clauses (x) and (y) in the preceding sentence (and any related pleadings or documents) as soon as practicable prior to the hearing to approve the sale of the Purchased Assets to the Purchaser and their filing with the Bankruptcy Court, and (II) any other pleadings and documents related to the sale or the transactions contemplated herein, not later than two (2) days prior to the Seller filing such pleadings and document with the Bankruptcy Court.

The Seller and the Purchaser shall cooperate in good faith with the drafting and submission to the Bankruptcy Court of all such pleadings or documents.

(b)     The Bankruptcy Court shall have entered the Sale Order by not later than November 24, 2022 (or such other date as agreed upon by the Purchaser in its sole discretion).

(c)     The Seller shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the Purchaser or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and the Ancillary Agreements and (ii) keep the Purchaser reasonably apprised of the status of all matters related to this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, including by promptly furnishing the Purchaser with copies of all notices, documents and communications received by the Seller or any of its Affiliates from the Bankruptcy Court or any Person with respect to the transactions contemplated by this Agreement, except for copies of notices or communications filed by non-Debtors, and fully available to the Purchaser, on the Bankruptcy Court docket.

Section 6.13   <u>Sale Order</u>.  The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements, and the transactions contemplated hereby and thereby, (ii) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by the Seller of its obligations under this Agreement and the Ancillary Agreements, (b) authorize and empower the Seller to assume and assign to the Purchaser the Assigned Contracts on the terms acceptable to the Purchaser, (c) find that the Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, (d) find that the Purchaser is not a successor to any of the Seller or its Affiliates, and grant the Purchaser the protections of section 363(m) of the Bankruptcy Code, (e) find that the Purchaser has not violated Section 363(n) of the Bankruptcy Code by any action or inaction, (f) find that the Purchaser shall have no Liability or responsibility for any Liability or other obligation of the Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (g) find that, to the extent applicable, any holder of an Encumbrance with respect to a Purchased Asset is adequately protected under Section 363(e) of the Bankruptcy Code by having its liens, claims, interests, and encumbrances attach solely to the proceeds of the Sale, (h) find that the Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (i) find that the Purchaser shall have no Liability for any Excluded Liability, (j) provide that Excluded Liabilities shall include, but shall not be limited to, Liabilities that may result from any claims (as defined in Section 101(5) of the Bankruptcy Code) or causes of action asserted by a Governmental Body against any Person based on any of the Sellers' or any of the other Debtors' business, operations or the use, operation, possession or ownership of any of the Purchased Assets by the Seller, the other Debtors, and/or any of their predecessors or Affiliates prior to Closing, and (k) provide that this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby may, subject to the terms set forth herein, be specifically enforced against and binding upon the Debtors and their respective estates and Affiliates, and any chapter 7 or chapter 11 trustee of any of the Debtors or their respective estates. The Seller agrees to promptly take such

actions as are reasonably requested by the Purchaser to assist in obtaining Bankruptcy Court approval of the Sale Order, this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court in connection therewith.

Section 6.14   Bankruptcy Process. Unless the Purchaser is in material breach of this Agreement or this Agreement has been terminated, the Seller covenants and agrees that, if the Sale Order is entered, the terms of any chapter 11 plan submitted by the Seller to the Bankruptcy Court for confirmation or otherwise supported by the Seller shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or any of the Ancillary Agreement, or the rights of the Purchaser hereunder or thereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement and the Ancillary Agreements, including any transaction that is contemplated by or approved pursuant to the Sale Order. If the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement shall be appealed or any petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto, the Seller agrees to take any and all actions as may be commercially reasonable and appropriate to defend against such appeal, petition or motion, and to use its reasonable efforts to obtain an expedited resolution of such appeal.

Section 6.15   Acquisition Proposals.  From and after the Execution Date, the Seller shall not, and shall not authorize or permit any of its Affiliates or its representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding the Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binging) regarding an Acquisition Proposal. "Acquisition Proposal" shall mean any inquiry, proposal or offer from any Person (other than the Purchaser or any of its Affiliates) concerning an Alternative Transaction.

Section 6.16   Minden Assignment.  The Seller shall take all reasonable actions to (a) enforce section 6.12 of the Generate PSA and (b) assign, or cause the assignment of, the EDR Agreement, and the other agreements or documents referenced in section 6.12 of the Generate PSA as they relate to the Purchased Assets (to the extent acceptable to the Purchaser), to the Purchaser for no additional consideration.

Section 6.17   Acquired Projects.  No later than three (3) Business Days prior to the Closing, Seller shall use reasonable best efforts to provide the Purchaser schedules setting forth the following with respect to each Acquired Project (listed by Acquired Project):

(a)   a schedule of transformers and containers to which each Acquired Project has title, together with any Encumbrances thereon, and the serial numbers for each such transformer and container;

(b)   (i) any amounts currently due and payable under any equipment supply agreement for each Acquired Project, (ii) any equipment purchased for or to be used in connection with each Acquired Project that has been delivered to the Seller or any of its Affiliates and is not located at the project site for the applicable Acquired Project and (iii) any amendments, change

32

orders or waiver entered into or that are pending with respect to any equipment supply agreement for each Acquired Project; and

(c)    a list of each customer Contract assigned to the Purchaser with respect to each Acquired Project, including any DealID number, customer, date of the master agreement and order form.

Section 6.18    Waiver.  The Seller on its behalf and on behalf the Debtors, their estates, their Affiliates, and their successors and assigns hereby irrevocably release and waive all, and agree to not bring any, claims and causes of action of any kind or character whatsoever, whether known, unknown, asserted, unasserted, fixed or contingent, against the Purchaser, any of its Affiliates, and their respective Representatives with respect to any matter now existing or hereafter arising, including, without limitation, claims and causes of action under or related to the Master Agreement. Nothing herein shall limit the right of the Seller to enforce its rights against the Purchaser under this Agreement.

Section 6.19    Waiver of Non-Solicitation Obligations.  Effective as of the Execution Date, the Seller on behalf itself and its Affiliates hereby forever and irrevocably waives and agrees not to enforce any term or condition set forth in the Confidentiality Agreement or the Foundry Finance Agreement (and any related agreements) with respect to the non-solicitation obligations of the Purchaser and/or any of its Affiliates as it relates to any Employee, or any independent contractor or other Person who provides services to the Seller with respect to the Purchased Assets. The Purchaser agrees not to hire any Employee prior to December 1, 2022, without the express written consent of the Seller. Nothing herein shall limit the ability of the Purchaser and its Affiliates to hire any Employee from and after December 1, 2022.

Section 6.20    Replacement of Minden LC.  If the Minden Closing occurs, the Purchaser shall use its commercially reasonable efforts to cause the release of the cash collateral in an amount not to exceed $830,000 supporting the letter of credit, dated March 25, 2022, issued by BMO Harris Bank for the benefit of Nebraska Public Power District as soon as commercially reasonably practicable.

Section 6.21    License of IT Assets.  From and after the Closing Date, and for a period ending on December 31, 2022 (the "IT Use Deadline"), the Purchaser hereby grants to the Seller a fully paid up, royalty-free, non-transferable, non-sublicenseable, non-exclusive, worldwide, limited license to use the IT Assets set forth on Schedule 6.21 (the "Licensed IT Assets"), solely for the purpose of winding down the use of the Acquired Names on a transitional basis in connection with the Seller's administration of the Chapter 11 Cases, including fulfilling Seller's obligations under that certain Transition Services Agreement between Compute North LLC and CN Wolf Hollow LLC dated November 2, 2022 in connection with the Generate PSA.  The Seller shall not (and shall not permit any of its Affiliates to), at any time, copy, distribute, transfer, modify, destroy, delete or publicly disclose any of the Licensed IT Assets.  Following the IT Use Deadline, the Seller shall not, and shall cause its Affiliates not to, use or access the Licensed IT Assets for any purpose.

**ARTICLE VII**

**CONDITIONS TO CLOSING**

Section 7.1    <u>Conditions Precedent to the Obligations of the Purchaser and the Seller</u>. The respective obligations of the Seller and the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted by applicable Law, joint written waiver by the Purchaser and the Seller, of each of the following conditions:

(a)    no Law (including any Order) (whether temporary, preliminary or permanent) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated hereby shall be in effect; and

(b)    the Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be a Final Order, and this Agreement shall become effective in accordance with its terms.

Section 7.2    <u>Conditions Precedent to the Obligations of the Seller</u>.  The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Seller, in whole or in part, to the extent permitted by applicable Law):

(a)    the representations and warranties of the Purchaser contained in <u>Article V</u> shall be true and correct in all material respects (without giving effect to any limitation or qualification as to materiality set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(b)    the Purchaser shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(c)    the Purchaser shall have delivered, or caused to be delivered, to the Seller (or at the direction of the Seller) all of the items set forth in <u>Section 3.3</u>;

(d)    the Purchaser shall have instructed the Escrow Agent to deliver the Deposit to the Seller in accordance with <u>Section 2.2</u>; and

(e)    the Purchaser shall have delivered to the Seller appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions (or a written consent) duly adopted by the Purchaser's governing body approving the transactions contemplated by this Agreement and the Purchaser Ancillary Agreements, and authorizing the execution, delivery and performance by the Purchaser of this Agreement and the Purchaser Ancillary

34

Agreements; and (ii) a certificate as to the incumbency of officers of the Purchaser executing this Agreement and the Purchaser Ancillary Agreements.

Section 7.3     Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     (i) the representations and warranties of the Seller contained in Article IV that are qualified by a "materiality" limitation or qualification shall be true and correct in all respects as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all respects only as of such specified date), and (ii) the representations and warranties of the Seller contained in Article IV that are not qualified by a "materiality" limitation or qualification shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the foregoing;

(b)     the Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by the Seller on or prior to the Closing Date, and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the forgoing;

(c)     the Purchaser shall have received all of the items set forth in Section 3.2;

(d)     the Bankruptcy Court shall have determined that Seller can sell the Purchased Assets free and clear of any Encumbrances under any successor liability, vicarious liability or similar theory;

(e)     all Assigned Permits shall be validly assigned to the Purchaser effective as of the Closing; and

(f)     All Assigned Contracts set forth in Schedule 8.1(f) as of the Execution Date (i) shall be fully and validly executed, binding, and in full force and effect, (ii) shall not be subject to any objection, challenge, default or cure (other than any Cure Cost agreed upon by the Purchaser in its sole discretion), (iii) shall not require any consent, permit, authorization or notice, including from any non-Debtor or third party, for any assignment to the Purchaser and to the extent any such consent, permit, authorization or notice is required or contemplated, all such consents, permits, authorizations and/or notices have been obtained and/or provided; and (iv) shall be validly assigned to the Purchaser effective as of the Closing.

## ARTICLE VIII

## ADDITIONAL DEFINITIONS

Section 8.1     Certain Definitions.  As used herein:

35

(a)      "Acquired Projects" means the Big Spring Project, the North Sioux City Project, and the Minden Project.

(b)      "Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by Contract or otherwise).

(c)      "Alternative Transaction" means (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of the Seller which has the effect of limiting the ability of the Seller to perform its obligations under this Agreement, (ii) any merger, consolidation, share exchange or other transaction that has the effect of transferring, directly or indirectly, all or any portion of the assets of, or any issuance, sale or transfer of equity interests in, the Seller or the Purchased Assets which has the effect of limiting the ability of the Seller to perform its obligations under this Agreement, (iii) any direct or indirect transaction (or series of transactions) pursuant to which the Seller or any of its Affiliates sells, transfers, or disposes of, whether through a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation, or disposition, any of the Purchased Assets (in any form of transaction), or (iv) any other transaction (or series of transactions), including, without limitation, a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits in all or any portion of the Purchased Assets or any other assets of the Seller, in each case, excluding any sale of the Purchased Assets to the Purchaser under this Agreement.

(d)      "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(e)      "Anti-Money Laundering Laws" means, all federal, state, foreign and local anti-money laundering and similar laws, including without limitation the Money Laundering Control Act of 1986, the Bank Secrecy Act, as amended by the USA PATRIOT Act, and related regulations and guidelines of the U.S. Department of the Treasury's Financial Crimes Enforcement Network or other Governmental Body.

(f)      "Assigned Contracts" means all executory Contracts and unexpired leases that are expressly set forth on Schedule 8.1(f) attached hereto (taking into account any deemed update to such Schedule 8.1(f) attached hereto pursuant to Section 1.3 upon the Purchaser's delivery of a Designation Notice); provided, that a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, the Purchaser to the extent that such Contract is terminated by any other party thereto, or terminates or expires by its terms, at or prior to such time as it is to be assumed by the Seller and assigned to the Purchaser as an Assigned Contract hereunder.

(g)      "Assigned Permits" means all Permits set forth or required to be set forth on Section 4.11 of the Seller Disclosure Schedules.

(h)     "Avoidance Actions" means any claim, right, or cause of action of the Seller or any other Debtor arising under chapter 5 of the Bankruptcy Code and any analogous state law claims.

(i)     "Bankruptcy Exceptions" means applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

(j)     "Big Spring Project" means the data center project owned by Compute North Texas LLC.

(k)     "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(l)     "Code" means the Internal Revenue Code of 1986, as amended.

(m)     "Compute Holdings" means Compute North Holdings, Inc., a Delaware corporation.

(n)     "Compute North" means Compute North LLC, a Delaware limited liability company.

(o)     "COBRA Coverage" means the health continuation coverage requirements under Section 4980B of the Code and Part 6 of Title I of ERISA or any similar provision under other applicable Law.

(p)     "CN NE05" means Compute North NE05, LLC.

(q)     "Computer Software" means all Software owned by or purported to be owned by or licensed to the Seller and its Affiliates, including the "MinerSentry" software platform.

(r)     "Confidential Information" has the meaning set forth in the Confidentiality Agreement.

(s)     "Confidentiality Agreement" means the Confidentiality Agreement, dated as of October 4, 2022, by and between Compute North Holdings, Inc., Digital Currency Group, Inc. and Foundry Digital LLC, as amended, supplemented or otherwise modified from time to time.

(t)     "Contract" means any contract, indenture, note, bond, lease, license, commitment or other legally enforceable agreement, instrument or arrangement, as amended, modified or supplemented.

(u)    "Cure Costs" means the amounts that must be paid in connection with the assumption and/or assignment of each Assigned Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code, which amounts shall be acceptable to the Purchaser in its sole discretion.

(v)    "Development Agreement" means the Development Agreement between the City of Minden, Nebraska, and CN Minden, LLC, dated July 8, 2022 (as amended, restated, assigned or otherwise modified);

(w)    "EDR Agreement" means the Agreement for EDR Electric Service Under the Economic Development Rate, dated October 1, 2021, by and between Compute North NE05, LLC, Southern Public Power District, and Nebraska Public Power District (as amended, restated, or otherwise modified).

(x)    "Employee" means any current or former employee of the Seller or any of its Affiliates.

(y)    "Encumbrance" means any lien (statutory or otherwise, including as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), Liability, charge, mortgage, restrictive covenant or condition, deed of trust, option, pledge, interest (including any security interest or similar interest), title defect, hypothecation, easement, right of use, first offer or refusal, encroachment, servitude, lease, Order, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use, in each case, of any kind or nature whatsoever, whether imposed by Contract, Law or in equity, and whether arising before or after the commencement of the Chapter 11 Cases.

(z)    "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources, the environment or human health and safety (as pertains to exposure to Hazardous Materials), or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.), and other similar federal, state, provincial and local statutes.

(aa)    "Equipment" means all items of furniture, fixtures, furnishings, leasehold improvements, equipment, machinery, switchgear, containers, transformers, spare parts and other tangible personal property of every kind and description, owned or leased by the Seller, wherever located, including communications equipment, IT Assets, and any attached and associated hardware, routers, devices, panels, cables, cords, connectors and cards.

(bb)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(cc)    "ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described

in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

(dd)    "Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(ee)    "Final Order" means an Order of the Bankruptcy Court (or other court of competent jurisdiction having jurisdiction over the Chapter 11 Cases) entered by the Clerk of the Bankruptcy Court on the docket in any of the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that:  (i) is and remains in full force and effect, (ii) has not been modified, amended, reversed, vacated, enjoined, restrained or stayed, (iii) as to which the time to appeal, petition for certiorari or move for a new trial, stay, re-argument or rehearing shall have expired and as to which no appeal, petition for certiorari or motion for new trial, stay, re-argument or rehearing shall then be pending, and (iv) if an appeal, writ of certiorari, new trial, stay, re-argument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, re-argument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, re-argument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

(ff)    "Foundry Finance Agreement" means that certain Equipment Finance and Security Agreement by and between Foundry Digital LLC, as lender, and Compute North, LLC, as borrower, dated December 31, 2020 (as modified, amended or supplemented from time to time).

(gg)    "GAAP" means Generally Accepted Accounting Principles in the United States of America.

(hh)    "Generate PSA" means the Purchase and Sale Agreement, dated as of October 31, 2022, by and between CN Pledgor LLC and GC Data Center Equity Holdings, LLC, attached as Exhibit 1 to the *Order (I) Approving The Sale Of Debtor CN Pledgor LLC's Equity Interests In CN Borrower LLC Free And Clear Of All Liens, Claims, And Encumbrances, (II) Authorizing The Assumption And Assignment Of Certain Executory Contracts In Connection Therewith, And (III) Granting Related Relief* [Docket No. 362].

(ii)    "Governmental Body" means any applicable federal, state, provincial, local, municipal, or foreign government or any agency, bureau, board, commission, court, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof.

(jj)    "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes thereof, asbestos and asbestos containing materials, lead-based paint or lead-containing materials, polychlorinated biphenyls, perfluoroalkyl and polyfluouralkyl substances and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," or "toxic" (or words of similar meaning) under or pursuant to any Environmental Law, including any regulations adopted by a Governmental Body pursuant thereto.

(kk)    "Intellectual Property" means any and all of the following, whether owned or held for use, rights in and to any and all intellectual property and similar proprietary rights, including the following: (i) patents, and inventions, invention disclosures, discoveries and improvements (whether or not patentable), (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, (v) trade secrets and confidential information or know-how (including, research and development, formulas, manufacturing and production processes and techniques, technical data and designs), (vi) all industrial designs or community design registrations and any registrations and applications therefor throughout the world, (vii) rights in Software, (viii) domain names, social media identifiers and accounts, (ix) databases and data collections, (x) goodwill and the right to sue and obtain damages and other relief for past, present and future claims of infringement, dilution, violation and misappropriation of any and all of the foregoing, and (xi) in each case, as applicable, including any registrations of, applications to register, and renewals, modifications and extensions of, any of the foregoing with or by any Governmental Body, or other applicable registrar, in any jurisdiction throughout the world.

(ll)    "IT Assets" means all technology systems, networks, computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements that are owned, leased or licensed by the Seller or any of its Affiliates related to, or used in connection with, the Purchased Assets, including the Acquired Projects and "MinerSentry" software platform.

(mm)    "Kearney Project" means the data center project owned by CN NE05.

(nn)    "Knowledge of the Seller" means the actual knowledge of the President and Chief Financial Officer of Compute North.

(oo)    "Laws" means all (i) federal, state, provincial, local, municipal, foreign or other laws, statutes, legislations, constitutions, common law, resolutions, rules, edicts, codes, regulations, restrictions, ordinances, proclamations, treaties, conventions and requirements of, or issued, promulgated, enforced or entered by, any Governmental Body, and (ii) Orders.

(pp)    "Leased Real Property" means all of the real property leased, subleased or otherwise occupied by the Seller, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto.

40

(qq)    "Liability" means, as to any Person, any claim, debt, adverse claim, lien, liability, duty, responsibility, obligation, commitment, assessment, cost, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense), loss, damage, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, ascertained or ascertainable, fixed, absolute or contingent, matured or unmatured, direct or indirect, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, due or to become due, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(rr)    "Licensed Intellectual Property" means any and all Intellectual Property owned by a third party and licensed or sublicensed, or purported to be licensed or sublicensed, to the Seller or any of its Affiliates (i) under the Assigned Contracts and/or (ii) that is included in the Purchased Assets.

(ss)    "Master Agreement" means that certain Master Agreement, dated October 29, 2020, by and between Compute North, LLC and Foundry Digital LLC.

(tt)    "M&A Qualified Beneficiary" means, in connection with the transactions contemplated hereby, any Person who is, or becomes, an "M&A qualified beneficiary" within the meaning of Treasury Regulation Section 54.498013-9.

(uu)    "Memorandum of Understanding" means the Memorandum of Understanding, dated August 25, 2022, by and among the Economic Development Council of Buffalo County, Inc., the Nebraska Department of Economic Development, the City of Minden, Nebraska, CN Minden LLC, and Compute North NE05 LLC.

(vv)    "Minden Assumed Liabilities" means the Assumed Liabilities set forth on Schedule 1.2(a) relating exclusively to the Minden Project.

(ww)    "Minden Project" means the data center project owned by CN Minden LLC.

(xx)    "Minden Purchased Assets" means the Purchased Assets relating exclusively to the Minden Project.

(yy)    "NPPD" means Nebraska Public Power District.

(zz)    "Neutral Accountant" means an independent accounting firm jointly selected by the Purchaser and the Seller.  If the Purchaser and the Seller cannot jointly agree on a Neutral Accountant, the Purchaser and the Seller shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Neutral Accountant shall be selected by lot from these two firms by the respective accountants of the Purchaser and the Seller.

(aaa)    "North Sioux City Project" means the data center project owned by Compute North SD LLC.

41

(bbb)   "Open Source Materials" means any Software (in source or object code form) that is subject to a license or other agreement commonly referred to as an open source, free software, copyleft or community source code license (including but not limited to any code or library licensed under the GNU Affero General Public License, GNU General Public License, GNU Lesser General Public License, BSD License, Apache Software License, or any other public source code license arrangement), including without limitation any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org.

(ccc)   "Order" means any order, writ, judgment, injunction, decree, ruling, directive, determination or award made, issued or entered by any Governmental Body, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order).

(ddd)   "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

(eee)   "Owned Intellectual Property" means any and all Intellectual Property and Computer Software owned, or purported to be owned, by the Seller and/or any of its Affiliates which is used, held for use or otherwise necessary to operate the Purchased Assets, the Acquired Projects or the businesses of the Seller and/or its Affiliates to which the Purchased Assets relate.

(fff)   "Permits" means all permits, approvals, concessions, grants, franchises, licenses, clearances, registrations, variances, certifications, exemptions, endorsements, waivers and other authorizations issued by any Governmental Body.

(ggg)   "Permitted Encumbrances" means (i) Encumbrances for utilities or Taxes that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings or the payment or enforcement of which is stayed under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court, (ii) easements, rights of way, restrictive covenants, and encroachments against any of the Purchased Assets that do not, individually or in the aggregate, adversely affect the operation, ownership or transferability of the applicable Purchased Asset in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) any Encumbrances created by this Agreement or any of the Ancillary Agreements or created by the actions of the Purchaser or its Affiliates, and (v) mechanics', carriers', workers', repairers', landlords' and similar Encumbrances arising or incurred in the ordinary course of business for amounts that are not yet due and payable or the payment or enforcement of which is stayed under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court.

(hhh)   "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

42

(iii)    "Personal Information" means any personal information, personal data, personally identifiable information, personal financial information, protected health information, and any other information that identifies or reasonably identifies or is associated with an individual natural person Processed by the Seller in connection with the business and subject to regulation under Privacy Laws applicable to the business.

(jjj)    "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Person that is an individual.

(kkk)    "Petition Date" means September 22, 2022.

(lll)    "Privacy Law" means all Laws applicable to the Seller related to data or information privacy, data protection and/or data security, and the Payment Card Industry Data Security Standard ("PCI-DSS").

(mmm)"Privacy Policy" means the current published and internal privacy policy of the Seller or any of its Affiliates applicable to information (including Personal Information) Processed in connection with the Seller's business, and other industry standards or practices applicable to the protection and Processing of such information (including Personal Information and Seller Data).

(nnn)    "Process" or "Processing" or "Processed" means any operation or set of operations which is performed upon information, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure, deletion or destruction.

(ooo)    "Purchased Intellectual Property" means, collectively, the Owned Intellectual Property and the Licensed Intellectual Property.

(ppp)    "Purchased IT Assets" means all IT Assets that are included in the Purchased Assets.

(qqq)    "Purchased Leased Real Property" means all Leased Real Property that is included in the Purchased Assets.

(rrr)    "Purchaser Ancillary Agreements" means, collectively, the Bill of Sale and the Assignment and Assumption Agreement, the IP Assignment and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement.

(sss)    "Purchaser Parties" means, collectively, (i) the Purchaser, (ii) each of the current or former Affiliates of the Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

43

(ttt)    "Registered IP" means all Owned Intellectual Property that is registered or issued as a patent, trademark or copyright or filed as an application to register or issue as a patent, trademark or copyright.

(uuu)    "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

(vvv)    "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren (by blood, adoption or marriage).

(www) "Release" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(xxx)    "Representatives" means, with respect to the Seller or the Purchaser (as the case may be), the officers, directors, managers, employees, auditors, counsel, professionals, advisors, accountants, agents, contractors and other representatives of (i) the Seller or the Purchaser (as applicable) or (ii) any of the Affiliates of the Seller or the Purchaser (as applicable).

(yyy)    "Restricted Person" means any Person that is the subject or target of sanctions or restrictions under Sanctions, including: (i) listed on a Sanctions List; (ii) a government, or an agency or instrumentality of a government, of a Sanctioned Country; (iii) any Person that is, in the aggregate, fifty (50) percent or greater owned, directly or indirectly, or otherwise controlled by a person or persons in clause (i); (iv) resident of, or located in, operating from, or organized under the Laws of, a Sanctioned Country; or (v) otherwise the subject or target of Sanctions.

(zzz)    "Sale Order" means an Order or Orders of the Bankruptcy Court, each in form and substance acceptable to the Purchaser in its sole discretion, which shall, among other things, (i) approve the sale of the Purchased Assets by the Seller to the Purchaser pursuant to this Agreement, (ii) approve and authorize the Seller to enter into this Agreement and the Ancillary Agreement, and consummate the transactions contemplated by this Agreement and the Ancillary Agreement, (iii) approve the assignment by the Seller to the Purchaser, and the assumption by the Purchaser, of the Assumed Liabilities pursuant to this Agreement, (iv) approve the assumption and assignment of the Assigned Contracts to the Purchaser on terms acceptable to the Purchaser, and (v) contain findings of fact and conclusions of law in support of the relief granted therein.

(aaaa) "Sanctions" means, collectively, any applicable economic or financial sanctions, Laws, or trade embargoes and restrictions administered or enforced from time to time by, (a) the U.S. Department of the Treasury and its Office of Foreign Assets Control ("OFAC"), including but not limited to (i) those limiting transactions and financial relationships with persons on the lists administered by OFAC, including the Specially Designated Nationals and Blocked Persons List; and (ii) those restricting dealings with certain countries (including Cuba, Iran, North Korea, Syria and the Crimea, Donetsk and Luhansk regions of Ukraine), regions, regimes, vessels,

entities and individuals, and (iii) those restricting dealings with Persons that are in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by any Person or Persons described in clause (i), and (b) any other Sanctions Authority.

(bbbb) "Sanctions Authority" means the United States, the United Nations Security Council, the European Union, the United Kingdom, any other Governmental Body with jurisdiction over the Seller.

(cccc) "Sanctioned Country" means any country or other territory subject to a comprehensive export, import, financial, or investment embargo under Sanctions, which, as of the date hereof, consists of Cuba, Iran, North Korea, Syria, Venezuela and the Crimea, Donetsk and Luhansk regions of Ukraine.

(dddd) "Sanctions List" means any of the lists of specifically designated nationals or designated or sanctioned individuals or entities (or equivalent) issued by any Sanctions Authority, each as amended, supplemented or substituted from time to time.

(eeee) "Security Breach" means any unauthorized access to, or unauthorized use, modification, deletion, destruction, denial or disclosure of Seller Data under the control of the Seller's business that compromises the confidentiality or security of such Seller Data.

(ffff) "Seller Ancillary Agreements" means, collectively, the Bill of Sale and Assignment and Assumption Agreement, the IP Assignment and each other certificate, agreement or document (other than this Agreement) that the Seller is required to execute and/or deliver pursuant to the terms of this Agreement.

(gggg) "Seller Benefit Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case, that is sponsored, maintained or contributed to by the Seller or any other Debtor or to which the Seller or any other Debtor is obligated to contribute or with respect to which the Seller or any other Debtor has any Liability.

(hhhh) "Seller Data" means all data and information (including Personal Information) Processed by or on behalf of the Seller and/or its Affiliate that is used or held for use in connection with or otherwise related to the Purchased Assets, the Acquired Projects and/or the businesses of the Seller and/or its Affiliates to which the Purchased Assets relate, including, without limitation, data and information that is subject to contractual restrictions or obligations (e.g., confidentiality or data protection) relating to such Processing in Contracts between the Seller's business and third parties, and data and information Processed by the Seller's business that is subject to other legal or fiduciary obligations or requirements.

(iii)    "<u>Seller Disclosure Schedules</u>" means the Schedules to this Agreement that relate solely to the representations and warranties of the Seller set forth in <u>Article IV</u>.

(jjjj)    "<u>Seller Parties</u>" means, collectively, (i) the Seller, (ii) each of the current or former Affiliates of the Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in <u>clause (i)</u> or <u>clause (ii)</u> of this definition, and each of the Affiliates of any of the Persons described in this <u>clause (iii)</u>.

(kkkk) "<u>Seller Registered IP</u>" means all Registered IP owned or purported to be owned by the Seller.

(llll)    "<u>Software</u>" means computer software, programs, applications and databases in any form, including Internet web sites, web content and links, source code, object code, operating systems and specifications, data, databases, database management code, utilities, graphical user interfaces, menus, images, icons, forms, methods of processing, software engines, platforms, development tools, library functions, compilers, and data formats, all versions, updates, corrections, enhancements and modifications thereof, and all related documentation, developer notes, comments and annotations.

(mmmm)    "<u>SPPD</u>" means the Southern Public Power District.

(nnnn)    "<u>Straddle Period</u>" means any taxable period beginning before the Closing Date and ending after the Closing Date.

(oooo)    "<u>Tax</u>" and "<u>Taxes</u>" means any foreign or U.S. federal, state, county, or local income, transfer, sales, use, excise, franchise, profits, real and personal property, escheat, gross receipt, value added, stamp, license, capital gains, capital stock, production, business and occupation, disability, employment, payroll, severance, withholding or other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including all interest, additions, surcharges, fees or penalties related thereto.

(pppp)    "<u>Tax Return</u>" means any return, report, information return, declaration, claim for refund or other information or document (including any schedule or related or supporting information) filed or provided, or required to be filed or provided, with or to any Governmental Body with respect to Taxes (including in connection with the determination, assessment or collection of Taxes or the administration of any Law with respect to Taxes), including amendments thereto.

(qqqq) "<u>Transmission Agreement</u>" means the Transmission Facilities Construction Agreement at NPPD's Minden Substation, dated February 17, 2022, between CN Minden, LLC and Nebraska Public Power District.

Section 8.2    <u>Additional Defined Terms</u>.   The following terms have the meanings set forth in the Sections set forth below:

46

| **Defined Term** | **Location** |
|---|---|
| Actions | Section 4.5 |
| Acquired Names | Section 6.8 |
| Acquired Name Use Deadline | Section 6.8 |
| Acquisition Proposal | Section 6.15 |
| Agreement | Preamble |
| Allocation Schedule | Section 2.4 |
| Asset Taxes | Section 6.2(a) |
| Assumed Liabilities | Section 1.2(a) |
| Balance Sheet Date | Section 4.4 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale and Assignment and Assumption Agreement | Section 3.2(a) |
| Cash Purchase Price | Section 2.1(a) |
| Chapter 11 Cases | Recitals |
| Closing | Section 3.1 |
| Closing Cash Portion | Section 2.1(a)(i) |
| Closing Date | Section 3.1 |
| Construction Budget and Schedule | Section 4.12(a) |
| Credit Bid | Section 2.1(b) |
| Cure Estimate | Section 4.9(a) |
| Debtor | Recitals |
| Deposit | Section 2.2 |
| Designation Notice | Section 1.3 |
| Determination Date | Section 1.3(a) |
| e-mail | Section 9.9 |
| Escrow Account | Section 2.2 |
| Escrow Agent | Section 2.2 |
| Escrow Agreement | Section 2.2 |
| Escrow Instructions | Section 3.2(a) |
| Excluded Liabilities | Section 1.2(b) |
| Execution Date | Preamble |
| Financial Statements | Section 4.4 |
| Insurance Policies | Section 4.16 |
| Interim Arrangement | Section 1.3(d) |
| IP Assignment | Section 3.2(c) |
| IT Use Deadline | Section 6.21 |
| Legal Restraint | Section 3.5(c) |
| Licensed IT Assets | Section 6.21 |
| Master Contract | Section 4.9(c) |
| Minden Cash Portion | Section 2.1(a)(ii) |
| Minden Closing | Section 3.7(a) |
| Minden Outside Date | Section 3.7(a) |
| Nonassignable Assets | Section 1.3(d) |
| Outside Date | Section 3.5(b) |

| **Defined Term** | **Location** |
|---|---|
| Post-Closing Covenants | Section 9.2 |
| Purchase Price | Section 2.1(c) |
| Purchased Assets | Section 1.1 |
| Purchaser Designees | Section 9.10 |
| Purchaser | Preamble |
| Real Property Lease | Section 4.13(a) |
| Sale Motion | Section 6.12(a) |
| Seller | Preamble |
| Seller Insurance Coverage | Section 6.3 |
| Transfer Taxes | Section 6.2(a) |
| Transition Services Agreement | Section 3.2(e) |

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Payment of Expenses.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto will bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 9.2    Survival of Representations, Warranties; and Covenants.  None of the representations, warranties, covenants or agreements in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, including any rights arising out of any breach or violation of any such representations, warranties, covenants or other agreements, will survive the Closing, and all such representations, warranties, covenants and other agreements shall terminate and expire upon the occurrence of the Closing; provided, that each of the covenants and agreements set forth in this Agreement and/or any of the Ancillary Agreements which by their express terms are to be performed or complied with subsequent to the Closing Date (collectively, the "Post-Closing Covenants") and rights arising out of any breach or violation of any such Post-Closing Covenants shall survive the Closing in accordance with their terms.  In furtherance of the foregoing, each of the Seller and the Purchaser hereby waives, to the fullest extent permitted under applicable Law, any and all rights, claims, remedies and causes of action it may have against the other party hereto (including any rights, claims, remedies and causes of action arising under or based upon any federal, state, local or foreign statute, ordinance, rule, regulation or other Law) for any breach of any representation, warranty, covenant or obligation set forth in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, except with respect to the Post-Closing Covenants.  At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Seller, on the other hand, have any recourse against (i) the Seller or any of the Seller Parties, or (ii) the Purchaser or any of the Purchaser Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Seller or the Purchaser, as applicable, in this Agreement or any of the Ancillary Agreements, except with respect to claims against the Seller or the Purchaser, as applicable, for breaches of Post-Closing Covenants.

Section 9.3   No Successor Liability.   The Parties intend that upon the Closing, the Purchaser shall not assume any Liabilities (other than the Assumed Liabilities) and shall not be deemed to: (a) be the successor or successor employer of any Seller or any of its Affiliates; (b) have, de facto or otherwise, merged with or into any Seller or any of its Affiliates; (c) have any common law successor liability in relation to any Seller Benefit Plan, including with respect to withdrawal liability or contribution obligations, (d) be a mere continuation or substantial continuation of any Seller or any of its Affiliates or the enterprise(s) of any Seller or any of its Affiliates; or (e) be liable for any acts or omissions of any Seller or any of its Affiliates in the conduct of its, or of any of its Affiliates, business or arising under, or related to, the Purchased Assets (including, without limitation, any such acts or omissions that may result in any claims (as defined in Section 101(5) of the Bankruptcy Code) or causes of action asserted or to be asserted by a Governmental Body against any Person). Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that the Purchaser shall not be liable for any Liability or Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against any of the Debtors, the Seller or any of their respective Affiliates, or any of the Debtors', the Seller's, or their respective Affiliates' predecessors, successors or assigns, and the Purchaser shall have no successor or vicarious Liability of any kind or character, whether known or unknown, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the business of the Seller or any of its Affiliates, the Purchased Assets or any Liabilities of any of the Seller or any of its Affiliates arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 9.3 shall be reflected in the Sale Order.

Section 9.4   Sale Free and Clear.   On the Closing Date, the Purchased Assets shall be transferred to the Purchaser free and clear of all Encumbrances and Liabilities, other than Permitted Encumbrances and Assumed Liabilities.

Section 9.5   Entire Agreement; Amendments and Waivers.   This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings between the parties hereto with respect thereto.   Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the Purchaser and the Seller, or in the case of a waiver, by the party against whom the waiver is to be effective.   The waiver by any party hereto of any provision of this Agreement or any breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any other or subsequent breach of any provision of this Agreement.   No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 9.6   Counterparts.   For the convenience of the parties hereto, this Agreement and the Ancillary Agreements, and any amendments hereto or thereto, may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement, and to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar

reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any Ancillary Agreement shall raise the use of electronic signature, a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 9.7   <u>Governing Law</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

Section 9.8   <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)   THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL ACTIONS, CLAIMS, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR ANY COURT EXERCISING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT) IN RESPECT OF ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING AND AGREES THAT IT WILL NOT BRING ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING IN ANY OTHER COURT; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASES ARE DISMISSED OR IF THE BANKRUPTCY COURT IS UNABLE TO HEAR ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, IN ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE) WILL HAVE SOLE JURISDICTION OVER ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT AS A DEFENSE, COUNTERCLAIM OR OTHERWISE, IN ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, (A) ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE NAMED COURTS FOR ANY REASON OTHER THAN THE FAILURE TO SERVE PROCESS IN ACCORDANCE WITH <u>SECTION 9.9</u> (B) ANY CLAIM THAT IT OR ITS PROPERTY IS EXEMPT OR IMMUNE FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS COMMENCED IN ANY SUCH COURT (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF JUDGMENT, EXECUTION OF JUDGMENT OR OTHERWISE) AND (C) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) THE ACTION, CLAIM, SUIT OR PROCEEDING IN SUCH COURT IS BROUGHT IN AN INCONVENIENT FORUM, (II) THE VENUE OF SUCH ACTION, CLAIM, SUIT OR PROCEEDING IS IMPROPER OR (III) THIS AGREEMENT OR ANY OTHER AGREEMENT

OR INSTRUMENT CONTEMPLATED HEREBY OR ENTERED INTO IN CONNECTION HEREWITH, OR THE SUBJECT MATTER HEREOF OR THEREOF, MAY NOT BE ENFORCED IN OR BY ANY SUCH COURT. EACH PARTY HERETO AGREES THAT NOTICE OR THE SERVICE OF PROCESS IN ANY ACTION, CLAIM, SUIT OR PROCEEDING ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, SHALL BE PROPERLY SERVED OR DELIVERED IF DELIVERED IN THE MANNER CONTEMPLATED BY <u>SECTION 9.9</u>.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 9.9     <u>Notices</u>.   Except as otherwise expressly provided in this Agreement, all notices, requests, demands, consents, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when sent by electronic mail ("<u>e-mail</u>"), (b) when delivered personally, (c) one (1) Business Day after deposit with an overnight courier service, or (d) three (3) Business Days after the date of mailing by certified or registered mail, return receipt requested, with postage prepaid, in any such case to the parties hereto at the following addresses or e-mail addresses (or at such other address or e-mail address for a party hereto as shall be specified by like notice to the other party hereto):

If to the Seller:

c/o Compute North Holdings, Inc.
7575 Corporate Way
Eden Prairie, MN 55344
Attn: Barry Coulby, Jason Stokes
Email: barry.coulby@computenorth.com; jason.stokes@computenorth.com; legal@computenorth.com

with a copy (which shall not constitute effective notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Luis F. Gomar; Sayan Bhattacharyya
Email: luisgomar@paulhastings.com; sayanbhattacharyya@paulhastings.com

If to the Purchaser:

Foundry Digital LLC
1100 Pittsford Victor Road
Pittsford, NY 14534

Attn: Michael Colyer; Khurram Chhipa
Email: MColyer@foundrydigital.com; KChhipa@foundrydigital.com

with a copy (which shall not constitute effective notice) to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attn: Kristine Manoukian; Daniel Eisner
Email: kristine.manoukian@srz.com; daniel.eisner@srz.com

Section 9.10   Binding Effect; Assignment.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns, including, in the case of the Seller, any trustee or estate representative appointed in the Chapter 11 Cases or any successor chapter 7 case.  Each entity which is included in the Seller hereunder, shall be jointly and severally liable for all Liabilities and obligations of the Seller hereunder and under any Ancillary Agreement.  No assignment of this Agreement or any rights, interests or obligations hereunder may be made by any party hereto (by operation of Law or otherwise) without the prior written consent of the other party hereto, and any attempted assignment without the required consents shall be void; provided, however, that the Purchaser shall be entitled, without the consent of the Seller, (i) to designate one or more Affiliates of the Purchaser (any such Affiliate designated by the Purchaser, a "Purchaser Designee"), to purchase all or any portion of the Purchased Assets and/or assume all or any portion of the Assigned Contracts or Assumed Liabilities, and (ii) to assign or delegate all or any part of this Agreement or any of the Ancillary Agreements (a) to one or more Purchaser Designees or (b) for collateral security purposes to any lender providing financing to the Purchaser or any of its Affiliates.

Section 9.11   Severability.  If any term, condition or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party hereto.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 9.12   Injunctive Relief.  The parties hereto acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) an award of money damages would not be adequate to compensate the non-breaching party.  Accordingly, each of the parties hereto shall be entitled, in addition to any other rights and remedies existing in its favor at law or in equity, to equitable relief, an injunction or injunctions or Orders for specific performance to prevent breaches or threatened breaches of the

provisions of this Agreement and to enforce its rights hereunder, without the necessity of proving the inadequacy of money damages as a remedy.  The right to equitable relief, including specific performance and injunctive relief, shall exist in addition to and notwithstanding, and shall not be limited by, any other provision of this Agreement.  Each of the parties hereto hereby irrevocably waives any defense that a remedy at law is adequate and any requirement to obtain, furnish or post any bond, security or other instrument in connection with or as a condition to any actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason.  The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties hereto would have entered into this Agreement.

Section 9.13    Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable benefit, claim, cause of action, remedy or right of any kind hereunder, except that each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of Section 3.6(a), Section 9.2 and Section 9.14.

Section 9.14    Non-Recourse.  Except as expressly contemplated by this Agreement, no Purchaser Party (other than the Purchaser) and no Seller Party (other than the Seller) shall have any Liability under this Agreement or the Ancillary Agreements for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.

Section 9.15    Time of the Essence.  Time is of the essence in the performance of each of the obligations of the parties hereto and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

Section 9.16    Disclosure.  Any exception, qualification or other disclosure set forth on the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Agreement shall be deemed to be an exception, qualification or other disclosure with respect to all other representations or warranties contained in this Agreement to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent that such exception, qualification or disclosure is applicable to such other representations or warranties whether or not such exception, qualification or disclosure makes reference to such other representations or warranties or any of their Section references.

Section 9.17    Bulk Transfer Laws.  The Purchaser hereby acknowledges that the Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

Section 9.18    Certain Interpretations.

53

(a)     Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits of or to this Agreement.

(ii)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)     The table of contents and Article, Section and paragraph captions herein are for convenience of reference only, and shall not be deemed to limit or otherwise affect the meaning or interpretation of any of the provisions hereof.

(iv)     The words "include," "includes" and "including" and words of similar import, when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Any reference to "days" means calendar days unless Business Days are expressly specified.

(vi)     Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)     The words "herein," "hereinafter," "hereof" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not merely to a subdivision or particular provision in which such words appear unless the context otherwise requires.

(ix)     The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(x)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(xi)     The term "or" is disjunctive and not exclusive.

54

(xii)    The phrases "delivered" or "made available" and words of similar import, when used in this Agreement in reference to information or materials delivered or made available to the Purchaser, shall include information or materials that have been made available by the Seller in any "data room" (virtual or otherwise) to which the Purchaser has access (whether or not the Purchaser accesses such information or materials).

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)    Prior drafts of this Agreement or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be construed in favor of or against any party on account of its participation in the negotiations and/or drafting of such prior drafts or be used as an aid of construction or otherwise constitute evidence of the intent of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such prior drafts.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>:

**COMPUTE NORTH LLC**

By: *Drake Harvey*
75156D9531394BE...
Name: Drake Harvey
Title: President

**COMPUTE NORTH SD, LLC**

By: *Drake Harvey*
75156D9531394BE...
Name: Drake Harvey
Title: President

**COMPUTE NORTH TEXAS LLC**

By: *Drake Harvey*
75156D9531394BE...
Name: Drake Harvey
Title: President

**CN MINING LLC**

By: *Drake Harvey*
75156D9531394BE...
Name: Drake Harvey
Title: President

**CN MINDEN LLC**

By: *Drake Harvey*
75156D9531394BE...
Name: Drake Harvey
Title: President

**PURCHASER**:

**FOUNDRY DIGITAL LLC**

By: _Michael Colyer_
Name: Michael Colyer
Title:   Chief Executive Officer