## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-90273 (MI) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. 91 & 256** |

## NOTICE OF SUCCESSFUL BIDDER FOR JV ASSETS

**PLEASE TAKE NOTICE** that on September 26, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") filed with the United States Bankruptcy Court for the Southern District of Texas (the "Court") a motion [Docket No. 91] (the "Motion")[2] seeking entry of an order (the "Bidding Procedures Order"), approving Bidding Procedures, scheduling an auction of the Assets (the "Auction"), and granting other related relief.

**PLEASE TAKE FURTHER NOTICE** that on October 24, 2022, the Court entered the Bidding Procedures Order [Docket No. 256]. At the Bid Deadline, the Debtors received two Qualifying Bids for Debtor Compute North Member LLC's 50 percent membership interest in non-Debtor TZRC LLC (together with any related executory contracts or unexpired leases to be designated by the Purchaser (defined below), if any, the "JV Assets"). In accordance with the Bidding Procedures Order, the Debtors scheduled an Auction for the JV Assets, which took place virtually on November 15, 2022, at 1:00 p.m. (prevailing Central Time). At the conclusion of the auction, the Debtors in consultation with the Consultation Parties, announced that the final bid submitted by U.S. Data Group, Inc. (the "Purchaser") was the highest and best actionable bid for the JV Assets.

**PLEASE TAKE FURTHER NOTICE** that the Debtors, upon consultation with the Consultation Parties, have declared the Purchaser, as the Successful Bidder for the JV Assets. A copy of the purchase agreement, dated as of November 25, 2022, between Debtor Compute North Member LLC and the Purchaser is attached hereto as **Exhibit A** (the "Purchase Agreement"). In accordance with the Bidding Procedures, the Debtors have designated Lake Parime Limited ("Lake

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238). The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Parime") as the Back-Up Bidder, and the final bid submitted by Lake Parime at the Auction as the Back-Up Bid, for the JV Assets.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Purchase Agreement and the transactions contemplated thereunder (the "JV Sale") at a hearing (the "Sale Hearing"), scheduled to commence on **November 29, 2022 at 1:30 p.m. (prevailing Central Time)**, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 4th Floor, 515 Rusk Street, Houston, Texas 77002. The Sale Hearing may be adjourned or rescheduled by the Debtors, in consultation with the Consultation Parties, in accordance with the Bidding Procedures Order and the Bidding Procedures, including as stated orally at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that a schedule of Selected Target Contracts proposed to be assumed and assigned to the Purchaser, as assignee, in connection with the JV Sale is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that counterparties to the Selected Target Contracts may obtain the Purchaser's Adequate Assurance Information by contacting counsel to the Debtors, Paul Hastings LLP, Attn.: James T. Grogan III (jamesgrogan@paulhastings.com), Matthew Micheli (mattmicheli@paulhastings.com), and Michael Jones (michaeljones@paulhastings.com).

**PLEASE TAKE FURTHER NOTICE** that in accordance with the Bidding Procedures, any objections to adequate assurance of future performance by the Purchaser shall be filed no later than **4:00 p.m. (prevailing Central Time) on November 28, 2022**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, the Sale Order, and all other documents filed in these Chapter 11 Cases are available (a) free of charge by accessing the website maintained by the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/case/computenorthholdings/info or (b) for a fee by accessing the PACER system on the Court's website at https://ecf.txs.uscourts.gov.

[*Remainder of Page Intentionally Left Blank*]

Dated:  November 25, 2022
Houston, Texas

/s/ *James T. Grogan III*

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Luc Despins (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Daniel Ginsberg  (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email:  lucdespins@paulhastings.com
          sayanbhattacharyya@paulhastings.com
          danielginsberg@paulhastings.com

-and-

Matthew Micheli (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100
Email:  mattmicheli@paulhastings.com
          michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on November 25, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 */s/ James T. Grogan III*
James T. Grogan III

## Exhibit A

**Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**US DATA KING MOUNTAIN LLC**

**as Purchaser,**

**and**

**COMPUTE NORTH MEMBER LLC,**

**as Seller**

**Dated as of November 25, 2022**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .......................... 1

Section 1.1    Purchase and Sale of Assets.................................................................................. 1
Section 1.2    Assumption of Liabilities...................................................................................... 1
Section 1.3    Assigned Contracts ............................................................................................... 2

ARTICLE II CONSIDERATION; DEPOSIT .......................................................................................... 2

Section 2.1    Consideration ......................................................................................................... 2
Section 2.2    Deposit ................................................................................................................... 3
Section 2.3    Payment of Cash Purchase Price........................................................................... 3
Section 2.4    Allocation of Cash Purchase Price........................................................................ 3

ARTICLE III CLOSING AND TERMINATION .................................................................................... 4

Section 3.1    Closing ................................................................................................................... 4
Section 3.2    Closing Deliveries by the Seller ........................................................................... 4
Section 3.3    Closing Deliveries by the Purchaser ..................................................................... 6
Section 3.4    Termination of Agreement .................................................................................... 6
Section 3.5    Effect of Termination............................................................................................ 7

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ..................................... 8

Section 4.1    Organization and Qualification.............................................................................. 8
Section 4.2    Authority Relative to This Agreement .................................................................. 8
Section 4.3    Conflicts; Consents and Approvals........................................................................ 9
Section 4.4    Title and Condition of Purchased Assets .............................................................. 9
Section 4.5    Litigation.............................................................................................................. 10
Section 4.6    Intellectual Property; IT Assets ........................................................................... 10
Section 4.7    Assigned Contracts .............................................................................................. 11
Section 4.8    Compliance with Law .......................................................................................... 11
Section 4.9    Permits. ................................................................................................................ 11
Section 4.10   Brokers and Finders ............................................................................................ 12
Section 4.11   Real Property ....................................................................................................... 12
Section 4.12   Tax Returns; Taxes .............................................................................................. 13
Section 4.13   Insurance Policies ............................................................................................... 13
Section 4.14   Environmental Matters ....................................................................................... 13
Section 4.15   **NO OTHER REPRESENTATIONS** .............................................................. 14
Section 4.16   Undisclosed Liabilities ....................................................................................... 14

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER............................. 14

Section 5.1    Organization and Qualification............................................................................ 14
Section 5.2    Authority Relative to This Agreement ................................................................ 14
Section 5.3    Conflicts; Consents and Approvals...................................................................... 15
Section 5.4    Financial Capacity ............................................................................................... 15
Section 5.5    Brokers and Finders ............................................................................................ 15
Section 5.6    Qualification ........................................................................................................ 16
Section 5.7    Independent Investigation; Reliance By the Purchaser....................................... 16
Section 5.8    **RELIANCE/ACKNOWLEDGMENT** ............................................................ 16

i

ARTICLE VI COVENANTS AND AGREEMENTS ................................................................. 17

Section 6.1    Conduct of Seller ............................................................................................. 17
Section 6.2    Taxes ................................................................................................................. 17
Section 6.3    Insurance .......................................................................................................... 18
Section 6.4    Confidentiality ................................................................................................. 19
Section 6.5    Publicity ........................................................................................................... 19
Section 6.6    Wrong Pocket ................................................................................................... 19
Section 6.7    Use of Excluded Names ................................................................................... 20
Section 6.8    Access and Preservation of Records ............................................................... 20
Section 6.9    Further Assurances .......................................................................................... 20

ARTICLE VII CONDITIONS TO CLOSING ........................................................................ 21

Section 7.1    Conditions Precedent to the Obligations of the Purchaser and the Seller ...... 21
Section 7.2    Conditions Precedent to the Obligations of the Seller .................................... 22
Section 7.3    Conditions Precedent to the Obligations of the Purchaser ............................. 22

ARTICLE VIII ADDITIONAL DEFINITIONS ..................................................................... 23

Section 8.1    Certain Definitions ........................................................................................... 23
Section 8.2    Additional Defined Terms ............................................................................... 29

ARTICLE IX MISCELLANEOUS .......................................................................................... 30

Section 9.1    Payment of Expenses ....................................................................................... 30
Section 9.2    Survival of Representations, Warranties; and Covenants ................................ 31
Section 9.3    Entire Agreement; Amendments and Waivers ................................................ 31
Section 9.4    Counterparts ..................................................................................................... 32
Section 9.5    Governing Law ................................................................................................. 32
Section 9.6    Jurisdiction, Waiver of Jury Trial .................................................................... 32
Section 9.7    Notices ............................................................................................................. 33
Section 9.8    Binding Effect; Assignment ............................................................................ 34
Section 9.9    Severability ...................................................................................................... 34
Section 9.10   Injunctive Relief .............................................................................................. 35
Section 9.11   Third Party Beneficiaries ................................................................................. 35
Section 9.12   Intentionally Omitted. ..................................................................................... 35
Section 9.13   Time of the Essence ......................................................................................... 35
Section 9.14   Disclosure ........................................................................................................ 35
Section 9.15   Bulk Transfer Laws ......................................................................................... 36
Section 9.16   Certain Interpretations ..................................................................................... 36

## EXHIBITS

Exhibit A            Form of Bill of Sale
Exhibit B            Seller Disclosure Schedules

## SCHEDULES

Schedule 1.1         Purchased Assets
Schedule 1.2         Assumed Liabilities

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of November 25, 2022 (the "Execution Date"), by and between (a) Compute North Member LLC, a Delaware limited liability company (the "Seller"), and (b) US Data King Mountain LLC, a Nevada limited liability company (the "Purchaser"). Article VIII contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, the Seller and certain of its Affiliates have filed voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"); and

WHEREAS, the Seller desires to sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept from the Seller, all of the Seller's right, title and interest in and to the Purchased Assets in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1    Purchase and Sale of Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the Seller's right, title and interest in, to and under all of the assets, properties, rights and interests owned by Seller, as expressly set forth on Schedule 1.1 attached hereto, as the same shall exist at the Closing (collectively, the "Purchased Assets").

Section 1.2    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, the Purchaser shall assume from the Seller, shall become solely and exclusively liable for, and shall timely perform and discharge in accordance with their respective terms, those Liabilities set forth on Schedule 1.2 attached hereto (collectively, the "Assumed Liabilities"). Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, except for the Assumed

Liabilities, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of or against the Seller of any kind or nature whatsoever.

Section 1.3    <u>Assigned Contracts</u>.

(a)    From the Execution Date through (and including) the Closing Date, the Purchaser may elect to include in, or exclude from, the definition of Purchased Assets any Contract of the Seller that was or was not previously included in the Purchased Assets; <u>provided</u> that no such change to the definition of "Purchased Assets" shall reduce the amount of the Cash Purchase Price and/or remove the PMA, the TZRC Agreement or the TZCH Senior Note as an Assigned Contract. To exercise its rights under this <u>Section 1.3</u> to include any Contract in, or exclude any Contract from the Purchased Assets, the Purchaser shall deliver one or more written notices (each, a "<u>Designation Notice</u>") to the Seller specifying the Contract(s) to be so included or excluded, and such inclusion or exclusion of any such Contract shall occur automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of a Designation Notice to the Seller (it being understood that <u>Schedule 1.1</u> attached hereto shall be deemed automatically updated upon the Purchaser's delivery of a Designation Notice to reflect the addition of any Contract to, or exclusion of any Contract from the Purchased Assets).

(b)    The Seller shall take all reasonable actions required to assign the Assigned Contracts to the Purchaser at the Closing, including taking all reasonable actions required to obtain an Order of the Bankruptcy Court containing a finding that the proposed assignment of the Assigned Contracts to the Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(c)    At the Closing, the Seller shall, pursuant to the Sale Order and Bill of Sale, assign to the Purchaser each of the Assigned Contracts.

(d)    To the extent that the assignment to the Purchaser of any Assigned Contract or other Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party, then Seller shall obtain such necessary consent, waiver, confirmation or approval prior to the Closing.

**ARTICLE II**

**CONSIDERATION; DEPOSIT**

Section 2.1    <u>Consideration</u>. The aggregate consideration to be paid by the Purchaser to the Seller for the purchase of the Purchased Assets shall be as follows:

(a)    cash in the amount of ten million dollars ($10,000,000) (the "<u>Cash Purchase Price</u>"); <u>provided</u>, <u>however</u>, that the Cash Purchase Price shall be applied as follows:

(i)    three million dollars ($3,000,000) of the Cash Purchase Price (the "<u>Consideration</u>") shall be remitted to the Seller; and

(ii)      seven million dollars ($7,000,000) of the Cash Purchase Price (the "Note Paydown Amount") shall be remitted to TZ Capital Holdings, LLC, a Delaware limited liability company ("TZCH") to be applied against the outstanding balance of the Member Loan Secured Obligations (as defined in the TZRC Agreement) owing by Seller under that certain Secured Promissory Note dated April 8. 2022 (as amended) in favor of TZCH (the "TZCH Senior Note");

(b)      the full waiver and release by Purchaser, of any and all claims that it may have against Seller and/or its Affiliates, in Purchaser's capacity as a creditor of Seller and/or its Affiliates in the Chapter 11 Cases (the "Purchaser Waiver"), which for the avoidance of doubt, shall expressly exclude the waiver and release of (i) any claims related to Purchaser's enforcement of this Agreement and the Ancillary Agreements, and (ii) the Post-Closing Covenants Claims and Material Representations Claims; and

(c)      the assumption by the Purchaser of the Assumed Liabilities.

Section 2.2      Deposit. The Purchaser and the Seller have entered into an escrow agreement (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Escrow Agreement") with Epiq Corporate Restructuring, LLC (the "Escrow Agent"). Concurrently with the execution and delivery of the Escrow Agreement by the Seller, the Purchaser and the Escrow Agent, the Purchaser deposited $1,000,000 (the "Deposit") with the Escrow Agent by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in a segregated, noninterest-bearing account (the "Escrow Account") pursuant to the terms of the Escrow Agreement. The Deposit shall become payable, and shall be paid, to the Seller at the Closing. At the Closing, the Seller and the Purchaser shall instruct the Escrow Agent to deliver the Deposit to the Seller by wire transfer of immediately available funds into an account designated by the Seller. If this Agreement is validly terminated prior to the Closing, the Deposit shall be released and distributed to the Purchaser or the Seller in accordance with the terms set forth in Section 3.6(b), Section 3.6(c) and/or Section 3.6(d), as applicable.

Section 2.3      Payment of Cash Purchase Price. On the Closing Date, the Purchaser shall pay, or cause to be paid, the (A) Consideration minus the Deposit to the Seller by wire transfer of immediately available funds to the account or accounts of the Seller in accordance with written instructions delivered by the Seller to the Purchaser prior to the Closing Date; and (B) the Note Paydown Amount to TZCH by wire transfer of immediately available funds to the account or accounts of TZCH in accordance with written instructions delivered by the TZCH to the Purchaser prior to the Closing Date.

Section 2.4      Allocation of Cash Purchase Price. The Seller shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to the Purchaser a schedule allocating the Cash Purchase Price (including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and U.S. Treasury Regulations thereunder (such schedule, the "Allocation Schedule"). If the Purchaser raises any objection to the Allocation Schedule within thirty (30) days after the receipt thereof, the Seller and the Purchaser will negotiate in good faith to resolve such objection(s). If the Seller and the Purchaser are unable to reach an agreement on the Allocation Schedule within twenty (20) days

3

after the Purchaser first raises any objection to the Allocation Schedule, the Seller and the Purchaser shall submit to the Neutral Accountant a notice setting forth in reasonable detail their proposed allocations. The Neutral Accountant shall determine only the unresolved items with respect to the Allocation Schedule. The Neutral Accountant shall be instructed to determine its best estimate of the Allocation Schedule based on the unresolved items and provide a written description of the basis for its determination of the Allocation Schedule within twenty (20) days after the matter has been submitted to the Neutral Accountant, which written determination shall be final and binding and shall become the Allocation Schedule. The fees and expenses of the Neutral Accountant shall be split equally between the Seller, on the one hand, and the Purchaser, on the other hand. If the Purchaser does not raise any objection to the Allocation Schedule within thirty (30) days after the receipt thereof, the Purchaser shall be deemed to have conclusively accepted and agreed to the Allocation Schedule proposed by the Seller. The Seller and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and Form 8594 consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding) except as required by a final determination as defined in Section 1313 of the Code; provided, however, that nothing contained herein shall prevent the Seller or the Purchaser from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation Schedule, and neither the Seller nor the Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation Schedule. The Purchaser and the Seller shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation Schedule. The Purchaser and the Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Action challenging the Allocation Schedule.

## ARTICLE III

## CLOSING AND TERMINATION

Section 3.1    Closing. Upon the terms and subject to the conditions contained in this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of electronic documents and signatures by electronic mail at 10:00 a.m. (New York Time) on a date that is no later than the first (1st) Business Day following the date on which all of the conditions set forth in Article VII are satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing), or at such other place, date and/or time as the Purchaser and the Seller may mutually agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 3.2    Closing Deliveries by the Seller. At or prior to the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser:

(a)    a bill of sale, assignment and assumption agreement, in a form reasonably acceptable to and agreed by the Purchaser and attached as Exhibit A hereto (the "Bill of Sale"), duly executed by the Seller;

(b)      a membership interest transfer power, in a form reasonably acceptable to and agreed by the Purchaser (the "Transfer Power"), duly executed by the Seller;

(c)      the Transition Services Agreement, duly executed by the Seller;

(d)      a duly executed agreement evidencing the Purchaser Waiver in a form reasonably acceptable to, and agreed to by, Purchaser (the "Purchaser Waiver Agreement");

(e)      a duly executed non-foreign person affidavit of the Seller dated as of the Closing Date, sworn under penalty of perjury, and in the form provided at Treasury Regulations § 1.1445-2(b)(2)(iv)(B) or in the form of an IRS Form W-9 as described in Treasury Regulations § 1.1445-2(b)(2)(v);

(f)      the certificates required to be delivered pursuant to Sections 7.3(a) and 7.3(b);

(g)      an executed stipulation of dismissal with prejudice of dispute involving (i) the Debtors' Emergency Motion For Entry of an Order Pursuant to Sections 105(a), 362, and 542 of the Bankruptcy Code Enforcing the Automatic Stay, Compelling Turnover of Property of the Estate, and Sanctioning NextEra Energy and Its Affiliates for Violation of the Automatic Stay [Docket No. 165], and (ii) TZ Capital Holdings, LLC's Objection to the Debtors' Emergency Motion for Entry of an Order Pursuant to Sections 105(a), 362 and 542 of the Bankruptcy Code Enforcing the Automatic Stay, Compelling Turnover of Property of the Estate, and Sanctioning Nextera Energy and its Affiliates for Violations of the Automatic Stay [Docket No. 344] (the "TZCH Action"), on terms reasonably acceptable to Purchaser;

(h)      a duly executed full assignment of all right, title and interest of Compute North under the MARA MSA and any documents contemplated thereunder related to the operations of TZRC King Mountain LLC, a Delaware limited liability company ("TZRC KM") in form and substance acceptable to TZRC KM ("MARA Assignment");

(i)      evidence in form and substance reasonably acceptable to Purchaser and TZCH that the Mara Lien has been transferred to TZRC KM (the Purchaser and TZCH, each being authorized by the Seller to authorize and file the UCC financing statement amendment and other appropriate documentation and to take all such further actions as shall be necessary to accomplish such transfer);

(j)      a counterpart of each of the other Seller Ancillary Agreements required by this Agreement to be executed and delivered by the Seller at or prior to the Closing, duly executed by the Seller;

(k)      a written consent of TZCH to this Agreement and Seller's assignment of the membership interest held by it in TZRC LLC, a Delaware limited liability company ("TZRC");

(l)      any other third-party consents required to consummate the transactions contemplated hereby on terms reasonably satisfactory to Purchaser, including any assignments or consents to assignment with respect to any Assigned Contract or other Purchased Asset; and

(m)    such other instruments, agreements or documents as may be reasonably requested by Purchaser to carry out the transactions contemplated hereby with respect to the Purchased Assets and which are necessary or appropriate in order to place Purchaser in actual possession of the Purchased Assets.

Section 3.3    <u>Closing Deliveries by the Purchaser</u>. At or prior to the Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Seller:

(a)    the Consideration <u>minus</u> the Deposit;

(b)    the Bill of Sale, duly executed by the Purchaser;

(c)    Proof of the Note Paydown Amount having been made to TZCH, reasonably acceptable to Seller;

(d)    the Purchaser Waiver Agreement, duly executed by the Purchaser;

(e)    the certificates required to be delivered pursuant to <u>Sections 7.2(a)</u> and <u>7.2(b)</u>; and

(f)    a counterpart of each of the other Purchaser Ancillary Agreements required by this Agreement to be executed and delivered by the Purchaser at or prior to the Closing, duly executed by the Purchaser.

Section 3.4    <u>Termination of Agreement</u>.

This Agreement may be terminated at any time prior to the Closing as follows:

(a)    by the mutual written consent of the Seller and the Purchaser at any time prior to the Closing;

(b)    by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if the Closing shall not have been consummated on or prior to December 15, 2022 (the "<u>Outside Date</u>"); <u>provided</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of any of its representations, warranties, covenants or agreements set forth this Agreement;

(c)    by the written notice of the Purchaser to the Seller, or by the written notice of the Seller to the Purchaser, in either case, if any Governmental Body, including the Bankruptcy Court, shall have enacted, issued, promulgated, enforced or entered any Law (including any Order) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement (any such Law, a "<u>Legal Restraint</u>"); <u>provided</u>, that the right to terminate this Agreement under this <u>Section 3.4(c)</u> shall not be available to the Purchaser or the Seller, as applicable, if the Purchaser or the Seller, as applicable, is then in material breach or violation of this Agreement and such breach or violation is the cause of the Legal Restraint;

(d)        by the written notice of the Purchaser to the Seller, (i) if the Seller shall have breached or failed to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Sections 7.1 or 7.3, and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Purchaser, and (ii) any of the conditions set forth in Sections 7.1 or 7.3 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the material failure of Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(e)        by the written notice of the Seller to the Purchaser, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) thirty (30) days after written notice of such breach, failure or occurrence is given to the Purchaser by the Seller; provided, that, at the time of such termination, the Seller is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement;

(f)        by written notice of the Seller to the Purchaser, if all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to consummate the Closing on or prior to the date on which the Closing is required to have occurred pursuant to Section 3.1;

(g)        by written notice of the Purchaser to the Seller, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Seller fails to consummate the Closing on or prior to the date on which the Closing is required to have occurred pursuant to Section 3.1; and

(h)        by the Purchaser if any of the conditions set forth in Section 7.3 are not timely satisfied as set forth therein.

Section 3.5        Effect of Termination.

(a)        In the event of the valid termination of this Agreement pursuant to Section 3.4, this Agreement shall terminate and become null and void and of no further force or effect, the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto and there shall be no Liability hereunder on the part of the Seller or any of the other Seller Parties, or the Purchaser or any of the other Purchaser Parties; provided, that (i) the provisions of Section 3.4, this Section 3.5 and Article IX, and any defined terms used in any such Section or Article, shall remain in full force and effect and shall survive the termination of this Agreement; and (ii) no such termination shall relieve any party hereto from liability for any material breach of this Agreement that occurred prior to such termination; provided, further that upon such termination, each of the provisions of the Confidentiality Agreement shall survive and

7

remain in full force and effect for the longer of (A) the remainder of the term of survival applicable to such provision as set forth in the Confidentiality Agreement and (B) one (1) year following the date of such termination. Any termination of this Agreement pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other party hereto in accordance with Section 9.7; provided, that in the case of any termination of this Agreement pursuant to Section 3.4(a), the date of termination shall be the date of termination set forth in the writing signed by the Purchaser and the Seller.

(b)      If the Seller terminates this Agreement pursuant to Section 3.4(e) or Section 3.4(f), then the Seller shall be entitled to disbursement of the Deposit from the Escrow Account as liquidated damages, which the Seller and Purchaser acknowledge and agree: (i) is a fair estimate of the actual damages suffered in the event of such termination; and (ii) shall be the sole and exclusive remedy of Seller hereunder.

(c)      In the event of a termination of this Agreement pursuant to any provision of Section 3.4 (other than Section 3.4(e) or Section 3.4(f)), the Purchaser shall be entitled to disbursement of the Deposit.

(d)      In the event that this Agreement is terminated pursuant to Section 3.4 and the Seller or the Purchaser are entitled to receive the Deposit, then the Seller or the Purchaser may deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay to the Seller or the Purchaser, as applicable, the Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the Seller Disclosure Schedules, the Seller hereby makes the representations and warranties in this Article IV to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 4.1      Organization and Qualification. The Seller is a Delaware limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

Section 4.2      Authority Relative to This Agreement. Subject to entry of the Sale Order by the Bankruptcy Court, the Seller has all requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements, (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Seller Ancillary Agreements. Subject to entry of the Sale Order by the Bankruptcy Court, the execution and delivery by the Seller of this Agreement and each of the Seller Ancillary Agreements, the performance by the Seller of its obligations hereunder and thereunder, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly

8

authorized by all requisite action on the part of the Seller. Subject to entry of the Sale Order by the Bankruptcy Court, (i) this Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by the Seller and (ii) assuming the due authorization, execution and delivery by the other parties hereto and to the Seller Ancillary Agreements, this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered by the Seller will constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "Bankruptcy Exceptions").

Section 4.3    Conflicts; Consents and Approvals.

(a)    Except as set forth in Section 4.3(a) of the Seller Disclosure Schedules, and subject to the entry of the Sale Order by the Bankruptcy Court, none of the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation by the Seller of the transactions contemplated hereby or thereby, or the performance by the Seller of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Seller, (ii) result in a violation of or default (with or without notice or lapse of time, or both) under, require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any of the Assigned Contracts, (iii) assuming that all approvals, Orders, Permits, consents, registrations, declarations, notifications and filings set forth in Section 4.3(b) of the Seller Disclosure Schedules have been made, given or obtained, as applicable, violate any Law applicable to the Seller or by which any Purchased Asset is bound or affected, or (iv) result in the imposition or creation of any Encumbrance (other than any Permitted Encumbrance) on any of the Purchased Assets other than, in the case of clauses (ii), (iii) and (iv), for any such violations, defaults, unobtained consents, terminations, cancellations, accelerations, losses or Encumbrances that would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole.

(b)    Assuming the accuracy of the representations and warranties of the Purchaser in Section 5.3(b) and except as set forth in Section 4.3(b) of the Seller Disclosure Schedules, no approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Seller in connection with the execution and delivery by the Seller of this Agreement or any of the Seller Ancillary Agreements, the performance by the Seller of any of its obligations hereunder or thereunder, or the consummation by the Seller of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court, and (ii) such other approvals, Orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain, give or make would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets taken as a whole.

Section 4.4    Title and Condition of Purchased Assets. The Seller has good and valid title to (or, in the case of leased tangible Purchased Assets, a valid and subsisting leasehold

9

interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), all of the tangible Purchased Assets, including all Equipment that is part of the Purchased Assets. Upon the entry of the Sale Order by the Bankruptcy Court, the Seller will have the power and right to sell, assign, transfer, convey and deliver to the Purchaser good and valid title to (or, in the case of leased tangible Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), all of the tangible Purchased Assets. The tangible Purchased Assets are in reasonably good operating condition and repair for the purposes for which such Purchased Assets are used in the business of the Seller (normal wear and tear excepted).

Section 4.5    <u>Litigation</u>. Except for the Chapter 11 Cases and any Order entered in the Chapter 11 Cases or as set forth in <u>Section 4.5</u> of the Seller Disclosure Schedules, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "<u>Actions</u>"), pending or, to the Knowledge of the Seller, threatened against the Seller which would, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole. Except with respect to Orders issued in the Chapter 11 Cases or as set forth in <u>Section 4.5</u> of the Seller Disclosure Schedules, the Seller is not subject to any Order that relates to the Purchased Assets which would, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole.

Section 4.6    <u>Intellectual Property; IT Assets</u>.

(a)    Except as set forth in <u>Section 4.6(a)</u> of the Seller Disclosure Schedules or as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, (i) the Seller owns all right, title and interest in and to the Owned Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances), (ii) no Action is pending or, to the Knowledge of the Seller, threatened challenging the Seller's ownership of any Owned Intellectual Property or the Seller's use of any Licensed Intellectual Property, and (iii) the Owned Intellectual Property is not subject to any outstanding Order restricting the use thereof and the Licensed Intellectual Property is not subject to any outstanding Order restricting the Seller's use thereof. Except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent or approval of any other Person in respect of, the Purchaser's right to own or use any of the Purchased Intellectual Property.

(b)    To the Knowledge of the Seller, (i) all Registered IP that is registered or issued is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, and (ii) the Seller has paid all renewal, maintenance, and other fees when due as required to maintain each and every Registered IP in full force and effect. Except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, the Seller has valid and enforceable rights to use the Licensed Intellectual Property as

10

used in the conduct of the Seller's business, free and clear of any Encumbrances (other than Permitted Encumbrances), pursuant to a valid written license, sublicense or other written Contract between the Seller and the owner or licensor of such Licensed Intellectual Property.

(c)     To the Knowledge of the Seller and except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, (i) the use of the Purchased Assets as currently used by the Seller does not infringe Intellectual Property rights of any other Person, and (ii) no Person has alleged that the Seller's use of the Purchased Assets as currently used by the Seller infringes any Intellectual Property rights of such Person. To the Knowledge of the Seller and except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, no other Person is infringing any Owned Intellectual Property.

(d)     The Purchased IT Assets are adequate in all material respects for their intended use and are in good working condition (normal wear and tear excepted). There has not been any material malfunction with respect to any of the Purchased IT Assets that has not been remedied or replaced in all material respects. Except as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, the consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of, the payment of additional amounts with respect to, or require the consent of any other Person in respect of, the Purchaser's right to own or use any of the Purchased IT Assets as owned or used by the Seller in the conduct of its business prior to the Closing.

Section 4.7     Assigned Contracts. (a) each Assigned Contract (i) constitutes a valid and binding obligation of the Seller and, to the Knowledge of the Seller, each other party thereto and (ii) assuming such Assigned Contract is binding and enforceable against such other parties thereto, is in full force and effect, except in each of the preceding clauses (i) and (ii) as limited by the Bankruptcy Exceptions, (b) the Seller is not in material breach or material default under any Assigned Contract, except for breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases, and (c) assuming the entry of the Sale Order by the Bankruptcy Court, upon consummation of the transactions contemplated by this Agreement, each Assigned Contract shall continue in full force and effect.

Section 4.8     Compliance with Law. The Seller is in compliance with all applicable Laws with respect to its ownership or use of the Purchased Assets, except for any noncompliance that would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole. Except as set forth in Section 4.8 of the Seller Disclosure Schedules or as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, no investigations, inquiries or reviews by any Governmental Body have been commenced nor, to the Knowledge of the Seller, threatened that would impose any Liability on the Seller with respect to its ownership or use of the Purchased Assets.

Section 4.9     Permits. The Assigned Permits constitute all Permits that are necessary for the ownership or use of the Purchased Assets by the Seller in the conduct of its business,

except for any such Permit where the failure to hold such Permit would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole. The Seller is in compliance with its obligations under each of the Assigned Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Assigned Permit, except for such defaults or violations that would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole. There is no Action against the Seller relating to any of the Assigned Permits pending or, to the Knowledge of the Seller, threatened in writing.

Section 4.10   Brokers and Finders. Except as set forth in Section 4.10 of the Seller Disclosure Schedules, the Seller has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or any of the transactions contemplated hereby for which the Purchaser is or will become liable.

Section 4.11   Real Property.

(a)   Each lease, sublease or other occupancy agreement to which the Seller is a party and leases or otherwise occupies any Purchased Leased Real Property (collectively, together with all amendments, supplements and modifications thereto, the "Real Property Leases") is in full force and effect and constitutes a valid and binding obligation of the Seller and, to the Knowledge of the Seller, each other party thereto, except as limited by the Bankruptcy Exceptions and as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole. The Seller has valid leasehold title to the Purchased Leased Real Property subject to a Real Property Lease, free and clear of any Encumbrances (other than Permitted Encumbrances). To the Knowledge of the Seller, there are no matters or restrictions affecting the Real Property Leases that would reasonably be expected to materially interfere with or adversely affect in any material respect the continued use and occupancy by the Seller or the Purchaser of the applicable Purchased Leased Real Property.

(b)   Except as a result of the filing of the Chapter 11 Cases, the Seller and, to the Knowledge of the Seller, each of the other parties to a Real Property Lease have performed in all material respects all material obligations required to be performed by such Person under such Real Property Lease, and, to the Knowledge of the Seller, there does not exist any event, condition or omission that would constitute a material default or material breach (whether by lapse of time or notice or both) by the Seller under any Real Property Lease. The Seller has not received any written notice of any condemnation or eminent domain proceedings pending or threatened that affect any Purchased Leased Real Property. The Seller has not received any written notice of any zoning, ordinance, building, fire or health code or other legal violation affecting any Purchased Leased Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole.

(c)   Each Purchased Leased Real Property has been maintained in all material respects by the Seller in accordance with the applicable Real Property Lease. To the Knowledge

12

of the Seller, there are no material defects in, material mechanical failure of or material damage to any Purchased Leased Real Property.

Section 4.12    Tax Returns; Taxes. Except as set forth in Section 4.12 of the Seller Disclosure Schedules:

(a)    All material Tax Returns required to have been filed by the Seller with respect to the Purchased Assets have been duly filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns are true, correct and complete.

(b)    All Asset Taxes that have become due and payable prior to the Closing Date have been duly paid.

(c)    As of the Execution Date, there are no pending or, to the Knowledge of the Seller, threatened Actions for the assessment or collection of material Taxes owed or owing by the Seller in respect of any of the Purchased Assets.

(d)    The Seller has not executed or filed with any Governmental Body any agreement extending the period for assessment or collection of any material Taxes in respect of any of the Purchased Assets.

(e)    The Seller is not subject to any Tax ruling, allocation, sharing, indemnification, power of attorney, closing or similar agreement with respect to any of the Purchased Assets.

(f)    There are Encumbrances on any of the Purchased Assets that secure the payment of Taxes (other than Permitted Encumbrances).

Section 4.13    Insurance Policies. All insurance policies owned or held by the Seller or otherwise applicable to the Purchased Assets or the Assumed Liabilities (the "Insurance Policies") are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and no written notice of cancellation or termination (or any other threatened termination) has been received by the Seller with respect to any such Insurance Policy.

Section 4.14    Environmental Matters. Except (x) as set forth in Section 4.14 of the Seller Disclosure Schedules or (y) as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchased Assets, taken as a whole, (a) the Seller is in compliance with all Environmental Laws as such Environmental Laws relate to the Purchased Assets, (b) the Seller has not received written notice of any Action pending against the Seller with respect to any of the Purchased Assets arising under or relating to any Environmental Laws and, to the Knowledge of the Seller, no such Action is threatened, (c) no Hazardous Materials have been treated, stored, disposed of or Released in violation of, or so as to create a Liability under, Environmental Law by the Seller at any of the Purchased Leased Real Property, and (d) the Seller has not received any written notice from any Governmental Body regarding, or entered into any settlement agreement involving, the Seller's responsibilities for uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws with respect to the Purchased Assets.

Section 4.15   **NO OTHER REPRESENTATIONS**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS <u>ARTICLE IV</u>, NEITHER THE SELLER, ANY AFFILIATES OF THE SELLER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE SELLER, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER IMPLIED OR MADE BY THE SELLER, ANY AFFILIATE OF THE SELLER, OR ANY OF THEIR RESPECTIVE OFFICERS, MANAGERS, DIRECTORS, STOCKHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN THIS <u>ARTICLE IV</u>, THE SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES BY ANY MANAGER, OFFICER, DIRECTOR, STOCKHOLDER, MEMBER, PARTNER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF THE SELLER OR ANY OF ITS AFFILIATES).

Section 4.16   <u>Undisclosed Liabilities</u>. Seller has no Liabilities with respect to the Purchased Assets, except (a) those related to the TZCH Senior Note, (b) those arising under Assigned Contracts as disclosed on <u>Schedule 4.16</u> of the Seller Disclosure Schedules, and (c) those otherwise disclosed in this Agreement or in the Seller Disclosure Schedules.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby makes the representations and warranties in this <u>Article V</u> to the Seller as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 5.1   <u>Organization and Qualification</u>. The Purchaser is a Nevada limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.

Section 5.2   <u>Authority Relative to This Agreement</u>. The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and (d) consummate the transactions contemplated hereby and by each of the Purchaser Ancillary Agreements. The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary

14

Agreements, the performance by the Purchaser of its obligations hereunder and thereunder, and the consummation by the Purchaser of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

Section 5.3    Conflicts; Consents and Approvals.

(a)    None of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation by the Purchaser of the transactions contemplated hereby or thereby, or the performance by the Purchaser of any of its obligations hereunder or thereunder will (i) conflict with or violate the Organizational Documents of the Purchaser or (ii) assuming that all approvals, orders, Permits, consents, registrations, declarations, notifications and filings described in Section 5.3(b) have been made, given or obtained, as applicable, violate any Law applicable to the Purchaser or by which any of its properties or assets are bound.

(b)    No approval, Order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, the performance by the Purchaser of any of its obligations hereunder or thereunder, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Order by the Bankruptcy Court, and (ii) such approvals, Orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain, give or make would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 5.4    Financial Capacity. The Purchaser (a) has, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the Ancillary Agreements, (b) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Purchaser Ancillary Agreements, and (c) has not incurred any obligation, commitment, restriction or Liability of any kind that would impair or adversely affect such funds, resources and capabilities.

Section 5.5    Brokers and Finders. The Purchaser has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby for which the Seller or any of its Affiliates or Representatives will become liable.

15

Section 5.6    Qualification.

(a)    As of the Closing, the Purchaser will use commercially reasonable efforts of satisfying the conditions contained in sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

(b)    To the knowledge of the Purchaser, there exist no facts or circumstances that would cause, or be reasonably expected to cause, the Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

Section 5.7    Independent Investigation; Reliance By the Purchaser. The Purchaser (directly or through its Affiliates or Representatives) is an informed and sophisticated purchaser, and has engaged expert advisors that are experienced in the evaluation and acquisition of assets and liabilities such as the Purchased Assets and the Assumed Liabilities, as contemplated hereunder. The Purchaser (directly or through its Affiliates or Representatives) has undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby or thereby. The Purchaser confirms that the Seller has provided the Purchaser with the opportunity to ask questions of the officers and employees of the Seller and its Affiliates and to acquire additional information about the Purchased Assets and the Assumed Liabilities.

Section 5.8    **RELIANCE/ACKNOWLEDGMENT**.    NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS TO THE CONTRARY, THE PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLER IN ARTICLE IV OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES): (I) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON IS MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE SELLER, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR ANY PART THEREOF; (II) THE PURCHASER HAS NOT EXECUTED OR AUTHORIZED THE EXECUTION OF THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR ENTERED INTO THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN RELIANCE UPON, AND HEREBY SPECIFICALLY DISCLAIMS RELIANCE UPON, ANY PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY WHATSOEVER MADE OR OMITTED TO BE MADE TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES, INCLUDING ANY SUCH PROMISE, STATEMENT, PROJECTION, FORECAST, REPRESENTATION OR WARRANTY AS TO THE CONDITION, VALUE, QUALITY OR PROSPECTS OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, OR ANY PART THEREOF; (III) THE PURCHASED ASSETS ARE BEING

16

TRANSFERRED "AS IS", "WHERE IS" AND "WITH ALL FAULTS"; AND (IV) NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, AS TO THE ACCURACY OR COMPLETENESS OF ANY PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY OF THE FOREGOING MADE IN RESPONSE TO ANY DUE DILIGENCE REQUEST LIST OR MADE DURING ANY DUE DILIGENCE TELEPHONIC OR IN-PERSON MEETINGS), AND NONE OF THE SELLER, ANY AFFILIATES OF THE SELLER OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY TO THE PURCHASER OR ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO THE PURCHASER OR ANY OF ITS AFFILIATES, ADVISORS, OFFICERS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF, OR ANY SUCH PERSON'S USE OF OR RELIANCE ON, ANY SUCH PROJECTION, FORECAST, STATEMENT OR INFORMATION OR ANY ERRORS THEREIN OR OMISSIONS THEREFROM.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

Section 6.1    Conduct of Seller. During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (a) as required by the Bankruptcy Court, the Bankruptcy Code or other applicable Law, or (b) with the prior written consent of the Purchaser, the Seller shall: (i) use commercially reasonable efforts to (A) operate and/or maintain the tangible Purchased Assets in the ordinary course of business in all material respects and in compliance with applicable Laws, and (B) maintain and keep the tangible Purchased Assets in reasonably good operating condition and repair for the purposes for which such Purchased Assets are used in the business of the Seller (subject to normal wear and tear), (ii) use commercially reasonable efforts to preserve and maintain all of the Assigned Permits, (iii) not terminate, cancel or amend in any material respect any of the Assigned Contracts or Assigned Permits, or release, assign or waive any material rights thereunder, (iv) not cancel, forgive or compromise any material debt or claim that would have constituted a Purchased Asset if not so cancelled, forgiven or compromised, (v) not abandon or allow to lapse any rights in any Purchased Intellectual Property, (vi) not cancel or terminate any material Insurance Policy without obtaining comparable substitute insurance coverage, (vii) not voluntarily permit any of the Purchased Assets to become subject to any Encumbrance, except for Permitted Encumbrances, and (viii) not sell, assign, license, transfer, convey, lease, surrender, relinquish, terminate or otherwise dispose of any material portion of the Purchased Assets other than (A) in the ordinary course of business or (B) the disposition of obsolete, worn out, used or immaterial assets.

Section 6.2    Taxes.

17

(a)     Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, recording or other similar Taxes that arise from the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes"), as well as any related Tax Return preparation and filing costs, shall be borne and timely paid by the Purchaser. Each Tax Return with respect to such Transfer Taxes will be prepared and timely filed by the Purchaser. In the event that any such Tax Return requires execution by the Seller, the Seller shall promptly execute such Tax Return after receipt thereof from the Purchaser and deliver it to the Purchaser so long as such Tax Return was prepared in compliance with applicable Law.

(b)     The Seller shall be allocated and bear all property Taxes and similar ad valorem obligations (excluding, for the avoidance of doubt, income Taxes and Transfer Taxes) levied based upon or measured by the ownership or operation of the Purchased Assets (collectively, the "Asset Taxes") for (i) any period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date; provided, however, that the Seller shall not be liable for or be required to pay any Taxes resulting from any act, omission or transaction taken by the Purchaser or any of its Affiliates after the Closing, or any Tax election made by the Purchaser or any of its Affiliates that would be effective on or before the Closing Date. The Purchaser shall be allocated and bear all Asset Taxes (A) that are described in the proviso of the immediately preceding sentence, (B) for any period that begins on or after the Closing Date, and (C) the portion of any Straddle Period beginning after the Closing Date, including any such Asset Taxes that were paid or prepaid by the Seller at or prior to the Closing. For purposes of this Section 6.2(b), Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period ending on and including the Closing Date, on the one hand, and the number of days in such Straddle Period that occur after the Closing Date, on the other hand, and all other Asset Taxes (if any) based upon sales, purchases or receipts shall be allocated upon a hypothetical closing of the taxable year on the Closing Date. The party hereto responsible under applicable Law for paying an Asset Tax shall be responsible for preparing and filing the Tax Return for such Asset Tax and for paying such Asset Tax shown to be due on such Tax Return. The Seller, on the one hand, or the Purchaser, on the other hand, as the case may be, shall promptly (but in no event later than twenty (20) days after receipt of notice from the party hereto making such payment) provide reimbursement for any Asset Tax paid by the other party, all or a portion of which is the responsibility of such party in accordance with the terms of this Section 6.2(b).

Section 6.3     Insurance. The Purchaser hereby acknowledges and agrees that, effective upon the Closing, all policies of, and binders evidencing, any form or type of insurance that are owned or maintained by the Seller or any of its Affiliates that cover or relate to the Seller or any of its assets, liabilities, employees, businesses or operations (such policies and binders, the "Seller Insurance Coverage") may be terminated or modified by the Seller or any of its Affiliates to exclude coverage of the Purchased Assets and the Assumed Liabilities, and neither the Seller nor any of its Affiliates will be purchasing or otherwise acquiring any "tail" policy or other additional or substitute coverage for the foregoing. Any refund, rebate, credit or other amount paid, distributed or returned by any insurance provider or other Person in respect of, or relating

18

to, the Seller's or any of its Affiliates' termination or modification of any Seller Insurance Coverage shall be the property of the Seller or such Affiliate.

Section 6.4    Confidentiality.

(a)    The Purchaser shall, and the Purchaser shall cause its Representatives (as such term is defined in the Confidentiality Agreement) to, treat all nonpublic information obtained in connection with this Agreement and the transactions contemplated hereby as confidential in accordance with the terms of the Confidentiality Agreement.

(b)    Except as contemplated by Section 6.5, the Seller and the Purchaser will not, and the Seller and the Purchaser will cause their respective Affiliates and Representatives not to, disclose to any Person any information with respect to the legal, financial or other terms or conditions of this Agreement or any Ancillary Agreement or any of the transactions contemplated hereby and thereby. The foregoing does not restrict the right of any party hereto or any of its Affiliates or Representatives to disclose such information (i) to its Affiliates and Representatives, (ii) as required by any Law or requested by any Governmental Body (including the Bankruptcy Court), (iii) as is necessary and proper in conjunction with the filing of any Tax Return with any Governmental Body, (iv) as is reasonably necessary in connection with the enforcement, exercise or assertion of any right, remedy or defense relating to this Agreement or any Ancillary Agreement or the transactions contemplated hereby or thereby, and (v) in the case of the Seller and its Affiliates and Representatives, as may be necessary in connection with the Chapter 11 Cases and/or the administration of the Seller's and/or its Affiliates' chapter 11 estates. Each party will advise its Affiliates and Representatives with respect to the confidentiality obligations under this Section 6.4(b) and will be responsible for any breach or violation of such obligations by any such Persons.

Section 6.5    Publicity. Unless otherwise required by or reasonably necessary to comply with applicable Law or Bankruptcy Court requirements, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices made with the Bankruptcy Court related thereto, each of the Seller and the Purchaser agree that it (a) shall communicate and consult with each other prior to making any public disclosure or statements with respect to this Agreement or the transactions contemplated hereby and (b) shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party. Nothing in this Agreement shall restrict or prohibit the Seller or its Affiliates from communicating with their respective employees, customers, suppliers or other business relations.

Section 6.6    Wrong Pocket.

(a)    The Seller shall (i) promptly deliver to the Purchaser any mail or other communication relating to any of the Purchased Assets or any of the Assumed Liabilities and received by the Seller on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by the Seller on or after the Closing Date to the extent that such cash, electronic credits or deposits are Purchased Assets and (iii) promptly forward to the Purchaser any checks or other instruments of payment

19

that it receives on or after the Closing Date to the extent that such checks or other instruments are Purchased Assets.

(b)     The Purchaser shall (i) promptly deliver to the Seller any mail or other communication not relating to the Purchased Assets or the Assumed Liabilities and received by the Purchaser on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Seller any cash, electronic credits or deposits received by the Purchaser to the extent that such cash, electronic credits or deposits are not Purchased Assets and (iii) promptly forward to the Seller any checks or other instruments of payment that it receives on or after the Closing Date to the extent that such checks or other instruments are not Purchased Assets.

Section 6.7     Use of Excluded Names. It is expressly acknowledged and agreed that the Purchaser is not acquiring (on its own behalf or on behalf of any of its Affiliates) any right, title or interest in, or any right to use, the name "Compute North" or the identifier "CN" (including in any trademarks, service marks, trade dress, trade names, domain names, logos, identifying symbols, signs or corporate names), any variation or derivative thereof, or any names, identifiers or marks confusingly similar thereto (any of the foregoing, the "Excluded Names"). From and after the Closing Date, the Purchaser shall not use, and shall cause all of its Affiliates following the Closing not to use, the Excluded Names.

Section 6.8     Access and Preservation of Records. For a period of six (6) years following the Closing, the Purchaser agrees that it shall preserve and keep the books and records (whether in documentary or data form) held by it or its Affiliates relating to the Purchased Assets and the Assumed Liabilities and shall make such books and records available to the Seller and the Seller's auditors, attorneys, agents and other Representatives in connection with, among other things, (a) monitoring, preserving and enforcing the Seller's rights, remedies and obligations under this Agreement or any of the Seller Ancillary Agreements, (b) the preparation, examination or submission of any filings with Governmental Bodies (including Tax Returns), (c) financial reporting and accounting matters (including the preparation of financial statements), (d) insurance claims or related matters, (e) any request, inquiry, audit or other examination by any Governmental Body (including any Tax audits, claims and assessments), (f) the administration and/or closing of the Chapter 11 Cases, or (g) the conduct, defense, prosecution or settlement of any Action, whether pending or threatened. In the event the Purchaser wishes to destroy any such books or records at the end of such six year period, the Purchaser shall first give sixty (60) days' prior written notice to the Seller and the Seller shall have the right at its option and expense, upon prior written notice given to the Purchaser within such sixty (60) day period, to take possession of the applicable books or records within one hundred and twenty (120) days after the date of such notice.

Section 6.9     Further Assurances.

(a)     Subject to the terms and conditions of this Agreement and applicable Law, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with Section 3.4, the Seller and the Purchaser shall use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to ensure that the conditions precedent to the other party's obligations hereunder to consummate the transactions contemplated hereby set

20

forth in Article VII are satisfied and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable, but in any event on or prior to the Outside Date, including using its reasonable best efforts to obtain all necessary waivers, consents, approvals and Orders (including entry of the Sale Order by the Bankruptcy Court) and effecting all necessary registrations and filings to consummate and make effective the transactions contemplated hereby.

(b)     Subject to the terms and conditions of this Agreement, neither the Seller nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Seller or the Purchaser to consummate the transactions contemplated by this Agreement (including taking any action or refraining from taking any action the effect of which is intended or would reasonably be expected to result in any of the conditions to any party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied) unless taking such action or refraining from taking such action is required by applicable Law.

(c)     Without limiting the generality of the other provisions of this Section 6.9, to the extent any filing is required under the HSR Act or any other Antitrust Law, the Purchaser and the Seller shall, or shall cause its "ultimate parent entity" (as such term is defined by the rules to the HSR Act, "UPE"), if any, to promptly prepare and file all necessary documentation and effect all applications that are required thereunder with respect to the transactions contemplated under this Agreement. Each of the Purchaser and the Seller shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act or any other Antitrust Law. The Seller and the Purchaser shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the United States Federal Trade Commission, the United States Department of Justice or any other Governmental Body. If such a filing is made, the Purchaser and the Seller shall or shall cause its UPE, if any, to use its reasonable best efforts to obtain as promptly as possible any clearance required for the consummation of the transactions contemplated under this Agreement.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1     Conditions Precedent to the Obligations of the Purchaser and the Seller. The respective obligations of the Seller and the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted by applicable Law, joint written waiver by the Purchaser and the Seller, of each of the following conditions:

(a)     no Law (including any Order) (whether temporary, preliminary or permanent) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated hereby shall be in effect; and

(b)     the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be a Final Order.

Section 7.2    <u>Conditions Precedent to the Obligations of the Seller</u>. The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Seller, in whole or in part, to the extent permitted by applicable Law):

(a)    the representations and warranties of the Purchaser contained in <u>Article V</u> shall be true and correct in all material respects (without giving effect to any limitation or qualification as to materiality set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all material respects only as of such specified date), and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(b)    the Purchaser shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Seller shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(c)    the Purchaser shall have delivered, or caused to be delivered, to the Seller (or at the direction of the Seller) all of the items set forth in <u>Section 3.3</u>; and

(d)    the Purchaser shall have instructed the Escrow Agent to deliver the Deposit to the Seller in accordance with <u>Section 2.2</u>.

Section 7.3    <u>Conditions Precedent to the Obligations of the Purchaser</u>. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of the Seller contained in <u>Article IV</u> shall be true and correct in all respects (without giving effect to any limitation or qualification as to materiality set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date, which shall be so true and correct in all respects only as of such specified date), and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the foregoing;

(b)    the Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by the Seller on or prior to the Closing Date, <u>provided</u>, that, with respect to covenants, obligations and agreements that are qualified by a "materiality" limitation or qualification, Seller shall have performed such agreements, covenants and conditions, as so qualified, in all respects, and the Purchaser shall have received a certificate duly signed by an authorized person of the Seller, dated the Closing Date, certifying the forgoing;

(c)        Pursuant to the MARA Assignment, TZRC KM shall have a first priority security interest in certain collateral securing certain obligations under that Master Agreement dated November 21, 2021 ("MARA MSA"), and Order Form dated August 4, 2022 issued pursuant to the MARA MSA ("MARA Order Form"), each by and between Marathon Digital Holdings, Inc. ("MARA") and TZRC KM (the "MARA Lien"); and

(d)        the Purchaser shall have received all of the items set forth in Section 3.2.

## ARTICLE VIII

## ADDITIONAL DEFINITIONS

Section 8.1    Certain Definitions. As used herein:

(a)        "Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person. The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by Contract or otherwise).

(b)        "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(c)        "Antitrust Laws" means the HSR Act, the Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and any other applicable federal, state and foreign antitrust, merger control, competition or trade regulation Laws of any Governmental Body or Laws issued by any Governmental Body that are otherwise designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition.

(d)        "Assigned Contracts" means the PMA, the TZRC Agreement, the TZCH Senior Note and all executory Contracts and unexpired leases that are expressly set forth on Schedule 1.1 attached hereto (taking into account any deemed update to Schedule 1.1 attached hereto pursuant to Section 1.3(a) upon the Purchaser's delivery of a Designation Notice); provided, that a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, the Purchaser to the extent that such Contract is terminated by any other party thereto, or terminates or expires by its terms, at or prior to such time as it is to be assumed by the Purchaser and assigned to the Purchaser as an Assigned Contract hereunder.

(e)        "Assigned Permits" means all Permits issued to, and held by, the Seller that are included in the Purchased Assets.

23

(f)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(g)    "Code" means the Internal Revenue Code of 1986, as amended.

(h)    "Compute North" means Compute North LLC, a Delaware limited liability company.

(i)    "Confidentiality Agreement" means the Confidentiality Agreement, dated as of October 25, 2022, by and between Compute North Holdings, Inc. and the Purchaser, as amended, supplemented or otherwise modified from time to time.

(j)    "Contract" means any contract, indenture, note, bond, lease, license, commitment or other legally enforceable agreement, instrument or arrangement.

(k)    "Encumbrance" means any encumbrance, charge, restrictive covenant or condition, easement, encroachment, servitude, pledge, security interest, mortgage, lease, deed of trust, option, right of use, first offer or refusal, hypothecation or lien (statutory or otherwise) or similar restriction, whether imposed by Contract or Law.

(l)    "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.), and other similar federal, state, provincial and local statutes.

(m)    "Equipment" means all items of furniture, fixtures, furnishings, leasehold improvements, equipment, machinery, switchgear, containers, transformers, spare parts and other tangible personal property of every kind and description, owned or leased by the Seller, wherever located, including communications equipment, IT Assets, and any attached and associated hardware, routers, devices, panels, cables, cords, connectors and cards.

(n)    "Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(o)    "Final Order" means an Order of the Bankruptcy Court (or other court of competent jurisdiction having jurisdiction over the Chapter 11 Cases) entered by the Clerk of the Bankruptcy Court on the docket in any of the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (i) is and remains in full force and effect, (ii) has not been modified, amended, reversed, vacated or stayed, (iii) as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired and as to which no appeal, petition for certiorari or motion for new trial, stay,

reargument or rehearing shall then be pending, and (iv) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

(p)     "Governmental Body" means any applicable federal, state, provincial, local, municipal, or foreign government or any agency, bureau, board, commission, court, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof.

(q)     "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes thereof, asbestos and asbestos containing materials, polychlorinated biphenyls, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," or "toxic" (or words of similar meaning) under or pursuant to any Environmental Law, including any regulations adopted by a Governmental Body pursuant thereto.

(r)     "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

(s)     "Intellectual Property" means any and all of the following: (i) patents, (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names, (iii) copyrights, (iv) registrations and applications for any of the foregoing, and (v) trade secrets and confidential information or know-how (including, research and development, formulas, manufacturing and production processes and techniques, technical data and designs).

(t)     "IT Assets" means all computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements that are owned, leased or licensed by the Seller.

(u)     "Knowledge of the Seller" means the actual knowledge of the President and Chief Financial Officer of Compute North.

(v)     "Laws" means all (i) federal, state, provincial, local, municipal, foreign or other laws, statutes, legislations, constitutions, common law, resolutions, rules, edicts, codes, regulations, restrictions, ordinances, proclamations, treaties, conventions and requirements of, or issued, promulgated, enforced or entered by, any Governmental Body, and (ii) Orders.

(w)     "Leased Real Property" means all of the real property leased or subleased by the Seller, together with all buildings, structures, fixtures and improvements erected thereon,

25

and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto.

(x) "Liability" means, as to any Person, any claim, debt, adverse claim, lien, liability, duty, responsibility, obligation, commitment, assessment, cost, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense), loss, damage, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, ascertained or ascertainable, fixed, absolute or contingent, matured or unmatured, direct or indirect, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, due or to become due, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(y) "Licensed Intellectual Property" means all Intellectual Property that is licensed to the Seller and that is included in the Purchased Assets.

(z) "Neutral Accountant" means an independent accounting firm jointly selected by the Purchaser and the Seller. If the Purchaser and the Seller cannot jointly agree on a Neutral Accountant, the Purchaser and the Seller shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Neutral Accountant shall be selected by lot from these two firms by the respective accountants of the Purchaser and the Seller.

(aa) "Order" means any order, writ, judgment, injunction, decree, ruling, directive, determination or award made, issued or entered by any Governmental Body, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order).

(bb) "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

(cc) "Owned Intellectual Property" means all Intellectual Property owned by the Seller and that is included in the Purchased Assets.

(dd) "Permits" means all permits, approvals, concessions, grants, franchises, licenses, clearances, registrations, variances, certifications, exemptions, endorsements, waivers and other authorizations issued by any Governmental Body.

(ee) "Permitted Encumbrances" means (i) Encumbrances for utilities or Taxes that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings or the payment or enforcement of which is stayed under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court, (ii) easements, rights of way, restrictive covenants, encroachments and other similar Encumbrances against any of the

26

Purchased Assets that do not, individually or in the aggregate, adversely affect the operation of the applicable Purchased Asset in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) any Encumbrances created this Agreement or any of the Ancillary Agreements or created by the actions of the Purchaser or its Affiliates, (v) mechanics', carriers', workers', repairers', landlords' and similar Encumbrances arising or incurred in the ordinary course of business for amounts that are not yet due and payable or the validity or amount of which are being contested in good faith by appropriate proceedings or the payment or enforcement of which is stayed under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court, (vi) other Encumbrances that do not, individually or in the aggregate, materially and adversely affect a Purchased Asset, as determined by the Purchaser in its sole discretion, and (vii) the TZCH Lien.

(ff)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(gg)    "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Person that is an individual.

(hh)    "PMA" means that certain Modular Data Center Property Management Agreement dated as of March 8, 2022, entered into among TZRC KM, Seller and TZCH (as amended).

(ii)    "Purchased Intellectual Property" means, collectively, the Owned Intellectual Property and the Licensed Intellectual Property.

(jj)    "Purchased IT Assets" means all IT Assets that are included in the Purchased Assets.

(kk)    "Purchased Leased Real Property" means all Leased Real Property that is included in the Purchased Assets.

(ll)    "Purchaser Ancillary Agreements" means, collectively, the Bill of Sale, the Escrow Agreement, the Purchaser Waiver Agreement, the Transition Services Agreement and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement.

(mm)    "Purchaser Parties" means, collectively, (i) the Purchaser, (ii) each of the current or former Affiliates of the Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

(nn)    "Registered IP" means all Owned Intellectual Property that is registered or issued as a patent, trademark or copyright or filed as an application to register or issue as a patent, trademark or copyright.

(oo)    "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

(pp)    "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren (by blood, adoption or marriage).

(qq)    "Release" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(rr)    "Representatives" means, with respect to the Seller or the Purchaser (as the case may be), the officers, directors, managers, employees, auditors, counsel, professionals, advisors, accountants, agents, contractors and other representatives of (i) the Seller or the Purchaser (as applicable) or (ii) any of the Affiliates of the Seller or the Purchaser (as applicable).

(ss)    "Sale Order" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Seller and the Purchaser, which shall, among other things, approve (i) the sale of the Purchased Assets by the Seller to the Purchaser pursuant to this Agreement free and clear of all Encumbrances (other than Permitted Encumbrances), and (ii) the assignment by the Seller to the Purchaser, and the assumption by the Purchaser, of the Assumed Liabilities pursuant to this Agreement.

(tt)    "Seller Ancillary Agreements" means, collectively, the Bill of Sale, the Escrow Agreement, the Transition Services Agreement, the MARA Assignment, the Purchaser Waiver Agreement and each other certificate, agreement or document (other than this Agreement) that the Seller is required to execute and/or deliver pursuant to the terms of this Agreement.

(uu)    "Seller Disclosure Schedules" means the Schedules to this Agreement that relate solely to the representations and warranties of the Seller set forth in Article IV.

(vv)    "Seller Parties" means, collectively, (i) the Seller, (ii) each of the current or former Affiliates of the Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

(ww)   "Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

(xx)   "Tax" and "Taxes" means any foreign or U.S. federal, state, county, or local income, transfer, sales, use, excise, franchise, profits, real and personal property, gross receipt, value added, stamp, license, capital gains, capital stock, production, business and occupation, disability, employment, payroll, severance, withholding or other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including all interest, additions, surcharges, fees or penalties related thereto.

(yy)   "Tax Return" means any return, report, information return, declaration, claim for refund or other information or document (including any schedule or related or supporting information) filed or provided, or required to be filed or provided, with or to any Governmental Body with respect to Taxes (including in connection with the determination, assessment or collection of Taxes or the administration of any Law with respect to Taxes), including amendments thereto.

(zz)   "Transition Services Agreement" means a duly executed Transition Services Agreement in form and substance acceptable to Purchaser, Seller and TZCH (which services shall include (i) use of, and/or access to, Operator Background IP (as defined in the PMA) by Seller for purposes of performing the transition services, and (ii) the transfer of any and all customer data of TZRC KM and access to and information related to the network topography of TZRC KM) providing for no more than $100,000 in fees plus actual and documented costs incurred in connection with the services rendered pursuant thereto, payable by Purchaser, provided that such costs must be pre-approved in writing by Purchaser, which shall terminate by its terms on December 15, 2022.

(aaa)   "TZCH Lien" means the secured interest granted by the Seller in favor of TZCH under the TZRC Agreement and perfected by that certain U.C.C. Initial Filing No. 2022 3432473 of April 22, 2022.

(bbb)   "TZRC Agreement" means that certain Limited Liability Company Agreement of TZRC LLC dated as of November 24, 2021 entered into between Seller and TZCH (as amended).

Section 8.2     Additional Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
| --- | --- |
| Actions | 4.5 |
| Agreement | Preamble |
| Allocation Schedule | 2.4 |
| Asset Taxes | 6.2(b) |
| Assumed Liabilities | 1.2 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |

| **Defined Term** | **Location** |
|---|---|
| Bankruptcy Exceptions | 4.2 |
| Bill of Sale | 3.2(a) |
| Cash Purchase Price | 2.1(a) |
| Chapter 11 Cases | Recitals |
| Closing | 3.1 |
| Closing Date | 3.1 |
| DACA Accounts | 3.2(i) |
| Deposit | 2.2 |
| Designation Notice | 1.3(a) |
| e-mail | 9.7 |
| Escrow Account | 2.2 |
| Escrow Agent | 2.2 |
| Escrow Agreement | 2.2 |
| Excluded Names | 6.7 |
| Execution Date | Preamble |
| Insurance Policies | 4.13 |
| Legal Restraint | 3.4(c) |
| MARA | 7.3(c) |
| MARA Assignment | 3.2(h) |
| MARA Lien | 7.3(c) |
| MARA MSA | 7.3(c) |
| MARA Order Form | 7.3(c) |
| Outside Date | 3.4(b) |
| Post-Closing Covenants | 9.2 |
| Purchased Assets | 1.1 |
| Purchaser | Preamble |
| Real Property Leases | 4.11(a) |
| Seller | Preamble |
| Seller Insurance Coverage | 6.3 |
| Transfer Taxes | 6.2(a) |
| TZCH | 2.1(a) |
| TZCH Action | 3.2(g) |
| TZCH Senior Note | 2.1(a) |
| TZRC KM | 3.2(h) |
| UPE | 6.9(c) |

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Payment of Expenses. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto will bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; provided, that all (a) Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto), and (b) filing fees in connection

with any filings, applications or submissions under the HSR Act or any other Antitrust Law shall be borne solely by the Purchaser.

Section 9.2      Survival of Representations, Warranties; and Covenants. None of the representations, warranties, covenants or agreements in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, including any rights arising out of any breach or violation of any such representations, warranties, covenants or other agreements, will survive the Closing, and all such representations, warranties, covenants and other agreements shall terminate and expire upon the occurrence of the Closing; provided, that (i) each of the covenants and agreements set forth in this Agreement and/or any of the Ancillary Agreements which by their express terms are to be performed or complied with subsequent to the Closing Date (collectively, the "Post-Closing Covenants") and rights arising out of any breach or violation of any such Post-Closing Covenants (collectively, the "Post-Closing Covenants Claims") shall survive the Closing in accordance with their terms, and (ii) the representations and warranties in Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.6(a), 4.10 and 4.12 (collectively, the "Material Representations") and rights arising out of any breach or violation of any such Material Representations (collectively, the "Material Representations Claims") shall survive the Closing until the expiration of the applicable statute of limitations. In furtherance of the foregoing, each of the Seller and the Purchaser hereby waives, to the fullest extent permitted under applicable Law, any and all rights, claims, remedies and causes of action it may have against the other party hereto (including any rights, claims, remedies and causes of action arising under or based upon any federal, state, local or foreign statute, ordinance, rule, regulation or other Law) for any breach of any representation, warranty, covenant or obligation set forth in this Agreement and/or any of the Ancillary Agreements, or in any document, schedule, certificate, agreement or instrument delivered pursuant to or in connection with this Agreement and/or any of the Ancillary Agreements, except with respect to the Post-Closing Covenants or Material Representations, and excluding the Post-Closing Covenants Claims and Material Representations Claims. The parties hereto hereby waive and release, to the fullest extent permitted under applicable Law, any and all rights, claims, remedies and causes of action it may have against the other party and, as applicable, any other Purchaser Party or Seller Party (including any rights, claims, remedies and causes of action arising under or based upon any federal, state, local or foreign statute, ordinance, rule, regulation or other Law), except with respect to the Post-Closing Covenants and excluding the Post-Closing Covenants Claims. At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Seller, on the other hand, have any recourse against (i) the Seller or any of the Seller Parties, or (ii) the Purchaser or any of the Purchaser Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Seller or the Purchaser, as applicable, in this Agreement or any of the Ancillary Agreements, except with respect to claims against the Seller or the Purchaser, as applicable, for breaches of Post-Closing Covenants or Material Representations, and excluding Post-Closing Covenants Claims and Material Representations Claims.

Section 9.3      Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings between the parties hereto with respect

31

thereto. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the Purchaser and the Seller, or in the case of a waiver, by the party against whom the waiver is to be effective. The waiver by any party hereto of any provision of this Agreement or any breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any other or subsequent breach of any provision of this Agreement. No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 9.4    Counterparts. For the convenience of the parties hereto, this Agreement and the Ancillary Agreements, and any amendments hereto or thereto, may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement, and to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any Ancillary Agreement shall raise the use of electronic signature, a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 9.5    Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

Section 9.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL ACTIONS, CLAIMS, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR ANY COURT EXERCISING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT) IN RESPECT OF ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING AND AGREES THAT IT WILL NOT BRING ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING IN ANY OTHER COURT; PROVIDED, HOWEVER, THAT IF THE CHAPTER 11 CASES ARE DISMISSED OR IF THE BANKRUPTCY COURT IS UNABLE TO HEAR ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE

DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, IN ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE) WILL HAVE SOLE JURISDICTION OVER ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT AS A DEFENSE, COUNTERCLAIM OR OTHERWISE, IN ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, (A) ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE NAMED COURTS FOR ANY REASON OTHER THAN THE FAILURE TO SERVE PROCESS IN ACCORDANCE WITH SECTION 9.7, (B) ANY CLAIM THAT IT OR ITS PROPERTY IS EXEMPT OR IMMUNE FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS COMMENCED IN ANY SUCH COURT (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF JUDGMENT, EXECUTION OF JUDGMENT OR OTHERWISE) AND (C) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) THE ACTION, CLAIM, SUIT OR PROCEEDING IN SUCH COURT IS BROUGHT IN AN INCONVENIENT FORUM, (II) THE VENUE OF SUCH ACTION, CLAIM, SUIT OR PROCEEDING IS IMPROPER OR (III) THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR ENTERED INTO IN CONNECTION HEREWITH, OR THE SUBJECT MATTER HEREOF OR THEREOF, MAY NOT BE ENFORCED IN OR BY ANY SUCH COURT. EACH PARTY HERETO AGREES THAT NOTICE OR THE SERVICE OF PROCESS IN ANY ACTION, CLAIM, SUIT OR PROCEEDING ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, SHALL BE PROPERLY SERVED OR DELIVERED IF DELIVERED IN THE MANNER CONTEMPLATED BY SECTION 9.7.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 9.7    Notices. Except as otherwise expressly provided in this Agreement, all notices, requests, demands, consents, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when sent by electronic mail ("e-mail"), (b) when delivered personally, (c) one (1) Business Day after deposit with an overnight courier service, or (d) three (3) Business Days after the date of mailing by certified or registered mail, return receipt requested, with postage prepaid, in any such case to the parties hereto at the following addresses or e-mail addresses (or at such other address or e-mail address for a party hereto as shall be specified by like notice to the other party hereto):

If to the Seller:

c/o Compute North Holdings, Inc.
7575 Corporate Way
Eden Prairie, MN 55344
Attn: Barry Coulby, Jason Stokes
Email: barry.coulby@computenorth.com; jason.stokes@computenorth.com;
legal@computenorth.com

with a copy (which shall not constitute effective notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Luis F. Gomar; Sayan Bhattacharyya
Email: luisgomar@paulhastings.com; sayanbhattacharyya@paulhastings.com

If to the Purchaser:

c/o U.S. Data Group, Inc.
1221 Brickell Ave., Suite 900
Miami, FL 33131
Attn: Asher Genoot; Joel Block
Email: asher@usbitcoin.com; jblock@usbitcoin.com

with a copy (which shall not constitute effective notice) to:

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Attn: Robert J. Stark; Matt Uretsky; Andrew Carty
Email: rstark@brownrudnick.com; muretsky@brownrudnick.com;
acarty@brownrudnick.com

Section 9.8    Binding Effect; Assignment. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns, including, in the case of the Seller, any trustee or estate representative appointed in the Chapter 11 Cases. No assignment of this Agreement or any rights, interests or obligations hereunder may be made by any party hereto (by operation of Law or otherwise) without the prior written consent of the other party hereto, and any attempted assignment without the required consents shall be void.

Section 9.9    Severability. If any term, condition or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party hereto. Upon such determination that any term, condition or other provision

34

is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 9.10   Injunctive Relief. The parties hereto acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) an award of money damages would not be adequate to compensate the non-breaching party. Accordingly, each of the parties hereto shall be entitled, in addition to any other rights and remedies existing in its favor at law or in equity, to equitable relief, an injunction or injunctions or Orders for specific performance to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder, without the necessity of proving the inadequacy of money damages as a remedy. The right to equitable relief, including specific performance and injunctive relief, shall exist in addition to and notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the parties hereto hereby irrevocably waives any defense that a remedy at law is adequate and any requirement to obtain, furnish or post any bond, security or other instrument in connection with or as a condition to any actions instituted for injunctive relief, specific performance or other equitable remedies. Each of the parties hereto hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties hereto would have entered into this Agreement.

Section 9.11   Third Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable benefit, claim, cause of action, remedy or right of any kind hereunder, except that each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of Sections 3.5(a), 9.2 and 9.12.

Section 9.12   Intentionally Omitted.

Section 9.13   Time of the Essence. Time is of the essence in the performance of each of the obligations of the parties hereto and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

Section 9.14   Disclosure. Any exception, qualification or other disclosure set forth on the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Agreement shall be deemed to be an exception, qualification or other disclosure with respect to all other representations or warranties contained in this Agreement to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent that such exception, qualification or disclosure is applicable to such other

35

representations or warranties whether or not such exception, qualification or disclosure makes reference to such other representations or warranties or any of their Section references.

Section 9.15     Bulk Transfer Laws. The Purchaser hereby acknowledges that the Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

Section 9.16     Certain Interpretations.

(a)     Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits of or to this Agreement.

(ii)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)     The table of contents and Article, Section and paragraph captions herein are for convenience of reference only, and shall not be deemed to limit or otherwise affect the meaning or interpretation of any of the provisions hereof.

(iv)     The words "include," "includes" and "including" and words of similar import, when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Any reference to "days" means calendar days unless Business Days are expressly specified.

(vi)     Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)     The words "herein," "hereinafter," "hereof" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole

36

and not merely to a subdivision or particular provision in which such words appear unless the context otherwise requires.

(ix)    The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(x)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(xi)    The term "or" is disjunctive and not exclusive.

(xii)    The phrases "delivered" or "made available" and words of similar import, when used in this Agreement in reference to information or materials delivered or made available to the Purchaser, shall include information or materials that have been made available by the Seller in any "data room" (virtual or otherwise) to which the Purchaser has access (whether or not the Purchaser accesses such information or materials).

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)    Prior drafts of this Agreement or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be construed in favor of or against any party on account of its participation in the negotiations and/or drafting of such prior drafts or be used as an aid of construction or otherwise constitute evidence of the intent of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such prior drafts.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>:

**COMPUTE NORTH MEMBER LLC**

By: _Drake Harvey_ _____
75156D9531394BE...
Name: Drake Harvey
Title: President

*[Signature Page to the Asset Purchase Agreement]*

**PURCHASER**:

**US DATA KING MOUNTAIN LLC**

By: _____

Name: Asher Genoot

Title: Authorized Person

## Schedule 1.1

### Description of Purchased Assets

"Purchased Assets" means:

(a) 100% of the membership interest in TZRC LLC, a Delaware limited liability company ("TZRC"), held by Compute North Member LLC, a Delaware limited liability company, pursuant to the TZRC Agreement, which such membership interest represents 50% of all issued and outstanding membership interests in TZRC; and

(b) the PMA, the TZRC Agreement and the TZCH Senior Note (the "Assigned Contracts"); provided, that such assignment and assumption of the PMA does not include any license to Operator Background IP (as defined in the PMA) owned by the Seller and/or its Affiliates, successors, or assigns.

**Schedule 1.2**

**Description of Assumed Liabilities**

"Assumed Liabilities" means:

(a)     all Transfer Taxes;

(b)     all Asset Taxes for which the Purchaser is responsible under Section 6.2;

(c)     all Liabilities of the Seller under each Assigned Contract;

(d)     all Liabilities arising from the ownership, use or operation of the Purchased Assets after the Closing (including Liabilities in respect of Taxes for taxable periods, or portions thereof, beginning on or after the Closing Date); and

(e)     the Member Loan Secured Obligations (as defined in the TZRC Agreement) owing by Compute North Member LLC, and the obligation to repay the same under the TZCH Senior Note (collectively, the "Note Repayment Obligation"); provided that the outstanding balance of the Member Loan Secured Obligations shall be reduced by the Note Paydown Amount; and provided further that, for the avoidance of doubt, Purchaser shall not assume any obligations to provide a Parent Guaranty (as defined in the TZCH Senior Note); provided further that, Purchaser's assumption of the Note Repayment Obligation is contingent in all respects on the Purchaser and TZCH's entry into an agreement respecting the Note Repayment Obligation on terms acceptable to the Purchaser.

**<u>Exhibit B</u>**

**Selected Target Contracts**

**Selected Target Contracts**

| Non-Debtor Counterparty | Contract | Debtor Counterparty | Assignee |
| --- | --- | --- | --- |
| TZRC King Mountain LLC<br><br>TZ Capital Holdings, LLC | Modular Data Center Property Management Agreement dated as of March 8, 2022 | Compute North Member LLC | U.S. Data Group, Inc. |
| TZ Capital Holdings, LLC | Limited Liability Company Agreement of TZRC LLC dated as of November 24, 2021 | Compute North Member LLC | U.S. Data Group, Inc. |
| TZ Capital Holdings, LLC | Secured Promissory Note dated April 8, 2022 | Compute North Member LLC | U.S. Data Group, Inc. |