**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-90273 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Re: Docket Nos. 576, 577, 665, 666, 683 and 684** |

**NOTICE OF FILING OF: (I) REDLINE OF SECOND AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF COMPUTE NORTH HOLDINGS AND ITS DEBTOR AFFILIATES; AND (II) REDLINE OF DISCLOSURE STATEMENT OF THE SECOND AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF COMPUTE NORTH HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE** that on November 23, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed: (I) the *Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 576] (the "Plan"); and (II) *Disclosure Statement for the Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 577] (the "Disclosure Statement") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

**PLEASE TAKE FURTHER NOTICE** that on December 15, 2022, the Debtors filed: (I) the *Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings and Its Debtor Affiliates* [Docket No. 665] (the "Amended Plan"); and (II) *Disclosure Statement for the Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 666] (the "Amended Disclosure Statement") with the Court.

**PLEASE TAKE FURTHER NOTICE** that contemporaneously herewith, the Debtors filed: (I) the *Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings and Its Debtor Affiliates* [Docket No. 684] (the "Second Amended Plan"); and (II) *Disclosure Statement for the Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 683] (the "Second Amended Disclosure Statement") with the Court.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238).  The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as <u>Exhibit A</u> is a redline reflecting the changes between the Amended Plan and the Second Amended Plan.

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as <u>Exhibit B</u> is a redline reflecting the changes between the Amended Disclosure Statement and the Second Amended Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that copies of the Second Amended Plan, the Second Amended Disclosure Statement, as well as copies of all documents filed in these chapter 11 cases, are available free of charge by visiting the case website maintained by Debtors' claims, noticing and solicitation agent, Epiq Corporate Restructuring LLC, available at https://dm.epiq11.com/case/computenorthholdings/. You may also obtain copies of any pleadings by visiting pacer.uscourts.gov.

[*Remainder of Page Intentionally Left Blank*]

Dated: December 19, 2022  
      Houston, Texas

/s/ James T. Grogan III

**PAUL HASTINGS LLP**  
James T. Grogan III (TX Bar No. 24027354)  
600 Travis Street, 58th Floor  
Houston, Texas 77002  
Telephone:  (713) 860-7300  
Facsimile:  (713) 353-3100  
Email: jamesgrogan@paulhastings.com

-and-

Luc Despins (admitted *pro hac vice*)  
Sayan Bhattacharyya (admitted *pro hac vice*)  
Daniel Ginsberg  (admitted *pro hac vice*)  
200 Park Avenue  
New York, New York 10166  
Telephone:  (212) 318-6000  
Facsimile:  (212) 319-4090  
Email:  lucdespins@paulhastings.com  
       sayanbhattacharyya@paulhastings.com  
       danielginsberg@paulhastings.com

-and-

Matthew Micheli (admitted *pro hac vice*)  
Michael Jones (admitted *pro hac vice*)  
71 South Wacker Drive, Suite 4500  
Chicago, Illinois 60606  
Telephone:  (312) 499-6000  
Facsimile:  (312) 499-6100  
Email:  mattmicheli@paulhastings.com  
       michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on December 19, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ James T. Grogan III

James T. Grogan III

## Exhibit A

**Redline Second Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-90273 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |

**<span style="color:blue">SECOND</span> AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF**
**COMPUTE NORTH HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

PAUL HASTINGS LLP
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Luc Despins (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Daniel Ginsberg (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

Email:  lucdespins@paulhastings.com
        sayanbhattacharyya@paulhastings.com
        danielginsberg@paulhastings.com

-and-

Matthew Micheli (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email:   mattmicheli@paulhastings.com
         michaeljones@paulhastings.com

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: December ~~15~~19, 2022

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238).  The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

# TABLE OF CONTENTS

Page

SECTION 1. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW .......................................................................................................... 1
    *1.1*      *Defined Terms.* .................................................................................................... 1
    *1.2*      *Rules of Interpretation.* ...................................................................................... 11
    *1.3*      *Computation of Time.* ......................................................................................... 12
    *1.4*      *Governing Law.* .................................................................................................. 12
    *1.5*      *Reference to Monetary Figures.* ......................................................................... 12
    *1.6*      *Reference to the Debtors or the Reorganized Debtors.* ...................................... 12
    *1.7*      *Controlling Document.* ........................................................................................ 12

SECTION 2. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY CLAIMS ....................................................................................................................................... 12
    *2.1*      *Administrative Claims.* ....................................................................................... 13
    *2.2*      *Professional Fee Claims.* .................................................................................... 13
    *2.3*      *Priority Tax Claims.* ........................................................................................... 14

SECTION 3. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............... 14
    *3.1*      *Classification of Claims and Interests.* .............................................................. 14
    *3.2*      *Treatment of Claims and Interests.* .................................................................... 15
    *3.3*      *Special Provision Governing Unimpaired Claims.* ............................................ 18
    *3.4*      *Elimination of Vacant Classes.* .......................................................................... 18
    *3.5*      *Voting Classes, Presumed Acceptance by Non-Voting Classes.* ........................ 18
    *3.6*      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.* .... 18
    *3.7*      *Controversy Concerning Impairment.* ................................................................ 18
    *3.8*      *Subordinated Claims.* ......................................................................................... 18

SECTION 4. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................. 19
    *4.1*      General Settlement of Claims and Interests. ...................................................... 19
    *4.2*      Wind-Down Restructuring. .................................................................................. 19
    *4.3*      *Tax Matters.* ........................................................................................................ 22
    *4.4*      *Cancellation of Existing Securities and Agreements.* ........................................ 22
    *4.5*      *Corporate Action.* .............................................................................................. 23
    *4.6*      *Indemnification Obligations.* ............................................................................. 23
    *4.7*      *Section 1146 Exemption.* .................................................................................... 23
    *4.8*      *Director and Officer Liability Insurance.* .......................................................... 24

SECTION 5. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 24
    *5.1*      *Assumption and Rejection of Executory Contracts and Unexpired Leases.* ....... 24
    *5.2*      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* ......... 24
    *5.3*      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.* .... 24

| | | |
|---|---|---|
| *5.4* | *Insurance Policies, including D&O Insurance.* | 25 |
| *5.5* | *Reservation of Rights.* | 25 |
| *5.6* | *Nonoccurrence of Effective Date.* | 25 |
| *5.7* | *Contracts and Leases Entered Into After the Petition Date.* | 25 |
| SECTION 6. | PROVISIONS GOVERNING DISTRIBUTIONS | 25 |
| *6.1* | *Timing of Distributions.* | 25 |
| *6.2* | *Distribution Agent.* | 26 |
| *6.3* | *Rights and Powers of the Distribution Agent.* | 26 |
| *6.4* | *Delivery of Distributions and Undeliverable or Unclaimed Distributions.* | 26 |
| *6.5* | *Manner of Payment.* | 27 |
| *6.6* | *Compliance with Tax Requirements.* | 27 |
| *6.7* | *Allocations.* | 28 |
| *6.8* | *Foreign Currency Exchange Rate.* | 28 |
| *6.9* | *Setoffs and Recoupment.* | 28 |
| *6.10* | *Claims Paid or Payable by Third Parties.* | 28 |
| SECTION 7. | THE PLAN ADMINISTRATOR AND THE LITIGATION TRUST | 29 |
| *7.1* | *The Plan Administrator.* | 29 |
| *7.2* | *The Litigation Trust.* | 29 |
| *7.3* | *Wind-Down.* | 29 |
| *7.4* | *Tax Returns.* | 30 |
| *7.5* | *Dissolution of the Reorganized Debtors.* | 30 |
| SECTION 8. | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS | 31 |
| *8.1* | *Allowance of Claims.* | 31 |
| *8.2* | *Claims Administration Responsibilities.* | 31 |
| *8.3* | *Disputed Claims Process.* | 31 |
| *8.4* | *Estimation of Claims and Interests* | 31 |
| *8.5* | *Adjustment to Claims or Interests without Objection.* | 32 |
| *8.6* | *Disallowance of Claims or Interests.* | 32 |
| *8.7* | *No Distributions Pending Allowance.* | 32 |
| *8.8* | *Distributions After Allowance.* | 32 |
| *8.9* | *No Postpetition Interest on Claims.* | 33 |
| SECTION 9. | SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | 33 |
| *9.1* | *Effect of Confirmation.* | 33 |
| *9.2* | ***Release of Liens.*** | 33 |
| *9.3* | ***Releases by the Debtors.*** | 34 |
| *9.4* | ***Releases by the Releasing Parties.*** | 35 |
| *9.5* | ***Exculpation.*** | 35 |
| *9.6* | ***Injunction.*** | 36 |

*9.7*      *Protections Against Discriminatory Treatment.* ...................................................... 36

*9.8*      *Document Retention.* ...................................................................................... 36

*9.9*      *Reimbursement or Contribution.* ........................................................................ 37

SECTION 10. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ................ 37

*10.1*     *Conditions Precedent to the Effective Date.* ........................................................... 37

*10.2*     *Waiver of Conditions.* .................................................................................... 37

*10.3*     *Effect of Failure of Conditions.* ........................................................................ 38

*10.4*     *Substantial Consummation* ............................................................................. 38

SECTION 11. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............ 38

*11.1*     *Modification and Amendments.* ......................................................................... 38

*11.2*     *Effect of Confirmation on Modifications.* ............................................................. 38

*11.3*     *Revocation or Withdrawal of Plan.* .................................................................... 38

SECTION 12. RETENTION OF JURISDICTION ............................................................... 38

SECTION 13. MISCELLANEOUS PROVISIONS ............................................................... 40

*13.1*     *Immediate Binding Effect.* .............................................................................. 40

*13.2*     *Additional Documents.* ................................................................................... 40

*13.3*     *Payment of Statutory Fees.* .............................................................................. 40

*13.4*     *Statutory Committee and Cessation of Fee and Expense Payment.* ............................... 41

*13.5*     *Reservation of Rights.* .................................................................................... 41

*13.6*     *Successors and Assigns.* .................................................................................. 41

*13.7*     *Notices.* ...................................................................................................... 41

*13.8*     *Term of Injunctions or Stays.* ........................................................................... 41

*13.9*     *Entire Agreement.* ......................................................................................... 42

*13.10*    *Plan Supplement.* .......................................................................................... 42

*13.11*    *Nonseverability of Plan Provisions.* ................................................................... 42

*13.12*    *Votes Solicited in Good Faith.* .......................................................................... 42

*13.13*    *Closing of Chapter 11 Cases.* ........................................................................... 42

*13.14*    *Waiver or Estoppel.* ....................................................................................... 43

*13.15*    *Creditor Default* ........................................................................................... 43

**INTRODUCTION**

Compute North Holdings, Inc. and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), propose this joint liquidating chapter 11 plan for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Wind-Down Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**SECTION 1.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

*1.1*     *Defined Terms*.

As used in this Plan, capitalized terms have the meanings set forth below.

1.1.1     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 327, 328, 330, 365, 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through and including the Effective Date; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (d) any U.S. Trustee Fees.

1.1.2     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

1.1.3     "*Administrative and Priority Claims Reserve*" means a reserve established by the Plan Administrator on the Effective Date to be used to pay Holders of all Allowed Priority Claims and Allowed Administrative Claims, to the extent that such claims have not been paid in full on or before the Effective Date.

1.1.4     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced Entity was a debtor in a case under the Bankruptcy Code.

1.1.5     "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order); (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections

502, 503 or 507 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to disallowance under section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

1.1.6   "*Asset Purchase Agreement*" means a definitive purchase agreement for an Asset Sale, including all exhibits and schedules thereto, and as may be amended, modified, or supplemented in accordance with the terms thereof.

1.1.7   "*Asset Sale*" means a sale of the Estates' assets pursuant to section 363 of the Bankruptcy Code or the Plan.

1.1.8   "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which (a) shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, and which, if applicable, shall be in form and substance acceptable to relevant Purchaser(s) pursuant to an Asset Purchase Agreement or (b) was assumed in accordance with any Asset Purchase Agreement approved by a Sale Order.

1.1.9   "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims and Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable Law.

1.1.10   "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended, and as applicable to the Chapter 11 Cases.

1.1.11   "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

1.1.12   "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time, and as applicable to the Chapter 11 Cases.

1.1.13   "*Bar Date Order*" means the Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of 30 Largest Unsecured Creditors, and (C) Redact Certain Individual and Customer Confidential Information, (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information, (III) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), and (IV) Granting Related Relief [Docket No. 86].

1.1.14   "*Bar Date(s)*" means the applicable date(s) designated by the Bankruptcy Court (or pursuant to the Bankruptcy Rules) as the last date for filing Proofs of Claims or Interests in the Chapter 11 Cases of the respective Debtors, including the Claims Bar Date, the Governmental Unit Bar Date, and the Administrative Claims Bar Date.

1.1.15   "*Business Day*" means any day other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.1.16   "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

1.1.17   "*Causes of Action*" means any claims, cross-claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character

whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Action.

1.1.18     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

1.1.19     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors or any of the Estates.

1.1.20     "*Claims and Noticing Agent*" means Epiq Corporate Restructuring LLC, the claims, noticing, and solicitation agent retained or to be retained by the Debtors in the Chapter 11 Cases.

1.1.21     "*Claims Bar Date*" means the date established by Final Order of the Bankruptcy Court, including, without limitation, the Bar Date Order, by which Proofs of Claim must be Filed with respect to Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

1.1.22     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

1.1.23     "*Class*" means a class of Claims or Interests as set forth in Section 3 of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

1.1.24     "*CN Member*" means Compute North Member, LLC.

1.1.25     "*CNCC GUC Claim*" means any Claim against CN Corpus Christi LLC that is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Claim; (d) an Other Priority Claim; (e) an Intercompany Claim; or (f) a Claim subordinated under section 510(b) of the Bankruptcy Code.  For the avoidance of doubt, "CNCC GUC Claim" includes the amount of any Claim that is otherwise a Secured Claim to the extent the value of the collateral securing such Claim is less than the amount of such Claim, as determined in accordance with section 506(a) of the Bankruptcy Code.

1.1.26     "*Collateral*" means any property or interest in property of the Debtors' Estates subject to a Lien, charge, right of setoff, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.1.27     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code pursuant to that certain Notice of Appointment of Creditors' Committee Filed by the U.S. Trustee on October 6, 2022 [Docket No. 139].

1.1.28     "*Combined Hearing*" means the hearing held by the Bankruptcy Court to consider final approval of the Disclosure Statement and Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, which the Debtors have requested a hearing to commence on December 9, 2022, at [10:30 a.m.], prevailing Central Time, as such hearing may be continued from time to time.

1.1.29   "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.1.30   "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.1.31   "*Confirmation Hearing*" means the Combined Hearing, as it relates to Confirmation of the Plan.

1.1.32   "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

1.1.33   "*Consummation*" means the occurrence of the Effective Date under the Plan.

1.1.34   "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

1.1.35   "*Cure Notice*" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan or assumed and assigned under an Asset Purchase Agreement pursuant to section 365 of the Bankruptcy Code, a notice that (a) sets forth the proposed amount to be paid on account of a Cure Claim in connection with the assumption of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan or assumed and assigned to a Purchaser in connection with an Asset Sale; (c) sets forth the procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases, including the proposed objection deadline, and for the resolution by the Bankruptcy Court of any such disputes; and (d) states that the proposed assignee (if applicable) has demonstrated its ability to comply with the requirements of adequate assurance of future performance of the Assigned Contracts, including the assignee's financial wherewithal and willingness to perform under such executory contract or unexpired lease.

1.1.36   "*Cure/Assumption Objection Deadline*" means the date that is 14 days after Filing of the Assumed Executory Contracts and Unexpired Leases Schedule and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after the Filing of the initial Assumed Executory Contracts and Unexpired Leases Schedule, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors is proposed to be assigned to a third party after the Filing of the initial Assumed Executory Contracts and Unexpired Leases Schedule, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Assumed Executory Contracts and Unexpired Leases Schedule with such modification and (b) the date of the scheduled Confirmation Hearing or Sale Hearing, as applicable; *provided further that* the forgoing shall not apply to any Executory Contract or Unexpired Lease that has been assumed and assigned pursuant to a Final Order of the Bankruptcy Court.

1.1.37   "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

1.1.38   "*Debtor Release*" means the release set forth in Section 9.3 of the Plan.

1.1.39   "*Disclosure Statement*" means the related disclosure statement with respect to this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

1.1.40   "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; and (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which an objection or request for estimation has been Filed.

1.1.41   "*Distribution Agent*" means the Plan Administrator or the Entity or Entities selected by the Plan Administrator, as applicable, to make or facilitate distributions pursuant to the Plan.

1.1.42   "*Distribution Date*" means any date that is: (a) the Initial Distribution Date; (b) any Interim Distribution Date; or (c) the Final Distribution Date, as the context requires.

1.1.43   "*Distribution Reserve Accounts*" means the respective accounts holding each of the reserves established pursuant to this Plan, and such other reserve accounts as may be established by the Plan Administrator, including the Administrative and Priority Claims Reserve, the Plan Administration Operating Reserve, and the Secured Claims Reserve.

1.1.44   "*Distribution Record Date*" means the record date for purposes of determining which holders of Allowed Claims are eligible to receive distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.

1.1.45   "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Section 10 of the Plan have been satisfied or waived in accordance with Section 10 of the Plan and (b) no stay of the Confirmation Order is in effect.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.1.46   "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.47   "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case and all property (as defined in section 541 of the Bankruptcy Code) acquired by such Debtor after the Petition Date and before the Effective Date.

1.1.48   "*Excess Sale Proceeds*" means, in the event of an Asset Sale, an amount equal to (a) the aggregate net cash proceeds of such Asset Sale *less* (b) the aggregate amount required (i) to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims in priority of payment under the Bankruptcy Code or applicable nonbankruptcy law and (ii) to fund the Wind-Down Budget.

1.1.49   "*Excluded Customer Equipment*" means any customer-owned bitcoin mining equipment, wherever located, in which the Debtors hold a lien or security interest, the disposition of which has not been addressed by an order of the Bankruptcy Court prior to the Confirmation Date, which equipment is addressed under Section 4.2.3 of this Plan.

1.1.50   "*Exculpated Parties*" ~~means, collectively, and in~~ each ~~case~~of the following in ~~its~~their capacity as such: ~~(a) and, in~~ each ~~of~~case, to the maximum extent permitted by law: (i) the Debtors; (~~b~~ii) ~~the independent directors~~each director, manager, or officer of any Debtor entity; and (~~c~~iii) ~~with respect to each of~~ the ~~foregoing Entities in clauses (a)~~Committee and ~~(b),~~each of ~~the Related Parties of such Entity~~its members.~~.~~

1.1.51   "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.52   "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

1.1.53   "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

1.1.54    "*Final Distribution Date*" means the date on which a distribution is made by the Distribution Agent after the Reorganized Debtors' assets have been completely reduced to Cash, abandoned or otherwise disposed of, and the Reorganized Debtors have resolved all Disputed Claims and paid all Allowed Administrative Claims and Allowed Priority Claims.

1.1.55    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

1.1.56    "*General Unsecured Claim*" means any Claim against any of the Debtors that is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Claim; (d) a Parent GUC Claim, (e) an Other Priority Claim; (f) an Intercompany Claim; or (g) a Claim subordinated under section 510(b) of the Bankruptcy Code.  For the avoidance of doubt, "General Unsecured Claim" includes the amount of any Claim that is otherwise a Secured Claim to the extent the value of the collateral securing such Claim is less than the amount of such Claim, as determined in accordance with section 506(a) of the Bankruptcy Code.

1.1.57    "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

1.1.58    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.1.59    "*Governmental Unit Bar Date*" means the date by which Proofs of Claim must be Filed with respect to Claims held by Governmental Units.

1.1.60    "*Holdings*" means Compute North Holdings, Inc.

1.1.61    "*Holder*" means an Entity holding a Claim against or an Interest in a Debtor, as applicable.

1.1.62    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.63    "*Initial Distribution Date*" means, except as set forth in this Plan, the first Business Day at least 60 days after the Effective Date, or such longer or shorter period as may be reasonably determined by the Plan Administrator, to make initial Distributions under this Plan.

1.1.64    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor arising before the Petition Date.

1.1.65    "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor.

1.1.66    "*Interests*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, and including all common stock, preferred stock, limited partner interests, general partner interests, limited liability company interests, and any other equity, ownership, beneficial or profits interests in any of the Debtors, whether or not transferable, and options, warrants, rights, or other securities, agreements or interests to acquire or subscribe for, or which are exercisable, convertible or exchangeable into or for the shares (or any class thereof) of,

common stock, preferred stock, limited partner interests, general partner interests, limited liability company interests, or other equity, ownership, beneficial or profits interests in or of any Debtor, contractual or otherwise, including equity or equity-based incentives, grants or other instruments issued, granted or promised to be granted to current or former employees, directors, officers or contractors of the Debtors (in each case whether or not arising under or in connection with any employment agreement).

1.1.67    "*Interim Distribution Date*" means any date, other than the Final Distribution Date, after the Initial Distribution Date on which the Plan Administrator determines that an interim distribution should be made to Holders of Allowed Claims in light of, among other things, resolutions of Disputed Claims and the administrative costs of such a Distribution.

1.1.68    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Chapter 11 Cases.

1.1.69    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

1.1.70    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.1.71    "*Litigation Trust*" means the grantor trust created pursuant to Section 4.2.6 of the Plan to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Claims and Causes of Action set forth in the Schedule of Retained Causes of Action, in accordance with the terms of the Litigation Trust Agreement.  The Plan Administrator will also serve as trustee of the Litigation Trust.

1.1.72    "*Litigation Trust Agreement*" means the agreement governing the Litigation Trust.  The Litigation Trust Agreement will be included in the Plan Supplement.

1.1.73    "*Other Priority Claim*" means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.1.74    "*Parent Equity Interests*" means the outstanding Class A Voting Common Stock and the Class B Voting Common Stock, issued by Holdings, including any warrants, options or similar grants to acquire such interests, as well as any Claim subordinated under section 510(b) of the Bankruptcy Code that arises from rescission of a purchase or sale of, or for damages arising from the purchase or sale of, an equity interest in Holdings.

1.1.75    "*Parent GUC Claim*" means any Claim against Holdings that is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Claim; (d) an Other Priority Claim; (e) an Intercompany Claim; or (f) a Claim subordinated under section 510(b) of the Bankruptcy Code.  For the avoidance of doubt, "Parent GUC Claim" includes the amount of any Claim against Holdings that is otherwise a Secured Claim to the extent the value of the collateral securing such Claim is less than the amount of such Claim, as determined in accordance with section 506(a) of the Bankruptcy Code.

1.1.76    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

1.1.77    "*Petition Date*" means September 22, 2022.

1.1.78    "*Plan*" means this second amended joint chapter 11 plan of liquidation, the Plan Supplement, and all exhibits and schedules annexed hereto or referenced herein, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

1.1.79    "*Plan Administrator*" means the Person selected by the Debtors to administer the Plan Administrator Assets and effectuate the Wind-Down Restructuring and serve as trustee of the Litigation Trust.  All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator

Assets or the Litigation Trust assets, as applicable, subject to and in accordance with the Wind-Down Budget. The identity of the Plan Administrator and compensation payable to the Plan Administrator under the Plan will be disclosed in the Plan Supplement.

1.1.80 "*Plan Administrator Agreement*" means, that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan. The Plan Administrator Agreement will be included in the Plan Supplement.

1.1.81 "*Plan Administrator Assets*" means, on the Effective Date, all assets of the Estates vested in the Reorganized Debtors to be administered by Plan Administrator, and, thereafter, all assets held from time to time by Reorganized Debtors to be administered by Plan Administrator.

1.1.82 "*Plan Administrator Operating Reserve*" means the reserve in the initial amount as determined by the Debtors established on the Effective Date and which is deemed necessary by the Plan Administrator to satisfy its anticipated fees, costs and expenses in accordance with the Wind-Down Budget.

1.1.83 "*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

1.1.84 "*Plan Oversight Committee*" means a committee formed on the Effective Date consisting of at least two members to be selected by the Committee to oversee the implementation of the Plan by the Plan Administrator following the Effective Date, whose specific rights and responsibilities are set forth in Section 7.2 of the Plan. The members of the Plan Oversight Committee will be identified in the Plan Supplement..

1.1.85 "*Plan Sale*" means any Asset Sale(s) consummated pursuant to the Plan.

1.1.86 "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Assumed Executory Contracts and Unexpired Leases Schedule; (b) the Schedule of Retained Causes of Action; (c) the Wind-Down Transaction Memorandum; (d) the Plan Administrator Agreement; and (e) the Litigation Trust Agreement, in each case prepared in consultation with the Committee. The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement, following consultation with the Committee, up to the Effective Date as set forth in this Plan.

1.1.87 "*Preferred Equity Interests*" means the Series C Convertible Preferred Stock and the Series C-1 Convertible Preferred Stock issued by Holdings, which is senior in right to distribution over the Parent Equity Interests, including any warrants, options or similar grants to acquire such interests.

1.1.88 "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.1.89 "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

1.1.90 "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.1.91 "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Section 2.2 of this Plan.

1.1.92 "*Professional Fee Claim*" any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional on or after the Petition Date through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

1.1.93 "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

1.1.94 "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Governmental Unit Bar Date, or the Administrative Claims Bar Date, as applicable.

1.1.95 "*Purchaser*" means the purchaser or purchasers under an Asset Purchase Agreement, together any successors to and permitted assigns of such purchaser(s).

1.1.96 "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

1.1.97 "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

1.1.98 "*Released Parties*" means (a) each Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the Plan Administrator; (d) the Committee; (e) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; (f) all Holders of Claims or Interests that abstain from voting on the Plan, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and who do not object to the Plan; and (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries, affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided, however, that* (i) any Holder of a Claim or Interest that opts out of the releases in accordance with the procedures set forth in the Solicitation Procedures Order shall not be a "Released Party"; (ii) any Holder of a Claim or Interest who timely Files an objection to the Plan in respect of the releases contained in Section 9.4 of the Plan, shall not be a "Released Party"; and (iii) any Entity or Affiliate of an Entity that is identified on the *Schedule of Retained Causes of Action* shall not be a "Released Party" under the Plan.

1.1.99 "*Releasing Parties*" means (a) the Released Parties; (b) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in

accordance with the procedures set forth in the Solicitation Procedures Order; (c) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; and (e) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (d), such Entity and its current and former Affiliates, interest holders, predecessors, successors, assigns, subsidiaries, and affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

1.1.100   "*Reorganized Debtors*" means each of the Debtors on and after the Effective Date of the Plan.

1.1.101   "*Retained Causes of Action*" means with respect to any Entity identified on the Schedule of Retained Causes of Action, all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Estate may hold against such Entity, including, without limitation, any claims and causes of action for failure to pay for products or services provided or rendered by any of the Debtors, claims and causes of action arising under contracts with the Debtors, claims and causes of action seeking the recovery of any of the Debtors' accounts receivable or other receivables or rights to payment created or arising in connection with any of the Debtors' businesses, including overpayments and tax refunds, claims and causes of action arising under chapter 5 of the Bankruptcy Code, and claims and causes of action for torts committed against the Debtors; provided that the Retained Causes of Action shall not include all Causes of Action settled, released, or exculpated under the Plan.

1.1.102   "*Sale Hearing*" means a hearing to approve an Asset Sale, which hearing may be the Confirmation Hearing.

1.1.103   "*Sale Order*" means, with respect to an Asset Sale consummated pursuant to section 363 of the Bankruptcy Code, the Final Order of the Bankruptcy Court approving such Asset Sale pursuant to the applicable Asset Purchase Agreement.

1.1.104   "*Schedule of Retained Causes of Action*" means the schedule of Retained Causes of Action of the Debtors included in the Plan Supplement.

1.1.105   "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

1.1.106   "*Secured Claim*" means a Claim that is: (a) secured by a valid, perfected, and enforceable Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

1.1.107   "*Secured Claims Reserve*" means the account to be established and maintained by the Plan Administrator and funded with any proceeds of the sale of assets securing the Secured Claims, less the costs of the Plan Administrator that are chargeable against such proceeds under section 506(c) of the Bankruptcy Code.

1.1.108   "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

1.1.109   "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

1.1.110  "*Solicitation Procedures Order*" means the order entered by the Bankruptcy Court conditionally approving the adequacy of the Disclosure Statement, approving the solicitation and notice procedures with respect to confirmation of the Plan, approving the form of ballot and notices in connection therewith, scheduling certain dates with respect thereto, and granting related relief.

1.1.111  "*Third-Party Release*" means the release set forth in Section 9.4 of the Plan.

1.1.112  "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.113  "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.114  "*Unsecured Claim*" means any Claim that is not a Secured Claim.

1.1.115  "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

1.1.116  "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

1.1.117  "*Wind-Down Budget*" means a budget for the reasonable activities and expenses to be incurred in winding down and liquidating and dissolving the Debtors' Estates, as set forth in the Plan Supplement.

1.1.118  "*Wind-Down Distributable Cash*" means: (a) Cash on hand as of the Effective Date; (b) Cash or non-Cash consideration, as monetized, received by or on behalf of the Debtors after the Effective Date; (c) any Excess Sale Proceeds;  and (d) the net proceeds of any Retained Causes of Action recovered by the Litigation Trust, minus (e) (1) Cash held in the Distribution Reserve Accounts; (2) U.S. Trustee Fees, and (3) the Professional Fee Escrow Account.

1.1.119  "*Wind-Down Restructuring*" means the wind down, liquidation and dissolution of the Debtors' Estates following the Effective Date as set forth in Section 4.2 of this Plan.

1.1.120  "*Wind-Down Transactions Memorandum*" means the summary of transaction steps to complete the Wind-Down Restructuring, which shall be (a) included in the Plan Supplement; and (b) consistent with the Plan.

1.1.121  "*Wind-Down Transactions*" means the transactions implementing a Wind-Down Restructuring as set forth in the Wind-Down Transaction Memorandum.

*1.2    Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references to "Sections" are references to Sections hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in

accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws.

## 1.3    Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## 1.4    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require the application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed under New York law shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtor, as applicable.

## 1.5    Reference to Monetary Figures.

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

## 1.6    Reference to the Debtors or the Reorganized Debtors.

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## 1.7    Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the

relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, including the Plan Supplement, the Confirmation Order shall control.

## SECTION 2.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Section 3 hereof.

*2.1    Administrative Claims.*

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator agree to less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Reorganized Debtors shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due) with a Cash distribution from the Administrative and Priority Claims Reserve by the Plan Administrator; (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Plan Administrator, as applicable; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided that* any Administrative Claim that has been assumed by any non-Debtor Entity in connection with an Asset Sale shall not be an obligation of the Debtors under the Plan.

### 2.1.1    Administrative Claims Bar Date

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by this Section 2, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. **Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, their respective Estates, or the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.** Objections to such requests must be Filed and served on the requesting party by the latter of (a) 60 days after the Effective Date, or (b) 60 days after the date on which such Administrative Claim is Filed.

### 2.1.2    Administrative and Priority Claims Reserve

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Administrative and Priority Claims Reserve in Cash. Any Cash remaining in the Administrative and Priority Claims Reserve after payment of all Allowed Administrative Claims and Allowed Priority Claims shall be available for distribution in accordance with the Plan.

*2.2    Professional Fee Claims.*

### 2.2.1    Final Fee Applications and Payment of Professional Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five days after the Effective Date. The

Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account.

The Reorganized Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

### 2.2.2   Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors using Cash on hand. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When such Allowed Professional Fee Claims have been paid in full, any remaining amount held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

### 2.2.3   Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### 2.2.4   Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2.3   *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## SECTION 3.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1   *Classification of Claims and Interests.*

Except for the Claims addressed in Section 2 hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Person, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Persons, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Persons after the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 3A | CNCC GUC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 4 | Parent GUC Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Preferred Equity Interests | Impaired | Entitled to Vote |
| Class 8 | Parent Equity Interests | Impaired | Entitled to Vote |

*3.2    Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and such Holder.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

3.2.1    Class 1 – Secured Claims

3.2.1.1    *Classification*: Class 1 consists of all Secured Claims.

3.2.1.2  *Treatment*: Except to the extent that a Holder of an Allowed Secured Claims agrees in writing to less *favorable* treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Secured Claim, each holder of an Allowed Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; (iii) the Debtor's interest in the Collateral securing such Holder's Allowed Secured Claim; or (iii) such other treatment rendering such Claim Unimpaired.

3.2.1.3  *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan.

3.2.2    Class 2 – Other Priority Claims

3.2.2.1  *Classification*: Class 2 consists of all Other Priority Claims.

3.2.2.2  *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor: (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired.

3.2.2.3  *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.2.3    Class 3 – General Unsecured Claims

3.2.3.1  *Classification*: Class 3 consists of all General Unsecured Claims.

3.2.3.2  *Treatment*: On the Effective Date, each General Unsecured Claim shall be discharged and released, and each Holder of an allowed General Unsecured Claim shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1 and Class 2, on account of such General Unsecured Claim. Distributions of Wind-Down Distributable Cash shall be distributed by the Distribution Agent on the applicable Distribution Date in accordance with the Plan until all Allowed General Unsecured Claims in Class 3 are paid in full (taking into account any distributions made by the Litigation Trust on account of Allowed General Unsecured Claims) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed General Unsecured Claims shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

3.2.3.3  *Voting*: Class 3 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan and shall receive Ballots.

3.2.4    Class 3A – CNCC GUC Claims

3.2.4.1  *Classification*: Class 3A consists of all CNCC GUC Claims.

3.2.4.2  *Treatment*: On the Effective Date, each CNCC GUC Claim shall be cancelled, released and extinguished, and each Holder of a CNCC GUC Claim shall not receive or retain any distribution, property, or other value on account of its CNCC GUC Claim.

3.2.4.3  *Voting*: Class 3A is Impaired under the Plan. Class 3A is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of CNCC GUC Claims are not entitled to vote to accept or reject the Plan.

3.2.5      Class 4 – Parent GUC Claims

3.2.5.1   *Classification*: Class 4 consists of all Parent GUC Claims.

3.2.5.2   *Treatment*: On the Effective Date, each Parent GUC Claim shall be discharged and released, and each Holder of an Allowed Parent GUC Claim shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, and Class 3, on account of such Parent GUC Claim. Distributions of Wind-Down Distributable Cash shall be distributed on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Parent GUC Claims in Class 4 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent GUC Claims) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed Parent GUC Claims shall be subject to the Plan Administrator first paying in full (x) all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate and (y) all Holders of General Unsecured Claims.

3.2.5.3   *Voting*: Class 4 is Impaired under the Plan. Holders of Parent GUC Claims are entitled to vote to accept or reject the Plan and shall receive Ballots.

3.2.6      Class 5 – Intercompany Claims

3.2.6.1   *Classification*: Class 5 consists of all Intercompany Claims.

3.2.6.2   *Treatment*: On the Effective Date, each Intercompany Claim shall be cancelled, released and extinguished, and each Holder of an Intercompany Claim shall not receive or retain any distribution, property, or other value on account of its Intercompany Claim.

3.2.6.3   *Voting*: Class 5 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

3.2.7      Class 6 – Intercompany Interests

3.2.7.1   *Classification*: Class 6 consists of all Intercompany Interests.

3.2.7.2   *Treatment*: On the Effective Date, each Intercompany Interest shall be cancelled, released and extinguished, and each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

3.2.7.3   *Voting*: Class 6 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

3.2.8      Class 7 – Preferred Equity Interests

3.2.8.1   *Classification*: Class 7 consists of all Preferred Equity Interests.

3.2.8.2   *Treatment*: On the Effective Date, all Preferred Equity Interests shall be cancelled, released and extinguished, and each Holder of Allowed Preferred Equity Interests shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, Class 3, and Class 4, on account of such Preferred Equity Interests. Distributions of Wind-Down Distributable Cash shall be distributed on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Preferred Equity Interests in Class 7 are paid in full (taking into account any distributions made by the Litigation Trust on account of Preferred Equity Interests) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that

all Distributions to Holders of Allowed Preferred Equity Interests shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

        3.2.8.3  *Voting*: Class 7 is Impaired under the Plan and is deemed to have rejected the Plan pursuant to section 1126(g) of the *Bankruptcy* Code.  Holders of Existing Parent Interests are not entitled to vote to accept or reject the Plan.

        3.2.9  <u>Class 8 – Parent Equity Interests</u>

        3.2.9.1  *Classification*: Class 8 consists of all Parent Equity Interests.

        3.2.9.2  *Treatment*: On the Effective Date, all Parent Equity Interests shall be cancelled, released, and extinguished, and each Holder of Allowed Parent Equity Interests shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, Class 3, Class 4, and Class 7, on account of its Parent Equity Interests.  Distribution of the Wind-Down Distributable Cash shall be distributed on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Parent Equity Interests in Class 8 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent Equity Interests) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed Parent Equity Interests shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

        3.2.9.3  *Voting*: Class 8 is Impaired under the Plan.  Holders of Parent Equity Interests are entitled to vote to accept or reject the Plan and shall receive Ballots.

3.3     *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing herein shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

3.4     *Elimination of Vacant Classes*.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

3.5     *Voting Classes, Presumed Acceptance by Non-Voting Classes*.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

3.6     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more Classes of Impaired Claims.  The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Section 11 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment

applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

3.7     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

3.8     *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## SECTION 4.
## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  For the avoidance of doubt, such settlement and compromise shall not include or affect any Causes of Action listed in the Schedule of Retained Causes of Action.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Section 6 hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

4.2     Wind-Down Restructuring.

The provisions set forth in this Section 4 shall govern implementation of the Plan.

4.2.1     Wind-Down Transactions

On or before the Effective Date, to the extent not inconsistent with any Sale Order and any Asset Purchase Agreement, the Debtors or Reorganized Debtors, as applicable, shall take all applicable actions set forth in the Wind-Down Transactions Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Wind-Down Restructuring, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Wind-Down Restructuring that are consistent with and pursuant to the terms and conditions of the Plan and Wind-Down Transactions Memorandum, which transactions may include, as applicable: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and Wind-Down Transaction Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer,

assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Wind-Down Transaction Memorandum and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; and (4) all other actions that the applicable Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Wind-Down Restructuring, including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law.

### 4.2.2    Sources of Consideration for Plan Distributions

The Debtors shall fund distributions under the Plan with Wind-Down Distributable Cash.

### 4.2.3    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Confirmation Order, the Sale Order, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, but after consummation of any Asset Sale, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the assets of the Debtors other than any interest of the Debtors in the Excluded Customer Equipment shall vest in the Reorganized Debtors for the purpose of winding down the Estates, free and clear of all Liens, Claims, charges, or other encumbrances. On the Effective Date, (a) the Plan Administrator shall be appointed and shall be authorized to administer, liquidate, monetize and distribute the Wind-Down Distributable Cash, in accordance with the Plan Administrator Agreement, and (b) any interest of the Debtors in the Excluded Customer Equipment, including any liens or security interests held by the Debtors in Excluded Customer Equipment, is deemed abandoned to the owner or operator of the real property where such equipment is located.

### 4.2.4    Reorganized Debtors

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions in accordance with the Wind-Down Budget, (e) assisting the Litigation Trust in enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Plan, the Confirmation Order, any Asset Purchase Agreement, and any Sale Order, and (h) administering the Plan in an efficacious manner.

The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### 4.2.5    Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Reorganized Debtors shall cease and all such persons shall be deemed to have resigned, solely in their capacities as such.  On the Effective Date the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies without any further action required on the part of any such Reorganized Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Reorganized Debtors, or the members of any Reorganized Debtor.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors.  The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

### 4.2.6    Litigation Trust

On or before the Effective Date, (i) the Litigation Trust shall be created and established by the execution and delivery of the Litigation Trust Agreement and any other necessary action, and (ii) all Retained Causes of Action shall be transferred to and vest in the Litigation Trust, free of all Claims, Liens and interests.  The Litigation Trust shall reduce to Cash or otherwise liquidate the Retained Causes of Action and distribute the proceeds to Holders of Claims and Interests in accordance with the Plan and the Litigation Trust Agreement.  The costs and expenses incurred by the Litigation Trust on and after the Effective Date shall be paid from the proceeds of Retained Causes of Action and in accordance with the Wind-Down Budget.  Upon entry of the Final Decree, the Litigation Trust shall be dissolved without further action by the Plan Administrator.

### 4.2.7    Dissolution of the Debtors

Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than thirty (30) days following the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Reorganized Debtors with respect to their affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of each Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.  The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule.

### 4.2.8    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Section 9 hereof, any applicable Final Order, and any applicable Asset Purchase Agreement, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action.  On the Effective Date, the Retained Causes of Action shall vest in the Litigation Trust, and the Litigation Trust's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases

and exculpations contained in the Plan, including in Section 9 hereof, pursuant to a Final Order, Sale Order, Asset Purchase Agreement, or as assigned and transferred pursuant to any applicable Asset Purchase Agreement, which, in each case, shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Litigation Trust may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Holders of Claims and Interests. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Litigation Trust will not pursue any and all available Retained Causes of Action. Except as specifically released under the Plan or pursuant to a Final Order, Sale Order, Asset Purchase Agreement, or as assigned or transferred pursuant to any applicable Asset Purchase Agreement, the Debtors and the Reorganized Debtors expressly reserve the right of the Litigation Trust to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Section 9 hereof, pursuant to a Final Order, or as assigned and transferred under any applicable Asset Purchase Agreement. Unless otherwise agreed upon in writing by the parties to the applicable Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor or the Litigation Trust, without the need for any objection or responsive pleading by the Reorganized Debtors, the Litigation Trust or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Litigation Trust may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Reorganized Debtors and/or the Litigation Trust, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Notwithstanding anything contained herein to the contrary (including the releases described in Section 9), to the extent the Debtors have previously released certain claims and Causes of Action against a party, including pursuant to any Sale Order, any Asset Purchase Agreement, or any Final Order, nothing in the Plan shall be construed to revive such released claims and Causes of Action against such party, or to impair or otherwise limit the releases provided thereunder.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors, for the benefit of the Litigation Trust, notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Litigation Trust, except as otherwise expressly provided in the Plan, including Section 9 hereof. The Litigation Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Litigation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

4.2.9    Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, the Plan Administrator, the Litigation Trust and the respective officers, members and managers (as applicable) thereof, are authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and

conditions of the Plan, without the need for any approvals, authorizations, actions, notices, or consents, except for those expressly required pursuant to the Plan.

4.3     *Tax Matters*.

The terms of the Plan, the Asset Sales (as applicable) and the Wind-Down Transactions shall be structured to minimize, to the extent practicable, the aggregate tax impact of the Wind-Down Transactions on the Debtors and the Reorganized Debtors, taking into account both the cash tax impact of the Wind-Down Transactions on the Debtors in the tax year of the Wind-Down Transactions and Asset Sales (as applicable) and the tax liability of the Reorganized Debtors in subsequent tax years.

4.4     *Cancellation of Existing Securities and Agreements*.

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise provided in this Plan and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, Securities and other documents evidencing or governing Claims or Interests (other than those Claims Reinstated under the Plan) shall be cancelled and the rights of the Holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan or the Confirmation Order.  Nothing contained herein shall be deemed to cancel, terminate, release or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order or hereunder.

4.5     *Corporate Action*.

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including implementation of the Wind-Down Transactions and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Wind-Down Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate or organizational structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equityholders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Section 4.5 shall be effective notwithstanding any requirements under nonbankruptcy Law.

4.6     *Indemnification Obligations*.

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (1) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced or terminated after the Effective Date, and (4) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on or after the Petition Date.  All such obligations shall be

23

deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, for any reason, including by reason of section 502(e)(1)(B) of the Bankruptcy Code.

4.7     *Section 1146 Exemption*.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including in connection with a Plan Sale) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Wind-Down Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including in connection with a Plan Sale), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

4.8     *Director and Officer Liability Insurance*.

After the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

## SECTION 5.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     *Assumption and Rejection of Executory Contracts and Unexpired Leases*.

On the Effective Date, except as otherwise provided herein or the Confirmation Order, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (2) is a D&O Policy or relates to the indemnification obligations of the Debtors, the Reorganized Debtors or the Plan Administrator; (3) is subject to a rejection notice or assumption notice Filed with the Bankruptcy Court; (4) is a contract assumed by the Debtors or to be assumed by the Debtors and assigned to another third party, as applicable, pursuant to an Asset Purchase Agreement; or (5) is an Asset Purchase Agreement. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

5.2     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, **must be Filed with the Bankruptcy Court within thirty days** after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, and (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any such Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified and treated for all purposes as general unsecured claims against the applicable Debtor counterparty.

5.3     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan, in connection with an Asset Sale, or by Final Order or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such rejected Executory Contracts or Unexpired Leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

5.4     *Insurance Policies, including D&O Insurance*.

5.4.1   Each of the Debtors' insurance policies that is executory, including D&O Insurance, and any agreements, documents, or instruments relating thereto, shall be assumed by the Debtors on behalf of the applicable Debtor and vest in the applicable Reorganized Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless (a) such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or a request to reject such insurance policy is pending on the Effective Date, or (b) such insurance policy was previously assumed and assigned to a Purchase under an Asset Purchase Agreement. Coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies. Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.5     *Reservation of Rights*.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized

Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.6     *Nonoccurrence of Effective Date*.

        In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

5.7     *Contracts and Leases Entered Into After the Petition Date*.

        Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## SECTION 6.
## PROVISIONS GOVERNING DISTRIBUTIONS

6.1     *Timing of Distributions*.

        In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any requirement under the Plan that the Reorganized Debtor or Disbursing Agent make a payment or Distribution on a date shall mean that such party is required to commence the process of making a payment or Distribution on such date...

6.2     *Distribution Agent*.

        All distributions under the Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

6.3     *Rights and Powers of the Distribution Agent*.

        6.3.1   Powers of the Distribution Agent.

        The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

        6.3.2   Expenses Incurred on or After the Effective Date.

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent, in each case directly related to distributions under the Plan, shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.  In the event that the Reorganized Debtors object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Reorganized Debtors and such

Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Reorganized Debtors and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

6.4     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    6.4.1    Record Date for Distribution.

    On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    6.4.2    Delivery of Distributions in General.

    Subject to Bankruptcy Rule 9010, all Distributions under the Plan to holders of Allowed Claims shall be made to the Holder of each Allowed Claim at the address of such Holder as listed on the Schedules as of the Distribution Record Date, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such Holder that provides an address for such Holder different from the address reflected on the Schedules.

    6.4.3    Minimum Distributions.

    Neither the Reorganized Debtors nor the Distribution Agent shall have any obligation to make a distribution of Wind-Down Distributable Cash that consists of less than $50.  Notwithstanding anything contained herein to the contrary, if, on any Distribution Date there remains $10,000 or less available for distribution to holders of Allowed General Unsecured Claims, in lieu of making any further Distributions to the holders of such Claims, the Reorganized Debtor may distribute such Cash to the charity of the Reorganized Debtor's choice.

    6.4.4    Undeliverable Distributions and Unclaimed Property.

    In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no further distribution to such Holder shall be made unless and until the Distribution Agent is notified in writing of the then-current address of such Holder, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of sixty (60) days from the date of issuance thereof.  All distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of sixty (60) days after distribution thereof shall be deemed unclaimed property under Bankruptcy Code section 347(b), and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims to such property or Interest in property shall be discharged and forever barred.

    Checks issued by the Reorganized Debtor on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  After that date, all Claims in respect of void checks shall be released and forever barred and the proceeds of those checks shall be deemed unclaimed property in accordance with section 347(b) of the Bankruptcy Code

    6.4.5    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Section 4.4 hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

6.5     *Manner of Payment*.

All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.6     *Compliance with Tax Requirements*.

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

Any person entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Distribution Agent an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8.

6.7     *Allocations*.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

6.8     *Foreign Currency Exchange Rate*.

Except as otherwise provided in a Final Order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

6.9     *Setoffs and Recoupment*.

Except as expressly provided in this Plan, including pursuant to Section 9 hereof, each Reorganized Debtor may, pursuant to sections 553 and 558 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1)

agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Causes of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

6.10    *Claims Paid or Payable by Third Parties*.

      6.10.1    <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

      6.10.2    <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      6.10.3    <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## SECTION 7.
## THE PLAN ADMINISTRATOR AND THE LITIGATION TRUST

7.1    <u>*The Plan Administrator*</u>.

The Plan Administrator shall be appointed effective as of the Effective Date. The rights, powers, privileges, obligations, and compensation of the Plan Administrator shall be set forth in the Plan Administrator Agreement, which shall be filed as part of the Plan Supplement.

7.2    *The Litigation Trust*.

On or before the Effective Date, (i) the Litigation Trust shall be created and established by the execution and delivery of the Litigation Trust Agreement and any other necessary action, and (ii) all Retained Causes of Action shall be transferred to and vest in the Litigation Trust, free of all Claims, Liens and interests. The rights, powers, privileges, obligations, and compensation of the Litigation Trust shall be set forth in the Litigation Trust Agreement, which shall be filed as part of the Plan Supplement.

7.3     *Wind-Down*.

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court consistent with the Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates. Under the Plan Administrator Agreement, the Plan Administrator shall be obligated to consult with the Plan Oversight Committee approximately every thirty (30) days concerning matters related to the Wind-Down Estates. The Plan Administrator shall have the rights, authority and duties set forth in the Plan Administrator Agreement.

On and after the Effective Date, in accordance with the Litigation Trust Agreement, the Litigation Trust shall be responsible for the administration, pursuit, prosecution, litigation, settlement, dismissal or other action taken or contemplated to be taken with regard to the Retained Causes of Action, and shall have the authority to administer, pursue, prosecute, litigate, settle, dismiss or otherwise take action in furtherance of resolving each Retained Cause of Action, subject to the terms and conditions set forth in the Litigation Trust Agreement, the Plan and the Confirmation Order.

The Plan Administrator shall have the authority to hire counsel to advise it in connection with its duties, powers and rights under the Plan Administrator Agreement and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties therein, and pay reasonable compensation to such advisors, without further approval of the Bankruptcy Court. The Plan Administrator shall be entitled to retain professionals in its sole discretion, including any professionals employed by the Debtors or the Committee in the Chapter 11 Cases. The provision of services by a professional to the Debtors or the Committee shall not disqualify such professional from employment by the Plan Administrator.

The Litigation Trust shall have the authority to hire counsel to advise it in connection with its duties, powers and rights under the Litigation Trust Agreement and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties therein, and pay reasonable compensation to such advisors, without further approval of the Bankruptcy Court. The Litigation Trust shall be entitled to retain professionals in its sole discretion, including any professionals employed by the Debtors or the Committee in the Chapter 11 Cases. The provision of services by a professional to the Debtors or the Committee shall not disqualify such professional from employment by the Litigation Trust. The Plan Oversight Committee shall have the right, subject to the consent of the Plan Administrator (which shall not be unreasonably withheld, delayed or conditioned) to select counsel to represent the Litigation Trust and to administer, pursue, prosecute, litigate, settle, dismiss or otherwise take action in furtherance of resolving each Retained Cause of Action.

Any professionals retained by the Plan Administrator or the Litigation Trust shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred, without further order of the Bankruptcy Court. To the extent there are fees and expenses incurred by the Plan Administrator, the Litigation Trust of their respective retained professionals in excess of the amounts set forth in the Wind-Down Budget, such fees may be paid from the Wind-Down Estates, subject to the consent of the Plan Oversight Committee (which shall not be unreasonably withheld, delayed or conditioned). If any dispute arises between the Plan Administrator and the Plan Oversight Committee over matters where consent of the Plan Oversight Committee is required, the Plan Administrator will present the disputed matter to the Bankruptcy Court for resolution after notice and a hearing and will not act on the disputed matter absent further order of the Bankruptcy Court.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of any Asset Purchase Agreement Sale Order and any other documents contemplated thereby; (2) to the extent applicable, file certificates of merger or

equivalent documents, together with all other necessary corporate and company documents, to effect the merger and consolidation of the Debtors *other than* Holdings into Compute North LLC, under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions in accordance with the Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of merger or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or Governing Body of any Reorganized Debtor. From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' entry into the Wind-Down Transactions, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

The Debtors shall include a Wind-Down Budget in the Plan Supplement.

7.4     *Tax Returns*.

From and after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Reorganized Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

7.5     *Dissolution of the Reorganized Debtors*.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Reorganized Debtors shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which any of the Reorganized Debtors is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Reorganized Debtors and withdraw the Reorganized Debtors from registration in all applicable states.

## SECTION 8.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

8.1     *Allowance of Claims*.

The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed. Upon such determination, the Debtors or Reorganized Debtors, as applicable, may update the Claims Register to reflect such Proofs of Claim as Allowed and, upon delivery of the applicable treatment for such Unimpaired Claims under Section 3 (including, for the avoidance of doubt, Reinstatement), to mark such Proofs of Claims as satisfied. The Debtors may determine to Reinstate a claim that would be an Unimpaired Claim under the Plan, even if no timely Proof of Claim is filed therefor.

8.2     *Claims Administration Responsibilities*.

The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) File, withdraw, or litigate to judgment any objections to Claims, (2) settle or compromise any such objections to Claims without further notice to or action, order, or approval of the Bankruptcy Court, and (3) administer and adjust the Claims Register to reflect such settlements or compromises without further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to Section 4.2.7 of the Plan.

Any objections to Proofs of Claims (other than Administrative Claims) shall be served and Filed (a) on or before the date that is one hundred and eighty days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of a Claim or (b) such later date as ordered by the Bankruptcy Court.

8.3     *Disputed Claims Process*.

If the Debtors or Reorganized Debtors dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors, as applicable, or the holder of such Claim may elect to have the validity or amount of any Claim adjudicated by the Bankruptcy Court instead.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.

If the Debtors or Reorganized Debtors, as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Section 8.1 of the Plan or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors or Reorganized Debtors, as applicable, shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

8.4     *Estimation of Claims and Interests*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim or Interest.

8.5     *Adjustment to Claims or Interests without Objection*.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

8.6     *Disallowance of Claims or Interests*.

Except as otherwise expressly set forth herein, and subject to the terms hereof, including Section 9, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

8.7     *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

8.8     *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim or Interest the distributions (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

8.9     *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim

## SECTION 9.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

9.1     *Effect of Confirmation.*

Consistent with section 1141(d)(3) of the Bankruptcy Code, the Plan does not grant the Debtors a discharge.  Notwithstanding the foregoing, except as otherwise expressly provided in the Plan or any contract, instrument or other agreement or document created pursuant to the Plan, the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release, effective as of the Effective Date, of such Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including

withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the holder of such a Claim or Interest has accepted the Plan.  On the  Effective Date, all persons and Entities shall be precluded from asserting against the Reorganized Debtors or the Litigation Trust, or any of their respective assets or properties, any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan.

9.2    **Release of Liens**.

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder, and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.**

**On the Effective Date, concurrently with the consummation of an Wind-Down Restructuring that is consummated under the Plan and except as set forth in any Asset Purchase Agreement, the assets sold in such Wind-Down Restructuring shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, interests or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Sale Order (which may be the Confirmation Order), the Plan and any Asset Purchase Agreement, as applicable.**

9.3    **Releases by the Debtors**.

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in**

each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, their Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out of court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the pursuit of Confirmation and Consummation, the pursuit of Asset Sales, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; (2) any Causes of Action to the extent set forth on the Schedule of Retained Causes of Action; or (3) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

9.4      *Releases by the Releasing Parties*.

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or their Affiliates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination,

negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out of court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the pursuit of Confirmation and Consummation, the pursuit of Asset Sales, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations of any party under any Sale Order and any Asset Purchase Agreement, or any document, instrument, or agreement executed to implement the transactions set forth in such Sale Order and/or Asset Purchase Agreement, as applicable; (2) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (3) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

9.5    *Exculpation*.

Effective as of the Effective Date, to the extent permitted by applicable law, and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Disclosure Statement, the Plan (including the Plan Supplement), or any Wind-Down Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have and, upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity

36

for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

9.6     *Injunction*.

Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  In addition, the Related Parties of any Exculpated Parties shall not incur liability for any cause of action or claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan ((a) and (b), collectively, the "Solicitation Actions").  No entity or person may commence or pursue a claim or cause of action of any kind against any Related Party of an Exculpated Party that arose or arises from, in whole or in part, any Solicitation Actions, without this Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim for actual fraud, gross negligence, or willful misconduct against any such Related Party of an Exculpated Party and such party is not protected pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such claim or cause of action against such Related Party of an Exculpated Party.

9.7     *Protections Against Discriminatory Treatment*.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.8     *Document Retention*.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

9.9     *Reimbursement or Contribution*.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## SECTION 10.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

10.1    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived:

10.1.1    the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and such order shall have become a Final Order;

10.1.2    the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Wind-Down Transactions) all Wind-Down Expenses incurred or estimated to be incurred, through the Effective Date;

10.1.3    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

10.1.4    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan;

10.1.5    all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been funded into the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

10.1.6    no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan; and

10.1.7    the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Wind-Down Transactions (including shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date: (a) if applicable, any Sale Order; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by this Plan; (c) all other material customary documents delivered in connection with transactions of this type (including any and all documents implementing, achieving, contemplated by or relating to the Wind-Down Transactions).

10.2    *Waiver of Conditions.*

Except as otherwise specified in this Plan, any one or more of the conditions to Consummation (or any component thereof) set forth in this Section 10 may be waived by the Debtors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided however* that the Debtors may not waive the requirements of Section 10.1.5 without the prior written consent of the Committee.

10.3    *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

10.4    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## SECTION 11.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

11.1    *Modification and Amendments*.

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify the Plan, following consultation with the Committee, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to (1) those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors expressly reserve their right to revoke or withdraw, or to alter, amend, or modify the Plan, following consultation with the Committee, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

11.2    *Effect of Confirmation on Modifications*.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

11.3    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.   If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## SECTION 12.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

12.1.1   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any

Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

12.1.2  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

12.1.3  resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

12.1.4  ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

12.1.5  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date, including any Causes of Action retained by the Debtors under the Schedule of Retained Causes of Action;

12.1.6  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

12.1.7  enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

12.1.8  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

12.1.9  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.1.10  issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.1.11  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Section 9 hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.1.12  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.10 hereof;

12.1.13  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.1.14  determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

12.1.15  enter a final decree closing the Chapter 11 Cases;

12.1.16  adjudicate any and all disputes arising from or relating to distributions under the Plan;

12.1.17  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

12.1.18  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

12.1.19  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.1.20  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12.1.21  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Section 9 hereof;

12.1.22  enforce all orders previously entered by the Bankruptcy Court; and

12.1.23  hear any other matter not inconsistent with the Bankruptcy Code.

## SECTION 13.
## MISCELLANEOUS PROVISIONS

13.1    *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests (a) are Impaired or Unimpaired, (b) have, or are deemed to have accepted the Plan, or (c) failed to vote to accept or reject the Plan),

All Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

13.2    *Additional Documents*.

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.3    *Payment of Statutory Fees*.

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

13.4    *Statutory Committee and Cessation of Fee and Expense Payment*.

On the Confirmation Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided however*, that the Committee shall continue in existence and have standing and a right to be heard after the Effective Date for the limited purposes of (i) filing and prosecuting applications for allowance of Professional Fee Claims, and (ii) any appeal of the Confirmation Order or other appeal to which the Committee is a party, and the Reorganized Debtors shall be responsible solely for fees and expenses incurred by the members or advisors to the Committee with respect to these limited matters.  Except as set forth in the foregoing sentence, the Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

13.5    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

13.6    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

13.7    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Compute North Holdings, Inc.<br>7575 Corporate Way<br>Eden Prairie, MN 55344<br>Attention: Drake Harvey | Paul Hastings LLP<br>600 Travis Street, Fifty-Eighth Floor<br>Houston, TX 77002 \|<br>Attention: James Grogan |
| **United States Trustee** | **Counsel to the Creditors' Committee** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>Attn:  Jason B. Ruff | McDermott Will & Emery LLP<br>2501 North Harwood Street, Suite 1900<br>Dallas, Texas 75201<br>Attn: Charles R. Gibbs |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities stating that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

13.8    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and

extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

13.9    *Entire Agreement.*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.10    *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/case/computenorthholdings/ or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

13.11    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

13.12    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

13.13    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided,* as of the Effective Date, the Plan Administrator, on behalf of any of the Reorganized Debtors, may submit separate orders to the Bankruptcy Court under certification of counsel closing each of the closing cases and changing the caption of the Chapter 11 Cases accordingly, *provided further* that matters concerning Claims may be heard and adjudicated in a remaining case regardless of whether the applicable Claim is

against a Debtor in a closing case. Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last remaining case, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

13.14   *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

13.15   *Creditor Default*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon such an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to recover from the defaulting creditor reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized Debtors in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: December ~~15~~19, 2022

COMPUTE NORTH HOLDINGS, INC.
on behalf of itself and all other Debtors


_/s/ Drake Harvey_
Drake Harvey
President

**Exhibit B**

**Redline Second Amended Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) Case No.  22-90273 (MI) |
| | ) |
| Debtors. | ) |
| | ) |

**DISCLOSURE STATEMENT FOR**
**THE SECOND AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF**
**COMPUTE NORTH HOLDINGS, INC.  AND ITS DEBTOR AFFILIATES**

---

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR COMPUTE NORTH HOLDINGS, INC.  AND ITS DEBTOR AFFILIATES.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North Holdings, Inc. (4534); Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD, LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238).  The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No.  24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100

Email: jamesgrogan@paulhastings.com
-and-


Luc Despins (*pro hac vice* admission pending)
Sayan Bhattacharyya (*pro hac vice* admission pending)
Daniel Ginsberg  (*pro hac vice* admission pending)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: lucdespins@paulhastings.com
         sayanbhattacharyya@paulhastings.com
         danielginsberg@paulhastings.com

-and-

Matthew Micheli (*pro hac vice* admission pending)
Michael Jones (*pro hac vice* admission pending)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100
Email: mattmicheli@paulhastings.com
         michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>**

**DISCLOSURE STATEMENT, DATED DECEMBER ~~15~~19, 2022**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THIS "<u>DISCLOSURE STATEMENT</u>").  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VIII</u> HEREIN.

IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND INTEREST HOLDERS.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL PERSONS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

IF YOU WANT TO VOTE ON THE PLAN, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT FOR VOTING TO ACCEPT OR REJECT THE PLAN ON OR BEFORE JANUARY 26, 2023, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "<u>VOTING DEADLINE</u>").

THE VOTING RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS DECEMBER 14, 2022 (THE "<u>VOTING RECORD DATE</u>").

A HEARING TO CONSIDER FINAL APPROVAL OF THIS DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN (THE "<u>COMBINED HEARING</u>") WILL BE HELD BEFORE THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE, IN COURTROOM 404 OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHER DISTRICT OF TEXAS, 415 RUSK, HOUSTON, TEXAS 77002, ON [FEBRUARY [•]], 2023, AT [•]:00 [•].M., PREVAILING CENTRAL TIME.  THE COMBINED HEARING MAY BE ADJOURNED OR CONTINUED FROM FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN AS INDICATED IN ANY NOTICE OR AGENDA OF MATTERS SCHEDULED FOR A PARTICULAR HEARING THAT IS FILED WITH THE BANKRUPTCY COURT OR BY ANNOUNCEMENT IN OPEN COURT.

ANY OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED AND FILED ON OR BEFORE JANUARY 26, 2023, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "<u>OBJECTION DEADLINE</u>").

**PLEASE READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  THIS DISCLOSURE STATEMENT SUMMARIZES THE MATERIAL TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

**THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(B), THE PROCEDURES FOR COMPLEX CASES IN THE SOUTHERN DISTRICT OF TEXAS (EFFECTIVE AUGUST 1, 2021) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.**

**THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.**

<u>**DISCLAIMER**</u>

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Chapter 11 Cases.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  Factual information contained in this Disclosure

Statement has been provided by the Debtors' management except where otherwise specifically noted.

This Disclosure Statement contains forward-looking statements within the meaning of section 27a and section 21e of the United States Securities Act of 1933, as amended (the "Securities Act"). Such statements may contain words such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology, and may include, without limitation, information regarding the Debtors' expectations with respect to future events. Forward-looking statements are inherently uncertain and are subject to certain risks and uncertainties that could cause actual results to differ from those expressed or implied in this Disclosure Statement and the forward-looking statements contained herein. **Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is, therefore, speculative**.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein. This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors or the Plan Administrator may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, except as otherwise provided in the Plan or in accordance with applicable law. The information contained in this Disclosure Statement, including the information regarding the history, businesses, and operations of the Debtors and their non-Debtor affiliates, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. Except where specifically noted, the financial information contained in this Disclosure Statement

and the exhibits hereto has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors have not authorized any Person or Entity in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or make any representation or statement regarding this Disclosure Statement, the Plan or the Solicitation, in each case, other than that which is contained in this Disclosure Statement and the exhibits hereto or as otherwise incorporated by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

Certain of the information contained in this Disclosure Statement is by its nature forward looking and contains estimates, assumptions and projections that may be materially different from actual future results.  The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in <u>Article VIII</u>, "Risk Factors." Moreover, Confirmation and Consummation of the Plan are subject to certain material conditions precedent described in Section X of the Plan.  There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  Except as required by law, the Debtors disclaim any obligation to update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................................... 2

ARTICLE I. THE PLAN .................................................................................................................. 3

    A.    General Settlement of Claims and Interests. ................................................................. 4
    B.    Wind-Down Transactions ............................................................................................ 4
    C.    Unclassified Claims .................................................................................................... 5
    D.    Classified Claims and Interests .................................................................................. 6

ARTICLE II. VOTING PROCEDURES AND REQUIREMENTS ............................................. 12

    A.    Parties Entitled to Vote on the Plan .......................................................................... 12
    B.    Classes Entitled to Vote on the Plan ........................................................................ 12
    C.    Votes Required for Acceptance by a Class ............................................................... 12
    D.    Certain Factors to Be Considered Prior to Voting .................................................... 13
    E.    Classes Not Entitled to Vote on the Plan .................................................................. 14
    F.    Solicitation Procedures ............................................................................................. 14
    G.    Voting Procedures .................................................................................................. ~~15~~16
    H.    Plan Objection Deadline ............................................................................................ 19

ARTICLE III. BUSINESS OVERVIEW AND CORPORATE HISTORY .............................. ~~19~~20

    A.    Business Overview ................................................................................................ ~~19~~20
    B.    Prepetition Capital Structure ................................................................................. ~~21~~22

ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 FILING ................................... ~~24~~25

    A.    Overview ............................................................................................................... ~~24~~25
    B.    Dislocation in the Capital and Credit Markets ....................................................... ~~24~~25
    C.    Lack of Financing ................................................................................................. ~~24~~25
    D.    Supply Chain and Fixed Asset Issues .................................................................... ~~25~~26
    E.    Energy Price Volatility ......................................................................................... ~~25~~26
    F.    Decline in Bitcoin Price ........................................................................................ ~~26~~27
    G.    Prepetition Restructuring Efforts ........................................................................... ~~26~~27

ARTICLE V. MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11
        CASES ................................................................................................................. ~~27~~28

    A.    First Day Relief ................................................................................................... ~~27~~28
    B.    Schedules and Statements ..................................................................................... ~~27~~28
    C.    Claims Bar Dates .................................................................................................. ~~28~~29
    D.    Appointment of Creditors' Committee ................................................................... ~~28~~29
    E.    Retention of Professionals .................................................................................... ~~28~~29
    F.    Bidding and Sale Procedures and Asset Sales ....................................................... ~~29~~30
    G.    Postpetition Marketing Process ............................................................................. ~~34~~35
    H.    Committee Objection ............................................................................................ ~~35~~36

ARTICLE VI. OTHER KEY ASPECTS OF THE PLAN ..................................................... ~~35~~37

A.     Distributions .......................................................................... ~~35~~37
B.     Wind-Down Transactions ....................................................... ~~36~~37
C.     Operations between the Confirmation Date and Effective Date. ... ~~37~~38
D.     Sources and Uses of Cash for Plan Distributions. ................. ~~37~~38
E.     Vesting of Assets in the Reorganized Debtors ....................... ~~38~~39
F.     The Reorganized Debtors ....................................................... ~~38~~39
G.     The Plan Administrator and the Litigation Trust .................. ~~38~~40
H.     Dissolution of the Debtors ..................................................... ~~40~~42
I.     The Plan Supplement .............................................................. ~~41~~42
J.     Bankruptcy Code Section 1146 .............................................. ~~41~~42
K.     Preservation of Causes of Action .......................................... ~~41~~43
L.     Treatment of Executory Contracts and Insurance Policies .... ~~45~~47
M.     Settlement, Releases, Exculpations, and Injunctions; Survival of
          Indemnification and Exculpation Obligations ..................... ~~46~~48

ARTICLE VII. CONFIRMATION PROCEDURES ............................... ~~52~~54

A.     Combined Hearing on Confirmation and Final Approval of Disclosure
          Statement and Solicitation ..................................................... ~~52~~54
B.     Requirements for Confirmation of the Plan ........................... ~~53~~55
C.     Best Interests of Creditors / Liquidation Analysis ................ ~~54~~56
D.     Feasibility .............................................................................. ~~55~~57
E.     Acceptance by Impaired Class ............................................... ~~55~~58
F.     Confirmation without Acceptance by Impaired Class ........... ~~55~~58
G.     Alternatives to Confirmation and Consummation of the Plan ... ~~57~~59

ARTICLE VIII. RISK FACTORS .......................................................... ~~57~~59

A.     Considerations that May Affect Recoveries Available to Holders of
          Allowed Claims Under the Plan ............................................ ~~57~~59
B.     Bankruptcy-Specific Considerations ..................................... ~~59~~62
C.     Other Considerations ............................................................. ~~62~~64

ARTICLE IX. CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX
          CONSEQUENCES OF THE PLAN TO THE DEBTORS ......... ~~62~~65

A.     Tax Status of Compute North Holdings, Inc. ........................ ~~63~~65
B.     Certain Federal Income Tax Consequences to the Debtors for U.S. Federal
          Income Tax Purposes ............................................................. ~~63~~66
C.     Wind-Down Transactions ....................................................... ~~64~~67
D.     Distribution of Retained Causes of Action ............................ ~~64~~67
E.     Ownership of Interests in the Litigation Trust ...................... ~~64~~67
F.     Reservation of Rights ............................................................. ~~65~~67

ARTICLE X. CONCLUSION AND RECOMMENDATION ................. ~~65~~67

## <u>TABLE OF EXHIBITS</u>

EXHIBIT A    Plan of Liquidation

EXHIBIT B    Liquidation Analysis

<u>EXHIBIT C    Supplemental Disclosure Regarding the Plan's Global Settlement</u>

## INTRODUCTION

This document and the accompanying materials (this "Disclosure Statement") provides information, pursuant to section 1125 of the Bankruptcy Code, regarding the *Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "Plan"),[2] dated December ~~15~~19, 2022, filed by Compute North Holdings, Inc ("Holdings", and together with its above-captioned affiliates as debtors and debtors in possession, "Compute North" or the "Debtors").  A copy of the Plan is attached hereto as **Exhibit A**.  The rules of interpretation set forth in Section 1 of the Plan shall govern the interpretation of this Disclosure Statement.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan, as required under section 1125 of the Bankruptcy Code.  Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or certifications required pursuant to the Plan.

The Plan constitutes a liquidating Chapter 11 plan for the Debtors and provides for Distribution of the Debtors' Assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Plan and the priority provisions of the Bankruptcy Code.  The Plan contemplates the appointment of a Plan Administrator to implement the terms of the Plan and make Distributions in accordance with its terms.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur at various intervals after the Effective Date as determined by the Plan Administrator in accordance with the Plan.

The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates and therefore seek to confirm the Plan.  As described below, only holders of Class 3 General Unsecured Claims, Class 4 Parent GUC Claims, Class 7 Preferred Equity Interests and Class 8 Parent Equity Interests are entitled to vote to accept or reject the Plan.

The Debtors are seeking the Bankruptcy Court's approval of the Plan.  Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of that chapter 11 plan.  The Debtors submit this Disclosure Statement in accordance with such requirements.  This Disclosure Statement includes the following information:

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

- an overview of the Plan (Article I);

- the indebtedness of the Debtors and information regarding pending claims and administrative expenses (Article I);

- an overview of voting procedures and requirements (Article II);

- an overview of the operation of the Debtors' business (Article III);

- a disclaimer indicating that no statements or information concerning the Debtors or their assets or securities are authorized other than those set forth in the Disclosure Statement (Disclaimer);

- a discussion of key events leading to the commencement of the Debtors' bankruptcy cases (Article IV);

- a discussion of the material developments and events of the Chapter 11 Cases (Article V);

- a discussion of the transactions contemplated by, and other key aspects of, the Plan (Article VI);

- requirements for confirmation of the Plan (Article VII.B);

- risk factors associated with the Plan (Article VIII);

- tax consequences of the Plan (Article IX).

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors expressly reserve the right to alter, amend or modify the Plan one or more times before substantial consummation thereof.

# ARTICLE I.
# THE PLAN

Generally speaking, the Plan: (a) provides for the full and final resolution of all Claims against and Interests in the Debtors; (b) contemplates the appointment of a Plan Administrator to (i) market and sell any remaining assets of the Debtors and otherwise wind-down the Debtors' businesses and affairs; (ii) pay and reconcile Claims; and (iii) administer the Plan in an efficacious manner; (c) provides for Cash distributions in accordance with the Plan; and (d) pays Allowed Administrative Claims and Allowed Priority Claims. The Debtors believe that Confirmation of the Plan will maximize the value of the Debtors' remaining assets, and will avoid the lengthy delay and additional cost of liquidation under chapter 7 of the Bankruptcy Code. The key components of the Plan are summarized below, including the proposed treatment of Claims and Interests under the Plan.

## A.      General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

In that regard, the Plan offers to release claims and Causes of Action that the Debtors may have against Holders of Claims and Interests, provided that (1) such Holders of Claims and Interests vote to accept the Plan or are deemed to accept the Plan and do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, (2) such Holders of Claims and Interests abstain from voting on the Plan and do not affirmatively opt out of the releases set forth in the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and do not object to the Plan, or (3) such Holders of Claims and Interests vote to reject the Plan or are deemed to reject the Plan and do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan; *provided, however,* that any Entity or Affiliate of an Entity that is identified on the Schedule of Retained Causes of Action will not be a Released Party under the Plan.

The Plan is deemed to be a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Section 6 of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

## B.      Wind-Down Transactions

On the Effective Date, the Debtors will effectuate the Wind-Down Transactions contemplated by the Plan.  As a result:

- On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the assets of the Debtors (other than the Excluded Customer Equipment and the Retained Causes of Action) shall vest in the Reorganized Debtors, and the Retained Causes of Action shall vest in the Litigation Trust, for the purpose of winding down the Estates, free and clear of all Liens, Claims, charges, or other encumbrances;

- On the Effective Date, the Litigation trust shall be created, and the Retained Causes of Action shall vest in the Litigation Trust;

- The Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably

possible consistent with the Wind-Down Budget, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions consistent with the Wind-Down Budget, (e) filing appropriate tax returns, (f) complying with its continuing obligations under the Plan, the Confirmation Order, the Asset Purchase Agreement, if any, and (g) administering the Plan in an efficacious manner;

- On the Effective Date, a Litigation Trust will be formed for the purpose of enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action identified on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; and

- On the Effective Date, the Plan Administrator shall be appointed and shall be authorized to administer, liquidate and monetize the Debtors' Estates and distribute the Wind-Down Distributable Cash, in accordance with the Plan and the Plan Administrator Agreement.

### C.   Unclassified Claims

#### 1.   Unclassified Claims Summary

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Expense Claims | Paid in full | 100% |
| Professional Fee Claims | Paid in full | 100% |
| Priority Tax Claims | Paid in full | 100% |

#### 2.   Unclassified Claims Details

##### a.   Administrative Claims

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator agree to less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Reorganized Debtors shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due) with a Cash distribution from the Administrative and Priority Claims Reserve by the Plan Administrator; (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Plan Administrator, as applicable; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided that*

any Administrative Claim that has been assumed by any non-Debtor Entity in connection with an Asset Sale shall not be an obligation of the Debtors under the Plan.

### b.        Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.   The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account.  The Reorganized Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

### c.        Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### d.        Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.   Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### D.        Classified Claims and Interests

#### 1.        Classified Claims and Interests Summary

The Plan establishes a comprehensive classification of Claims and Interests.  The table below summarizes the classification, treatment, and voting rights of the Claims and Interests, by Class, under the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 3A | CNCC GUC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 4 | Parent GUC Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Preferred Equity Interests | Impaired | Entitled to Vote |
| Class 8 | Parent Equity Interests | Impaired | Entitled to Vote |

### 2.    Recovery Analysis

In developing the Plan, the Debtors gave due consideration to various restructuring alternatives. The Debtors conducted a review of their current operations, prospects as an ongoing business, financial projections, and estimated recoveries in a chapter 7 liquidation scenario. The Debtors believe that any alternative to Confirmation, such as a chapter 7 liquidation, would result in significantly less value available for distribution to its creditors, as demonstrated by the Liquidation Analysis, attached as **Exhibit B** to this Disclosure Statement.

### 3.    Classified Claims and Interests Details

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and such Holder. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

### a.    Class 1 – Secured Claims

(i)    <u>Classification</u>: Class 1 consists of all Secured Claims.

(ii)   <u>Treatment</u>: Except to the extent that a Holder of an Allowed Secured Claim agrees in writing to less *favorable* treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Secured Claim, each holder of an Allowed Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; (iii) the Debtor's interest in the Collateral securing such Holder's Allowed Secured Claim; or (iv) such other treatment rendering such Claim Unimpaired.

(iii)   <u>Voting</u>: Class 1 is Unimpaired under the Plan. Holders of Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan.

**b.**      **Class 2 – Other Priority Claims**

(i)   <u>Classification</u>: Class 2 consists of all Other Priority Claims.

(ii)   <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor: (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired.

(iii)   <u>Voting</u>: Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

**c.**      **Class 3 – General Unsecured Claims**

(i)   <u>Classification</u>: Class 3 consists of all General Unsecured Claims.

(ii)   <u>Treatment</u>: On the Effective Date, each General Unsecured Claim shall be discharged and released, and each Holder of an Allowed General Unsecured Claim shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and

Allowed Claims in Class 1 and Class 2, on account of such General Unsecured Claim. Distributions of Wind-Down Distributable Cash shall be distributed by the Distribution Agent on the applicable Distribution Date in accordance with the Plan until all Allowed General Unsecured Claims in Class 3 are paid in full (taking into account any distributions made by the Litigation Trust on account of Allowed General Unsecured Claims) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed General Unsecured Claims shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

(iii)   <u>Voting</u>: Class 3 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan and shall receive Ballots.

**d.   Class 3A – CNCC GUC Claims**

(i)   <u>Classification</u>: Class 3A consists of all CNCC GUC Claims.

(ii)   <u>Treatment</u>: On the Effective Date, each CNCC GUC Claim shall be cancelled, released and extinguished, and each Holder of a CNCC GUC Claim shall not receive or retain any distribution, property, or other value on account of its CNCC GUC Claim.

(iii)   <u>Voting</u>: Class 3A is Impaired under the Plan. Class 3A is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of CNCC GUC Claims are not entitled to vote to accept or reject the Plan.

**e.   Class 4 – Parent GUC Claims**

(i)   <u>Classification</u>: Class 4 consists of all Parent GUC Claims.

(ii)   <u>Treatment</u>: On the Effective Date, each Parent GUC Claim shall be discharged and released, and each Holder of an Allowed Parent GUC Claim shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and

Allowed Claims in Class 1, Class 2, and Class 3, on account of such Parent GUC Claim. Distributions of Wind-Down Distributable Cash shall be distributed on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Parent GUC Claims in Class 4 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent GUC Claims) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed Parent GUC Claims shall be subject to the Plan Administrator first paying in full (x) all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate and (y) all Holders of General Unsecured Claims.

(iii)   Voting: Class 4 is Impaired under the Plan. Holders of Parent GUC Claims are entitled to vote to accept or reject the Plan and shall receive Ballots.

**f.   Class 5 – Intercompany Claims**

(i)   Classification: Class 5 consists of all Intercompany Claims.

(ii)   Treatment: On the Effective Date, each Intercompany Claim shall be cancelled, released and extinguished, and each Holder of an Intercompany Claim shall not receive or retain any distribution, property, or other value on account of its Intercompany Claim.

(iii)   Voting: Class 5 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

**g.   Class 6 – Intercompany Interests**

(i)   Classification: Class 6 consists of all Intercompany Interests.

(ii)   Treatment: On the Effective Date, each Intercompany Interest shall be cancelled, released and extinguished, and each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest.

(iii)   Voting: Class 6 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**h.      Class 7 – Preferred Equity Interests**

(i)      <u>Classification</u>: Class 7 consists of all Preferred Equity Interests.

(ii)     <u>Treatment</u>: On the Effective Date, all Preferred Equity Interests shall be cancelled, released and extinguished, and each Holder of Allowed Preferred Equity Interests shall be entitled to receive its Pro Rata Share of (a) the Wind-Down Distributable Cash, if any, remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, Class 3, and Class 4, on account of such Preferred Equity Interests. Distributions of Wind-Down Distributable Cash shall be distributed on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Preferred Equity Interests in Class 7 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent GUC Claims) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed Preferred Equity Interests shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

(iii)    <u>Voting</u>: Class 7 is Impaired under the Plan.  Holders of Preferred Equity Interests are entitled to vote to accept or reject the Plan and shall receive Ballots.

**i.      Class 8 – Parent Equity Interests**

(i)      <u>Classification</u>: Class 8 consists of all Parent Equity Interests.

(ii)     <u>Treatment</u>:  On the Effective Date, all Parent Equity Interests shall be cancelled, released, and extinguished, and each Holder of Allowed Parent Equity Interests shall be entitled to receive its Pro Rata Share of (a) the Wind-Down Distributable Cash, if any, remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, Class 3, Class 4, and Class 7, on account of its Parent Equity

Interests.  Distribution of the Wind-Down Distributable Cash shall be distributed on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Parent Equity Interests in Class 8 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent GUC Claims) or the Wind-Down Distributable Cash is exhausted; *provided, however*, that all Distributions to Holders of Allowed Parent Equity Interests shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

(iii)    <u>Voting</u>: Class 8 is Impaired under the Plan.  Holders of Parent Equity Interests are entitled to vote to accept or reject the Plan and shall receive Ballots.

## ARTICLE II.
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Parties Entitled to Vote on the Plan

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable, or contractual rights to which the Claims of that Class are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### B.    Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan (each a "<u>Voting Class</u>", and collectively the "<u>Voting Classes</u>"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | General Unsecured Claims | Impaired |
| 4 | Parent GUC Claims | Impaired |
| 7 | Preferred Equity Interests | Impaired |
| 8 | Parent Equity Interests | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions.  If your Claim is included in the Voting Classes, you should read your Ballot and

carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent (as defined below) on behalf of the Debtors, otherwise provided to you.

### C.      Votes Required for Acceptance by a Class

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

Under the Bankruptcy Code, acceptance of a proposed chapter 11 plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of the Holders of more than one-half in number of total allowed claims that have voted and an affirmative vote of Holders holding at least two-thirds in dollar amount of the total allowed claims that have voted.

### D.      Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors, which may impact recoveries under the Plan, include the following:

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement;

- the Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the Holders, and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to Holders as those proposed in the Plan;

- there is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe

13

that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection; and

- any delays of either Confirmation or the occurrence of Effective Date could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the votes of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to Article VIII, entitled "Risk Factors" of this Disclosure Statement.

### E.     Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, Holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  If a claim is unimpaired under a proposed plan, section 1126(f) of the Bankruptcy Code deems the holder of such claim to have accepted the plan, and thus, the holders of claims in such unimpaired classes are not entitled to vote on the plan.  If a claim or interest is impaired under a proposed plan and will not receive or retain any property under the plan on account of such claims or interests, section 1126(g) of the Bankruptcy Code deems the holder of such claim to have rejected the plan, and thus, the holders of claims in such classes are not entitled to vote on the plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3A | CNCC GUC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### F.     Solicitation Procedures

#### 1.     Solicitation

The Debtors retained Epiq Corporate Restructuring, LLC ("Epiq") to act, among other things, as the solicitation agent (the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.[3]

### 2. Solicitation Package

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of December 14, 2022 (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- a cover letter;

- the Ballot which includes the option to opt out of certain third party release and applicable voting instructions, together with a preaddressed, postage prepaid return envelope;

- instructions on where they may obtain copies of this Disclosure Statement and Plan (without exhibits, except the Solicitation and Voting Procedures);

- a notice of the Combined Hearing substantially in the form approved by the Bankruptcy Court (the "Combined Hearing Notice"); and

- Such other materials as the Bankruptcy Court may direct.

### 3. Distribution of the Solicitation Package

The Debtors will cause their counsel to distribute the Solicitation Packages (excluding Ballots) to counsel to Holders of Claims in the Voting Classes via electronic mail before 4:00 p.m. prevailing Central Time on December 22, 2022, or as soon as reasonably practical thereafter.

The Solicitation Package (except for the Ballots) may also be obtained from Epiq by (i) visiting https://dm.epiq11.com/computenorthholdings; (ii) writing to Compute North Holdings, Inc., c/o Epiq Ballot Processing, 10300 SW Allen Blvd., Beaverton, OR 97005; and/or (iii) emailing ComputeNorthHoldingsInfo@epiqglobal.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

The Debtors intend to file the Plan Supplement on or before January 18, 2022. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://dm.epiq11.com/computenorthholdings. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of

---

[3]   The Bankruptcy Court entered order authorizing Epiq's retention pursuant to the *Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 15].

the Plan Supplement by (i) writing to Compute North Holdings, Inc., c/o Epiq Ballot Processing, 10300 SW Allen Blvd., Beaverton, OR 97005; and/or (ii) emailing ComputeNorthHoldingsInfo@epiqglobal.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote. Such Holders will receive only the Combined Hearing Notice and a Non-Voting Status Notice. The Debtors are only distributing a Solicitation Package, including a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

### G.  Voting Procedures

If, as of the Voting Record Date, you are a Holder of a Claim in Class 3, Class 4, Class 7 or Class 8 – the Voting Classes – you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it using the instructions provided. If your Claim or Interest is not included in a Voting Class you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

#### 1.  Voting Deadline

The Disclosure Statement Order established a deadline to vote on the Plan of **January 26, 2023, at 4:00 p.m., prevailing Central Time (the "Voting Deadline")**. To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by the e-balloting platform, first class mail, overnight delivery, or personal delivery, so that the Ballot is actually received by Epiq no later than the Voting Deadline.

#### 2.  Voting Instructions

As described above, the Debtors have retained Epiq to serve as the Solicitation Agent for purposes of the Plan. Epiq is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| To be counted as votes to accept or reject the Plan, all ballots (each, a "Ballot") must be completed, properly executed, and returned in the pre-paid, pre-addressed return envelope included in the Solicitation Package or delivered by: (1) first class mail; (2) overnight courier; (3) hand delivery; or (4) via E-Ballot, so that they are **actually received**, in any case, by the Solicitation Agent by the Voting Deadline, which **is January 26, 2023, at 4:00 p.m., prevailing Central Time**. The Debtors may extend the Voting Deadline, in their discretion, |

| without further order of the Bankruptcy Court. | |
| --- | --- |
| **If by First Class Mail:** | **If by Hand Delivery or Overnight Mail:** |
| **Compute North Holdings, Inc., et al.** c/o Epiq Ballot Processing P.O. Box 4422 Beaverton, OR 97076-4422 | **Compute North Holdings, Inc., et al.** c/o Epiq Ballot Processing 10300 SW Allen Blvd. Beaverton, OR 97005 |
| **To submit your Ballot via Solicitation Agent's online balloting portal, visit https://dm.epiq11.com/computenorthholdings. Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot.** **The Solicitation Agent's online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.** | |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; (c) hand-delivery, or (d) using the e-balloting platform so that the Ballots are actually received by Epiq no later than the Voting Deadline at the return address or e-balloting address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

**As described more fully on the applicable Ballots and Non-Voting Status Notice, Holders who are entitled to vote on the Plan may opt out of the third party release provided in Section IX of the Plan by (a) checking the box on the Ballot and (b) voting to reject the Plan or abstaining from voting on the Plan, and with respect to non-Voting Classes, by submitting the form attached to the Non-Voting Status Notice. If a Holder votes to accept the Plan, such Holder will be deemed to consent to the third party release, unless such Holder elects to opt out of the third party release by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan. The election to withhold consent to grant such release is at such Holder's option.  Distributions**

17

**to be made to Holders under the Plan will not be affected by a Holder's election to opt out of the third party release. Likewise, any such Holder that votes to accept or reject the Plan and submits a Ballot without checking the box to opt out of the third party release will be deemed to consent to the third party release. Accordingly, the Debtors urge Holders permitted to vote on the Plan to thoroughly and carefully read their Ballots, including their right to opt out of the third party release.**

**The Debtors urge you to consult your own advisors regarding the proposed releases set forth in the Plan.**

### 3.     Ballots Not Counted

The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (b) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (c) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely Filed; provided that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00; (d) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot cast via the E-Ballot portal shall be deemed to contain an original signature); (e) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (f) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

### 4.     Disputed Claims Procedures

The Disclosure Statement Order authorizes the Debtors to temporarily allow Claims against which an objection is pending as of the Voting Record Date in an amount that the Bankruptcy Court deems appropriate for purposes of permitting the Holder of such Claim to vote to accept or reject the Plan. Pursuant to the Solicitation Procedures, if a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is Filed with the Bankruptcy Court not less than ten days before the Voting Deadline: (a) the Debtors shall cause the applicable Holder to be served with a disputed claim notice (which notice shall include the opportunity to opt out of certain third party releases and be served together with such objection); and (b) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined below) occurs. The Holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection, *provided that* the applicable Holder may request allowance of such Claim in a different amount for voting purposes by filing a motion under Bankruptcy Rule 3018 so that such motion may be adjudicated or resolved not less than three (3) days prior to the Voting Deadline.

If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Bankruptcy Court fewer than ten days before the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise.

A "Resolution Event" means the occurrence of one or more of the following events no later than three days prior to the Voting Deadline: (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder to vote its Claim in an agreed upon amount; or (e) the pending objection is voluntarily withdrawn by the objecting party. No later than two Business Days following the occurrence of a Resolution Event, the Debtors shall cause Epiq to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder to the extent such Holder has not already received a Solicitation Package containing a Ballot.

### H.    Plan Objection Deadline

The Disclosure Statement Order established January 26, 2023, at 4:00 p.m., prevailing Central Time, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline").  All objections to the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are actually received on or before the Plan Objection Deadline.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS PERMITTED BY APPLICABLE LAW OR COURT ORDER.

HOLDERS OF CLAIMS MUST VOTE THEIR ENTIRE CLAIMS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT YOUR VOTE.  ACCORDINGLY, A BALLOT THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN.

ANY BALLOT THAT IS PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED TO THE DEBTORS THAT FAILS TO INDICATE ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN IT WILL NOT BE COUNTED.

IT IS IMPORTANT THAT THE HOLDER, OR THE AGENT, DESIGNEE, OR NOMINEE THEREOF, OF A CLAIM IN A VOTING CLASS FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON THE APPLICABLE BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

If the Holder, or the agent, designee, or nominee thereof has any questions regarding the Ballot, or did not receive a copy of the Disclosure Statement or Plan, or needs additional copies of such materials, they should contact the Solicitation Agent via email to ComputeNorthHoldingsInfo@epiqglobal.com and reference "Compute North" in the subject line.

## ARTICLE III.
## BUSINESS OVERVIEW AND CORPORATE HISTORY

### A.    Business Overview

Compute North was formed in 2020.  Compute North is the direct parent of, and owns 100% of the equity interests in, Compute North LLC ("CN LLC"), which was formed in 2017. In turn, CN LLC is the direct or indirect parent of all of the remaining Debtor entities, controlling (either directly or indirectly) 100 percent of the equity interests of all of the remaining Debtors. A chart summarizing Compute North's organizational structure as it existed on the Petition Date is set forth below (the "Structure Chart").

## Summary Organizational Chart as of the Petition Date



**Note: All subsidiaries were wholly-owned unless specifically noted otherwise.**
(1) Compute North Holdings, Inc. was a guarantor under the Generate Facility and NextEra Note.
(2) Compute North LLC was a guarantor under the Generate Facility and borrower under the Marathon Note.
(3) CN Mining LLC was the borrower under the Foundry Financing.
(4) CN Wolf Hollow LLC and Compute North NE05 LLC were guarantors under the Generate Facility.
(5) CN Borrower LLC was the borrower under the Generate Facility.
(6) Compute North Member LLC was the borrower under the NextEra Note.

21

Prior to the Petition Date, the Debtors were a leader in and focused on the development and management of sustainable, cost-efficient computer data centers (each a "<u>Facility</u>") that could be used by customers in the blockchain, cryptocurrency mining, and distributed computing space. The Debtors' Facilities were owned in three asset silos, the "Operating Companies," the "Generate Project Financing" and the "Joint Ventures" (comprised of the "NextEra JV" and the "Marathon JV"), each of which is described on the Structure Chart.  The Debtors also operated three (3) fully operational Facilities, with approximately 117MW of aggregate capacity, and two (2) partially operational Facilities, with approximately 124MW of aggregate capacity, with the aggregate expected capacity at those Facilities totalling 580MW. The Debtors had planned two (2) other Facilities that were in development as of the Petition Date, representing an additional 335MW of aggregate capacity.  As of the Petition Date, the Debtors' operational or partially operational Facilities provided services to approximately eighty-four (84) customers and contained over 467 containers.

Prior to the Petition Date, and as more fully described in the First Day Declaration, the Debtors offered a host of services at the Facilities. Specifically, the Debtors' operations included three main business segments: (a) Hosted Cryptocurrency Mining Services, (b) Bitcoin Mining, and (c) Cryptocurrency Equipment Sales.  The Debtors' core business segment was providing hosting services for cryptocurrency mining by customers at the Facilities. As a hosting services provider, the Debtors provided a suite of services to customers that ranged from offering rack space, energy, and broadband access to a full scale, hands on experience which provided customers with additional services including monitoring, troubleshooting, firmware management, miner configuration, and mining pools. To support the Hosted Cryptocurrency Mining Services segment of its business, the Debtors also engaged in the sale of cryptocurrency mining equipment to customers.  Further, prior to the Petition Date, the Debtors also engaged in some Bitcoin mining of their own at their Facilities.

### 1. Corporate

The Debtors' corporate headquarters were in Eden Prairie, Minnesota. As of the Petition Date, Compute North employed 148 people, made up of eighty-seven (87) full time salaried employees, sixty (60) full time hourly employees and one (1) part time hourly employee. In addition, Compute North also utilized three (3) independent contractors.

These employees provided various services, including management, business development, human resources, compliance, information technology, billing, collections, safety, legal, payroll, tax, treasury, and accounting, among others. All, or a portion, of the compensation cost for these employees was allocated to the applicable Debtor and non-Debtor affiliate and joint venture partner for which the employees provided services.

### B. Prepetition Capital Structure

### 1. Summary

Prior to the Peititon Date, the Debtors, together with their non-Debtor affiliates, maintained a complex capital structure with different silos of secured and unsecured obligations with varying interest rates and maturities. As described in greater detail below, the Debtors consolidated long-term debt obligations as of the Petition Date totalled approximately $128.3 million (collectively, the "Prepetition Debt Obligations"), consisting of, among other things: (i) the NextEra Note in the amount of $99,809,696.27; (ii) the Foundry Financing in the amount of $7,466,005.26; and (iii) the Marathon Note (each as defined below) in the amount of $21,013,027.03.

| Funded Debt Obligations | Total Outstanding |
|---|---|
| NextEra Note | $99,809,696.27 |
| Foundry Financing | $7,466,005.26 |
| Marathon Note | $21,013,027.03 |
| **Total Funded Debt:** | **$128,288,728.56** |

Additionally, as of the Petition Date, certain non-Debtor affiliates of Compute North had long-term debt obligations. Specifically, non-Debtor affiliate CN Borrower, LLC ("CN Borrower") was the borrower under the Prepetition Generate Facility (as defined below) in the amount of $101,383,118.71. The Prepetition Generate Facility was supported by, among other things, Debtor CN Pledgor LLC's ("CN Pledgor") pledge of its equity in CN Borrower and unsecured guarantees from Holdings and CN LLC.

### 2. NextEra Note

Debtor Compute North Member LLC ("CN Member") was party to that Senior Secured Promissory Note (the "NextEra Note") in favor of TZ Capital Holdings, LLC ("TZ Capital"). CN Member made draws, as of the Petition Date, under the NextEra Note in the amount of $94,850,676.50. Including accrued PIK interest, a total of $99,809,696.27 was outstanding under the NextEra Note as of the Petition Date. The NextEra Note was issued in connection with the

member loan made by TZ Capital as set forth in that certain Limited Liability Company Agreement of TZRC LLC (TZRC) and was secured by CN Member's membership interest in the TZRC. Further, Holdings executed that certain Guaranty Agreement, dated as of April 8, 2022 (the "NextEra Parent Guaranty"), in favor of TZ Capital by which Holdings provided an unsecured guaranty to TZ Capital for the obligations under the NextEra Note. As described more fully in Article V hereof, the purchaser of certain of the Debtors' assets, as part of such sale, has agreed to the assumption of certain liabilities, including the principal and interest amounts due and owing by CN Member under the NextEra Note.

### 3. Foundry Financing

CN Borrower was party to that certain Equipment Finance and Security Agreement, dated as of December 31, 2020 (the "Foundry Financing Agreement") with Foundry Digital LLC ("Foundry"), pursuant to which Foundry provided equipment financing for certain digital currency mining equipment. On March 15, 2022, CN Borrower assigned its rights and obligations under the Foundry Financing Agreement to CN Mining, LLC ("CN Mining"). The Foundry Financing Agreement was secured by certain mining equipment of CN Mining. As of the Petition Date, $7,466,005.26 remained outstanding under the Foundry Financing Agreement. As part of the Foundry Sale (as defined below), the purchase price for the Foundry Purchased Assets (as defined below) includes a credit bid by Foundry, which consists of $8,969,845 in outstanding principal and accrued and unpaid interest, fees, costs, and expenses as of the Petition Date plus any other amounts and obligations under the Foundry Finance Agreement. The Foundry Sale is described in greater detail below in Article V(E) hereof.

### 4. Marathon Note

On July 1, 2021, Compute North TX06 LLC ("CN TX06") borrowed $30,000,000 from Marathon Digital Holdings, Inc. ("Marathon"), pursuant to a Senior Secured Promissory Note (the "Prior Marathon Note"). On July 1, 2022, CN LLC, CN TX06 and Marathon agreed to restructure the obligations to Marathon under the Prior Marathon Note. In particular, the Prior Marathon Note was exchanged for, and replaced with, an unsecured Senior Promissory Note from CN LLC in favor of Marathon in the same amount (the "Marathon Note"), and Marathon agreed to reduce the face amount of the Prior Promissory Note by application of certain customer deposits by CN LLC related to the Wolf Hollow Facility in the amount of $9,175,718.40. As of the Petition Date, $21,013,027.03 remained outstanding under the Marathon Note.

### 5. Generate Facility

On the Petition Date, CN Borrower, a non-Debtor Affiliate, was party to that Credit and Guaranty Agreement, dated as of February 7, 2022 (the "Prepetition Generate Facility", as amended on April 28, 2022 and June 17, 2022, and as further amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Credit Agreement"), by and among CN Borrower, CN Wolf Hollow LLC, a non-Debtor (the "Wolf Hollow Project Company"), Compute North NE05 LLC, a non-Debtor (the "Kearney Project Company" and together with the Wolf Hollow Project Company, the "Prepetition Subsidiary Guarantors"), Generate Lending, LLC, as lender (in such capacity, the "Prepetition Lender"), and Generate Lending, LLC, as administrative agent (in such

capacity, the "Prepetition Administrative Agent") and collateral agent (in such capacity, the "Prepetition Collateral Agent", and together with the Prepetition Administrative Agent, the "Prepetition Agents" and together with the Prepetition Lender, the "Prepetition Generate Secured Parties"), which consisted of a Tranche A of Loans in the original principal amount of $21,541,441.68 ("Tranche A") and a Tranche B of Loans in the original principal amount of $72,720,280.11 ("Tranche B"; together with Tranche A, the "Prepetition Generate Loans"). Tranche A consisted of certain Prepetition Generate Loans used to expand the Kearney Project Company's Facility in Kearney, Nebraska (the "Kearney Facility"), with such Prepetition Generate Loans maturing on February 7, 2026. Tranche B consisted of certain Prepetition Generate Loans which were to be used to finance the Wolf Hollow Project Company's Facility in Granbury, Texas, called Wolf Hollow (the "Wolf Hollow Facility"), with such Prepetition Generate Loans set to mature on October 28, 2026.

The Kearney Project Company and the Wolf Hollow Project Company, both non-Debtors, had guaranteed CN Borrower's obligations under the Prepetition Generate Facility. Further, CN LLC and Holdings (collectively, the "Sponsors") were party to that certain Guaranty Agreement, dated as of February 7, 2022 (the "Generate Parent Guaranty"), entered into by the Sponsors in favor of the Prepetition Administrative Agent by which the Sponsors provided an unsecured guaranty to the Prepetition Administrative Agent for the obligations under the Prepetition Credit Agreement. As of the Petition Date, $101,383,118.71 remained outstanding under the Prepetition Generate Facility.

The Prepetition Generate Facility was secured by (i) CN Pledgor's pledge of 100% of the equity of CN Borrower to the Prepetition Administrative Agent and (ii) a lien on substantially all of the assets of non-Debtors CN Borrower, the Wolf Hollow Project Company and the Kearney Project Company.

As described in greater detail in Article V(E) hereof, the Generate Sale (as defined below), included a full release and payoff of all outstanding amounts under the Prepetition Credit Agreement as well as the unsecured guarantees of Debtors CN Wolf Hollow LLC and Compute North NE05 LLC in connection therewith.

### 7. Equity Interests

Prior to the Petition Date, the Debtors were a privately held company. As of August 24, 2022, the Debtors had (i) 1,700,000 Class A Voting Common Stock issued and outstanding; (ii) 1,055,647 Class B Voting Common Stock issued and outstanding; (iii) 39,014 Series C-1 Convertible Preferred Stock issued and outstanding; and (iv) 360,465 Series C Convertible Preferred Stock issued and outstanding.

### ARTICLE IV.
### EVENTS LEADING TO THE CHAPTER 11 FILING

#### A.    Overview

There were numerous adverse events that led to the commencement of these Chapter 11 Cases. From supply chain and inventory issues, to dislocation in the capital and cryptocurrency

markets, Compute North was unable to maintain sufficient liquidity to bring planned projects in development online and pay all of its obligations on a current basis. As discussed further below, cryptocurrency prices collapsed – Bitcoin prices recently hit lows that were about 75% below its all-time highs in late 2021 – while the rates charged for the electricity required to mine Bitcoin essentially doubled.

### B.      Dislocation in the Capital and Credit Markets

Compute North, in large measure, funded its growth through debt and equity. With the expectation that debt and equity financings would remain available, Compute North made strategic decisions regarding new facility development and fixed asset acquisition necessary to meet long term growth plans and customer demand. Compute North expended cash to launch new facility developments and fund fixed asset purchases reducing liquidity. With the tightening of the credit markets in 2022 and lack of available financing, in the months leading up to these Chapter 11 Cases, Compute North was not able to obtain new project financing to meet its liquidity needs and continue developing facilities.

### C.      Lack of Financing

Although the Prepetition Lender had offered financing for the Kearney Project and the Wolf Hollow Project, Compute North was unable to obtain financing for other Facilities that were in development due in part to material dislocation in credit and capital markets during 2022.

In addition, on July 22, 2022, the Prepetition Lender sent a notice of default (the "Notice of Default") to Compute North asserting various events of default under the Prepetition Credit Agreement. On August 12, 2022, the Prepetition Lender provided notice to Compute North that it was exercising the voting rights of the pledged securities of CN Borrower. The Prepetition Lender also formed a new board of managers at CN Borrower and appointed its own managers (the "Generate Managers").

On August 23, 2022, Compute North received notice from BMO Harris Bank, the bank for CN Borrower and its subsidiaries (collectively, the "Generate Entities"), that the Prepetition Lender had exercised rights under deposit account control agreements in place as part of the Prepetition Generate Facility and restricted Compute North's and certain of its non-Debtor Affiliates' access to the Generate Entities' cash collateral.

Notwithstanding the foregoing and as further discussed in Article V herein, Compute North and the Prepetition Lender continued negotiations in order to reach a resolution with respect to Compute North's liquidity issues and a long term solution regarding ownership and management of the Generate Entities. Compute North continued those discussions during these Chapter 11 Cases to maximize the value of Compute North's assets, as described more fully in Article V(E) hereof, which culminated in the consummation of the sale of the Debtors' equity interest in the Generate Entities to the Prepetition Lender.

### D.      Supply Chain and Fixed Asset Issues

Compute North's fixed assets, which are primarily comprised of modular containers, the pad mounted electrical transformers and other electrical infrastructure necessary to develop a

data center, are all long-lead-time products.   As such, even under normal circumstances, Compute North would be required to place orders for such products well in advance of a data center coming on line and becoming revenue generating.   However, the global supply chain disruptions that began in 2020 and accelerated in 2021 impacted the availability of the materials necessary for Compute North to develop data centers and exacerbated this mismatch of expenditures and revenue.   In particular, because of these disruptions, in 2021, Compute North was required to procure large quantities of fixed assets in advance to meet projected development schedules.   These purchases required significant upfront deposits to secure manufacture and delivery of the fixed assets.   Those upfront deposits, $30.9 million in 2021 and $41.4 million in 2022, materially reduced Compute North's liquidity.   As that equipment was completed, Compute North was required to take delivery and pay for any outstanding balances.   Without a funding source, Compute North's limited resources were insufficient to pay the outstanding amounts for the fixed assets, necessitating the commencement of these Chapter 11 Cases.

## E.   Energy Price Volatility

In 2022, increases in the price of electricity had a materially negative impact on Compute North's business.   Energy prices increased based on, among other things, the increase in natural gas prices as a result of the instability in geopolitics.   As energy prices increases, Compute North's gross margins decreased and shrank to levels at which Compute North was unable to pay for its fixed costs of operations during certain periods.

Compute North's typical hosting services agreements (each an "HSA" and, collectively, the "HSAs") did not expressly allow it to pass increased energy costs through to its customers. While Compute North did have the ability to manage energy use during a period of high power costs, this was not an effective strategy for addressing long-term energy price increases. Ultimately, the prolonged period of high-energy prices made it difficult for Compute North to realize an operating profit at any of the Facilities and some Facilities operated at a loss, which contributed to Compute North's need to commence these Chapter 11 Cases.

## F.   Decline in Bitcoin Price

Substantially all of Compute North's revenue was related directly and indirectly to the mining of Bitcoin.   Most of Compute North's customers mined cryptocurrency.   Compute North's sale of equipment to customers related almost exclusively to mining hardware and Compute North mined its own Bitcoin to help fund operations.   The major dislocation and sell-off in Bitcoin had a significant impact on Compute North's business.   The sustained downturn in Bitcoin value and prices coincided with a confluence of broader global economic instability and events, exacerbating the Debtors' situation.

At current Bitcoin prices, coupled with high energy costs in ERCOT, it was difficult for Bitcoin miners – including Compute North's prepetition mining operations -- to profitably operate during certain periods of the day due to fluctuations in energy prices.   The sustained downturn in the cryptocurrency market negatively affected Compute North's ability to generate revenue throughout all its business segments, contributing to the commencement of these Chapter 11 Cases.

27

### G.      Prepetition Restructuring Efforts

As a result of the foregoing factors, Compute North lacked the liquidity needed to continue funding the development of data centers that were being built out, despite the fact that Compute North had already invested millions of dollars in those development projects.  Compute North explored all available alternatives, including, among other things, negotiating with key stakeholders for additional capital, marketing certain projects still in development for sale, and engaging in lengthy negotiations with the Prepetition Lender regarding a resolution with respect to Compute North's liquidity issues and a long term solution regarding ownership and management of the non-Debtor entities controlled by the Prepetition Lender.

Although in the weeks leading up to these Chapter 11 Cases Compute North engaged in advanced negotiations with the Prepetition Lender and other prospective counter-parties to solve its liquidity crisis by selling certain of its assets or obtaining new financing, none of these sale or financing transactions were able to be consummated within the time frame available to Compute North to effectuate an out-of-court restructuring.  Facing the threat of ongoing degradation to the value of its business, including the potential loss of assets that were available to sell, Compute North had no choice but to commence these Chapter 11 Cases in order to preserve and maximize the value of its assets.

### ARTICLE V.
### MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES

### A.      First Day Relief

On September 22, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. On the Petition Date and shortly thereafter, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and service providers, and other third parties following the commencement of the Chapter 11 Cases. The Bankruptcy Court granted all of the relief initially requested in the First Day Motions on an interim or final basis. The relief granted with respect to the First Day Motions included, among other things, (a) interim and supplemental interim orders authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions [Docket Nos. 84, 247]; (b) an order directing joint administration of the Chapter 11 Cases [Docket No. 41]; (c) an order authorizing the Debtors to pay certain prepetition taxes and fees [Docket No. 46]; (d) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business [Docket No. 85]; (e) an order granting authority to pay prepititon employees' wages and related obligations in the ordinary course of business and continue certain employee benefit programs [Docket No. 47];and (f) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or

discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance [Docket No. 48].

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed or downloaded, free of charge, at https://dm.epiq11.com/computenorthholdings. A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the *Declaration of Harold Coulby, Chief Financial Officer and Treasurer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* [Docket No. 22].

## B.    Schedules and Statements

On September 22, 2022, the Debtors filed *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements of Financial Affairs and (B) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 21] (the "Extension Motion"), requesting that the Bankruptcy Court extend the period of time to file the Schedules and Statements (as defined in the Extension Motion) by twenty-two (22) days.  On September 23, 2022, the Bankruptcy Court entered the order approving the Extension Motion [Docket No. 45] (the "Extension Order").  Pursuant to the Extension Order, the time within which the Debtors must file the Schedules and Statements was extended to and including October 28, 2022 without prejudice to the Debtors' right to seek an additional extension upon cause shown therefor.

On October 28, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 293 through 311].  On November 4, 2022, the Debtors filed their amended Schedules and Statements [Docket Nos. 420 through 438].

## C.    Claims Bar Dates

The Bankruptcy Code allows the Bankruptcy Court to fix the time within which Proofs of Claim must be Filed in the Chapter 11 Cases.  Any creditor whose Claim is not scheduled in the Schedules and Statements or whose Claim is scheduled as disputed, contingent, or unliquidated is required to File a Proof of Claim.

On September 26, 2022, the Bankruptcy Court entered an order (the "Bar Date Order") [Docket No. 86] approving, among other things: (a) other than the exceptions set forth in the Bar Date Order, November 23, 2022, at 5:00 p.m. prevailing Central Time (the "Claims Bar Date") as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) March 21, 2023, at 5:00 p.m. prevailing Central Time as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases (the "Governmental Unit Bar Date" and, together with the Claims Bar Date, the "Bar Dates"); (c) procedures for filing Proofs of Claim; and (d) the form and manner of notice of the Bar Dates.

## D.    Appointment of Creditors' Committee

On October 6, 2022, the U.S. Trustee appointed five members to the Committee [Docket No. 139]. The Committee is currently comprised of the following five members: (a) RK Mission Critical LLC ("RK Mission"); (b) Touzi Capital, LLC; (c) Sunbelt Solomon; (d) U.S. Data Mining Group, Inc.; and (e) MP2 Energy LLC.

### E.     Retention of Professionals

The Debtors filed applications for the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the chapter 11 cases, including: (a) Paul Hastings LLP ("Paul Hastings"), as restructuring counsel [Docket No. 124]; (b) Jefferies, as investment banker [Docket No. 125]; (c) Portage Point Partners, LLC ("Portage Point"), as financial advisor [Docket No. 123], and (d) Epiq as their claims and noticing agent in the Chapter 11 Cases [Docket No. 12].

On September 22, 2022, the Bankruptcy Court entered an order approving the Debtors' retention of Epiq [Docket No. 15]. On October 24, 2022, the Bankruptcy Court entered orders approving the Debtors' retention of (a) Paul Hastings [Docket No. 251]; (b) Jefferies [Docket No. 254]; and (c) Portage Point [Docket No. 250].

In addition, on October 3, 2022, the Debtors filed (i) the *Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (the "Interim Compensation Procedures") [Docket No. 122], whereby the Debtors sought to establish an orderly process for the allowance and payment of compensation for professional services rendered and reimbursement of expenses incurred by attorneys and other professionals who are retained pursuant to sections 327 or 1103 of the Bankruptcy Code during the Chapter 11 Cases, and (ii) filed the *Motion for Entry of an Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (Ii) Granting Related Relief* (the "OCP Motion") [Docket No. 121], seeking authority to retain and compenstate certain professionals utilized in the orfinary course of business pursuant to certain compensation procedures.  On October 24, 2022, the Bankruptcy Court entered orders approving the Interim Compensation Procedures [Docket No. 249] and the OCP Motion [Docket No. 248].

### F.     Bidding and Sale Procedures and Asset Sales

On the September 26, 2022, the Debtors filed the *Debtors' Emergency Motion for Entry of (I) an Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Certain Bidding Procedures, Assumption, Assignment, and Rejection Procedures, and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter Into Asset Purchase Agreements With Stalking Horse Bidders; and (D) Scheduling a Hearing On the Approval of the Sale of the Debtors Assets Free and Clear of All Encumbrances As Well As the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of the Debtors Assets Free and Clear of all Encumbrances, (B) Approving Asset Purchase Agreements, (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Waiving Stay Provisions Pursuant to Bankruptcy Rules 6004(H) and 6006(D)* [Docket No. 91] (the "Bidding Procedures and Sale Motion").[4]

On October 11, 2022 the Bankruptcy Court held a hearing to consider the Sale and Bidding Procedures Motion (the "Initial Bidding Procedures Hearing"). Prior to the Initial

---

[4]    Capitalized terms not defined in this section shall have the meanings ascribed to such terms in the Bidding Proecures and Sale Motion.

Bidding Procedures Hearing, the Debtors received several objections, including one from the Committee. The Debtors were able to negotiate a resolution of all obejctions at the Initial Bidding Procedures Hearing by bifurcating the sale procedures. The Debtors obtained approval of certain aspects of the sale procedures, including, the De Minimis Asset Sale Procedures, the Contract Procedures and designation of Stalking Horse Bidders. On October 13, 2022, the Bankruptcy Court entered the *Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Rejection Procedures and Certain Assumption and Assignment Procedures and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter into Asset Purchase Agreements with Stalking Horse Bidders; and (D) Scheduling a Further Hearing on the Approval of the Debtors' Proposed Bidding Procedures and Related Relief* [Docket No. 191] (the "Initial Sale Procedures Order"). The Initial Sale Procedures Order contemplated that the Debtors would seek approval of a final sale procedures order at a subsequent hearing, which was held before the Bankruptcy Court on October 21, 2022 (the "Final Bidding Procedures Hearing").

The relief requested by the Debtors in the Bidding Procedures and Sale Motion with respect to the Bidding Procedures, the final approval of the Assumption and Assignment Procedures, and the proposed key dates and timeline for the Debtors' sale process, as set forth below, were approved at the Final Bidding Procedures Hearing. On October 24, 2022, the Bankruptcy Court entered the *Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Certain Bidding Procedures, Assumption, Assignment, and Rejection Procedures, and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter into Asset Purchase Agreements with Stalking Horse Bidders; and (D) Scheduling a Hearing on the Approval of the Sale of the Debtors' Remaining Assets Free and Clear of all Encumbrances as well as the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 256] (the "Final Sale Procedures Order").  Pursuant to the Final Sale Procedures Order, the proposed key dates and timeline for the Debtors' sale process were as set forth below:

| Deadline | Item |
|---|---|
| October 11, 2022 at 9:00 a.m. (prevailing Central Time) | Initial Bidding Procedures Hearing |
| October 18, 2022 | Deadline to Serve Assumption Notice |
| October 21, 2022 at 1:30 p.m. (prevailing Central Time) | Final Bidding Procedures Hearing |
| October 25, 2022 | Stalking Horse Designation Deadline |
| October 27, 2022 at 5:00 p.m. (prevailing Central Time) | Bid Deadline |
| October 31, 2022 | Deadline to Serve Supplemental Assumption Notice |
| November 1, 2022 at 10:00 a.m. (prevailing Central Time) | Auction Commencement |

| November 1, 2022 at 4:00 p.m. (prevailing Central Time) | Deadline to Object to Assumption Notice |
| November 3, 2022 at 4:00 p.m. (prevailing Central Time) | Deadline to Object to Sale |
| November 7, 2022 at 8:00 a.m. (prevailing Central Time) | Deadline to Object to Adequate Assurance |
| November 7, 2022 at 9:00 a.m. (prevailing Central Time) | Initial Sale Hearing |

### 1.     Generate Sale

On October 24, 2022, the Debtors filed the *Stipulation and Agreed Order by and among Compute North LLC, Compute North NE05 LLC, CN Wolf Hollow LLC, and Generate Lending, LLC Concerning Certain Project Management Agreements* [Docket No. 246] (the "Generate Sale Stipulation"), by and among (i) CN LLC, (ii) the Kearney Project Company, (iii) the Wolf Hollow Project Company, and (iv) Generate, whereby the parties announced their intention to enter in a purchase and sale agreement (the "Generate PSA"), which provided for the sale of CN Pledgor's equity interest in non-Debtor CN Borrower, which owns the Kearney Project Company and the Wolf Hollow Project Company (the "CN Pledgor Assets"), to Generate, subject to court approval. Pursuant to the Generate Sale Stipulation, the Kearny Project Company and the Wolf Hollow Project Company would pay the Debtors a total of $500,000.00, representing amounts due and owing under their respective property management agreements (each, a "PMA").  In addition, the Kearny Project Company, the Wolf Hollow Project Company and Generate would be responsible for an up-front payment on a account of accrued service fees of $210,000.00, as well as weekly payments totaling $110,000.00 to continue operating under the PMAs.  On October 25, 2022, the Bankruptcy Court entered the Generate Sale Stipulation [Docket No. 266].  The payments contemplated under the Generate Sale Stipulation provided an immediate infusion of cash to the Debtors as well as additional funding to continue operating the projects as a going concern while continuing to finalize the Generate PSA.

In accordance with the Final Sale Procedures Order, the Debtors scheduled an Auction for November 1, 2022, at 10:00 a.m. (prevailing Central Time).  At the Bid Deadline, the Debtors received only one Qualifying Bid for the CN Pledgor Assets.  As such, the Debtors cancelled the Auction with respect to the CN Pledgor Assets and, in consultation with the Consultation Parties, declared Generate as the Successful Bidder for the CN Pledgor Assets.

On October 28. 2022, the Debtors filed *Notice of Successful Bidder for CN Pledgor Assets* [Docket No. 256] with respect to the CN Pledgor Assets and scheduled a hearing for approval of the Generate PSA on October 31, 2022.  Because there was only one bid for the CN Pledgor Assets, the Debtors did not designated a Back-Up Bidder for the CN Pledgor Assets. Pursuant to the Generate PSA, Generate agreed to pay a purchase price of $5,000,000.00 with respect to the CN Pledgor Assets. On November 1, 2022, the Bankruptcy Court entered the *Order (I) Approving the Sale of Debtor CN Pledgor LLC's Equity Interests in CN Borrower LLC Free and Clear of all Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related*

32

*Relief* [Docket No. 362] (the "Generate Sale Order") approving the Debtors' entry into the Generate PSA and the sale of the CN Pledgor Assets to Generate (the "Generate Sale"). The Debtors closed the Generate Sale on November 2, 2022.

In connection with the Generate PSA, the parties thereto executed broad general releases, including the release of all claims and causes of action based on or relating to, or in any manner arising from, in whole or in part, (i) the Generate PSA, (ii) the Prepetition Credit Agreement, (iii) the Generate Guaranty Agreement, (iv) that certain Pledge Agreement, dated as of February 7, 2022, entered into by CN Pledgor as Pledgor and Generate as Collateral Agent (the "Pledge Agreement"), (v) that certain Voting Agreement, dated as of February 2, 2022, by and among Holdings and each holder of the preferred stock of Holdings party thereto (the "Voting Agreement"), (vi) that certain Letter Agreement, dated as of October 18, 2022, by and among Mercuria Energy America, LLC, the Wolf Hollow Company and Generate (the "Letter Agreement"), (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with the Generate PSA, the Prepetition Credit Agreement, the Generate Guaranty Agreement, the Pledge Agreement, the Voting Agreement, or the Letter Agreement or upon any other act or omission, transaction, agreement, event, or other occurrence related to the foregoing taking place on or before the Closing, and (viii) any other related claims. The specific terms of these releases are set forth in the Generate Sale Order.

The Debtors, in consultation with the Consultation Parties, adjourned the Auction with respect to the Debtors' remaining assets to November 14, 2022 at 10:00 a.m. (prevailing Central Time). *See Notice of Adjournment of Auction* [Docket No. 442]. In accordance with the Final Sale Procedures Order, the Debtors, in consultation with the Consultation Parties, further continued the Auction, solely with respect to the Debtors' membership interests in CN Member or non-Debtor TZRC LLC and certain excess inventory or equipment of the Debtors that is not subject to, or included in, another bid to November 15, 2022 at 10:00 a.m. (prevailing Central Time). Further, the Debtors, in consultation with the Consultation Parties, further continued the Auction with respect to the Debtors' remaining assets, properties, rights and interests, including (a) all assets properties, rights and interests of Compute North SD, LLC, Compute North Texas LLC, CN Mining LLC, CN Minden LLC, and/or relating to the Big Spring, Texas, North Sioux City, South Dakota, and Minden, Nebraska projects, facilities, developments, businesses or operations, and (b) all intellectual property, software, domain names, technology, intangible and other assets of the Debtors, to a date and time to be determined. *See Notice of Adjournment of Auction* [Docket No. 471].

## 2. Crusoe Sale

On November 14, 2022, pursuant to the Final Sale Procedures Order and the Bidding Procedures, the Debtors designated Crusoe Energy Systems, LLC ("Crusoe"), as the Succesful Bidder for 11 specific modular data center containers used to develop data center facilities and house cryptocurrency miners (the "Purchased Containers"), pursuant to that certain asset purchase agreement by and between Compute North and Crusoe (the "Crusoe APA"). *See Notice of Successful Bidder for Certain Container Assets* [Docket No. 477]. Pursuant to the Crusoe APA, the purchase price for the Purchased Containers was $1,547,000.00 or $140,636.36 per container. Ahead of the Bid Deadline, the Purchased

Containers were widely marketed. However, the Debtors received only one qualified bid for the Purchased Containers. As such, the Debtors did not designate a Back-Up Bidder for the Purchased Containers. In accordance with the Final Sale Procedures Order and the Bidding Procedures, the Debtors cancelled the Auction with respect to the Purchased Containers. On November 16, 2022, at a hearing to consider the sale of the Purchased Containers to Crusoe (the "Crusoe Sale"), the Bankrutpcy Court approved the Crusoe Sale, with the support of the Committee. The Debtors received one objection to the Crusoe Sale from RK Mission, which was resolved through the inclusion of certain language in the order approving the Crusoe Sale (the "Crusoe Sale Order") ensuring that any lien RK Mission's possessed would attached to the proceeds of the Crusoe Sale. On November 16, 2022, the Bankruptcy Court entered the Crusoe Sale Order. *See Order (I) Approving the Sale of Certain Assets of Compute North LLC to Crusoe Energy Systems, LLC Free and Clear of All Leans, Cleans, and Encumbrances and (II) Grnating Related Relief* [Docket No. 493]. The Debtors closed the Crusoe Sale on November 18, 2022.

### 3.     Auction and JV Asset Sale

In accordance with the Final Sale Procedures Order and the Bidding Procedures, the Debtors and their advisors marketed certain of the Debtors' assets, including certain joint venture assets comprising of: (a) 100 percent of the membership interests in TZRC held by CN Member, a Delaware limited liability company, which such membership interest represents 50 percent of all issued and outstanding membership interests in TZRC; and (b) that certain Modular Data Center Property Management Agreement, dated as of March 8, 2022, entered into among TZRC, CN Member and TZ Capital, a Delaware limited liability company, as the same may be amended from time to time (collectively, the "JV Assets"). The Debtors received two Qualifying Bids by the Bid Deadline for the JV Assets, one from U.S. Data Group, Inc. ("USBTC") and the other from Lake Parime Limited ("Lake Parime"). Accordingly, an Auction was held virtually on November 15, 2022, pursuant to the Bidding Procedures. After the bid submitted by USBTC was determined to be the Baseline Bid for the JV Assets, multiple rounds of overbids by both bidders followed, including breakout discussions between rounds in which the Debtors and the Consultation Parties engaged with USBTC and Lake Parime regarding their respective bids. This process ultimately resulted in two final bids. At the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, announced that the final bid submitted by USBTC was the highest or otherwise best bid for the JV Assets, and that Lake Parime's final bid was the Back-Up Bid.

USBTC's bid is memorialized in that certain asset purchase agreement, dated as of November 25, 2022 (the "USBTC APA"). The USBTC APA provides for, among other things, a cash purchase price of $3,000,000.00 to be paid to the Debtors on the closing date,[5] the assumption of certain liabilities, including the principal and interest amounts due and owing by CN Member under the NextEra Note (approximately $100 million), a full waiver of all unsecured claims held by USBTC, including any rejection damages, and $100,000.00 for transition services above and beyond all pass through costs.

---

[5]   The USBTC APA also provides for an additional $7 million of the cash purchase price to be paid to TZ Capital to repay the principal amount owing under the TZCH Senior Note (as defined in the USBTC APA), for a total cash purchase price of $10 million.

On November 29, 2022, the Bankruptcy Court entered an order approving the Debtors' entry into the USBTC APA and the transactions contemplated thereunder. *See Order (I) Approving the Sale of Certain Assets of Compute North Member LLC to US Data King Mountain LLC Free and Clear of Certain Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related Relief* [Docket No. 594]. The Debtors closed the sale of the JV Assets to USBTC on December 6, 2022.

### 4.      Foundry Sale

At the Bid Deadline established pursuant to the Final Sale Procedures Order, the Debtors received multiple bids across their various pools of assets, including a bid from Foundry for the assets identified in that certain purchase agreement, dated November 19, 2022, between the Debtors and Foundry (the "Foundry APA"). The assets being acquired by Foundry pursuant to the Foundry APA (the " Foundry Purchased Assets"), include, but are not limited to: (a) all assets related to the Debtors' facilities located in (i) Big Spring, Texas, (ii) North Sioux City, South Dakota, and (iii) Minden, Nebraska; (b) all assets of Debtor CN Mining LLC; (c) all mining equipment of CN LLC, Compute North SD, LLC, Compute North Texas LLC, CN Mining LLC, and CN Minden LLC; (c) certain modular data center containers and padmount transformers; and (d) all collateral under the Foundry Financing Agreement, pursuant to which Foundry provided equipment financing for certain digital currency mining equipment.

On November 19, 2022, the Debtors, in consulation with the Consultation Parties, declared Foundry as the Successful Bidder for the Foundry Purchased Assets. *See Notice of Succesful Bidder for Certain Assets* [Docket No. 511]. Pursuant to the Foundry APA, the purchase price for the Foundry Purchased Assets consists of $5,170,000.00 in cash; of which $4,000,000.00 in cash would be paid at the Closing (as defined in the Foundry APA) with respect to the Purchased Assets (other than the Minden Purchased Assets (as defined in the Foundry APA)) and $1,170,000.00 in cash would be paid at the Minden Closing[6] if any, in each case, subject to the terms and conditions of the Foundry APA. The purchase price also includes a credit bid of $8,969,846.00 plus additional obligations under the Foundry Financing Agreement, and the assumption of certain liabilities. The Debtors received no other bids for all of the Foundry Purchased Assets.

The Debtors sought approval of the Foundry APA and the transactions contemplated thereunder (the "Foundry Sale") at a hearing (the "Foundry Sale Hearing") on November 22, 2022 at 2:00 p.m. (prevailing Central Time), and the Bankruptcy Court entered an order approving the Foundry Sale [Docket No. 531]. On November 19, 2022, the Debtors served a notice of selected target contracts (the "Selected Target Contracts") proposed to be assumed and assigned to Foundry, as assignee, in connection with the Foundry Sale, subject to Foundry's right to amend the list of the Selected Target Contracts through and including the Closing (as defined in the Foundry APA) in accordance with Section 1.1 of the Foundry APA, upon the counterparties to such Selected Target Contracts, and filed a notice of the

---

[6]    "Minden Closing" has the meaning ascribed to that term in the Foundry APA. The Minden Closing relates to the purchase of the Minden Purchased Assets and the assumption of the Minden Assumed Liabilities (as defined in the Foundry APA).

same with the Bankruptcy Court [Docket No. 510]. To facilitate the closing of the Foundry Sale, the Debtors obtained an order on December 9, 2022, clarifying the terms under which the Debtors would assume and assign certain executory contracts to Foundry. *See Order (I) Authorizing Debtors to Assume and Assign Executory Contracts to Foundry Digital LLC Pursuant to Section 365 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 634]. The Foundry Sale closed on December 12, 2022. *See Notice of Closing of Sale to Foundry Digital LLC and Cancellation of Hearing Scheduled for December 12, 2022 AT 4:30 P.M.* [Docket No. 642].

### G.    Postpetition Marketing Process

In connection with the sale procedures, upon commencement of these Chapter 11 Cases, the Debtors, with the assistance of Jefferies and their other advisors, commenced a comprehensive sale process to market all of the Debtors' assets and to seek debtor-in-possession financing. The Debtors and their advisors prepared marketing materials, including teasers, requests for financing proposals, confidential information memoranda and a virtual data room. Jefferies contacted 153 entities identified as potential purchasers or lenders. Jefferies distributed non-disclosure agreements (each, an "NDA") to all 153 of those potential purchasers and lenders. For those parties that executed an NDA, the Debtors provided marketing materials which included information about the Debtors' operations, services and products. Potential bidders and lenders that executed an NDA were also granted access to the virtual data room with historical and projected financial information and were allowed to conduct due diligence and prepare bids and lending proposals. The virtual data room consisted of hundreds of documents, including the necessary information a potential purchaser or lender would need to make a proposal. Overall, 83 of those parties have signed a NDA and were granted access to diligence materials.

### H.    Committee Objection

On December 15, 2022, the Committee filed an objection (the "Committee Objection") to the Debtors' motion seeking conditional approval of the Disclosure Statement. The Committee argues, in part, that the Disclosure Statement should not be approved because Plan – on its face – cannot be confirmed in its current form. Further, the Committee asserts that the Disclosure Statement does not provide voting parties with adequate information. The Debtors strongly disagree with the Committee's assessments.

For instance, the Committee argues that the Plan's exculpation provision renders the Plan "patently unconfirmable." However, Section 9.5 of the Plan, which contains the exculpation provision is self limiting. By its terms, the exculpation is available to exculpated parties to the extent permitted by applicable law. If applicable law limits the scope of the Plan's exculpation provisions, then the Plan conforms to such limitations.

The Committee also takes issue with the release provisions contained within the Plan as overly broad and unjustifiable. Here, the Committee's argument is both flawed and premature. It is flawed because the Plan is treated as a motion to approve a Global Settlement among the Debtors and their stakeholders. In that regard, the Plan does not contemplate a wide ranging litigation campaign following confirmation. Rather, the Plan offers broad releases to, among others, (1) Holders of Claims and Interests who do not affirmatively opt out of the releases

provided by the Plan, (2) the Committee, (3) the Plan Administrator, and (4) the Debtors' current and former officers and directors.  If the release provisions of the Plan were removed as the Committee requests, Holders of Claims and Interests would no longer be eligible for a release under the Plan and could be exposed to future litigation risk.  Accordingly, the Debtors urge Holders of Claims and Interests to vote to accept the Plan.

The Committee's objection to the releases is also premature, as the releases proposed in the Plan will be addressed at the Combined Hearing on confirmation of the Plan and final approval of this Disclosure Statement.  The Debtors will be prepared to present evidence at the Combined Hearing that the release provisions are appropriate, necessary and comply with applicable law.

The Committee also argues that the Debtors' assets should vest in a liquidating trust. The Debtors have attempted to resolve the Committee's concerns in this regard under the Plan by providing that a Litigation Trust will be formed upon the Effective Date that will receive any Retained Causes of Action for the benefit of Holders of Claims and Interests.  Although the Committee contends that the inclusion of a liquidating trust will result in tax savings for the Debtors' estates, the only assets which the Debtors anticipate realizing a taxable gain on will would be potentially proceeds of the Retained Causes of Action, which have a tax basis of zero dollars, and the contribution of those claims to the Litigation Trust resolves that concern. Thus, the Committee's concerns in this respect are misplaced.

## ARTICLE VI.
## OTHER KEY ASPECTS OF THE PLAN

### A.    Distributions

Under the Bankruptcy Code, only claims and interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court has determined, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of the Debtors.  Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, on the Effective Date, the Debtors shall make initial distributions under the Plan on account of Allowed Claims, including those that become Allowed as of the Effective Date, subject to the Reorganized Debtors' right to object to Claims.  A more detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims or Interests is set forth in Article I above.

### B.    Wind-Down Transactions

#### 1.    Overview of the Wind-Down Transactions

On or before the Effective Date, to the extent not inconsistent with any Sale Order and any Asset Purchase Agreement, the Debtors or Reorganized Debtors, as applicable, shall take all applicable actions set forth in the Wind-Down Transactions Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Wind-Down Restructuring, and any transaction described in, approved by, contemplated by, or necessary to effectuate the

Wind-Down Restructuring that are consistent with and pursuant to the terms and conditions of the Plan and Wind-Down Transactions Memorandum, which transactions may include, as applicable: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and Wind-Down Transaction Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Wind-Down Transaction Memorandum and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; and (4) all other actions that the applicable Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.  All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall, and shall be deemed to, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Wind-Down Restructuring, including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law.

## 2.    Corporate Governance; Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Reorganized Debtors shall cease and all such persons shall be deemed to have resigned, solely in their capacities as such.  On the Effective Date the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies without any further action required on the part of any such Reorganized Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Reorganized Debtors, or the members of any Reorganized Debtor.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors.  The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date

by and between the Reorganized Debtors and the Purchaser.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

### C.     Operations between the Confirmation Date and Effective Date.

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as Debtors in possession in the ordinary course in a manner consistent with the transactions contemplated by the Plan, subject to all applicable orders of the Bankruptcy Court and the provisions of the Bankruptcy Code.

### D.     Sources and Uses of Cash for Plan Distributions.

The Debtors shall fund distributions under the Plan with Wind-Down Distributable Cash. The Debtors' Cash on hand, collection of accounts receivable, the proceeds of Asset Sales, and liquidation of the Debtors' remaining assets, provide adequate liquidity to fund distributions to be made under the Plan and shall fund the Administrative and Priority Claims Reserve, the Secured Claims Reserve, the Professional Fee Escrow Account, the Plan Administration Operating Reserve, and other obligations under the Plan.

As of the date hereof, the Debtors had approximately $18.4 million in Cash for satisfaction of Claims and their obligations under the Plan.  In addition, the Debtors expect to close Asset Sales in advance of confirmation of the Plan for approximately $10.5 million in Cash.

The Debtors proposed sources and uses for distributions under the Plan are described below.

| Estimated Sources & Uses: | Amount: |
|---|---|
| **Estimated Sources** | |
| Cash and Cash Equivalents | $18,383,237.00 |
| Cash Proceeds from Asset Sales | $10,545,000.00 |
| Accounts Receivable | $2,356,183.00 |
| Post-Confirmation Equipment Sales | $11,961,759.00 |
| Other Proceeds | $194,257.00 |
| **Total:** | **$43,440,437.00** |
| **Estimated Uses** | |
| Priority Claims & Fees | $286,946.00 |
| Chapter 11 Administrative Claims | $4,658,871.00 |
| Unpaid and Accrued Chapter 11 Professional Fees | $15,415,087.00 |
| 503(b)(9) Claims | $1,309,053.00 |
| U.S. Trustee Fees | $185,666.00 |
| Plan Administrator Costs | $2,350,000.00 |
| General Unsecured Claims | $19,234,813.00 |
| **Total:** | **$43,440,437.00** |

### E.     Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Confirmation Order, the Sale Order, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, but after consummation of any Asset Sale, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the assets of the Debtors other than any interest of the Debtors in the Excluded Customer Equipment shall vest in the Reorganized Debtors for the purpose of winding down the Estates, free and clear of all Liens, Claims, charges, or other encumbrances.  On the Effective Date, (a) the Plan Administrator shall be appointed and shall be authorized to administer, liquidate, monetize and distribute the Wind-Down Distributable Cash, in accordance with the Plan and the Plan Administrator Agreement, and (b) any interest of the Debtors in the Excluded Customer Equipment, including any liens or security interests held by the Debtors in Excluded Customer Equipment, is deemed abandoned to the owner or operator of the real property where such equipment is located..

**F.      The Reorganized Debtors**

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions in accordance with the Wind-Down Budget, (e) assisting the Litigation Trust in enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Plan, the Confirmation Order, any Asset Purchase Agreement, and any Sale Order, and (h) administering the Plan in an efficacious manner.

The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

**G.      The Plan Administrator and the Litigation Trust**

**1.      The Plan Administrator**

On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Reorganized Debtors shall cease and all such persons shall be deemed to have resigned, solely in their capacities as such.  On the Effective Date the Plan Administrator shall be appointed as the sole

manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies without any further action required on the part of any such Reorganized Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Reorganized Debtors, or the members of any Reorganized Debtor.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors.  The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court consistent with the Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates, following consultation with the Plan Oversight Committee.  Under the Plan Administrator Agreement, the Plan Administrator shall be obligated to consult with the Plan Oversight Committee approximately every thirty (30) days concerning matters related to the Wind-Down Estates. The Plan Administrator shall have the rights, authority and duties set forth in the Plan Administrator Agreement.

The Plan Administrator shall have the authority to hire counsel to advise it in connection with its duties, powers and rights under the Plan Administrator Agreement and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties therein, and pay reasonable compensation to such advisors, without further approval of the Bankruptcy Court. The Plan Administrator shall be entitled to retain professionals in its sole discretion, including any professionals employed by the Debtors or the Committee in the Chapter 11 Cases. The provision of services by a professional to the Debtors or the Committee shall not disqualify such professional from employment by the Plan Administrator

Any professionals retained by the Plan Administrator or the Litigation Trust shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred, without further order of the Bankruptcy Court.  To the extent there are fees and expenses incurred by the Plan Administrator, the Litigation Trust or their respective retained professionals in excess of the amounts set forth in the Wind-Down Budget, such fees may be paid from the Wind-Down Estates, subject to the consent of the Plan Oversight Committee (which shall not be unreasonably withheld, delayed or conditioned). If any dispute arises between the Plan Administrator and the Plan Oversight Committee over matters where consent of the Plan Oversight Committee is required, the Plan Administrator will present the disputed matter to the Bankruptcy Court for resolution after notice and a hearing and will not act on the disputed matter absent further order of the Bankruptcy Court.

### 2.      Litigation Trust

On or before the Effective Date, (i) the Litigation Trust shall be created and established by the execution and delivery of the Litigation Trust Agreement and any other necessary action,

and (ii) all Retained Causes of Action shall be transferred to and vest in the Litigation Trust, free of all Claims, Liens and interests. The Litigation Trust shall reduce to Cash or otherwise liquidate the Retained Causes of Action and distribute the proceeds to Holders of Claims and Interests in accordance with the Plan and the Litigation Trust Agreement. The costs and expenses incurred by the Litigation Trust on and after the Effective Date shall be paid from the proceeds of Retained Causes of Action and in accordance with the Wind-Down Budget. Upon entry of the Final Decree, the Litigation Trust shall be dissolved without further action by the Plan Administrator. The rights, powers, privileges, obligations, and compensation of the Litigation Trust shall be set forth in the Litigation Trust Agreement, which shall be filed as part of the Plan Supplement.

On and after the Effective Date, in accordance with the Litigation Trust Agreement, the Litigation Trust shall be responsible for the administration, pursuit, prosecution, litigation, settlement, dismissal or other action taken or contemplated to be taken with regard to the Retained Causes of Action and shall have the authority to administer, pursue, prosecute, litigate, settle, dismiss or otherwise take action in furtherance of resolving each Retained Cause of Action, subject to the terms and conditions set forth in the Litigation Trust Agreement, the Plan and the Confirmation Order.

The Litigation Trust shall have the authority to hire counsel to advise it in connection with its duties, powers and rights under the Litigation Trust Agreement and may hire such additional attorneys, accountants and other professionals as may be required or appropriate in connection with its duties therein, and pay reasonable compensation to such advisors, without further approval of the Bankruptcy Court. The Litigation Trust shall be entitled to retain professionals in its sole discretion, including any professionals employed by the Debtors or the Committee in the Chapter 11 Cases. The provision of services by a professional to the Debtors or the Committee shall not disqualify such professional from employment by the Litigation Trust. The Plan Oversight Committee shall have the right, subject to the consent of the Plan Administrator (which shall not be unreasonably withheld, delayed or conditioned) to select counsel to represent the Litigation Trust and to administer, pursue, prosecute, litigate, settle, dismiss or otherwise take action in furtherance of resolving each Retained Cause of Action.

### H.    Dissolution of the Debtors

Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than thirty (30) days following the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Reorganized Debtors with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of each Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of

any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule.

### I.      The Plan Supplement

The Debtors will file the Plan Supplement no later than January 18, 2023. The Plan Supplement will include as exhibits (a) the Assumed Executory Contracts and Unexpired Leases Schedule; (b) the Schedule of Retained Causes of Action; and (c) the Wind-Down Transaction Memorandum; and (d) the Litigation Trust Agreement.

### J.      Bankruptcy Code Section 1146

Pursuant to section 1146(a) of the Bankruptcy Code, the Plan provides that (a) the issuance, transfer or exchange of equity securities under the Plan, (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest, or (c) the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order will direct the appropriate federal, state, or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### K.      Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Section 9 hereof, any applicable Final Order, and any applicable Asset Purchase Agreement, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. On the Effective Date, the Retained Causes of Action shall vest in the Litigation Trust, and the Litigation Trust's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Section 9 hereof, pursuant to a Final Order, Sale Order, Asset Purchase Agreement, or as assigned and transferred pursuant to any applicable Asset Purchase Agreement, which, in each case, shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Litigation Trust may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Holders of Claims and Interests. **No Entity may rely**

**on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Litigation Trust will not pursue any and all available Retained Causes of Action. Except as specifically released under the Plan or pursuant to a Final Order, Sale Order, Asset Purchase Agreement, or as assigned or transferred pursuant to any applicable Asset Purchase Agreement, the Debtors and the Reorganized Debtors expressly reserve the right of the Litigation Trust to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Section 9 hereof, pursuant to a Final Order, or as assigned and transferred under any applicable Asset Purchase Agreement. Unless otherwise agreed upon in writing by the parties to the applicable Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor or the Litigation Trust, without the need for any objection or responsive pleading by the Reorganized Debtors, the Litigation Trust or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Litigation Trust may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Reorganized Debtors and/or the Litigation Trust, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Notwithstanding anything contained herein to the contrary (including the releases described in Section 9), to the extent the Debtors have previously released certain claims and Causes of Action against a party, including pursuant to any Sale Order, any Asset Purchase Agreement, or any Final Order, nothing in the Plan shall be construed to revive such released claims and Causes of Action against such party, or to impair or otherwise limit the releases provided thereunder.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors, for the benefit of the Litigation Trust, notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Litigation Trust, except as otherwise expressly provided in the Plan, including Section 9 hereof. The Litigation Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Litigation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Below are certain Retained Causes of Action that the Reorganized Debtors or the Plan Administrator, as applicable, may pursue in accordance with the best interests of the Reorganized Debtors and their Estates. Further information on the Retained Causes of Action will be included on the Schedule of Retained Causes of Action, to be filed with the Plan Supplement.  The failure to describe any Retained Cause of Action in this Disclosure Statement shall not prejudice the rights of the Debtors and Reorganized Debtors in respect of any Retained Cause of Action that is described or referenced in the Schedule of Retained Causes of Action.

### 1.   Atlas Technology Group LLC

On September 2, 2021, CN LLC and Atlas Technology Group LLC ("Atlas") entered into that certain master agreement (the "Master Agreement"), under which CN LLC agreed to provide, subject to specified terms and conditions, "colocation" and other services for Atlas-owned Bitcoin mining equipment (the "Equipment") as specified in an attached order form. The Master Agreement was an exceptionally valuable agreement in which Atlas committed to pay CN LLC more than $130 million over the term of the Master Agreement. The Debtors possess multiple Claims and Causes of Action against Atlas resulting from certain breaches of Atlas' obligations under the Master Agreement. Atlas' breaches include, among others, failing to (i) deliver the Equipment as promised, and (ii) pay deposits and other amounts due and owing under the Master Agreement. Rather than comply with its obligations under the Master Agreement and rectify the breaches thereunder, on June 16, 2022, Atlas purported (ineffectually) to terminate the Master Agreement, claiming an excess of "Outage Days" despite having never notified CN LLC of a single Outage Day as required under the Master Agreement. After Atlas failed to pay certain amounts within the contractual cure period under the Master Agreement, on July 11, 2022, CN LLC informed Atlas that it had duly terminated the Master Agreement and demanded payment in accordance with its express terms, including, as liquidated damages, all amounts due for the remainder of the applicable term of the Master Agreement.

### 2.   RK Mission Critical, LLC

Prior to the Petition Date, CN LLC was party to that certain teaming agreement, dated as of April 20, 2020 (collectively with the Standard Terms and Conditions of Sale, Revision November 2020 referenced in order forms thereunder (the "Terms"), as amended, supplemented, or otherwise modified from time to time, the "Teaming Agreement"), under which RK Mission Critical LLC, a Colorado limited liability company ("RKMC"), agreed to provide, and CN LLC agreed to accept, the assistance of RKMC in designing, developing and manufacturing modules for CN LLC's business. On December 21, 2021, CN LLC executed a purchase order (the "Purchase Order") to purchase certain containers from RKMC, which was governed by and subject to the Terms and by which CN LLC granted RKMC "a security interest in any Goods provided by RKMC and all attachments, replacements and proceeds thereof, to secure Buyer's performance hereunder and payment of the purchase price, interest on any past-due amounts as set forth in Section 2 and the costs of collection, including reasonable attorney's fees."

At the time the purchased containers were actually delivered to CN LLC, pursuant to the Purchase Order, RKMC had not filed a UCC-1 financing statement to perfect its security interest in the containers. On or about July 26, 2022, RKMC filed a UCC-1 financing statement (the "July 26 Financing Statement") against CN LLC with the secretary of state of the State of

Delaware.  The July 26 Financing Statement purported to perfect a security interest in "[a]ll goods sold by [RKMC] and delivered to [CNN LLC] including, without limitation, all Goods sold by [RKMC] and delivered to Debtor hereafter, wherever located," including the purchased containers.  On July 28, 2022, RKMC filed a UCC-3 statement (the "UCC-3", and collectively with the July 26 Financing Statement, the "Financing Statements") amending the collateral description contained in the July 26 Financing Statement to provide a specific list of containers that were to be subject to RKMC's security interest.  The effect of the UCC-3 was to render unperfected RKMC's security interest in containers RKMC had delivered to CNN LLC other than those listed in the UCC-3.

The filing of the Financing Statements occurred less than ninety (90) days prior to the Petition Date. The filing of the Financing Statements and the purported perfection of RKMC's security interest as set forth therein, were transfers within the meaning of 11 U.S.C. §§ 101(54) and 547 (the "Transfers"). The Transfers occurred more than thirty (30) days after the delivery of the purchased containers to CN LLC. Upon the commencement of these Chapter 11 Cases, the Debtors' interests in the delivered containers became property of the Debtors' Estates. As such, the Debtors possess colorable claims against RKMC to avoid the Transfers under 11 U.S.C. § 547(b), and to preserve the Transfers and any purported security interest granted thereby, pursuant to 11 U.S.C. § 551, for the benefit of the Debtors' Estates.

### 3.  Rohit Shirole

Rohit Shirole ("Shirole") was formerly employed by CN LLC and Holdings as a Vice President of Strategy and Business Development.  On December 8, 2021, Shirole's employment was terminated for cause. Shortly thereafter, Shirole commenced a lawsuit against CN LLC and Holdings in the Fourth Judicial District for the State of Minnesota, Hennepin County, styled *Rohit Shirole v. Compute North Holdings, Inc. and Compute North LLC*, Case No. 22-CV-22-2274 (the "Minnesota Action") asserting various claims arising out of his employment. On March 4, 2022, CN LLC and Holdings filed their answer to Shirole's complaint in the Minnesota Action, asserting various counterclaims, including (i) breach of the duty of loyalty, (ii) tortious interference with contract, and (iii) unfair competition. The parties proceeded through the Minnesota Action as well as through mediation in the months leading up to the Petition Date. However, the mediation was unsuccessful and the parties did not reach a resolution.  The Minnesota Action was stayed upon the commencement of the Chapter 11 Cases.

### 4.  Bootstrap Energy, LLC

The Debtors are party various commercial arrangements with Bootstrap Energy, LLC, Corpus Christi Energy Park, LLC and their respective affiliates, shareholders, employees, officers, directors, agents, representatives and advisors (collectively, "Bootstrap"), including that certain commercial agreement, dated March 16, 2022 (the "Bootstrap Agreement").  The Debtors believe they have numerous claims and Causes of Action against Bootstrap, including claims and Causes of Action arising under chapter 5 of the Bankruptcy Code (including claims for turnover, fraudulent transfers under federal and state law, and preferential transfers), claims and Causes of action for breach of contract, equitable relief, negligence, conversion and other intentional torts, breach of express and implied warranties, statutory and common law claims and Causes of Action, and other claims or Causes of Action arising from or related to, in any way, the Debtors'

commercial dealings with Bootstrap, all of which the Debtors hereby reserve and retain. For example, Debtor Compute North LLC paid approximately $647,000 to Bootstrap in early September under duress because Bootstrap had threatened to terminate an agreement with the Debtors if it did not receive payment.  In the Debtors' view, this payment was preferential and can be avoided under sections 547 and 550 of the Bankruptcy Code.  The Debtors also possess multiple claims and Causes of Action against Bootstrap resulting from certain breaches of Bootstrap's obligations under the Bootstrap Agreement. Bootstrap's breaches include, among others, failing to (i) provide a satisfactory Letter of Agreement with AEP Texas that would, within 60 days of the execution of the Bootstrap Agreement, provide the Debtors with 300 megawatts of interconnection capacity by October 31, 2022 (the "AEP Letter Agreement"), and (ii) honor its obligation to transfer fee title to the Project Site (as defined in the Bootstrap Agreement) by June 6, 2022.  Pursuant to the Bootstrap Agreement, the Debtors maid a payment to Bootstrap of $11,530,000.00 in reliance upon Bootstrap's representations and covenants that it would obtain a satisfactory AEP Letter Agreement by May 15, 2022 and a deed transfer of the Project Site by June 6, 2022.

Bootstrap Energy LLC ("BE") and Corpus Christi Energy Park, LLC ("CCEP") disagree with the Debtors' position.  Instead, BE and CCEP maintain that the Debtors' foregoing summary of disputed claims is misleading. First, according to Bootstrap, the March 16 design-build contract is between CCEP and Debtor CN Corpus Christi, LLC ("CNCC"). Bootstrap says there are no other parties to such contract and any suggestion otherwise is contrary to both the facts and governing law. Second, Bootstrap contends that the Corpus Christi Project stalled due to multiple breaches by Debtor CNCC under said contract, not on account of CCEP. In support of this allegation, Bootstrap alleges that, (1) on June 3, 2022, Debtor CNCC failed to timely make the initial payment of $718,996.56 under a May 12, 2022 change order; (2) on August 26, 2022, Debtor CNCC failed to make the $6,100,000 payment to CCEP for completion of contract milestone #3; and (3) Debtor CNCC failed to punctually execute the Letter of Agreement with AEP Texas and post security thereunder, performance of each such obligation being time is of the essence under said contract. Bootstrap accuses Debtor CNCC of inaccurately contending that CCEP failed to timely present a satisfactory Letter of Agreement, but, according to Bootstrap, Debtor CNCC admitted in writing months ago that (i) Debtor CNCC had an acceptable Letter of Agreement, and (ii) Debtor CNCC was not executing the Letter of Agreement because it did not have its project capital in place.  Bootstrap further contends that Debtor CNCC shared these writings with third parties, including for purposes of soliciting capital and potential bidders for its assets, thereby objectively confirming that Debtor CNCC did, in fact, find the Letter of Agreement acceptable. Bootstrap also maintains that statements that it failed to honor its undertaking to convey fee title to the project site on June 6, 2022 are incomplete. Bootstrap argues that (a) under the terms of said contract, the June 6 date was a soft target, (b) on June 3, 2022 (i.e., a few days before the soft target) Debtor CNCC breached its payment obligations under said contract (see above), and (c) on June 16, 2022 CCEP duly exercised its right to stop work, which work stoppage has been in effect ever since pending the cure by Debtor CNCC of its multiple contract breaches. It is, therefore Bootstrap's position that Debtor CNCCs' failure to meet its payment obligations and otherwise perform under said contract have caused CCEP to suffer considerable harm giving rise to CCEP's claim against Debtor CNCC for $14,906,026.00 (Claim No. 10057). Separately, in connection with an unrelated purchase order for a 345kv transformer not pertaining to the Corpus Christi project, BE has a claim against Debtor Compute North, LLC for $4,114,700.00 (Claim No. 10058).

The Debtors disagree with and dispute Bootstrap's position.

**L.      Treatment of Executory Contracts and Insurance Policies**

**1.      Assumption or Rejection of Executory Contracts**

On the Effective Date, except as otherwise provided herein or the Confirmation Order, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (2) is a D&O Policy or relates to the indemnification obligations of the Debtors, the Reorganized Debtors or the Plan Administrator; (3); is subject to a rejection notice or assumption notice Filed with the Bankruptcy Court; (4) is a contract assumed by the Debtors or to be assumed by the Debtors and assigned to another third party, as applicable, pursuant to an Asset Purchase Agreement; or (5) is an Asset Purchase Agreement.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**2.      No Cure Obligations**

Except as set forth in the Plan Supplement, there are no anticipated cure obligations with respect to any Executory Contract or Unexpired Lease to which the Debtors are a party.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to any Executory Contract or Unexpired Lease assumed pursuant to the Plan.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute a finding by the Bankruptcy Court that (i) each such assumption is in the best interest of the Debtors and their Estates, and (ii) the requirements of section 365(b)(l) of the Bankruptcy Code are deemed satisfied.

**3.      Insurance Policies, D&O Insurance and Agreements**

Each of the Debtors' insurance policies that is executory, including D&O Insurance, and any agreements, documents, or instruments relating thereto, shall be assumed by the Debtors on behalf of the applicable Debtor and vest in the applicable Reorganized Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless (a) such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or a request to reject such insurance policy is pending on the Effective Date, or (b) such insurance policy was previously assumed and assigned to a Purchaser under an Asset Purchase Agreement.  Coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies. Modifications, Amendments, Supplements, Restatements, or Other Agreements.

### 4. Post-Petition Contracts and Leases

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 5. Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### M. Settlement, Releases, Exculpations, and Injunctions; Survival of Indemnification and Exculpation Obligations

### 1. Effect of Confirmation

Consistent with section 1141(d)(3) of the Bankruptcy Code, the Plan does not grant the Debtors a discharge. Notwithstanding the foregoing, except as otherwise expressly provided in the Plan or any contract, instrument or other agreement or document created pursuant to the Plan, the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release, effective as of the Effective Date, of such Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the

holder of such a Claim or Interest has accepted the Plan. On the Effective Date, all persons and Entities shall be precluded from asserting against the Reorganized Debtors or the Litigation Trust, or any of their respective assets or properties, any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan.

> ### 2. Releases

> #### a. Release of Liens

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.**

**On the Effective Date, concurrently with the consummation of an Wind-Down Restructuring that is consummated under the Plan and except as set forth in any Asset Purchase Agreement, the assets sold in such Wind-Down Restructuring shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, interests or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Sale Order (which may be the Confirmation Order), the Plan and any Asset Purchase Agreement, as applicable.**

**b.** **Releases by the Debtors**

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, their Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out of court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the pursuit of Confirmation and Consummation, the pursuit of Asset Sales, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; (2) any Causes of Action to the extent set forth on the Schedule of Retained Causes of Action; or (3) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.   A list of the parties proposed to be released by the Debtors, and a description of the nature of the relevant claims, is annexed hereto as Exhibit C.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Wind Down Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

c.      Releases by the Releasing Parties

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or their Affiliates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out of court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the pursuit of Confirmation and Consummation, the pursuit of Asset Sales, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases

52

set forth above do not release (1) any obligations of any party under any Sale Order and any Asset Purchase Agreement, or any document, instrument, or agreement executed to implement the transactions set forth in such Sale Order and/or Asset Purchase Agreement, as applicable; (2) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (3) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.  A list of the parties and claims proposed to be released by the Debtors  (and thus by the Releasing Parties, including creditors that do not opt out of the Third-Party Release) and a description of the nature of the relevant claims, is annexed hereto as Exhibit C.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Wind Down Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

### 3.        Exculpations and Injunctions

#### a.        Exculpation

Effective as of the Effective Date, to the extent permitted by applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Disclosure Statement, the Plan (including the Plan Supplement), or any Wind-Down Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have

constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

b.    Injunctions

Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. In addition, the Related Parties of any Exculpated Parties shall not incur liability for any cause of action or claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan ((a) and (b), collectively, the "Solicitation Actions").  No entity or person may commence or pursue a claim or cause of action of any kind against any Related Party of an Exculpated Party that arose or arises from, in whole or in part, any Solicitation Actions, without this Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim for actual fraud, gross

**negligence, or willful misconduct against any such Related Party of an Exculpated Party and such party is not protected pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such claim or cause of action against such Related Party of an Exculpated Party.**

### 4.  Survival of Indemnification and Exculpation Obligations

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (1) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced or terminated after the Effective Date, and (4) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on or after the Petition Date.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, for any reason, including by reason of section 502(e)(1)(B) of the Bankruptcy Code.

## ARTICLE VII.
## CONFIRMATION PROCEDURES

### A.  Combined Hearing on Confirmation and Final Approval of Disclosure Statement and Solicitation

The Debtors filed a motion seeking entry of a proposed Disclosure Statement Order approving this Disclosure Statement. Pursuant to Paragraph P of the Bankruptcy Court's Procedures for Complex Cases (Effective August 1, 2021). The Debtors obtained conditional approval of the Disclosure Statement on December [16], 2022 Docket No. [•].

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan.  The Debtors intend to seek final approval of the Disclosure Statement and Confirmation of the Plan at the Combined Hearing. Pursuant to the interim Disclosure Statement Order, the Combined Hearing is scheduled to commence on [February [•]], 2023, at [•] [•].m., prevailing Central Time, before the Honorable Judge Marvin Isgur, United States Bankruptcy Judge, in Courtroom 404 of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 19801.  The Combined Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The

Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Combined Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

### B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation are (1) that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly", (2) the Plan is "fair and equitable" as to such Class, (3) the Plan is feasible, and (4) the Plan is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan.  The Plan fully complies with the statutory requirements for Confirmation listed below.

- The Plan complies with all of the applicable provisions of the Bankruptcy Code.

- The proponents of the Plan have complied, or will have complied, with all of the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder has (a) accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

### C.     Best Interests of Creditors / Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that, as a condition to confirmation, each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Holders of Claims in the Voting Classes must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above. The Debtors believe that Holders of Claims in the Voting Classes would receive no distribution if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, for the reasons explained below.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit B**. Under the Plan, the Plan Administrator will conduct an orderly marketing and sale process for remaining assets, which is expected to result in higher sale proceeds than the forced-sale approach conducted in chapter 7. Moreover, it is anticipated that, unlike a chapter 7 trustee, the Plan Administrator will have the resources needed to fulfill the conditions precedent in the Foundry Sale for a successful sale of the Minden Facility to Foundry. As such, asset values to be realized through the Plan would likely be diminished if the cases were converted to chapter 7. Furthermore, as a result the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under chapter 7, the value of any Distributions to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 would be less than the value of distributions hereunder. This is because conversion of the Chapter 11 Cases to chapter 7 would require the appointment of a chapter 7

trustee, and in turn, such chapter 7 trustee's likely retention of new professionals.  The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with additional costs to the Debtors' Estates and delay compared to the time of distributions under the Plan.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit B** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation, that the Debtors demonstrate that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors to the Debtors, unless such liquidation or reorganization is proposed in the Plan. The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all Administrative Claims and Priority claims unless holders of such Claims consent to other treatment. The Plan provides for the payment of both Priority Claims and Administrative Claims. The Debtors believe that the Plan is feasible on this basis. See Section 4.2.2 of the Plan for further discussion of the sources of consideration for distributions under the Plan.

Further, as set forth herein, the Debtors commenced the Chapter 11 Cases to allow for an efficient and orderly sale of their Assets, followed by a wind-down process, which the Plan accomplishes.  The Debtors will be conducting business operations after the Effective Date, to the extent necessary to implement the Wind-Down Transactions and to monetize the Debtors' assets.

Accordingly, the Debtors believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

### E.    Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in Article VII.F below, each class of claims or interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, the Voting Classes described herein will have voted to accept the Plan only

if two-thirds in amount and a majority in number of Holders of Claims in each Voting Class that actually vote on the Plan vote to accept.

### F.    Confirmation without Acceptance by Impaired Class

Section 1129(b) of the Bankruotcy Court allows a bankruptcy court to confirm a plan over the rejection or deemed rejection of the plan by a class of claims or interests if the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

#### 1.    No Unfair Discrimination

This test applies to Classes that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class.  The Debtors believe the Plan and the treatment of all Classes under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

#### 2.    Fair and Equitable

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100 percent of the amount of the allowed claims or interests in such Class.  As to a dissenting class, the test sets different standards depending on the type of claims or interests of a debtor in such class.   In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Class of Secured Claims: That each holder of a secured claim:  (a) retains its liens on property to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the Effective Date of the Plan, of at least the allowed amount of such claim; (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (c) receives the "indubitable equivalent" of its allowed secured claim.

- Class of Unsecured Claims: That either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive or retain any property under the plan.

- Class of Equity Interests: That either (a) each holder of an impaired interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (b) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

## G.    Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated several alternatives to the transactions set forth in the Plan. After studying these alternatives, the Debtors believe that the Plan is the preferred approach to effectuating the company's restructuring and maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies.  If the Plan is not confirmed, the Debtors' ability to continue operating as a going concern could be severely jeopardized. The realistic alternatives likely will be either (i) the preparation and presentation of an alternative chapter 11 plan, (ii) a sale of some or all of the assets of the company pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.  See **Exhibit B** for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

## ARTICLE VIII.
## RISK FACTORS

The following provides a summary of various important considerations and other risk factors associated with the Plan; however, it is not exhaustive.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

## A.    Considerations that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan

### 1.    Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recoveries of Some Holders of Allowed Claims

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.

Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan. Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

### 2. The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes

The Debtors cannot know with certainty, at this time, the final results of the sale transactions, the existence or results of any potential Causes of Action, the number or amount of Claims in the Voting Classes that will ultimately be Allowed, and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim Filed in their Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

### 3. Any Valuation of Any Assets to be Distributed under the Plan Is Speculative

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, as it depends on, among other things, proceeds of future asset sales that have not yet occurred as well as the amount of proceeds of litigation identified on the Schedule of Retained Causes of Action, which is inherently uncertain. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Claims in the Voting Classes.

### 4. The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates and/or the Debtors' available Cash, including Sale Proceeds, is materially lower than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

### 5. Certain Tax Implications of the Debtors' Bankruptcy

Holders of Allowed Claims entitled to vote should carefully review Article IX of this Disclosure Statement, "Certain United States Federal Income Tax Consequences," for a

description of certain tax implications of the Plan and the Chapter 11 Cases. Holders of Allowed Claims should consult with their own tax advisors for the tax implications to them of the Plan and the Chapter 11 Cases. This Disclosure Statement only provides a summary of certain U.S. federal income tax implications of the Plan and the Chapter 11 Cases. Foreign tax considerations are not described herein.

### 6. The Plan Administrator

The ultimate amount of Cash available to make distributions to Holders of Allowed Claims depends, in part, proceeds from the sale of the Debtors' assets, as well as the manner in which the Plan Administrator conducts the wind-down process. The expenses of the Plan Administrator will be given priority over distributions to Holders of Allowed Claims. As a result, if the Plan Administrator incurs professional or other expenses in excess of current expectations, the amount of distributions to Holders of Allowed Claims will decrease.

The ultimate amount of Cash available for distributions to Holders of Allowed Claims also will be affected by the performance and relative success of the Plan Administrator in pursuing the Retained Causes of Action. The less successful the Plan Administrator is in pursuing such matters, the less Cash there will be available for distribution to Holders of Allowed Claims.

There is a risk that the Plan Administrator may be unable to pursue certain Retained Causes of Action or assert claims in connection therewith because of inadequate funding and inability to retain counsel on a contingent fee basis.

### 7. Releases

The Plan proposes to release the Released Parties. The Debtors' assert that releases and third-party releases, included in the Plan are an integral part of the Debtors' overall restructuring efforts. Importantly, (a) all Holders of Claims or Interests that vote to accept or are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, (b) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and settled all Claims and Causes of Action against the Debtors.

### B. Bankruptcy-Specific Considerations

### 1. Objections to the Plan's Classification or Amounts of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification or amounts of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification or amounts.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Section 10 of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived, the Effective Date will not occur.

### 3. Failure to Satisfy Voting Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 4. Amendment of Plan Prior to Confirmation by the Debtors

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation.  The potential impact of any such amendment or waiver on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  In addition, if the Debtors seek to modify or amend the Plan after receiving sufficient acceptances, but prior to Confirmation, re-solicitation may be required.

### 5. Non-Confirmation or Delay of Confirmation of the Plan

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by a bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may determine that this Disclosure Statement and/or the solicitation procedures did not satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.  If the Debtors fail to achieve Confirmation, absent an immediate cash infusion, the Chapter 11 Cases would likely be converted to chapter 7.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed.  A dissenting Holder could challenge the solicitation procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the solicitation may be invalid.  If the Bankruptcy Court determined that the solicitation procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the distributions that Holders of Claims or Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain, and (b) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims or Interests.

### 6.  Non-Consensual Confirmation

The Debtors intend to seek Confirmation notwithstanding the deemed rejection of the Plan by certain Classes of Claims or Interests.  The Bankruptcy Court may confirm the Plan pursuant to the "cram-down" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

### 7.  Other Parties-in-Interest May Be Permitted to Propose Alternative Plans that Are Less Favorable to Certain Stakeholders

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative chapter 11 plan.  Under the Bankruptcy Code, a Debtor in possession initially has the exclusive right to propose and solicit acceptances of a chapter 11 plan for a period of 120 days from filing.  Such exclusivity period can be reduced or terminated, however, upon order of the Bankruptcy Court.  If such an order were to be entered, other parties in interest would then have the opportunity to propose one or more alternative plans.

### 8.  Conversion to Chapter 7

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be

appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See **Exhibit B** for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 9. Failure to Obtain Approval of Releases, Injunctions, and Exculpation

Section IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of claims that may otherwise be asserted against the Debtors, the Reorganized Debtors, and the other Released Parties, among others. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

### 10. Failure to Generate Sufficient Cash to Continue in Chapter 11

The Debtors may not be able to generate sufficient Cash to continue operating in chapter 11 for a prolonged period of time. It is also unclear whether the Debtors will be able to obtain postpetition financing to fund administrative expenses through confirmation of an alternative chapter 11 plan.

### 11. Plan Based on Assumptions

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its businesses and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (a) ability to obtain adequate liquidity and financing sources; (b) ability to maintain the public's confidence in the Debtors' viability as a continuing entity and enterprise and to attract and retain sufficient business; and (c) ability to retain key employees, as well as the overall strength and stability of general economic conditions of industries in which the Company operates. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' businesses.

### C. Other Considerations

### 1. The Debtors May Be Adversely Affected by Litigation

The Debtors may become parties to litigation, and litigation in which the Debtors are already a party may not be resolved in their favor. In general, litigation can be expensive and time consuming to bring or defend. Litigation could result in settlements or damages that could significantly affect the Debtors' financial positions. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final

resolution of any litigation.  The impact of any such litigation on the Debtors' business and financial stability, however, could be material.

## ARTICLE IX.
## CERTAIN MATERIAL UNITED STATES FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S.  INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### A.    Tax Status of Compute North Holdings, Inc.

Holdings is and since its formation has been treated as a corporation for federal tax purposes.  The Debtors that are organized as limited liability companies and that are directly or indirectly wholly-owned by Holdings are each disregarded as an entity separate from Holdings.  Accordingly, the gain, loss or income from debt discharge with respect to any transaction engaged in by a Debtor organized as a limited liability company and that is directly or indirectly wholly-owned by Holdings will be reported on Holdings' federal income tax return.

### B.    Certain Federal Income Tax Consequences to the Debtors for U.S. Federal Income Tax Purposes

Section 382 of the IRC contains certain rules limiting the ability of corporations to utilize NOLs when there has been an "ownership change" (the "Annual Section 382 Limitation"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) that takes place during the three-year period ending on the date on which such change in ownership is tested.

As a general rule, the Annual Section 382 Limitation equals the product of the value of the stock of the loss corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (2.97% for ownership changes that occur during November 2022). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. The Annual Section 382 Limitation is increased in the case of a corporation that has net unrealized built-in gains ("NUBIG"), i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. Such a corporation can generally use NOLs in excess of its Annual Section 382 Limitation to the extent that it recognizes those NUBIGs for U.S. federal income tax purposes in the five years following the ownership change.

In addition to limiting a corporation's ability to use NOLs, the Annual Section 382 Limitation may also apply to certain losses or deductions which are "built-in" as of the date of the ownership change and that are subsequently recognized. If a loss corporation has a net-unrealized built-in loss ("NUBIL") at the time of the ownership change, then any built-in losses or deductions (which for this purpose includes a portion of the depreciation or amortization of depreciable or amortizable assets that have a built-in loss) that are recognized during the following five years (up to the amount of the original built-in loss) generally will be subject to the Annual Section 382 Limitation. Absent an applicable exception (discussed below), a NUBIL would also be subject to the Annual Section 382 Limitation.

Section 382(l)(5) of the IRC provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(l)(5) Bankruptcy Exception"). The 382(l)(5) Bankruptcy Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by the IRC and applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change.

In the present case it is expected that Holdings will undergo an ownership change as a result of the implementation of the Plan. Moreover, the Debtors do not expect the 382(l)(5) Exception to apply as pre-change shareholders and pre-change creditors will not own equity in Holdings after the ownership change. Consequently, those Debtors' NOLs, if any, are expected to be significantly limited or eliminated by the Annual Section 382 Limitation.

## C.      Wind-Down Transactions

Transactions engaged in by Holdings and its directly or indirectly wholly-owned limited liability company subsidiaries pursuant to the Wind-Down Restructuring may generate gain, loss,

cancellation of indebtedness income or a combination thereof. The consummation of these transactions may reduce the Debtors' NOLs.

### D. Distribution of Retained Causes of Action

On or before the Effective Date, the Debtors intend to distribute all of their Retained Causes of Action to the Litigation Trust. The distribution of the Retained Causes of Action will cause Holdings to recognize taxable gain equal to the excess of the fair market value of the Retained Causes of Action as of the date of the distribution, over Holdings' tax basis in the Retained Causes of Action. Holdings will be allowed to offset any gain recognized with respect to this distribution against the Debtors' NOLs. Any gain recognized by Holdings that exceeds the Debtors' NOLs will be subject to tax at the federal corporate tax rate of 21%.

### E. Ownership of Interests in the Litigation Trust

The Plan Administrator intends to treat the Litigation Trust as a grantor trust for tax purposes. The Litigation Trust will recognize taxable income or taxable loss, as the case may be, equal to the difference between the amount recovered with respect to a particular claim and the Litigation Trust's tax basis in that claim. As a grantor trust, the Litigation Trust's taxable income or taxable loss will be reported to, and includible in the taxable income of, the Holders of Claims and Interests in proportion to their relative interests in the Litigation Trust.

### F. Reservation of Rights

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article IX and the other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

**This summary discussion does not include any description of the U.S. federal, state, local, non-U.S. income or other tax consequences to equity owners of Holdings or to creditors of the Debtors. In particular, without limitation, this summary does not address the income or other tax consequences to such persons of any gain or loss recognition or income from discharge of indebtedness resulting from the transactions described or contemplated hereunder. All such equity owners and creditors should consult with their own tax advisors regarding the above mentioned and any other consequences of the transactions described or contemplated hereunder.**

### ARTICLE X.
### CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result from any other scenario. Any alternative to confirmation of the Plan, moreover, could result in extensive delays and increased administrative expenses. Accordingly, the Debtors urge holders of Claims in the Voting Classes to evidence their acceptance of the Plan by returning their Ballots so that

they are received by the Solicitation Agent no later than 4:00 p.m., prevailing Central Time, on January 26, 2023.

[*Remainder of page intentionally left blank*]

Dated: December ~~15~~19, 2022      **COMPUTE NORTH HOLDINGS, INC.,**
on behalf of itself and the other Debtor Entities.

*/s/ Drake Harvey*
Drake Harvey
President

# EXHIBIT A

**Plan of Liquidation**

**(INTENTIONALLY OMITTED)**

**EXHIBIT B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR COMPUTE NORTH HOLDINGS, INC, et al.

### I.     Introduction

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* (the "Disclosure Statement").

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, to demonstrate that the proposed plan as described in the Disclosure Statement satisfies the "best interests" of creditors test, the Debtors, with assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available to holders of claims and interests, assuming a hypothetical Chapter 7 liquidation of the Debtors (the "Liquidation Analysis"). In addition, the Debtors, with assistance of their advisors, have prepared a hypothetical Chapter 11 wind-down analysis (the "Chapter 11 Wind-Down Analysis"), to outline the various value drivers that an orderly Chapter 11 wind-down provides as compared to a Chapter 7 liquidation. The Liquidation Analysis and the Chapter 11 Wind-Down Analysis are based upon certain assumptions detailed in the Disclosure Statement and in the Global Notes and Assumptions set forth below.

**Statement of Limitations**

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a Chapter 7 case or, alternatively, a Chapter 11 wind-down involves the extensive use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis may not materialize in an actual Chapter 7 liquidation or Chapter 11 wind-down, and unanticipated events and circumstances could materially affect the ultimate results in an actual Chapter 7 liquidation or Chapter 11 wind-down.

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis were prepared for the sole purpose of generating a reasonable, good faith estimate of the net proceeds that would be realized if the Debtors' assets were liquidated in accordance with Chapter 7 of the Bankruptcy Code or through a Chapter 11 wind-down. The Liquidation Analysis and the Chapter 11 Wind-Down Analysis are not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS OR CHAPTER 11 WIND-DOWN ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS ARE HYPOTHETICAL EXERCISES THAT HAVE BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE NET PROCEEDS THAT

WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE OR IN A CHAPTER 11 WIND-DOWN AS OF THE CONVERSION DATE (DEFINED BELOW). THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS ARE NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS DO NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION OR WIND-DOWN.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS OR CHAPTER 11 WIND-DOWN ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH HEREIN. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSES SET FORTH HEREIN.

**Basis of Presentation**

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis are based on the internal, unaudited financial statements of the Debtors as of September 22, 2022 (unless otherwise indicated). The actual assets available to the Debtors' estates and claims arising in the event of an actual liquidation or wind-down may differ from the assets assumed to be available pursuant to the Liquidation Analysis.

The Debtors have neither fully evaluated claims filed nor adjudicated any claims that have been or may be asserted against the Debtors before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ materially from the claim amounts used in the Liquidation Analysis.

Based on the foregoing, and the Global Notes and Assumptions below, the Debtors believe the following Liquidation Analysis reflects the likely results of a Chapter 7 liquidation as compared to an orderly wind-down of the debtors' estates pursuant to a liquidating Chapter 11 plan.

**Chapter 11 Wind-Down Analysis Compared to Chapter 7 Liquidation Analysis**

The below exhibit provides a side-by-side comparison of the respective recoveries for various classes of claims and interests based on the proposed liquidation scenarios.

| Proceeds and Claims | Asset / Claim Value | Chapter 11 Wind-Down Analysis | | | | Chapter 7 Liquidation Analysis | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low ($) | Low (%) | High ($) | High (%) | Low ($) | Low (%) | High ($) | High (%) |
| *Liquidation Proceeds* | | | | | | | | | |
| Total Distributable Value Before Plan Administration / Liquidation Costs | $ 86,751,126 | $ 39,351,375 | 45% | $ 41,590,437 | 48% | $ 28,229,433 | 33% | $ 30,949,378 | 36% |
| Plan Administration / Liquidation Costs | | 1,600,000 | | 2,350,000 | | 2,417,457 | | 3,005,855 | |
| **Net Liquidation Proceeds Available for Distribution** | **$ 86,751,126** | **$ 37,751,375** | **44%** | **$ 39,240,437** | **45%** | **$ 25,811,977** | **30%** | **$ 27,943,523** | **32%** |
| *Claims* | | | | | | | | | |
| Chapter 11 Priority & Administrative Claims | N/A | $ 21,855,623 | 100% | $ 21,855,623 | 100% | $ 19,724,023 | 100% | $ 19,724,023 | 100% |
| Class 1 - Secured Claims | $ - | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 3 - General Unsecured Claims | $27 million - $195 million | 15,895,752 | 8% | 17,384,813 | 64% | 6,087,954 | 3% | 8,219,500 | 30% |
| Class 3A - CNCC GUC Claims | 4,114,700 | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 4 - Parent GUC Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 7 - Preferred Equity Interests | 107,278,945 | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 8 - Parent Equity Interests | 3,460,108 | - | 0% | - | 0% | - | 0% | - | 0% |

| Proceeds and Claims | Asset / Claim Value | Chapter 11 Wind-Down Analysis | | | | Chapter 7 Liquidation Analysis | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low ($) | Low (%) | High ($) | High (%) | Low ($) | Low (%) | High ($) | High (%) |
| *Liquidation Proceeds* | | | | | | | | | |
| Total Distributable Value Before Plan Administration / Liquidation Costs | $ 86,851,126 | $ 39,451,375 | 45% | $ 41,690,437 | 48% | $ 28,329,433 | 33% | $ 31,049,378 | 36% |
| Plan Administration / Liquidation Costs | | 1,600,000 | | 2,350,000 | | 2,420,707 | | 3,009,105 | |
| **Net Liquidation Proceeds Available for Distribution** | $ 86,851,126 | $ 37,851,375 | 44% | $ 39,340,437 | 45% | $ 25,908,727 | 30% | $ 28,040,273 | 32% |
| *Claims* | | | | | | | | | |
| Chapter 11 Priority & Administrative Claims | N/A | $ 21,855,623 | 100% | $ 21,855,623 | 100% | $ 19,724,023 | 100% | $ 19,724,023 | 100% |
| Class 1 - Secured Claims | $ - | | 0% | | 0% | | 0% | | 0% |
| Class 3 - General Unsecured Claims | $27 million - $195 million | 15,995,752 | 8% | 17,484,813 | 65% | 6,184,704 | 3% | 8,316,250 | 31% |
| Class 3A - CNCC GUC Claims | 4,114,700 | | 0% | | 0% | | 0% | | 0% |
| Class 4 - Parent GUC Claims | - | | 0% | | 0% | | 0% | | 0% |
| Class 7 - Preferred Equity Interests | 107,278,945 | | 0% | | 0% | | 0% | | 0% |
| Class 8 - Parent Equity Interests | 3,460,108 | | 0% | | 0% | | 0% | | 0% |

## Process Assumptions

The Liquidation Analysis has been prepared assuming that the Debtors converted their cases from Chapter 11 to Chapter 7 on or about December 31, 2022 ("Conversion Date"). On the Conversion Date, it is assumed that the Office of the United States Trustee would appoint a Chapter 7 trustee ("Trustee") to oversee the liquidation of the Debtors' estates. The Chapter 11 Wind-Down Analysis presumes that a plan administrator ("Plan Administrator") would be appointed as of December 31, 2022 to oversee the wind-down of the Debtors' estates within the Chapter 11 Wind-Down Analysis. In both the Liquidation Analysis and the Chapter 11 Wind-Down Analysis, assets with initial bids are preliminarily assumed to be sold prior to the Conversion Date. Cash proceeds from the potential sales have been estimated based on the initial bids received. To the extent asset sales have been consummated, the amount of cash proceeds received have been used.

## Consolidated Liquidation

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis assume that the Debtors would be liquidated or wound down in a jointly administered and substantively consolidated proceeding. Therefore, the Liquidation Analysis and the Chapter 11 Wind-Down Analysis consider a consolidated company liquidation / wind-down for the Debtors. The Liquidation Analysis and the Chapter 11 Wind-Down Analysis assume unsecured intercompany claims arising post-petition and pre-petition between and amongst the Debtors would be settled.

## Global Notes and Assumptions

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis should be read in conjunction with the following global notes and assumptions.

1. *Significant dependence on unaudited financial statements.* The Liquidation Analysis and the Chapter 11 Wind-Down Analysis contain numerous estimates. Proceeds available for distribution are based upon the unaudited financial statements of the Debtors as of September 22, 2022 and are assumed to be substantially the same as of the Conversion Date, unless otherwise noted.

2. *Chapter 7 liquidation and Chapter 11 plan administration costs and length of liquidation process.* The Liquidation Analysis assumes that the liquidation would involve the forced sale of substantially all Debtors' assets over a period of approximately 180 days post-Conversion Date ("Liquidation Period"), as well as efforts by a chapter 7 trustee to arrange distributions and otherwise administer and wind down the estates.

   The Chapter 11 Wind-Down Analysis assumes an orderly wind-down of the estate by the Plan Administrator over a period of approximately one year ("Wind-Down Period"). In an actual liquidation or wind-down, the wind-down process and Liquidation Period / Wind-Down Period could vary significantly, thereby impacting distributions and recoveries. For example, the potential for

priority, contingent, and other claims, litigation and rejection costs, and delays in the final determination of Allowed Claims could substantially impact both the timing and amount of distributions and recoveries. Additionally, in light of industry and market instability, it is possible that the Liquidation Period would be materially extended. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation or wind-down.

3. *Additional Claims*. The cessation of business in a Chapter 7 liquidation is likely to cause additional claims to be asserted against the Debtors' Estates that otherwise would not exist absent such a liquidation. Examples of these kinds of claims include employee-related claims, such as severance or similar claims, tax liabilities, claims related to the rejection of unexpired leases and executory contracts, and others. These additional claims could be significant and, in certain circumstances, may be entitled to priority under the Bankruptcy Code. The Debtors cannot be certain of the sufficiency of any adjustments made for these potential claims in these Chapter 7 Liquidation Analysis and the Chapter 11 Wind-Down Analysis. Subsequently, the Chapter 7 Liquidation Analysis and the Chapter 11 Wind-Down Analysis do not assume any additional potential proceeds arising from retained causes of action.

4. *Distribution of liquidation proceeds*. Chapter 7 and Chapter 11 Administrative Claims, Priority Claims, professional and trustee fees, and other Claims that may arise in a liquidation or wind-down scenario would be paid in full from the liquidation / wind-down proceeds before the balance of any proceeds will be made available to pay any secured and General Unsecured Claims. Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis are estimated in accordance with the absolute priority rule.

## Chapter 11 Wind-Down Analysis for the Debtors

The schedule shown below presents the net liquidation proceeds available for distribution in a hypothetical Chapter 11 wind-down of the estate following consummation of various asset sales through the Wind-Down Period. The Chapter 11 Wind-Down Analysis estimates the high and low asset recoveries, which are based on the asset book value as of September 22, 2022, except as otherwise indicated.

**Chapter 11 Wind-Down Analysis - Consolidated Debtors Wind-Down (Actual Dollars)**

| | Notes | Book Value | Estimated Recovery | | | |
|---|---|---|---|---|---|---|
| | | | Low % | Low $ | High % | High $ |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $ 18,383,237 | 100% | $ 18,383,237 | 100% | $ 18,383,237 |
| Cash Proceeds from Asset Sales | 1 | 8,695,000 | 100% | 8,695,000 | 100% | 8,695,000 |
| Accounts Receivable - PMA, Colocation & Mining | 2 | 1,247,319 | 100% | 1,247,319 | 100% | 1,247,319 |
| Accounts Receivable - Other | 2 | 3,334,241 | 27% | 913,183 | 33% | 1,108,865 |
| Other Current Assets | 3 | 2,657,145 | 0% | - | 0% | - |
| **Total Current Assets** | | $ 34,316,942 | 85% | $ 29,238,739 | 86% | $ 29,434,421 |
| **Non-Current Assets** | | | | | | |
| Property & Equipment | 4 | $ 30,335,991 | 33% | $ 9,918,379 | 39% | $ 11,961,759 |
| Prepaid Expenses | 5 | 13,009,372 | 1% | 194,257 | 1% | 194,257 |
| Intangible Assets | 6 | - | 0% | - | 0% | - |
| Other Non-Current Assets | 7 | 9,088,821 | 0% | - | 0% | - |
| **Total Non-Current Assets** | | $ 52,434,184 | 19% | $ 10,112,637 | 23% | $ 12,156,016 |
| **Total Distributable Value Before Plan Administration Costs** | 8 | $ 86,751,126 | 45% | $ 39,351,375 | 48% | $ 41,590,437 |
| | | | | | | |
| **Less: Plan Administration Costs** | | | | | | |
| Plan Administrator Professional Fees | 9 | | | $ 1,500,000 | | $ 2,000,000 |
| Plan Administrator | 10 | | | 100,000 | | 350,000 |
| **Total Plan Administration Costs** | | | | $ 1,600,000 | | $ 2,350,000 |
| **Net Liquidation Proceeds Available for Distribution** | 11 | | | $ 37,751,375 | | $ 39,240,437 |

| Claims | | Claim Amount | Claims Recovery Estimate | | | |
|---|---|---|---|---|---|---|
| | | | Low % | Low $ | High % | High $ |
| **Priority Claims** | 12 | $ 286,946 | 100% | $ 286,946 | 100% | $ 286,946 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 37,464,429 | | 38,953,491 |
| **Chapter 11 Administrative Claims** | 13 | $ 21,568,677 | 100% | $ 21,568,677 | 100% | $ 21,568,677 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 15,895,752 | | 17,384,813 |
| **Class 1 - Secured Claims** | 14 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 15,895,752 | | 17,384,813 |
| **Class 3 - General Unsecured Claims** | 15 | $27 million - $195 million | 8% | $ 15,895,752 | 64% | $ 17,384,813 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 3A - CNCC GUC Claims** | 16 | $ 4,114,700 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 4 - Parent GUC Claims** | 16 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 7 - Preferred Equity Interests** | 17 | $ 107,278,945 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 8 - Parent Equity Interests** | 18 | $ 3,460,108 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |

6

**Chapter 11 Wind-Down Analysis - Consolidated Debtors Wind-Down (Actual Dollars)**

| | Notes | Book Value | Estimated Recovery | | | |
|---|---|---|---|---|---|---|
| | | | Low % | Low $ | High % | High $ |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $ 25,483,237 | 100% | $ 25,483,237 | 100% | $ 25,483,237 |
| Cash Proceeds from Asset Sales | 1 | 1,695,000 | 100% | 1,695,000 | 100% | 1,695,000 |
| Accounts Receivable - PMA, Colocation & Mining | 2 | 1,247,319 | 100% | 1,247,319 | 100% | 1,247,319 |
| Accounts Receivable - Other | 2 | 3,334,241 | 27% | 913,183 | 33% | 1,108,865 |
| Other Current Assets | 3 | 2,657,145 | 0% | - | 0% | - |
| **Total Current Assets** | | $ 34,416,942 | 85% | $ 29,338,739 | 86% | $ 29,534,421 |
| **Non-Current Assets** | | | | | | |
| Property & Equipment | 4 | $ 30,335,991 | 33% | $ 9,918,379 | 39% | $ 11,961,759 |
| Prepaid Expenses | 5 | 13,009,372 | 1% | 194,257 | 1% | 194,257 |
| Intangible Assets | 6 | - | 0% | - | 0% | - |
| Other Non-Current Assets | 7 | 9,088,821 | 0% | - | 0% | - |
| **Total Non-Current Assets** | | $ 52,434,184 | 19% | $ 10,112,637 | 23% | $ 12,156,016 |
| **Total Distributable Value Before Plan Administration Costs** | 8 | $ 86,851,126 | 45% | $ 39,451,375 | 48% | $ 41,690,437 |
| | | | | | | |
| **Less: Plan Administration Costs** | | | | | | |
| Plan Administrator Professional Fees | 9 | | | $ 1,500,000 | | $ 2,000,000 |
| Plan Administrator | 10 | | | 100,000 | | 350,000 |
| **Total Plan Administration Costs** | | | | $ 1,600,000 | | $ 2,350,000 |
| **Net Liquidation Proceeds Available for Distribution** | 11 | | | $ 37,851,375 | | $ 39,340,437 |

| Claims | Notes | Claim Amount | Claims Recovery Estimate | | | |
|---|---|---|---|---|---|---|
| | | | Low % | Low $ | High % | High $ |
| **Priority Claims** | 12 | $ 286,946 | 100% | $ 286,946 | 100% | $ 286,946 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 37,564,429 | | 39,053,491 |
| **Chapter 11 Administrative Claims** | 13 | $ 21,568,677 | 100% | $ 21,568,677 | 100% | $ 21,568,677 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 15,995,752 | | 17,484,813 |
| **Class 1 - Secured Claims** | 14 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 15,995,752 | | 17,484,813 |
| **Class 3 - General Unsecured Claims** | 15 | $27 million - $195 million | 8% | $ 15,995,752 | 65% | $ 17,484,813 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 3A - CNCC GUC Claims** | 16 | $ 4,114,700 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 4 - Parent GUC Claims** | 16 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 7 - Preferred Equity Interests** | 17 | $ 107,278,945 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 8 - Parent Equity Interests** | 18 | $ 3,460,108 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |

**Footnotes to Chapter 11 Wind-Down Analysis**

1. **Cash and Cash Equivalents**

   The Debtors' cash and cash equivalents bank balance is $18,38325,483,237 as of the week ending November 25. The cash and cash equivalents exclude any petty cash or Fidelity retirement accounts as the balances are immaterial. The cash balance includes sale proceeds of $5,000,000 and $1,547,000 collected prior to the Conversion Date for the asset sales to Generate for the Wolf Hollow and Kearney Facilities and to Crusoe Energy Systems, LLC ("Crusoe") for various inventory, respectively. In addition, the cash balance includes sale proceeds of $4,000,000 and $3,100,000 collected after November 25 but prior to Conversion Date for the asset sales to Foundry and U.S. Bitcoin, respectively. Restricted cash is estimated at $813,457 to cash collateralize a construction bond related to development of the Debtors' in process project in Nebraska ("Minden"). The cash is restricted from the Debtors use except to secure the construction bond for buildout of the Minden project, but the Debtors expect that upon sale or liquidation of Minden, the purchaser will be required to post a bond and the restricted cash will be returned to the Debtors. The Chapter 11 Wind-Down Analysis assumes liquidation proceeds of cash and cash equivalents and restricted cash are 100% of the unaudited book value.

| Description | Entity | Amount |
|---|---|---|
| Cash and Cash Equivalents | Compute North LLC | $ 17,569,780 |
| Restricted Cash - Minden Project | CN Minden LLC | 813,457 |
| **Total** | | **$ 18,383,237** |
| Description | Entity | Amount |
| Cash and Cash Equivalents | Compute North LLC | $ 24,669,780 |
| Restricted Cash - Minden Project | CN Minden LLC | 813,457 |
| **Total** | | **$25,483,237** |

**Cash Proceeds from Asset Sales**

The Debtors' have included cash proceeds estimated to be received from various asset sales anticipated to be consummated on or before December 31, 2022. The cash proceeds are estimated to be $81,695,000 based on initial bids received prior to November 25, 2022. The sale proceeds include an estimated bid for Minden. Despite diligent efforts, the Debtors were unable to obtain an actionable offer to acquire the Corpus Christ Project, and CN Corpus Christi LLC, the owner of the Corpus Christi Project, is not expected to receive any cash proceeds from a sale of its assets. All sale proceeds have been detailed in the schedule below ("Sale Proceeds Schedule"). Similar to cash and cash equivalents, the Chapter 11 Wind-Down Analysis assumes the sale proceeds have a 100% recovery of estimated cash value.

| Description | Entity | Amount |
|---|---|---|
| King Mountain | Compute North LLC | $ 3,000,000 |
| Foundry Miners | Compute North LLC | 4,000,000 |
| Minden | Compute North LLC | 1,170,000 |
| De Minimis Assets | Compute North LLC | 525,000 |
| **Total** | | **$ 8,695,000** |
| **Description** | **Entity** | **Amount** |
| Minden | Compute North LLC | $ 1,170,000 |
| De Minimis Assets | Compute North LLC | 525,000 |
| **Total** | | **$ 1,695,000** |

2. **Accounts Receivable**

Accounts Receivable recoveries are based upon the accounts receivable aging as of September 22, 2022, the anticipated receipt of the November project management agreement ("PMA") income and transition services agreement ("TSA") for the NextEra JV project ("King Mountain Project"), as well as various November and December mining and colocation receipts forecasted to be collected after November 25 and before December 31. The recovery percentages of the book value accounts receivable aging as of September 22, 2022 vary by aging bucket (no recovery if aged greater than 90 days or 70% to 85% for receivables aged 90 days or less). The Debtors estimate no recovery for $1,492,417 of mining receipts as the Debtors have already collected the amounts post-petition or the amounts are intercompany and will not have a net impact of the Debtors consolidated cash. In addition, the Debtors estimate no recovery for $167,376 of taxes on customer deposits, which are unlikely to be received. Furthermore, $380,000 of Generate-related PMA income is included with no recovery as the amount was collected as part of the sale agreement's $5 million cash proceeds. Finally, the King Mountain Project PMA and TSA income and various November and December mining and colocation receipts have a forecasted 100% recovery. This results in a net blended recovery range for all receivables of 47% to 51%.

3. **Other Current Assets**

The Debtors' estimated book balance of other current assets is approximately $2,657,145. Other current assets include restructuring services, SAAS subscriptions, technology subscriptions, insurance policies, leases, and other prepaid agreements. The Debtors estimate no recovery of other current assets in aggregate based on their review of actual balances on a counterparty-by-counterparty basis.

4. **Property & Equipment**

Property and equipment primarily consist of computer hardware and software, containers, transformers, miners, and other buildout and construction costs remaining after any auctions and respective sale hearings. In a wind-down, property and equipment are estimated to achieve blended recoveries of approximately 28% to 39%. All software, supplies and buildout and construction costs are estimated to have no recovery value. Office furniture, fixtures, and computer hardware is estimated to have a recovery of 15% to 30%. Transformers and mining equipment are estimated to have 25% to 50% recovery value. Assumes the Debtors retain all 63 unsold containers to be marketed and sold in an orderly sale process over time for approximately $150,000 to $175,000 per container.

5. **Prepaid Expenses**

The Debtors' estimated book balance of prepaid expenses is approximately $13,009,372. Deposits include lease payments, credit card reserves, and mining equipment deposits. No agreements have been made with the lessors to return lease deposits. The mining equipment deposits relate to customer funded amounts that the Debtors have placed mining equipment deposits with a third-party supplier. The Debtors have not received the mining equipment relating to the deposits, and no agreement has been made with the supplier to return the deposits. The Debtors expect to receive a 100% recovery of credit card reserves. Finally, the Debtors may recover additional cash from resolutions regarding the cancellation of prepaid insurance policies no longer required by the Debtors. However, the Chapter 11 Wind-Down Analysis does not contemplate any additional potential recoveries. In aggregate, the Debtors estimate a recovery for prepaid expenses of 1%%.

6. **Intangible Assets**

   Intangible assets reflect the Debtors' intangible assets as of September 22, 2022 and relates to the Debtors' intellectual property in the form of patents, trademarks, and websites that have not previously been valued and does not carry any value on the Debtors' books and records. The Debtors do not have any goodwill value marked in their books and records. Miner Sentry is an intangible asset, but it is not ascribed value in the Debtors' books and records. Any value attributed to Miner Sentry is as part of the broader asset sales detailed in the aforementioned Sale Proceeds Schedule. As such, no recoverable value was assigned to the Debtors' goodwill and intangible assets.

7. **Other Non-Current Assets**

   The Debtors' estimated book balance of other non-current assets is approximately $9,088,821. Other non-current assets include prepaid interest, deferred commission, and site and electrical buildouts. The Debtors assign no recovery value to non-current assets.

8. **Total Distributable Value Before Liquidation Costs**

   Represents the gross value generated through the sale / disposition of the Debtors' assets prior to wind-down related expenses.

9. **Plan Administrator Professional Fees**

   Represents the Debtors' expenses incurred and payable during the Wind-Down Period. The Debtors estimate that total Plan Administrator professional fees will range between $1,500,000 and $2,000,000.

10. **Plan Administrator**

    Chapter 11 plan administrator fees incurred and payable for administration of the Chapter 11 Wind-Down Analysis. The Debtors estimate that total Plan Administrator fees will range between $100,000 and $350,000.

11. **Net Liquidation Proceeds Available for Distribution**

    Represents the net value available for distribution to the Debtors' claims.

12. **Priority Claims**

    Represents unsecured claims related to estimated pre-petition taxes and unpaid commissions claims that were filed as of November 23, 2022 (the "Bar Date"). Includes estimated 2022 pre-petition taxes equal to 2021 total. Assumes certain accrued employee wages and benefits are paid as part of the Chapter 11 Administrative Claims.

13. **Chapter 11 Administrative Claims**

Represents the total 503(b)(9) and other administrative claims filed as of the Bar Date and accrued outstanding post-petition expenses, such as fees payable to the trustee for fourth quarter disbursements, accrued payroll and benefits, restricted receipts, paid time off ("PTO"), estimated freight and shipping charges, insurance premiums, mining hosting fees, and unpaid and accrued Chapter 11 professional fees incurred in the Chapter 11 cases through December 31, 2022. The Chapter 11 Wind-Down Analysis assume that the Debtors cease operations at all facilities following consummation of various asset sales in early December; however, the Debtors keep approximately 14 corporate level employees to continue various business and reporting functions through the Conversion Date.

14. **Class 1 – Secured Claims**

Aggregate secured claims as of the Bar Date are equal to $0. As of the Bar Date, $143,207,370 secured claims were filed. These claims have been reallocated to their proper claims status based on the following adjustments: Howard County Tax Office's $12,248 filed claim includes a duplicate claim of $6,124 and the remainder of the claim was reallocated to a priority tax claim; Koch Filter Corporation's filed claim of $67,784 has been allocated to General Unsecured Claims as there is no know secured interest for the claim; MVP Logistics LLC's filed claim of $314,211 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; Nebraska Public Power District's filed claim of $813,457 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; RK Mission Critical LLC's ("RKMC") filed claim of $38,693,054 includes a duplicate claim of $19,346,527 and the remainder of the claim was allocated to General Unsecured Claims as the Disclosure Statement does not contemplate a security interest; TZ Capital Holdings LLC's ("TZ Capital") filed claim of $102,085,861 has been waived as part of U.S. Bitcoin's bid for the King Mountain Project; US Digital Mining Texas LLC's filed claim of $1,200,000 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; WW Grainger Inc.'s filed claim of $20,755 has been removed as the claim balance as it has been identified as a cure cost for potential bidders to assume as part of various asset sales.

15. **Class 3 – General Unsecured Claims**

Represents the total General Unsecured Claims filed as of the Bar Date less any erroneously filed claims. Erroneously filed claims refer to claims reviewed by the Debtors that have been identified as erroneous for reasons including, among other things, duplicative claims, misclassified claims, and claims waived as part of various bids received. The filed General Unsecured Claims include, among other things, (1) pre-petition trade claims, (2) undisputed pre-petition litigation claims, and (3) numerous other types of pre-petition liabilities. The Debtors have included certain incremental scheduled General Unsecured Claims in the balance that were not marked as contingent, unliquidated, or disputed that did not have a corresponding filed claim as of the Bar Date. As noted previously, the Debtors have not fully reconciled all claims and believe the allowed General Unsecured Claims balance could vary materially in an actual liquidation or wind-down. In addition, General Unsecured Claims may include, among other things, claims that are speculative in amount, such as disputed litigation claims that may be asserted against the Debtors, any amounts related to potential rejection damages claims, and customer deposit claims.; however, the Debtors' have excluded the impact of these claims for the purpose of the Chapter 7 Liquidation Analysis. Finally, General Unsecured Claims exclude certain claims, such as Intercompany Claims and any claims waived as part of bids received prior to November 25. Specifically, General Unsecured Claims exclude all claims the Debtors presume will be resolved as part of an asset sale transaction, including Foundry Digital and U.S. Bitcoin. The conclusion

of the Chapter 11 Wind-Down Analysis is that General Unsecured Claims will receive any cash value recovery remaining in a Chapter 11 Wind-Down Analysis beyond the recovery classes previously listed. For presentation purposes, the Debtors display a range of General Unsecured Claims values as the total could vary materially in an actual liquidation or wind-down. The General Unsecured Claims range from approximately $27 million of scheduled General Unsecured Claims, which exclude potential rejection damages, customer deposit claims, claims waived as part of asset sale transactions, and other speculative claims (as outlined above), to approximately $195 million of filed General Unsecured Claims, which exclude potential rejection damages and include certain scheduled claims not designated as contingent, unliquidated, or disputed without a corresponding filed claim and exclude erroneously filed claims and claims waived as part of asset sale transactions (as outlined above).

16. **Class 3A – CNCC GUC Claims**

Represents claims filed against CN Corpus Christi LLC for various costs related to the partially developed Corpus Christi Project. Despite diligent efforts, CN Corpus Christi LLC was unable to obtain an actionable offer to acquire the Corpus Christ Project, and, thus, there are no anticipated cash proceeds from a sale of this Debtor's assets. As a result, the Debtors anticipate that there will be no distributions to creditors in this class.

17. **Class 4 – Parent GUC Claims**

Represents the balance outstanding under the Debtors' Parent GUC Claims as of the Conversion Date, which totals $0. TZ Capital's unsecured parent guarantee claim has been waived as part of the U.S. Bitcoin bid. All additional and incremental parent guarantees for the Prepetition Generate Facility have been released as part of the Generate sale.

18. **Class 7 – Preferred Equity Interests**

Estimated balance of Preferred Equity Interests as of the Conversion Date. The Preferred Equity Interests include four classes of equity: Convertible Preferred Stock, Convertible Preferred II Stock, Series C-1 Convertible Preferred Stock, and Series C Convertible Preferred Stock. These shares comprise 10.8% of total shares in the Debtors' equity structure. All restricted stock units ("RSU") not purchased, options and RSUs issued and outstanding, and shares available for issuance are excluded from the claims pool (14.4% of total shares in the Debtors' equity structure).

19. **Class 8 – Parent Equity Interests**

Estimated balance of Parent Equity Interests as of the Conversion Date. The Parent Equity Interests include two classes of equity: Class A Voting Common Stock and Class B Non-Voting Common Stock. These shares comprise 74.8% of total shares in the Debtors' equity structure.

## Chapter 7 Liquidation Analysis for the Debtors

The schedule shown below presents the net liquidation proceeds available for distribution in a hypothetical Chapter 7 case. The Liquidation Analysis estimates the high and low asset recoveries, which are based on the asset book value as of September 22, 2022, except as otherwise indicated.

**Chapter 7 Liquidation Analysis - Consolidated Debtors Wind-Down (Actual Dollars)**

| | Notes | Book Value | Estimated Recovery Low % | Low $ | High % | High $ |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $ 18,383,237 | 100% | $ 18,383,237 | 100% | $ 18,383,237 |
| Cash Proceeds from Asset Sales | 1 | 8,695,000 | 87% | 7,525,000 | 87% | 7,525,000 |
| Accounts Receivable - PMA, Colocation & Mining | 2 | 1,247,319 | 50% | 623,659 | 100% | 1,247,319 |
| Accounts Receivable - Other | 2 | 3,334,241 | 10% | 326,137 | 20% | 652,273 |
| Other Current Assets | 3 | 2,657,145 | 0% | - | 0% | - |
| **Total Current Assets** | | $ 34,316,942 | 78% | $ 26,858,033 | 81% | $ 27,807,829 |
| **Non-Current Assets** | | | | | | |
| Property & Equipment | 4 | $ 30,335,991 | 4% | $ 1,177,143 | 10% | $ 2,947,292 |
| Prepaid Expenses | 5 | 13,009,372 | 1% | 194,257 | 1% | 194,257 |
| Intangible Assets | 6 | - | 0% | - | 0% | - |
| Other Non-Current Assets | 7 | 9,088,821 | 0% | - | 0% | - |
| **Total Non-Current Assets** | | $ 52,434,184 | 3% | $ 1,371,400 | 6% | $ 3,141,549 |
| **Total Distributable Value Before Liquidation Costs** | 8 | $ 86,751,126 | 33% | $ 28,229,433 | 36% | $ 30,949,378 |
| | | | | | | |
| **Less: Liquidation Costs** | | | | | | |
| Chapter 7 Professional Fees | 9 | | | $ 1,500,000 | | $ 2,000,000 |
| Trustee Fees | 10 | | 3.25% | 917,457 | 3.25% | 1,005,855 |
| **Total Liquidation Costs** | | | | $ 2,417,457 | | $ 3,005,855 |
| **Net Liquidation Proceeds Available for Distribution** | 11 | | | $ 25,811,977 | | $ 27,943,523 |

| Claims | | Claim Amount | Claims Recovery Estimate Low % | Low $ | High % | High $ |
|---|---|---|---|---|---|---|
| **Priority Claims** | 12 | $ 286,946 | 100% | $ 286,946 | 100% | $ 286,946 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 25,525,031 | | 27,656,577 |
| **Chapter 11 Administrative Claims** | 13 | $ 19,437,077 | 100% | $ 19,437,077 | 100% | $ 19,437,077 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 6,087,954 | | 8,219,500 |
| **Class 1 - Secured Claims** | 14 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 6,087,954 | | 8,219,500 |
| **Class 3 - General Unsecured Claims** | 15 | $27 million - $195 million | 3% | $ 6,087,954 | 30% | $ 8,219,500 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 3A - CNCC GUC Claims** | 16 | $ 4,114,700 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 4 - Parent GUC Claims** | 17 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 7 - Preferred Equity Interests** | 18 | $ 107,278,945 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 8 - Parent Equity Interests** | 19 | $ 3,460,108 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |

13

**Chapter 7 Liquidation Analysis - Consolidated Debtors Wind-Down (Actual Dollars)**

| | Notes | Book Value | | Estimated Recovery | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Low % | Low $ | High % | High $ |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $ 25,483,237 | 100% | $ 25,483,237 | 100% | $ 25,483,237 |
| Cash Proceeds from Asset Sales | 1 | 1,695,000 | 31% | 525,000 | 31% | 525,000 |
| Accounts Receivable - PMA, Colocation & Mining | 2 | 1,247,319 | 50% | 623,659 | 100% | 1,247,319 |
| Accounts Receivable - Other | 2 | 3,334,241 | 10% | 326,137 | 20% | 652,273 |
| Other Current Assets | 3 | 2,657,145 | 0% | - | 0% | - |
| **Total Current Assets** | | $ 34,416,942 | 78% | $ 26,958,033 | 81% | $ 27,907,829 |
| **Non-Current Assets** | | | | | | |
| Property & Equipment | 4 | $ 30,335,991 | 4% | $ 1,177,143 | 10% | $ 2,947,292 |
| Prepaid Expenses | 5 | 13,009,372 | 1% | 194,257 | 1% | 194,257 |
| Intangible Assets | 6 | - | 0% | - | 0% | - |
| Other Non-Current Assets | 7 | 9,088,821 | 0% | - | 0% | - |
| **Total Non-Current Assets** | | $ 52,434,184 | 3% | $ 1,371,400 | 6% | $ 3,141,549 |
| **Total Distributable Value Before Liquidation Costs** | 8 | $ 86,851,126 | 33% | $ 28,329,433 | 36% | $ 31,049,378 |
| | | | | | | |
| **Less: Liquidation Costs** | | | | | | |
| Chapter 7 Professional Fees | 9 | | | $ 1,500,000 | | $ 2,000,000 |
| Trustee Fees | 10 | | 3.25% | 920,707 | 3.25% | 1,009,105 |
| **Total Liquidation Costs** | | | | $ 2,420,707 | | $ 3,009,105 |
| **Net Liquidation Proceeds Available for Distribution** | 11 | | | $ 25,908,727 | | $ 28,040,273 |

| Claims | Notes | Claim Amount | Claims Recovery Estimate | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Low % | Low $ | High % | High $ |
| **Priority Claims** | 12 | $ 286,946 | 100% | $ 286,946 | 100% | $ 286,946 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 25,621,781 | | 27,753,327 |
| **Chapter 11 Administrative Claims** | 13 | $ 19,437,077 | 100% | $ 19,437,077 | 100% | $ 19,437,077 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 6,184,704 | | 8,316,250 |
| **Class 1 - Secured Claims** | 14 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 6,184,704 | | 8,316,250 |
| **Class 3 - General Unsecured Claims** | 15 | $27 million - $195 million | 3% | $ 6,184,704 | 31% | $ 8,316,250 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 3A - CNCC GUC Claims** | 16 | $ 4,114,700 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 4 - Parent GUC Claims** | 17 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 7 - Preferred Equity Interests** | 18 | $ 107,278,945 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 8 - Parent Equity Interests** | 19 | $ 3,460,108 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |

**Footnotes to Chapter 7 Liquidation Analysis**

1. **Cash and Cash Equivalents**

   The Debtors' cash and cash equivalents balance is $~~18,383~~25,483,237 as of the week ending November 25. The cash and cash equivalents are based on the bank cash balance as of the week ending November 25. The cash and cash equivalents exclude any petty cash or Fidelity retirement accounts as the balances are immaterial. The cash balance includes sale proceeds of $5,000,000 and $1,547,000 collected prior to the Conversion Date for the asset sales to Generate for the Wolf Hollow and Kearney Facilities and to Crusoe for various inventory, respectively. In addition, the cash balance includes sale proceeds of $4,000,000 and $3,100,000 collected after November 25 but prior to Conversion Date for the asset sales to Foundry and U.S. Bitcoin, respectively. Restricted cash is estimated at $813,457 to cash collateralize a construction bond related to development of Minden. The cash is restricted from the Debtors use except to secure the construction bond for buildout of the Minden project, but the Debtors expect that upon sale or liquidation of Minden, the purchaser will be required to post a bond and the restricted cash will be returned to the Debtors. The Liquidation Analysis assumes liquidation proceeds of cash and cash equivalents and restricted cash are 100% of the unaudited book value.

   | Description | Entity | Amount |
   |---|---|---|
   | Cash and Cash Equivalents | Compute North LLC | $ 17,569,780 |
   | Restricted Cash - Minden Project | CN Minden LLC | 813,457 |
   | **Total** | | **$ 18,383,237** |
   | Description | Entity | Amount |
   | Cash and Cash Equivalents | Compute North LLC | $24,669,780 |
   | Restricted Cash - Minden Project | CN Minden LLC | 813,457 |
   | **Total** | | **$25,483,237** |

   **Cash Proceeds from Asset Sales**

   The Debtors' have included cash proceeds estimated to be received from various asset sales anticipated to be consummated on or before December 31, 2022. The cash proceeds are estimated to be $~~7~~,525,000 based on initial bids received prior to November 25, 2022. The sale proceeds ~~include~~exclude an estimated bid for Minden. Despite diligent efforts, the Debtors were unable to obtain an actionable offer to acquire the Corpus Christ Project, and CN Corpus Christi LLC, the owner of the Corpus Christi Project, is not expected to receive any cash proceeds from a sale of its assets. All sale proceeds have been detailed in the Sale Proceeds Schedule below. All initial bids received for assets prior to November 25, 2022 have an estimated 100% recovery of cash sale proceeds, but the bid for Minden has no forecasted recovery value, as it is assumed to be actionable only through an orderly wind-down process as detailed in the Chapter 11 Wind-Down Analysis.

   | Description | Entity | Amount |
   |---|---|---|
   | King Mountain | Compute North LLC | $ 3,000,000 |
   | Foundry Miners | Compute North LLC | 4,000,000 |
   | Minden | Compute North LLC | - |
   | De Minimis Assets | Compute North LLC | 525,000 |
   | Total | | $ 7,525,000 |

| Description | Entity | Amount |
|---|---|---|
| Minden | Compute North LLC | $ - |
| De Minimis Assets | Compute North LLC | 525,000 |
| Total | | $ 525,000 |

2. **Accounts Receivable**

Accounts Receivable recoveries are based upon the accounts receivable aging as of September 22, 2022, the anticipated receipt of the November PMA income and TSA for the King Mountain Project, as well as various November and December mining and colocation receipts forecasted to be collected after November 25 and before December 31. The recovery percentages of the book value accounts receivable aging as of September 22, 2022 vary by aging bucket (no recovery if aged greater than 90 days or 25% to 50% for receivables aged 90 days or less). The Debtors estimate no recovery for $1,492,417 of mining receipts as the Debtors have already collected the amounts post-petition or the amounts are intercompany and will not have a net impact of the Debtors consolidated cash. In addition, the Debtors estimate no recovery for $167,376 of taxes on customer deposits, which are unlikely to be received. Furthermore, $380,000 of Generate-related PMA income is included with no recovery as the amount was collected as part of the sale agreement's $5 million cash proceeds. Finally, the King Mountain Project PMA and TSA income and various November and December mining and colocation receipts have a forecasted 50% to 100% recovery range. This results in a net blended recovery range for all receivables of 21% to 41%.

3. **Other Current Assets**

The Debtors' estimated book balance of other current assets is approximately $2,657,145. Other current assets include restructuring services, SAAS subscriptions, technology subscriptions, insurance policies, leases, and other prepaid agreements. The Debtors estimate no recovery of other current assets in aggregate based on their review of actual balances on a counterparty-by-counterparty basis.

4. **Property & Equipment**

Property and equipment primarily consist of computer hardware and software, containers, transformers, miners, and other buildout and construction costs remaining after any auctions and respective sale hearings. In a liquidation, property and equipment are estimated to achieve blended recoveries of approximately 4% to 10%. All software, supplies and buildout and construction costs are estimated to have no recovery value. Office furniture, fixtures, and computer hardware is estimated to have a recovery of 5% to 15%. Transformers and mining equipment estimate to have 10% to 25% recovery value. Assumes the Debtors retain all 63 unsold containers to be liquidated for a 5% to 12.5% recovery.

5. **Prepaid Expenses**

The Debtors' estimated book balance of deposits is approximately $13,009,372. Deposits include lease payments, credit card reserves, and mining equipment deposits. No agreements have been made with the lessors to return lease deposits. The Debtors have not received the mining equipment relating to their deposit, and no agreement has been made with the vendor to return the deposit. The Debtors expect to receive a 100% recovery of credit card reserves. Finally, the Debtors may recover additional cash from resolutions regarding the cancellation of prepaid insurance policies no longer required by the Debtors. However, the Chapter 7 Liquidation Analysis does not contemplate any additional potential recoveries. In aggregate, the Debtors estimate a recovery for prepaid expenses of 1%.

16

6. **Intangible Assets**

Intangible assets reflect the Debtors' intangible assets as of September 22, 2022 and relates to the Debtors' intellectual property in the form of patents, trademarks, and websites that have not previously been valued and does not carry any value on the Debtors' books and records. The Debtors do not have any goodwill value marked in their books and records. Miner Sentry is an intangible asset, but it is not ascribed value in the Debtors' books and records. Any value attributed to Miner Sentry is as part of the broader asset sales detailed in the aforementioned Sale Proceeds Schedule. As such, no recoverable value was assigned to the Debtors' goodwill and intangible assets.

7. **Other Non-Current Assets**

The Debtors' estimated book balance of other non-current assets is approximately $9,088,821. Other non-current assets include prepaid interest, deferred commission, and site and electrical buildouts. The Debtors assign no recovery value to non-current assets.

8. **Total Distributable Value Before Liquidation Costs**

Represents the gross value generated through the sale / disposition of the Debtors' assets prior to liquidation related expenses.

9. **Chapter 7 Professional Fees**

Includes an estimate for certain professionals that would be retained by the Trustee during the Liquidation Period, including financial advisors and legal counsel. The Debtors estimate that Chapter 7 Professional Fees will range between $1,500,000 and $2,000,000.

10. **Trustee Fees**

Trustee fees required to facilitate the sale and wind-down of the Debtors' assets, assumed to be 3.25% of Total Distributable Value. These fees are assumed to be used for marketing and administrative costs of the Trustee during the Liquidation Period.

11. **Net Liquidation Proceeds Available for Distribution**

Represents the net value available for distribution to the Debtors' claims.

12. **Priority Claims**

Represents unsecured claims related to estimated pre-petition taxes and unpaid commissions claims that were filed as of the Bar Date. Includes estimated 2022 pre-petition taxes equal to 2021 total. Assumes certain accrued employee wages and benefits are paid as part of the Chapter 11 Administrative Claims.

13. **Chapter 11 Administrative Claims**

Represents the total 503(b)(9) and other administrative claims filed as of the Bar Date and accrued outstanding post-petition expenses, such as fees payable to the trustee for fourth quarter disbursements, accrued payroll and benefits, restricted receipts, PTO, estimated freight and shipping charges, insurance premiums, mining hosting fees, and unpaid and accrued Chapter 11 professional fees incurred in the Chapter 11 cases through December 31, 2022. The Liquidation Analysis assumes that the Debtors cease operations at all facilities following consummation of various asset sales in early December; however, the Debtors keep approximately 14 corporate level employees to continue various business and reporting functions through the Conversion Date.

14. **Class 1 – Secured Claims**

Aggregate secured claims as of the Bar Date are equal to $0. As of the Bar Date, $143,207,370 secured claims were filed. These claims have been reallocated to their proper claims status based on the following adjustments: Howard County Tax Office's $12,248 filed claim includes a duplicate claim of $6,124 and the remainder of the claim was reallocated to a priority tax claim; Koch Filter Corporation's filed claim of $67,784 has been allocated to General Unsecured Claims as there is no know secured interest for the claim; MVP Logistics LLC's filed claim of $314,211 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; Nebraska Public Power District's filed claim of $813,457 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; RKMC filed claim of $38,693,054 includes a duplicate claim of $19,346,527 and the remainder of the claim was allocated to General Unsecured Claims as the Disclosure Statement does not contemplate a security interest; TZ Capital's filed claim of $102,085,861 has been waived as part of U.S. Bitcoin's bid for the King Mountain Project; US Digital Mining Texas LLC's filed claim of $1,200,000 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; WW Grainger Inc.'s filed claim of $20,755 has been removed as the claim balance as it has been identified as a cure cost for potential bidders to assume as part of various asset sales.

15. **Class 3 – General Unsecured Claims**

Represents the total General Unsecured Claims filed as of the Bar Date less any erroneously filed claims. Erroneously filed claims refer to claims reviewed by the Debtors that have been identified as erroneous for reasons including, among other things, duplicative claims, misclassified claims, and claims waived as part of various bids received. The filed General Unsecured Claims include, among other things, (1) pre-petition trade claims, (2) undisputed pre-petition litigation claims, and (3) numerous other types of pre-petition liabilities. The Debtors have included certain incremental scheduled General Unsecured Claims in the balance that were not marked as contingent, unliquidated, or disputed that did not have a corresponding filed claim as of the Bar Date. As noted previously, the Debtors have not fully reconciled all claims and believe the allowed General Unsecured Claims balance could vary materially in an actual liquidation or wind-down. In addition, General Unsecured Claims may include, among other things, claims that are speculative in amount, such as disputed litigation claims that may be asserted against the Debtors, any amounts related to potential rejection damages claims, and customer deposit claims; however, the Debtors' have excluded the impact of these claims for the purpose of the Chapter 7 Liquidation Analysis. Finally, General Unsecured Claims exclude certain claims, such as Intercompany Claims and any claims waived as part of bids received prior to November 25. Specifically, General Unsecured Claims exclude all claims the Debtors presume will be resolved as part of an asset sale transaction, including Foundry Digital and U.S. Bitcoin. The conclusion of the Liquidation Analyses is that General Unsecured Claims will receive any cash value recovery remaining in a Chapter 7 liquidation beyond the recovery classes previously listed. For presentation purposes, the Debtors display a range of General Unsecured Claims values as the total could vary materially in an actual liquidation or wind-down. The General Unsecured Claims range from approximately $27 million of scheduled General Unsecured Claims, which exclude potential rejection damages, customer deposit claims, claims waived as part of asset sale transactions, and other speculative claims (as outlined above), to approximately $195 million of filed General Unsecured Claims, which exclude potential rejection damages and include certain scheduled claims not designated as contingent, unliquidated, or disputed without a corresponding filed claim and exclude erroneously filed claims and claims waived as part of asset sale transactions (as outlined above).

16. **Class 3A – CNCC GUC Claims**

    Represents claims filed against CN Corpus Christi LLC for various costs related to the partially developed Corpus Christi Project. Despite diligent efforts, CN Corpus Christi LLC was unable to obtain an actionable offer to acquire the Corpus Christi Project, and, thus, there are no anticipated cash proceeds from a sale of this Debtor's assets. As a result, the Debtors anticipate that there will be no distributions to creditors in this class.

17. **Class 4 – Parent GUC Claims**

    Represents the balance outstanding under the Debtors' Parent GUC Claims as of the Conversion Date, which totals $0. TZ Capital's unsecured parent guarantee claim has been waived as part of the U.S. Bitcoin bid. All additional and incremental parent guarantees for the Prepetition Generate Facility have been released as part of the Generate sale.

18. **Class 7 – Preferred Equity Interests**

    Estimated balance of Preferred Equity Interests as of the Conversion Date. The Preferred Equity Interests include four classes of equity: Convertible Preferred Stock, Convertible Preferred II Stock, Series C-1 Convertible Preferred Stock, and Series C Convertible Preferred Stock. These shares comprise 10.8% of total shares in the Debtors' equity structure. All RSUs not purchased, options and RSUs issued and outstanding, and shares available for issuance are excluded from the claims pool (14.4% of total shares in the Debtors' equity structure).

19. **Class 8 – Parent Equity Interests**

    Estimated balance of Parent Equity Interests as of the Conversion Date. The Parent Equity Interests include two classes of equity: Class A Voting Common Stock and Class B Non-Voting Common Stock. These shares comprise 74.8% of total shares in the Debtors' equity structure.

**<u>EXHIBIT C</u>**

**<u>Released Claims and Parties</u>**

**EXHIBIT C**

**Supplemental Disclosure Regarding the Plan's Global Settlement**

**I.      Overview.**

The Plan represents a Global Settlement between the Debtors and their various stakeholders.  In that regard, the Plan is a motion to the Bankruptcy Court under Bankruptcy Rule 9019 for approval of the Global Settlement and, if the Plan is confirmed by the Bankruptcy Court, it would result in a settlement and release of certain claims and Causes of Action that the Debtors may have against third parties.

You should be aware that litigation is inherently uncertain and there can be no assurance that there would be any additional recoveries for Holders of Allowed Claims or Interests if the Debtors, the Plan Administrator or the Litigation Trust prosecuted the claims and causes of action that may be released under the Plan to judgment.  Litigation is subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors. Moreover, even if the Debtors believe they may hold claims against third parties that are eligible to be released under the Plan, there is no assurance that the Bankruptcy Court or any other court of competent jurisdiction would ultimately concur with the Debtors and enter judgment in the Debtors' favor if they were to prosecute such claims.  It is likely that such claims and causes of action would be vigorously opposed by the applicable defendants.  Furthermore, there can be no assurance that the Debtors or the Litigation Trust, as the case may, would not incur significant costs associated with bringing all possible claims and causes of action held by the Debtors.  If the Debtors or Litigation Trust were unsuccessful in recovering more on these claims than the cost to bring them, Distributions under the Plan would be reduced, and such reduction to the amount of Distributions could be material.

With that in mind, the Debtors' release is set forth in its entirety in Section 9.3 of the Plan.  In pertinent part, Section 9.3 of the Plan provides that the releases of claims the Debtors may hold are limited to "Released Parties" as defined in the Plan.  In turn, the term "Released Parties" is defined in Section 1.1.98 of the Plan to mean:

(a) each Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the Plan Administrator; (d) the Committee; (e) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; (f) all Holders of Claims or Interests that abstain from voting on the Plan, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and who do not object to the Plan; and (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former

1

Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries, affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided, however*, that (i) any Holder of a Claim or Interest that opts out of the releases in accordance with the procedures set forth in the Solicitation Procedures Order shall not be a "Released Party"; (ii) any Holder of a Claim or Interest who timely Files an objection to the Plan in respect of the releases contained in Section 9.4 of the Plan, shall not be a "Released Party"; and (iii) any Entity or Affiliate of an Entity that is identified on the Schedule of Retained Causes of Action shall not be a "Released Party" under the Plan.

Importantly, with respect to the Released Parties, the releases set forth in Section 9.3 of the Plan **do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; (2) any Causes of Action to the extent set forth on the Schedule of Retained Causes of Action; or (3) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.**

Holders of Claims and Interests who are entitled to vote on the Plan should also be aware that the Debtors have entered into a variety of different transactions, including sales of significant assets and/or business lines, sales of de minimis assets and settlements of claims, pursuant to which the Debtors have received varying forms of consideration from the counterparties thereto. As part of such transactions, the Debtors exchanged general mutual releases with certain parties to these transactions or agreed to allow Claims held by such parties against one or more of the Debtors. These transactions include (a) the sale of the equity in CN Borrower LLC to an affiliate of Generate Lending, LLC, (b) the sale of CN Member's equity interests in TZRC LLC to an affiliate of U.S. Data Mining Group, Inc. and related settlement with NextEra Energy Resources, LLC and certain of its affiliates, (c) the sale of substantially all of the Debtors other projects and assets to Foundry Digital LLC and (d) a settlement with Marathon Digital Holdings, Inc.

As such, potential claims against the parties to these transactions have already been reduced and/or released pursuant to Bankruptcy Court order in exchange for significant consideration to the Debtors and their Estates. In addition to the approximately $13.6 million in cash proceeds received by the Debtors in these transactions, the Debtors also estimate that they received approximately $217.3 million in non-cash consideration in connection with these transactions (not including the release of guaranty claims aggregating more than $203 million), which greatly reduced the Debtors' claims pool, thereby significantly enhancing creditor recoveries.

As a result, many potentially significant claims and causes of action that otherwise would have been available for prosecution and/or settlement by the Debtors or the Litigation Trust, as

the case may be, have already been settled, waived and/or released during these Chapter 11 Cases.

As a result, in preparing this **Exhibit C**, the Debtors and their advisors have conducted a review and analysis of the Debtors' prepetition transactions to determine whether there were any transactions with potential claims or causes of action that might be worth pursuing and **which have not already been released in the Chapter 11 Cases**. Other than the claims included in the Schedule of Retained Causes of Action, the Debtors and its advisors were not able to identify any such claims or causes of action. In addition, this **Exhibit C** omits any claims and causes of action that (i) the Debtors have identified in Article VI.K. of the Disclosure Statement because those claims and causes of action are proposed to be retained under the Plan and will be set forth on the Schedule of Retained Causes of Action, and (ii) are less than $6,425.00, pursuant to 11 U.S.C § 547(c)(9).

## II.     Review of Released Fiduciary-Duty Claims.

In connection with the Debtors' restructuring efforts, in August 2022, the Debtors' board of directors appointed a new independent director with restructuring experience named Scott Tillman. Mr. Tillman is the manager of Pi Consulting, LLC, which provides board representation for special situations. Mr. Tillman currently sits on the Independent Committee of the Board of Compute North Holdings, Inc.

Following the Petition Date and in conjunction with the formulation of the Plan, the Debtors tapped Mr. Tillman to oversee, with counsel's assistance, an investigation focused on identifying any viable fiduciary duty claims against directors or officers of the Debtors that may be released under the terms of the Plan. In addition to reviewing board materials and other relevant documents, currently Mr. Tillman and counsel have interviewed six current and former Compute North officers and directors. Interviews with additional officers and directors and certain third parties are ongoing.

In conducting this investigation, the Debtors have focused solely on claims that may actually be released under the terms of the Plan as currently drafted. This is due, in part, because the Debtor releases in the Plan are narrowly tailored, expressly carving out any "claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence." This carve out of claims the Debtors may have for actual fraud, willful misconduct, or gross negligence is particularly important given that the Debtors are all Delaware entities, and thus Delaware law governs the fiduciary duties of their officers and directors. *In re Alta Mesa Resources, Inc.*, October 13, 2022 Slip Copy 2022 WL 7750353 (recognizing that, under the internal affairs doctrine, the fiduciary duties of a Delaware entity's officers and directors are governed by Delaware law). Under Delaware law, officers and directors owe two fiduciary duties—the duty of care and the duty of loyalty. *Gantler v. Stephens*, 965 A.2d 695, 709-10 (Del. 2009) (holding that the standards governing the duty of care and the duty of loyalty are the same for officers and directors).

A claim for breach of the duty of care requires a showing of "gross negligence," which, as noted above, is expressly carved out of the Debtors' release. In other words, the Debtors' officers and directors are only being released from ordinary negligence, which is not actionable under Delaware law in a claim for breach of the duty of care in any event. *See Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("[A] corporate director is only considered to have breached his duty of care in instances of gross negligence."); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994) (same), *aff'd*, 663 A.2d 1156 (Del. 1995). In addition, Compute North Holdings, Inc.'s certificate of incorporation expressly exculpates its directors from all duty of care liability, as permitted under the Delaware General Corporation Law, and the affiliated Debtors are all LLCs that are "member managed" by Compute North Holdings, Inc. *See Firefighters' Pension System of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212 (Del. Ch. 2021) ("Section 102(b)(7) [of the Delaware General Corporation Law] and its exceptions preserve liability for breaches of the duty of loyalty, including its subsidiary element of good faith, while permitting exculpation for breaches of the duty of care."); *Rothenberg v. Santa Fe Pac. Corp.*, 18 Del. J. Corp. L. 743, 753 (Del. Ch. May 18, 1992) ("[S]ince the purpose of §102(b)(7) is to enable corporations to eliminate director liability for monetary damages for duty of care violations, it follows that the statutory exceptions to §102(b)(7) concern director conduct that involves other than breaches of the duty of care.").[1]

### A.      Fiduciary Duty of Care

Under the facts presented, the Debtors can conclusively say that no viable claims for breach of the duty of care are being released under the Plan.  To have a viable claim for breach of the duty of care, the plaintiff must allege gross negligence – ordinary negligence will not suffice.  Here, claims for conduct that could be construed as gross negligence will not be released.

### B.      Fiduciary Duty of Loyalty

Under Delaware law, the duty of loyalty requires officers and directors of a corporation to act (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action (or non-action) is in the best interests of the company and its stockholders.  Thus, a director's or officer's duty of loyalty is often implicated in connection with (i) conflicts of interest and (ii) corporate opportunities.  A conflict of interest may exist when a director has a direct or indirect personal or financial interest in a transaction or other matter involving the corporation.  Similarly, if a director or officer gains access to a corporate opportunity related to the business of the corporation, the director or officer must make that opportunity available to the corporation before pursuing it on his own behalf. It is important to note that any breaches of the "good faith" component of the duty of loyalty are not being released insofar as "willful misconduct" is expressly carved out and, under Delaware law, bad faith requires an intentional dereliction of duty or actual intent to harm the corporation. *See Lenois v. Lawal*, No. CV 11963-VCMR, 2017 WL 5289611, at *15 (Del. Ch. Nov. 7, 2017) ("The Delaware Supreme Court explicated the spectrum of bad faith in *Disney*. The Supreme Court identified 'three different categories of fiduciary behavior' that must be considered. The first

---

[1] Compute North Holdings, Inc.'s certificate of incorporation provides that "[t]o the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." The certificate of incorporation has included substantially the same language from the time it was originally filed.

'involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent.' This type of behavior does not constitute bad faith. The second, an 'intentional dereliction of duty, a conscious disregard for one's responsibilities,' rises to the level of bad faith. The third, 'so-called 'subjective bad faith,'' exists on the far end of the spectrum and refers to 'fiduciary conduct motivated by an actual intent to do harm.'").

### 1.  Expense Reimbursements

Mr. Tillman and counsel have identified a potential issue arising from circumstances surrounding the reimbursement of expenses charged by co-founder, former CEO, and director Dave Perrill on a corporate American Express card.  In July 2022, the reimbursement of Mr. Perrill for expenses charged to this American Express card, which Mr. Perrill personally guarantees, became a matter of concern within Compute North. Mr. Perrill has always maintained that the reimbursed expenses in question were all incurred in connection with the entertainment of current and prospective customers and business partners and were therefore legitimate business expenses that benefitted the Debtors.  Approximately $61,000.00 in expense reimbursements have been questioned to date as part of this review.

### 2.  Transactions or Arrangements with Perrill-Owned Entities

Mr. Tillman and counsel have also identified a small number of transactions or arrangements between Compute North and entities owned by Mr. Perrill or members of his immediate family ("**Perrill-Owned Entities**").

#### a.  The Office Sublease

Compute North's headquarters are in a building owned by another business related to Mr. Perrill. It appears that, until 2020, the Debtors occupied office space in the building rent free. As of January 1, 2020, Compute North LLC entered into a sublease with WAND Corporation (the "**Sublandlord**") under a Master Lease between the Sublandlord and the landlord, 7575 Management, LLC (the "**Landlord**"). The Landlord and the Sublandlord are both Perrill-Owned Entities, and Dave Perrill is (or was at relevant times) the Managing Member of the Landlord and the CEO of the Sublandlord. The sublease was signed by Dave Perrill on behalf on both Compute North LLC and the Sublandlord. Dave Perrill also signed the Landlord's consent to the Sublease. An amendment to sublease was entered into as of October 1, 2020.  At this point, the Debtors have no reason to believe that the sublease was unfair to Compute North.  In particular, based on the investigation thus far, the rent per square foot seems to have been in line with the market for comparable office space in Eden Prairie and well below the average rent for comparable office space in nearby Minneapolis.

#### b.  Software Licenses

The Debtors use a standard suite of Microsoft business software products under licenses procured by a Perrill-Owned Entity known as TechFactory. As a registered Microsoft distributor, TechFactory was able to procure the licenses for a lower cost than the Debtors would otherwise have had to pay. At this point, it appears that the license fees have always been passed through to Compute North at cost.

### c.      Digital Marketing Services

A Perrill-Owned Entity known as PerrillCo. has been providing Compute North with digital marketing services for a number of years. A "Change Order: Digital Marketing" was signed by Dave Perrill on behalf of Compute North LLC as of August 1, 2019. The Change Order provided for a "one time project investment" of $15,600 for "strategy, personae, and content creation" and a "brand refresh" and a "monthly investment" of $8,170 for "email marketing, content marketing, paid media, and ongoing SEO management." At this point, the Debtors have no reason to believe that purchased services have not been provided or that the prices charged were unfair to Compute North.

### d.      Office-Related Purchases and Services

As noted above, WAND Corporation, a Perrill-Owned Entity, is the Sublessor from which Compute North subleases its headquarters office space in Eden Prairie. As reflected in the Debtors' Statement of Financial Affairs, WAND Corporation has purchased office furniture and fixtures for Compute North and provided certain office-related services such as IT installation. The total amount of payments to WAND Corporation in the twelve months preceding the Petition Date was $141,058.96, the vast majority of which was for office furniture and fixtures. At this point, the Debtors have no reason to believe that the prices charged were unfair to Compute North or that the payments were otherwise problematic.

## III.     Transfers within 90 Days of Petition Date.

Under certain circumstances, and subject to various defenses, sections 547 and 550 of the Bankruptcy Code allow a trustee or debtor-in-possession to avoid and recover transfers made to third parties within 90 days prior to commencing a bankruptcy case (or within one-year prior to the Bankruptcy Case with respect to "insiders" of the debtor).[2]  Attached hereto as **Schedule 1** is a list of payments made by the Debtors to non-insiders within 90 days of the Petition Date (the "**90-Day Payments**"), including the amount of the payments, the recipients, the date of each payment and the payor.  To the extent the 90-Day Payments were made on account of antecedent obligations, and if not returned to the Estates would entitle the recipients to recover more than they would recover if the Chapter 11 Cases were converted to cases under Chapter 7, such payments may be subject to avoidance under Bankruptcy Code section 547.  The Debtors have not yet undertaken an analysis of defenses that could be raised by recipients of 90-Day Payments.  Thus, it is possible that some of the 90-Day Payments would not be avoidable or recoverable because of statutory defenses set forth in Section 547 of the Bankruptcy Code.  Among other things, the payments may have been made in the ordinary course of the Debtors' business, and some may have involved a contemporaneous exchange of new value. In either of these circumstances, the recipient of a 90-Day Payment would be able to assert a defense to avoidance of the transfer.  In any event, as set forth in the Plan and the Disclosure Statement, the Debtors propose to release Holders of Claims and Interests that received 90-Day Payments provided that the recipients do not affirmatively opt out of the releases provided under the Plan.

## IV.     Insider Payments Made Within One-Year of Petition Date.

---

[2] Payments to statutory insiders within one-year of the Petition Date are analyzed in Section IV below.

The Debtors' Statement of Financial Affairs reflects approximately $4,085,889.00 in payments to statutory insiders over the twelve months preceding the Petition Date. Based on the investigation thus far, it appears that these payments consisted entirely of (i) ordinary course payments of base compensation and bonuses pursuant to offer letters, (ii) amounts paid pursuant to the Debtors' key employee retention plan implemented from July through September of 2022 to incentivize certain key officers to remain with the company through the bankruptcy process, (iii) ordinary course payment of board fees, and (iv) in one case, contractual reimbursement of accounted-for relocation expenses pursuant to an offer letter.

As previously mentioned, if a transfer is made to someone who is an insider at the time the transfer is made, section 547 of the Bankruptcy Code provides that the covered period is extended for up to one year prior to the commencement of the bankruptcy case. Attached hereto as **Schedule 2** is a list of payments made by the Debtors to insiders within one year prior to the Petition Date (the "**One-year Payments**"), including the amount of the payments, the recipients, the date of each payment and the payor. To the extent the One-Year Payments were made on account of antecedent obligations, and if not returned to the Estates would entitle the recipients to recover more than they would recover if the Chapter 11 Cases were converted to cases under Chapter 7, such payments may be subject to avoidance under Bankruptcy Code section 547. The Debtors have reviewed the payments and the majority of them are payments made in the ordinary course for salaries, bonus, board fees and reimbursements for job expenses. Payments made in the ordinary course of a debtor's business are not avoidable as preferences. *See* 11 U.S.C. § 547(c)(2). The Debtors do not believe that they have any viable causes of action to avoid payments of salaries and routine bonuses to their employees, even if those employees qualified as an insider at the time the payments were made, because the amounts were paid in the ordinary course of the Debtors' business or on ordinary business terms.

The only One-year Payments of which the Debtors are aware that were arguably not made in the ordinary course of business were certain retention payments made when the Debtors implemented a Key Employee Retention Program ("**KERP**") to provide incentives for certain key employees to remain with the Debtors through the restructuring process. KERP payments were made to key employees needed for the restructuring in July and August (and for one employee September) as an advance for future services. Under the terms of the KERP, if the employees voluntarily resigned prior to the vesting date, they were required to refund the money paid. Under the terms of the KERP, payments would not be earned until the earlier of March 31, 2023, or the occurrence of an "Emergence Event." Emergence Events included (i) the effective date of the Debtors' plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (ii) dismissal of the Debtors' Chapter 11 cases, (iii) conversion of the Debtors' Chapter 11 cases to ones under Chapter 7 of the Bankruptcy Code, or (iv) the sale of all or substantially all of the Debtors' assets. As a result, the Debtors do not believe these payments can be avoided or recovered as preferences because they were not made "on account of an antecedent debt" as required by section 547 of the Bankruptcy Code. Rather, they were advances to be earned at a later point in time.

A list of the KERP payments, including the amount, recipient and date of each payment, is annexed to this Exhibit as **Schedule 3**.

**V.      Customer Disclosure.**

7

For the avoidance of doubt, all customers of the Debtors who (i) do no affirmatively opt out of the releases provided by the Plan, and (ii) are not included on the Schedule of Retained Causes of Action, will be deemed to be released from any and all actions to collect on past due amounts under any and all customer contracts or agreements they are party to. Pursuant to the Plan, any such agreements that are still apart of the Debtors' Estates will be rejected. To that end, the pursuit of any such amounts would be highly contentious and have significant costs and risks associated therewith. To be clear, as noted in Article VI.K of the Disclosure Statement, the Debtors are not releasing any claims against Atlas Technology Group LLC.

**Schedule 1**

**90-Day Payments**

**Schedule 2**

**One-Year Payments**

**Schedule 3**

**KERP Payments**