```
                       UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                        .
IN RE:                                  .  Case No. 22-90273
                                        .  Chapter 11
COMPUTE NORTH HOLDINGS INC.             .
and CN MINING, LLC,                     .  515 Rusk Street
                                        .  Houston, TX 77002
                 Debtors.               .
                                        .  Tuesday, December 20, 2022
. . . . . . . . . . . . . . . . .       .  1:59 p.m.
```

TRANSCRIPT OF MOTION FOR ENTRY OF ORDER (I) IDENTIFYING ASSETS
     AND (II) CONFIRMING TERMS OF MODIFIED CONTRACT [410];
  EMERGENCY MOTION DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN
     ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE
   DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND
NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS'
JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS AND
NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES
 WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF [578];
    STIPULATION BY MARATHON DIGITAL HOLDINGS, INC. AND THE
  DEBTORS, GENERATE LENDING, LLC AND CERTAIN AFFILIATES AND
                  MVP LOGISTICS, LLC [630];
       JOINT MOTION FOR EXPEDITED CONSIDERATION [643];
      EMERGENCY MOTION TO COMPEL REJECTION OF EXECUTORY
                     CONTRACT [644];
    EMERGENCY MOTION FOR RELIEF FROM AUTOMATIC STAY [645]
              BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:            Courtroom ECRO Personnel

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):


For the Debtor:            Paul Hastings LLP
                           By:  JAMES T. GROGAN, III, ESQ.
                           600 Travis Street, 58th Floor
                           Houston, Texas 77002
                           (713) 860-7300

                           Paul Hastings LLP
                           By:  SCOTT C. SHELLEY, ESQ.
                           200 Park Avenue
                           New York, NY 10166
                           (212) 318-6000

                           Paul Hastings LLP
                           By;  MATTHEW MICHELI, ESQ.
                           71 South Wacker Drive, Suite 4500
                           Chicago, IL 60606
                           (312) 499-6000


For the Official           McDermott Will & Emery LLP
Committee of Unsecured     By: CHARLES GIBBS, ESQ.
Creditors:                 2501 North Harwood Street
                           Suite 1900
                           Dallas, TX 75201-1664
                           (214) 295-8000


                           McDermott Will & Emery LLP
                           By:  KRISTIN GOING, ESQ.
                           One Vanderbilt Avenue
                           New York, NY 10017
                           (212) 547-5429

For Generate Lending,      Kirkland & Ellis LLP
LLC:                       By:  ELIZABETH JONES, ESQ.
                                CHRISTOPHER MARCUS, ESQ.
                           601 Lexington Avenue
                           New York, New York 10022
                           (212) 756-2000

For Marathon Digital       Weil, Gotshal & Manges LLP
Holdings:                  By:  ALEXANDER COHEN, ESQ.
                                JESSICA LIOU, ESQ.
                           767 Fifth Avenue
                           New York, NY 10153
                           (212) 310-8020
```

TELEPHONIC APPEARANCES (Continued):

| | |
|---|---|
| For MP2 Energy Texas LLC d/b/a Shell Energy | Cokinos Young<br>By:  MARIA BARTLETT, ESQ.<br>Four Houston Center<br>1221 Lamar, 16th Floor<br>Houston, TX 77010<br>(713) 535-5524 |
| For the United States Trustee: | Office of United States Trustee<br>By:  JAYSON RUFF, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77003<br>(713) 718-4650 |
| For Corpus Christi Energy Park, LLC and Bootstrap Energy LLC: | Carrington, Coleman, Sloman & Blumenthal, LLP<br>By:  MARK A. CASTILLO, ESQ.<br>901 Main Street, Suite 5500<br>Dallas, TX 75202<br>(214) 855-3000 |
| For Konza Mining Fund I, LP: | Galloway Johnson Tompkins Burr & Smith<br>By:  BRANCH M. SHEPPARD, ESQ.<br>     ANNAROSE HARDING, ESQ.<br>1301 McKinney Street, Suite 1400<br>Houston, TX 77010<br>(713) 599-0700 |
| Also Present: | RYAN HAMILTON<br>Jefferies LLC<br><br>DRAKE HARVEY, President and CEO<br>Compute North Holdings, Inc.<br><br>RYAN MERSCH<br>Portage Point Partners LLC |

1

1          (Proceedings commence at 1:59 p.m.)

2              THE COURT:  All right.  Good afternoon.  We are here

3   on the Compute North Holdings case.  It is 22-90273.

4              Appearances should have been made electronically.

5   I'm going to start by taking an update by Mr. Grogan as to

6   where he believes he wants to go today, and what other matters

7   might be on the docket today.  I am unable to be in court

8   because of a COVID diagnosis, but I am active and participating

9   with you from a remote location.

10             Mr. Grogan?

11             MR. GROGAN:  Good afternoon, Your Honor.  Sorry to

12  hear you're not feeling well.

13             Your Honor, I think that we've made progress, but,

14  you know, we've got the -- we've (indiscernible) cleanup

15  (indiscernible) progress in the view of the Committee in

16  particular.  I'm going to take a shot at making some

17  concessions here on the record that I think may get just a

18  little (indiscernible) the Committee's concerns.

19             I know just -- we just thought there was some level

20  of objection about an hour ago, so (indiscernible) doing this

21  in real time, and I apologize, but if it's (indiscernible) --

22             THE COURT:  Mr. Grogan, if I can get you to pick up

23  your phone, please.  I'm having trouble hearing you.

24             MR. GROGAN:  Your Honor, is that better?

25             THE COURT:  It is, and that's maybe because I'm

1  connecting in through sort of a three-way or something, but I

2  can hear you now.

3        MR. GROGAN:  Okay.  So, Your Honor, you know, we got

4  the Committee's supplemental objection about an hour ago.  You

5  know, I've been through it.  I think there are some things that

6  we, you know, certainly can do to address the vast majority of

7  their concerns.  If you want me to, I can just kind of do a --

8  do a summary of what we would propose to revise in order to

9  accommodate them.

10        THE COURT:  I don't have any problem going that way.

11  It makes some sense to me.  I thought there were some obvious

12  things to do as well.  So why don't you go ahead and let's see

13  where you are.

14        MR. GROGAN:  Okay.  So, Your Honor, the first thing

15  the Committee took issue with was the filing date for the

16  retained causes of action list.  We had proposed January 18th

17  for that, which was, I think, eight days prior to the voting

18  deadline.  You know, this is somewhat of a just pick a date.  I

19  would propose that we move it back to January 13th to give the

20  parties even more time.

21        You know, there is some benefit to not making that as

22  quick as possible, because, you know, we might be able to reach

23  some incremental settlements between now and that date, which

24  would actually benefit the estate, then I -- you know, there is

25  -- there is some benefit to having a little bit of time before

1   that becomes final.  But I would think that, you know, January

2   13th is certainly a workable date.

3          Your Honor, the second thing that they took issue

4   with was the fact that in our supplemental disclosures

5   regarding relief causes of action, we gave customers notice

6   that, you know, we were not going to pursue them for any

7   collection actions if they -- if they elected not to opt out of

8   the releases.  In our view, that's just the fair thing to do.

9   I don't see any reason to leave customers in the dark.

10          We are in a position where we're going to have to

11   reject the customer contracts, and I think just as a matter of

12   fairness for that constituency, we need to tell them, you know,

13   we have a release structure, and if you don't opt out of it,

14   you're going to be the beneficiary of a release.

15          The next item that they took issue with was the

16   90-day payment list.  You know, just to be clear, the list that

17   we provided in the supplemental disclosures, which was filed as

18   Exhibit C to the amended disclosure statement, is just a list

19   of creditors that we are proposing would be beneficiaries of

20   releases under the plan, so long as they don't opt out of the

21   releases.

22          There are additional parties on the 90-day payment

23   list that we filed as part of the statement of financial

24   affairs, and I think, you know, just as a matter of additional

25   disclosure, it would not be hard for me to add a statement

1  that, the point is it refers people to the full list on the

2  statement of financial affairs, which is a matter of public --

3  public record.  And then they can -- you know, to the extent

4  anybody is curious as to who was left off the list, they can

5  see that in comparison to the list we filed as Exhibit C.

6        Your Honor, on the solicitation deadlines, I was -- I

7  am trying to get this served out by Friday.  I am a little bit

8  constrained by Epiq.  Obviously, they -- you know, we've got a

9  holiday weekend coming up.  Epiq told me that if I can get them

10 final documents by 7 p.m. this evening, they can have it filed

11 in -- filed out -- or served out by Friday.

12        I think, just to address the Committee's concern that

13 we didn't have a firm deadline, what we would do there is add

14 that the solicitations will be served no later than Tuesday,

15 which still gives us more than 28 days' notice of the plan and

16 disclosure statement.  So those are the -- those are the

17 changes and accommodations that we have to offer in order to

18 address the Committee's residual concerns.

19        THE COURT:  Thank you.

20        Let me hear from, perhaps, somebody.  This says,

21 "Press 5-star."  Let me get them active.  Give me just a

22 second.

23        Mr. Gibbs, good morning -- or good afternoon.

24        MR. GIBBS:  Good afternoon, Your Honor.  Chuck Gibbs

25 with the firm of McDermott Will & Emery (indiscernible) going,

1  which we represent the Committee.  Maybe it's just for me --

2          THE COURT:  Mr. Gibbs, you're -- I need -- I need you

3  to pick up your phone as well, I think.

4          MR. GIBBS:  I don't know if I can, but if I can't,

5  I'll dial up (indiscernible).

6          THE COURT:  Or just get closer to the speaker or

7  something.

8          MR. GIBBS:  Can you hear me?  Is that getting --

9          THE COURT:  We'll give it a shot.

10          MR. GIBBS:  -- better at all?

11          THE COURT:  That is better.

12          MR. GIBBS:  If you don't (indiscernible) take a

13  ten-second break, I'll call in on my cell.

14          THE COURT:  Let's take the break.  It's tough -- it's

15  tough hearing you.

16          MR. GIBBS:  Okay.  Thank you, Judge.

17          I'm sorry.

18          THE COURT:  No problem.

19      (Pause)

20          THE COURT:  Mr. Gibbs, let's try that.  Mr. Gibbs?

21          MR. GIBBS:  Yes.  Can you hear me now, Judge Isgur?

22          THE COURT:  Oh, much better.  Thank you.

23          MR. GIBBS:  All right.  Again, I apologize for the

24  interruption.  I was asking whether you thought it would be

25  better for me to refrain from commenting until you've raised

1   whatever concerns you had, or do you want me just to respond to

2   Mr. Grogan's comments, or deal with my overarching objections?

3   I'll proceed any way you would like.

4           THE COURT:  Well, why don't I defer to you.

5           MR. GIBBS:  Okay.  Well, thank you, Judge.

6           Let me, first, address the proposals that Mr. Grogan

7   just offered the Court on the record, and that was to back up

8   the deadline for the debtor to file its list of retained causes

9   of action from the 18th to the 13th.  While it does make that

10  deadline 13 days before the current (indiscernible) deadline, I

11  still have the same concern, which is that people may have cast

12  ballots through the first weeks of (indiscernible) and

13  materials on the reasonable assumption that they are, in fact,

14  getting (indiscernible) pieces.

15          They are getting something in exchange for giving

16  something only to find out that their name is on the retained

17  causes of action list.  So I'm -- you know, you can never

18  eliminate the problem if we extend this out for just, for a

19  vote, before that but the retained causes of action is

20  published, but I'm concerned that moving it back from the 18th

21  to the 13th doesn't allay my concern that people will be making

22  decisions and voting on potentially incorrect information.

23          That's maybe my first response with the first issue

24  they raised.  You know, I think I'm fine with them referring to

25  -- referring creditors to the full list of 90-day payments that

1   are found on the schedules.  It may -- you know, it may cost a

2   few dollars more, but it might be easier just to attach the

3   schedules, because that is the comprehensive list of 90-day

4   payments.

5         I know that the debtor did not include -- or I

6   understand today that the debtor didn't include certain

7   creditors on the Exhibit C for various reasons, so, I mean,

8   there may be footnotes or other incremental information they

9   would need to attach to the full list to apprise creditors of

10  why certain ones are not -- is not -- the debtor doesn't intend

11  to go after certain creditors.

12        The solicitation deadline, the big problem we had, as

13  we pointed out in our objection, was that it was the 22nd or as

14  soon thereafter as practicable, which we found to be wholly

15  unsatisfactory because it could significantly compress the

16  voting deadline or time the creditors had to vote if the

17  solicitations materials went out later than the 22nd.  If they

18  are now proposing it will be no later than the 27th, I think

19  that solves one problem and exacerbates another.

20        So it gives us clarity as to when the materials would

21  go out, but it potentially further compresses the voting

22  deadline.  To the extent that we (indiscernible) the solution

23  to the deadline to get materials out, it's going to be no later

24  than the 27th, we ought to count the days from the 27th and

25  make that the appropriate voting deadline rather than further

1  compressing what I think is already a too-compressed timeline

2  for the creditors to make the decision whether to vote yes or

3  no.

4           So I think those are my responses to the suggestions,

5  and I'm happy to give the Court the benefit of our thoughts

6  with respect to what we thought we were going forward on today,

7  or I can wait and have you deal with these sort of seriatim off

8  of your other concerns.

9           THE COURT:  Is there anybody else that wants to

10 address anything about the solicitation motion and Mr. Grogan's

11 proposal on how to resolve things?  If so, please press

12 "five-star" one time.

13          So, Mr. Grogan, can I -- I hate doing all this

14 negotiation the way we're doing it, but I think it's just the

15 best way given the time deadline.  I'm going to propose some

16 stuff that isn't an order and try and listen to what problems

17 it creates.

18          It seems to me that if somebody votes believing that

19 they're going to get a release, and then they don't get a

20 release, that we need to give them the ability to change that

21 vote more meaningfully than normal.  So if you get a vote in

22 where someone voted before they got the list, can we adopt a

23 procedure to make it easy for them to change their vote?

24          Second, can we accept all of your other proposals,

25 and then extend the voting deadline out by, roughly, five more

1    days?  At that point, I think we'll have adequate opportunity

2    for people to absorb the list.  We will have solved the

3    vote-change deadline by giving more people an opportunity to

4    change, I think, resolves both what you and the Committee are

5    trying to do.

6            And when I look at your schedule, I, frankly, don't

7    see that five more days of voting out on the tail end is going

8    to adversely affect where you need to go.  I may misunderstand

9    that.  Other than that, it looked to me like your proposals

10   work for me and, generally, for Mr. Gibbs.

11           MR. GROGAN:  Thank you, Your Honor.

12           Certainly, we can add five days to the voting

13   deadline on the back end.  I think, currently -- and, Mr.

14   Shelley, correct me if I'm wrong, but I think that we had

15   proposed January 28th, right?  Was it --= Mr. Shelley, I think

16   you may be on mute.

17           THE COURT:  Yeah.  I'm going to get -- he's just now

18   (indiscernible) his line.  Let me get him.

19           I've got you active, Mr. Shelley.  Good afternoon.

20           MR. SHELLEY:  Good afternoon, Your Honor.  Scott

21   Shelley, Paul Hastings (indiscernible).  (Indiscernible), the

22   date we have proposed is (indiscernible) voting deadline and

23   the objection deadline.

24           THE COURT:  So, again, this may be my connection

25   problem because I am literally on a boat.  Mr. Shelley, can I

```
1   get you to pick your phone up, please?
2             MR. SHELLEY:  Yes, Your Honor.  I apologize for that.
3             The deadline in our procedures as proposed were
4   January 26th.
5             MR. GROGAN:  So then, I guess, we would move it to
6   whatever you -- February 1st, or --
7             THE COURT:  Wait.  What day of the week --
8             MR. GROGAN:  January 31st, I believe.
9             THE COURT:  Yeah.  If you went to February 1 --
10            MR. GROGAN:  The 31st -- the 31st.
11            THE COURT:  February -- let's call it February 1.
12  Does that work for a voting deadline?
13            MR. GROGAN:  That works, Your Honor.
14            THE COURT:  Mr. Gibbs, if we did those two things,
15  i.e., made it easier for someone to change their vote if
16  they're on the list, and extended the deadline out by five more
17  days as well as moving up to January 13th the disclosure list,
18  have we resolved your concerns?
19            MR. GIBBS:  On those issues, yes, Your Honor.  I
20  think we have.  And can you hear me?  Because I keep getting a
21  message saying my hand is lowered.
22            THE COURT:  I can hear you.  I can hear you.
23            MR. GIBBS:  Now I (indiscernible) --
24            THE COURT:  Okay.  Well, then what other issues do
25  you have that you want to raise, Mr. Gibbs?
```

1          MR. GIBBS:  It's really our -- with respect to the

2     content in the plan of the releases being granted, and you had

3     asked -- you had asked the debtor to come back with a

4     description of the value of the claims being released and the

5     reasons for the proposed release, and we don't think that what

6     the debtor has done in the revised disclosure statement and

7     revised plan adequately addressed the Court's concerns, and

8     still are problematic for us.

9          In the eight-page supplement that they've attached,

10    you have the first few pages basically regurgitating the

11    releases that are in the plan.  You have one paragraph that

12    describes the fact that the independent director has caused six

13    interviews to be conducted of directors and officers and,

14    apparently, concluding that they have concluded that there are

15    no meritorious causes of action based on that because they're

16    still proposing a plan that releases current and former Ds and

17    Os with no consideration, at least being disclosed, having been

18    given by those parties.

19          Typically, independent directors hire independent

20    counsel to do their investigation.  We have no disclosure of

21    what the investigation was, any report from the independent

22    director as to the results of the six interviews they've done,

23    or any memo from counsel.  And I'll point out, I believe it's

24    counsel to the debtors that is doing the interviews rather than

25    counsel for the independent director, so we're concerned that

1  the plan should not be sent out for votes unless they more

2  wholesomely describe the value of the claims that they believe

3  exist.

4        They do go through six pages of explaining their

5  interpretation of Delaware law and why there would be no breach

6  of duty (indiscernible) unless there's a finding of gross

7  negligence for fraud.  If you assume that that's disclosure to

8  the creditors of the value of the claims, I would probably take

9  issue with that, but I think it misses the point.  They need to

10 be indicating what transactions they have reviewed, what the

11 content of the interviews found and information they've

12 gathered, and what led them to conclude that they should

13 release these parties for no consideration and no value

14 whatsoever.

15        So I think -- and I think they also ought to point

16 out to the creditors that based on this structure, it's likely

17 the estate is not going to be able to tap a $10 million D&O

18 policy, because if they are saying you can (indiscernible) go

19 after Ds and Os for gross negligence and fraud, those would

20 likely be exceptions to the D&O coverage obligations.  So to

21 take the question of whether or not to (indiscernible) -- to

22 constructively fraudulent transfer against the insurer if they

23 were paid probably millions of dollars for a policy that can

24 never be touched.

25        They are also releasing their accountant as a party

1   that's named as a -- or there is absolutely no discussion of

2   (indiscernible) investigation as to whether or not there is any

3   potential liability with the accountant.  So there is -- in our

4   opinion, there is still insufficient disclosure to warrant us

5   going out for votes when the premise of the plan is that these

6   people get full and complete releases even though they're

7   offering zero consideration.

8           And to the extent the Court doesn't agree with us and

9   thinks that the debtor is on notice of potential problems

10  (indiscernible) to go forward with this disclosure statement

11  and proves ultimately that it's sufficient, we would ask the --

12  for the permission to our have solicitation letter attached

13  directly behind the debtor's solicitation in the solicitation

14  materials that go out.

15          We don't think the estate should be burdened by a

16  second mailout of just our letter, and we also don't think it's

17  appropriate to bury it somewhere in 200 pages of documents.

18  And I can argue further with the Court to present further

19  argument to the Court on why it's appropriate, why its straight

20  down the middle in plain English, and why it should not have to

21  be amended to include unsupported allegations that the debtor

22  made in its reply last Friday, but I'll pause there, Judge, and

23  see if you have any questions of where we stand.

24          THE COURT:  Mr. Grogan, where do I see the benefit to

25  the estate of giving the releases?

1          MR. GROGAN:  Your Honor, it's the -- the disclosure

2    statement does make clear that these are -- these are mutual

3    releases between the debtor and all of its stakeholders.  This

4    is a settlement plan, and we are -- we are not interested in

5    proposing a plan that basically declares war on every -- every

6    stakeholder.  It's --

7          THE COURT:  No, I understand that, but where do I see

8    in the plan what -- and let's talk about the directors, and

9    let's talk about the accountant, both issues that Mr. Gibbs

10   identified, what is the benefit to the debtor of giving

11   releases to the directors and the accountant?  Where do I see

12   that in the disclosure statement?

13         MR. GROGAN:  Your Honor, we have enjoyed -- we have

14   enjoyed good governance over this case from the beginning.  The

15   directors and officers have worked extraordinarily hard to

16   generate a meaningful return for creditors, and the estate has

17   directly benefitted from the work that they've been doing

18   through -- to monetize the assets and provide the benefits

19   under the plan, which is, you know, a cash distribution on

20   prepetition claims.

21         THE COURT:  Well, no.  That's the new 1125(e)

22   provision that you included that Mr. Gibbs is not objecting to.

23   I'm talking about the general release to them.  Where do you

24   ever identify the benefits of the estate of giving a general

25   release as opposed to the 1125(e) protection?  Or maybe he's

1   objecting to the 1125(e) protection.  I haven't heard that if

2   he is.

3           MR. GROGAN:  Your Honor, we're not give -- I think

4   there is -- there is a fundamental misunderstanding.  We are

5   not giving a general release to the directors and officers.

6   This is a limited release, and there are -- there are

7   carveouts.  For example, we are not releasing any director or

8   officer from breach of duty of care.  The -- you know, and we

9   make that very clear in the supplemental disclosures that we

10  are -- that we are putting out there.

11          And I do not think it's accurate to say that we are

12  somehow waiving any claims that could be asserted against the

13  D&O policy, because there is literally -- there are literally

14  no releases in this plan against anybody for a breach of duty

15  of care.

16          THE COURT:  Mr. Gibbs, is he right about that?

17          MR. GIBBS:  What the plan does is releases the

18  current and former directors and officers from any and all

19  claims except those founded upon gross negligence and fraud.

20  There is no also-exception for any claims based on a breach of

21  fiduciary duty or duty of breach of a duty of care or loyalty.

22  So I just disagree with --

23          THE COURT:  Well, this is -- this is --

24          MR. GIBBS:  -- Mr. Grogan's characterization --

25          THE COURT:  This is the -- no.  This is easy.  If he

1  intended to do that, let's do that, and doesn't that resolve

2  your objection?

3          MR. GIBBS:  Absolutely.  If they're not releasing

4  them from duties -- breaches of duty of care and loyalty,

5  that's the basis for retained causes of action that we think

6  are appropriate, and then we will bring, unless our examination

7  believes that aren't any meritorious claims.  We have not done

8  that.  We have tried to save the estate money, and what we've

9  now -- what we've now learned is that there have been six

10  interviews done by the debtor of current and former Ds and Os.

11          THE COURT:  Hold on.  Hold on.

12          Mr. Grogan, if I understood you right, all this

13  requires is changing some language to assure that that release

14  isn't there, right?

15          MR. GROGAN:  Your Honor, what I said was they -- so

16  it -- let me -- I want to be very clear about that.  Under --

17  these are -- these are Delaware corporations to get -- to

18  assert a cause of action against somebody.  Under Delaware law,

19  you have to allege gross negligence.  The directors and

20  officers are not being released from gross negligence, willful

21  misconduct, or actual fraud.

22          So if anybody wants to assert a claim for breach of

23  duty of care, they have to allege gross negligence, and that is

24  not a release cause of action.

25          THE COURT:  Wait a minute.  Are you going to preserve

1    any allegation of breaches of duty of care against the

2    directors, and let whoever alleges it worry about whether it's

3    gross negligence or simple negligence?  You told me that you're

4    not releasing any --

5            MR. GROGAN:  But they --

6            THE COURT:  -- breach of a duty of care.

7            MR. GROGAN:  They are not -- they are not released.

8            THE COURT:  So (indiscernible) --

9            MR. GROGAN:  So you would have to allege -- you would

10   have to allege gross negligence.

11           THE COURT:  Well, there are two different statements

12   here.  One is the debtor --

13           MR. GROGAN:  Yeah.

14           THE COURT:  -- doesn't think these are worth anything

15   because we'd have to prove gross negligence, and we don't think

16   they can.  But number two is we're not releasing anything from

17   the duty of care if it turns out that we are wrong about that,

18   and simple negligence is enough to bring a claim.  Both of

19   those statements can be true.  Are they?

20           MR. GROGAN:  Your Honor, I do not think simple

21   negligence is enough to bring a claim.

22           THE COURT:  I understand that (indiscernible) --

23           MR. GROGAN:  So that's an inaccurate -- that's --

24           THE COURT:  So why do we need to release it?

25           MR. GROGAN:  I do not think -- I do not think we have

1   a release of breach of duty of care.

2           THE COURT:  Well, then let's just add a simple

3   statement to the list of things that aren't being released,

4   that there is no release of allegations of a breach to duty of

5   care, and I think we solve the problem.

6           MR. GROGAN:  Okay.

7           THE COURT:  Mr. Gibbs, am I right?

8           MR. GIBBS:  I believe you are, Judge.  If it's clear

9   that they are not releasing the current and former Ds and Os of

10  claims based upon breach of duty of care and loyalty, then I

11  think that was our -- the primary thrust of our objection.

12          THE COURT:  Okay.

13          MR. GROGAN:  Well, we -- they are getting a release

14  from breach of duty of loyalty to the extent that it is not

15  gross negligence, fraud, or willful misconduct.

16          MR. GIBBS:  That's our problem, Judge.  It's

17  completely circular.

18          THE COURT:  Yeah.

19          MR. GIBBS:  And --

20          THE COURT:  Okay.  Then tell me the benefit to the

21  estate of giving that release.

22          MR. GROGAN:  Your Honor, there are -- the releases

23  are mutual.  We are offering releases to the creditor

24  constituency --

25          THE COURT:  Right.  You haven't identified one claim

1    that the former directors have against the estate.  Why do you

2    need to -- why -- what is the benefit to the estate?  I got it

3    that they're mutual.  The Committee is objecting because you're

4    giving a release with no benefit.

5               MR. GROGAN:  Your Honor --

6               THE COURT:  (Indiscernible) --

7               MR. GROGAN:  Your Honor, they're not -- they're not

8    worth pursuing.  It's a waste of the estate's money to pursue

9    causes of action which are -- which are not worth pursuing, and

10   we have provided an analysis that shows that these -- the

11   claims that Mr. Gibbs is trying to drum up will simply waste

12   money.

13              THE COURT:  Okay.

14              MR. GROGAN:  And we're -- we are --

15              THE COURT:  Well, I think --

16              MR. GROGAN:  We are the fiduciaries.  We are the

17   fiduciaries of this estate.

18              THE COURT:  I think you get to do this.  I am going

19   to overrule his objection, and I'll allow you to proceed on

20   that basis.  I won't rule on his motion to include the letter.

21              Mr. Grogan, I think I can't force you to include the

22   letter under Century Glove (phonetic) or otherwise.  I think he

23   can send any letter he wants, and the estate has to pay for

24   sending the letter.  That will cost the estate a fortune.  So

25   do you want to attach his letter in the manner that he

1   suggested, or do you want him to send his own letter at your

2   expense?

3          MR. GROGAN:  Your Honor, I am willing to include a

4   letter from the Committee.  However, the one he drafted is --

5   you know, it is inaccurate in two fundamental respects.

6          First, it suggests that we are giving global releases

7   to the directors and officers.  We are not.  It needs to be

8   clear that there are carveouts for any conduct which could be

9   construed as gross negligence, willful misconduct, or fraud.

10  So they should not be suggesting that the directors and

11  officers are just being released from any imaginable claim.

12         Second, it is inaccurate in the sense that it tells

13  creditors that they are -- that they are being asked to give

14  releases, but it does not say anything about the fact that if

15  they -- if they opt -- if they stay within the release

16  structure and do not opt out of the releases, they actually get

17  a release.  That is a -- that is an important fact that needs

18  to be added to his letter so that people know if they do not

19  opt out, they get a release.  It is a give a release, get a

20  release.

21         THE COURT:  For the same reason that I can't force

22  you to send his letter, I can't force him to change his letter.

23  He is communicating to his beneficiaries.  He gets to

24  communicate in the manner that he wants, and you get to pay for

25  it.  So you can either include his letter in the manner that he

1    is requesting, or I'm going to let him send his own letter and

2    make you pay for it.  That's what the law is.

3              MR. GROGAN:  Your Honor, that's -- that's fine.

4    That's fine.  We will send his letter.

5              THE COURT:  All right.  And you will send it as --

6              MR. GIBBS:  And, Your Honor, --

7              THE COURT:  -- immediately behind your letter, right?

8    Not hidden on the 200th page like he fears.  In this stack of

9    paperwork, your cover letter, and then his cover letter, right?

10             MR. GROGAN:  I'm -- is that for me, Your Honor?

11             THE COURT:  It is.

12             MR. GROGAN:  Yes.  We'll -- we'll put it -- so how do

13   you want it structured?  Do you want the -- you want the -- you

14   want his letter on top of the disclosure statement?

15             THE COURT:  No.  It's going to -- you're going to

16   have a cover letter, and I think his request was his -- I'll

17   let --

18             This is all voluntary on your part, Mr. Gibbs.  Tell

19   him what you want in order to not (indiscernible) on your own.

20   He can either (indiscernible) do it.  I'm not going to make him

21   do it.  It's a save -- money-saving issue.

22             MR. GIBBS:  That's correct.  Our request,

23   specifically, is that it go directly behind the solicitation

24   letter drafted and sent by the debtor that will, we presume,

25   will be on top of all the actual solicitation materials.

```
 1              MR. GROGAN:  Okay.  That's fine, Your Honor.

 2              THE COURT:  Okay.

 3              MR. GROGAN:  We'll get it sent out.

 4              THE COURT:  And I am -- I do believe that the debtor

 5   can decide simply not to pursue something on the grounds that

 6   it thinks there aren't claims.  That may or may not be a

 7   prudent decision.  It may or may not want to get

 8   (indiscernible), and it may or may not be one that gets

 9   confirmation, but we're at a disclosure statement hearing.  I'm

10   overruling the objection that it is fundamentally flawed at

11   this point.

12              MR. GIBBS:  Thank you, Judge.

13              THE COURT:  But we have not (indiscernible).

14              Thank you.

15              What do we have next?

16              MR. GROGAN:  Your Honor, I think next, we will go to

17   a couple of agreed orders that we had worked out with Corpus

18   Christi Energy Park regarding their motion to lift -- lift the

19   stay and motion to compel assumption of rejection.

20              Mr. Micheli is going to handle those.

21              THE COURT:  Thank you.

22              Get his line active.  Mr. Micheli, good afternoon.

23              MR. MICHELI:  Good afternoon, Your Honor.  Are you

24   able to hear me?

25              THE COURT:  Yes.  You're coming through clearly.
```

```
1            MR. MICHELI:  All right.  Yes, Your Honor.  As
2   Mr. Grogan indicated, the next two matters on the agenda are
3   emergency motions filed by Corpus Christi Energy Park.  The
4   first was a motion to compel rejection of the debtor's and
5   Corpus Christi Energy Park's design to build a contract, and
6   the second was a motion for relief from the automatic stay with
7   respect to that contract.

8            Your Honor, the parties have agreed to the forms of
9   order, the form of order with respect to the motion to compel
10  appears at Docket Number 688, and the -- the agreed relief,
11  Your Honor, is that that contract is going to be deemed
12  terminated upon entry of that order.  The debtors -- Corpus
13  Christi Energy Park was seeking rejection.  Obviously, the
14  debtors had submitted a notice of termination of the contract,
15  and so the parties have agreed to the termination of that
16  agreement, and both sides preserve all of their rights with
17  respect to that contract going forward.

18           And then, Your Honor, the second order is on the
19  motion to -- for relief from stay, which the agreed order on
20  that appears at Docket Number 689, and that is simply a
21  withdrawal of that motion, Your Honor, without prejudice to
22  Corpus Christi Energy Park's right to file that at a later date
23  to the extent necessary.

24           THE COURT:  Thank you.

25           And who do we have on the phone from 214-855-3102?
```

1          MR. CASTILLO:  Good afternoon, Your Honor.  Mark

2  Castillo of Carrington Coleman on behalf of Corpus Christi

3  Energy Park LLC.

4          THE COURT:  Mr. Castillo, good afternoon.

5          I didn't have any problem with the orders that you

6  all had agreed to, Mr. Castillo.  If you want to address, then

7  you may, otherwise, I'll just see if anyone else objects, and

8  if no one objects, I will sign your two orders.

9          MR. MICHELI:  Thank you, Judge.  Just here if there

10  were any questions.  Thank you very much.

11          THE COURT:  Thank you.

12          Does any party object to the entry of either 688 or

13  689?  Okay.  There are no objections.  I will sign those two

14  orders.  They will be entered this afternoon.

15          Thank you.

16          MR. MICHELI:  Thank you, Your Honor.

17          THE COURT:  (Indiscernible).

18          MR. MICHELI:  Your Honor, we also -- the next -- yes.

19  The next matter is with respect to a (indiscernible) and agreed

20  order, and a joint motion filed by the debtors and Marathon

21  Digital Holdings, Inc., for emergency approval of that

22  stipulation and agreed order.

23          Your Honor, that motion was filed at Docket Number

24  643 and attached at 643-1 is the stipulation and agreed order.

25  Your Honor, on December 15th, we filed a notice of -- excuse me

1  -- a notice of hearing with respect to the joint motion, and

2  the affidavit would serve us with respect to the motion and the

3  notice of hearing appear at Docket Numbers 657 and 677

4  respectively.

5         In addition, Your Honor, yesterday we submitted and

6  filed a notice of virtual hearing regarding the joint motion

7  which appears at Docket Number 680, and the affidavit of

8  service with respect to that matter appears at Docket Number

9  694.

10        Your Honor, this is a -- this is a stipulation and

11  agreed order that the parties have been working on for many

12  weeks, and it is an agreed order between the debtors, Marathon

13  Digital Holdings, Inc., MVP Logistics LLC, which is a party

14  that the debtors have a contract to warehouse some services

15  with, and Generate Lending, LLC, and GC Data Center Equity

16  (phonetic) Holdings, LLC., who is the party that now owns the

17  debtors former Kearney and Wolf Hollow sites.

18        In short, Your Honor, the stipulation and agreed

19  order provides for the return of nearly 14,000 uninstalled

20  miners that are owned by Marathon Digital.  Marathon is one of

21  the largest customers of the debtors, and, also, contract

22  counterparty with the debtors among other things, and

23  Marathon's miners, Your Honor, are uninstalled.  So these are

24  cryptocurrency miners that have never actually been put into

25  one of the facilities to begin their mining.

1          Those uninstalled miners are located in three
2    locations, the MVP Warehouse located in Humble, Texas, and then
3    the former facilities owned by the debtors that are now owned
4    by Generate, the facility is in Kearney, Nebraska, and Wolf
5    Hollow.  Your Honor, in essence, what this deal does is it's an
6    agreement among those parties to allow Marathon to retrieve its
7    miners.

8          First and foremost, the debtors are agreeing that
9    those miners are not property of the debtor's estates.  Those
10   miners are owned by Marathon, and the debtors are also agreeing
11   to release and terminate any liens or security interests that
12   they may have with respect to Marathon's miners.  Marathon and
13   the debtors have also agreed, Your Honor, to reduce and allow a
14   portion of Marathon's claim.

15         Specifically, Your Honor, Marathon, it filed a proof
16   of claim in the approximate amount of $42 million, $21 million
17   of which related to a note between the debtors and Marathon.
18   The debtors and -- the debtors do not seek the amount of that
19   note, and I believe Marathon was in agreement with the amount
20   of that note subject to certain fees and expenses that they may
21   have claimed with respect to that note.

22         The debtors have also asserted against Marathon
23   certain charges with respect to past warehousing charges
24   related to the MVP storage.  Marathon disputed those amounts
25   and those invoices, Your Honor, and in order to resolve those

1  disputed invoices, Marathon has agreed to reduce its proof of

2  claim solely with respect to its note by $1 million from

3  approximately 21 million to $20 million, and the parties then

4  reserve all of their rights with respect to Marathon's

5  remaining proofs of claim.

6          Further, Your Honor, the debtors have agreed, and

7  we'll be filing notices of objection, with respect to the

8  (indiscernible) contract, and Marathon reserves all of its

9  rights with respect to setoff recruitment and other equitable

10  remedies that it may have.

11          Your Honor, with respect to MVP, as indicated, MVP is

12  the warehousing party that the debtors have a contract with to

13  store various equipment, Marathon had filed proofs of claim on

14  the debtors' cases in the amount of approximately $155,000.

15  During the discussions with Marathon and MVP and the debtors,

16  MVP has asserted various liens with respect to the miners

17  located in their warehousing facilities, and those are with

18  respect to not just Marathon's miners but to -- to other miners

19  that are located in those facilities.

20          As part of the settlements and in satisfaction of

21  those asserted liens, the debtors have agreed and are seeking

22  authority to pay those two invoices, or excuse me, those proofs

23  of claim in the amount of $155,416.20 in full satisfaction in

24  any and all prepetition claims that MVP has, and the debtors

25  believe that this is a benefit to not just Marathon but to the

1  debtors and their other customers as well.

2         This will allow, obviously, MVP to obtain its miners.

3  It will also allow the debtors to retrieve miners that they

4  have storage with MVP, and it also will allow for other

5  customers who are seeking return of their equipment to obtain

6  their miners as well.  To be clear, Your Honor, the debtors are

7  not agreeing to any costs associated with the retrieval of

8  miners.  The debtors are paying their invoice -- excuse me,

9  their warehousing charges current on a post-petition basis, and

10  the debtor -- but the debtors have not agreed, and Marathon

11  acknowledges that they are responsible for any and all, what

12  I'll call, retriever charges or pick the pack (phonetic) and

13  prepare charges.

14         Those are the charges that MVP will incur in order to

15  prepare the Marathon for shipping and pick-up by Marathon.

16  And, Your Honor, the last piece of the settlement is that MVP

17  and Generate have agreed that they will make the miners

18  available for pick-up on a mutually agreed schedule with

19  Marathon, and that that timeline should be no later than seven

20  days after the Court enters its order.

21         We did receive, Your Honor, one -- some comments from

22  the Unsecured Creditors Committee, one, with respect to MVP's

23  lien rights on a go-forward basis, and we have language that

24  we'd like to read into the record to clarify that issue, and

25  that language is as follows:

1          Taking into account the payment being sought as part
2   of the stipulation of $155,416.29 from the debtors to MVP, I
3   set forth in the stipulation an agreed order, MVP was paid in
4   full as of the date of filing of the stipulation and agreed
5   order and waives any and all lien rights it may have had with
6   respect to any and all miners in its possession as of that
7   date.  As of Tuesday, December 20, 2022, MVP is owed $11,219.97
8   for weekly warehousing charges for which the debtors have not
9   yet been invoiced.
10          The debtors intend to pay those amounts and the
11  weekly warehousing charges that come due in the ordinary course
12  of business until the debtors reject their contract with MVP.
13  The debtors will not pay for costs incurred to pick, pack, and
14  prepare any miners for shipping or retrieval except as set
15  forth in the stipulation and agreed order that covers
16  Marathon's miners, MVP and the debtors reserve all of their
17  rights with respect to the assertion of liens on the miners MVP
18  has in its possession related to future unpaid warehousing
19  charges and pick, pack, and prepare (indiscernible).
20          Your Honor, we do have evidence today, I will pause,
21  though, and answer any questions that you have or allow others
22  to speak with respect to this stipulation.
23          THE COURT:  With respect to the stipulation that he
24  just -- the additional portion that you just read in the
25  record, who do we have from Marathon to confirm their part of

1  that stipulation?  Please press "five-star" one time.

2          Ms. Liou, good afternoon.

3          MS. LIOU:  Good afternoon, Your Honor.  Jessica Liou

4  from Weil, Gotshal & Manges on behalf of Marathon Digital

5  Holdings, Inc.  I can confirm, Your Honor, that we are in

6  agreement with that language read into the record.  I do want

7  to make two selections to what Mr. Micheli relayed to the Court

8  about what the stipulation provides.

9          First off, I do want to say that Marathon filed a

10 proof of claim in excess of $42 million, so I didn't want that

11 to confuse the record.  In addition, the stipulation itself is

12 self-effectuating once it is entered with respect to the

13 rejection of all of Marathon's agreements.  But other than

14 that, Your Honor, we would -- we are grateful for you hearing

15 this motion on an emergency basis given your busy schedule, and

16 we do believe that it is a benefit for resolution of multiple

17 disputes between the parties, and it's a good outcome, and we

18 would ask that you approve it.

19         THE COURT:  Thank you.

20         Let me hear any party that objects to the relief

21 sought in the stipulation.  All right.  There are no objections

22 that are being voiced.

23         You said you wanted to offer some proof and support,

24 Mr. Micheli.  Go ahead.

25         MR. MICHELI:  Yes, Your Honor.  Thank you.

1          The debtors did submit a declaration of Drake Harvey,

2    their president, in support of the motion.  That declaration

3    appears at Docket Number 693, and we would request that that be

4    entered into evidence.  Mr. Harvey is available today, Your

5    Honor, we -- for cross-examination to the extent anyone has any

6    questions with respect to his declaration.

7          THE COURT:  Is there any objection to the admission

8    of 693 as substantive evidence of today's hearing?  Is there

9    any party that wishes to cross-examine Mr. Harvey?  All right.

10   The declaration filed at 693 is admitted.  No party is seeking

11   to cross-examine.

12          Does any party have any additional evidence besides

13   the Harvey' declaration?  So, Mr. Micheli, just to be certain

14   that I'm doing the right thing, you referenced ECS 643 as the

15   target of the hearing.  I think 643 is what I asked us to take

16   up 630 on an expedited basis, but, really, the substantive

17   order you want me to sign is 630?  And I want to be sure that,

18   A, I'm right about that, and, B, that 630 hasn't changed.

19          MR. MICHELI:  Your Honor, that is correct.  630 has

20   not changed.  For convenience, we also attached that

21   stipulation to 643, which also -- which is actually 643-1, but

22   that is correct.

23          THE COURT:  All right.  Hearing no objection and

24   reviewing the proof by Mr. Harvey as well as the thorough

25   presentation by the debtor, I find that this is in the best

```
 1   interests of the estate.  No party is objecting.  It's putting
 2   the miners back where they belong.  It's resolving certain
 3   obligations of the debtor.  No party is objecting.  We'll have
 4   this entered today.  I'll sign the order.  Thank you.
 5            MS. LIOU:  Thank you, Your Honor.
 6            MR. MICHELI:  Thank you, Your Honor.
 7            THE COURT:  So I --
 8            MR. MICHELI:  The last thing I need done, Your
 9   Honor, --
10            THE COURT:  Go ahead.
11            MR. MICHELI:  No, please.  Sorry.
12            THE COURT:  No.  I'm eager to get the other order
13   submitted by 7:00, and so I'm -- I was going to skip ahead to
14   what are we going to do to get the revised order?  I need
15   Mr. Gibbs to sign off as to form, and I need it filed so that I
16   can get it entered by 7:00.
17            Mr. Grogan, what's that going to take to pull that
18   off?
19            MR. GROGAN:  Your Honor, I don't think we need much
20   time.  Mr. Shelley is, I think, handling -- handling whatever
21   revisions we need to make, but it will be, you know, as we
22   described on the record, and I will circulate a revised
23   document as soon as we get off the hearing to Mr. Gibbs for
24   signoff with the changes we discussed, and then we can file
25   that under a certificate of conference.
```

```
 1                THE COURT:  That would be great.

 2                MR. GROGAN:  Or certificate of counsel, I should say.

 3                THE COURT:  Yeah.  Would you notify Ms. Do as soon as

 4    it gets filed?  She can get it to me right away.

 5                MR. GROGAN:  I will, Your Honor.

 6                MR. GIBBS:  And, Your Honor, --

 7                THE COURT:  (Indiscernible) -- go ahead, Mr. Gibbs.

 8                MR. GIBBS:  I just wanted to ask Mr. Shelley to make

 9    sure he copies Ms. Going also on the proposed order.  I'm going

10    to have to deal with an emergency for the next couple of hours,

11    and I don't want to slow things down.

12                THE COURT:  Thank you.

13                Why don't I release Mr. Shelley and Ms. Going from

14    this part of the hearing so that they can get to work on that

15    order, and then we'll next move to whatever else Mr. Micheli

16    wants to talk about.

17                Hold on.  I've got someone else that wanted to

18    participate.  Let's see.

19                Someone had pressed "five-star" once, and then they

20    pressed it again, which turned it off.  So I don't know who

21    that was.  There we go.  Hold on.

22                Mr. Shelley, your line has been open the whole time.

23    Go ahead.

24                MR. SHELLEY:  Thank you, Your Honor.

25                One point I wanted to clarify.  The Court has
```

1  expressed the concern before about making it as easy as

2  possible for parties to change their votes to the extent

3  subsequent disclosures make them change their mind.  Our

4  current voting procedures in Section 3(g) currently provide

5  that if multiple ballots are filed by the same holder of a

6  claim prior to the voting deadline, a later filed ballot

7  supersedes the other one and automatically controls.

8           So I think that's about as easy a procedure as we

9  could have, and I'm open to other suggestions if someone wants

10  a different procedure, but I think that's about as easy as we

11  could do it.

12           THE COURT:  Why don't you put in my order that if you

13  receive a ballot from someone that was cast prior to the date

14  on which they appeared on the list, there won't be very many

15  like this, that you will send to them a notice of their right

16  to change the vote by overnight mail along with the new ballot

17  to give them the ability to do that.  Can you just include that

18  in my order, so you don't need to change anything else within

19  the procedures?

20           MR. SHELLEY:  Yes.  That's fine, Your Honor.

21           THE COURT:  And I assume, we're talking this may

22  happen three or four times, right?  You're not suing that many

23  people.  Especially not (indiscernible) --

24           MR. SHELLEY:  (Indiscernible).

25           THE COURT:  -- who would have -- who would have

1   already voted, so -- okay.  Let's do it that way, and I'll feel

2   good about that.

3          Anybody else?  Okay.

4          Mr. Shelley, Ms. Going, good luck.

5          Mr. Micheli.

6          MR. MICEHELI:  Thank you, Your Honor.

7          The last matter on our agenda for today was a status

8   conference with respect to a motion filed by KONZA MINING FUND

9   I, LP, which appeared at Docket Number 410.  KONZA filed a

10  notice of status hearing, which appeared at Docket Number 685,

11  Your Honor.

12         THE COURT:  Correct.  So if I could just

13  (indiscernible) --

14         MR. MICHELI:  Your Honor, I believe KONZA is -- I'm

15  sorry.  Go ahead, Your Honor.

16         THE COURT:  No.  I just was going to have KONZA's

17  lawyer "five-star" one time.

18         Mr. Shepard, I haven't found your "five-star".  Let

19  me see if I can find you.  There you are.  Mr. Shepard, good

20  afternoon.

21         MR. SHEPARD:  Good afternoon.  It's nice to see you,

22  Judge.  It's been a while.

23         And, if you could, unmute --

24         THE COURT:  Good to see you.

25         MR. SHEPARD:  -- Annarose Harding as well.

```
1              THE COURT:  Ms. Harding, if you would, press
2   "five-star" one time on your line, or -- there we go.  Go
3   ahead, please.
4              MR. SHEPARD:  Very good.  Sorry about that.
5              Branch Shepard and Annarose --
6              THE COURT:  Ms. Harding, I just (indiscernible) --
7              MR. SHEPARD:  -- Harding (indiscernible) --
8              MS. HARDING:  Good afternoon, Judge.
9              THE COURT:  Good afternoon.
10             All right.  Go ahead, Mr. Shepard.
11             MR. SHEPARD:  Thank you, Judge.
12             Branch Shepard and Annarose Harding for KONZA.  And
13  we are a little bit going back and forth with this situation
14  because there are still some -- some miners that appear to be
15  MIA, and Ms. Harding has some additional information that she
16  can share, and we also conferred with our client to get the
17  latest update today, but there is a little bit of confusion, I
18  think, between the debtor of where these miners actually ended
19  up and possibly their counsel as well that we're kind of in
20  flux right now, but I'll let Ms. Harding update the Court.
21             THE COURT:  Thank you.
22             Ms. Harding.
23             MS. HARDING:  Yes, Judge.  Our motion, the subject of
24  our motion was 583 miners that KONZA was trying to identify the
25  whereabouts.  Debtor's counsel has provided some additional
```

1  information, but as of today, there is still 103 miners that

2  our client is not able to account for.  We believe 90 of those

3  miners are still in the B facility, and there are 12 that are

4  at the Wolf Hollow location, but the new owner is telling us

5  that those miners are not actually at the Wolf Hollow location,

6  which is what debtor's counsel has actually told us.

7          So part of our problem is that we're getting

8  conflicting information from the new owner and debtor's

9  counsel, which is leaving our client in limbo as to the status

10  of these 103 miners, Judge.

11          THE COURT:  All right.  But from the debtor's point

12  of view, you may have assigned these contracts somewhere else,

13  but I don't think that absolves your need to follow through,

14  and it sounds like you are.

15          What's it going to take to figure out where the

16  miners are that belong to Ms. Harding's client?

17  (Indiscernible) --

18          MR. MICHELI:  Yes, Your Honor.  This is the first I'm

19  hearing about the -- yes, Your Honor.  Matt Micheli of Paul

20  Hastings.  We've been going back and forth and providing

21  information to KONZA.  I believe this is the first time I'm

22  hearing about these 103 miners specifically.  We're happy to

23  continue to work with them, Your Honor.  And as I've indicated

24  to them, you know, I'm happy to enter into an agreed order.

25          And more, too, I think what we did with U.S. Data

1   Group and others to allow for them to identify and obtain their

2   miners.  But, Your Honor, I will follow up with our client

3   today, and if the information that we have -- I will note, Your

4   Honor, that our client did conduct a inventory of miners, a

5   physical inventory of miners prior to turning over possession

6   of the locations that were sold.  So we can -- the best I can

7   do, at this point, since I don't have access -- our client does

8   not have access to those facilities is, we can go off of the

9   inventory that we had as of that time.

10          But, you know, I will note that Generate -- and the

11   facilities have also (indiscernible) helpful in working through

12   these issues, so we're happy to continue to work with both

13   parties to try and resolve.

14          THE COURT:  So what does a miner cost?

15          MR. MICHELI:  I believe, a few thousand dollars, Your

16   Honor, at least on the secondary market.

17          THE COURT:  So each miner is worth two or three

18   thousand?

19          MR. MICHELI:  Potentially.  It depends on how -- it

20   also depends on the age of the miners as well.

21          THE COURT:  Okay.

22          MR. SHEPARD:  And, Judge, I don't know if that is

23   completely accurate.  I'd have to confirm that amount with our

24   client, but I think just so you're aware, the hundreds of

25   miners that they have, they have invested millions of dollars

1   into the miners and getting these contracts worked out, and

2   they've got miners now that are in limbo.  They are not

3   energized.  They are not performing.

4           They've got investors that they have to answer to,

5   and KONZA is being prejudiced on a daily basis when these

6   miners are not in operation, essentially.  And so, you know,

7   we're in a position that, you know, they are incurring damages

8   with these miners that are not operating, and Mr. Micheli has

9   been very helpful it seems, and I'm not trying to ambush him

10  here today by talking about these 103 miners.  This is

11  something we just (indiscernible) --

12          THE COURT:  He didn't take it that way, I don't

13  think.

14          Look, you tell me what you want me to do.  I've said

15  they need to cooperate.  It sounds like they are cooperating.

16  Do you all want to go do a physical exam?  Would that help you

17  find them or not?  I mean, these are pretty massive facilities

18  to be looking for these miners at.  So if you all want to go do

19  a physical --

20          MR. SHEPARD:  Okay.

21          THE COURT:  -- inspection, I don't have a problem

22  with that, and I doubt (indiscernible) --

23          MR. SHEPARD:  (Indiscernible) --

24          THE COURT:  -- the debtors.

25          MR. SHEPARD:  -- do that.  Yeah.  We can ask our

1  client if they want to do that.  I don't know if they want to

2  go to those lengths.  I think there may be an instance, if we

3  need to, you know, essentially, you know, get some of these

4  miners picked up and energized for somebody else, you know,

5  that -- that is something that we've talked about, but we've

6  just got to -- just must figure out where these miners, in

7  fact, are.

8          And so I think that's kind of where we are, and

9  debtor's counsel has been working with us.  I'm not, by any

10 means, saying they have not been.  It's just a matter of a lot

11 of moving parts.

12         THE COURT:  Look, here's what I'm going to do.  I'm

13 opening discovery to help you find your miners if you want to

14 spend money on discovery instead of cooperative turnover

15 information.  I think you're entitled to do discovery.  It

16 sounds like, economically, you're better off sitting back for a

17 few more days.  And then whenever you want an evidentiary --

18         MR. SHEPARD:  We agree.

19         THE COURT:  Whenever you want an evidentiary hearing,

20 if you'll contact Ms. Do, we'll schedule you for an evidentiary

21 hearing.  I don't know what that's going to prove one way or

22 the other until we know where the miners are.

23         MR. SHEPARD:  Certainly, yes.  And I agree, Judge,

24 it's, you know, another few days or, you know, a little after

25 Christmas or something, if we can gather that information.  We

1   just learned -- you know, learned about the 103 miners today

2   from our client, so that's --

3            THE COURT:  Fair enough.  Fair enough.

4            MR. SHEPARD:   -- news to us as well.

5            THE COURT:  All right.

6            Any problem with me just opening discovery?  I'm not

7   encouraging you to use it.  When it comes time and you need to

8   use it, use it, and then let me know when you're ready for an

9   evidentiary hearing through Ms. Do.

10           MR. SHEPARD:  Thank you, Judge.

11           THE COURT:  Any problem with that by the debtor?

12           MR. MICHELI:  No.  That's acceptable, Your Honor.

13           THE COURT:  Okay.  What else can we cover today?

14           MR. MICHELI:  Your Honor, I believe that covers all

15   of the matters on the agenda for today.

16           THE COURT:  Let me see if anyone else has anything

17   they need to cover.

18           Are there any matters that someone believes we should

19   have called today that we haven't called?  If so, please press

20   five, star one time on your phone.

21           All right.  We're going to recess.  Please remember

22   to contact Ms. Do as soon as you file your proposed order.

23           And, Ms. Do, if you will, just get in touch with me

24   right away.

25           Hold on.  I've got one more party.

```
 1              Mr. Shelley, go ahead.

 2              MR. SHELLEY:  Thank you, Your Honor.

 3              One last item is we need to have a hearing date for

 4   the confirmation hearing, so we're thinking given that we're

 5   pushing back to the various deadlines, looking at the calendar,

 6   we think that February 13th would work well subject to the

 7   court's availability.

 8              THE COURT:  All right.  February 16th at 1:30 in the

 9   afternoon for a confirmation hearing.  Would that work?

10              MR. SHELLEY:  That's excellent, Your Honor.

11         (Multiple speakers, no record)

12              THE COURT:  Anyone have any objection to that?  All

13   right.  That will be the confirmation hearing.  Thank you.

14              MR. GROGAN:  Thank you, Judge.

15              THE COURT:  Any other issues that I've got to cover?

16              All right.

17              MR. GROGAN:  Your Honor --

18              THE COURT:  (Indiscernible) --

19              MR. GROGAN:  No.  I was just going to say, if it's

20   you that's -- if it's you that has tested positive, I hope you

21   recover quickly.  If you're just quarantined, you've done so in

22   style.  If you're doing it (indiscernible).

23              THE COURT:  No.  What happened is I've tested

24   positive, and I've been sick, and my wife is my age, and I

25   don't want to go home and infect her, so I'm camping out, but I
```

1    appreciate the good wishes.  Thank you.

2              MR. GROGAN:  Thank you.

3              MR. GIBBS:  Thanks, Your Honor.

4              THE COURT:  We're in recess.  Thank you.

5         (Proceedings concluded at 3:03 p.m.)

6                          *  *  *  *  *

7

8

9

10

11

12

13

14                **C E R T I F I C A T I O N**

15

16              I, Alicia Jarrett, court-approved transcriber, hereby

17    certify that the foregoing is a correct transcript from the

18    official electronic sound recording of the proceedings in the

19    above-entitled matter.

20

21

22

23    _____

24    ALICIA JARRETT, AAERT NO. 428      DATE: December 27, 2022

25    ACCESS TRANSCRIPTS, LLC