Jeffrey D. Klobucar (jklobucar@bassford.com)
MN State Bar No. 0389336
(*admitted pro hac vice* [ECF #190])
**BASSFORD REMELE, P.A.**
100 South Fifth Street, Suite 1500
Minneapolis, MN 55402
(612) 333-3000 – Telephone
(612) 746-1239 - Facsimile

J. Michael Sutherland (msutherland@ccsb.com)
State Bar No. 19524200
Robert C. Rowe (rrowe@ccsb.com)
State Bar No. 24086253
**CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, TX 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

BANKRUPTCY COUNSEL FOR ROHIT SHIROLE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*,**[1] | § § § § | **Case No. 22-90273 (MI)** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |
| | § | **(Hearing Requested for Feb. 9, 2023 at 9:00 a.m. CT concurrently with continued hearing on Motion for Relief from Stay [ECF 342].)** |
| | § § § § | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, IL 60654.

**ROHIT SHIROLE'S EMERGENCY MOTION FOR TEMPORARY ALLOWANCE OF CLAIMS, AS AMENDED, FOR PURPOSES OF VOTING PURSUANT TO FED. R. BANKR. P. 3018(a) AND OTHER RELIEF PURSUANT TO 11 U.S.C. § 105**

## Notice pursuant to L.B.R. 9013-1(i)

**Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

## Notice pursuant to L.B.R. 9013-1(b)

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing. Represented parties should act through their attorney.**

## Notice of Request for Emergency Hearing

**The Court had previously directed that a hearing on this Emergency Motion would be set for 9:00 a.m. on February 9, 2023, and was to be combined with a continued hearing on Shirole's Motion for Relief from Stay [ECF 342]. For purposes of clarity, in addition to the Notice of Hearing to be filed herewith, Shirole requests that the hearing on this Emergency Motion be held on February 9, 2023 at 9:00 a.m.**

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

      NOW COMES Shirole ROHIT SHIROLE ("Shirole" or "Movant"), and files this *Motion*

*for Temporary Allowance of Claims, as Amended, for Purposes of Voting Pursuant to Fed. R.*

*Bankr. P. 3018(a) and Other Relief Pursuant to 11 U.S.C. § 105* (the "<u>Motion</u>"), and in support thereof would respectfully show the Court as follows:

## I. <u>INTRODUCTION AND BASIS FOR EMERGENCY RELIEF</u>

Shirole was formerly employed by Debtors Mining Project Wind Down LLC (f/k/a Compute North LLC ("<u>Compute North</u>")) and Mining Project Wind Down Holdings Inc (f/k/a Compute North Holdings, Inc. ("<u>Holdings</u>," and collectively with Compute North, "<u>Defendants</u>" or "<u>Debtors</u>")) as a Vice President of Strategy and Business Development. In December 2021, Shirole commenced a lawsuit against Defendants in the Fourth Judicial District for the State of Minnesota, Hennepin County, styled *Rohit Shirole v. Compute North Holdings, Inc. and Compute North LLC*, Case No. 22-CV-22-2274 (the "<u>Minnesota Action</u>"). In the Minnesota Action, Shirole has asserted claims against the Defendants under Minnesota law for, *inter alia*, discrimination, retaliation, wage loss, wrongful termination, breach of contract, and unjust enrichment. (*See* **Exhibit E** to the Declaration of Rohit Shirole (the "<u>Shirole Decl.</u>") filed herewith) In March 2022, the Defendants answered the Amended Complaint and filed counterclaims against Shirole for breach of the duty of loyalty, tortious interference with contract, and unfair competition. (*See* **Exhibit F** to the Shirole Decl.) Shirole filed a reply to the Defendants' counterclaims. (*See* **Exhibit G** to the Shirole Decl.) The parties proceeded with the Minnesota Action for months, including through mediation in August 2022. (*See* Shirole Decl. at ¶ 16) That mediation was unsuccessful and the parties did not reach resolution. (*See* Shirole Decl. at ¶ 20) Shortly thereafter, the Defendants and their affiliates filed these jointly administered chapter 11 cases.

Shirole has filed two proofs of claim in this matter [Claims 10055 and 10056][2] (the "Claims") related to his claims against the Debtors, both of which have been the subject of an objection by the Debtors (the "Objection"), and both of which Claims have now been amended by Shirole [Claims 10160 and 10161, respectively].[3] Pursuant to the Solicitation and Voting Procedures approved by the Court in this matter (*See* ECF 715 (the "Solicitation Procedures Order")), because the Debtors have not designated such Objection as an objection on a "reduce and allow" basis, Shirole, as a Holder of a Disputed Claim, pursuant to the terms of the Solicitation Procedures Order, would be unable to vote his claims in the amount set forth therein with respect to the Second Amended joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and its Debtor Affiliates (the "Plan"), absent a Court order.[4]  *See* ECF 715 at pp. 6-8. As Shirole wishes to cast his vote(s) with respect to the Plan, and to have such votes be counted in their stated amounts, he now seeks a further Court order on an emergency basis, temporarily allowing his Claims and estimating the amount of such Claims for purposes of voting pursuant to Bankruptcy Rule 3018(a) and for such other relief as may be just and equitable under the circumstances.

---

[2] (*See* **Exhibits K** and **L** to the Shirole Decl., as amended)

[3] *See* ECF 814 and ECF 816.  Notably, the Debtors objected to the substance of Claim 10055 (ECF 816) and objected to Claim 10056 on the basis that it is duplicative of Claim 10055 (ECF 814). Shirole concedes that, upon information and belief, he has a claim against both Compute North Holdings, Inc. and Compute North, LLC for one amount, jointly and severally, but as the currently proposed chapter 11 plan does not contain provisions for substantive consolidation, both claims are viable. (*See* the Plan, generally)

[4] On January 17, 2022, subsequent to a hearing on Shirole's Motion for Relief from Stay [ECF #342], and pursuant to this Court's Order entered on the docket on that same day [ECF #829], Shirole has been granted leave of the Court to vote both claims in their full amount—noting that the amount to be considered or "estimated" for purposes of balloting will be determined in concert with the hearing on the instant Motion to be held on February 9, 2023.

## II.  PARTIES

Shirole is an individual who resides in the County of Hennepin, Minnesota. Compute North is a Delaware limited liability company with a registered office address of 7575 Corporate Way, Eden Prairie, MN 55344.  Holdings is a Delaware corporation not registered to do business in the State of Minnesota, with a Delaware Secretary of State registered address of 1209 Orange Street, Wilmington, Delaware, 19801. Both Holdings and Compute North are Debtors in this jointly administered chapter 11 bankruptcy case.  *See* FN 1, herein.

## III.  JURISDICTION

This Court has jurisdiction over this motion pursuant to 28 U.S.C. §157 and §1334. This matter is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (G). Venue of this case in this district is proper pursuant to 28 U.S.C. §1408 and §1409. The statutory predicates for the relief sought herein include, without limitation, § 105(a) of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule ("LBR") 9013-1 for the United States Bankruptcy Court for the Southern District of Texas. This Motion is brought pursuant to Bankruptcy Rules 9014 and LBR 9013-1.

## IV.  RELEVANT FACTS[5]

Shirole was originally employed by the Debtors as a Vice President of Sales and Corporate Development—and most recently employed as a Vice President of Strategy and Business Development. (Shirole Decl. at ¶ 1) On March 27, 2021, Shirole and the Debtors entered into that certain 2021 Sales Commission Plan (the "Commission Plan"), pursuant to which, Shirole was to be paid commissions on colocation services, logistics sales, customer funded capital expenditures,

---

[5] Shirole incorporates herein by reference the factual allegations contained in the Amended Complaint filed in the Minnesota action (attached as Exhibit E to the Shirole Decl.), but provides a factual summary of  his claims here for the Court's convenience.

and colocated equipment sales. (Shirole Decl. at ¶ 2; **Exhibit A** to the Shirole Decl.) In addition, pursuant to that certain Restricted Stock Agreement (the "Stock Agreement") and otherwise, at or around the time of his termination, Shirole was the owner of 36,309 shares of stock in the Debtors. (Shirole Decl. at ¶ 21; **Exhibit B** to the Shirole Decl.)

Throughout his employment with the Debtors, the Debtors regularly failed to make timely and full payments of commissions to Shirole and failed to provide him with commission statements for four consecutive months—namely, May, June, July, and August of 2021. (Shirole Decl., ¶ 4) Further, the commission statements Shirole received from the Debtors reflected inaccurate information, and his payments were sometimes off by tens of thousands of dollars.  (Shirole Decl., ¶ 5)

Shirole regularly raised issues with the decisions of the Debtors' management to "deprioritize" the company's customers in favor of the interests of the Debtors' (and the Debtors' officers') own digital currency mining interests. (Shirole Decl., ¶ 6) At one point, he also raised issues with Management of the Debtors regarding perceived inaccuracies in financial reporting, and reported various inappropriate and improper comments regarding racial demographics with respect to determining future site locations to the Debtors' HR department. (Shirole Decl., ¶ 7)

After he reported such conduct, his employment was suspended by the Debtors. (Shirole Decl., ¶ 8)  On December 7, 2021, through counsel, Shirole informally sent a copy of a  civil complaint to the Debtors, indicating to the Debtors that he would initiate a lawsuit if his wrongful suspension was not lifted.  (Shirole Decl., ¶ 9)  On the next day following the informal delivery of the initial complaint to the Debtors (December 8, 2021), the Debtors terminated Shirole's employment. (Shirole Decl., ¶ 10)

On December 10, 2021, Shirole's counsel demanded payment of all compensation due to me after my termination pursuant to Minn.Stat. § 181.111 and § 181.45.[6] (Shirole Decl. at ¶ 11; **Exhibit C** to the Shirole Decl.) No additional compensation demanded was forthcoming within the required timeline. (Shirole Decl., ¶ 11)  In addition, after Debtors stated they would terminate Shirole's employment,  Shirole, though counsel, demanded the truthful reason for his termination by the Debtors, in writing. (Shirole Decl. at ¶ 12; **Exhibit D** to the Shirole Decl.) No response from the Debtors was received within 10 days of that demand as required by Minn.Stat. § 181.933, sub. 1. (Shirole Decl., ¶ 12)

On December 17, 2021, through counsel, Shirole formally served a copy of the complaint (the "Complaint"), thereby commencing a lawsuit against Defendants in the Fourth Judicial District for the State of Minnesota, Hennepin County, styled *Rohit Shirole v. Compute North Holdings, Inc. and Compute North LLC*, Case No. 22-CV-22-2274, alleging claims against the Defendants under Minnesota law for, *inter alia*, discrimination, retaliation, wage loss, wrongful termination, breach of contract, and unjust enrichment (the "Minnesota Action"). (Shirole Decl. at ¶ 13; **Exhibit E** to the Shirole Decl.)  On or about January 21, 2022, the Defendants answered the Amended Complaint and filed counterclaims against Shirole for breach of the duty of loyalty, tortious interference with contract, and unfair competition. (Shirole Decl. at ¶ 14; **Exhibit F** to the Shirole Decl.) On February 23, 2022, Shirole filed a reply to the Defendants' Counterclaims. (Shirole Decl. at ¶ 15; **Exhibit G** to the Shirole Decl.)

The Debtors and Shirole proceeded with the Minnesota Action for months, including through mediation in August 2022. (Shirole Decl., ¶ 16)  As part of the Minnesota Action, prior to

---

[6] Shirole's counsel had already made this statutory demand earlier, during continued negotiations related to his termination and refusal to sign a non-compete. (*See* Exhibit G to the Shirole Decl.)

mediation, the Debtors provided Shirole with certain information regarding commissions purportedly owed him.  (Shirole Decl. at ¶ 17; **Exhibit H** to the Shirole Decl.) The information provided by the Debtors included official business records, sent through their counsel, as early as December 6, 2021, demonstrating that the Debtors owed commissions to Shirole in the minimum amount of $3,905,866.40.  (Shirole Decl. at ¶ 18; **Exhibit H** to the Shirole Decl.) The amounts set forth in Exhibit H were significantly incorrect for multiple reasons, including the exclusion of CapEx Contribution sales, certain hardware sales, and certain colocation sales. (Shirole Decl., ¶ 19)  The mediation related to the Minnesota Action was ultimately unsuccessful and the parties did not reach resolution. (Shirole Decl., ¶ 20)

At the time of Shirole's termination, he owned 36,309 shares of stock in the Debtors. (Shirole Decl., ¶ 21) During the course of his employment with the Debtors as a sales executive, Shirole made substantial ongoing sales of more than $2 billion in revenue.[7] (Shirole Decl., ¶ 22)

Under the Commission Plan, Shirole understood that he was entitled to commissions with respect to sale of colocation services upon the occurrence of three conditions: (1) the client had executed the agreement and/or order form, (2) the client had paid the "down deposit," and (3) the equipment had been received and turned up (if applicable) within 12 months of Shirole's termination.  (Shirole Decl. at ¶ 23; **Exhibit A** to the Shirole Decl.)  At the time of Shirole's termination, such criteria had been met with respect to numerous hosting clients whose accounts he managed—namely, the following:

| | | |
|---|---|---|
| Altonomy db, | Integrated Ventures | Touzi Capital |
| Atlas Mining | Konza Mining | U.S. Bitcoin |
| Bit Digital | Marathon DH | Value Chain Venture |
| Compass Mining | NFN8 | Wayfaring Corp. |
| Culver Ventures | Omnific Ventures | White Rock Management |

---

[7] The total amount of the contracts for hosting services sold by Shirole is $2,107,085,390.88 (*See* Exhibit I to the Shirole Decl.)

GEM Mining            Optimal Founders            Zero G Capital
Gilley Enterprises    SupplyBit
Haylo Group           Teracel

(Shirole Decl. at ¶ 24; **Exhibit I** to the Shirole Decl.) The total amount of colocation/hosting commissions to which Shirole was entitled as of the date of my termination is $9,197,345.93. (Shirole Decl. at ¶ 25; **Exhibit I** to the Shirole Decl.)

Also under the Commission Plan, Shirole understood that he was entitled to commissions with respect to equipment sales immediately after the equipment was received by the client and the client had paid. (Shirole Decl. at ¶ 26; **Exhibit A** to the Shirole Decl.) With respect to equipment sales, Shirole met the necessary criteria for earning commissions with respect to numerous sales in favor of the following vendors:

Compass Mining        Haylo Group        Optimal Founders
Culver Ventures       Konza Mining       VCV (Value Chain Ventures)
GEM Mining            NFN8               Wayfaring Group
Gilley Enterprises    Omnific Ventures   Zero G Capital

(Shirole Decl. at ¶ 27; **Exhibit I** to the Shirole Decl.) The total amount of equipment sale commissions to which Shirole was entitled as of the date of his termination is $1,673,622.00. (Shirole Decl. at ¶ 28; **Exhibit I** to the Shirole Decl.)

Also under the Commission Plan, Shirole understood he was entitled to commissions on customer CapEx Contribution sales in the amount of 1%. (Shirole Decl. at ¶ 29; **Exhibit A** to the Shirole Decl.) With respect to CapEx Contribution sales, Shirole's was entitled to commissions with respect to projects by U.S. Bitcoin and Marathon Digital Holdings (Shirole Decl. at ¶ 30; **Exhibit I** to the Shirole Decl.)  The total amount of CapEx Contribution commissions to which Shirole was entitled at the time of his termination was $449,000.00. (Shirole Decl. at ¶ 31; **Exhibit I** to the Shirole Decl.)

Accordingly, the total amount of commissions to which Shirole was entitled at the time of his termination is **$11,319,967.93**. (Shirole Decl. at ¶ 32; **Exhibit I** to the Shirole Decl.)

On March 7, 2021, approximately three months after his termination, the Debtors elected, pursuant to the Restricted Stock Agreement, to repurchase 36,308 of the 36,309 shares in the Debtors owned by Shirole. (Shirole Decl. at ¶ 33; **Exhibit J** to the Shirole Decl.) At or near the time of this purported repurchase, Shirole believes the per share market price represented by the Debtors to potential investors was $254.00, which calculates to a value of $9,222,232.00 that should have been remitted to him by the Debtors for the repurchase of his 36,308 shares. (Shirole Decl., ¶ 34)

The Debtors took possession and control of such shares by removing them from Shirole's "Carta" equity management solutions account (the account in which the shares were held)—but never remitted any funds to Shirole as consideration for the appropriated shares. Shirole was thus unable to sell such shares for fair market value at that time. (Shirole Decl., ¶ 35) Shirole has not received any amounts in exchange for the shares taken from me by the Debtors, and holds only one remaining share.  (Shirole Decl., ¶¶ 36, 37)

These amounts, among others, including, without limitation, mandatory double damages related to unpaid commissions pursuant to Minnesota law, comprise the amount and nature of Shirole's Claims against the Debtors.[8]

---

[8] **Ongoing Discovery Dispute**: On January 10, 2023, Shirole, through counsel, made a request for the following information: For purposes of calculating commissions: (1) Copies of all signed customer and Joint Venture contracts, addenda, schedules and Order Forms from July 2020 through December 9, 2022; (2) Copies of all invoices from manufacturers from which the Debtors purchased miners from July 2020 through December 9, 2022; (3) Calculations for all profit-sharing agreements with Bit Digital through December 9, 2022; (4) Copies of all customer invoices for hardware purchases and hosting services from July 2020 through January 2023; and (5) Copies of all Power Purchase Agreements (PPAs) along with power invoices from July 2020 through January 2023.

## IV.  RELIEF REQUESTED

Shirole seeks an order from the Court temporarily allowing his Claims against the Debtors, as amended, in the amount of $32,453,436.89 for purposes of voting on the Plan.[9]

## V.  ARGUMENT AND AUTHORITIES

### A.    Governing Standards for Temporary Allowance of Claims.

Bankruptcy Rule 3018(a) allows a bankruptcy judge to "temporarily allow [an objected to] claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Fed. R. Bankr. P. 3018(a). The policy behind temporarily allowing claims is "to prevent possible abuse by plan proponents who might ensure acceptance of a plan by filing last minute objections to the claims of dissenting creditors." *In re Mangia Pizza Invs.*, *LP*, 480 B.R. 669, 679 (Bankr. W.D. Tex. 2012), *citing In re Armstrong*, 294 B.R. 344, 354 (10th Cir. BAP 2003), *aff'd*, 97 Fed.Appx. 285 (10th Cir. 2004). Several courts have held that the question whether

---

For determining whether there was applicable insurance, Shirole, through counsel requested recent copies of enumerated insurance policies, confirmation of tender of claims under such policies, and confirmation that such policies were in place from August to December 2021, including, without limitation, D&O policies, EPL Policies, CGL policies, and excess policies.

Shirole, through counsel, followed up on January 15, 2023, and did not receive any documents in response.  On January 18, 2023, Shirole, through counsel, again followed up to request the above-referenced documents, in addition to copies of all closing documents and communications related to any of the Debtors' stock offerings in late 2021—early 2022 to establish share prices related to Shirole's claims.

On the morning of this Emergency Motion (January 27, 2023), Debtors produced myriad insurance policies requested by Shirole.  Debtors did not produce any reservation of rights letters or other documents regarding the tender of Shirole's claims to such insurers, as requested, nor, as of the date of this Emergency Motion, and despite follow-up emails from Shirole's counsel on January 18th and 24th, have the Debtors produced any of the requested financial documents or closing documents related to calculating the disputed amounts of the Claims.

[9] As noted on numerous occasions, Shirole's claims against the Debtors are made on a joint and several basis, though he is entitled to only one amount for his asserted claims.

a claimant to whose claim an objection has been filed is entitled to vote is a matter left to the discretion of the court. *In re Gen. Homes Corp*., 134 B.R. 853, 860 (Bankr. S.D. Tex. 1991), *citing In re Amarex*, 61 B.R. 301 (Bankr. W.D. Okla. 1985); *In re Goldstein*, 114 B.R. 430 (Bankr. E.D. Pa. 1990); *In re Coral Petroleum, Inc*., 60 B.R. 377 (Bankr. S.D. Tex. 1986).

Courts have considered numerous factors in deciding whether to temporarily allow claims for voting purposes.  In the case of *In re Harmony Holdings, LLC*, the South Carolina Bankruptcy Court found persuasive the factors considered in *In re Gardinier, Inc*., 55 B.R. 601 (Bankr. M.D. Fla. 1985), namely,

> (1) whether the objection to the claim at issue appears to be frivolous or without basis, (2) the effective power which the holder of the disputed claim may have to scuttle the reorganization proceeding, which is almost near completion, and (3) given the facts of that case, that the debtor was willing to preserve funds to pay the disputed claim under the terms of the plan in the event the claim was ultimately allowed.

*In re Mangia Pizza Invs*., *LP*, 480 B.R. at 680, citing  (Bankr. W.D. Tex. 2012), *citing In re Harmony Holdings, LLC*, 395 B.R. 350, 354 (Bankr. D. S.C. 2008).  Other courts have considered whether "the objection was filed too late to be heard prior to the confirmation hearing," or "when fully hearing the objection would delay administration of the case." *See In re Armstrong*, 294 B.R. at 354.  Yet other courts have considered the expectations of the parties regarding treatment of the claim as evidenced in the proposed plans. *See In re Stone Hedge Props*., 191 B.R. 59 (Bankr. M.D. Pa. 1995). Despite the vagaries of the factors to be considered, it is clear the Court has broad authority to determine whether to temporarily allow or disallow a claim for purposes of voting.

**B.      Shirole's Claims Should Be Allowed for Voting Purposes**

**1.      The Debtors' Objections were filed at the last minute, depriving Shirole of a fair opportunity to obtain evidence in support of his claim.**

First, this Court may consider whether the objection was filed late or "at the last minute," either to ensure acceptance of a plan or to avoid a proper hearing.  *In re Mangia Pizza Invs., LP*, 480 B.R. at 680. The parties to this dispute are quite familiar with one another. In the instant matter, despite the filing of Shirole's Claims on November 11, 2022, (not to mention Debtors' knowledge of the scope of Shirole's well-articulated claims set forth in the Minnesota Action and the filing of a motion for relief from stay seeking to pursue such claims outside of this case (*See* ECF 342)), the Objection to Shirole's claims by the Debtors did not occur until January 13, 2023—less than three weeks prior to the date on which his vote would be cast against or in favor of the Plan (February 1, 2023). *See* ECF #715. The delay in filing an objection—one that was likely anticipated by the Debtors weeks ago, smacks of gamesmanship and should not be countenanced (much less rewarded) by this Court. Further, Shirole has specifically requested that specific information be provided to him so that he can set forth the evidence necessary to demonstrate his Claims, yet such requests have not been satisfied as of the time of this Motion. (*See* FN 8, *supra*) Regardless, Shirole should be permitted to vote some aspect of his claim through the temporary allowance procedure invoked herein.

**2.      To the extent the Objection purports to render Shirole's Claim a nullity, it is without actual basis.**

In the Objection, the Debtors indicate that Shirole's Claims are objectionable for two reasons: (1) that the portion of his Claims related to the Debtors' failure to pay him for the value of his shares in the Debtors should be subordinated pursuant to 11 U.S.C. § 510(b), and (2) that

the remaining portion of his Claims (at least $11,319,967.93)[10] is subject to the statutory cap provided in 11 U.S.C. § 502(b)(7). Both aspects of the objection are without merit, and as a result, Shirole's claim should be temporarily allowed for purposes of voting.

a. **Shirole's claim for damages related to the Debtors' election to buyback his stock is not subject to mandatory subordination.**

First, the purpose of mandatory subordination is to protect a debtor and creditors from nefarious action of shareholders, not to permit a debtor to use its failure to abide by its obligations as a sword. "The statute was designed to prevent stockholders from reaping the benefit of unlimited profits without also fully accepting the inherent risks of ownership, namely loss of their investment." *In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 782 (Bankr. D. Del. 2004).

In the typical case where mandatory subordination is required, it is the shareholder who, recognizing that his investment in a debtor may not be recouped, invokes the debtor's obligation under applicable stock agreements to pay them pursuant to a buyback provision—completely the opposite of what has happened here.

Here, as part of its scheme to wrongly and discriminatorily terminate Shirole and abscond with the massive value he provided to the company (again, more than $2 billion in anticipated revenue),[11] the Debtors elected to buyback his shares—effectively converting ownership of the same to the Debtors with no plan to remit the corresponding consideration to him in exchange. This conduct, *engaged in by the Debtors*, rendered Shirole a creditor of the Debtors, and not an equity owner at the time of the filing of these chapter 11 cases. The Bankruptcy Code does condone or protect debtors from such predatory and inequitable conduct. As a result, Debtors' arguments in this respect are hollow and their Objection in this respect should be overruled.

---

[10] (*See* Exhibits K and L to the Shirole Decl.)

[11] (*See* Shirole Decl. at ¶ 22; Exhibit I to the Shirole Decl.)

> **b.** **The Debtors' Objection to Shirole's employment claims is frivolous.**

The gravamen of the Debtors Objection focuses on the "statutory cap" set forth in Section 502(b)(7) of the Code. (Debtors' Objection ¶¶ 23-25)  Of course, the Debtors concede in the Objection (as they must) that Shirole's claim should only be disallowed "to the extent the Claim exceeds the cap under Section 502(b)(7)." (*See* Objection, ¶ 24)  Section 502(b) of the Bankruptcy Code provides as follows:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> \*\*\*
>
> > 7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—
> >
> > > (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
> > >
> > > > (i) the date of the filing of the petition; or
> > > >
> > > > (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
> > >
> > > (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

*See* 11 U.S.C. § 502(b)(7).  Importantly, Shirole was an employee and officer of the Debtors prior to his termination. (Shirole Decl. at ¶ 1) The Debtors are well aware of Shirole's prior compensation actually paid in the year prior to his termination, as they paid him such

compensation.[12] With respect to the provisions of § 502(b)(7)(A), if employment of that statute was the true impetus and focus of the Objection, the Debtors could have sent him a "reduce and allow" objection that would have permitted him to vote a substantial amount with respect to the Plan. The Debtors did not do that. Instead, rather than permit Shirole the ability to vote on the Plan to the extent of a year's worth of compensation (which the Debtors could have easily calculated), the Debtors elected to completely disenfranchise Shirole with respect to the Plan— likely based on the indubitable adversity between the parties.

Further, the Debtors wholly ignore the provisions of § 502(b)(7)(B), which clearly provides that Shirole should be permitted to vote with respect to any amounts owed to him *at the time of his termination*.[13] 11 U.S.C. § 502(b)(7)(B). Incredibly, as set forth in Exhibit H to the Shirole Decl., as early as December 6, 2021, the Debtors were (and must remain) aware that their own records demonstrate owed commissions in the amount of *more than $3.9 million*. (*See* Exhibit H to the Shirole Decl.) Despite that, with respect to the Objection, Ryan Mersch, a director with Portage Point, the financial advisor to the Debtors, attested to "thoroughly reviewing the Claim" and the "Debtors' books and records." (*See* ECF 816-1 at ¶¶ 5 and 9) However, neither the Debtors, nor Mr. Mersch, makes any reference to the fact that the Debtor had previously provided Shirole with information demonstrating that at least $3.9 million in commissions was owed to him at the time of his termination.

Again, the Debtors, including their well-paid financial consultant (Portage Point), are in an equal (if not superior) position to evaluate whether or not certain commissions were earned by

---

[12] Shirole estimates that his actually paid compensation for the one-year period immediately prior to his termination is $1,352,672, a fact readily ascertainable by the Debtors. (*See* ¶ 37 to the Shirole Decl.)

[13] Mr. Shirole was terminated on December 8, 2021. (*See* Shirole Decl. at ¶ 10)

Shirole prior to his termination under the terms of the Commission Plan. While Shirole admits that the ultimate burden of proof with respect to his Claims may fall on him,[14] knowing that Shirole was not paid millions of dollars in commissions based on literally billions of dollars in sales, the Debtors could have permitted him to vote in some amount instead of simply objecting to his claim outright—especially in light of the onerous voting conditions and excessively expedited timeline on which such objections are to proceed in relation to confirmation (and ignoring, for the moment, the Debtors' abject failure to promptly respond to corresponding discovery requests—*despite a clear admonition from this Court in that regard at the hearing on January 17, 2023*).[15] But, it is beyond dispute that the Debtors sought instead to completely disenfranchise Mr. Shirole.

As a result, the Debtors' Objection, as presented, in this respect is frivolous, without actual basis, and is potentially in bad faith.  As a result, Shirole's claim should be temporarily allowed in the amount of $32,453,436.89 for purposes of voting on the Plan.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Shirole respectfully requests and prays that this Court hear this Emergency Motion on February 9, 2023 at 9:00 a.m. CT (concurrently with the previously scheduled, continued hearing on Movant's Motion for Relief from Stay [ECF 342]), and, thereafter, enter an order temporarily allowing Movant to vote his Claims with respect to the Plan, in the amount of $32,453,436.89. Shirole additionally requests such other and further relief which may be just and equitable, and to which he may be entitled.

---

[14] *See In re Fidelity Holding Co., Ltd.,* 837 F.2d 696, 698 (5th Cir. 1988).

[15] Again, the Objection, as filed, was not a "reduce and allow" objection, so absent the relief provided by this Court, Shirole would not have been able to vote. (*See* ECF 715, 816)

Dated: January 27, 2023

Respectfully submitted,

**BASSFORD REMELE**
*A Professional Association*

By:   */s/ Jeffrey D. Klobucar*
Jeffrey D. Klobucar (jklobucar@bassford.com)
MN State Bar No. 0389336
(*admitted pro hac vice* [ECF #190])
100 South Fifth Street, Suite 1500
Minneapolis, MN 55402
(612) 333-3000 – Telephone
(612) 746-1239 – Facsimile

J. Michael Sutherland (msutherland@ccsb.com)
State Bar No. 19524200
Southern District Admin. No. 13736
Robert C. Rowe (rrowe@ccsb.com)
State Bar No. 24086253
Southern District Admin. No. 3782278
**CARRINGTON, COLEMAN,**
**SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, TX 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**COUNSEL FOR ROHIT SHIROLE**

## CERTIFICATE OF SERVICE

The undersigned certifies that, on January 27, 2023, a true and correct copy of this document was properly served via ECF-Notice upon the following parties and/or their counsel of record:  the Debtors, the Official Committee of Unsecured Creditors, parties requesting notice, and the U.S. Trustee.

*/s/  J. Michael Sutherland*
J. Michael Sutherland