Jeffrey D. Klobucar (jklobucar@bassford.com)  
MN State Bar No. 0389336  
(*admitted pro hac vice* [ECF #190])  
**BASSFORD REMELE, P.A.**  
100 South Fifth Street, Suite 1500  
Minneapolis, MN 55402  
(612) 333-3000 – Telephone  
(612) 746-1239 - Facsimile  

J. Michael Sutherland (msutherland@ccsb.com)  
State Bar No. 19524200  
Robert C. Rowe (rrowe@ccsb.com)  
State Bar No. 24086253  
**CARRINGTON, COLEMAN,  
SLOMAN & BLUMENTHAL, L.L.P.**  
901 Main Street, Suite 5500  
Dallas, TX 75202  
(214) 855-3000 – Telephone  
(214) 580-2641 – Facsimile  

**BANKRUPTCY COUNSEL FOR ROHIT SHIROLE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **MINING PROJECT WIND DOWN** | § | |
| **HOLDINGS, INC. (f/k/a Compute** | § | **Case No. 22-90273 (MI)** |
| **North Holdings, Inc.),** *et al.*,[1] | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |
| | § | |

## ROHIT SHIROLE'S OBJECTION TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE DEBTORS' THIRD AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN, JOINDER, AND RESERVATION OF RIGHTS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, IL 60654.

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES ROHIT SHIROLE ("Shirole"), and files this *Objection to Final Approval of the Disclosure Statement and Confirmation of the Debtors' Third Amended Joint Liquidating Chapter 11 Plan, Joinder, and Reservation of Rights* (the "Objection"), and in support thereof would respectfully show the Court as follows:

## INTRODUCTION AND BASIS FOR RELIEF

On December 21, 2022, the Debtors obtained conditional approval of the adequacy of their proposed Disclosure Statement [ECF 723-2] (the "Disclosure Statement"), as well as approval to notice and solicit votes with respect to their Second Amended Joint Liquidating Chapter 11 Plan [ECF 723-1] (the "Second Plan"). On the eve of the deadline to object to the Second Plan, the Debtors filed their Third Amended Joint Liquidating Chapter 11 Plan (the "Plan") [ECF 889 – filed on January 31, 2023]. For myriad reasons, the Disclosure Statement is not deserving of final approval as it fails to provide creditors with adequate notice with respect to their respective rights to vote on the Plan and the consequences thereof. Further, the Plan cannot be confirmed as a matter of law in that, *inter alia*, it contains impermissible, broad, and unwarranted to releases of non-debtor third-parties, contrary to clear Fifth Circuit precedent, as well as in contravention to notions of equity and fairness.

## OBJECTION

**I. THE DISCLOSURE STATEMENT DOES NOT PROVIDE ADEQUATE INFORMATION.**

Bankruptcy Code section 1125 prohibits solicitation of votes on a chapter 11 plan prior to court approval of a written disclosure statement containing "adequate information." *See* 11 U.S.C. § 1125(b).

> The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.

*Texas Extrusion Corp. v. Lockheed Corp.* (*In re Texas Extrusion Corp.*), 844 F.2d 1142, 1157 (5th Cir.1988) (*vacated on other grounds*, *Adams v. First Fin. Dev. Corp.* (*In re First Fin. Dev. Corp.*), 960 F.2d 23 (5th Cir.1992). The Disclosure Statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable…that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 § 1125(a)(1); *Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998).

Among the important factors to be considered by creditors when evaluating a chapter 11 plan, are the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; the litigation likely to arise in a non-bankruptcy context; and the relationship of the debtor with the affiliates. *In re Divine Ripe, L.L.C*., 554 B.R. 395, 402 (Bankr. S.D. Tex. 2016), *citing In re Metrocraft Pub. Servs., Inc*., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). The extent to which the estate may recover assets to fund distributions is also an important concern to voting creditors as it assists in evaluating the estimated return. *See In re U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996).

Here, with respect to the Disclosure Statement, the Debtors provide a long list of potentially voidable transfers—including, without limitation, payments made within the 90 days prior to the petition date, payments made within a year prior to the petition dates (to insiders), and payments made under a Key Employee Retention Program voluntarily employed by the Debtor pre-petition (KERP payments). (*See* Exhibit C, Section III to the Disclosure Statement and appended Schedules 1-3, ECF 723-2 at pp. 150-161)

With respect to the non-insider preferences, the Debtors have disclosed that "the Debtors have not undertaken an analysis of defenses that could be raised by recipients of 90-Day Payments," and then speculate that such recipients may have defenses to such claims. (*See* Exhibit C, Section III to the Disclosure Statement at p. 150 of 162) Certainly, this is the case in every chapter 11 matter—it is hardly a reason to simply forego the actual analysis, or, for that matter, to justify the broad releases proposed in the Plan as to such recipients. The creditors are entitled to know whether the releases proposed by the Debtors with respect to such 90-Day Payments would obviate their (collective or respective) ability to realize a return on their allowed claims. The Disclosure Statement falls far short in that respect.

With respect to insider preferences (payments made within 1 year of the petition date to insiders of the Debtors), the Debtors disclose more than $4 million of such potentially actionable payments. While the Debtors provide information regarding the nature and timing of salary payments during this time (*See* Exhibit C, Section IV to the Disclosure Statement and Schedule 2), they do not disclose any information regarding the reasons for increases in salary for executives while the business crept towards insolvency. (*Id*.) Further, in nearly the same breath, they lump vastly different and substantial KERP payments into that same category of payments made in the year prior—which could serve to confuse creditors regarding whether all such payments within the one-year payment are to be similarly considered. (*See* Exhibit C, § IV and Schedule 3). In fact, significant information has been withheld regarding the KERP payments—namely the specific terms of such agreements, and information regarding the reasons such programs were necessary. For example, Mr. Harvey, the COO and President of the Debtors, received a payment of $20,000 on August 5, 2022, another payment of $50,000 25 days later, and a third payment of $60,000 the day before the chapter 11 cases were filed—totaling $130,000 in the 60 days prior to the filing

(knowing, most likely, that the filing was imminent). (*See* Exhibit C to the Disclosure Statement at Schedule 3) The Debtors disclose that such payments are not subject to avoidance because they have been deemed (all in the Debtors' view) not to have been earned until the occurrence of a future "Emergence Event," and thus, were purportedly not transferred "on account of an antecedent debt." (*Id.*) This "Emergence Event" seems, from the perspective of an unsecured creditor, to have been concocted specifically to permit insiders to potentially avoid preference liability. However, no disclosure is made as to whether the Debtors have analyzed the potential avoidance of such payments under some other theory of avoidance (e.g., as a preferential transfer on account of an antecedent debt that was merely subject to a condition subsequent, as a fraudulent transfer, or as a transfer unauthorized under §549 of the Bankruptcy Code, etc., or even whether the theory of money already transferred to such insiders on the eve of the petition date can truly be "earned" 6 months later as the Debtors (self-servingly) suggest).

Additionally, KERPs or "pay to stay" plans are, at least within the confines of a chapter 11 case, required to meet the standard set forth in 11 U.S.C. § 503(c)(1)—which generally bars Debtors from implementing such plans for the benefits of insiders. *See In re Country Fresh Holding Co. Inc.,* No. 21-30574, 2021 WL 2932680, at *5 (Bankr. S.D. Tex. July 12, 2021)*, citing In re Residential Cap.,* LLC, 478 B.R. 154, 169 (Bankr. S.D. N.Y. 2012). To the extent the Debtors made such decisions in contemplation of insolvency, but purposefully outside the scope of this case, information in that regard should be disclosed—the creditors are entitled to be informed of the Debtors' analysis of these issues to further determine whether they might be prejudiced under the Plan as a result.

Also, with respect to this particular plan, because of the substantial and broad releases of insiders—again, insiders who were paid hundreds of thousands of dollars in the time period

immediately preceding the filing of these chapter 11 cases—the relationship with the Debtors and their affiliates (including such insiders), requires far more than the cursory statements and recitations of the funds received and the dates they received them. Also, it is unclear from the Disclosure Statement whether the purportedly independent investigations by the Debtors (effectively, of themselves) have been coordinated with the Committee. Despite the Committee's somewhat abrupt departure from its previous position in opposition to the Plan on the evening before the deadline to object to the Plan, the extent and results of any such investigation have not yet been disclosed. (*See* ECF #888)

Further, the Disclosure Statement makes reference to provisions regarding the distribution of "Wind-Down Distributable Cash," to be distributed by the Distribution Agent on the Distribution Date in accordance with the Plan until all general unsecured claims are paid in full. (*See* Article I (D)(3)(c) of the Disclosure Statement, ECF 723-2, p. 18-19 of 162) Further, the Debtors assert that

> Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, on the Effective Date, the Debtors shall make initial distributions under the Plan on account of Allowed Claims, including those that become Allowed as of the Effective Date, subject to the Reorganized Debtors' right to object to Claims.

(*See* Article VI (A) of the Disclosure Statement, ECF 723-2, p. 46 of 162) The manner in which the Debtors intend to deal with Disputed Claims related to creditors' potential right to a distribution in the event of an Allowed Claim is unclear—thus precluding creditors from determining their rights in such instance.

Finally, the timing of the Plan Supplement is troubling as the final documents, including modified scheduled of retained actions, have been filed (and may continue to be filed) in the immediate days leading up to the voting deadline—occluding the full consequences of

confirmation from the creditor body. As such, as creditors will not have (and have not had) adequate information to determine whether the plan is in their respective best interests, the Disclosure Statement should not be finally approved.

## II.  THE PLAN SHOULD NOT BE CONFIRMED.

In order to confirm a plan, such plan must be proposed in good faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(3).  The Plan does not meet this standard, and confirmation should be denied.

### A.  The proposed releases are impermissible.

In the Plan, the Debtors propose to grant broad releases to, *inter alia*, their current and former officers, managers, and directors, with respect to nearly all claims (other than those arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court). (*See ¶* 9.4 of the Plan)  In addition, the Debtors also propose that all of the Releasing Parties (as defined in the Plan and which includes numerous non-consenting unsecured creditors) will "conclusively, absolutely, unconditionally, irrevocably, and forever [release and discharge] each Debtor, Reorganized Debtor, and each other Released Party (which includes such former officers, managers, and directors)" from every conceivable claim other than those excerpted from the releases.[2] (*See ¶* 9.3 of the Plan)  The Debtors frame these releases as being the subject of a subsumed Rule 9019 motion, occurring simultaneously with, and as a part of, confirmation of the Plan. (*See ¶¶* 9.3, 9.4 of the Plan; *passim*). But because the proposed releases in the Plan are neither fair, nor equitable, and because they

---

[2] Most notable is the exclusion of claims "arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court." (*See ¶¶* 9.3, 9.4 of the Plan)

effectively work to confer an impermissible discharge upon the Debtors within the confines of a liquidating plan, the Plan should not be confirmed.

### 1. The Plan effectively proposes an impermissible discharge as part of a liquidating plan.

As a preliminary matter, it is black-letter law that a liquidating plan may not provide for the discharge of the Debtor. *See* 11 U.S.C. § 1143(d). In the recent *Highland Capital* matter, among other things, the Fifth Circuit stated in relation to an expansive exculpation/release clause:

> The simple fact of the matter is that there is a circuit split concerning the effect and reach of § 524(e). Our court along with the Tenth Circuit hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code. *Pacific Lumber*, 584 F.3d at 252–53; *Landsing Diversified Props. V. First Nat'l Bank & Tr. Co. of Tulsa* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 600 (10th Cir. 1990) (*per curiam*).

*See Newpoint Advisors v. Highland Capital Management, L.P.* (*In re: Highland Capital Management, L.P.*, 48 F.4th 419, 436 (5th Cir. 2022); s*ee also, Bank of New York Trust Co. v. Official Unsecured Creditors' Comm*. (*In re Pacific Lumber Co.*), 584 F.3d 229, 251 (5th Cir. 2009); *In re Bigler*, 442 B.R. 537, 543–44 (Bankr. S.D. Tex. 2010); *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021). Further,

> An injunction preventing the post-confirmation prosecution of claims would certainly operate as a discharge of the Debtors. Accordingly, it is impermissible under the Code. For the same reasons, actions against property of the Estate may not be enjoined after the confirmation of a liquidating plan. § 1141(c) & (d)(3).

*In re Bigler,* 442 B.R. at 545-546.

Yet, despite this unequivocal authority, the practical effect of the provisions of the proposed Plan related to releases and injunctions is to discharge the Debtors from any claims for myriad forms of liability, from creditors large and small—unless, of course, all such creditors affirmatively act to reserve their rights (a reservation that the Bankruptcy Code and other

applicable law already affords them without such additional action). (*See* ¶¶ 9.3, 9.4, 9.6 of the Plan; 11 U.S.C. § 1143(d))  For all intents and purposes, the proposed releases are an attempt at an "end-around" with respect to the clear prohibitions on granting a discharge to liquidating debtors, and are thus, impermissible.

## 2. The proposed releases are neither fair nor equitable.

A compromise proposed in accordance with Bankruptcy Rule 9019 must be "fair and equitable" and in the best interests of the estate.  *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

> Five factors inform the "fair and equitable" analysis: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise.

*In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). The Debtor bears the burden of establishing that the balance of the factors supports such a finding.  *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008)(Isgur, J. and Steen, C.J.)  With respect to factor three, related to the paramount interest of creditors and a proper deference to their respective views, courts generally consider the consideration offered by the settling party and the degree to which creditors object.  *See Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* (*In re Cajun Elec. Power Coop.*), 119 F.3d 349 (5th Cir.1997); *In re Foster Mortgage Corp.*, 68 F.3d 914 (5th Cir.1995); *U.S. v. AWECO, Inc.*, 725 F.2d 293 (5th Cir.1984).

      **a.**      **There is no exchange of valuable consideration to support the releases offered to the Debtors' principals.**

With respect to such a resolution of potential claims within the auspices of Rule 9019, "[i]t is undeniable that a compromise must be based on valuable consideration." *See In re Jackson Brewing Co.*, 624 at 603. Here, according to the release language, the Released Parties, including the Debtors' principals (and anyone remotely related to them) are entitled to a release "in exchange for good and valuable consideration, including…the contributions and services of the Released Parties in facilitating the expeditions reorganization of the Debtors and implementation of the restructuring contemplated by the Plan…" (*See* ¶ 9.4 of the Plan)  With respect to the Debtors' officers, managers, and directors, such language seems to assume that these principals of the Debtors were not already bound by their fiduciary duties under applicable law to do so, and that they have not already been paid, handsomely, for such efforts (notably, with funds no longer in the estate that could have been used to satisfy the claims of the very creditors their services purportedly assisted). (*See* Exhibit C to the Disclosure Statement at Schedules 2 and 3) As noted by the Debtors in the Disclosure Statement, and assuming *arguendo* that Delaware law applies to the determination of such duties here,

> [u]nder Delaware law, officers and directors owe two fiduciary duties—the duty of care and the duty of loyalty. *Gantler v. Stephens*, 965 A.2d 695, 709-10 (Del. 2009) (holding that the standards governing the duty of care and the duty of loyalty are the same for officers and directors).

(*See* Exhibit C, ¶ II to the Disclosure Statement [ECF 723-2 p. 147 of 162])  Further, when an entity has reached the point of insolvency, it is well-settled that under Delaware law, the directors of a company owe fiduciary duties to the company's creditors. *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 790–91 (Del. Ch. 2004). "When a corporation is insolvent, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.

Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). Further, at least one theory of Delaware law, describes an

> insolvent corporation as becoming akin to a trust for the benefit of the creditors. This line of thinking has been termed the "trust fund doctrine." Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets.

*Id., citing Geren v. Quantum Chem. Corp.*, 1995 WL 737512, at *3 (2d Cir. Dec. 13, 1995); *Automatic Canteen Co. of America v. Wharton*, 358 F.2d 587, 590 (2d Cir.1966). Accordingly, these principals already had the legal obligation to provide their services in contribution to the Debtors' "reorganization" efforts and to take such steps as are necessary to implement their own proposed restructuring for the benefit of creditors of the Debtors' estates.[3] These individuals were free at any time to resign their positions if they were not satisfied with the compensation granted by the Debtors prior to the Petition Date or approved by the Bankruptcy Court (in advance) after the Petition Date.  However, they apparently did not resign and did not advance any motion to the

---

[3] For example, in exchange for his leadership and guidance of the company over the year prior to the filing, Dave Perrill, the Former President and CEO of the Debtors was paid more than $620,000 (aside from payments made to his personally owned entities related to the Debtors). (*See* Exhibit C to the Disclosure Statement, Schedule 2 [ECF 723-2, pp. 157-160])  With respect to KERP payments—payments designed to retain essential personnel to assist the company in its efforts to continue forward, Harold Coulby was paid $185,000, Jason Stokes was paid $170,000, Drake Harvey was paid $130,000, and Kyle Wenzel was paid $70,000 (totaling $555,000 among these four alone)—all within the 60 days prior to the filing of these chapter 11 cases. It is unfathomable that they should also be offered additional consideration for performing their already legally required duties at the expense of creditors—to which they owe fiduciary duties when the Debtors are insolvent.

Bankruptcy Court for any modified compensation arrangement. Any purported additionally necessary consideration is merely sleight of hand, and should not be countenanced.[4]

Further, the Plan (and the Disclosure Statement) is unclear about what, exactly, the estate receives in exchange for the releases it purports to confer on its officers, directors, and managers. In Exhibit C to the Disclosure Statement, the Debtors go through a panoply of statements regarding the uncertainty of litigation and the "parade of horribles" regarding potential outcomes were the Plan Administrator or the Trustee of the Litigation Trust to pursue certain claims (whether against insiders or recipients of 90-Day Payments). (*See* Exhibit C, Section III to the Disclosure Statement at p. 150 of 162) However, and somewhat paradoxically, the Debtors do not describe any instances of non-willful conduct that would make any practical sense for anyone to pursue against the Debtors' insiders.[5] But this fact does not justify the release; instead, it militates against it. If none of the claims against the Debtors or their insiders are truly plausible, as the Debtors assert— whether because they require a level of harm not within the purported scope of the release anyway (gross negligence, actual fraud, etc.), or because such claims are truly cost prohibitive, then the rationale for wasting the Court's and the creditors' time advocating for such treatment (when it is the subject of much dispute and is currently contrary to binding Fifth Circuit precedent) is unclear at best and at worst, suggests there is more than meets the eye with respect to claims the principals

---

[4] Although in the context of plan releases and exculpation, rather than "new value" to overcome absolute priority, the proposal is strangely reminiscent of the notion of "sweat equity" substituting for real value, rejected so long ago in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988). Here, it is hard to find the "sweat," or why the same labor by a chapter 11 trustee, independent plan trustee, or even a chapter 7 trustee would not suffice just as well or better.

[5] Again, the Debtors admit they did not analyze the bases for preference claims related to 90-Day Payments prior to soliciting approval of the Plan. (*See* Exhibit C, Section III to the Disclosure Statement at p. 150 of 162)

seek to have released (and have disclosed to creditors)—especially as these releases seem to be the *raison d'etre*, or at least a particularly important goal, of the underlying Plan.

    **B.**  **It is unclear that the treatment of creditors proposed in the Plan is better than the treatment creditors would receive in a chapter 7 case.**

  Section 1129(a)(7) provides that in order to confirm a plan, "each holder of a claim in a class either accept the plan or receive at least as much as it would receive in a chapter 7 liquidation." *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993). The Debtors have submitted competing liquidation analyses, but such analyses fail to set forth sufficient explanation as to why a chapter 7 trustee would be unable to, for example, sell property and equipment of the Debtors for the same price the Plan Administrator could, or why the cash proceeds estimated to be received in the chapter 11 analysis are $1,695,000, whereas the estimated proceeds to be received from asset sales in the chapter 7 analysis are more than $1 million less—especially when the estimates are both based on "initial bids received prior to November 25, 2022." (*See* Liquidation Analysis, ECF 723-2 pp. 134 and 140 of 142)

  Additionally, the liquidation analyses project a difference of more than $8 million between the sale of "property and equipment" in the Debtors' chapter 11 analysis when compared to their chapter 7 analysis. (*Id.*) Presumably, the same sale personnel or auctioneer would be available to an eventual chapter 7 trustee as would be available to the Plan Administrator—and such a gap seems wholly contrived. Shirole contends that the Debtors have not met their burden in this respect, and have failed to demonstrate that creditors would receive more as part of this likely highly contested chapter 11 matter.

    **C.**  **The claim estimation process outlined in the plan is untenable, contrary to law, and serves to deprive creditors of the right to have their claims adjudicated.**

  Bankruptcy Rule 3018 permits the Court to temporarily allow claims for purposes of voting—i.e., acceptance of rejection of a plan. 11 U.S.C. § 3018(a). To do this, practically, the

Court necessarily estimates the amount of the claim at issue. *In re TransAmerican Nat. Gas Corp.*, 79 B.R. 663, 666 (Bankr. S.D. Tex. 1987). However, these estimates for voting or other temporary purposes are not mandated by the Bankruptcy Code to be final, or serve as a future limitation on what a creditor might prove on a fulsome record related to its claim. However, this is precisely the conundrum the Debtors impermissibly seek to create for creditors under the terms of the Plan.

The Plan provides, in relevant part:

> Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. ***In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions)***, and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim or Interest.

(*See* Section 8.4 of the Plan, ECF 723-2, p. 115 of 162)(emphasis added) Such a provision is unduly prejudicial to a creditor who has sought to have its claim temporarily estimated for purposes of voting (or has been required to do so under the auspices of the Solicitation Procedures Order), but due to the expedited timeline of the confirmation process in this case (or for other reasons potentially outside its control), has been unable to have its claim adjudicated by the Bankruptcy Court (or other court of competent jurisdiction) prior to confirmation. The Debtors make no distinction in the Plan between claims estimated for voting purposes, and claims otherwise

estimated for purposes of allowance pursuant to 11 U.S.C. § 502(c).  Further, such a provision is in direct contravention to 11 U.S.C. § 502(j), which permits a creditor to seek reconsideration of a disallowed or allowed claim, for cause.

> **D. The Plan does not contain any Disputed Claims reserve or other manner in which to ensure claimants with Disputed Claims will be permitted to recover their ratable distribution in the event of an eventual Allowed Claim.**

"Section 1123(a)(4) requires a plan to provide the same treatment for each claim of a particular class. That means, as practical matter, that all allowed claims within a particular class should get the same treatment, and that if claims are disputed and not yet allowed (but have the potential to be allowed), reasonable measures must be taken to ensure that the required same treatment is received if and when they're allowed." *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011).  With respect to Disputed Claims, the Plan provides as follows:

> Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; provided that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

(*See* Section 8.7 of the Plan, ECF 723-2, p. 115 of 162)  It further provides:

> To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim or Interest the distributions (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

(*See* Section 8.8 of the Plan, ECF 723-2, p. 116 of 162) However, the Plan does not appear to contain a provision for a "disputed claims reserve" designed to avoid the discriminatory treatment precluded by section 1123(a)(4). It is thus unclear how the Plan will protect the interests of creditors with Disputed Claims (as defined in the Plan). Accordingly, the Plan should not be confirmed.

## RESERVATION OF RIGHTS AND JOINDER

Shirole expressly reserves all rights, interests, claims, administrative expense claims, counterclaims, rights of setoff and recoupment, and/or defenses pertaining to the same, including, but not limited to the right to further amend, modify, and/or supplement this objection and to raise additional objections at or before the hearing on confirmation of the Plan (and at any subsequent hearing), including serving additional discovery and requesting and conducting depositions as necessary, and hereby joins in the objections of other parties in interest to the extent not inconsistent herewith.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, because the Plan does not comport with applicable law, Shirole respectfully requests and prays that this Court sustain his objection, deny confirmation of the Plan, and grant such other and further relief which may be just and equitable, and to which he may be entitled.

Dated: February 1, 2023        Respectfully submitted,

      **BASSFORD REMELE**
      *A Professional Association*

By:   */s/ Jeffrey D. Klobucar*
      Jeffrey D. Klobucar (jklobucar@bassford.com)
      MN State Bar No. 0389336
      (*admitted pro hac vice* [ECF #190])
      100 South Fifth Street, Suite 1500
      Minneapolis, MN  55402
      (612) 333-3000 – Telephone
      (612) 746-1239 – Facsimile

      J. Michael Sutherland (msutherland@ccsb.com)
      State Bar No. 19524200
      Southern District Admin. No. 13736
      Robert C. Rowe (rrowe@ccsb.com)
      State Bar No. 24086253
      Southern District Admin No. 3782278
      **CARRINGTON, COLEMAN,**
      **SLOMAN & BLUMENTHAL, L.L.P.**
      901 Main Street, Suite 5500
      Dallas, TX  75202
      (214) 855-3000 – Telephone
      (214) 580-2641 – Facsimile

      **COUNSEL FOR ROHIT SHIROLE**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of this document was properly served on this 1st day of February, 2023, upon all parties receiving notices by Pacer/ECF.  Further service, if and as appropriate, will be noted in a corresponding supplemental certificate of service.

      */s/ J. Michael Sutherland*
      J. Michael Sutherland