IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*,<br><br>Debtors.[1] | § Chapter 11<br>§<br>§ Case No. 22-90273 (MI)<br>§<br>§ (Jointly Administered)<br>§<br>§ **Re: Docket No. 889** |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF MINING PROJECT WIND DOWN HOLDINGS, INC. (F/K/A COMPUTE NORTH HOLDINGS, INC.) AND ITS DEBTOR AFFILIATES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors (collectively, the "Debtors") submits this statement (the "Statement") in support of confirmation of the *Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and Its Debtor Affiliates* [ECF No. 889] (the "Plan").[2] In support of confirmation, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, IL 60654.

[2] Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Plan.

**PRELIMINARY STATEMENT**

1. The Committee fully supports Plan confirmation. The Plan—which is the culmination of extensive negotiations between the Debtors, the Committee, and other stakeholders—embodies the spirit of compromise that animates the chapter 11 process. The Plan is the product of the Debtors' and the Committee's efforts to create an efficient process for the wind down of the Debtors' estates. After careful analysis and consultation with its advisors, the Committee is convinced the Plan offers the greatest potential for recoveries to unsecured creditors and represents the best possible outcome in these cases.

2. Importantly, the Plan preserves both potential causes of action against certain of the Debtors' current and former directors and officers, as well as one of the estates' most significant remaining assets—the Retained Causes of Action. To maximize value for unsecured creditors, the Committee negotiated extensively with the Debtors regarding the Plan release provisions and insisted upon the creation of a Litigation Trust to ensure these assets would be preserved for creditors' benefit. The Committee worked closely with the Debtors to identify viable estate claims that could be pursued post-confirmation to increase creditors' ultimate recoveries. The parties also worked together to determine the best governance structure for the Litigation Trust, which will be overseen by the creditors themselves through the Plan Oversight Committee. And, until the Plan becomes effective, the Committee will continue in its fiduciary role to ensure that the interests of unsecured creditors are paramount as the Plan is consummated.

3. As a result of the parties' efforts, unsecured creditors will receive more than they would in a hypothetical liquidation. Thus, based upon extensive analysis, and in full exercise of its fiduciary duties, the Committee has determined that the Plan provides the best possible means to expeditiously wind down the Debtors' operations, preserve remaining estate value, and

distribute that value to the creditor body. In addition, the Committee expects that the Debtors will demonstrate, by the evidence that will be adduced at the Confirmation Hearing, that the Plan satisfies the applicable requirements of Bankruptcy Code section 1129—that the Plan was proposed in good faith, appropriately classifies claims and interests, is fair and equitable—and otherwise complies with the Bankruptcy Code's confirmation requirements. For these reasons, the Committee will request at the Confirmation Hearing that the Court confirm the Plan.

## RELEVANT BACKGROUND

4. The Debtors commenced these cases on September 22, 2022, and the Committee was appointed shortly thereafter.[3] The Debtors continue to operate their businesses and manage their properties as debtors in possession.

5. On November 23, 2022, the Debtors filed the original version of their chapter 11 plan (the "Original Plan").[4] Subsequently, on December 16, 2022, the Debtors filed an amended version of the Original Plan (the "Amended Plan").[5] The Debtors filed a second amended plan on December 19, 2022.[6] On December 21, 2022, after having overruled the Committee's objections[7] at a hearing on the Debtors' motion seeking conditional approval of the Debtors' disclosure statement (the "Disclosure Statement")[8] and certain related relief, the Court entered an

---

[3] ECF No. 139. On February 7, 2023, the U.S. Trustee reconstituted the Committee following the resignation of one of its members. *See The United States Trustee's Notice of Appointment of Reconstituted Committee of Unsecured Creditors* [ECF No. 928].

[4] ECF No. 576.

[5] ECF No. 665.

[6] ECF No. 684.

[7] ECF Nos. 663, 702.

[8] The solicitation version of the Disclosure Statement is available at ECF No. 723.

3

order[9] that approved the Disclosure Statement on a conditional basis and approved the procedures for soliciting votes on the Plan. Solicitation followed.

6. While solicitation was ongoing, the Committee and the Debtors worked diligently to address the Committee's objections to confirmation and final approval of the Disclosure Statement. After several weeks of good-faith, arm's-length negotiations, the Debtors and Committee reached an agreement that is embodied in the current iteration of the Plan, which was filed on January 31, 2022. Significantly, the Plan provides for scaled-back releases and the creation of a Litigation Trust that will be responsible for pursuing causes of action, including the Retained Causes of Action,[10] for the benefit of unsecured creditors.

7. The revised release provisions in the Plan release the Debtors' claims against, among others, specifically identified directors and officers, each of whom served in his/her respective position as of the Petition Date and therefore necessarily provided value to the estates via the efforts attendant to the chapter 11 process.[11] At the same time, claims against directors and officers who served in their respective position as of the Petition Date, but who are not specifically identified in the Plan, are released solely to the extent such persons' liability for any wrongful acts exceeds the applicable combined limits of the Debtors' D&O Policies.[12] Moreover, directors and officers who did not hold their positions as of the Petition Date will not receive releases under the Plan.[13] Thus, the Plan preserves the optionality to (i) complete a post-confirmation investigation into whether there are causes of action against certain of the Debtors'

---

[9] ECF No. 715.

[10] The Second Amended Schedule of Retained Causes of Action is available at ECF No. 843-1.

[11] *See* Plan § 1.1.98 ("Released Parties").

[12] *See id.*

[13] *See id.*

4

current and former directors and officers based on prepetition conduct and (ii) pursue those causes of action in an effort to increase creditor recoveries.

8. Furthermore, the Debtors and the Committee, along with their respective advisors, worked cooperatively to identify claims and causes of action against third parties that could be pursued post-confirmation to enhance creditor recoveries. One such third party is Corpus Christi Energy Park, LLC, which is affiliated with Bootstrap Energy, LLC (for ease, these entities and any related parties are referred to collectively as "CCEP"). The Debtors and CCEP are party to various commercial arrangements that were entered into in connection with a planned data center in Corpus Christi, Texas, known as "Bootstrap." The Debtors have determined that the estates hold numerous and significant claims against CCEP arising out of the parties' dealings.[14] These claims are being assigned to the Litigation Trust so they can be pursued following confirmation.

## STATEMENT

9. Three objections to Plan confirmation were filed.[15] One objection, filed by Rohit Shirole,[16] has been deemed withdrawn pursuant to the *Agreed Order Resolving Rohit Shirole's Motion for Relief Under 11 U.S.C. § 362(d) from Automatic Stay to Continue Litigation Against Certain Debtors and Waiver of 30-Day Hearing Requirement*.[17] Another objection was filed by CCEP (the "CCEP Objection"),[18] which, given CCEP's status as one of the Litigation Trust's

---

[14] The Amended Schedule of Retained Causes of Action explains that the estates have "numerous claims and Causes of Action against Bootstrap, including claims and Causes of Action arising under chapter 5 of the Bankruptcy Code (including claims for turnover, fraudulent transfers under federal and state law, and preferential transfers), claims and Causes of action for breach of contract, equitable relief, negligence, conversion and other intentional torts, breach of express and implied warranties, statutory and common law claims and Causes of Action, and other claims or Causes of Action arising from or related to, in any way, the Debtors' commercial dealings with Bootstrap." ECF No. 835-2 at 6.

[15] ECF Nos. 894; 897; 899.

[16] ECF No. 894.

[17] ECF No. 920.

[18] ECF No. 897.

5

primary targets, is not surprising. The CCEP Objection, however, lacks merit and should be overruled. The other remaining objection (the "Decimal Objection"), filed by Decimal Digital Currency I, LLC ("Decimal"), is, fundamentally, not an objection to the Plan. Rather, it is an objection to the Debtors selling certain "Acquired Hardware" that Decimal contends it owns. The Committee believes that Decimal's concerns easily can be addressed without altering the Plan in any way. The CCEP Objection and the Decimal Objection should therefore be overruled.

## I. The CCEP Objection

10. The CCEP Objection comprises a self-serving attempt to insulate itself from litigation at the expense of other creditors and should be overruled.

11. *First*, CCEP states that the Plan is "retaliatory" and therefore not filed in good faith. CCEP Objection ¶¶ 12–13. "Bankruptcy courts normally construe [the good-faith requirement in] § 1129(a)(3) narrowly." *In re Double H Transportation LLC*, 603 F. Supp. 3d 468, 477 (W.D. Tex. 2022). "A plan may not be the one that the creditors would themselves design and may indeed not be confirmed and yet still pass the good faith requirement." *In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993). When a plan is "proposed with [a] legitimate and honest purpose" and "has a reasonable hope of success," the good faith requirement is satisfied. *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

12. The basis for CCEP's good-faith argument is that, after a potential sale transaction between the Debtors and CCEP was abandoned, the Debtors "reclassified" CCEP's claim in retaliation. That argument ignores the realities of the parties' contemplated deal. When the Original Plan was filed on November 23, negotiations were ongoing. Prior to CCEP walking

away from the sale on December 15,[19] the expectation was that CCEP's claim would be resolved as part of that deal. As the Debtors have stated, "a sale transaction between the Parties was contemplated and negotiated, but never ultimately finalized, whereby, among other things, Bootstrap offered to release its prepetition Claim."[20] Because CCEP was expected to have no claim, there was no need to account for it in the Original Plan. When circumstances changed, the Original Plan was amended in light of those changed circumstances. Effectively, the Amended Plan did not "reclassify" CCEP's claim—it classified it for the first time. Further, in connection with its ongoing sale efforts throughout these cases, it is the Committee's understanding that the Debtors extensively marketed the Bootstrap project. Only when those efforts failed to deliver a buyer did it become clear that there was no value to distribute on account of the Bootstrap project, a fact that needed to be reflected in the Plan.

13. The facts make clear that the purpose of the amendments of which CCEP makes issue was to adapt the Plan to a changing economic reality, not to "retaliate" against CCEP. Because the Plan was "proposed with the legitimate and honest purpose" of effectively and expeditiously winding down the Debtors' estates "and has a reasonable hope of success," the Plan was proposed in good faith. *See Sun Country*, 764 F.2d at 408.

14. **Second**, CCEP states that the Plan unfairly discriminates against Class 3A. CCEP Objection ¶ 15. "Unfair discrimination works only among claimants of equal nonbankruptcy priority." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 698 (Bankr. N.D. Tex. 2013) (quoting 7 Collier on Bankruptcy ¶ 1129.03[3][b][ix] (16th ed.)). Thus, the unfair discrimination

---

[19] The Introduction to the CCEP Objection describes "the December 15, 2022 termination of CCEP's and Debtors' contract buyout negotiations."

[20] ECF No. 860 ¶ 5.

test requires that the relevant classes "have similar legal entitlements against the debtor." *In re Landing Assocs., Ltd.*, 157 B.R. 791, 822 (Bankr. W.D. Tex. 1993).

15. Class 3A consists of holders whose claims are against a single Debtor—Mining Project Wind Down Corpus Christi LLC f/k/a CN Corpus Christi LLC ("CNCC")—an entity with no assets to distribute to creditors. The members of Class 3A do not have recourse against other Debtors, so they do not "have similar legal entitlements" when compared to creditors of Debtors that do have assets to distribute. Because "[t]he two kinds of claims have entirely different legal entitlements against the estate's assets," the "unfair discrimination analysis is actually inapposite." *See Landing Assocs.*, 157 B.R. at 822.

16. **Third**, CCEP states that the Plan is not fair and equitable. CCEP Objection ¶ 19. "When assessing whether a plan is 'fair and equitable' in a cramdown scenario, courts must invoke the absolute-priority rule." *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 433 (5th Cir. 2022). CCEP contends that the Plan violates the absolute priority rule because Classes 7 and 8—consisting of equity interests in the Debtors' ultimate parent, Mining Project Wind Down Holdings, Inc. f/k/a Compute North Holdings, Inc. ("Holdings")[21]—could theoretically (but not realistically) receive a distribution.

17. CCEP ignores the fact that Class 6—consisting of Intercompany Interests (i.e., "any Interest held by a Debtor in another Debtor" Plan § 1.1.65)—will "not receive or retain any distribution, property, or other value on account of its Intercompany Interest." Plan § 3.2.7.2.

---

[21] CCEP mistakenly states that Classes 7 and 8 "consist of claims for equity interests *in the various Debtors*." CCEP Objection ¶ 21. That statement is incorrect because those classes consist solely of equity interests (preferred and common) in a single Debtor—Holdings. *See* Plan §§ 3.2.8.1 ("Class 7 consists of all Preferred Equity Interests."), 1.1.87 ("'*Preferred Equity Interests*' means the Series C Convertible Preferred Stock and the Series C-1 Convertible Preferred Stock issued by Holdings . . . ."), 3.2.9.1 ("Class 8 consists of all Parent Equity Interests."), and 1.1.74 ("'*Parent Equity Interests*' means the outstanding Class A Voting Common Stock and the Class B Voting Common Stock, issued by Holdings . . . .").

The relevant Debtor entity for present purposes (CNCC) is wholly owned by another Debtor, Mining Project Wind Down LLC f/k/a Compute North LLC ("LLC"). Section 1129(b)(2)(B) prevents "the holder of any . . . interest that is junior to the claims of [the relevant unsecured] class" from "receiv[ing] or retain[ing] under the plan on account of such junior . . . interest any property." *See* 11 U.S.C. § 1129(b)(2)(B)(ii). In this case, LLC is not receiving (and cannot possibly receive) a distribution "on account of" its junior interest in CNCC (because its Intercompany Interest is being wiped out). The possibility that separate Debtor entities in another branch of the corporate structure could (in theory) prove solvent and allow for equity to recover is irrelevant to whether the Plan is fair and equitable with respect to Class 3A.

18.     **Fourth**, CCEP states that the Plan's classification scheme violates the principle that similar claims will normally be classified together. CCEP Objection ¶ 22. However, "the Fifth Circuit has recognized that separate classification of claims of equal rank and priority may, in certain circumstances, be justified." *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007). "Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme." *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), *aff'd*, 662 F.3d 315 (5th Cir. 2011).

19.     The creditors of CNCC in Class 3A have different legal rights than creditors holding claims against other Debtors, which is a proper basis for classifying the claims separately. *See, e.g.*, *Idearc*, 423 B.R. at 160 ("The Plan's classification scheme is rationally based because it is based on the ***respective legal rights*** of each holder of a Claim against or Idearc Interest in the ***applicable Debtor's Estate***") (emphasis added). Separate classification of Class 3A based upon its "respective legal rights" vis-à-vis the "applicable Debtor's Estate" is

9

entirely legitimate. In *Mallinckrodt*, for example, a noteholder maintained that two series of notes should be in the same class because they shared "equal rights and priority." *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022). The two sets of notes, however, provided holders with recourse against different debtor entities. Although the notes were issued by the same debtor, one set was "guaranteed only by the parent company" while the other set was "guaranteed by 60 other debtor entities." *Id*. Because the notes had "different structuring rights" and the noteholders had "different prebankruptcy entitlements," "they [could] be classified separately." *Id*. The same is true here—claims in Class 3A have different rights and entitlements with respect to different debtor entities, which supports their classification.

20. Furthermore, courts, including the Fifth Circuit, hold that a "non-creditor interest" can justify separate classification. *In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993); *see also Heritage Org.*, 375 B.R. 230, 303–04 (Bankr. N.D. Tex. 2007) (explaining that "courts have permitted separate classification of claims where a particular group of claimants holds a 'non-creditor' interest that may affect its voting on a plan" and citing a myriad of examples). Thus, "separate classification of a claim whose holder's vote would likely be cast for 'ulterior motives' is permissible" and plans "have done so specifically **when the creditor was a litigation target**." *In re Novinda Corp.*, 585 B.R. 145, 156 (B.A.P. 10th Cir. 2018) (emphasis added).

21. Judge Houser's decision in *Heritage Organization, L.L.C.* addressed a similar scenario. *See* 375 B.R. 230. There, certain creditors (the "Kornman Parties") were placed in a separate class from other general unsecured claimants. Predictably, the Kornman Parties challenged the plan's classification scheme. The court, however, found that the Kornman Parties held "a non-creditor interest by virtue of their litigation exposure and their status as targets in the

10

Kornman Adversary Proceeding and other litigation" and therefore had "every motivation to block approval of the settlements and confirmation of the Second Amended Plan for reasons having little to do with their status as contingent, indemnification creditors." *Id*. at 305. The court explained that the Kornman Parties had a "unique interest" in seeing that "the Heritage estate remain administratively insolvent and unable to fund the high cost of continued litigation against them." *Id*. Because this non-creditor interest was a legitimate basis for separate classification, the Kornman Parties' objection was overruled. *Id*. at 306.

22. Here, the estates have significant claims against CCEP that the Plan is assigning to the Litigation Trust to pursue post-confirmation. CCEP's own claims, on the other hand, are against an entity with no assets to distribute to its creditors, meaning that CCEP has nothing to gain from the Plan's confirmation. The result is that CCEP would benefit tremendously from having the Plan fail, even if the Plan is highly favorable to the creditor body. Accordingly, like the Kornman Parties, CCEP has a significant non-creditor interest in rendering the Debtors' estates "administratively insolvent and unable to fund the high cost of [] litigation against [it]." In light of its overriding non-creditor interest, CCEP's objection to the Plan is hardly surprising.

23. Because there are "reasonable bas[e]s for the classification scheme," *Idearc*, 423 B.R. at 160, the scheme does not contravene the rule that "claims may not be classified separately ***solely*** to gerrymander a favorable vote on a plan." *In re Premiere Network Servs., Inc.*, 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005) (emphasis added).

24. ***Fifth***, CCEP states that the Plan cannot be confirmed because it does not comply with the "best interests of creditors" test under Bankruptcy Code section 1129(a)(7). CCEP Objection ¶ 25–26. Satisfying the best-interests test requires the plan proponent to show "that each dissenting creditor [will] receive at least as much as they would in a hypothetical Chapter 7

11

liquidation of the Debtor." *In re LMR, LLC*, 496 B.R. 410, 440 (Bankr. W.D. Tex. 2013). Here, the Debtors' uncontroverted Liquidation Analysis[22] demonstrates that creditors of CNCC in Class 3A are receiving ***precisely*** what they would receive in a chapter 7 liquidation, and there is no evidence that this conclusion is incorrect. The Plan therefore satisfies the best-interests test.

25. **Sixth**, CCEP incorrectly states that the Plan is unconfirmable under Bankruptcy Code section 1129(a)(10) because no impaired class has accepted the Plan. CCEP Objection ¶ 27. It is the Committee's understanding, however, that at least one impaired class has accepted the Plan, a fact that will be borne out in the to-be-filed voting results. Numerous courts—including the only court of appeals to consider the issue—have concluded that section 1129(a)(10) applies on a "per plan" not "per debtor" basis. *See, e.g.*, *JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props., Inc. (In re Transwest Resort Props., Inc.)*, 881 F.3d 724, 729 (9th Cir. 2018) (applying section 1129(a)(10) on a "per-plan" basis and noting that "Congress could have required plan approval from an impaired class for each debtor involved in a plan, but it did not do so"); *In re Station Casinos, Inc.*, Case No. BK-09-52477, 2010 WL 11492265, at *23 (Bankr. D. Nev. Aug. 27, 2010) (finding that "the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10)"); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) ("it is appropriate to test compliance with section 1129(a)(10) on a per-plan basis"), *appeal dismissed sub nom. R2 Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *In re SGPA, Inc.*, Case No. 1-01-02609, 2001 Bankr. LEXIS

---

[22] The Liquidation Analysis is Exhibit B to the Disclosure Statement. ECF No. 723-2.

2291, at *21–22 (Bankr. M.D. Pa. Sept. 28, 2001) (same). As long as one impaired class accepts the Plan, section 1129(a)(10) is satisfied and the Plan is confirmable.

26. **Seventh**, CCEP objects to final approval of the Disclosure Statement, asserting that the Disclosure Statement does not provide adequate information regarding the Plan. CCEP Objection ¶ 28. First, contrary to CCEP's assertion, the Disclosure Statement does explain, in clear terms, the basis for the Plan's classification of claims.[23] Second, the reconstitution of the various Debtor entities is explained in detail in the Wind Down Transactions Memorandum filed as part of the Plan Supplement.[24] Thus, CCEP's disclosure objections are unfounded.

27. From the Committee's perspective, though, the disclosure objections' legal deficiencies are not the most concerning part. More troubling is the fact that these purported problems were plainly cooked up after the fact in an attempt to give CCEP's objection more weight. Conspicuously, CCEP never raised any concerns regarding the Disclosure Statement's adequacy when the Debtors first sought conditional approval. Indeed, despite appearing at the December 20 hearing where the Court conditionally approved the Disclosure Statement, counsel for CCEP never indicated that the Disclosure Statement was inadequate in any respect.[25] CCEP opted instead to wait until the eleventh hour, after votes had been cast, to assert its baseless disclosure objection. If CCEP had raised concerns regarding the Disclosure Statement initially, the Debtors could have addressed them before solicitation. However, ensuring that creditors receive adequate information is obviously not CCEP's end game.

---

[23] With respect to Class 3A – CNCC GUC Claims, the Disclosure Statement provides that this class: "Represents claims filed against CN Corpus Christi LLC for various costs related to the partially developed Corpus Christi Project. Despite diligent efforts, CN Corpus Christi LLC was unable to obtain an actionable offer to acquire the Corpus Christ Project, and, thus, there are no anticipated cash proceeds from a sale of this Debtor's assets. As a result, the Debtors anticipate that there will be no distributions to creditors in this class."

[24] The Wind Down Transactions Memorandum is available as Exhibit C to ECF No. 835.

[25] *See generally* Hearing Tr. (December 20, 2022), ECF No. 754.

28.     CCEP undoubtedly is aware that denying final approval of the Disclosure Statement at this late stage would necessitate a costly and time-consuming re-solicitation process. Re-solicitation would prejudice creditors infinitely more than any of CCEP's contrived disclosure deficiencies. Despite its feigned concern over creditors' welfare, CCEP is more than willing to jeopardize creditors' recoveries and risk the estates becoming administratively insolvent in order to advance its own parochial interests. The Court should reject CCEP's transparent ploy to manufacture leverage at the expense of the creditor body and grant approval of the Disclosure Statement on a final basis.

## II.     The Decimal Objection

29.     Although styled as a confirmation objection, the Decimal Objection, at bottom, concerns the possibility that the Debtors may sell certain "Acquired Hardware" allegedly belonging to Decimal. The Committee agrees with Decimal's assertion that nothing in the Bankruptcy Code expressly or implicitly allows a debtor to sell property in which the debtor's estate has no interest.[26] The Plan, however, does not purport to allow the Debtors to sell property that they do not own. The Committee further has no intention of allowing the Debtors to sell property that rightfully belongs to creditors, and would expect the Plan Oversight Committee similarly to protect creditor interests. To the extent clarifying language in the Confirmation Order will assuage Decimal's concerns, the Committee would support the inclusion of such language. The Committee submits, however, that outright denial of confirmation of the Plan is unnecessary.

---

[26] *See* Decimal Objection ¶ 2.

14

## **RESERVATION OF RIGHTS**

30. The Committee reserves all rights to supplement this Statement in advance of the Confirmation Hearing, respond to any supplemental objections to the Plan or to any modifications to the Plan, and to address any such issues at the Confirmation Hearing.

**CONCLUSION**

For the reasons stated, the Committee respectfully requests that the Court overrule the CCEP Objection and the Decimal Objection and grant such other and further relief as the Court may deem just and proper. Furthermore, based on the evidence the Committee anticipates will be adduced at the Confirmation Hearing regarding satisfaction of the applicable requirements of Bankruptcy Code section 1129, the Committee will respectfully request that the Court confirm the Plan.

Dated: February 8, 2023

Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

/s/ *Charles R. Gibbs*
Charles R. Gibbs
Texas State Bar No. 7846300
2501 North Harwood Street, Suite 1900
Dallas, TX 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mwe.com

- *and* -

Kristin K. Going (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
Stacy A. Lutkus (admitted *pro hac vice*)
Natalie Rowles (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY 10017-5404
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: kgoing@mwe.com
    dazman@mwe.com
    salutkus@mwe.com
    nrowles@mwe.com

*Counsel to the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

     I certify that on February 8, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                         /s/ *Charles R. Gibbs*
                                          Charles R. Gibbs