# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MINING PROJECT WIND DOWN HOLDINGS, INC. | ) | Case No. 22-90273 (MI) |
| (f/k/a Compute North Holdings, Inc.), *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF (A) FINAL APPROVAL OF DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THIRD AMENDED JOINT LIQUIDATING CHAPTER 11 PLAN OF MINING PROJECT WIND DOWN HOLDINGS, INC. (F/K/A COMPUTE NORTH HOLDINGS, INC.) AND ITS DEBTOR AFFILIATES (II) OMNIBUS REPLY TO OBJECTIONS THERETO

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185 (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (257); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, Illinois 60654.

# TABLE OF CONTENTS

**Page**

RELIEF REQUESTED..................................................................................................... 1

ARGUMENT .................................................................................................................... 5

I.     CASE BACKGROUND AND OBJECTIONS. ....................................................... 6

     A.    Wind-Down Transactions. ...................................................................... 10

     B.    Classification and Treatment of Claims and Interests. ......................... 14

     C.    The Solicitation Process and Voting Results. ....................................... 18

     D.    Objections. ............................................................................................ 21

          1.    Bootstrap Objection. ................................................................ 21

II.    FINAL APPROVAL OF THE DISCLOSURE STATEMENT IS WARRANTED
     AND THE DEBTORS COMPLIED WITH THE SOLICITATION
     PROCEDURES ORDER. ..................................................................................... 28

     A.    The Disclosure Statement Satisfies the Requirements of the Bankruptcy
         Code. ...................................................................................................... 28

          1.    The Disclosure Statement Contains Adequate Information.................... 28

     B.    The Debtors Complied with the Solicitation Procedures Order. ......................... 31

          1.    The Debtors Complied with the Notice Requirements Set Forth in
             the Solicitation Procedures Order. .............................................. 31

          2.    The Ballots Used to Solicit Holders of Claims Entitled to Vote on
             the Plan Complied with the Solicitation Procedures Order. .................... 33

          3.    The Debtors' Solicitation Period Complied with the Solicitation
             Procedures Order and Bankruptcy Rule 3018(b)................................... 33

          4.    The Debtors' Vote Tabulation Procedures Complied with the
             Solicitation Procedures Order. ................................................... 33

          5.    Waiver of Certain Solicitation Package Mailings................................... 34

          6.    Solicitation of the Plan Complied with the Bankruptcy Code and
             Was in Good Faith. .................................................................. 34

III.   THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE
     BANKRUPTCY CODE AND SHOULD BE CONFIRMED. ........................................ 35

     A.    The Plan Complies with the Applicable Provisions of the Bankruptcy
         Code (§ 1129(a)(1)). ................................................................................. 35

          1.    The Plan Satisfies the Classification Requirements of Section 1122
             of the Bankruptcy Code. .......................................................... 35

          2.    The Plan Satisfies the Mandatory Plan Requirements of
             Section 1123(a) of the Bankruptcy Code.................................... 39

3.      The Plan Complies with the Discretionary Provisions of
        Section 1123(b) of the Bankruptcy Code...................................................... 42

4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.......... 62

B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy
        Code (§ 1129(a)(2)). ..................................................................................... 62

1.      The Debtors Complied with Section 1125 of the Bankruptcy Code. ...... 63

2.      The Debtors Complied with Section 1126 of the Bankruptcy Code. ...... 63

C.      The Plan Is Proposed in Good Faith (§ 1129(a)(3)). ........................................... 65

D.      The Plan Provides that the Debtors' Payment of Professional Fees and
        Expenses Are Subject to Court Approval (§ 1129(a)(4)). ................................... 67

E.      The Debtors Disclosed All Necessary Information Regarding Directors,
        Officers, and Insiders (§ 1129(a)(5)). ................................................................ 68

F.      The Plan Does Not Require Governmental Regulatory Approval
        (§ 1129(a)(6)). ................................................................................................... 69

G.      The Plan Satisfies the Best Interests Test (§ 1129(a)(7)). .................................. 70

H.      The Plan Is Confirmable Notwithstanding the Requirements of
        Section 1129(a)(8) of the Bankruptcy Code. ...................................................... 71

I.      The Plan Provides for Payment in Full of All Allowed Priority Claims
        (§ 1129(a)(9)). ................................................................................................... 72

J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
        (§ 1129(a)(10)). .................................................................................................. 73

K.      The Plan Is Feasible (§ 1129(a)(11)). ................................................................ 74

L.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ........................ 77

M.      Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Inapplicable. .............. 77

N.      Section 1129(c) of the Bankruptcy Code Is Inapplicable. .................................. 79

O.      The Plan Complies with the Other Provisions of Section 1129 of the
        Bankruptcy Code (Section 1129(d)–(e))............................................................. 79

P.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of
        the Bankruptcy Code........................................................................................... 80

1.      The Plan Does Not Unfairly Discriminate with Respect to the
        Impaired Classes that Have Not Voted to Accept the Plan
        (§ 1129(b)(1)). ................................................................................................. 81

2.      The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))............................... 83

Q.      Modifications to the Plan. ................................................................................... 85

ii

R.      Good Cause Exists to Waive the Stay of the Confirmation Order. ..................... 86

IV.     THE UNRESOLVED OBJECTIONS, IF ANY, SHOULD BE OVERRULED. ........... 88

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re 203 N. LaSalle St. Ltd. P'ship*,
    190 B.R. 567 (Bankr. N.D. Ill. 1995) .......................................................81

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ...................................................36

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. D. Del. 2007) ..........................................................86

*In re Ambanc La Mesa L.P.*,
    115 F.3d 650 (9th Cir. 1997) ...................................................................81

*In re Apex Oil Co.*,
    118 B.R. 683 (Bankr. E.D. Mo. 1990) ...............................................68, 69

*In re Armstrong World Indus., Inc.*,
    348 B.R.111 (D. Del. 2006)...............................................................36, 82

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) .................................................81

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)...........................................................................70, 83

*In re Beyond.com Corp.*,
    289 B.R. 138 (Bankr. N.D. Cal. 2003) ...................................................69

*In re Burns & Roe Enters., Inc.*,
    No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..............85

*In re Cajun Elec. Power Coop.*,
    150 F.3d. 503 (5th Cir. 1999) .......................................28, 29, 63, 65

*In re Capmark Fin. Grp. Inc.*,
    No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ...............74

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
    860 F.2d 94 (3d Cir. 1988)......................................................................70

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986)......................................................67

*In re Chateaugay Corp.*,
  10 F.3d 944 (2d Cir. 1993)......................................................................................36

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) ......................................................................81

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)...............................................................36, 68

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992)...................................................................................60

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005)................................................................................60

*In re Flintkote Co.*,
  486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................74

*Floyd v. Hefner*,
  2006 WL 2844245 (S.D. Tex. Sept. 29, 2006) ......................................................28

*In re Foster Mortg.*,
  68 F.3d 914 (5th Cir. 1995) ...................................................................................46

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................81

*In re Future Energy Corp.*,
  83 B.R. 470 (Bankr. S.D. Ohio 1988).....................................................................67

*In re Global Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009).............85

*In re Haas*,
  162 F.3d 1087 (11th Cir. 1998). ...........................................................................82

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007).........................................................36, 46, 76

*In re Hunt*,
  146 B.R. 178 (Bankr. N.D. Tex. 1992)...................................................................31

*In re Idearc Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009)...........................................................36, 87

*In re J T Thorpe Co.*,
  308 B.R. 782 (Bankr. S.D.Tex. 2003) ..................................................................................35

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987)............................................................................................36

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993)..............................................................................................36

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) .................................................................................81

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)..............................................................................................74

*In re Lason, Inc.*,
  300 B.R. 227 (Bankr. D. Del. 2003) ..................................................................................71

*In re Lernout & Hauspie Speech Prods., N.V.*,
  301 B.R. 651 (Bankr. D. Del. 2003) ..................................................................................81

*In re Lisanti Foods, Inc.*,
  329 B.R. 491 (D.N.J. 2005) .........................................................................................28, 67

*In re Local Insight Media Holdings, Inc.*,
  No. 10-13677 (KG) (Bankr. D. Del. Nov. 3, 2011)...........................................................57

*In re Majestic Star Casino, LLC*,
  No. 09-14136 (KG) (Bankr. D. Del. Mar. 10, 2011) .........................................................57

*In re MCorp Fin., Inc.*,
  137 B.R. 219 (S.D. Tex. 1992) ..........................................................................................80

*In re Metrocraft Publ'g. Servs., Inc.*,
  39 B.R. 567 (Bankr. N.D. Ga. 1984) .................................................................................30

*In re Moody Nat'l SHS Houston H, LLC*,
  No. 10-30172, 2010 WL 5116872 (Bankr. S.D. Tex. 2010) .............................................53

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988)..............................................................................................28

*In re PC Liquidation Corp.*,
  383 B.R. 856 (E.D.N.Y. 2008) ..........................................................................................28

*In re Phoenix. Petrol. Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................30

*In re Pizza of Haw. Inc.*,
   761 F.2d 1374, 1382 (9th Cir. 1985) ..................................................................74

*In re Placid Oil Co.*,
   753 B.R. F.3d 151 (5th Cir. 2014) ......................................................................31

*In re Premier Int'l Holdings, Inc.*,
   No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ............58

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000).........................................................................58, 61

*Republic Supply Co. v. Shoaf*,
   815 F.2d 1046 (5th Cir. 1987) ......................................................................52, 53

*In re River Village Assocs.*,
   181 B.R. 795 (E.D. Pa. 1995) ............................................................................28

*In re Rusty Jones, Inc.*,
   110 B.R. 362 (Bankr. N.D. Ill. 1990) .................................................................68

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988)..................................................................30

*In re Sears Methodist Ret. Sys., Inc.*,
   2015 WL 1066882 (Bankr. N.D. Tex. Mar. 6, 2015) ..........................................60

*In re Sherwood Square Assoc.*,
   107 B.R. 872 (Bankr. D. Md. 1989) ...................................................................68

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................58

*In re Star Ambulance Serv., LLC*,
   540 B.R. 251 (Bankr. S.D.Tex. 2015) .........................................35, 63, 65, 66, 77

*In re Stratford Assocs. Ltd. P'ship*,
   145 B.R. 689 (Bankr. D. Kan. 1992) ..................................................................68

*In re T-H New Orleans L.P.*,
   116 F.3d 790, 801 (5th Cir. 1997) ...............................................................65, 75, 76

vii

*In re Texas Extrusion Corp,*
    844 F.2d 1142 (5th Cir. 1988) ...................................................................................28, 29

*In re Tex. Rangers Baseball Partners*,
    521 B.R. 134 (Bankr. N.D. Tex 2014)......................................................................28

*In re Tex. Tamale Co.*,
    219 B.R. 732 (Bankr. S.D. Tex 1998) ......................................................................31

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ......................................................................68

*In re Transwest Resort Props.*,
    881 F.3d 724, 729-30 (9th Cir. 2018) ......................................................................26

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ....................................................................30

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ......................74

*In re Verso Corp.*,
    No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ...............................................60

*In re Village at Camp Bowie I, L.P.,*
    710 F.3d 239, 247 (5th Cir. 2013) ...........................................................................65

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)......................................................................................74

*In re Woerner*,
    783 F.3d 266 (3d Cir. 2015)....................................................................................28

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007) ...............................................................52, 53

**Statutes**

11 U.S.C.
    § 101(51D)(B)......................................................................................................79
    § 328(a)...............................................................................................................67
    § 1123(b)(1)-(3)..................................................................................................42
    § 1125(a)(1).........................................................................................................28
    § 1126(a), (f).......................................................................................................64
    § 1129(a)(5)(A)(ii)..............................................................................................68

28 U.S.C. § 1930.......................................................................................................77

Bankruptcy Code

§ 101(31) ........................................................................................68
§ 328 ..............................................................................................67
§ 330 ..............................................................................................67
§ 330(a)(1)(A) ................................................................................67
§ 365 .........................................................................................43, 62
§ 365(b)(1) ......................................................................................62
§ 365(f) ...........................................................................................87
§ 503(b) ..........................................................................................72
§ 507(a)(1) ......................................................................................73
§ 507(a)(2) ................................................................................72, 77
§ 507(a)(8) ......................................................................................73
§ 1122 ......................................................................................passim
§ 1122(a) ..................................................................................35, 36
§ 1123 ............................................................................35, 43, 85
§ 1123(a)(1) ...............................................................................14, 39
§ 1123(a)(2) ....................................................................................39
§ 1123(a)(3) ....................................................................................40
§ 1123(a)(4) ....................................................................................40
§ 1123(a)(5) ................................................................40, 41, 52, 53
§ 1123(a)(6) ................................................................11, 12, 41
§ 1123(a)(7) ..............................................................................41, 42
§ 1123(b) ........................................................................................42
§ 1123(b)(1) .............................................................................42, 43
§ 1123(b)(2) ....................................................................................43
§ 1123(b)(3)(A) ..................................................................44, 46, 52
§ 1123(d) ........................................................................................62
§ 1125 ......................................................................................passim
§ 1125(a) ..................................................................................28, 30
§ 1125(e) ..............................................................................34, 35, 60
§ 1126 ......................................................................................63, 72
§ 1126(a) ........................................................................................64
§ 1126(b) ........................................................................................30
§ 1126(b)(2) ....................................................................................30
§ 1126(c) ..............................................................................34, 64, 72
§ 1126(d) ........................................................................................64
§ 1126(f) ..............................................................................20, 34, 64, 72
§ 1126(g) ........................................................................................20
§ 1127(a) ........................................................................................85
§ 1129 ......................................................................................passim
§ 1129(a) ..................................................................................passim
§ 1129(a)(1) ....................................................................................35
§ 1129(a)(2) ..............................................................59, 62, 63, 65
§ 1129(a)(3) ..............................................................59, 65, 66, 67, 74

§ 1129(a)(4) ............................................................................................................67
§ 1129(a)(5) ......................................................................................................68, 69
§ 1129(a)(5)(A)(i) ..................................................................................................68
§ 1129(a)(5)(B) ......................................................................................................68
§ 1129(a)(6) ......................................................................................................69, 70
§ 1129(a)(7) ..............................................................................................25, 70, 71
§ 1129(a)(7)(A) ......................................................................................................71
§ 1129(a)(8) ..........................................................................................71, 72, 73, 80
§ 1129(a)(9) ......................................................................................................72, 73
§ 1129(a)(9)(A) ......................................................................................................72
§ 1129(a)(9)(B) ......................................................................................................72
§ 1129(a)(9)(C) ................................................................................................14, 73
§ 1129(a)(10) ....................................................................25, 26, 27, 72, 73, 74
§ 1129(a)(11) ....................................................................................74, 75, 76, 77
§ 1129(a)(12) ..........................................................................................................77
§§ 1129(a)(13)-1129(a)(16) ...........................................................................77, 78
§ 1129(b) ........................................................................................................*passim*
§ 1129(b)(1) ..........................................................................................80, 81, 82, 83
§ 1129(b)(2)(B)(i) ..........................................................................................83, 84
§ 1129(b)(2)(B)(ii) ........................................................................................83, 84
§ 1129(c)-(e) ..........................................................................................................79
§ 1129(d) ................................................................................................................79
§ 1129(e) ................................................................................................................79

United States Securities Act of 1933
§ 5..........................................................................................................................79

Bankruptcy Rule
R. 3017 ..................................................................................................................31
R. 3017(d) ..............................................................................................................34
R. 3018(b) ..............................................................................................................33
R. 3018(c) ..............................................................................................................33
R. 3019 ............................................................................................................85, 86
R. 3020 ..................................................................................................................87
R. 3020(e) ........................................................................................................86, 87
R. 6004 ..................................................................................................................87
R. 6004(h) ........................................................................................................7, 86
R. 6006 ..................................................................................................................87
R. 6006(d) ........................................................................................................7, 86
R. 9019 ............................................................................................................46, 48

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 .........................29, 35, 63

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787 ...............................29, 35

## RELIEF REQUESTED

Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.) and its affiliated debtors as debtors in possession in the above-captioned cases (the "Debtors" or the "Company"), submit this memorandum of law in support of their request for entry of an order, substantially in the form filed concurrently herewith (the "Proposed Confirmation Order"): (i) approving on a final basis the *Disclosure Statement for the Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 577] (the "Initial Disclosure Statement"), as amended by the *Disclosure Statement for the Amended Joint Liquidating Chapter 11 Plan of  Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 666] (the "Amended Disclosure Statement") and the *Disclosure Statement for the Second Amended Joint Liquidating Chapter 11 Plan of  Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 683] (the "Second Amended Disclosure Statement", and together with the Initial Disclosure Statement, the Amended Disclosure Statement, and as may further be amended, modified, or supplemented from time to time, the "Disclosure Statement"); (ii) confirming the *Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 576] (the "Initial Plan"), as amended by the *Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 665] (the "First Amended Plan,"), the *Second Amended Joint Prepackaged Chapter 11 Plan of Liquidation of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 691] (the "Second Amended Plan,"), and the *Third Amended Joint Prepackaged Chapter 11 Plan of Liquidation of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and Its Debtor Affiliates* [Docket No. 889] (the "Third Amended Plan") and together with the Initial Plan, the First Amended Plan, the Second Amended

Plan and as may further be amended, modified, or supplemented from time to time, the "Plan"),[2] including the *Plan Supplement* [Docket No. 835] (the "Plan Supplement") and the *Notice of Filing Amendment to Plan Supplement* [Docket No. 843].  In support of confirmation of the Plan and final approval of the Disclosure Statement, and in response to the objections thereto, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Plan represents the culmination of the Debtors' extraordinary efforts to maximize the value of their assets through an extensive marketing and sales process that resulted in the successful closing of four separate major asset sales and several de minimis asset sales.  As a result of the hard work put in by the Debtors and their advisors over the past four months since commencing these cases, the Debtors are now pleased to report that the Plan, which provides for the distribution of the proceeds of the sale of substantially all of the Debtors' assets to Holders of Allowed Claims, has been overwhelmingly accepted by the Holders of General Unsecured Claims who voted on the Plan.

2.      The Plan is the product of extensive settlements negotiated between the Debtors, the Committee and numerous other key stakeholders.  These negotiations resulted in substantial revisions to the Plan as originally proposed, to address concerns voiced by the Committee and other stakeholders, including (a) significant modifications to, and narrowing of, the Plan's release provisions, (b) significant modifications to the provisions governing the Retained Causes of Action, to broaden their scope and provide an opportunity for enhanced recoveries for general

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the Proposed Confirmation Order, as applicable.

unsecured creditors, and (c) the addition of a Litigation Trust, which will be overseen by the Plan Oversight Committee, to pursue the Retained Causes of Action.

3.      The Plan is also premised on major settlements with a number of key creditors. During the days leading up to the Voting Deadline (as defined below), the Debtors reached settlements of the significant claims asserted by RK Mission Critical LLC ("RKMC" and such settlement, the "RKMC Settlement") and Marathon Digital Holdings, Inc. ("Marathon"), one of the Debtors largest customers, creditors and equity holders. These settlements resolved more than $130 million of disputed Claims asserted by these parties, who have now agreed to support the Plan.

4.      In addition, the Debtors recently reached settlements with (i) US Digital Mining Texas LLC, (ii) Digital Alchemy LLC, (iii) GH Effect, Inc., (iv) Power Asset Recovery Corporation, (v) Alder BTC Holdings LLC, Alder Opportunity LP, and Alder SPV I LLC, (vi) NBTC Limited, (vii) MP2 Energy Texas LLC d/b/a Shell Energy Solutions, (viii) TWC Financial LLC, with each of these parties also agreeing to support the Plan and the releases thereunder. These hard-fought and carefully negotiated settlements, combined with the Plan modifications negotiated with the Committee, underscore the fact that this fully consensual Plan embodies a global settlement (the "Global Settlement").

5.      An essential component of the Global Settlement is the agreement reached with the Committee to narrow and limit the scope of the releases provided for under the Plan.  Although the Debtors originally proposed granting broad general releases to all current and former officers and directors of the Debtors, under the Global Settlement, the Debtor Release is limited to an identified list in the Plan of the Debtors' current officers and directors.  *Current* officers and

directors that are not identified on such list will not receive releases, other than to the extent any claims against them result in liability in excess of the Debtors' D&O Liability Insurance Policies. *Former* officers and directors are not covered by the Debtor Release.

6.     The Plan also provides mechanisms for the continued liquidation and monetization of the Debtors' remaining assets.  Although the Debtors have sold a significant portion of their assets during these cases pursuant to Bankruptcy Code section 363, the Debtors still own substantial equipment and potentially valuable Causes of Action.  Under the Plan, the remaining equipment will be marketed and sold by the Plan Administrator, and the Causes of Action will be transferred to the Litigation Trust.  The proceeds of these equipment sales, and any recoveries in respect of the Causes of Action, will be distributed to Holders of Allowed Claims and Interests in accordance with the Plan.  The Plan Administrator is also tasked with reconciling and resolving claims asserted against the Debtors.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur at various intervals after the Effective Date as determined by the Plan Administrator.

7.     Confirmation of the Plan, which incorporates the terms of the Global Settlement, will avoid the extra layer of expense attendant to a chapter 7 liquidation, and will avoid value leakage attributable to a liquidation by a chapter 7 trustee, who likely would lack the necessary experience and expertise in the bitcoin mining industry to maximize the value of the Debtors' Estates.  As set forth in the Disclosure Statement, the Debtors believe that the Plan and the Global Settlement will maximize value for all stakeholders and is in the best interests of the Debtors' Estates.

8.      Notwithstanding the significant benefits the Plan provides to the Debtors' Estates, certain parties have filed objections to confirmation of the Plan (collectively, the "Objections"). One Objection has already been resolved. As discussed in greater detail below, the Debtors request that the remaining Objections, to the extent not resolved or withdrawn, be overruled.

9.      As detailed below and in the objection chart attached hereto as **Exhibit A** (the "Objection Chart") and incorporated herein by reference, the Debtors believe that the remaining Objections are without merit and, to the extent not withdrawn or settled, should be overruled.

10.     For the reasons set forth herein, and as the uncontroverted evidence will show, the Plan satisfies the required elements of the Bankruptcy Code and Bankruptcy Rules, and importantly, the Plan and the Global Settlement represents the culmination of a successful process for the sale of the Debtors' Assets that maximizes value for stakeholders.  The Debtors believe that the Plan represents the best available outcome for the Debtors and all other parties in interest. For these reasons, and as set forth more fully in this memorandum, the Plan should be confirmed.

## ARGUMENT

11.     This memorandum is organized into four sections.  The first section provides an overview of the Plan, the Global Settlement, the Debtors' solicitation of the Plan, and a summary of the various objections filed with respect to the Plan.  The second section requests final approval of the Disclosure Statement and a finding that the Debtors complied with the Solicitation Procedures Order[3] and the dates established therein.  The third section contains the Debtors' "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, requests

---

[3]     See *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with respect thereto, and (V) Granting Related Relief* [Docket No. 715] ("Solicitation Procedures Order").

that the Bankruptcy Court confirm the Plan.  Lastly, the fourth section specifically addresses the sole remaining Objection to the Plan.

12.     In support of confirmation of the Plan, the transactions contemplated thereunder (including the Global Settlement) and final approval of the Disclosure Statement, contemporaneously herewith the Debtors have filed the (a) *Declaration of Drake Harvey, President of the Debtors, in Support of (I) Final Approval of Disclosure Statement,(II) Confirmation of Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc. (F/K/A Compute North Holdings, Inc.) and Its Debtor Affiliates and (III) the Debtors' Omnibus Reply to Objections Thereto* (the "Harvey Declaration"), (b) *Declaration of Ryan Mersch in Support of (I) Final Approval of Disclosure Statement, (II) Confirmation of Third Amended Joint Liquidating Chapter 11 Plan Mining Project Wind Down Holdings, Inc. (F/K/A Compute North Holdings, Inc.) and Its Debtor Affiliates and (III) the Debtors' Omnibus Reply to Objections Thereto* (the "Mersch Declaration"), and *Declaration of Scott Tillman, Independent Director of Compute North Holdings, Inc., In Support of the Debtors' Joint Liquidating Chapter 11 Plan* (the "Tillman Declaration"). The Debtors are prepared to offer live testimony from each of these witnesses at the Combined Hearing as necessary.

## I.     Case Background and Objections.

13.     On September 22, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

14.    On the Petition Date, the Debtors filed the *Declaration of Harold Coulby, Chief Financial Officer & Treasurer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* [Docket No. 22] (the "First Day Declaration") detailing the facts and circumstances of the Debtors' Chapter 11 Cases.

15.    On October 6, 2022, the U.S. Trustee appointed five members to the Committee [Docket No. 139].

16.    On September 26, 2022, the Debtors filed their *Emergency Motion for Entry of (I) an Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Certain Bidding Procedures, Assumption, Assignment, and Rejection Procedures, and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter Into Asset Purchase Agreements With Stalking Horse Bidders; and (D) Scheduling a Hearing On the Approval of the Sale of the Debtors Assets Free and Clear of All Encumbrances As Well As the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of the Debtors Assets Free and Clear of all Encumbrances, (B) Approving Asset Purchase Agreements, (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Waiving Stay Provisions Pursuant to Bankruptcy Rules 6004(H) and 6006(D)* [Docket No. 91] (the "Bidding Procedures and Sale Motion").  On October 24, 2022, Court entered an order [Docket No. 256] (the "Bidding Procedures Order") approving, among other things, certain bidding procedures governing the proposed sale of the Debtors' Assets.

17.     Pursuant to the Bidding Procedures Order, on November 1, 2022, the Bankruptcy Court entered an order approving the Debtors entry into that certain purchase and sale agreement relating to the sale of the Debtors' equity interests in the Kearney Project company and the Wolf Hollow Project Company (the "Generate Sale"). The Debtors closed the Generate Sale on November 2, 2022.

18.     On November 14, 2023, in accordance with the Bidding Procedures Order, the Bankruptcy Court approved the sale of 11 specific modular data center containers used to develop data center facilities and house cryptocurrency to Crusoe Energy Systems, LLC for an aggregate purchase price of $1,547,000.00, or $140,636.36 per container. (the "Crusoe Sale"). The Debtors closed the Crusoe Sale on November 18, 2022.

19.     Moreover, the Bankruptcy Court, on November 22, 2022, approved the Debtors entry into that certain purchase agreement, dated November 19, 2022, between the Debtors and Foundry Digital LLC with an aggregate purchase price of $5,170,000.00 (the "Foundry Sale"). The Foundry Sale also included a credit bid of $8,969,846.00 and the assumption of certain liabilities. The Foundry Sale closed on December 12, 2022 with respect to all purchased assets other than the assets at the Debtors' facilities in Minden, Nebraska, the closing of which is expected to occur prior to March 31, 2023.

20.     On November 29, 2022, the Bankruptcy Court entered an order approving the Debtors entry into that certain asset purchase agreement, dated as of November 25, 2022 by and among the Debtors and U.S. Data Group, Inc. for, in part, the assumption of approximately $100 million in secured indebtedness plus $3,100,000.00 (the "USBTC Sale") to the Debtors' estate. The Debtors closed the USBTC Sale on December 6, 2022.

21.     On November 23, 2022, the Debtors filed with the Bankruptcy Court the Initial Plan and the Initial Disclosure Statement, along with the Solicitation Procedures Motion[4] pursuant to which the Debtors sought, in part, (i) conditional approval of the Disclosure Statement and (ii) a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan.

22.     On December 15, 2022, the Debtors filed with the Bankruptcy Court the First Amended Plan and the Amended Disclosure Statement. On December 19, 2022, the Debtors filed with the Bankruptcy Court the Second Amended Plan and the Second Amended Disclosure Statement.

23.     On December 20, 2022, the Bankruptcy Court held a hearing to consider the Solicitation Procedures Motion, the adequacy of the Disclosure Statement and approval of the procedures proposed by the Debtors for solicitation of votes to accept or reject the Plan (the "Solicitation Procedures"). On December 21, 2021, the Bankruptcy Court entered the Solicitation Procedures Order which, in relevant part, (a) established February 1, 2023 at 4:00 p.m. (prevailing Central Time), as the objection deadline for the Disclosure Statement and the Plan, (b) approved the Solicitation Procedures, and (c) conditionally approved the Disclosure Statement.

24.     On December 21, 2022 the Debtors filed with the Bankruptcy Court the Combined Hearing Notice.   On or before December 27, 2022, the Debtors caused the Claims and Noticing Agent to serve the Solicitation Package, including the Combined Hearing Notice in accordance

---

[4]     *Debtors' Emergency Motion For Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 578] (the "Solicitation Procedures Motion").

with the terms of the Solicitation Procedures Order on all parties on the Debtors' creditor matrix and all interested Holders of record.[5]

25.     On January 6, 2023, the Debtors filed the *Emergency Motion for Entry of an Order Authorizing (I) Change of Corporate Names and (II) Change of Case Caption* [Docket No 784] (the "Name Change Motion"), requesting authority to (a) take all necessary actions to change the Debtors' corporate name, and (b) continue to the joint administration of the Chapter 11 Cases under an updated case caption. On January 19, 2023, the Bankruptcy Court entered an order approving the Name Change Motion [Docket No. 841].

### A.     Wind-Down Transactions.

26.     The Plan contemplates the sale of the Debtors' remaining assets, the consolidation of certain Debtor entities, and distribution of the sale proceeds to the Holders of Claims and Interests.  Through the Wind-Down Transactions described in the Plan, the Debtors will take all applicable actions set forth in the Wind-Down Transactions Memorandum, and may take any additional action as may be necessary or appropriate, to effectuate the wind-down of the Debtors' Estates.  The Wind-Down Transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and Wind-Down Transaction Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any

---

[5]     *See Affidavit of Service* [Docket No. 767] (the "Solicitation Notice Affidavit"), ¶ 2.

asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Wind-Down Transaction Memorandum and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; and (d) all other actions that the applicable Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

27.    As set forth in the Wind-Down Transactions Memorandum, the Debtors contemplate: (a) the merger of the Merging Debtor Subsidiaries[6] into Mining Project Wind Down LLC (f/k/a Compute North LLC) ("CN LLC"); (b) amending and restating the certificate of incorporation and by-laws for Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.) ("Holdings") to include provisions prohibiting Holdings from issuing non-voting equity securities to the extent required by Bankruptcy Code section 1123(a)(6); (c) amending and restating the certificate of formation of each of CN LLC, Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) and Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus

---

[6]    As used herein, "Merging Debtor Subsidiaries" means:  CN Atoka LLC; CN Big Spring LLC; CN Colorado Bend LLC; CN Developments LLC; CN Equipment LLC; CN King Mountain LLC; CN Mining LLC; CN Pledgor LLC; Compute North Member LLC; Compute North NC08 LLC; Compute North NY09 LLC; Compute North SD, LLC; Compute North Texas LLC; Compute North TX06 LLC; and Compute North TX10 LLC.  For the avoidance of doubt, Debtors CN Corpus Christi LLC and CN Minden LLC are not Merging Debtor Subsidiaries.

Christi LLC) to include provisions prohibiting these entities from issuing non-voting equity securities to the extent required by Bankruptcy Code Section 1123(a)(6); (d) Holdings issuing one share of stock to the Plan Administrator; and (e) CN LLC, Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) and Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) each issuing member interests to the Plan Administrator, who shall be the sole member of each of these entities.

28.     The Debtors will prepare and execute an Agreement of Merger among CN LLC and the Merging Debtor Subsidiaries, and each of these entities shall execute appropriate consents authorizing the merger.  On the Effective Date of the Plan, the Debtors will file the executed Certificate of Merger with the Delaware Secretary, and all of the Merging Debtor Subsidiaries will merge with and into CN LLC, with CN LLC being the surviving entity of such merger.

29.     The Debtors and/or the Plan Administrator, as applicable will continue to pursue the closing of the sale of the Debtors' assets related to the Minden Project.  Following the earlier of (i) the Minden Closing Date (as defined in that certain Asset Purchase Agreement, dated as of November 19, 2022 by and between CN LLC, Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC), Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC), Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC), and Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC), as sellers, and Foundry Digital LLC, as purchaser, *see* Docket No. 531, and (ii) April 1, 2023, the Plan Administrator will determine whether to merge Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) into CN LLC.

30.     On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors,

officers, or other Governing Body, subject to the provisions of the Plan and the Plan Administrator Agreement.  In addition, on the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, or Governing Body of the Reorganized Debtors shall cease and all such persons shall be deemed to have resigned, solely in their capacities as such.

31.    On the Effective Date, the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, as applicable, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies without any further action required on the part of any such Reorganized Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Reorganized Debtors, or the members of any Reorganized Debtor.  From and after the Effective Date, and subject to the Plan Administrator Agreement and the Litigation Trust Agreement, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors.

32.    Also on the Effective Date, the Plan Oversight Committee shall be formed consisting of Touzi Capital, LLC and Decimal Digital Currency I, LLC to oversee the implementation of the Plan by the Plan Administrator. The Specific rights and responsibilities of the Plan Oversight Committee are set forth in and governed by the Plan Administrator Agreement.

33.    The Plan facilitates the wind-down of the Debtors' Estates on terms designed to maximize value for creditors.  The Plan provides an orderly process for liquidating the Debtors' remaining Bitcoin mining equipment, including miners and containers, with the proceeds to be distributed in accordance with the priority provisions of the Bankruptcy Code, as embodied in the

Plan. The Plan is designed to provide meaningful recoveries for unsecured creditors who otherwise would likely receive a reduced recovery under a chapter 7 liquidation scenario.

> **B.     Classification and Treatment of Claims and Interests.**

34.     In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Priority Tax Claims, Administrative Claims or Professional Fee Claims. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim.[7]

35.     Similarly, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator, agree to less favorable treatment, the Debtors or the Reorganized Debtors shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed (or as soon as reasonably practicable thereafter) with a Cash distribution from the Administrative and Priority Claims Reserve by the Plan Administrator; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Plan Administrator, as applicable; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided that* any Administrative

---

[7]     *See* Plan, § 2.3.

Claim that has been assumed by any non-Debtor Entity in connection with an Asset Sale shall not be an obligation of the Debtors under the Plan.[8]

36.     With respect to Professional Fee Claims, all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than forty-five days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account.  The Reorganized Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.[9]  To the extent a Professional agrees to such treatment in writing, the Plan Administrator may pay such Professional's Allowed Professional Fee Claim after the Effective Date.

37.     Each Holder of a Secured Claim will receive, at the option of the applicable Debtor or Reorganized Debtor: (a) payment in full in Cash; (b) Reinstatement of such Claim; (iii) the Debtor's interest in the Collateral securing such Holder's Allowed Secured Claim; or (c) such other treatment rendering such Claim Unimpaired, unless the Holder of an Allowed Secured Claims agrees in writing to less favorable treatment.[10]  Each Holder of an Allowed Other Priority

---

[8]     *Id*, § 2.1.

[9]     *Id*, § 2.2.

[10]    *Id*, § 3.2.1.

Claim will receive, at the option of the applicable Debtor or Reorganized Debtor: (a) payment in full in Cash; or (b) such other treatment rendering such Claim Unimpaired.[11]

38.     Each Holder of an Allowed General Unsecured Claim shall be entitled to receive, on account of such General Unsecured Claim, its Pro Rata Share of the Wind-Down Distributable Cash remaining after satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1 and Class 2,.   Distributions to Holders of General Unsecured Claims shall be made by the Distribution Agent on the applicable Distribution Date in accordance with the Plan until all Allowed General Unsecured Claims in Class 3 are paid in full (taking into account any distributions made by the Litigation Trust on account of Allowed General Unsecured Claims) or the Wind-Down Distributable Cash is exhausted.   All Distributions to Holders of Allowed General Unsecured Claims shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.[12]

39.     With respect to Class 3A (CNCC GUC Claims), because there is no value at Debtor Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC), the Plan provides that on the Effective date, each CNCC GUC Claim shall be cancelled, released and extinguished, and each Holder of a CNCC GUC Claim shall not receive or retain any distribution, property, or other value on account of its CNCC GUC Claim.

40.     With respect to Parent GUC Claims, the Plan provides that on the Effective Date, each Parent GUC Claim shall be discharged and released, and each Holder of an Allowed Parent

---

[11]   *Id*, § 3.2.2.

[12]   *Id*, § 3.2.3.

GUC Claim shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all senior claims (i.e., Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, and Class 3) on account of such Parent GUC Claim.  Distributions of Wind-Down Distributable Cash shall be made on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Parent GUC Claims in Class 4 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent GUC Claims) or the Wind-Down Distributable Cash is exhausted.

41.     With respect to Intercompany Claims and Intercompany Interests, the Plan provides that on the Effective Date, each Intercompany Claim and Intercompany Interest shall be cancelled, released and extinguished, and each Holder of an Intercompany Claim and Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Claim or Intercompany Interest.

42.     Under the Plan, each Holder of Allowed Preferred Equity Interests shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all senior Classes (i.e., Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, Class 3, and Class 4) on account of such Preferred Equity Interests. Distributions of Wind-Down Distributable Cash shall be made on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Preferred Equity Interests in Class 7 are paid in full (taking into account any distributions made by the Litigation Trust on account of Preferred Equity Interests) or the Wind-Down Distributable Cash is exhausted.

43.     Finally, under the Plan, on the Effective Date, all Parent Equity Interests shall be cancelled, released, and extinguished on the Effective Date, and each Holder of Allowed Parent Equity Interests shall be entitled to receive its Pro Rata Share of the Wind-Down Distributable Cash, if any, remaining after satisfaction of all senior Claims and Interests (i.e., Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Class 1, Class 2, Class 3, Class 4, and Class 7) on account of its Parent Equity Interests. Distribution of the Wind-Down Distributable Cash shall be made on the applicable Distribution Date by the Distribution Agent in accordance with the Plan until all Allowed Parent Equity Interests in Class 8 are paid in full (taking into account any distributions made by the Litigation Trust on account of Parent Equity Interests) or the Wind-Down Distributable Cash is exhausted.

44.     With respect to the distributions to each of these Classes of Claims and Interests, all Distributions to Holders of Allowed Claims and Interests shall be subject to the Plan Administrator first paying in full all operating expenses of the Reorganized Debtors and/or reserving in the Plan Administrator Operating Reserve for such operating expenses as is reasonable and appropriate.

45.     The Debtors believe that the terms of the Plan and the Wind-Down Transactions embodied therein are consistent with the Global Settlement and will maximize the value of the Estates for the benefit of creditors.

### C.     The Solicitation Process and Voting Results.

46.     On December 27, 2022, the Debtors, through their counsel, distributed a solicitation package containing the Bankruptcy Court approved solicitation materials and documents (the "Solicitation Package"), which included (i) a cover letter, (ii) the Ballots which included the option to opt out of certain third party releases and applicable voting instructions, together with a pre-

addressed, postage prepaid return envelope, (iii) instructions on where parties may obtain copies of the Disclosure Statement and the Plan, free of charge, (iv) a notice of the Combined Hearing substantially in the form approved by the Bankruptcy Court (the "Combined Hearing Notice"), and (v) such other materials as was directed by the Bankruptcy Court. The Ballots stated in clear and conspicuous language that, to be counted as votes to accept or reject the Plan, all Ballots must be must be properly executed, completed, and returned in the pre-paid, pre-addressed return envelope included in the Solicitation Package or delivered by: (1) first class mail; (2) overnight courier; (3) hand delivery; or (4) via E-Ballot, so that they are actually received by the Claims and Noticing Agent, in any case, no later than February 1, 2023, at 4:00 p.m. (the "Voting Deadline"). After the Voting Deadline passed, the Claims and Noticing Agent tabulated the votes submitted by the Voting Classes.  Set forth below are the voting results with respect to the Voting Classes tabulated on a consolidated basis:

| VOTING CLASS | TOTAL BALLOTS COUNTED | | | | Class Voting Result |
| | ACCEPT | | REJECT | | |
| | AMOUNT | NUMBER | AMOUNT | NUMBER | |
|---|---|---|---|---|---|
| **Class 3**<br>GENERAL UNSECURED CLAIMS | $104,192,314.33<br>91.91% | 30<br>75.00% | $9,176,615.66<br>8.09% | 10<br>25.00% | Accepts |
| **Class 4**<br>PARENT GUC CLAIMS | $300,000.00<br>41.05% | 1<br>16.67% | $430,783.44<br>58.95% | 5<br>83.33% | Rejects |
| **Class 7**<br>PREFERRED EQUITY INTERESTS | 47,261.000<br>99.83% | N/A | 79.000<br>.17% | N/A | Accepts |
| **Class 8**<br>PARENT EQUITY INTERESTS | 1,706,583.000<br>100.00% | N/A | 0.000<br>0.00% | N/A | Accepts |

47.     Holders of Claims and Interests were not provided a Solicitation Package if such Holders were either (i) unimpaired under and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, (ii) impaired, entitled to receive no distribution on account of such Claims or Interests under the Plan and, therefore, deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, or (iii) subject to a pending objection by the Debtors and not entitled to vote the disputed portion of their Claim or Interest.  However, the Debtors did serve notices and forms to opt out of the Plan's third-party releases to such parties in (i), (ii) and (iii) (except for Holders of Class 5 Intercompany Claims and Class 6 Intercompany Interests).

48.     On or before December 27, 2022, in accordance with the Solicitation Procedures Order, the Claims and Noticing Agent mailed the Non-Voting Status Notices and applicable opt-out forms on all parties required to receive such materials pursuant to the Solicitation Procedures Order, providing such parties with the opportunity to elect to opt-out of the Third-Party Release in the Plan.[13]  A Holder that decided to opt-out of the Third-Party Release was required to check a box on the Opt-Out Form and return the Opt-Out Form to the Claims and Noticing Agent so that it was actually received by the Claims and Noticing Agent by the Voting Deadline.

49.     Contemporaneously herewith, the Debtors filed their certification of votes (the "Voting Report"), which details the results of the Plan voting process and indicates that the Plan was approved by the Voting Class.

---

[13]   *See* Solicitation Notice Affidavit, ¶ 2.

**D.      Objections.**

50.      The Debtors received three (3) formal Objections with respect to Confirmation of the Plan and final approval of the Disclosure Statement.  The formal objections were filed by Rohit Shirole (the "Shirole Objection"),[14] Corpus Christi Energy Park, LLC (the "Bootstrap Objection"),[15] and Decimal Digital Currency I, LLC ("Decimal" and, such objection, the "Decimal Objection").[16]  The Shirole Objection has been resolved. On February 6, 2023, the Bankruptcy Court entered the *Agreed Order Resolving Rohit Shirole's Motion for Relief Under 11 U.S.C. § 362(D) From Automatic Stay to  Continue Litigation Against Certain Debtors Waiver of 30-Day Hearing Requirement* [Docket No. 920] (the "Shirole Order"), pursuant to which the Shirole Objection was deemed withdrawn, with prejudice. With respect to the Decimal Objection, although the Debtors have engaged in productive discussions with Decimal, as of the date of this filing, a settlement has not been finalized. As such, the Objection Chart attached hereto as Exhibit A addresses the Debtors' response with respect to the Decimal Objection.

**1.      Bootstrap Objection.**

51.      On February 1, 2023, Corpus Christi Energy Park, LLC ("CCEP"), filed the Bootstrap Objection.  The Bootstrap Objection focuses on the fact that the Plan limits CCEP's recovery to the assets of the entity at which CCEP's claims have been asserted.  The CCEP Objection attempts to assert improper motives to the Debtors for failing to provide CCEP with an unjustified windfall, at the expense of other creditors.  In reality, the treatment of the claims held by CCEP under Class 3A of the Plan is both legally justified and required by the Bankruptcy Code.

---

[14]      *See* Docket No. 894.

[15]      *See* Docket No. 897.

[16]      *See* Docket No. 899.

52.     As described in the Bootstrap Objection, on March 16, 2022, CCEP and Debtor Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) ("CNCC") entered into "a design-build contract (the "DB Contract") pursuant to which CCEP agreed to design and construct for CNCC a 300-megawatt high voltage substation connecting to the ERCOT transmission grid, together with an office building, utility connections and certain other improvements."[17]  Before these chapter 11 cases began, the Debtors spent considerable efforts seeking to find a buyer for the Corpus Christi Project possessing the capital needed to bring that project to fruition.  After the Debtors commenced these Chapter 11 Cases, they continued these efforts and, ultimately, only one prospective counterparty to a transaction emerged: CCEP.

53.     The parties entered into extensive negotiations in an effort to resolve the future of the Corpus Christi Project, but, shortly after the Debtors and the Committee believed they had reached agreement on the terms of a sale transaction, CCEP revoked its offer and filed a motion to compel the Debtors to reject the DB Contract.[18] CNCC entered into these negotiations with the goal of monetizing its interests in the partially developed Corpus Christi Project. As the counterparty to the DB Contract, CCEP was fully aware that all of CNCC's value in the Corpus Christi Project was tied to the DB Contract, that there would be no Corpus Christi Project without the DB Contract, and thus the value of that Debtor would be completely eviscerated if it lost the benefit of the DB Contract.

54.     Nevertheless, CCEP made a strategic decision to revoke its purchase offer, pursue termination of the DB Contract, and thereby end CNCC's options to realize any monetary value.

---

[17]     *See* Bootstrap Objection, ¶ 6.

[18]     *See* Docket No. 644.

When the negotiations with CCEP failed, it became clear that there was no recoverable value at CNCC.  Indeed, as reflected in the *Agreed Order Resolving Corpus Christi Energy Park, LLC's Emergency Motion to Compel Rejection of the DB Contract* [Docket No. 709], entered by the Bankruptcy Court on December 20, 2022, the DB Contract, which was the only asset of CNCC, was terminated. Accordingly, the Debtors amended the Plan to provide CNCC's creditors without a recovery because there would be no cash or cash proceeds available from CNCC.  CCEP's assertion that "[t]he only discernable motivation behind such treatment is retaliation for the failed buyout negotiations and for CCEP's Rejection Motion," is clearly misplaced.[19]   Contrary to CCEP's assertion, the motivation behind the Plan amendment was to avoid delivering a windfall to creditors of CNCC – an entity with no available assets to distribute – to the detriment of the Debtors' other creditors. The result was entirely predictable when CCEP took the actions it decided to take during the Chapter 11 Cases. Moreover, the inclusion of the Claims held by CCEP under Class 3A in the Plan amendment was a negotiated part of the Global Settlement and, therefore, enjoys the support of the Committee and other key stakeholders of the Debtors.

55.    CCEP's arguments that the Plan was not proposed in good faith and involves improper "gerrymandering" are entirely misplaced.  As noted above, the Debtors amended the Plan only when it became evident that there would be no realizable value at CNCC.  Inclusion of the CCEP Claim in Class 3 would unfairly and unconstitutionally prejudice the rights of the Debtors' other creditors by diluting their recoveries in order to provide an unjustified windfall to CCEP.

---

[19]   *See id*, ¶ 11.

56.     Bankruptcy Code section 1122 does not require that CCEP's claims must be included in Class 3.  All that section 1122 requires is that claims within a class must be substantially similar.  Thus, even assuming that CCEP's claims were substantially similar to the claims in Class 3 – which they are not, since they are asserted against a Debtor with no assets to distribute – section 1122 would not require inclusion of CCEP's claims in Class 3.

57.     CCEP's reliance on *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850 (Bankr. S.D. Tex. 2001) is misplaced.  *Sentry* actually supports separate classification of CCEP's claim.[20] The Plan thus satisfies the Bankruptcy Code classification requirements, and likewise, does not discriminate unfairly because it provides CCEP exactly what it is entitled to: no recovery from the Debtor that is liable on the claim because that Debtor has no assets to distribute.[21]

58.     Similarly, the Plan satisfies the requirement under Bankruptcy Code section 1129(b)(2) that the Plan must be "fair and equitable" as to the Claims in Class 3A.  As noted, there are no assets available for distribution to creditors of CNCC.  Importantly, the equity interests in CNCC likewise will receive no distributions under the Plan, as all Intercompany Interests, including the equity interests in CNCC, will be cancelled, released and extinguished, on the Effective Date, and "each Holder of an Intercompany Interest shall not receive or retain any

---

[20]     *Sentry* 264 B.R. at 860 (stating that "[m]ost of the commentators agree that § 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified.") (citing 7 *COLLIER ON BANKRUPTCY*, ¶ 1123.03[1][a] (15th ed. rev. 1999)).

[21]     CCEP's arguments concerning potential litigation recoveries in favor of CNCC are speculative at best.  Each of the Retained Causes of Action will have to be litigated or otherwise resolved, and potential defendants retain the ability to assert all available defenses.  It is unclear whether the Litigation Trust will be able to secure any recoveries on account of the Retained Causes of Action.  Moreover, these Retained Causes of Action, including the potential preference claim against CCEP, reside at Debtors other than CNCC, meaning that the proceeds thereof – if any – would not properly be distributed to creditors in Class 3A.  *See Compute North LLC Amended Statement of Financial Affairs* [Docket No. 431] (listing six payments aggregating $682,096.90 made by Compute North LLC to Bootstrap Energy LLC within ninety (90) days of the Petition Date).

distribution, property, or other value on account of its Intercompany Interest."[22]  Therefore, no holder of a claim or interest junior to the Class 3A creditors will receive or retain and property under the Plan.

59.    CCEP's argument that the Plan improperly gerrymanders CCEP's claim is mistaken.  CCEP's claim was properly classified in Class 3A in order to avoid improper dilution of the recoveries of other creditors with claims against a ***different Debtor***.  CCEP's claim was not placed in a separate class in order to impact voting.  Even if CCEP's claim were to be included in Class 3 for voting purposes, Class 3 would still overwhelmingly support acceptance of the Plan, and the result would not be changed.

60.    Moreover, CCEP's argument that the Plan runs afoul of Bankruptcy Code section 1129(a)(7) (by providing creditors in that class less than they would receive under chapter 7) is incorrect.  As noted, there are no assets to distribute to Holders of Claims in Class 3A, whether under the Plan or in a chapter 7 liquidation.  The zero recovery Class 3A creditors receive under the Plan is the same zero recovery they would receive under chapter 7.

61.    Further, CCEP's claims that Bankruptcy Code section 1129(a)(10) must be satisfied by *each* Debtor in the joint Plan does not align with the plain language of section 1129(a)(10).[23]  To support this notion, CCEP relies on the holding on *In re Trib. Co.*, 464 B.R. (Bankr. D. Del. 2011).  However, the "per debtor" reasoning underpinning the Delaware decision

---

[22]    *See* Plan § 3.2.7.2.

[23]    Bankruptcy Code section 1129(a)(10) sets forth the following confirmation requirement:  "(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

is not binding on and has not been adopted by courts in the Fifth Circuit.[24]  The only Circuit court decision to address this question has, in fact, rejected the "per debtor" approach in favor of the "per plan" interpretation which only requires the acceptance of the plan by one impaired class of claims under the plan.[25]

62.    The text of Bankruptcy Code section 1129(a)(10) provides that:

> "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

The language of section 1129(a)(10) is clear and unambiguous. The plain reading of the statute clearly supports the "per plan" approach. The text does not distinguish between creditors of different debtors and makes no reference to debtors at all. Adopting CCEP's proposed "per debtor" approach would contravene the purposes of the chapter 11 process. It would give holdout creditors in multi-debtor cases the unilateral right to reject any plan they do not like and unfairly hold up confirmation by nullifying the Debtors' ability to rely on section 1129(b) for confirmation over the objection of the rejecting class. In accordance with the plain language of Bankruptcy Code section 1129(a)(10), the Debtors have *one* joint liquidating plan that addresses and deals with the claims of multiple Debtors. Adopting the "per debtor" approach here would unnecessarily prolong the Debtors' bankruptcy process and siphon off value from the Debtors" estates.

63.    Pursuant to section 1129(a)(10), a joint chapter 11 plan may be confirmed if a single impaired class of claimants with claims against any debtor accepts the joint plan. Here,

---

[24]    *See In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 104 (Bankr. N.D. Tex. 2017) ("[T]here is certain authority that supports a notion that section 1129(a)(10) of the Bankruptcy Code is to be applied on a 'per plan' basis rather than a 'per debtor' basis.").

[25]    *See In re Transwest Resort Props.*, 881 F.3d 724, 729-30 (9th Cir. 2018).

Holders of impaired Claims in Class 3 have voted overwhelmingly to accept the Plan, satisfying the requirement of section 1129(a)(10). Because the text of section 1129(a)(10) calls only for the approval of one class of impaired claims, only one Class's approval is required under the Plan.

64.     Lastly, CCEP's argument that the Disclosure Statement does not contains "adequate information" is misplaced.  The Disclosure Statement clearly explains that there are no anticipated cash proceeds from the Corpus Christi Project, and that therefore, creditors in Class 3A are not entitled to any recovery.  Regarding the consolidation of the various Debtor entities, the Disclosure Statement states that the Wind-Down Transactions will be as described in the Wind-Down Transactions Memorandum.[26]   The Debtors filed the Wind-Down Transactions Memorandum as part of the Plan Supplement on January 18, 2023 [Docket No. 835, Ex. C].

65.     The Disclosure Statement accurately reflects the Plan and the treatment of Claims and Interests against the Debtors' Estates.  No further disclosure regarding the Corpus Christi Project is required to satisfy Bankruptcy Code section 1125.

66.     To the extent not resolved or withdrawn, the Debtors believe, for the reasons stated herein, that the Bootstrap Objection should be overruled.

---

[26]   *See* Disclosure Statement at § 37.

II.     **Final Approval of the Disclosure Statement Is Warranted and the Debtors Complied with the Solicitation Procedures Order.**

    A.     **The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code.**

        1.     **The Disclosure Statement Contains Adequate Information.**

67.     A debtor's disclosure statement must provide sufficient information to permit an informed judgment by impaired creditors entitled to vote on the plan.[27] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[28] Courts within the Fifth Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[29] Congress granted bankruptcy courts wide discretion in determining the adequacy of a disclosure statement to facilitate effective reorganizations of debtors in a broad range of businesses, taking into account the various facts and circumstances that accompany chapter 11

---

[27]   *See, e.g.*, *In re Woerner*, 783 F.3d 266, 271 (5th Cir. 2015) (The proponent of a chapter 11 plan "must provide a court-approved disclosure statement that contains 'adequate information' about the assets, liabilities, and financial affairs of the debtor sufficient to enable creditors to make an 'informed judgment' about the plan."); *In re Tex. Rangers Baseball Partners*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.").

[28]   11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *see also Floyd v. Hefner*, No. H-03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible standard); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.").

[29]   *See, e.g.*, *In re Texas Extrusion Corp.*, 844 F.2d at 1157; *In re River Village Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (same); *Mabey v. Southwestern Elec. Power Co.* (*In re Cajun Elec. Power Coop., Inc.*), 150 F.3d 503, 518 (5th Cir. 1998 (same); *In re Phx. Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same); *see also Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes adequate information in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court.") (internal quotation marks and citations omitted); *In re Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 507 (D.N.J. 2005) (same), *aff'd*, 241 F. App'x 1 (3d Cir. 2007).

cases.[30]    Accordingly, the determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case.[31]

68.    Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

a.    the events which led to the filing of a bankruptcy petition and the relationship of a debtor with the affiliates;

b.    a description of the available assets and the value of the present condition of a debtor while in chapter 11;

c.    the anticipated future of the company and the claims asserted against a debtor;

d.    the source of information stated in the disclosure statement;

e.    the estimated return to creditors under a chapter 7 liquidation;

f.    the future management of a debtor;

g.    the chapter 11 plan or a summary thereof;

h.    the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

i.    the information relevant to the risks posed to claimants under the plan;

j.    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

k.    the litigation likely to arise in a nonbankruptcy context; and

---

[30]    *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408–09 (1977); *see also In re Cajun Elec. Power Coop. Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) ("[W]ith respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court.'" (quoting S. Rep. No. 95-989, at 121 (1978)).

[31]    *See In re Texas Extrusion Corp.*, 844 F.2d at 1157 ("The determination of what is adequate information is subjective and made on a case by case basis.").

l.      the tax attributes of a debtor.[32]

69.     The Disclosure Statement contains, among other things, descriptions and summaries of the following:  (a) classification and treatment of claims and interests under the Plan, including who is entitled to vote and how to vote on the Plan; (b) the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness; (c) events leading to these chapter 11 cases, including the Debtors' prepetition business operations; (d) certain key events and developments during these chapter 11 cases, (e) certain important effects of confirmation of the Plan; (f) a discussion of the transactions contemplated by, and other key aspects of, the Plan; (g) the releases and exculpations contemplated by the Plan; (h) certain financial information about the Debtors, including a liquidation analysis; (i) the statutory requirements for confirming the Plan; (j) certain risk factors holders of claims should consider before voting to accept or reject and the Plan and information regarding alternatives to confirmation of the Plan; (k) certain important disclosures regarding securities laws; and (l) certain U.S. federal income tax consequences of the Plan.

70.     For the reasons set forth above, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) and should be approved.

---

[32]   *In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics is not necessary in every case. *In re Phoenix. Petrol.*, 278 B.R. at 393; *U.S. Brass*, 194 B.R. at 425.

**B.**      **The Debtors Complied with the Solicitation Procedures Order.**

71.      As noted above, on December 21, 2022, the Bankruptcy Court entered the Solicitation Procedures Order and (i) conditionally approved, pending final approval through the Confirmation Order the Disclosure Statement, and (iii) approved the form and manner of the Combined Hearing Notice, the Solicitation Procedures, the form of Ballots, and voting tabulation procedures.[33]  The Debtors complied with the Solicitation Procedures approved in the Solicitation Procedures Order.

**1.**      **The Debtors Complied with the Notice Requirements Set Forth in the Solicitation Procedures Order.**

72.      The Debtors satisfied the notice requirements set forth in the Solicitation Procedures Order and Bankruptcy Rule 3017.  The U.S. Court of Appeals for the Fifth Circuit has adopted the general rule that "[d]ue process requires that notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency of a proceeding."[34]  When evaluating the sufficiency of notice, courts in this Circuit consider whether "(1) the notice apprised the claimant of the pendency of the action, and (2) [whether] it was sufficiently timely to permit the claimant to present his objections."[35]  Indeed, "[w]hether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case."[36]

---

[33]      *See generally* the Solicitation Procedures Order.

[34]      *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

[35]      *In re Christopher*, 28 F.3d 512, 518 (5th Cir. 1994); *In re Tex. Tamale Co.*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998).

[36]      *In re Hunt*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992).

73.     In this case, the Debtors have satisfied these requirements.  *First*, on December 27, 2022, the Debtors published the Combined Hearing Notice in the national edition of *The New York Times*.[37]

74.     *Second*, on December 28, 2022, the Debtors distributed the Solicitation Packages, which included, in part, (i) the appropriate form of Ballots for those Holders of Claims and Interests entitled to vote accept or reject to the Plan; (ii) a cover letter; (iii) the Combined Hearing Notice; and (iv) a letter from the Committee.  The materials included in the Solicitation Package informed all Holders of Claims and Interest of record of, among other things: (a) the date and time set for the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan; (b) the deadline for filing objections to the Plan and the Disclosure Statement; (c) the deadline for voting on the Plan, and (d) the deadline to submit an Opt-Out Form.[38]  *Third,* the cover letter included in the Solicitation Package included instructions on how to obtain the Plan, the Disclosure Statement and the Solicitation Procedures Orders without a fee through the Debtors' restructuring website,  https://dm.epiq11.com/computenorthholdings,  or  at  the  Bankruptcy  Court's  PACER website.  Accordingly, the Debtors submit that all parties in interest had sufficient notice of the Voting Deadline, the Objection Deadline and the Combined Hearing, and no party has been prejudiced by this schedule.

---

[37]   *See Affidavit of Publication* [Docket No. 756] (the "Publication Notice").

[38]   *See* Solicitation Notice Affidavit.

**2.      The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Solicitation Procedures Order.**

75.      The form of ballots used complied with the Bankruptcy Rules and were approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order.[39]  No party has objected to the sufficiency of the ballots.  Based on the foregoing, the Debtors submit that they complied with the Solicitation Procedures Order and satisfied the requirements of Bankruptcy Rule 3018(c).

**3.      The Debtors' Solicitation Period Complied with the Solicitation Procedures Order and Bankruptcy Rule 3018(b).**

76.      The Debtors' solicitation period complied with the Solicitation Procedures Order and Bankruptcy Rule 3018(b).  *First*, as demonstrated above, the Solicitation Packages were transmitted to all Holders of Claims and Interests entitled to vote on the Plan.  *Second*, the solicitation period complied with the Solicitation Procedures Order[40] and was adequate under the particular facts and circumstances of these cases.  Accordingly, the Debtors submit that they complied with the Solicitation Procedures Order and satisfied the requirements of Bankruptcy Rule 3018(b).

**4.      The Debtors' Vote Tabulation Procedures Complied with the Solicitation Procedures Order.**

77.      The Debtors request that the Bankruptcy Court find that the Debtors' tabulation of votes complied with the Solicitation Procedures Order.  The Claims and Noticing Agent reviewed all ballots received, in accordance with the procedures described in the Solicitation Procedures Motion[41] and subsequently approved in the Solicitation Procedures Order.[42]  Because The Claims

---

[39]   *See* Solicitation Procedures Order ¶ 5.

[40]   *See id.* ¶ 4.

[41]   *See generally* Voting Report.

[42]   *See* Solicitation Procedures Order ¶ 10.

and Noticing Agent complied with all of the Solicitation Procedures, the Debtors respectfully submit that the Bankruptcy Court should approve the Debtors' tabulation of votes confirming that in the Voting Classes the requisite majorities in amount and number of Claims and Interests, as applicable, voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

### 5.    Waiver of Certain Solicitation Package Mailings.

78.    Bankruptcy Rule 3017(d) requires transmission of a court-approved disclosure statement to, inter alia, classes of unimpaired creditors and equity security holders unless the court orders otherwise.  The Solicitation Procedures Order authorized the Debtors to forgo sending Solicitation Packages to holders of Claims and Interests in Classes 1, 2, 3A, 5 and 6 because such Holders were either (i) unimpaired and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, (ii) impaired and conclusively deemed to reject the Plan; or (iii) held Intercompany Claims or Intercompany Interests.[43]

### 6.    Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.

79.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.

80.    As set forth in the Harvey Declaration, the Mersch Declaration and the Solicitation Procedures Motion, and as demonstrated by the Debtors' compliance with the Solicitation Procedures Order, the Debtors at all times engaged in arm's-length, good-faith negotiations and

---

[43]    *See* Solicitation Procedures Order ¶¶ 16, 17.

took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

### III. The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.

#### A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

81.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[44]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

#### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

82.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or

---

[44]   S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.") (citing, *inter alia*, *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011)); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003) ("The Plan complies with the applicable provisions of the Bankruptcy Code, including the requirements of Sections 1122 and 1123(a) and (b) of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code.").

interest is substantially similar to the other claims or interests of
such class.

83.     "Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."[45]  Claims or interests designated to a particular class must be substantially similar to each other,[46] but it is not necessary that all claims with equal priority be classified in the same class.[47]  Courts have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[48]

84.     The Plan's classification of Claims and Interests is consistent with the Global Settlement and satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into separate classes, with Claims and Interests in each class differing from the Claims and Interests in each other class in a legal or factual way or based on other relevant

---

[45]     *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), aff'd, 662 F.3d 315 (5th Cir. 2011).

[46]     *See id.*

[47]     *See In re Armstrong World Indus., Inc.*, 348 B.R 136, 159 (D. Del. 2006).

[48]     Courts have identified grounds justifying separate classification, including: (i) where members of a class possess different legal rights, and (ii) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Chateaugay Corp.. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . . .").

criteria.[49]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following classes:

a.     <u>Class 1</u>: Secured Claims;

b.     <u>Class 2</u>: Other Priority Claims;

c.     <u>Class 3</u>: General Unsecured Claims;

d.     <u>Class 3A</u>: CNCC GUC Claims;

e.     <u>Class 4</u>: Parent GUC Claims;

f.     <u>Class 5</u>: Intercompany Claims;

g.     <u>Class 6</u>: Intercompany Interests;

h.     <u>Class 7</u>: Preferred Equity Interests; and

i.     <u>Class 8</u>: Parent Equity Interests.

85.     Claims and Interests assigned to each particular class described above are substantially similar to the other Claims and Interests in such class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular claims or interests into the classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[50]  Namely, the Plan separately classifies the claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally

---

[49]   *See* Plan, § III.

[50]   *See id.*

dissimilar to the Claims or Interests in other classes or because substantial administrative convenience resulted from such classification.  For example:

  a.  Secured Claims (Class 1) are classified separately due based on the fact that the Holders of Claims in this Class have rights against collateral.

  b.  Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.

  c.  General Unsecured Claims (Class 3) are appropriately classified separately as the Claims in this Class are substantially similar to the other claims in this Class.

  d.  CNCC GUC Claims (Class 3A) are appropriately classified separately as the Claims in this Class are substantially similar to the other claims in this Class. Claims in this Class have been classified separately from claims in Class 3 because there are significant claims at CNCC but no assets, such that inclusion of CNCC GUC Claims in Class 3 would provide an improper windfall to creditors of CNCC and unfairly dilute the recoveries to Estate creditors generally.

  e.  Parent GUC Claims (Class 4) are appropriately classified separately because Parent GUC Claims are general unsecured claims that arise under Holdings and are structurally subordinated to unsecured claims at the other Debtors.

  f.  Intercompany Claims (Class 5) are dissimilar from claims held by non-Debtors, and Intercompany Interests (Class 6) are appropriately classified separately from Preferred Equity Interests (Class 7) and Parent Equity Interests (Class 8) given that Preferred Equity Interests and Parent Equity Interests are held by non-Debtors and may be entitled to a distribution under the Plan to the extent Distributable Value is available for Holders of Interests in these Classes.[51]

  86.  Accordingly, the Claims or Interests assigned to each particular Class under the Plan are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions.  Moreover, the separate classification of certain Claims or Interests was done in consultation with the Committee as part

---

[51] *See id.*, § III.

of the Global Settlement. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

87.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

#### a. Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).

88.     Section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan designate classes of claims and equity interests, subject to section 1122 of the Bankruptcy Code. As discussed above, the Plan designates 6 Classes of Claims and 3 Classes of Interests, subject to section 1122.[52]   Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

#### b. Classes that Are Not Impaired (§ 1123(a)(2)).

89.     Section 1123(a)(2) of the Bankruptcy Code requires that a chapter 11 plan specify which classes of claims or equity interests are unimpaired under the plan.  The Plan meets this requirement by setting forth the treatment of each Class in Section III that is not impaired. Specifically, the Plan identifies Classes 1 and 2 as unimpaired in Section III in accordance with section 1123(a)(2) of the Bankruptcy Code.

---

[52]     *Id.*

**c.      Treatment of Impaired Classes (§ 1123(a)(3)).**

90.      Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan meets this requirement by setting forth the treatment of each Class in Article III that is impaired.

**d.      Equal Treatment within Classes (§ 1123(a)(4)).**

91.      Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective class, except to the extent otherwise agreed to by the Debtors and any such holder.

**e.      Means for Implementation (§ 1123(a)(5)).**

92.      Section 1123(a)(5) of the Bankruptcy Code requires a plan provide "adequate means" for its implementation.   Section IV of the Plan and elsewhere in the Plan provide a detailed description of the transactions that will occur under the Plan.   Specifically, the Plan and the Plan Supplement, consistent with the Global Settlement, provide for, among other things: (a) the wind-down and dissolution of the Debtors; (b) the appointment of a Plan Administrator to administer and wind-down the Debtors' Estates; (c) the creation and establishment of a Litigation Trust; (d) the preservation of Causes of Action for the benefit of the Litigation Trust; (e) the effectuating of certain documents; (f) the authorization for the Debtors and/or Reorganized Debtors, as applicable, to take all corporate actions contemplated by the Plan; and (g) the cancellation of existing securities and agreements, and the surrender of existing securities. The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements

40

included in the Plan Supplement. Thus, the Debtors believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### e.      Issuance of Non-Voting Securities (§ 1123(a)(6)).

93.     Section 1123(a)(6) of the Bankruptcy Code requires a plan to provide for the inclusion in the charter of (a) the debtor, (b) certain entities to which property of the estate is transferred, and (c) certain entities with which the debtor is merged or consolidated, a provision prohibiting the issuance of non-voting equity securities and providing an appropriate distribution of voting power among voting classes of equity securities. Under the Plan, and pursuant to the Wind-Down Transactions, certain of the Debtors will be merged into Mining Project Wind Down LLC (f/k/a Compute North LLC), and the governing corporate documents of each surviving Debtor will be amended and restated to provide that each such entity if prohibited from issuing non-voting equity securities.  As such, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### f.      Directors and Officers (§ 1123(a)(7)).

94.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." In accordance with Section 4.2.5 of the Plan and consistent with the Global Settlement, on the Effective Date, all managers, officers, directors, sale director or Governing Body of the Reorganized Debtors shall be deemed to have resigned their respective positions, and shall be replaced by the Plan Administrator. The appointment of the Plan Administrator as the sole manager, sole director and sole officer of the Reorganized Debtors on the Effective Date is

consistent with the interests of creditors, equity security holders and public policy. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

#### a. Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.

95. Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; (d) modify the rights of holders of claims and interests; and (e) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[53]

#### b. Impairment/Unimpairment of Claims and Interests (§ 1123(b)(1)).

96. Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." Under Section III of the Plan, Classes 1 and 2 are unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Interests within such classes.[54] On the other hand, Classes 3, 3A, 4, 5, 6, 7 and 8 are impaired since the Plan modifies the rights of the Holders of Claims and Interests within such classes as contemplated in section 1123(b)(1) of the

---

[53]   *See* 11 U.S.C. § 1123(b)(1)–(3), (5–6).

[54]   *See* Plan, § III.

42

Bankruptcy Code.[55]   Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### c.      Assumption/Rejection of Executory Contracts and Leases (§ 1123(b)(2)).

97.      Section 1123(b)(2) of the Bankruptcy Code allows a Plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.  Section 5.1 of the Plan provides that, on the Effective Date, each Executory Contracts and Unexpired Leases of the Debtors not previously rejected, assumed, or assumed and assigned shall be deemed rejected in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, *unless* such Executory Contract or Unexpired Lease: (1) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (2) is a D&O Policy or relates to the indemnification obligations of the Debtors, the Reorganized Debtors or the Plan Administrator; (3); is subject to a rejection notice or assumption notice Filed with the Bankruptcy Court; (4) is a contract assumed by the Debtors or to be assumed by the Debtors and assigned to another third party, as applicable, pursuant to an Asset Purchase Agreement; or (5) is an Asset Purchase Agreement.[56]   Accordingly, the treatment of executory contracts and unexpired leases in the Plan is authorized by, and is consistent with, section 1123(b)(2) of the Bankruptcy Code.

---

[55]   *See id.*

[56]   *See id.,* § V.1.

### d.   Settlement, Releases, Exculpation, Injunction, and Cancellation of Liens (§ 1123(b)(3)).

98.    Section 1123(b)(3)(A) of the Bankruptcy Code allows a Plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

### (i)   Release and Exculpation Provisions

99.    The Plan contains release and exculpation provisions that were integral components of the complex negotiations and compromises underlying the Plan and the Global Settlement. Specifically, the Plan contains:

- Releases in Section 9.3 of the Plan by the Debtors and the Reorganized Debtors in favor of the Released Parties[57] (collectively, the "Debtor Release");

---

[57]   "Released Parties" means, collectively, in each case in its capacity as such: (a) each Debtor and its retained financial advisors, attorneys, accountants, investment bankers, and other professionals; (b) the officers and directors of the Debtors on or after the Petition Date as listed on Schedule 1.1.98 to the Plan; (c) the Plan Administrator; (d) the Committee and each of its members, solely in their capacity as such; (e) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; (f) all Holders of Claims or Interests that abstain from voting on the Plan, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and who do not object to the Plan; and (g) with respect to each of the foregoing clauses (c) through (f), such Entity's current and former Affiliates, subsidiaries, advisors, principals, partners, manager, members, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals, in each case to the extent a claim or Cause of Action arises from actions taken or omissions by any such person in its capacity as a related person of one of the parties listed in clauses (c) through (f) and is released as against such party; provided, however, that with respect to each of the individuals that served as an officer or director of the Debtors as of the Petition Date not listed on Schedule 1.1.98 (each, an "Other D&O"), each Other D&O shall be a Released Party solely to the extent such party's legal obligations for any wrongful acts exceed the applicable combined limits (taking into account covered defense costs) of the Debtors' available insurance policies that cover, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage (such policies, the "D&O Policies"), subject to the following: any recovery by or on behalf of the Litigation Trust (and the beneficiaries thereof) on account of any cause of action (other than with respect to claims for gross negligence, willful misconduct or fraud) against any Other D&O, in each case by way of settlement or judgment, shall be limited to the applicable D&O Policies' available combined limits, after payment from such D&O Policies of any covered costs and expenses incurred by the covered parties in connection with the defense of such cause of action; provided further that any rights under applicable law of current directors and officers of the Debtors to indemnification and advancement of costs shall be preserved; provided, further, that (i) any Holder of a Claim or Interest who opts out of the releases in accordance with the procedures set forth in the Solicitation Procedures Order shall not be a "Released Party" under the Plan; (ii) any Holder of a Claim or Interest who timely Files an objection to the Plan in respect of the releases contained in Section 9.4 of the Plan, shall not

---

44

- Releases in Section 9.4 of the Plan by the Releasing Parties[58] in favor of the Released Parties (collectively, the "Third-Party Release"); and

- An exculpation provision in Section 9.5 of the Plan in favor the Exculpated Parties (the "Exculpations").

These provisions, among other things, are the product of extensive, good-faith, arms-length negotiations, were a material inducement for parties to vote for or otherwise support the Plan and enter into the Global Settlement, are supported by the Debtors and their key constituencies, are consistent with applicable precedent, and, therefore, should be approved.

### (I)    The Debtor Release Is Appropriate.

100.    Section 9.3 of the Plan provides for the release and discharge of certain Claims and Causes of Action held by each and all of the Debtors, the Reorganized Debtors and their Estates to the Released Parties.[59] The Debtor Release also includes applicable carve outs and do not release

---

be a "Released Party" under the Plan; (iii) any of the Debtors' current and former officers, directors and managers not specifically identified in clauses (b)-(g) above shall not be a "Released Party" under the Plan; and (iv) any Entity or Affiliate of an Entity that is identified on the Schedule of Retained Causes of Action shall not be a "Released Party" under the Plan.  For the avoidance of doubt, no party listed on the Schedule of Retained Causes of Action nor any of the Debtors' current and former officers, directors and managers not specifically identified in clauses (b)-(g) above shall receive a release pursuant to clauses (e) or (f) above.  Plan, Section 1.1.98.

[58]  "Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Released Parties; (b) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; (c) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; and (e) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (d), such Entity and its current and former Affiliates, interest holders, predecessors, successors, assigns, subsidiaries, and affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively. Plan, Section 1.1.99.

[59]  *See* Plan, § 9.3.

(i) any obligations arising on or after the Effective Date; (ii) any Cause of Action included on the Schedule of Retained Causes of Action; or (iii) any claim or liability relating to any Released Party's actual fraud, willful misconduct, or gross negligence.

101.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[60]  The Debtors' Releases are evaluated under the standard set forth in Bankruptcy Rule 9019.[61]  In this case, the Debtor Release is "fair and equitable and in the best interest of the [Debtors' E]state[s]" and should be approved.[62]

102.    *First*, the Plan, including the Debtor Release, is the result of extensive negotiations with the Committee and other key stakeholders that resulted in the culmination of the Global Settlement. The Debtor Release was heavily negotiated by sophisticated parties, each of which were represented by competent counsel and financial advisors. Indeed, the Third Amended Plan and the changes therein reflect the comprehensive Global Settlement reached with the Committee and other key stakeholders, and, more specifically, certain agreed upon language with respect to the Debtor Release. Specifically, the Third Amended Plan was revised to remove the broad general release by the Debtors of all current and former officers and directors, and replaced with a much narrower provision whereby officers and directors who served the Debtors prior to the Petition

---

[60]    *See, e.g.*, *In re Bigler LP*, 442 B.R. at 547 (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *Heritage Org., LLC*, 375 B.R. at 311 ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . .") (emphasis omitted); *In re General Homes Corp. FGMC*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . .").

[61]    *In re Bigler LP*, 442 B.R. at 543 n.6 ("[S]ettlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under Rule 9019.").

[62]    *In re Foster Mortg.*, 68 F.3d 914, 917 (5th Cir. 1995).

Date do not receive releases.  Moreover, consistent with the Global Settlement, only specifically identified officers and directors that worked for the Debtors on or after the Petition Date, as listed on Schedule 1.1.98 to the Plan, are entitled to a release under the Plan except for conduct determined by the Bankruptcy Court to have resulted from actual fraud, willful misconduct or gross negligence.  With respect to the other officers and directors of the Debtors on or after the Petition Date who are not listed on Schedule 1.1.89 of the Plan (the "Other D&Os"), those parties are Released Parties solely to the extent such party's legal obligations for any wrongful acts exceed the applicable combined limits (taking into account covered defense costs) of the Debtors' D&O Policies, and any rights under applicable law of current and former directors and officers of the Debtors to indemnification and advancement of costs are preserved.  The Third Amended Plan, reflecting the terms of the Global Settlement, also specifically provides that any of the Debtors' current and former officers, directors and managers not specifically identified in clauses (b)-(g) of the Plan definition of "Released Party" shall not be a "Released Party" under the Plan, including by virtue of voting to accept the Plan or abstaining and not opting out of the releases thereunder.

103.    The Debtors' board of directors (the "Board") and management, following extensive negotiations and deliberations, ultimately determined that the Global Settlement, including the revisions to the Debtor Release, is fair to and in the best interests of the Debtors, their creditors, and all other stakeholders.[63] The changes made to the Debtor Release, as embodied by the Global Settlement, helped ensure that the Debtors did not face a contested Combined Hearing with the Committee and other key stakeholders and the risk of unnecessary delay and expenses associated therewith. Consistent therewith, on January 29, 2023, the Board authorized

---

[63]    *See* Tillman Declaration at ¶ 14.

the filing of the Third Amended Plan which embodied the modified terms of the Debtor Release and the Global Settlement.

104.    Consequently, the Plan is now fully supported by the Committee and other of the Debtors' key stakeholders. Indeed, on January 31, 2023, the Committee filed a notice with the Bankruptcy Court declaring their support for the Plan and its recommendation that unsecured creditors entitled to vote on the Plan vote to accept.[64]  Pursuant to the Committee Statement in Support, the Committee states that they believe that the Plan, including the modified terms of the Debtor Release, is in the best interests of the Debtors' unsecured creditors.[65]

105.    Moreover, resolutions reached with certain other key stakeholders demonstrate further support for the Plan, including the Debtor Release. Pursuant to the RKMC Settlement, RKMC will now support the Plan, vote its Allowed Claim in favor thereof, and not opt out of the Debtor Release.[66]  Additionally, on January 30, 2022, the Debtors, as part of the Global Settlement, filed the *Emergency Motion to Approve Settlement with Marathon Digital Holdings, Inc. Pursuant to Bankruptcy Rule 9019* [Docket No. 881] (the "Marathon Settlement Motion"), by which the Debtors' entered into a settlement with one of their largest creditors, customers, and preferred equity investors (the "Marathon Settlement"). Absent the Marathon Settlement, Marathon would have voted to reject the Plan and opted out of the Debtor Release. With the Marathon Settlement, the Debtors obtain the benefit of Marathon's support for the Plan and the Debtor Release.[67]

---

[64]    *See Notice of Committee Recommendation to Unsecured Creditors to Vote to Accept the Debtors' Chapter 11 Plan* [Docket No. 888] (the "Committee Statement in Support").

[65]    *Id.*

[66]    *See Debtors' Emergency Motion to Approve Settlement with RK Mission Critical LLC Pursuant to Bankruptcy Rule 9019* [Docket No. 886] at ¶ 23.

[67]    *See* Marathon Settlement Motion at ¶ 16.

106.    Further, the Holders in Classes 3, 7 and 8 voted—overwhelmingly—in favor of the Plan, including the release provisions included therein.[68]

107.    This level of support demonstrates the stakeholders' interest in approval of the Plan, including the Debtor Release contained therein.

108.    **Second**, the Debtors believe that the Debtor Release does not release any valuable, colorable claims against the Released Parties.  When the Debtors began the process of formulating and soliciting the Plan, the Committee raised various concerns about the Debtor Release, including a concern that the Debtors may have valuable Causes of Action that would be released under earlier versions of the Plan.[69]  As noted in the Tillman Declaration, on August 8, 2022, during the Debtors' evaluation of strategic alternatives in response to the Debtors' deteriorating liquidity position and near-term cash requirements, the Board appointed Scott Tillman as an independent manager.[70] After the Petition Date, the Board requested that Mr. Tillman, with the assistance of counsel, conduct an investigation focused on identifying any viable breach of fiduciary duty claims, or other claims, against directors or officers of the Debtors that may be released under the terms of the Plan.  Mr. Tillman also investigated payments to insider officers and directors in the one-year period before the Petition Date to determine whether any of those payments are potentially avoidable under applicable provisions of the Bankruptcy Code. In addition to reviewing board materials and other relevant documents, Mr. Tillman and counsel interviewed ten current and former Compute North officers and directors.[71]

---

[68]    *See* Voting Declaration, Ex. A.

[69]    *See* Tillman Declaration at ¶ 5.

[70]    See *id* at ¶ 3.

[71]    *See id* at ¶ 9.

109.     During the course of Mr. Tillman's independent investigation, the Debtors and the Committee entered into extensive, arms' length negotiations regarding the Debtor Release that ultimately resulted in the Global Settlement that is now embodied in the Plan.[72] The Global Settlement, in part, resolved the Committee's objections to the Debtor Release in order to facilitate confirmation of the Plan. As noted above, under the terms of the modified Debtor Release (a) officers and directors who served the Debtors prior to the Petition Date do not receive releases, (b) officers and directors of the Debtors on and after the Petition Date that are listed on Schedule 1.1.89 of the Plan will receive releases under the Plan except for conduct determined by the Court to have resulted from actual fraud, willful misconduct or gross negligence, and (c) officers and directors of the Debtors on and after of the Petition Date who are <u>not</u> listed on Schedule 1.1.89 of the Plan remain subject to claims by the Litigation Trust, but only up to the limits of coverage available under the Debtors' D&O Liability Insurance Policies.[73]

110.     As a result of his investigation, Mr. Tillman concluded that the Debtor Release, as set forth in the Plan and modified by the Global Settlement, is justified.[74] According to the Tillman Declaration, the Debtor Release, as modified by the terms of the Global Settlement, reflects a sound exercise of Debtors' business judgment and is in the best interest of the Debtors' creditors.[75]

111.     ***Third***, each of the Released Parties has made a substantial contribution to the Debtors' Estates.  The Released Parties played an integral role in the formation of the Plan, including the modifications that resulted in the Global Settlement, and contributed to the Plan by

---

[72]   *See id* at ¶ 12.

[73]   *See id* at ¶ 13.

[74]   See *id* at ¶ 11.

[75]   See *id* at ¶ 16.

expending significant time and resources analyzing and negotiating the issues presented by the Chapter 11 Cases.  For instance,  the Debtors' directors, officers, and other agents that are receiving a release under the Plan have been instrumental in negotiating, formulating, and implementing the Global Settlement and the major Asset Sales the Debtors consummated during these Chapter 11 Cases and many will play important roles in implementing the Wind-Down Transactions contemplated under the Plan and the Global Settlement.  The Debtor Release, in particular, is an integral component of the consideration to be provided to their personnel for their efforts throughout these Chapter 11 Cases and an important part of the compromises and resolutions embodied in the Plan.

112.    ***Finally***, the Debtor Release is essential to the Debtors' Chapter 11 Cases and the consummation of the transactions contemplated under the Plan because it constitutes an integral term of the Global Settlement.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the transactions contemplated therein.  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan.  Importantly, the Debtor Release was vigorously negotiated by the Debtors, the Committee and other sophisticated entities that were represented by able counsel and financial advisors as part of settlement negotiations.  In light of the Debtors' Releases being essential to the Plan and the Global Settlement, the Debtors believe that the record of these Chapter 11 Cases fully supports the essential nature of these releases.

113.   For these reasons, the Debtor Release is justified, is in the best interests of creditors, is an integral part of the Plan and the Global Settlement, and satisfies key factors considered by courts in this jurisdiction in determining whether a debtor release is proper.

**(II)     The Third-Party Release Is Appropriate.**

114.   The Plan provides an appropriately tailored release by third parties in Section 9.4 of the Plan that (i) is consistent with the terms of the Global Settlement, and (ii) applies only to consenting parties and, therefore, should be approved.   Specifically, the Plan provides for a discharge and release of claims against the Released Parties (*i.e.*, parties who actively participated in the Debtors' Plan negotiations and whose contributions and concessions have facilitated and made possible the Debtors' proposed Plan), in their respective capacities, for, among other things, acts arising out of these Chapter 11 Cases and transactions related thereto.

115.   Under section 1123(b)(6) of the Bankruptcy Code, a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."   Here, the Third-Party Release is proper under sections 1123(b)(6), 1123(a)(5), and 1123(b)(3)(A) of the Bankruptcy Code as a consensual settlement of Claims and Causes of Action by the Releasing Parties in exchange for consideration provided by the Released Parties.[76]   A plan may include a nondebtor release if "it releases claims only of parties who have consented and to whom consideration has been provided."[77]   A nondebtor release may constitute consideration for

---

[76]   *See, e.g.*, *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. Sept. 14, 2016), Conf. Hr'g Tr. at 14 (ECF No. 352) ("If there are third-party releases that are negotiated between the Debtor and third parties as part of their deal, that doesn't seem to me to really run afoul of anything.").

[77]   *See Bigler*, 442 B.R. at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a nondebtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization") (citations omitted); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan.").

a settlement of claims under section 1123(b)(3) of the Bankruptcy Code.[78]  It may also be "an essential means of implementing [a p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code."[79]

116.    Under Fifth Circuit law, third-party releases that are, as here, (a) consensual, (b) specific in language, (c) integral to the Plan, (d) a condition of the settlement, and (e) given for consideration, do not violate the Bankruptcy Code and should be allowed and included in the Plan.[80]  The critical factor in determining whether a release is consensual is whether—after the Debtors' due process obligations of providing appropriate notice—"the affected creditor timely objects to the provision."[81]

---

[78]    *See Bigler*, 442 B.R. at 549 (approving nondebtor release under section 1123(b)(3)).

[79]    *In re Moody Nat'l SHS Houston H, LLC*, Case No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

[80]    *See In re Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate § 524(e)."); *see also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286–88 (5th Cir. 2016) (discussing the specificity requirement for third-party releases in Fifth Circuit); *FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a nondebtor release where "the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself"); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third-party); *Republic Supply Co. v. Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (noting that "the Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient").

[81]    *See In re Wool Growers*, 371 B.R. at 776 (citing *In re Zale Corp.*, 62 F.3d 746, 760–61 (5th Cir. 1995)) (emphasis added); *see also In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (ECF No. 1250) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (ECF No. 142) (overruling U.S. Trustee objection and confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they opted out of the same); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (ECF No. 1324) (confirming chapter 11 plan where general unsecured creditors were unimpaired and deemed to have consented to third-party release provisions unless they opted out of the same); *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016), Conf. Hr'g Tr. at 42 (ECF No. 191) (debtors correctly characterized that release was consensual as debtors provided extensive notice of plan and confirmation hearing and no party specifically objected to plan's release provisions); *see also In re RAAM Glob. Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 19, 2016), Conf. Hr'g Tr. at 61 (ECF No. 399) ("[A]s to the holders of claims, it's limited to parties that

---

117.    Further, the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures") provide:

> If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.[82]

118.    Here, the Third-Party Release satisfies the Fifth Circuit's standard and the Complex Rules.   First, the Third-Party Release is fully consensual.   Parties in interest were provided extensive notice of these Chapter 11 Cases, the deadline to object to the Plan, and the deadline to submit an Opt-Out Form.   Each of the Non-Voting Status Notices that was sent to Holders of Claims and Interests in Non-Voting Classes and the Ballot that was sent to the Voting Class expressly included, in bold font, the terms of the Third-Party Release, as set forth in Section 9.4 of the Plan.   The Non-Voting Status Notices and the Ballot advised careful review and consideration of the terms of the Third-Party Release, along with the Exculpation and Injunction provisions.   The language of the Third-Party Release was also emphasized using bold font in the Plan and Disclosure Statement.   The language of the Third-Party Release is also sufficiently specific to put the Releasing Parties on notice of the Claims being released as the Third-Party Release describes the nature and type of Claims released.

---

have accepted and not opted out, and having reviewed it and in the absence of objections I think it is within the range of authority I have under existing Fifth Circuit law.").

[82]    Complex Case Procedures, ¶ 40.

119.     Furthermore, the circumstances of these chapter 11 cases warrant the Third-Party Release because it is integral to the Plan and critical to the success of the transactions contemplated thereunder.  There is no dispute that the Released Parties supplied integral services, even prior to the Petition Date, which enabled the Debtors to propose the Plan and proceed to confirmation.  The Third-Party Release was a critical negotiated term of the Plan.  Without the Third-Party Release, the Debtors' key stakeholders would not have been willing to fund and otherwise support the consensual restructuring transactions contemplated by the Restructuring Support Agreement, support confirmation of the Plan, and enable the Debtors to emerge from bankruptcy as a viable company.

120.     Moreover, the third parties bound by the Releases have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release.  Specifically, each Holder of a Claim or Interest that votes to accept the plan, and does not object to the Plan or opt out of the Releases, will receive a release, so long as that Holder is not listed on the Schedule of Retained Causes of Action.  The Debtors believe this provides Holder of Claims and Interest valuable consideration and a strong incentive to refrain from opting out. As described in the Harvey Declaration, the consummation of the Plan and the Global Settlement would not have been possible without the Released Parties' support and contributions.[83]  Each Released Party has made a substantial contribution to these Chapter 11 Cases.

121.     The Third-Party Release also complies with the Complex Case Procedures regarding consensual releases.  As evidenced by the Solicitation Notice Affidavit, the Ballots were

---

[83]     *See* Harvey Decl., ¶ 28.

sent to all creditors entitled to vote on the Plan and the Non-Voting Status Notices was sent to all non-voting creditors and parties in interest.[84]   The Ballot and the Non-Voting Status Notice informed creditors of the Third-Party Release by providing the exact language of the Release, Exculpation, and Injunction Provisions in bold, conspicuous font and providing the identities of the parties subject to those provisions.[85]   The Ballot provided a checkbox to opt-out of the consensual Third-Party Release, and the Non-Voting Status Notices included an Opt-Out Form that also provided a checkbox to opt-out of the consensual Third-Party Release.[86]

122.   The Third-Party Releases are also sufficiently specific to put the Releasing Parties on notice of the Claims being released.  The Third-Party Releases describe the nature and type of Claims being released, including Claims with respect to:

> [T]he Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out of court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the pursuit of Confirmation and Consummation, the pursuit of Asset Sales, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Plan § 9.4.

---

[84]   *See* Solicitation Notice Affidavit.

[85]   *See* Solicitation Procedures Motion, Ex. B; Solicitation Procedures Order, Ex. 2.

[86]   *See id.*

123.    As discussed above, the Released Parties, including certain of the Debtors'
directors, officers and members of their board, played an integral role in the formulation and
negotiation of the Plan, the Global Settlement and the transactions contemplated thereby, and the
Released Parties have expended significant time and resources analyzing and negotiating the issues
presented by the Debtors' commercial relationships, and have successfully negotiated settlements
of many complex claims.   The Released Parties also played a critical role in the Asset Sales that
monetized many of the assets of the Debtors' Estates, positioning the Debtors to distribute
proceeds to unsecured creditors.  The proposed resolution of the Debtors' Chapter 11 Cases would
not have been possible without the Released Parties' support and contributions.  Further, without
the extensive deliberations, diligence and hard-fought negotiations employed by the Released
Parties, the Global Settlement would not have been possible. Each Released Party has made a
substantial contribution to these Chapter 11 Cases.[87]  Accordingly, the Third-Party Release should
be approved.

124.    Ultimately, given the substantial contributions provided by the Released Parties to
the Chapter 11 Cases, in addition to the consideration being provided to the third parties bound by
the releases as a result of the Global Settlement embodied and set forth in the Plan, the Third-Party
Release is crucial to the Plan and it is imperative that the Third-Party Release be approved to help
effectuate the transactions contemplated under the Plan.

---

[87]    *See, e.g.*, *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Nov. 3, 2011) [Docket
No. 1037] (confirming plan that treated holders of claims and interest that did not vote to reject plan or were not
members of a class deemed to reject plan as releasing parties); *In re Majestic Star Casino, LLC*, No. 09-14136
(KG) (Bankr. D. Del. Mar. 10, 2011) (confirming plan that treated holders of claims and interests that did not
vote to accept plan as releasing parties) [Docket No. 1059].

125.     Accordingly, the Debtors submit that the Third-Party Release is appropriately tailored under the circumstances of these Chapter 11 Cases, is justified by the record of these Chapter 11 Cases, is consistent with the practices of this jurisdiction, and should be approved.

### (III)    The Exculpation Provision Is Appropriate.

126.     Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved under appropriate circumstances.[88]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[89]

127.     In connection with the hearing on conditional approval of the Disclosure Statement, the Debtors amended the definition of Exculpated Parties to address the Bankruptcy Court's prior concerns over its scope, and to limit exculpation to fiduciaries.[90]  As amended, the Plan's definition of Exculpated Parties now only include the following estate fiduciaries:

---

[88]   *See, e.g.*, *In re Exco Res. Inc., et al.*, Case No. 18-30155 (MI) (Bankr. S.D. Tex. June 18, 2019) (ECF No. 2128) (order confirming chapter 11 plan and approving similar exculpation provision); *In re Parker Drilling Co., et al.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex. Mar. 7, 2019) (ECF No. 459) (same); *In re Expro Holdings US Inc., Ch. 11 Case No. 17-60179 (DRJ) (Bankr. S.D. Tex. Jan. 25, 2018) (ECF No. 212) (same); In re GenOn Energy, Inc.*, Case No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (ECF No. 1250) (same); *In re Ameriforge Grp., Inc.*, Case No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (ECF No. 142) (same); *In re Ultra Petrol. Corp.*, Case No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (ECF No. 1324) (same); *In re Stone Energy Corp.*, Case No. 16-36390 (MI) (Bankr. S.D. Tex. Feb. 15, 2017) (ECF No. 528) (same); *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) (ECF No. 1629) (same); *In re RAAM Global Energy Co.*, Case No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 19, 2016) (ECF No. 376) (same); *In re Energy XXI, Ltd*, Case No. 16-31928 (DRJ) (Bankr. S.D. Tex. Dec. 13, 2016) (ECF No. 1809) (same).

[89]   *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

(i) the Debtors; and (ii) the Committee and each of its members.[91]

128.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, as well as the terms of the Global Settlement, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties, in accordance with Section 9.5 of the Plan.

129.    Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan as it relates to the Debtors.

130.    As discussed above, this Bankruptcy Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Exculpated Parties.  Further, these findings imply that the Plan and the Global Settlement were negotiated at arm's length and in good faith.

131.    Here, there can be no doubt that the Debtors themselves are entitled to the relief embodied in the Exculpations. Exculpated Parties actively negotiated with holders of claims and interests across the Debtors' capital structure in connection with the Plan, the Global Settlement and these Chapter 11 Cases.  Such negotiations were at arm's length, hard-fought and extensive and the resulting Asset Sale agreements and settlements were implemented in good faith with a high degree of transparency.  As a result, the Plan enjoys support from the impaired accepting

---

[91]    *See* Plan, § 1.1.50.

classes sufficient to satisfy the Bankruptcy Code's requirements for confirmation of the Plan.[92]

Having acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, the

Debtors are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the

Exculpations.[93]

132.     The Exculpated Parties played a critical role in negotiating, formulating, and

implementing the Disclosure Statement, the Plan, the Global Settlement, the Plan Supplement, and

related documents in furtherance of the Wind-Down Transactions.[94]   Accordingly, the Bankruptcy

Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the

Exculpated Parties.

133.     Additionally, the promise of exculpation played a significant role in facilitating

Plan negotiations.   All of the Exculpated Parties played a key role in developing the Plan and the

Global Settlement, and likely would not have been so inclined to participate in the plan process

without the promise of exculpation.   Exculpation for parties participating in the plan process is

appropriate where plan negotiations could not have occurred without protection from liability.[95]

---

[92]   *See, e.g.*, Voting Report.

[93]   *See In re Sears Methodist Ret. Sys., Inc*., No. 14-32821-11, 2015 WL 1066882, at *9 (Bankr. N.D. Tex. Mar. 6, 2015).

[94]   *See* Hr'g Tr. 58:18–19, *In re Verso Corp*., No. 16-10163 (KG) (Bankr. D. Del. June 24, 2016) [Docket No. 1231] ("[T]he debtors did not do this alone; they did it with the help of many others.").

[95]   *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *see also In re Pilgrim's Pride*, Case No. 08–45664–DML–11, 2010 WL 200000, at *5 ("Debtors, serving through their management and professionals as debtors in possession, acted in the capacity of trustees for the benefit of their creditors . . . [t]o the extent Debtors acted in the Chapter 11 Cases, other than in bad faith, pursuant to the authority granted by the Code or as directed by court order, Debtors' management and professionals presumptively should not be subject to liability.").

134. Further, the exculpation provision is necessary and appropriate to protect parties who have made substantial contributions to the development of the Plan, the Global Settlement and the transactions contemplated thereunder from future collateral attacks related to actions taken in good faith in connection therewith.

135. Accordingly, under the circumstances, it is appropriate for the Bankruptcy Court to find that the Exculpated Parties have acted in good faith and in compliance with the law, and to approve the Exculpations.[96]

**(iii) The Injunction Provision Is Appropriate.**

136. The injunction provision set forth in Section 9.6 of the Plan implements the Plan's release, discharge, and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such claims or interests released, discharged, or subject to exculpation pursuant to Section 9.5 of the Plan. Thus, the injunction provision is a key provision of the Plan because it enforces the release, discharge, and exculpation provisions that are centrally important to the Plan. As such, to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision must also be appropriate. Moreover, this injunction provision is narrowly tailored to achieve its purpose, and similar injunctive provisions have been approved in other complex chapter 11 cases in this district.[97]

---

[96] *See PWS Holding*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and gross negligence exceptions); *Indianapolis Downs*, 486 B.R. at 306 (same).

[97] *See, e.g.*, *In re Weatherford Int'l PLC, et al.*, at ¶ 28, Case No. 19-33694 (DRJ) (Bankr. S.D. Tex. Sept. 11, 2019) (ECF No. 343) (approving similar injunctions and finding that they are "an integral part of th[e] Plan and essential to its implementation."); *In re Halcón Res. Corp., et al.*, Case No. 19-34446 (DRJ) (Bankr. S.D. Tex. Sept. 24, 2019) (ECF No. 321); *In re Gastar Expl. Inc., et al.*, at ¶ 34, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21,

### 4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.

137.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

138.    The Plan complies with section 1123(d) of the Bankruptcy Code.  The Assumed Executory Contracts and Unexpired Leases Schedule, filed with the Plan Supplement at Exhibit A, provides for the satisfaction of any cure amounts associated with Executory Contracts to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.[98]  In accordance with Article VI of the Plan and Section 365 of the Bankruptcy Code, the Debtors will satisfy any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

### B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

139.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements

---

2018) (ECF No. 282); *In re Goodrich Petroleum Corp.*, ¶¶ 29, 108, Case No. 16-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016) (ECF No. 531) (approving substantially similar injunction as being "necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Release, and the Exculpation, and . . . narrowly tailored to achieve this purpose"); *In re SandRidge Energy, Inc.*, at ¶¶ 43, 88, Case No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016) (ECF No. 901) (approving substantially similar "injunction provisions [as being] essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge, Debtor Release, the Third Party Release, and the exculpation provisions . . . ."); *In re RAAM Global Energy Co.*, Case No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 19, 2016) (ECF No. 376) (approving substantially similar injunction provision).

[98]    *See* Plan Supplement, Ex. A (The Assumed Executory Contracts and Unexpired Leases Schedule).

set forth in sections 1125 and 1126 of the Bankruptcy Code.[99]  As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 1.  The Debtors Complied with Section 1125 of the Bankruptcy Code.

140.    As discussed in Part I of this memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code. Moreover, pursuant to the Solicitation Procedures Order, the Bankruptcy Court conditionally approved the Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code.  As set forth in the Voting Report, the Debtors solicited votes on the Plan consistent with the Solicitation Procedures approved by the Bankruptcy Court.  Further, in compliance with section 1125(b), the Debtors did not solicit acceptance of the Plan from any Holder of a Claim or Interest prior to entry of the Solicitation Procedures Order.

### 2.  The Debtors Complied with Section 1126 of the Bankruptcy Code.

141.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

---

[99]    *See* H.R. Rep. No. 95–595, at 412 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.");*See also, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) (Bohm, J.) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125."); *Star Ambulance*, 540 B.R. at 262 ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126.").

> (a)     The holder of a claim or interest allowed under section 502
> of [the Bankruptcy Code] may accept or reject a plan. . . .
>
> (f)     Notwithstanding any other provision of this section, a class
> that is not impaired under a plan, and each holder of a claim
> or interest of such class, are conclusively presumed to have
> accepted the plan, and solicitation of acceptances with
> respect to such class from the holders of claims or interests
> of such class is not required.[100]

142.    As set forth in Part I of this memorandum, in accordance with section 1125 of the
Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of
Allowed Claims and Interests in Classes 3, 4, 7 and 8—the only impaired classes entitled to vote
under the Plan.

143.    The Debtors did not solicit votes from Holders of Claims and Interests in Classes 1
and 2 because Holders of Claims and Interests in these classes are unimpaired and, pursuant to
section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

144.    All Claims and Interests in Class 5 (Intercompany Claims), Class 3A (CNCC GUC
Claims) and Class 6 (Intercompany Interests) will be cancelled, released and extinguished without
any distribution, in which case Holders of such Claims and Interests will be conclusively deemed
to reject the Plan and are not entitled to vote on the Plan.

145.    Sections 1126(c) and 1126(d) of the Bankruptcy Code specify the requirements for
acceptance of a plan by classes of claims and interests:

> (c)     A class of claims has accepted a plan if such plan has been accepted by
> creditors, other than any entity designated under subsection (e) of this
> section, that hold at least two-thirds in amount and more than one-half in
> number of the allowed claims of such class held by creditors, other than any

---

[100]   11 U.S.C. § 1126(a), (f).

Case 22-90273 Document 938 Filed in TXSB on 02/08/23 Page 77 of 106

entity designated under subsection (e) of this section, that have accepted or rejected such plan.

(d)     A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) or this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

146.    As described above, the class of claims voting to accept the Plan did so in sufficient number and by sufficient amounts as required by the Bankruptcy Code.[101]   Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

## C.     The Plan Is Proposed in Good Faith (§ 1129(a)(3)).

147.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[102]   "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied."[103]  "[T]o be proposed in good faith, a plan must fairly achieve a result

---

[101]   *See* Voting Report.

[102]   *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997); *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (citing *In re Cajun Elec. Power*, 150 F.3d at 519).

[103]   *T-H New Orleans*, 116 F.3d at 802; *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *Star Ambulance*, 540 B.R. at 262.

consistent with the [Bankruptcy] Code."[104]  "It does not require the bankruptcy judge to determine whether the ends achieved in the plan contravene non-bankruptcy law."[105]

148.    The Debtors negotiated, developed, and proposed the Plan, which embodies the terms of the Global Settlement, in accordance with section 1129(a)(3) of the Bankruptcy Code.

149.    Here. the Plan has been proposed in good faith and for the legitimate purpose of effectuating the terms of the Global Settlement., winding down the Debtors and liquidating the Estates of each of the Debtors and distributing the Assets of each such Estate on a fair and equitable basis, thereby maximizing the returns available to Holders of Claims and Interests, as applicable. All the transactions contemplated by the Plan—including the Global Settlement, the Liquidating Trust Agreement and the Plan Administrator Agreement—were negotiated and consummated at arm's length, in good faith and without collusion, fraud, or attempt to take grossly unfair advantage of any party, allowing creditors to receive greater and more expeditious distributions under the Plan than they would receive through a chapter 7 liquidation. The Debtors proposed the Plan with legitimate purposes including (1) facilitating the sale of the Debtors' remaining Assets; (2) providing a prompt and efficient liquidation under chapter 11; and (3) maximizing the recovery to Holders of Claims and Interests under the circumstances. Consequently, the Debtors believe that the Plan was proposed in good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.

150.    Throughout the negotiation of the Plan, the Global Settlement and these Chapter 11 Cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of

---

[104]   *Cypresswood Land Partners*, 409 B.R. at 425 (quoting *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991)).

[105]   *Star Ambulance*, 540 B.R. at 263.

all constituents with an even hand.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

> **D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

151.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[106]

152.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  In accordance with Section 1129(a)(4) of the Bankruptcy Code, all Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.[107]  The Bankruptcy Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Bankruptcy Cases.[108] All such fees and expenses, however, remain subject to final review for reasonableness by the Bankruptcy Court. Section 2.2.1 of the Plan, moreover, provides that all Professionals shall file all final requests for payment of Professional Fee Claims no later than 45 days after the

---

[106] *See Lisanti Foods,* 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[107] 11 U.S.C. §§ 328(a), 330(a)(1)(A).

[108] *See Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 249].

Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.

      E.      **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

     153.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."[109] Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[110]  Section 1129(a)(5)(A)(ii) directs the Bankruptcy Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which courts have interpreted to mean: (a) experience in the reorganized debtors' business and industry;[111] (b) experience in financial and management matters;[112] (c) that the debtors and creditors believe

---

[109]  11 U.S.C. § 1129(a)(5)(B); *see also In re Texaco, Inc.*, 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (finding requirements of § 1129(a)(5)(B) satisfied where the plan discloses debtors' existing officers and directors who will continue to serve after plan confirmation); *In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990) (finding § 1129(a)(5)(B) satisfied where plan fully disclosed that certain insiders will be employed by reorganized debtor and the terms of employment of such insiders).

[110]  11 U.S.C. § 1129(a)(5)(A)(ii).

[111]  *See In re Rusty Jones, Inc.,* 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)); *Drexel Burnham,* 138 B.R. at 760 ((citing *Toy & Sports*, 37 B.R. at 149–50).

[112]  *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

control of the entity by the proposed individuals will be beneficial;[113] and (d) does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[114] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[115] The Debtors satisfied section 1129(a)(5) of the Bankruptcy Code.

154. Pursuant to Section 1.1.79 of the Plan, the Debtors disclosed the identity of the Plan Administrator in the Plan Supplement, who shall serve as the sole manager, sole director, and sole officer of the Reorganized Debtors.[116] The Plan Administrator is competent, has relevant and valuable business and industry experience, and will assist with the wind down of the Debtors' Estates. Additionally, the Debtors filed the Litigation Trust Agreement as part of the Plan Supplement.[117] The Trustee of the Litigation Trust shall pursue any all Claims and Causes of Action vested in the Litigation Trust, as appropriate, and, pursuant to Section 1.1.71 of the Plan, shall be the Plan Administrator. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

155. Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. The Debtors are not changing any rates that

---

[113] *See Apex Oil Co.*, 118 B.R. at 704–05.

[114] *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[115] 7 COLLIER ON BANKRUPTCY ¶ 1129.02[5][b] (16th ed. 2018).

[116] *See* Plan, § 1.1.78; Plan Supplement, Ex. E (Plan Administrator Agreement).

[117] *See* Plan Supplement, Ex. F (Litigation Trust Agreement).

require approval by any governmental agency.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

**G.    The Plan Satisfies the Best Interests Test (§ 1129(a)(7)).**

156.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (a)    each holder of a claim or interest of such class—
>
> > (i)  has accepted the plan; or
> >
> > (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

157.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[118]    A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis.[119]    Further, as section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Classes 3, 7 and 8 voted to accept the Plan.  However, Holders of

---

[118]  *Bank of Am. Nat'l Tr. & Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7.

[119]  *Block Shim Dev. Co.-Irving*, 939 F.2d at 292.

Claims and Interests in Class 3A, Class 6 and Class 7 are impaired and, thus deemed to reject the Plan (collectively, the "Deemed Rejecting Classes"). Accordingly, to satisfy the best interests test, the Debtors must demonstrate that each of the Holders in the Deemed Rejecting Classes, as applicable, will receive at least as much under the Plan as that Holder would receive in a chapter 7 liquidation.[120]

158.   The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test. As set forth in the Disclosure Statement[121] and the Mersch Declaration,[122] the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each of the Deemed Rejecting Classes under the Plan. The projected recoveries for these classes under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[123] Specifically, as demonstrated by the Liquidation Analysis, Class 3A (CNCC GUC Claims), Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) would all receive no recovery under a hypothetical chapter 7 liquidation, indicating that these classes would receive an amount equal to or in excess of such recovery pursuant to the Plan.

### H.   The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

159.   Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. As set forth above, the Holders of Claims in (i) Class 1, Secured Claims, and (ii) Class 2, Other Priority Claims are unimpaired

---

[120]   *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[121]   *See* Disclosure Statement, Ex. B.

[122]   Mersch Decl., ¶ 11.

[123]   *See* Disclosure Statement, Ex. C.

under the Plan within the meaning of section 1124 of the Bankruptcy Code and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

160.    Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims in their respective class that have voted.  11 U.S.C. § 1126(c).  As set forth above and in the Voting Report, Class 3 (General Unsecured Claims), Class 7 (Preferred Equity Interest) and Class 8 (Parent Equity Interests) each voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code, while Class 4 (Parent GUC Claims) did not vote to accept the Plan (the "Rejecting Class", and together with the Deemed Rejecting Classes, the "Rejecting Classes").

161.    Holders of Claims in the Deemed Rejecting Classes are deemed to have rejected the Plan and, thus, were not entitled to vote.  Consequently, while the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Deemed Rejecting Classes or the Rejecting Class, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

162.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of

the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

163.    The treatment of Administrative Claims, Professional Fee Claims, and Priority Tax Claims, under Section II of the Plan, and of Other Priority Claims under Section III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

164.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  Section 1129(a)(10) does not "require any particular

degree of impairment" so long as the plan is deemed to have been proposed "in good faith as required by section 1129(a)(3)."[124]

165.    Here, Classes 3, 7 and 8, each of which is impaired, voted to accept the Plan independent of any insiders' votes.  Thus, the Plan has been accepted by at least one voting Class holding non-insider Claims.  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.    The Plan Is Feasible (§ 1129(a)(11)).**

166.    Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[125]

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[126]

Rather, a debtor must provide only a reasonable assurance of success.[127]  As such, courts will find

---

[124]    *In re Vill. at Camp Bowie I, L.P.*, 454 B.R. 702, 708–09 (Bankr. N.D. Tex. 2011), *aff'd*, 710 F.3d 239 (5th Cir. 2013).

[125]    11 U.S.C. § 1129(a)(11).

[126]    *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115 ; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *see also In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (finding that feasibility "contemplates whether the debtor can realistically carry out its plan and whether the plan offers a reasonable prospect of success and is workable") (internal citations omitted).

[127]    *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also In re Pizza of Haw. Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (citation omitted) ; *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

that a plan is feasible if a debtor offers a reasonable assurance that consummation of the plan is not likely to be followed by a further need for financial reorganization.[128]  As demonstrated below, the Plan, which incorporates the terms of the Global Settlement, is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

167.    In assessing feasibility, courts consider, among others, the following factors: (a) the adequacy of the capital structure; (b) the earning power of the business; (c) the economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; and (f) any other matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[129]  "There is no requirement, however, that [a] court consider all six factors."[130]

168.    A liquidating plan does not exempt a plan from meeting the requirements under section 1129(a)(11), but it does reduce the emphasis on future performance after the plan becomes effective.[131]  To demonstrate that a liquidating plan is feasible, a plan proponent need only show that "the successful performance of [the plan's] terms is not dependent or contingent upon any

---

[128]  *See In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) ("To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by . . . liquidation, or the need for further financial reorganization.'") (citing 11 U.S.C. § 1129(a)(11)); *In re T-H New Orleans*, 116 F.3d at 801 ("Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation"); *In re Lakeside Glob. II*, 116 B.R. at 507 ("The purpose of the feasibility requirement is 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'") (citations omitted).

[129]  *See Save Our Springs*, 632 F.3d at 173 n.6.

[130]  *Id.* at 173.

[131]  *See U.S. v. Haas (In re Haas)*, 162 F.3d 1087, 1090 (11th Cir. 1998).

future, uncertain event."[132]  A plan proponent does not need to establish that the success of any

future litigation is guaranteed or that a trust's funds will never run out.[133]

169.    The Plan is feasible because the performance of the terms under the Plan or the

Global Settlement are not based on any future, uncertain event.  The Plan, which implements the

terms of the Global Settlement, provides for the distribution of the proceeds from the sale of all of

the Debtors' Assets in accordance with the priority scheme of the Bankruptcy Code and the terms

of the Plan. Any assets remaining in the Debtors' Estates as of the Effective Date will vest in the

Reorganized Debtors, or the Litigation Trust, as the case may be, for the administration, liquidation

and distribution by the Plan Administrator, in accordance with the Plan and the Plan Administrator

Agreement. Since none of the requirements for carrying out the Plan are contingent upon future,

uncertain events (as any future litigation is not considered a contingent, uncertain future event)

and the Plan provides fixed governance mechanisms for both the Plan Administrator Agreement

and the Litigation Trust Agreement, the Plan satisfies section 1129(a)(11) of the Bankruptcy

Code.[134]

170.    Additionally, pursuant to the Global Settlement, the Debtors have the support of

the Committee and other key stakeholders in the Chapter 11 Cases. The Debtors provided ample

opportunity for the various parties to these Chapter 11 Cases to evaluate the feasibility of the Plan

---

[132]  *Heritage Org., L.L.C.,* 375 B.R. at 311 (holding that the creation of a creditor trust with res consisting of estate cash and the proceeds of any future successful litigation in addition to a fixed trust governance mechanism qualified as feasible).

[133]  *In re T-H New Orleans L.P.,* 116 F.3d 790, 801 (5th Cir. 1997) (stating that a court "need not require a guarantee of success").

[134]  *See T-H New Orleans*, 116 F.3d at 801.

throughout these proceedings and during the negotiation of the current Plan. Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11).

**L.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

171.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan." Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

172.    The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code because Section 13.3 of the Plan provides for the payment of all fees due and payable by each of the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors) under 28 U.S.C. § 1930.[135]

**M.      Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Inapplicable.**

173.    Section 1129(a)(13) of the Bankruptcy Code requires that all "retiree benefits", as defined in section 1114 of the Bankruptcy Code, continue to be paid post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[136] Section 1114 of the Bankruptcy Code defines "retiree benefits" as those payments made for the purpose of providing or reimbursing payments for retired employees, their spouses and their dependents for medical benefits.[137]    The Debtors do not provide retiree benefits within the meaning of

---

[135]    *See, e.g., Star Ambulance*, 540 B.R. at 267 (holding that plan provision requiring payment of fees under 28 U.S.C. § 1928 satisfies requirements of section 1129(a)(12)); *Cypresswood Land Partners*, 409 B.R. at 433 (holding that testimony that Debtors would pay fees under 28 U.S.C. § 1928 satisfies requirements of section 1129(a)(12)).

[136]    *See* 11 U.S.C. § 1129(a)(13).

[137]    *See id.* § 1114(a).

section 1114 of the Bankruptcy Code.  Therefore, section 1129(a)(13) of the Bankruptcy Code does not apply to the Plan.

174.    Section 1129(a)(14) of the Bankruptcy Code requires domestic support obligations to be paid, if required by judicial or administrative order or statute, which first become payable after the date of filing the petition.[138]   The Debtors do not owe any domestic support obligations. Therefore, section 1129(a)(14) of the Bankruptcy Code does not apply to the Plan.

175.    Section 1129(a)(15) of the Bankruptcy Code requires that an individual chapter 11 debtor, in a case in which the holder of an allowed unsecured claim objects to plan confirmation, either pay all unsecured claims in full or that the debtor's plan devote an amount equal to five years' worth of the debtor's disposable income to unsecured creditors.[139]   The Debtors are not an "individual" as contemplated by this section of the Bankruptcy Code.  Therefore, section 1129(a)(15) of the Bankruptcy Code does not apply to the Plan.

176.    Section 1129(a)(16) of the Bankruptcy Code conditions confirmation of a plan on the fact that all transfers under the plan will be made in accordance with applicable provisions of "nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust."[140]   None of the Debtors are a nonprofit corporation or trust as contemplated by this section of the Bankruptcy Code.   Therefore, section 1129(a)(16) of the Bankruptcy Code does not apply to the Plan.

---

[138]   *See id.* § 1129(a)(14).

[139]   *See id*. § 1129(a)(15).

[140]   *See id*. § 1129(a)(16).

**N.      Section 1129(c) of the Bankruptcy Code Is Inapplicable.**

177.    Section 1129(c) of the Bankruptcy Code prohibits confirmation of multiple plans,[141] and is not implicated because there is only one proposed plan before the Bankruptcy Court.

**O.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(d)–(e)).**

178.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.

179.    Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[142]   The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.   Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.   Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

180.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Chapter 11 Cases are a "small business case."[143]   Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

---

[141]   *See id*. § 1129(c).

[142]   *See id*. § 1129(d).

[143]   *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050[] (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

**P.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

181.    As noted above, Class 3A (CNCC GUC Claims), Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) are impaired classes deemed to have rejected the Plan. Additionally, Class 4 (Parent GUC Claims) voted to reject to the Plan. Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[144]

182.    The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  **First**, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  **Second**, the Plan is fair and equitable with respect to the Rejecting Classes.  The Plan, as well as the Global Settlement, has been proposed in good faith, is reasonable, and meets the requirements that no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest and no Holder of a Claim or Interest in

---

[144]    *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 862 (Bankr. S.D. Tex. 2011) ("[I]f the plan meets all of the requirements for plan confirmation except § 1129(a)(8), the plan may nevertheless be confirmed if the plan is fair and equitable and does not discriminate unfairly . . . ."); *In re MCorp Fin., Inc.*, 137 B.R. 219, 231 (S.D. Tex. 1992).

a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest.  Accordingly, the Plan is fair and equitable towards all holders of Claims or Interests in the Rejecting Classes.  **Third**, the Plan does not discriminate unfairly with respect to the Rejecting Classes because similarly situated Holders will receive substantially similar treatment on account of their Claims or Interests in such class.  Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

> **1.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

183.     Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[145]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[146]  A threshold inquiry to assessing whether a proposed plan of

---

[145]  *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am. Nat'l Tr. & Savs. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[146]  *See In re Coram Healthcare Corp.*, 315 B.R. 321, at 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination), *aff'd*, 308 B.R. 672 (D. Del. 2004); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[147]

184.   Section 1129(b)(1) does not prohibit discrimination between classes; it only prohibits discrimination that is "unfair."[148]  In ascertaining whether discrimination is unfair, courts apply a rebuttable presumption that unfair discrimination exists if there is:

> (1) [A] dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.[149]

This presumption can be rebutted by a showing that there is a reasonable basis for disparate treatment,[150] including favoring necessary business trade creditors and vendors.  Difference in treatment would not constitute "unfair discrimination," therefore, if there is a reasonable basis to treat creditors differently, including by favoring trade creditors and vendors that are important to the Debtors' ongoing operations.[151]

185.   Here, the Plan's treatment of non-accepting impaired classes (*i.e.*, the Rejecting Classes) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims and Interests in each Rejecting Class are not similarly situated to any other class,

---

[147]   *See Aleris Int'l,* 2010 WL 3492664, at *31 (citing *Armstrong World Indus.*, 348 B.R. at 121).

[148]   *In re Armstrong*, 348 B.R. at 121; *In re 11, 111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

[149]   *In re Armstrong*, 348 B.R. at 121; *In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999).

[150]   *Genesis Health*, 266 B.R. at 611–12.

[151]   *See In re Richard Buick, Inc.*, 126 B.R. 840, 852 (Bankr. E.D. Pa. 1991) (finding that a plan that provided certain trade creditors with 100% recovery and other general unsecured creditors with a 5% recovery was reasonable because the trade claims were "absolutely necessary to the future success of the [d]ebtor's business").

given their distinctly different legal character or nature from all other claims and interests.  The Plan's treatment of the Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.

186.    **First**, there is no unfair discrimination with respect to CNCC GUC Claims (Class 3A).  The Debtors separately classified the CNCC GUC Claims from General Unsecured Claims because there are significant Claims at CNCC but no assets, such that inclusion of CNCC GUC Claims in Class 3 would provide an improper windfall to creditors of CNCC and unfairly dilute the recoveries to the Debtors' Estate and creditors generally.

187.    ***Second***, there is no unfair discrimination with respect to Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) because each of Class 5 Claims and Class 6 Interests are legally distinct in nature from all other classes under the Plan.  Class 5 Claims arise from Claims held by a Debtor against any other Debtor arising at any time prior to the Effective Date and Class 6 Interests are Interests in a Debtor held by another Debtor.  Because these claims and interests are dissimilar and legally distinct, the Plan does not discriminate unfairly pursuant to section 1129(b)(1) of the Bankruptcy Code.

188.    Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the deemed rejection by the Deemed Rejecting Classes.

## 2.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

189.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[152]  This

---

[152]    *203 N. LaSalle St. P'ship*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full,

requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[153]  Under the Plan, no Holder of a Claim or Interest junior to an impaired, rejecting Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest.

190.    With respect to Class 4 (Parent GUC Claims), which voted to reject the Plan, the Plan distributes value to Holders of Claims and Interests in accordance with the requirements of section 1129(b) of the Bankruptcy Code.  Section 1129(b)(2)(B), which is relevant here, provides that:

"With respect to a class of unsecured claims –

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section."[154]

191.    Two Classes are junior to Class 4: Class 7 Preferred Equity Interests and Class 8 Parent Equity Interests.  Under the Plan, the Holders of Claims in Class 4 will either receive full payment on account of the Allowed amounts of such Class 4 Claims, or no Holder of an Interest

---

§ 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[153]    *See id.*

[154]    *See* 11 U.S.C. § 1129(b)(2)(B).

in Class 7 or Class 8, the classes junior to the rejecting Class 4, will receive or retain any property under the Plan on account of such junior Interest. The treatment of Class 4 Parent GUC Claims is therefore consistent with the requirements of section 1129(b)(2)(B) and the Plan should be confirmed notwithstanding its rejection by Class 4.

192.   Accordingly, the Plan is "fair and equitable" with respect to all impaired classes of claims and interests and satisfies section 1129(b) of the Bankruptcy Code.

## Q.   Modifications to the Plan.

193.   Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification. Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[155]

---

[155]   *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

194.     On December 19, 2022, the Debtors filed the Second Amended Plan [Docket No. 691] and a redline [Docket No. 692] showing the changes against the Initial Plan and the First Amended Plan. As noted above, on December 27, 2022, the Debtors, through their counsel, distributed the Solicitation Package to those Holders of Claims and Interests entitled to vote on the Plan. On January 30, 2023, the Debtors filed the Third Amended Plan which, among other things, incorporated the terms of the Global Settlement and modified the scope of the releases granted to the Debtors' current and former director and officers. The Confirmation Order includes certain modifications to the Plan to address formal and informal objections raised by various parties. The Debtors submit that none of the Plan modifications will adversely affect the treatment of those Classes of Claims and Interests that voted to accept the Plan. Therefore, such modifications will not require the Debtors to re-solicit acceptances for the Plan.[156]  Accordingly, the requirements of section 1127 have been satisfied.   Moreover, Bankruptcy Rule 3019 is satisfied because the modifications do not impact, let alone materially impact, any creditor's or equity holder's treatment under the Plan.[157]

**R.     Good Cause Exists to Waive the Stay of the Confirmation Order.**

195.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Bankruptcy Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the

---

[156]   *See* FED. R. BANKR. P. 3019(a); *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

[157]   *See Solar King Corp.*, 90 B.R. at 826 ("[Section 1127] permits modifications that might technically have a negative impact on claimants where the modifications are not substantial.  [Bankruptcy Rule 3019] should be interpreted in such a fashion as to give effect to, not to undermine, [section 1127].  Thus, if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code. Each rule also permits modification of the imposed stay upon court order.

196.    The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[158] As noted above, these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information. Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs. The Debtors' prompt emergence from chapter 11 is an important component of the Plan, and a pause upon confirmation of the Plan at this juncture would be prejudicial to all parties in interest that continue to incur the cost and expense of the Chapter 11 Cases, and could create material disruption to the business, including critical relationships with customers, vendors, and the Debtors' employees, including its inspector workforce.

197.    For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the transactions contemplated under the Plan and the Global Settlement so that the Effective Date may occur as soon as possible after the confirmation date. Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

---

[158]   Bankruptcy Rule 3020(e) advisory committee's note to 1999 amendment; *see Idearc*, 423 B.R. at 158 ("Good cause exists for waiving and eliminating the stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e). In particular, the Plan represents a fair and equitable compromise by and among the major parties-in-interest in the Chapter 11 Cases and should be consummated as expeditiously as possible.").

**IV.      The Unresolved Objections, If Any, Should Be Overruled.**

198.     The Debtors received three (3) formal Objections to confirmation of the Plan.  (The Debtors have also received and responded to several informal questions and information requests from parties that filed no objection to the Plan.)  As set forth above, the Debtors have successfully resolved one of these Objections, and they believe the remaining Objections should be overruled, to the extent not resolved or withdrawn prior to the Combined Hearing.  The Objections and the proposed resolutions with respect to each are described in detail in the summary chart attached hereto as **Exhibit A**.  To the extent any Objection is not resolved or withdrawn prior to the commencement of the Combined Hearing, the Debtors request that such Objection be overruled for the reasons set forth herein and the Debtors reserve their rights to respond to such Objections at the Combined Hearing.

<div align="center"><u>**CONCLUSION**</u></div>

199.     For all of the reasons set forth herein and in the Harvey Declaration and the Mersch Declaration, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement on a final basis and confirm the Plan, as incorporating the terms of the Global Settlement, as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

Dated:  February 8, 2023
Houston, Texas

/s/  James T. Grogan III

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Luc Despins (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Daniel Ginsberg  (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email:  lucdespins@paulhastings.com
        sayanbhattacharyya@paulhastings.com
        danielginsberg@paulhastings.com

-and-

Matthew Micheli (admitted *pro hac vice*)
Michael Jones (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100
Email:  mattmicheli@paulhastings.com
        michaeljones@paulhastings.com

*Counsel to the Debtors and Debtors in Possession*

89

**<u>Exhibit A</u>**

**Summary of Objections**

| In re Mining Project Wind Down Holding Inc. (f/k/a Compute North Holdings, Inc.), *et al.*, Case No. 22-90273 (MI) Summary of Confirmation Objections | | | |
|---|---|---|---|
| Docket No. | Objecting Party | Basis for Objection | Debtors' Proposed Resolution / Status |
| 894 | Rohit Shirole | • Shirole argues that the Disclosure Statement is not deserving of final approval as it fails to provide creditors with adequate notice with respect to their respective rights to vote on the Plan and the consequences thereof.<br><br>• Shirole also argues that the Plan cannot be confirmed as a matter of law because it contains impermissible, broad, and unwarranted to releases of non-debtor third-parties, contrary to clear Fifth Circuit precedent, as well as in contravention to notions of equity and fairness. | *Withdrawn*. *See* Shirole Order, ¶ 11. |
| 897 | Corpus Christi Energy Park, LLC (CCEP) | • CCEP argues that the Plan discriminates against Class 3A in violation of the Bankruptcy Code, and is therefore, not confirmable.<br><br>• CCEP also argues that the Plan was not proposed in good faith, that the Plan is not fair and equitable to Class 3A, and that the alleged discriminatory treatment creates a gerrymandering of the voting classes to rig the vote in favor of confirmation.<br><br>• CCEP objects to Plan's satisfaction of requirements of Sections 1129(b)(2)(B), 1129(a)(7), and 1129(a)(10) of the Bankruptcy Code<br><br>• CCEP also argues that creditors did not have critical information to determine whether their rights are properly addressed in the Amended Plan and creditors are unable to make an informed decision regarding the Plan | For the reasons described herein (*See* ¶¶ 51-66), the Debtors believe this objection, to the extent not resolved or withdrawn prior to the Combined Hearing, be overruled. |

| 899 | Decimal Digital Currency I, LLC | • Decimal objects to the Debtors' proposal to sell cryptocurrency equipment they do not own to fund Plan distributions because Decimal argues they, in fact, own such equipment.<br><br>• Decimal argues that the Plan was not proposed in good faith with respect to the treatment of the property interests of Decimal in the relevant equipment.<br><br>• Decimal also argues that the Plan does not provide adequate means for implementation in violation of Section 1123(a)(5) of the Bankruptcy Code. | • The Debtors disagree with Decimal's position with respect to title to the cryptocurrency mining equipment at issue in the Decimal Objection (the "Equipment").<br><br>• Nevertheless, the Debtors do not believe this is an issue that needs to be decided at confirmation. Further, the Debtors are adding language to the Proposed Confirmation Order that makes it clear that none of the Equipment ordered by Decimal will be sold absent further order of the Bankruptcy Court deciding the issue of title to the Equipment.<br><br>• Decimal argues that the Plan was not proposed in good faith. The Debtors vehemently disagree with this assertion for the reasons set forth herein (*See* ¶¶ 147-50). There is no evidence that the Plan is anything but the result of a good faith effort by the Debtors to resolve Claims and distribute the value of their assets in accordance with the Bankruptcy Code as set forth herein.<br><br>• Decimal also argues that the Plan does not provide adequate means for implementation. The Debtors disagree that they have not satisfied § 1123(a)(5) of the Bankruptcy Code. As set forth in the Mersch Declaration –any potential value that could be achieved through the sale of the Equipment, which is not in the Debtors Possession and has not even cleared U.S. Customs is not included in the Debtors' liquidation analysis as a source of distributable value. |

| In re Mining Project Wind Down Holding Inc. (f/k/a Compute North Holdings, Inc.), *et al.*, Case No. 22-90273 (MI) Summary of Confirmation Objections | | | |
|---|---|---|---|
| **Docket No.** | **Objecting Party** | **Basis for Objection** | **Debtors' Proposed Resolution / Status** |
| | | | • Therefore, to the extent not resolved or withdrawn, the Debtors believe that the Decimal Objection should be overruled. |
| *Informal Responses Received* | | | |
| N/A | Howard County, Texas, and certain other taxing entities (the "Texas Taxing Authorities") | • The Texas Taxing Authorities requested language in the Proposed Confirmation Order regarding the payment of their ad valorem tax Claims. | ***Resolved***. Language added to Proposed Confirmation Order (¶ 117). |
| N/A | Power Asset Recovery Corporation (PARC) | • PARC requested language be included in the Proposed Confirmation Order clarifying that certain prepetition agreements by and among the Debtors and PARC are not executory and not subject to assumption and/or assignment. | ***Resolved***. *Stipulation and Agreed Order* [Docket No. 893] set for hearing February 16, 2023. |
| N/A | Foundry Digital LLC | • Foundry suggested language for the Proposed Confirmation Order clarifying its contract rights and rights pursuant to the Foundry APA. | ***Resolved***. Language added to Proposed Confirmation Order (¶ 116). |

| In re Mining Project Wind Down Holding Inc. (f/k/a Compute North Holdings, Inc.), *et al.*, Case No. 22-90273 (MI)<br>Summary of Confirmation Objections | | | |
|---|---|---|---|
| **Docket No.** | **Objecting Party** | **Basis for Objection** | **Debtors' Proposed Resolution / Status** |
| N/A | BMO Harris Bank N.A. | • BMO requested language in the Proposed Confirmation order regarding the cure amounts associated with assumption and assignment of certain of their agreements with the Debtors. | ***Resolved***. Language added to Proposed Confirmation Order (¶ 118). |

4