**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MINING PROJECT WIND DOWN HOLDINGS, INC. | ) Case No. 22-90273 (MI) |
| (f/k/a Compute North Holdings, Inc.), *et al.*,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF DRAKE HARVEY,**
**PRESIDENT OF THE DEBTORS, IN SUPPORT OF**
**(I) FINAL APPROVAL OF DISCLOSURE STATEMENT,**
**(II) CONFIRMATION OF THIRD AMENDED JOINT LIQUIDATING**
**CHAPTER 11 PLAN OF MINING PROJECT WIND DOWN HOLDINGS, INC.**
**(F/K/A COMPUTE NORTH HOLDINGS, INC.) AND ITS DEBTOR AFFILIATES**
**AND (III) THE DEBTORS' OMNIBUS REPLY TO OBJECTIONS THERETO**

I, Drake Harvey, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am the President of Mining Project Wind Down LLC (f/k/a Compute North LLC) and the other above-captioned debtors and debtors in possession (collectively, the "Debtors").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, Illinois 60654.

2.      In my capacity as President, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

3.      I submit this declaration (this "Declaration") in support of the *Debtors' (I) Memorandum of Law in Support of (A) Final Approval of Disclosure Statement and (B) Confirmation of Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and its Debtor Affiliates and (II) Omnibus Reply to Objections Thereto*, filed contemporaneously herewith (the "Confirmation Memorandum"), and in support of confirmation of the *Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 576] (the "Initial Plan"), as amended by the *Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 665] (the "First Amended Plan,"), the *Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* [Docket No. 691] (the "Second Amended Plan"), and the *Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and its Debtor Affiliates* [Docket No. 889] (the "Third Amended Plan", and together with the Initial Plan, the First Amended Plan, the Second Amended Plan, and as may further be amended, modified, or supplemented from time to time, the "Plan"),[2] including the Global Settlement (as defined below) contemplated thereunder.

4.      Except as otherwise indicated,[3] all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with other

---

[2]     Capitalized terms used but not defined herein have the meanings set forth in the Plan or the Confirmation Memorandum, as applicable.

[3]     Certain of the disclosures herein relate to matters within the personal knowledge of employees of the Debtors or other professionals employed by the Debtors and are based on information provided by such individuals.

members of the Debtors' management team and the Debtors' advisors, my review of information concerning the Debtors' operations, financial affairs, and restructuring initiatives.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## QUALIFICATIONS

5.      I was appointed President of Compute North in September 2022, and prior to that appointment I served as Compute North's Chief Operating Officer.

6.      Prior to joining Compute North in April 2021, I held leadership positions in telecommunications, technology, and SaaS businesses, and also have experience leading startup companies.  I hold a BS in Business Administration from the University of Delaware.

## BACKGROUND

5.      In my role as President, I am well acquainted with and involved in various aspects of the Debtors' operations, financial affairs, and systems, including the Plan, the Global Settlement, and the wind-down transactions contemplated therein.  As a result of my knowledge and understanding of the Debtors' financial history and business operations, I am qualified to testify regarding the statements made herein, including whether the Plan satisfies the Bankruptcy Code "feasibility" test.

## CONFIRMATION REQUIREMENTS

6.      Based on my personal involvement in the Plan negotiation and formulation process, on discussions with the Debtors' advisors, and on information provided by the Debtors' counsel, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code. Moreover, the Plan embodies a global settlement (the "Global Settlement") with the Official Committee of Unsecured Creditors of the Debtors (the "Committee") and the other key stakeholders who have agreed to support the Plan, which is the product of extensive, good faith,

arm's-length negotiations among the Debtors and their various stakeholders.  All parties have worked towards an outcome for these chapter 11 cases that maximizes the value of the Debtors' estates for the benefit of the Debtors' stakeholders. As a result, I believe that the Plan is proposed in good faith, and that the Debtors, acting through their officers, directors, and professionals, have conducted themselves in a manner that complies with applicable law in relation to the formulation and negotiation of, and voting on, the Plan.

7.      To achieve the Global Settlement, the Debtors engaged in lengthy negotiations with the Committee regarding Plan structure.   These hard-fought negotiations resulted in substantial revisions to the Plan as originally proposed, to address concerns voiced by the Committee and other stakeholders, including (a) significant modifications to, and narrowing of, the Plan's release provisions, (b) significant modifications to the provisions governing the Retained Causes of Action, to broaden their scope and provide an opportunity for enhanced recoveries for General Unsecured Creditors, and (c) the addition of a Litigation Trust, which now contemplates the appointment of a Plan Oversight Committee whose members have been chosen by the Committee, to pursue the Retained Causes of Action. As a result, the Committee recommended that all unsecured creditors entitled to vote on the Plan vote to accept the Plan.[4]

8.      The Plan is also premised on major settlements with a number of key creditors. During the days leading up to the Voting Deadline, the Debtors reached settlements of the significant claims and other disputes with RK Mission Critical LLC ("RKMC" and such settlement, the "RKMC Settlement") and Marathon Digital Holdings, Inc. ("Marathon"), one of the Debtors' largest customers, creditors and equity holders, that resulted in material reductions

---

[4]     *Notice of Committee Recommendation to Unsecured Creditors to Vote to Accept the Debtors' Chapter 11 Plan* [Docket No. 888] (the "Committee Statement in Support").

to the asserted amounts of those creditors' claims and provided other value maximizing benefits to the estates. .

9.      In addition, the Debtors recently reached settlements with (i) US Digital Mining Texas LLC, (ii) Digital Alchemy LLC, (iii) GH Effect, Inc., (iv) Power Asset Recovery Corporation, (v) Alder BTC Holdings LLC, Alder Opportunity LP, and Alder SPV I LLC, (vi) NBTC Limited, (vii) MP2 Energy Texas LLC d/b/a Shell Energy Solutions, and (viii) TWC Financial LLC, with each of these parties also agreeing to support the Plan and the releases thereunder.

10.     The culmination of these efforts is that the Class of General Unsecured Claims have voted overwhelmingly to accept the Plan. ,

**I.      The Plan Satisfies the Requirements of Confirmation.**

11.     Based on discussions I have had with the Debtors' professionals, advisors, and members of the management team, I am aware that the Debtors must demonstrate that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  Below I set out facts with respect to those requirements, the events that have occurred throughout these Chapter 11 Cases, my experience as the Debtors' President, and discussions I have had with the Debtors' professionals, advisors, and members of the management team.

    **A.      The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

        **1.      Classification of Claims and Interests.**

12.     Section 3 of the Plan designates the classification of Claims and Interests.  In particular, Section 3 of the Plan classifies the Claims against and Interests in the Debtors into the following Classes:

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 3A | CNCC GUC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 | Parent GUC Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 8 | Parent Equity Interests | Impaired | Entitled to Vote |

13.     There are 9 Classes of Claims and Interests under the Plan.  These classifications reflect the Debtors' capital and corporate structure (and therefore the relative priority of the Claims and Interests).  Based on discussions I have had with the Debtors' professionals, advisors, and members of the management team, I believe each Class comprises substantially similar Claims or Interests, and each instance of separate classification of similar Claims and Interests was based on valid business, factual, and legal reasons.  Moreover, I understand the separate classification of certain Claims or Interests was done in consultation with the Committee in conjunction with the Global Settlement.

> **2.     Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

14.     <u>Section 1123(a)(1) of the Bankruptcy Code</u>:  Section 3 of the Plan designates Classes of Claims and Interests, other than certain priority claims described in the Bankruptcy Code.

15.     <u>Section 1123(a)(2) of the Bankruptcy Code</u>:  Section 3 of the Plan identifies each Class of Claims and Interests that is Unimpaired under the Plan.

16.     <u>Section 1123(a)(3) of the Bankruptcy Code</u>:  Section 3 of the Plan sets forth the treatment of Impaired Claims and Interests.

17.     <u>Section 1123(a)(4) of the Bankruptcy Code</u>:  Section 3 of the Plan provides that Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, except to the extent otherwise agreed to by the Debtors and any such Holder.

18.     <u>Section 1123(a)(5) of the Bankruptcy Code</u>:  The Plan, in Section 4, and the Plan Supplement, consistent with the Global Settlement, provide for adequate means for implementation of the Plan, including: (a) the wind-down and dissolution of the Debtors; (b) the appointment of a Plan Administrator to administer and wind-down the Debtors' Estates; (c) the creation and establishment of a Litigation Trust; (d) the preservation of the Retained Causes of Action for the benefit of the Litigation Trust; (e) the effectuating of certain documents; (f) the authorization for the Debtors and/or Reorganized Debtors, as applicable, to take all corporate actions contemplated by the Plan; and (g) the cancellation of existing securities and agreements, and the surrender of existing securities.

19.     <u>Section 1123(a)(6) of the Bankruptcy Code</u>:  The Plan provides for the wind-down of the Debtors and distribution of the Debtors' assets already liquidated or to be liquidated and does not provide for the issuance of non-voting securities.

20.     <u>Section 1123(a)(7) of the Bankruptcy Code</u>:  In accordance with Section 4.2.5 of the Plan, on the Effective Date, all managers, officers, directors, sole director or Governing Body of the Debtors shall be deemed to have resigned their respective positions.  I believe the

appointment of the Plan Administrator as the sole manager, sole director and sole officer of the Reorganized Debtors after the Effective Date is consistent with the interests of creditors, equity security holders and public policy.

**3.     The Settlements Embodied and Set Forth in the Plan Are Appropriate.**

21.     As previously noted, the Plan incorporates a Global Settlement, including  Claims and controversies[5] between the Debtors and the Released Parties.  Each component of the Global Settlement, including, without limitation, the treatment of Claims and Interests pursuant to the Plan, is an integral, integrated, and inextricably linked part of the Global Settlement.

22.     I believe the Global Settlement embedded in the Plan is the fair and equitable result of extensive good faith and arm's-length discussions between and among the Debtors and other parties in interest, including the Committee.   In reaching these settlement terms, the Debtors considered (a) the probability of success and risk of loss of litigating numerous litigation issues, including the validity, extent, and priority of General Unsecured Claims, the validity and enforceability of Intercompany Claims, and the allocation of assets among the Estates, (b) the complexity of the litigation, and (c) the enormous expense, inconvenience, and delay attendant to the litigation.  Based on the facts and circumstances of these Chapter 11 Cases, I believe that the Global Settlement is fair, equitable, and reasonable, clearly falls within the range of litigation possibilities, and is in the best interests of the Debtors, the Reorganized Debtors, the Estates, and their respective property, and their creditors, and other parties in interest.   This belief is supported by the Committee's endorsement of the Plan and the votes of creditors who have accepted the Plan.

---

[5]     Other than Causes of Action retained by the Reorganized Debtors pursuant to the Plan.

23.     Absent the approval of the Global Settlement integrated and set forth in the Plan, the potential costs to each of the Debtors' Estates of litigating Debtor-creditor and inter-creditor issues would be prohibitive, particularly when compared to the amounts at stake with respect to a number of the settled issues.

24.     The Global Settlement eliminates the need to litigate potentially complex issues. The implementation of the Global Settlement is a critical Plan mechanism providing significant benefit and net value for the Estates, and therefore, pursuant to Bankruptcy Rule 9019, the Court is authorized to approve the Global Settlement on the terms of and subject to the conditions set forth in the Plan.

**4.     The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate.**

25.     I understand that Section 9 of the Plan sets forth certain release, exculpation, and injunction provisions, including releases in Section 9.3 of the Plan by the Debtors and the Reorganized Debtors (collectively, the "Debtor Release"), releases in Section 9.4 of the Plan (collectively, the "Third-Party Release"), an exculpation provision in Section 9.5 of the Plan (the "Exculpation"), and an injunction provision in Section 9.6 of the Plan (the "Injunction"). Based on my knowledge of the Debtors' restructuring efforts and information provided by the Debtors' advisors, I believe that the Plan's release, exculpation, and injunction provisions are appropriate because, among other things, they are the product of extensive good faith, arm's-length negotiations, were a material inducement for parties to support the Plan and the Global Settlement and are supported by the Debtors and their key constituents.  Specifically, these provisions were the subject of lengthy negotiations between the Debtors and the Committee, during which the Debtors agreed to limit and modify the releases.  As a result of these efforts and concessions, the Debtors and the Committee reached a compromise culminating in this

consensual Plan.  Accordingly, I believe the release, exculpation, and injunction provisions are in the best interests of creditors and an exercise of sound business judgment by the Debtors.

        **a.**       **The Debtor Release and Third-Party Release Are Appropriate.**

26.    Based on my knowledge of the Debtors' restructuring efforts and information provided by other members of the Debtors' management team and the Debtors' advisors, I believe that the Debtor Release and Third-Party Release set forth in Section 9 of the Plan (together, the "Plan Releases") are appropriate for the reasons set forth below.

27.    I understand that the Plan, including the Debtor Release, is now fully supported by the Committee and other of the Debtors' key stakeholders.

28.    The Plan, including the Debtor Release, is the result of extensive negotiations with the Committee and other key stakeholders that resulted in the culmination of the Global Settlement. The Debtor Release was heavily negotiated by sophisticated parties, each of which were represented by competent counsel and financial advisors. Indeed, the Third Amended Plan and the changes therein reflect the comprehensive Global Settlement reached with the Committee and other key stakeholders, and, more specifically, certain agreed upon language with respect to the Debtor Release. Specifically, the Third Amended Plan was revised to remove the broad general release by the Debtors of all current and former officers and directors, and replaced with a much narrower provision whereby officers and directors who served the Debtors prior to the Petition Date do not receive releases.  Moreover, consistent with the Global Settlement, only specifically identified officers and directors that worked for the Debtors on or after the Petition Date, as listed on Schedule 1.1.98 to the Plan, are entitled to a release under the Plan except for conduct determined by the Bankruptcy Court to have resulted from actual fraud, willful misconduct or gross negligence.  With respect to the other officers and directors of the

Debtors on or after the Petition Date who are <u>not</u> listed on Schedule 1.1.89 of the Plan (the "<u>Other D&Os</u>"), those parties are Released Parties solely to the extent such party's legal obligations for any wrongful acts exceed the applicable combined limits (taking into account covered defense costs) of the Debtors' D&O Policies, and any rights under applicable law of current and former directors and officers of the Debtors to indemnification and advancement of costs are preserved.  The Third Amended Plan, reflecting the terms of the Global Settlement, also specifically provides that any of the Debtors' current and former officers, directors and managers not specifically identified in clauses (b)-(g) of the Plan definition of "Released Party" shall not be a "Released Party" under the Plan, including by virtue of voting to accept the Plan or abstaining and not opting out of the releases thereunder.

29.     The Debtors' board of directors (the "<u>Board</u>") and management, following extensive negotiations and deliberations, ultimately determined that the Global Settlement, including the revisions to the Debtor Release, is fair to and in the best interests of the Debtors, their creditors, and all other stakeholders. The changes made to the Debtor Release, as embodied by the Global Settlement, helped ensure that the Debtors did not face a contested Combined Hearing with the Committee and other key stakeholders and the risk of unnecessary delay and expenses associated therewith. Consistent therewith, the Board authorized the filing of the Third Amended Plan which embodied the modified terms of the Debtor Release and the Global Settlement.

30.     Consequently, the Plan is now fully supported by the Committee and other of the Debtors' key stakeholders. Indeed, on January 31, 2023, the Committee filed a notice with the Bankruptcy Court declaring their support for the Plan and its recommendation that unsecured

creditors entitled to vote on the Plan vote to accept.[6]   Pursuant to the Committee Statement in Support, the Committee states that they believe that the Plan, including the modified terms of the Debtor Release, is in the best interests of the Debtors' unsecured creditors.

31.     Moreover, resolutions reached with certain other key stakeholders demonstrate further support for the Plan, including the Debtor Release. Pursuant to the RKMC Settlement, RKMC will now support the Plan, vote its Allowed Claim in favor thereof, and not opt out of the Debtor Release.[7]   Additionally, on January 30, 2022, the Debtors, as part of the Global Settlement, filed the *Emergency Motion to Approve Settlement with Marathon Digital Holdings, Inc. Pursuant to Bankruptcy Rule 9019* [Docket No. 881] (the "Marathon Settlement Motion"), by which the Debtors entered into a settlement with one of their largest creditors, customers, and preferred equity investors (the "Marathon Settlement"). With the Marathon Settlement, the Debtors obtain the benefit of Marathon's support for the Plan and the Debtor Release.

32.     Furthermore, the Holders in Classes 3, 7 and 8 voted in favor of the Plan, including the release provisions included therein.  I believe this level of support demonstrates the stakeholders' interest in approval of the Plan, including the Debtor Release contained therein. Therefore, the Plan Releases are the result of lengthy negotiations between the Debtors, the Committee, and other key stakeholders which led the Committee and several key creditors to support the Plan.  Accordingly, the Plan Releases are consistent with the Global Settlement.

33.     Moreover, I believe that each of the parties covered by the Plan Releases (collectively, the "Released Parties") has made a substantial contribution to the Debtors' Estates. The Released Parties played an integral role in the formulation of the Plan, including the modifications that resulted in the Global Settlement, and contributed to the Plan by expending

---

[6]     *See* the Committee Statement in Support.
[7]     *See Debtors' Emergency Motion to Approve Settlement with RK Mission Critical LLC Pursuant to Bankruptcy Rule 9019* [Docket No. 886] at ¶ 23.

significant time and resources analyzing and negotiating the issues presented by the Chapter 11 Cases. For instance, the Debtors' directors, officers, and other agents that are receiving a release under the Plan have been instrumental in negotiating, formulating, and implementing the difficult, value-maximizing, multi-transaction asset-sale process that has enabled the Debtors to get to a point where they can seek confirmation of the Plan. Many of these people will have critical roles in the successful implementation of the Wind-Down Transactions and Claims reconciliation contemplated under the Plan and the Global Settlement. The Debtor Release, in particular, is an integral component of the consideration to be provided to the Debtors' key personnel for their invaluable efforts throughout these Chapter 11 Cases and an important part of the compromises and resolutions embodied in the Plan.

34.     Lastly, I understand that the Debtor Release is essential to the Debtors' Chapter 11 Cases and the consummation of the transactions contemplated under the Plan because it constitutes an integral term of the negotiated Global Settlement embodied thereunder. As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors. In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan. Importantly, the Debtor Release was vigorously negotiated by the Debtors, the Committee and other sophisticated entities that were represented by able counsel and financial advisors as part of settlement negotiations. In light of the Debtors' Releases being essential to the Plan and the Global Settlement, I believe the record of these Chapter 11 Cases fully supports the essential nature of these releases.

35.     I understand that the Plan, consistent with the Global Settlement, also provides for a discharge and release of claims against the Released Parties (*i.e.*, parties who actively

participated in the Debtors' Plan negotiations and whose contributions and concessions have facilitated and made possible the Debtors' proposed Plan), in their respective capacities, by the Releasing Parties (including Holders of Claims and Interests that voted to accepted, or abstained from voting, and did not opt out of the Plan Releases pursuant to the Voting Procedures) for, among other things, acts arising out of these Chapter 11 Cases and transactions related thereto.

36.     I understand the Third-Party Release is fully consensual.  Parties in interest were provided extensive notice of these Chapter 11 Cases, the deadline to object to the Plan, and the deadline to submit an Opt-Out Form.  Each of the Non-Voting Status Notices that was sent to Holders of Claims and Interests in Non-Voting Classes and the Ballot that was sent to the Voting Class expressly included, in bold font, the terms of the Third-Party Release and the procedure for opting out.  The Non-Voting Status Notices and the Ballot advised careful review and consideration of the terms of the Third-Party Release, along with the exculpation and injunction provisions.  The language of the Third-Party Release was also emphasized using bold font in the Plan and Disclosure Statement.  I believe the language of the Third-Party Release is also sufficiently specific to put the Releasing Parties on notice of the Claims being released as the Third-Party Release describes the nature and type of Claims released.

37.     Furthermore, I understand that the Third-Party Release is integral to the Plan and the Global Settlement and critical to the success of the transactions contemplated thereunder. The Released Parties supplied critical goods and services, even prior to the Petition Date, which enabled the Debtors to propose the Plan and proceed to confirmation.  The Third-Party Release was an essential negotiated term of the Plan and the Global Settlement.  Without the Third-Party Release, the Debtors' key stakeholders would not have been willing to support confirmation of

the Plan, and enable the Debtors to wind down their businesses in an efficient manner designed to maximize value for the benefit of stakeholders.

38.     Moreover, I believe the third parties bound by the Releases have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release.  Specifically, each Holder of a Claim or Interest that votes to accept the Plan, and does not object to the Plan or opt out of the Releases, will receive a release, so long as that Holder is not listed on the Schedule of Retained Causes of Action, other than with respect to: (a) obligations of any party under any Sale Order and any Asset Purchase Agreement, or any document, instrument, or agreement executed to implement the transactions set forth in such Sale Order and/or Asset Purchase Agreement, as applicable; (b) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (c) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.

39.     The Debtors believe this provides Holders of Claims and Interests valuable consideration and a strong incentive to refrain from opting out.

40.     I believe that the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the Claims being released as the Third-Party Releases describe the nature and type of Claims being released.

41.     As discussed above, the Released Parties, including certain of the Debtors' current officers and directors, played an integral role in the formulation and negotiation of the Plan, the Global Settlement, and the transactions contemplated thereby, and the Released Parties

have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' commercial relationships, and have successfully negotiated settlements of many complex claims, resulting in the Global Settlement.   The Released Parties also played a critical role in the Asset Sales that monetized many of the assets of the Debtors' Estates, positioning the Debtors to distribute proceeds to unsecured creditors.   The proposed resolution of the Debtors' Chapter 11 Cases would not have been possible without the Released Parties' support and contributions.   Further, without the extensive deliberations, diligence, and hard-fought negotiations employed by the Released Parties, the Global Settlement would not have been possible.   Each Released Party has made a substantial contribution to these Chapter 11 Cases. Accordingly, I believe the Third-Party Release should be approved.

42.     For the reasons stated above, I believe the Plan Releases are justified, are in the best interests of creditors, are consistent with the Global Settlement, and are an integral part of the Plan.

### b.     The Exculpation Provisions Are Appropriate.

43.     The exculpation provision is an integral piece of the Global settlement embodied by the Plan and is the product of good faith, arm's-length negotiations among sophisticated entities represented by able counsel and financial advisors.   The parties covered by the Exculpation (collectively, the "Exculpated Parties") have participated in good faith in these Chapter 11 Cases and in formulating and negotiating the Plan as it relates to the Debtors, as well as the terms of the Global Settlement, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.   I have been advised that the exculpation provision in the Plan is consistent with the applicable law.

44.    The Debtors, the Committee and its members actively negotiated in good faith with certain Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan, the Global Settlement, and these Chapter 11 Cases.  Such negotiations were at arm's length, hard-fought and extensive and the resulting agreements were implemented in good faith with a high degree of transparency.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Global Settlement, the Plan Supplement, and related documents in furtherance of the restructuring transactions, as applicable.

45.    Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan and the Global Settlement that paved the way for a successful reorganization and likely would not have been so inclined to participate in the Plan process without the promise of exculpation.

46.    Accordingly, based on information provided by the Debtors' counsel, I believe the exculpation provision is appropriate and consistent with the Global Settlement.

c.    **The Injunction Provisions Are Appropriate.**

47.    It is my understanding that the injunction provision functions to implement the Plan Releases and the exculpation provision.  Because the Plan Releases and the exculpation provision are essential to the Plan, the Injunction is likewise a key Plan provision. I therefore believe that the Injunction, like the Plan Releases and the exculpation provision, is appropriate and consistent with the Global Settlement.

5.    **The Plan Provides for Cure Amounts.**

48.    The Assumed Executory Contracts and Unexpired Leases Schedule, filed with the Plan Supplement at Exhibit A, provides for the satisfaction of any Cure amounts associated with

17

Executory Contracts to be assumed pursuant to the Plan.  The Debtors will satisfy any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

### B. The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

#### 1. The Disclosure Statement Contains Adequate Information.

49.     Based on my review of the Disclosure Statement and discussions I have had with the Debtors' professionals, advisors, and members of the management team, I believe that the Disclosure Statement contains adequate information.   It contains, among other things, descriptions and summaries of:  (a) classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan; (b) the Debtors' corporate history and corporate structure, business operations, and indebtedness; (c) events leading to these Chapter 11 Cases; (d) certain important effects of Confirmation of the Plan; (e) the releases and exculpations contemplated by the Plan; (f) certain financial information about the Debtors, including a liquidation analysis; (g) the statutory requirements for confirming the Plan; (h) certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan; and (i) certain U.S. federal income tax consequences of the Plan.

#### 2. The Debtors' Solicitation of the Plan was Appropriate.

50.     Based on my understanding and discussions that I have had with the Debtors' advisors, I believe that the Debtors' solicitation of votes on the Plan was in good faith.  To the best of my knowledge and belief, the Opt-Out Form, and the Ballot for voting on the Plan were served on the relevant parties in interest to known Holders of Claims and Interests in soliciting

and tabulating votes on the Plan.  Moreover, the Debtors have timely filed their Schedules of assets and liabilities with the Clerk of the Bankruptcy Court in accordance with the Court's prior order regarding the filing of such Schedules.

51.     I believe that the Debtors have at all times engaged in arm's-length, good faith negotiations, evidenced by the Global Settlement, and have taken appropriate actions in connection with the solicitation of the Plan.

**C.     The Debtors Proposed the Plan in Good Faith (11 U.S.C. § 1129(a)(3)).**

52.     Based on my knowledge of the Debtors' restructuring efforts and information provided by other members of the Debtors' management team and the Debtors' advisors, I believe that the Plan was proposed in good faith, with the legitimate purpose of effectuating the terms of the Global Settlement, winding down the Debtors, liquidating the Estates of each of the Debtors, and distributing the assets of each such Estate on a fair and equitable basis, thereby maximizing the returns available to Holders of Claims and Interests, as applicable.

53.     All the transactions contemplated by the Plan—including the Global Settlement, Liquidating Trust Agreement and the Plan Administrator Agreement—were negotiated and consummated at arm's length, in good faith and without collusion, fraud, or attempt to take grossly unfair advantage of any party, allowing creditors to receive greater and more expeditious distributions under the Plan than they would receive through a chapter 7 liquidation.  The Debtors proposed the Plan with legitimate purposes including (1) facilitating the sale of the Debtors' remaining assets; (2) providing a prompt and efficient liquidation under chapter 11; and (3) maximizing the recovery to Holders of Claims and Interests under the circumstances. Consequently, the Debtors believe that the Plan and the Global Settlement were proposed in

good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.

    **D.**    **The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (11 U.S.C. § 1129(a)(4)).**

54.    The Plan provides that Professional Fee Claims and corresponding payments are subject to Court approval and provides that the Debtors' professionals shall file all final requests for payment of professional claims no later than 45 days after the Effective Date.

    **E.**    **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

55.    Pursuant to Section 1.1.79 of the Plan, the Debtors disclosed the identity of the Plan Administrator in the Plan Supplement, who shall serve as the sole manager, sole director, and sole officer of the Reorganized Debtors.[8]  The Plan Administrator is competent, has relevant and valuable business and industry experience, and will assist with the wind down of the Debtors' Estates.  Additionally, the Debtors filed the Litigation Trust Agreement as part of the Plan Supplement.  The Trustee of the Litigation Trust shall pursue any all Claims and Causes of Action set forth in the Schedule of Retained Causes of Action, and, pursuant to Section 1.1.71 of the Plan, shall be the Plan Administrator.

    **F.**    **The Plan Does Not Require Governmental Regulatory Approval (11 U.S.C. § 1129(a)(6)).**

56.    Based on my knowledge of the Debtors' business and information provided by the Debtors' advisors, I believe that the Debtors are not changing any rates that it charges that require approval by any governmental agency.

    **G.**    **The Plan Satisfies the Best Interests Test (11 U.S.C. § 1129(a)(7)).**

---

[8]    *See* Plan, § 1.1.78; Plan Supplement, Ex. E (Plan Administrator Agreement).

57.     I understand that the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each of the Deemed Rejecting Classes under the Plan.  The projected recoveries for these Classes under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation. Specifically, as demonstrated by the liquidation analysis, Class 3A (CNCC GUC Claims), Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) would all receive no recovery under a hypothetical chapter 7 liquidation, indicating that these Classes would receive an amount equal to or in excess of such recovery pursuant to the Plan.

**H.     The Plan Is Feasible (11 U.S.C. § 1129(a)(11)).**

58.     It is my understanding, based on conversations with the Debtors' counsel, that section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed only if it is feasible, i.e., if the Debtors will be able to make all payments required under the plan and the Debtors' reorganization is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan.  The Plan, which incorporates the terms of the Global Settlement, is feasible because the performance of the terms under the Plan or the Global Settlement are not based on any future, uncertain event. Since even before the Petition Date, the Debtors have made extraordinary efforts to maximize the value of their assets through an extensive marketing and sales process that resulted in the successful closing of four separate major asset sales and several de minimis asset sales.  As a result of this hard work by the Debtors and their advisors over the past four months since commencing these Chapter 11 Cases, the Plan, which implements the terms of the Global Settlement, provides for the distribution of the proceeds of the sale of substantially all of the Debtors' assets to Holders of Allowed Claims, has been overwhelmingly accepted by the Holders of General Unsecured Claims who voted on the Plan.  Although the Debtors have sold a

substantial portion of their assets during these cases, I understand that the Plan provides a mechanism for the continued liquidation and monetization of the Debtors' remaining assets, including equipment and potentially valuable Causes of Action. The Plan provides for the distribution of these proceeds in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. Any assets remaining in the Debtors' Estates as of the Effective Date will vest in the Reorganized Debtors, for the administration, liquidation and distribution by the Plan Administrator, in accordance with the Plan Administrator Agreement. The Litigation Trust shall administer the Litigation Trust assets and make distributions of any and all proceeds to Holders of Claims and Interests in accordance with the Plan and the Litigation Trust Agreement. Since none of the requirements for carrying out the Plan are contingent upon future, uncertain events (as any future litigation is not considered a contingent, uncertain future event), the Plan provides fixed governance mechanisms for both the Plan Administrator Agreement and the Litigation Trust Agreement, and the Plan is supported by the Committee and other key stakeholders in these Chapter 11 Cases, I believe the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**I.      All Statutory Fees Have Been or Will Be Paid under the Plan (11 U.S.C. § 1129(a)(12)).**

59.      I understand that Section 13.3 of the Plan provides for the payment of all fees due and payable by the Debtors under 28 U.S.C. § 1930.

**J.      Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code Do Not Apply (11 U.S.C. § 1129(a)(13)-(16)).**

60.      The Debtors do not provide "retiree benefits". The Debtors are not obligated to pay any domestic support obligations. None of the Debtors are "individuals". None of the Debtors is a nonprofit corporation or trust.

**K.      The Plan Satisfies Cram-Down Requirements (11 U.S.C. 1129(b)).**

61.      To the best of my knowledge, no creditor or interest Holder junior to a Class that is deemed to reject will receive any recovery under the Plan on account of such Claim or Interest and similarly situated Holders will receive substantially similar treatment on account of their Claims or Interests in such Class.

62.      In addition, I am informed that Class 4 has voted to reject the Plan.  To the best of my knowledge, the Plan distributes value to Holders of Claims and Interests in the priorities set forth in the Bankruptcy Code, and, with respect to Class 4, either the Holders of Claims in Class in 4 will receive full payment on account of the allowed amounts of such Class 4 Claims, or no Holder of a Claim or Interest in a class junior to such rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest.

63.      It is my understanding that the Plan does not discriminate unfairly with respect to the rejecting Classes because the Plan's classification scheme rests on legally permissible rationale, and all similarly situated Holders of Claims and Interests will receive substantially similar treatment.  As such, I believe the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**L.      The Principal Purpose of the Plan Is Not the Avoidance of Taxes as Required under Section 1129(d) of the Bankruptcy Code.**

64.      The Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, and no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.

**II.      Good Cause Exists to Waive the Stay of the Confirmation Order**

65.      The Debtors' prompt emergence from chapter 11 is an important component of the Plan, and I believe that a pause upon Confirmation of the Plan at this juncture would be

prejudicial to all parties in interest that continue to incur the cost and expense of the Debtors' Chapter 11 Cases.

66.     Based on my knowledge of the Debtors' restructuring efforts, I am satisfied that these Chapter 11 Cases and the related Plan transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information, evidenced by the Global Settlement.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously.

67.     For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the transactions contemplated under the Plan and the Global Settlement so that the Effective Date may occur as soon as possible after the Confirmation Date.

68.     Based on the foregoing, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## **OBJECTIONS**

69.     I understand that on February 1, 2023, Corpus Christi Energy Park, LLC ("CCEP"), filed an objection (the "Bootstrap Objection")[9] and that the Bootstrap Objection focuses on the fact that the Plan separately classifies claims asserted against Debtor Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) ("CNCC") in Class 3A.

70.     I am also aware that, on March 16, 2022, CCEP and Debtor CNCC entered into "a design-build contract (the "DB Contract") pursuant to which CCEP agreed to design and

---

[9]     *Corpus Christi Energy Park, LLC's Objection to (I) Final Approval of Debtors' Disclosure Statement and (II) Confirmation of Debtors' Liquidating Chapter 11 Plan* [Docket No. 897].

construct for CNCC a planned 300-megawatt high voltage substation connecting to the ERCOT transmission grid, together with an office building, utility connections and other improvements located in Corpus Christi, Texas (the "Corpus Christi Project"). Before these Chapter 11 Cases began, the Debtors spent considerable efforts seeking to find a buyer for the Corpus Christi Project who possessed the capital needed to bring that project to fruition. After the Debtors commenced these Chapter 11 Cases, they continued these efforts and, ultimately, only one prospective counterparty to a transaction emerged: CCEP.

71.     The Debtors and the Committee entered into extensive negotiations with CCEP in an effort to resolve the future of the Corpus Christi Project, but, shortly after the Debtors and the Committee believed they had reached agreement on the terms of a sale transaction, CCEP revoked its offer and filed a motion to compel the Debtors to reject the DB Contract.[10] Ultimately, I understand that as a result of the motion filed by CCEP, the DB Contract was terminated and the parties reserved their respective claims against each other.

72.     As a result of the actions taken by CCEP during these Chapter 11 Cases, there are no proceeds from the assets of CNCC to distribute. As there are no distributions available to make to the Holders of Claims against CNCC, the Plan classifies claims against CNCC in Class 3A and provides CNCC's creditors no recovery. It is my understanding that if creditors of CNCC were allowed to share in the proceeds from the sale of different debtors, that would dilute the recovery of those other creditors and provide a windfall to the creditors of CCEP. By separately classifying creditors of CNCC – an entity with no available assets to distribute – the Debtors were trying to avoid an unfair and inequitable result.

73.     I also believe that CCEP is wrong when it maintains that the Plan was not proposed in good faith. The Debtors have sought repeatedly to treat all creditors and interest

---

[10]     *See* Docket No. 644.

holders appropriately under the distribution priorities of the Bankruptcy Code.  When it became evident that there would be no realizable value at CNCC, the Debtors took what they considered to be a good faith action of protecting the recoveries of creditors holding claims against Debtors that had monetized assets for distribution.  Inclusion of the CCEP Claim in Class 3 would unfairly prejudice the rights of the Debtors' other creditors by diluting their recoveries

74.    I also understand that the Plan satisfies the requirement under Bankruptcy Code section 1129(b)(2) that the Plan must be "fair and equitable" as to the Claims in Class 3A.  As noted, there are no assets available for distribution to creditors of CNCC.  Importantly, the equity interests in CNCC likewise will receive no distributions under the Plan, as all Intercompany Interests, including the equity interests in CNCC, will be cancelled, released and extinguished, on the Effective Date, and "each Holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest."[11]  Therefore, no Holder of a Claim or Interest junior to the Class 3A creditors will receive or retain any property under the Plan.

75.    I believe CCEP's argument that the Plan improperly gerrymanders CCEP's claim is mistaken.  CCEP's claim arises under the DB Contract and the counterparty to that contract is clearly CNCC.  There is no other Debtor, and thus no other Class of Claims, that would be applicable to CCEP's claims against CNCC.  As a result, I believe that CCEP's claim was properly classified in Class 3A.  CCEP's claim was clearly not placed in a separate Class in order to impact voting.  Class 3A is deemed to reject the Plan.  And even if CCEP's claim were to be included in Class 3 for voting purposes, my understanding is that Class 3 would still overwhelmingly support acceptance of the Plan, and the result would not be changed. For these reasons, I believe the Bootstrap Objection should be overruled.

---

[11]    *See* Plan § 3.2.7.2.

76.     I understand that on February 1, 2023, Decimal Digital Currency I, LLC also filed an objection (the "Decimal Objection").[12]  However, I understand that all of the assertions in the Decimal Objection relate to the issue of whether Decimal or the Debtors hold title to certain mining equipment (the "Equipment").  The Debtors have not sold, nor have sought authority to sell, the Equipment.  Further, the Debtors are not seeking to sell the Equipment pursuant to the Plan.  The Debtors do not dispute Decimal's contention that the Debtors cannot sell what they do not own but Decimal's conclusion that it has title to the Equipment has not been established.  Title to the Equipment is disputed and given that fact, the Debtors will agree not to sell the Equipment absent further order of the Bankruptcy Court deciding the title dispute.

*[Remainder of Page Intentionally Left Blank]*

---

[12]  *Decimal Digital Currency I, LLC's (I) Objection to (A) Confirmation of the Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and its Debtor Affiliates and (B) Final Approval of the Disclosure Statement for the Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and its Debtor Affiliates and (II) Reservation of Rights* [Docket No. 899].

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge information, and belief.

Dated: February 8, 2023          Respectfully submitted,
       Eden Prairie, Minnesota

                                 /s/ Drake Harvey
                                 Drake Harvey
                                 President
                                 Mining Project Wind Down LLC