**EXHIBIT B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR COMPUTE NORTH HOLDINGS, INC, et al.

### I.      Introduction

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and Its Debtor Affiliates* (the "Disclosure Statement").

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, to demonstrate that the proposed plan as described in the Disclosure Statement satisfies the "best interests" of creditors test, the Debtors, with assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available to holders of claims and interests, assuming a hypothetical Chapter 7 liquidation of the Debtors (the "Liquidation Analysis"). In addition, the Debtors, with assistance of their advisors, have prepared a hypothetical Chapter 11 wind-down analysis (the "Chapter 11 Wind-Down Analysis"), to outline the various value drivers that an orderly Chapter 11 wind-down provides as compared to a Chapter 7 liquidation. The Liquidation Analysis and the Chapter 11 Wind-Down Analysis are based upon certain assumptions detailed in the Disclosure Statement and in the Global Notes and Assumptions set forth below.

### Statement of Limitations

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a Chapter 7 case or, alternatively, a Chapter 11 wind-down involves the extensive use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis may not materialize in an actual Chapter 7 liquidation or Chapter 11 wind-down, and unanticipated events and circumstances could materially affect the ultimate results in an actual Chapter 7 liquidation or Chapter 11 wind-down.

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis were prepared for the sole purpose of generating a reasonable, good faith estimate of the net proceeds that would be realized if the Debtors' assets were liquidated in accordance with Chapter 7 of the Bankruptcy Code or through a Chapter 11 wind-down. The Liquidation Analysis and the Chapter 11 Wind-Down Analysis are not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS OR CHAPTER 11 WIND-DOWN ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS ARE HYPOTHETICAL EXERCISES THAT HAVE BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE NET PROCEEDS THAT

WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE OR IN A CHAPTER 11 WIND-DOWN AS OF THE CONVERSION DATE (DEFINED BELOW). THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS ARE NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS DO NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE CHAPTER 11 WIND-DOWN ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION OR WIND-DOWN.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS OR CHAPTER 11 WIND-DOWN ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH HEREIN. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSES SET FORTH HEREIN.

**Basis of Presentation**

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis are based on the internal, unaudited financial statements of the Debtors as of September 22, 2022 (unless otherwise indicated). The actual assets available to the Debtors' estates and claims arising in the event of an actual liquidation or wind-down may differ from the assets assumed to be available pursuant to the Liquidation Analysis.

The Debtors have neither fully evaluated claims filed nor adjudicated any claims that have been or may be asserted against the Debtors before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ materially from the claim amounts used in the Liquidation Analysis.

Based on the foregoing, and the Global Notes and Assumptions below, the Debtors believe the following Liquidation Analysis reflects the likely results of a Chapter 7 liquidation as compared to an orderly wind-down of the debtors' estates pursuant to a liquidating Chapter 11 plan.

**Chapter 11 Wind-Down Analysis Compared to Chapter 7 Liquidation Analysis**

The below exhibit provides a side-by-side comparison of the respective recoveries for various classes of claims and interests based on the proposed liquidation scenarios.

| Proceeds and Claims | Asset / Claim Value | Chapter 11 Wind-Down Analysis | | | | Chapter 7 Liquidation Analysis | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low ($) | Low (%) | High ($) | High (%) | Low ($) | Low (%) | High ($) | High (%) |
| *Liquidation Proceeds* | | | | | | | | | |
| Total Distributable Value Before Plan Administration / Liquidation Costs | $ 86,851,126 | $ 39,451,375 | 45% | $ 41,690,437 | 48% | $ 28,329,433 | 33% | $ 31,049,378 | 36% |
| Plan Administration / Liquidation Costs | | 1,600,000 | | 2,350,000 | | 2,420,707 | | 3,009,105 | |
| **Net Liquidation Proceeds Available for Distribution** | **$ 86,851,126** | **$ 37,851,375** | **44%** | **$ 39,340,437** | **45%** | **$ 25,908,727** | **30%** | **$ 28,040,273** | **32%** |
| *Claims* | | | | | | | | | |
| Chapter 11 Priority & Administrative Claims | N/A | $ 21,855,623 | 100% | $ 21,855,623 | 100% | 19,724,023 | 100% | 19,724,023 | 100% |
| Class 1 - Secured Claims | $ - | - | 0% | - | | - | 0% | - | 0% |
| Class 3 - General Unsecured Claims | $27 million - $195 million | 15,995,752 | 8% | 17,484,813 | 65% | 6,184,704 | 3% | 8,316,250 | 31% |
| Class 3A - CNCC GUC Claims | 4,114,700 | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 4 - Parent GUC Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 7 - Preferred Equity Interests | 107,278,945 | - | 0% | - | 0% | - | 0% | - | 0% |
| Class 8 - Parent Equity Interests | 3,460,108 | - | 0% | - | 0% | - | 0% | - | 0% |

**Process Assumptions**

The Liquidation Analysis has been prepared assuming that the Debtors converted their cases from Chapter 11 to Chapter 7 on or about December 31, 2022 ("Conversion Date"). On the Conversion Date, it is assumed that the Office of the United States Trustee would appoint a Chapter 7 trustee ("Trustee") to oversee the

3

liquidation of the Debtors' estates. The Chapter 11 Wind-Down Analysis presumes that a plan administrator ("Plan Administrator") would be appointed as of December 31, 2022 to oversee the wind-down of the Debtors' estates within the Chapter 11 Wind-Down Analysis. In both the Liquidation Analysis and the Chapter 11 Wind-Down Analysis, assets with initial bids are preliminarily assumed to be sold prior to the Conversion Date. Cash proceeds from the potential sales have been estimated based on the initial bids received. To the extent asset sales have been consummated, the amount of cash proceeds received have been used.

**Consolidated Liquidation**

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis assume that the Debtors would be liquidated or wound down in a jointly administered and substantively consolidated proceeding. Therefore, the Liquidation Analysis and the Chapter 11 Wind-Down Analysis consider a consolidated company liquidation / wind-down for the Debtors. The Liquidation Analysis and the Chapter 11 Wind-Down Analysis assume unsecured intercompany claims arising post-petition and pre-petition between and amongst the Debtors would be settled.

**Global Notes and Assumptions**

The Liquidation Analysis and the Chapter 11 Wind-Down Analysis should be read in conjunction with the following global notes and assumptions.

1. *Significant dependence on unaudited financial statements.* The Liquidation Analysis and the Chapter 11 Wind-Down Analysis contain numerous estimates. Proceeds available for distribution are based upon the unaudited financial statements of the Debtors as of September 22, 2022 and are assumed to be substantially the same as of the Conversion Date, unless otherwise noted.

2. *Chapter 7 liquidation and Chapter 11 plan administration costs and length of liquidation process.* The Liquidation Analysis assumes that the liquidation would involve the forced sale of substantially all Debtors' assets over a period of approximately 180 days post-Conversion Date ("Liquidation Period"), as well as efforts by a chapter 7 trustee to arrange distributions and otherwise administer and wind down the estates.

   The Chapter 11 Wind-Down Analysis assumes an orderly wind-down of the estate by the Plan Administrator over a period of approximately one year ("Wind-Down Period"). In an actual liquidation or wind-down, the wind-down process and Liquidation Period / Wind-Down Period could vary significantly, thereby impacting distributions and recoveries. For example, the potential for priority, contingent, and other claims, litigation and rejection costs, and delays in the final determination of Allowed Claims could substantially impact both the timing and amount of distributions and recoveries. Additionally, in light of industry and market instability, it is possible that the Liquidation Period would be materially extended. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation or wind-down.

3. *Additional Claims*. The cessation of business in a Chapter 7 liquidation is likely to cause additional claims to be asserted against the Debtors' Estates that otherwise would not exist absent such a liquidation. Examples of these kinds of claims include employee-related claims, such as severance or similar claims, tax liabilities, claims related to the rejection of unexpired leases and executory contracts, and others. These additional claims could be significant and, in certain circumstances, may

be entitled to priority under the Bankruptcy Code. The Debtors cannot be certain of the sufficiency of any adjustments made for these potential claims in these Chapter 7 Liquidation Analysis and the Chapter 11 Wind-Down Analysis. Subsequently, the Chapter 7 Liquidation Analysis and the Chapter 11 Wind-Down Analysis do not assume any additional potential proceeds arising from retained causes of action.

4. *Distribution of liquidation proceeds*. Chapter 7 and Chapter 11 Administrative Claims, Priority Claims, professional and trustee fees, and other Claims that may arise in a liquidation or wind-down scenario would be paid in full from the liquidation / wind-down proceeds before the balance of any proceeds will be made available to pay any secured and General Unsecured Claims. Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis and the Chapter 11 Wind-Down Analysis are estimated in accordance with the absolute priority rule.

## Chapter 11 Wind-Down Analysis for the Debtors

The schedule shown below presents the net liquidation proceeds available for distribution in a hypothetical Chapter 11 wind-down of the estate following consummation of various asset sales through the Wind-Down Period. The Chapter 11 Wind-Down Analysis estimates the high and low asset recoveries, which are based on the asset book value as of September 22, 2022, except as otherwise indicated.

**Chapter 11 Wind-Down Analysis - Consolidated Debtors Wind-Down (Actual Dollars)**

| | Notes | Book Value | Low % | Low $ | High % | High $ |
|---|---|---|---|---|---|---|
| | | | | Estimated Recovery | | |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $ 25,483,237 | 100% | $ 25,483,237 | 100% | $ 25,483,237 |
| Cash Proceeds from Asset Sales | 1 | 1,695,000 | 100% | 1,695,000 | 100% | 1,695,000 |
| Accounts Receivable - PMA, Colocation & Mining | 2 | 1,247,319 | 100% | 1,247,319 | 100% | 1,247,319 |
| Accounts Receivable - Other | 2 | 3,334,241 | 27% | 913,183 | 33% | 1,108,865 |
| Other Current Assets | 3 | 2,657,145 | 0% | - | 0% | - |
| **Total Current Assets** | | $ 34,416,942 | 85% | $ 29,338,739 | 86% | $ 29,534,421 |
| **Non-Current Assets** | | | | | | |
| Property & Equipment | 4 | $ 30,335,991 | 33% | $ 9,918,379 | 39% | $ 11,961,759 |
| Prepaid Expenses | 5 | 13,009,372 | 1% | 194,257 | 1% | 194,257 |
| Intangible Assets | 6 | - | 0% | - | 0% | - |
| Other Non-Current Assets | 7 | 9,088,821 | 0% | - | 0% | - |
| **Total Non-Current Assets** | | $ 52,434,184 | 19% | $ 10,112,637 | 23% | $ 12,156,016 |
| **Total Distributable Value Before Plan Administration Costs** | 8 | $ 86,851,126 | 45% | $ 39,451,375 | 48% | $ 41,690,437 |
| | | | | | | |
| **Less: Plan Administration Costs** | | | | | | |
| Plan Administrator Professional Fees | 9 | | | $ 1,500,000 | | $ 2,000,000 |
| Plan Administrator | 10 | | | 100,000 | | 350,000 |
| **Total Plan Administration Costs** | | | | $ 1,600,000 | | $ 2,350,000 |
| **Net Liquidation Proceeds Available for Distribution** | 11 | | | $ 37,851,375 | | $ 39,340,437 |

| Claims | | Claim Amount | Low % | Low $ | High % | High $ |
|---|---|---|---|---|---|---|
| | | | | Claims Recovery Estimate | | |
| **Priority Claims** | 12 | $ 286,946 | 100% | $ 286,946 | 100% | $ 286,946 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 37,564,429 | | 39,053,491 |
| **Chapter 11 Administrative Claims** | 13 | $ 21,568,677 | 100% | $ 21,568,677 | 100% | $ 21,568,677 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 15,995,752 | | 17,484,813 |
| **Class 1 - Secured Claims** | 14 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 15,995,752 | | 17,484,813 |
| **Class 3 - General Unsecured Claims** | 15 | $27 million - $195 million | 8% | $ 15,995,752 | 65% | $ 17,484,813 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | | | |
| **Class 3A - CNCC GUC Claims** | 16 | $ 4,114,700 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 4 - Parent GUC Claims** | 16 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 7 - Preferred Equity Interests** | 17 | $ 107,278,945 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 8 - Parent Equity Interests** | 18 | $ 3,460,108 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |

6

**Footnotes to Chapter 11 Wind-Down Analysis**

1. **Cash and Cash Equivalents**
   The Debtors' cash and cash equivalents bank balance is $25,483,237 as of the week ending November 25. The cash and cash equivalents exclude any petty cash or Fidelity retirement accounts as the balances are immaterial. The cash balance includes sale proceeds of $5,000,000 and $1,547,000 collected prior to the Conversion Date for the asset sales to Generate for the Wolf Hollow and Kearney Facilities and to Crusoe Energy Systems, LLC ("Crusoe") for various inventory, respectively. In addition, the cash balance includes sale proceeds of $4,000,000 and $3,100,000 collected after November 25 but prior to Conversion Date for the asset sales to Foundry and U.S. Bitcoin, respectively. Restricted cash is estimated at $813,457 to cash collateralize a construction bond related to development of the Debtors' in process project in Nebraska ("Minden"). The cash is restricted from the Debtors use except to secure the construction bond for buildout of the Minden project, but the Debtors expect that upon sale or liquidation of Minden, the purchaser will be required to post a bond and the restricted cash will be returned to the Debtors. The Chapter 11 Wind-Down Analysis assumes liquidation proceeds of cash and cash equivalents and restricted cash are 100% of the unaudited book value.

| Description | Entity | Amount |
|---|---|---|
| Cash and Cash Equivalents | Compute North LLC | $24,669,780 |
| Restricted Cash - Minden Project | CN Minden LLC | 813,457 |
| **Total** | | **$25,483,237** |

**Cash Proceeds from Asset Sales**
The Debtors' have included cash proceeds estimated to be received from various asset sales anticipated to be consummated on or before December 31, 2022. The cash proceeds are estimated to be $1,695,000 based on initial bids received prior to November 25, 2022. The sale proceeds include an estimated bid for Minden. Despite diligent efforts, the Debtors were unable to obtain an actionable offer to acquire the Corpus Christi Project, and CN Corpus Christi LLC, the owner of the Corpus Christi Project, is not expected to receive any cash proceeds from a sale of its assets. All sale proceeds have been detailed in the schedule below ("Sale Proceeds Schedule"). Similar to cash and cash equivalents, the Chapter 11 Wind-Down Analysis assumes the sale proceeds have a 100% recovery of estimated cash value.

| Description | Entity | Amount |
|---|---|---|
| Minden | Compute North LLC | $ 1,170,000 |
| De Minimis Assets | Compute North LLC | 525,000 |
| **Total** | | **$ 1,695,000** |

2. **Accounts Receivable**
   Accounts Receivable recoveries are based upon the accounts receivable aging as of September 22, 2022, the anticipated receipt of the November project management agreement ("PMA") income and transition services agreement ("TSA") for the NextEra JV project ("King Mountain Project"), as well as various November and December mining and colocation receipts forecasted to be collected after November 25 and before December 31. The recovery percentages of the book value accounts receivable aging as of September 22, 2022 vary by aging bucket (no recovery if aged greater than 90 days or 70% to 85% for receivables aged 90 days or less). The Debtors estimate no recovery for $1,492,417 of mining receipts as the Debtors have already collected the amounts post-petition or the amounts are

intercompany and will not have a net impact of the Debtors consolidated cash. In addition, the Debtors estimate no recovery for $167,376 of taxes on customer deposits, which are unlikely to be received. Furthermore, $380,000 of Generate-related PMA income is included with no recovery as the amount was collected as part of the sale agreement's $5 million cash proceeds. Finally, the King Mountain Project PMA and TSA income and various November and December mining and colocation receipts have a forecasted 100% recovery. This results in a net blended recovery range for all receivables of 47% to 51%.

3. **Other Current Assets**
   The Debtors' estimated book balance of other current assets is approximately $2,657,145. Other current assets include restructuring services, SAAS subscriptions, technology subscriptions, insurance policies, leases, and other prepaid agreements. The Debtors estimate no recovery of other current assets in aggregate based on their review of actual balances on a counterparty-by-counterparty basis.

4. **Property & Equipment**
   Property and equipment primarily consist of computer hardware and software, containers, transformers, miners, and other buildout and construction costs remaining after any auctions and respective sale hearings. In a wind-down, property and equipment are estimated to achieve blended recoveries of approximately 28% to 39%. All software, supplies and buildout and construction costs are estimated to have no recovery value. Office furniture, fixtures, and computer hardware is estimated to have a recovery of 15% to 30%. Transformers and mining equipment are estimated to have 25% to 50% recovery value. Assumes the Debtors retain all 63 unsold containers to be marketed and sold in an orderly sale process over time for approximately $150,000 to $175,000 per container.

5. **Prepaid Expenses**
   The Debtors' estimated book balance of prepaid expenses is approximately $13,009,372. Deposits include lease payments, credit card reserves, and mining equipment deposits. No agreements have been made with the lessors to return lease deposits. The mining equipment deposits relate to customer funded amounts that the Debtors have placed mining equipment deposits with a third-party supplier. The Debtors have not received the mining equipment relating to the deposits, and no agreement has been made with the supplier to return the deposits. The Debtors expect to receive a 100% recovery of credit card reserves. Finally, the Debtors may recover additional cash from resolutions regarding the cancellation of prepaid insurance policies no longer required by the Debtors. However, the Chapter 11 Wind-Down Analysis does not contemplate any additional potential recoveries. In aggregate, the Debtors estimate a recovery for prepaid expenses of 1%.

6. **Intangible Assets**
   Intangible assets reflect the Debtors' intangible assets as of September 22, 2022 and relates to the Debtors' intellectual property in the form of patents, trademarks, and websites that have not previously been valued and does not carry any value on the Debtors' books and records. The Debtors do not have any goodwill value marked in their books and records. Miner Sentry is an intangible asset, but it is not ascribed value in the Debtors' books and records. Any value attributed to Miner Sentry is as part of the broader asset sales detailed in the aforementioned Sale Proceeds Schedule. As such, no recoverable value was assigned to the Debtors' goodwill and intangible assets.

7. **Other Non-Current Assets**

8

The Debtors' estimated book balance of other non-current assets is approximately $9,088,821. Other non-current assets include prepaid interest, deferred commission, and site and electrical buildouts. The Debtors assign no recovery value to non-current assets.

8. **Total Distributable Value Before Liquidation Costs**
   Represents the gross value generated through the sale / disposition of the Debtors' assets prior to wind-down related expenses.

9. **Plan Administrator Professional Fees**
   Represents the Debtors' expenses incurred and payable during the Wind-Down Period. The Debtors estimate that total Plan Administrator professional fees will range between $1,500,000 and $2,000,000.

10. **Plan Administrator**
    Chapter 11 plan administrator fees incurred and payable for administration of the Chapter 11 Wind-Down Analysis. The Debtors estimate that total Plan Administrator fees will range between $100,000 and $350,000.

11. **Net Liquidation Proceeds Available for Distribution**
    Represents the net value available for distribution to the Debtors' claims.

12. **Priority Claims**
    Represents unsecured claims related to estimated pre-petition taxes and unpaid commissions claims that were filed as of November 23, 2022 (the "Bar Date"). Includes estimated 2022 pre-petition taxes equal to 2021 total. Assumes certain accrued employee wages and benefits are paid as part of the Chapter 11 Administrative Claims.

13. **Chapter 11 Administrative Claims**
    Represents the total 503(b)(9) and other administrative claims filed as of the Bar Date and accrued outstanding post-petition expenses, such as fees payable to the trustee for fourth quarter disbursements, accrued payroll and benefits, restricted receipts, paid time off ("PTO"), estimated freight and shipping charges, insurance premiums, mining hosting fees, and unpaid and accrued Chapter 11 professional fees incurred in the Chapter 11 cases through December 31, 2022. The Chapter 11 Wind-Down Analysis assume that the Debtors cease operations at all facilities following consummation of various asset sales in early December; however, the Debtors keep approximately 14 corporate level employees to continue various business and reporting functions through the Conversion Date.

14. **Class 1 – Secured Claims**
    Aggregate secured claims as of the Bar Date are equal to $0. As of the Bar Date, $143,207,370 secured claims were filed. These claims have been reallocated to their proper claims status based on the following adjustments: Howard County Tax Office's $12,248 filed claim includes a duplicate claim of $6,124 and the remainder of the claim was reallocated to a priority tax claim; Koch Filter Corporation's filed claim of $67,784 has been allocated to General Unsecured Claims as there is no know secured interest for the claim; MVP Logistics LLC's filed claim of $314,211 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; Nebraska Public Power District's filed claim of $813,457 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; RK Mission Critical LLC's ("RKMC") filed claim of $38,693,054 includes a

duplicate claim of $19,346,527 and the remainder of the claim was allocated to General Unsecured Claims as the Disclosure Statement does not contemplate a security interest; TZ Capital Holdings LLC's ("TZ Capital") filed claim of $102,085,861 has been waived as part of U.S. Bitcoin's bid for the King Mountain Project; US Digital Mining Texas LLC's filed claim of $1,200,000 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; WW Grainger Inc.'s filed claim of $20,755 has been removed as the claim balance as it has been identified as a cure cost for potential bidders to assume as part of various asset sales.

15. **Class 3 – General Unsecured Claims**
Represents the total General Unsecured Claims filed as of the Bar Date less any erroneously filed claims. Erroneously filed claims refer to claims reviewed by the Debtors that have been identified as erroneous for reasons including, among other things, duplicative claims, misclassified claims, and claims waived as part of various bids received. The filed General Unsecured Claims include, among other things, (1) pre-petition trade claims, (2) undisputed pre-petition litigation claims, and (3) numerous other types of pre-petition liabilities. The Debtors have included certain incremental scheduled General Unsecured Claims in the balance that were not marked as contingent, unliquidated, or disputed that did not have a corresponding filed claim as of the Bar Date. As noted previously, the Debtors have not fully reconciled all claims and believe the allowed General Unsecured Claims balance could vary materially in an actual liquidation or wind-down. In addition, General Unsecured Claims may include, among other things, claims that are speculative in amount, such as disputed litigation claims that may be asserted against the Debtors, any amounts related to potential rejection damages claims, and customer deposit claims; however, the Debtors' have excluded the impact of these claims for the purpose of the Chapter 7 Liquidation Analysis. Finally, General Unsecured Claims exclude certain claims, such as Intercompany Claims and any claims waived as part of bids received prior to November 25. Specifically, General Unsecured Claims exclude all claims the Debtors presume will be resolved as part of an asset sale transaction, including Foundry Digital and U.S. Bitcoin. The conclusion of the Chapter 11 Wind-Down Analysis is that General Unsecured Claims will receive any cash value recovery remaining in a Chapter 11 Wind-Down Analysis beyond the recovery classes previously listed. For presentation purposes, the Debtors display a range of General Unsecured Claims values as the total could vary materially in an actual liquidation or wind-down. The General Unsecured Claims range from approximately $27 million of scheduled General Unsecured Claims, which exclude potential rejection damages, customer deposit claims, claims waived as part of asset sale transactions, and other speculative claims (as outlined above), to approximately $195 million of filed General Unsecured Claims, which exclude potential rejection damages and include certain scheduled claims not designated as contingent, unliquidated, or disputed without a corresponding filed claim and exclude erroneously filed claims and claims waived as part of asset sale transactions (as outlined above).

16. **Class 3A – CNCC GUC Claims**
Represents claims filed against CN Corpus Christi LLC for various costs related to the partially developed Corpus Christi Project. Despite diligent efforts, CN Corpus Christi LLC was unable to obtain an actionable offer to acquire the Corpus Christ Project, and, thus, there are no anticipated cash proceeds from a sale of this Debtor's assets. As a result, the Debtors anticipate that there will be no distributions to creditors in this class.

17. **Class 4 – Parent GUC Claims**
Represents the balance outstanding under the Debtors' Parent GUC Claims as of the Conversion Date, which totals $0. TZ Capital's unsecured parent guarantee claim has been waived as part of the U.S.

Bitcoin bid. All additional and incremental parent guarantees for the Prepetition Generate Facility have been released as part of the Generate sale.

18. **Class 7 – Preferred Equity Interests**

Estimated balance of Preferred Equity Interests as of the Conversion Date. The Preferred Equity Interests include four classes of equity: Convertible Preferred Stock, Convertible Preferred II Stock, Series C-1 Convertible Preferred Stock, and Series C Convertible Preferred Stock. These shares comprise 10.8% of total shares in the Debtors' equity structure. All restricted stock units ("RSU") not purchased, options and RSUs issued and outstanding, and shares available for issuance are excluded from the claims pool (14.4% of total shares in the Debtors' equity structure).

19. **Class 8 – Parent Equity Interests**

Estimated balance of Parent Equity Interests as of the Conversion Date. The Parent Equity Interests include two classes of equity: Class A Voting Common Stock and Class B Non-Voting Common Stock. These shares comprise 74.8% of total shares in the Debtors' equity structure.

## Chapter 7 Liquidation Analysis for the Debtors

The schedule shown below presents the net liquidation proceeds available for distribution in a hypothetical Chapter 7 case. The Liquidation Analysis estimates the high and low asset recoveries, which are based on the asset book value as of September 22, 2022, except as otherwise indicated.

**Chapter 7 Liquidation Analysis - Consolidated Debtors Wind-Down (Actual Dollars)**

| | Notes | Book Value | Estimated Recovery | | | |
|---|---|---|---|---|---|---|
| | | | Low % | Low $ | High % | High $ |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $ 25,483,237 | 100% | $ 25,483,237 | 100% | $ 25,483,237 |
| Cash Proceeds from Asset Sales | 1 | 1,695,000 | 31% | 525,000 | 31% | 525,000 |
| Accounts Receivable - PMA, Colocation & Mining | 2 | 1,247,319 | 50% | 623,659 | 100% | 1,247,319 |
| Accounts Receivable - Other | 2 | 3,334,241 | 10% | 326,137 | 20% | 652,273 |
| Other Current Assets | 3 | 2,657,145 | 0% | - | 0% | - |
| **Total Current Assets** | | $ 34,416,942 | 78% | $ 26,958,033 | 81% | $ 27,907,829 |
| **Non-Current Assets** | | | | | | |
| Property & Equipment | 4 | $ 30,335,991 | 4% | $ 1,177,143 | 10% | $ 2,947,292 |
| Prepaid Expenses | 5 | 13,009,372 | 1% | 194,257 | 1% | 194,257 |
| Intangible Assets | 6 | - | 0% | | 0% | |
| Other Non-Current Assets | 7 | 9,088,821 | 0% | | 0% | |
| **Total Non-Current Assets** | | $ 52,434,184 | 3% | $ 1,371,400 | 6% | $ 3,141,549 |
| **Total Distributable Value Before Liquidation Costs** | 8 | $ 86,851,126 | 33% | $ 28,329,433 | 36% | $ 31,049,378 |
| | | | | | | |
| **Less: Liquidation Costs** | | | | | | |
| Chapter 7 Professional Fees | 9 | | | $ 1,500,000 | | $ 2,000,000 |
| Trustee Fees | 10 | | 3.25% | 920,707 | 3.25% | 1,009,105 |
| **Total Liquidation Costs** | | | | $ 2,420,707 | | $ 3,009,105 |
| **Net Liquidation Proceeds Available for Distribution** | 11 | | | $ 25,908,727 | | $ 28,040,273 |

| Claims | | Claim Amount | Claims Recovery Estimate | | | |
|---|---|---|---|---|---|---|
| | | | Low % | Low $ | High % | High $ |
| **Priority Claims** | 12 | $ 286,946 | 100% | $ 286,946 | 100% | $ 286,946 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 25,621,781 | | 27,753,327 |
| **Chapter 11 Administrative Claims** | 13 | $ 19,437,077 | 100% | $ 19,437,077 | 100% | $ 19,437,077 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 6,184,704 | | 8,316,250 |
| **Class 1 - Secured Claims** | 14 | $ - | 0% | $ | 0% | $ |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 6,184,704 | | 8,316,250 |
| **Class 3 - General Unsecured Claims** | 15 | $27 million - $195 million | 3% | $ 6,184,704 | 31% | $ 8,316,250 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 3A - CNCC GUC Claims** | 16 | $ 4,114,700 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 4 - Parent GUC Claims** | 17 | $ - | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 7 - Preferred Equity Interests** | 18 | $ 107,278,945 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |
| **Class 8 - Parent Equity Interests** | 19 | $ 3,460,108 | 0% | $ - | 0% | $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - |

**Footnotes to Chapter 7 Liquidation Analysis**

1. **Cash and Cash Equivalents**

   The Debtors' cash and cash equivalents balance is $25,483,237 as of the week ending November 25. The cash and cash equivalents are based on the bank cash balance as of the week ending November 25. The cash and cash equivalents exclude any petty cash or Fidelity retirement accounts as the balances are immaterial. The cash balance includes sale proceeds of $5,000,000 and $1,547,000 collected prior to the Conversion Date for the asset sales to Generate for the Wolf Hollow and Kearney Facilities and to Crusoe for various inventory, respectively. In addition, the cash balance includes sale proceeds of $4,000,000 and $3,100,000 collected after November 25 but prior to Conversion Date for the asset sales to Foundry and U.S. Bitcoin, respectively. Restricted cash is estimated at $813,457 to cash collateralize a construction bond related to development of Minden. The cash is restricted from the Debtors use except to secure the construction bond for buildout of the Minden project, but the Debtors expect that upon sale or liquidation of Minden, the purchaser will be required to post a bond and the restricted cash will be returned to the Debtors. The Liquidation Analysis assumes liquidation proceeds of cash and cash equivalents and restricted cash are 100% of the unaudited book value.

   | Description | Entity | Amount |
   |---|---|---|
   | Cash and Cash Equivalents | Compute North LLC | $24,669,780 |
   | Restricted Cash - Minden Project | CN Minden LLC | 813,457 |
   | **Total** | | **$25,483,237** |

   **Cash Proceeds from Asset Sales**

   The Debtors' have included cash proceeds estimated to be received from various asset sales anticipated to be consummated on or before December 31, 2022. The cash proceeds are estimated to be $525,000 based on initial bids received prior to November 25, 2022. The sale proceeds exclude an estimated bid for Minden. Despite diligent efforts, the Debtors were unable to obtain an actionable offer to acquire the Corpus Christ Project, and CN Corpus Christi LLC, the owner of the Corpus Christi Project, is not expected to receive any cash proceeds from a sale of its assets. All sale proceeds have been detailed in the Sale Proceeds Schedule below. All initial bids received for assets prior to November 25, 2022 have an estimated 100% recovery of cash sale proceeds, but the bid for Minden has no forecasted recovery value, as it is assumed to be actionable only through an orderly wind-down process as detailed in the Chapter 11 Wind-Down Analysis.

   | Description | Entity | Amount |
   |---|---|---|
   | Minden | Compute North LLC | $ - |
   | De Minimis Assets | Compute North LLC | 525,000 |
   | Total | | $ 525,000 |

2. **Accounts Receivable**

   Accounts Receivable recoveries are based upon the accounts receivable aging as of September 22, 2022, the anticipated receipt of the November PMA income and TSA for the King Mountain Project, as well as various November and December mining and colocation receipts forecasted to be collected after November 25 and before December 31. The recovery percentages of the book value accounts receivable aging as of September 22, 2022 vary by aging bucket (no recovery if aged greater than 90 days or 25% to 50% for receivables aged 90 days or less). The Debtors estimate no recovery for $1,492,417 of mining receipts as the Debtors have already collected the amounts post-petition or the

amounts are intercompany and will not have a net impact of the Debtors consolidated cash. In addition, the Debtors estimate no recovery for $167,376 of taxes on customer deposits, which are unlikely to be received. Furthermore, $380,000 of Generate-related PMA income is included with no recovery as the amount was collected as part of the sale agreement's $5 million cash proceeds. Finally, the King Mountain Project PMA and TSA income and various November and December mining and colocation receipts have a forecasted 50% to 100% recovery range. This results in a net blended recovery range for all receivables of 21% to 41%.

3. **Other Current Assets**
The Debtors' estimated book balance of other current assets is approximately $2,657,145. Other current assets include restructuring services, SAAS subscriptions, technology subscriptions, insurance policies, leases, and other prepaid agreements. The Debtors estimate no recovery of other current assets in aggregate based on their review of actual balances on a counterparty-by-counterparty basis.

4. **Property & Equipment**
Property and equipment primarily consist of computer hardware and software, containers, transformers, miners, and other buildout and construction costs remaining after any auctions and respective sale hearings. In a liquidation, property and equipment are estimated to achieve blended recoveries of approximately 4% to 10%. All software, supplies and buildout and construction costs are estimated to have no recovery value. Office furniture, fixtures, and computer hardware is estimated to have a recovery of 5% to 15%. Transformers and mining equipment estimate to have 10% to 25% recovery value. Assumes the Debtors retain all 63 unsold containers to be liquidated for a 5% to 12.5% recovery.

5. **Prepaid Expenses**
The Debtors' estimated book balance of deposits is approximately $13,009,372. Deposits include lease payments, credit card reserves, and mining equipment deposits. No agreements have been made with the lessors to return lease deposits. The Debtors have not received the mining equipment relating to their deposit, and no agreement has been made with the vendor to return the deposit. The Debtors expect to receive a 100% recovery of credit card reserves. Finally, the Debtors may recover additional cash from resolutions regarding the cancellation of prepaid insurance policies no longer required by the Debtors. However, the Chapter 7 Liquidation Analysis does not contemplate any additional potential recoveries. In aggregate, the Debtors estimate a recovery for prepaid expenses of 1%.

6. **Intangible Assets**
Intangible assets reflect the Debtors' intangible assets as of September 22, 2022 and relates to the Debtors' intellectual property in the form of patents, trademarks, and websites that have not previously been valued and does not carry any value on the Debtors' books and records. The Debtors do not have any goodwill value marked in their books and records. Miner Sentry is an intangible asset, but it is not ascribed value in the Debtors' books and records. Any value attributed to Miner Sentry is as part of the broader asset sales detailed in the aforementioned Sale Proceeds Schedule. As such, no recoverable value was assigned to the Debtors' goodwill and intangible assets.

7. **Other Non-Current Assets**
The Debtors' estimated book balance of other non-current assets is approximately $9,088,821. Other non-current assets include prepaid interest, deferred commission, and site and electrical buildouts. The Debtors assign no recovery value to non-current assets.

8. **Total Distributable Value Before Liquidation Costs**
   Represents the gross value generated through the sale / disposition of the Debtors' assets prior to liquidation related expenses.

9. **Chapter 7 Professional Fees**
   Includes an estimate for certain professionals that would be retained by the Trustee during the Liquidation Period, including financial advisors and legal counsel. The Debtors estimate that Chapter 7 Professional Fees will range between $1,500,000 and $2,000,000.

10. **Trustee Fees**
    Trustee fees required to facilitate the sale and wind-down of the Debtors' assets, assumed to be 3.25% of Total Distributable Value. These fees are assumed to be used for marketing and administrative costs of the Trustee during the Liquidation Period.

11. **Net Liquidation Proceeds Available for Distribution**
    Represents the net value available for distribution to the Debtors' claims.

12. **Priority Claims**
    Represents unsecured claims related to estimated pre-petition taxes and unpaid commissions claims that were filed as of the Bar Date. Includes estimated 2022 pre-petition taxes equal to 2021 total. Assumes certain accrued employee wages and benefits are paid as part of the Chapter 11 Administrative Claims.

13. **Chapter 11 Administrative Claims**
    Represents the total 503(b)(9) and other administrative claims filed as of the Bar Date and accrued outstanding post-petition expenses, such as fees payable to the trustee for fourth quarter disbursements, accrued payroll and benefits, restricted receipts, PTO, estimated freight and shipping charges, insurance premiums, mining hosting fees, and unpaid and accrued Chapter 11 professional fees incurred in the Chapter 11 cases through December 31, 2022. The Liquidation Analysis assumes that the Debtors cease operations at all facilities following consummation of various asset sales in early December; however, the Debtors keep approximately 14 corporate level employees to continue various business and reporting functions through the Conversion Date.

14. **Class 1 – Secured Claims**
    Aggregate secured claims as of the Bar Date are equal to $0. As of the Bar Date, $143,207,370 secured claims were filed. These claims have been reallocated to their proper claims status based on the following adjustments: Howard County Tax Office's $12,248 filed claim includes a duplicate claim of $6,124 and the remainder of the claim was reallocated to a priority tax claim; Koch Filter Corporation's filed claim of $67,784 has been allocated to General Unsecured Claims as there is no know secured interest for the claim; MVP Logistics LLC's filed claim of $314,211 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; Nebraska Public Power District's filed claim of $813,457 has been allocated to General Unsecured Claims as there is no known secured interest for the claim; RKMC filed claim of $38,693,054 includes a duplicate claim of $19,346,527 and the remainder of the claim was allocated to General Unsecured Claims as the Disclosure Statement does not contemplate a security interest; TZ Capital's filed claim of $102,085,861 has been waived as part of U.S. Bitcoin's bid for the King Mountain Project; US Digital Mining Texas LLC's filed claim of $1,200,000 has been allocated to General Unsecured Claims as there is no known secured interest

for the claim; WW Grainger Inc.'s filed claim of $20,755 has been removed as the claim balance as it has been identified as a cure cost for potential bidders to assume as part of various asset sales.

15. **Class 3 – General Unsecured Claims**
Represents the total General Unsecured Claims filed as of the Bar Date less any erroneously filed claims. Erroneously filed claims refer to claims reviewed by the Debtors that have been identified as erroneous for reasons including, among other things, duplicative claims, misclassified claims, and claims waived as part of various bids received. The filed General Unsecured Claims include, among other things, (1) pre-petition trade claims, (2) undisputed pre-petition litigation claims, and (3) numerous other types of pre-petition liabilities. The Debtors have included certain incremental scheduled General Unsecured Claims in the balance that were not marked as contingent, unliquidated, or disputed that did not have a corresponding filed claim as of the Bar Date. As noted previously, the Debtors have not fully reconciled all claims and believe the allowed General Unsecured Claims balance could vary materially in an actual liquidation or wind-down. In addition, General Unsecured Claims may include, among other things, claims that are speculative in amount, such as disputed litigation claims that may be asserted against the Debtors, any amounts related to potential rejection damages claims, and customer deposit claims; however, the Debtors' have excluded the impact of these claims for the purpose of the Chapter 7 Liquidation Analysis. Finally, General Unsecured Claims exclude certain claims, such as Intercompany Claims and any claims waived as part of bids received prior to November 25. Specifically, General Unsecured Claims exclude all claims the Debtors presume will be resolved as part of an asset sale transaction, including Foundry Digital and U.S. Bitcoin. The conclusion of the Liquidation Analyses is that General Unsecured Claims will receive any cash value recovery remaining in a Chapter 7 liquidation beyond the recovery classes previously listed. For presentation purposes, the Debtors display a range of General Unsecured Claims values as the total could vary materially in an actual liquidation or wind-down. The General Unsecured Claims range from approximately $27 million of scheduled General Unsecured Claims, which exclude potential rejection damages, customer deposit claims, claims waived as part of asset sale transactions, and other speculative claims (as outlined above), to approximately $195 million of filed General Unsecured Claims, which exclude potential rejection damages and include certain scheduled claims not designated as contingent, unliquidated, or disputed without a corresponding filed claim and exclude erroneously filed claims and claims waived as part of asset sale transactions (as outlined above).

16. **Class 3A – CNCC GUC Claims**
Represents claims filed against CN Corpus Christi LLC for various costs related to the partially developed Corpus Christi Project. Despite diligent efforts, CN Corpus Christi LLC was unable to obtain an actionable offer to acquire the Corpus Christ Project, and, thus, there are no anticipated cash proceeds from a sale of this Debtor's assets. As a result, the Debtors anticipate that there will be no distributions to creditors in this class.

17. **Class 4 – Parent GUC Claims**
Represents the balance outstanding under the Debtors' Parent GUC Claims as of the Conversion Date, which totals $0. TZ Capital's unsecured parent guarantee claim has been waived as part of the U.S. Bitcoin bid. All additional and incremental parent guarantees for the Prepetition Generate Facility have been released as part of the Generate sale.

18. **Class 7 – Preferred Equity Interests**

16

Estimated balance of Preferred Equity Interests as of the Conversion Date. The Preferred Equity Interests include four classes of equity: Convertible Preferred Stock, Convertible Preferred II Stock, Series C-1 Convertible Preferred Stock, and Series C Convertible Preferred Stock. These shares comprise 10.8% of total shares in the Debtors' equity structure. All RSUs not purchased, options and RSUs issued and outstanding, and shares available for issuance are excluded from the claims pool (14.4% of total shares in the Debtors' equity structure).

19. **Class 8 – Parent Equity Interests**

Estimated balance of Parent Equity Interests as of the Conversion Date. The Parent Equity Interests include two classes of equity: Class A Voting Common Stock and Class B Non-Voting Common Stock. These shares comprise 74.8% of total shares in the Debtors' equity structure.

**EXHIBIT C**

**Supplemental Disclosure Regarding the Plan's Global Settlement**

## I.    Overview.

The Plan represents a Global Settlement between the Debtors and their various stakeholders.  In that regard, the Plan is a motion to the Bankruptcy Court under Bankruptcy Rule 9019 for approval of the Global Settlement and, if the Plan is confirmed by the Bankruptcy Court, it would result in a settlement and release of certain claims and Causes of Action that the Debtors may have against third parties.

You should be aware that litigation is inherently uncertain and there can be no assurance that there would be any additional recoveries for Holders of Allowed Claims or Interests if the Debtors, the Plan Administrator or the Litigation Trust prosecuted the claims and causes of action that may be released under the Plan to judgment.  Litigation is subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors.  Moreover, even if the Debtors believe they may hold claims against third parties that are eligible to be released under the Plan, there is no assurance that the Bankruptcy Court or any other court of competent jurisdiction would ultimately concur with the Debtors and enter judgment in the Debtors' favor if they were to prosecute such claims.  It is likely that such claims and causes of action would be vigorously opposed by the applicable defendants.  Furthermore, there can be no assurance that the Debtors or the Litigation Trust, as the case may, would not incur significant costs associated with bringing all possible claims and causes of action held by the Debtors.  If the Debtors or Litigation Trust were unsuccessful in recovering more on these claims than the cost to bring them, Distributions under the Plan would be reduced, and such reduction to the amount of Distributions could be material.

With that in mind, the Debtors' release is set forth in its entirety in Section 9.3 of the Plan. In pertinent part, Section 9.3 of the Plan provides that the releases of claims the Debtors may hold are limited to "Released Parties" as defined in the Plan.  In turn, the term "Released Parties" is defined in Section 1.1.98 of the Plan to mean:

(a) each Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the Plan Administrator; (d) the Committee; (e) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan in accordance with the procedures set forth in the Solicitation Procedures Order; (f) all Holders of Claims or Interests that abstain from voting on the Plan, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and who do not object to the Plan; and (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and

1

assigns, subsidiaries, affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided, however*, that (i) any Holder of a Claim or Interest that opts out of the releases in accordance with the procedures set forth in the Solicitation Procedures Order shall not be a "Released Party"; (ii) any Holder of a Claim or Interest who timely Files an objection to the Plan in respect of the releases contained in Section 9.4 of the Plan, shall not be a "Released Party"; and (iii) any Entity or Affiliate of an Entity that is identified on the Schedule of Retained Causes of Action shall not be a "Released Party" under the Plan.

Importantly, with respect to the Released Parties, the releases set forth in Section 9.3 of the Plan **do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Wind-Down Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; (2) any Causes of Action to the extent set forth on the Schedule of Retained Causes of Action; or (3) claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.**

Holders of Claims and Interests who are entitled to vote on the Plan should also be aware that the Debtors have entered into a variety of different transactions, including sales of significant assets and/or business lines, sales of de minimis assets and settlements of claims, pursuant to which the Debtors have received varying forms of consideration from the counterparties thereto. As part of such transactions, the Debtors exchanged general mutual releases with certain parties to these transactions or agreed to allow Claims held by such parties against one or more of the Debtors. These transactions include (a) the sale of the equity in CN Borrower LLC to an affiliate of Generate Lending, LLC, (b) the sale of CN Member's equity interests in TZRC LLC to an affiliate of U.S. Data Mining Group, Inc. and related settlement with NextEra Energy Resources, LLC and certain of its affiliates, (c) the sale of substantially all of the Debtors other projects and assets to Foundry Digital LLC and (d) a settlement with Marathon Digital Holdings, Inc.

As such, potential claims against the parties to these transactions have already been reduced and/or released pursuant to Bankruptcy Court order in exchange for significant consideration to the Debtors and their Estates. In addition to the approximately $13.6 million in cash proceeds received by the Debtors in these transactions, the Debtors also estimate that they received approximately $217.3 million in non-cash consideration in connection with these transactions (not including the release of guaranty claims aggregating more than $203 million), which greatly reduced the Debtors' claims pool, thereby significantly enhancing creditor recoveries.

As a result, many potentially significant claims and causes of action that otherwise would have been available for prosecution and/or settlement by the Debtors or the Litigation Trust, as the case may be, have already been settled, waived and/or released during these Chapter 11 Cases.

As a result, in preparing this **Exhibit C**, the Debtors and their advisors have conducted a review and analysis of the Debtors' prepetition transactions to determine whether there were any transactions with potential claims or causes of action that might be worth pursuing and **which have not already been released in the Chapter 11 Cases**. Other than the claims included in the Schedule of Retained Causes of Action, the Debtors and its advisors were not able to identify any such claims or causes of action. In addition, this **Exhibit C** omits any claims and causes of action that (i) the Debtors have identified in Article VI.K. of the Disclosure Statement because those claims and causes of action are proposed to be retained under the Plan and will be set forth on the Schedule of Retained Causes of Action, and (ii) are less than $6,425.00, pursuant to 11 U.S.C § 547(c)(9).

## II.    Review of Released Fiduciary-Duty Claims.

In connection with the Debtors' restructuring efforts, in August 2022, the Debtors' board of directors appointed a new independent director with restructuring experience named Scott Tillman. Mr. Tillman is the manager of Pi Consulting, LLC, which provides board representation for special situations. Mr. Tillman currently sits on the Independent Committee of the Board of Compute North Holdings, Inc.

Following the Petition Date and in conjunction with the formulation of the Plan, the Debtors tapped Mr. Tillman to oversee, with counsel's assistance, an investigation focused on identifying any viable fiduciary duty claims against directors or officers of the Debtors that may be released under the terms of the Plan. In addition to reviewing board materials and other relevant documents, currently Mr. Tillman and counsel have interviewed six current and former Compute North officers and directors. Interviews with additional officers and directors and certain third parties are ongoing.

In conducting this investigation, the Debtors have focused solely on claims that may actually be released under the terms of the Plan as currently drafted. This is due, in part, because the Debtor releases in the Plan are narrowly tailored, expressly carving out any "claims or liabilities arising out of or relating to a Released Party's actual fraud, willful misconduct, or gross negligence." This carve out of claims the Debtors may have for actual fraud, willful misconduct, or gross negligence is particularly important given that the Debtors are all Delaware entities, and thus Delaware law governs the fiduciary duties of their officers and directors. *In re Alta Mesa Resources, Inc.*, October 13, 2022 Slip Copy 2022 WL 7750353 (recognizing that, under the internal affairs doctrine, the fiduciary duties of a Delaware entity's officers and directors are governed by Delaware law). Under Delaware law, officers and directors owe two fiduciary duties—the duty of care and the duty of loyalty. *Gantler v. Stephens*, 965 A.2d 695, 709-10 (Del. 2009) (holding that the standards governing the duty of care and the duty of loyalty are the same for officers and directors).

A claim for breach of the duty of care requires a showing of "gross negligence," which, as noted above, is expressly carved out of the Debtors' release. In other words, the Debtors' officers and directors are only being released from ordinary negligence, which is not actionable under Delaware law in a claim for breach of the duty of care in any event. *See Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("[A] corporate director is only considered to have breached his duty of care in instances of gross negligence."); *Cinerama, Inc. v.*

*Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994) (same), *aff'd*, 663 A.2d 1156 (Del. 1995). In addition, Compute North Holdings, Inc.'s certificate of incorporation expressly exculpates its directors from all duty of care liability, as permitted under the Delaware General Corporation Law, and the affiliated Debtors are all LLCs that are "member managed" by Compute North Holdings, Inc. *See Firefighters' Pension System of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212 (Del. Ch. 2021) ("Section 102(b)(7) [of the Delaware General Corporation Law] and its exceptions preserve liability for breaches of the duty of loyalty, including its subsidiary element of good faith, while permitting exculpation for breaches of the duty of care."); *Rothenberg v. Santa Fe Pac. Corp.*, 18 Del. J. Corp. L. 743, 753 (Del. Ch. May 18, 1992) ("[S]ince the purpose of §102(b)(7) is to enable corporations to eliminate director liability for monetary damages for duty of care violations, it follows that the statutory exceptions to §102(b)(7) concern director conduct that involves other than breaches of the duty of care.").[1]

## A. Fiduciary Duty of Care

Under the facts presented, the Debtors can conclusively say that no viable claims for breach of the duty of care are being released under the Plan. To have a viable claim for breach of the duty of care, the plaintiff must allege gross negligence – ordinary negligence will not suffice. Here, claims for conduct that could be construed as gross negligence will not be released.

## B. Fiduciary Duty of Loyalty

Under Delaware law, the duty of loyalty requires officers and directors of a corporation to act (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action (or non-action) is in the best interests of the company and its stockholders. Thus, a director's or officer's duty of loyalty is often implicated in connection with (i) conflicts of interest and (ii) corporate opportunities. A conflict of interest may exist when a director has a direct or indirect personal or financial interest in a transaction or other matter involving the corporation. Similarly, if a director or officer gains access to a corporate opportunity related to the business of the corporation, the director or officer must make that opportunity available to the corporation before pursuing it on his own behalf. It is important to note that any breaches of the "good faith" component of the duty of loyalty are not being released insofar as "willful misconduct" is expressly carved out and, under Delaware law, bad faith requires an intentional dereliction of duty or actual intent to harm the corporation. *See Lenois v. Lawal*, No. CV 11963-VCMR, 2017 WL 5289611, at *15 (Del. Ch. Nov. 7, 2017) ("The Delaware Supreme Court explicated the spectrum of bad faith in *Disney*. The Supreme Court identified 'three different categories of fiduciary behavior' that must be considered. The first 'involves lack of due care— that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent.' This type of behavior does not constitute bad faith. The second, an 'intentional dereliction of duty, a conscious disregard for one's responsibilities,' rises to the level of bad faith. The third, 'so-called 'subjective bad faith,'' exists on the far end of the spectrum and refers to 'fiduciary conduct motivated by an actual intent to do harm.'").

---

[1] Compute North Holdings, Inc.'s certificate of incorporation provides that "[t]o the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." The certificate of incorporation has included substantially the same language from the time it was originally filed.

### 1. Expense Reimbursements

Mr. Tillman and counsel have identified a potential issue arising from circumstances surrounding the reimbursement of expenses charged by co-founder, former CEO, and director Dave Perrill on a corporate American Express card. In July 2022, the reimbursement of Mr. Perrill for expenses charged to this American Express card, which Mr. Perrill personally guarantees, became a matter of concern within Compute North. Mr. Perrill has always maintained that the reimbursed expenses in question were all incurred in connection with the entertainment of current and prospective customers and business partners and were therefore legitimate business expenses that benefitted the Debtors. Approximately $61,000.00 in expense reimbursements have been questioned to date as part of this review.

### 2. Transactions or Arrangements with Perrill-Owned Entities

Mr. Tillman and counsel have also identified a small number of transactions or arrangements between Compute North and entities owned by Mr. Perrill or members of his immediate family ("**Perrill-Owned Entities**").

#### a. The Office Sublease

Compute North's headquarters are in a building owned by another business related to Mr. Perrill. It appears that, until 2020, the Debtors occupied office space in the building rent free. As of January 1, 2020, Compute North LLC entered into a sublease with WAND Corporation (the "**Sublandlord**") under a Master Lease between the Sublandlord and the landlord, 7575 Management, LLC (the "**Landlord**"). The Landlord and the Sublandlord are both Perrill-Owned Entities, and Dave Perrill is (or was at relevant times) the Managing Member of the Landlord and the CEO of the Sublandlord. The sublease was signed by Dave Perrill on behalf on both Compute North LLC and the Sublandlord. Dave Perrill also signed the Landlord's consent to the Sublease. An amendment to sublease was entered into as of October 1, 2020. At this point, the Debtors have no reason to believe that the sublease was unfair to Compute North. In particular, based on the investigation thus far, the rent per square foot seems to have been in line with the market for comparable office space in Eden Prairie and well below the average rent for comparable office space in nearby Minneapolis.

#### b. Software Licenses

The Debtors use a standard suite of Microsoft business software products under licenses procured by a Perrill-Owned Entity known as TechFactory. As a registered Microsoft distributor, TechFactory was able to procure the licenses for a lower cost than the Debtors would otherwise have had to pay. At this point, it appears that the license fees have always been passed through to Compute North at cost.

#### c. Digital Marketing Services

A Perrill-Owned Entity known as PerrillCo. has been providing Compute North with digital marketing services for a number of years. A "Change Order: Digital Marketing" was signed by Dave Perrill on behalf of Compute North LLC as of August 1, 2019. The Change Order provided for a "one time project investment" of $15,600 for "strategy, personae, and content

5

creation" and a "brand refresh" and a "monthly investment" of $8,170 for "email marketing, content marketing, paid media, and ongoing SEO management." At this point, the Debtors have no reason to believe that purchased services have not been provided or that the prices charged were unfair to Compute North.

### d.    Office-Related Purchases and Services

As noted above, WAND Corporation, a Perrill-Owned Entity, is the Sublessor from which Compute North subleases its headquarters office space in Eden Prairie. As reflected in the Debtors' Statement of Financial Affairs, WAND Corporation has purchased office furniture and fixtures for Compute North and provided certain office-related services such as IT installation. The total amount of payments to WAND Corporation in the twelve months preceding the Petition Date was $141,058.96, the vast majority of which was for office furniture and fixtures. At this point, the Debtors have no reason to believe that the prices charged were unfair to Compute North or that the payments were otherwise problematic.

## III.    Transfers within 90 Days of Petition Date.

Under certain circumstances, and subject to various defenses, sections 547 and 550 of the Bankruptcy Code allow a trustee or debtor-in-possession to avoid and recover transfers made to third parties within 90 days prior to commencing a bankruptcy case (or within one-year prior to the Bankruptcy Case with respect to "insiders" of the debtor).[2]  Attached hereto as **Schedule 1** is a list of certain payments made by the Debtors to non-insiders within 90 days of the Petition Date (the "**90-Day Payments**") that may be released under the Plan if the applicable transferees do not opt out of the releases in the Plan.  Schedule 1 includes the amount of the payments, the transferees, the date of each payment, and the Debtor payor.  To be clear, this is not a list of all payments made by the Debtors within 90-days of the commencement of the Chapter 11 Cases.  For example, payments made to parties that are not entitled to vote on the Plan as well as payments made to parties that have already received a Court-approved release are not included here.  Additionally, there are potential preference claims that the Debtors have determined or may determine to pursue which will be included on the Schedule of Retained Causes of Action. To see the names of all recipients of payments made by the Debtors within 90 days of the commencement of the Chapter 11 Cases, parties should refer to the Statement of Financial Affairs, Part 2, filed by certain of the Debtors at docket numbers 424, 428, 431, 435 and 436 and available free of charge at https://dm.epiq11.com/case/computenorthholdings/dockets.  To the extent the 90-Day Payments were made on account of antecedent obligations, and if not returned to the Estates would entitle the recipients to recover more than they would recover if the Chapter 11 Cases were converted to cases under Chapter 7, such payments may be subject to avoidance under Bankruptcy Code section 547.  The Debtors have not yet undertaken an analysis of defenses that could be raised by recipients of 90-Day Payments.  Thus, it is possible that some of the 90-Day Payments would not be avoidable or recoverable because of statutory defenses set forth in Section 547 of the Bankruptcy Code.  Among other things, the payments may have been made in the ordinary course of the Debtors' business, and some may have involved a contemporaneous exchange of new value. In either of these circumstances, the recipient of a 90-Day Payment would be able to assert a defense to avoidance of the transfer.  In any event, as set forth in the Plan and the Disclosure Statement,

---

[2] Payments to statutory insiders within one-year of the Petition Date are analyzed in Section IV below.

the Debtors propose to release Holders of Claims and Interests that received 90-Day Payments provided that the recipients do not affirmatively opt out of the releases provided under the Plan.

## IV. Insider Payments Made Within One-Year of Petition Date.

The Debtors' Statement of Financial Affairs reflects approximately $4,085,889.00 in payments to statutory insiders over the twelve months preceding the Petition Date. Based on the investigation thus far, it appears that these payments consisted entirely of (i) ordinary course payments of base compensation and bonuses pursuant to offer letters, (ii) amounts paid pursuant to the Debtors' key employee retention plan implemented from July through September of 2022 to incentivize certain key officers to remain with the company through the bankruptcy process, (iii) ordinary course payment of board fees, and (iv) in one case, contractual reimbursement of accounted-for relocation expenses pursuant to an offer letter.

As previously mentioned, if a transfer is made to someone who is an insider at the time the transfer is made, section 547 of the Bankruptcy Code provides that the covered period is extended for up to one year prior to the commencement of the bankruptcy case. Attached hereto as **Schedule 2** is a list of payments made by the Debtors to insiders within one year prior to the Petition Date (the "**One-year Payments**"), including the amount of the payments, the recipients, the date of each payment and the payor. To the extent the One-Year Payments were made on account of antecedent obligations, and if not returned to the Estates would entitle the recipients to recover more than they would recover if the Chapter 11 Cases were converted to cases under Chapter 7, such payments may be subject to avoidance under Bankruptcy Code section 547. The Debtors have reviewed the payments and the majority of them are payments made in the ordinary course for salaries, bonus, board fees and reimbursements for job expenses. Payments made in the ordinary course of a debtor's business are not avoidable as preferences. *See* 11 U.S.C. § 547(c)(2). The Debtors do not believe that they have any viable causes of action to avoid payments of salaries and routine bonuses to their employees, even if those employees qualified as an insider at the time the payments were made, because the amounts were paid in the ordinary course of the Debtors' business or on ordinary business terms.

The only One-year Payments of which the Debtors are aware that were arguably not made in the ordinary course of business were certain retention payments made when the Debtors implemented a Key Employee Retention Program ("**KERP**") to provide incentives for certain key employees to remain with the Debtors through the restructuring process. KERP payments were made to key employees needed for the restructuring in July and August (and for one employee September) as an advance for future services. Under the terms of the KERP, if the employees voluntarily resigned prior to the vesting date, they were required to refund the money paid. Under the terms of the KERP, payments would not be earned until the earlier of March 31, 2023, or the occurrence of an "Emergence Event." Emergence Events included (i) the effective date of the Debtors' plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (ii) dismissal of the Debtors' Chapter 11 cases, (iii) conversion of the Debtors' Chapter 11 cases to ones under Chapter 7 of the Bankruptcy Code, or (iv) the sale of all or substantially all of the Debtors' assets. As a result, the Debtors do not believe these payments can be avoided or recovered as preferences because they were not made "on account of an antecedent debt" as required by section 547 of the Bankruptcy Code. Rather, they were advances to be earned at a later point in time.

A list of the KERP payments, including the amount, recipient and date of each payment, is annexed to this Exhibit as **<u>Schedule 3</u>**.

## V.      **Customer Disclosure.**

For the avoidance of doubt, all customers of the Debtors who (i) do no affirmatively opt out of the releases provided by the Plan, and (ii) are not included on the Schedule of Retained Causes of Action, will be deemed to be released from any and all actions to collect on past due amounts under any and all customer contracts or agreements they are party to. Pursuant to the Plan, any such agreements that are still apart of the Debtors' Estates will be rejected. To that end, the pursuit of any such amounts would be highly contentious and have significant costs and risks associated therewith. To be clear, as noted in <u>Article VI.K</u> of the Disclosure Statement, the Debtors are not releasing any claims against Atlas Technology Group LLC.