**<u>Exhibit 4</u>**

**Coulby Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| COMPUTE NORTH HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-90273 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF HAROLD COULBY, CHIEF**
**FINANCIAL OFFICER AND TREASURER OF THE DEBTORS, IN**
**SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Harold Coulby, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.     I am the Chief Financial Officer and Treasurer of Compute North Holdings, Inc. ("Holdings", and together with its above-captioned affiliates as debtors and debtors in possession, "Compute North" or the "Debtors").  I have extensive experience as a corporate executive in the energy sector. I have served as Treasurer of Compute North since May 9, 2022, and as Chief Financial Officer of Compute North since June 28, 2022.  From January 2022 to May 2022, I was Assistant Treasurer for Constellation Energy Group. From 2010 until I joined Holdings, I was also the Assistant Treasurer and Director Project Finance for Exelon.  From 2008 to 2010, I served as Manager of Technical Accounting for UniStar Nuclear Energy.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Compute North LLC (7185); CN Corpus Christi LLC (5551); CN Atoka LLC (4384); CN Big Spring LLC (4397); CN Colorado Bend LLC (4610); CN Developments LLC (2570); CN Equipment LLC (6885); CN King Mountain LLC (7190); CN Minden LLC (3722); CN Mining LLC (5223); CN Pledgor LLC (9871); Compute North Holdings, Inc. (4534); Compute North Member LLC (8639); Compute North NC08 LLC (8069); Compute North NY09 LLC (5453); Compute North SD LLC (1501); Compute North Texas LLC (1883); Compute North TX06 LLC (5921); and Compute North TX10 LLC (4238). The Debtors' service address for the purposes of these chapter 11 cases is 7575 Corporate Way, Eden Prairie, Minnesota 55344.

2.      I received my Bachelor of Science degrees in Accounting and Business Management from Mount St. Mary's University. I received my Masters of Business Administration from Loyola University Maryland.

3.      In my capacity as Treasurer and CFO, I am generally familiar with Compute North's day-to-day operations, business and financial affairs, and books and records. I am over the age of 18 and authorized to submit this Declaration on behalf of Compute North.

4.      I submit this declaration to assist this Court and parties in interest in understanding: (a) Compute North, its operations, and its capital structure; (b) the circumstances related to the commencement of these cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on September 22, 2022 (the "Petition Date"); and (c) the emergency relief that Compute North has requested from this Court (the "Bankruptcy Court") pursuant to the motions and applications described herein (collectively, the "First Day Motions").

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of Compute North's management team, board of directors, and advisors (including auditors and legal counsel), my review of relevant documents and information concerning Compute North's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

6.      This Declaration is divided into five sections:

- Section I provides an overview of these cases, including a summary of the need for these Chapter 11 Cases;

- Section II describes Compute North's organizational structure, business and business segments;

- Section III describes the prepetition capital structure of Compute North and its affiliates;

- <u>Section IV</u> discusses the circumstances leading to the commencement of these Chapter 11 Cases; and

- <u>Section V</u> summarizes the First Day Motions and the bases for the relief sought therein.

**I.     OVERVIEW**

7.      Founded in 2017, Compute North is a leader in data centers, focused on delivering sustainable, cost-effective infrastructure for customers in the blockchain, cryptocurrency mining and distributed computing space. With operations across the United States, Compute North brings a unique combination of data center, energy, and technology expertise to meet the growing demand for purpose-built infrastructure solutions for highly specialized computing needs.

8.      As described in more detail below in Section IV, a confluence of events has created a liquidity crisis that has severely impeded Compute North's ability to complete the development of several new facilities that Compute North commenced when the market and financial conditions for Compute North's business were far more favorable.  In particular, cryptocurrency prices have collapsed – bitcoin prices recently hit lows that were almost 75% below its all-time highs in late 2021 – while the rates charged for the electricity required to mine bitcoin have essentially doubled over the past year.

9.      In addition to these adverse market conditions, Compute North has faced severe challenges from an interplay of supply chain issues and challenges in the working relationship with one of Compute North's primary lenders, Generate Lending, LLC, an affiliate of Generate Capital (collectively, "<u>Generate</u>").

10.     With respect to supply chain issues, Compute North's business model relies on ordering specialized long-lead-time inventory that is necessary to complete the buildout of facilities in development and bring them on line.  To obtain this inventory for projects expected to

3

come on line in 2022, Compute North expended significant capital in 2021 in the form of advance payments.  While this made sense at the time, it was based, in part, on having a long term source of financing to assist in funding the remaining development costs.

11.     In February 2022, Generate agreed to lend up to $300 million in project financing to pay for project development costs at certain of Compute North's facilities.  Generate also purchased about 1% of the preferred equity in Holdings.[2]  As part of the Prepetition Generate Facility (as defined below), Generate obtained a right of first refusal to finance all of Compute North's future projects and the right to appoint a director to Holdings' board of directors.

12.     In July 2022, in the absence of any payment default, Generate asserted several technical events of default under the Prepetition Generate Facility.  These technical defaults formed a basis for Generate to exercise remedies to take control of material assets of Compute North, disrupting Compute North's business operations.  Compute North rebutted many of the defaults alleged by Generate and entered into a dialogue with Generate regarding a potential forbearance.  Following an exchange of forbearance proposals, Generate elected to exercise pledged voting rights over CN Borrower, LLC ("CN Borrower"), a non-Debtor and the owner of the entities that own the Kearney Facility (as defined below) and the Wolf Hollow Facility (as defined below).  Generate also took control of the bank accounts of those non-Debtor entities, which at the time contained approximately $23.6 million.

13.     Generate also utilized the voting rights to amend the limited liability company agreement of CN Borrower, install a board of managers at CN Borrower and appoint managers to such board (the "Generate Managers").  Accordingly, Compute North lost control over CN

---

[2]     At the same time, Compute North obtained approximately $85 million in new preferred equity investments from Generate and other investors.

Borrower and its subsidiaries, which own the Kearney Facility and the Wolf Hollow Facility (collectively, the "Generate Entities"). The Generate Managers and Generate also executed an amendment to the Prepetition Generate Facility that improved the terms of the loan for Generate.

14.     As a result of the foregoing, none of the Generate Entities are Debtors in these Chapter 11 Cases.  Compute North's loss of control over the Generate Entities contributed to business disruptions leading up to the commencement of these Chapter 11 Cases.

15.     As a result of the foregoing factors, Compute North lacked the liquidity needed to continue funding the development of data centers that were being built out, despite the fact that Compute North had already invested millions of dollars in those development projects.  Compute North explored all available alternatives, including, among other things, negotiating with key stakeholders for additional capital, marketing certain projects still in development for sale, and engaging in lengthy negotiations with Generate regarding a resolution with respect to Compute North's liquidity issues and a long term solution regarding ownership and management of the Generate Entities.

16.     Although in the weeks leading up to these Chapter 11 Cases Compute North engaged in advanced negotiations with Generate and other prospective counter-parties to solve its liquidity crisis by selling certain of its assets or obtaining new financing, none of these sale or financing transactions were able to be consummated within the time frame available to Compute North to effectuate an out-of-court restructuring.  Facing the threat of ongoing degradation to the value of its business, including the potential termination of contracts that Compute North may be able to assign in a sale transaction, Compute North had no choice but to commence these Chapter 11 Cases in order to preserve and maximize the value of its assets.

17.     These Chapter 11 Cases will be funded in the near term by Compute North's available unrestricted cash, which is extremely limited.[3]  Accordingly, Compute North intends to administer these Chapter 11 Cases on an expedited timeline.  Compute North expects to effectuate either a reorganization of its business resulting in a scaled-down organization focusing on ownership and project management of certain Facilities (as defined below) or a sale of Compute North's Facilities as a going concern.  Compute North will be filing a Sale Motion which seeks approval to commence a sale process to market and sell Compute North's assets under section 363 of the Bankruptcy Code.  Compute North also anticipates filing a proposed plan in the near term to effectuate an expeditious exit from these Chapter 11 Cases.

## II.     COMPUTE NORTH'S BUSINESS

### A.     Corporate Structure

18.     Holdings was formed in 2020.  Holdings is the direct parent of, and owns 100% of the equity interests in, Compute North LLC ("CN LLC"), which was formed in 2017. In turn, CN LLC is the direct or indirect parent of all of the remaining Debtor entities, controlling (either directly or indirectly) 100 percent of the equity interests of all of the remaining Debtors.  A chart summarizing Compute North's organizational structure is attached hereto as Exhibit A (the "Structure Chart").

19.     Compute North's Facilities are owned in three asset silos, the "Operating Companies," the "Generate Project Financing" and the "Joint Ventures" (comprised of the "NextEra JV" and the "Marathon JV"), each of which is described on the Structure Chart.

20.     The Operating Companies Silo.  Compute North owns and operates and is developing certain Facilities through entities in the "Operating Companies" silo, as set forth on

---

[3]     Compute North holds approximately $8,721,311.77 in unencumbered cash as of the Petition Date.

the Structure Chart. As a general matter, the Facilities in this silo have trade debt, but they do not have any funded indebtedness. As of the Petition Date, Compute North directly owns and operates two Facilities that represent approximately 20MW of remote computing capacity. The first of these Facilities is in Big Spring, Texas, has a capacity of 13MW, is located on a former World War II propeller manufacturing facility and was chosen for its access to energy sources. It is a large, robust building with the core infrastructure to adapt to the evolving needs of blockchain remote computing and utilizes containers and traditional data center space. The second of these Facilities, located in North Sioux City, South Dakota, has a capacity of 7MW and was built on a former Gateway computer site.

21.     Two of the Debtors also own the rights to Facilities that are still in the development phase. First, Debtor CN Corpus Christi LLC's principal asset is its interest in a planned 300MW data center on a 40-acre site located in Corpus Christi, Texas.[4] This Facility, also known as "Bootstrap", will have an anticipated capacity to host approximately 167 modular containers when completed. To date, Compute North has invested more than $14 million in the development of its Corpus Christi Facility, but liquidity constraints have delayed Compute North's ability to finish development of this Facility and bring it online.

22.     Finally, Debtor CN Minden LLC owns the rights to a Facility under development in Minden, Nebraska, which is projected to come online in the first quarter of 2023. It is anticipated that this Facility will host approximately 19 containers and have a capacity of 35MW. Compute North has invested approximately $3.5 million in development of this Facility but liquidity constraints have delayed the completion of this project as well.

---

[4]     CN Corpus Christi LLC's principal assets are located in Corpus Christi, Texas.

23.     The Generate Project Financing Silo. As discussed above, Generate, through the Prepetition Generate Facility, initially agreed to finance a facility that Compute North had opened in 2019 in Kearney, Nebraska (the "Kearney Facility") and just a few months later agreed to finance a new 300MW facility that Compute North was developing near Granbury, Texas, called Wolf Hollow (the "Wolf Hollow Facility").

24.     After closing on the Prepetition Generate Facility, Compute North initiated a major expansion of the Kearney Facility that materially increased its customer capacity by increasing capacity to 100MW.  Compute North also added storage and office space at the Kearney Facility. As the third, and most successful Facility that Compute North had developed, the Kearney Facility was in many ways the "crown jewel" of Compute North's portfolio.  Kearney was chosen for its ideal location in America's heartland and its direct access to a variety of energy sources.  Kearney utilizes a containerized model, built to optimize power and heat management in a tightly integrated framework, specifically designed for high-computing needs.  The Kearney Facility is fully online at this time.

25.     The Wolf Hollow Facility was to be the largest data center development to date by Compute North, with a scalable capacity of up to 600MW.  When the initial development is complete, the Wolf Hollow Facility will have 300MW of capacity but is only partially online as of the Petition Date. Wolf Hollow is located next to one of the cleanest, most efficient natural gas plants in the U.S. on a 45-acre site with the capacity to host more than 160 modular containers

26.     Debtor CN Pledgor LLC, owns 100% of the equity of non-Debtor CN Borrower, which in turn owns 100% of the equity of (i) Compute North NE05 LLC, which is the owner of the Kearney Facility, and (ii) CN Wolf Hollow LLC, which is the owner of the Wolf Hollow Facility.  As discussed above, Generate appointed the Generate Managers at CN Borrower but, as

of the Petition Date, CN LLC manages and operates these facilities under a certain Property Management Agreement (the "Kearney PMA") dated as of February 7, 2022, by and among Compute North NE05 LLC and CN LLC and a certain Property Management Agreement (the "Wolf Hollow PMA" and together with the Kearney PMA, the "PMAs") dated as of April 28, 2022, by and among CN Wolf Hollow LLC and CN LLC.

27.   Pursuant to the PMAs, CN LLC provides various management services to the Wolf Hollow Facility and the Kearney Facility in exchange for fixed fees, potential bonus payments and reimbursement of certain expenses. In order to comply with the terms of the PMAs, certain of Compute North's employees provide services to the Wolf Hollow Facility and the Kearney Facility either on-site at the locations or remotely.

28.   The Joint Venture Silo. Compute North also owns and operates or is developing other data centers through non-Debtor affiliate joint venture companies.  Debtor Compute North Member LLC owns 50% of TZRC LLC, a non-Debtor joint venture entity (the "NextEra Joint Venture Facility"). This Facility is a 280MW Facility located on a 29-acre wind farm in McCamey, Texas ("King Mountain").  The Facility has 110MW operational with the remainder still in development but expected to come online in the coming weeks. NextEra Energy ("NextEra") owns the other 50% of the NextEra Joint Venture Facility.  Compute North Member LLC operates and manages the facility through a project management agreement.  The NextEra Joint Venture Facility marks the first behind-the-meter wind project of its kind in the state and provides offtake for the wind asset.

29.   Compute North also owns 40% of Marathon Compute North 1 LLC, a non-Debtor joint venture and 18% of Marathon Compute North 2 LLC, a non-Debtor joint venture (the

"Marathon Joint Ventures"). The Marathon Joint Ventures are non-operating entities. Marathon Digital Holdings, a third-party, owns the remaining equity of the Marathon Joint Ventures.

**B.      Business Overview**

30.      As described above in Section I, Compute North's business focuses on the development and management of cost-efficient computer data centers (each a "Facility") that can be used by customers in the blockchain, cryptocurrency mining and distributed computing space. As of the Petition Date, Compute North operates 3 fully operational Facilities, with approximately 135MW of aggregate capacity at Big Spring, Sioux City and Kearney,[5] and 2 partially operational Facilities, with approximately 124MW of aggregate capacity at King Mountain and Wolf Hollow,[6] with total expected capacity at those Facilities totalling 580MW. Compute North also operates or will operate 2 Facilities that are in development, Minden and Corpus Christi, representing an additional 335MW of aggregate capacity. Compute North's operational or partially operational Facilities provide services to approximately 84 customers and contain over 466 containers housing over $700 million worth of its customers' equipment.

31.      The Facilities. Two key steps in building out a Facility are identifying the geographical location for the Facility and developing the structure and lay out of the Facility. As described below, Compute North distinguishes itself from its competitors in both of these regards. First, Compute North takes particular care in selecting the location for its Facilities. Due to the immense amount of energy consumed in cryptocurrency mining, the biggest overhead cost for such operations is the cost of power. Cryptocurrency miners also have a public perception problem

---

[5]      As discussed above, Kearney is owed by Compute North NE05 LLC, a non-Debtor affiliate which is managed by the Generate Managers, and is operated by Compute North pursuant to the Kearney PMA.

[6]      As discussed above, Wolf Hollow is owed by CN Wolf Hollow LLC, a non-Debtor affiliate which is managed by the Generate Managers, and is operated by Compute North pursuant to the Wolf Hollow PMA.

based on their energy consumption that has been prominent in the mainstream media. Compute North is able to help cryptocurrency miners address these problems, while also differentiating itself from its competitors, by providing the ability to bring customers' energy load directly to efficient energy sources. Specifically, Compute North strategically chooses the locations for its data centers based on environmental, regulatory and geopolitical stability. When identifying and choosing locations for its data centers, Compute North focuses on energy efficiency and, in some instances, the potential for on-site renewables consumption. Compute North also strategically locates its sites for easier access to cost-effective energy sources.

32. Once a location has been identified, Compute North constructs its data centers from modular containers (the "Containers") which house all of the components of the data centers and can be deployed more efficiently than construction of a tradition data center. Compute North has worked with its Container supplier to create a design that (a) is optimized specifically for bitcoin mining, (b) is less expensive to manufacture, and (c) takes less time to construct than a traditional data center. This allows Compute North to identify locations and bring them online quicker than traditional data centers. This combination of features—lower costs to build, operate and scale—makes Compute North's data centers a great fit for cryptocurrency mining businesses.

33. Business Segments. While Compute North offers a host of services at its Facilities, its operations include three main business segments: (a) Hosted Cryptocurrency Mining Services, (b) with Bitcoin Mining, and (c) Cryptocurrency Equipment Sales.

34. Compute North's "core business" is providing hosting services for cryptocurrency mining by customers at the Facilities. As a hosting service, Compute North provides a suite of services that range from offering rack space, energy and broadband access to a full scale, hands on experience which provides customers with services including monitoring, troubleshooting,

firmware management, miner configuration and mining pools.   To support the Hosted Cryptocurrency Mining Services segment of its business, Compute North also engages in the sale of cryptocurrency mining equipment to customers.   Further, Compute North engages in some Bitcoin mining of its own at its Facilities.

### (i)      Hosted Cryptocurrency Mining Services

35.      Compute North provides a variety of hosting services to cryptocurrency miners. In simple terms, cryptocurrency mining is the process by which new blockchain transactions are verified and new cryptocurrency assets enter the market.   "Mining" is the term used to refer to a process where networks of specialized computers perform and solve extremely complex mathematical problems to generate new digital "coins" and verify new transactions. The first computer that solves the equation is awarded the newly created cryptocurrency asset. Specifically, Compute North offers application-specific integrated circuit (ASIC) mining services powering up Bitcoin mining gear.

36.      Compute North maintains various levels of hosted cryptocurrency mining services. Under Compute North's most basic hosting package, Compute North provides customers with the capability to self-manage their miners but Compute North provides the power, the network, and the rack space necessary to operate the miners, as well as onsite personnel that can perform miner maintenance activities, as directed by the customer.

37.      Under Compute North's more comprehensive services, Compute North manages the miners and provides a wide range of managed blockchain services, including daily hashrate monitoring and alerting, miner configuration, troubleshooting, network upgrades and firmware management.   Through Compute North's managed blockchain services, miners are set up with MinerSentry®, Compute North's propriety monitoring and alerting system, which monitors a host of potential issues such as offline devices, low hashrate, or high temperature. Compute North

monitors and automatically dispatches onsite technicians to investigate alerts received from MinerSentry®. At the client's direction, Compute North can also handle configuration of a client's miners. This service is designed for customers that prefer to be hands-off with the maintenance and upkeep of their miners

38.     Compute North provides access to its data centers and services to customers through hosting service agreements ("HSAs").[7] As an initial matter, customers execute a HSA with CN LLC that has a term between three and five years. Typically, under the HSAs, CN LLC is granted a lien on the customer equipment to secure obligations under the HSA. CN LLC files UCC financing statements to perfect its liens and security interests in a customer's mining equipment and servers. Under the HSA, customers do not have a right to terminate the agreement prior to the expiration of the term thereunder. Customers may choose to provide their own mining equipment, which Compute North installs and manages, or, as described in greater detail below, may purchase such equipment directly from Compute North.

39.     CN LLC's rights under each HSA are freely assignable and as Facility space becomes available, CN LLC assigns the customer to the available Facility for the services to be provided under the HSA. Once a Facility has been chosen and the customer's equipment is located at such Facility, the purchase order related to the HSA and the corresponding UCC financing statements are partially assigned by CN LLC to the entity that owns such Facility under a Partial

---

[7]     Compute North maintains a list of its customers, including customer names and addresses (the "Customer List"), which is kept confidential by Compute North and is not ascertainable by outside parties through any proper means. Public disclosure of the Customer List would provide an opportunity for Compute North's competitors to utilize this information to the detriment of Compute North and its estates. Compute North's customers are generally contract counterparties and I understand that Compute North will need to provide certain notices to the Customer List in connection with the Chapter 11 Cases, and that the information contained in the Customer List will be included within certain other filings made in connection with the Chapter 11 Cases. If such notices and filings are not redacted to prevent disclosure of Compute North's confidential commercial information, Compute North's ability to continue to operate its business during the pendency of these Chapter 11 Cases and to maximize value for the benefit of all stakeholders could be impaired.

Assignment and Assumption Agreement.  A customer may be partially assigned to more than one Facility.

40.     Revenues for Compute North's Hosted Cryptocurrency Mining Services segment were $11.6 million in 2020 and $34.1 million in 2021.

### (ii)     Bitcoin Mining

41.     Compute North also generates revenue by mining Bitcoin. As Bitcoin is mined, Compute North converts it to U.S. dollars on a daily basis.  As a result, Compute North does not typically hold bitcoin on its balance sheet.  Compute North maintains cryptocurrency wallets with respect to its mining operations and those cryptocurrency wallets also contain customer subaccounts or subwallets. Compute North maintains subaccounts or subwallets for customers because the mining gear that is awarded the bitcoin could belong to a customer. Compute North currently holds seven cryptocurrency wallets for its mining activities on the Genesis and Bitstamp exchanges.

42.     Revenues for Compute North's Bitcoin Mining segment were $0.3 million in 2020 and $12.1 million in 2021.

### (iii)     Cryptocurrency Equipment Sales

43.     As mentioned above, Compute North provides customers who utilize its hosting services with the option to buy the equipment needed for all their mining and hosting needs from Compute North.[8]  Compute North helps source and distribute mining products from a variety of brands, including Bitmain and MicroBT.  When new mining products are introduced to the market, Compute North conducts certain testing to ensure compatibility with its hosting infrastructure. Compute North handles all aspects of the logistics surrounding the purchase and sale of the mining

---

[8]     Compute North also sells equipment to customers that do not use Compute North's hosting service.

equipment, from ordering to hardware implementation and offering its customers a seamless and professional experience.

44.     Revenues for Compute North's Cryptocurrency Equipment Sales segment were $1.3 million in 2020 and $19.1 million in 2021.

### C.     Corporate

45.     Compute North's corporate headquarters is in Eden Prairie, Minnesota.  As of the Petition Date, Compute North employed 148 people, made up of 87 full time salaried employees, 60 full time hourly employees and 1 part time hourly employee. In addition, Compute North also utilizes 3 independent contractors.

46.     These employees provide various services, including management, business development, human resources, compliance, information technology, billing, collections, safety, legal, payroll, tax, treasury, and accounting, among others. All, or a portion, of the compensation cost for these employees is allocated to the applicable Debtor and non-Debtor affiliate and joint venture partner for which the employees provide services.

### III.     Prepetition Capital Structure

47.      Compute North, together with its non-Debtor affiliates, has a complex capital structure with different silos of secured and unsecured obligations with varying interest rates and maturities.  As of the Petition Date, Compute North's consolidated long-term debt obligations totalled approximately $128.3 million and consisted of, among other things, the NextEra Note in the amount of $99,809,696.27, the Foundry Financing in the amount of $7,466,005.26 and the Marathon Note (each as defined below) in the amount of $21,013,027.03.

48.     As of the Petition Date, non-Debtor affiliates of Compute North also had long term debt obligations. Specifically, CN Borrower is the borrower under the Prepetition Generate Facility in the amount of $101,383,118.71. The Prepetition Generate Facility is supported by,

among other things, Debtor CN Pledgor's pledge of its equity in non-Debtor CN Borrower and unsecured guarantees from Holdings and CN LLC.

### A.    NextEra Note

49.    Compute North Member LLC ("CN Member") is party to that Senior Secured Promissory Note (the "NextEra Note") in favour of TZ Capital Holdings, LLC ("TZ Capital"). CN Member has made draws, to date, under the NextEra Note in the amount of $94,850,676.50. Including accrued PIK interest, a total of $99,809,696.27 remains outstanding under the NextEra Note as of the Petition Date.  The NextEra Note was issued in connection with the member loan made by TZ Capital as set forth in that certain Limited Liability Company Agreement of TZRC LLC (the "JV") and is secured by CN Member's membership interest in the JV.  Further, Holdings is party to that certain Guaranty Agreement, dated as of April 8, 2022 (the "NextEra Parent Guaranty"), in favor of TZ Capital by which Holdings provided an unsecured guaranty to TZ Capital for the obligations under the NextEra Note.

### B.    Foundry Financing

50.    CN Borrower was party to that certain Equipment Finance and Security Agreement, dated as of December 31, 2020 (the "Foundry Financing Agreement") with Foundry Digital LLC ("Foundry") pursuant to which Foundry provides equipment financing for certain digital currency mining equipment.  On March 15, 2022, CN Borrower assigned its rights and obligations under the Foundry Financing Agreement to CN Mining, LLC ("CN Mining").  The Foundry Financing Agreement is secured by certain mining equipment of CN Mining. As of the Petition Date, $7,466,005.26 remains outstanding under the Foundry Financing Agreement.

### C.    Marathon Note

51.    On July 1, 2021, Compute North TX06 LLC ("CN TX06") borrowed $30,000,000 from Marathon Digital Holdings, Inc. ("Marathon") pursuant to a Senior Secured Promissory Note

(the "Prior Marathon Note").  On July 1, 2022, CN LLC, CN TX06 and Marathon agreed to restructure the obligations to Marathon under the Prior Marathon Note.  In particular, the Prior Marathon Note was exchanged for, and replaced with, an unsecured Senior Promissory Note from CN LLC in favor of Marathon in the same amount (the "Marathon Note"), and Marathon agreed to reduce the face amount of the Senior Secured Promissory Note by application of certain customer deposits by CN LLC related to the Wolf Hollow Facility in the amount of $9,175,718.40. As of the Petition Date, $21,013,027.03 remains outstanding under the Marathon Note.

### D. Generate Facility

52.     CN Borrower LLC, a non-Debtor ("CN Borrower"), is party to that Credit and Guaranty Agreement, dated as of February 7, 2022 (the "Prepetition Generate Facility", as amended on April 28, 2022 and June 17, 2022, and as further amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Credit Agreement"), by and among CN Borrower, CN Wolf Hollow LLC, a non-Debtor (the "Wolf Hollow Project Company"), Compute North NE05 LLC, a non-Debtor (the "Kearney Project Company" and together with the Wolf Hollow Project Company, the "Prepetition Subsidiary Guarantors"), Generate Lending, LLC, as lender (in such capacity, the "Prepetition Lender"), and Generate Lending, LLC, as administrative agent (in such capacity, the "Prepetition Administrative Agent") and collateral agent (in such capacity, the "Prepetition Collateral Agent", and together with the Prepetition Administrative Agent, the "Prepetition Agents" and together with the Prepetition Lender, the "Prepetition Generate Secured Parties"), consisting of a Tranche A of Loans in the original principal amount of $21,541,441.68 ("Tranche A") and a Tranche B of Loans in the original principal amount of $92,273,637.50

("Tranche B"; together with Tranche A, the "Prepetition Generate Loans").[9]  Tranche A consists of certain Prepetition Generate Loans used to expand the Kearney Facility, with such Prepetition Generate Loans maturing on February 7, 2026.  Tranche B consists of certain Prepetition Generate Loans used to finance the Wolf Hollow Facility, with such Prepetition Generate Loans maturing on October 28, 2026.

53.     The Kearney Project Company and the Wolf Hollow Project Company, both non-Debtors, guarantee the Borrower's obligations under the Prepetition Generate Facility. Further, CN LLC and Holdings (collectively, the "Sponsors") are party to that certain Guaranty Agreement, dated as of February 7, 2022 (the "Generate Parent Guaranty"), entered into by the Sponsors in favor of the Prepetition Administrative Agent by which the Sponsors provided an unsecured guaranty to the Prepetition Administrative Agent for the obligations under the Prepetition Credit Agreement.  As of the Petition Date, $101,383,118.71 remains outstanding under the Prepetition Generate Facility.

54.     The Prepetition Generate Facility is secured by (i) Debtor CN Pledgor LLC's pledge of 100% of the equity of non-Debtor CN Borrower to the Prepetition Administrative Agent and (ii) a lien on substantially all of the assets of non-Debtors CN Borrower, the Wolf Hollow Project Company and the Kearney Project Company.[10]

---

[9]     As discussed herein, Generate executed Amendment No. 3 to the Prepetition Generate Facility on August 23, 2022.

[10]    The Wolf Hollow Project Company is also party to that certain Mercuria 2002 ISDA Master Agreement, dated as of April 11, 2022 (together with the schedule and annex thereto, the "Mercuria Hedge") with Mercuria Energy America, LLC.  The Mercuria Hedge is cross-collateralized with the Prepetition Generate Facility sharing a lien on the assets of the Wolf Hollow Project Company on a *parri passu* basis. The Prepetition Agent, the Prepetition Hedge Provider, CN Borrower and the Wolf Hollow Project Company are parties to that certain Collateral Agency and Intercreditor Agreement, dated as of April 28, 2022 (the "Intercreditor Agreement"), pursuant to which the relative priorities of the obligations under the Prepetition Generate Facility and the Mercuria Hedge are set forth.

### E.  General Unsecured Claims

55.   In addition, as of the Petition Date, Compute North had outstanding obligations due and owing to general unsecured creditors in the approximate amount of $18,374,138.  Compute North's unencumbered cash on hand as of the Petition Date is approximately $8,721,311.77.

### F.  Equity Interests

56.   Holdings is a privately held company. As of August 24, 2022, Holdings had (i) 1,700,000 Class A Voting Common Stock issued and outstanding; (ii) 1,081,436 Class B Voting Common Stock issued and outstanding; (iii) 39,014 Series C-1 Convertible Preferred Stock issued and outstanding; and (iv) 360,465 Series C Convertible Preferred Stock issued and outstanding.

## IV.  CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

57.   As previously mentioned, there have been numerous adverse events that have led to the commencement of these Chapter 11 Cases.  From the supply chain and inventory issues to the dislocation in the capital and cryptocurrency markets, Compute North has been unable to maintain sufficient liquidity to bring planned projects in development online and pay all of its obligations on a current basis.

### A.  Generate

58.   In the second quarter of 2022, Generate determined to stop funding new projects other than Kearney and Wolf Hollow.  Generate's decision to stop financing new projects forced Compute North to seek alternate funding sources at a time of material dislocation in credit and capital markets. A new funding source did not materialize and the lack of liquidity impacted Compute North's ability to continue to make necessary capital investments in projects under development and fulfil inventory purchases that were already in process.

59.     More particularly, on July 22, 2022, Generate sent a notice of default (the "<u>Notice of Default</u>") to Holdings, Compute North and CN Borrower asserting 19 events of default under the Prepetition Credit Agreement.  Compute North disputed the validity of the Notice of Default.  Indeed, many of the alleged defaults were technical in nature or rebuttable.  On July 26, 2022, Compute North responded to Generate disputing the validity of the alleged defaults and noting that Compute North would continue to investigate certain of the allegations.

60.     Compute North and Generate also began discussions over a forbearance agreement but were unable to reach an agreement. On August 12, 2022, Generate provided notice to Compute North that it was exercising the voting rights of the pledged securities of CN Borrower.  Among other things, Generate appointed the Generate Managers to form a new board of managers at CN Borrower.

61.     Furthermore, on August 23, 2022, the Generate Managers and Generate executed an Amendment No. 3 to the Prepetition Generate Facility, purporting to modify the prepayment premium provisions and adding provisions relating to protective advances, including an effective interest rate of 23% thereon.  Compute North received no consideration for these modifications to the Prepetition Generate Facility.

62.     Finally, on August 23, 2022, Compute North received notice from BMO Harris Bank, the bank for the Generate Entities, that Generate executed its rights under deposit account control agreements in place as part of the Prepetition Generate Facility and restricted Compute North's and certain of its non-Debtor affiliates' access to the Generate Entities' bank accounts, which as of August 23, 2022, contained approximately $23.6 million.

63.     Notwithstanding the foregoing, Compute North and Generate have continued negotiations in order to reach a resolution with respect to Compute North's liquidity issues and a

long term solution regarding ownership and management of the Generate Entities.  Compute North intends to continue those discussions in these Chapter 11 Cases to maximize the value of Compute North's assets.

        **B.**      **Supply Chain and Fixed Asset Issues**

        64.      Compute North's fixed assets, comprised of the Containers, the pad mounted electrical transformers and other electrical infrastructure necessary to develop a data center, are all long-lead-time products.  As such, even under normal circumstances, Compute North is required to place orders for such products well in advance of a data center coming on line and becoming revenue generating.    However, the global supply chain disruptions that began in 2020 and accelerated in 2021 impacted the availability of the materials necessary for Compute North to develop data centers and exacerbated this mismatch of expenditures and revenue.  In particular, because of these disruptions, in 2021, Compute North was required to procure large quantities of fixed assets in advance to meet projected development schedules.  These purchases required significant upfront deposits to secure manufacture and delivery of the fixed assets. Those upfront deposits, $30.9 million in 2021 and $$41.4 million in 2022, materially reduced Compute North's liquidity. As that equipment is completed, Compute North is required to take delivery and pay for any outstanding balances.  Without a funding source, Compute North's limited resources are insufficient to pay the outstanding amounts for the fixed assets, necessitating the commencement of these Chapter 11 Cases.

        **C.**      **Dislocation in the Capital and Credit Markets**

        65.      To date, Compute North has, in large measure, funded its growth through debt and equity. With the expectation that debt and equity financings would remain available, Compute North made strategic decisions regarding new facility development and fixed asset acquisition

necessary to meet long term growth plans and customer demand. Compute North expended cash to launch new facility developments and fund fixed asset purchases reducing liquidity. With the tightening of the credit markets in 2022 and lack of available financing, in the months leading up to these Chapter 11 Cases, Compute North was not able to obtain new project financing to meet its liquidity needs and continue developing facilities. Indeed, Compute North currently has 4 Facilities in development for which it does not have the funds to continue development. Absent additional funding, Compute North must sell these partially developed facilities as part of these Chapter 11 Cases.

**D.      Energy Price Volatility**

66.      Recent increases in the price of electricity has had a materially negative impact on Compute North's business. Energy prices have increased based on, among other things, the increase in natural gas prices as a result of the recent instability in geopolitics.  As energy prices increase, Compute North's gross margins decrease and if energy prices rise enough, the gross margins can, and have, shrunk to levels at which Compute North is unable to pay for its fixed costs of operations during certain periods.

67.      Compute North's typical HSA does not expressly allow it to pass increased energy costs through to customers. The HSAs do, however, provide Compute North with the ability to shut customer equipment down when the energy prices exceed those as set forth in the respective HSA. While this mechanism helps to manage expenses during a period of high power costs, it is not an effective strategy for addressing long term energy price increases.  If customers are not allowed to operate for material periods of time, their businesses will also suffer, affecting their ability to pay amounts due under the HSAs and, ultimately, impacting Compute North's ability to continue to generate revenue.

### E.    Decline in Bitcoin Price

68.    Substantially all of Compute North's revenue is related directly and indirectly to the mining of bitcoin. Most of Compute North's customers mine cryptocurrency. Compute North's sale of equipment to customers relates almost exclusively to mining hardware and Compute North mines its own bitcoin to help fund operations. The major dislocation and sell off in bitcoin has had a significant impact on Compute North's business. The sustained downturn in bitcoin value and prices has coincided with a confluence of broader global economic instability and events.

69.    At current bitcoin prices, coupled with high energy costs in ERCOT, it is difficult for bitcoin miners to profitably operate during certain periods of the day due to fluctuations in energy prices, including Compute North's mining operations. The sustained downturn in the cryptocurrency market has negatively affected Compute North's ability to generate revenue throughout all its business segments contributing to the commencement of these Chapter 11 Cases.

## V.    FIRST DAY MOTIONS

70.    Contemporaneously with this Declaration, Compute North filed numerous First Day Motions in this Chapter 11 Case seeking orders granting various forms of relief intended to provide stability and facilitate its continued operations and the efficient administration of the Chapter 11 Cases.  Compute North seeks to, among other things, ensure the continuation of its business operations and cash management system without interruption, preserve valuable relationships with employees, ensure that the there is sufficient liquidity to run Compute North's business and fund the Chapter 11 Cases, and allow for other business operations without interruption.

71.    I have read and understand each of the First Day Motions and the relief requested therein.  Based on my review, and to the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement

is incorporated herein by reference.  I believe that the relief requested in the First Day Motions is necessary, in the best interests of Compute North's estates, its creditors, and all other parties in interest, and will allow Compute North to operate with minimal disruption during the pendency of these Chapter 11 Cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to Compute North, its business, and its estates.

72.    An immediate and orderly transition into Chapter 11 is critical to the viability of Compute North's operations, and any delay in granting the relief requested in the First Day Motions could jeopardize Compute North's ability to restructure.  A description of the relief requested and the facts supporting each of the First Day Motions is attached hereto as Exhibit B. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Bankruptcy Court should grant the relief requested in each of the First Day Motions.

[*Remainder of page intentionally left blank*.]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2022
Eden Prairie, Minnesota

*/s/ Harold Coulby*

Harold Coulby
Chief Financial Officer and Treasurer

**Exhibit A**

**(Corporate Organizational Chart)**

# Summary Organizational Chart



**Note: All subsidiaries are wholly-owned unless specifically noted otherwise.**
(1) Compute North Holdings, Inc. is a guarantor under the Generate Facility and NextEra Note.
(2) Compute North LLC is a guarantor under the Generate Facility and borrower under the Marathon Note.
(3) CN Mining LLC is the borrower under the Foundry Financing.
(4) CN Wolf Hollow LLC and Compute North NE05 LLC are guarantors under the Generate Facility.
(5) CN Borrower LLC is the borrower under the Generate Facility.
(6) Compute North Member LLC is the borrower under the NextEra Note.

* 50% owned by NextEra Energy
** 60% owned by Marathon Digital Holdings, Inc.
*** 82% owned by Marathon Digital Holdings, Inc.

**Exhibit B**

**(First Day Motions and Requested Relief)**

**I. Administrative Motions**

A.  Joint Administration Motion – By this motion, Compute North is seeking entry of an order directing the joint administration of the Chapter 11 Cases and granting related relief.

B.  Claims Agent Retention Motion – By this motion, Compute North is seeking entry of an order authorizing the retention and appointment of Epiq Corporate Restructuring, LLC ("Epiq") as claims, noticing, and solicitation agent in lieu of the Clerk of the Court in Compute North's Chapter 11 Cases with full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in Compute North's Chapter 11 Cases and granting related relief.

C.  Consolidated List of Creditors Motion – By this motion, Compute North is seeking entry of an order authorizing Compute North to file a consolidated creditor matrix, file a consolidated top 30 creditors list, redact certain personal information, approving the form and manner of notifying creditors of the commencement of the Chapter 11 Cases and other information, setting bar dates for filing proofs of claim, including (i) approving the proposed proof of claim form, (ii) establishing a deadline for filing requests for administrative expenses under section 503(b)(9) of the Bankruptcy Code, (iii) approving the proposed bar date notice, and (iv) approving the proposed form of publication notice, and granting related relief.

D.  Motion to Extend Deadline to File SOALs and SOFAs – By this motion, Compute North is seeking entry of an order extending the deadline to file schedules of assets and liabilities and statements of financial affairs by 30 days, extending the time to file Rule 2015.3 financial reports and granting related relief.

**II. Operational Motions**

E.  Cash Management Motion – By this motion, Compute North is seeking entry of an order authorizing Compute North to continue operating its cash management system, maintaining its existing bank accounts and business forms, paying related prepetition obligations, performing intercompany transactions, and granting related relief.

F.  Employee Wages Motion – By this motion, Compute North is seeking entry of an order authorizing Compute North to pay prepetition wages, salaries, compensation, reimbursable expenses, and certain incentives to employees and continue providing employees with benefits pursuant to various employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto and granting related relief

G.   <u>Insurance Motion</u> – By this motion, Compute North is seeking entry of an order authorizing Compute North to continue its insurance coverage entered into prior to the commencement of the Chapter 11 Cases and to satisfy prepetition obligations related thereto including to amend, extend, renew, rollover, replace, or obtain new insurance policies and premium financing arrangements and to take all appropriate actions in connection therewith in the ordinary course of business, and granting related relief.

H.   <u>Utility Motion</u> – By this motion, Compute North is seeking entry of an order approving Compute North's proposed adequate assurance of payment for future utility services, prohibiting utility providers from altering, refusing, or discontinuing services, approving Compute North's proposed procedures for resolving additional assurance requests, and granting related relief.

I.   <u>Taxes and Fees Motion</u> – By this motion, Compute North is seeking entry of an order authorizing the payment of various local, state, and federal taxing and regulatory authorities on account of taxes that arose prepetition and in the ordinary course, and granting related relief.