IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | **Case No. 22-90273 (MI)** |
| **MINING PROJECT WIND DOWN** | § | |
| **HOLDINGS, INC. (f/k/a Compute North** | § | **(Jointly Administered)** |
| **Holdings, Inc.),** *et al.*,[1] | § | |
| | § | |
| **Debtors.** | § | |

**CORPUS CHRISTI ENERGY PARK, LLC's BENCH BRIEF IN REPLY TO
(I) STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
AND (II) DEBTORS' MEMORANDUM OF LAW
CONCERNING DISCLOSURE STATEMENT AND PLAN**

**[Relates to Dkt. No. 935 and 938]**

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

CORPUS CHRISTI ENERGY PARK, LLC ("CCEP"), files this *Bench Brief in Reply* to the (I) Statement of the Official Committee of Unsecured Creditors Concerning Final Approval of Debtors' Disclosure Statement and Confirmation of Debtors' Liquidating Chapter 11 Plan and (II) Debtors' Memorandum of Law, and in support hereof respectfully shows the Court as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, Illinois 60654.

## I. REPLY SUMMARY

The "consolidated" Plan should not be confirmed without re-consolidating Class 3A into Class 3. The Plan, as amended, is not in good faith, improperly strips scheduled assets from CN Corpus Christi, LLC's ("CNCC") creditors without compensation, carries no impaired vote by the un-consolidated CNCC debtor, treats equal and junior classes better than Class 3A creditors, and ensures Class 3A gets less than they would in Chapter 7.

The UCC and Debtors plead to carve out CNCC from the Plan (only when carving them out suits the Debtors) because they allege CNCC's creditors could not possibly fare better in a Chapter 7 than absolutely nothing. But prior filings from these same parties belie this argument. The UCC was designated to represent ALL unsecured creditors in these estates and did not carve out any estates from its investigation and pursuit of officer and director litigation. These recoveries would inure to the benefit of CNCC's creditors like CCEP. Further, the Debtors swore under penalty of perjury to this Court and creditor body that: *CNCC* had the contract with CCEP,[2] *CNCC* had $20 million in capitalized costs for the project,[3] and *CNCC* had the claims for breach of contract and under chapter 5.[4] For Debtors now to argue instead that different Debtors own these assets and claims does not comply with their sworn Schedules.

The Committee also misconstrues CCEP's Objection as a "self-serving attempt to insulate itself from litigation" – but it is nothing of the sort. CCEP simply does not wish its estate to be cleverly denuded and then fully excluded from distributions under the "consolidated" Plan. CNCC creditors simply fare better in Chapter 7. If Class 3A is not re-consolidated into Class 3, then the

---

[2] CCEP Exhibit 957-5, CNCC Schedules, Doc. 315, p. 22 Sch. G.

[3] Id., p. 18, Sch. A/B Item 77.

[4] Id., p. 10, Notes 1.h.; and p. 18, Sch. A/B Item 74.

Plan at least should vest its assets (including estate claims) in its creditors. If Debtors' and UCC's protestations to this Court are true, Class 3 loses nothing and Class 3A receives what it would in Chapter 7. Otherwise, for the reasons below, CCEP's Objections to the Disclosure Statement and Plan should be sustained and confirmation denied.

## II.  ARGUMENTS AND AUTHORITIES

**A. UCC's First Argument – Trust us, we're looking out for the unsecureds.**

1.  The UCC's Statement alleges "until the Plan becomes effective, the Committee will continue in its fiduciary role to ensure that the interests of unsecured creditors are paramount as the Plan is consummated." Statement, ¶ 2. However, the UCC has patently shirked its fiduciary duties to CNCC's unsecured creditors by throwing them under the bus. The U.S. Trustee's latest Notice of Reconstituted Committee entrusts the UCC to perform its duties for all unsecured creditors, including those under CNCC. *See* Doc. 928 (listing each Debtor entity, including CNCC, for which the UCC is appointed to protect). In turn, the UCC sought and obtained approval to retain professionals to protect the interests of CNCC's unsecured creditors, like CCEP. *See* Doc. 447 Application and Doc. 601 Order (both listing every estate's interest to be represented, including "CN Corpus Christi LLC (5551)"). The UCC has worked with Debtors to denude the CNCC estate, transfer assets—including causes of action against contract parties, directors, and officers—to a consolidated group that excludes CNCC, and then argued that CNCC has no assets to distribute.[5] Debtors similarly imply the stripping of CNCC's estate is okay because "Class 3A in the Plan amendment was a negotiated part of the Global Settlement and, therefore, enjoys the support of the Committee and other key stakeholders of the Debtors." Memorandum, ¶ 54. Of

---

[5] The UCC Statement explains "the Plan preserves the optionality to (i) complete a post-confirmation investigation into whether there are causes of action against certain of the Debtors' current and former directors and officers based on prepetition conduct and (ii) pursue those causes of action in an effort to increase creditor recoveries." Doc. 935, ¶ 7. Just not for CNCC's creditors.

course it does. Who wouldn't sign up for a deal to take assets from a different debtor and then put them into their own pockets? The Court should give no weight to the Debtors' and UCC's self-serving implications they are performing their fiduciary duty to CNCC's estate.

**B. UCC's Second Argument – The estates hold claims against CCEP.**

2.  The UCC alleges it has "numerous and significant claims against CCEP." Statement, ¶ 5. This is not grounds for separate and lesser treatment under the Plan. This is merely grounds for an objection to CCEP's $15 million claim against CNCC. Further, this is not grounds for disenfranchising other CNCC creditors. *See, e.g.,* CCEP Exhibit 957-9, CNCC Claim #10028 by Urban Solution Group, LLC.

**C. UCC's Third Argument – CCEP walked away from a deal and the Amendment was the first time to ever classify CNCC's claims.**

3.  This is an odd gaslight by both the Debtors and the UCC, who itself killed a deal with CCEP by overreaching on a deal when there were literally no other buyers. Despite the false narrative by Debtors and UCC that CCEP walked away instead of being pushed away, finger pointing regarding confidential negotiations is improper. Notwithstanding, it is flatly false to say the Amended Plan was the first time CNCC's claims were classified. *See* UCC Statement, ¶ 12. The Original Plan rightly classified all unsecured creditors for all consolidated Debtors to be in Class 3. This included CCEP. The Amended Plan attempted to carve them out. In fact, the Amended Plan and Disclosure Statement did not even accurately carve out CCEP; they instead incorrectly attempted to exclude an entirely different claim. *See* CCEP's Proof of Claim [CCEP Ex. 957-6, POC #10057] (stating a claim against CNCC for $14.9 million), and Bootstrap's Proof of Claim [CCEP Ex. 957-13, POC #10058] (stating a claim against Compute North, LLC for $4.1 million); *compare with* Amended Plan [Doc. 667-1] at pp. 3, 15 (creating Class 3A, consisting of,

*inter alia*, all unsecured claims against CNCC) and Liquidation Analysis [Doc. 723-2] at pg. 3 (errantly valuing Class 3A claims at $4.1 million).

**D. UCC's Fourth Argument – CCEP has different legal entitlements than other creditors.**

4. The UCC presents half of an argument that CCEP has no recourse against other Debtors. *See* Statement ¶ 15. This argument goes too far and is not supported by evidence that all other creditors have recourse against all other consolidated Debtors.

5. The UCC's reliance on *In Re Landing Assocs., Ltd.*, 157 B.R. 791 (Bankr. W.D. Tex. 1993) is unpersuasive because the facts fundamentally differ from the case at hand. In *Landing Assocs.*, the complaining creditor held a secured claim and based its argument of unfair discrimination on the treatment of unsecured creditors. *Id.* at 822. It is under this context in which the court held "[t]he two kinds of claims have different legal entitlements against the estate's assets, so that the unfair discrimination analysis is inapposite." *Id*. CCEP's claim of unfair discrimination is predicated on the treatment of its *unsecured* claim versus the treatment of every other *unsecured* claim. Debtors' plan discriminates against CCEP, an unsecured creditor, by separating it out from the rest of the unsecured creditors that are in Class 3. Unlike a secured creditor and an unsecured creditor, the Class 3 and Class 3A unsecured creditors have the same legal entitlements.

**E. UCC's Fifth Argument – Junior Classes are barely retaining more property interest than Class 3A.**

6. Under Debtors' plan, Preferred and Parent Equity Interests (Classes 7 and 8, respectively) are eligible to receive distributions "on account of" their interests and despite Class 3A creditors being cut out from distributions entirely. Plan, §§ 3.2.8 and 3.2.9. This violates the absolute priority rule prohibiting any junior class from receiving property under a plan unless all senior classes are either paid in full or have voted to approve the plan. *See* 11 U.S.C. §

1129(b)(2)(B)(ii); *see, e.g., In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 585 (Bankr.W.D.Tex. 2010) (debtors' plan did not violate absolute priority rule where equity interests' entitlement to remainder of litigation trust proceeds was contingent upon "payment in full of all senior classes").

7. The UCC, apparently following Debtors' lead in hoping the consolidation problem can be resolved by pretending it does not exist, blithely concludes the treatment of Classes 7 and 8 is "irrelevant" to CCEP because those equity interests are in "another branch of the corporate structure." Statement, ¶ 17. Notwithstanding the consolidation issue, the UCC's application of the absolute priority rule is contrary to its clear language. *See* 11 U.S.C. § 1129(b)(2)(B) ("[T]he holder of *any* claim or interest that is junior to the claims of [a class of unsecured claims] will not receive or retain under the plan on account of such junior claim or interest any property") (emphasis added); *see also In re Petroleum Corp.*, 913 F.3d 533, 548-59 (5th Cir. 2019), *withdrawn and superseded on rehearing*, 943 F.3d 758 ("[A] plan may not allocate any property whatsoever to *any* junior class ... unless *all* senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claims.") (emphasis added).

8. Debtors also imply that the absolute priority rule is not relevant here and should be disregarded because the rights of Classes 7 and 8 to distributions are only "theoretical" and unlikely to manifest. It should go without saying, but the low probability of distributions to Classes 7 and 8 has no bearing whatsoever on application of the absolute priority rule, particularly given Debtors' carefully orchestrated and deliberate efforts to strip assets from CNCC and design the Plan to specifically carve out a class of unsecured creditors and guaranteed that such class gets nothing. *See Norwest Bank Worthington et al v. Ahlers*, 485 U.S. 197, 207-08 (1988) (holding absolute priority rule is implicated even where retained property is of no or *de minimis* value).

**F. UCC's Sixth Argument – Different guarantee obligations and potential litigation allow for separate classes.**

9. The cases relied upon to argue CNCC's creditors can be treated differently are based upon facts not before this Court.

10. The UCC argues the creditors of CNCC have different legal rights than creditors holding claims against other Debtors. *See* UCC Statement ¶ 19. The UCC's argument relies on *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022). In *Mallinckrodt*, the court held two series of notes could be classified differently because the notes had "different prebankruptcy entitlements" and "different structuring rights". The court came to this conclusion because one note was guaranteed by the parent company only and the other note was guaranteed by the parent company and 60 other companies. *Id.* The classification of the notes had nothing to do with who the debtor entity was on the note, but rather who guarantees the note, which created different legal rights. *Id.* That is, prior to bankruptcy the holder of the note supported by 60 other guarantees had the legal right to seek contribution from the other guarantors.

11. Here, there are no guarantees, no different "prebankruptcy legal entitlements", and no "different structuring rights". Unlike the two noteholders in *Mallinckrodt*, Class 3 contains various claims against various Debtor entities. The only difference between claims in Class 3A and Class 3 is which Debtor the claim is against. But Debtors chose to consolidate their bankruptcy Plan, obliterating the legal formalities between entities and different "legal entitlements" because of now disregarded unique Debtor entities for voting, asset grouping, and distribution grouping.

12. The UCC's also argues that CCEP can be classified differently because the Court may presume CCEP is acting in bad faith. *See* Statement, ¶¶ 20-22. The UCC compares CCEP to a group of creditors in *In re Heritage Organization, L.L.C.*, 375 B.R. 230 (Bankr. N.D. Tex. 2007) who prolonged plan confirmation by failing to turn over documents, be candid with the trustee,

and respond to the trustee. *Id.* at 255. The *Heritage* court categorized the creditor's attempt to block confirmation of the plan as an initiative to deplete the assets of the estate so that the trustee could not pursue litigation against the creditor, which was indicative of the creditor's previous treatment of the bankruptcy estate.

13. Here, CCEP has not acted in bad faith in any way, shape, or form. It has merely objected to an unlawful Plan. To be sure, CCEP objected to the Plan only after it was amended to mistreat CCEP. CCEP merely wants to be treated as all other similarly situated creditors are by being placed in the consolidated Class 3. Unlike the estate in *Heritage*, administrative insolvency is not a concern for the Debtors. The same factors that led to the *Heritage* court's decision do not exist in the present case. Finally, it is the height of irony for the UCC to argue the estate may become administratively insolvent because the Debtor and Committee professionals will make it so by insisting on mistreating CNCC's estate.

**F. UCC's Seventh Argument – CNCC creditors cannot possibly do better than $0.**

14. The UCC cheekily bolds and italicizes CNCC's estate is getting "*precisely* what they would receive in a chapter 7 liquidation". Statement, ¶ 24. Not so. As explained in the Statement itself, the UCC intends to pursue litigation on behalf of the estates, including CNCC concerning its failed project. Yet the Plan summarily strips any recovery away from the very creditors harmed by the alleged claims. Chapter 7 contains no such unilateral asset stripping.

**F. UCC's Eighth Argument – CNCC doesn't have a plan, there is only a consolidated Plan – *sometimes*.**

15. The UCC and Debtors both argue an impaired class is only necessary per plan, rather than per debtor. UCC's Statement, ¶ 25; Debtors' Memorandum ¶ 61-63. The problem with this argument is there is no consolidated plan for CNCC. Rather, CNCC has been cut out from the group plan, left alone on an island, stripped of its assts and litigation claims. CNCC simply is not

part of the "group" Plan and has no impaired classes of claims voting in favor of any plan for CNCC.

**F. UCC's Final Argument –Disclosure Statement objections were due February 1, 2023 – except for CCEP for whom they were due a month and a half earlier.**

16. Notwithstanding the February 1, 2023 objection deadline for everyone else, the UCC argues CCEP should have objected to the Disclosure Statement on December 20, 2022. *See* Statement, ¶ 27. This is patently unreasonable, especially when CCEP was still reeling from being entirely cut out of the Plan. The UCC argues re-solicitation at this late stage would be costly and time consuming, so the Court should ignore legitimate Disclosure Statement issues. *See* Statement, ¶ 28. This is the very reason the Court admonished the estate professionals to choose wisely in seeking conditional approval, that this very issue may happen. It is not appropriate for the UCC to take a gamble with the estate's solvency with conditional approval and then later use cost as a defense to disclosure issues.

17. Indeed, the UCC's own Statement illustrates that the Disclosure Statement did not adequately explain the severance of CNCC's estate from the Plan. The UCC Statement explains "ulterior motives" and "significant claims" against CCEP are the reason for separate classification of CNCC claims. *See* Statement, ¶¶ 20-22. This is not disclosed in the Disclosure Statement. Nor does the Disclosure Statement disclose why only non-CNCC creditors should share in recoveries of CNCC litigation (or how this is even legal). Thus, not only is the Disclosure Statement insufficient, it is inaccurate.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, CCEP respectfully requests and prays the Court deny final approval of the Disclosure Statement and confirmation of the Amended Plan as long as it denudes the CNCC estate of its assets, including litigation claims, fails to carry a single

impaired CNCC class vote, leaves Class 3A worse than Chapter 7, and treats Class 3A worse than equal and junior classes for the reasons stated above. CCEP respectfully requests all further relief to which CCEP may be justly entitled at law or equity.

Dated: February 15, 2023                Respectfully submitted,

By: */s/Mark A. Castillo*
Mark A. Castillo
  Texas State Bar No. 24027795
Robert C. Rowe
  Texas State Bar No. 24086253
**CARRINGTON, COLEMAN, SLOMAN**
  **& BLUMENTHAL, L.L.P.**
901 Main St., Suite 5500
Dallas, TX  75202
Telephone:     214-855-3000
Facsimile:     214- 580-2641
Email: markcastillo@ccsb.com
             rrowe@ccsb.com

***Bankruptcy Counsel for***
***Corpus Christi Energy Park, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on all parties receiving notice via the Court's ECF system in this case on this 15th day of February, 2023.

 */s/Robert C. Rowe*
Robert C. Rowe