

**EXHIBIT**

**7**

# Agreement Between
# Owner and Design-Builder - Lump Sum
## (DBIA Form No. 525 (modified))

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the 16th day of March in the year of 2022, by and between the following parties, for services in connection with the Project identified below.

**OWNER:**

CN Corpus Christi LLC, a Delaware limited liability company, having an address at c/o Compute North Holdings, Inc., 7575 Corporate Way, Eden Prairie, MN 55344.

**DESIGN-BUILDER:**

Corpus Christi Energy Park LLC, a Texas limited liability company, having an address at 3838 Oak Lawn Avenue, Suite 1000, Dallas, Texas 75219

**PROJECT:**

Project Name: **Corpus Christi Energy Park**

Project Site (or "Site"): 1290 McKinzie Road, Corpus Christi, TX 78410.

See legal description attached hereto as Exhibit A and survey map depicting the Site on Exhibit A-1 .

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

## Article 1

### Scope of Work

**1.1** Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

## Article 2

### Contract Documents

**2.1** The Contract Documents are comprised of the following:

**2.1.1** All duly executed and delivered written modifications and amendments to this Agreement issued in accordance with the *General Conditions of Contract* attached hereto as Exhibit B

("General Conditions of Contract"), and any Change Orders, which shall be in the form of Exhibit E;

**2.1.2** The Basis of Design Documents, which are comprised of: the Design-Builder's Scope of Work attached hereto as Exhibit C-1, and the Drawings and Specifications attached hereto as Exhibit D;

**2.1.3** This Agreement, including all exhibits and attachments, duly executed and delivered by Owner and Design-Builder;

**2.1.4** The General Conditions of Contract; and

**2.1.5** Construction Documents prepared and approved in accordance with Section 2.4 of the General Conditions of Contract.

## Article 3

### Interpretation and Intent

**3.1** Design-Builder and Owner, prior to execution of the Agreement, shall carefully review all the Contract Documents, including the various documents comprising the Basis of Design Documents, for any conflicts or ambiguities. Design-Builder and Owner will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**3.2** The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event inconsistencies, conflicts, or ambiguities between or among the Contract Documents are discovered after execution of the Agreement, Design-Builder and Owner shall attempt to resolve any ambiguity, conflict or inconsistency informally, recognizing that the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof (with any Change Orders treated as amendments to this Agreement).

**3.3** Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

**3.4** If the Scope of Work contains design specifications: (a) Design-Builder shall be entitled to reasonably rely on the accuracy of the information represented in such design specifications and their compatibility with other information set forth in the Scope of Work, including any performance specifications; and (b) Design-Builder shall be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by such inaccurate design specification.

**3.5** The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

## Article 4

### Ownership of Work Product

**4.1** **Work Product.** All drawings, specifications and other documents and electronic data, including such documents identified in the General Conditions of Contract, furnished by Design-Builder to Owner



2

under this Agreement ("Work Product") are deemed to be instruments of service and Owner shall retain the ownership and property interests therein, including but not limited to any intellectual property rights, copyrights and/or patents; provided, however, that, for the avoidance of doubt, to the extent any such Work Product is not, by its nature, specific and unique to the Site, Owner shall not have any rights thereto to the exclusion of any other Person.

## Article 5

### Contract Time

**5.1 Date of Commencement.** The Work shall commence promptly following (and, in any event within 5 days of) the execution and delivery of this Agreement by Design-Builder and Owner (the date on which Work commences, the "Date of Commencement"), unless the parties mutually agree otherwise in writing.

**5.2 Substantial Completion and Final Completion.**

**5.2.1** Deed transfer and Owner's access. Fee title to the Project Site shall be conveyed to Owner and Owner's access to Owner's Area shall be granted no later than June 6, 2022 unless a later date is required by Owner in order to complete its diligence review of the Project Site. Fee title to the Project Site shall be conveyed to Owner free and clear of all encumbrances (other than Permitted Encumbrances) pursuant to a special warranty deed, the form and substance of which shall be acceptable to Owner (such acceptance not to be unreasonably withheld, conditioned, or delayed)

**5.2.2** Substantial Completion of the entire Work shall be achieved no later than October 31, 2022 (such date, subject to a one-day adjournment for each day (or portion thereof) that a Force Majeure Event delays Substantial Completion of the Work, the "Scheduled Substantial Completion Date"). No later than the date of Substantial Completion, Design Builder shall cause to be granted to Owner the Transmission Easement (defined in Exhibit A attached hereto), which shall be in form and substance approved by Owner (such approval not to be unreasonably withheld, conditioned or delayed).

**5.2.3** Design-Builder shall endeavor to achieve the milestones enumerated below as Items 1, 2 and 4 by the respective specified dates.

| 1. Deed Transfer / Owner Access: | June 6, 2022 |
|---|---|
| 2. FOB Transformer 1: | July 15, 2022 |
| 3. Substantial Completion: | Scheduled Substantial Completion Date (which is scheduled to be October 31, 2022 absent the occurrence of any Force Majeure Event(s) that delay Substantial Completion of the Work |
| 4. Final Completion: | November 30, 2022 |

**5.2.4** Final Completion of the Work shall be achieved as expeditiously as reasonably practicable. Final Completion is the date when all Work is complete pursuant to the definition of Final Completion set forth in Section 1.2.7 of the General Conditions of Contract.

**5.2.5** All of the dates set forth in this Article 5 (collectively the "Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract.

**5.3 Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence: (i) in the case of Owner, only as to (y) the punctual payment of Installment Payments as and when the same



3

become due and payable, and (z) performance of Owner's obligations under Section 3.3.2 of the General Conditions, and (ii) in the case of Design-Builder, only as to the obligation of Design-Builder to achieve Substantial Completion on or prior to the Scheduled Substantial Completion Date (it being agreed that Owner's exclusive remedy for the failure by Design-Builder to achieve Substantial Completion on or prior to the Scheduled Substantial Completion Date is that liquidated damages set forth in Sections 5.4 and 5.5 hereof**).**

**5.4    Liquidated Damages.** Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. The amount of any liquidated damages provided in this Agreement is neither a penalty nor a forfeiture, but rather was calculated to compensate Owner for damages resulting from the failure of Design-Builder to achieve Substantial Completion by the Scheduled Substantial Completion Date (it being agreed by the Parties that such amount is a reasonable estimate of such damages). Design-Builder agrees that if Substantial Completion is not attained by the Scheduled Substantial Completion Date (or if the Scheduled Substantial Completion Date is not a Business Day, the first Business Day following the Scheduled Substantial Completion Date) (such date, the "LD Date"), Designer-Builder shall pay Owner, as liquidated damages, an amount equal to $50,000.00 per Business Day for each Business Day that Substantial Completion extends beyond the LD Date. In the event any liquidated damages are due and payable hereunder, the Substantial Completion Payment shall be reduced by the amount of such liquidated damages; and, if the Substantial Completion Payment is thereby reduced to zero, then the Final Completion Payment shall be reduced by any remaining liquidated damages (subject to the LD Cap).

**5.5**    Any liquidated damages assessed pursuant to this Agreement shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties and any other damages, whether special or consequential, and of whatsoever nature incurred by Owner which are occasioned by any delay in achieving the Contract Time(s).

Owner and Design-Builder agree that the maximum aggregate liability Design-Builder has for any liquidated damages that may be assessed under this Agreement for failure to achieve the Scheduled Substantial Completion Date shall be Three Million Dollars ($3,000,000.00) (the "LD Cap").

**5.6    Early Completion Bonus.** If Substantial Completion is attained on or before the Scheduled Substantial Completion Date (the "Bonus Date"), Owner shall pay Design-Builder at the time of Final Payment under Section 7.3 hereof an early completion bonus in an amount equal to $50,000.00 per Business Day for each business for each day that Substantial Completion is attained earlier than the Bonus Date. Owner and Design-Builder agree that the maximum aggregate amount that Design-Builder shall receive as the early Completion Bonus is One Million Dollars ($1,000,000.00).

# <u>Article 6</u>

## Contract Price

**6.1    Contract Price.** Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract the sum of **Twenty-Four Million, Two Hundred Fifty Thousand Dollars ($24,250,000.00**) ("Contract Price"), subject to adjustments made in accordance with the General Conditions of Contract or the other Contract Documents. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements.

The Contract Price is inclusive of (i) the $500,000.00 in consideration for the conveyance of the Project Site via a special warranty deed and grant of the Transmission Easement, and (ii) the $2,371,500.00 of Earnest Money (as defined in that certain Corpus Christi Energy Park Term Sheet-Purchase Agreement fully by the



parties on February 1, 2022 ("**Term Sheet**")) to the extent such Earnest Money is actually released to Design-Builder in partial satisfaction of the first Installment Payment on the date hereof.

**6.2    Markups for Changes.** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 9.4.1.3 or 9.4.1.4 of the General Conditions of Contract, the following markups shall be allowed on such changes:

**6.2.1**    For additive Change Orders, including additive Change Orders arising from both additive and deductive items, it is agreed that Design-Builder shall receive a Fee of fifteen percent (15.0%) of the additional costs incurred for that Change Order, which fee shall be inclusive of Design-Builder's overhead and profit thereon.

**6.2.2**    For deductive Change Orders, including deductive Change Orders arising from both additive and deductive items, the deductive amounts shall not include any additional reduction to account for Design-Builder's Fee.

# Article 7

## Procedure for Payment

**7.1    Installment Payments.**

**7.1.1**    Design-Builder shall submit to Owner an Application for Payment upon achieving each Payment Milestone in accordance with Exhibit F to this Agreement and Article 6 of the General Conditions of Contract.

**7.1.2**    Owner shall make payment (each such payment, a "Progress Payment" or an "Installment Payment") within ten (10) Business Days after Owner's receipt of each properly submitted and accurate Application for Payment in accordance with Article 6 of the General Conditions of Contract, but in each case less the total of payments previously made, and less amounts properly withheld under Section 6.3 of the General Conditions of Contract (if any).

**7.2    Retainage on Installment Payments.**

**7.2.1**    Owner will retain ten percent (10%) of each Application for Payment to be paid with the funds due pursuant to the final Application for Payment.

**7.3    Final Payment.** Design-Builder shall submit its final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract. Owner shall make payment on Design-Builder's properly submitted and accurate final Application for Payment no sooner than forty-one (41) days and no later than forty-five (45) days after Owner's receipt and approval of the final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4    Interest**. Payments due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing on the tenth (10th) Business Day after payment is due at the rate of ten percent (10.0%) of the unpaid amount per annum until paid.

**7.5    Record Keeping and Finance Controls.** With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of two (2) years after Final Payment, Owner and Owner's accountants shall be afforded access to, and the right to



5

audit from time-to-time, upon reasonable notice, Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of two (2) years after Final Payment. Such inspection shall take place at Design-Builder's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed to by the Owner and Design-Builder as part of this Agreement are only subject to audit to confirm that such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

## <u>Article 8</u>

### Termination for Convenience

**8.1**    Upon thirty (30) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement; provided, however, that no such termination shall be effective unless and until Owner paid to Design-Builder for the following:

   **8.1.1**    All cost and expense for the Work executed by Design-Builder, and for the actual loss, cost or expense that is incurred or suffered by Design-Builder in connection with the performance of the Work (but, for the avoidance of doubt, excluding lost profits or lost opportunity (except to the extent provided in Section 8.1.3 hereof);

   **8.1.2**    The actual and substantiated costs and expenses attributable to such termination, including (i) demobilization costs, and (ii) amounts due in settlement of terminated contracts with Subcontractors and Design Consultants (it being agreed by Design-Builder that Design-Builder shall use good faith efforts to minimize such costs and expenses, although Owner acknowledges that Design-Builder can provide no assurances as to a particular result); and

   **8.1.3**    Overhead and profit, as liquidated damages, in an amount (the "***TCLD Amount***") equal to (a) the product of (i) 0.15 and (ii) the sum of (y) the amount of the Contract Price paid through the date of such termination and (z) the total amount payable under Sections 8.1.1 and 8.1.2, less (b) the amount of the Contract Price paid through the date of such termination; <u>provided</u>, <u>however</u>, that in no event shall the TCLD Amount be less than $2,137,500.00.

**8.2**    The obligations of Owner and Design-Builder under this Article 8 shall survive the termination of this Agreement and the other Contract Documents.

## <u>Article 9</u>

### Representatives of the Parties

**9.1**    **Owner's Representatives.**

   **9.1.1**    Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract:

    Drake Harvey
   *Chief Operating Officer*
   <u>Drake.Harvey@computenorth.com</u>
   512-695-9505

   **9.1.2**    Owner designates each of the individuals listed below as its Owner's Representative, which of whom, individually, has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract:



Jeff Jackson
*Vice President, Site Development*
Jeff.Jackson@computenorth.com
612-900-5927

Nate Hubert
*Vice President, Operations*
Nate.Hubert@computenorth.com
612-369-5274

With a copy of any communication to either of the foregoing to legal@computenorth.com

**9.2     Design-Builder's Representatives.**

**9.2.1**   Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract:

Matthew Held
Matt.held@bootstrap-energy.com
310.210.4545

**9.2.2**   Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract:

Steve Quisenberry
steveq@bootstrap-energy.com
561.339.2096

## Article 10

### Bonds and Insurance

**10.1     Insurance.** Design-Builder shall procure the insurance coverages set forth in Exhibit G attached hereto and in accordance with Article 5 of the General Conditions of Contract.

**10.2     Bonds and Other Performance Security.** Design-Builder shall be obligated to provide performance bonds or other performance security, except (y) in the case of Design-Builder, Design-Builder shall cause Recon and Saber to furnish performance and payment bonds under their respective Subcontracts and the Owner shall be designated as a dual obligee on such bonds, and (z) in the case of Owner, Owner shall satisfy its obligations under Section 3.3 of the General Conditions.

## Article 11

### Other Provisions

**11.1     Other provisions, if any, are as follows:**

11.1.1     Notwithstanding anything in the Contract Documents to the contrary, Owner hereby approves the Design-Builder's Scope of Work and the Drawings and Specifications (and, as a result, any provisions Contract Documents relating to interim design submissions are not applicable).



11.1.2    Design-Builder represents to Owner that as of the Effective Date: (i) Design-Builder has entered into each of the Subcontracts listed on Exhibit H hereto (each such Subcontract, a "Material Agreement"), (ii) each of such Subcontracts is in full force and effect, and, to Design-Builder's knowledge, no defaults by Design-Builder or the relevant Subcontractor exist thereunder, (iii) true, correct and complete copies of each such Subcontract have been delivered to Owner, and (iv) all Material Agreements are in full force and effect.

11.1.3    Owner covenants that, to the extent Owner prosecutes or causes the prosecution of the Owner's Scope of Work (or any portion thereof) ("Owner Work") at any time prior to Final Completion, Owner shall not interfere with the performance of the Work by Design-Builder, unless otherwise permitted to do so under this Agreement (it being agreed that any such interference shall constitute an Owner Delay). Design-Builder agrees to reasonably cooperate with Owner's contractors performing Owner Work prior to Final Completion (it being agreed that any such cooperation, to the extent it delays Substantial Completion (by diverting Design-Builder's resources or otherwise), shall constitute an Owner Delay, provided Design-Builder promptly documents any such delay by presenting Owner with a Change Order describing the facts giving rise to such delay with reasonable particularity).

11.1.4    Design-Builder represents that it has received draft Letters of Agreement with AEP Texas for a total of 550 MW pending execution that will provide Owner a point of delivery for 300 MW of electricity consumption at the substation on a timeline to achieve Substantial Completion by October 31, 2022 ("Letter of Agreement"). Within sixty (60) days of execution of this Agreement, Design-Builder covenants that it will present to Owner a Letter of Agreement with AEP for 300 MW of customer interconnection capacity for execution that is satisfactory to Owner and subject only to execution by Owner, such approval and execution not to be unreasonably withheld, conditioned, or delayed. For avoidance of doubt, notwithstanding any other provision of this Agreement, an AEP delay shall not be an event of Force Majeure for purposes of Design-Builder's obligation to present a satisfactory Letter of Agreement to Owner (for the avoidance of doubt, it being agreed that after presentation of a satisfactory Letter of Agreement to Owner, any delay on the part of AEP shall be an event of Force Majeure). Design-Builder covenants that it will grant AEP Texas and any other utility necessary land access to achieve the Substantial Completion date. All payments associated with the transaction and Letter of Agreement with AEP, including any adjustments for the increase to 300 MW and all contribution in aid of construction ("CIAC") payments, are included in the Contract Price.

Any security required by the Letter of Agreement is excluded from Contract Price. If (1) Design-Builder fails to present Owner a satisfactory Letter of Agreement within the 60 days as indicated above or (2) unless Owner is in default of its payment obligations hereunder when and as due, (y) the Letter of Agreement is executed and secured by Owner and (z) Design-Builder fails to fund in accordance with the CIAC payment schedule, then, in either case, Design-Builder shall promptly refund to Owner all amounts paid to Design-Builder under this Agreement and the Term Sheet and this Agreement shall terminate in accordance with paragraph 11.2.1(vi) of General Conditions Exhibit B.

11.1.5    Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 of the General Conditions of Contract shall be resolved in a court of competent jurisdiction in the state in which the Project is located.

DocuSign Envelope ID: 4DC083EF-B4E3-42AD-98D4-AD43256AC489

[*The remainder of this page is intentionally blank.*]

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**

**DESIGN-BUILDER:**

**CN Corpus Christi LLC**
*(Name of Owner)*

**Corpus Christi Energy Park, LLC**
*(Name of Design-Builder)*

_____
*(Signature)*

By: _____
*(Signature)*    69471E0D901440A...

Dave Perrill
*(Printed Name)*

Steven Quisenberry
*(Printed Name)*

CEO
*(Title)*

Chief Executive Officer
*(Title)*

Date: _____3/16/22_____

Date: _____3/16/2022_____

**Exhibit A**
**Legal Description of Project Site**



**Project Site:** The fee simple interest in the following Land:

### DESCRIPTION FOR A
### 33.500 ACRE TRACT

A DESCRIPTION FOR A 33.500 ACRE TRACT IN THE SOUTHEAST QUARTER OF THE ADAMS, BEATY & MOULTON SURVEY 409, A-555, NUECES COUNTY, TEXAS, SAID 33.500 ACRE TRACT BEING PART OF A CALLED 114.205 ACRE TRACT AS CONVEYED TO BOOTSTRAP ENERGY, LLC, RECORDED IN DOCUMENT NO. 202208479, OF THE OFFICIAL PUBLIC RECORDS OF NUECES COUNTY, TEXAS (O.P.R.N.C.T.). SAID 33.500 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CALCULATED POINT LYING IN MCKINZIE ROAD (120 FOOT RIGHT OF WAY), SAID POINT BEING THE SOUTHWEST CORNER OF SAID 114.205 ACRE TRACT, NORTHWEST CORNER OF TRACT "B" OF TRACT V, A CALLED 30.41 ACRE TRACT CONVEYED TO VALERO MANAGEMENT PARTNERSHIP, L.P. RECORDED IN VOLUME 2053, PAGE 302, DEED RECORDS OF NUECES COUNTY, TEXAS (D.R.N.C.T.), LYING IN THE EAST LINE OF A CALLED 69.50 ACRE TRACT CONVEYED TO CAROLE D SKEEN, RECORDED IN DOCUMENT NO. 2020033380, OF THE OFFICIAL PUBLIC RECORDS OF NUECES COUNTY, TEXAS (O.P.R.N.C.T.) AND BEING THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT, FROM WHICH A BROKE CONCRETE MONUMENT WITH IRON ROD FOUND IN THE EAST RIGHT-OF-WAY LINE OF MCKINZIE ROAD (120 FOOT RIGHT OF WAY) BEARS N 89°25'11" E, A DISTANCE OF 50.70 FEET;

THENCE, N 00°47'46" W ALONG THE WEST LINE OF SAID 114.205 ACRE TRACT AND THE EAST LINE OF SAID 69.50 ACRE TRACT, A DISTANCE OF 1,464.38 FEET TO A CALCULATED POINT IN THE WEST LINE OF SAID 114.205 ACRE TRACT, THE EAST LINE OF SAID 69.50 ACRE TRACT AND BEING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, OVER AND ACROSS SAID 114.205 ACRE TRACT, THE FOLLOWING THREE (3) COURSES AND DISTANCES:

1. N 89°12'14" E, A DISTANCE OF 133.94 FEET TO A 5/8 INCH IRON ROD WITH A CAP STAMPED "SAM, LLC" SET FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

2. S 50°20'23" E, A DISTANCE OF 2,214.45 FEET TO A 5/8 INCH IRON ROD WITH A CAP STAMPED "SAM, LLC" SET FOR THE NORTHERN SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

3. S 01°33,59" E, A DISTANCE OF 34.34 FEET TO A 5/8 INCH IRON ROD WITH A CAP STAMPED "SAM, LLC" SET FOR SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, LYING IN THE SOUTH LINE OF SAID 114.205 ACRE TRACT AND THE NORTH LINE OF SAID 30.41ACRE TRACT, FROM WHICH A 1-1/2 INCH IRON PIPE FOUND FOR THE SOUTHEAST CORNER OF SAID 114.205 ACRE TRACT, THE NORTHEAST CORNER OF SAID 30.41ACRE TRACT AND LYING IN THE WEST LINE OF A CALLED 742.54 ACRE TRACT CONVEYED TO BRAMAN RANCHES LLC RECORDED IN DOCUMENT NO. 2008044426, OF THE OFFICIAL PUBLIC RECORDS OF NUECES COUNTY, TEXAS (O.P.R.N.C.T.) BEARS, N 89°25'11" E, A DISTANCE OF 820.62 FEET;

THENCE, S 89°25'11" W, A DISTANCE OF 1,819.38 FEET TO THE POINT OF BEGINNING AND CONTAINING 33.500 ACRES OF LAND.

**Tract 2: Transmission Easement.**

No later than the date of Substantial Completion, Design-Builder shall, at its sole expense, procure a grant of a perpetual easement from the owner of the surface estate of the Adjoining Tract (as described more particularly below), and shall obtain or assign for the benefit of Owner, for the purpose of constructing and operating a transmission line and related facilities and improvements, together with customary rights of access, inspection, maintenance, repair, and the like, which easement (i) will extend from the Project Site over and along the Adjoining Tract to a permanent point of interconnection to be constructed by AEP and (ii)  have a width of at least 50 feet  with a centerline to be located and designed by Design-Builder and approved by Owner, such approval not to be unreasonably withheld, conditioned, or delayed (the "Transmission Easement ").

Said Adjoining Tract is described as an 80.705 acre tract in the southeast quarter of the Adams, Beaty & Moulton Survey 409, A-555, Nueces County, Texas, said 80.705 acre tract being part of a called 114.205 acre tract as conveyed to Bootstrap Energy, LLC, recorded in document no. 202208479, of the Official Public Records of Nueces County, Texas (O.P.R.N.C.T.).

**Exhibit B**
**General Conditions of Contract (Form 535)**



## Article 1

### General

**1.1 Mutual Obligations**

**1.1.1** *Owner and Design-Builder* commit at all times to cooperate fully with each other to permit each party to realize the benefits afforded under the Contract Documents.

**1.2 Basic Definitions**

**1.2.1** *AEP* means AEP Texas, Inc., a Delaware corporation, its affiliates and assigns.

**1.2.2** *Agreement* refers to the executed contract between Owner and Design-Builder under DBIA Document No. 525, *Standard Form of Agreement Between Owner and Design-Builder - Lump Sum* (2010 Edition), as from to time amended, modified or supplemented in writing by Design-Builder and Owner.

**1.2.3** *Basis of Design Documents* are as follows: the Design-Builder's Scope of Work (Exhibit C-1), the Drawings and Specifications (Exhibit D) and any Change Orders (Exhibit E).

**1.2.4** *Business Day* shall mean any day other than a Saturday, Sunday, a national holiday or a day on which insured depository institutions are authorized or required to be closed in the State of Texas or the State of New York.

**1.2.5** *Construction Documents* are the documents, consisting of Drawings and Specifications, to be prepared or assembled by the Design-Builder consistent with the Basis of Design Documents unless a deviation from the Basis of Design Documents is specifically set forth in a Change Order executed by both the Owner and Design-Builder, as part of the design review process contemplated by Section 2.4 of these General Conditions of Contract.

**1.2.6** *COVID-19 Event* shall mean the occurrence of the COVID-19 pandemic but only to the extent Substantial Completion is delayed thereby (and except to the extent any such delay is a result of the failure of Design-Builder to comply in all material respects with applicable laws, regulations, or other compulsory mandates of governmental authorities having jurisdiction over Design-Builder, the Work, or the Site as in effect on the date hereof).

**1.2.7** *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.8** *Design-Build Team* is comprised of the Design-Builder, the Design Consultant, and key Subcontractors identified by the Design-Builder.

**1.2.9** *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder, to furnish design services required under the Contract Documents. A Design Sub-Consultant is a qualified, licensed design professional who is not an employee of the Design Consultant, but is retained by the Design Consultant or employed or retained by anyone under contract to Design Consultant, to furnish design services required under the Contract Documents.

**1.2.10** *Final Completion* is the date on which all Work is complete in accordance with the Contract Documents, including but not limited to, completion of, or written waiver by Owner of, any items

identified in the punch list prepared under Section 6.6.1 and the submission of all documents set forth in Section 6.7.2.

**1.2.11**   *Force Majeure Events* are those events that delay Substantial Completion of the Work and are beyond the reasonable control of Design-Builder, including the occurrence of any of the following events (which have the effect or are reasonably expected to, prevent or hinder Design-Builder's compliance with its obligations hereunder): war, invasion, riot, terrorist incidents or other civil unrest, floods, adverse weather conditions not reasonably anticipated, labor strikes, labor stoppages or slowdowns, earthquakes, fire or explosion, pandemics, a COVID-19 Event, epidemics, and other acts of God, delays by AEP (to the extent the same are not attributable to acts or omissions of the Design-Builder), governmental laws, orders or restrictions, embargoes or blockades in effect on or after the date of this Agreement, or Owner Delays. In any such event, Design-Builder shall give notice of suspension to Owner as soon as reasonably practicable stating the date and extent of such suspension and the cause thereof, and Design-Builder shall resume the performance of such obligations as soon as reasonably practicable after such Force Majeure Event ceases to delay Substantial Completion of the Work. Design-Builder shall promptly (and in any event within 7 days of first becoming aware of such Force Majeure Event) notify Owner, in writing, of any Force Majeure Events, and the failure to do so precludes Design-Builder from seeking remedy related to such Force Majeure Events.

**1.2.12**   *General Conditions of Contract* refer to this DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition), as from time to time amended, modified or supplemented in writing by Design-Builder and Owner.

**1.2.13** Intentionally omitted.

**1.2.14**   *Hazardous Condition* means (i) the presence of any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or (ii) the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements, in each case under the foregoing clauses (i) and (ii), to the extent in violation of Legal Requirements. The Parties acknowledge the presence of multiple underground pipelines as shown on the Survey (the "Pipelines"), each of which may contain hazardous materials subject to regulation by governmental authorities, including the Texas Rail Road Commission and/or Surface Transportation Board, and which Pipeline are owned and operated by third-parties.

**1.2.15**   *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, protocols, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site (including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601, et seq.), the practices involved in the Project or Site, or any Work, including, for the avoidance of doubt, the Electric Reliability Council of Texas ("**ERCOT**"), the Public Utility Commission of Texas ("**PUCT**"), as well as engineering, design, construction and applicable requirements of AEP under the utility's tariffs and Letter of Agreement, and any required regulatory consents and approvals.

**1.2.16**   *Mechanic's Lien* means a mechanic's or materialman's lien that (i) arises under Chapter 53 of the Texas Property Code and/or the Texas Constitution, as then in effect, and (ii) creates a lien (other than an inchoate lien) against the Site in favor of any Design Professional, Subcontractor or Sub-Subcontractor for which Design-Builder or its Subcontractor are responsible.

**1.2.17**   *Owner Delay* means any delay in the prosecution of the design, development or construction of the Work by Design-Builder that results in a delay of Substantial Completion and is caused by or attributable to any act or omission of Owner, or affiliate of Owner or any of its or their owners, directors, officers, personnel, agents or representatives (each, an "*Owner Party*"), including, but not limited to: (i) delay by Owner in the submission of information or the giving of authorizations or approvals or the performance of any other obligations of Owner under the Contract Documents within the time limits set forth in the Contract Documents, (ii) changes to the

Basis of Design Documents requested by Owner, or (iii) any act, neglect, failure or omission of Owner or any Owner Party that interferes with Design-Builder's completion of the Work in accordance with the Contract Documents. Notwithstanding anything in the Contract Documents to the contrary, Design-Builder shall be entitled to an increase of the Contract Price for the direct costs and expenses Design-Builder can reasonably demonstrate it has incurred as a result of such Owner Delay.

**1.2.18** *Owner Party* has the meaning set forth in the definition of Owner Delay.

**1.2.19** *Owner's Project Criteria* means the Design-Builder's Scope of Work, and other Project-specific technical requirements agreed upon by Design-Builder and Owner in writing.

**1.2.20** *Permitted Encumbrances* means (a) statutory liens for current real estate taxes, assessments, or the like, not yet due or delinquent or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) zoning, entitlement, conservation restriction, and other land use and environmental regulations by governmental authorities which do not materially interfere with the intended use of the Site or Transmission Easement, (c) all covenants, conditions, restrictions, easements, charges, rights-of-way, other encumbrances, and other similar matters of record shown on that certain commitment for an owner's policy of title insurance (Commitment No. 214949341) issued on February 21, 2022, by Security Escrow & Title LLC, as agent for Texan Title Insurance Company, or disclosed by an ALTA survey of the Project Site and Transmission Easement, and (d) that certain road access easement in the approximate location shown on the Survey (it being agreed that the final location of said easement may differ, provided any such difference shall not materially interfere with the intended use of the Site).

**1.2.21** *Site* means the land on which the Project is located, which land is described on Exhibit A to the Agreement and may also be referred to as the "Project Site".

**1.2.22** *Subcontract* means any contract by and between Design-Builder and a Subcontractor relating to the performance of a portion of the Work and shall include contracts for the procurement of materials and supplies.

**1.2.23** *Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

**1.2.24** *Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

**1.2.25** *Substantial Completion* or *Substantially Complete* means the date on which (a) the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Project or a portion thereof for its intended purposes, and (b) energization of the substation has been achieved with commencement of delivery service from AEP pursuant to the relevant AEP service agreement with a minimum firm service capacity value of at least 200 megawatts (MW) but not to exceed the facility design rating of 300 MW. For the avoidance of doubt, the phrase "*use the Project or a portion thereof for its intended purposes*" does not require completion by Owner of the Owner's Scope of Work, which scope of work is expressly not the responsibility of Design-Builder under the Contract Documents.

**1.2.26** *Survey* means that certain ALTA/NSPS survey of the Land by SAM, LLC, dated March 2, 2022.

**1.2.27** *Warranty Period* means the period from and after the date on which Substantial Completion is achieved up to and including (a) in the case of patent defects or non-conforming Work, the first (1st) anniversary of Substantial Completion, and (b) in the case of latent defects or non-conforming

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98D4-AD43256AC489

Work, the fifth (5th) anniversary of Substantial Completion.

**1.2.28** *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents.

**Article 2**

**Design-Builder's Services and Responsibilities**

**2.1 General Services.**

**2.1.1** Design-Builder's Representative shall be reasonably available to Owner and shall have the necessary expertise and experience required to supervise the Work. Design-Builder's Representative shall communicate regularly with Owner and shall be vested with the authority to act on behalf of Design-Builder. Design-Builder's Representative may be replaced only with the mutual agreement of Owner and Design-Builder.

**2.1.2** Design-Builder shall provide Owner with a bi-weekly status report detailing the progress of the Work, including (i) whether the Work is proceeding according to schedule, (ii) whether discrepancies, conflicts, or ambiguities exist in the Contract Documents that require resolution, (iii) whether health and safety issues exist in connection with the Work; (iv) [intentionally omitted]; and (v) other items that require resolution so as not to jeopardize Design-Builder's ability to complete the Work for the Contract Price and within the Contract Time(s).

**2.1.3** Design-Builder shall prepare and submit together with the status report contemplated by Section 2.1.2 hereof, a schedule for the execution of the Work for Owner's review and response. The schedule shall indicate the dates for the start and completion of the various stages of Work, including the dates when Owner information and approvals are required, if any, to enable Design-Builder to achieve the Contract Time(s) stated in Section 5.2 of the Agreement as may be adjusted due to events of Force Majeure. The schedule shall be revised as required by conditions and progress of the Work, but such revisions shall not relieve Design-Builder of its obligations to complete the Work within the Contract Time(s), as such dates may be adjusted in accordance with the Contract Documents. Owner's review of, and response to, the schedule shall not be construed as relieving Design-Builder of its complete and exclusive control over the means, methods, sequences and techniques for executing the Work.

**2.1.4** The parties will meet within seven (7) days after execution of the Agreement to discuss issues affecting the administration of the Work and to implement the necessary procedures, including those relating to submittals and payment, to facilitate the ability of the parties to perform their obligations under the Contract Documents.

**2.2 Design Professional Services.**

**2.2.1** Design-Builder shall, consistent with applicable state licensing laws, provide through qualified, licensed design professionals employed by Design-Builder, or procured from qualified, independent licensed Design Consultants, the necessary design services, including architectural, engineering and other design professional services, for the preparation of the required drawings, specifications and other design submittals to permit Design-Builder to complete the Work consistent with the Contract Documents. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant.

**2.2.2** Design-Builder shall be responsible for providing a design for the construction of the Project which is consistent with the Scope of Work. Design-Builder shall be responsible for any errors in the design related services furnished by Design-Builder under the Agreement, including any portions thereof provided by Design-Builder's Subcontractors. Design-Builder agrees that the

Drawings and Specifications (including any portions thereof provided by Design-Builder's Subcontractors) will be accurate and free from any material errors. Design-Builder shall, at no cost to Owner, correct or revise the Drawings and Specifications in the event of any such errors and, subject to the terms of the Contract Documents, perform any necessary modifications to the Work so that the Work complies with the Contract Documents. Design-Builder shall not be released from any liability by reason of Owner's approval of the Drawings and Specifications (it being agreed that Owner is relying upon Design-Builder's skill and knowledge in preparing the Drawings and Specifications); provided, however, that notwithstanding the foregoing, if Owner requires or requests that Design-Builder to change, amend or modify the Drawings and Specifications (whether by Change Order or otherwise) and the Design-Builder properly advises that such change should not be made, Owner assumes responsibility for any error in, or any adverse result arising from, any such change, amendment or modification.

**2.3    Standard of Care for Design Professional Services.**

**2.3.1**    The standard of care for all design professional services performed to execute the Work shall be that Design-Builder shall perform the Work in a professional manner and the Work shall be performed with the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project.

**2.4    Design Development Services.**

**2.4.1**    Design-Builder and Owner shall, consistent with any applicable provision of the Contract Documents, agree upon any interim design submissions that Owner may wish to review, which interim design submissions may include design criteria, drawings, diagrams and specifications setting forth the Project requirements. Interim design submissions shall be consistent with the Basis of Design Documents, as the Basis of Design Documents may have been changed through the design process set forth in this Section 2.4.1. On or about the time of the scheduled submissions, Design-Builder and Owner shall meet and confer about the submissions, with Design-Builder identifying during such meetings, among other things, the evolution of the design and any changes to the Basis of Design Documents, or, if applicable, previously submitted design submissions. Changes to the Basis of Design Documents, including those that are deemed minor changes under Section 9.3.1, shall be processed in accordance with Article 9. Minutes of the meetings, including a full listing of all changes, will be maintained by Design-Builder and provided to all attendees for review. Following the design review meeting, Owner shall have the opportunity to review and approve the interim design submissions and meeting minutes in a time that is consistent with the turnaround times necessary to achieve Design-Builder's schedule.

**2.4.2**    Design-Builder shall submit to Owner Construction Documents setting forth in detail drawings and specifications describing the requirements for construction of the Work. The Construction Documents shall be consistent with the latest set of interim design submissions, as such submissions may have been modified in a design review meeting and recorded in the meetings minutes. The parties shall have a design review meeting to discuss, and Owner shall have the opportunity to review and approve, the Construction Documents in accordance with the procedures set forth in Section 2.4.1 above. Design-Builder shall proceed with construction in accordance with the engineer's approved Construction Documents and shall submit one set of approved Construction Documents to Owner prior to commencement of construction.

**2.4.3**    Owner's review and approval of interim design submissions, meeting minutes, and the Construction Documents is for the purpose of mutually establishing a conformed set of Contract Documents consistent with the Design-Builder Scope of Work. Neither Owner's review nor approval of any interim design submissions, meeting minutes, and Construction Documents shall be deemed to transfer any design liability from Design-Builder to Owner; provided, however, that notwithstanding the foregoing, if Owner requires or requests that Design-Builder to change, amend or modify the Drawings and Specifications (whether by Change Order or otherwise) and the Design-Builder properly advises that such change should not be made, Owner assumes responsibility for

17

any error in, or any adverse result arising from, any such change, amendment or modification. Design-Builder shall not unreasonably withhold its consent to any comment by Owner (it being agreed that any such comment that is tantamount to a Change Order shall be issued pursuant to Article 9 and not this Section 2.4.

**2.4.4**    To the extent not prohibited by the Contract Documents or Legal Requirements, Design-Builder may prepare interim design submissions and Construction Documents for a portion of the Work to permit construction to proceed on that portion of the Work prior to completion of the Construction Documents for the entire Work.

**2.4.5**    Notwithstanding anything in the Contract Documents to the contrary, in any case in which (i) the approval of Owner is a requirement hereunder and (ii) Design-Builder seeks Owner's approval in writing (which writing shall contain a reasonable degree of specificity in order to allow Owner to make an informed decision regarding the matter then in question or under consideration), (y) the failure of Owner to approve such matter (or, if it does not approve of such matter, to respond in the negative (which response shall include a reasonable basis for such disapproval and describe with reasonable particularity the reasons therefor)) within 5 days which delays Substantial Completion shall constitute an Owner Delay and (z) unless Design-Builder is willfully uncooperative or acting in bad faith, any matter unresolved after 10 days shall be deemed to be an Owner Delay.

**2.5**    **Legal Requirements.**

**2.5.1**    Design-Builder shall perform the Work, or cause the Work of any Subcontractor to be performed, in accordance with all Legal Requirements and shall provide all notices applicable to the Work as required by the Legal Requirements.

**2.5.2**    The Contract Price and/or Contract Time(s) shall be adjusted to compensate Design-Builder for the effects of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work. Such effects may include, without limitation, revisions Design-Builder is required to make to the Construction Documents because of changes in Legal Requirements, to the extent those changes affect the Work.

**2.6**    **Government Approvals and Permits.**

**2.6.1**    Except as identified in an Owner's Permit List attached as an exhibit to the Agreement, Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees required for the prosecution of the Work by any government or quasi-government entity having jurisdiction over the Project.

**2.6.2**    Owner shall provide reasonable assistance to Design-Builder in obtaining any permits, approvals and licenses relating to Design-Builder's Scope of Work.

**2.7**    **Design-Builder's Construction Phase Services.**

**2.7.1**    Unless otherwise provided in the Contract Documents to be the responsibility of Owner or a separate contractor, Design-Builder shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit Design-Builder to complete construction of the Work consistent with the Contract Documents.

**2.7.2**    Design-Builder shall perform, or cause to be performed, all engineering design and construction activities efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents. Design-Builder shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction.

**2.7.3**    Design-Builder shall employ only Subcontractors who are qualified and, if applicable, duly licensed to perform the Work consistent with the Contract Documents.

**2.7.4**    As between Owner and Design-Builder, Design-Builder is and shall be responsible for the proper performance of the Work of Subcontractors. As between Design-Builder and any Subcontractor, liability for any acts or omissions of any such Subcontractor shall lie with such Subcontractor, and shall not affect the rights of Owner against Design-Builder. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Subcontractor or Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

**2.7.5**    Design-Builder shall coordinate the activities of all Subcontractors. If Owner performs other work on or at the Site with separate contractors under Owner's control, Design-Builder agrees to reasonably cooperate and coordinate its activities with those of such separate contractors so that the Work can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.7.6**    Design-Builder shall keep the Site reasonably free from debris, trash and construction wastes to permit Design-Builder to perform its construction services efficiently, safely and without interfering with the use of adjacent land areas. Upon Substantial Completion of the Work, or a portion of the Work, Design-Builder shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

**2.7.7**    Design-Builder shall employ (or cause one of its Subcontractors to employ) an on-site superintendent during the performance of physical Work at the Site. If Owner reasonably finds the work of such superintendent to be unsatisfactory, Owner shall have the right to require Design-Builder to promptly terminate and replace such superintendent with someone reasonably satisfactory to Owner.

**2.8**    **Design-Builder's Responsibility for Project Safety.**

**2.8.1**    Design-Builder recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Design-Builder assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work. Design-Builder shall, prior to commencing construction, designate a Safety Representative with the necessary qualifications and experience to supervise the implementation and monitoring of all safety precautions and programs related to the Work. Design-Builder's Safety Representative shall be an individual stationed at the Site who may have responsibilities on the Project in addition to safety. The Safety Representative shall make periodic inspections of the Site and shall hold bi-weekly safety meetings with Design-Builder's personnel, Subcontractors and others as applicable.

**2.8.2**    Design-Builder and Subcontractors shall comply with all Legal Requirements relating to construction safety on or in conjunction with the Site, as well as any specific safety requirements set forth in the Contract Documents, provided that such contract-specific requirements do not violate any applicable Legal Requirement. Design-Builder will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Owner, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.8.3**    Design-Builder's responsibility for safety under this Section 2.8 is not intended in any way to relieve Subcontractors and Sub-Subcontractors of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injuries, losses, damages or accidents resulting from

their performance of the Work.

**2.8.4**   Design-Builder agrees to coordinate and reasonably cooperate with Owner regarding health and safety matters at the Site, including the Owner's Area.

**2.8A**   **Owner's Responsibility for Safety.**

**2.8A.1**   Owner recognizes the importance of performing the Owner's Scope of Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site (including the Owner's Area), whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Owner assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Owner's Scope of Work. Owner shall, prior to commencing construction, designate a Safety Representative with the necessary qualifications and experience to supervise the implementation and monitoring of all safety precautions and programs related to the Work. Owner's Safety Representative shall be an individual stationed at the Owner's Area who may have responsibilities in addition to safety. Owner's Safety Representative shall make periodic inspections of the Owner's Area and shall hold bi-weekly safety meetings with Design-Builder's personnel, Subcontractors and others as applicable.

**2.8A.2**   Owner and its separate contractors shall comply with all Legal Requirements relating to construction safety on or in conjunction with the Owner's Area. Owner will immediately report in writing any safety-related injury, loss, damage or accident arising from the performance of the Owner's Scope of Work to Design-Builder and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving such work.

**2.8A.3**   Owner's responsibility for safety under this Section 2.8A is not intended in any way to relieve its separate contractors (and their subcontractors) of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injuries, losses, damages or accidents resulting from their performance of the Owner's Scope of Work.

**2.8A.4**   Owner agrees to coordinate and reasonably cooperate with Design-Builder regarding health and safety matters at the Site, including the Owner's Area.

**2.9**   **Design-Builder's Warranty.**

**2.9.1**   During the Warranty Period, except for any Warranty Exclusion Condition (as defined below), Design-Builder warrants to Owner that the construction, including all materials and equipment furnished as part of the construction, shall be new and of good quality, in conformance with the Contract Documents, free of defects in materials and workmanship, and completed in a good and workmanlike manner, in accordance with Legal Requirements (ordinary wear and tear, and de minimis deviations excepted) (such standard of performance, the "Warranty Standard").

"Warranty Exclusion Condition" means any defects or non-conformance caused by abuse, alterations, or failure to maintain the Work in a commercially reasonable manner, and Owner acknowledges and agrees that any modifications, extensions, attachments to, completion of or repair by Owner or Owner's agents or contractors shall void Design-Builder's warranty and may void any manufacturers' warranties. Neither (y) Owner's routine maintenance, nor (z) repairs (whether or not performed in the event of an emergency), shall void the warranties in Section 2.9, provided any such maintenance or repairs are performed by Owner in accordance with any applicable manufacturer's protocols and in a manner consistent with standard industry practices.

Design-Builder only makes the warranties expressly set forth in this Section 2.9.1, and hereby expressly disclaims any and all other warranties, express or implied. Owner expressly agrees not

to make, and hereby waives, any claims on account of breach of warranty other than to the extent the warranty is provided for under this Agreement, whether or not foreseeable and whether or not anticipated, and agrees that the sole rights and remedies for any breach of warranties expressly set forth in this Agreement shall be (y) for Design-Builder to correct the non-conforming work so it meets the Warranty Standard or (z) if after three attempts undertaken diligently or three opportunities to undertake Design-Builder has failed to correct any particular non-conforming Work within the Warranty Period, provide Owner with financial compensation for the cost to repair the non-conforming work or defect.

Design-Builder shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

**2.9.2**    Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner with greater warranty rights than set forth in this Section 2.9 or the Contract Documents. Design-Builder will provide Owner with all manufacturers' warranties upon Substantial Completion (to the extent the same are assignable).

**2.10    Correction of Nonconforming Work.**

**2.10.1**    Design-Builder agrees to correct any Work that is found to not be in conformance with the Warranty Standard during the Warranty Period.

**2.10.2**    Provided any such written notice is delivered to Design-Builder within the Warranty Period, Design-Builder shall, within ten (10) days of receipt of written notice from Owner that the Work is not in conformance with the Warranty Standard, take meaningful steps to commence correction of such nonconforming Work, including the evaluation, assessment, correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work affected by the nonconforming Work. If Design-Builder fails to commence meaningful steps within such ten (10) day period, Owner, in addition to any other remedies provided under the Contract Documents, may provide Design-Builder with written notice that Owner will commence correction of such nonconforming Work with its own forces. If Owner does perform such corrective Work in the absence of Design-Builder timely commencing meaningful steps, Design-Builder shall be responsible for all reasonable costs incurred by Owner in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the ten (10) day period identified herein shall be deemed inapplicable.

**2.10.3**    The one-year period referenced in Section 2.10.1 above applies only to Design-Builder's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Owner may have regarding Design-Builder's other obligations under the Contract Documents.

<u>Article 3</u>

**Owner's Services and Responsibilities**

**3.1    Duty to Cooperate.**

**3.1.1**    Owner shall, throughout the performance of the Work, cooperate with Design-Builder and perform its responsibilities, obligations and services in a timely manner to facilitate Design-Builder's timely and efficient performance of the Work and so as not to delay or interfere with Design-Builder's performance of its obligations under the Contract Documents.

**3.1.2**    Owner shall provide timely reviews and approval of interim design submissions and Construction Documents consistent with the turnaround times necessary to maintain Design-Builder's schedule.

**3.1.3**    Owner shall give Design-Builder timely notice of any Work that Owner notices to be defective or not in compliance with the Contract Documents.

**3.2**    Intentionally omitted.

**3.3**    **Financial Information.**

**3.3.1**    On or prior to the Effective Date, Owner has provided written confirmation from one or more banks or other financing institutions ("Financing Source") to the satisfaction of the Design-Builder that, subject to the execution of the Agreement, funds will be available to satisfy Owner's obligations under the Agreement.

**3.3.2**    Within ten (10) business days after Design-Builder provides Owner with Letter of Agreement for execution, Owner will execute and provide security as required in the Letter of Agreement. Design-Builder shall fund the CIAC payments as required.

**3.3.3**    If Owner fails to maintain such financial security, Design-Builder may stop Work under Section 11.3 hereof or exercise any other right permitted under the Contract Documents.

**3.3.4**    Design-Builder shall cooperate with the reasonable requirements of Owner's Financing Source. Notwithstanding the preceding sentence, after execution of the Agreement Design-Builder shall have no obligation to execute for Owner or Owner's lenders or other financial sources any documents or agreements that require Design-Builder to assume obligations or responsibilities greater than those existing obligations Design-Builder has under the Contract Documents.

**3.4**    **Owner's Representative.**

**3.4.1**    Owner's Representative shall be responsible for providing Owner-supplied information and approvals in a timely manner to permit Design-Builder to fulfill its obligations under the Contract Documents. Owner's Representative shall also provide Design-Builder with reasonably prompt notice if it observes any failure on the part of Design-Builder to fulfill its contractual obligations, including any errors, omissions or defects in the performance of the Work. Owner's Representative shall communicate regularly with Design-Builder and shall be vested with the authority to act on behalf of Owner.

**3.5**    **Government Approvals and Permits.**

**3.5.1**    Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees set forth in the Permit List attached as an exhibit to the Agreement, if any.

**3.5.2**    Each Party shall provide reasonable assistance to the other Party in obtaining those permits, approvals and licenses.

**3.6**    **Owner's Separate Contractors.**

**3.6.1**    Owner is responsible for all work (other than Design-Builder's Scope of Work) performed at the Site (including the Owner's Area), using separate Contractors. Design-Builder shall not have responsibility for any work other than Design-Builder's Scope of Work.

**3.6.2**    Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to unreasonably interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

**Article 4**

**Hazardous Conditions and Differing Site Conditions**

4.1     **Hazardous Conditions.**

**4.1.1**     Design-Builder shall be responsible for any and all Hazardous Conditions created or placed thereon by Design-Builder, its subcontractors, representatives or agents (each, a "**Design-Builder Caused Hazardous Condition**"). Owner shall be responsible for any and all Hazardous Conditions created or placed thereon by Owner, its contractors, representatives or agents (each, an "**Owner Hazardous Condition**"). The allocation of responsibility for Hazardous Conditions under this Section 4.1.1 shall not limit any rights that either Owner or Design-Builder may have against third-parties under applicable law.

**EACH OF DESIGN-BUILDER AND OWNER EXPRESSLY RECOGNIZES THOSE HAZARDOUS UNDERGROUND PIPELINES AS INDICATED ON THE SURVEY AND IS REQUIRED BY STATE LAW TO CONDUCT UNDERGROUND UTILITY LOCATE BEFORE ANY SOIL DISTURBANCE BY OWNER OR BY OWNER'S SEPARATE CONTRACTORS, REGARDLESS IF INDICATED ON THE SURVEY OR NOT.** Upon encountering any Hazardous Conditions, all persons will stop work immediately in the affected area and duly notify each of Design-Builder and Owner and, if required by Legal Requirements, all government or quasi-government entities with jurisdiction over the Project or Site.

**4.1.2     Owner Hazardous Conditions.**

**4.1.2.1**     Upon discovering or receiving notice of an Owner Hazardous Condition, Owner shall take the necessary measures required to ensure that such Owner Hazardous Condition is remediated or rendered harmless. Such necessary measures shall include Owner retaining qualified independent experts to (i) ascertain whether Owner Hazardous Condition has actually been encountered, (ii) if it has been encountered, prescribe the remedial measures that Owner must take either to remove such Owner Hazardous Condition or render such Owner Hazardous Condition harmless, and (iii) perform the remedial measures that Owner must take either to remove such Owner Hazardous Condition or render such Owner Hazardous Condition harmless.

**4.1.2.2**     Design-Builder shall be obligated to resume Work at the affected area of the Project only after Owner's expert provides it with written certification that (i) such Owner Hazardous Condition has been removed or rendered harmless and (ii) all necessary approvals have been obtained from all government and quasi-government entities having jurisdiction over the Project or Site.

**4.1.2.3**     Design-Builder will be entitled, in accordance with these General Conditions of Contract, to an adjustment in its Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by any such Owner Hazardous Conditions (and such delay shall be considered an Excused Delay under Section 8.2 of the General Conditions of Contract).

**4.1.2.4**     To the fullest extent permitted by law, Owner shall indemnify, defend and hold harmless Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them, and their officers, directors, employees and agents, from and against any and all claims, losses, damages, liabilities and expenses, including attorneys' fees and expenses, arising out of

or resulting from the presence, removal or remediation of any such Owner Hazardous Conditions at the Site.

### 4.1.3 Design-Builder Caused Hazardous Condition.

**4.1.3.1**    Upon discovering or receiving notice of a Design-Builder Caused Hazardous Condition, Design-Builder shall take the necessary measures required to ensure that such Design-Builder Caused Hazardous Condition is remediated or rendered harmless. Such necessary measures shall include Design-Builder retaining qualified independent experts to (i) ascertain whether such Design-Builder Caused Hazardous Condition has actually been encountered, (ii) if it has been encountered, prescribe the remedial measures that Design-Builder must take either to remove such Design-Builder Caused Hazardous Condition or render such Design-Builder Caused Hazardous Condition harmless, and (iii) perform the remedial measures that Design-Builder must take either to remove such Design-Builder Caused Hazardous Condition or render such Design-Builder Caused Hazardous Condition harmless.

**4.1.3.2**    To the fullest extent permitted by law, Design-Builder shall indemnify, defend and hold harmless Owner and Owner's officers, directors, employees and agents from and against all claims, losses, damages, liabilities and expenses, including attorneys' fees and expenses, arising out of or resulting from from the presence, removal or remediation of any such Design-Builder Caused Hazardous Conditions at the Site.

## 4.2    Differing Site Conditions.

**4.2.1**    Concealed or latent physical conditions or subsurface conditions at the Site that (i) materially differ from the conditions indicated in the Contract Documents or (ii) are of an unusual nature, differing materially from the conditions ordinarily encountered and generally recognized as inherent in the Work are collectively referred to herein as "Differing Site Conditions." If Design-Builder encounters a Differing Site Condition, Design-Builder will be entitled, if appropriate, to an adjustment in the Contract Price and/or (provided such Differing Site Condition delays Substantial Completion) Contract Time(s) to the extent Design-Builder's cost and/or time of performance are adversely impacted by the Differing Site Condition.

**4.2.2**    Upon encountering a Differing Site Condition, Design-Builder shall provide prompt written notice to Owner of such condition, which notice shall not be later than fourteen (14) days after such condition has been encountered. Design-Builder shall, to the extent reasonably possible, provide such notice before the Differing Site Condition has been substantially disturbed or altered.

<u>**Article 5**</u>

**Insurance and Bonds**

## 5.1    Design-Builder's Insurance Requirements.

**5.1.1**    Design-Builder is responsible for procuring and maintaining the insurance for the Work in the coverages and amounts all as set forth on Exhibit G (Insurance Requirements) to the Agreement. Coverage shall be secured from insurance companies authorized to do business in the state in which the Project is located, and with a minimum rating set forth in the Agreement.

**5.1.2**    Design-Builder's insurance shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Work.

**5.1.3**    Prior to commencing any construction services hereunder, Design-Builder shall provide Owner with ACORD certificates and insurance policies (if requested in writing) evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Owner. If any of the foregoing insurance coverages are required to remain in force after final payment are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Design-Builder with reasonable promptness according to the Design-Builder's information and belief.

**5.2**    **Owner's Liability Insurance.**

**5.2.1**    Owner is responsible for procuring and maintaining the insurance for the Owner's Scope of Work in the coverages and amounts all as set forth on Exhibit I (Insurance Requirements) to the Agreement. Coverage shall be secured from insurance companies authorized to do business in the state in which the Project is located, and with a minimum rating set forth in the Agreement.

**5.2.2**    Owner's insurance shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Owner's Scope of Work.

**5.2.3**    Prior to commencing any of Owner's Scope of Work, Owner shall provide Design-Builder with ACORD certificates and insurance policies (if requested in writing) evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Design-Builder. If any of the foregoing insurance coverages are required to remain in force after final payment are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Owner with reasonable promptness according to the Owner's information and belief.

**5.3**    **Owner's Property Insurance.**

**5.3.1**    Owner shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located property insurance upon the entire Project to not less than the full insurable value of the Work, including professional fees, overtime premiums and all other expenses incurred to replace or repair the insured property comprising the Work. The property insurance obtained by Owner shall include as additional insureds the interests of Owner, Design-Builder, Design Consultants and Subcontractors of any tier. Such insurance shall include but not be limited to the perils of fire and extended coverage, theft, vandalism, malicious mischief, collapse, flood, earthquake, debris removal and other perils or causes of loss as called for in the Contract Documents. The property insurance shall include physical loss or damage to the Work, including materials and equipment in transit, at the Site or at another location as may be indicated in Design-Builder's Application for Payment and approved by Owner. The Owner is responsible for the payment of any deductibles under the insurance required by this Section 5.3.1.

**5.3.2**    Intentionally omitted.

**5.3.3**    Prior to Design-Builder commencing any Work, Owner shall provide Design-Builder with certificates evidencing that (i) all Owner's insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect until Design-Builder has completed all of the Work and has received final payment from Owner and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Design-Builder. Owner's property insurance shall not lapse or be canceled if Owner occupies a portion of the Work pursuant to Section 6.6.3 hereof. Owner shall provide Design-

Builder with the necessary endorsements from the insurance company prior to occupying a portion of the Work.

**5.3.4**  Any loss covered under Owner's property insurance shall be adjusted with Owner and Design-Builder and made payable to both of them as trustees for the insureds as their interests may appear, subject to any applicable mortgage clause. All insurance proceeds received as a result of any loss will be placed in a separate account and distributed in accordance with such agreement as the interested parties may reach. Any disagreement concerning the distribution of any proceeds will be resolved in accordance with Article 10 hereof.

**5.3.5**  Owner and Design-Builder waive against each other and Owner's separate contractors, Design Consultants, Subcontractors, agents and employees of each and all of them, all damages covered by property insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Owner shall, where appropriate, require similar waivers of subrogation from Owner's separate contractors, Design Consultants and Subcontractors and shall require each of them to include similar waivers in their contracts. These waivers of subrogation shall not contain any restriction or limitation that will impair the full and complete extent of its applicability to any person or entity unless agreed to in writing prior to the execution of this Agreement.

**5.4**    **Risk of Loss**

**5.4.1**    Until the earlier of Substantial Completion or termination of the Agreement, Design-Builder shall bear the risk of physical loss or damage to the Work and all equipment and Work incorporated or to be incorporated into the Work, and prior to the transfer of title to Owner as contemplated herein, Design-Builder shall bear the risk of title to the Work and all equipment and Work incorporated or to be incorporated into the Work. Transfer of title to the Work shall not affect the allocation of risk of loss or otherwise relieve Design-Builder of its obligations with respect to the Work. Upon the termination of the Agreement or after Substantial Completion pursuant to paragraph 6.6 of the General Conditions, Owner shall bear the risk of physical loss and damage to the Work.

**Article 6**

**Payment**

**6.1**    **Intentionally omitted.**

**6.2**    **Installment Payments.**

**6.2.1**    On achieving each Payment Milestone, Design-Builder shall submit for Owner's review and approval its Application for Payment requesting payment of the applicable Installment Payment Amount per Exhibit F. The Application for Payment shall be accompanied by all supporting documentation required by the Contract Documents and/or established at the meeting required by Section 2.1.4 hereof.

**6.2.2**    **Intentionally omitted**.

**6.2.3**    All discounts offered by Subcontractor, Sub-Subcontractors and suppliers to Design-Builder for early payment shall accrue one hundred percent to Design-Builder.

**6.2.4**    The Application for Payment shall constitute Design-Builder's representation that the applicable Payment Milestone has been achieved consistent with the Contract Documents, and that title to all Work will pass to Owner free and clear of all claims, liens, encumbrances, and

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98D4-ADA3256AC489

security interests upon the incorporation of the Work into the Project, or upon Design-Builder's receipt of payment, whichever occurs earlier.

**6.2.5**    Each Application for Payment shall be certified by an officer of Design-Builder that such application it is true and complete. Design-Builder shall include with each Application for Payment copies of conditional lien waivers contemplating receipt of payment by Design-Builder, all Subcontractors, and (to the extent any such sub-subcontractor's or supplier's work exceeds $100,000 in value) each sub-subcontractor and supplier of goods or materials to the Project.

**6.3**     **Withholding of Payments.**

**6.3.1**    On or before the date established in the Agreement, Owner shall pay Design-Builder all amounts properly due. If Owner reasonably believes that Design-Builder is not entitled to all or part of an Application for Payment as a result of Design-Builder's failure to achieve the applicable Payment Milestone, it will notify Design-Builder in writing at least three (3) days prior to the date payment is due. The notice shall indicate the specific amounts at issue, the reasons therefor, and the specific measures Owner believes in good faith that Design-Builder must take to rectify Owner's concerns. Design-Builder and Owner will attempt to resolve Owner's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Design-Builder may pursue its rights under the Contract Documents, including those under Article 10 hereof.

**6.3.2**    Unless any such conditions are waived, in writing, by Owner, Owner shall not be obligated to make an Installment Payment to Design-Builder if:

> **6.3.2.1**    Design-Builder is then in material default of any of its obligations hereunder or under any other Contract Document, following notice thereof by Owner to Design-Builder and the expiration of any applicable cure period; or

> **6.3.2.2**    Owner has received written notice that a Mechanic's Lien exists and remains uncured and/or Owner has received a Texas Property Code funds trapping notice and is required to withhold payment as a result thereof.

**6.3.3**    Notwithstanding anything to the contrary in the Contract Documents, Owner shall pay Design-Builder all undisputed amounts in an Application for Payment within the times required by the Agreement.

**6.4**     **Right to Stop Work and Interest.**

**6.4.1**    If Owner fails to pay timely Design-Builder any amount that becomes due and payable to Design-Builder in accordance with the terms of this Contract, Design-Builder, in addition to all other remedies provided in the Contract Documents, may stop Work pursuant to Section 11.3 hereof. All payments due and unpaid shall bear interest at the rate set forth in the Agreement.

**6.5**     **Design-Builder's Payment Obligations.**

**6.5.1**    Design-Builder will pay Design Consultants and Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Design-Builder has received from Owner on account of their work. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 7.3 hereof and in accordance with the procedures required under state law.

**6.6     Substantial Completion.**

**6.6.1**     Design-Builder shall notify Owner when it believes the Work is Substantially Complete. Within three (3) Business Day of Owner's receipt of Design-Builder's notice, Owner and Design-Builder will jointly inspect such Work to verify that it is Substantially Complete in accordance with the requirements of the Contract Documents. If such Work is Substantially Complete, Owner and Design-Builder will jointly shall prepare a Certificate of Substantial Completion that will set forth (i) the date of Substantial Completion of the Work, (ii) the remaining items of Work that have to be completed before final payment (the "Punch List Items"), (iii) [intentionally omitted], and (iv) an acknowledgment that warranties commence to run on the date of Substantial Completion, except as may otherwise be noted in the Certificate of Substantial Completion.

**6.6.2**     [Intentionally omitted].

**6.6.3**     Owner, at its option, may use a portion of the Work which has been determined to be Substantially Complete, provided, however, that (i) a Certificate of Substantial Completion has been issued for the portion of Work addressing the items set forth in Section 6.6.1 above, (ii) Design-Builder and Owner have obtained the consent of their sureties and insurers, and to the extent applicable, the appropriate government authorities having jurisdiction over the Project, and (iii) Owner and Design-Builder agree that Owner's use or occupancy will not interfere with Design-Builder's completion of the remaining Work.

**6.6.4**     Upon Substantial Completion and agreement by the Parties on the Punch List Items, Owner shall grant Design-Builder unrestricted access to the Site (including de-energization of the substation to the extent reasonably necessary for safe work practices) for a period of thirty (30) days so that Design-Builder may complete such Punch List Items; provided, however, that, at Owner's option, Owner may elect to deny Design-Builder such access, in which event, the Parties shall agree to a reasonable amount of consideration to be paid by Design-Builder to Owner (or netted against the Final Completion Payment) in satisfaction of Design-Builder's then remaining obligation to complete such Punch List Items (whereupon Design-Builder shall be released from any further obligation to complete the Punch List Items and such items will be the sole responsibility of Owner).

**6.7     Final Payment.**

**6.7.1**     After receipt of a final Application for Payment from Design-Builder, Owner shall make final payment by the time required in the Agreement, provided that Design-Builder has achieved Final Completion.

**6.7.2**     At the time of submission of its final Application for Payment, Design-Builder shall provide the following information:

**6.7.2.1**  An affidavit that there are no claims, obligations or liens outstanding or unsatisfied for labor, services, material, equipment, taxes or other items performed, furnished or incurred for or in connection with the Work which will in any way affect Owner's interests including conditional (subject to payment only) lien release and waiver as prescribed by state law;

**6.7.2.2**  A general release executed by Design-Builder waiving, upon receipt of final payment by Design-Builder, all claims hereunder, except those claims previously made in writing to Owner and remaining unsettled at the time of final payment;

**6.7.2.3**  [Intentionally omitted]; and

**6.7.2.4**  All operating manuals, warranties and other deliverables required by the Contract

Documents.

**6.7.3**    Intentionally omitted.

**6.7.4**    Work not in conformity with the Warranty Standard discovered after Substantial Completion and within the Warranty Period, whether or not such deficiencies would have been included on the Punch List if discovered earlier, shall be deemed warranty Work. Such deficiencies shall be corrected by Design-Builder under Sections 2.9 and 2.10 herein, and shall not be a reason to withhold final payment from Design-Builder.

<u>**Article 7**</u>

**Indemnification**

**7.1**    **Patent and Copyright Infringement.**

**7.1.1**    Design-Builder shall defend and indemnify any third-party action or proceeding brought against Owner and any resulting costs, damages, or judgment based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Owner shall give prompt written notice to Design-Builder of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Design-Builder shall indemnify and hold harmless Owner from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding. Design-Builder agrees to keep Owner informed of all developments in the defense of such actions.

**7.1.2**    If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Design-Builder shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Design-Builder cannot so procure such right within a reasonable time, Design-Builder shall promptly, at Design-Builder's option and at Design-Builder's expense, (i) modify the Work so as to avoid infringement of any such patent or copyright or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**7.1.3**    Sections 7.1.1 and 7.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i) relating solely to a particular process or product of a particular manufacturer specified by Owner and not offered or recommended by Design-Builder to Owner or (ii) arising from modifications to the Work by Owner or its agents after acceptance of the Work. If the suit, claim or proceeding is based upon events set forth in the preceding sentence, Owner shall defend, indemnify and hold harmless Design-Builder to the same extent Design-Builder is obligated to defend, indemnify and hold harmless Owner in Section 7.1.1 above.

**7.1.4**    The obligations set forth in this Section 7.1 shall constitute the sole agreement between the parties relating to liability for infringement of violation of any patent or copyright.

**7.2**    **Tax Claim Indemnification.**

**7.2.1**    If, in accordance with Owner's direction, an exemption from taxes is claimed for all or part of the Work, Owner shall indemnify, defend and hold harmless Design-Builder from and against any liability, penalty, interest, fine, tax assessment, attorneys' fees or other expenses or costs incurred by Design-Builder as a result of any action taken by Design-Builder in accordance with Owner's directive. Owner shall furnish Design-Builder with any applicable tax exemption certificates necessary to obtain such exemption, upon which Design-Builder may rely.

**7.3**     **Payment Claim Indemnification.**

    **7.3.1**     Provided that Owner is not in breach of its contractual obligation to make payments to Design-Builder for the Work, Design-Builder shall indemnify, defend and hold harmless Owner from any claims or mechanic's liens brought against Owner or against the Project as a result of the failure of Design-Builder, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work. Within twenty (20) days of receiving written notice from Owner that such a claim or mechanic's lien has been filed, Design-Builder shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond. If Design-Builder fails to do so, Owner will have the right to discharge the claim or lien and hold Design-Builder liable for costs and expenses incurred, including attorneys' fees.

**7.4**     **Design-Builder's General Indemnification.**

    **7.4.1**     To the fullest extent permitted by law, Design-Builder shall indemnify, defend and hold harmless the Owner and its officers, directors, shareholders, employees, consultants and agents (collectively the "Owner Indemnitees") from and against claims, liabilities, damages, losses, liens, causes of action, suits, judgments, and expenses (including, but not limited to, attorneys' fees) (collectively the "Claims"), asserted by an unaffiliated third-party arising out of, caused by, or resulting from (1) any violation of Legal Requirements in the performance of the Work by Design-Builder or any Subcontractor, or (2) any act or omission of Design-Builder, any Subcontractor or any Sub-subcontractor that results in damage to such third-party claimant's property, or death or injury to such third-party claimant; provided, however, that Design-Builder shall have no liability hereunder in respect of any such Claims to the extent such Claims arose out of, were caused by, or resulted from the acts or omissions of any Owner Indemnitee. Owner Indemnitee shall promptly advise Design-Builder in writing of any action, administrative or legal proceeding or investigation as to which this indemnification may apply, and Design-Builder, at Design-Builder's expense, shall assume on behalf of Owner (and the other Owner Indemnitees) and conduct with due diligence and in good faith the defense thereof with counsel reasonably satisfactory to Owner.

**7.5**     **Owner's General Indemnification.**

    **7.5.1**     To the fullest extent permitted by law, Owner shall indemnify, defend and hold harmless Design-Builder and its respective officers, directors, shareholders, employees, consultants and agents (collectively the "Design-Builder Indemnitees") from and against any Claims asserted by an unaffiliated third-party arising out of, caused by, or resulting from (1) any violation of Legal Requirements in the performance of the Owner's Scope of Work by Owner or any of Owner's separate contractors or subcontractors, or (2) any act or omission of Owner or any of its separate contractors or subcontractors that results in damage to such third-party claimant's property, or death or injury to such third-party claimant; provided, however, that Owner shall have no liability hereunder in respect of any such Claims to the extent such Claims arose out of, were caused by, or resulted from the acts or omissions of a Design-Builder Indemnitee. The relevant Design-Builder Indemnitees shall promptly advise Owner in writing of any action, administrative or legal proceeding or investigation as to which this indemnification may apply, and Owner, at Owner's expense, shall assume on behalf of such relevant Design-Builder Indemnitees and conduct with diligence and in good faith the defense thereof with counsel satisfactory to such relevant Design-Builder Indemnitees.

<u>**Article 8**</u>

**Time**

**8.1**     **Obligation to Achieve the Contract Times.**

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98B4-AD43256AC489

**8.1.1** Design-Builder agrees that it will commence performance of the Work and achieve the Contract Time(s) in accordance with Article 5 of the Agreement.

**8.2** **Delays to the Work.**

**8.2.1** If Design-Builder is delayed in the performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of its own or those for whom Design-Builder is responsible ("Excused Delay") and the Excused Delay delays Substantial Completion of the Work, the Contract Time(s) for performance shall be reasonably extended by Change Order. Subject to the terms of this Agreement, examples of Excused Delays that delay Substantial Completion include acts or omissions of Owner or anyone under Owner's control (including separate contractors), changes in the Work, Differing Site Conditions, Hazardous Conditions, and Force Majeure Events.

**8.2.2** In addition to Design-Builder's right to a time extension for those events set forth in Section 8.2.1 above, Design-Builder shall also be entitled to an appropriate adjustment of the Contract Price.

**8.2.3** An extension of time and an increase of the Contract Price, together with Design-Builder overhead and profit, shall be the sole remedy of Design-Builder for any delay on the Project. The Owner's reasonable, good faith exercise of any of its rights or remedies under the Contract Documents shall not necessarily constitute interference with the Design-Builder's performance of the Work, but (for the avoidance of doubt) may constitute an Owner Delay in respect of which Design-Builder may be entitled to an extension of time or an increase of the Contract Price. Notwithstanding anything herein to the contrary, the reasonable exercise of any of its rights or remedies under the Contract Documents by Design-Builder as a result of a breach of the Contract Documents by Owner shall, to the extent the same delays (or can reasonably be expected to delay) Substantial Completion, toll the period of time within which Design-Builder must achieve Substantial Completion in order to avoid liquidated damages or be entitled to incentive compensation.

## Article 9

### Changes to the Contract Price and Time

**9.1** **Change Orders.**

**9.1.1** A Change Order is a written instrument issued as a result of a change in the Work caused by a request from Owner after execution of the Agreement signed by Owner and Design-Builder, stating their agreement upon all of the following:

**9.1.1.1** The scope of the change in the Work;

**9.1.1.2** The amount of the adjustment to the Contract Price; and

**9.1.1.3** The extent of the adjustment to the Contract Time(s).

**9.1.2** All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents. Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes. Design-Builder shall have no obligation under this Agreement to accept any Change Order.

**9.1.3** If Owner requests a proposal for a change in the Work from Design-Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse

Design-Builder for reasonable costs incurred for estimating services, design services and services involved in the preparation of proposed revisions to the Contract Documents.

**9.2      Work Change Directives.**

**9.2.1**    A Work Change Directive is a written order prepared and signed by Owner directing a change in the Work prior to agreement on an adjustment in the Contract Price and/or the Contract Time(s).

**9.2.2**    Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for the Work Change Directive. Upon reaching an agreement, the parties shall prepare and execute an appropriate Change Order reflecting the terms of the agreement. Design-Builder shall have no obligation under this Agreement to accept any Work Change Directive.

**9.3      Minor Changes in the Work.**

**9.3.1**    Design-Builder may make Minor Changes in the Work consistent with the intent of the Contract Documents, provided, however, that Design-Builder shall promptly inform Owner, in writing, of any such changes and record such changes on the documents maintained by Design-Builder. A "Minor Change" in the Work is a change that does not involve an adjustment in the Contract Price and/or Contract Time(s) and does not materially and adversely affect the Work, including the design, quality, performance and workmanship required by the Contract Documents.

**9.4      Contract Price Adjustments.**

**9.4.1**    The increase or decrease in Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

**9.4.1.1**  Unit prices set forth in the Agreement or as subsequently agreed to between the parties;

**9.4.1.2**  A mutually accepted lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Owner;

**9.4.1.3**  Costs, fees and any other markups set forth in the Agreement; or

**9.4.1.4**  If an increase or decrease cannot be agreed to as set forth in items 9.4.1.1 through 9.4.1.3 above and Owner issues a Work Change Directive, the cost of the change of the Work shall be determined by the reasonable expense and savings in the performance of the Work resulting from the change, including a reasonable overhead and profit, as may be set forth in the Agreement.

In the case of any increase in Contract Price resulting from a change in the Work or otherwise, without duplication of the effect of any other provision of this Agreement, it is agreed that Design-Builder shall receive a Fee of fifteen percent (15.0%) of such increase in Contract Price resulting from such change in the Work (which fee shall be inclusive of Design-Builder's overhead and profit thereon).

**9.4.2**    If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Owner or Design-Builder because of differences in the character or quantity of such unit items as originally contemplated, such unit prices shall be equitably adjusted.

**9.4.3**    If Owner and Design-Builder disagree upon whether Design-Builder is entitled to be paid for any services required by Owner, or if there are any other disagreements over the scope of Work or proposed changes to the Work, Owner and Design-Builder shall resolve the disagreement pursuant to Article 10 hereof. As part of the negotiation process, Design-Builder shall furnish Owner with a good faith estimate of the costs to perform the disputed services in accordance with Owner's interpretations. If the parties are unable to agree and Owner requires Design-Builder to perform a Change Order requested by Owner notwithstanding Design-Builder's objection thereto, Design-Builder shall proceed to perform such Change Order, conditioned upon Owner issuing a written notice to Design-Builder (i) requesting Design-Builder to proceed and (ii) specifying Owner's interpretation of the work to be performed under such Change Order. If this occurs, Design-Builder shall be entitled to submit in its Applications for Payment an amount equal to eighty-five percent (85%) of its reasonable estimated cost to perform the services, and Owner agrees to pay such amounts, with the express understanding that (i) such payment by Owner does not prejudice Owner's right to argue that it has no responsibility to pay for such services and obtain reimbursement of improperly paid amounts, and (ii) receipt of such payment by Design-Builder does not prejudice Design-Builder's right to seek full payment of the disputed services if Owner's order is deemed to be a change to the Work.

**9.5**    **Emergencies.**

**9.5.1**    In any emergency affecting the safety of persons and/or property at the Site, Design-Builder may act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract Price and/or Contract Time(s) on account of emergency work shall be determined as provided in this Article 9.


## Article 10

### Contract Adjustments and Disputes

**10.1**    **Requests for Contract Adjustments and Relief.**

**10.1.1**    If either Design-Builder or Owner believes that it is entitled to relief against the other for any event arising out of or related to the Work or Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall, if possible, be made prior to incurring any cost or expense and in accordance with any specific notice requirements contained in applicable sections of these General Conditions of Contract. In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed twenty-one (21) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later. Such notice shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request.

**10.2**    **Dispute Avoidance and Resolution.**

**10.2.1**    The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Design-Builder and Owner each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**10.2.2**    Design-Builder and Owner will first attempt to resolve disputes or disagreements at the field level through discussions between Design-Builder's Representative and Owner's Representative which shall conclude within fourteen (14) days of the written notice provided for in Section 10.1.1 unless the Owner and Design-Builder mutually agree otherwise.

**10.2.3**   If a dispute or disagreement cannot be resolved through Design-Builder's Representative and Owner's Representative, Design-Builder's Senior Representative and Owner's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement. Five (5) days prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**10.2.4**   If after meeting the Senior Representatives determine that the dispute or disagreement cannot be resolved on terms satisfactory to both parties, the parties shall submit within thirty (30) days of the conclusion of the meeting of Senior Representatives the dispute or disagreement to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. Unless otherwise mutually agreed by the Owner and Design-Builder and consistent with the mediator's schedule, the mediation shall commence within ninety (90) days of the submission of the dispute to mediation.

**10.3**   **Arbitration.**

**10.3.1**   Any claims, disputes or controversies between the parties arising out of or relating to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 above, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the AAA then in effect, unless the parties mutually agree otherwise.

**10.3.2**   The award of the arbitrator(s) shall be final and binding upon the parties without the right of appeal to the courts. Judgment may be entered upon it in accordance with applicable law by any court having jurisdiction thereof.

**10.3.3**   Design-Builder and Owner expressly agree that any arbitration pursuant to this Section 10.3 may be joined or consolidated with any arbitration involving any other person or entity (i) necessary to resolve the claim, dispute or controversy, or (ii) substantially involved in or affected by such claim, dispute or controversy. Both Design-Builder and Owner will include appropriate provisions in all contracts they execute with other parties in connection with the Project to require such joinder or consolidation.

**10.3.4**   The prevailing party in any arbitration, or any other final, binding dispute proceeding upon which the parties may agree, shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred by the prevailing party.

**10.4**   **Duty to Continue Performance.**

**10.4.1**   Unless provided to the contrary in the Contract Documents, Design-Builder shall continue to perform the Work and Owner shall continue to satisfy its payment obligations to Design-Builder, pending the final resolution of any dispute or disagreement between Design-Builder and Owner.

**10.5**   **CONSEQUENTIAL DAMAGES.**

**10.5.1**   NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY (EXCEPT AS EXPRESSLY SET FORTH IN SECTION 10.5.2 BELOW), NEITHER DESIGN-BUILDER NOR OWNER SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

**10.5.2**   The consequential damages limitation set forth in Section 10.5.1 above is not intended to affect the payment of liquidated damages or lost early completion bonus, if any, set forth in Article 5 of the Agreement, which both parties recognize has been established, in part, to reimburse Owner or reward Design-Builder for some damages that might otherwise be deemed to be consequential.

Notwithstanding Section 10.5.1, to the extent a claim for loss of use caused by Design-Builder or its Subcontractors or Sub-Subcontractors is within the scope of coverage of an insurance policy required to be maintained under the Agreement and any such claim is actually paid by the insurer, Owner shall have the right to assert a claim for such loss of use. For the avoidance of doubt, Design-Builder's maximum aggregate liability for any such loss of use claims is and shall be limited to whatever proceeds are actually recovered from such insurance.

## Article 11

### Pause Work and Termination for Cause

**11.1**   **Owner's Right to Pause Work.**

**11.1.1**   Owner may, without cause and for its convenience, order Design-Builder to pause or temporarily suspend the Work, provided any such pause or such suspension shall not exceed twenty (20) days for any single instance, and collectively with all other pauses or suspensions not more than forty (40) days in the aggregate, during the duration of the Work.

**11.1.2**   If Owner so pauses or suspends the Work and such pause or suspension delays Substantial Completion, Design-Builder shall be entitled to an adjustment of the Contract Time(s) to the extent such pause or suspension delays Substantial Completion and such delay shall be considered and Excused Delay under Section 8.2 of the General Conditions of Contract.

**11.2**   **Owner's Right to Perform and Terminate for Cause.**

**11.2.1**   If Design-Builder materially fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without cause, Design Consultants or Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed by the Contract Time(s), as such times may be adjusted, or (vi) perform material obligations under the Contract Documents, then Owner, in addition to any other rights and remedies provided in the Contract Documents or by law, shall have the rights set forth in Sections 11.2.2 and 11.2.3 below.

**11.2.2**   Upon the occurrence of an event set forth in Section 11.2.1 above, Owner may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured, or meaningful steps to cure have been commenced and are being diligently prosecuted, within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails to cure, or reasonably commence to cure, such problem, then Owner may give a second written notice to Design-Builder of its intent to terminate within an additional ten (10) day period. If Design-Builder, within such seven (7) day period, fails to cure, or reasonably commence to cure as aforesaid, such problem, then Owner may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration.

**11.2.3**   Upon declaring the Agreement terminated pursuant to Section 11.2.2 above, Owner may enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, which have been purchased or provided for the performance of the Work, all of which Design-Builder hereby transfers, assigns and sets over to Owner for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of such termination, Design-Builder shall not be entitled to receive any further

payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. At such time, if the unpaid balance of the Contract Price exceeds the cost and expense incurred by Owner in completing the Work, such excess shall be paid by Owner to Design-Builder. If Owner's cost and expense of completing the Work exceeds the unpaid balance of the Contract Price, then Design-Builder shall be obligated to pay the difference to Owner. Such costs and expense shall include not only the cost of completing the Work, but also losses, damages, costs and expense, including attorneys' fees and expenses, incurred by Owner in connection with the reprocurement and defense of claims arising from Design-Builder's default.

**11.2.4**   If Owner improperly terminates the Agreement for cause, the termination for cause will be converted to a termination for convenience in accordance with the provisions of Article 8 of the Agreement.

**11.3   Design-Builder's Right to Stop Work.**

**11.3.1**   Design-Builder may, in addition to any other rights afforded under the Contract Documents or at law, stop the Work for the following reasons:

> **11.3.1.1**   Owner's failure to provide financial assurances as required under Section 3.3 hereof;

> **11.3.1.2**   Owner's failure to pay amounts properly when due under Design-Builder's Application for Payment in accordance with this Agreement; or

> **11.3.1.3**   the occurrence of Events of Force Majeure, but only for such duration that Design-Builder, acting prudently, is prevented from safe and efficient continuation of the Work.

**11.3.2**   Should any of the events set forth in either Section 11.3.1.1 or 11.3.1.2 above occur, Design-Builder has the right to provide Owner with written notice that Design-Builder will stop the Work unless said event is cured within seven (7) days from Owner's receipt of Design-Builder's notice. If Owner does not cure the problem within such seven (7) day period, Design-Builder may stop the Work. In such case, Design-Builder shall be entitled to make a claim for adjustment to the Contract Price and Contract Time(s) to the extent it has been adversely impacted by such stoppage.

**11.4   Design-Builder's Right to Terminate for Cause.**

**11.4.1**   Design-Builder, in addition to any other rights and remedies provided in the Contract Documents or by law, may terminate the Agreement for cause for the following reasons:

> **11.4.1.1**   The Work has been stopped (y) for more than forty (40) days during the duration of the Project, because of court order, any government authority having jurisdiction over the Work, provided that such stoppages are not due to the acts or omissions of Design-Builder or anyone for whose acts Design-Builder may be responsible, or (z) for more than forty (40) days during the duration of the Project, because of orders by Owner under Section 11.1.1 hereof;

> **11.4.1.2**   Owner's failure to provide Design-Builder with any information, permits or approvals that are Owner's responsibility under the Contract Documents which result in the Work being stopped for more than forty (40) days during the duration of the Project, even though Owner has not ordered Design-Builder in writing to stop and suspend the Work pursuant to Section 11.1.1 hereof; or

> **11.4.1.3**   Owner's failure to cure the problems set forth in either Section 11.3.1.1 or

11.3.1.2 above in accordance with this Agreement after Design-Builder has stopped the Work.

**11.4.2**   Upon the occurrence of an event set forth in Section 11.4.1 above, Design-Builder may provide written notice to Owner that it intends to terminate the Agreement unless the problem cited is cured, or meaningful steps to cure have been commenced and are being diligently prosecuted by Owner, within ten (10) days of Owner's receipt of such notice. If Owner fails to cure, or meaningful steps to cure such problem have not been commenced, then Design-Builder may give a second written notice to Owner of its intent to terminate within an additional ten (10) day period. If Owner, within such ten (10) day period, fails to cure, or meaningful steps to cure such problem have not been commenced, then Design-Builder may declare the Agreement terminated for default by providing written notice to Owner of such declaration (whereupon Design-Builder shall be entitled to recover in the same manner as if Owner had terminated the Agreement for convenience under Article 8 of the Agreement).

**11.5**   **Bankruptcy of Owner or Design-Builder.**

**11.5.1**   If either Owner or Design-Builder voluntarily institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents. Accordingly, should such event occur:

**11.5.1.1**   The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

**11.5.1.2**   The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 11.

**11.5.2**   The rights and remedies under Section 11.5.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code or the right of Design-Builder to stop Work under any applicable provision of these General Conditions of Contract.

**11.6**   **Survival.** The obligations of Owner under this Article 11 shall survive the termination of this Agreement and the other Contract Documents.

**Article 12**

**Electronic Data**

**12.1**   **Electronic Data.**

**12.1.1**   The parties recognize that Contract Documents, including drawings, specifications and CAD modeling and other Work Product may be transmitted among Owner, Design-Builder and others in electronic media as an alternative to paper hard copies (collectively "Electronic Data").

**12.2**   **Transmission of Electronic Data.**

**12.2.1**  Owner and Design-Builder shall agree upon the software and the format for the transmission of Electronic Data. Each party shall be responsible for securing the legal rights to access the agreed-upon format, including, if necessary, obtaining appropriately licensed copies of the applicable software or electronic program to display, interpret and/or generate the Electronic Data.

**12.2.2**  Neither party makes any representations or warranties to the other with respect to the functionality of the software or computer program associated with the electronic transmission of Work Product. Unless specifically set forth in the Agreement, ownership of the Electronic Data does not include ownership of the software or computer program with which it is associated, transmitted, generated or interpreted.

**12.2.3**  By transmitting Work Product in electronic form, the transmitting party does not transfer or assign its rights in the Work Product. The rights in the Electronic Data shall be as set forth in Article 4 of the Agreement. Under no circumstances shall the transfer of ownership of Electronic Data be deemed to be a sale by the transmitting party of tangible goods.

**12.3**    **Electronic Data Protocol.**

**12.3.1**   The parties acknowledge that Electronic Data may be altered or corrupted, intentionally or otherwise, due to occurrences beyond their reasonable control or knowledge, including but not limited to compatibility issues with user software, manipulation by the recipient, errors in transcription or transmission, machine error, environmental factors, and operator error. Consequently, the parties understand that there is some level of increased risk in the use of Electronic Data for the communication of design and construction information and, in consideration of this, agree, and shall require their independent contractors, Subcontractors and Design Consultants to agree, to the following protocols, terms and conditions set forth in this Section 12.3.

**12.3.2**   Electronic Data will be transmitted in the format agreed upon in Section 12.2.1 above, including file conventions and document properties, unless prior arrangements are made in advance in writing.

**12.3.3**   The Electronic Data represents the information at a particular point in time and is subject to change. Therefore, the parties shall agree upon protocols for notification by the author to the recipient of any changes which may thereafter be made to the Electronic Data, which protocol shall also address the duty, if any, to update such information, data or other information contained in the electronic media if such information changes prior to Final Completion of the Project.

**12.3.4**   The transmitting party specifically disclaims all warranties, expressed or implied, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the media transmitting the Electronic Data. However, transmission of the Electronic Data via electronic means shall not invalidate or negate any duties pursuant to the applicable standard of care with respect to the creation of the Electronic Data, unless such data is materially changed or altered after it is transmitted to the receiving party, and the transmitting party did not participate in such change or alteration.

## Article 13

### Miscellaneous

**13.1**    **Confidential Information.**

**13.1.1**   Confidential Information is defined as information which is determined by the transmitting party to be of a confidential or proprietary nature and: (i) the transmitting party identifies as either

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98B4-AD43256AC489

confidential or proprietary; (ii) the transmitting party takes steps to maintain the confidential or proprietary nature of the information; and (iii) the document is not otherwise available in or considered to be in the public domain. The receiving party agrees to maintain the confidentiality of the Confidential Information and agrees to use the Confidential Information solely in connection with the Project. The parties agree that the Term Sheet and this Agreement is Confidential Information.

**13.2 Assignment.**

**13.2.1**  Neither Design-Builder nor Owner shall, without the written consent of the other (in such other's sole discretion), assign (including without limitation by operation of law), transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents. Notwithstanding the foregoing, Owner may transfer or assign all of its rights and obligations under this Agreement to an affiliate, provided that such affiliate agrees to be bound by the terms of the Contract Documents and assume all of the rights and obligations of Owner under this Agreement. No such assignment to an affiliate (including without limitation by operation of law) shall constitute a novation of Owner's obligations under the Contract Documents.  Notwithstanding the above to the contrary, Owner may, from time to time, without Design-Builder's consent, conditionally or unconditionally, hypothecate, mortgage, pledge, collaterally assign, or otherwise encumber and grant security interests in Owner's interests in this Agreement.

**13.2.2  Accommodation of Financing Parties**. To facilitate Owner's obtaining of financing for the Work, Design-Builder will make reasonable efforts to provide such (x) estoppel certificates as to the then current status of this Agreement and other matters reasonably requested by Owner or its financing parties, and (y) information regarding the Project, as may be reasonably requested by Owner or its financing parties in connection with financing the Work; provided, however, that Design-Builder shall have no obligation to enter into any such arrangement that would have effect of increasing the obligations, or diminishing the rights, of Design-Builder under the Contract Documents by more than a de minimis amount.

**13.3 Successorship.**

**13.3.1**  Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**13.4 Governing Law.**

**13.4.1**  The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**13.5 Severability.**

**13.5.1**  If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**13.6 No Waiver.**

**13.6.1**  The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**13.7**     **Headings.**

**13.7.1**   The headings used in these General Conditions of Contract, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**13.8**     **Notice.**

**13.8.1**   Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement, or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the facsimile number of the intended recipient.

**13.9**     **Amendments.**

**13.9.1**   The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

**Exhibit C-1**
**Design-Builder's Scope of Work**



The following scope of real property and construction work to be undertaken by the Design-Builder, completed and/or delivered to Owner within the Contract Times and incorporated into the Project Site for Owner.

1. Conveyance to Owner of the Project Site, comprised of approximately 33.5 acres of land more particularly described on Exhibit A, in fee simple title by special warranty deed in form and substance reasonably acceptable to Owner

   a. Obtaining for benefit of Owner a pre-construction ALTA survey of the Project Site and Transmission Easement, including metes and bounds legal description thereof, and an owner's title insurance policy with coverage in the amount of the value of the land (as reasonably agreed upon by the parties), at Design-Builder's expense, with terms and conditions reasonably satisfactory to Owner

      i. ALTA As-Built survey is excluded from Scope of Work

   b. Substation area. Two acre area to be reserved by Design-Builder for Owner's substation with a temporary construction area; marginal areas around these will have soil-stabilization consistent with Texas Commission on Environmental Quality (TCEQ) best management practices (BMPs) for stormwater pollution prevention and surfaced with compacted gravel;

   c. Owner's Building. In addition to building descripted in Section 6 below, two acre parking / laydown area will be compacted gravel; marginal areas around these will have soil-stabilization consistent with TCEQ BMPs for stormwater pollution prevention

2. Site Access & Access Control

   a. 20-foot wide rolling vehicle access gate into Owner's Area with pedestrian gate, equipped with badge reader(s) (security CCTV by others)

   b. Perimeter fence of the Project Site and the Owner's Area, 8-foot tall chain link (2-inch mesh) topped with 3-strand barbed wire

   c. Common access roadway (crushed rock) into the Site and Owners Area together with grant of perpetual access easement for adjoining land owner.

3. Substation rated for 300MVA, 138/34.5kV, designed, built and commissioned on a turnkey basis in accordance with the Master Engineering, Procurement and Construction Agreement by and between Corpus Christi Energy Park, LLC and Saber Power, Inc. dated January 31, 2022 (Saber Power Agreement), a copy of which has been furnished to Owner.

   a. Single 138kV point of interconnect from AEP with customary revenue meter, control and protection equipment;

   b. (1) main power transformer, 300MVA, 138/34.5kV installed and energized

   c. Dual 34.5kV transformer secondaries each feeding an individual 150MVA feeder breaker;

      i.  Two 34.5kV overhead medium voltage circuits will be carried to terminal pole(s) outside the substation to accommodate termination (by Owner) of MV switches and feeder circuits which are outside the scope of this DB Contract

      ii.  Final location of Owner's medium voltage interface point(s) of interconnection, to be external to substation and within 50 feet of substation fence.

  d.  All customary structures, electrical apparatus and systems for substation control, protection, metering, grounding grid, grounding coordination with AEP substation, lightening protection shield wire, fence, etc.

  e.  Substation drawing packaging including customary documentation (stamped designs and calculations, relay test reports, as-built drawings, etc.)

4.  Single 138kV temporary connection to one existing 138kV overhead circuit for the benefit of Owner as provided for in the AEP Letter of Agreement.

  a.  All customary structures, electrical apparatus and systems for temporary power connection

  b.  Hard temporary tap to be rated at 300MVA attaching to LCRA circuit at a location designated by AEP or LCRA

5.  Permanent Service

  a.  Work, as defined in Letter of Agreement, to be completed by AEP for the benefit of Owner as set forth in the fully-funded and secured Letter of Agreement

  b.  In support of permanent service, the following scope will be accomplished by the Design-Builder as part of the Work which shall encompass the following:

      i.  Design, procurement and construction of an aerial 138kV circuit and together with required structures and other features appurtenant to this power line, all of which shall be installed and tested by the Design-Builder up to the point-of-connection (POC) structure designated by AEP in their final detail design; however, such circuit will remain electrically un-terminated pending AEP completion of permanent service work.

      ii.  The POC will be energized by AEP upon completion of their permanent service works pursuant to the Letter of Agreement. Coordination of the final attachment and energization subject to coordination between Owner and AEP at a date subsequent to the anticipated Final Completion under this Design-Build Contract.

  c.  After Final Completion, any remaining obligation in respect to final attachment work, if any, to complete and energize the permanent service circuit or to de-terminate and dismantle or otherwise is excluded from Scope of Work.

6.  Owner's Building:

  a.  2,500 square-foot pre-engineered steel building shell intended usage for office/administration, maintenance and material storage; enclosed building shell only conforming with state building code requirements. With the exception of basic plumbing and electric, and the office area stated below, building interior finishing is outside the Design-Builder's scope.

    i.   Approximately 2500 sq ft Pre-engineered metal building 14 eave height min

    ii.   Concrete floor capable of highway loads

    iii.   (2x) 12 x 14 manual rollup doors, two bays

    iv.   (1x) 10 x 20 modular office space w/ HVAC (mini split)

    v.   (1x) Gender Neutral Restroom

    vi.   120/240V 300A service (separate meter from AEP distribution)

    vii.   water, sewer, fiber connections

    viii.   Electronic badge-reader access controlled gate and building doors

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98D4-AD43256AC489



**Exhibit C-2**
**Owner's Scope of Work**

Owner's Scope of Work means all work at the Project Site (including without limitation the Owner's Area) other than Design-Builder's Scope of Work.

1. Owner's Area means the area of land delineated as such on Exhibit A-1 attached hereto and is confined to the land within the fenceline establishing the boundary of the Owner's Area, together with any reasonable extensions outside that fenceline for Owner's contractor(s) to connect its facilities to the Design-Builder's medium voltage terminals and public utilities, if any.

2. Generally, Owner's scope outside of the Owner's Area will be limited to construction of two overhead electrical distribution circuits extending from the Design-Builder's interface point called out in 3.c.(ii) above at a location to be more precisely defined during Design-Builder's detail design.
   a. Owner shall be responsible for the termination of the medium voltage collection circuits at the terminal pole(s) described in 3c(i) – (ii) of Exhibit C-1.

3. Owner shall be solely responsible for arranging and paying for its own temporary construction power and lighting, water for dust control and other purposes, and any other services such as temporary office, portable toilets, trash collection and disposal, and the like.

4. Owner shall be solely responsible to control and coordinate the flow of Owner personnel and materials to the Project Site including workforce of Owner and Owner's contractor(s) arriving and departing the Project Site, the delivery, receipt and staging of all Owner construction machinery, construction materials and capital equipment arriving and departing the Project Site. All Owner materials shall be delivered directly into the Owner's Area during established receiving hours for the Project Site. Owner deliveries and construction traffic shall not unreasonably impede the activities of the Design-Builder and other parties utilizing the common access road.

5. Owner shall be solely responsible for safety and security at and within the Owner's Area including controlling access/egress to the Owner's Area and loss prevention of Owner's materials or Owner's equipment.

6. Owner shall be solely responsible for complying with Texas One-Call requirements prior to any ground disturbance performed by Owner or Owner's subcontractors within Owner's Area or Owner's scope of work.

7. Owner's Area is also graphically depicted in Exhibit D, Item 2.A.

**Exhibit D**
**Drawings and Specifications**



The following represent the drawings and specifications related to the Design-Builder's Scope of Work.

1) Substation Design
   a. Saber - 138/34.5 kV Single Line (Drawing 03846-000-REV3)
   b. Saber - 138/34.5 kV General Arrangement (Drawing 03846-1000-REV3)
   c. Saber – Panel layout (Drawing 03846-7000-REV3)
   d. Saber – Bill of Material (Document 03846-B-1000)
   e. Saber – Frameless Metal Build Specification (Document 03846-131010A)
   f. TSEA Energia – Transformer Technical Data Sheet (Technical Proposal SC-294/21) dated 11/5/2021
2) Site Planning
   a. Recon - General site plan (Drawing FENCE PLAN SKETCH-Rev A)
   b. SAM – Boundary ALTA/NSPS Land Title Survey prepared by SAM LLC dated March 2, 2022 under the seal of JM Tucker, PLS No. 5202.
   c. Rock Engineering - Geotechnical Subsurface Investigation and Recommendations for the Proposed Corpus Christi Energy Park RETL Report Number: G122001 dated February 25, 2022

**Exhibit E**
**Form of Change Orders**



**[*See attached.*]**

# Design-Build Change Order Form

For Use with DBIA Document No. 525, *Standard Form of Agreement Between Owner and Design-Builder – Lump Sum* (2010 Edition) and DBIA Document No. 530, *Standard Form of Agreement Between Owner and Design-Builder – Cost Plus Fee with an Option for A Guaranteed Maximum Price* (2010 Edition)

| Change Order Number: | Change Order Effective Date:<br>(date when executed by both parties) |
|---|---|
| Project: | Design-Builder's Project No: |
| | Date of Agreement: |
| Owner: | Design-Builder: |

Scope of the Change:

| | |
|---|---|
| Original Contract Price: | $ |
| Net Change by Previous Change Order No(s):        to: | $ |
| This Change Order Increase/Decrease (attach breakdown): | $ |
| New Contract Price: | $ |

| | | |
|---|---|---|
| Original Contract Completion Date: | _____ 20____ | |
| Adjustments by Change Order No(s)        to: | _____ (calendar days) | |
| This Change Order Contract Time Increase/Decrease: | _____ (calendar days) | |
| Revised Substantial Completion Date: | _____ 20____ | |

By executing this Change Order, Owner and Design-Builder agree to modify the Agreement's Scope of Work, Contract Price and Contract Time as stated above.  Upon execution, this Change Order becomes a Contract Document issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder*, (2010 Edition).

| **OWNER:** | **DESIGN-BUILDER:** |
|---|---|
| By: _____ | By: _____ |
| Printed Name: _____ | Printed Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

**Exhibit F**
**Installment Payments**



The following installment payments shall be made in accordance with the Contract Documents.

| Milestone No. | Payment Milestone | Installment Payment Amount* |
|---|---|---|
| 1 | Execution and Delivery of the Contract Documents | 11,530,000.00 ** |
| 2 | Deed transfer | 500,000.00 *** |
| 3 | FOB Transformer | 6,100,000.00 |
| 4 | AEP Letter of Agreement for 300MW | 3,750,000.00 |
| 5 | Substantial Completion | 2,120,000.00 |
| 6 | Final Completion | 250,000.00 + retainage |

* Applicable retainage per Article 7.2.1

** The first Installment Payment Amount is inclusive of the $2,371,500.00 of Earnest Money (to the extent such Earnest Money is actually released to Design-Builder in partial satisfaction of the first Installment Payment on the date hereof).

*** Retainage shall not apply to Milestone 2 (Deed transfer).

The conditions to the first Installment Payment, and the conditions and supporting documentation to accompany the relevant Application for Payment for Installment Payments 2 through 7 are as follows:

1) Milestone No.1: Execution and Delivery of Contract Documents:
    a. This Agreement and Exhibits and Attachments
    b. The Material Agreements
2) Milestone No.2: Deed transfer
    a. The Deed
3) Milestone No.3: FOB Transformer
    a. Per Incoterms® 2020, Free on Board (FOB) Port of Santos, Brazil
    b. Commercial invoice
    c. Bill of Lading
4) Milestone No.4: AEP Letter of Agreement 300MW
    a. Execution by Owner and AEP of the Letter of Agreement with AEP for 300MW delivery service
5) Milestone No.5: Substantial Completion
    a. Certificate of Substantial Completion as defined in 6.6 of General Conditions of Contract
6) Milestone No.6: Final Completion
    a. Evidence of completion of Punch List Items according to 6.7.1 of General Conditions of Contract
    b. Documents per 6.7.2 of General Conditions of Contract
    c. Payment of retainage

A separate Application for Payment shall not be required for the first Installment Payment on the date hereof.

**Exhibit G**
**Insurance Requirements**



I.    DESIGN-BUILDER'S LIABILITY INSURANCE

A.    Prior to commencement of any Work and throughout the time that Work is being performed, and any additional time specified herein, the Design-Builder shall purchase from and shall maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Design-Builder and, to the fullest extent permitted by law, also protect the Owner and all other parties listed in Exhibit G-1A from claims, suits, proceedings, damages, liabilities, judgments, costs, and expenses which actually or allegedly arise out of, result from, or are connected with Design-Builder's acts, omissions, Work, attempted Work, and completed Work, whether such Work is performed by Design-Builder, any Subcontractor of any tier (a "Subcontractor Party" or "Subcontractor Parties"), or anyone directly or indirectly employed or contracted by any of them, or anyone for whose acts any of them may be liable or responsible, including but not limited to those set forth below:

.1    Claims under workers' compensation, disability benefits and other similar employee benefit acts that are applicable to the Work to be performed;

.2    Claims for damages because of bodily injury, occupational sickness or disease, or death of the Design-Builder's employees;

.3    Claims for damages because of bodily injury, sickness or disease, or death of any person other than the Design-Builder's employees;

.4    Claims for damages insured by personal injury liability coverage;

.5    Claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom and loss of use of property not injured;

.6    Claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

.7    Claims for bodily injury or property damage arising out of products or materials supplied hereunder;

.8    Claims under contractual liability insurance covering Design-Builder's indemnity obligations under this Contract; and

.9    Completed operations coverage shall remain in effect for a minimum of five years after acceptance of Design-Builder's completed Work by Owner or throughout the warranty period, whichever is longer.

In addition to the foregoing, if the Design-Builder or a Subcontractor Party(ies) performs or will perform design, design-build, engineering, surveying, testing, or other professional services (collectively "Professional Services"), Design-Builder shall maintain professional errors and omissions liability insurance covering the errors, acts, or omissions of the Design-Builder and its Subcontractor Parties in the performance of the Professional Services portions of the Work, with a limit of not less than $3,000,000 (or such higher limit required by Owner) and with all coverage retroactive to the date of the commencement of the Work. Such professional liability coverage may be on a claims made form, but must cover the full period of the services being performed and continue in force (either by renewal or the procurement of tail coverage) for a period of not less than two years following the completion of the Work. Notwithstanding the foregoing to the contrary, in the event the Design-Builder or a Subcontractor Party(ies) performs Professional Services in connection with any major building systems, including, without limitation, fire protection/sprinkler

systems and window wall systems, then Design-Builder shall notify Owner of such event and Owner shall have the right to require higher limits for professional errors and omissions liability insurance.

B.      The insurance required by Section 1.1 shall be written for not less than limits of liability specified below or required by law, whichever coverage is greater:

      1.      GENERAL LIABILITY – written on an occurrence based ISO CG 00 01 policy form including coverage for bodily injury (including but not limited to bodily injury, sickness, disease, and death), property damage, and personal and advertising injury arising out of or resulting from all ongoing operations and all products/completed operations, including contractual liability (with coverage no less broad than that provided by the unmodified ISO CG 00 01 04 13 policy form) and independent Design-Builders coverage (no less broad that that provided by an unmodified ISO form CG 00 01 04 13 policy form):

Bodily Injury & Property Damage:      $1,000,000 each occurrence/$2,000,000 aggregate

                                             $2,000,000 products/completed operations aggregate

Personal & Advertising Injury:      $1,000,000 each offense

      2.      AUTOMOBILE LIABILITY – including coverage for all owned, non-owned, and hired automobiles:

Bodily Injury & Property Damage:      $1,000,000 each accident

If the Work requires the removal and transportation of hazardous material from the project site, the Auto Liability coverage must be amended to include pollution liability coverage applicable to all hazardous waste hauling vehicles and include the MCS-90 Endorsement and Pollution Liability Endorsement CA9948.

      3.      WORKERS COMPENSATION AND EMPLOYERS LIABILITY – including coverage applying to all individuals employed or retained with respect to the Work. Such coverage shall not exclude any owner, partner, or officer, even if permitted by law. The coverage shall be provided in accordance with state statutory requirements in the jurisdiction in which work is being performed. If the Work involves any employment on or adjacent to navigable waterways, then the policy must be endorsed to include U.S. Longshore and Harbor Workers (USL&H) and Jones Act coverages, as applicable:

Workers Compensation: Statutory

Employers Liability:      $1,000,000 each accident/$1,000,000 disease – each employee/$1,000,000 disease – policy limit

      4.      EXCESS LIABILITY - excess of and follow form to the underlying general liability, automobile liability, and employers liability:

                    $5,000,000 each occurrence or offense

                    $5,000,000 aggregate

C.      All policies referenced herein shall include a severability of interests condition or clause, providing coverage to each insured as if such insured were the only insured under the policy and shall include a waiver of subrogation against Owner, and all other parties as Owner may designate and as listed in Exhibit

G-1A. Where permitted by law, the waivers and releases contained in this Insurance Requirements Addendum will survive the end of the term of the Agreement, and will apply even if a claim or loss arose, in whole or in part, from the ordinary negligence or strict liability of the intended beneficiary of the waiver or release, to the extent permitted by law.

D.      Except for Professional Liability, the insurance coverage required herein shall be provided on an occurrence basis. Professional Liability may be provided on a claims made basis provided coverage is retroactive to the commencement of the Work and coverage is maintained for a period of at least two years after completion of the Work. All insurance shall be provided by insurers licensed or otherwise authorized to transact business in the state in which the Project is located, which have a current claims paying ability rating not less than A-, class size VIII by A.M. Best Company or a comparable rating by another comparable rating organization acceptable to Owner, and which are otherwise acceptable to Owner.

F.      Coverages shall be maintained without interruption from the date of commencement of the Work until the date of final payment and for any additional time required herein, and, with respect to the Design-Builder's completed operations coverage, until the expiration of the period for correction of Work or the expiration of the time period defined in paragraph A.9 above.

G.      Certificates of insurance acceptable to the Owner shall be filed with the Owner at least five days prior to commencement of the Work and/or entering onto the Project site and shall be available to Owner at all times. Design-Builder shall provide renewal certificates of insurance to Owner prior to the expiration of the policies. The certificates shall include additional insured and waiver of subrogation in favor of Owner and all other parties that Owner may designate. Information concerning reduction of coverage on account of revised limits or claims paid under the policies or both shall be furnished by Design-Builder with such certificates and/or at any time upon request by or on behalf of the Owner. Design-Builder's insurance policies shall provide Owner 30 days' written notice prior to any cancellation or expiration of policies required hereunder. These certificates and the insurance policies required by this Section 1.1 shall, to the extent commercially available, contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner and its lender. An additional certificate evidencing continuation of liability coverage, including coverage for completed operations shall be submitted with the final Application for Payment as required by the Contract documents.

H.      With the exception of the Workers Compensation and Employers Liability Policy and Professional liability policy (if applicable), all of Design-Builder's insurance policies required in Section 1.1 shall include (1) the Owner and all other parties listed in Exhibit G-1A (hereinafter referred to as "Insured Parties") as additional insureds on a primary and non-contributory basis (with the insurer agreeing not to seek contribution from any other insurance available to the additional insured) for all claims, suits, demands, proceedings, liability, or damages arising out of or caused in whole or in part by the Design-Builder's acts or omissions during the Design-Builder's ongoing operations and for claims, suits, proceedings, liability, or damages arising out of Design-Builder's products and/or completed operations, to the fullest extent permitted by law. Such insurance shall be provided by forms providing coverage no less broad than that provided by ISO forms CG 20 10 04 13 and CG 20 37 04 13 coupled with a primary and non-contributory endorsement.

I.      No acceptance by or on behalf of Owner of any insurer shall be construed to be a representation, certification, or warranty of such insurer's solvency, and no acceptance by or on behalf of Owner as to the amount, type, and/or form of any insurance shall be construed to be a representation, certification, or warranty of the sufficiency of such insurance. No acceptance by or on behalf of Owner of evidence of insurance coverage which does or does not fully comply with all of the requirements of this Exhibit shall prejudice Owner or any other Insured Parties in the event of loss or damage arising out of or resulting from Design-Builders acts or omissions, the Work, attempted Work, failure to furnish or perform Work, or completed Work nor shall it relieve Design-Builder of any obligation to provide all insurance coverage required herein.

J.      In the event of any failure by Design-Builder to comply with provisions of this Section 1.1 or if the Design-Builder shall fail to timely deliver any required evidence of insurance to Owner within five (5) days of demand (including endorsements), Owner may, at its option, but without obligation, upon notice to Design-Builder, purchase such insurance, at Design-Builder's sole cost and expense. The cost of such insurance and the cost of arranging such insurance shall be paid by Design-Builder to Owner upon demand or Owner may deduct all payments made from any amounts due to Design-Builder. Any such action shall not relieve Design-Builder from the obligations to maintain insurance or from Design-Builder's indemnity or other obligations or liability.

II.     SUBCONTRACTOR PARTY LIABILITY INSURANCE

A.      Design-Builder shall cause each of its Subcontractor Parties to purchase and maintain insurance of the type specified in Section 1.1 and to otherwise comply with the insurance requirements set forth herein, including, but not limited to, the additional insured requirements, unless a waiver is secured from Owner. If requested by or on behalf of Owner, Design-Builder shall furnish copies of certificates of insurance to Owner evidencing such coverage for each Subcontractor Party of any tier and, if requested by or on behalf of Owner, shall furnish or cause Subcontractor Parties to furnish copies of the certificates of insurance, and copies of the insurance policies, upon request, to Owner. Nothing in this Section shall limit Design-Builder's indemnification requirements to Owner and other parties under the contract. In addition, Design-Builder shall cause all Subcontractor Parties which perform or will perform Professional Services to carry professional errors and omissions liability insurance covering the errors, acts, or omissions of the Subcontractor Party(ies) in the performance of the Work, with a limit of not less than $3,000,000 or such higher limit as required by the Owner with all coverage retroactive to the date of the commencement of the Work. Such professional liability coverage may be on a claims made form but must cover the full Contract Time and continue in force (either by renewal or the procurement of tail coverage) for a period of not less than six years following the completion of the Work or the statute of limitations or the statute or repose, whichever is longer. Design-Builder remains fully responsible for all loss, damage, claims, costs, and expenses not covered by a Subcontractor Party's insurance policies. Notwithstanding the foregoing to the contrary, in the event Design-Builder or a Subcontractor Party self-performs Professional Services in connection with any major building systems, including, without limitation, fire protection/sprinkler systems and window wall systems, then Design-Builder shall notify Owner of such event and Owner shall have the right to require higher limits for professional errors and omissions liability insurance.

B.      In the event of any failure by Design-Builder to comply with provisions of this Section 1.2 or if Design-Builder shall fail to deliver any required evidence of insurance to Owner within forty-eight (48) hours of demand (including endorsements), Owner may, at its option, but without obligation, upon notice to Design-Builder, purchase such insurance, at Design-Builder's sole cost and expense. The cost of such insurance and the cost of arranging such insurance shall be paid by Design-Builder to Owner upon demand or Owner may deduct all payments made from any amounts due to Design-Builder. Any such action shall not relieve Design-Builder from the obligations to maintain insurance or from Design-Builder's indemnity or other obligations or liability.

**EXHIBIT G-1A**



**ADDITIONAL INSUREDS**

The additional insureds to be listed on the corresponding policies, as described above, are as follows:

CN Corpus Christi LLC

Compute North LLC

**Exhibit H**
**List of Material Agreements**



The following documents form the basis of the List of Material Agreements:

1) Engineering, Procurement and Construction Management Agreement by and between Corpus Christi Energy Park, LLC and Recon Development, LLC dated December 31, 2021.

   a. Materials and Equipment Purchase Order No. 3496R2 issued by Recon Management Services, Inc. to Transformadores e Serviços de Energía das Américas (TSEA Energy) dated November 11, 2021.

2) Master Engineering, Procurement and Construction Agreement by and between Corpus Christi Energy Park, LLC and Saber Power, Inc. dated January 31, 2022.

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98D4-AD43256AC489

**Exhibit I**
**Owner's Insurance**



Throughout the time that Work is being performed, and any additional time specified herein, the Owner shall purchase from and shall maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located or authorized to do business in at least one state within the contiguous United States, the insurance set forth below to cover Owner's Scope of Work or loss arising out of Owner's Area for which Owner is legally liable:

      1.     GENERAL LIABILITY – written on an occurrence based policy form including coverage for bodily injury (including but not limited to bodily injury, sickness, disease, and death), property damage, and personal and advertising injury arising out of or resulting from all ongoing operations and all products/completed operations, including contractual liability:

Bodily Injury & Property Damage:    $1,000,000 each occurrence/$2,000,000 aggregate

                                        $2,000,000 products/completed operations aggregate

Personal & Advertising Injury:    $1,000,000 each offense

      2.     AUTOMOBILE LIABILITY – including coverage for all owned, non-owned, and hired automobiles:

Bodily Injury & Property Damage:    $1,000,000 each accident

      3.     WORKERS COMPENSATION AND EMPLOYERS LIABILITY – including coverage for all employees of Owner:

Workers Compensation: Statutory Employers Liability:

                                    $500,000 each accident/$500,000 disease – each employee/$500,000 disease – policy limit

      4.     EXCESS LIABILITY - excess of and follow form to the underlying general liability, automobile liability, and employers liability:

                                    $4,000,000 each occurrence or offense

                                    $4,000,000 aggregate

A.     Coverages shall be maintained without interruption from the date of commencement of the Owner's Scope of Work until the date of completion with respect to Owner's Scope of Work.

B.     Certificates of insurance acceptable to the Design-Builder shall be filed with the Design-Builder prior to commencement of the Owner's Scope of Work. Owner shall provide renewal certificates of insurance to Design-Builder prior to the expiration of the policies listed hereunder. The certificates shall include additional insured status in favor of Design-Builder

C.     Owner's commercial general liability insurance policy required hereunder shall include (1) Design-Builder as an additional insured on a primary and non-contributory basis (with the insurer agreeing not to seek contribution from any other insurance available to the additional insured) for all claims, suits, demands, proceedings, liability, or damages arising directly and solely from Owner's Scope of Work.

D.     No acceptance by or on behalf of Design-Builder of any insurer shall be construed to be a representation, certification, or warranty of such insurer's solvency, and no acceptance by or on behalf of

DocuSign Envelope ID: 4BC083F5-B4E3-42AB-98D4-AD43256AC489

Design-Builder as to the amount, type, and/or form of any insurance shall be construed to be a representation, certification, or warranty of the sufficiency of such insurance. No acceptance by or on behalf of Design-Builder of evidence of insurance coverage which does or does not fully comply with all of the requirements of this Exhibit shall prejudice Design-Builder or any other Insured Parties in the event of loss or damage arising directly and solely from Owner's Scope of Work nor shall it relieve Owner of any obligation to provide all insurance coverage required herein.