# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*,[1] | Case No. 22-90273 (MI) |
| Debtors. | (Jointly Administered) |

## RESPONSE OF BITNILE, INC. TO DEBTORS' OBJECTION TO CLAIM NO. 42

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, Illinois 60654.

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Claimant BitNile, Inc. ("BitNile"), by and through its counsel, hereby files this response (the "Response") to the objection (the "Objection") of the above captioned debtors and debtors in possession (collectively the "Debtors") to Claim Number 42 (the "Rejection Claim"). In support of this Response, BitNile respectfully states as follows:

## I.  INTRODUCTION

1. BitNile's Rejection Claim arises from its August 15, 2022 agreement with Compute North LLC ("Compute North"), pursuant to which Compute North agreed to provide BitNile with services for BitNile's Bitcoin miners at the Debtors' Wolf Hollow facility. Unbeknownst to BitNile, at that time, Compute North had lost control of its Wolf Hollow facility and made material misrepresentations to BitNile about its financial condition and ability to perform. One week later, in reliance on Compute North's knowingly false assurances that BitNile's mining equipment would be energized promptly, BitNile paid Compute North an initial deposit of over $2 million, and began shipping its approximately $40 million in mining equipment to Wolf Hollow. To date, the Debtors have failed to provide any services to BitNile in connection with the parties' agreement and BitNile still has not received all of its miners back from the Debtors.

2. The Debtors' baseless Objection argues that BitNile's claim should be limited to approximately $1 million – just half the cost of BitNile's deposit and excluding the approximately $20 million in additional damages incurred by BitNile. Yet the Debtors never energized BitNile's miners, did not perform any of their obligations under the Master Agreement, and the Debtors have not returned to BitNile many of its approximately 6,500 miners, which at the time had a value in excess of $40 million. With its Master Agreement recently rejected, after months of damaging delay, and still without recovery of its miners, BitNile is now forced to find another location (or

2

build its own) to energize and operate its miners. BitNile is entitled to a claim for the damages it incurred as a result.

3. The Debtors' Objection does not dispute that they never provided <u>any</u> services to BitNile, or that their failure to do so constitutes a breach of the Master Agreement and Order Form. Nor does the Debtors' Objection dispute that Compute North LLC and its executives defrauded BitNile, by, among other things, making material misrepresentations to induce BitNile to: (i) sign the agreements when Compute North knew that it could not perform as it no longer had control of its mining facility, and (ii) send the deposit and tens of millions of dollars of mining equipment to Compute North. Instead, the Debtors claim that nearly all damages incurred as a result of their fraudulent conduct and complete failure to perform should be excused solely based on the Master Agreement's purported limitations on liability.

4. The Objection has no merit and should be rejected because the Master Agreement's limitations on damages do not apply to BitNile's deposit, and because contractual limitations on liability do not apply in cases of fraud or intentional misconduct. Thus, the Debtors' Objection should be overruled.

## II. FACTS AND PROCEDURAL BACKGROUND

5. BitNile is a significant Bitcoin miner. BitNile and Compute North LLC are parties to that certain Master Agreement, dated August 15, 2022 (the "<u>Master Agreement</u>"), pursuant to which Compute North was to provide colocation and other services for BitNile's Bitcoin mining hardware (the "<u>Mining Equipment</u>"). BitNile's Mining Equipment has a value in excess of $40 million.

3

6. Upon entry into the Master Agreement, BitNile and Compute North executed an Order Form (the "Order Form")² pursuant to which (a) BitNile delivered approximately 6,572 miners to Compute North, to be located in the Wolf Hollow Facility in Granbury, Texas (the "Wolf Hollow Facility"), which facility was owned by non-debtor CN Borrower, LLC ("CN Borrower") and (b) Compute North was to install those miners and provide, among other things, electricity and network connectivity necessary to operate those miners.

7. On August 22, 2022, BitNile paid an initial deposit in the amount of $2,012,088.00 (the "Deposit") to Compute North. At the time the Deposit was made, BitNile was assured that its Mining Equipment would be ready for use and energized in the September/October 2022 time period. Nevertheless, the Mining Equipment was never energized or "powered on."

8. According to the Declaration of Harold Coulby, Chief Financial Officer and Treasurer of the Debtors, In Support of the Chapter 11 Petitions and First Day Pleadings [Docket No. 22] (the "Coulby Declaration") unbeknownst to BitNile, just three days prior to execution of the Master Agreement (that is, August 12, 2022), the Debtors' lender and purchaser herein, Generate Lending LLC ("Generate"), exercised a voting proxy and appointed its own managers to form a new board and take control of CN Borrower and the Wolf Hollow Facility and also exercised its rights under a deposit account control agreement and restricted use of a bank account containing $23.6 million. Coulby Declaration ¶¶ 60–62. None of this was disclosed to BitNile by the Debtors.

9. The Deposit was never returned and has never been accounted for by the Debtors.

10. On September 22, 2022 (the "Petition Date"), Debtors filed for relief under chapter 11 of title 11 of the U.S. Code (the "Bankruptcy Code").

---

² A copy of the Master Agreement and Order Form are annexed as Exhibit A hereto.

4

11. On November 16, 2022, BitNile timely filed its claim against Compute North LLC in the amount of $2,124,493 (the "Claim"). A true and correct copy of the Claim is attached hereto and incorporated fully by this reference as Exhibit B.

12. On January 10, 2023, BitNile voted to "Reject" the Debtors' Plan and also "Opted Out" of the third party releases. The Opt Out was important as BitNile previously commenced a lawsuit in the United States District Court for the District of Minnesota against various officers and employees of Compute North for fraud, fraudulent concealment/fraudulent nondisclosure, and civil conspiracy.

13. On January 19, 2023, Debtors filed an objection to the BitNile Claim, alleging that: (i) BitNile was not entitled to claim the amount of its Deposit because the Master Agreement "provides that deposits under the agreement are 'non-transferrable under any circumstance and are not refundable' except under certain conditions not applicable to BitNile or its deposit"; and (ii) BitNile was not entitled to claim storage and shipping costs as they were "BitNile's to bear" and "the Debtors were never responsible for them, under the Master Agreement or otherwise." [Docket No. 846] (the "Initial Objection").

14. On January 27, 2023, this Court entered an Order rejecting certain contracts (the "Rejection Order"), including the Master Agreement and Order Form, and permitting BitNile thirty (30) days to submit proofs of claim based on those rejected contracts. [Docket No. 871.]

15. BitNile filed its Rejection Claim on February 1, 2023. A true and correct copy of the Rejection Claim is attached hereto and incorporated fully by this reference as Exhibit C. The Rejection Claim asserted a claim for damages in the following amounts:

| Category | Amount |
|---|---|
| Deposit paid | $2,012,088.00 |
| Storage fees incurred to-date | $22,481.70 |
| Estimated additional storage fees expected to be incurred through May 2023[3] | $20,000.00 |
| Initial moving fees to Wolf Hollow Facility | $90,405.00 |
| Estimated moving fees from Wolf Hollow Facility | $68,072.00 |
| Estimated packaging costs to ship Mining Equipment | TBD[4] |
| Lost profits for the period October 1, 2022 through June 2023, which is comprised of: $103,556.85 in losses between October 1, 2022 and January 31, 2023,[5] and estimated losses of $125,446.92 for February 1, 2023 through June 30, 2023 (based on the average per diem losses for the period October 1, 2022 through January 31, 2023) | $229,003.95 |
| Estimated cover damages (for the period July 1, 2023 through September 30, 2027)[6] | $18,625,454.40 |
| **TOTAL** | $21,067,505.05[7] |

---

[3] BitNile includes expenses, costs, and lost revenue through June 2023, as BitNile hopes to a secure an alternate site for its Mining Equipment to be powered on by July 1, 2023. BitNile reserves the right to supplement its claimed damages to the extent that BitNile is unable to secure an alternate site for the Mining Equipment to be powered on by July 1, 2023, and/or the Debtors damage or fail to release to BitNile any of the Mining Equipment.

[4] BitNile is awaiting an estimate of these costs from US Bitcoin Corp. as operator of the Wolf Hollow Facility.

[5] These amounts were calculated using the calculator available at https://www.coinwarz.com/mining/bitcoin/calculator, utilizing the following inputs: (i) Bitcoin Mining Hashrate: 650 PH (for 6,572 machines); (ii) Power Consumption of 1,985,000 Watts (for all 6,572 machines); (iii) Electrical costs all in at $0.07; and (iv) Pool/maintenance fee of .03%.

[6] These cover damages were calculated by comparing the pricing set forth in BitNile's agreements with Compute North during the period covered by those agreements, and the pricing demanded by Generate, and is subject to change.

[7] In addition, BitNile has not yet received return of all of its miners, which had a value of $40 million and which BitNile fears may be damaged and/or wrongfully withheld. In fact, in the first shipment of 861 miners received by BitNile (just over 1% of the total miners held by the Debtors),

11999968-3
4861-2154-8119.1

16. On February 13, 2023, the Debtors filed their Objection to the Rejection Claim, and base the Objection on two arguments. *First*, the Debtors claim that BitNile is not entitled to claim the Deposit of $2,012,088 because the Master Agreement provides that deposits are "non-transferrable under any circumstance and are not refundable" except under certain conditions "not applicable" here. *See* Objection, ¶ 22. *Second*, the Debtors claim that the remainder of BitNile's Rejection Claim is not recoverable based upon the Master Agreement's waiver of consequential damages, which provides that:

> IN NO EVENT SHALL COMPUTE NORTH BE LIABLE TO CUSTOMER OR ANY OTHER PERSON, FIRM, OR ENTITY IN ANY RESPECT, INCLUDING, WITHOUT LIMITATION, FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, RELIANCE, EXEMPLARY, OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS, LOSS OF REVENUE, LOSS OF BUSINESS, OR COST OF COVER OF ANY KIND OR NATURE WHATSOEVER, ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT EVEN IF ADVISED OF THE POSSIBILITY THEREOF. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, COMPUTE NORTH'S TOTAL CUMULATIVE LIABILITY UNDER OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT LAW, WARRANTY, OR OTHERWISE (INCLUDING ATTORNEYS' FEES), SHALL BE LIMITED TO DIRECT DAMAGES NOT TO EXCEED THE AMOUNTS ACTUALLY RECEIVED BY COMPUTE NORTH FROM CUSTOMER FOR THE SERVICE MONTH DURING WHICH THE EVENT GIVING RISE TO THE CLAIM OCCURRED

Objection, ¶ 23; Master Agreement, § 11.3. According to the Debtors, BitNile's claim should be reduced to $1,006,044 as liquidated damages, which is half the Deposit and equivalent to one month of hosting fees under the Master Agreement, because the parties agreed that, as a remedy for any contractual breaches, BitNile would be entitled to "a refund of any fees paid to Compute North for the service month during which the nonperformance occurred." Objection, ¶ 28.

---

BitNile has observed equipment that is damaged and dented, which will result in additional losses to BitNile.

17. None of the Debtors' arguments in their Objection have any merit.

### III. ARGUMENTS AND AUTHORITIES

#### I. The Objection Does Not Validly Refute the Claims

18. It is well-settled that a creditor's properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. 11 U.S.C. § 502(a); Federal Rule of Bankruptcy Procedure 3001(f) (the "Bankruptcy Rules"). Once a proof of claim has been properly executed and filed, the objecting party must come forth with evidence to refute at least one of the allegations essential to the claim. *In re Reilly*, 245 B.R. 768, 773 (2d Cir. BAP 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000). In other words, "it is a debtor who bears the initial burden of going forward to produce evidence sufficient to negate the prima facie validity of the filed . . . ." *In re Desert Village Ltd. P'ship*, 321 B.R. 443, 446 (Bankr. N.D. Ohio 2004) (citing *Morton v. Morton (In re Morton)*, 298 B.R. 301, 307 (6th Cir. BAP 2003)).

19. Accordingly, a party objecting to a claim must present affirmative evidence to overcome the presumption of validity. *See In re Allegheny International, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) (burden shifts to objector to produce sufficient evidence to negate the prima facie validity of the filed claim); *In re Sterling Packaging Corp.*, 265 B.R. 701 (Bankr. W.D. Pa. 2001); *In re Planet Hollywood Int'l*, 274 B.R. 391, 394 (D. Del. 2001). "[A] party objecting to a claim has the initial burden of presenting a substantial factual basis to overcome the prima facie validity of proof of claim [and] [t]his evidence must be a probative force equal to that of the creditor's proof of claim." *In re Hinkley*, 58 B.R. 339, 348 (Bankr. S.D. Tex. 1986), *aff'd*, 89 B.R. 608 (S.D. Tex. 1988), *aff'd*, 879 F.2d 859 (5th Cir. 1989); *see also In re Lewis*, 80 B.R. 39, 40 (E.D. Pa. 1987) (citing Collier on Bankruptcy). "[T]o overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Reilly*, 245 B.R. at 773. Only when "the debtor has met that burden, the

8

burden of going forward shifts back to the creditor, and the creditor bears the ultimate burden of persuasion." *Morton*, 298 B.R. at 307.

20. The Objection is legally insufficient because as presently styled, it offers no evidence to support the Debtors' allegations that they not liable for the Rejection Claim or that otherwise overcome the presumption that the Rejection Claim, as filed, is valid.

21. The Debtors' sole arguments in opposition to the Rejection Claim rely on the terms of the Master Agreement. The Debtors do not dispute—or introduce a single shred of evidence to contradict—BitNile's claims that the Debtors engaged in fraud and intentional misconduct, nor show that the Debtors ever performed any services at all in connection with the Master Agreement. In fact, the Debtors acknowledge that "nonperformance by the Debtors occurred." Declaration of Ryan Mersch in Support of Debtors' Objection to Claim No. 42 of BitNile, Inc. for Contract Rejection Damages, dated February 13, 2023 [Docket No. 964-1] ("Mersch Decl."), ¶ 5. And, as set forth below, the terms of the Master Agreement do not support Debtors' Objection. Thus, the Debtors' Objection should be rejected in its entirety.

## II. The Master Agreement Does Not Bar BitNile's Rejection Claim

22. The Debtors' assertion that the terms of the Master Agreement bar any portion of BitNile's Rejection Claim has no merit for at least three reasons.

23. *First*, the Debtors' contention that BitNile's Rejection Claim is seeking a "refund" of the Deposit pursuant Section 5.1 of the Master Agreement has no merit. What BitNile seeks is not a "refund," but rather damages for the Debtors' failure to perform any of the services they agreed to perform. However, of greater significance, even if BitNile were seeking a "refund," pursuant to the plain and unambiguous terms of the Master Agreement, it would be entitled to the full amount of its Deposit because BitNile is entitled to "a refund of any fees paid to Compute North for the service month during which [ ] nonperformance occurred." *See* Master Agreement,

9

§ 11.4; *see also id.*, § 5.1. The Debtors do not dispute that they never performed <u>any</u> services for <u>any</u> months. Accordingly, a claim for the amount of the Deposit is appropriate and allowable.

24. *Second*, under clear New York law—which governs interpretation of the Master Agreement—a contractual limitation providing that fees are non-refundable cannot be construed to limit liability where a party fails to provide any performance at all, or engages in intentional misconduct. *See Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("Because the fee's non-refundable status functions in the same manner as the other contractual limitations on liability, the fee's nonrefundable status is subject to the same public policy considerations that justify disregarding limitations on liability in the event of willful misconduct or gross negligence. Furthermore, the non-refundable fee was paid by [plaintiff] not as a gift but as one element in a bargained for exchange and, in that context, 'the word non-refundable cannot be construed as a license to provide little or no consideration and to still retain an advance payment.'"). As the Debtors do not dispute that they failed to provide any services, and do not dispute that they engaged in intentional misconduct, any limitations in the Master Agreement do not apply to BitNile's Rejection Claim.

25. *Third*, none of the Master Agreement's purported limitations on liability apply where Compute North and its executives fraudulently induced BitNile to enter into the Master Agreement. Under New York law, "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983). Similarly, "'Texas courts may not enforce a contractual limitation of liability as a defense to an intentional tort such as fraud.'" *Simmonds Equip., LLC v. GGR Int'l,*

10

*Inc.*, 126 F. Supp. 3d 855, 867 (S.D. Tex. 2015) (holding that party could not limit liability based on agreement); *Aluchem, Inc. v. Sherwin Alumina, L.P.*, No. CIV.A. C-06-183, 2007 WL 1100473, at *9 (S.D. Tex. Apr. 11, 2007) (same).

26. BitNile has submitted allegations of intentional and fraudulent misconduct by the Debtors in connection with its Rejection Claim. *See* Exhibit C hereto. In fact, on November 15, 2022, BitNile even filed a separate action in the United States District Court for the District of Minnesota against various officers and employees of Compute North for fraud, fraudulent concealment/fraudulent nondisclosure, and civil conspiracy. *See BitNile, Inc. v. Perrill, et al.*, Case 0:22-cv-02911-WMW-DTS (D. Minn). A copy of the Complaint in that action, which also contains significant allegations of fraud that have not been rebutted, is annexed as Exhibit D hereto.

27. The Objection does not dispute that the Debtors perpetrated a fraud against BitNile, nor do the Debtors submit any evidence that could refute BitNile's claim of fraud. In fact, the Debtors do not even attempt to address BitNile's statements in its Rejection Claim that "BitNile was assured that its Mining Equipment would be ready for use and energized . . . [T]he Debtors made material misrepresentations to BitNile about their financial condition and their abilities to operate and energize the facility. BitNile believes that it was defrauded in connection with the execution of the Master Agreement and the inducement to make the Deposit . . ." Attachment to Rejection Claim at p. 1.

28. BitNile suffered significant losses as a result of the Debtors' malfeasance and the rejection of its Master Agreement and Order Form. All such losses other than the Deposit are not, as the Debtors claim, "consequential damages." Objection, ¶¶ 23-27. "General damages 'are the natural and probable consequence of the breach' of a contract . . . By contrast, consequential, or special, damages do not 'directly flow from the breach.'" *Biotronik A.G. v. Conor Medsystems*

11

*Ireland, Ltd.*, 22 N.Y.3d 799, 805–06 (2014). Here, BitNile seeks the Deposit, other fees paid directly to the Debtors, moving and packaging costs that result of the Debtors' nonperformance, lost profits, and cover damages. Lost profits may be deemed general, rather than consequential, damages where, as here, "the non-breaching party bargained for such profits and they are 'the direct and immediate fruits of the contract'" or the "natural and probable consequence of the defendant's breach." *Id.* (holding lost profits were direct, not consequential, damages in case involving distribution contract). With respect to BitNile's cover damages, "[c]osts of cover are also generally considered to be direct damages." *In re Enron Corp.*, 367 B.R. 384, 408 (Bankr. S.D.N.Y. 2007). *See also Max-Planck-Gesellschaft Zur Forderung Der Wissenchaften E.V. v. Whitehead Inst. for Biomedical Rsch.*, No. CIV.A. 09-11116-PBS, 2010 WL 2900340, at *2 (D. Mass. July 26, 2010) ("Replacing services provided by a breaching party is a natural and foreseeable consequence of the breach, and therefore constitutes 'general damages' not barred by the contracts, which preclude only 'consequential' and 'incidental' damages."). Yet even if any of BitNile's claimed damages were "consequential," they would be recoverable as the Master Agreement's contractual limitation on consequential damages is unenforceable as a result of the Debtors' fraud against BitNile.

29. Since Debtors have failed to introduce any facts to introduce any evidence to overcome the presumptive validity of BitNile's Rejection Claim, the Debtors' Objection should be overruled.

### III. There Is No Basis to Reduce the Rejection Claim to $1,006,004

30. The Debtors also claim that BitNile's Rejection Claim should be reduced to $1,006,004 as "liquidated damages." That argument fails for at least three reasons.

31. *First*, under the plain language of the Master Agreement, where the Debtors fail to perform their obligations, BitNile is entitled to "a refund of any fees paid to Compute North for

12

the service month during which the nonperformance occurred." Master Agreement, § 11.4. The $2,012,088 Deposit constituted two months' worth of "Service Fees" and "Package Fees." *See* Order Form at p.2. BitNile also paid $22,481.70, and expects to pay an additional approximately $20,000, to the Debtors as storage fees. All of those amounts were paid during months of the Debtors' nonperformance. There is no basis under the plain language of the Master Agreement to limit the "refund of any fees paid" to the fees paid for <u>one</u> month, where the nonperformance lasted several months. Accordingly, Section 11.4 of the Master Agreement entitles BitNile to a return of the entire Deposit and all storage fees.

32. *Second*, as set forth in Point II above, any contractual limitations on damages do not apply due to the Debtors' fraud and intentional misconduct.

33. *Third*, this Court has previously held that a "liquidated damages clause of a rejected executory contract is not enforceable." *In re TransAmerican Nat. Gas Corp.*, 79 B.R. 663, 668 (Bankr. S.D. Tex. 1987). The Master Agreement was rejected by this Court on January 27, 2023. [Docket No. 871.] Thus, any "liquidated damages" provisions are not enforceable, and this Court should look to BitNile's actual damages of over $21 million, as detailed in BitNile's Rejection Claim.

[*Remainder of this page intentionally left blank*]

11999968-3
4861-2154-8119.1

## PRAYER

WHEREFORE, BitNile respectfully requests and prays the Court overrule the Objection and such other and further relief as it deems just and proper.

Houston, Texas
March 13, 2023

/s/ *Jason S. Brookner*
**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Amber M. Carson (TX Bar No. 24075610)
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7127
Facsimile: (713) 986-5966
Email:  jbrookner@grayreed.com
  acarson@grayreed.com

- and -

**OLSHAN FROM WOLOSKY, LLP**
Adam H. Friedman (*pro hac vice* forthcoming)
1325 Avenue of the Americas
New York, NY 10019
Telephone: (212) 451-2216
Facsimile: (713) 451-2222
Email:  afriedman@olshanlaw.com

**COUNSEL TO BITNILE INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 13th day of March 2023, he caused a true and correct copy of the foregoing document to be served electronically via the Court's CM/ECF system for the Southern District of Texas.

/s/ *Jason S. Brookner*
Jason S. Brookner