<u>**Exhibit A**</u>

**Stipulation and Agreed Order**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MINING PROJECT WIND DOWN HOLDINGS, INC. | ) Case No. 22-90273 (MI) |
| (f/k/a Compute North Holdings, Inc.), *et al.*, | ) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

### STIPULATION AND AGREED ORDER BY AND AMONG THE DEBTORS, NEBRASKA PUBLIC POWER DISTRICT, SOUTHERN PUBLIC POWER DISTRICT, FOUNDRY DIGITAL LLC AND MINDEN MINING LLC

This stipulation and agreed order (this "Stipulation and Agreed Order") is made and entered into by and among (a) the above-captioned debtors and debtors in possession (collectively, the "Debtors"), (b) Nebraska Public Power District ("NPPD"), (c) Southern Public Power District ("SPPD"), (d) Foundry Digital LLC ("Foundry"), and (e) Minden Mining LLC (the "Minden Purchaser", and together with the Debtors, NPPD, SPPD and Foundry, the "Parties," and each individually, a "Party"). The Parties hereby stipulate and agree as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Debtors' service address for the purposes of these chapter 11 cases is 300 North LaSalle, Suite 1420, Chicago, Illinois 60654.

## RECITALS

**WHEREAS**, NPPD is a public corporation and political subdivision of the State of Nebraska that is authorized by the State of Nebraska to engage in the generation, transmission, sale, and distribution of electricity.

**WHEREAS**, SPPD owns and operates an electric system comprised of subtransmission and/or distribution facilities, and SPPD is a wholesale customer of NPPD.

**WHEREAS**, on October 1, 2021, Compute North NE05, LLC ("CN NE05"), NPPD and SPPD entered into the Agreement for EDR Electric Service (the "Original EDR Agreement"), which was subsequently transferred to Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) ("CN Minden") by CN NE05.

**WHEREAS**, on February 11, 2022, CN Minden entered into the Restated and Amended Agreement for EDR Electric Service between CN Minden, NPPD and SPPD (the "First Restated EDR Agreement").  The First Restated EDR Agreement was executed by CN Minden and SPPD but was not signed by NPPD.

**WHEREAS**, CN Minden and NPPD entered into the Transmission Facilities Construction Agreement at NPPD's Minden Substation between CN Minden and NPPD, dated February 17, 2022, attached hereto as Exhibit A-1 (the "Construction Agreement") relating to construction activities at NPPD's Minden Substation, pursuant to which CN Minden intended to own and operate a colocation and hosting facility (the "Facility") and NPPD agreed to construct and, if necessary, upgrade the NPPD electric system to provide electric service to SPPD at the location of the Facility to enable SPPD to provide electric service to the Facility.  Pursuant to Section 4.3 of the Construction Agreement, CN Minden was required to "obtain and provide to NPPD one or more standby Letters of Credit" in the amount of $813,457 (the "Debtor LOC").

**WHEREAS**, on March 25, 2022, BMO Harris Bank N.A. ("BMO") issued the Debtor LOC in favor of NPPD pursuant to and in satisfaction of CN Minden's obligations under Section 4.3 of the Construction Agreement.

**WHEREAS**, CN Minden and the City of Minden, Nebraska (the "City") entered into the Development Agreement, dated July 8, 2022, attached hereto as Exhibit A-2 (the "Development Agreement").

**WHEREAS**, on September 22, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").  The Chapter 11 Cases have been consolidated for procedural purposes only and are jointly administered pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, on October 6, 2022, the Office of the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**WHEREAS**, on October 24, 2022, the Bankruptcy Court entered the *Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Certain Bidding Procedures, Assumption, Assignment, and Rejection Procedures, and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter into Asset Purchase Agreements with Stalking Horse Bidders; and (D) Scheduling a Hearing on the Approval of the Sale of the Debtors' Remaining Assets Free*

3

*and Clear of All Encumbrances as well as the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 256] (the "Bidding Procedures Order").

**WHEREAS**, in accordance with the Bidding Procedures Order, NPPD filed the following objections to the sale process: (i) *Nebraska Public Power District's Objection to the Debtors' Assumption and Assignment of Contracts and Cure Amount in Connection with Proposed Sale* [Docket No. 369]; (ii) *Nebraska Public Power District's Amended Objection to the Debtors' Assumption and Assignment of Contracts and Cure Amount in Connection with Proposed Sale* [Docket No. 502]; and (iii) *Nebraska Public Power District's Objection to Adequate Assurance of Future Performance by the Successful Bidder* [Docket No. 516] (collectively, the "NPPD Objections").

**WHEREAS**, on November 19, 2022, certain of the Debtors entered into the Asset Purchase Agreement, by and between Foundry and Compute North LLC, Compute North SD, LLC, Compute North Texas LLC, CN Mining LLC, and CN Minden, dated November 19, 2022 (the "Asset Purchase Agreement"),[2] and the Debtors filed the *Notice of Successful Bidder for Certain Assets* [Docket No. 511] declaring Foundry the successful bidder for the assets described in the Asset Purchase Agreement.  Under Section 9.10 of the Asset Purchase Agreement, the Purchaser is entitled, without the consent of the Seller, to designate one or more Affiliates (any such Affiliate designated by the Purchaser, a "Purchaser Designee") to purchase all or any portion of the Purchased Assets and/or assume all or any portion of the Assigned Contracts, which include the Minden Agreements (as defined below), and the Purchaser has designated the Minden Purchaser as such Purchaser Designee with respect to the Minden Purchased Assets, including the Minden Agreements.

---

[2] Capitalized terms that are used but not defined herein shall, unless otherwise indicated herein, have the meanings ascribed to such terms in the Asset Purchase Agreement.

4

**WHEREAS**, on November 22, 2022, the Bankruptcy Court conducted a hearing on the approval of the sale of the Purchased Assets to the Purchaser and related relief (the "Sale Hearing") and entered the *Order (I) Approving the Sale of the Purchased Assets Free and Clear of All Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 531] (the "Sale Order"), which, among other things, approved the Asset Purchase Agreement and the transactions contemplated therein, including the sale of the Minden Purchased Assets to the Purchaser or a Purchaser Designee in accordance with the terms of the Asset Purchase Agreement. At the Sale Hearing, the Debtors, the Purchaser and NPPD announced on the record that they had reached an agreement in principle, subject to the parties' reservation of rights, to be memorialized in subsequent documentation, regarding the assumption and assignment of the EDR agreement and Construction Agreement that would resolve the NPPD Objections, which agreement is memorialized in this Stipulation and Agreed Order and the Second Restated EDR Agreement (as defined below).

**WHEREAS**, on December 12, 2022, the Debtors filed a *Notice of Closing of Sale to Foundry Digital LLC and Cancellation of Hearing Scheduled for December 12, 2022 at 4:30 p.m.* [Docket No. 642], whereby the Debtors provided notice of the Closing of the transactions contemplated by the Asset Purchase Agreement (other than the Minden Closing and the sale of the Minden Purchased Assets).

**WHEREAS**, on February 15, 2023, the Nebraska Department of Economic Development issued a Notice of Award to the City of Minden approving the Site and Building Development Fund grant for the Minden Purchaser, attached hereto as Exhibit A-3 (the "Notice of Award"),

which pursuant to the Second Restated EDR Agreement constitutes Customer's[3] "agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law".  The Notice of Award is approved by and acceptable to NPPD and satisfies any obligation and/or condition with respect to "an agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law", including Customer's obligations to secure such agreement for economic development project under Article 2, Sections 1 and 4 of the Second Restated EDR Agreement, which, subject to the terms of the Second Restated EDR Agreement, must be maintained after the assignment of the Second Restated EDR Agreement to the Minden Purchaser.

**WHEREAS**, this Stipulation and Agreed Order is being entered into pursuant to and in furtherance of the Asset Purchase Agreement and the Sale Order, is expressly authorized by the Sale Order, and all of the rights, benefits, interests, protections, findings, conclusions and authorizations granted to, or in favor or for the benefit of, the Purchaser (as such term is used in the Sale Order), including the Minden Purchaser, under the Asset Purchase Agreement and the Sale Order are incorporated herein as if fully set forth herein.

**WHEREAS**, in furtherance of the Asset Purchase Agreement, the Sale Order and this Stipulation and Agreed Order, CN Minden, NPPD and SPPD have each agreed that (a) contemporaneously with their execution of this Stipulation and Agreed Order and by no later than the Bankruptcy Court's approval of this Stipulation and Agreed Order, each shall execute and deliver the Second Restated and Amended Agreement for EDR Electric Service in the form attached hereto as Exhibit A-4 (the "Second Restated EDR Agreement"), which Second Restated

---

[3]    All references to "Customer" in this paragraph shall have the meaning ascribed to such term in the Second Restated EDR Agreement.

EDR Agreement shall amend, restate and supersede the Original EDR Agreement, the First Restated EDR Agreement and any other amendment entered into prior to the execution of the Second Restated EDR Agreement, and (b) effective upon and as part of the Minden Closing, the Second Restated EDR Agreement shall be, and shall be deemed, validly assumed and assigned by CN Minden to the Minden Purchaser in accordance with the terms of the Asset Purchase Agreement.

**WHEREAS**, pursuant to the Asset Purchase Agreement and the Sale Order, Seller shall deliver the Minden Purchased Assets to the Minden Purchaser at the Minden Closing.  The Minden Purchased Assets to be delivered to the Minden Purchaser upon the Minden Closing include, among others, the assumption and assignment by CN Minden to the Minden Purchaser of the following agreements, which shall be deemed binding on the parties thereto and in full force and effect, without further amendment or modification:  (i) the Second Restated EDR Agreement (which shall amend, restate and supersede the Original EDR Agreement, the First Restated EDR Agreement and any other amendment entered into prior to the execution of the Second Restated EDR Agreement, each in its entirety); (ii) the Construction Agreement; and (iii) the Development Agreement (the agreements in clauses (i) through (iii), collectively, the "Minden Agreements").

**WHEREAS**, effective as of the Minden Closing, (a) each of the Minden Agreements shall be and shall be deemed to be binding on, and enforceable against, each of NPPD, SPPD, and the City (as applicable), and their respective affiliates, predecessors, successors and assigns, without further amendment or modification, (b) any objection or challenge to the assignment of any of the Minden Agreements to the Minden Purchaser are and shall be deemed withdrawn or overruled with prejudice, (c) any defaults (whether known, unknown, asserted or unasserted) under any of the Minden Agreements which have accrued on or before the Minden Closing are and shall be

deemed to be waived and released, and any cure obligations with respect to any of the Minden Agreements are and shall be deemed satisfied, (d) any and all conditions to the obligations of NPPD, SPPD and/or the City (as applicable) arising under the Minden Agreements through the Minden Closing have been or are deemed satisfied, (e) any consent, permit, authorization from, or notice to, any non-Debtor or third party with respect to the assignment of any of the Minden Agreements to the Minden Purchaser are and shall be deemed to have been obtained, provided and/or otherwise overridden by operation of the Sale Order and/or the Bankruptcy Code, and (f) the Minden Agreements shall be, and shall be deemed, validly assumed and assigned to the Minden Purchaser in accordance with the Asset Purchase Agreement.

**WHEREAS**, in furtherance of the Sale Order, the statements made on the record at the hearing held by the Bankruptcy Court on November 22, 2022, and the Bankruptcy Court's docket entry on this matter made on November 22, 2022 [Docket No. 530], the Debtors submit this Stipulation and Agreed Order for the Bankruptcy Court's approval.

**WHEREAS**, the Bankruptcy Court has jurisdiction to approve this Stipulation and Agreed Order under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these chapter 11 cases in this District is proper under 28 U.S.C. §§ 1408 and 1409. The Bankruptcy Court may enter this Stipulation and Agreed Order, which constitutes a final order, consistent with Article III of the United States Constitution. The statutory predicates for the relief granted in this Stipulation and Agreed Order are Bankruptcy Code sections 105, 363, and 365. Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9014, and 9019, and the applicable Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").

**WHEREAS**, the Debtors' entry into and execution of this Stipulation and Agreed Order and any other agreements, documents and/or instruments entered (or to be entered into) in connection herewith or with the transactions contemplated herein, including the Second Restated EDR Agreement, and assumption and assignment of the Minden Agreements to the Minden Purchaser upon and as part of the Minden Closing in accordance with and subject to the terms of this Stipulation and Agreed Order and the Asset Purchase Agreement, constitute an exercise of the Debtors' sound business judgment and are in the best interests of the Debtors, their estates and their creditors, and other parties in interest.  The Minden Agreements are an integral part of the Purchased Assets being purchased by the Purchaser and the Minden Purchaser (as applicable) and, accordingly, the assumption and assignment of the Minden Agreements to the Minden Purchaser in accordance with and subject to the terms of this Stipulation and Agreed Order and the Asset Purchase Agreement is reasonable and enhances the value of the Debtors' estates.  The Minden Purchaser has or is deemed to have provided adequate assurance of future performance with respect to the Minden Agreements within the meaning of section 365 of the Bankruptcy Code.

**WHEREAS**, after good-faith, arm's length discussions, the Parties have agreed to resolve their disputes and enter into, and jointly submit, this Stipulation and Agreed Order.

**NOW, THEREFORE, IT IS STIPULATED AND AGREED TO BY THE PARTIES, AND UPON APPROVAL BY THE BANKRUPTCY COURT OF THIS STIPULATION AND AGREED ORDER, IT IS SO ORDERED AS FOLLOWS:**

1.      The above recitals are incorporated herein by reference with the same force and effect as if fully set forth hereafter.

2.      The Debtors are authorized to enter into and execute the applicable Minden Agreements, and any other agreements, documents and/or instruments in connection herewith and/or with the transactions contemplated herein, and perform their obligations thereunder and

hereunder, and take any and all actions necessary or appropriate in connection with this Stipulation and Agreed Order and the Minden Agreements.

3.      The Debtors are authorized to take any and all actions necessary or appropriate to assume and assign the Minden Agreements (and their rights, title, interests and benefits therein or thereto) to the Minden Purchaser effective upon and as part of the Minden Closing in accordance with the terms of the Asset Purchase Agreement.

4.      Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision of any agreement (including any of the Minden Agreements) or applicable nonbankruptcy law that prohibits, restricts, limits or conditions the assignment of any of the Minden Agreements, the Debtors are authorized to assume and assign each of the Minden Agreements (and their rights, title, interests and benefits therein or thereto) to the Minden Purchaser in accordance with the terms of the Asset Purchase Agreement.  There shall be no accelerations, assignment fees, increases or any other fees charged (directly or indirectly) to the Minden Purchaser or the Purchaser as a result of the assumption and assignment of any of the Minden Agreements.  Nothing in this paragraph shall limit any rate change pursuant to the EDR Schedule (as defined in the Second Restated EDR Agreement).

5.      Subject to the terms and conditions hereof, including NPPD's acknowledgement and agreement (which is deemed to be provided upon its execution of this Stipulation and Agreed Order) that the Notice of Award fully satisfies CN Minden's, Minden Purchaser's and Customer's (as such term is used in the Second Restated EDR Agreement) obligations under Article 2, including Sections 1 and 4, of the Second Restated EDR Agreement (and any other condition or obligation relating to an agreement with the state or any political subdivision to provide an economic development project thereunder), NPPD is authorized and has directed a draw on the

Debtor LOC; *provided*, *however*, that NPPD shall promptly return to the Debtors all of the funds drawn under the Debtor LOC in the event NPPD receives a replacement letter of credit or another form of Security (as defined in the Construction Agreement) from or on behalf of the Minden Purchaser in accordance with the Construction Agreement.  If the Minden Purchaser chooses to provide NPPD with a replacement letter of credit rather than another form of Security (as defined in the Construction Agreement), such replacement letter of credit shall be in accordance with the terms required by the Construction Agreement.  BMO is hereby authorized to exercise its setoff rights against the Debtors' cash collateral account No. XXX5743 (the "<u>Account</u>") to satisfy the Debtors' obligations owed to BMO under that certain Application and Indemnity Agreement dated March 14, 2022.  BMO is entitled to setoff the sum of $813,457.00 from the Account and close said Account.  The 14-day stay period provided by Bankruptcy Rule 4001(a)(3) is hereby waived.

6.     NPPD acknowledges and agrees that (a) prior to July 1, 2022, CN Minden conducted preliminary site work for the real estate where CN Minden intended to construct its facility in Kearney County, Nebraska, and NPPD accepts the site work performed as compliance with, and satisfaction of the requirement to commence construction by the Construction Commencement Date (as defined in the Construction Agreement) found in, Section 4.7 of the Construction Agreement, (b) Section 4.7 of the Construction Agreement is satisfied, including any obligations of the Customer thereunder, and (c) any defaults (or alleged defaults) on the part of the Customer under Section 4.7 of the Construction Agreement are expressly waived and released. For the avoidance of doubt, notwithstanding anything to the contrary contained herein or in the Construction Agreement, (i) the return, pursuant to this Stipulation and Agreed Order, of any of the amounts drawn by NPPD under the Debtor LOC, the drawing upon or termination of the Debtor LOC, or the replacement or substitution of the Debtor LOC (or proceeds thereof) for another form

of security supplied by or on behalf of the Minden Purchaser shall not constitute a return by NPPD of "any remaining Security to Customer" under Section 2.2 of the Construction Agreement or terminate the Construction Agreement, and (ii) NPPD acknowledges and agrees that the In-Service Date (as defined in the Construction Agreement) has not occurred.

7.     Effective as of the Minden Closing:  (i) the Construction Agreement is and shall be deemed valid, binding, and in full force and effect, and enforceable against each party thereto; (ii) there are no defaults or breaches that must be cured under section 365(b) of the Bankruptcy Code for the Construction Agreement to be assumed and assigned to the Minden Purchaser, or any other cure obligations arising under or relating to the Construction Agreement; (iii) any and all existing, alleged, asserted or unasserted defaults and/or breaches by, and claims and/or challenges against, CN Minden, the Minden Purchaser, the Customer,[4] and/or their respective affiliates, predecessors, successors and/or assigns arising from or relating to the Construction Agreement and arising from or relating to any fact, event or circumstance occurring prior to the Minden Closing are, and are deemed to be, for all purposes cured, waived, and released; (iv) the Construction Agreement shall be, and shall be deemed, validly assumed and assigned by CN Minden to the Minden Purchaser in accordance with the Asset Purchase Agreement; (v) NPPD consents, and waives any objection or challenge, to the assumption and assignment of the Construction Agreement to the Minden Purchaser; (vi) any and all conditions to the obligations of NPPD arising under the Construction Agreement through the Minden Closing have been or are deemed satisfied; and (vii) upon the assumption and assignment of the Construction Agreement by CN Minden to the Minden Purchaser in accordance with the Asset Purchase Agreement, (a) the Construction Agreement is

---

[4]     All references to "Customer" in this paragraph 7 shall have the meaning ascribed to such term in the Construction Agreement.

and shall be a valid, binding, effective and enforceable agreement by and between the Minden Purchaser and NPPD, and shall remain valid, binding and in full force and effect (and enforceable by the Minden Purchaser) following such assumption and assignment to the Minden Purchaser in accordance with its terms (as modified by this Stipulation and Agreed Order), (b) the Minden Purchaser shall be deemed a Customer under the Construction Agreement, succeed to all of CN Minden's or Customer's rights, title, interests and benefits thereunder, and have all of the rights, title, interests, benefits, contractual obligations and privileges appurtenant thereto, (c) any obligations of CN Minden, Customer or any of the other Debtors that were required to be performed under the Construction Agreement through and including the date of the assignment thereof to the Minden Purchaser have been or are deemed to have been performed and/or satisfied, and (d) the Minden Purchaser agrees to use commercially reasonable efforts to recommence construction in accordance with and subject to the terms of the Construction Agreement as soon as reasonably practicable after the Minden Closing.  Nothing in this paragraph shall in any way waive the Minden Purchaser's obligation to provide and maintain the Security required in Section 4.3 of the Construction Agreement, subject to the terms of the Construction Agreement.

8.      Contemporaneously with the execution of this Stipulation and Agreed Order and by no later than the Bankruptcy Court's approval of this Stipulation and Agreed Order, CN Minden, NPPD and SPPD shall each execute and deliver the Second Restated EDR Agreement, which shall amend, restate and supersede the Original EDR Agreement, the First Restated EDR Agreement and any other amendment entered into prior to the execution of the Second Restated EDR Agreement, and upon execution thereof by a party thereto, the Second Restated EDR Agreement shall be valid, binding and enforceable against such party.

9.       Each of NPPD and the other parties to the Second Restated EDR Agreement acknowledge and agree that, notwithstanding anything to the contrary in the Second Restated EDR Agreement, (a) the Notice of Award (i) constitutes, and is deemed to constitute, Customer's[5] "agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law" for all purposes under the Second Restated EDR Agreement, including Article 2, Sections 1 and 4 thereof, and neither CN Minden nor the Minden Purchaser is required to enter into, obtain or provide any other agreement to satisfy Customer's obligations thereunder, (ii) is in form and substance satisfactory to, and acceptable and approved by, NPPD in all respects and for all purposes under the Second Restated EDR Agreement, and (iii) has been and is deemed to have been timely entered into, obtained and/or provided to NPPD in all respects and for all purposes under the Second Restated EDR Agreement, including prior to the deadlines set forth in Article 2 thereof, (b) the Minden Purchaser shall have the right to take service at the rates provided in the EDR Schedule (as defined in the Second Restated EDR Agreement and as may change from time to time), (c) NPPD has or is deemed to have provided all required approvals under the Second Restated EDR Agreement, including Article 2 thereof, relating to Customer's agreement with the state or political subdivision to provide an economic development project pursuant to state or local law, (d) all notices and information required under the Second Restated EDR Agreement, including Article 2, Section 4 thereof, to transfer or assign the Second Restated EDR Agreement to the Minden Purchaser has been and is deemed to have been provided prior to the applicable deadlines and in accordance with the Second Restated EDR Agreement, with no other notices and information being required, (e) upon the Minden Closing, the transfer or

---

[5]    All references to "Customer" in this paragraph 9 shall have the meaning ascribed to such term in the Second Restated EDR Agreement.

assignment of the Second Restated EDR Agreement to the Minden Purchaser shall constitute a valid and enforceable transfer or assignment, and (f) Article 2, Section 5 of the Second Restated EDR Agreement has been satisfied.

10.    Effective as of the Minden Closing:  (i) the Second Restated EDR Agreement is and shall be deemed valid, binding, and in full force and effect, and enforceable against each party thereto; (ii) there are no, and are deemed not to be any, defaults or breaches that must be cured under section 365(b) of the Bankruptcy Code for the Second Restated EDR Agreement to be assumed and assigned to the Minden Purchaser, or any other cure obligations arising under or relating to the Second Restated EDR Agreement; (iii) and any and all existing, alleged, asserted or unasserted defaults and/or breaches by, and claims and/or challenges against, CN Minden, the Minden Purchaser, the Customer,[6] and/or their respective affiliates, predecessors, successors and/or assigns arising from or relating to the Second Restated EDR Agreement and arising from or relating to any fact, event or circumstance occurring prior to the Minden Closing are, and are deemed to be, for all purposes cured, waived, and released; (iv) the Second Restated EDR Agreement shall be, and shall be deemed to be, validly assumed and assigned by CN Minden to the Minden Purchaser in accordance with the Asset Purchase Agreement, and each of NPPD and SPPD consents, and waives any objection or challenge, to the assumption and assignment of the Second Restated EDR Agreement to the Minden Purchaser; (v) all of CN Minden's or Customer's obligations under Article 2, Sections 1, 4 and 5 of the Second Restated EDR Agreement have been fully performed and satisfied, and neither CN Minden nor the Minden Purchaser shall have any obligations or be required to take any action; and (vi) upon the assumption and assignment of the

---

[6]    All references to "Customer" in this paragraph 10 shall have the meaning ascribed to such term in the Second Restated EDR Agreement.

Second Restated EDR Agreement by CN Minden to the Minden Purchaser in accordance with the Asset Purchase Agreement, (a) the Second Restated EDR Agreement is and shall be deemed a valid, binding, effective and enforceable agreement by and between the Minden Purchaser, NPPD and SPPD, and shall remain valid, binding and in full force and effect (and shall be enforceable by the Minden Purchaser) following such assumption and assignment to the Minden Purchaser in accordance with its terms (as modified by this Stipulation and Agreed Order), (b) the Minden Purchaser shall be deemed a Customer under the Second Restated EDR Agreement, succeed to all of CN Minden's or Customer's rights, title, interests, contractual obligations and benefits thereunder, and have all of the rights, title, interests, benefits and privileges appurtenant thereto, (c) any and all conditions to the obligations of NPPD and SPPD arising under the Second Restated EDR Agreement through the Minden Closing have been or are deemed satisfied, and (d) any obligations of CN Minden, Customer or any of the other Debtors that were required to be performed under the Second Restated EDR Agreement through and including the date of the assignment thereof to the Minden Purchaser have been or are deemed to have been performed and/or satisfied.

11.     Effective as of the Minden Closing:  (i) the Development Agreement is and shall be deemed valid, binding, and in full force and effect, and enforceable against each party thereto; (ii) there are, and are deemed not to be any, no defaults or breaches that must be cured under section 365(b) of the Bankruptcy Code for the Development Agreement to be assumed and assigned to the Minden Purchaser, or any other cure obligations arising under or relating to the Development Agreement; (iii) and any and all existing, alleged, asserted or unasserted defaults and/or breaches by, and claims and/or challenges against, CN Minden, the Minden Purchaser, the

Developer[7], and/or their respective affiliates, predecessors, successors and/or assigns arising from or relating to the Development Agreement and arising from or relating to any fact, event or circumstance occurring prior to the Minden Closing are, and are deemed to be, for all purposes cured, waived, and released; (iv) the Development Agreement shall be, and shall be deemed to be, validly assumed and assigned by CN Minden to the Minden Purchaser in accordance with the Asset Purchase Agreement, and the City has consented, or is deemed to have consented (and has waived, or is deemed to have waived, any objection or challenge) to the assumption and assignment of the Development Agreement to the Minden Purchaser; and (v) upon the assumption and assignment of the Development Agreement by CN Minden to the Minden Purchaser in accordance with the Asset Purchase Agreement, (a) the Development Agreement is and shall be a valid, binding, effective and enforceable agreement by and between the Minden Purchaser and the City, and shall remain valid, binding and in full force and effect (and shall be enforceable by the Minden Purchaser) following such assumption and assignment to the Minden Purchaser in accordance with its terms (as modified by this Stipulation and Agreed Order), (b) the Minden Purchaser shall be deemed a Developer under the Development Agreement, succeed to all of CN Minden's or Developer's rights, title, interests and benefits thereunder, and have all of the rights, title, interests, benefits and privileges appurtenant thereto, (c) any and all conditions to the obligations of the City under the Development Agreement have been or are deemed satisfied; and (d) any obligations of CN Minden, Developer or any of the other Debtors that were required to be performed under the Development Agreement through and including the date of the assignment thereof to the Minden Purchaser have been or are deemed performed and/or satisfied.

---

[7]   All references to "Developer" in this paragraph 11 shall have the meaning ascribed to such term in the Development Agreement.

12. Each of the Parties acknowledges and agrees that nothing in this Stipulation and Agreed Order shall in any way relinquish or waive an applicable Party's obligation to perform, or continue to perform, its specific duties and obligations required under the applicable Minden Agreements after the date of the Minden Closing. Notwithstanding anything contained in the preceding sentence or the Minden Agreements, each of the Parties acknowledges and agrees that any duty or obligation to enter into, secure, obtain or provide an acceptable agreement with the state or political subdivision to provide an economic development project pursuant to state or local law has been performed and satisfied by the applicable deadlines, and the Minden Purchaser shall have no duties or obligations (including as Customer[8]) to enter into, secure, obtain or provide any further agreement, but, as stated above in this Stipulation and Agreed Order, shall be required to maintain the same subject to the terms of the Second Restated EDR Agreement and this Stipulation and Agreed Order.

13. Each of the Parties acknowledges and agrees that nothing in this Stipulation and Agreed Order shall in any way act as a waiver of an applicable Party's breach of the applicable Minden Agreements which first occurs after the date of the Minden Closing.

14. Each Party is authorized, and shall use commercially reasonable efforts, to take, or cause to be taken, any and all actions, and to do, or cause to be done, any and all things necessary, proper or advisable under applicable law, or otherwise consistent with the terms of this Stipulation and Agreed Order (including using commercially reasonable efforts to obtain all necessary waivers, consents, approvals and orders and effecting all necessary registrations and filings (as applicable)) to give effect to the terms of, or in connection with, this Stipulation and Agreed Order,

---

[8] "Customer" shall have the meaning ascribed to such term in the Second Restated EDR Agreement.

including as it relates to the assumption and assignment of the Minden Agreements to the Minden Purchaser, and to consummate the Minden Closing.

15.    The NPPD Objections are withdrawn or overruled with prejudice.

16.    All objections, if any, and any and all joinders thereto, to the relief requested and/or granted in this Stipulation and Agreed Order, and/or the assumption and assignment of any of the Minden Agreements, whether formal or informal, filed or stated on the record before this Court, to the extent not resolved, waived, withdrawn or previously overruled, and all reservations of rights included therein, are overruled and denied on their merits and with prejudice.

17.    Notice of the entry of this Stipulation and Agreed Order was sufficient and appropriate under the circumstances, complied with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no additional or other notice need be provided.

18.    This Stipulation and Agreed Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

19.    Notwithstanding any provision in the Bankruptcy Rules to the contrary, including, without limitation, Bankruptcy Rule 6004(h) or Bankruptcy Rule 4001(a)(3), this Stipulation and Agreed Order shall be immediately effective and enforceable on the date the Bankruptcy Court approves this Stipulation and Agreed Order.

20.    The undersigned persons represent and warrant that they have full authority to execute this Stipulation and Agreed Order, and that the respective Parties have full knowledge of and have consented to this Stipulation and Agreed Order.

21.    This Stipulation and Agreed Order shall (a) be binding upon (i) each of the Parties, their affiliates and their respective successors and assigns, including, without limitation, the

reorganized debtors, any wind down estate or trustee in bankruptcy, (ii) any person or entity acting through, or on behalf of, or claiming to act through, or on behalf of, the Debtors or their estates (including, but not limited to any plan administrator), and any of the other Parties hereto, and (iii) the Debtors' estates and creditors, and others parties in interest in the Chapter 11 Cases, and (b) be unaffected by any transfer or change of control of any person or entity referred to in clause (a) of this paragraph 21.

22.     This Stipulation and Agreed Order and any actions taken pursuant hereto shall survive the entry of any order, including any order converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, confirming any plan of reorganization or liquidation of the Debtors, or dismissing any of the Debtors' chapter 11 cases, and this Stipulation and Agreed Order shall be and shall remain enforceable and in full force and effect in the Chapter 11 Cases and in any superseding case.  This Stipulation and Agreed Order, and the obligations of the parties hereunder, shall not be released, waived, discharged or otherwise affected in any way by any plan of reorganization or liquidation in any of the Debtors' chapter 11 cases (or any document, agreement or instrument entered into or to be entered into or executed in connection therewith), any order confirming such plan or the consummation of any such plan.  Any order granting conversion or dismissal of any of the Debtors' chapter 11 cases shall specifically provide that this Stipulation and Agreed Order shall survive such conversion or dismissal.

23.     Notwithstanding anything to the contrary herein, the obligations of Foundry, the Minden Purchaser, their affiliates, and any of their respective successors and assigns (as applicable) under this Stipulation and Agreed Order and/or any of the Minden Agreements are subject to and conditioned upon the occurrence of the Minden Closing.

20

24.     This Stipulation and Agreed Order may be executed in multiple counterparts, each of which shall be deemed an original, and any one of which need not contain the signature of more than one (1) party, but all such counterparts taken together shall constitute one and the same instrument.  This Stipulation and Agreed Order, to the extent signed and delivered by means of scanned pages via electronic mail or by electronic means using DocuSign or otherwise, shall be treated in all manner and respects as original contracts and shall be considered to have the same binding legal effects as if they were the original signed versions thereof delivered in person.  At the reasonable request of any party, the other party shall re-execute original forms and deliver them to all such parties.  No party shall raise the use of email or electronic means using DocuSign or otherwise to deliver a signature or the fact that any signature was transmitted or communicated through the use of email or electronic means using DocuSign or otherwise as a defense to the formation of a contract and each such party forever waives any such defense.

25.     The Bankruptcy Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Stipulation and Agreed Order.

 Signed: March ____, 2023                    _____

                                             THE HONORABLE MARVIN ISGUR
                                             UNITED STATES BANKRUPTCY JUDGE

IN WITNESS WHEREOF and in agreement herewith, by and through the undersigned, the

Parties have executed and delivered this Stipulation and Agreed Order as of the date set forth

below.

Dated: March 15, 2023

Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.)
Mining Project Wind Down LLC (f/k/a Compute North LLC)
Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC)
Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC)
Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC)
Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC)
Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC)
Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC)
Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC)
Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722)
Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC)
Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC)
Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC)
Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC)
Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC)
Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC)
Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC)
Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC)
Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC)

By: _____

DocuSigned by:
*Drake Harvey*
───5A7888BDF58A90 1─
Name: Drake Harvey
Title: President

Nebraska Public Power District

By: _____
        Name:
        Title:


Southern Public Power District

By: _____
        Name:
        Title:


Foundry Digital LLC

By: _____
        Name:
        Title:


Minden Mining LLC

By: _____
        Name:
        Title:

IN WITNESS WHEREOF and in agreement herewith, by and through the undersigned, the

Parties have executed and delivered this Stipulation and Agreed Order as of the date set forth

below.

Dated: March 15, 2023

Mining Project Wind Down Holdings Inc. (f/k/a
Compute North Holdings, Inc.)
Mining Project Wind Down LLC (f/k/a Compute
North LLC)
Mining Project Wind Down Corpus Christi LLC
(f/k/a CN Corpus Christi LLC)
Mining Project Wind Down Atoka LLC (f/k/a CN
Atoka LLC)
Mining Project Wind Down BS LLC (f/k/a CN Big
Spring LLC)
Mining Project Wind Down Colorado Bend LLC
(f/k/a CN Colorado Bend LLC)
Mining Project Wind Down Developments LLC
(f/k/a CN Developments LLC)
Mining Project Wind Down Equipment LLC (f/k/a
CN Equipment LLC)
Mining Project Wind Down King Mountain LLC
(f/k/a CN King Mountain LLC)
Mining Project Wind Down MDN LLC (f/k/a CN
Minden LLC) (3722)
Mining Project Wind Down Mining LLC (f/k/a CN
Mining LLC)
Mining Project Wind Down Pledgor LLC (f/k/a CN
Pledgor LLC)
Mining Project Wind Down Member LLC (f/k/a
Compute North Member LLC)
Mining Project Wind Down NC08 LLC (f/k/a
Compute North NC08 LLC)
Mining Project Wind Down NY09 LLC (f/k/a
Compute North NY09 LLC)
Mining Project Wind Down STHDAK LLC (f/k/a
Compute North SD, LLC)
Mining Project Wind Down Texas LLC (f/k/a
Compute North Texas LLC)
Mining Project Wind Down TX06 LLC (f/k/a
Compute North TX06 LLC)
Mining Project Wind Down TX10 LLC (f/k/a
Compute North TX10 LLC)

By: _____
    Name:
    Title:

Nebraska Public Power District

By: _____
    Name: Christopher Elliott
    Title: Senior Staff Attorney

Southern Public Power District

By: _____
    Name:
    Title:

Foundry Digital LLC

By: _____
    Name:
    Title:

Minden Mining LLC

By: _____
    Name:
    Title:

IN WITNESS WHEREOF and in agreement herewith, by and through the undersigned, the Parties have executed and delivered this Stipulation and Agreed Order as of the date set forth below.

Dated: March 15, 2023

Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.)
Mining Project Wind Down LLC (f/k/a Compute North LLC)
Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC)
Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC)
Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC)
Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC)
Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC)
Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC)
Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC)
Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722)
Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC)
Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC)
Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC)
Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC)
Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC)
Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC)
Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC)
Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC)
Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC)

By: _____
    Name:
    Title:

Nebraska Public Power District

By: _____
    Name:
    Title:

Southern Public Power District

By: _____
    Name:  Neal Niedfeldt
    Title:  President/Chief Executive Officer

Foundry Digital LLC

By: _____
    Name:
    Title:

Minden Mining LLC

By: _____
    Name:
    Title:

IN WITNESS WHEREOF and in agreement herewith, by and through the undersigned, the Parties have executed and delivered this Stipulation and Agreed Order as of the date set forth below.

Dated: March _15_, 2023

Mining Project Wind Down Holdings Inc. (f/k/a Compute North Holdings, Inc.)
Mining Project Wind Down LLC (f/k/a Compute North LLC)
Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC)
Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC)
Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC)
Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC)
Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC)
Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC)
Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC)
Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722)
Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC)
Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC)
Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC)
Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC)
Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC)
Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC)
Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC)
Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC)
Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC)

By: _____
    Name:
    Title:

Nebraska Public Power District

By: _____
    Name:
    Title:

Southern Public Power District

By: _____
    Name:
    Title:

Foundry Digital LLC

By: _Michael Colyer_____
    Name:  Michael Colyer
    Title:  Chief Executive Officer

Minden Mining LLC

By: _Michael Colyer_____
    Name:  Michael Colyer
    Title:  Authorized Signatory

**Exhibit A-1**

Construction Agreement

CRF 22-L20-49

<p style="text-align:center; color:red;">CONFIDENTIAL</p>

## TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT
## AT NPPD'S MINDEN SUBSTATION

THIS TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT AT NPPD'S MINDEN SUBSTATION ("**Agreement**") is made and entered into as of the 17th day of February , 2022, between CN Minden, LLC, a limited liability company organized under the laws of the State of Delaware (hereinafter referred to as "Customer"), and NEBRASKA PUBLIC POWER DISTRICT, a public corporation and political subdivision of the State of Nebraska (hereinafter referred to as the "**NPPD**").

**WHEREAS,** Customer intends to own and operate the Customer Facility and wishes to enable the Customer Facility to obtain service from the Retail Service Provider by means of the Transmission System;

**WHEREAS,** NPPD is willing to construct the NPPD Transmission Facilities, and any necessary NPPD Network Upgrades, which will be used to provide transmission service to the Retail Service Provider that will serve the Customer Facility;

**AND WHEREAS,** the Parties enter into this Agreement to establish the rights and obligations of each Party for construction and payment for the NPPD Transmission Facilities for the Customer Facility.

**NOW THEREFORE,** in consideration of, and subject to the mutual covenants contained herein, the Parties agree as follows:

## ARTICLE 1 - DEFINITIONS AND INCORPORATED APPENDICES

**1.1**     **Defined Terms.** Unless otherwise specified in this Agreement, the following terms shall, for the purposes of this Agreement, have the following meanings:

"**Affiliate**" shall mean , in relation to a Party, any company or corporation which (i) directly or indirectly controls such Party; (ii) is directly or indirectly controlled by such Party; or (iii) is directly or indirectly controlled by a company or corporation which directly or indirectly controls such Party; where "controls", "controlled by" and "under common control with" mean the possession directly, or indirectly through one or more intermediaries, of more than fifty percent (50%) of the outstanding voting stock or ownership of the company in question, or the power to direct or cause the direction of management policies of, any person, whether through ownership of stock, as a general partner or trustee, by contract or otherwise. Affiliate includes, but is not limited by, the meaning given to that term in the Business Corporation Act of Nebraska.

"**A.M. Best**" shall mean A.M. Best Company, Inc. or any successor thereto.

"**Business Day**" means any day on which banks in Nebraska are open for business, beginning at 8:00 a.m. and ending at 5:00 p.m. local time in Columbus, Nebraska.

"**Confidential Information**" means any non-public information (including, without limitation, any scientific, engineering, technical, commercial, financial, process, personnel or economic data or information, information about project-related costs, operating and maintenance history, and business and other plans) disclosed by or on behalf of either party to the other party, either directly or indirectly, in written, oral, graphic, electronic or other form, pursuant to this Agreement, that: (a) is marked or identified as "confidential" or "proprietary" at the time of disclosure, (b) is provided under circumstances reasonably indicating its confidentiality, and confirmed in writing within five (5) Business Days, (c) the definition of Stranded Cost Estimate and Full Build Out

CONFIDENTIAL

Conditions, (d) each date contained in the definition of In-Service Date, Section 3.3, Section 3.5, or Section 4.4, or elsewhere in this Agreement. Confidential Information does not, however, include any information that (i) is now, or later becomes, publicly known and made generally available to the Receiving Party through no action or inaction of the Receiving Party; (ii) is already in the possession of the Receiving Party at the time of disclosure by the Disclosing Party; (iii) is obtained by the Receiving Party from a third party without a breach of such third party's obligations of confidentiality to the Disclosing Party; or (iv) is independently developed by the Receiving Party without use of or reference to the Disclosing Party's Confidential Information.

"**Construction Commencement Date**" shall have the meaning set forth in Section 4.7.

"**Construction Costs**" shall mean any costs and expenses incurred by NPPD including for NPPD's consultants and contracted suppliers and service providers, to design, engineer, procure, construct, install, and test the NPPD Transmission Facilities.

"**Contribution in Aid of Construction or (CAIOC)**" shall mean a portion of the Construction Costs that are nonrefundable funds to be paid for by Customer, in accordance with Section 4.1.

"**Cost Estimate**" shall have the meaning set forth in Section 3.2.

"**Credit Rating**" means the rating then assigned to an entity's senior, unsecured long-term debt obligations (not supported by third party credit enhancements) or if such entity does not have a rating for its senior, unsecured long-term debt, then the rating assigned to such entity as an issuer rating by Fitch, S&P, Moody's or any other rating agency agreed to by the Parties.

"**Customer Facility**" shall mean the additional hosting and colocation facilities to be located at an address to be determined near Minden, NE, in Parcel ID 0003303.01, with a legal description of Lot 1, Section 32, Township 7, Range 14 W, whose load is shown in Appendix B.

"**Disclosing Party**" means either Party to this Agreement, when disclosing Confidential Information to the other Party hereto.

"**Effective Date**" shall have the meaning given in Section 2.1.

"**Fitch**" shall mean Fitch Ratings, Inc., or any successor thereto, or in the event that there is no such successor, a nationally recognized credit rating agency.

"**Force Majeure**" shall mean any cause beyond the control of the Party affected, including but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightning, epidemic, war, riot, civil disturbance or disobedience, labor dispute, nonresponsive or unacceptable bids by contractors and vendors, sabotage, acts of public enemy, acts of terrorism, explosions, orders, regulations or restrictions imposed by any Governmental Authority, or cancellation or revocation of any Regulatory Approval for reasons other than the affected Party's failure to comply with the terms thereof, which, in any of the foregoing cases, by exercise of due diligence such Party could not reasonably have been expected to avoid, and which, by the exercise of due diligence, it has been unable to overcome, but does not include any cause arising out of a Party's act of negligence or intentional wrongdoing nor mere economic hardship of a Party.

**Formula Contribution in Aid of Construction (FCAIOC)** shall mean a portion of the Construction Costs that are nonrefundable funds to be paid for by Customer, in accordance with Section 4.2.

CONFIDENTIAL

"**Full Build Out Conditions**" shall mean when the Customer Facility has received delivery from its Retail Service Provider at least 551,880 Megawatt hours of electrical energy (based on 730 days times 24 hours per day times the minimum guaranteed load as stated in **Appendix B**), which were consumed after the In-Service Date, and that occurred over a consecutive period of no more than 730 days. This required amount of consumption shall be based on the metering used to determine billing from NPPD to Retail Service Provider.

"**Good Utility Practices**" shall mean, at any particular time, any of the practices, methods and acts engaged in or approved by a significant portion of the electric utilities located in the United States during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time a decision is made, could be expected to produce the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.  Good Utility Practices are not intended to be limited to the optimum practices, methods or acts to the exclusion of all others, but rather to be a range of acceptable practices, methods or acts.

"**Governmental Authority**" shall mean any federal, state, local governmental, regulatory, or administrative agency, court, commission, administration, department, board, governmental subdivision, or authority, or any person acting as a delegate or agent of any of the foregoing having jurisdiction over the subject matter and Party.  Notwithstanding the foregoing, neither the Retail Service Provider nor NPPD shall be considered a Governmental Authority.

"**Governmental Charges**" shall mean any present or future tax, levy, impost, duty charge, assessment, or fee of any nature (including interest, penalties, and additions thereto) that is imposed by any Governmental Authority in respect of any payment under this Agreement.

 "**In-Service Date**" shall mean the day that both of the following have occurred: (a) NPPD Transmission Facilities and NPPD Network Upgrades have been completed and energized, and (b) Customer has confirmed in writing to the Retail Service Provider and NPPD it is prepared to receive the supply of power from the Retail Service Provider, via the NPPD Transmission Facilities, at a load no less than the minimum guaranteed load and no greater than the maximum load as stated in Appendix B.  A targeted In-Service Date will be provided in a written notification to Customer from NPPD after NPPD Network Upgrades are determined by NPPD.

 "**Laws**" shall mean all federal, state or local laws, codes, rules, regulations, and orders of any Governmental Authority applicable to the Party and matter at issue.

"**Letter of Credit**" shall mean a letter of credit issued by a Qualified Issuer either (a) in the form of the letter of credit attached hereto as Appendix C, or (b) otherwise in form and substance satisfactory to NPPD at NPPD's discretion.

"**Loss**" shall have the meaning given in Section 8.1.

"**Moody's**" shall mean Moody's Investor Service, Inc. or any successor thereto, or in the event that there is no such successor, a nationally recognized credit rating agency

 MVA" means mega-volt-amps (million volt-amps)

"**National Electric Safety Code**" shall mean the National Electrical Safety Code, as published by The Institute of Electrical and Electronics Engineers, Incorporated.

CONFIDENTIAL

"**NPPD Transmission Facilities**" shall mean all facilities and equipment, including upgrades to the Transmission System, owned, operated and maintained by NPPD, as located and described in Appendix A.

"**NPPD Network Upgrades**" shall mean all facilities and equipment, including upgrades to the Transmission System, owned, operated and maintained by NPPD, that are part of the transmission network and are needed to serve the load defined in Appendix B, but are not considered part of the NPPD Transmission Facilities. NPPD shall design, engineer, procure, construct, install, test, own, operate, and maintain the NPPD Network Upgrades as described in a Notice to Construct ("NTC") from the Southwest Power Pool ("SPP"). NPPD shall complete the NPPD Network Upgrades in accordance with NPPD's applicable standards for the procurement, engineering, and construction of facilities in its electrical transmission and distribution system, the project plan, the applicable SPP Requirements, all requirements of applicable electric industry safety and/or engineering codes and standards, including the National Electric Safety Code and those of NPPD, Good Utility Practices, and all applicable Laws.  NPPD shall commence and continue performance of the NPPD Network Upgrades upon receipt and acceptance of a written NTC. Customer is not under any financial obligations associated with the NPPD Network Upgrades but acknowledges that these must be completed prior to taking any service as determined by NPPD.

"**NTP**" shall have the meaning given in Section 3.1.

"**NTP Date**" shall mean the date on which the NTP is issued under Section 3.2.

"**Party**" shall mean either Customer or NPPD and "**Parties**" shall mean both Customer and NPPD.

"**Point of Interconnection**" shall mean the location of NPPD facility ownership demarcation to serve the Retail Service Provider for the Customer, as depicted in Appendix A.

"**Qualified Guarantor**" shall mean an entity incorporated, doing business and having an office in the United States (a) with assets in the amount of One Billion Dollars ($1,000,000,000) in the United States and an Investment Grade Credit Rating or (b) that has otherwise been approved in writing by NPPD, as shown by NPPD's signing the acceptance of the Guaranty Agreement.

"**Qualified Issuer**" shall mean a U.S. commercial bank either organized under the laws of the United States or a state therein, in each case, having a Credit Rating equivalent to "A-" or better as determined by S&P or Fitch and "A3" or better as determined by Moody's, provided, that if the Credit Ratings by S&P, Fitch and Moody's are not equivalent, then the highest of the Credit Ratings shall control for purposes of determining whether the entity's Credit Rating meets the requirements for a Qualified Issuer. For a surety bond it shall mean an insurance company with an "aaa" issuer credit rating by A.M. Best or a financial strength rating of "A++" by A.M. Best.

"**Receiving Party**" means either Party to this Agreement, when receiving Confidential Information from the other Party hereto.

"**Records**" shall have the meaning given in Section 3.6.

"**Regulatory Approvals**" shall have the meaning given in Section 10.8.

"**Retail Service Provider**" shall mean the Southern Public Power District.

CONFIDENTIAL

"**S&P**" shall mean Standard & Poor's or any successor thereto, or in the event that there is no such successor, a nationally recognized credit rating agency.

"**Security**" shall have the meaning given in Article 4.

"**Stranded Cost Estimate**" shall mean $813,457.

"**Transmission System**" shall mean the electric transmission facilities of NPPD.

"**Term**" shall have the meaning given in Section 2.2.

"**Termination Payments**" shall mean the payments due to NPPD from Customer upon the termination of this Agreement, as set out in Section 6.3.

"**Work**" shall have the meaning given in Section 3.1.

1.2     **Attachments and Appendices**.
        The following appendices are incorporated into and shall be part of this Agreement:

|   |   |
|---|---|
| Appendix A | Depiction of NPPD Transmission Facilities, Point of Interconnection, Retail Service Provider Facilities and Customer Facility |
| Appendix B | Customer Facility Service Requirements |
| Appendix C | Form of Letter of Credit |
| Appendix D | Form of Escrow Agreement |
| Appendix E | Form of Surety Bond |

## ARTICLE 2 - TERM OF AGREEMENT

**2.1     Effective Date.**  This Agreement shall become effective on the date first written above (the "**Effective Date**").

**2.2     Term.**  This Agreement shall continue in full force and effect from the Effective Date until the date that NPPD returns any remaining Security to Customer under Section 4.2, unless Customer terminates this Agreement before such date pursuant to Section 6.2 (the "**Term**").

**2.3     Survival.**  The applicable provisions of this Agreement shall continue in effect after termination hereof to the extent necessary to provide for final billings, billing adjustments, the determination and enforcement of liability and indemnification obligations arising from acts or events that occurred while this Agreement was in effect and for the enforcement of obligations that continue beyond the term of this Agreement as specifically provided herein.

## ARTICLE 3 - CONSTRUCTION OF NPPD TRANSMISSION FACILITIES

**3.1     NPPD Transmission Facilities.**  NPPD shall design, engineer, procure, construct, install, test, own, operate, and maintain the NPPD Transmission Facilities as described in Appendix A (the "**Work**"). NPPD shall perform the Work in accordance with NPPD's applicable standards for the procurement,

CONFIDENTIAL

engineering, and construction of facilities in its electrical transmission and distribution system, the project plan, the Customer Service Requirements, all requirements of applicable electric industry safety and/or engineering codes and standards, including the National Electric Safety Code and those of NPPD, Good Utility Practices, and all applicable Laws.  NPPD shall commence and continue performance of the Work upon receipt of a written notice to proceed ("**NTP**") and Security under Section 4.3 from Customer. NPPD may, at its sole discretion, proceed with constructing the NPPD Transmission Facilities with or without a NTP. NPPD Transmission Facilities may be limited in capacity until completion of the NPPD Network Upgrades, where NPPD, in its sole discretion, determines such availability.

**3.2      NPPD Notice to Proceed "NTP".** Execution of this Agreement will be deemed as meaning Customer has provided written authorization to proceed with the Work, and the date Customer issues such **NTP** shall be the NTP Date (**"NTP Date"**).

**3.3      Customer Facility Layout.**  Customer shall submit the legal description and a plot plan for the Customer Facility to NPPD for review prior to commencement of construction of the Customer Facility. NPPD shall review and provide any comment on such plot plan which it deems necessary and advisable. NPPD shall then perform the Work in accordance with Section 3.1.

**3.4      NPPD Completion Obligations and Project Schedule.**  NPPD shall use all reasonable efforts and Good Utility Practices to (a) perform the Work in accordance with the project schedule, which schedule may be revised from time to time by mutual agreement of the Parties, and (b) in any event, to complete the Work on or before a targeted date that will be provided in a written notification to Customer from NPPD after NPPD Network Upgrades are determined by NPPD. NPPD shall, at Customer's request and expense, use reasonable efforts to accelerate the Work under this Agreement in order to meet any deadlines requested by Customer that are earlier than those set forth in the project schedule, provided that Customer authorizes such actions and the Construction Costs associated therewith in advance.

**3.5      Land Rights and Access.**  Upon reasonable notice and supervision by NPPD, Customer shall provide at no cost to NPPD any necessary access for ingress and egress across lands owned or controlled by Customer and/or its Affiliates for the construction, operation and maintenance of necessary lines, switches, and other equipment to interconnect the NPPD Transmission Facilities and the Point of Interconnection.  NPPD shall obtain transmission line easements from third parties to the extent required for the NPPD Transmission Facilities in form and substance reasonably satisfactory to NPPD.

**3.6      Records and Audit Rights.**  NPPD shall maintain all reports, documents, data, correspondence, books, and records created in connection with the performance of the Work and the incurrence of the Construction Costs (the "**Records**") and make the Records available to Customer and its representatives for review and audit during NPPD's normal business hours upon at least twenty-four (24) hours' notice.  If applicable, NPPD shall maintain the Records in accordance with generally accepted accounting principles. NPPD shall maintain all Records throughout the Term and for a period of three (3) years thereafter or for such longer period as may be required by Law or Good Utility Practices.

**3.7      Customer Status Reports.** Customer shall inform NPPD in writing, within 30 days, of any time that it determines there is a delay in the construction and commissioning of the Customer Facility that impacts the In-Service Date.

**ARTICLE 4 - CONTRIBUTION IN AID OF CONSTRUCTION AND CREDIT SUPPORT**

**4.1      Contribution in Aid of Construction.**  Within thirty (30) days of the NTP Date, Customer shall pay zero dollars and zero cents ($0.00)  to NPPD prior to the start of construction. Such nonrefundable payment(s) are to be used by NPPD to cover approximately 50% of the costs associated with installing a

<div align="center">CONFIDENTIAL</div>

second transformer as part of the NPPD Transmission Facilities, as requested by Customer. NPPD does not include these costs in its determination of the Stranded Cost Estimate.

**4.2    Formula Contribution in Aid of Construction**. In addition to the Contribution in Aid of Construction in Section 4.1 above, within thirty (30) days of the NTP Date, Customer shall also pay zero dollars and zero cents ($0.00) to NPPD prior to the start of construction. Such nonrefundable payment(s) are to be used by NPPD to cover a portion of the Construction Costs that, in NPPD's sole discretion, are costs associated with the NPPD Transmission Facilities that are at risk of not be recovered during the operation of the Customer Facility at the minimum guaranteed load as stated in **Appendix B**.

**4.3    Financial Assurances.** In accordance with the schedule below, Customer shall obtain and provide to NPPD one or more standby Letters of Credit, cash to be held in an interest-bearing escrow account pursuant to an escrow agreement with a Qualified Issuer in the form attached hereto as Appendix D (with interest accruing to the benefit of Customer) and/or surety bonds from a Qualified Issuer in form attached hereto as Appendix E, upon which Letter(s) of Credit, escrow agreement for cash or surety bonds (or any such combination of the foregoing) are in a form and substance acceptable to NPPD issued by Qualified Issuers, can be drawn, and shall be in the aggregate amount of the Stranded Cost Estimate less the Formula Contribution in Aid of Construction (the "**Security**") listed in the table of this Section 4.3 below.  NPPD's obligations under this Agreement are conditional upon receipt and maintenance of the Security.  This Security will remain in force until (i) drawn on by NPPD under the terms of this Agreement, (ii) reduced under Section 4.4, or (iii) released under Section 4.5. Customer may substitute one form of Security for another of such forms upon sixty (60) days written notice to NPPD. Customer may substitute one Letter of Credit for another Letter of Credit upon thirty (30) days notice if such notice identifies the Qualified Issuer and provides evidence of the credit rating of the issuer satisfactory to NPPD, and the substitute Letter of Credit is in a form and substance acceptable to NPPD.

| Security Due Date | Associated Work Being Secured | Security Required for Stranded Cost Estimate |
|---|---|---|
| Due by March 15, 2022.  If Security is not provided to NPPD by March 15, 2022, NPPD will consider the Customer to have provided a notice to terminate this Agreement in accordance with Section 6.2. | Initial Engineering Long Lead Time Equipment Award Substation Construction Commission | $813,457 |

**4.4    Paying Down Security.**  Following the In-Service Date, and for a period of up to 3 years from such date, Customer may, at their option, lower their amount of required Security on a calendar quarterly basis, based upon a $1 for $1 ratio of the transmission charges (T-line and T-sub) on their paid electrical bills after the In-Service Date for Customer Facility loads metered from the NPPD Minden substation. At the end of each calendar quarter, Customer may lower its Security by the total calendar quarterly amount that was paid for transmission electrical service in that calendar quarterly period.

**4.5    Release of Security.**  NPPD shall return any remaining Security or confirm release of the standby Letter of Credit not drawn by NPPD to Customer promptly after the date that is three (3) years following the In-Service Date; provided, however, that if Customer has not accomplished the Full Build Out Conditions by such date, the Security shall remain in place until Customer has accomplished the Full Build Out Conditions. Customer shall be entitled to, but shall not have any obligation to, replenish any portion of the Security drawn by NPPD.

CONFIDENTIAL

**4.6     Draws on Security.**  NPPD may draw on the Security upon Customer's failure to pay amounts due under Article 6.

**4.7     Conditions Subsequent**.  This Agreement is predicated upon Customer's plan to construct up to the Full Build Out Conditions.  In the event Customer does not commence such construction by the Construction Commencement Date, NPPD may terminate this Agreement and proceed under Section 6.3. The "**Construction Commencement Date**" will be _____7/1/2022_____.  In the event Customer does not accomplish the Full Build Out Conditions by the third anniversary of the In-Service Date, NPPD may terminate this Agreement at its own discretion and proceed under Section 6.3.

**4.8     Failure of Customer to provide the Security as required shall result in loss of all service to the Customer Facility**. Within 2 business days of such failure to provide Security, NPPD is obligated to open any switches/breakers as needed to remove electric service to the Customer Facility.

**4.9     Further Security Adjustments For Other Users.** The following process will be used if other users are allocated any capacity from the NPPD Transmission Facility prior to the In-Service Date: Customer 's allocated percentage of the Security Required for Stranded Cost Estimate in Section 4.3 shall be based on the projected peak use of the NPPD Transmission Facilities by Customer and any other users to have interconnection at the new NPPD Transmission Facilities pursuant to such other user(s) having a written agreement with NPPD entered into prior to the In-Service Date.

**4.10    Payment.**  For any amount payable by Customer to NPPD pursuant to Article 4 of this Agreement, NPPD shall render an invoice by electronic mail and regular mail to Customer, with return receipt requested, to the address of a person designated by Customer.  Customer shall pay all undisputed amounts to NPPD by electronic funds transfer within 30 days from the date Customer receives the invoice.  If the 30th day falls on a non-business day, payment shall be due on the immediately succeeding business day

### ARTICLE 5 - FORCE MAJEURE

**5.1     Notice.**  The Party unable to carry out an obligation imposed on it by this Agreement due to Force Majeure shall notify the other Party in writing or by telephone, followed up in writing, within a reasonable time after the occurrence of the cause relied on.

**5.2     Duration of Force Majeure.**  Except as set forth in Section 5.3, no Party shall be considered in breach or default as to any obligation under this Agreement to the extent such Party is delayed or prevented from fulfilling the obligation due to an event of Force Majeure, whether occurring on the Transmission System, the Customer Facility, the NPPD Transmission Facilities, or any connecting electric generating, transmission or distribution system affecting the Party's operations.  A Party shall be excused from whatever performance is affected only for the duration of the Force Majeure and while the Party exercises reasonable efforts to alleviate such situation.  As soon as the non-performing Party is able to resume performance of its obligations excused as a result of the occurrence of Force Majeure, such Party shall give prompt notice thereof to the other Party and shall recommence performance.

**5.3     Obligation to Make Payments.**  Any Party's obligation to make payments under this Agreement shall not be suspended by Force Majeure.

### ARTICLE 6 - SUSPENSION OF WORK; TERMINATION AND PAYMENT OF COSTS

**6.1     Suspension.**  Once NPPD has commenced performance of the Work in accordance with Section 3.1, any suspension of the Work shall be at NPPD's discretion.

CONFIDENTIAL

**6.2    Termination for Convenience.**   Customer may terminate this Agreement for any reason whatsoever before the third anniversary of the In-Service Date by providing a minimum of three (3) Business Days written notice of termination to NPPD.  Such termination shall be effective upon Customer's satisfaction of all Termination Payments as set out in Section 6.3.

**6.3    Termination Payments**. If this Agreement is terminated by NPPD pursuant to Section 4.7, Customer shall pay to NPPD the value of the remaining Security (if any) and NPPD will retain all Contribution in Aid of Construction and Formula Contribution in Aid of Construction payments received as detailed in Sections 4.1, 4.2 and 4.3.  If this Agreement is terminated by Customer per Section 6.2 **and** such notice to terminate is provided more than thirty (30) days following NPPD's written notification (for Work completion target date) provided in accordance with Section 3.4, Customer shall pay to NPPD the value of the remaining Security (if any) and NPPD will retain all Contribution in Aid of Construction and Formula Contribution in Aid of Construction payments received as detailed in Sections 4.1, 4.2 and 4.3.  If this Agreement is terminated by Customer per Section 6.2 **and** such notice to terminate is provided within thirty (30) days following NPPD's written notification (for Work completion target date) provided in accordance with Section 3.4, NPPD will retain all Contribution in Aid of Construction and Formula Contribution in Aid of Construction payments received as detailed in Sections 4.1and 4.2 and Customer shall pay to NPPD the lesser of (x) the Stranded Cost Estimate, or (y) the following amount (the "**Stranded Cost Amount**"):

**(a)**    the sum of:

(i)    actual Construction Costs incurred by NPPD;

(ii)    any reasonable costs incurred in winding up the Work;

(iii)    any reasonable costs incurred in removing NPPD Transmission Facilities already installed;

(iv)    any reasonable costs incurred to demobilize personnel, equipment and materials;

(v)    any amounts relating to commitments for future work, materials or labor contracts in respect of the NPPD Transmission Facilities for which NPPD is obligated or liable to any contractors, vendors or other parties; and

(vi)    charges assessed, if any, by the bulk transmission system operator related to the NPPD Transmission Facilities which are payable by NPPD,

*minus*

**(b)**    any amounts which NPPD is able to recover through its reasonable efforts to sell or reuse any equipment or facilities.

NPPD shall use reasonable efforts to mitigate and minimize each of the costs and expenses set forth in clause (a), items (i)-(vi) above.  Customer's payment of the Stranded Cost Estimate or Stranded Cost Amount (as applicable) shall be Customer's sole and exclusive liability, and NPPD's sole and exclusive remedy (except for NPPD's rights to draw on the Security if needed to recover such amount), for Customer's termination of this Agreement.

**6.4    Payment.**   For any amount payable by Customer to NPPD pursuant to Section 6.3 of this Agreement, NPPD shall render an invoice by electronic mail and regular mail to Customer, with return receipt requested, to the address of a person designated by Customer.  Customer shall pay all undisputed

CONFIDENTIAL

amounts to NPPD by electronic funds transfer within 30 days from the date Customer receives the invoice. If the 30th day falls on a non-business day, payment shall be due on the immediately succeeding business day.  If Customer disputes any amounts included in the invoice delivered under this Section 6.4, Customer shall deliver notice thereof to NPPD prior to the date such invoice would otherwise be due.  Upon receipt of such notice, NPPD shall provide all documentation and evidence of NPPD's disputed amounts as may be reasonably requested by Customer, and the Parties shall use commercially reasonable efforts to promptly resolve the dispute.  Failure of the Parties to settle the dispute shall not negate NPPD's right to draw on the Security.

**6.5     Termination for Cause.**  Customer may terminate this Agreement and exercise all other rights and remedies available at law or in equity if NPPD breaches this Agreement and fails to cure such breach within thirty (30) days thereafter.  Customer shall not be liable for the payments set forth in Section 6.3 following a termination pursuant to this Section 6.5.

## ARTICLE 7 - ASSIGNMENT

**7.1     General Provision**.  Neither Party may assign any of its rights or transfer or purport to transfer any of its obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed, except (a) to an Affiliate of the assigning Party, or (b) in the case of Customer as assigning Party, to (i) any entity providing security or financing for the construction of the Customer Facility as collateral security (and in connection therewith, NPPD shall execute and deliver to such financing parties such consents and other agreements and documents in a form acceptable to NPPD as may be requested by such financing parties), (ii) a purchaser of all or substantially all of the assets of Customer, or (iii) a purchaser of the Customer Facility or any interest therein; provided that in all cases, the assigning Party provides prior notice of such assignment and the assignee agrees in writing to be bound by the terms of this Agreement.

## ARTICLE 8 - INDEMNITY

**8.1     General.**  Each Party shall indemnify and hold harmless the other Party, the other Party's Affiliates, and its and their respective officers, shareholders, stakeholders, managers, representatives, directors, agents and employees, from and against any and all loss, liability, damage, cost or expense, for liability for bodily injury to or death of persons, or damage to property of persons (including reasonable legal fees and expenses, litigation costs, consultant fees, investigation fees and sums paid in settlements of claims and any such fees and expenses incurred in enforcing this indemnity or collecting any sums due hereunder) (collectively, "**Loss**") to the extent arising out of, in connection with, or resulting from (i) the indemnifying Party's breach of any terms or conditions of this Agreement, or failure to perform any of its obligations under, this Agreement; or (ii) the negligence or willful misconduct of the indemnifying Party, its Affiliates, or its or their contractors and regardless whether arising under law or otherwise; provided, however, that no Party shall have any indemnification obligations under this Section 8.1 with respect to any Loss to the extent the Loss results from the gross negligence or willful misconduct of the Party seeking indemnity.

**8.2     Amount Owing.**  If an indemnifying Party is obligated to indemnify and hold any indemnified person harmless under this Article 8, the amount owing to the indemnified person shall be the amount of such indemnified person's actual Loss, not of any insurance or other recovery.

**8.3     Defense of Claim.**  Promptly after receipt by a Party of any claim or notice of the commencement of any action, administrative, or legal proceeding, or investigation as to which the indemnity provided for in this Article 8 may apply, the indemnified Party shall notify the indemnifying Party in writing of such fact.     The indemnifying Party shall assume the defense thereof with counsel designated by such indemnifying Party and satisfactory to the indemnified Party, provided, however, that if the defendants in

CONFIDENTIAL

any such action include both the indemnifying Party and the indemnifying Party and the indemnified Party and the indemnifying Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to, or inconsistent with, those available to the indemnifying Party, the indemnified Party shall have the right to select and be represented by separate counsel, at the indemnifying Party's expense.

**8.4** **Failure to Defend.** If the indemnifying Party fails to assume the defense of a claim meriting indemnification, the indemnified Party may, at the sole expense of the indemnifying Party, contest, settle, or pay such claim; provided, however, that settlement or full payment of any such claim may be made only following consent of the indemnifying Party or, absent such consent, written opinion of the indemnified Party's counsel that such claim is meritorious or warrants settlement.

**8.5** **Consequential Losses**. Neither Party shall be liable for any incidental, indirect or consequential economic, exemplary or punitive damages, costs or expenses, loss of profits, loss of revenue, or lost opportunity howsoever characterized suffered by an indemnified Party which arises due to the indemnifying Party's breach of or failure to perform its obligations under this Agreement

**ARTICLE 9 - NOTICE**

**9.1** **General.** Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "**Notice**") shall be in writing (regardless of whether the applicable provision expressly requires a writing) and delivered personally, mailed by certified mail, postage prepaid and return receipt requested, sent by nationally recognized overnight courier, or sent by email, as follows:

To NPPD:
Arthur R. Wiese
Vice President, Energy Delivery
Nebraska Public Power District
1414 15th Street
P.O. Box 499
Columbus, NE  68602-0499
Telephone – (402) 563-5203
Email address  arwiese@nppd.com

Copy To:
Harold L. Hadland
Office of the General Counsel
Nebraska Public Power District
1414 15th Street
P.O. Box 499
Columbus, NE  68602-0499
Telephone – (402) 563-5046
Email address  hlhadla@nppd.com

To Customer:
Tad Piper
Chief Financial Officer
Compute North
7575 Corporate Way
Eden Prairie, MN  55344
Email: tad.piper@computenorth.com

Copy To:

Attn: Finance Department
Compute North
7575 Corporate Way
Eden Prairie, MN  55344
Email: ap@computenorth.com

Notice given by personal delivery, mail, or courier shall be effective upon actual receipt or rejection, as identified in the return receipt (in the case of mail) or on the tracking report (in the case of courier). Notice given by email shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. Any Party hereto may change any address to which Notice is to be given to it by giving notice of such change of address as provided above.

CONFIDENTIAL

## ARTICLE 10 - MISCELLANEOUS

**10.1    Mutual Representation.**  Each Party represents and warrants to the other that the execution and delivery of this Agreement (a) has been duly authorized by all necessary procedures, (b) does not violate any provision of the Party's governing documents or Laws applicable to the Party, and (c) does not result in the breach of any agreement by which such Party is bound.

**10.2    Confidentiality.**

**(a)**      The Receiving Party shall not to use any Confidential Information of the Disclosing Party for any purpose other than performance of the Receiving Party's obligations under this Agreement. The Receiving Party shall not to disclose any Confidential Information of the Disclosing Party to any party other than the Receiving Party's Affiliates and its directors, officers, employees, consultants, agents, and advisors (including financial and technical advisors, legal counsel and accountants) (collectively, "**Representatives**") who are required to have the information in order to carry out the Receiving Party's obligations hereunder; provided, however, that the Receiving Party may disclose Confidential Information required to be disclosed by applicable Laws but must first give the Disclosing Party reasonable advance written notice of such requirement (to the extent reasonably practicable) prior to such disclosure in order to enable the Disclosing Party to seek an order protecting the Confidential Information from public disclosure. The Receiving Party will not (and will not attempt to) reverse engineer, disassemble or decompile any prototypes, software or other tangible objects that embody the Disclosing Party's Confidential Information and that are provided to the Receiving Party under this Agreement. The Receiving Party will notify the Disclosing Party immediately upon learning of any unauthorized use or disclosure of Confidential Information and will cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party prevent further unauthorized disclosure or misuse.

**(b)**      The Receiving Party will take reasonable measures to protect the secrecy of and avoid unauthorized disclosure and use of the Confidential Information of the Disclosing Party. Without limiting the foregoing, the Receiving Party will take at least those measures that it takes to protect its own similar confidential information to protect the Disclosing Party's Confidential Information and will ensure that its Representatives who have access to the Disclosing Party's Confidential Information are under obligations with respect to use and disclosure of the Confidential Information at least as protective of the Disclosing Party as this Agreement, prior to any disclosure of Confidential Information to such Representatives. Each party will be fully responsible to the other for any breach of this Agreement by its Representatives. The Receiving Party will only make copies of the Disclosing Party's Confidential Information as reasonably necessary in order to carry out the Purpose. The Receiving Party will reproduce the Disclosing Party's proprietary rights notices on any copies it makes of the Disclosing Party's Confidential Information, in the same manner in which such notices were set forth in or on the original.

**(c)**      Upon any termination or expiration of this Agreement, the Receiving Party's obligations with respect to each item of Confidential Information disclosed prior to such expiration or termination will survive for five (5) years after the date of its disclosure.

**(d)**      If either Party violates, or threatens to violate, any of the provisions of this Section 10.2, the other Party shall be entitled to immediate and permanent injunctive relief (without the necessity of posting of a bond as a pre-condition to the issuance of the relief sought), it being agreed that the damages which the non-breaching Party would sustain upon such violation are difficult or impossible to ascertain in advance.

**10.3    Waiver.**  Any waiver at any time by a Party of its rights with respect to a default under this Agreement, or with respect to any other matters arising in connection with this Agreement, shall not be deemed a waiver or continuing waiver with respect to any subsequent default or other matter.  Except as

CONFIDENTIAL

provided in Article 6, the remedies of the Parties hereunder are cumulative and in addition to all rights and remedies at law and in equity.

**10.4      Governing Law; Venue.**  The validity, interpretation and performance of this Agreement and each of its provisions shall be governed by the Laws of the State of Nebraska, without regard to the conflicts of law provisions.  Any legal or equitable action arising out of or in any way connected with this Agreement shall be instituted only in the District Court of Platte County, Nebraska.

**10.5      Amendments.**  This Agreement may be amended by and only by a written instrument duly executed by the Parties.  Upon satisfaction of all applicable Laws, an amendment to this Agreement shall become effective and a part of this Agreement.

**10.6      Entire Agreement.**  This Agreement constitutes the entire agreement among the Parties hereto with reference to the subject matter hereof and supersedes all prior oral and written communications pertaining hereto, except as specifically incorporated herein.  In the event of a conflict between the body of this Agreement and any Appendix hereto, the terms and provisions of the body of this Agreement shall prevail and be deemed to be the final intent of the Parties.

**10.7      Binding Effect.**  This Agreement and the rights and obligations hereof, shall be binding upon and shall inure to the benefit of the successors and assigns of the Parties hereto.

**10.8      Regulatory Requirements**.  Each Party shall use commercially reasonable efforts to (a) seek any necessary regulatory approvals, permits, and certificates for which such Party is responsible ("**Regulatory Approvals**"), and (b) maintain such Regulatory Approvals for so long as such Regulatory Approvals are required for the continued performance of such Party's obligations hereunder.

**10.9      No Partnership Created.**  Nothing contained in this Agreement shall be construed as constituting a joint venture or partnership between the NPPD and Customer.

**10.10     No Third Party Beneficiaries.**  This Agreement and all rights hereunder are intended for the sole benefit of the Parties and shall not imply or create any rights on the part of, or obligations to, any other person.

**10.11     Severability.**  In the event all or part of any of the terms, covenants or conditions of this Agreement, or the application of any such terms, covenants or conditions, shall be held invalid, illegal or unenforceable by any court having jurisdiction, all other terms, covenants and conditions of this Agreement and their application not adversely affected thereby shall remain in force and effect; *provided, however,* that the remaining valid and enforceable provisions materially retain the essence of the Parties' original bargain.

**10.12     Captions.**  The captions contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope of intent of this Agreement or the intent of any provision contained herein.

**10.13     Further Assurances**.  Each of the Parties hereto shall from time to time and at all times from and after the date hereof, without further consideration do all such further acts and execute and deliver all further agreements and other documents and instruments as may be reasonably necessary to give effect to this Agreement or to otherwise give effect to the provision of this Agreement.

CONFIDENTIAL

**10.14   Counterparts.** This Agreement may be executed in any number of counterparts, and each executed counterpart shall have the same force and effect as an original instrument.  A signature page in "PDF" format or an electronic signature to this Agreement shall be deemed an original and binding upon the party against which enforcement is sought.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers or agents on the day and year below written.

**CN MINDEN, LLC**

By: _____*Tad Piper*_____

Name: ___Tad Piper___

Title: ___Chief Financial Officer___

Date: ___Feb 14, 2022___

**NEBRASKA PUBLIC POWER DISTRICT**

By: _____Arthur R. Wiese_____

Name: ___Arthur R. Wiese___

Title: ___Vice President Energy Delivery___

Date: ___February 17, 2022___

CONFIDENTIAL

**APPENDIX A**
**to**
**Transmission Facilities Construction Agreement**
**dated** <u>Febraury 17</u> **, 2022**
**between**
**CN Minden, LLC**
**and**
**Nebraska Public Power District**

**Description of the NPPD Transmission Facilities,**
**Retail Service Provider Facilities, and Point of Interconnection to Customer Facility**

The Transmission Facilities to be constructed for Customer Facility, and of which will require securitization is as follows:

Construct 115/34.5 kV facilities (See Figure 1 – NPPD Minden Substation One Line Diagram will be replaced with NPPD Minden Substation General Arrangement in a superseded Appendix A).

CONFIDENTIAL



Figure 1 – NPPD Minden Substation One Line Diagram

<p style="text-align:center; color:red">CONFIDENTIAL</p>

**APPENDIX B**
**to**
**Transmission Facilities Construction Agreement**
**dated** <u>February 17</u>**, 2022**
**between**
**CN Minden, LLC**
**and**
**Nebraska Public Power District**

**Customer Facility Service Requirements**

The Customer Facility shall meet all Facility Connection Requirements posted on NPPD.com as of the Effective Date, currently posted at
https://docs.nppd.com/FacilityConnectionRequirements.pdf

Customer Facility Service Requirements shall include:

- All service shall be at 34.5 kV
- Maximum load of the Customer Facility shall be 35 MW at a minimum of 95% power factor (36.9 MVA).
- Minimum guaranteed load of the Customer Facility shall be 31.5 MW.
- The Customer Facility shall be designed and installed to accommodate any metering needs as specified by NPPD and as may be further agreed to in a separate agreement between the Parties for metering equipment, which shall be limited to that metering needed for the applicable rates desired by Customer.
    1. Customer shall provide NPPD with access to their facilities, as required by NPPD, for such metering.
    2. Instrument transformers installed on Customer's facilities at metering points required by rate shall meet NPPD accuracy requirements.  Said instrument transformers shall be installed, owned and maintained by Customer and be used solely for connection to revenue meters.
    3. Meters installed in Customer's facilities at metering points required by the applicable rate shall be provided, installed, owned and maintained by NPPD at Customer's expense and according to NPPD standards.

Desired location of the Point of Interconnection at the voltage indicated above is to be located at NPPD's Minden Substation.

CONFIDENTIAL

**APPENDIX C**
**to**
**Transmission Facilities Construction Agreement**
**dated** February 17**, 2022**
**between**
**CN Minden, LLC**
**and.**
**Nebraska Public Power District**


**Form of Letter of Credit**


[Issuer Letterhead]


Approved: _____

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

DATE: _____

BENEFICIARY:  NEBRASKA PUBLIC POWER DISTRICT

ADDRESS:       Nebraska Public Power District
                        1414 15th Street
                        P.O. Box 499
                        Columbus, NE  68602-0499
                        Attn:  Vice President & Chief Financial Officer
                        Telephone Number:  (402) 563-5459
                        Facsimile Number:   (402) 563-5528


APPLICANT:    CN Minden, LLC
ADDRESS:       _____
                        _____
                        Attn: _____
                        Telephone Number: _____
                        Facsimile Number:  _____

WE, _____, N.A., ("BANK"), ISSUE THIS IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER _____ ("LETTER OF CREDIT") IN FAVOR OF NEBRASKA PUBLIC POWER DISTRICT ("BENEFICIARY") FOR THE ACCOUNT OF CN MINDEN, LLC ("CUSTOMER") AS ACCOUNT PARTY IN THE AMOUNT OF US $_____ UNITED STATES DOLLARS) AND AUTHORIZE THE BENEFICIARY TO DRAW AT SIGHT ON _____BANK.

WE ARE INFORMED BY CUSTOMER THAT THIS LETTER OF CREDIT IS ISSUED PURSUANT TO SECTION 4.3 OF THE TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT DATED AS OF _____, ("AGREEMENT") BETWEEN CUSTOMER AND BENEFICIARY. THIS LETTER OF CREDIT IS AVAILABLE FOR PAYMENT AGAINST YOUR SIGHT DRAFT(S)

<p style="text-align:center; color:red;">CONFIDENTIAL</p>

DRAWN ON BANK MARKED "DRAWN UNDER BANK'S IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____", AT SIGHT WHEN ACCOMPANIED BY A LETTER ON THE BENEFICIARY'S LETTERHEAD CONTAINING THE FOLLOWING STATEMENTS DATED AND PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF BENEFICIARY (SIGNED AS SUCH):

"THE UNDERSIGNED HEREBY CERTIFIES THAT (I) I AM DULY AUTHORIZED TO EXECUTE THIS DOCUMENT ON BEHALF OF NEBRASKA PUBLIC POWER DISTRICT ("BENEFICIARY"), (II) THE AMOUNT OF THE DRAFT ACCOMPANYING THIS CERTIFICATE IS DUE AND OWING, OR OTHERWISE MAY BE DRAWN PURSUANT TO THE AGREEMENT BETWEEN  CUSTOMER AND BENEFICIARY (WHICH DRAWING CONDITIONS INCLUDE THE RIGHT TO DRAW UPON THIS LETTER OF CREDIT IN FULL UPON AN EVENT AS DEFINED IN THE TRANSMISSION FACILITIES CONSTRUCTION AGREEMENT), AND (III) ALL REQUIRED NOTICES, IF ANY HAVE BEEN PROVIDED TO CUSTOMER."

IF A DEMAND FOR PAYMENT MADE BY YOU HEREUNDER DOES NOT, IN ANY INSTANCE, CONFORM TO THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT, WE SHALL GIVE YOU PROMPT NOTICE THAT THE PURPORTED DEMAND WAS NOT EFFECTED IN ACCORDANCE WITH THIS LETTER OF CREDIT, STATING THE REASONS THEREFOR AND THAT WE ARE RETURNING THE DOCUMENTS TO YOU, AS WE MAY ELECT.  UPON BEING NOTIFIED THAT THE PURPORTED DEMAND WAS NOT EFFECTED IN CONFORMITY WITH THIS LETTER OF CREDIT, YOU MAY ATTEMPT TO CORRECT ANY SUCH NONCONFORMING DEMAND FOR PAYMENT.

THIS LETTER OF CREDIT EXPIRES ON _____ OR IF SUCH DATE IS EXTENDED PURSUANT TO THE TERMS HEREOF, THE DATE AS SO EXTENDED ("EXPIRATION DATE").

SPECIAL CONDITIONS:

THIS LETTER OF CREDIT MAY NOT BE AMENDED, CHANGED OR MODIFIED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BENEFICIARY AND THE LETTER OF CREDIT ISSUER; PROVIDED, HOWEVER, THE AMOUNT AVAILABLE FOR DRAWING UNDER THIS LETTER OF CREDIT MAY BE REDUCED AUTOMATICALLY, WITHOUT AMENDMENT, FROM TIME TO TIME UPON OUR RECEIPT OF REDUCTION CERTIFICATE STATING THE AMOUNT OF REDUCTION AND AVAILABLE AMOUNT AFTER SUCH REDUCTION, EXECUTED AND PURPORTEDLY SIGNED BY BOTH APPLICANT AND BENEFICIARY.

PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED, AND THE AMOUNT OF THIS LETTER OF CREDIT WILL BE REDUCED BY THE AMOUNT OF EACH DRAWING HONORED BY US.

WE HEREBY AGREE WITH YOU THAT DOCUMENTS PRESENTED UNDER AND IN CONFORMITY WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED ON PRESENTATION IF PRESENTED ON OR BEFORE THE EXPIRATION DATE OF THIS LETTER OF CREDIT AT _____ BANK, N.A., C/O _____ USA.

IF A COMPLYING PRESENTATION IS MADE PRIOR TO 12:00 P.M. (NEW YORK TIME) ON A BUSINESS DAY THEN LETTER OF CREDIT ISSUER SHALL, PRIOR TO CLOSE OF BUSINESS ON THE SECOND FOLLOWING BUSINESS DAY, MAKE PAYMENT IN IMMEDIATELY AVAILABLE FUNDS.  IF A COMPLYING PRESENTATION IS MADE AT OR AFTER 12:00 P.M. (NEW YORK TIME) ON A BUSINESS DAY, THEN LETTER OF CREDIT ISSUER SHALL, PRIOR

CONFIDENTIAL

TO CLOSE OF BUSINESS ON THE THIRD FOLLOWING BUSINESS DAY, MAKE PAYMENT IN IMMEDIATELY AVAILABLE FUNDS.  AS USED IN THIS LETTER OF CREDIT, THE TERM "BUSINESS DAY" SHALL MEAN A DAY OTHER THAN SATURDAY OR SUNDAY OR ANY OTHER DAY IN WHICH BANKING INSTITUTIONS IN THE STATE OF NEW YORK ARE AUTHORIZED OR REQUIRED BY LAW TO CLOSE.

PAYMENTS OF DRAWINGS UNDER THIS LETTER OF CREDIT SHALL BE MADE FROM FUNDS OF THE LETTER OF CREDIT ISSUER AND NOT ANY MONEYS PROVIDED TO THE LETTER OF CREDIT ISSUER BY THE APPLICANT.

ALL LETTER OF CREDIT ISSUER CHARGES ARE FOR THE ACCOUNT OF THE APPLICANT.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR ADDITIONAL PERIOD(S) OF ONE YEAR FROM THE EXPIRATION DATE HEREOF, OR ANY FUTURE EXPIRATION DATE UNLESS AT LEAST 90 (NINETY) DAYS PRIOR TO THE EXPIRATION DATE WE SEND YOU NOTICE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) OR OVERNIGHT COURIER THAT WE ELECT NOT TO CONSIDER EXPIRATION DATE OF THIS LETTER OF CREDIT EXTENDED FOR ANY SUCH ADDITIONAL PERIOD.  UPON RECEIPT OF SUCH NOTICE, YOU MAY DRAW ON THIS LETTER OF CREDIT BY PRESENTING YOUR ONE SIGHT DRAFT TO US FOR AN AMOUNT UP TO THE UNUSED BALANCE OF THIS LETTER OF CREDIT AT ANY TIME WITHIN 30 DAYS OF THE THEN RELEVANT EXPIRATION DATE.

UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS IRREVOCABLE STANDBY LETTER OF CREDIT IS ISSUED SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, 2007 REVISION, INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 600 (THE "UCP600") AND AS TO MATTERS NOT ADDRESSED BY UCP600 SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE TO THE LAWS OF THE STATE OF NEW YORK.  IN THE EVENT OF CONFLICT, THE UCP600 WILL CONTROL.

PLEASE ADDRESS ALL CORRESPONDENCE REGARDING THIS LETTER OF CREDIT TO _____ BANK, N.A., VIA COURIER TO: _____ BANK, C/O,_____USA INCLUDING THE LETTER OF CREDIT NUMBER MENTIONED ABOVE.

_____, N.A.
THE LETTER OF CREDIT ISSUER


_____
AUTHORIZED SIGNATURE

CONFIDENTIAL

**APPENDIX D**
**to**
**Transmission Facilities Construction Agreement**
**dated** February 17**, 2022**
**between**
**CN Minden, LLC**
**and.**
**Nebraska Public Power District**

**Form of Escrow Agreement**

**ESCROW AGREEMENT**

This Escrow Agreement ("Agreement") is made and effective this _____ day of _____, 2022 ("Effective Date"),

**BETWEEN:**        CN Minden, LLC, a Delaware limited liability company ("Customer")
**AND:**        NEBRASKA PUBLIC POWER DISTRICT, a public corporation and political subdivision of the State of Nebraska ("NPPD")
**AND:**        ("Escrow Agent"), a _____ with its head office located:

**RECITALS**

WHEREAS, NPPD and Customer entered into that certain Transmission Facilities Construction Agreement dated _____, 2022 (the "Construction Agreement"), pursuant to which NPPD has agreed to construct transmission facilities which will be used to provide electric service to Customer's data center facility, and which electric service will be provided through a retail service provider affiliated with NPPD.

WHEREAS, In connection with the construction of such transmission facilities and pursuant to Section 4.3 of the Construction Agreement, Customer agrees to place in escrow certain funds to provide security to NPPD with respect to Customer's obligations under the Construction Agreement, and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

WHEREAS, Customer agrees to deposit certain funds in escrow with the Escrow Agent, on the terms and conditions more particularly described herein.

WHEREAS, Terms used but not defined herein shall have the meanings assigned to such terms under the Construction Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated herein by this reference, and the premises and mutual covenants herein contained, the parties hereto intending to be legally bound, agree as follows:

CONFIDENTIAL

1.     **Establishment of Fund.** Customer has caused to be deposited with the Escrow Agent the sum of $_____ in immediately available cash (such sum, or the balance thereof remaining from time to time being referred to herein as the "Fund").

2.     **Treatment of Fund.** Those monies, and subsequent monies deposited therein, constituting the Fund shall be deposited in a segregated, interest-bearing account pursuant to the terms of this Escrow Agreement.  Such account shall be titled the "CN Minden, LLC Electric Facilities Escrow Account" and held in the name of Customer.  The parties agree that, for tax reporting purposes, all interest and other income from investment of the Fund shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by Customer, whether or not such income was disbursed during such calendar year.  Prior to the Effective Date, Customer shall provide the Escrow Agent with its certified tax identification number by furnishing a form W-9, and Customer and NPPD shall provide such other forms and documents that the Escrow Agent may reasonably request.   The parties understand that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code, as may be amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Fund.

3.     **Investment of Fund.** The Fund will be kept in a money market account with the Escrow Agent.  The Fund will not be kept in any other investment account without the written consent of the parties.  Escrow Agent will provide regular statements to Customer, including periodic statements reflecting transactions executed on behalf of the Fund.  Any investment income earned by the Fund, to the extent it exceeds the amount stated in Section 1, shall not become part of the Fund and shall be disbursed to Customer upon termination of this Escrow Agreement in accordance with Section 4(c) of the Construction Agreement.

4.     **Escrow Procedure and Payment Instruction.** The Fund shall be held and disbursed in accordance with the terms of this Escrow Agreement as set out in this Section 4.

(a)     If NPPD claims a right to payment (a "Payment Claim") pursuant to either Article 4 or Article 6 of the Construction Agreement, then pursuant to the terms of this Section 4, NPPD may request a disbursement of the portion of the Fund equal to the Payment Claim (up to the amount of the Fund remaining) by providing notice to the Escrow Agent and Customer, in the form of Exhibit A, along with a certificate signed by an authorized representative of NPPD, stating the basis for such Payment Claim.  The Escrow Agent shall deliver to NPPD within two (2) Business Days the amount of money specified in the Payment Claim, up to the amount remaining in the Fund.

(b)     At any time during the term of this Escrow Agreement, and upon termination of Customer's obligations to post Security under the Construction Agreement, upon receipt of a joint disbursement request in the form of Exhibit B signed by both Customer and NPPD, the Escrow Agent shall deliver to the party specified in such joint disbursement request

CONFIDENTIAL

the amount of money specified in the joint disbursement request, up to the amount remaining in the Fund.

        (c)     The parties each acknowledge that Escrow Agent is authorized to use the funds transfer instructions provided below to disburse funds without a verifying the call-back person set forth in Section 12 so long as the form of Exhibit A or Exhibit B is used to request the disbursement and the proceeds are wired to one of the recipient accounts designated below. The form of Exhibit A or Exhibit B may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The form of Exhibit A or Exhibit B may be executed and accepted by facsimile or portable data file (PDF) and any such signature shall be of the same force and effect as an original signature.

If to Customer to:

        Bank Name:   Wells Fargo Bank, N.A.
        Bank Address: 420 Montgomery
                      San Francisco, CA 94104
        ABA #:
        Bank Account Name:
        Bank Account #:

If to NPPD to:

        Bank Name:       Wells Fargo Bank, N.A
        Bank Address:     420 Montgomery
                      San Francisco, CA 94104

        ABA Number:     _____
        Account Name:    _____
        Account Number:  _____

     5.     **Termination.**  This Escrow Agreement shall terminate upon the disbursement of the balance of the Fund in accordance with the provisions of Section 4 hereof.

     6.     **Limitation of Escrow Agent's Capacity.**

        A.     This Escrow Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations shall be read into this Escrow Agreement against Escrow Agent.  This Escrow Agreement constitutes the entire agreement between the Escrow Agent and the other parties hereto in connection with the subject matter of this escrow, and no other agreement entered into between the parties, or any of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be referred to herein or deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof,

CONFIDENTIAL

and the Escrow Agent's rights and responsibilities shall be governed solely by this Escrow Agreement.

   B. Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or for the form of execution thereof, or for the identity or authority of any person executing such subject matter.  Escrow Agent shall be under no duty to investigate or inquire as to the validity or accuracy of any document, agreement, instruction or request furnished to it hereunder believed by it to be genuine and the Escrow Agent may rely and act upon, and shall not be liable for acting or not acting upon, any such document, agreement, instruction or request.  Escrow Agent shall in no way be responsible for notifying, nor shall it be its duty to notify, any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited herewith.

   7. **Authority to Act.**

   A. Escrow Agent is hereby authorized and directed by the undersigned to deliver the subject matter of this Escrow Agreement only in accordance with the provisions of this Escrow Agreement.

   B. Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing the investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement.

   C. Escrow Agent may consult with legal counsel at the cost and expense of Customer in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting in accordance with the advice of such counsel.

   8. **Compensation.**  Escrow Agent shall be entitled to reasonable compensation as well as reimbursement for its reasonable costs (equal to $30.00 per check issued) and expenses incurred in connection with the performance by it of service under this Escrow Agreement (including reasonable fees and expenses of Escrow Agent's counsel) and Customer agrees to so pay Escrow Agent reasonable compensation and reimburse Escrow Agent for reasonable costs and expenses.  The parties hereto agree that escrow fees shall be due and payable in the amount of $500.00 for the initial setup of the first two escrow accounts and $250.00 for the setup of any subsequent accounts and such fees will be paid by Customer upon the commencement of the escrow and exclusive of amount in the Fund.

CONFIDENTIAL

9.    **Indemnification.**    Customer agrees to indemnify and hold Escrow Agent, its affiliates and their officers, employees, successors, assigns, attorneys and agents (each an "Indemnified Party") harmless from all losses, costs, claims, demands, expenses, damages, penalties and attorney's fees suffered or incurred by any Indemnified Party or Escrow Agent as a result of anything which it may do or refrain from doing in connection with this Escrow Agreement or any litigation or cause of action arising from or in conjunction with this Escrow Agreement or involving the subject matter hereof or the Fund or monies deposited hereunder or for any interest upon any such monies, including, without limitation arising out of, the negligence of Escrow Agent; provided that the foregoing indemnification shall not extend to the gross negligence or willful misconduct of Escrow Agent.

10.    **Miscellaneous.**

A.    Escrow Agent shall make no disbursement, investment or other use of Fund until and unless it has collected funds for the Fund.  Escrow Agent shall not be liable for collection items until the proceeds of the same in actual cash have been received or the Federal Reserve has given Escrow Agent credit for the funds.

B.    Escrow Agent may resign at any time by giving written notice to the parties hereto, whereupon the parties hereto will immediately appoint a successor Escrow Agent.  Until a successor Escrow Agent has been named and accepts its appointment or until another disposition of the subject matter of this Escrow Agreement has been agreed upon by all parties hereto, Escrow Agent shall be discharged of all of its duties hereunder, save to keep the Fund whole.

C.    All representations, covenants, and indemnifications contained in this Escrow Agreement shall survive the termination of this Escrow Agreement.

D.    Escrow Agent shall provide monthly statements of the account to NPPD and Customer.

11.    **Discharge of Escrow Agent.** Upon the delivery or return of all of the Fund pursuant to the terms of this Escrow Agreement, the duties of Escrow Agent shall terminate and Escrow Agent shall be discharged from any further obligation hereunder.

12.    **Escrow Instructions.**  Attached hereto as Schedule 1 (the "Security Schedule") is a list of authorized signatories (with signature identification) and authorized call-back persons for each of the parties to this Agreement (other than the Escrow Agent).  In the event funds transfer instructions are given which differ from the funds transfer instructions to disburse funds as set out in Section 4(c), the Escrow Agent shall seek confirmation of such instructions or directions by making a successful telephone call to the person or persons designated on the Security Schedule, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The authorized signatures and the persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow

CONFIDENTIAL

Agent, and in the case of an addition of an authorized signatory, the writing must be accompanied by an incumbency certificate with signature identification certified by an existing authorized signatory.  If the Escrow Agent is unable to contact any of the authorized representatives identified in the Security Schedule for call-back confirmation, the Escrow Agent is hereby authorized to seek confirmation of such instructions by a successful telephone call-back to any one or more of the party's officers.  Such officer shall deliver to the Escrow Agent a fully executed incumbency certificate certified by an existing authorized signatory, and the Escrow Agent may rely upon the confirmation of anyone purporting to be such officer.

13.    **Notice.** Any payment, notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when personally delivered to the party hereunder specified or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

If to Escrow Agent:

If to Customer:

      With a copy to:

If to NPPD:

      Nebraska Public Power District
      Attn: Arthur R. Wiese
      Vice President Energy Delivery
      1414 15th Street
      P.O. Box 499
      Columbus, NE  68602-0499
      Telephone: (402) 563-5575
      Email: arwiese@nppd.com

      With a Copy to:

      Nebraska Public Power District
      Attn: Harold L. Hadland
      Office of the General Counsel
      1414 15th Street
      P.O. Box 499
      Columbus, NE  68602-0499

CONFIDENTIAL

Telephone: (402) 563-5046
Email: hlhadla@nppd.com


Any party may unilaterally designate a different address by giving notice of each such change in the manner specified above to each other party.  Notwithstanding the foregoing, no notice to the Escrow Agent shall be deemed given to or received by the Escrow Agent unless actually delivered to an officer of the Escrow Agent having responsibility under this Escrow Agreement.

14.     **Governing Law.**  This Escrow Agreement is being made in and is intended to be construed according to the laws of the State of Nebraska.  It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns.  Any legal or equitable action arising out of or in any way connected with this Escrow Agreement shall be instituted only in the District Court of Lancaster County, Nebraska, or the United States District Court for the District of Nebraska sitting in Lincoln, Nebraska.

15.     **Construction.**  Words used in the singular number may include the plural and the plural may include the singular.  The section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Escrow Agreement.

16.     **Amendment.**  The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by Customer, NPPD, and Escrow Agent.

17.     **Force Majeure.**  Escrow Agent shall not be liable to the undersigned for any loss or damage arising out of any acts of God, strikes, equipment or transmission failure, war, terrorism, or any other act or circumstance beyond the reasonable control of Escrow Agent.

18.     **Written Agreement.**  This Escrow Agreement represents the final agreement between the parties, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

19.     **Publication; Disclosure.**  By executing this Escrow Agreement, Customer, NPPD, and the Escrow Agent acknowledge that the exhibits, schedules, and signatures to this Escrow Agreement (including related attachments) contain certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement.  The parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement,

CONFIDENTIAL

or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If a party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other parties of the legal requirement to do so.  If any party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that party shall promptly notify in writing the other parties.

20.    **Counterparts.** This Agreement may be executed in any number of counterparts, and each executed counterpart shall have the same force and effect as an original instrument. A signature page in "PDF" format or an electronic signature to this Agreement shall be deemed an original and binding upon the party against which enforcement is sought.

This Escrow Agreement has been executed by the parties effective as of the Effective Date set forth above.

CN MINDEN, LLC

Date:_____        By: _____
                             Name: _____
                             Title: _____

NEBRASKA PUBLIC POWER DISTRICT

Date:_____        By: _____
                             Name: _____
                             Title: _____

(Bank name), Escrow Agent, hereby accepts its appointment as Escrow Agent as described in the foregoing Escrow Agreement, subject to the terms and conditions set forth therein.

(Bank Name)

Date:_____        By:_____
                             Name: _____
                             Title: _____

Date:_____        By:_____
                             Name: _____
                             Title: _____

CONFIDENTIAL

**EXHIBIT A**

**PAYMENT CLAIM**

Pursuant to that certain Escrow Agreement dated effective _____among CN Minden, LLC, NEBRASKA PUBLIC POWER DISTRICT ("NPPD"), and (Bank Name), NPPD hereby requests disbursement of funds pursuant to Section 4(a) in the amount and manner described below from account number _____ titled "CN Minden, LLC Electric Facilities Escrow Account" Escrow Account.

Please disburse to:   Nebraska Public Power District

Amount to disburse:  $_____

Form of disbursement:        Money Wire

Attached to this Disbursement Request is a certificate signed by an authorized representative of NPPD stating the basis for such claim payment.

IN WITNESS WHEREOF:  NPPD has executed this Disbursement Request effective as of the date first written above.


Nebraska Public Power District


_____
Name: _____
Title:  _____
Date:  _____

CONFIDENTIAL

**EXHIBIT B**


**JOINT DISBURSEMENT REQUEST**


Pursuant to that certain Escrow Agreement dated effective _____among CN MINDEN, LLC ("Customer"), NEBRASKA PUBLIC POWER DISTRICT ("NPPD"), and (Bank name), Customer and NPPD hereby jointly request disbursement of funds in the amount and manner described below from account number _____ titled "CN MINDEN, LLC Electric Facilities Escrow Account" Escrow Account.

Please disburse to:

_____

Amount to disburse:  $_____

Form of disbursement:        Money Wire

IN WITNESS WHEREOF:  the parties hereto have executed this Joint Disbursement Request in multiple counterparts, each of which is and shall be considered an original for all intents and purposes, effective as of the date first written above.


CN Minden, LLC                              Nebraska Public Power District


_____              _____
Name: _____              Name: _____
Title: _____            Title: _____
Date: _____             Date: _____

<p style="text-align:center; color:red;">CONFIDENTIAL</p>

**Schedule 1**

**SECURITY SCHEDULE**

Telephone Number(s) for Call-Backs and Person(s) Designated to Confirm Funds Transfer Instructions and Execute Instructions, and Other Documents in Connection with this Escrow Agreement

CN Minden, LLC Contact Information:

| Name/Title | Telephone Number | Signature Identification |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

<div align="center">CONFIDENTIAL</div>

NPPD Contact Information:

| Name | Telephone Number | Signature Identification |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

Escrow Agent will attempt to contact the contacts in the order they appear on this Security Schedule.  Verification is needed from one contact for the party receiving the disbursement and the contact must be separate from the person who signed the Disbursement Request for dual control purposes.

CONFIDENTIAL

**APPENDIX E**
**to**
**Transmission Facilities Construction Agreement**
**dated** February 17**, 2022**
**between**
**CN Minden, LLC**
**and.**
**Nebraska Public Power District**

**Form of Surety Bond**

TRANSMISSION FACILITIES CONSTRUCTION
AGREEMENT PAYMENT BOND

Bond No._____

KNOW ALL MEN BY THESE PRESENTS, that we,_____(hereinafter called "Principal"), as Principal, and

_____(hereinafter called "Surety"), as Surety, are held and firmly bound unto_____, a public corporation and political subdivision of the State of Nebraska (hereinafter called "Obligee"), as Obligee, in the maximum penal sum of _____(\$_____) for the payment of which the said Principal and Surety bind themselves, jointly and severally, firmly by these presents.

WHEREAS**,** Principal intends to own and operate a facility located at_____(the  "\_\_"),  and wishes to enable the_____to obtain service from the_____(the "Retail Service Provider) by means of the electric transmission facilities of the Obligee (the "Transmission System");

WHEREAS**,** Obligee is willing to construct certain transmission facilities (the "_____"), which will be used to provide transmission service to the Retail Service Provider that will serve the_____, and the Principal is willing to use and pay for transmission service it receives from the_____via the_____;

WHEREAS**,** the Principal and Obligee have entered into a Transmission Facilities Construction Agreement (the "Agreement") on _____, 2022 to establish the rights and obligations of the Principal and Obligee for construction and  payment for the_____that will be used to provide transmission service to the Retail Service Provider that will serve the_____; and

WHEREAS, Section 4.3 of the aforementioned Agreement between Principal and Obligee requires that the Principal obtain and provide security for its payment obligations under the Agreement, which may be in the form of one or more surety bonds acceptable to the Obligee, and shall be in the aggregate amount of the Stranded Cost Estimate less the Formula Contribution in Aid of Construction as defined in the Agreement as\_\_\_\_(\$_____) (this "Bond").

<p style="text-align:center; color:red">CONFIDENTIAL</p>

NOW, THEREFORE, the condition of this obligation is such that if the Principal shall well and truly accomplish its Full Build Out Conditions under said Agreement, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

**PROVIDED**, **HOWEVER**, that this Bond is subject to the following terms and conditions:

1. No parties other than the named Obligee may make a claim on this Bond, and no suit, action or proceeding in law or equity shall be brought or maintained by anyone other than the Obligee named herein.

2. In the event of any claim made under this Bond by the Obligee, the Surety shall have fifteen (15) calendar days to conduct an investigation and the Obligee shall provide such documentation or evidence as may be reasonably requested by the Principal and Surety.

3. The penal sum of this Bond shall be reduced by and to the extent of any payments made hereunder from the Surety to the Obligee.

4. Pursuant to Section 4.4 of the Agreement, the penal sum of this Bond shall be automatically reduced, on a quarterly basis, by the amount that the Obligee and the Principal mutually agree was paid for transmission electrical service in that quarterly period. This decrease in penal sum shall occur regardless of whether the Surety issues a decrease rider to this Bond.

5. The Obligee agrees that it will release this Bond pursuant to Section 4.3 of the Agreement upon the Principal having accomplished the Full Build Out Conditions.  Until such release this Bond shall remain in full force and effect for the penal sum of this Bond stated in Section 4.3 of the Agreement and in the Whereas above.

6. Regardless of the number of years this Bond shall continue in force and the number of premiums which shall be payable or paid by Principal; the liability of the Surety shall not be cumulative from year to year nor period to period.

<p align="center" style="color:red">CONFIDENTIAL</p>

7.  In no event shall the liability of the Surety exceed the penal sum of this Bond, as it may be decreased from time to time.

This Bond is governed by the laws of the state of Nebraska and the state courts located therein shall have exclusion jurisdiction and venue of any suit, action or proceeding in law or equity on this Bond

Signed and sealed this___day of_____, 20____.

By: _____          By: _____

_____          _____
Print Name & Title          Print Name & Title

[SEAL]

**Exhibit A-2**

Development Agreement

EXECUTION COPY 7/1/2022

CN MINDEN LLC
Minden, NE

### DEVELOPMENT AGREEMENT

This **DEVELOPMENT AGREEMENT** (this "Agreement") is made and entered into as of the 8th day of July 2022 by and between **THE CITY OF MINDEN, NEBRASKA**, a Nebraska municipal corporation (the "City") and **CN MINDEN LLC**, a Delaware limited liability company ("Developer"). The City and Developer may be referred to herein as a "Party" or collectively as the "Parties".

### PRELIMINARY STATEMENTS

Developer intends to acquire fee simple title to certain real property located at or near the Northwest corner of 33rd and N Roads in Minden, Kearney County, Nebraska, known as Lot 1, Compute North NE-13 Subdivision and as is more particularly described in <u>Exhibit A</u> attached hereto (the "<u>Property</u>"). After acquisition, Developer intends to construct structures and facilities and install digital, computer and communications equipment (the "<u>Development</u>") necessary for providing computing services, electronic data storage and related uses upon the Property (the "<u>Use</u>"). In connection with the planned development of the Property and the Use, the City has approved replatting and rezoning of the Property, and Developer has agreed to construct the Development and operate for the Use of the Property, as further described in this Agreement and subject to the terms and conditions of this Agreement.

NOW THEREFORE, the City and Developer, in consideration of the terms, covenants and conditions herein set forth, hereby agree as follows:

1. **Development Design**.

   a. Developer agrees to design and construct, or to engage a third-party contractor to design and construct, and to operate the Development in a manner such that the sound emanating from the Development during operations does not cause the sound level measured at the respective Test Points located at the border of the Property as shown on <u>Exhibit B</u> to exceed the maximum sound requirement for each Test Point as set forth on <u>Exhibit B</u> (the "<u>Sound Requirements</u>"). Developer agrees to complete, at its sole cost and expense, during or after commissioning of the Development, one sound model validation test at the 8 Test Points and the 4 monitoring points under full operating conditions during the month of January 2023 (or at a later date, provided such date has been pre-approved by the City in writing) using the same testing methods and processes as the USG Sound Studies (defined below), a copy of which shall be provided to the City.

   b. If the City reasonably believes that the sound emanating from the Development during operations results in sound level measurements exceeding the Sound Requirements, the City may provide notice to the Developer (a "<u>Sound Notice</u>"). Within 15 Business Days of the date of the Sound Notice, Developer shall engage Urban Solution Group or, if acceptable to the City in its reasonable discretion, another engineering firm experienced in sound measurements, to conduct a study (which shall be performed as soon as reasonably practicable) and to prepare and deliver to the City a report of the average

4864-3566-3647.8

DocuSign Envelope ID: 32CB4365-84B1-4578-A848-99F323B6C939

sound produced by the Development measured at each of the Test Points (the "Sound Report"). The Sound Report shall utilize the same methods and parameters used in the reports produced by Urban Sound Group dated January 24, 2022, March 25, 2022 and June 14, 2022 attached as Exhibit B-1, Exhibit B-2 and Exhibit B-3 hereto (the "USG Sound Studies"). The Developer shall be responsible for the expense of preparing all Sound Reports following any Sound Notices and any Sound Report required under Section 1.d following required Development Modifications. Notwithstanding the foregoing, the City shall reimburse the Developer for the expense of any Sound Reports prepared following Sound Notices (other than the first Sound Report prepared in any calendar year following a Sound Notice) if any such Sound Reports show that the Sound Requirements have not been exceeded. In this Agreement, a "Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day which is a legal holiday in the State of Nebraska.

c.  If the sound levels at the Test Points reported in the Sound Report exceed the Sound Requirements, then Developer shall, at its sole cost and expense, change operations or install sound reduction features sufficient to reduce the sound produced by the Development to meet the Sound Requirements (the "Development Modifications") within 90 days of the date of the Sound Report (the "Sound Mitigation Period"), provided that the Sound Mitigation Period may be extended if Developer provides notice to City that Development Modifications may not be completed due to reasonable delays in obtaining necessary equipment or scheduling contractors. In the event Developer has not completed the Development Modifications by the expiration of the Sound Mitigation Period for reasons other than a delay due to a Force Majeure Event (as defined in Section 2 below), then for every day beginning with the day after the last day of the Sound Mitigation Period through and including the date on which the Development Modifications are completed, Developer shall pay to City liquidated damages in the amount of one-thousand dollars ($1,000.00) per day that the Development is operating. If Developer has not completed the Development Modifications within sixty (60) days after the last day of the Sound Mitigation Period for reasons other than a delay due to a Force Majeure Event, then Developer shall, upon receipt of written notification from the City (and notwithstanding the procedures described in Section 9 below), immediately suspend operations of the Development until the Development Modifications are complete. If the delay for completing the Development Modifications is due to a Force Majeure Event, then Sound Mitigation Period shall be extended for the same duration as the Force Majeure event.

d.  After any Development Modifications have been completed, Developer shall promptly, upon request of the City, at Developer's sole cost and expense, engage the engineering firm that produced the Sound Report, to prepare and deliver another Sound Report to the City to confirm that the Development Modifications have successfully reduced the sound levels to be in accordance with the Sound Requirements.

e.  For clarity, the Parties recognize that Developer's implementation of any Development Modifications shall not relieve it from its obligation to ensure that the sound levels continue to remain at or below the Sound Requirements while the Development is in operation, and that Developer shall continue to comply with the procedures described

4864-3566-3647.8

in paragraphs (b), (c) and (d) on a prospective basis unless a higher sound limit is specifically permitted under City regulations applicable to the Property.

2.    **Cessation of Use**.  Unless due to a Force Majeure Event, if Developer ceases operation of the Development for the Use for any consecutive period of 150 days (with the 150th day thereof considered the "Cessation Date"), Developer shall promptly provide written notice to the City.  Thereafter, Developer shall remove the Development and restore the Property to a condition necessary for agriculture use, as reasonably determined by the City, within 180 days of the Cessation Date (the "Restoration Date").  Notwithstanding the forgoing, Developer or Developer's permitted assignee may, in good faith and upon written notification to the City, restart operations of the Development for the Use at any time prior to the Restoration Date and, in such event, the notice of cessation shall be considered rescinded and restoration of the Property shall not be required unless operations cease for another consecutive period of 180 days as provided above.  If the Developer ceases operation of or is prevented from operating the Development due to a Force Majeure Event, the Cessation Date shall be the later of 150 days after the end of the Force Majeure Event, or completion of repairs or reconstruction made necessary by the Force Majeure Event, where such repairs or reconstruction shall commence as soon as is reasonably practicable under the circumstances then and there existing.  For purposes of this Agreement, a "Force Majeure Event" means an event or circumstance beyond the Developer's reasonable control and not attributable to the Developer's action or inaction, including, without limitation: (a) acts of God; (b) flood, fire, tornado, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) actions, embargoes, or blockades in effect on or after the date of this Agreement; (e) national or regional emergency; (f) strikes, labor stoppages or slowdowns, or other industrial disturbances; and (g) shortage of adequate power.

3.    **City Approvals**.  The City has approved and recorded the final plat (the "Plat") depicted in Exhibit C attached to this Agreement. The City shall promptly review any building permits, certificates of occupancy and all other approvals lawfully required for Developer to construct and operate the Development upon the Property for the Use and to obtain access to all abutting and appurtenant rights of way controlled by the City (collectively, the "City Approvals") in accordance with ordinances, building codes, rules and regulations promulgated by the City.  The City agrees that it shall not unreasonably withhold or delay any of the City Approvals provided that Developer complies with all applicable laws, regulations, and ordinances of the City and pays all lawful permit and application fees.

4.    **Power Interruption**.  In the event that the Nebraska Public Power District or the Southwest Power Pool shall institute any reduction or elimination of electrical service to the City or electric customers residing in the City (including those residing within the City's extra-territorial jurisdiction), Developer understands and acknowledges that electrical service to the Property may be reduced or eliminated, as determined by the Nebraska Public Power District or the Southwest Power Pool, and that the City shall not be responsible or liable to Developer for any such reduction or elimination of electrical service.

5.    **No Improvement District or Special Assessments; Development Fee**.  The City shall create no improvement district solely arising out of the development of the Property.  The City waives any requirement of Developer to pay any special or other assessment solely arising out of the construction of the Development.  In consideration for the foregoing and the City's performance of its other obligations hereunder, Developer shall pay the City the sum of $50,000 per year in advance, in two equal installments of $25,000, due and payable on or before January 1 and July 1 of each year

following commencement of operations (the "Development Fee"), with the first payment due and payable upon Developer's written notice to the City of the commencement of operations, prorated for the partial period from the commencement of operations through January 1 or July 1, as the case may be. The Development Fee shall increase annually by three percent (3%) on January 1.

6. **No Obligation to Construct or Operate**.  The City hereby acknowledges that Developer as of the date hereof may not own fee title to the Property.  The City further agrees that none of the obligations of Developer set forth herein shall be binding against Developer until such time as Developer have acquired fee title to the Property.  It is expressly agreed that nothing contained in this Agreement shall be construed to contain a covenant, either expressed or implied, for Developer to acquire fee title to the Property.

7. **Developer Rights**.  The Parties agree that Developer shall have all rights to undertake and complete the Development and to Use the Property in accordance with this Agreement.  Developer must adhere to all City building, zoning and code regulations and all other laws affecting the Use of the Property or the Development.  Nothing in this Agreement provides for or allows any circumvention of municipal, state or federal approval processes for the Development.  Developer shall assume all liabilities, costs and expenses, either direct or indirect, related to the Use of the Property and the Development.

8. **City Rights**.  The City assumes no obligation to pay for any expenses either direct or indirect incurred by Developer as a result of the Development.

9. **Defaults and Remedies**.  In the event a Party fails to observe and perform any material term of this Agreement and such failure continues for a period of thirty (30) days after written notice from the other Party, then such Party may (A) terminate this Agreement, in which event such Party shall have no further obligations or liabilities hereunder, and/or (B) pursue any remedies such Party may have under this Agreement, at law or in equity.

10. **Institution of Legal Actions; Governing Law**.  Any legal actions instituted pursuant to this Agreement must be filed in Kearney County, Nebraska.  This Agreement shall be construed under the laws of the State of Nebraska.

11. **Counterparts**.  This Agreement may be executed in any number of identical counterparts, each of which for all purposes shall be deemed an original, and all of which shall constitute collectively one agreement.

12. **No Agency Created**.  Nothing contained in this Agreement creates any partnership, joint venture or agency relationship between Developer and the City.

13. **Assignment**.  Developer may not assign this Agreement, nor any of its obligations to the City contained herein, without the City's prior written consent, which will not be unreasonably withheld.

14. **Time of the Essence**.  Time is of the essence regarding all obligations of the Parties hereto.

15. **Binding Effect and Amendments; No Third-party Beneficiaries**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and any lawful successors and assigns of the parties and shall not be amended except by written agreement of the Parties.  Nothing in this

4

Agreement is intended to confer upon any other person or entity any rights, benefits or remedies of any kind or character whatsoever, and no third person or entity shall be deemed a third-party beneficiary of this Agreement.

16.     **Severability**.  The provisions of this Agreement shall be deemed severable.  If any part of this Agreement shall be held invalid, illegal or unenforceable, the remainder shall remain in full force and effect, and such invalid, illegal or unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein.

4864-3566-3647.8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the dates hereinafter set forth.

THE CITY:

THE CITY OF MINDEN, NEBRASKA
a Nebraska municipal corporation

Date: 7-8-22

By: _____
Mayor

6

4864-3566-3647.8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the dates hereinafter set forth.

DEVELOPER:

CN MINDEN LLC, a Delaware limited liability company

Date: July 8, 2022

By: *Jeff Jackson*

Name: Jeff Jackson

Title: VP of Site Development

7

Exhibits to
Development Agreement
dated 7/8/2022 between
City of Minden and CN Minden LLC

**EXHIBIT A**

**DESCRIPTION OF THE PROPERTY**

Lot 1, Compute North NE-13 Subdivision, a Subdivision being part of the
Southwest ¼ of the Southwest ¼, Section 32, Township 7 North, Range 14 West of the 6th P.M.,
as surveyed, platted and recorded in Kearney County, Nebraska.

**EXHIBIT B**
**SOUND MEASUREMENT**

| Test Point* | Location on Property Border | Sound Requirement (dbA)** |
|---|---|---|
| TP1 | NW | 71.6 |
| TP2 | N | 75.2 |
| TP3 | NE | 66.0 |
| TP4 | E | 66.3 |
| TP5 | SE | 64.1 |
| TP6 | S | 69.4 |
| TP7 | SW | 64.1 |
| TP8 | W | 72.1 |

\*   Test Point – Locations on border of Property as shown on Figure 1 below.

\*\* Sound Requirement – Measurement and calculation of sound to determine compliance with Sound Requirement based on methods used in USG Sound Studies.

**Figure 1:** *Noise Contour Plot with Data Center Fence Line Noise Levels (dBA)*

Numbers with Colored Background – Contour Line Noise Levels
Numbers with White Background – Noise Levels at Fence Line Locations



**EXHIBIT B-1**

Pre-Operations Ambient Monitoring Report
Prepared by
Urban Solution Group
January 24, 2022

(Copy attached.)



## Pre-Operations Ambient Monitoring Report

Compute North, Minden Data Center
Kearney County, Nebraska
(Parcel ID #: 0003303.00)

Prepared for:

Compute North, LLC
7575 Corporate Way
Eden Prairie, MN 55344

Prepared by:

Urban Solution Group, LLC
4230 Elati Street, Suite 200
Denver, CO 80216

Jan 24, 2022



# Table of Contents

1. Introduction ........................................................................................................................................ 1

2. Summary ............................................................................................................................................. 2

3. Ambient Monitoring Results ............................................................................................................. 3

4. Notations ............................................................................................................................................ 5

Appendix 1 – Summary Data and Charts ................................................................................................. 6

Appendix 2 – Sound Fundamentals ....................................................................................................... 11

Appendix 3 – Glossary ............................................................................................................................ 14



| **Report Submitted to:** | **Report Contact:** |
|---|---|
| Julia Sonnen | Cam Hornor |
| (651) 383-7850 | (720) 749-2916 |
| Compute North | Urban Solution Group |
| julia.sonnen@computenorth.com | cam.hornor@urbansolutiongroup.com |

## 1. Introduction

**Urban Solution Group, LLC (Urban)** was commissioned by **Compute North, LLC** to document the ambient A-weighted sound pressure levels at multiple locations adjacent to Compute North's proposed data center location in Minden, Nebraska. Detailed location information is as follows;

| | |
|---:|:---|
| **Data Center Location:** | 32 7 14 SW 1/4 EXCEPT TRACT IN SW CORNER 32-7-14 LIBERTY 156.61 AC. Minden, Nebraska |
| **Duration:** | 72-Hours: Starting at 5:00 p.m. Monday, January 10, 2022 Ending at 5:00 p.m. Thursday, January 13, 2022 |
| **Monitoring Point (MP) Coordinates:** | MP 1.   40°31'25.78"N, 98°56'17.70"W |
| | MP 2.   40°32'7.46"N, 98°55'50.24"W |
| | MP 3.   40°31'33.47"N, 98°54'56.80"W |
| | MP 4.   40°31'3.39"N, 98°56'0.50"W |

***Figure 1.*** *Aerial View of Monitoring Locations and Proposed Minden Data Center*





## 2.  Summary

Urban collected noise measurements at four locations to document background ambient noise levels near the proposed Minden Data Center, outside of Minden, NE. This reporting period analyzed sound measurements collected from January 10, 2022 at 5:00 p.m., to January 13, 2022 at 5:00 p.m. Figure 1 shows monitoring points in relation to the proposed data center location. Table 1 below shows the overall A-weighted averages (Leq) for the 72-hour monitoring period. The daytime and nighttime periods are defined as 7:00 a.m. − 10:00 p.m., and 10:00 p.m. − 7:00 a.m. respectively.

*Table 1*. *Overall Study Averages for Monitoring Period*

| Location | Daytime Averages (Leq) | Nighttime Averages (Leq) | Overall Averages (Leq) |
|---|---|---|---|
| | dBA | | |
| Monitoring Point 1 | 44.5 | 40.2 | 42.8 |
| Monitoring Point 2 | 43.5 | 35.7 | 41.2 |
| Monitoring Point 3 | 44.5 | 45.0 | 44.7 |
| Monitoring Point 4 | 45.9 | 44.5 | 45.3 |



## 3.  Ambient Monitoring Results

Urban collected ambient sound level measurements at four locations adjacent to the proposed Minden Data Center to document background ambient noise levels. The ambient sound monitoring study took place from 5:00 p.m. Monday, January 10, 2022, to 5:00 p.m. Thursday, January 13, 2022, using four Type 1 Svantek SV307 hand-held sound level meters. The sound level meters collected A-weighted noise levels and were each calibrated before and after the measurement period. Environmental data (wind speed & direction, humidity, air temperature, etc.) was also recorded with a weather station attached to the sound level meter at Monitoring Point 4, situated approximately 2,700 feet southwest of the site.

The proposed Compute North, Minden Data Center location is situated at the corner of 33 Road and North Road, approximately 1.8 miles northeast of the town of Minden, NE. It is zoned agricultural per the county of Kearney online property portal.

The sound level meters are set to record audio files when the levels exceed 45 dBA in the daytime (7:00 a.m. – 10:00 p.m.) and 45 dBA in the nighttime (10:00 p.m. – 7:00 a.m.). Based on the audio files, the most common sounds for the monitoring locations include vehicle traffic, wind, trains, farm equipment activity, and airplanes.

Table 2 through Table 5 (on the next page) show the A-weighted noise average (LAeq) for each of the three days at all four monitoring points. This tabular data is calculated over the daytime (7:00 a.m. – 10:00 p.m.) and nighttime (10:00 p.m. – 7:00 a.m.) periods.

Figure 2 through Figure 5 in Appendix 1 contain charts with hourly data (LAeq, LA10, and LA90 for 1-hour periods) as well as wind speeds for each of the monitoring points.



*Table 2. Daily and Overall Sound Level Averages for Monitoring Point 2*

| Description | Day 1 | Day 2 | Day 3 | Overall Average |
|---|---|---|---|---|
| Average Wind Speed (mph) | 5.3 | 7.3 | 6.7 | **6.4** |
| **A-Weighted Levels** | | | | |
| Daytime – $LA_{Day}$ (dBA) *(7:00 a.m. - 10:00 p.m.)* | 46.8 | 41.8 | 43.1 | **44.5** |
| Nighttime – $LA_{Night}$ (dBA) *(10:00 p.m. - 7:00 a.m.)* | 42.8 | 37.8 | 38.0 | **40.2** |
| Overall $LA_{eq}$ (dBA) | 45.3 | 40.2 | 41.3 | **42.8** |

*Table 3. Daily and Overall Sound Level Averages for Monitoring Point 2*

| Description | Day 1 | Day 2 | Day 3 | Overall Average |
|---|---|---|---|---|
| Average Wind Speed (mph) | 5.3 | 7.3 | 6.7 | **6.4** |
| **A-Weighted Levels** | | | | |
| Daytime – $LA_{Day}$ (dBA) *(7:00 a.m. - 10:00 p.m.)* | 45.4 | 42.2 | 42.2 | **43.5** |
| Nighttime – $LA_{Night}$ (dBA) *(10:00 p.m. - 7:00 a.m.)* | 38.1 | 33.6 | 33.8 | **35.7** |
| Overall $LA_{eq}$ (dBA) | 43.1 | 39.7 | 39.8 | **41.2** |

*Table 4. Daily and Overall Sound Level Averages for Monitoring Point 3*

| Description | Day 1 | Day 2 | Day 3 | Overall Average |
|---|---|---|---|---|
| Average Wind Speed (mph) | 5.3 | 7.3 | 6.7 | **6.4** |
| **A-Weighted Levels** | | | | |
| Daytime – $LA_{Day}$ (dBA) *(7:00 a.m. - 10:00 p.m.)* | 45.2 | 44.7 | 43.4 | **44.5** |
| Nighttime – $LA_{Night}$ (dBA) *(10:00 p.m. - 7:00 a.m.)* | 48.3 | 42.7 | 39.5 | **45.0** |
| Overall $LA_{eq}$ (dBA) | 47.0 | 43.8 | 41.9 | **44.7** |

*Table 5. Daily and Overall Sound Level Averages for Monitoring Point 4*

| Description | Day 1 | Day 2 | Day 3 | Overall Average |
|---|---|---|---|---|
| Average Wind Speed (mph) | 5.3 | 7.3 | 6.7 | **6.4** |
| **A-Weighted Levels** | | | | |
| Daytime – $LA_{Day}$ (dBA) *(7:00 a.m. - 10:00 p.m.)* | 47.8 | 44.5 | 44.8 | **45.9** |
| Nighttime – $LA_{Night}$ (dBA) *(10:00 p.m. - 7:00 a.m.)* | 48.0 | 40.1 | 40.2 | **44.5** |
| Overall $LA_{eq}$ (dBA) | 47.9 | 42.8 | 43.1 | **45.3** |



## 4. Notations

The services provided for this project were performed in accordance with generally accepted professional consulting services. No warranty, expressed or implied, is made or intended by rendition for these consulting services or by furnishing oral or written reports of the findings made. Sound level meter and accompanying equipment serial numbers, along with calibration information, may be sent if requested. Urban Solution Group generated this report for the exclusive use of Compute North, LLC.



## Appendix 1 – Summary Data and Charts



**Figure 2.** *Chart of Hourly Averages from Monitoring Point 1*

*Figure 3.* Chart of Hourly Averages from Monitoring Point 2



*Figure 4.* Chart of Hourly Averages from Monitoring Point 3



*Figure 5.* Chart of Hourly Averages from Monitoring Point 4



## Appendix 2 – Sound Fundamentals

Sound is a series of vibrations transmitted through the air, or other medium, and can be heard when they are processed by the human ear. There are two important properties that describe sound; frequency and amplitude. Frequency is determined by the rate of movement and is measured in cycles per second, which is known as Hertz (Hz). A healthy human ear can hear 20 Hz – 20,000 Hz (Figure A). The sensation associated with frequency is commonly referred to as the pitch of a sound. High frequencies produce a higher pitch and vice versa. The amplitude of a sound is determined by the maximum displacement of air molecules produced by the vibrations. These displacements lead to pressure fluctuations in air, which are expressed in decibels (dB). Decibels are a logarithmic ratio of sound pressure over the standard threshold of hearing. The more energy a sound has, the larger the pressure fluctuations, resulting in a louder sound.



***Figure A***. *Auditory field displaying thresholds for a human ear at different frequencies*

Frequency weightings are applied to measurements to provide a better match between measured results and human perception. Each weighting, in relation to their frequency components, allows for a consistent measurement of the different type of noise sources. A-weighted decibel sound pressure levels (dBA) are measurements recorded from a sound level meter measuring sounds similar to the response of the ear (Figure B). While C-weighted (dBC) measurements are for low-frequency components.



***Figure B.*** *Common sound weightings up to 20 kHz, Z-weighting means no weighting*

Each measurement has an exponential time factor. Slow time weighting is the most common for environmental noise measurements and will be used for these measurements. For recording over long periods of time, the sound level meter records each weighted decibel reading with an equivalent, or average, continuous sound level reading (Leq). Leq represents the same energy as the actual time varying sound signal (Figure C). LAeq refers to the equivalent continuous sound level for an A-weighted measurement.



***Figure C:*** *Sound level recording displaying Leq, a steady-state sound level, over a noise measurement*

Environmental noise is a combination of various noise sources. These sources may include; vehicle traffic, aircraft flyovers, wind, weather disturbances, commercial or industrial activities, and other short-term events. These sources create "background noise". Background noise varies throughout the day, generally following the cycle of human activity. Figure D presents typical A-weighted (dBA) sound levels for multiple sources of sound.



***Figure D:*** *Common A-weighted sound levels*



## Appendix 3 – Glossary

**Ambient Noise**

All noises that exist in an area and are not related to facility. Ambient noise includes sound from other industrial noise not subject to this directive, transportation sources, animals and nature.

**Average Sound Level**

See Energy Equivalent Sound Level.

**A-weighted sound level**

The sound level as measured on a sound level meter using a setting that emphasizes the middle frequency components similar to the frequency response of the human ear.

**Calibration**

A procedure used for the adjustment of a sound level meter using a reference source of a known sound pressure level and frequency. Calibration must take place before and after the sound level measurements.

**Day Night Sound Level (Ldn)**

Is the average noise level over a 24-hour period. The noise between the hours of 22:00 and 07:00 is artificially increased by 10 dB. The nighttime noise is weighted to consider the decrease in community background noise.

**Daytime Average Sound Level (Lday)**

The time-averaged A-weighted sound level measured between the daytime hours, which are usually 7:00 am to 7:00 pm (7:00 am to 9:00 pm for Weld County Code).

**Decibel (dB)**

A unit of measure of sound pressure that compresses a large range of numbers into a more meaningful scale. The basic unit of measurement for sound levels.

**dBA**

The decibel (dB) sound pressure level filtered through the A filtering network to approximate human hearing response. See dB and A-weighted Sound Level.

**Energy Equivalent Sound Level (Leq)**

The Leq is a single-number average, sound level that represents cumulative acoustical energy as measured over a specified time interval.

**Facility**

Any operation used in exploration, processing, development and transportation of energy resources.

**Frequency**

The number of oscillations per second for a sound wave.



**Impulse Noise**
Unwanted, instantaneous sharp sounds that create sudden impulses of pressure similar to gunfire and explosions.

**Noise Reduction**
The difference in sound pressure level between two points

**Ldn**
See Day night sound level.

**Leq**
See Energy Equivalent Sound Level.

**L10**
Sound level exceeded for 10% of the measurement period. Commonly used as a measure of traffic noise

**L90**
Sound level exceeded for 90% of the measurement period. Commonly used as a measure of the background noise level when significant noise level fluctuations are present (as in traffic noise).

**Nighttime Average Sound Level (Lnight)**
The time-averaged A-weighted sound level measured between the nighttime hours, which are usually 7:00 pm to 7:00 am (9:00 pm to 7:00 am for Weld County Code).

**Noise**
Generally understood as unwanted sound.

**Noise Impact Assessment (NIA)**
Identifies the expected sound level emanating from a facility as measured 15 m from the nearest or most impacted permanently or seasonally occupied dwelling. It also identifies what the permissible sound level is and how it was calculated.

**Noise Reduction Coefficient (NRC)**
A single number rating of the sound absorption properties for a material. An NRC value of zero indicates the material is purely reflective. An NRC value of one indicates perfect absorption.

**Octave**
A series of electronic filters separate sound into discrete frequency bands, making it possible to know how sound energy is distributed as a function of frequency. The octave band has a center frequency that is double the center frequency of the octave band preceding it.

**Point Source**

A source that radiates sound from a single point. Generally used to model equipment when looking at the sound impact over a large area.

**Receiver**

A person or piece of equipment that is affected by noise.

**Sound**

A series of vibrations transmitted through the air, or other medium, and can be heard when they are processed by the human ear.

**Sound Level Meter (SLM)**

An instrument that contains a microphone and filter used to measure sound levels, using standard frequency-weightings and exponentially weighted time averaging.

**Sound Power Level**

A physical measurement of the amount of power a sound source radiates into the surrounding air. It is the rate at which sound energy is emitted, or received, per unit time.

**Sound Transmission Class (STC)**

An integer rating that measures how well a barrier or building partition attenuates sound. Indicates how well a barrier is at stopping sound from transmitting through it.

**1/3 Octave**

The 1/3 octave band analysis provides a finer breakdown of sound distribution as a function of frequency.

**EXHIBIT B-2**
Minden Data Center Sound Summary
Prepared by
Urban Solution Group
April 25, 2022

(Copy attached.)



**Minden Data Center Sound Summary**

**4/25/2022**

---

The following represents the results of the Minden Data Center pre-operations ambient monitoring report and the noise impact assessment.

Pre-Operations Ambient Montioring Report

In January of 2022, Compute North commissioned an ambient sound monitoring report for the Minden Data Center location.

The reporting period analyzed sound measurements collected from January 10, 2022 at 5:00 p.m., to January 13, 2022 at 5:00 p.m. Figure 1 shows four monitoring points in relation to the proposed data center location.  Daytime and nightime monitoring was performed with the daytime and nighttime periods being defined as 7:00 a.m. – 10:00 p.m., and 10:00 p.m. – 7:00 a.m. respectively.



*Figure 1. Aerial View of Monitoring Locations and Proposed Minden Data Center*



Noise Impact Assessment

A noise impact assesement was conducted using SoundPLAN 8.2. This is a commercially available, three-dimensional, computer-based, noise-modeling software. This is a predictive model to aid in ascertaining the environmental impact of the proposed facility on the surrounding environment. The results of this assessment compared the predicted levels of the Minden Data Center to the perceived sound pressure levels at the receptors.

The assessment evaluates A-weighted sound levels (dBA) which is the sound level as measured on a sound level meter using a setting that emphasizes the middle frequency components similar to the frequency response of the human ear. The largest change in noise level (from pre-operational ambient to post-operation ambient) is an anticipated 2.6 decibel. This is less than the 3.0 decibel audibility threshold, and therefore cannot be heard.

| Minden Data Center Sound Summary | | | | | | |
|---|---|---|---|---|---|---|
| Receptor | Property Owner | Ambient Sound Measurement Point | Ambient Sound Level (dBA) | Distance to Facility (ft) | Facility Sound Pressure Level (dBA) | Cumulative (ASL + SPL) (dBA) | Increase over Ambient (dBA) |
| R01 | Brian & Barb Petersen | MP4 | 45.3 | 2,780 | 38.6 | 46.1 | 0.8 |
| R02 | Steve & Anna Petersen | MP1 | 42.8 | 1,972 | 42.0 | 45.4 | 2.6 |
| R03 | Griffin & Amy Latter | MP2 | 41.2* | 3,527 | 34.9 | 42.1 | 0.9 |
| R04 | Don & Linda Schwenka | MP3 | 44.7 | 4,071 | 32.5 | 45.0 | 0.3 |
| R05 | Kevin & Virginia Sinsel | MP2 | 41.2* | 4,158 | 33.9 | 41.9 | 0.7 |

*Ambient sound measurement points for receptors R03 and R05 were measured at the same location, approximately 1,200' east of receptor R03. Ambient sound measurement points for receptors R01, R02, and R04 are the same location as the receptor, as shown below.



**EXHIBIT B-3**
Minden Data Center

Urban Solution Group
Letter dated June 14, 2022
(Copy attached.)



June 14, 2022

Compute North, LLC
7575 Corporate Way,
Eden Prairie, MN 55344

Attn:   Michelle Matthews (Director, Site Development, Compute North)

Re:   Compute North, Minden Data Center, Kearney County Nebraska
      Noise Levels, Metrics, and Compliance, (Parcel ID #: 0003303.00)

Dear Ms. Matthews,

Urban Solution Group ("USG") has been engaged to complete a Noise Impact Assessment (NIA) for the proposed Compute North Data Center in Minden, Nebraska (the "CN Data Center").  In connection with the NIA, USG has completed certain studies and developed a computer noise model to both quantify the current ambient noise levels, and determine the noise impact of the CN Data Center on the surrounding area.

Specifically, USG prepared a Pre-Operations Ambient Monitoring Report dated January 24, 2022 (the "Ambient Report") which quantifies the local ambient sound levels existing at four locations nearby the residences neighboring the site for the proposed CN Data Center. This was a 72-hour study conducted January 10-13, 2022.

Further, as part of the NIA, a computer noise model was prepared using data collected at an existing CN facility, in combination with manufacturers noise data, to generate predictions of noise levels at the five neighboring residences during operations. The computer noise model is complete, and results are available, though the full report is still under review.

Based on the Ambient Report and the results of the noise model, USG prepared the CN Data Center Sound Summary dated April 25, 2022, which summarizes the predicted operational sound levels at the five residences neighboring the proposed facility (these are the agreed upon operational facility noise levels and are presented in Table 1 attached).

This letter outlines the proposed method of demonstrating compliance with the agreed upon facility operational noise levels of the CN Data Center. Attached as Figure 1 to this letter are the maximum sound levels during operations, measured at test points ("Test Points") located at the property border of the CN Data Center.

## COMPLIANCE MEASUREMENT

Factors critical to the development of an effective compliance program include protocols that significantly reduce (or eliminate) the impact of ambient noise levels from other sources as well as deviations due to environmental conditions.  Compliance measurements should also be taken at easily accessible locations, without intruding on property of neighbors or having to shut the facility down.

In general, a compliance measurement will be carried out by taking a sound level measurement with a sound level meter (SLM) at the point of interest. The SLM measures all the sounds at the measurement location, which is of course the cumulative sum of both the preexisting ambient sounds (all the sounds that exist at a given location prior to facility operation; generally called the ambient) and the noise generated by the facility itself (called the facility contribution).

## COMPLIANCE MEASUREMENT LOCATION

It is proposed by USG that the compliance measurement location used for determining facility compliance be chosen as a set of Test Points along the proposed CN Data Center fence line. The noise levels identified at these Test Points come directly from the computer noise model and correspond directly to the agreed upon noise levels that also came from the same noise model.

The benefits of taking compliance noise level measurements at the Test Points along the facility fence line as opposed to measurements at a distance further from the facility are;

1. *Ambient Noise Level Sensitivity:* Ever changing ambient noise levels (changes in vehicle traffic, lawn mowing, farm operations, etc.) at the residence can significantly affect the compliance noise level measurement at any given time. The data center facility owner can control the noise emitted from their property, but they cannot control the ambient noise at a given residence. Facility noise is much quieter as we get farther away from the facility and closer to a given residence, making a compliance sound level measurement at a distance further from the facility far more susceptible to ambient noise level variations (making it difficult to ascertain compliance).

   Taking a compliance measurement at the facility fence line significantly reduces ambient noise level sensitivity because facility noise levels are much higher at the facility fence line (and are therefore the dominating noise source this close to the facility). Compliance demonstration is easier since it can be accomplished with a single SLM measurement that can be compared directly to the corresponding agreed upon noise level (i.e.: the noise level expected at the fence line that corresponds to the agreed upon level at the residences as outlined in Table 1) from the noise model.

2. *Environmental Conditions:* Ever changing environmental conditions can affect the compliance measurement levels (wind speed and direction, rain, etc.). This is due to effects such as a rustling leaves, tall grass swaying in the wind, noise from seasonal streams, etc. Obviously, the facility owner has no control over the environmental

conditions. While compliance measurements do require relatively fair weather (wind less than 10mph, no rain, etc.), these fence line measurements are far less susceptible to environmental conditions under which the measurements are taken compared to measurements taken a distance further from the facility. This eliminates a significant margin of error with the compliance verification measurement.

The noise model developed in the NIA controls all environmental variables and quantifies the facility contribution noise levels at every point in the study domain (essentially, the entire surrounding area within 1 mile of the proposed facility). Therefore, the agreed upon maximum allowable noise levels at the residences from the noise model, directly correspond to the noise levels at the fence line of the data center. Thus, compliance with the agreed upon facility noise levels can be more clearly demonstrated with a SLM measurement at the proposed facility fence line due to reduced sensitivity to both ambient sound level changes and environmental conditions.

**COMPLIANCE NOISE LEVELS AND FENCE LINE MEASUREMENT LOCATIONS**

The facility noise levels are predicted to be relatively steady given that the facility equipment runs steadily, and the operation runs 24 hours per day during most days of the year. Thus, the Leq (energy noise level average) is utilized for compliance verification since this is the standard environmental noise level metric for steady industrial applications. We also use the A-weighted version of this metric (LAeq) since this is how most regulated maximum permissible noise levels are defined (since it takes into account the fact that the human ear is more sensitive to certain frequencies than others).

Facility sound pressure level (dBA) contributions immediately surrounding the proposed data center in Minden, NE, are shown in the noise contour plot in  Figure 1 on the following page. The contours are provided in 5 decibel increments with the color scale indicating the sound level of each contour line. The sound level numbers on the contour map with colored backgrounds denote the A-weighted levels of each contour line, whereas the sound level numbers with white backgrounds are the predicted A-weighted facility contribution sound levels at each fence line location.

The noise levels at each of the four corners of the fence (fence line is denoted by the black dashed line) are presented, as well as noise levels midway between the corners. These locations are easily identifiable and can be used for A-weighted compliance noise measurements.

The uncertainty with modeled noise level approximations is 3 decibels (per ISO standard 9613-1,2). Thus, when validating compliance, measured noise levels that deviate from the predicted facility contribution by up to 3 decibels (either higher or lower) would be reasonable and fall within international standard expectations.

**CONCLUSION**

Based on the ambinet noise levels measured at the residences of interest (as quantified in the Ambient Report dated January 24, 2022), and the results of the facility noise model developed as part of the NIA, USG believes that sound levels measured at the Test Points along the facility fence line will more accurately demonstrate compliance with the agreed upon maximum facility noise level limits at the residences, since they correspond directly to these compliance noise levels in the model for the ambinet noise levels and environmental conditions used. This method will eliminate the impact of factors outside of the facility owner's control associated with noise levels at locations further away from the facility (instantaneous ambient noise levels at a given residence in excess of those listed in the Ambient Report; and/or adverse environmental conditions).

If you have any further questions, please contact us anytime.

Respectfully submitted,

Vincent Ginter, P.Eng., M.Sc.
Engineering Manager
Urban Solution Group



**Table 1:** *Agreed Upon Noise Level Limits (from the April 25, 2022, Summary), with Corresponding Noise Levels at Fence Line Test Points*

| Receptor | | Distance to Edge of Pad | | Target Max Increase Above Ambient | Noise Level (with Facility in Operation) | Increase Above Ambient |
|---|---|---|---|---|---|---|
| # | Description | Feet | | dBA | dBA | dBA |
| R01 | R01 Brian & Barb Petersen | 2,780 | S | 3.0 | 46.1 | 0.8 |
| R02 | R02 Steve & Anna Petersen | 1,972 | W | 3.0 | 45.4 | 2.6 |
| R03 | R03 Griffin & Amy Latter | 3,527 | N | 3.0 | 42.1 | 0.9 |
| R04 | R04 Don & Linda Schwenka | 4,071 | E | 3.0 | 45.0 | 0.3 |
| R05 | R05 Kevin Sinsel | 4,158 | N | 3.0 | 41.9 | 0.7 |
| TP1 | Test Point (Facility Fence Line) | 0 | NW | -- | 71.6 | -- |
| TP2 | Test Point (Facility Fence Line) | 0 | N | -- | 75.2 | -- |
| TP3 | Test Point (Facility Fence Line) | 0 | NE | -- | 66.0 | -- |
| TP4 | Test Point (Facility Fence Line) | 0 | E | -- | 66.3 | -- |
| TP5 | Test Point (Facility Fence Line) | 0 | SE | -- | 64.1 | -- |
| TP6 | Test Point (Facility Fence Line) | 0 | S | -- | 69.4 | -- |
| TP7 | Test Point (Facility Fence Line) | 0 | SW | -- | 64.1 | -- |
| TP8 | Test Point (Facility Fence Line) | 0 | W | -- | 72.1 | -- |

**Figure 1:** *Noise Contour Plot with Data Center Fence Line Noise Levels (dBA)*

Numbers with Colored Background – Contour Line Noise Levels
Numbers with White Background – Noise Levels at Fence Line Locations



**EXHIBIT C**

**PLAT**
COMPUTE NORTH NE-13 SUBDIVISION

Recorded:      January 12, 2022
                    Instrument 2022-00048
                    Kearney County

*Glide #42*

STATE OF NEBRASKA)
COUNTY OF KEARNEY) ss.       202200048
Entered in the Numerical index and Filed for Record
this _12th_ day of _January_, 20 _22_
at _1:45_ P M in Book _271_ of
Microfilm on Page _363-372_.
_Myra Johnson_ Myra Johnson, County Clerk
_____ Deputy County Clerk

INDEXED-RECORDED-COMPARED
Paid $ _64.00_ ck _9pages (10)_

A SUBDIVI
SECTION 32, TOWNSH

```
NORTHWEST CORNER, SOUTHWEST QUARTER
SECTION 32, T.7 N, R 14 W
FOUND 1" IRON PIN
W    34.12'    MAG NAIL IN POWER POLE
E    36.33'    MAG NAIL IN LONE POST
```

## LEGAL DESCRIPTION

A tract of land being part of the Sout
SW1/4), of Section Thirty-two (32), 1
West of the 6th Principal Meridian, K
described as follows:

Commencing at a 1" iron pin at the
Section 32; thence S 89°50'17" E on t
bearings contained herein are relative t
corner of a tract of land deeded to N
recorded in Book 84, Page 890, and fil
the POINT OF BEGINNING; thence
distance of 715.00 feet; thence N 00
Southwest Quarter a distance of 450.00
parallel with said South line a distan
Northeast corner of said Nebraska Pub
the East line of said Nebraska Public P
a distance of 450.00 feet to the Point of
Containing 7.38 acres more or less, of
used for road purposes on the south side

COUNTY ROAD R.O.W.

33 ROAD

COUNTY ROAD R.O.W.

33.00' 33.00'

WEST LINE SW 1/4

S00°21'34"E 264.3.37'(M)/2640.00'(R)

N89°50'17"W
300.00'(M)&(D)

N89°50'17"W

450.00'(M)&(D)

S00°21'34"E 450.00'(M)&(D)
417.00'(M)
425.00'

NEBRASKA
PUBLIC POWER
DISTRICT
SUBSTATION

DEDICATED FOR
ROAD USE

LOT
298141
6.84 A

G:\Projects\130\130-P\130-P500 to P599\130-P535-008 Civil-Dwgs\Design Drawings\Survey Design\EX_Base CN Minden FINAL.dwg

BOOK _271_ PAGE _363_

FINAL PLAT
# –COMPUTE NORTH NE-13 SUBDIVISION–
## A SUBDIVISION BEING PART OF THE SOUTHWEST 1/4 OF THE SOUTHWEST 1/4,
### SECTION 32, TOWNSHIP 7 NORTH, RANGE 14 WEST OF THE 6th P.M., KEARNEY COUNTY, NEBRASKA



**LEGAL DESCRIPTION**

A tract of land being part of the Southwest Quarter of the Southwest Quarter (SW1/4 SW1/4), of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th Principal Meridian, Kearney County, Nebraska, and more particularly described as follows:

Commencing at a 1" iron pin at the Northwest Quarter of the Southwest Quarter of Section 32; thence S 89°50'17" E on the South line of said Southwest Quarter, and all bearings contained herein are relative thereto, a distance of 300.00 feet to the Southeast corner of a tract of land deeded to Nebraska Public Power District in Warranty Deed recorded in Book 84, Page 890, and filed in the Kearney County Register of Deeds and the POINT OF BEGINNING; thence continuing S 89°50'17" E on said South line a distance of 715.00 feet; thence N 00°21'34" W parallel with the West line of said Southwest Quarter a distance of 450.00 feet to a 5/8" rebar w/cap; thence N 89°50'17" W parallel with said South line a distance of 715.00 feet to a 5/8" rebar w/cap at the Northeast corner of said Nebraska Public Power District tract; thence S 00°21'34" E on the East line of said Nebraska Public Power District tract and parallel with said West line a distance of 450.00 feet to the Point of Beginning.

Containing 7.38 acres more or less, of which 0.54 acres more or less is presently being used for road purposes on the south side.

**SURVEYOR'S CERTIFICATE**

I, Chad Dixon, Nebraska Professional Registered Land Surveyor No. 672, do hereby certify that the survey of "COMPUTE NORTH NE-13 SUBDIVISION", a subdivision being part of the Southwest 1/4 of the Southwest 1/4 of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th P.M., Kearney County, Nebraska, was performed by Shawn T. Boyd, L.S. No. 736, under my direct supervision using known and recorded monuments. All information shown on the above plat is accurate and correct to the best of my knowledge and belief.

Chad Dixon
Nebraska Professional Registered Land Surveyor No. 672

Date  12-7-2021

(SEAL)

**PLAT PREPARED FOR:**
Gary A. Frith and Ruth K. Frith,
Trustees of the Frith Living Trust
405 Alcott Court
Colorado Springs, CO 80921

**ZONING:**
Current Zoning: A-Agriculture District
Proposed Zoning: D-Industrial District

**LEGEND**
▲ = SECTION CORNERS FOUND
● = CORNERS FOUND
○ = CORNERS ESTABLISHED (CAPPED 5/8" x 24" REBAR)
× = TEMPORARY POINT
(M) = MEASURED DISTANCES
(R) = RECORDED DISTANCES
(D) = DEEDED DISTANCES
P.O.B. = POINT OF BEGINNING
— — = SECTION LINE
———— = BOUNDARY LINE
— — — = EASEMENT LINE
— — — = BUILDING SETBACK LINE

LOT 1
298141 S.F.
6.84 Ac±

NEBRASKA PUBLIC POWER DISTRICT SUBSTATION

SHEET 1 OF 2

M&A
Miller & Associates
Consulting Engineers, P.C.
1111 CENTRAL AVENUE
KEARNEY, NE 68847-6653
Fax: 308-234-6456
Fax: 308-234-1146
www.miller-engineers.com

KEARNEY CO-COMPUTE NORTH NE-13 SUB.

FINAL PLAT
# –COMPUTE NORTH NE-13 SUBDIVISION–
## A SUBDIVISION BEING PART OF THE SOUTHWEST 1/4 OF THE SOUTHWEST 1/4,
### SECTION 32, TOWNSHIP 7 NORTH, RANGE 14 WEST OF THE 6th P.M., KEARNEY COUNTY, NEBRASKA

## DEDICATION

The plat of "COMPUTE NORTH NE-13 SUBDIVISION", a subdivision being part of the Southwest 1/4 of the Southwest 1/4 of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th P.M., Kearney County, Nebraska, as it appears on the foregoing plat and as described in the accompanying certificate, is created with the free consent and in accordance with the desires of the undersigned owners. That said real estate as platted herein, shall hereafter be known as the plat of "COMPUTE NORTH NE-13 SUBDIVISION", a subdivision being part of the Southwest 1/4 of the Southwest 1/4 of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th P.M., Kearney County, Nebraska and shall be described and referred to at all times hereafter by that name. The streets and utility easements hereon are dedicated to the public.

Gary A. Frith and Ruth K. Frith, Trustees of the Frith Living Trust.

_Gary A. Frith_ (signature)     _Ruth K. Frith_ (signature)
Gary A. Frith                   Ruth K. Frith

## ACKNOWLEDGEMENTS
STATE OF _Colorado_ )
                     )S.S.
COUNTY OF _El Paso_  )
The foregoing instrument was acknowledged before me this _4_ day of _December_, 2021, by Gary A. Frith, Trustee of the Frith Living Trust.

_____
Notary Public
My commission expires _June 19, 2024_

(S E A L)

TYLER BAKER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20204021479
MY COMMISSION EXPIRES JUNE 19, 2024

## ACKNOWLEDGEMENTS
STATE OF _Colorado_ )
                     )S.S.
COUNTY OF _El Paso_  )
The foregoing instrument was acknowledged before me this _4_ day of _December_, 2021, by Ruth K. Frith, Trustee of the Frith Living Trust.

_____
Notary Public
My commission expires _June 19, 2024_

(S E A L)

TYLER BAKER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20204021479
MY COMMISSION EXPIRES JUNE 19, 2024

## PLANNING COMMISSION APPROVAL

The undersigned, _Rita Crooks_, Chairman of the City Planning Commission of the City of Minden, Nebraska, does hereby certify that the plat of "COMPUTE NORTH NE-13 SUBDIVISION", a subdivision being part of the Southwest 1/4 of the Southwest 1/4 of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th P.M., Kearney County, Nebraska, was submitted to the Minden Planning Commission at its regular meeting on the _8_ day of _December_, 2021, and was approved and accepted by the Planning Commission on said date.

_Rita Crooks_
Chairperson, Planning Commission
City of Minden, Nebraska

## CITY COUNCIL APPROVAL

The plat of "COMPUTE NORTH NE-13 SUBDIVISION", a subdivision being part of the Southwest 1/4 of the Southwest 1/4 of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th P.M., Kearney County, Nebraska, was submitted to the City Council in and for the City of Minden, Kearney County, Nebraska, and duly considered by this council at its regular meeting assembled on the _8_ day of _December_, 2021, and upon motion duly made and recorded, the same was approved in all respects by a majority vote of the members of the council dated the _8_ day of _December_, 2021.

_Ted Urias_                      (S E A L)
Mayor
City of Minden, Nebraska

Attest: _Abbey Jordan_
City Clerk



## RESOLUTION

Be it resolved by the Mayor and Council of the City of Minden, Nebraska, that the plat of "COMPUTE NORTH NE-13 SUBDIVISION", a subdivision being part of the Southwest 1/4 of the Southwest 1/4 of Section Thirty-two (32), Township Seven (7) North, Range Fourteen (14) West of the 6th P.M., Kearney County, Nebraska, duly made out, acknowledged, and certified, and the same hereby is approved, accepted, and ordered filed and recorded in the Office of the Register of Deeds of Kearney County, Nebraska.

_Ted Urias_                      (S E A L)
Mayor
City of Minden

Attest: _Abbey Jordan_
City Clerk



SHEET 2 OF 2

| | |
|---|---|
| PARTY CHIEF: | SHAWN T. BOYD L.S. 738 |
| DRAWN BY: | Byron D. Maxson |
| JOB NUMBER: | L00-P526-005 |
| 1111 CENTRAL AVENUE | MINDEN-SATE & SEASON |
| KEARNEY, NE 68847-6633 | |
| Tel: 308-234-6456 | |
| Fax: 308-234-1146 | |
| www.miller-engineers.com | |

M&A
Miller & Associates
Consulting Engineers, P.C.

KEARNEY CO-COMPUTE NORTH NE-13 SUB.

**Exhibit A-3**

Notice of Award

| | |
|---|---|
| **From:** | Coleman, Benjamin |
| **To:** | Abbey Jordan |
| **Cc:** | Michael Colyer; Bracht, David L.; Gewecke, Kelly; Khurram Chhipa (KChhipa@foundrydigital.com); Reichert, Lorena; Ryan Boyle (RBoyle@foundrydigital.com); Manoukian, Kristine |
| **Subject:** | Notice of Award |
| **Date:** | Wednesday, February 15, 2023 9:43:58 AM |

**-CAUTION: EXTERNAL EMAIL from Benjamin.Coleman@nebraska.gov
Do not click any links or open any attachments unless you are expecting the email and
know the content is safe.**

Hello Abbey and Michael,

It is a pleasure to inform you that the City of Minden's Site and Building Development Fund (SBDF) application has been approved for the amount of $20,000. The Nebraska SBDF funds will be used to assist Minden Mining, LLC's SBDF usage in Minden, NE.

While costs may be incurred at this time (2/23/2023), not all expenses may be reimbursable under the guidelines of the Nebraska Site and Building Development Fund. Our Department will send you a contract with terms and conditions on uses of the funds, reporting requirements, and the draw down process.

We congratulate City of Minden and Minden Mining, LLC on successfully obtaining Nebraska SBDF funds. We look forward to working with you in carrying out your project. If you have any questions regarding SBDF feel free to contact me at any time.

Best Regards,

**Benjamin J. Coleman**
*Economic Development Consultant*

**Nebraska Department of Economic Development**
245 Fallbrook Blvd, Suite 002
Lincoln, NE  68521
benjamin.coleman@nebraska.gov
Office: #402-471-4668
**opportunity.nebraska.gov**  |  **Facebook**  |  **Twitter**

**Exhibit A-4**

Second Restated EDR Agreement

## SECOND RESTATED AND AMENDED
## AGREEMENT FOR EDR ELECTRIC SERVICE
## BETWEEN
## MINING PROJECT WIND DOWN MDN LLC (F/K/A CN MINDEN LLC)
## AND
## SOUTHERN PUBLIC POWER DISTRICT
## AND
## NEBRASKA PUBLIC POWER DISTRICT

This Second Restated and Amended Agreement for EDR Electric Service under the Economic Development Rate (the "Second Restated EDR Agreement") is entered into by and between Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) ("Customer"), a limited liability company organized under the laws of the State of Delaware, Southern Public Power District, a public corporation and political subdivision of the State of Nebraska ("Southern"), and Nebraska Public Power District, a public corporation and political subdivision of the State of Nebraska ("NPPD"), with Customer, Southern and NPPD sometimes hereinafter referred to singularly as Party and together as Parties.

RECITALS

WHEREAS, NPPD is authorized by the State of Nebraska to engage in the generation, transmission, sale and distribution of electricity; and

WHEREAS, Southern owns and operates an electric system comprised of subtransmission and/or distribution facilities, and Southern is a wholesale customer of NPPD; and

WHEREAS, NPPD has an Economic Development Rate Schedule ("EDR Schedule"), and said EDR Schedule is available to any wholesale customer that meets the requirements for service under such EDR Schedule; and

WHEREAS, Customer, which receives electricity service from Southern, plans to construct and operate a data center facility(ies) to be located in Kearney County, Nebraska, which Customer expects to meet the End-Use Customer qualifications described in the EDR Schedule, including entering into an agreement with the State of Nebraska or any political subdivision to provide an economic development project pursuant to state or local law and providing satisfactory proof of such agreement in a form that is acceptable to NPPD; and

WHEREAS, Customer desires to enter into a service agreement with NPPD and Southern to purchase and receive electric service from NPPD and Southern under this Second Restated EDR Agreement utilizing the provisions of the EDR Schedule; and

WHEREAS, by this Second Restated EDR Agreement, the Parties desire to restate and amend, in its entirety, each of the original agreement for EDR Electric Service, dated October 1, 2021, between Compute North NE05, LLC, Southern and NPPD, which was transferred to Customer pursuant to letter dated November 9, 2022 from Compute North NE05, LLC to NPPD, to provide for the updated ownership of the data center facility for purposes of clarifying the Parties' obligations, and the Restated and Amended Agreement for EDR Electric Service, dated February 11, 2022, between Customer, Southern and NPPD, which agreement was not signed by NPPD.

NOW, THEREFORE, The Parties agree as follows:

## ARTICLE 1 - DEFINITIONS

Section 1.      Capitalized terms used but not otherwise defined herein are defined in the EDR Schedule, NPPD's General Firm Power Service (GFPS) Rate Schedule (or successor wholesale rate schedule), or in other documents as referenced within this Second Restated EDR Agreement.

## ARTICLE 2 - TERM AND EFFECTIVE DATE

Section 1.      This Second Restated EDR Agreement shall become effective upon October 1, 2021, and shall continue in force and effect for a term of 60 months from the date upon which Southern commences to take service under this Second Restated EDR Agreement, or for a term of 84 months following the date set forth above in this Section 1, whichever is the first to occur. Customer must enter into an agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law prior to April 15, 2023. Customer must continue to meet its obligations under such agreement as determined by the state or political subdivision to maintain the effectiveness of this Second Restated EDR Agreement. Customer must provide NPPD satisfactory proof of such agreement in a form that is acceptable to NPPD in order to take service under the EDR Schedule.  If such proof is not provided or if such proof is not satisfactory to NPPD on or before April 15, 2023, then this Second Restated EDR Agreement shall be terminated.

For purposes of determining the date upon which Southern commences service under this Second Restated EDR Agreement, the following shall apply:

1)      Service under this Second Restated EDR Agreement shall commence as determined in accordance with either subparagraph a) or subparagraph b) as set forth and described in Section 9.2 of the EDR Schedule and as Customer has selected such option below. Service under this Second Restated EDR Agreement shall continue thereafter for a duration not to exceed sixty (60) consecutive months, all in accordance with and subject to the provisions of the EDR Schedule.

  X     Service commences pursuant to EDR Schedule Section 9.2, subparagraph a). NPPD will notify Customer and Southern in writing at such time as the Qualifying End-Use Customer Load served hereunder meets the eligibility requirements to take service under the EDR Schedule, including, but not limited to 1) NPPD's prior approval of Customer's agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law and 2) meeting the minimum monthly load and load factor requirements of the EDR Schedule and the schedule requirements for commencement of service as specified in this Section 1, or

        Service commences pursuant to EDR Schedule Section 9.2, subparagraph b). Southern, Customer and NPPD agree that such service shall begin on _____, 20__, which date may be revised by a written amendment to this Second Restated EDR Agreement by the Parties, subject to 1) NPPD's prior approval of Customer's agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law and 2) meeting the minimum monthly load and load factor requirements of the EDR Schedule and the schedule requirements for commencement of service as specified in this Section 1.

2)     The 24-month time period for commencement of service, as set forth and described in Section 9 of the EDR Schedule shall begin on the effective date of this Second Restated EDR Agreement, which date is first above written.

Section 2.     Upon termination of this Second Restated EDR Agreement, Customer will transition to and take service under the applicable Southern retail service rate schedule for the continued service to the electric load that had been served under the Second Restated EDR Agreement.

Section 3.     Customer may terminate this Second Restated EDR Agreement by providing the other Parties with written notice of intended termination at least thirty (30) calendar days prior to the termination, and by making arrangements for the continued service to the electric load that had been served under the Second Restated EDR Agreement.

Section 4.     Customer may transfer this Second Restated EDR Agreement after providing the other Parties with written notice of the planned transfer with the name of the transferee and the type of transaction at least thirty (30) calendar days prior to the transfer, provided such transfer maintains the effectiveness of Customer's agreement with the state or any political subdivision to provide an economic development project.  Customer must provide NPPD satisfactory proof of the transfer of such agreement with the state or any political subdivision in a form that is acceptable

to NPPD within ninety (90) days of the transfer of this Second Restated EDR Agreement. If such proof is not provided within this timeframe, then service under the EDR Schedule shall be discontinued and this Second Restated EDR Agreement shall be terminated.

Section 5.   This Second Restated EDR Agreement shall terminate if any Transmission Facility Construction Agreement for a specific NPPD substation site to construct new 115 kV equipment in and 115 kV facilities, as necessary, terminating at NPPD's Minden 115 kV Substation and, as necessary, NPPD's Hastings 230/115 kV Substation are not entered into between Customer and NPPD by February 17, 2022. Such Transmission Facility Construction Agreement will contain provisions to serve 35 MW of total data center load from NPPD's Minden 115 kV Substation and Hastings 230/115 kV Substation.

## ARTICLE 3 - SERVICE PROVIDED

Section 1.   NPPD shall provide wholesale electric service to Southern under the terms of the EDR Schedule, for subsequent resale by Southern to Customer's Qualifying End-Use Customer Load as further described in Exhibit A attached hereto, and which by this reference is incorporated herein. Southern shall provide retail electric service to Customer's Qualifying End-Use Customer Load, as further described in Exhibit A, in accordance with a separate service agreement between Southern and Customer for purposes of such service, and consistent with the Second Restated EDR Agreement.

Section 2.   The following conditions shall apply to and govern service provided under this Second Restated EDR Agreement:

1) Customer represents and warrants that, as of the effective date of this Second Restated EDR Agreement, it either meets or will meet the qualifications and requirements as set forth in Section 3 of the EDR Schedule.

2) The EDR Schedule effective as of February 1, 2023 and attached hereto as Exhibit B, shall apply to service under this Second Restated EDR Agreement, and said EDR Schedule is, by this reference, incorporated herein.

3) Customer will be limited to a maximum demand of 35,000 kW for Qualifying End-Use Customer Load. If Customer has additional load at this site other than its Qualifying End-Use Customer Load, such load will not be eligible for service under the EDR Schedule. Qualifying End-Use Customer Load must be separately metered in accordance with Section 5 of the EDR Schedule.

4) If Customer elects to take less than 35,000 kW for Qualifying End-Use Customer Load at this site in Kearney County, NE, Customer has the option to enter into a separate EDR agreement for a second site in Kearney County, NE or Adams County, NE, with such second, separate EDR agreement being subject to Southern and NPPD's approval, by February 1, 2022, provided; 1) Customer will be limited to maximum demand of 35,000 kW for Qualifying End-Use Customer Load at the two sites, 2) the Qualifying End-Use Customer Load is served from NPPD's Minden 115 kV Substation and, as necessary, NPPD's Hastings 230/115 kV Substation, 3) such Qualifying End-Use Customer Load for both sites has met the eligibility requirements within the timelines established in Article 2, Section 1 of this Second Restated EDR Agreement, and 4) Customer agrees to modify by an instrument in writing approved by Southern and NPPD to lower the maximum demand of Qualifying End-Use Customer Load under this Second Restated EDR Agreement.

5) The provisions of Section 9.3 of the EDR Schedule shall apply for determining Southern's eligibility to continue to receive service under the EDR Schedule, for subsequent resale to Customer during the term of this Second Restated EDR Agreement.

## ARTICLE 4 - RATES AND CHARGES

Section 1.      For service provided by NPPD to Southern under this Second Restated EDR Agreement, the rates and charges specified in the EDR Schedule shall be billed to and paid by Southern.

## ARTICLE 5 - LOCATIONS OF DELIVERY POINT(S) AND METERING

Section 1.      For purposes of this Second Restated EDR Agreement, an Exhibit A shall be entered into identifying the location(s) where electric service will be delivered by NPPD and received by Southern.  Said Exhibit A shall also identify the location of metering provided in accordance with the requirements of the EDR Schedule.

## ARTICLE 6 - GOVERNING DOCUMENT

Section 1.      In the event of any conflict between this Second Restated EDR Agreement and the EDR Schedule, the provisions of the EDR Schedule shall govern.

## ARTICLE 7 – GOVERNING LAW AND JURISDICTION

Section 1.      This Second Restated EDR Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska, without giving effect to any conflicts of laws principles or provisions.  The Parties agree the courts of the State of Nebraska shall have exclusive

jurisdiction and venue of any litigation arising out of, under or involving this Second Restated EDR Agreement.  Each Party irrevocably consents to service of process by registered mail, return receipt requested, at its address for Notices as provided in Article 8.  Nothing in this Second Restated EDR Agreement will affect the right of a Party hereto to serve process of service in any other manner permitted by law.

## ARTICLE 8 – NOTICES

Customer:
Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC)
Drake Harvey
300 North LaSalle, Suite 1420
Chicago, Illinois 60654

Southern:
Southern Public Power District
4550 W Husker Highway
P.O. Box 1687
Grand Island, Nebraska 68802
Telephone: (308) 384-2350

NPPD:
Billy Cutsor, Contracts Manager
Nebraska Public Power District
PO Box 499, 1414-15th Street
Columbus, NE  68602-0499
Email: bjcutso@nppd.com

## ARTICLE 9 – MISCELLANEOUS

Section 1.    **Counterparts; Exchange by Electronic Transmission**.  This Second Restated EDR Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

IN WITNESS WHEREOF, the Parties hereto have caused this Second Restated EDR Agreement to be executed by their duly authorized officers or representatives as of the dates indicated below.

MINING PROJECT WIND DOWN MDN LLC          SOUTHERN PUBLIC POWER DISTRICT
(F/K/A CN MINDEN LLC)

By: _____DocuSigned by:_____                       By: _____
_____Drake Harvey_____
_____5A793B2D97F24AD..._____

Title: _President_____                    Title: _____

Date: _____                         Date: _____


NEBRASKA PUBLIC POWER DISTRICT


By: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the Parties hereto have caused this Second Restated EDR Agreement to be executed by their duly authorized officers or representatives as of the dates indicated below.

MINING PROJECT WIND DOWN MDN LLC          SOUTHERN PUBLIC POWER DISTRICT
(F/K/A CN MINDEN LLC)


By: _____          By: _____

Title: _____          Title: __President/Chief Executive Officer__

Date: _____          Date: __March 15, 2023__


NEBRASKA PUBLIC POWER DISTRICT


By: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the Parties hereto have caused this Second Restated EDR Agreement to be executed by their duly authorized officers or representatives as of the dates indicated below.

MINING PROJECT WIND DOWN MDN LLC
(F/K/A CN MINDEN LLC)

SOUTHERN PUBLIC POWER DISTRICT

By: _____

By: _____

Title: _____

Title: _____

Date: _____

Date: _____

NEBRASKA PUBLIC POWER DISTRICT

By: _Courtney Dentlinger_

Title: _VP Customer Services and External Affairs & CCO_

Date: _3-15-23_



Loss factors: Applied to all demand and energy usage recorded at the point of measurement per the current Southern PPD wholesale billing exhibit.

CN MINDEN, LLC

NPPD Minden
34.5 kV Bus

308

Legend

Bus A
Point of Measurement
Property of NPPD
Property of Southern PPD

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|

EXHIBIT A
SOUTHERN PPD
FOR
C N MINDEN, LLC

DRAWN  DATE
CHECKED  DATE
APPROVED  DATE
FILMED

Nebraska Public Power District
CADD FILE:

REVISION

VERSIONS/REVISIONS

NO.

**Exhibit B**

EDR Schedule

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 1 | **Of** | 9 **Sheets** |

## ECONOMIC DEVELOPMENT RATE SCHEDULE

`

### SECTION 1.  AVAILABILITY

This Economic Development Rate Schedule is available to an electric utility that has:

1. Qualifying End-Use Customer Load, and
2. Entered into a wholesale power supply contract with NPPD that specifies service under the General Firm Power Service (GFPS) Rate Schedule, and
3. Not provided notice to NPPD to limit or reduce their power and energy purchases from NPPD under the wholesale power supply contract.  Any Service Agreement entered into by the Wholesale Customer and NPPD prior to the Wholesale Customer providing such notice to NPPD shall continue to qualify for service under this Economic Development Rate Schedule for the duration of the Service Agreement.

This Economic Development Rate Schedule is provided for under, and subject to the requirements of, Nebraska Revised Statutes Section 70-655(2). This Economic Development Rate Schedule is also available to the NPPD retail division for service to its qualifying retail customers.

### SECTION 2.  APPLICABILITY

This Economic Development Rate Schedule is applicable to a Wholesale Customer providing electric service to a Qualifying End-Use Customer Load that meets the requirements of this Economic Development Rate Schedule.  Qualifying End-Use Customer Load served under this Economic Development Rate Schedule shall be disqualified from taking service under the Supplement No. 1 to the GFPS Rate Schedule, the Energy Curtailment Program Rate Schedule, the Large Customer Interruptible Rate Schedule, the Large Customer Market-Based Rate Schedule, the Interruptible Market-Based Rate Schedule, and/or the Standby Service Rate Schedule.

NPPD limits its commitment to provide service under this Economic Development Rate Schedule to arrangements and circumstances in which NPPD at its sole discretion determines that it has sufficient surplus production capacity and energy available to provide such service.

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

**Effective:**   With service provided on and after February 1, 2023

**Approved:**   12/8/22     **Resolution No.:**   22-41     **Issued By:**   Todd J. Swarz

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| Schedule: | SPP No. 6 | Issued: | 12/14/22 |
|---|---|---|---|
| Supersedes Schedule: | SPP No. 6 | Issued: | 12/15/21 |
| Sheet No.: | 2 | Of | 9 Sheets |

| ECONOMIC DEVELOPMENT RATE SCHEDULE |
|---|

## SECTION 3.   END-USE CUSTOMER QUALIFICATIONS

To qualify to take service under this Economic Development Rate Schedule, the Wholesale Customer's End-Use Customer must meet all of the following requirements:

1. Provide new or additional electric load of 1,000 kW or greater during the applicable Billing Period.
2. The new or additional electric load must have a Monthly Load Factor of sixty percent (60%) or greater during the applicable Billing Period.
3. The End-Use Customer must have entered into an agreement with the state or any political subdivision to provide an economic development project pursuant to state or local law, and must continue to meet its obligations under said agreement as determined by the state or political subdivision.  The End-Use Customer must provide NPPD satisfactory proof of such agreement in a form that is acceptable to NPPD.
4. The End-Use Customer must enter into a written Service Agreement.

## SECTION 4.  DEFINITIONS

The definitions listed in the GFPS Rate Schedule shall apply together with the following additions:

A.   End-Use Customer – A retail customer of a Wholesale Customer or NPPD.

B.   Incremental Production Cost – The forecasted annual cents/kWh variable generation costs, purchased power costs, and/or lost off-system sale revenues that NPPD estimates it will incur due to serving the estimated additional Qualifying End-Use Customer Load(s).

C.   Monthly Load Factor – The Qualifying End-Use Customer Load's total kWh energy consumption during the Billing Period, divided by their maximum Measured Demand kW during the Billing Period, divided by the number of hours in the Billing Period. During the first twenty-four (24) Billing Periods that a Qualifying End-Use Customer Load takes service under this Economic Development Rate Schedule, NPPD will, if requested by the Wholesale Customer and/or End-Use Customer, utilize an alternate method for calculating the Monthly Load Factor. This alternate method shall only be applicable where the End-Use Customer adds new, additional electric load requirements greater than 500 kilowatts during a Billing Period that operates with an electrical load factor greater than 60% during the remainder of that Billing Period. The End-Use

TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.

Effective:   With service provided on and after February 1, 2023

Approved:   12/8/22   Resolution No.:   22-41   Issued By:   _Todd S. Swanz_

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 3 | **Of** | 9 **Sheets** |

| ECONOMIC DEVELOPMENT RATE SCHEDULE |
|---|

`

Customer shall notify NPPD of the initial start day/hour and characteristics of said additional load. NPPD will review the meter data at the conclusion of the Billing Period and calculate the load factor for the preexisting load and for each new block of load added during the Billing Period, taking into account the time at which said load increases occurred and the duration. The Monthly Load Factor for such Billing Period shall be the minimum of these calculated load factors. In all subsequent Billing Periods, said new blocks of load shall be considered as preexisting load in the load factor calculations.

D.    Production Energy – The Wholesale Customer's Billing Energy for service under this Economic Development Rate Schedule.

E.    Production Energy Rate – The rate applicable for billing the Wholesale Customer for Production Energy.

F.    Qualifying End-Use Customer Load – The new or additional load of an End-Use Customer that meets the requirements of this Economic Development Rate Schedule.  An End-Use Customer may qualify for service under this Economic Development Rate Schedule for multiple, distinct load expansions, provided that each load expansion independently meets the requirements of this Economic Development Rate Schedule and that the load associated with each expansion is metered separately to allow for the application of the rates and billing provisions in this Economic Development Rate Schedule. A single written agreement with the state or any political subdivision may apply to multiple expansions and fulfill the corresponding qualification requirement in Section 3.3 of this Economic Development Rate Schedule. Each such qualifying expansion shall be considered as a separate and distinct Qualifying End-Use Customer Load for purposes of implementing the provisions of this Economic Development Rate Schedule.

G.    Service Agreement – The written agreement among NPPD, the Wholesale Customer and the applicable End-Use Customer, or between NPPD and its End-Use Customer, setting forth the location, conditions and information necessary to implement the electric service and the requirements of this Economic Development Rate Schedule, and such other provisions, terms and conditions deemed necessary by NPPD.

H.    Wholesale Customer - Any municipality, public power district, or rural electric cooperative which purchases electric power and energy from NPPD and which has

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

**Effective:**   With service provided on and after February 1, 2023

**Approved:**   12/8/22    **Resolution No.:**   22-41    **Issued By:**   _Todd S. Swaz_

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 4 | **Of** | 9 **Sheets** |

## ECONOMIC DEVELOPMENT RATE SCHEDULE

entered into a Wholesale Power Contract with NPPD that specifies service under the General Firm Power Service Rate Schedule, and the NPPD retail division.

## SECTION 5.  METERING

To take service under this Economic Development Rate Schedule, the Qualifying End-Use Customer Load must be separately metered with an interval recording demand meter.  NPPD shall install a suitable interval recording demand meter on the Qualifying End-Use Customer Load.  If such meter is required for NPPD to appropriately account for the applicable End-Use Customer's load in the determination of the Wholesale Customer's power bill under the GFPS Rate Schedule prior to the commencement of service under this Economic Development Rate Schedule and when such service ends, then the cost of such metering and the expenses associated with meter reading, testing, replacement, and associated activities and functions shall be the responsibility of NPPD. In all other cases such costs and expenses shall be the responsibility of the Wholesale Customer.

In-lieu of the metering arrangement in the preceding paragraph, the Wholesale Customer may provide and install the meter and associated metering equipment at its expense provided that the meter is revenue accurate, meets NPPD's meter specifications, and is manufactured, installed, and maintained in accordance with industry standards followed by NPPD.  Expenses associated with meter reading, testing, replacement, and related activities for a meter owned by the Wholesale Customer shall be the responsibility of the Wholesale Customer.  The Wholesale Customer shall follow NPPD's wholesale metering testing schedule and shall allow NPPD to witness the testing of any such meter.  The Wholesale Customer must provide NPPD with access to remotely read the meter or provide NPPD with the required metering information in an NPPD-approved format no later than the second business day after the end of each calendar month so that the Wholesale Customer's wholesale purchase power bill can be calculated.

## SECTION 6.  WHOLESALE CUSTOMER BILLING PROCEDURE

The Wholesale Customer's total load, including the Qualifying End-Use Customer Load(s) taking service under this Economic Development Rate Schedule, will be used for the purposes of determining the hour(s) from which the Wholesale Customer's Billing Demands shall be selected under the GFPS Rate Schedule.  In determining the Wholesale Customer's monthly wholesale purchase power bill, the Qualifying End-Use Customer Load(s) taking service under this Economic Development Rate Schedule shall be excluded from the other loads of the Wholesale Customer, and the billing provisions and rates of the GFPS Rate Schedule shall be applied to

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

**Effective:**   With service provided on and after February 1, 2023

**Approved:**   12/8/22   **Resolution No.:**   22-41   **Issued By:**   Todd S. Swartz

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 5 | **Of** | 9  **Sheets** |

| ECONOMIC DEVELOPMENT RATE SCHEDULE |
|---|

such other loads.  The billing provisions and rates of this Economic Development Rate Schedule shall be applied to the Qualifying End-Use Customer Load(s) taking service under this Economic Development Rate Schedule.

NPPD and the Wholesale Customer will agree on loss factors for adjusting metered quantities for the Qualifying End-Use Customer Load to Bus A for use in determining the Wholesale Customer's Billing Demand and Billing Energy quantities under the GFPS Rate Schedule and this Economic Development Rate Schedule.

A. Billing Demands (all adjusted to Bus A quantities):

Transmission line, transmission substation, and Reactive Supply & Voltage Control Service demands:  The monthly kW billing demands for each Qualifying End-Use Customer Load taking service under this Economic Development Rate Schedule shall be the Qualifying End-Use Customer Load that is coincident with the hour(s) used to bill these services to the Wholesale Customer for their remaining load in the Billing Period under the provisions of the GFPS Rate Schedule.  The transmission substation charge shall only apply if NPPD has provided for the high voltage transmission substation facilities required for the first transformation below 115 kV for service to the Qualifying End-Use Customer Load.

B. Billing Energy (all adjusted to Bus A quantities):

Production Energy, Regulation Up Service, Regulation Down Service, Spinning Reserve Service and Supplemental Reserve Service Energy:  The monthly kWh billing energy for each Qualifying End-Use Customer Load taking service under this Economic Development Rate Schedule shall be the total energy consumption of such Qualifying End-Use Customer Load during the Billing Period.

## SECTION 7.  MONTHLY RATES

All rates are based on power and energy quantities adjusted to Bus A.

### Monthly Customer Charges

Customer Charge per Qualifying End-Use
Customer Load Taking Service Under
This Economic Development Rate Schedule:                    $500.00

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

**Effective:**   With service provided on and after February 1, 2023

**Approved:**   12/8/22   **Resolution No.:**   22-41   **Issued By:**   _Todd S. Swanson_

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 6 | **Of** | 9 **Sheets** |

## ECONOMIC DEVELOPMENT RATE SCHEDULE

`

**Monthly Demand Charges (per kW of Billing Demand)**

Transmission Line Demand,
Transmission Substation Demand,
and Reactive Supply & Voltage Control
Service Demand:                              The corresponding demand rates applicable to the Wholesale Customer under the GFPS Rate Schedule.

**Monthly Energy Charges (per kWh of Billing Energy)**

Note – the Production Cost Adjustment (PCA) Rate Schedule does not apply to service under this Economic Development Rate Schedule.

1. Production Energy:                    See Section 8 of this Economic Development Rate Schedule.

2. Regulation Up Service,
   Regulation Down Service,
   Spinning Reserve Service,
   and Supplemental Reserve
   Service Energy:                           The corresponding energy rates applicable to the Wholesale Customer under the GFPS Rate Schedule.

## SECTION 8.  PRODUCTION ENERGY RATE

The initial Production Energy Rate applicable to the Wholesale Customer with a Qualifying End-Use Customer Load shall be the applicable rate stated in the following table that corresponds to the effective date of the executed Service Agreement for such Qualifying End-Use Customer Load:

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

**Effective:** With service provided on and after February 1, 2023

**Approved:** 12/8/22   **Resolution No.:** 22-41   **Issued By:** _Todd S. Swanz_

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 7 | **Of** | 9 **Sheets** |

| ECONOMIC DEVELOPMENT RATE SCHEDULE |
|---|

| Effective Date of Service Agreement | Initial Production Energy Rate ($/kWh) |
|---|---|
| 01/01/17 – 01/31/19 | $0.027 |
| 02/01/19 – 01/31/22 | $0.025 |
| 02/01/22 – 01/31/23 | $0.02636 |
| 02/01/23 – Present | $0.03075 |

NPPD will calculate a new initial Production Energy Rate to become effective on or about January 1st of each year, and, at NPPD's sole option, at any time during a year when NPPD has executed Service Agreement(s) at the then-current specified initial Production Energy Rate that cover load which in aggregate equals or exceeds 50,000 kW or when in NPPD's sole discretion there has been a major generation and/or market event that significantly impacts NPPD's Incremental Production Cost. The initial Production Energy Rate shall be equal to or greater than 110% of the Incremental Production Cost.

For each Qualifying End-Use Customer Load, the applicable Production Energy Rate used for billing Production Energy shall be reviewed and revised (if required) each time there is a change in the initial Production Energy Rate listed in the table in this Section 8 according to the following procedure:

1. If the new Production Energy Rate is greater than the Production Energy Rate currently applicable to the Qualifying End-Use Customer Load, then the Production Energy Rate for such customer shall increase if necessary to be equal to 110% of the Incremental Production Cost utilized in the determination of the new initial Production Energy Rate in the table in this Section 8.

2. If the new Production Energy Rate is less than the Production Energy Rate currently applicable to the Qualifying End-Use Customer Load, then the Production Energy Rate for such customer shall be reduced to the greater of:

   a. The new initial Production Energy Rate in effect in the table in this Section 8, or
   b. The lowest initial Production Energy Rate in effect during the calendar year in which the Service Agreement became effective or in the three (3) preceding calendar years.

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

**Effective:** With service provided on and after February 1, 2023

**Approved:** 12/8/22   **Resolution No.:** 22-41   **Issued By:** Todd S. Swazy

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| Schedule: | SPP No. 6 | Issued: | 12/14/22 |
|---|---|---|---|
| Supersedes Schedule: | SPP No. 6 | Issued: | 12/15/21 |
| Sheet No.: | 8 | Of | 9 | Sheets |

| ECONOMIC DEVELOPMENT RATE SCHEDULE |
|---|

The revised Production Energy Rate applicable to the Qualifying End-Use Customer Load shall become effective on the same date as the effective date of the revised Economic Development Rate Schedule.

The Wholesale Customer shall pass through to the End-Use Customer the Production Energy Rate and the transmission and ancillary service costs billed under this Economic Development Rate Schedule with no mark-up, except for any applicable loss factor adjustment and the application of any contractual or legal requirements such as lease payments, franchise fees, gross revenue taxes, etc.

## SECTION 9.  SPECIAL TERMS AND CONDITIONS

1. Service under this Economic Development Rate Schedule is only applicable and available through a written Service Agreement 1) among NPPD, the Wholesale Customer, and the applicable End-Use Customer or, 2) between NPPD and its End-Use Customer.

2. The Wholesale Customer may take service for a Qualifying End-Use Customer Load under this Economic Development Rate Schedule for a maximum of 60 consecutive months. The Wholesale Customer shall commence taking service under this Economic Development Rate Schedule as follows:

    a. In the Billing Period immediately following the Billing Period in which the Qualifying End-Use Customer Load first meets the minimum 1,000 kW size and Monthly Load Factor requirements stated in Section 3 of this Economic Development Rate Schedule, or,

    b. At the date specified in the Service Agreement that is chosen by the Wholesale Customer and applicable End-Use Customer, and agreed to by NPPD, that is no later than 24 months after the effective date of the Service Agreement. If at such specified date the Qualifying End-Use Customer Load does not meet the minimum 1,000 kW size and Monthly Load Factor requirements stated in Section 3 of this Economic Development Rate Schedule, then service under this Rate Schedule shall not commence until such minimum requirements are met.

If the Wholesale Customer does not commence service under this Economic Development Rate Schedule within 24 months of the effective date of the Service Agreement for the Qualifying End-Use Customer Load, the 60-month maximum eligibility period for this rate

---

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

---

**Effective:**   With service provided on and after February 1, 2023

Approved:   12/8/22    Resolution No.:   22-41    Issued By:   _Todd S. Swarz_

# NEBRASKA PUBLIC POWER DISTRICT

I12-0977

| | | | |
|---|---|---|---|
| **Schedule:** | SPP No. 6 | **Issued:** | 12/14/22 |
| **Supersedes Schedule:** | SPP No. 6 | **Issued:** | 12/15/21 |
| **Sheet No.:** | 9 | **Of** | 9 **Sheets** |

## ECONOMIC DEVELOPMENT RATE SCHEDULE

shall be reduced by one month for each additional month delay in commencing service under this Economic Development Rate Schedule.

3. During the period that the Wholesale Customer is taking service under this Economic Development Rate Schedule, if the monthly peak load and/or Monthly Load Factor of their Qualifying End-Use Customer Load drops below the minimum requirements stated in Section 3 of this Economic Development Rate Schedule for two (2) consecutive Billing Periods, then such Qualifying End-Use Customer Load shall henceforth be included with the Wholesale Customer's other load and billed under the rates and billing provisions of the GFPS Rate Schedule. Subsequently, if during any remaining portion of the original 60-month (or shorter) eligibility period the monthly peak load and Monthly Load Factor of the Qualifying End-Use Customer Load exceeds the minimum requirements stated in Section 3 of this Economic Development Rate Schedule, NPPD shall allow the Wholesale Customer to resume service under this Economic Development Rate Schedule for the applicable Qualifying End-Use Customer Load for the remaining portion of the original eligibility period.

## SECTION 10. RESERVATION OF AUTHORITY AND RIGHT TO AMEND

This Economic Development Rate Schedule, and all rates, charges, provisions, terms, conditions, supplements and specifications of service therein, was adopted by Resolution of the NPPD Board of Directors which retains all rights, powers and authority to supplement, amend, supersede, revise, withdraw, cancel and otherwise modify or change any or all of this Economic Development Rate Schedule, and all rates, charges, provisions, terms, conditions, supplements and specifications of service therein, at any time, with or without notice, pursuant and subject only to the statutes of the State of Nebraska governing electric service and rates. Nothing contained in this Economic Development Rate Schedule shall be construed as affecting in any way the right and authority of NPPD to make such changes except and unless it is stated in the provisions of the Service Agreement for the Qualifying End-Use Customer Load.

**TAX CLAUSE: In the event of the imposition of any new or increased tax or any payment in lieu thereof, in excess of that provided for under Article VIII, Section 11 of the Nebraska Constitution, by any lawful authority on the production, transmission, or sale of electricity, the rate provided herein may be increased to reflect the amount of such tax or in lieu of tax increase.**

| | | |
|---|---|---|
| | **Effective:** | With service provided on and after February 1, 2023 |
| **Approved:** 12/8/22   **Resolution No.:** 22-41 | **Issued By:** | Todd S. Swanz |