**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), et al., | Case No. 22-90273 (MI) |
| Debtors.[1] | |

**RESPONSE TO DENY / REJECT THE SUPPLEMENT 1230 TO OBJECTION 1199 AND PROPOSED ORDER 1199-2 TO CLAIM ASSERTED BY NELU MIHAI (CLAIM NO. 10029)**

1. NELU MIHAI, PhD, former funding Chief Technology Officer at Compute North LLC ("Company") / Debtors, in his capacity as Creditor ("Creditor") and "Claimant" of the Claim no. 10029 filed on October 24, 2022, in case 22-90273 (the "Bankruptcy Case", "Case no. 22-90273"), hereby files this Petition/ Response ("Response") to docket 1230, REPLY IN SUPPORT OF PLAN ADMINISTRATOR'S OBJECTION TO CLAIM ASSERTED BY NELU MIHAI (CLAIM NO. 10029), issued by the Plan Administrator, but signed by Mr. Charles R. Gibbs from MCDERMOTT WILL & EMERY LLP and by ASK LLP representatives, *Counsel to the Mining Project Wind Down Holdings, Inc. Litigation Trust and the Plan Administrator*, on the date of the first hearing, August 14,

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

2023, document that constitute a veritable Supplement to Objection 1199 and Proposed Order 1199-1. Nelu Mihai provides his Response in less than 30 days from 8/14/2023.

2. Nelu Mihai declares that this document was not given to him during the hearing, and Nelu Mihai was in impossibility to respond to it on the hearing date. That procedure placed him in a delay that did not occur with the other Creditors.

3. With this Response to the Supplement 1230 to Objection 1199 and *Supplemental Declaration of Michael Tribolet, Managing Member of Tribolet Advisors LLC, in Support of the Plan Administrator's Objection to Claim Asserted by Nelu Mihai*, Nelu Mihai provides new discoveries that wholly refute the Reply 1230, the Supplemental Declaration 1230-1 and any proposed Order related to Objection 1199 supplemented by Objection 1230, Reply not having any factual basis, nor legal basis. With this Response Nelu Mihais demonstrate again, but in more detail, based on new discoveries, the legal and factual basis for the Court:

   **to allow the Claim no. 10029 to be admitted and granted with allowance**

   **to reject the "Objection" to Claim Asserted by Nelu Mihai (Claim No. 10029) (the "Objection" document 1199 filed on 07/07/2023),**

   **to reject the Reply 1230 and any order related to these Objection, Reply and Supplemental Declaration**

   **as well to reject "the Proposed Order" 1199-2 filed by the Plan Administrator and any additional proposed order suggested / requested by Debtors to deny the Claim 10029**

   and, based on evident legal and factual bases, the Claim 10029 and Proof of Claim 10029 should be ordered with allowance by the Court.

   Nelu Mihai respectfully states as follows in support thereof:

4. <u>The Response is submitted legally</u>, in less than 30 days before 09/14/2023, considering the date of service as 8/14/2023.

5. <u>Nelu Mihai provides now the email received by him from Mr. Tribolet, the Plan Administrator (from Tribolet Advisors, LLC) who recognizes the legal bases of Creditor's claim 10029, and practically admits that Nelu Mihai is entitled to receive admittance of claim 10029, recognizes in fact the Claimant's rights to receive the penalties for both the pre-Petition Date period, and the post-Petition Date period</u> (**Exibit**

**9-1)**. Mr. Tribolet, the Plan Administrator, wrote: *"Our position on the interest would be that it would only accrue to the date of the bankruptcy which was 9/22/22. This was due to the contract being rejected by the Debtor. I can instruct my counsel to file an objection in the court to this claim or I can ask you to amend your claim 10029 from $220,909.03 to $7,090.91 as calculated below"*. With all due respect, it is certain that Mr. Tribolet quotes what the "Debtor" (only one Debtor?) and eventually his "Reviewing Parties" told him, without in-depth investigation of the payroll checks, in regards to penalties and unpaid accrued amounts calculations. Probably he was presented a copy of the erroneous "opinion" of the Debtors in possession about paying the full amount of $300,000 to Nelu Mihai, before the Petition Date. This old opinion was expressed in one of the hearings in 2022: that Debtors paid extra money (not true), that they paid Nelu Mihai with the full amount of $300,000 "cash severance" before 9/22/2022 (not true), from which "$150,000 were "paid" one day before the Petition Date (untruthful). This old erroneous opinion of the Debtors in possession (Company) was presented during a Court hearing, under oath, by the former new CFO, Mr. Harold Eugene Coulby (mentioned in paragraph 22 of this Response, as being a bonus beneficiary on 8/30/2022, 22 days before the Petition Date) in the form of a written, false, financial statement, and orally sustained by the Company former new CFO. This old opinion about paying the full amount of cash severance of $300,000 is not anymore sustained by the Plan Administrator, the other Creditors etc., as can be seen even in the Reply 1230 and other documents issued by the Plan Administrator and his team (but no explanation about misinforming the Court, the creditors, and the public was yet provided). This opinion about full payment of the "cash severance" before the Petition Date is not based on real facts and has no legal grounds: therefore, both the Objection 1199 and Supplemental Objection to it, docket 1230, have no legal bases, no factual basis, and, more than that, the discoveries and the argumentation in the case ask and imposed for fully rejection, denial of both Objection 1199, Reply 1230, and any Proposed Order related to such Objection.

6. The so called "bellow calculation" referred in Mr. Tribolet email from June 6, 2023, contains some negotiation amount that has no connection to the factual and accurate situation of separation payments for the 9.a terms of the Separation Agreement, but

copies and continues the disadvantaging treatment the Debtors had toward Nelu Mihai, after he helped them to get funded.

7. Does Mr. Tribolet recognize that his team ("Reviewing Parties' and team) copies the position of the Debtors, expressed before the Court appointed the Plan Administrator? Nelu Mihai respectfully ask the Court and the Pan Administrator to give him the benefit of doubt and to consider the real factual basis and applicable legislation in the Creditor's claim 10029. It is proven that the Debtors made gross mistakes (willfully?) in their calculations and treatment toward Nelu Mihai, hiding, erasing or altering large numbers of delay days in paying the "cash severance" by-monthly amounts, by hiding the unlawful deductions, taxation and egregious subtractions from both Claimant's salaries and the "cash severance" by-monthly installments, both during the pre-Petition date period and after the Petition Date.

8. The numerous errors in the Debtors' Financial Disclosure Statements of the case, issued and reissued by Debtors in possession, represented only by new executives hired after Nelu Mihai helped the Company to get funded with $385M, prove that these Debtors' new executives unlawfully repudiated mainly one term of the Separation Agreement (the Penalties Rate), without any right (and after recognizing some other terms), but in an unlawful and discriminatory manner, that should be sanctioned by the Court, by rejecting the all the Objections to Claim 10029 and giving green light for payments of the credit Nelu Mihai fully deserve.

9. Nelu Mihai also provides now emails and discoveries proving that the "credit score" of the Debtors was very low, even negative, and there was a discriminatory treatment toward him, fully justifying the terms of the Separation Agreement signed between Claimant and the Debtors on March 28, 2022, regarding the penalties rate (percentage). The unfair usage of the terms like "egregious" and "usurious", by the Plan Administrator team, if not disparaging, already unfairly disadvantages the Claimant, as creditor, entitled to equal treatment, compared to other creditors. More than that, Nelu Mihai was placed in delay with both claims; claims were subjected to unfair Objections (the Plan Administrator also filed an Objection to Claimant's other claim 10026, for modifying reducing the claim amount of approx. $150,000 with the amount of the 4/15/2022 installment, ($13,636.36 )for the payment on 4/15/2022, discovered consulting the

   Insperity PEO Services L.P.; this new Objection was done ignoring the priority imposed by U.S.C. § 507(a)(4) for a portion of the claim for the unpaid amount of separation "cash severance"; the new Objection did not analyzed the unlawful subtractions revealed by the payroll check obtained recently from Insperity PEO Services L.P., and mentiones in this Response to docket 1230).

10. The disadvantaging actions against the Claimant Nelu Mihai were (during his employment and continued with higher intensity when the Debtors, or Debtors in possessions had new executives) are:

11. a) the double and detrimental erroneous records of Claimant's number of shares (different from the shares stipulated in his "Employment Offer", The Compute North LLAC / Debtors tried to deceit Nelu Mihai of his number of vested shares, decided by both parties in the hiring agreement. The Debtors dishonestly declared that they made a mistake in the electronic records (different from the written hiring offer/agreement), and they asked Nelu Mihai to sign another hiring agreement during the separation of Nelu Mihai from the Compute North LLC / Debtors. Nelu Mihai declined.

12. b) the willful deformation of Claimant's real professional "rocks" (achievements / professional performances) in order to reduce to zero the annual bonus (the Employment Offer referred an annual bonus in 2021 and every year) (see Exhibits 9-3, 9-4, 9-5, 9-6: email correspondence between Nelu Mihai and the two Debtors founders, after the Debtors willfully distorted the records of his "rocks", ignoring that the Debtors paid annual bonuses to all his large team of employees, hired by him in 2021). When Nelu Mihai joined the Debtors, the company had only one engineer for all its technology. Even more, in an almost discriminatory manner, at the end of 2021, after obtaining the $385M funding, mainly grace of Nelu Mihai's reputation and business plan, the Debtors gave him a so-called bonus of $152.86 that had $52.86 taxes, and the rest of $100 was taken by the Debtors ($0 payment to Nelu Mihai, according to payroll check / stub no. 10157929 provided by Insperity PEO Services L.P.).

13. c) the delays of transferring the 401(k) contributions into Nelu Mihai's 401(k) account kept by the 401(k) plan administrator

14. d) the Debtors did not invest the funds received from Generate Capital and National Grid Partners as it was presented in the investment deck used to close the round

15. e) the history of Debtors lawsuits, media negative questionable image of the Company, related to social issues, ethnicity etc. (Exhibit 9-2)
16. These above-mentioned factual evidences, as well as many other facts, imposed to establish warranties for Claimant to receive the separation "cash severance" payments according to the terms of the Separation Agreement.
17. The Separation Agreement stipulated at Chapter 9.a that the Claimant Nelu Mihai should have been paid "*when the other executives were paid*".
18. Anticipating that the company would declare bankruptcy, the other executives ,who are also creditors, started to pay themselves large amounts of money, at random dates (as shown on Schedules 2 of Disclosure Statements 723-2 and 683). Why the Debtors did not pay Nelu Mihai when they paid the other executives, as specified in the Separation Agreement signed on March 28, 2022? Is this discrimination? For certain, Nelu Mihai is not treated equally with the other Creditors in the similar situation, especially with the other Creditors who are former executives of Debtors.
19. The Debtors knew that the Separation Agreement between Nelu Mihai and them carried penalties for cash consideration payments (or reductions), not paid timely on the other executives' payments. The Separation Agreement is a contract signed voluntarily by the Debtors and Nelu Mihai. The Plan Administrator and the other creditors have no legal ground to change the terms of the Separation Agreement between Nelu Mihai, Claimant, and the Debtors. Is this not another discrimination, as Nelu Mihai is the only executive in the Company from Silicon Valley and one with great merit of bringing funding to the Debtors? The Debtors would have not received $385M funding without Nelu Mihai's major contribution. How much money would have gotten the other creditors and former executives without the funding of $385M, closed due to the reputation, business plan and efforts of the Claimant Nelu Mihai? How much money the Plan Administrator would have available to dispose to Creditors, without the $385M funding?
20. In addition, the Plan Administrator Declaration associated with the Reply 1230, docket 1230-1, at paragraph 7, page 3, has an evident, unacceptable deformation and change of the terms of the Separation Agreement. Nelu Mihai was supposed to be paid "*on the same date(s) as base salary are paid to the Company's other executives*" (Chapter 9.a Separation Agreement). The other Company's executives were paid with base salary after

    the Petition Date (September 22, 2022). Based on the terms of the Separation Agreement the Company was obliged to pay Nelu Mihai as well. The last payment for Nelu Mihai cash severance was on September 16, 2022, and no payments were made after the Petition Date. Honoring the terms of the Severance Agreement Compute North (the Debtors) would have been a wise business decision.

21. It should be underscored that the other executives were paid until February 2023, with large salaries, for restructuring the Company. Well, now there is no restructuring, the Company is liquidating its assets. As a businessman, Nelu Mihai is asking: would it not have been better for shareholders, creditors, employees if the Plan Administrator would have taken control of the Company (Estate) on 9/22/2022? How much money would have been saved? Obviously for fairness, it is necessary to reject the Objections 1199 and 1230 to Claim 10029 and to give allowance to Claim 10029.

22. The separation amount of $300,000 should have been paid in one payment, the same way the other executives were paid large bonuses one day before the Petition Date (Edward Drake Harvey III – the new COO, paid with $60,000 bonus on 9/21/2022 one day before the Petition Date), 22 days before the Petition Date (Harold Eugene Coulby, new CFO, paid with retention bonus of $110,000 on 8/30/2022; Jason Stokes, new CLO, paid with retention bonus of $110,000 on 8/30/2022; Edward Drake Harvey III, paid with retention bonus of $50,000 on 8/30/2022; Kyle David Wenzel, former VP of Sales, paid with retention bonus of $50,000 on 8/30/2022) etc., as declared by Debtors in the Financial Disclosure Statements 723-2 and 683 ("Schedules 2"). In conclusion, the Objections to claim 10029 should be entirely rejected, denies, and the claim should receive allowance, as having indubitable factual basis and legal basis.

23. After consultations with experts in human resources, payroll, taxes from Morgan Stanley and other companies, etc. who also helped to obtain and analyzed the requested copies of the payroll stubs from Insperity PEO Services L.P. (which were not sent to Nelu Mihai as requested in *The Initial Disclosure Rule 26* docket 1245), it was discovered and reconfirmed that:

24. a) At every base salary pay date, including 3/31/2022 (the last day of employment) there was a delay in the Claimant's separation payments. At every bi-monthly payroll pay date for the other employed executives, between March 31 and September 22,2022 no amount

due was paid in full (each payment of "cash severance" before the Petition Date was not in full, was not conform to the Separation Agreement signed on March 28, 2022).

25. b) For example, on April 15, 2022, many incorrect (exciding the lawful amounts and ignoring the incident legislation) deductions and taxes were unlawfully subtracted from the amount supposed to be paid ($13,626.36). One of such unlawful deductions which was done erroneously is the following: it was for **Flexible Spending Account** (please note that Nelu Mihai was not employed by the Debtors after March 31, 2022. Nelu Mihai never asked in the Separation Agreement to have this optional deduction retained from his severance bi-monthly installments. In fact, there is no legislation to apply such deductions while not employed. In April, May, June, July, August, September 2022 this amount was not paid back to Nelu Mihai, rendering any so-called by-monthly amount to a reduced amount with this unlawful FSA deduction. The Claimant complained to Company representatives, but the Company have not reimbursed him with this unlawfully subtracted amount from his severance payment. If the Debtor had goodwill, it would have refunded the FSA illegal deduction on the next payment. By not doing that, the Debtor breached the separation agreement from the beginning.

26. c) The same unlawful diminutions were done starting with April 15, 2022 for **federal taxes** (ignoring the IRS regulations of *Publication 15 (Circular E) 2022, page 21, Effective Date of Form W4*, imposing that a W4 form filed by Nelu Mihai with the Debtors in 2021, when Nelu Mihai started his employment with them, should remain applicable for all the following payroll or separation amount payments, without any limitation or derailments). The Claimant's experts calculated the correct federal taxes for every payroll stub obtained from Insperity PEO Services L.P., and there are unlawful reductions and delays at every by monthly date when an EFT (electronic fund transfer) was done for separation cash.

27. d) Other by-monthly unlawful diminutions were done starting with April 15, 2022, for **state taxes** (ignoring the IRS regulations of Publication 15 (Circular E) 2022). The Claimant's experts calculated the correct California state taxes for every payroll stub obtained from Insperity PEO Services L.P., and there are unlawful reductions and delays at every by monthly date when an EFT (electronic fund transfer) was done for cash severance.

28. e) Even more unlawful diminutions were done starting with April 15, 2022 for Medicare. ignoring the terms of the Separation Agreement signed on March 28, 2022, where a whole chapter is about Nelu Mihai being under Medicare (over 65 years old), ignoring the IRS Publication 15 regulations, and the income until every payroll date, and other legislation applicable. The Claimant's experts calculated the correct Medicare taxes for every payroll stub obtained from Insperity PEO Services L.P., and there are unlawful reductions and delays at every by monthly date when an EFT (electronic fund transfer) was done for cash severance.

29. Erroneously, the Plan Administrator and his Reviewing Parties state that *"The Claimant relies on the Separation Agreement attached to his proof of claim, as well as Schedule 2 to the Debtors' Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and its Debtor Affiliates [Docket No. 683] (the "Schedule 2") (a summary of transfers to insiders in the one year preceding the Petition Date)."* The Court is respectfully asked to observe that Nelu Mihai never cited the docket 683 "Schedule 2". In the Claimant's response to Objection 1199 to Claim 10029 Nelu Mihai referred docket 723-2" Schedule 2". Even more, both docket 723-2 and 683 "Schedule 2" contain the gross mistake that Nelu Mihai would have received an amount of $11,538 on September 16, 2022. As Nelu Mihai asked the honorable Court during one 2022 hearing to impose the Debtors in Possession to correct and eliminate their false statement that Nelu Mihai have received on September 21, 2022 the rest of the "cash severance" payment of $150,000, the same way Nelu Mihai respectfully request the Court to reject the Supplemental Objection, the Reply 1230, and the Plan Administration Declaration as being without any legal base, their position being fully rebutted by the Separation Agreement, by the Schedule 2 of docket 723-2 and 683, and by the Debtors' records, also kept at Insperity PEO Services L.P. (Nelu Mihai obtained these documents only on September 2023, with the help of the Claimant's experts; before that date, Nelu Mihai did not have access to them, starting with Claimant's employment Termination Date, May 31, 2022. Per Court request, Nelu Mihai can provide a confidential copy of these payroll stub for pe period March 31-September 22, 2022, but these documents are in the fully possession, control and custody of the Plan Administrator, and contain bank info, SSN, and other fiscal / confidential information to be filed publicly).

30. The position of the Debtors, Plan Administrator and the other authors of the Reply 1230 is wrong, unlawful, and contradictory to the payroll checks provided by Insperity PEO Services L.P. The table with so called payments figured at paragraph 11 page 5 of the Reply 1230 is another gross mistake. Never ever the Debtors did pay in full amounts of $13.636.36. Once again, the Reviewing Parties of the Plan Administrator copy the opinion of the Debtors, without doing any investigation into the correct records, represented by the payroll records kept by Insperity PEO Services L.P. The Reviewing Parties of the Plan Administrator ignore that unlawful amounts and taxes and deductions were erroneously subtracted from each by-monthly payroll "pay" (in fact, there were only direct deposits, on each payroll check is figured the routing number and Claimant's account number and the date of EFT – Electronic Fund Transfer).

31. Nelu Mihai submits, in opposition to the so-called accuracy of table represented by the Debtors on page 5 paragraph 11 of docket 1230, a table with the correct amounts transferred by EFT, in relation to the Separation Agreement, after April 1, 2022 to present time.

32. In this correct table, based on the real paychecks kept at Insperity PEO Services L.P. and bank account info, there is the last column, representing the <u>percentage of diminutions of each amount represented erroneously by the Debtors in their table of docket 1230</u> (**between 30,05% and 37,25%,** meaning that **every single by-monthly payment was reduced by at least a third or a quarter, and was delayed by many days, both pre-Petition Date, but also post Petition Date**). Also, column four states the real amounts paid to Nelu Mihai, in relation to Separation Agreement, after April, 2022 (his Termination Date was March 31, 2022). Similarly, column three states the exact transferred amounts by EFT, into Nelu Mihai's bank account.

| Payroll Check No. | Date of EFT (Direct Deposit) | Amount paid ($) | Unpaid amount ($) | The Debtors wrongly stated "as paid" amount ($) | Unpaid percentage (%) |
|---|---|---|---|---|---|
| 67596944 | 9/16/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |
| 67294781 | 9/2/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |
| 66988605 | 8/19/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |

| | | | | | |
|---|---|---|---|---|---|
| 66685164 | 8/5/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |
| 13,636.36 | 7/22/2022 | 9,444.91 | 4,191.45 | 13,636.36 | 30.7373082 |
| 66044876 | 7/8/2022 | 9,538.63 | 4,097.73 | 13,636.36 | 30.05002801 |
| 65733005 | 6/24/2022 | 9,538.63 | 4,097.73 | 13,636.36 | 30.05002801 |
| 65416407 | 6/10/2022 | 9,538.63 | 4,097.73 | 13,636.36 | 30.05002801 |
| 65145314 | 5/27/2022 | 9,206.06 | 4,430.30 | 13,636.36 | 32.48887533 |
| 64880454 | 5/13/2022 | 8,543.18 | 5,093.18 | 13,636.36 | 37.34999663 |
| 64593683 | 4/29/2022 | 8,543.18 | 5,093.18 | 13,636.36 | 37.34999663 |
| 10208869 | 4/15/2022 | 12,957.94 | 7,936.65 | 20,894.59 | 37.9842342 |

The last row includes the payments of $7,258.23 stipulated in the Chapter 9.d of the Separation Agreement, which has no link with the "severance cash payments" from chapter 9.a of The Separation Agreement.

33. The Reply 1230 proves that no real paychecks were consulted by the Reply's signers / issuers. In a disadvantaging way, for the Claimant Nelu Mihai, the Debtors try to misinform the Court about the remaining unpaid amounts, without going into any reductions by any unlawful taxes and deductions. What is strange is the fact that the Plan Administrator declaration for this Reply is done also under oath. It is hard to believe that the Plan Administrator have not read the terms of the Separation Agreement about "Legal taxes and deductions", stipulated in Chapter 10.h.

34. The new discoveries provided by Insperity PEO Services L.P., referred by the Debtors in the Separation Agreement, indubitably demonstrate that no "cash severance" installment was paid (transferred) timely or consistently with the terms of the Separation Agreement.

35. The Reply 1230 and the Plan Administrator's Declaration 1230-1 (for Supplemental Objection) fail to demonstrate that each installment was timely and fully (in its integrality, with no unlawful reductions, deductions, taxes) paid on the same date with the other executives' base salary payments dates, as the term of the Separation Agreement stipulate, not before September 16, 2022, and nor after September 22, 2022. It is evident that Nelu Mihai was not paid after September 16, 2022, while the other executives were paid, until February 2023, when the Company was in a so-called reorganizing status. No single installment payment of cash severance was consistent the terms of the Separation Agreement.

36. Not even to this date, the Plan Administrator gave the Court an answer about the amount of recognized Company's debt of $150,000 toward Claimant Nelu Mihai, debt which was

unlawfully presented as being in fact paid on September 21, 2022, one day before the Petition Date, but, in reality, never paid to the Claimant. If this check is in the Debtor's books, but not registered with Insperity PEO Services L.P., who cashed it? The payroll checks, kept also by Insperity PEO Services L.P. do not have any payment made to Nelu Mihai, Claimant, on the date of September 21, 2022, nor on any other date after September 16, 2022. After September 16, 2022, many other Company's executives received base salary payments, until February 2023 or later. This this factual evidence situation imposes the allowance for Claim 10029, based on the Chapter 9.a terms of the Separation Agreement and based on the recognition (on June 6, 2023), by the Plan Administrator, that Nelu Mihai is entitled to receive full amount of penalties for delays and accrued unpaid amounts of cash severance, both before and after the Petition Date. The new discoveries emphase the attributes of priority, recognition and administrative type of the credit requested by Claimant Nelu Mihai in claim 10029, which should be granted with allowance by the Court.

37. In addition, the signers and issuers of the Reply 1230 and Declaration 1230-1 ignore that they have the legal obligation to pay Nelu Mihai's cash severance and penalties, even after the Petition Date, according to the **Chapter 18, Binding Effect**[2] of the Separation Agreement.

## B. PENALTIES CALCULATIONS BEFORE THE PETITION DATE, BASED ON NEW DISCOVERIES

Penalties on delayed payments due to unlawful reductions of the $13,636.36 installments amounts with over-calculated state taxes (calculated only for the period before the Petition Date)

The payroll checks obtained from Insperity PEO Services L.P. numbered 10208869, 64593683, 64880454, 65145314, 65416407, 65733005, 66044876, 66363671, 66988605, 67294781 and 67596944 reflect severance installments payments reductions totaling **$4,982.08.** The calculations for 161 delay days to Petition Date (4/15/2022 installment delay and not full payment), 147 delay days to Petition Date (4/29/2022 installment delay

---

[2] "This Agreement will be binding upon and will inure to the benefit of the Parties hereto, their respective heirs, representatives, successors and assigns and will be automatically assigned by the Company to the controlling entity"..

and not full payment), 133 delay days to Petition Date (5/13/2022 installment delay and not full payment), 119 delay days to Petition Date (5/27/2022 installment delay and not full payment), 105 delay days (6/10/2022 installment delay to Petition Date and not full payment), 91 delay days (6/24/2022 installment delay to Petition Date and not full payment), 77 delay days (7/08/2022 installment delay to Petition Date and not full payment), 63 delay days (7/22/2022 installment delay to Petition Date and not full payment), 49 delay days (8/05/2022 installment delay to Petition Date and not full payment), 35 delay days to Petition Date (8/19/2022 installment delay to Petition Date and not full payment), 21 delay days to Petition Date (9/02/2022 installment delay to Petition Date and not full payment), 7 delay days to Petition Date (8/16/2022 installment delay to Petition Date and not full payment). The unpaid accrued amount of overcalculated and subtracted as state taxes to the Petition Date is **$4,982.08.** The penalties calculated are in the amount of **$8,381.49.**

38. Penalties on delayed payments due to unlawful decreases of the $13,636.36 installments amounts with over-calculated federal taxes (calculated only for the period before the Petition Date)

The payroll checks obtained from Insperity PEO Services L.P. numbered 10208869, 64593683, 64880454, 65145314, 65416407, 65733005, 66044876, 66363671, 66988605, 67294781 and 67596944 reflect unpaid severance installments payments reductions in the amount of **$18,905.77, with penalties calculated according to Chapter 9.a of the Separation Agreement, for the period before the Petition Date in in amount of $31,795.77.** The calculations for 161 delay days to Petition Date (4/15/2022 installment delay and not full payment), 147 delay days to Petition Date (4/29/2022 installment delay and not full payment), 133 delay days to Petition Date (5/13/2022 installment delay and not full payment), 119 delay days to Petition Date (5/27/2022 installment delay and not full payment), 105 delay days (6/10/2022 installment delay to Petition Date and not full payment), 91 delay days (6/24/2022 installment delay to Petition Date and not full payment), 77 delay days (7/08/2022 installment delay to Petition Date and not full payment), 63 delay days (7/22/2022 installment delay to Petition Date and not full payment), 49 delay days (8/05/2022 installment delay to Petition Date and not full payment), 35 delay days to Petition Date (8/19/2022 installment delay to Petition Date

and not full payment), 21 delay days to Petition Date (9/02/2022 installment delay to Petition Date and not full payment), 7 delay days to Petition Date (8/16/2022 installment delay to Petition Date and not full payment) has the result of **$31,795.77**. The unpaid accrued amount of over-calculated and subtracted as federal taxes to the Petition Date is **$18,905.77.**

39. Penalties for delays of unpaid amounts wrongly calculated as Social Security Tax, and unlawfully subtracted from cash severance installments before the Petition Date, despite the fact that the limit of $147,000 income was reached.

    The IRS Regulation Publication 15 imposes that after the amount of $147,000 income is reached, no more social security taxes should be subtracted from the cash severance installments. The number of days of non-payment, prior the Petition Date (5/27/2022 until 9/22/2022) is 126 days. The delayed and unpaid amount is $295.62 - $144.37=**$151.25 (for Claim 10026).** Penalties calculation: 126 days x 2%/pay x $151.25 = **$381.15 (for Claim 10029).**

40. For the period April 1st 2022 to the Petition Date, the total amount of penalties for over taxation as Medicare tax for Nelu Mihai, over 65 years old and not self-employed: $17.18 + $51.54 + $85.90 + $120.27 + $118.09 = **$392.98** (Insperity PEO Services L.P, according checks number 66363671, 66988605, 67294781 and 67596944, starting with 7/22/2022). The total amount unpaid, meaning paid for unlawful Medicare taxation is: $122.72 + $122.72 + $122.72 + $122.72 + $93.72 = **$584.60.**

41. Penalties calculated for reducing the installment due on 4/15/2022 with an amount for unlawful Flexible Spending Account while the Claimant was not employed (unpaid cash severance amounts, not following the IRS Publication 15 (Circular E) that does not stipulate to deduct any optional FSA amounts from severance payments)

    The FSA amount unlawfully subtracted from the instalment of $13.636,36 was of **$211.54**. The number of delay days until the Petition Date is 161. The penalties for this accrued unpaid severance obligations are $211.54 x 161 x 2/100, meaning **$681.16.**

42. **Summary for the accrued unpaid cash severance amounts for the period April 1st 2022 to the Petition Date**

    **The new discoveries prove that there is an extra unpaid cash severance amount, calculated for the period April 1st 2022 to the Petition Date, in the amount of**

> **$4,982.08, plus $18,905.77, plus $151.25, plus $584.60, plus $211.54, meaning $14,835.96. To this amount should be added 136,363.68 ($300,000 - $13,636.36 x 12 paid installments), totaling $151,199.64 (unpaid accrued cash severance at the Petition Date).**

43. **The penalties for the unpaid amount of $136,363.68 for 7 days until 9/22/2022 are in the amount of $19,090.92**

44. **Summary for the accrued unpaid cash severance amounts for the period April 1st 2022 to the Petition Date**

    **The penalties owed for the period between April 1st 2022 and the Petition Date are in the amount of $8,381.49, plus $31,795.77, plus $381.15, plus $392.98, plus $681.16, plus $19,090.92, meaning $60,723.47 (sixty thousand seven hundred twenty three dollars and forty seven cents).**

45. To the penalties amount of $60,723.47, calculated for the period April 1st 2022 to the Petition Date, the Claimant also requests the penalties calculated for the accrued unpaid cash severance amount after the Petition Date ($151,199.64), as above mentioned at paragraphs 11 to 17 and 30, and in the previous responses and Claim 10029 related documents submitted by Nelu Mihai. The factual bases and legal grounds for also receiving the penalties for the period after the Petition Date are stipulated in Chapter 9.a of the Severance Agreement submitted by Nelu Mihai. These calculations should be done to the accrued unpaid cash severance amount of $151,199.64, for at least 159 days (between 9/23/2022 and 2/28/2023), at the rate stipulated in the Separation Agreement, chapter 9.a.

46. It is proved, with the new discoveries, that the Company willfully increased the subtractions, deductions, taxes from each severance payment installment, inducing delays, and contradicting the Chapter 10.h, 9.a of the Separation Agreement, but also the IRS Publication 15, the IRS publications related to the validity of the 2021 W4 form provided by the Claimant Nelu Mihai to the Company when hired and all the other bankruptcy rules referred by the Claimant Nelu Mihai in the previous submitted documents. The Claimant respectfully asks the Court to reject the Objections 1199, 1230, and the related proposed orders, formulated by the Plan Administrator, the other creditors

representatives, the Reviewing Parties or any other part in this case. The creditor Nelu Mihai respectfully requests the Court to fully grant allowance to Claim 10029.

47. Nelu Mihai respectfully asks the Court to take into consideration Nelu Mihai's merit in funding the Company, in elaborating profitable reorganizing and reorientation strategies for the Company (his business plan involving profitable business, including AI etc., different from bitcoins mining; his business plan and vision that attracted funding investors and was validated by industries and analysts in 2023, but were abandoned by the other former executives of the Debtors) and to grant allowance to his claim 10029.

## C. RESERVATION OF RIGHTS

48. The Claimant expressly reserves the right to amend, modify, and supplement this Response to Supplemental Objection, and the right to respond to any assertion regarding the Claim and Objection. The Claimant further reserves all rights to present any evidence at a designated hearing for this proceeding to support his Claim. The Claimant reserves the right to contest any other Objections asserted by the Plan Administrator and other Creditors on any other grounds. Nothing herein shall constitute an admission of any assertions coming from the Plan Administrator, his Reviewing Parties or other Creditors.

## D. CONCLUSION

49. **The Claimant, Nelu Mihai, respectfully requests that the Claim 10029 and Proof of Claim 10029 be allowed in their entirety, and that the Court grant such other of allowance, by rejecting the Objection 1199 to this Claim and the Proposed Order 1199, the Supplemental Declaration 1230-1 and Supplemental Objection 1230, as well any Proposed Order in relation to Claim 10029.**

Respectfully submitted,

Dated: September 10, 2023

NELU MIHAI, PhD

_____,

NELU MIHAI.
201 Harrison Street Apt. 210
San Francisco CA 94105
Telephone: (408) 410-3896
Email: nelumihai@prodigy.net

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 22-90273 (MI) |
| MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), et al., | |
| Debtors.[1] | |

Certificate of Service

I certify that on August 10, 2023, I caused a Response to the Reply, document no. 1230 case 22-90273, to be delivered thru Pacer system to the U.S. Bankruptcy Court for Southern District of Texas, the Plan Administrator, Tribolet Advisors LLC, ASK LLC, Mr. Charles R. Gibbs from MCDERMOTT WILL & EMERY LLP, *Counsels to the Mining Project Wind Down Holdings, Inc. Litigation Trust and the Plan Administrator* and other recipients, parts in case for case 22-9027, and for case 22-9027.

Respectfully,

……………………………………………………..

Nelu Mihai

201 Harrison Street #210, San Francisco, CA 94105

nelumihai@prodigy.net

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.