IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*, | Case No. 22-90273 (MI) |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF MICHAEL TRIBOLET, MANAGING MEMBER OF TRIBOLET ADVISORS LLC, IN SUPPORT OF THE AMENDED OBJECTION TO CLAIM NO. 14 OF BOBS LIMITED BY PLAN ADMINISTRATOR

I, Michael Tribolet, hereby declare under penalty of perjury:

1.  I am the Managing Member of Tribolet Advisors LLC, the court-appointed plan administrator (the "Plan Administrator")[1] in the above-referenced cases.

2.  In my capacity as Plan Administrator, I am the main person responsible for winding down, dissolving, and liquidating the Debtors' estates. These responsibilities include managing and overseeing the claims reconciliation and objection process, which involves the collective effort

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Objection (defined herein).

of myself; my counsel, including ASK LLP; my financial advisor, Grant Thornton LLP; and certain former employees of the Reorganized Debtors (collectively, the "Reviewing Parties"). In connection with my responsibilities, I assumed possession of and am generally familiar with the Debtors' books and records which reflect, among other things, the Debtors' liabilities and the amount thereof owed to their creditors both as of and subsequent to the Petition Date. Among the documents and information for which I assumed possession in my capacity as Plan Administrator are the Debtors' bank registers, bank statements, accounting records, and emails.

3. I have read the *Amended Objection to Claim No. 14 of Bobs Limited by Plan Administrator* (the "Objection").

4. To the best of my knowledge, information, and belief, the assertions made in the Objection are accurate. In evaluating proof of claim 14 filed by claimant Bobs Limited (the "Proof of Claim" and "Claimant", respectively), I, in a collective effort with one or more of the Reviewing Parties under my supervision, thoroughly reviewed the Proof of Claim, the Debtors' books and records, and the supporting documentation provided by Claimant.

5. Claimant contends in its Proof of Claim that it is owed various sums of money in connection with the Debtors' failure to deliver certain cryptocurrency mining equipment. To support its Proof of Claim, the Claimant relies on a Master Agreement dated February 19, 2021 and accompanying Order Form. I separately located copies of these documents in the Debtors' records, a copy of which is attached as **Exhibit 1**.

The Initial Purchase Price

6. According to the Master Agreement and Order Form, Claimant ordered approximately 300 Minerva mining units (the "Equipment") from the Debtors at an initial purchase price of $1,290,000.00.

7.  According to the Debtors' bank statements and bank register in my possession, relevant portions of which are attached hereto as **Exhibits 2** and **3,** a total of $1,289,935.00 was paid toward the Claimant's initial purchase price under the Master Agreement and Order Form. Specifically, the Debtors received approximately 80% of the initial purchase price in February 2021 in the form of four payments in the combined amount of $1,031,950.00. An additional payment of $257,985.00 was received in April 2021. The bank statements do not identify the payor of these payments. The bank register identifies the payor as "Merchant Mining" or "Merchant Mining LLC". Although I cannot say with certainty that these payments came directly from Claimant, I believe these particular payments should be credited toward Claimant's purchase obligations under the Master Agreement and Order Form based on their consistence both in timing and amount with the terms of the Master Agreement and Order Form (which provides that 80% of the purchase price is to be paid at the time of signing and 20% before shipment). In addition, the Master Agreement and Order Form were signed by "Matthew Merchant" as "Director" using an electronic signature from the email address "merchantmining2020@gmail.com". Based on the above, it is my belief that the initial purchase price obligations under the Master Agreement and Order Form were satisfied (with the exception of a $65.00 difference).

<u>The Debtors Ordered the Equipment from a Supplier, True North Data Solutions (U.S.), Inc.</u>

8.  The Debtors' books and records reflect that the Debtors placed an order for 600 units of Minerva mining equipment with a third party supplier, True North Data Solutions (U.S.), Inc. ("<u>True North</u>"). Attached hereto as **Exhibit 4** is a copy of an Equipment Purchase Agreement between Compute North LLC and True North dated February 19, 2021 (the "<u>True North Purchase Agreement</u>").

9. According to the information available to me, the Debtors intended to send 300 of the mining units it was purchasing from True North to Claimant in fulfillment of Claimant's purchase order. The True North Purchase Agreement was entered into on the same day as the Master Agreement and Order Form. In addition, the Debtors' internal emails, including those attached hereto as **Exhibit 5**, demonstrate the Debtors' intent regarding the use of equipment ordered from True North. For example, the Debtors' employee Ro Shirole stated in an internal email on February 21, 2021: "Just a reminder that we have 2 incoming wires tomorrow from Merchant Mining and we will need to turn around a wire to True North asap in the morning." In a later email of June 23, 2021, Debtors' employee Mason Rudin writes to Ro Shirole, stating: "We have three customers that have Minerva miners purchased from us via True North – Merchant Mining, ZG Compute, NFN8. It looks like we have two signed contracts for True North to facilitate these orders for Minerva 100TH, one for 600 (Merchant Mining & ZG Compute) and the other for 250 (NFN8)." Once again, the Debtors reference "Merchant Mining" rather than "Bobs Limited". However, based on all of the information available to me it is my belief that these emails refer to equipment which was to be delivered in accordance with the Order Form.

<u>The Debtors Paid True North for the Equipment in Full</u>

10. The initial purchase price for the 600 miners ordered from True North was $2,460,000.00. The True North Purchase Agreement provides that 80% of the purchase price ($1,968,000.00) was due at the time of signing with the remaining 20% balance ($492,000.00) due prior to shipment.

11. According to the Debtors' bank statements and bank register, the Debtors paid 80% of the purchase price under the True North Purchase Agreement in February 2021. Specifically,

4

these documents show that Compute North LLC made two payments of $984,000.00 each (in the combined amount of $1,968,000.00) to True North in February 2021. **Exhibits 2, 3**.

12. In May 2021, True North informed the Debtors of a 15% price increase for the mining equipment which it retroactively applied to the True North Purchase Agreement. Attached hereto as **Exhibit 6** is email correspondence from True North to the Debtors, which states in part: "due to impacts arising from global supply chain and capacity constraints, all Minerva MV7 orders placed to-date will be subject to a 15% price increase," or an additional $369,000.00 for the units ordered under the True North Purchase Agreement.

13. As a result of True North's price increase, True North issued a revised invoice to the Debtors. **Exhibit 6.** Based on this invoice, the Debtors' outstanding balance due to True North under the True North Purchase Agreement, after crediting the $1,968,000.00 deposit amount, was $861,000.00, which was comprised of the remaining original 20% balance of $492,000.00, plus the 15% increase of $369,000.00.

14. The Debtors' bank statements and bank register reflect that the Debtors paid True North the $861,000.00 outstanding balance in the form of (i) $820,000.00 paid to True North in February 2021 and (ii) $41,000.00 paid to True North in November 2021. According to the Debtors' records available to me, the $820,000.00 payment was initially paid by the Debtors to True North for a deposit in connection with another of the Debtors' customer's orders. After that customer cancelled its order, True North applied the $820,000.00 deposit amount toward the purchase price owing under the True North Purchase Agreement. *See* **Exhibit 7** (email from True North confirming that the Debtors' order for 250 units is "VOID, and that a refund of $820,000 is due"); **Exhibit 8** (email from Heather Boyle of True North dated November 3, 2021, explaining

that the "payment of $820k made on the cancelled order was applied to the order for 600 units leaving the balance of $41k owing.").

15.     Based on the bank statements and bank register, as well as the Debtors' email communications, the Debtors paid True North in full for the mining equipment it ordered under the True North Purchase Agreement, including the 300 units which were intended for Claimant.

<u>It is Unclear Whether Claimant Paid the Debtors for the 15% Price Increase</u>

16.     Based on a review of the Debtors' records, the Debtors passed True North's 15% price increase on to its customers, including Claimant. For example, Ro Shirole's email to True North dated June 4, 2021 states "Hello! Our clients representing 600 of the 850 units on order have agreed to the 15% increase and are in the process of wiring the funds to us." **Exhibit 7.** However, there is conflicting information in the Debtors' books and records as to whether Claimant actually paid the 15% price increase. The bank statements confirm that the Debtors received a payment on or about June 8, 2021 for $193,500.00 (representing 15% of the $1,290,000 initial purchase price). The bank register identifies the payor for this payment as "Merchant Mining LLC" and it appears the Debtors at least initially credited this payment toward Claimant's obligations. However, I am also aware of later emails suggesting that this sum was booked incorrectly and should in fact have been credited to the customer ("ZG") who ordered the other 300 units that made up the 600 unit order with True North. *See* **Exhibit 9**.

17.     I, in coordination with the Reviewing Parties, conducted a full review of the Debtors' bank register and have been unable to identify a second incoming payment for $193,500.

18.     As a result of the conflicting information in the Debtors' books and records, I am unable to verify whether Claimant paid the 15% price increase for the Equipment.

Claimant Directed that the Equipment be Re-Routed to True North

19. According to the True North Purchase Agreement, the Equipment was originally intended to be delivered to the Debtors' facility in Kearney, Nebraska, where the Debtors could provide colocation and hosting services for the Equipment in accordance with the Master Agreement. However, the Order Form with Claimant provides for a 5% hardware facilitation fee in the event that a hosting agreement is not executed with the Debtors. According to correspondence between the Debtors and Claimant, in August 2021 Claimant directed that the Equipment be delivered to a non-debtor address in Calgary, Alberta, rather than a Debtor facility. In connection with its election to re-route the Equipment to a non-debtor facility, Claimant paid the 5% hardware facilitation fee in the sum of $64,500.00 on August 24, 2021. *See* **Exhibit 10** (August 17, 2021 letter from Claimant counsel to Debtors); **Exhibit 3** (bank register).

20. Email correspondence sent by Claimant to the Debtors and True North on November 17, 2021, a copy of which is attached as **Exhibit 11**, similarly reflects Claimant's decision that the Equipment no longer be delivered to or hosted by the Debtors:

> I confirm and acknowledge and agree to the transition of the 300 Minervas to True North. I confirm that we want the 300 Minerva's which we ordered through Compute North to be sent directly to True North in Alberta from Minerva in China. They should not go to the USA at all but rather should go to True North in Alberta directly from Mineva.

Non-Delivery of Equipment

21. The Debtors' books and records reflect that, of a total of approximately 600 mining units ordered under the True North Purchase Agreement, 300 units were ordered for Claimant and 300 units were ordered for another customer, "ZG".

22. Based on email correspondence with True North, True North had not delivered the Equipment to Claimant as of December 28, 2021. **Exhibit 12**.

23. I am aware of deposition testimony given by an officer of True North on July 27,

2023 in connection with this bankruptcy proceeding, during which Mr. Allard stated that True North placed an order with the manufacturer for equipment that was ultimately to be delivered to Claimant, but that the manufacturer had not delivered Claimant's equipment to True North.

24. I am not aware of any documentation or other information in the Debtors' books and records to suggest the Equipment was ever delivered to Claimant or the Debtors.

25. The Debtors' books and records reflect that True North caused the delivery of between 62 and 74 units to the Debtors for their customer, ZG, for which the Debtors paid a $22,009.38 shipping fee.[2] **Exhibit 13**. The Debtors' records reflect that ZG cancelled the balance of its 300 unit order and True North issued a credit memo for $1,122,170 for 238 miners on May 2, 2022. **Exhibit 14**.

26. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief as of the date hereof.

Dated:  September 18, 2023

/s/ *Michael Tribolet*
Michael Tribolet
Managing Member
Tribolet Advisors LLC, solely in its
capacity as Plan Administrator

---

[2] The shipping fee paid to True North appears in the Debtors' bank register and bank statements (Exhibits 3-4).

8

Exhibit A