# Exhibit 1

## Tribolet Declaration

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*, | Case No. 22-90273 (MI) |
| | (Jointly Administered) |
| Debtors.[1] | |

## DECLARATION OF MICHAEL TRIBOLET, MANAGING MEMBER OF TRIBOLET ADVISORS LLC, IN SUPPORT OF THE PLAN ADMINISTRATOR'S MEMORANDUM OF LAW IN OPPOSITION TO CLAIMANT MIHAI'S (I) MOTION FOR INITIAL DISCLOSURE PURSUANT TO RULE 26(a)(1)(A)(1) AND (II) OBJECTION TO PART OF THE PLAN ADMINISTRATOR'S DISCOVERIES REQUEST DOCKET 1237

I, Michael Tribolet, hereby declare under penalty of perjury:

1. I am the Managing Member of Tribolet Advisors, LLC, the court-appointed plan administrator (the "Plan Administrator")[2] in the above-referenced cases.

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Opposition (defined herein).

2.      In my capacity as Plan Administrator, I am the main person responsible for winding down, dissolving, and liquidating the Debtors' estates.  These responsibilities include managing and overseeing the claims reconciliation and objection process, which involves the collective effort of myself; my counsel, including ASK LLP; my financial advisor, Grant Thornton LLP; and certain former employees of the Reorganized Debtors (collectively, the "Reviewing Parties").  In connection with my responsibilities, I am generally familiar with the Debtors' books and records that reflect, among other things, the Debtors' liabilities and the amount owed to their creditors both as of and subsequent to the Petition Date.

3.      I have read the memorandum of law in opposition (the "Opposition") to the *Motion for Initial Disclosure Pursuant to Rule 26(a)(1)(A)(1): the Propounding Party is in the Solely Possession, Control, Custody Of Wages And Separation Agreement Payment Documents and Calculations, EFI etc., the Debtors (Including Insperity PEO Services L.P.) Being the Issuers of Such Documents/Information* (Docket No. 1245) and *Objection to Part of the Plan Administrator's Discoveries Request Docket 1237* (Docket 1268) filed by Nelu Mihai (the "Claimant").

4.      To the best of my knowledge, information, and belief, the assertions made in the Opposition are accurate.  I, in a collective effort with one or more of the Reviewing Parties under my supervision, thoroughly reviewed the Proof of Claim filed by Claimant, which is attached hereto as **Exhibit A.**

5.      I, in a collective effort with one or more of the Reviewing Parties under my supervision, also thoroughly reviewed the Debtor email records for the relevant time period to determine whether any email records existed relevant to Claimant's claim, the Motion, or this Opposition. Attached hereto as **Exhibit B** is a copy of a relevant email found.

6.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief as of the date hereof.

Dated:  September 20, 2023

/s/ *Michael Tribolet*
Michael Tribolet
Managing Member
Tribolet Advisors LLC, solely in its
capacity as Plan Administrator

# Exhibit A

| United States Bankruptcy Court for the Southern District of Texas | |
|---|---|
| **Name of Debtor:** Compute North Holdings, Inc. | **For Court Use Only** |
| **Case Number:** 22-90273 | Claim Number: 0000010029<br>File Date: 10/24/2022 17:01:53 |

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

04/22

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim): _____ Nelu Mihai _____

Other names the creditor used with the debtor: _____

**2. Has this claim been acquired from someone else?** ☑ No ☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name     Nelu Mihai | Name _____ |
| Address  201 Harrison Street | Address _____ |
|          Suite 210 | _____ |
|          | _____ |
| City     San Francisco | City _____ |
| State    CA     ZIP Code  94105 | State _____ ZIP Code _____ |
| Country (if International): _____ | Country (if International): _____ |
| Phone:   4084103896 | Phone: _____ |
| Email:   nelumihai@icloud.com | Email: _____ |

| 4. Does this claim amend one already filed? | 5. Do you know if anyone else has filed a proof of claim for this claim? |
|---|---|
| ☑ No | ☑ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? |
| Filed on _____<br>MM / DD / YYYY | _____ |

Page 1 of 3

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes.

Last 4 digits of the debtor's account or any number you use to identify the debtor:

____  ____  ____  ____

**7. How much is the claim?**

$ 220,909.03 _____ unliquidated

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Employee Agreements (Contracts)
_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:
_____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of petition.**

$_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $_____

| **Part 3:** | **Sign Below** |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it.  FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☑ I am the creditor.<br><br>☐ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent.  Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other co-debtor.  Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Nelu Mihai*                    10/24/2022 17:01:53<br>Signature                             Date<br><br>**Provide the name and contact information of the person completing and signing this claim:**<br><br>Name    Nelu Mihai<br><br>Address    201 Harrison Street<br><br>          Suite 210<br><br>City    San Francisco<br><br>State    CA                  Zip   94105<br><br>Country (in international)    United States<br><br>Phone    4084103896<br><br>Email    nelumihai@icloud.com |

## SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release ("Agreement") is made and entered into by and between Nelu Mihai ("Executive") and Compute North LLC (the "Company") and Compute North Holdings, Inc. (the "Parent") on the date set forth below, to be effective on the Effective Date (as defined herein). Each of Executive, the Company, and the Parent is herein individually referred to as a "Party" and together as the "Parties."

WHEREAS, effective February 15, 2021, Executive was granted an option to purchase 27,876 shares of Class B non-voting common stock of Compute North Holdings, Inc. subject to a Stock Option Agreement between the Parent and the Executive and further subject to the terms and conditions of that certain Compute North Holdings, Inc. 2020 Stock Incentive Plan (the "Stock Plan"), which Option was granted as an incentive stock option under Section 422(a) of the Internal Revenue Code of 1986, as amended (the "Code") (the "Incentive Stock Option" or "ISO"); and

WHEREAS, the Incentive Stock Option is evidenced and further governed by a Stock Option Agreement executed by the Parties (the "ISO Agreement"); and

WHEREAS, effective February 15, 2021, Executive was granted an option to purchase 16,808 shares of Class B non-voting common stock of Compute North Holdings, Inc. subject to a Stock Option Agreement between the Parent and the Executive and further subject to the terms and conditions of the Stock Plan, which Option was granted as a non-statutory stock option subject to Code section 83(a) (the "Non-Qualified Stock Option" or "NQSO"); and

WHEREAS, the Non-Qualified Stock Option is evidenced and further governed by a Stock Option Agreement executed by the Parties (the "NQSO Agreement"); and

Page 1

WHEREAS, Executive was employed by the Company and/or its predecessor or affiliated companies beginning on or about February 15, 2021, as the Company's Chief Technology Officer and Executive's employment with the Company as an employee will end for all time as of March 31, 2022 (the "Separation Date"); and

WHEREAS, Executive and the Company mutually agree to end the at-will employment relationship between them as of the Separation Date and to resolve any potential claims between them arising out of or relating to Executive's employment, and the cessation thereof, according to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree to be legally bound by the following promises and acknowledgments:

1. **Separation Date.** Executive's employment with the Company terminated as an employee for all purposes effective as of the Separation Date.

2. **Effective Date**.  The "Effective Date" of this Agreement is the fifteenth (15th) day after Executive's execution of this Agreement, as set forth in Section 5 below, provided that Executive (1) does not exercise Executive's right to rescind (revoke) as set forth in that paragraph, and (2) otherwise fully complies with the terms of this Agreement during the interim period after he executes the Agreement.

3. **Meaning of "Released Parties."**  The term "Released Parties," as used in this Agreement, includes the Company as well as the Company's PEO provider, Insperity PEO Services, L.P.  ("Insperity") and all of the Company's and Insperity's past, present, and future shareholders, parents, subsidiaries, and affiliates, joint venturers, and other current or former

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

related entities thereof, and all of the past, present, and future officers, directors, executives, agents, insurers, legal counsel, and successors and assigns of said entities.

4. **Executive's Release of Claims.**  Subject to Paragraph 7 below, in exchange for valuable consideration, including that contained herein, Executive, on behalf of himself, his spouse, representatives, agents, heirs, trusts and assigns, hereby unconditionally and irrevocably releases Released Parties to the maximum extent permitted by law, from any and all claims, debts, obligations, demands, judgments, or causes of action of any kind whatsoever, whether known or unknown, that Executive has or may have had prior to the date of Executive's execution of this Agreement for any action or omission by any of the Released Parties and/or due to any matter whatsoever relating to Executive's employment or cessation of employment with the Company. Without limiting in any way the foregoing general release, this release specifically includes but is not limited to the following:

    a.     All claims and causes of action arising under the following laws, as amended: Section 1981 of the Civil Rights Act of 1866; Title VII of the Civil Rights Act; the Americans with Disabilities Act; the Age Discrimination in Employment Act and/or Older Workers Benefit Protection of 1990; the Family and Medical Leave Act; the Worker Adjustment and Retraining Notification Act; the National Labor Relations Act; the Labor Management Relations Act; the Fair Credit Reporting Act; the Executive Retirement Income Security Act of 1974; the Genetic Information Nondiscrimination Act of 2008; the Health Insurance Portability and Accountability Act; the Occupational and Safety Health Act; the Equal Pay Act; Executive Orders 11246 and 11141; the Consolidated Omnibus Budget Reconciliation Act of 1986; the Rehabilitation Act of 1973; the Electronic

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

Communications Privacy Act of 1986 (including the Stored Communications Act); the Minnesota Human Rights Act (MHRA) and any other federal, state, or local law or regulation regarding employment; and

b.     All claims and causes of action arising under any other federal, state or local law, regulation or ordinance, including for employment discrimination on any basis, hostile work environment, retaliation, wrongful discharge, retaliatory discharge, constructive discharge, unsafe working conditions, breach of express or implied contract, breach of collective bargaining agreement, breach of implied covenant of good faith and fair dealing, fraud, detrimental reliance, promissory estoppel, defamation, negligence, negligent or intentional misrepresentation, invasion of privacy, defamation, libel, slander, battery, failure to pay wages, bonuses, commissions, or other compensation, attorneys' fees, interference with economic gain or contractual relations, and intentional and negligent infliction of emotional distress or "outrage"; and

c.     All claims and causes of action by Executive that Released Parties have acted unlawfully or improperly in any manner whatsoever, prior to the date of Executive's execution of this Agreement.

Nothing in this release of claims shall be interpreted to release Executive's right, if any, to any vested employment-related benefits.  Executive acknowledges that this release constitutes a full settlement, accord, and satisfaction of all claims covered by this release.

**5.     Acknowledgement.**  Executive acknowledges and agrees that Executive has been provided a copy of this Agreement, has signed this Agreement voluntarily, and with full knowledge of its effects.  In addition, Executive hereby acknowledges and agrees as follows:

Page 4

a.     This Agreement has been written in a manner that is calculated to be understood, and is understood, by Executive;

b.     The release provisions of this Agreement apply to any rights Executive may have under the Age Discrimination in Employment Act up to the date of this Agreement;

c.     The release provisions of this Agreement do not apply to any rights or claims Executive may have under the Age Discrimination in Employment Act that arise after the date he signs this Agreement;

d.     The release provisions of this Agreement do not apply to any rights or claims Executive may have if Paragraph 16 ("Mutual Non Disparagement") is breached by the Released Parties after the date he signs this Agreement;

e.     Executive has been advised that he should consult with an attorney prior to signing this Agreement;

f.     Executive has been provided a period of twenty-one (21) calendar days (the "Review Period") from the date he was provided this Agreement to consider it. Executive may sign this Agreement before the expiration of the Review Period, but if Executive does, Executive agrees that he is knowingly and expressly waiving any remaining portion of the specified time period;

g.     If Executive signs this Agreement, pursuant to the Minnesota Human Rights Act (MHRA), Executive may rescind (revoke) his waiver or release of rights or remedies under the MHRA within fifteen (15) calendar days after signing this Agreement.  Pursuant to the Age Discrimination in Employment Act (ADEA), Executive may revoke his waiver or release of rights under the ADEA within seven (7) calendar days after signing this agreement.  To be effective, any rescission or

Page 5

revocation must be in writing and delivered to David Movius, Esq., General

Counsel, Compute North LLC, 7575 Corporate Way, Eden Prairie, MN  55344

either by hand or by mail, within the applicable seven or fifteen-day period.  If sent

by mail, the rescission must be postmarked within the applicable seven (7) or fifteen

(15) day period, properly addressed to the Company, and sent by certified mail,

return receipt requested.  Should Executive exercise Executive's right to rescind or

revoke a waiver and release pursuant to the terms of this section, Executive shall

not receive any of the consideration set forth in Paragraph 9 ("Consideration") and

terms and conditions the ISO Agreement and NQSO Agreement, presented to

Employee as part of his employment offer, shall remain in effect, without

modification.

6.       **No Admission of Liability.**  Executive acknowledges that neither this Agreement

nor the fact of the Parties' resolution shall be construed as an admission by the Company or any

of the Released Parties that they have acted wrongfully or that Executive has or had any valid

rights or claims whatsoever, and Executive acknowledges that the Released Parties specifically

deny any liability or wrongful acts.  Moreover, neither this Agreement, nor anything herein, shall

be admissible in any proceeding as evidence of, or an admission by the Released Parties of, any

violation of any federal, state, or local laws, or of their own policies or procedures.

7.       **Protected Rights.**  Executive understands that nothing in this Agreement shall be

construed to prohibit him from filing a charge with or participating in an investigation or

proceeding conducted by the Equal Employment Opportunity Commission, the National Labor

Relations Board, or any similar state or federal agency.  However, Executive understands that he

has waived and released any and all claims for money damages and equitable relief that Executive

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

may recover from Released Parties pursuant to the filing or prosecution of any administrative charge against Released Parties, or any resulting civil proceeding or lawsuit brought on his behalf for the recovery of such relief, and which arises out of the matters that are and may be released or waived by this Agreement.  Executive also understands that this Agreement does not limit his ability to communicate with any government agencies or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information, without notice to the Company.  This Agreement also does not limit Executive's right to receive an award for information provided to any government agencies.

8.   **Accrued Obligations.** Company will pay all of Executive's accrued but unpaid vacation, expense reimbursements, wages, and other benefits due to the Executive under any Company-provided plans, policies, or arrangements as of the Executive's termination date (the "Accrued Obligations").  Expense reimbursements are subject to the applicable Section 409A requirements set forth in Paragraph 12, below. The Company and the Parent will timely and properly provide to the Executive the documentation and instructions needed to continue health care coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

9.   **Consideration**.  In exchange for executing and not revoking this Agreement, Executive shall receive from the Company (and not from Insperity, which has no independent or other payment obligations), the following:

a.   **Cash Severance.**  As severance, the Company will pay Executive three hundred thousand dollars ($300,000) over a fourty four (44) week period commencing as of the Effective Date; such amount to be paid in substantially equal installments of

Page 7

$13,636.36 each, payable over 22 payperiods, with payments made on the same date(s) as base salary are paid to the Company's other executives. Executive's right to severance payments under this paragraph shall prospectively end if Executive breaches any portion of this Agreement prior to the end of this 44 week period. If the Company or Parent fail to pay an installment on time, at the same date(s) as base salary are paid to the Company's other executives, the Company will pay a penalty of 2% of the delayed installment per every delayed day.

b.    **Extended Incentive Stock Option Exercise and Vesting Opportunity.** As of the Separation Date, Executive is currently vested in 13,938 of the 27,876 Options granted thereunder (the "Vested ISOs"), and has 13,938 Options that have not yet vested (the "Unvested ISOs"). Moreover, pursuant to Section 12.4 of the Stock Plan, failure to exercise the Vested ISOs within such 3 month period will result in any unexercised portion of the ISO being deemed to be a non-qualified stock option (and not an incentive stock option under Code section 422). Accordingly, in the event Executive fails to exercise the 13,938 Vested ISOs within 3 months of the Separation Date, the ISO will be deemed to be a non-qualified stock option. In addition, on that date which is 3 months following the Separation Date, the deadline for Executive to exercise the Vested ISOs will be extended to March 31, 2023. All of the Unvested ISOs will immediately and permanently forfeit effective on the Separation Date. Executive will have 90 days in which he may exercise any Vested ISOs without restriction. However, starting July 1, 2022, and notwithstanding anything in the foregoing to the contrary, Executive's right to exercise any

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

unexercised Vested ISOs will immediately expire if Executive is in breach of any portion of this Agreement."

c.    **Extended Non-Qualified Stock Option Exercise Opportunity.** As of the Separation Date, Executive is currently vested in 8,404 of the 16,808 Options granted thereunder (the "Vested NQSOs"), and has 8,404 Options that have not yet vested (the "Unvested NQSOs"). In addition, the deadline for Executive to exercise the Vested NQSOs will be extended to March 31, 2023. All of the Unvested NQSOs will immediately and permanently forfeit effective on the Separation Date. Executive will have 90 days in which he may exercise any Vested NQSOs without restriction. However, starting July 1, 2022, and notwithstanding anything in the foregoing to the contrary, Executive's right to exercise any unexercised Vested NQSOs will immediately expire if Executive is in breach of any portion of this Agreement

d.    <u>**Additional Consideration.**</u> As additional consideration under this Agreement, Executive shall be entitled to a payment in the amount of $7,258.23, payable a single lump sum on the same date the first cash severance payment installment is paid under subparagraph b, above, subject to applicable deductions and withholdings; provided however, Executive's right to this additional consideration shall forfeit if the Executive breaches any portion of this Agreement prior to the date this additional consideration is paid.

10.    <u>**COBRA Benefit.**</u>  . The Company and the Parent will timely and properly provide to the Executive the documentation and instructions needed to continue health care coverage

Page 9

pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), ensuring that there will be sufficient time left, required for the timely processing of the "COBRA" enrollment.  If the Executive is to timely and properly elect to continue health care coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), the Company will reimburse one hundred percent (100%) of the COBRA premium required for Executive and Executive's dependents (if any) under the Company's group medical and dental plans  for coverage continuation through November 30, 2022 or such earlier date as Executive ceases to be eligible for COBRA.  From and after November 30, 2022, payment of the premium required for the duration of the COBRA continuation period will be the sole responsibility of the Executive. Executive's right to subsidized COBRA coverage under this paragraph shall prospectively terminate in the event Executive breaches the terms of this Agreement.

        **g.**    <u>**No Other Payments.**</u>  For the avoidance of doubt and further clarification, payments to Executive under this Paragraph 9 are the only payments Executive will receive from the Company on account of the separation of his employment with the Company as an employee.

        **h.**    <u>**Withholding Taxes.**</u>  The Company shall be entitled to withhold from any payment due to Executive hereunder any amounts required to be withheld by applicable tax laws or regulations.

    **11.**    <u>**Return of Company Property.**</u>  Executive agrees to return all Company documents and other Company property, including but not limited to computers, laptops, and tablets, and phones and any other electronic device, software or hardware currently in Executive's possession, care, custody, or control, as requested and within the time-frame to be specified by the Company.

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

12.     **Confidentiality and Invention Assignment Agreement.**  Executive acknowledges the validity, enforceability, and continuing effect of the Confidentiality and Invention Assignment Agreement he previously executed on or about February 15, 2021 according to its terms and to the maximum extent possible.

13.     **Additional Acknowledgements**.  On or about February 15, 2021, Executive represented and acknowledged, in a signed document he submitted to the Company, that he had various prior inventions or original works of authorship; Executive hereby confirms that there have been no changes to the Exhibit A that constitutes his acknowledgement.

11.     **No Future Employment or Reapplication.**  Executive hereby understands and agrees that he will not reapply for employment with or be re-employed by the Company or any of its subsidiaries, divisions or affiliates in the future and that he will never knowingly apply to the Company or any  of its subsidiaries, divisions or affiliates for any job or position in the future.  Executive agrees that if he knowingly or unknowingly applies for a position and is offered or accepts such a position, the offer may be withdrawn and he may be terminated without notice, cause, or legal recourse.

12.     **Section 409A.**  The payments under this Agreement are intended to comply with Section 409A of the Internal Revenue Code ("Section 409A") or an exemption thereunder and will be construed and administered in accordance with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral will be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a

Page 11

"separation from service" under Section 409A. If payment of any amount subject to Section 409A is triggered by a separation from service that occurs while Executive is a "specified employee" (as defined by Section 409A) with, and if such amount is scheduled to be paid within six months after such separation from service, the amount shall accrue without interest and shall be paid on the first business day after the end of such six-month period, or, if earlier, within 15 days after Executive's death. If any payment subject to Section 409A is contingent on the delivery of a release by Executive and could occur in either of two years, the payment will occur in the later year.  As required by Treas. Reg. 1.409A-3(i)(1)(iv), in order to be payable to Executive, all expense reimbursements must satisfy the following (i) – (iii):

(i)     the amount of expenses eligible for reimbursement during each calendar year cannot affect the expenses eligible for reimbursement in any other calendar year;

(ii)    any reimbursement of an eligible expense shall be paid to the Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(iii)   any right to reimbursements under this Agreement shall not be subject to liquidation or exchange for another benefit.

Notwithstanding anything in this Paragraph 12 to the contrary, with respect to amounts payable to the Executive under this Agreement, in no event whatsoever shall the Company be liable to Executive for any additional tax, interest or penalty that may be imposed on Executive by the Internal Revenue Service under Section 409A or for any damages for failing to comply with Section 409A.

13.     **Medicare** Executive represents that he is a Medicare beneficiary.  Accordingly, Executive affirms, covenants, and warrants he has made no claim for illness or injury against, nor is he aware of any facts supporting any claim against, the Released Parties under which Released Parties could be liable for medical expenses incurred by Executive before or after the execution of

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

this Agreement.  Furthermore, Executive is aware of no medical expenses which Medicare has paid and for which Released Parties are or could be liable now or in the future.  Executive agrees and affirms that, to the best of his knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist.  Executive will indemnify, defend, and hold Released Parties harmless from Medicare claims, liens, damages, conditional payments, and rights to payment, if any, including attorneys' fees, and Executive further agrees to waive any and all future private causes of action for damages pursuant to 42 U.S.C. § 1395y(b)(3)(A) et seq.

14.   **Resolution of Disputes.**  Any dispute, controversy, or claim, whether contractual or non-contractual, between the Parties hereto arising directly or indirectly out of or connected with this Agreement, relating to the breach or alleged breach of any representation, warranty, agreement, or covenant under this Agreement, unless mutually settled by the Parties hereto, shall be resolved by binding arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association (the "AAA").  The Parties agree that before the proceeding to arbitration that they will mediate their disputes before the AAA by a mediator approved by the AAA.  Any arbitration shall be conducted by a single arbitrator approved by the AAA and mutually acceptable to Company and Executive.  If the Parties are unable to agree on the mediator or the arbitrator, then the AAA shall select the arbitrator.  The resolution of the dispute by the arbitrator shall be final, binding, non-appealable, and fully enforceable by a court of competent jurisdiction under the Federal Arbitration Act.  The arbitration award shall be in writing and shall include a reasoned opinion for the decision.  The arbitration shall be held in the Minneapolis metropolitan area.  The Company shall pay all AAA, mediation, and arbitrator's fees and costs.

15.   **Governing Law & Venue.**  This Agreement will be governed by and construed in accordance with the laws of the State of Minnesota without giving any effect to any choice or

Page 13

conflict of law provision that would cause the application of the laws of any jurisdiction other than the State of Minnesota. The venue of any dispute arising out of this Agreement will be the District Court of Hennepin County, Minnesota, or the United States Federal District Court sitting in Minneapolis, Minnesota, unless applicable state or federal law dictates otherwise.

16. **Non-Disparagement.** Parties agree not to make, or induce other person to make, any oral or written statements that are derogatory as to, defame, or disparage the personal and/or business reputations, practices or conduct of Employer or Executiveto any person or organization whatsoever. Such prohibited derogatory, defamatory or disparaging statements include, but are not limited to, private conversations or communications; public statements or communications; statements made on the air, whether via radio, television or other media; and statements appearing in print, whether in newspapers, magazines, books or other printed sources, or electronically on the Internet in the form of e-mail, social media or other postings, or any other electronic writing. Parties understand and agree that this mutual non-disparagement term is a material term of the Agreement and that any violation of this term would constitute a material breach of the Agreement. Parties agree that the current article ("Non Disparagement") will expire after one year has elapsed since the signing date of the Agreement.

17. **Waiver**. The waiver of one Party of a breach of any provision of this Agreement by the other Party will not operate or be construed as a waiver of any subsequent breach.

18. **Binding Effect**. This Agreement will be binding upon and will inure to the benefit of the Parties hereto, their respective heirs, representatives, successors and assigns and will be automatically assigned by the Company to the controlling entity in the event the Company is sold

Page 14

or merges with another entity, but will not be assignable by the Parties unless mutually agreed to in writing.

19.    **Entire Agreement**.   This Agreement will be deemed to express, embody and supersede all previous understandings, agreements and commitments, whether written or oral, between the Parties hereto with respect to the subject matter hereof and to fully and finally set forth the entire agreement between the Parties hereto.  No modifications will be binding unless stated in writing and signed by all Parties hereto.  For the avoidance of doubt, the Parties intend Paragraph 9.b to amend the ISO Agreement and for Paragraph 9.c to amend the NQSO Agreement, which are by this reference hereby incorporated into this Agreement.

20.    **Counterparts**.  The Agreement may be signed in one or more counterparts but all of which taken together will constitute one instrument.

21.    **Article and Headings**.  Each article, section and subsection heading is not to be considered part of this Agreement, is included solely for convenience and is not intended to be full or accurate descriptions of the content thereof.

22.    **Construction**.  The Parties and their respective counsel have had the opportunity to review and revise this Agreement and acknowledge that the normal rule of construction that any ambiguities are to be resolved against the drafting Party will not be employed in the interpretation of this Agreement.

23.    **Electronic Signatures.**  Electronic signatures in the form of PDF or facsimile will be considered original signatures for the purpose of this Agreement.

Document Ref: NZNHU-SWEON-CYNJM-ELRKS

**IN WITNESS WHEREOF**, the undersigned Parties have entered into this Agreement on the day and year first above written.  **THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

ACCEPTED AND AGREED:

*Nelu Mihai*

Date: Mar 28, 2022

Nelu Mihai

COMPUTE NORTH LLC

By: Dave Perrill

Its: Chief Executive Officer

Date: Mar 28, 2022

COMPUTE NORTH HOLDINGS, INC.

By: Dave Perrill

Its: Chief Executive Officer

Date: Mar 28, 2022

Page 16

# Signature Certificate

Reference number: NZNHU-SWEON-CYNJM-ELRKS

| Signer | Timestamp | Signature |
|---|---|---|

**Nelu Mihai**
Email: nelu.mihai@computenorth.com

| | |
|---|---|
| Sent: | 28 Mar 2022 13:29:26 UTC |
| Viewed: | 29 Mar 2022 01:14:05 UTC |
| Signed: | 29 Mar 2022 01:30:42 UTC |

*Nelu Mihai*

IP address: 98.210.182.218
Location: San Jose, United States

**Dave Perrill**
Email: dave.perrill@computenorth.com

| | |
|---|---|
| Sent: | 28 Mar 2022 13:29:26 UTC |
| Viewed: | 29 Mar 2022 01:42:05 UTC |
| Signed: | 29 Mar 2022 01:42:39 UTC |

IP address: 172.58.128.3
Location: Hialeah, United States

Document completed by all parties on:
29 Mar 2022 01:42:39 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



Penalties for severance package delay per day, month and year.
Penalties need to be calculated based on the actual delay when the final p
Total due if the severance is not paid per agreement by 02/04/2023

| | | 2%/Per Day | Per month | Per year | Penalty at 02/04/2023 |
|---|---|---|---|---|---|
| September | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 40909.08 |
| | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 36818.172 |
| October | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 32727.264 |
| | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 28636.356 |
| November | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 24545.448 |
| | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 20454.54 |
| December | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 16363.632 |
| | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 12272.724 |
| January | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 8181.816 |
| | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 4090.908 |
| February | 13636.36 | 272.7272 | 8181.816 | 99272.7 | 0 |
| Total | 150000 | 2999.9992 | 89999.98 | 1092000 | 220909.032 |

payment is done.

 Penalty per day after 02/04/2023

2999.9992

# Exhibit B

| | |
|---|---|
| **From:** | Dallas EG Team 8 |
| **To:** | Spencer Barron |
| **Subject:** | FW: Payroll Additions |
| **Date:** | Thursday, April 14, 2022 3:57:43 PM |
| **Attachments:** | image001.png |
| | image002.png |

Thank you,

**Lisa Davis**
Payroll Implementation Specialist

545 E. John Carpenter Freeway | Suite 1200 | Irving, TX 75062
OFFICE: 972-871-5718 | EMAIL: Dallas.EGTeam8@insperity.com



**Insperity offices will be closed Friday, April 15, 2022, in observance of Good Friday.**
Please note that phone and e-mail support for benefits, 401(k) and WebSupport will be unavailable from the Insperity Contact Center on this day.

**Insperity is here to help**
We look forward to working with you prior to this holiday closure to meet your immediate payroll processing needs. If you have any questions, please contact your Insperity payroll specialist before noon on Thursday, April 14. It is our pleasure to be of service to you and the employees working at your business.

**From:** Amanda Piff <amanda.piff@computenorth.com>
**Sent:** Tuesday, April 12, 2022 7:24 PM
**To:** Dallas EG Team 8 <Dallas.EGTeam8@insperity.com>
**Subject:** Payroll Additions

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Team-

Please add the following pay to employees for the 4/15 payroll.

████████ -

Commissions taxed at supplemental rates

1. ██████████ **- $5,000**
2. ██████████ **- $5,000**
3. ██████████ **- $1,000**
4. ████████████ **- $12,000**

Severance-

**Nelu Mihai - $20,894.59**
   This number includes the first payment of 22 for severance $13,636.36 plus the one-time payout of $7,258.23, per the severance agreement.

Thank you,
Amanda