<pre>
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2             FOR THE SOUTHERN DISTRICT OF TEXAS

 3                      HOUSTON DIVISION

 4   IN RE:                     §     CASE NO. 22-90273-11
                                §     HOUSTON, TEXAS
 5   MINING PROJECT WIND DOWN    §     MONDAY,
     HOLDINGS, INC., ET AL,      §     SEPTEMBER 11, 2023
 6          DEBTORS.             §     1:29 P.M. TO 3:01 P.M.

 7
                       MOTION HEARING (VIA ZOOM)
 8
               BEFORE THE HONORABLE MARVIN ISGUR
 9               UNITED STATES BANKRUPTCY JUDGE

10


11


12      APPEARANCES:                   SEE NEXT PAGE

13


14


15         (Recorded via CourtSpeak; No log notes)
              (Issues with the Judge's mic noted.)
16


17


18


19


20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22               Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.
</pre>

1                    APPEARANCES (VIA ZOOM):

2

3  FOR TRIBOLET ADVISORS, LLC:    ASK LLP
                                  Nicholas Brown, Esq.
4                                 2600 Eagan Woods Dr., Ste. 400
                                  St. Paul, MN  55121
5                                 651-406-9665

6

7  FOR BOBS LIMITED:              HOOVER SLOVACEK, LLP
                                  Steven A. Leyh, Esq.
                                  5051 Westheimer Rd. Ste. 1200
8                                 Houston, TX  77024
                                  713-977-8686
9

10

11

12  (Please also see Electronic Appearances.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

  WITNESSES:                    Direct   Cross   Redirect   Recross

3

4  PETER ALLARD
     By Mr. Brown                  10

5

6

7

  EXHIBITS:                              Offered    Received

8

  PLAN ADMINISTRATOR'S:
9  Ex. 3                                    12          13
   Ex. 5                                    13          13
10 Ex. 8                                    18          18
   Ex. 10                                   24          24
11 Ex. 11                                   44          44
   Ex. 13                                   46          46
12 Ex. 15                                   19          19
   Ex. 16                                   28          28
13 Ex. 19                                   32          32
   Ex. 20                                   49          49

14

15

16                                  ***

17

18

19

20

21

22

23

24

25

1      **HOUSTON, TEXAS; MONDAY, SEPTEMBER 11, 2023; 1:29 P.M.**

2      THE COURT:  All right, good afternoon.  We're here

3 in the Mining Project Wind Down case.  It is 22-90273.  To

4 appear on that case, if you would please press five star one

5 time on your phone, we'll get your line activated and we'll

6 proceed with the hearing.

7      Mr. Brown, good afternoon.

8      MR. BROWN:  Good afternoon, Your Honor.  This is

9 Nick Brown appearing on behalf of the Plan Administrator who

10 has filed the objection to claim.

11      THE COURT:  Thank you.  From a Canadian phone

12 number, 780-983-8159, who do we have on the line?

13    (No audible response.)

14      THE COURT:  If you're calling from that number,

15 you may have your own line muted.  We have you unmuted in

16 the courtroom.

17      MR. ALLARD:  Yes, I did.  Good afternoon, Your

18 Honor.  Peter Allard here representing True North Data

19 Solutions.

20      THE COURT:  Afternoon, Mr. Allard.

21      Ms. (Indiscernible) or someone from her office.

22      MR. LEYH:  This is Steve Leyh, Your Honor.  I'm

23 here on behalf of the claimant, Bobs Limited.

24      THE COURT:  Mr. Leyh, thank you.  Good afternoon.

25      All right, how do you want to proceed today?

1          MR. BROWN:  Your Honor, this is Nick Brown on

2    behalf of Plan Administrator.  Let's see.  So we plan on

3    proceeding with the objections and claim.  There has been a

4    response filed.  There's been a witness and exhibit list

5    filed by both parties.

6          More recently today, after receiving documents and

7    discovery over the course of the weekend, the Plan

8    Administrator filed an amended witness and exhibit list on

9    Docket 1251.  And the amended agenda, Your Honor, is at

10   Docket 1252.

11         Maybe I should pause, make sure Mr. Leyh has

12   access here.

13         MR. LEYH:  Yes, we do now.

14         MR. BROWN:  Okay.

15         THE COURT:  Thank you.

16         MR. BROWN:  So, Your Honor, so we plan on

17   proceeding here.  On behalf of the Plan Administrator, we

18   have brought two witnesses with us.  Mr. Allard will

19   introduce himself at the beginning as a non-party witness

20   that is involved factually in the circumstances of this

21   case.

22         Also, Mr. Tribolet, who is here on behalf of the

23   Plan Administrator, Tribolet Advisors, LLC, he is here and

24   prepared to testify as well.

25         THE COURT:  Mr. Leyh.

1          MR. LEYH:  Good afternoon, Your Honor.  Steve Leyh

2   on behalf of Bobs Limited.  We have a witness, Michael

3   Merchant, who is here and prepared to testify.

4          THE COURT:  All right.  And on the offer of

5   exhibits, have you all reached any understanding of what is

6   and is not admissible?

7          MR. BROWN:  We have not come to an understanding

8   prior to this hearing, Your Honor.

9          THE COURT:  All right.  Mr. Leyh, were you aware

10  that there would be a late-filed exhibit list?  Is that

11  because of something you (indiscernible) or what's going on

12  with that?

13         MR. LEYH:  There was an amended exhibit list filed

14  today, Your Honor.  The parties actually didn't get all of

15  the discovery responses, part of which came from non-

16  parties, until I think Thursday and -- or Friday.

17         And then part of my responses we had difficulty

18  with and we didn't get those to Mr. Brown until Saturday.

19         THE COURT:  So you're not objecting to the late-

20  filed exhibit -- or you may object to some individual

21  exhibits but you're not going to make a timeliness objection

22  under those circumstances, I assume.

23         MR. LEYH:  Correct.

24         THE COURT:  Okay.  How do you all want to go about

25  figuring what we're admitting and not admitting in terms of

1  exhibits?  Are we doing these through witnesses, reach an

2  agreement (indiscernible) --

3         MR. SPEAKER:  (Indiscernible).

4         MR. BROWN:  My plan was to do it through

5  witnesses.

6         THE COURT:  All right.  Who's your first witness,

7  Mr. Brown?

8         MR. BROWN:  Your Honor, (indiscernible) --

9         MR. LEYH:  (Indiscernible) --

10         MR. BROWN:  Go ahead.

11         MR. BROWN:  My plan was the same, Your Honor.

12         THE COURT:  That's fine.  Thank you.

13         MR. BROWN:  Your Honor, thank you.  And I do want

14  to get started by calling our first witness.

15         I do want to bring the Court's attention to a

16  motion in limine that we filed in relation to -- and asking

17  the Court to exclude certain evidence that relates to lost

18  profits.

19         The reason being, Your Honor, this is essentially

20  a breach of contract claim, and the issues arise under the

21  terms of that contract.  You'll find the contract at Docket

22  1261-1, the very first exhibit on our list.  It's the

23  contract between the claimant, Bobs Limited, and the Debtor,

24  Compute North, LLC.

25         And the basis for asking the Court to exclude

1    evidence about lost profits is that there is a clear

2    limitation of liability clause, clause number 14, of the

3    contract that says there will be no consequential damages,

4    including lost profits, available to the claimant.

5             And so I understand, Your Honor, based on the --

6    or the exhibit list that I've seen submitted by Bobs Limited

7    and the response to our claim objections they do intend or

8    would like to offer into evidence about the earnings that

9    they would have generated from the bitcoin miners that they

10   ordered but never received, including a forecast of earnings

11   and profits that they would have received into the future.

12            And we don't think that that's relevant, Your

13   Honor, based on 14.2 under the contract which says there

14   will be no consequential damages for lost profits.

15            THE COURT:  Mr. Leyh.

16            MR. LEYH:  Thank you, Your Honor.  We received the

17   motion in limine on Friday.  We are filing a response to it

18   now.

19            Our contention is that there was originally the

20   contract, Exhibit 1, and then there came to be a breach of

21   the contract.  And the contract was terminated by Compute

22   North.

23            There was a subsequent contract which there is no

24   writing for, an oral contract, which we think takes it out

25   of the preview of the restrictions under Section 14 of the

1    contract and then -- if it was still in force.

2         And then there was a second contract after the

3    first two -- or, excuse me, a third contract after the first

4    two, same thing.  It's oral, there's no modification

5    language, no writing.  And we don't think it's prohibited by

6    the terms of the first contract.

7         So we're opposed to the motion in limine and we

8    think the evidence needs to come in and be considered.

9         THE COURT:  All right.  Given the lateness of the

10   filing of the motion in limine, I will take the evidence

11   (indiscernible) I will consider in making a final decision

12   when we have the other evidence (indiscernible), so I'll

13   just take all of that under advisement.  But I'm not going

14   to not allow the evidence to be offered and heard; whether

15   it ever gets considered is a different question.

16                    Let's move ahead.

17         MR. BROWN:  Thank you, Your Honor.  The Plan

18   Administrator would like to call as its first witness

19   Mr. Peter Allard.

20         THE COURT:  Thank you.  Mr. Allard, would you

21   raise your hand, please, sir?

22      PETER ALLARD, TRIBOLET ADVISORS, LLC'S WITNESS, SWORN

23         THE COURT:  Thank you, Mr. Allard.  You can put

24   your hand down and you'll be asked questions by both

25   parties.

 1          MR. BROWN:  Good afternoon, Mr. Allard.  Thank you

 2  for being here today.  Can you hear me okay?

 3          THE WITNESS:  Yes, I can.

 4          MR. BROWN:  Okay, thanks.  Once again for the

 5  record, my name is Nick Brown, appearing here as counsel for

 6  the Plan Administrator in the Mining Project Wind Down

 7  Holdings, Inc. bankruptcy case.

 8                      DIRECT EXAMINATION

 9  BY MR. BROWN:

10  Q    And, Mr. Allard, did you receive a subpoena to appear

11  at this hearing today?

12  A    Yes, I did.

13  Q    Okay.  What is your full name, please?

14  A    Peter Allard.

15  Q    Are you affiliated with true -- a company called True

16  North Data Solutions, U.S., Incorporated?

17  A    Yes, I am.

18  Q    What is your position with that company?

19  A    I'm the president of True North.

20  Q    Where is True North Data Solutions, U.S., Incorporated

21  located?

22  A    Austin, Texas.

23  Q    Can you generally describe for the Court what it is

24  that your company, True North, does (indiscernible)

25  operation?

1   A    True North Data Solutions, U.S., Inc. is a

2   U.S.-domiciled entity that specifically engages in the sale

3   of high performance computer servers, including bitcoin

4   miners.

5   Q    Are you familiar with the company Compute North, LLC?

6   A    Yes, I am.

7   Q    How are you familiar with that company?

8   A    True North, previous to our equipment purchase

9   agreement in question, had relationships with some of the

10  senior executives at Compute North and have been industry

11  friends for some time.

12  Q    Has True North engaged in business with Compute North,

13  LLC?

14  A    Yes, we have.

15  Q    Okay.  I'd like to turn -- Mr. Allard, do you have

16  access to the Plan Administrator's exhibits?

17  A    Yes, I do.

18  Q    Okay.  I'd like for you to turn your attention to what

19  has been marked Exhibit Number 3, which is a purchase

20  agreement.

21  A    Okay.

22        MR. BROWN:  And let me pause just to make sure.

23  Does Your Honor have access to Exhibit 3 as well?

24        THE COURT:  I do.  I'm (indiscernible) on the

25  screen so that we're all looking at it at the same time as

1  well.

2          MR. BROWN:  Okay.  Let me pause for a second, make

3  sure I can do that here.  All right, thank you, Your Honor.

4  So you have that up on the screen; is that right?

5          THE COURT:  I do, yes.

6          MR. BROWN:  Okay, thank you.

7  BY MR. BROWN:

8  Q    All right, Mr. Allard, can you tell me what this

9  document is?

10  A    It's an equipment purchase agreement between True North

11  Data Solutions, U.S., Inc. and Compute North, LLC.

12  Q    All right.  And so what is this agreement memorializing

13  here?  Looks like someone was purchasing bitcoin miners from

14  your company; is that right?

15  A    That is correct.  Compute North was purchasing bitcoin

16  mining servers from our company.

17  Q    And there were about 600 miners purchased under the

18  terms of this agreement; is that right?

19  A    Yes, that is accurate.

20  Q    And the purchase price, I can find that under clause

21  one of this agreement on the first page; is that right?

22  A    Yes, that is accurate.

23          MR. BROWN:  Your Honor, at this time I'd like to

24  offer Exhibit 3 into evidence.

25          THE COURT:  Any objection?

1          MR. LEYH:  No objection.

2       (Plan Administrator Exhibit Number 3 was received in

3   evidence.)

4   BY MR. BROWN:

5   Q    Now, the purchase price is on clause one.  And if I

6   understand it, the total amount of the purchase price,

7   according to this document, is $2,460,000; is that right?

8   A    Yes, that is correct.

9   Q    And it looks like there is an 80 percent deposit due

10  shortly after this agreement was entered into and then the

11  20 percent balance was due at a later date; is that right?

12  A    Yes, that is correct.

13  Q    Okay.  I'd like to turn your attention to a new

14  exhibit.  It's Exhibit Number 5, Mr. Allard.  Please let me

15  know once you have it up.

16  A    Yes, I can see that.

17  Q    Is this an invoice that True North sent to Compute

18  North in connection with the agreement that we were just

19  talking about?

20  A    Yes, it is.

21          MR. BROWN:  Your Honor, I'd like to offer Exhibit

22  Number 5 into evidence.

23          THE COURT:  Any objection?

24          MR. LEYH:  No objection.

25          THE COURT:  5's admitted.

 1        (Plan Administrator's Exhibit Number 5 was received in

 2   evidence.)

 3             MR. BROWN:  Thank you.

 4   BY MR. BROWN:

 5   Q    Mr. Allard, according to this exhibit -- excuse me,

 6   this invoice, if I'm reading it correctly, did True North

 7   receive a payment of $1,968,000?

 8   A    To the best of my knowledge, yes, we did.

 9   Q    Is that your understanding -- is that what this invoice

10   is showing, based on your understanding?

11   A    Yes, it is.

12   Q    And does that correspond to the 80 percent deposit for

13   the 600 miners that we were just talking about?

14             MR. LEYH:  Objection, leading.

15             THE COURT:  Sustained.

16   BY MR. BROWN:

17   Q    Mr. Allard, what is this $1.968 million payment for?

18   A    To the best of my knowledge it would be an 80 percent

19   payment per the terms of conditions for 600 MV7 Miners, plus

20   a price increase of 15 percent.

21   Q    Was the 15 percent price increase included in the

22   original purchase agreement?

23   A    No, it was not.

24   Q    Can you explain to the Court how that price increase

25   came about?

1  A    The 15 percent price increase came about by way of the

2  manufacturer of the equipment.

3          MR. LEYH:  Objection, hearsay.

4          THE COURT:  I'm going to let you lay a foundation,

5  Mr. Brown, and see if it's hearsay or not.  I don't know if

6  it is.

7  BY MR. BROWN:

8  Q    Well, so, Mr. Allard, let me ask you a few more

9  questions about this 15 percent price increase.  Is the

10 price increase here something that True North charged

11 Compute North?

12 A    Yes, it is.

13 Q    And so was True North charging Compute North an

14 additional 15 percent on the original purchase price?

15 A    Yes, that is correct.

16 Q    Okay.  And so if I'm understanding this invoice, there

17 was a remaining amount due after the deposit of $861,000; is

18 that right?

19 A    Without pulling my calculator up, yes, that appears to

20 be correct.

21 Q    All right.  Mr. Allard, I'd like to turn your -- excuse

22 me.  Did you have correspondence with Compute North in

23 connection with the 15 percent price increase?

24 A    Yes, we did.

25 Q    Do you recall the specifics about that correspondence

1  with Compute North?

2  A   Yeah.   To the best of my recollection, when the price

3  increase was communicated from the manufacturer to True

4  North, we then communicated --

5         MR. LEYH:   Objection, hearsay.

6         THE COURT:   Overruled.

7         Go ahead, you can answer.

8  BY MR. BROWN:

9  A   The information was received from the manufacturer by

10  True North.   We then communicated, passed through the

11  communication and requested price increase to all of our

12  clients, including Compute North, and extended the offer to

13  either make the payment and continue with the purchase order

14  or to terminate the purchase order and request a refund.

15  Q   All right.   What sort of a response generally did you

16  get from your customers when they -- when you told them that

17  you were charging them an additional 15 percent?

18  A   Generally a very disappointed response.   Some clients

19  elected to pay the price increase, some did not.   And for

20  those clients, they were fully refunded.

21  Q   I'd like to turn your attention to what has been marked

22  Plan Administrator Exhibit Number 8; could you let me know

23  once you have that up?

24     (Pause)

25         MR. LEYH:   Hello, Steve Leyh here.   Have we lost

1    the audio?

2              THE COURT:  I can hear you.

3              MR. BROWN:  I don't -- I believe we're waiting.

4    BY MR. BROWN:

5    Q    Mr. Allard, do you have Exhibit Number 8 up?

6    A    Oh, pardon me, yes, I do.

7    Q    Thank you.  Mr. Allard, could you take a minute to look

8    through this exhibit which is an email chain between you and

9    representatives of Compute North?

10   A    Yes, I have it up and am familiar with it.

11   Q    All right.  Is this an example of what you were just

12   talking about where you informed a customer that you are

13   increasing a purchase price for these bitcoin miners by 15

14   percent and their response to that notice?

15   A    Yes, it is.

16   Q    Now, for Compute North specifically, and in connection

17   with this order for 600 miners that Compute North ordered

18   through your company, did Compute North agree to the 15

19   percent increase?

20   A    Yes, they did for the 600 units.

21   Q    Okay.  Were there -- was there an additional order for

22   additional units where Compute North did not agree to the 15

23   percent increase?

24   A    Yes, there was.

25   Q    And I'm looking at the bottom of the first page which

1   is an email from a representative of Compute North to you.

2   Can you tell me what is being discussed in that particular

3   email?

4   A    In this email of the clients that Compute North would

5   have had they passed through this information.  To my

6   knowledge, the clients that made up the 600-unit order

7   agreed to pay the price increase.  One of the clients making

8   up the 250-unit order did not agree to the price increase

9   and requested a refund.

10  Q    Do you know who the clients of Compute North were that

11  made up these 600 units?

12  A    To my knowledge there were two, of which one of them

13  was Bobs Limited.

14  Q    And how many of those 600 units were for Bobs Limited?

15  A    To my knowledge 300 of those units were intended for

16  Bobs Limited.

17          MR. BROWN:  Your Honor, I'd like to offer into

18  evidence Exhibit 8.

19          THE COURT:  Any objection?

20          MR. LEYH:  No, sir.

21          THE COURT:  Exhibit 8 is admitted.

22      (Plan Administrator Exhibit Number 8 was received in

23  evidence.)

24  BY MR. BROWN:

25  Q    Mr. Allard, you just referenced that there was an order

1  that Compute North placed with your company for 250 miners,

2  correct?

3  A    Yes, that's correct.

4  Q    I'd like to turn your attention to what has been marked

5  Plan Administrator Exhibit Number 15; do you have that up?

6  A    Yes, I can see that.

7  Q    Is this the purchase agreement that memorializes that

8  order from Compute North for 250 miners?

9  A    Yes, it is.

10         MR. BROWN:  Your Honor, I'd like to offer Exhibit

11  15 into evidence, please.

12         MR. LEYH:  Objection, relevance, not our order.

13         MR. BROWN:  I can come back to this, Your Honor.

14         THE COURT:  Well, what's the relevance?

15         MR. BROWN:  Well, okay, the relevance is that what

16  we are -- what I'm about to show is that there was a deposit

17  paid on this order that I'm asking Mr. Allard about that was

18  ultimately applied to the purchase price for the 600 miners

19  that are all very relevant to this hearing.

20         THE COURT:  I'm going to overrule the relevance

21  objection.

22         MR. BROWN:  Thank you, Your Honor.

23         THE COURT:  15 is admitted.  Go ahead.

24      (Plan Administrator Exhibit Number 15 was received in

25  evidence.)

1   BY MR. BROWN:

2   Q    All right, just one question on this Exhibit 15,

3   Mr. Allard.  Under section one you'll see purchase price

4   information; is that right?

5   A    Yes, that is correct.

6   Q    And how much was the deposit on this particular order?

7   A    The 80 percent deposit was $820,000.

8   Q    And did Compute North pay True North that $820,000

9   deposit?

10  A    Yes, they did.

11  Q    Now what happened with this order; was it ever filled?

12  A    No.  To the best of my recollection this order was not

13  filled.

14  Q    Okay.  If I remember correctly you were saying that

15  perhaps this particular client didn't appreciate the 15

16  percent price adjustment and they canceled the order; is

17  that right?

18          MR. LEYH:  Objection, leading.

19          THE COURT:  Sustained.

20  BY MR. BROWN:

21  Q    Mr. Allard, do you recall why this order was not

22  fulfilled?

23  A    Yes.  The client was unwilling to pay the price

24  increase of 15 percent.

25  Q    Did True North offer a refund to Compute North for its

1  deposit?

2  A    Yes, we did.

3  Q    Was that money ultimately refunded to Compute North?

4  A    To the best of my recollection a portion of that refund

5  was applied to fulfill the remaining amount due for the 600-

6  unit order.

7  Q    Do you remember what percentage of that deposit money

8  was applied to the 600-unit order?

9  A    Apologies, not off the top of my head, no.  But it

10  would have been whatever the full balance of what was

11  remaining was.

12  Q    I'd like to turn your attention to what has been marked

13  Plan Administrator Exhibit 10.  Mr. Allard, who is Heather

14  Boyer?

15  A    Heather Boyer is a former employee of True North who

16  had the role of financial control.

17  Q    Would Ms. Boyer have been keeping track of things such

18  as the receipts of revenues and the application of funds on

19  purchase orders?

20  A    Yes, she would have.

21  Q    Okay.  If you look at Exhibit 10, the -- it's an email

22  chain.  The last email at the bottom is an email from

23  Ms. Boyer to a Compute North representative; do you see

24  that?

25  A    Yes, I do.

1  Q    Okay.  It's dated November 3rd, 2021.  Could you read

2  aloud what Ms. Boyer is saying to the Compute North

3  representative?

4  A    Yes.  Ms. Boyer says:

5           "Hi, Ro.  Given the progress on the Minerva units,

6           shipping, it is appropriate to address the balance

7           owing on the account.  The payment of 820,000 made

8           on the canceled order was applied to the order for

9           600 units, leaving the balance of 41,000 owing.

10          If you could please have this wire processed,

11          preferably by November 5, that would be

12          appreciated.  Thanks kindly, Heather Boyer."

13 Q    Thank you.

14      Mr. Allard, does this email help to refresh your memory

15 about how much of that $820,000 deposit on the canceled

16 order was applied to the 600-unit order?

17 A    Yes, it does.

18 Q    And do you agree with the substance of this email which

19 says that in fact 820K was applied?

20 A    Yes, I do.

21 Q    This email also says that there was a balance of

22 $41,000 owing by Compute North; is that your recollection?

23 A    Vaguely but, yes, it is.

24 Q    Do you recall if that remaining $41,000 was paid by

25 Compute North?

1  A    I do believe it was, yes.  From my recollection there

2  were no monies outstanding from Compute North.

3  Q    Okay.  So just to be clear, on the 600-unit order that

4  Compute North placed with True North for I forget how much

5  the total purchase price was now, but you're saying

6  basically that Compute North has paid in full the amount it

7  is owed -- or that was owed for the 600 units; is that

8  right?

9            MR. LEYH:  Objection, leading.

10            THE COURT:  Sustained.

11 BY MR. BROWN:

12 Q    Mr. Allard, can you please just confirm is there any

13 amount that Compute North owes to True North for the 600-

14 unit order that was placed back in February, 2021?

15 A    No.  To the best of my recollection the 600-unit order

16 has been paid in full by Compute North.

17 Q    Mr. Allard, the email chain here involves someone named

18 Mr. Ro Shirole; do you see that?

19 A    Yes, I do.

20 Q    Was that someone that you communicated with in

21 connection with the Compute North (indiscernible)?

22            THE COURT:  (Indiscernible), Mr. Allard, take care

23 of your children (indiscernible) let's not worry about it.

24 It's fine.  Do you need a break or can we -- you okay now?

25 Are we good?

1          THE WITNESS:  I'm okay if you guys are.

2          MR. SPEAKER:  We're good.

3          MR. BROWN:  Okay.

4    BY MR. BROWN:

5    Q    Mr. Allard, could you explain generally to the Court

6    what -- who were your dealings with when you were

7    communicating with Compute North?

8    A    Our primary point of contact with True North at that

9    time was Ro Shirole.

10   Q    And who on your end was doing most of the communicating

11   with Compute North?

12   A    Would have been a combination of myself and Ro, or

13   Heather at that time from a financial perspective of

14   invoicing and other financial communications.

15          MR. BROWN:  Your Honor, I'd like to admit -- or

16   like to offer into evidence Exhibit Number 10, please.

17          THE COURT:  Mr. Leyh.

18          MR. LEYH:  No objection.

19          THE COURT:  Ten is admitted.

20       (Plan Administrator Exhibit Number 10 was received in

21   evidence.)

22   BY MR. BROWN:

23   Q    Now, Mr. Allard, does True North manufacture these

24   bitcoin miners?

25   A    No, we do not.

1  Q    So is it the case that True North has to obtain these

2  miners from a third party manufacturer?

3  A    Yes, that is correct.

4  Q    So regarding these 600 units that Compute North ordered

5  from your company, from whom did True North order the

6  bitcoin miners to fulfill that Compute North order?

7  A    Just two companies that we purchased equipment from, or

8  what's known as the Minerva semiconductor brand of

9  equipment.  Previous to Minerva incorporating as an entity

10 in Alberta, the equipment was purchased directly from a

11 company called HongKong Kisen Corporation.

12     Minerva Semiconductor Corporation later became the

13 North American facing entity for the Hong Kong Chinese

14 entity for all their manufacturing efforts.  So our total

15 orders were split between those two companies.

16 Q    After receiving this purchase order for 600 units from

17 Compute North, did True North turn around and place an order

18 with the manufacturer for these units?

19 A    Yes, we did.

20 Q    Was it for 600 units or did True North order a

21 different quantity?

22 A    True North ordered a different quantity.

23 Q    And why was that?

24 A    True North had additional purchase orders that were

25 combined into a larger purchase order.

1   Q    And True North order more than 600 units from the

2   manufacturer, correct?

3   A    Yes, that's correct.

4   Q    I'd like to turn your attention to Plan Administrator

5   Exhibit Number 16, please.  Once you're there, can you tell

6   me what this document is?

7        (Pause)

8   A    Yes.  This is an equipment purchase agreement between

9   True North Data Solutions U.S., Inc. and Hongkong Kisen

10  Corporation for the purchase of 2,406 miners.

11  Q    Were the -- so were the 600 units that Compute North

12  ordered from True North included in these 2,406 miners that

13  you ordered from the manufacturer here?

14  A    Yes, they were.

15  Q    And I see that this agreement was entered into maybe

16  within a week after the 600-unit order that Compute North

17  placed with your company; is that right?

18  A    Yes, it is.

19  Q    All right.  And this agreement also has under clause

20  one a purchase price showing -- is it right that clause one

21  shows how much True North was responsible for paying the

22  manufacturer for these 2,400 miners?

23  A    Yes, that's correct.

24  Q    Did True North pay the full purchase price to the

25  manufacturer under this agreement?

1  A     Yes, we did.

2  Q     And so just so I'm clear, it looks like under clause

3  one, there's a little bit more than $9 million owing under

4  this particular agreement.  Did True North pay over

5  $9 million to the manufacturer for these 2,406 miners?

6  A     Yes, to the best of my recollection the 80 percent has

7  been paid.  The majority of the 20 percent has been paid.  I

8  believe there was a small sum withheld which was at the time

9  that Minerva stopped delivering any equipment and this

10 matter proceeded to legal action.  But the 600 units in

11 question were paid in full.

12         MR. BROWN:  Okay, thank you, Mr. Allard.  We'll

13 get to the problems with the order fulfillment in a little

14 bit later.

15 Q     But let me ask you.  After True North entered into this

16 purchase agreement with the manufacturer, did you

17 communicate to Compute North that the miners had in fact

18 been ordered from the manufacturer?

19 A     Yes, that likely would have happened on a number of

20 occasions, either by text or by email.

21 Q     And did you communicate and make clear to Compute North

22 that True North was not the manufacturer here, that in fact

23 True North would need to rely on a third party manufacturer

24 to fulfill Compute North's order?

25         MR. LEYH:  Objection, leading.

1          MR. BROWN:  Your Honor, I don't think --

2          THE COURT:  I (indiscernible).  Answer it,

3   Mr. Allard.

4          MR. LEYH:  I'm sorry, Your Honor, I just --

5          THE WITNESS:  Yes.

6          MR. LEYH:  -- couldn't understand you.  What?

7          THE COURT:  I didn't think it was leading.  I'm

8   overruling the objection.

9          MR. LEYH:  Thank you.

10          THE COURT:  (Indiscernible), thank you.  Go ahead,

11   Mr. Allard, you can answer.

12   BY MR. BROWN:

13   A    Yes, it would have been clearly communicated that True

14   North was not the manufacturer and that Minerva and its

15   affiliates were the manufacturer.

16          MR. BROWN:  Your Honor, I'd like to offer

17   Exhibit 16 into evidence, please.

18          THE COURT:  Any objection?

19          MR. LEYH:  No.

20          THE COURT:  16 is admitted.

21      (Plan Administrator Exhibit Number 16 was received in

22   evidence.)

23   BY MR. BROWN:

24   Q    Now, Mr. Allard, you just alluded to there being some

25   problems with this order.  Could you explain to the Court

1  True North's issues with the manufacturer here in trying to

2  obtain these miners?

3  A    Yes.  So through the order purchase there were some

4  estimated delivery dates that had been established for

5  purchase orders of equipment.  Those dates had come and

6  gone.  Minerva and its representatives, both Kisen and its

7  representatives, told us at both times that they're

8  experiencing issues with their semiconductor foundry, the

9  group of the supply chain that's responsible for

10  manufacturing the chips themselves, and that that was the

11  root cause of the source of the delays, as well as some

12  other items which started leading into the pandemic with

13  human resources, shutdowns, and other items.

14  Q    When, if you recall, did you begin to realize that the

15  manufacturer was going to have trouble delivering these

16  pieces of equipment to you in a timely manner?

17  A    It would have been right around the estimated delivery

18  dates set forth in the contract that we would have been

19  notified for the first time that those were going to be

20  late.  And I'd suggest within 30 days of it because that's

21  when the remaining 20 percent payment was due was within

22  30 days of the shipping.

23  Q    Could you help me by pointing out under this contract

24  on Exhibit 16 where the estimated delivery date might be

25  shown?

1   A     I believe section three speaks to delivery.

2   Q     Okay.  What was your understanding of the estimated

3   delivery date for these miners?

4   A     Section 3.2, seller has an anticipated shipping period

5   of May 15th to June 31st.

6   Q     And once True North entered into this agreement with

7   the manufacturer, was this estimated delivery date something

8   that you communicated to Compute North?

9   A     Yes.  Those shipping dates should have been

10  reciprocated in the equipment purchase agreement between

11  True North and Compute North.

12  Q     Now, you also described that the manufacturer was

13  experiencing delays.  Did you communicate the manufacturer's

14  delays as they were taking place to Compute North?

15  A     Yes, we did.

16  Q     Would you say -- well let me -- strike that.  Did you

17  try to keep Compute North informed on the status of this

18  order and the incremental delays?

19  A     Yes.  We would have passed through information as

20  regularly as it was received from the manufacturer and tried

21  our best to maintain good relations and high degree of

22  communication.

23  Q     Do you feel that you maintained a high degree of

24  communication with Compute North in connection with their

25  order for 600 units?

1            MR. LEYH:  Objection, speculation.

2            MR. BROWN:  Your Honor, it's not speculation.  I'm

3    asking for his own opinion.

4            THE COURT:  Can you all hear me?

5            MR. BROWN:  Yes.

6            THE COURT:  I suddenly lost everything.  Hold on

7    just a moment.  The last question I heard was along the

8    lines of do you believe you maintained a high degree of

9    communication with them.  I didn't hear the answer to that.

10           MR. LEYH:  Mr. Leyh objected on the basis of

11   speculation.

12           THE COURT:  It's really relevance.  What's the

13   relevance, Mr. Brown?

14           MR. BROWN:  Simply to point out, Your Honor, that

15   Compute North was staying informed with how things were

16   transpiring and True North was trying to obtain these miners

17   from the manufacturer.

18           THE COURT:  I'll sustain the objection.

19           MR. BROWN:  Mr. Allard, --

20           THE COURT:  (Indiscernible).

21           MR. BROWN:  Thank you, Your Honor.

22   BY MR. BROWN:

23   Q    Let's see, Mr. Allard, could you please refer to Plan

24   Administrator Exhibit Number 19?  And are you there,

25   Mr. Allard?

1  A    Yes, I am.

2  Q    Is -- so this is an email from you to Mr. Shirole at

3  Compute North.  Is this an example of your keeping Compute

4  North informed on the status of these bitcoin miners and the

5  associated delay?

6  A    Yes.  This is a fair example of the type of

7  communication we would have been sharing at that time.

8         MR. BROWN:  Your Honor, I ask that Exhibit Number

9  19 be admitted into evidence.

10         MR. LEYH:  No objection.

11         THE COURT:  Nineteen is admitted.

12     (Plan Administrator Exhibit Number 19 was received in

13  evidence.)

14         MR. BROWN:  Thank you.

15  BY MR. BROWN:

16  Q    Now, Mr. Allard, when True North first entered into

17  this agreement with Compute North to provide it 600 units,

18  do you recall where those units were supposed to be

19  delivered?

20         MR. LEYH:  Objection.  The contract addresses that

21  is the best evidence.

22         THE COURT:  Overruled.  You can answer,

23  Mr. Allard.

24  BY MR. BROWN:

25  A    If my memory serves me correctly it was Kearney I

1  believe was the name of the town or the county that it was

2  in.  I'd have to refer back to the equipment purchase

3  agreement.

4           THE COURT:  I'm going to now sustain --

5           MR. BROWN:  Do --

6           THE COURT:  -- the objection because I think he

7  doesn't really remember.  The objection was that

8  (indiscernible) document.  And it's one thing if he has a

9  clear memory of it.

10          If it's another -- and you're not supposed to

11 memorize everything, Mr. Allard.  I'm fine if you don't

12 particularly remember exactly where something was to be

13 delivered.

14          But I'm going to make Mr. Brown go that extra step

15 to prove it up.  So I'll strike that answer.

16 BY MR. BROWN:

17 Q   Mr. Allard, I'd like to turn your attention back to an

18 exhibit that we previously covered.  It's Exhibit Number 3.

19 It's the contract between Compute North and your company for

20 the 600 units.  All right, if you can refer to the delivery

21 clause under the contract.

22 A   Yeah, Section 3.

23 Q   Does this help to refresh your recollection about where

24 the 600 units were originally to be delivered?

25 A   I believe it's just higher than Section 3.5 here.  So

1  we have here 3.1, the delivery destination, the equipment to

2  the buyer's facility is 3215 Global Drive Place in Kearney,

3  Nebraska.

4  Q   Okay.  And is that in fact to your understanding the

5  location for the delivery of the units as they were

6  initially -- when they were initially ordered?

7  A   Yes, it is.

8  Q   And it says that's to the buyer's facility.  Is the

9  buyer here referring to Compute North?

10  A   Yes, it is.

11  Q   All right.  Now, at some point later on was there a

12  change in the delivery instructions for True North?

13  A   Yes.  There was an agreement between Compute North and

14  the Merchants that this equipment would be delivered to an

15  Alberta facility.

16  Q   Can you explain who the Merchants are?

17  A   It's my understanding the Merchants are the principals

18  of Bobs Limited.

19  Q   What can you tell us about that agreement?

20  A   The agreement was for True North Data Solutions to

21  provide a hosting services environment for that equipment.

22  Q   Which equipment are you referring to?

23  A   The 300 units in question along with some other

24  equipment that was already landed in North America.

25  Q   Okay.  And you mentioned that in addition to True North

1   providing hosting services for the units, they'd also be

2   delivered to a different address; is that right?

3   A    Yes, that is correct.

4   Q    Tell me more about that.  How was that logistically

5   going to happen?

6   A    When the equipment for the Minerva equipment would have

7   been deemed available for shipping from the manufacturer,

8   True North would have revised the shipping address for that

9   equipment to go to its new location.

10  Q    And would the new location be a True North facility?

11  A    Yes, that is correct.

12  Q    And that is in Alberta, Canada, correct?

13  A    At that time it was, yes.  That has since in agreement

14  changed to a Texas location.

15  Q    And is that Texas location also a True North facility?

16  A    That is a joint venture facility that True North has an

17  interest in.

18  Q    Does Compute North have an interest in that joint

19  venture?

20  A    No, they do not.

21  Q    So once the units -- excuse me, let me start over,

22  please.  Once the location for delivery of the 300 units for

23  Bobs Limited was changed from Compute North's Kearney

24  address to True North's Alberta address, is it true that

25  those units would not be delivered to Compute North but

1  instead would go directly from the manufacturer to True

2  North?

3  A    Yes, that is correct.

4  Q    I'd like to turn your attention Exhibit 11, please.

5  Mr. Allard, do you recall when the transition -- I'll call

6  it transition or what you're just describing, when it was

7  decided that these units would be delivered directly to True

8  North and True North would provide hosting services; do you

9  remember when that arrangement came about?

10 A    If I recall correctly it was the fall of 2021.

11 Q    All right.  If you look at Exhibit Number 11, it's an

12 email between you, Mr. Shirole from Compute North, and

13 someone named -- someone's email address Matthew at get dot

14 love; do you see that?

15 A    Yes, I do.

16 Q    Can you tell me does this email chain reflect this new

17 arrangement that you were just describing?

18 A    Yes, it does.

19 Q    Who is the person with the email address Matthew at get

20 dot love?

21 A    To my knowledge that is Mr. Matthew Merchant.

22 Q    And please remind me, what is Mr. Matthew Merchant's

23 connection to Bobs Limited, if any?

24 A    I don't have visibility on what the formal attachment

25 is but he was a principal of the communication for managing

1  the affairs on behalf of either Bobs or other entities that

2  got engaged in hosting agreements with True North.

3  Q    And to your understanding which entity was Mr. Merchant

4  communicating on behalf of in this email chain here?

5  A    We came to understand this through Compute North that

6  that is the Bobs Limited entity.

7  Q    And your email here at the bottom is asking for

8  confirmation to this new arrangement.  And right above that

9  there is the email from Mr. Merchant that appears to be

10  confirming.  I don't see a similar email from Compute North.

11  Do you recall receiving confirmation that Compute North had

12  agreed to this change in the arrangement?

13  A    I do not, don't recall whether that was approved via

14  text, verbally, or by email.

15  Q    Do you recall receiving confirmation at all from

16  Compute North?

17  A    Yes, confirmation would have been received from Compute

18  North.

19  Q    So this new arrangement, is there a corresponding new

20  contract or other agreement that was written and signed?

21  A    As an amendment to the Compute North and Bobs

22  transaction or new agreement between Merchants and True

23  North?

24  Q    Either one.  Are you aware of any written agreement

25  that was drafted and executed as a result of this change in

1  how these miners were to be delivered and who was to provide

2  hosting services?

3  A    Yes, (indiscernible) --

4        MR. LEYH:  Objection.  He wouldn't have knowledge

5  of what Compute North did necessarily, so calls for

6  speculation.

7        MR. BROWN:  Your Honor, I'm only asking for from

8  True North's perspective.  True North would have been

9  involved both on the order side with Compute North and on

10 the -- this new transition to working directly with Bobs

11 Limited.  So I don't see how Mr. Allard would not have

12 personal knowledge.

13        THE COURT:  I'm just going to get you to reword

14 the question and see where we go with the reworded question,

15 Mr. Brown.

16 BY MR. BROWN:

17 Q    Mr. Allard, so this new arrangement here as you

18 described has True North providing hosting services for the

19 300 units that are to be delivered to Bobs Limited and

20 delivered to True North's address in Alberta instead of the

21 Kearney address.  Was there any written agreement prepared

22 to memorialize those terms?

23 A    Yes.  There was the hosting agreement struck between

24 True North and a company or entity by the name of Terra

25 International that would include those 300 units to be

1   hosted within the True North facility.

2   Q    Okay.  Does that agreement -- so is that between True

3   North and another entity, Terra International?

4   A    Correct.

5   Q    Is Terra International related in any way to Bobs

6   Limited?

7   A    Other than through who communicates on behalf of that

8   company, which are the Merchants, I do not know.

9   Q    Does that agreement between True North and Terra

10  International specifically reference these 300 miners?

11  A    It does reference 300 Minerva miners, yes.

12  Q    Does that agreement also talk about where those 300

13  miners are to be delivered?

14  A    Yes, it does.

15  Q    Is Compute North a party to that agreement?

16  A    No, they are not.

17  Q    Did True North share the agreement or invite Compute

18  North to participate in negotiations over the agreement with

19  Terra International?

20          MR. LEYH:  Objection, calls for speculation.

21          MR. BROWN:  Not at all, Your Honor.  I asked him

22  if True North communicated with Compute North about this new

23  agreement.

24          THE COURT:  Overrule the objection.  You can

25  answer, Mr. Allard.

1  BY MR. BROWN:

2  A    I don't recall exactly what the communication would or

3  would not have been at that time other than to say, you

4  know, until this day I don't -- didn't see a need to include

5  Compute North in that beyond the email confirmation that it

6  was agreed the equipment would be shipped to an Alberta

7  facility for True North to provide hosting services for.

8  Whether there was a verbal or text communication, I cannot

9  recall at this time.  I apologize.  I don't remember.

10 Q    All right.  Now just to be clear, this is in November,

11 2021, none of these 300 miners had been delivered by the

12 manufacturer, correct?

13 A    That is correct.

14 Q    Could you explain a little bit more about why you felt

15 that Compute North did not need to get involved in this new

16 agreement that True North had with Terra International?

17         THE COURT:  What's the relevance of that,

18 Mr. Brown?

19         MR. BROWN:  Your Honor, I do not have the -- a

20 copy of this written agreement but I'm just trying to

21 understand Compute North's connection or involvement with

22 the 300 miners in light of this new agreement that True

23 North reached with Terra International.

24         THE COURT:  Isn't the only question

25 (indiscernible) here whether Mr. Merchant was speaking for

1  Bobs?  Because if he was speaking for Bobs (indiscernible)

2  should go to Terra?  That's one thing.

3         If he wasn't speaking for Bobs and was speaking

4  not for Bobs, I don't see how Bobs gets hung with that

5  problem.  So isn't the only thing I need to worry about as

6  to the 300 whether Mr. Merchant had authority acting for

7  Bobs on this transaction?

8         MR. BROWN:  Certainly, Your Honor, --

9         THE COURT:  (Indiscernible).

10         MR. BROWN:  -- I agree with you.  That is

11  (indiscernible) --

12         THE COURT:  (Indiscernible) I don't know why it's

13  relevant other than we got to figure out Mr. Merchant's

14  authority.  And I don't know that -- I mean, maybe

15  Mr. Allard knows it.  Maybe (indiscernible) know Merchant or

16  (indiscernible) Terra for Bobs, he just knew Merchant was

17  there and (indiscernible) what do you know about

18  Mr. Merchant's legal relationship with Bobs and legal

19  relationship with Terra?

20         THE WITNESS:  Is that a --

21         THE COURT:  Do you know?

22         THE WITNESS:  -- question for me, Your Honor?

23         THE COURT:  Yes, sir.

24         THE WITNESS:  As far as the legal relationship

25  between Matthew Merchant and either of the entities, Bobs

1   Limited or Terra International, I do not have any visibility

2   with respect to the legal responsibilities.  To my

3   knowledge, Mr. Tony Merchant --

4            THE COURT:  That's fair.  No, that's what I

5   thought you were saying.  I just wanted to be sure.

6            How are we going to tie this down, Mr. Brown?  I

7   do need to get a full understanding and I don't want to end

8   up guessing.  Is that going to come in through Mr. Leyh's

9   witness or do you have a witness that's going to tie down

10  Merchant's authority to act for Bobs?

11           MR. BROWN:  We're going to have to get that from

12  Mr. Merchant, Your Honor.

13           MR. SPEAKER:  Except --

14           THE COURT:  Is he testifying today or --

15           MR. BROWN:  Bobs Limited's representative is here

16  and I believe is available as a witness.

17           Your Honor, I also have some contract evidence

18  where Bobs Limited entered into this original order with

19  Compute North and it's signed by Mr. Merchant on behalf of

20  Bobs Limited, so there's that.

21           THE COURT:  Okay.

22           MR. BROWN:  I guess, Your Honor, I understand your

23  concern here.  It's not as big of a concern at least

24  initially for me because I know that there's documentation

25  to support it and witness testimony.  But I appreciate your

1  concern at this juncture of the testimony.

2          THE COURT:  Okay.  I'm -- I just don't want to

3  head off into left field when I'm -- I just -- I

4  (indiscernible) evidence has shown so far.  And I know

5  Mr. Leyh has to cross examine him.  If there is an email

6  from Mr. Merchant that says deliver them to Alberta, as to

7  whether he was acting for Bobs when he sent that, I can't

8  tell.  And Mr. Allard would have to guess I think as to what

9  -- who Mr. Merchant was acting for.

10          So that's why I think a lot of this other stuff

11 may not be terribly relevant; because if Mr. Merchant was

12 acting for Bobs, then it's over as to (indiscernible), I

13 think.  But if he wasn't, I also think it's over for

14 (indiscernible), Mr. Leyh, am I missing an issue here?

15          MR. LEYH:  No, sir.  I think you're dead-on.

16          THE COURT:  Mr. Brown, do you think I'm missing an

17 issue?

18          MR. BROWN:  If I'm understanding your thinking,

19 Your Honor, I think it's an important issue.  I would like

20 to ask Mr. Allard one more question about this email before

21 I move on.

22          THE COURT:  Okay.  Go ahead.

23 BY MR. BROWN:

24 Q   Mr. Allard, let's see, about -- it's -- I would like to

25 refer you to the particular email here that is from

1  Mr. Merchant to you at 2:40 in the morning that begins with,

2  good morning, gents; do you see that?

3  A    Yes, I do.

4  Q    Okay.  The first really -- or the only really paragraph

5  here is about three or four lines from Mr. Merchant to you.

6  It says:  "I confirm and acknowledge and agree to the

7  transition of the 300 Minervas to True North."

8       And then this is what I want to highlight.  It says:

9  "I confirm that we," and I want to underline for you the

10  word "we," "want the 300 Minervas which we," and I want to

11  again underline the word "we," "ordered through Compute

12  North to be sent directly to True North."

13       So if you know, who do you believe Mr. Merchant was

14  referring to when he used the word "we?"

15  A    My understanding is he would be referring to either

16  principals or executives of the entity who purchased the

17  equipment from Compute North, which I understand to be Bobs

18  Limited.

19           MR. BROWN:  Your Honor, I'd like to offer

20  Exhibit 11 into evidence.

21           THE COURT:  Any objection?

22           MR. LEYH:  No objection.

23           THE COURT:  Exhibit 11 is admitted.

24       (Plan Administrator Exhibit Number 11 was received in

25  evidence.)

1          (Pause)

2          MR. BROWN:  All right, Your Honor, one minute

3    here, I'm sorry.

4    BY MR. BROWN:

5    Q    Now, Mr. Allard, that was in November, 2021 when the

6    transition occurred.  Do you recall if any of those 300

7    miners that were earmarked for Bobs Limited or Terra

8    International had been delivered by the manufacturer by

9    December 2021?

10          MR. LEYH:  I'm sorry, Mr. Brown, I didn't

11   understand what -- part of what you said.  Could you repeat

12   that, please?  Sorry.

13          MR. BROWN:  Yeah.  Okay.

14   BY MR. BROWN:

15   Q    Following the transition confirmation in November,

16   2021, Mr. Allard, do you recall if by the time of December,

17   2021 any of the miners there were -- that were earmarked for

18   Bobs Limited or Terra International, any of those 300 units

19   had been delivered by the manufacturer?

20   A    No, they had not.

21   Q    I want to turn your attention to exhibit -- Plan

22   Administrator Exhibit Number 13.

23          (Pause)

24   A    Okay.

25   Q    Okay.  On page three of this document, which is an

1  email chain, I want to refer you to your email to Compute

2  North representatives on December 28th at 11:14 p.m. where

3  it begins, Brenna, Scott will continue; do you see that?

4  A    Yes, I do.

5  Q    And is this consistent with your recollection that none

6  of the miners from the 600-unit order had been delivered as

7  of late December, 2021?

8  A    Yes, that is my understanding.

9  Q    And is it also your understanding that of those 600

10  units, 300 were to be delivered to the Merchant group and

11  300 to Compute North; is that right?

12  A    Yes, that is accurate.

13  Q    And the 300 units to the Merchant group, that's what we

14  were just discussing; is that right?

15  A    Yes, it is.

16        MR. BROWN:  I'd like to offer Exhibit 13 into

17  evidence.

18        THE COURT:  Any objection?

19        MR. LEYH:  No.

20        THE COURT:  It's admitted.

21     (Plan Administrator Exhibit Number 13 was received in

22  evidence.)

23  BY MR. BROWN:

24  Q    Now, Mr. Allard, going into 2022, is it true that the

25  manufacturer still had not delivered any of the miners under

1  the 600-unit order?

2  A    To my recollection I believe there was a small number

3  of units delivered to Compute North.  I do not recall what

4  the total order volume was.

5  Q    Okay.  So in 2022, we've already had the transition

6  where of those 600 units, the 300 that were for Bobs Limited

7  are no longer being delivered to Compute North; is that

8  right?

9  A    Correct.

10  Q    So to the extent that any of the 600 units were

11  delivered to Compute North, would those have been units for

12  Bobs Limited or units for another customer not related to

13  Bobs Limited?

14  A    Those would have been unrelated to Bobs Limited.

15  Q    So after the transition where now True North is going

16  to be providing hosting services and the units are going to

17  be going to True North's facility, who did you believe was

18  responsible for ensuring that the manufacturer delivered

19  those 300 units to True North?

20         MR. LEYH:  Objection, calls for speculation.

21         THE COURT:  Sustained.

22  BY MR. BROWN:

23  Q    Mr. Allard, who was responsible for ensuring that the

24  manufacturer delivered the 300 units to True North after you

25  had arranged with Terra International for those 300 units to

1   be delivered to a True North facility directly?

2          MR. LEYH:  Objection.  I didn't understand the

3   question.  I -- sorry.

4          THE COURT:  Well, --

5          MR. BROWN:  I --

6          THE COURT:  -- I'm going to raise my own.  Asking

7   for a legal conclusion, Mr. Brown.

8          MR. BROWN:  Mr. Allard, --

9          THE WITNESS:  Mr. Brown, would you like

10  (indiscernible) --

11         THE COURT:  (Indiscernible) answering until we get

12  beyond that objection.  Mr. Brown.

13         MR. BROWN:  I'm going to ask a new question, Your

14  Honor.

15         THE COURT:  Thank you.

16  BY MR. BROWN:

17  Q   Mr. Allard, did you tell -- sorry, let me start over.

18  Did you tell Mr. Merchant that True North was responsible

19  for these 300 miners?

20  A   I'm trying to think back through our hosting services

21  agreement.  To my knowledge there was never a direct

22  conversation on who was responsible for delivery of the

23  equipment, with the exception that my underlying

24  responsibility as selling that equipment to Compute North,

25  there's certainly a responsibility there on behalf of True

1  North to deliver equipment.  But I don't recall any

2  independent specific conversation about these 300 units

3  after the group decision to relocate them to an Alberta

4  facility.

5  Q    Mr. Allard, could you turn your attention to Plan

6  Administrator Exhibit Number 20?  And let me know once

7  you've had a chance to review that email.

8      (Pause)

9  A    Yes, I've reviewed it.

10 Q    All right.  Does this email refresh your memory about

11 whether you told Mr. Merchant that True North would be

12 responsible for the 300 miners?

13 A    Yes, it does.

14 Q    Okay.  And so after reviewing this email, what is your

15 answer?  My question is, did you tell Mr. Merchant that True

16 North would accept responsibility for the 300 miners?

17 A    Yes, we did.

18          MR. BROWN:  Your Honor, I'd like to offer

19 Exhibit 20 in evidence.

20          THE COURT:  Any objection?

21          MR. LEYH:  No objection, Your Honor.

22          THE COURT:  20 is admitted.

23      (Plan Administrator Exhibit Number 20 was received in

24 evidence.)

25 BY MR. BROWN:

1  Q    Mr. Allard, did Bobs -- or, excuse me, did True North

2  ever receive any of these 300 units from the manufacturer?

3  A    No, it did not.

4  Q    Could you explain to the Court your efforts on behalf

5  of True North to try to get these 300 units delivered by the

6  manufacturer?

7            MR. LEYH:  Objection, leading, it's leading.

8            THE COURT:  What's the relevance?

9            MR. BROWN:  Okay.  Well, Your Honor, only just to

10  show that -- try to highlight the reason for why these units

11  were never delivered, and specifically to highlight that it

12  was -- had nothing to do with Compute North actions or

13  inactions.

14            THE COURT:  That's relevant so I'm going to allow

15  it.  Go ahead.  I'm going to also overrule the leading

16  objection.

17            You can answer, Mr. Allard.

18            THE WITNESS:  Could you repeat the question,

19  please?

20            MR. BROWN:  Sure.

21  BY MR. BROWN:

22  Q    Mr. Allard, could you describe to the Court your

23  efforts on behalf of True North to obtain these 300 miners

24  that are now supposed to be delivered directly to your

25  Alberta, Canada location?  What efforts did True North take

1   to get those miners delivered from the manufacturer?

2          MR. LEYH:  Objection, Your Honor, relevance.  We

3   didn't get them, True North didn't get them.  What -- you

4   know, somebody tried to get them, great.  What difference

5   does it make?  They didn't show up?

6          THE COURT:  Well, can you stipulate that from and

7   after January 12 of 2022 that the Debtor did not interfere

8   with the delivery in any way?

9          MR. LEYH:  No, because I don't know that.

10          THE COURT:  I'm just saying that's what he said

11   the relevance was.  He wants to prove that the Debtor, who

12   is, again assuming the proof of claim got filed, did not

13   stop True North from taking over the delivery.

14          Let me just ask that.  Mr. Allard, after January

15   12th of 2022, is there anything that the Debtor did, that

16   Compute North did, to interfere with the delivery by the

17   manufacturer to you or to the Merchant group?

18          THE WITNESS:  Specifically to True North, no.

19   With respect to Bobs, I would be unaware of any efforts or

20   not there.

21          THE COURT:  Mr. Brown, if you -- I do think it's

22   relevant although I think there's a limit to the relevance

23   and whatever the testimony is, it is what it is.

24          MR. BROWN:  I understand, Your Honor.  Let's see.

25   Just a couple more questions.

1          THE COURT:  Again, to sort of wear my concerns on

2    my sleeve here, I don't know (indiscernible) let's assume

3    that Mr. Merchant -- and now I'm going to change the

4    assumption.  I'm going to assume (indiscernible) was

5    representing Bobs at this stage.

6          I don't know whether this absolves the Debtor from

7    its duty anyway.  It may have.  But I don't know from a law

8    point of view what this does to Compute North's duties.  And

9    that's certainly not a question for Mr. Allard.  But his

10   company said they would do it.  That may not relieve your

11   company of liability.  And I (indiscernible) get to that

12   answer very easily, just to tell you (indiscernible) --

13          MR. BROWN:  Well, I think --

14          THE COURT:  -- are right now.

15          MR. BROWN:  I understand, Your Honor.  And that is

16   one of the heart -- if there's more than one heart, that's

17   certainly one of the hearts to this matter.  I agree it's a

18   legal issue.

19          To the extent that, you know, what I want to show

20   Your Honor is that True North was working toward trying to

21   obtain these miners from the manufacturer.  And that I then

22   want to show that Mr. Merchant got involved to some extent

23   in those efforts just to show, you know, that neither of

24   them was involving Compute North in the process at this

25   point or going forward.

1          THE COURT:  Yeah.

2   BY MR. BROWN:

3   Q    So, Mr. Allard, just generally can you explain did you

4   keep on the manufacturer to try to get these miners --

5   basically what were you doing to try to get these miners?

6   A     So from the logistical perspective of delivering the

7   miners which Bobs had purchased from Compute North, True

8   North on behalf of all of its clients who purchased miners,

9   such as Compute North, were unilateral and un-agnostic

10  (phonetic) to specific clients.

11       We exhausted all of our personal relationships with

12  executives and decision makers within Minerva and

13  affiliates.  We regularly communicated with attempted voice

14  calls, text messages, emails.

15       When that tactic proved to be unfruitful, we got

16  engaged with legal counsel who issued demand letters,

17  eventually statements of claim, against Minerva and its

18  affiliates for all of the undelivered equipment for which

19  True North had obligations to its clients for.

20  Q    Thank you.  Could you keep Compute North updated on

21  your efforts in 2022 and beyond to procure these units from

22  the manufacturer?

23  A    There were no inquiries from Compute North for updates.

24  I do believe at some point those communications would have

25  slowed down given Compute North's issues which you folks are

1  discussing.

2  Q    Are you referring to the bankruptcy filing?

3  A    Yes, I am.

4  Q    Okay.  What about Mr. Merchant; did you keep

5  Mr. Merchant updated in your efforts to procure this

6  equipment from the manufacturer?

7          MR. LEYH:  Objection, Your Honor, relevance.

8  We've gone way beyond the contract that my client had with

9  Compute North.  The contract's not assignable, except with

10  prior written consent.  There is none.  Now we're off in the

11  weeds about what did Mr. Allard do in regard to trying to

12  get the manufacturers to move.  And so what?  We don't have

13  a contract with either one of them.  Enough.

14          MR. BROWN:  Your Honor, --

15          THE COURT:  I'm going to allow us to go there.

16  But I got to tell you, I feel very misled by what's happened

17  in this case, Mr. Brown.  The Declaration that got filed as

18  part of the objection appears palpably false.  Why am I

19  getting that?  How'd I get that Declaration?

20          MR. LEYH:  You got that, --

21          MR. BROWN:  I'm --

22          MR. LEYH:  -- Your Honor, because I filed an

23  objection to it and said it's false.

24          THE COURT:  No, I previously barred Mr. Mersch

25  from filing Declarations until he got his act together.  And

1  now I get a Declaration that says something that the

2  evidence appears to me he was just not being truthful.  What

3  is going on that I'm getting these kind of things?  I am --

4  have you read his Declaration?

5           MR. LEYH:  Your Honor, I may have misspoke.  His

6  Declaration was attached to the claim objection.  It's not

7  something --

8           THE COURT:  That's right.

9           MR. LEYH:  -- (indiscernible) filed last week.

10           THE COURT:  No, I know that.  It's attached to the

11  claim objection.  And it doesn't appear to be accurate.

12           MR. LEYH:  That's what my objection to his

13  Declaration says, it's false.

14           THE COURT:  Under penalty of perjury.  He's done

15  this to you before.  Why am I getting this again?

16           MR. BROWN:  Your Honor, if I can respond, we are

17  not relying in any capacity on that Declaration.  We are

18  relying on the evidence that I'm putting before the Court --

19           THE COURT:  You filed it as part of your

20  objection.

21           MR. BROWN:  Your Honor, if I may --

22           THE COURT:  Tribolet has not modified an objection

23  to this (indiscernible) and attached false Declaration, and

24  I want to know why.

25           MR. BROWN:  Your Honor, I apologize.  The Debtors

1    had filed the objection before Mr. Tribolet was appointed as

2    Plan Administrator.

3                 THE COURT:  (Indiscernible) adopting the objection

4    and living with it and he hasn't changed it.

5                 MR. BROWN:  Your Honor, I apologize.  I can only

6    tell the Court that we are not relying on that Declaration.

7    We're relying on the evidence --

8                 THE COURT:  I don't care if you're relying

9    (indiscernible), you're relying on the objection.  And the

10   objection attaches the Declaration.  And you didn't file an

11   amended objection.

12                And I'm sitting here learning all this information

13   for the first time today because I had a Declaration that

14   was palpably false.  And you didn't get it fixed.  How long

15   is it going to take you to file an amended objection that

16   you're willing to stand on your objection?

17                And I want to know what this fight's about before

18   I'm just having all this evidence unfold before me having

19   nothing to do with really what's in the objection.  I get

20   totally surprised today.  And it's not the way that we

21   should be conducting business.  How long do you want to get

22   that amended?

23                MR. BROWN:  I apologize, Your Honor.  I would be

24   more than happy to file an amended Declaration.  We can do

25   it very quickly or very --

1          THE COURT:  I don't want an amended Declaration.

2    I want an objection filed by Mr. Tribolet that he's willing

3    to live with that amends the prior objection.  He has to

4    live with everything in it because he adopted this one by

5    proceeding today.  And I am not happy.

6          MR. SPEAKER:  Oh, God.

7       (Mr. Leyh/Mr. Speaker confer.)

8          THE COURT:  Can you get an amended one filed in

9    two weeks?

10         MR. BROWN:  Your Honor, --

11         THE COURT:  (Indiscernible).

12         MR. BROWN:  -- we can get one filed in one week.

13         THE COURT:  Okay.  Not later than one week from

14   today I'm going to get an amended objection.

15         Mr. Leyh, I'm going to give you another week to

16   respond to the amended objection.

17         I need to know what the fight's about before I

18   start going any further into the evidentiary record.  At

19   every turn I get -- I learn something new.  And that ought

20   to be in the pleadings, not where we are today.  I'll review

21   all this on the 25th, take a look at where we are.

22         Can you respond in a week if they amend in a week,

23   Mr. Leyh?

24         MR. LEYH:  Yes, I can, Your Honor.  Might I

25   address something --

1          THE COURT:  Go ahead.

2          MR. LEYH:  Matthew Merchant is here today.  He is

3  here today because we thought we had an in-person hearing.

4  We don't now.  And he came from Europe.  And rather than

5  come from Europe again in a couple of weeks, would it be all

6  right if he appeared virtually next time?

7          THE COURT:  Yes, sir, that would be fine.

8          MR. LEYH:  Okay.  And so one week for --

9          THE COURT:  The 18th I'm going to get an amended

10  objection, 25th an amended answer.  We'll review everything

11  on the 26th and we'll set you for a further hearing.

12          Thank you all.

13          MR. LEYH:  The 26th will be like a status

14  conference and we'll get set.

15          THE COURT:  No.  I'll just review it in chambers

16  on the 26th.  I'll review it in chambers on the 26th and

17  then we'll get you a new setting shortly after that.

18          And, yes, he can attend by video.

19          MR. LEYH:  Thank you.

20          THE COURT:  Thank you.

21          MR. BROWN:  Thank you.

22          THE COURT:  Thank you, Mr. Brown, thank you,

23  Mr. Leyh.

24          Mr. Allard, thank you, sir.

25          THE WITNESS:  Thank you, Your Honor.

1      (Proceeding adjourned at 3:01 p.m.)

2                    * * * * *

3           *I certify that the foregoing is a correct*

4  *transcript to the best of my ability due to the condition of*

5  *the electronic sound recording of the ZOOM/video/telephonic*

6  *proceedings in the above-entitled matter.*

7  */S/ MARY D. HENRY*

8  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

9  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

10 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

11 *JTT TRANSCRIPT #67687*

12 *DATE FILED:  OCTOBER 2, 2023*

13

14

15

16

17

18

19

20

21

22

23

24

25