## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), et al., | Case No. 22-90273 (MI) |
| Debtors.[1] | |

**RESPONSE TO DENY / REJECT THE SUPPLEMENT 1230 TO OBJECTION 1199 AND PROPOSED ORDER 1199-2 TO CLAIM ASSERTED BY NELU MIHAI (CLAIM NO. 10029)**

1. NELU MIHAI, PhD, former funding Chief Technology Officer at Compute North LLC ("Company") / Debtors, in his capacity as Creditor ("Creditor") and "Claimant" of the Claim no. 10029 filed on October 24, 2022, in case 22-90273 (the "Bankruptcy Case", "Case no. 22-90273"), hereby files this Petition/ Response ("Response") to docket 1230, REPLY IN SUPPORT OF PLAN ADMINISTRATOR'S OBJECTION TO CLAIM ASSERTED BY NELU MIHAI (CLAIM NO. 10029), issued by the Plan Administrator, but signed by Mr. Charles R. Gibbs from MCDERMOTT WILL & EMERY LLP and by ASK LLP representatives, *Counsel to the Mining Project Wind Down Holdings, Inc. Litigation Trust and the Plan Administrator*, on the date of the first hearing, August 14,

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

2023, document that constitute a veritable Supplement to Objection 1199 and Proposed Order 1199-1. Nelu Mihai provides his Response in less than 30 days from 8/14/2023.

2. Nelu Mihai declares that this document was not given to him during the hearing, and Nelu Mihai was in impossibility to respond to it on the hearing date. That procedure placed him in a delay that did not occur with the other Creditors.

3. With this Response to the Supplement 1230 to Objection 1199 and *Supplemental Declaration of Michael Tribolet, Managing Member of Tribolet Advisors LLC, in Support of the Plan Administrator's Objection to Claim Asserted by Nelu Mihai*, Nelu Mihai provides new discoveries that wholly refute the Reply 1230, the Supplemental Declaration 1230-1 and any proposed Order related to Objection 1199 supplemented by Objection 1230, Reply not having any factual basis, nor legal basis. With this Response Nelu Mihais demonstrate again, but in more detail, based on new discoveries, the legal and factual basis for the Court:

**to allow the Claim no. 10029 to be admitted and granted with allowance**

**to reject the "Objection" to Claim Asserted by Nelu Mihai (Claim No. 10029) (the "Objection" document 1199 filed on 07/07/2023),**

**to reject the Reply 1230 and any order related to these Objection, Reply and Supplemental Declaration**

**as well to reject "the Proposed Order" 1199-2 filed by the Plan Administrator and any additional proposed order suggested / requested by Debtors to deny the Claim 10029**

and, based on evident legal and factual bases, the Claim 10029 and Proof of Claim 10029 should be ordered with allowance by the Court.

Nelu Mihai respectfully states as follows in support thereof:

4. <u>The Response is submitted legally</u>, in less than 30 days before 09/14/2023, considering the date of service as 8/14/2023.

5. <u>Nelu Mihai provides now the email received by him from Mr. Tribolet, the Plan Administrator (from Tribolet Advisors, LLC) who recognizes the legal bases of Creditor's claim 10029, and practically admits that Nelu Mihai is entitled to receive admittance of claim 10029, recognizes in fact the Claimant's rights to receive the penalties for both the pre-Petition Date period, and the post-Petition Date period (**Exibit**</u>

**9-1)**. Mr. Tribolet, the Plan Administrator, wrote: *"Our position on the interest would be that it would only accrue to the date of the bankruptcy which was 9/22/22. This was due to the contract being rejected by the Debtor. I can instruct my counsel to file an objection in the court to this claim or I can ask you to amend your claim 10029 from $220,909.03 to $7,090.91 as calculated below"*. With all due respect, it is certain that Mr. Tribolet quotes what the "Debtor" (only one Debtor?) and eventually his "Reviewing Parties" told him, without in-depth investigation of the payroll checks, in regards to penalties and unpaid accrued amounts calculations. Probably he was presented a copy of the erroneous "opinion" of the Debtors in possession about paying the full amount of $300,000 to Nelu Mihai, before the Petition Date. This old opinion was expressed in one of the hearings in 2022: that Debtors paid extra money (not true), that they paid Nelu Mihai with the full amount of $300,000 "cash severance" before 9/22/2022 (not true), from which "$150,000 were "paid" one day before the Petition Date (untruthful). This old erroneous opinion of the Debtors in possession (Company) was presented during a Court hearing, under oath, by the former new CFO, Mr. Harold Eugene Coulby (mentioned in paragraph 22 of this Response, as being a bonus beneficiary on 8/30/2022, 22 days before the Petition Date) in the form of a written, false, financial statement, and orally sustained by the Company former new CFO. This old opinion about paying the full amount of cash severance of $300,000 is not anymore sustained by the Plan Administrator, the other Creditors etc., as can be seen even in the Reply 1230 and other documents issued by the Plan Administrator and his team (but no explanation about misinforming the Court, the creditors, and the public was yet provided). This opinion about full payment of the "cash severance" before the Petition Date is not based on real facts and has no legal grounds: therefore, both the Objection 1199 and Supplemental Objection to it, docket 1230, have no legal bases, no factual basis, and, more than that, the discoveries and the argumentation in the case ask and imposed for fully rejection, denial of both Objection 1199, Reply 1230, and any Proposed Order related to such Objection.

6. The so called "bellow calculation" referred in Mr. Tribolet email from June 6, 2023, contains some negotiation amount that has no connection to the factual and accurate situation of separation payments for the 9.a terms of the Separation Agreement, but

copies and continues the disadvantaging treatment the Debtors had toward Nelu Mihai, after he helped them to get funded.

7. Does Mr. Tribolet recognize that his team ("Reviewing Parties' and team) copies the position of the Debtors, expressed before the Court appointed the Plan Administrator? Nelu Mihai respectfully ask the Court and the Pan Administrator to give him the benefit of doubt and to consider the real factual basis and applicable legislation in the Creditor's claim 10029. It is proven that the Debtors made gross mistakes (willfully?) in their calculations and treatment toward Nelu Mihai, hiding, erasing or altering large numbers of delay days in paying the "cash severance" by-monthly amounts, by hiding the unlawful deductions, taxation and egregious subtractions from both Claimant's salaries and the "cash severance" by-monthly installments, both during the pre-Petition date period and after the Petition Date.

8. The numerous errors in the Debtors' Financial Disclosure Statements of the case, issued and reissued by Debtors in possession, represented only by new executives hired after Nelu Mihai helped the Company to get funded with $385M, prove that these Debtors' new executives unlawfully repudiated mainly one term of the Separation Agreement (the Penalties Rate), without any right (and after recognizing some other terms), but in an unlawful and discriminatory manner, that should be sanctioned by the Court, by rejecting the all the Objections to Claim 10029 and giving green light for payments of the credit Nelu Mihai fully deserve.

9. Nelu Mihai also provides now emails and discoveries proving that the "credit score" of the Debtors was very low, even negative, and there was a discriminatory treatment toward him, fully justifying the terms of the Separation Agreement signed between Claimant and the Debtors on March 28, 2022, regarding the penalties rate (percentage). The unfair usage of the terms like "egregious" and "usurious", by the Plan Administrator team, if not disparaging, already unfairly disadvantages the Claimant, as creditor, entitled to equal treatment, compared to other creditors. More than that, Nelu Mihai was placed in delay with both claims; claims were subjected to unfair Objections (the Plan Administrator also filed an Objection to Claimant's other claim 10026, for modifying reducing the claim amount of approx. $150,000 with the amount of the 4/15/2022 installment, ($13,636.36 )for the payment on 4/15/2022, discovered consulting the

Insperity PEO Services L.P.; this new Objection was done ignoring the priority imposed by U.S.C. § 507(a)(4) for a portion of the claim for the unpaid amount of separation "cash severance"; the new Objection did not analyzed the unlawful subtractions revealed by the payroll check obtained recently from Insperity PEO Services L.P., and mentiones in this Response to docket 1230).

10. The disadvantaging actions against the Claimant Nelu Mihai were (during his employment and continued with higher intensity when the Debtors, or Debtors in possessions had new executives) are:

11. a) the double and detrimental erroneous records of Claimant's number of shares (different from the shares stipulated in his "Employment Offer", The Compute North LLAC / Debtors tried to deceit Nelu Mihai of his number of vested shares, decided by both parties in the hiring agreement. The Debtors dishonestly declared that they made a mistake in the electronic records (different from the written hiring offer/agreement), and they asked Nelu Mihai to sign another hiring agreement during the separation of Nelu Mihai from the Compute North LLC / Debtors. Nelu Mihai declined.

12. b) the willful deformation of Claimant's real professional "rocks" (achievements / professional performances) in order to reduce to zero the annual bonus (the Employment Offer referred an annual bonus in 2021 and every year) (see Exhibits 9-3, 9-4, 9-5, 9-6: email correspondence between Nelu Mihai and the two Debtors founders, after the Debtors willfully distorted the records of his "rocks", ignoring that the Debtors paid annual bonuses to all his large team of employees, hired by him in 2021). When Nelu Mihai joined the Debtors, the company had only one engineer for all its technology. Even more, in an almost discriminatory manner, at the end of 2021, after obtaining the $385M funding, mainly grace of Nelu Mihai's reputation and business plan, the Debtors gave him a so-called bonus of $152.86 that had $52.86 taxes, and the rest of $100 was taken by the Debtors ($0 payment to Nelu Mihai, according to payroll check / stub no. 10157929 provided by Insperity PEO Services L.P.).

13. c) the delays of transferring the 401(k) contributions into Nelu Mihai's 401(k) account kept by the 401(k) plan administrator

14. d) the Debtors did not invest the funds received from Generate Capital and National Grid Partners as it was presented in the investment deck used to close the round

15. e) the history of Debtors lawsuits, media negative questionable image of the Company, related to social issues, ethnicity etc. (Exhibit 9-2)

16. These above-mentioned factual evidences, as well as many other facts, imposed to establish warranties for Claimant to receive the separation "cash severance" payments according to the terms of the Separation Agreement.

17. The Separation Agreement stipulated at Chapter 9.a that the Claimant Nelu Mihai should have been paid "*when the other executives were paid*".

18. Anticipating that the company would declare bankruptcy, the other executives ,who are also creditors, started to pay themselves large amounts of money, at random dates (as shown on Schedules 2 of Disclosure Statements 723-2 and 683). Why the Debtors did not pay Nelu Mihai when they paid the other executives, as specified in the Separation Agreement signed on March 28, 2022? Is this discrimination? For certain, Nelu Mihai is not treated equally with the other Creditors in the similar situation, especially with the other Creditors who are former executives of Debtors.

19. The Debtors knew that the Separation Agreement between Nelu Mihai and them carried penalties for cash consideration payments (or reductions), not paid timely on the other executives' payments. The Separation Agreement is a contract signed voluntarily by the Debtors and Nelu Mihai. The Plan Administrator and the other creditors have no legal ground to change the terms of the Separation Agreement between Nelu Mihai, Claimant, and the Debtors. Is this not another discrimination, as Nelu Mihai is the only executive in the Company from Silicon Valley and one with great merit of bringing funding to the Debtors? The Debtors would have not received $385M funding without Nelu Mihai's major contribution. How much money would have gotten the other creditors and former executives without the funding of $385M, closed due to the reputation, business plan and efforts of the Claimant Nelu Mihai? How much money the Plan Administrator would have available to dispose to Creditors, without the $385M funding?

20. In addition, the Plan Administrator Declaration associated with the Reply 1230, docket 1230-1, at paragraph 7, page 3, has an evident, unacceptable deformation and change of the terms of the Separation Agreement. Nelu Mihai was supposed to be paid "*on the same date(s) as base salary are paid to the Company's other executives*" (Chapter 9.a Separation Agreement). The other Company's executives were paid with base salary after

the Petition Date (September 22, 2022). Based on the terms of the Separation Agreement the Company was obliged to pay Nelu Mihai as well. The last payment for Nelu Mihai cash severance was on September 16, 2022, and no payments were made after the Petition Date. Honoring the terms of the Severance Agreement Compute North (the Debtors) would have been a wise business decision.

21. It should be underscored that the other executives were paid until February 2023, with large salaries, for restructuring the Company. Well, now there is no restructuring, the Company is liquidating its assets. As a businessman, Nelu Mihai is asking: would it not have been better for shareholders, creditors, employees if the Plan Administrator would have taken control of the Company (Estate) on 9/22/2022? How much money would have been saved? Obviously for fairness, it is necessary to reject the Objections 1199 and 1230 to Claim 10029 and to give allowance to Claim 10029.

22. The separation amount of $300,000 should have been paid in one payment, the same way the other executives were paid large bonuses one day before the Petition Date (Edward Drake Harvey III – the new COO, paid with $60,000 bonus on 9/21/2022 one day before the Petition Date), 22 days before the Petition Date (Harold Eugene Coulby, new CFO, paid with retention bonus of $110,000 on 8/30/2022; Jason Stokes, new CLO, paid with retention bonus of $110,000 on 8/30/2022; Edward Drake Harvey III, paid with retention bonus of $50,000 on 8/30/2022; Kyle David Wenzel, former VP of Sales, paid with retention bonus of $50,000 on 8/30/2022) etc., as declared by Debtors in the Financial Disclosure Statements 723-2 and 683 ("Schedules 2"). In conclusion, the Objections to claim 10029 should be entirely rejected, denies, and the claim should receive allowance, as having indubitable factual basis and legal basis.

23. After consultations with experts in human resources, payroll, taxes from Morgan Stanley and other companies, etc. who also helped to obtain and analyzed the requested copies of the payroll stubs from Insperity PEO Services L.P. (which were not sent to Nelu Mihai as requested in *The Initial Disclosure Rule 26* docket 1245), it was discovered and reconfirmed that:

24. a) At every base salary pay date, including 3/31/2022 (the last day of employment) there was a delay in the Claimant's separation payments. At every bi-monthly payroll pay date for the other employed executives, between March 31 and September 22,2022 no amount

due was paid in full (each payment of "cash severance" before the Petition Date was not in full, was not conform to the Separation Agreement signed on March 28, 2022).

25. b) For example, on April 15, 2022, many incorrect (exciding the lawful amounts and ignoring the incident legislation) deductions and taxes were unlawfully subtracted from the amount supposed to be paid ($13,626.36). One of such unlawful deductions which was done erroneously is the following: it was for **Flexible Spending Account** (please note that Nelu Mihai was not employed by the Debtors after March 31, 2022. Nelu Mihai never asked in the Separation Agreement to have this optional deduction retained from his severance bi-monthly installments. In fact, there is no legislation to apply such deductions while not employed. In April, May, June, July, August, September 2022 this amount was not paid back to Nelu Mihai, rendering any so-called by-monthly amount to a reduced amount with this unlawful FSA deduction. The Claimant complained to Company representatives, but the Company have not reimbursed him with this unlawfully subtracted amount from his severance payment. If the Debtor had goodwill, it would have refunded the FSA illegal deduction on the next payment. By not doing that, the Debtor breached the separation agreement from the beginning.

26. c) The same unlawful diminutions were done starting with April 15, 2022 for **federal taxes** (ignoring the IRS regulations of *Publication 15 (Circular E) 2022, page 21, Effective Date of Form W4*, imposing that a W4 form filed by Nelu Mihai with the Debtors in 2021, when Nelu Mihai started his employment with them, should remain applicable for all the following payroll or separation amount payments, without any limitation or derailments). The Claimant's experts calculated the correct federal taxes for every payroll stub obtained from Insperity PEO Services L.P., and there are unlawful reductions and delays at every by monthly date when an EFT (electronic fund transfer) was done for separation cash.

27. d) Other by-monthly unlawful diminutions were done starting with April 15, 2022, for **state taxes** (ignoring the IRS regulations of Publication 15 (Circular E) 2022). The Claimant's experts calculated the correct California state taxes for every payroll stub obtained from Insperity PEO Services L.P., and there are unlawful reductions and delays at every by monthly date when an EFT (electronic fund transfer) was done for cash severance.

28. e) Even more unlawful diminutions were done starting with April 15, 2022 for Medicare. ignoring the terms of the Separation Agreement signed on March 28, 2022, where a whole chapter is about Nelu Mihai being under Medicare (over 65 years old), ignoring the IRS Publication 15 regulations, and the income until every payroll date, and other legislation applicable. The Claimant's experts calculated the correct Medicare taxes for every payroll stub obtained from Insperity PEO Services L.P., and there are unlawful reductions and delays at every by monthly date when an EFT (electronic fund transfer) was done for cash severance.

29. Erroneously, the Plan Administrator and his Reviewing Parties state that *"The Claimant relies on the Separation Agreement attached to his proof of claim, as well as Schedule 2 to the Debtors' Second Amended Joint Liquidating Chapter 11 Plan of Compute North Holdings, Inc. and its Debtor Affiliates [Docket No. 683] (the "Schedule 2") (a summary of transfers to insiders in the one year preceding the Petition Date)."* The Court is respectfully asked to observe that Nelu Mihai never cited the docket 683 "Schedule 2". In the Claimant's response to Objection 1199 to Claim 10029 Nelu Mihai referred docket 723-2" Schedule 2". Even more, both docket 723-2 and 683 "Schedule 2" contain the gross mistake that Nelu Mihai would have received an amount of $11,538 on September 16, 2022. As Nelu Mihai asked the honorable Court during one 2022 hearing to impose the Debtors in Possession to correct and eliminate their false statement that Nelu Mihai have received on September 21, 2022 the rest of the "cash severance" payment of $150,000, the same way Nelu Mihai respectfully request the Court to reject the Supplemental Objection, the Reply 1230, and the Plan Administration Declaration as being without any legal base, their position being fully rebutted by the Separation Agreement, by the Schedule 2 of docket 723-2 and 683, and by the Debtors' records, also kept at Insperity PEO Services L.P. (Nelu Mihai obtained these documents only on September 2023, with the help of the Claimant's experts; before that date, Nelu Mihai did not have access to them, starting with Claimant's employment Termination Date, May 31, 2022. Per Court request, Nelu Mihai can provide a confidential copy of these payroll stub for pe period March 31-September 22, 2022, but these documents are in the fully possession, control and custody of the Plan Administrator, and contain bank info, SSN, and other fiscal / confidential information to be filed publicly).

30. The position of the Debtors, Plan Administrator and the other authors of the Reply 1230 is wrong, unlawful, and contradictory to the payroll checks provided by Insperity PEO Services L.P. The table with so called payments figured at paragraph 11 page 5 of the Reply 1230 is another gross mistake. Never ever the Debtors did pay in full amounts of $13.636.36. Once again, the Reviewing Parties of the Plan Administrator copy the opinion of the Debtors, without doing any investigation into the correct records, represented by the payroll records kept by Insperity PEO Services L.P. The Reviewing Parties of the Plan Administrator ignore that unlawful amounts and taxes and deductions were erroneously subtracted from each by-monthly payroll "pay" (in fact, there were only direct deposits, on each payroll check is figured the routing number and Claimant's account number and the date of EFT – Electronic Fund Transfer).

31. Nelu Mihai submits, in opposition to the so-called accuracy of table represented by the Debtors on page 5 paragraph 11 of docket 1230, a table with the correct amounts transferred by EFT, in relation to the Separation Agreement, after April 1, 2022 to present time.

32. In this correct table, based on the real paychecks kept at Insperity PEO Services L.P. and bank account info, there is the last column, representing the underlined percentage of diminutions of each amount represented erroneously by the Debtors in their table of docket 1230 (**between 30,05% and 37,25%,** meaning that **every single by-monthly payment was reduced by at least a third or a quarter, and was delayed by many days, both pre-Petition Date, but also post Petition Date**). Also, column four states the real amounts paid to Nelu Mihai, in relation to Separation Agreement, after April, 2022 (his Termination Date was March 31, 2022). Similarly, column three states the exact transferred amounts by EFT, into Nelu Mihai's bank account.

| Payroll Check No. | Date of EFT (Direct Deposit) | Amount paid ($) | Unpaid amount ($) | The Debtors wrongly stated "as paid" amount ($) | Unpaid percentage (%) |
|---|---|---|---|---|---|
| 67596944 | 9/16/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |
| 67294781 | 9/2/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |
| 66988605 | 8/19/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |

| 66685164 | 8/5/2022 | 9,415.91 | 4,220.45 | 13,636.36 | 30.94997492 |
| 13,636.36 | 7/22/2022 | 9,444.91 | 4,191.45 | 13,636.36 | 30.7373082 |
| 66044876 | 7/8/2022 | 9,538.63 | 4,097.73 | 13,636.36 | 30.05002801 |
| 65733005 | 6/24/2022 | 9,538.63 | 4,097.73 | 13,636.36 | 30.05002801 |
| 65416407 | 6/10/2022 | 9,538.63 | 4,097.73 | 13,636.36 | 30.05002801 |
| 65145314 | 5/27/2022 | 9,206.06 | 4,430.30 | 13,636.36 | 32.48887533 |
| 64880454 | 5/13/2022 | 8,543.18 | 5,093.18 | 13,636.36 | 37.34999663 |
| 64593683 | 4/29/2022 | 8,543.18 | 5,093.18 | 13,636.36 | 37.34999663 |
| 10208869 | 4/15/2022 | 12,957.94 | 7,936.65 | 20,894.59 | 37.9842342 |

The last row includes the payments of $7,258.23 stipulated in the Chapter 9.d of the Separation Agreement, which has no link with the "severance cash payments" from chapter 9.a of The Separation Agreement.

33. The Reply 1230 proves that no real paychecks were consulted by the Reply's signers / issuers. In a disadvantaging way, for the Claimant Nelu Mihai, the Debtors try to misinform the Court about the remaining unpaid amounts, without going into any reductions by any unlawful taxes and deductions. What is strange is the fact that the Plan Administrator declaration for this Reply is done also under oath. It is hard to believe that the Plan Administrator have not read the terms of the Separation Agreement about "Legal taxes and deductions", stipulated in Chapter 10.h.

34. The new discoveries provided by Insperity PEO Services L.P., referred by the Debtors in the Separation Agreement, indubitably demonstrate that no "cash severance" installment was paid (transferred) timely or consistently with the terms of the Separation Agreement.

35. The Reply 1230 and the Plan Administrator's Declaration 1230-1 (for Supplemental Objection) fail to demonstrate that each installment was timely and fully (in its integrality, with no unlawful reductions, deductions, taxes) paid on the same date with the other executives' base salary payments dates, as the term of the Separation Agreement stipulate, not before September 16, 2022, and nor after September 22, 2022. It is evident that Nelu Mihai was not paid after September 16, 2022, while the other executives were paid, until February 2023, when the Company was in a so-called reorganizing status. No single installment payment of cash severance was consistent the terms of the Separation Agreement.

36. Not even to this date, the Plan Administrator gave the Court an answer about the amount of recognized Company's debt of $150,000 toward Claimant Nelu Mihai, debt which was

unlawfully presented as being in fact paid on September 21, 2022, one day before the Petition Date, but, in reality, never paid to the Claimant. If this check is in the Debtor's books, but not registered with Insperity PEO Services L.P., who cashed it? The payroll checks, kept also by Insperity PEO Services L.P. do not have any payment made to Nelu Mihai, Claimant, on the date of September 21, 2022, nor on any other date after September 16, 2022. After September 16, 2022, many other Company's executives received base salary payments, until February 2023 or later. This this factual evidence situation imposes the allowance for Claim 10029, based on the Chapter 9.a terms of the Separation Agreement and based on the recognition (on June 6, 2023), by the Plan Administrator, that Nelu Mihai is entitled to receive full amount of penalties for delays and accrued unpaid amounts of cash severance, both before and after the Petition Date. The new discoveries emphase the attributes of priority, recognition and administrative type of the credit requested by Claimant Nelu Mihai in claim 10029, which should be granted with allowance by the Court.

37. In addition, the signers and issuers of the Reply 1230 and Declaration 1230-1 ignore that they have the legal obligation to pay Nelu Mihai's cash severance and penalties, even after the Petition Date, according to the **Chapter 18, Binding Effect**[2] of the Separation Agreement.

## B. PENALTIES CALCULATIONS BEFORE THE PETITION DATE, BASED ON NEW DISCOVERIES

Penalties on delayed payments due to unlawful reductions of the $13,636.36 installments amounts with over-calculated state taxes (calculated only for the period before the Petition Date)

The payroll checks obtained from Insperity PEO Services L.P. numbered 10208869, 64593683, 64880454, 65145314, 65416407, 65733005, 66044876, 66363671, 66988605, 67294781 and 67596944 reflect severance installments payments reductions totaling **$4,982.08.** The calculations for 161 delay days to Petition Date (4/15/2022 installment delay and not full payment), 147 delay days to Petition Date (4/29/2022 installment delay

---

[2] "This Agreement will be binding upon and will inure to the benefit of the Parties hereto, their respective heirs, representatives, successors and assigns and will be automatically assigned by the Company to the controlling entity"..

and not full payment), 133 delay days to Petition Date (5/13/2022 installment delay and not full payment), 119 delay days to Petition Date (5/27/2022 installment delay and not full payment), 105 delay days (6/10/2022 installment delay to Petition Date and not full payment), 91 delay days (6/24/2022 installment delay to Petition Date and not full payment), 77 delay days (7/08/2022 installment delay to Petition Date and not full payment), 63 delay days (7/22/2022 installment delay to Petition Date and not full payment), 49 delay days (8/05/2022 installment delay to Petition Date and not full payment), 35 delay days to Petition Date (8/19/2022 installment delay to Petition Date and not full payment), 21 delay days to Petition Date (9/02/2022 installment delay to Petition Date and not full payment), 7 delay days to Petition Date (8/16/2022 installment delay to Petition Date and not full payment). The unpaid accrued amount of overcalculated and subtracted as state taxes to the Petition Date is **$4,982.08.** The penalties calculated are in the amount of **$8,381.49.**

38. Penalties on delayed payments due to unlawful decreases of the $13,636.36 installments amounts with over-calculated federal taxes (calculated only for the period before the Petition Date)

The payroll checks obtained from Insperity PEO Services L.P. numbered 10208869, 64593683, 64880454, 65145314, 65416407, 65733005, 66044876, 66363671, 66988605, 67294781 and 67596944 reflect unpaid severance installments payments reductions in the amount of **$18,905.77, with penalties calculated according to Chapter 9.a of the Separation Agreement, for the period before the Petition Date in in amount of $31,795.77.** The calculations for 161 delay days to Petition Date (4/15/2022 installment delay and not full payment), 147 delay days to Petition Date (4/29/2022 installment delay and not full payment), 133 delay days to Petition Date (5/13/2022 installment delay and not full payment), 119 delay days to Petition Date (5/27/2022 installment delay and not full payment), 105 delay days (6/10/2022 installment delay to Petition Date and not full payment), 91 delay days (6/24/2022 installment delay to Petition Date and not full payment), 77 delay days (7/08/2022 installment delay to Petition Date and not full payment), 63 delay days (7/22/2022 installment delay to Petition Date and not full payment), 49 delay days (8/05/2022 installment delay to Petition Date and not full payment), 35 delay days to Petition Date (8/19/2022 installment delay to Petition Date

and not full payment), 21 delay days to Petition Date (9/02/2022 installment delay to Petition Date and not full payment), 7 delay days to Petition Date (8/16/2022 installment delay to Petition Date and not full payment) has the result of **$31,795.77**. The unpaid accrued amount of over-calculated and subtracted as federal taxes to the Petition Date is **$18,905.77.**

39. Penalties for delays of unpaid amounts wrongly calculated as Social Security Tax, and unlawfully subtracted from cash severance installments before the Petition Date, despite the fact that the limit of $147,000 income was reached.

    The IRS Regulation Publication 15 imposes that after the amount of $147,000 income is reached, no more social security taxes should be subtracted from the cash severance installments. The number of days of non-payment, prior the Petition Date (5/27/2022 until 9/22/2022) is 126 days. The delayed and unpaid amount is $295.62 - $144.37=**$151.25 (for Claim 10026).** Penalties calculation: 126 days x 2%/pay x $151.25 = **$381.15 (for Claim 10029).**

40. For the period April 1st 2022 to the Petition Date, the total amount of penalties for over taxation as Medicare tax for Nelu Mihai, over 65 years old and not self-employed: $17.18 + $51.54 + $85.90 + $120.27 + $118.09 = **$392.98** (Insperity PEO Services L.P, according checks number 66363671, 66988605, 67294781 and 67596944, starting with 7/22/2022). The total amount unpaid, meaning paid for unlawful Medicare taxation is: $122.72 + $122.72 + $122.72 + $122.72 + $93.72 = **$584.60.**

41. Penalties calculated for reducing the installment due on 4/15/2022 with an amount for unlawful Flexible Spending Account while the Claimant was not employed (unpaid cash severance amounts, not following the IRS Publication 15 (Circular E) that does not stipulate to deduct any optional FSA amounts from severance payments)

    The FSA amount unlawfully subtracted from the instalment of $13.636,36 was of **$211.54**. The number of delay days until the Petition Date is 161. The penalties for this accrued unpaid severance obligations are $211.54 x 161 x 2/100, meaning **$681.16.**

42. **Summary for the accrued unpaid cash severance amounts for the period April 1st 2022 to the Petition Date**

    **The new discoveries prove that there is an extra unpaid cash severance amount, calculated for the period April 1st 2022 to the Petition Date, in the amount of**

$4,982.08, plus $18,905.77, plus $151.25, plus $584.60, plus $211.54, meaning $14,835.96. To this amount should be added 136,363.68 ($300,000 - $13,636.36 x 12 paid installments), totaling $151,199.64 (unpaid accrued cash severance at the Petition Date).

43. **The penalties for the unpaid amount of $136,363.68 for 7 days until 9/22/2022 are in the amount of $19,090.92**

44. **Summary for the accrued unpaid cash severance amounts for the period April 1st 2022 to the Petition Date**

   **The penalties owed for the period between April 1st 2022 and the Petition Date are in the amount of <u>$8,381.49, plus $31,795.77, plus $381.15, plus $392.98, plus $681.16, plus $19,090.92, meaning $60,723.47 (sixty thousand seven hundred twenty three dollars and forty seven cents).</u>**

45. To the penalties amount of <u>$60,723.47</u>, calculated for the period April 1st 2022 to the Petition Date, the Claimant also requests the penalties calculated for the accrued unpaid cash severance amount after the Petition Date ($151,199.64), as above mentioned at paragraphs 11 to 17 and 30, and in the previous responses and Claim 10029 related documents submitted by Nelu Mihai. The factual bases and legal grounds for also receiving the penalties for the period after the Petition Date are stipulated in Chapter 9.a of the Severance Agreement submitted by Nelu Mihai. These calculations should be done to the accrued unpaid cash severance amount of $151,199.64, for at least 159 days (between 9/23/2022 and 2/28/2023), at the rate stipulated in the Separation Agreement, chapter 9.a.

46. It is proved, with the new discoveries, that the Company willfully increased the subtractions, deductions, taxes from each severance payment installment, inducing delays, and contradicting the Chapter 10.h, 9.a of the Separation Agreement, but also the IRS Publication 15, the IRS publications related to the validity of the 2021 W4 form provided by the Claimant Nelu Mihai to the Company when hired and all the other bankruptcy rules referred by the Claimant Nelu Mihai in the previous submitted documents. The Claimant respectfully asks the Court to reject the Objections 1199, 1230, and the related proposed orders, formulated by the Plan Administrator, the other creditors

representatives, the Reviewing Parties or any other part in this case. The creditor Nelu Mihai respectfully requests the Court to fully grant allowance to Claim 10029.

47. Nelu Mihai respectfully asks the Court to take into consideration Nelu Mihai's merit in funding the Company, in elaborating profitable reorganizing and reorientation strategies for the Company (his business plan involving profitable business, including AI etc., different from bitcoins mining; his business plan and vision that attracted funding investors and was validated by industries and analysts in 2023, but were abandoned by the other former executives of the Debtors) and to grant allowance to his claim 10029.

## C. RESERVATION OF RIGHTS

48. The Claimant expressly reserves the right to amend, modify, and supplement this Response to Supplemental Objection, and the right to respond to any assertion regarding the Claim and Objection. The Claimant further reserves all rights to present any evidence at a designated hearing for this proceeding to support his Claim. The Claimant reserves the right to contest any other Objections asserted by the Plan Administrator and other Creditors on any other grounds. Nothing herein shall constitute an admission of any assertions coming from the Plan Administrator, his Reviewing Parties or other Creditors.

## D. CONCLUSION

**49. The Claimant, Nelu Mihai, respectfully requests that the Claim 10029 and Proof of Claim 10029 be allowed in their entirety, and that the Court grant such other of allowance, by rejecting the Objection 1199 to this Claim and the Proposed Order 1199, the Supplemental Declaration 1230-1 and Supplemental Objection 1230, as well any Proposed Order in relation to Claim 10029.**

Respectfully submitted,

Dated: September 10, 2023

NELU MIHAI, PhD

_____,

NELU MIHAI.
201 Harrison Street Apt. 210
San Francisco CA 94105
Telephone: (408) 410-3896
Email: nelumihai@prodigy.net

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-90273 (MI) |

Certificate of Service

I certify that on August 10, 2023, I caused a Response to the Reply, document no. 1230 case 22-90273, to be delivered thru Pacer system to the U.S. Bankruptcy Court for Southern District of Texas, the Plan Administrator, Tribolet Advisors LLC, ASK LLC, Mr. Charles R. Gibbs from MCDERMOTT WILL & EMERY LLP, *Counsels to the Mining Project Wind Down Holdings, Inc. Litigation Trust and the Plan Administrator* and other recipients, parts in case for case 22-9027, and for case 22-9027.

Respectfully,

………………………………………………..

Nelu Mihai

201 Harrison Street #210, San Francisco, CA 94105

nelumihai@prodigy.net

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551); Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

EXHIBIT 9-1

**„From:** Michael Tribolet <xxxxxxx.x.xxxxxxxx@triboletadvisors.com>
**Subject: RE: Proof of claim 10028**
**Date:** Jun 6, 2023 at 11:24 AM
**To:** Nelu Mihai <xxxxxxxxx@icloud.com>

Our position on the interest would be that it would only accrue to the date of the bankruptcy which was 9/22/22. This was due to the contract being rejected by the Debtor. I can instruct my counsel to file an objection in the court to this claim or I can ask you to amend your claim 10029 from $220,909.03 to $7,090.91 as calculated below.

…"

This copy is true, correct, and represents a redacted extract of the original email sent to my by Mr. Michale A.Tribolet, on June 6, 2023.

Nelu Mihai

Claimant, case 22-90273

San Francisco CA

September 4, 2023

FOR CONFORMITY WITH THE ORIGINAL

https://ncnewsline.com/briefs/lawsuit-alleges-racial-demographics-activists-drove-compute-north-to-withdraw-original-plan-for-cryptofarm-in-pitt-county/

# NC NEWSLINE

# Lawsuit alleges racial demographics, activists drove Compute North to withdraw original plan for cryptofarm in Pitt County

**By:** [Lisa Sorg](#) **- March 14, 2022 10:46 am**



Compute North, which plans to host a controversial cryptomining center in Greenville, allegedly withdrew its application for a different site in Pitt County because of the area's racial demographics, [according to a lawsuit](#) filed last month in Minnesota state court.

Compute North is headquartered in Eden Prairie, Minnesota. It has since selected a site within the Greenville city limits for its cryptocurrency operations, [Policy Watch reported in January](#).

The lawsuit, filed by Rohit Shirole, is an employment dispute that details allegations of racial discrimination, but also includes information about Compute North's siting decisions . Shirole, whose title was vice president and business development, is of South Asian descent. He alleges he was treated differently from white employees because of his race. He also alleges that the company asked him to sign an "overly broad" non-compete agreement, then

1

FOR CONFORMITY WITH THE ORIGINAL

https://ncnewsline.com/briefs/lawsuit-alleges-racial-demographics-activists-drove-compute-north-to-withdraw-original-plan-for-cryptofarm-in-pitt-county/

fired him after he refused to do so. The company allegedly owes him back pay, based on sales commissions.

The company denies all allegations of racial discrimination, retaliation and non-payment, according to court records.

On Nov. 3, 2021, Shirole attended a conference call with top Compute North officials and a customer, Marathon Digital Holdings. Marathon Digital Holdings is building one of the largest Bitcoin mining operations in North America. On that call, Compute North Chief Operating Officer Drake Harvey allegedly stated that the original site in Pitt County was in "'an economically downtrodden area'" and the residents were "'non-white','" court documents read. Harvey allegedly stated that these factors combined with an "'activist individual' made the site less desirable."

According to court documents, Shirole was "shocked" by this statement.

The proposed site, across from Belvoir Elementary School on Highway 33, is in a predominantly Latinx and Black neighborhood. Southerly Magazine reported in December about community opposition to the Compute North operation, led by several women of color. Neighborhood residents were especially concerned about noise levels from the cryptofarm, generated by hundreds of fans to keep computers cool.

Two days before the call with Marathon Digital, on Nov. 1, the company had announced it would not operate a cryptofarm there. At the time, the company issued a statement explaining its decision:

"After thoughtful review of our proposed data center facility in Pitt County, Compute North has decided that it is in the best interest of all stakeholders to pursue an alternative location for our project … Integrity is a core value at Compute North and our desire to be a good neighbor and valued member of the business community is authentic and unwavering."

In its court filings, Compute North admitted it held the conference call and that it withdrew from Pitt County "because of site logistics." The company denied "any use of racial demographics in site selection."

Compute North has yet to publicly announce its new site in Greenville. In January, the Greenville City Council amended its zoning ordinance to allow "modular data processing centers" in industrial areas. The properties that meet the zoning criteria are on the city's northeast side.

Compute North has stated publicly that their computers can process other types of data besides cryptocurrency. COO Harvey Drake told the Greenville City Council that it could host other businesses that require immense computing power.

Yet court documents establish that Compute North is in the business of providing co-location services to digital currency mining companies. They locate, develop and provide physical locations for the computer equipment used in maintaining blockchain software for digital currency.

FOR CONFORMITY WITH THE ORIGINAL

https://ncnewsline.com/briefs/lawsuit-alleges-racial-demographics-activists-drove-compute-north-to-withdraw-original-plan-for-cryptofarm-in-pitt-county/



*Compute North originally planned to operate its cryptomining operation across the street from Belvoir Elementary School in Pitt County. Community opposition prompted the company to withdraw its proposal. It has not announced a new site, but a recent zoning amendment would allow Compute North to operate in industrial areas inside the Greenville city limits, such as near the airport. (Google Maps)*

Cryptomining uses a network of high-powered computers to verify cryptocurrency — an alternative form of money, including Bitcoin or Ethereum. The allure of cryptocurrency is that it sidesteps banks and financial institutions. There are two ways to buy cryptocurrency: either purchase coins that are already in circulation through a currency exchange, or become a miner and receive new coins as a reward for the work.

Cryptocurrencies are unlike traditional cash transactions. If you bought a service or item using cryptocurrency, the funds would not be withdrawn from a bank account. Instead the virtual transactions are recorded in a public ledger, known as a "block chain." Each transaction is saved as a "block." (If you think of an old-school checkbook ledger, each entry would be a "block.") Those transactions, or blocks, must first be verified. This is where the "mining" comes in.

Individual miners and their computers, such as those hosted onsite by Compute North, compete to solve complex mathematical problems to verify each crypto transaction — the block. The payoff for winning miners is that they receive some amount of

3

FOR CONFORMITY WITH THE ORIGINAL

https://ncnewsline.com/briefs/lawsuit-alleges-racial-demographics-activists-drove-compute-north-to-withdraw-original-plan-for-cryptofarm-in-pitt-county/

cryptocurrency. The value of Bitcoin and other digital currencies, though, is volatile. Bitcoin and Ethereum prices have fallen 38% since this time last year.

The trillions of guesses that verify each crypto-transaction requires advanced computational power — and electricity. Cryptofarm computers consume enormous amounts of energy, much of it from fossil fuels, the main driver of climate change. While some cryptofarming companies do use some renewable energy, that often includes hydropower, which has its own environmental problems. The dams can harm ecosystems, degrade water quality and prevent fish from migrating. At a recent congressional hearing, several federal lawmakers were concerned that cryptomining operations are also burning fossil fuels at power plants that might otherwise be closed.

EXHIBIT 9-3 Correspondence with Compute North Founders about the Company willfully altering the professional achievements / performance of Nelu Mihai in 2021 Case 22-90273

**From:** Nelu Mihai <nelu.mihai@computenorth.com>
**Subject: Nelu Mihai's Rocks**
**Date:** Mar 16, 2022 at 9:05 PM
**To:** Dave Perrill <dave.perrill@computenorth.com>
**Cc:** PJ Lee <pj.lee@computenorth.com>

Dave,

We always need to be correct with our assertions.

On Monday, I was shown a paper with ALL my Rocks not done. ***That was deeply incorrect.***

Therefore, I have created this report with Traction Tools, which shows **the correct records**.

I have also attached extra documentation.

Facts:

1. The HPC/ODC rock was completed on time, but the company was in difficult financial situation in June 2021 and investing in the Google hybrid cloud would have risked getting into financial default. There are many emails proving this issue.
2. Immersion project was finished on time and a solution was presented. The company did not invest in the proposed solution. The funny thing is that now after 6 months the new contractor hired to work on this project is proposing the same solutions, with the same vendors. Repeat, after 6 months of my initial proposal.
3. The Cloud container project proposed a high-quality vendor (recommended by Eli) and solution, but the company did not want to buy it: "*we do not have customers for non-crypto applications*" and "we do not have a data center to deploy it".
4. You brought the Big Springs issue. Facts:
   a. The operations proposed a solution based on DCX and I found it reasonable.
   b. After operations started the project, your *new COO decided to stop it*. He called a meeting with KT, Ro and I, stating, among other reasons, that *he does not consider immersion technology viable,* that *the vendor is from Europe (German-Polish) and CN does not have the skills to build an immersion facility*.
   c. Then we decided to complete the two tests that I strongly advised to do before starting the buildup. Well, after two weeks the COO concluded that he does not have resources to complete the tests and they were again cancelled.

In one years spent in CN, the company invested in projects proposed by me the amount of $50K.

In our last 1-on-1 you stated that "CN does not invest in products without having, first of all, customers." This is fine, but in no company in this world the CTO is responsible for sales or bringing customers.

On the product side, I have proposed CN tremendous products and solution, but CN funded none to completion.

EXHIBIT 9-3 Correspondence with Compute North Founders about the Company willfully altering the professional achievements / performance of Nelu Mihai in 2021 Case 22-90273

The only funding provided was for MinerSentry.

**We have also talked about the bonus. You said that this is it something that is at your discretion. Of course. But it is hard to justify this decision based on the correct report from Traction Tools and the fact that all my direct reports have received bonuses.**

I guess you wanted to humiliate me as the worst performer in the company 😊 ?

**Are you sure about that? Even the 360 Employee Survey has shown my team as the second best performing after Sales.**

I lost time of my life.

How much CN lost by not funding my advice on the product side: time will tell.

Or maybe you will never know.

I will follow up later tonight with a counteroffer to your proposal from Monday.

No need to reply to this email. It is just for the record.

**Nelu Mihai,** Ph.D.

Chief Technology Officer

**Compute North**

t: +1 952.213.1547

www.computenorth.com

-----------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------

**Correct Status of Nelu's Rocks (Traction Tools Records)**

2

EXHIBIT 9-3 Correspondence with Compute North Founders about the Company willfully altering the professional achievements / performance of Nelu Mihai in 2021 Case 22-90273

-----------------------------------------------------------------------------------------------------------

**Cloud Container – Rock Completed**

**From:** Nelu Mihai <nelu.mihai@computenorth.com>
**Sent:** Monday, September 27, 2021 3:21 PM
**To:** All Executives <all.executives@computenorth.com>
**Subject:** FW: IT Compute Module, final proposal

The famed "cloud container" 😊 . My recommendation is to select TAS as the supplier of our first sample. Another one of my Q3 Rocks.

**Nelu Mihai,** Ph.D.

Chief Technology Officer

**Compute North**

t: +1 952.213.1547

www.computenorth.com

**From:** Friesen, Kurtis <xxxxxxxx@tas.com>

**Sent:** Monday, September 13, 2021 4:10 PM
**To:** Nelu Mihai <nelu.mihai@computenorth.com>
**Cc:** Mann, Ron <xxxxx@tas.com>; Pasierbowicz, Jackie <xxxxxxxxxxxxxx@tas.com>; Latham, Warren <xxxxxxx@tas.com>; Jeff Tollefson <xxxx.xxxxxxxxx@computenorth.com>
**Subject:** IT Compute Module, final proposal

Nelu,

We're pleased to present our final quote for your custom 18 rack compute module. If all looks good in the attached quote, just give us the green light and we'll get to work immediately on fabrication.

Best,

Kurtis

**Kurtis Friesen** | Director of Modular Data Center Products

TAS Energy | 6110 Cullen Blvd. | Houston, TX 77021

Office: +1 (832) 615-6259 | Mobile: +1 (425) 591-6078

*Confidentiality: This e-mail and any attachments are confidential and proprietary to TAS Energy Inc. If you are not a named recipient or received this mail in error, please notify the sender immediately, delete this email and do not discuss the contents with another person, use it for any purpose or store or copy the information in any medium.*

EXHIBIT 9-3 Correspondence with Compute North Founders about the Company willfully altering the professional achievements / performance of Nelu Mihai in 2021 Case 22-90273

**Immersion Container – Rock Completed**

**From:** Nelu Mihai
**Sent:** Monday, September 27, 2021 3:17 PM
**To:** All Executives <all.executives@computenorth.com>
**Subject:** Immersion Containers - Evaluation documentation (Q3 Rock)

 Team,  Attached you can find the documentation for the immersion containers resulted from the due diligence process (my Q3 rock).

We should discuss and decide what are the next steps for Q4.

 **Nelu Mihai,** Ph.D.

Chief Technology Officer

**Compute North**

t: +1 952.213.1547

www.computenorth.com

-------------------------------------------------------------------------------------------------------

**HPC/Optimized Computing – Rock Completed**

 **From:** Nelu Mihai <nelu.mihai@computenorth.com>

**Sent:** Sunday, June 27, 2021 11:38 AM
**To:** All Executives <all.executives@computenorth.com>
**Subject:** HPC/Optimized Computing - Rock Q2

 Team,

 This is the presentation for the HPC/Optimized Computing Service  (Rock Q2). While some activities have been started, others will start in Q3. The goal is, by the end of Q3, to have in place a medium scale hardware infrastructure easy to be scaled up (IaaS) and the software development stack (PaaS) ready-to-go for non-crypto services. By mid of Q3 we should be ready to host the first customer.

You can send me the observations/comments by email or do this on Wednesday when I will have the f2f presentation. I will address all of them on Wednesday.

After your approval, I propose to present a summarized version to all employees.

Thanks,

4

EXHIBIT 9-3 Correspondence with Compute North Founders about the Company willfully altering the professional achievements / performance of Nelu Mihai in 2021 Case 22-90273

**Nelu Mihai,** Ph.D.

Chief Technology Officer

**Compute North**          t: +1 952.213.1547          www.computenorth.com

Download all attachments as a zip file

HPC and OC-Q2.pptx
772.7kB


Compute North Edge Proposal Final 091321.pdf
502.1kB


Immersion Cooling Suppliers.xlsx
11.7kB


Immersion Cooling Supplier Evaluation - Final.docx

47.5kB

---

This copy is true, correct, and represents a redacted extract of the original emails

Nelu Mihai

Claimant, case 22-90273

San Francisco CA

September 5, 2023

5

# High Performance/Optimized Computing POC
# (HP/OC – POC)

## Nelu Mihai

# POC – HPC/Optimized Computing - Goals

- Build an application-ready PaaS for AI / Blockchain applications;
- Accommodate 2-3 medium scale apps;
- Take advantage of avaialble services from public clouds (for complex apps);
- Find the Product(Service)-Market-Fit for non-crypto services;
- Fine-tune the pricing model for non-crypto services;
- Identify 1-2 customers;
- Learn and address the challenges of building cost effective non-crypto containers.

# IaaS – HPC/Optimized Computing + Crypto Mining



**Purpose Built Distributed Cloud**

HPC/OC   HPC/OC   HPC/OC

**Purpose Built DC**   **Purpose Built DC**   **Purpose Built DC**

Click to add text

• • •

**Public Clouds**







# Hybrid Cloud - Why?

- Build of the work of others: augment CN with the services and scaling of public cloud;
- Why Outpost (AWS)? - Richest collection of services and the leader;
- Why Anthos (GCP)? - Kubernetes and TensorFlow stack (most used AI platform);
- Why OCI? – Cheapest, most diversified,  unlimited cloud storage/databases

Strategy:

- CN is the best-in-class Applications Specific Cloud (ASC) or Purpose Built Cloud (PBC);

- Public clouds are CN's business partners for  general pupose, highly scalable computing;

- CN and public clouds are complementary.

# PaaS − HPC/Optimized Computing + Crypto Mining



Services

| Crypto | Blockchain | AI ML/DL | Other |

**Purpose Built Distributed Cloud**

HPC/OC   HPC/OC   HPC/OC

**Purpose Built DC**   **Purpose Built DC**   **Purpose Built DC**

# "Cloud Containers"

Cloud Container / AC



Nvidia GPUs

Cloud Container / AC



Data Storage

Cloud Container



Immersion

**Dream** - Cloud Container



Reflective Paint
Solar Modules
Heat Reuse
Geothermal Heat Pump

# Main Tasks of the HPC/OC POC  (R&D)

- Hybrid clouds with AWS, GCP, OCI (not a multicloud, yet)
- Tensorflow, AI software platform, for ML/DL apps
- Kubernetes ecosystem for SW container-based apps
- Lambda, serverless platform on AWS
- Connectivity with storage/databases from AWS, GCP, OCI
- Cloud container for non-crypto apps (no immersion)
- Identify GPU systems to be used (configuration, real estate, price)

# POC – HPC/Optimized Computing



**Purpose Built Data Center**





**Public Clouds**

# HPC/OC POC – Capex Proposed Budget

| Item | Approximate Budget | Start Date | End Date | Observations |
|------|-------------------|------------|----------|--------------|
| AWS Outpost | $180K-$200K | Q2 | Q3 | + Pay-per-sue AWS |
| Anthos Google | $150k- $180K | Q2 | Q3 | + Pay-per-use GCP |
| OCI ( Oracle) | $10K+ | Q2 | Q3 | + Pay-per-use |
| Cloud container (non – immersion) | $200K-$400K | Q2 | Q3? | Price based on functionality |
| Nvidia GPUs / one container | TBD | Q2 | Q3 | Ideally paid by customers |
| Cyber security reinforcement/container | $20K | Q3 | Q3 | Hardware + Software /Optional |
| MIsc. | $50K | Q2 | Q3 | Hardware/Software |
| Total | $600K - $850 | | | |

# "Buzzwords" - Help

- Hybrid cloud: cloud with services running agnostically on private and public clouds
- IaaS – Infrastructure as a Service
- PaaS – Platform as a Service
- GCP – Google cloud
- OCI – Oracle cloud
- ML – Machine learning: the study of computer algorithms that improve automatically through experience and by the use of data
- DL – Deep learning: a subset of ML focused on algorythms based on artificial neural networks

- Outpost – AWS hybrid cloud
- Anthos – Google hybrid/multi cloud
- TensorFlow – AI platform
- Kubernetes – runtime and platform for SW containers
- Cloud – programming paradigm for distributed logic and data
- Distributed Cloud – heterogeniuos geographic distribution of proprietary clouds
- Container: lightweight, portable, SW execution unit.

# Immersion Container Technologies
# Due Diligence and Validation

**Jeff Tollefson and Nelu Mihai**

## Introduction

Immersion cooling for crypto miners is an effective method to substantially increase hash rate by immersing the miners in a dielectric fluid. Currently ambient air supplied by fans at high flow rates is the primary method of cooling miners and other computational equipment e.g. GPU's. Immersion cooling not only improves hash rate but it is generally not constrained by ambient temperature so immersion cooling can be implemented in areas that would not easily support air cooling. This is important because much of the available low cost power is in areas that have high summer ambient temperatures.

A list of four suppliers of Immersion cooling systems was selected with the intent of ranking them in accordance with several criteria. There are other suppliers but these four are recommended as potential suppliers.

## Ranking Criteria

The suppliers were contacted to provide information on the following criteria which is important to the ranking process:

1. Container dimensions for length, width, and height (feet).
   There must be a minimum floor area (length x width) to facilitate access for surveillance and maintenance. If the floor area is too large, the number of containers that the proposed site could support may be too restrictive.

2. Maximum power per container (kw).
   The power density (number of miners x (power/miner)) should be high in order to maximize revenue per container. The economy of scale should improve in proportion to container power.

3. Power per ft$^2$ of floor area (kw per ft$^2$).
   This criterion is also an indication of power density. For a given container floor area which is approximately length x width, it shows how power is distributed over the footprint of the container. If the total footprint of the containers on a site is the same regardless of the container size, then a higher number for this criterion also will result in a higher site MW usage.

4. Cost per container ($)
   All other criteria being equal, the lowest cost per container would govern.

5. Container cost per kw ($/kw).
   The container cost per kw is an excellent indicator that describes the value associated with the purchase. Other costs associated with operation both fixed and variable need to be considered in determining the present value over the life of the container.

6. Number of miners per container.
   The total number of miners that the container can accommodate was obtained from the supplier.

7. The cost per miner ($/miner).
   This is the ratio of the container cost to the number of miners that the container can accommodate. This criterion shows that a high container cost may be justified if it can accommodate a large number of miners.

8. Delivery time per container i.e. time from P.O to site delivery (weeks).
   When a site demands an expedited timeline for full implementation of containers then this criterion becomes critical.

2

9. Container production rate (number per delivery period).
   Criterion 9 along with criterion 8 is critical when the site demands an expedited timeline for full implementation of the containers.

10. Hash rate improvement vs air cooled containers (%).
    Immersion cooling allows for overclocking miners. Overclocking in air cooled containers may not be possible especially during periods of warm weather.

**Supplier Presentation**

1. DCX Corporation is headquartered in Poland. The company specializes in Immersion Cooling Systems and can supply both modular container units and large systems that can be installed in buildings. DCX is the supplier of the 11 MW single phase liquid immersion cooling system that is being installed in a building at the Big Springs, Tx site. The largest modular container unit that can be supplied as described on the DCX website is a 40 ft container that can accommodate 1080 miners and 3.2 MW density. DCX has been requested to provide information on the 10 criteria but cannot supply it until late in September or early October due to workload on the Big Springs project. The system at Big Springs is comprised of 246 liquid cooling containers that can each accommodate 12 miners, 6 primary cooling loops containing a mixture of ethylene glycol and demineralize water, and 6 dry coolers that are located outside of the building. The system is sound and expected to function as designed. Although information on the modular containers has not been provided, it is expected that the design will be very similar to that at Big Springs but on a smaller scale.

2. CES Intelliflex is headquartered in Edmonton, Alberta. The company produces modular container single phase liquid immersion cooling systems of various sizes ranging from 1.0 MW up to 5.0 MW. The CES design circulates the dielectric fluid through an air-cooled heat exchanger that is located outside of the container (can be roof mounted) so a separate cooling water loop is not

3

required. This method of cooling the dielectric fluid should improve efficiency and optimize the Power Usage Effectiveness (PUE). After having discussions with CES and reviewing some design documentation, their immersion cooling system is sound and is expected to function as designed.

3. Rykor Energy Systems is headquartered in Massachusetts and has a manufacturing facility in Livingston Texas. The company produces modular container single phase liquid immersion cooling systems with sizes up to approximately 1.0 MW. The Rykor design circulates the dielectric fluid through an air-cooled heat exchanger that is located outside of the container, so a separate cooling water loop is not required. This method of cooling the dielectric fluid should improve efficiency and optimize the Power Usage Effectiveness (PUE). Rykor is currently supplying containers to a client and may temporarily be constrained to provide large quantities of complete modules to Compute North. They can supply incomplete modules and provide personnel onsite to complete the installation. After having discussions with Rykor and reviewing some design documentation, their immersion cooling system is sound and is expected to function as designed.

4. Midas Green Technologies is headquartered in Austin Texas. The company produces modular container single phase liquid immersion cooling systems with sizes up to approximately 1.8 MW. The Midas Green design uses a separate ethylene glycol and demineralized cooling water loop that removes heat from the dielectric fluid through a heat exchanger. After having discussions with Midas Green and reviewing some design documentation, their immersion cooling system is sound and is expected to function as designed.

**Spreadsheet**

The attached spreadsheet shows the information for criteria 1 thru 10. Only DCX needs to supply additional information to complete all criteria. Referring to the spreadsheet, some key observations include:

4

- The CES design has the highest power rating.
- The CES design has the highest power rating per square foot of floor area.
- The Midas Green design has the lowest cost per kw.
- Midas Green has the highest production rate.
- Midas Green has the lowest cost per miner.
- The suppliers all show a significant hash-rate improvement over a non-immersion system. The numbers shown appear to be conservative and the actual improvement is likely higher.

**Recommendation**

With the information provided by the suppliers, the following ranking is recommended.

1. CES Intelliflex
2. Midas Green Technologies.
3. DCX
4. Rykor Energy Solutions.

Recommend to buy only one container in the beginning for testing in the field. The soonest we can get one container delivered to Compute North is 16 weeks.

Note: DCX is ranked third because their design for the Big Springs project is well understood and we have communicated extensively with their project team. All of the suppliers have sound designs and should be considered especially if a large deployment is required that would exceed the production capability of any one supplier.

5

**Shortlist of Potential 'Modular Container' Immersion Cooling Systems**

| Supplier | Container Dimensions (ft) | | | Maximum Power per Container | Power per ft$^2$ Floor Area | Cost per Container | Cost per KW | Miners per Container | Cost per Miner | Delivery per Container | Container Production Rate | Hashrate Improvement vs non Immersion | Notes (see below the spreadsheet) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Length | Width | Height | KW | KW/ft$^2$ | ($) | $/KW | | $/miner | Weeks | Number supplied over delivery period | Percent | |
| DCX | 40 | | | 3200 | | | | | | | | 40 | |
| CES Intelliflex | 60 | 13 | 12 | 5000 | 6.4 | 2,500,000 | 500 | 1152 | 2170 | 16 | 18 | 32 | 1, 2 |
| RyKor Energy | 40 | 8 | 9.6 | 923 | 2.9 | 1,298,000 | 1207 | 384 | 3380 | 16 | 10 | 20 | 3 |
| Midas Green | 53 | 8.5 | 9.5 | 1840 | 4.1 | 800,000 | 435 | 480 | 1667 | 20 | 40 | >20 | 4 |

Note 1:  Maximum power of largest container is actually 6000 KW.  Reduced to 5000 KW for conservatism
Note 2:  Under normal conditions production rate is about 20 to 21  containers per 16 week delivery period.
Note 3:  Initial production rate of 10 containers/delivery period increases to 12 containers/4 weeks thereafter.
Note 4:  A cooling container with dimensions of 40(ft) x 8(ft) x 9.5(ft) is also required

6


### Modular Data Center Products

# Compute North
# 18 Rack IT Module



TAS OPJ172
09/13/2021

The information submitted herein is the proprietary and confidential work product of TAS Energy, Inc. ("TAS") and is protected by several patents. It is to be used by you for evaluation purposes only and is not to be disclosed to third parties without the prior written consent of TAS. Any non-authorized disclosure will result in TAS' pursuit of any and all available remedies at law.



Modular Data Center Products

September 13, 2021

Nelu Mihai
Compute North

RE: Firm Bid Proposal, Modular IT Solution

 Dear Nelu,

Thank you for the opportunity to provide a firm quote for your Edge modular IT solution based on the TAS Modular IT design.

The TAS Edge modular IT system has been configured to accommodate 18 standard 48U racks at a capacity of 10kW per rack and has a flexible design architecture with respect to power distribution, IT rack capacity and cooling architectures to allow for IT power and density expansion.

This quotation is based on Compute North's specific requirements per our discussions on August 31 for one Nexus 18 rack compute module.  As discussed, we have quoted the base IT module with a single "A" power feed with 150kW of cooling, N+0 (3 50kW cooling modules) and multiple options for you to choose from for any added features or services.  We did not include shipping in this proposal but will quote that once you determine the final site location.

Regarding the power inputs we discussed on our last call, the cooling modules do require 480v AC while the IT is 415v AC per your inputs.  We just require 480v AC to the module and we will stepdown and distribute the power to the different systems as needed.

Thanks again for the opportunity to support Compute North on this new program and we look forward to working with you and the Compute North team.


Best Regards,

*Ron Mann*

Ron Mann
Vice President Engineering
TAS Energy
M: (832) 350-0181
rmann@tas.com

 

## Scope of Supply Summary

1. Structural Fabrication
   1.1. Supply and fabrication of modular base with assembled dimensions of 11' wide by 40' long by 9' tall less the cooling modules.
   1.2. Supply and fabrication of two commercial doors.
   1.3. Exterior power cabinet for A, B, and Aux, NEMA 3R rated.
   1.4. Standard TAS white paint on all exterior and interior surfaces.
   1.5. Supply and fabrication of walls and framing system for the enclosure.

2. Mechanical
   2.1. Three (3) 50kW DX cooling units to support 150kW, N+0
   2.2. Install exterior wall and ceiling panels as required.
   2.3. Install hot and cold aisle containment separation as required.

3. Electrical
   3.1. 415v AC distributed power to each rack enclosure.
   3.2. 480v AC to DX cooling units.
   3.3. NEMA 3R power cabinet with A power only.
   3.4. Lighting, exit, and 110v convenience power AC outlets.
   3.5. Overhead cable trays for electrical and data cables.
   3.6. Provide bus bar electrical drops for each rack.
   3.7. Single rack PDUs for power distribution of the IT gear.
   3.8. Optional UPS back-up for IT equipment.

4. Management
   4.1. TAS control and monitoring software for all electrical, mechanical systems.
   4.2. BMS interface

5. Fire Detection and Suppression
   5.1. Optional Fire detection and suppression system

6. Rack Integration
   6.1. Optional procurement and installation of 48U racks and PDUs.
   6.2. Optional IT rack integration and testing services.

7. Test and Validation
   7.1. TAS will test and validate all system components prior to shipment.

8. Site Assembly/Commissioning
   8.1. Optional onsite support less cooling unit installation and support equipment costs.
   8.2. Site commissioning and test of system and controls as an option.




Modular Data Center Products

## Pricing

This pricing is based upon TAS Standard Terms & Conditions.

| | |
|---|---|
| Base TAS Edge Module ……………………………………… | $ xxxxxx.xx |
| DX Cooling (3 units), 150kW IT Load …………………… | $ xxxxx |
| Shipping ………………………………………………………… | Not included |
| **Total Base System ……………………………………………** | **$ xxxxxx.xx** |

Module Options:

| | |
|---|---|
| Procure/install 18 IT racks and 1 PDU Rack ………… | $ xxxxx.xx |
| Fire Detection and Suppression System ……………… | $ xxxxx.xx |
| IT UPS Back-Up Support ………………………………… | $ xxxxx.xx |
| Dual Power (B power, ATS and PDUs, Busway) …… | $ xxxxx.xx |
| Rack IT integration Services (TSS) ………………… | $ xxxxx.xx |
| Site Installation and Commissioning …………………… | $ xxxxx.xx |
| N+1 Cooling @ 50kW each …………………………… | $ xxxxx.xx |

## Assumptions

1. Design or construction of the module does not include any NEMA, Seismic, wind or snow load certifications.
2. All utilized components will adhere to standard electrical code requirements.
3. Excludes UL or other module level agency certifications developed or performed by TAS.
4. Shipping, unloading and final placement not included.


