# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MINING PROJECT WIND DOWN HOLDINGS, | § | Case No. 22-90273 (MI) |
| INC. (f/k/a Compute North Holdings, Inc.), *et al* [1] | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## RESPONSE TO PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NOS. 10109, 10151, AND 45 OF ULUCK TECHNOLOGY PTE. LTD
### (Re: ECF 1343)

Creditor ULUCK Technology PTE. Ltd ("ULUCK" and/or "Claimant") by and through its counsel hereby file this Response in Opposition to the *Plan Administrator's Objection to Claim Nos. 10109, 10151, and 45 of ULUCK Technology PTE. Ltd.* (ECF 1343) (the "Claim Objection"), and presents as follows:

---

[1] On September 28, 2023, the Court entered the *Final Decree Closing Certain Cases and Amending Caption of Remaining Cases* [Docket No. 1287], closing the chapter 11 cases of the following sixteen entities: Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The chapter 11 cases of the remaining three Reorganized Debtors: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); and Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551), shall remain open and jointly administered under the above caption. The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

73580576;6

## PRELIMINARY STATEMENT

1.      On July 14, 2021 Compute North LLC ("Compute North" and/or "Debtor") and Claimant entered into a Master Agreement with attached Order Form (the "Master Agreement").[2]

2.      Under the terms of the Master Agreement, Debtor would store, provide certain mining services, and power 300 miners for a five-year term with energy provided at $0.059 per kwh, with an anticipated daily rate of $1,345.76 for a total services fee of $2,422,368.00.

3.      Pursuant to the Master Agreement, Claimant paid the Debtor over $80,000 as a deposit and shipped approximately 190 miners to the Debtor from China, which cost approximately $40,000.

4.      Despite entering into the Master Agreement, accepting the $80,000, and consistently reassuring the Claimant that the Debtor would perform its obligations, the Debtor did nothing.  The Claimant lost the deposit, shipping fees, storage fees, and opportunity costs all because the Debtor utterly failed to fulfill any of its obligations.  Indeed, the miners were never even taken out of their shipping boxes.  A picture sent from the storage facility is attached as **Exhibit 2** to the Declaration of David Zhang in Support of Response to Plan Administrator's Objection to Claim No. 10109, 10151, and 45 of Uluck Technology PTE. LTD ( the "Zhang Decl.")

5.      Despite the Debtor's obvious unjust enrichment and failure to do anything, the Plan Administrator argues that Claimant should receive nothing.   The Plan Administrator's arguments are inequitable, unfair, and contrary to the law.

---

[2] A true and correct copy of the Master Agreement is attached to the Zhang Decl. as **Exhibit 1.**

**RELIEF REQUESTED**

6.      Claimant respectfully requests that this Court (i) overrule the Plan Administrator's

objection to $1,726,759.91 of ULUCK's Claim Nos. 10109, 10151, and 45 as being barred from

recovering under the terms of the Master Agreement.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction of this objection and motion pursuant to 28 U.S.C.

§ 1128 and 11 U.S.C. § 1129.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and § 1409.

9.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B).

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

10.     On July 14, 2021 Compute North and Claimant entered into the Master

Agreement.

11.     Under the terms of the Master Agreement, Debtor would store, provide certain

mining services, and power 300 miners for a five-year term with energy provided at $0.059 per

kwh, with an anticipated daily rate of $1,345.76 for a total services fee of $2,422,368.00.

12.     In relevant part, Minnesota law governs the Master Agreement. *See* Section 16.6.

Two clauses from the Master Agreement relied on by the Plan Administrator are not applicable,

here, Section 6.1 and Section 14. These sections state:

> "**Section 6.1**: The Initial Setup Fees, Initial Deposit and Hardware Deposit are
> non-refundable and non-transferrable under any circumstance."

Master Agreement at p. 2.

> "**Section 14.1**: Customer understands and acknowledges that, in certain situations,
> Services and Equipment functionality may be unavailable due to factors outside
> of Compute North's control. This includes, but is not limited to force majeure,
> weather, network failures, pool operator failures, denial of service attacks,
> currency network outages, hacking or malicious attacks on the crypto networks or

exchanges, power outages, or Acts of God. COMPUTE NORTH SHALL HAVE NO OBLIGATION, RESPONSIBILITY, OR LIABILITY FOR ANY OF THE FOLLOWING: (A) ANY INTERRUPTION OR DEFECTS IN THE EQUIPMENT FUNCTIONALITY CAUSED BY FACTORS OUTSIDE OF COMPUTE NORTH'S REASONABLE CONTROL; (B) ANY LOSS, DELETION, OR CORRUPTION OF CUSTOMER'S DATA OR FILES WHATSOEVER; (C) ANY LOST REVENUE TO CUSTOMER DURING OUTAGES, EQUIPMENT FAILURES, ETC.; (D) DAMAGES RESULTING FROM ANY ACTIONS OR INACTIONS OF CUSTOMER OR ANY THIRD PARTY NOT UNDER COMPUTE NORTH'S CONTROL; OR (E) DAMAGES RESULTING FROM EQUIPMENT OR ANY THIRD PARTY EQUIPMENT.

**Section 14.2**. IN NO EVENT SHALL COMPUTE NORTH BE LIABLE TO CUSTOMER OR ANY OTHER PERSON, FIRM, OR ENTITY IN ANY RESPECT, INCLUDING, WITHOUT LIMITATION, FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS OF ANY KIND OR NATURE WHATSOEVER, ARISING OUT OF MISTAKES, NEGLIGENCE, ACCIDENTS, ERRORS, OMISSIONS, INTERRUPTIONS, OR DEFECTS IN TRANSMISSION, OR DELAYS, INCLUDING, BUT NOT LIMITED TO, THOSE THAT MAY BE CAUSED BY REGULATORY OR JUDICIAL AUTHORITIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OBLIGATIONS OF COMPUTE NORTH PURSUANT TO THIS AGREEMENT. COMPUTE NORTH'S TOTAL CUMULATIVE LIABILITY UNDER THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT LAW, WARRANTY, OR OTHERWISE, SHALL BE LIMITED TO DIRECT DAMAGES NOT TO EXCEED THE AMOUNTS ACTUALLY RECEIVED BY COMPUTE NORTH FROM CUSTOMER IN THE TWELVE (12) MONTHS PRIOR TO THE DATE OF THE EVENT GIVING RISE TO THE CLAIM.

**14.3 Remedy**. Customer's sole remedy for Compute North's non-performance of its obligations under this Agreement shall be a refund of any fees paid to Compute North for the then-current service month. Unless applicable law requires a longer period, any action against Compute North in connection with this Agreement must be commenced within one (1) year after the cause of the action has accrued.

Master Agreement at p. 6.

13.    On July 23, 2021, in connection with the Master Agreement, and upon Debtor's request, Claimant transferred a $83,145.98 deposit to Debtor. *See* Invoice Dated July 15, 2021 and E-mail Correspondence dated July 23, 2021, attached to the Zhang Decl. as **Exhibit 16** and **17**, respectively.

14.     Pursuant to the Order Form, attached as Exhibit A to the Master Agreement, the Initial Deposit Fee, consisted of two months of Service Fees and two Months of Package Fees. These fees, however, are only invoiced beginning on the date of Installation. *See* Zhang Decl. **Exhibit 1**, Attachment A.

15.     On November 12, 2021, Claimant transmitted its first shipment consisting of: 190 miners. This shipment cleared U.S. Customs and Boarder Protection on November 17,2021. *See* Department of Homeland Security Form attached to the Zhang Decl. as **Exhibit 3**.

16.     On May 28, 2022, Debtor transmitted a second shipment consisting of: 184 miners. This shipment cleared U.S. Customs and Boarder Protection on May 29, 2022.  *See* Department of Homeland Security Form attached to the  Zhang Decl. as **Exhibit 4**.

17.     Claimant originally shipped its miners to Los Angeles warehouse.

18.     On May 26, 2022, Debtor contacted Claimant via email and represented it could service 200 units. In relevant part, in the May 26, 2022 email correspondence Debtor states:

        a.  "I understand that you have 200 units that can be delivered to our Granbury site. They can be ready to receive those as soon as tomorrow."

        b.  "Units will be installed same day into the container."

*See* Email Correspondence dated May 26, 2022, attached to the Zhang Decl. as **Exhibit 5.**

19.     Thereafter on, June 17, 2022, Debtor, again, represented it could service Claimant's miners. Debtor stated: "We have made the decision to deploy all 300 of your units at our Granbury, TX facility so there are no further delays." *See* Email Correspondence dated June 17, 2022 attached to the Zhang Decl. as **Exhibit 6**.

20.    Debtor and Claimant made arrangements for delivery, and without further information Debtor confirmed receipt on July 14, 2022. *See* Email Correspondence dated July 14, 2022, attached to the Zhang Decl. as **Exhibit 7**.

21.    While Debtor filed a voluntary petition under title 11 of the United States Bankruptcy Code, on September 22, 2022 (the "Petition Date"), Debtor continued to represent that it could render performance under the Master Agreement. *See* Docket No. 1.

22.    In response to an inquiry from Claimant, regarding the impact of the bankruptcy, and operation of the equipment, Debtor represented that "the Wolf Hollow project company is not part of the bankruptcy filing and is continuing to as planned/communicated. There is no change to the development of the schedule." *See* E-mail Correspondence dated September 27, 2022 attached to the Zhang Decl. as **Exhibit 8**.

23.    Claimant sought additional information from Debtor on multiple occasions, but was—again—mislead or kept in the dark. *See* E-mail Correspondence dated October 6, 2022, October 17, 2022, October 20, 2022, October 30, 2022, November 14, 2022, and November 18, 2022, attached to the Zhang Decl. as **Exhibit 9, Exhibit 10, Exhibit 11, Exhibit 12, Exhibit 13, and Exhibit 14,** respectively.

24.    On November 16, 2022, days before the bar date, Claimant, a foreign corporation, received Debtor's P.O.C. form. Thereafter, on February 24, 2023, Claimant filed proof of claim number 45 in the general unsecured claim amount of $1,726,759.91 ("Claim", which amended previously filed proof of claim nos. 10109 and 10151). *See* Claim attached to the Zhang Decl. as **Exhibit 15**.

25.    In connection with the Master Agreement, Claimant incurred the following costs:

Deposit:                                                    $83,145.98
Shipping Fees:                                          $42,679.73

| | |
|---|---|
| Storage Fees: | $21,350.00 |
| Charge from MVP Logistics: | $3,337.00 |
| Loss of value from purchasing miners in March to receipt back: | $607,300.00 |
| Replacement opportunity cost: | $968,947.20 |
| Total Claim | $1,726,759.91 |

26.     On February 16, 2023, the Court entered an order confirming the *Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc., (f/k/a Compute North Holdings, Inc.) and Its Debtor Affiliates* (ECF 1019) (the "Confirmation Order" and "Plan").

27.     On February 24, 2023, Claimant filed proof of claim number 45 in the general unsecured claim amount of $1,726,759.91 ("Claim", which amended previously filed proof of claim nos. 10109 and 10151.[3])

28.     On November 2, 2023 the Plan Administrator objected to Claim on the basis that Claimant is barred from recovering under the terms of the Master Agreement (the "Objection").

29.     Additionally, the Plan Administrator concedes that the "Debtor did not provide *any* services, under the Master Agreement." *See* Objection at ¶ 12.   Nonetheless, the Plan Administrator argues that Claimant should receive absolutely nothing for the Debtor's complete failure to perform any portion of its obligations under the Master Agreement and receiving over $80,000 in fees.

## **RESPONSE TO OBJECTION**

30.     The Plan Administrator contends that the Claim should be disallowed in its entirety because Claimant contractually waived its Claim. Objection at ¶ 15. Additionally, the Plan Administrator asserts that Section 6.1 relinquishes any rights to deposit funds.  Objection at ¶ 16. Additionally, the Plan Administrator without providing a scintilla of factual evidence and

---

[3] A true and correct copy of ULUCK's Claim(s) are attached the Zhang Decl. as Exhibit 15.

with limited legal analysis contends that Section 14, limits Claimant's ability seek incidental, loss in value, and replacement cost. Objection at ¶ 19.

31.     But these arguments ignore the plain language of the Master Agreement, the applicable law (Minnesota Contract law), and the facts of this case (*i.e.*, the Debtor took over $80,000 and promised to provide services, and did nothing.)

I.      **The Objection does not refute any of the allegations set forth in Claim; thus, the Claims Administrator has failed to shift the burden of proof back to the Claimant**

32.     A claimant's proof of claim is entitled to the presumption of prima facie validity under Bankruptcy Rule 3001(f) only until an objecting party refutes at least one of the allegations that is essential to the claim's legal sufficiency. *In re Starnes*, 231 B.R. 903, 912 (N.D. Tex. 1998).  *In re 804 Congress, L.L.C.*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015). "The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by *substantial evidence*." *In re Gray,* 18-12760 2019 Bankr. LEXIS 934, *8 (Bankr. N.D. Mar. 28, 2019). "In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Id*.

33.     An objecting party must provide the court with evidence above and beyond the blanket assertion of an objection. "The mere filing of an objection does not satisfy this requirement. Furthermore, a litigant who fails to support a point with appropriate authority or fails to show why the point is sound despite a lack of supporting authority loses the point." *In re Wilkinson*, 175 B.R. 627, 628 (Bankr. E.D. Va. 1994). Conclusory statements are insufficient to rebut 3001(f)'s presumption. The objecting party must put forth "evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least

one of the allegations that is essential to the claim's legal sufficiency." *Id.* (quoting *In re Rally Partners*, LP, 306 B.R. 165, 168-69 (Bankr. E.D. Tex. 2003).

34.     Only after the objecting party meets this initial burden does the ultimate burden of proof shift to the creditor-claimant. *In re Nazu, Inc.,* 350 B.R. 304, 323 (Bankr. S.D. Tex. 2006)("Because the Debtor has produced no evidence to rebut Farr's Claim, Farr need not produce additional evidence to prove her Claim beyond a preponderance of the evidence."); *In re Brown,* 221 B.R. 46, 47-48 (Bankr. S.D. Ga. 1998).

35.     Factually, the Plan Administer fails to assert any facts that would undermine the legal sufficiency of the Claim. At best, the Plan Administrator points, without further explanation, to certain provisions of the Master Agreement. The Plan Administrator does not articulate how or why Section 14 and Section 6.1 are applicable. The Claims Administrator does not specifically object to any portion of the Claim. In the Objection to Claim, the Plan Administrator simply states "Based on this express contractual language limiting liability, Claimant is barred from recovering damages" and then lists several kinds of damages.  Objection at ¶ 19. The Objection is simply an impermissible blanket objection.

36.     As stated above, to shift the burden of proof back to the Claimant, the Claims Administrator must present "substantial evidence" to support his objection. *In re Gray,* 18-12760 2019 Bankr. LEXIS 934, *8 (Bankr. N.D. Mar. 28, 2019). Similarly, a mere assertion of an objection - without substantial supporting evidence or really an argument as to why and how these provisions are applicable- does not shift the burden of proof back to the Claimant. *Wilkinson,* 175 B.R. at 628. The Plan Administrator did not offer any evidence, or even an

explanation, to support its Objection. Thus, the Objection lacks specificity and has not met the standard for shifting the burden back to the Claimant.[4]

## II.   Nothing in Section 6 and Section 14 of the Master Agreement apply to the Claim

37.   Claimant paid $83,145.98 as the "Initial Setup," "Initial Deposit," and "Hardware Deposit." Plan Administrator concedes that "Debtor did not provide any services under the Master Agreement prior to the Petition Date." Objection  12. Thus, it did not employ any hardware. Indeed, the Debtor never even opened the shipping boxes containing equipment. **Exhibit 2** of the Zhang Decl. Nevertheless, the Plan Administrator argues that the portion of the Claim for $83,145.98 should be denied based on Section 6.1: "The Initial Setup Fees, Initial Deposit and Hardware Deposit are non-refundable."

38.   Similarly, Section 14 of the Master Agreement does not bar damages. In Minnesota, exculpatory clauses are enforceable only under certain circumstances, and they are not favored in the law. *Schlobohm v. Spa Petite*, 326 N.W.2d 920, 923 (Minn. 1982). "A clause exonerating a party from liability will be strictly construed against the benefited party." *Id.* This Court has balanced the interest in parties' freedom to contract against the disfavor of exculpatory clauses by holding that "parties to a contract may, without violation of public policy, protect themselves against liability resulting from their own negligence." *Id.* at 922-923. "If the [exculpatory] clause is either ambiguous in scope or purports to release the benefited party from liability for intentional, willful or wanton acts, it will not be enforced." *Id; see Dewitt v. London Rd. Rental Ctr., Inc.*, 910 N.W.2d 412, 416 (Minn. 2018) (applying a rule of strict construction to

---

[4] The Plan Administrator cites: *Transport Corp. of America, Inc. v. International Business Machines Corporation*, Inc., 30 F.3d 953, 960 (8th Cir. 1994); *Far East Aluminum Works Ltd. Co. v. Viracon Inc.,* 27 F. 4th 1361, 1366 (8th Cir. 2022) , *Spectro Alloys Corp.* v. Franz, 534 N.W.2d 261, 268-69 (Minn. 1995)*.* These cases analyze damages through the lens of the Uniform Commercial Code (the "U.C.C."). The issues at hand fall outside the scope of the U.C.C. Therefore, none of the Plan Administrator's cited authority is relevant or controlling.

an ambiguous indemnification provision because "we disfavor agreements seeking to indemnify the indemnitee for losses occasioned by its own negligence" ); *Solidification, Inc. v. Minter*, 305 N.W.2d 871, 873 (Minn. 1981) (applying a rule of strict construction to exculpatory clauses); *Justice v. Marvel, LLC*, 979 N.W.2d 894, 901-02 (Minn. 2022) (Invalidated language in an exculpatory clause that clearly prohibited "any and all claims" simply because the "negligence" of the operator was not included.)

39.    When the "express contractual language" of Section 14 is analyzed through this lens it becomes evident that it is not applicable here. Objection at 19. Section 14.1, deals with factors outside Debtor's control and third party acts. The very first sentence frames the scope of the provision and states that "Services and Equipment *functionality* may be unavailable due to factors outside of Compute North's Control." (emphasis added) The second sentence provides examples of the kind  of circumstances this provision contemplates. For example, "weather," "network failure," and "Acts of God."

40.    The Plan Administrator does not, and cannot, assert that Debtor's inaction is the result of any third party act. In fact, Debtor actively represented that it would perform under the contract, and stated it had the ability to install the equipment in one of its other locations. *See* Email Correspondence dated June 17, 2022 attached to the Zhang Decl. as **Exhibit 6.**  Moreover, "functionality" is not at issue here because Debtor did not render any services under the Master Agreement.   Applying strict construction, Section 14 is at best ambiguous, and thus not enforceable.

41.    Debtor's reliance on 14.2 suffers from a similar flaw. In Section 14.2, Debtor does three things. First, it lists who is covered by the clause –"Customer," "any other person," or "firm," and then follows with kinds damages it seeks to limit – "indirect,"  "consequential" and

"special," for example. Thereafter, the kind conduct covered by the clause, "MISTAKES," "NEGLIGENCE," "ACCIDENTS," "ERRORS," "OMISSIONS," "INTERRUPTIONS." Lastly, and most critically, Debtor defines whose conduct is covered by the provision:

> "INCLUDING BUT NOT LIMITED TO, THOSE THAT MAY BE CAUSED BY *REGULATORY OR JUDICIAL AUTHORITIES* ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OBLIGATIONS OF COMPUTE NORTH PURSUANT TO THIS AGREEMENT."

Master Agreement at p. 6, ¶ 3.

42.     Accordingly, the scope of Section 14.2 is limited to damages caused by regulatory or judicial authorities that: arise out of or relate to the agreement or Debtor's obligations. Here, again, the Plan Administrator fails to articulate how any regulatory or judicial authority caused Claimants asserted damages. As with Section 14.1, a strict construction of Section 14.2 renders it inapplicable.

43.     Lastly, Section 14.3 is equally inapplicable. Section 14.3 attempts to limit Debtors liability for nonperformance to a refund "for the then-current service month." The question whether or not a remedy specifically set forth in a contract is intended to be an exclusive remedy is to be determined from a careful analysis of the contract in its entirety in the absence of circumstances readily showing that the remedy was intended to be exclusive; Minnesota Courts have repeatedly held that a specified remedy should be considered as permissive rather than exclusive and thus not a bar to other remedies provided by law. *See Tunell v. D.M. Osborne & Co.* 31 Minn. 343, 17(1883); *D.M. Osborne & Co. v. Marks*, 33 Minn. 56, (1885).

44.     Debtor concedes that it did not render services under the contract. *See* Objection at ¶ 19. Therefore, there is no "then-current service month" applicable. The parties intended for this provision to control once Debtor began to service the miners.

**III.    Despite the Plan Administrator's unpersuasive reliance on certain contract provision, Claimant is entitled to recover on multiple common law tort remedies, including (a) breach of the implied covenant of good faith and fair dealing, (b) misrepresentation, and (c) repudiation**

 *a. Debtor breached the covenant of good faith and fair dealing*

  45. In Minnesota, "every contract includes an implied covenant of good faith and fair dealing." *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) "[C]ourts employ the good faith performance doctrine to effectuate the intentions of parties, or to protect their reasonable expectations." Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 371 (1980). The implied covenant of good faith and fair dealing applies when one party exercises discretion, thereby controlling the other party's benefit. *Id* at 369. "Bad faith is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties." *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W. 2d 121, 125 (Minn. App. 1998). Under the implied covenant of good faith, "a party to a contract cannot avoid its duties under the contract by . . . disabling itself from performance." *Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443, 449 (Minn. 1980); *see also Miller v. O.B. McClintock Co.*, 210 Minn. 152, 159, 297 N.W. 724, 728 (1941) ("A person may not escape liability under an agreement upon a condition by preventing the happening of the condition.").

  46. Here, the Debtor assured Claimant that it would perform services under the Master Agreement, time and time again, and thus the Claimant sent the Debtor over $80,000 and hundreds of minors. *See* Zhang Decl. at 9, 10 and 6. In turn, the Debtor pocketed the cash and did nothing.

       b.     *Debtor fraudulently misrepresented its ability and intent to perform under the Master Agreement and concealed material information from Claimant*

47.     To prevail on a claim for fraud in Minnesota, a plaintiff must show that: (1) there was a false representation by a party of a past or existing material fact, susceptible of knowledge (2) the representation was made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) The representation was made with the intention to induce another to act in reliance thereon; (4) The representation caused the other party to act in reliance thereon; and, (5) That the party suffered pecuniary damage as a result of the reliance. *See Aranda v. Ruelas*, 2020 Minn. Lexis 5262, *62 (27-CV-18-12854)(Minn. May, 27, 2020) (citing *Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 533 (Minn. 1986) (citing *Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 533 (Minn. 1986).

48.     In *Sjogren,* the Minnesota Supreme Court held that nondisclosure or concealment of material information can be regarded as a misrepresentation for the purposes of applying the standard for fraudulent misrepresentation where one of the three "special circumstances" mentioned in *Klein v. First Edina Nat. Bank*, 293 Minn. 418, 196 N.W.2d 619, 622 (1972) are present. *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 366 (1976). The *Klein* "special circumstances" include:

       a.     One who speaks must say enough to prevent his words from misleading the other party. (citing, *Newell v. Randall*, 32 Minn. 171, (1884))

       b.     One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. (citing, *March v. Webber*, 13 Minn. 99 (109) (1868)).

c.    One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. *See*, *e.g.*, *Wells-Dickey Trust Co. v. Lien*, 164 Minn. 307, 204 N.W. 950 (1925).

49.    In *Newell*, the defendant responded to a direct question about his finances, prior to a merchant agreeing to let him purchase items on credit. *Newell v. Randall*, 32 Minn. 171, 172 (1884). The defendant represented to have "merchandise and book-accounts, to the amount of $3,000," but omitting indebtedness in his business to the amount of $2,100. *Id*. The Court found that this was not "mere passive non-disclosure" and the half-truth communicated by defendant was "calculated to convey false impression." *Id*. at 172-73.

50.    Here, Debtor falsely represented that it intended to perform under the Master Agreement. Debtor was aware of the falsity of the statement; Debtor made this representation to induce Claimant and indeed caused Claimant to act in reliance thereon; and, as a result, Claimant suffered damages.

      *c.    Debtor's nonperformance constitutes a material breach justifying recession of the Master Agreement*

51.    Generally, "rescission of a contract is justified by a material breach or substantial failure in performance." *Cloverdale Foods of Minn., Inc. v. Pioneer Snacks*, 580 N.W.2d 46, 49 (Minn. App. 1998) (citing *Cut Price Super Markets v. Kingpin Foods, Inc.*, 256 Minn. 339, 398 (1959)); *see also Busch v. Model Corp.*, 708 N.W.2d 546, 551 (Minn. App. 2006). "A material breach is '[a] breach of contract that is significant enough to permit the aggrieved party to elect to treat the breach as total (rather than partial), thus excusing that party from further performance and affording it the right to sue for damages.'" *BOB Acres, LLC*, 797 N.W.2d 723, 728-729; *Sitek v. Striker*, 764 N.W.2d 585, 593 (Minn. App. 2009). A breach is material if "one of the

primary purposes: of the contract is violated, or if it "goes to the root or essence of the contract." *Steller v. Thomas*, 232 Minn. 275, 542 (1950); *BOB Acres*, LLC, 797 N.W.2d at 728. The party asserting excuse of performance or rescission has the burden to prove materiality. *Berg v. Ackman,* 431 N.W.2d 264, 266 (Minn. App. 1986); *Space Or., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450 (Minn. 1980) (holding "the general defects clause in this purchase agreement does not apply to defects that arise from factors within the control of the vendors. We cannot accept the interpretation that would allow vendors to escape performing the overall purpose of the transaction, that of the sale of real property, by creating a title defect.")

52.     Here, Debtor did not perform any services. The Debtor did nothing. Thus, Claimant has the right to rescind the agreement and sue for damages.

## <u>CONCLUSION</u>

WHEREFORE, ULUCK Technology PTE Ltd., respectfully requests that this Court overrule the Plan Administrator's Objection to Claim Nos. 10109, 10151, and 45 in its entirety.

*[remainder of page intentionally left blank]*

73580576;6

Dated: December 4th, 2023          Respectfully submitted,

                                   **AKERMAN LLP**

                                   _/s/ David W. Parham_
                                   David W. Parham, SBN: 15459500
                                   2001 Ross Avenue, Suite 3600
                                   Dallas, TX 75201
                                   Telephone:   (214) 720-4300
                                   Facsimile:    (214) 981-9339
                                   david.parham@akerman.com

                                   -and-

                                   R. Adam Swick, SBN 24051794
                                   AKERMAN LLP
                                   500 West 5th Street, Suite 1210
                                   Austin, Texas 78701
                                   Telephone:     (737) 999-7103
                                   Facsimile:      (512) 623-6701
                                   adam.swick@akerman.com

                                   _Counsel to ULUCK Technology PTE. Ltd._

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 4, 2023, a true and correct copy of the foregoing was served via the Court's Electronic Case Filing System to all parties registered or otherwise entitled to receive electronic notices including to the following:

PLAN ADMINISTRATOR

Michael Tribolet
c/o Kara E. Casteel
Nicholas C. Brown
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
kcasteel@askllp.com
nbrown@askllp.com

                                   _/s/ David W. Parham_
                                   David W. Parham

73580576;6