**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 22-90273 (MI)<br><br>(Jointly Administered) |
| TRIBOLET ADVISORS LLC, IN ITS CAPACITY AS PLAN ADMINISTRATOR AND TRUSTEE FOR THE MINING PROJECT WIND DOWN HOLDINGS, INC. LITIGATION TRUST,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID PERRILL, PETER J. LEE, TAD PIPER, MARSHALL JOHNSON, SPENCER BARRON, TOM KIEFFER, KYLE WENZEL, KRISTYAN MJOLSNES, ELI SCHER, and JOSE LIMA,<br><br>    Defendants. | Adv. Pro. No._____ |

---

[1] On September 28, 2023, the Court entered the *Final Decree Closing Certain Cases and Amending Caption of Remaining Cases* [Docket No. 1287], closing the chapter 11 cases of the following sixteen entities: Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The chapter 11 cases of the remaining three Reorganized Debtors: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); and Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551), shall remain open and jointly administered under the above caption. The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

# COMPLAINT

Tribolet Advisors LLC ("Plaintiff"), Plan Administrator for the confirmed Third Amended Joint Liquidating Chapter 11 Plan of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and its Debtor Affiliates [Dkt. No. 889] (the "Plan") and Trustee for the Litigation Trust of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) and its Debtor Affiliates (collectively, "Compute North" or the "Debtors" and, as of the Plan's effective date, the "Reorganized Debtors"), hereby files this adversary complaint (the "Complaint") against Defendants David Perrill, Peter J. Lee, Tad Piper, Marshall Johnson, Spencer Barron, Tom Kieffer, Kyle Wenzel, Kristyan Mjolsnes, Eli Scher, and Jose Lima (collectively, the "Defendants"), by its attorneys McDermott Will & Emery LLP, alleging upon information and belief the following:

## I.  INTRODUCTION

1.      Defendants—former officers and directors of Compute North—flagrantly breached fiduciary duties they owed to Compute North, which ultimately culminated in the loss of key company assets and Compute North's bankruptcy.

2.      Compute North originally was founded as a "self-mining" cryptocurrency ("crypto") company.  Compute North mined Bitcoin ("BTC") for itself and then sold the mined Bitcoin to earn revenue.

3.      Compute North subsequently developed a second business segment — its "Hosted Cryptocurrency Mining Service" or "Colocation Service".  Through this business segment, Compute North developed and operated crypto mining data center facilities.  Compute North generated revenue by providing access to the crypto mining data center facilities and offering managed service packages to customers interested in mining their own crypto.

2

4.      Problems befell Compute North when Defendants prioritized rapidly increasing the size of the company and preparing it for an initial public offering ("IPO") in the hopes of reaping personal profits over the best interest of the company.  Defendants promulgated a "Lets F*cking Go" culture, engaging in reckless actions that were not in the best interest of Compute North and ultimately jeopardizing the very survival of Compute North.

5.      Defendants agreed to four different risky financing arrangements to raise capital, including a debt financing arrangement with Generate Capital, PBC ("Generate") that was secured with some of Compute North's most profitable assets – two crypto mining facilities.  Despite knowing that Compute North would likely be unable to survive as a company without these assets, Defendants were responsible for Compute North defaulting on its financing arrangement with Generate.

6.      Certain of the Defendants also recklessly caused Compute North to execute over $86 million in purchase orders for crypto mining containers to support aggressive company growth goals.  These purchase orders drained the company of liquidity it needed to continue to operate as a going concern and greatly exacerbated Compute North's liquidity crisis.  The Defendants responsible for executing these purchase orders ignored financial risk warnings from members of Compute North's accounting and finance team and signed these purchase orders without presenting them to the Board of Directors.  These Defendants also recklessly relied on the hope that Generate would provide additional funds to satisfy the debt incurred by these purchase orders, without any assurance from Generate that it would provide such funding.

7.      Defendants were aware that they—and individuals they hired—did not have the requisite experience to safely operate Compute North, monitor its finances, handle risky debt

financing arrangements, or oversee Compute North's rapid expansion plans. However, Defendants did nothing to remedy this problem.

8.      External auditors, consultants, and even certain Compute North employees explicitly warned Defendants that Compute North's internal controls, financial oversight, and risk management measures were deficient and posed a significant risk to the company's ability to continue as a going concern. Yet, Defendants consciously disregarded this guidance at the expense of the company.

9.      Defendants masked and endangered Compute North's financial health by utilizing deferred accounting revenue without making sure that adequate internal controls were implemented to ensure accuracy and integrity of the company's financial statements.

10.     Defendants knew that Compute North's profitability could be significantly impacted by price volatility in the crypto and electricity markets, yet failed to take adequate measures to account for these risks. Defendants also failed to implement adequate internal controls and risk management measures with respect to capitalizing hedges for Compute North's Hosted Cryptocurrency Mining Service customer contracts, which caused Compute North to take on excessive risk.

11.     Despite Compute North's liquidity issues, the Officer Defendants continued to receive large bonuses.

12.     Certain of the Defendants also used Compute North as their own personal piggy bank at the expense of Compute North and its creditors, using Compute North's funds for lavish personal expenses and strip clubs in the disguise of "business expenses" and intermingling aspects of Compute North's business with other business entities owned by the CEO of Compute North.

13.     When Compute North was on the verge of filing for bankruptcy, certain Defendants recklessly caused Compute North to enter into a multi-million dollar contract with a customer without disclosing Compute North's default under the Generate Credit Agreement or Compute North's impending bankruptcy.  This subjected Compute North to a risk of a multi-million-dollar lawsuit on the eve of Compute North filing for bankruptcy, which this customer subsequently filed in the U.S. District Court for the District of Minnesota.

14.     The Defendants additionally failed to act in Compute North's best interest when they failed to adequately safeguard Compute North's physical assets, which caused Compute North to sustain additional losses.

15.     At all relevant times, the Board was passive and failed to take steps to protect Compute North's long-term solvency and viability as a company.

16.     Plaintiff brings this action to recover damages from Defendants, each as an officer and/or director of Compute North at all relevant times hereto, for multiple breaches of their fiduciary duties owed to Compute North, including the duties of due care, loyalty, good faith and oversight, in connection with Defendants' conduct and omissions, including, among other things, their: (a) approval of material and risky financial, transactional, and/or strategic decisions that imperiled Compute North's liquidity and its key assets; (b) failure to hire, train, and supervise individuals with sufficient expertise and competencies to manage and to operate Compute North, (c) failure to implement and maintain effective internal controls, risk mitigation measures, recordkeeping, and financial oversight; (d) failure to oversee and manage Compute North's operations and financial reporting; (e) prioritization of Compute North's expansion and preparation for an IPO to the detriment of the company; (f) failure to remedy deficiencies identified internally and by external experts; (g) failure to maintain accurate records necessary for auditors

to reconcile deferred revenue and complete an audit of Compute North's FY 2021 financial statements; (h) allowance of Compute North to transact with other entities owned or controlled by Defendant Perrill without an assessment of fair market value; (i) approval and/or allowance of inappropriate and excessive travel and entertainment expenses to be approved and reimbursed with company funds; (j) conscious disregard of glaring issues in Compute North's financial information or lack thereof; (k) conscious disregard of known risks to Compute North's solvency and liquidity and failure to stay adequately apprised of Compute North's liquidity; (l) actions and/or inactions which caused Compute North to default on key financing agreements; (m) failure to seek written approval from Generate for Compute North to own bitcoin as required under the debt financing agreement; (n) failure to adequately safeguard Compute North's physical assets; and (o) failure to approve remedial measures that could have helped Compute North during its liquidity crisis.

17.      As a direct and proximate result of the actions or omissions of the Defendants that knowingly or recklessly placed Compute North's fiscal health and solvency directly at risk, Defendants are responsible for the damages suffered by Compute North in the form of lost assets, lost revenue, increased insolvency, unnecessary proliferation of creditor claims, and expenses incurred in this bankruptcy case.

18.      Plaintiff also seeks to recover all amounts fraudulently transferred to certain of the Defendants for little or no consideration or benefit to Compute North.

## II.  PROCEDURAL BACKGROUND

19.      On September 22, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code").  The respective cases of the Debtors were ordered jointly administered under Case No. 22-90273 (the "Bankruptcy Case").

6

20.     On February 16, 2023, the Court confirmed the Plan, which provided for the appointment of the Plan Administrator and establishment of the Litigation Trust.  The effective date of the Plan was March 31, 2023 (the "Effective Date").

21.     On the Effective Date, pursuant to Bankruptcy Code section 1123(b), certain retained claims and causes of action (the "Retained Causes of Action") were transferred and vested in the Litigation Trust.[2]  The Retained Causes of Action include all the Debtors' rights, remedies, claims, and causes of action against the Defendants.[3]  Plaintiff, as Trustee of the Litigation Trust, has authority to administer, pursue, prosecute, litigate, settle, dismiss, or otherwise take action in furtherance of resolving each of the Retained Causes of Action.

### III.  JURISDICTION AND VENUE

22.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and section 12.1.5 of the Plan.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409 in that this is the District in which the Bankruptcy Case is pending.

24.     This Adversary Proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that this Court, absent consent of the

---

[2]     Plan § 4.2.8.

[3]     The Retained Causes of Action are described in the *Schedule of Retained Causes of Action* [Dkt. No. 818].

parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

25.    This Adversary Proceeding relates to the Bankruptcy Case.

## IV.  PARTIES

26.    Tribolet Advisors LLC, in its capacity as the Plan Administrator for the Plan and Trustee for the Litigation Trust, is the Plaintiff herein and may be served in this case through its undersigned counsel.  Pursuant to the Plan, Plaintiff is the sole representative of the Reorganized Debtors' estates and has authority to administer, pursue, prosecute, litigate, settle, dismiss, or otherwise take action with respect to the Debtors' claims and causes of action against the Defendants.

27.    Defendant David Perrill ("Perrill"), an individual, upon information and belief, resides in Eden Prairie, Minnesota.  Perrill was the founder and former Chief Executive Officer ("CEO") of Compute North.  Perrill served as CEO from August 2017 until September 2022.  At all relevant times, Perrill was also a Director on the Board of Directors of Compute North (the "Board").

28.    Defendant Peter J. Lee ("Lee"), an individual, upon information and belief, resides in Wayzata, Minnesota.  Lee was the co-founder of Compute North and former Chairman of the Board.  Lee served on Compute North's Board from August 2017 until December 2022.  At all relevant times, Compute North marketed Defendant Lee as a member of its executive leadership team, specifically the "Executive Director - Energy".

29.    Defendant Marshall Johnson ("Johnson"), an individual, upon information and belief, resides in Long Lake, Minnesota.  Johnson was the former President of Compute North. Johnson served as President from June 2019 until March 2021.  From or before March 2020 until

February 28, 2022, Defendant Johnson was a Director on the Board. After Defendant Johnson's tenure on the Board ended in February 2022, he became an advisor to the Board.

30.     Defendant Spencer Barron ("Barron"), an individual, upon information and belief, resides in Eden Prairie, Minnesota. Barron was the former Chief People Officer ("CPO") and VP of Finance of Compute North. Barron served as VP of Finance from January 2018 through August 2019. Barron served as CPO from November 2021 until October 2022.

31.     Defendant Kyle Wenzel ("Wenzel"), an individual, upon information and belief, resides in Minneapolis, Minnesota. Wenzel was the former Chief Commercial Officer ("CCO") and Vice President of Sales of Compute North. Wenzel served as Vice President of Sales from March 2021 until October 2021. Wenzel served as CCO from October 2021 until October 2022.

32.     Defendant Tad Piper ("Piper"), an individual, upon information and belief, resides in Minneapolis, Minnesota. Piper was the former Chief Financial Officer ("CFO") of Compute North. Piper served as CFO from May 2020 until June 2022.

33.     Defendant Kristyan Mjolsnes ("Mjolsnes"), an individual, upon information and belied, resides in Eden Prairie, Minnesota. Mjolsnes was the former VP of Marketing of Compute North from October 2019 until October 2022.

34.     Defendant Eli Scher ("Scher"), an individual, upon information and belief, resides in New York, New York. Scher was a former Director of the Board. Scher served as a Director of the Board at all relevant times.

35.     Defendant Jose Lima ("Lima"), an individual, upon information and belief, is a citizen of Houston, Texas. Lima was a former Director of the Board. Lima served as a Director of the Board at all relevant times.

36.     Defendant Tom Kieffer ("Kieffer"), an individual, upon information and belief, resides in Minneapolis, Minnesota.  Kieffer was a former Director of the Board.  Kieffer served as a Director of the Board at all relevant times.

37.     The individual Defendants identified in paragraphs 27 to 36 above are referred to collectively as "Defendants".  The individual Defendants identified in paragraphs 27 to 33 above were officers of Compute North and are referred to collectively as "Officers" or the "Officer Defendants".  The individual Defendants identified in paragraphs 27 to 29 and 34 to 36 above were members of the Board of Compute North and are referred to collectively as "Directors" or "Director Defendants".

38.     The Defendants were officers, directors, and/or employees of Compute North, which had its principal office located at 7575 Corporate Way, Eden Prairie, Minnesota 55344.

## V.  BACKGROUND ON CRYPTOCURRENCY MINING

39.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens."  Cryptocurrencies are digital assets that hold value and can be used to buy goods and services.  Bitcoin (BTC) and Ethereum (ETH) are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

40.     All cryptocurrencies exist on a "blockchain."  A blockchain is an open-sourced string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.

41.     All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are validated in batches of transactions, called "blocks."

42.     Those "blocks" are publicly available and reflect all the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

43.     There are a number of different blockchains.  The first and most popular blockchain is the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.

44.     The process by which BTC is created and BTC transactions are validated is referred to as "mining."  Cryptocurrency miners utilize high-powered computers, which devote computer power to solve complex cryptographic puzzles on the BTC computer network.  Once a miner solves the cryptographic puzzle, it will have validated a BTC transaction and created a new block in the blockchain.  To incentivize participation in the validation of BTC transactions, miners who validate transactions are rewarded with newly-minted BTC.  Currently, the reward for mining one block is 3.125 BTC.

## VI.  FACTS SUPPORTING CLAIMS

**A.     Compute North's Founding and Business Segments**

### *i.  Defendants Perrill and Lee Co-Founded Compute North*

45.     Defendants Perrill and Lee co-founded Compute North LLC ("CN LLC") in 2017. At its founding, CN LLC was 50% owned by Perrill Technology, LLC ("PerrillCo"), of which Perrill is the sole member, and 50% owned by Coeranbrooke, LLC, of which Lee is the sole member.

46.     Compute North Holdings, Inc. ("CN Holdings") was formed on November 4, 2020. CN Holdings is the direct parent of, and owns 100% of the equity interests in, CN LLC.  In turn, CN LLC is the direct or indirect parent of all the remaining Debtor entities, controlling (either directly or indirectly) 100% of the equity interests of all the remaining Debtors.  A chart summarizing Compute North's organizational structure is attached hereto as Exhibit A (the "Organizational Chart").

47.     Upon information and belief, Defendant Perrill had no experience working in the cryptocurrency or cryptocurrency mining industries prior to co-founding CN LLC.  His previous experience included:  (i) founder and CEO of Secure Connect, Inc., which focused on Payment Card Industry (PCI) compliance and network security for the restaurant and hospitality industry; and (ii) CEO of Digital Clinic, which was a company focused on digital signage in the dental, medical and veterinary fields.

48.     Upon information and belief, Defendant Lee had no experience working in the cryptocurrency or cryptocurrency mining industries prior to co-founding CN LLC.  Prior to, and at the time of founding CN LLC, Defendant Lee was Co-Founder and Managing Partner of EverStream Energy Capital Management, LLC, an investment company focused on sustainable and renewable energy investing.

*ii.  Compute North's Board of Directors*

49.     Defendants Perrill and Lee were Directors on Compute North's Board from the time it was formed until Compute North declared bankruptcy on the Petition Date.

50.     Defendant Johnson was appointed to be a Director on the Board on or before March 2020.  Defendant Johnson was a Director until February 28, 2022, after which time he became a Board advisor.

12

51.     Defendant Lima was appointed to be a Director on the Board on or before March 2020.  Defendant Lima was a Director when Compute North declared bankruptcy on the Petition Date.

52.     Defendant Kieffer was appointed to be a Director on the Board on or before November 2020.  Defendant Kieffer was a Director until February 28, 2022, after which he became a Board advisor.

53.     Defendant Scher was appointed to be a Director on the Board on or before March 2021.  Defendant Scher was a Director when Compute North declared bankruptcy on the Petition Date.

54.     Andrew Marino was appointed to be a Director on the Board on or before February 2022.  Mr. Marino served on the Board until his resignation from the Board in July 2022.

55.     Brian Falik was appointed to be a Director on the Board on or before February 2022.  Mr. Falik served on the Board until his resignation from the Board in August 2022.

56.     Steve Stenbeck was appointed to be a Director on the Board on or before February 2022.  Mr. Stenbeck served on the Board until his resignation from the Board in July 2022.

57.     Scott Tillman was appointed to be a Director on the Board on or before August 2022.   Mr. Tillman was a Director when Compute North declared bankruptcy on the Petition Date.

### iii. Compute North's Self-Mining Crypto and Crypto Mining Equipment Sales Business Segment

58.     Compute North was initially founded as a self-mining crypto company. (*Declaration of Harold Coulby, Chief Financial Officer and Treasurer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 22] (the "First Day Decl."), ¶ 41.)

59.     Compute North generated revenue through selling BTC[4] it was rewarded from crypto mining.  Compute North would sell the BTCs it mined for their value in U.S. dollars the same day it obtained the BTCs.  Accordingly, Compute North did not typically hold BTC on its balance sheets.  (First Day Decl. ¶¶ 41-42.)  Instead, the balance sheets reflected the fiat U.S. dollar proceeds from Compute North's mined BTC.

60.     Compute North also derived revenue from selling cryptocurrency mining equipment to customers.

### iv. Compute North's Hosted Cryptocurrency Mining Service Business Segment

61.     In 2018, Compute North developed its Hosted Cryptocurrency Mining Service. This business segment was focused on providing mining infrastructure and computing space to customers in the cryptocurrency mining industry, including publicly traded companies.

62.     Through this business segment, Compute North developed and managed computer data centers (each, a "Facility," multiple, "Facilities").  These Facilities offered crypto mining customers "a suite of services that range[d] from offering rack space, energy and broadband access to a full scale, hands-on experience which provide[d] customers with services including monitoring, troubleshooting, firmware management, miner configuration and mining pools." (*Id.* ¶ 34.)  The Facilities were sustainably designed to take advantage of renewable energy sources like solar and wind, which garnered attention from investors and lenders.

63.     Compute North purchased, developed, and/or expanded Facilities in Texas, Nebraska, and South Dakota.  Compute North operated three fully operational Facilities, located in Big Spring, Texas ("Big Spring Facility"), Sioux City, South Dakota ("Sioux City Facility"), and Kearney, Nebraska ("Kearney Facility"); operated two Facilities that were still expanding,

---

[4]     BTC was the first, and is currently the most popular, cryptocurrency.

located in McCamey, Texas ("<u>King Mountain Facility</u>") and Wolf Hollow, Texas ("<u>Wolf Hollow</u> <u>Facility</u>"); and was developing two Facilities in Minden, Nebraska ("<u>Minden Facility</u>") and Corpus Christi, Texas ("<u>Bootstrap Facility</u>").

**B.    Defendants Promulgated a Company Culture of Reckless, "LFG" Decision Making**

64.    Defendants, by reason of their positions as officers, directors, and fiduciaries of Compute North and because of their ability to control the business and corporate affairs of Compute North, owed a duty to act in the best interests of Compute North and to exercise good faith and diligence in the management of the financial affairs of Compute North and the use and preservation of its assets.    Yet, Defendants did not reasonably and prudently oversee Compute North's finances, assets, and risk mitigation measures.

65.    Defendants sought to pursue aggressive growth opportunities that were presented to them without thinking about the risks and negative consequences that Compute North and its financial health could or would face as a result of pursuing such opportunities.

66.    Defendants approached potential problems with a we will "figure it out" attitude. However, this approach quickly escalated to the point where Defendants were unable to "figure it out" as problems started to arise and compound from Compute North's pursuit of so many growth opportunities.

67.    Defendants' reckless decision making was driven, in part, by a company culture of "LFG[5] momentum" that was championed by Defendant Perrill.

68.    Officer Defendants would often sign emails sent to other Compute North employees stating "LFG!!!".

---

[5]    "LFG" means "Lets F*cking Go."

69.     In March 2022, Defendant Lee sent Defendant Perrill an email describing Compute

North's LFG culture and his fears about leadership in place.

Date:   Thu, 24 Mar 2022 10:18:41 PM -0500
Sent:   Thu, 24 Mar 2022 10:18:40 PM -0500
Subject: Re: Confidential thoughts.
From:   pj.lee@computenorth.com
To:     Dave Perrill <dave.perrill@computenorth.com>;
Thanks for the question. I want to give it a lot more thought but will give you a steam of consciousness (which comes at the risk of responding too quickly without having filtered and refined all of my thinking).  These are meant for you to ponder during your vacation.

My quick reaction to your question is that I don't feel safe with the leadership in place now. Not because they are not capable (the opposite) but because they are not deeply experienced in the field of energy or project development, real estate and construction. They are learning on the job and they will naturally make mistakes as they learn. Everyone does. They are not connected in our industry and will take more risks than they need to or give away money to people that are happy to take our lunch and gouge us.  They are hiring people that they think are experienced in the industry but what i see is hiring junior talent that are not better than they are. There is a prevailing mind set to LFG every step along the way but not a cautious nature to every major decision that is made. I am used to a culture of deeper thought and analytics that we don't have. I am amazed that major 8 or 9 figure decisions are not made with extensive modeling and sensitivity analysis. We don't have ANY analyst resources that build models, understands them or follow the answers that analytical thought and debate provides. It scares the hell out of me. The dollar amounts are getting larger and the stakes are getting higher while the investors growing more sophisticated. We of course need to keep pace in a rapidly changing industry and we are in a coveted pole position that is fleeting if we don't make the right moves .  I am used to a culture of more debate and analytical decision making. I would hire more people from real estate or renewable energy development and operations as they are the closest comparables to our industry. At the same time we need to invent a BRAND NEW business of ODC which is your background and opportunity to differentiate with technology innovation but we are behind (probably because we hired the wrong CTO). A start up within a growing company will be hard. Resources will need to be pulled from elsewhere but everyone is stretched. How should they be allocated?

The capital need is far greater than it ever was and the wrong decisions mean the difference between life for death.  I have seen a lot of death from eager companies in capital intensive industries that overextended and couldn't catch up when markets turned or others could raise more money more effectively. Capital support will come but only if the money is convinced that the leadership has the right experience and the right connections to be successful. We don't yet, IMO

So where do we go?  Constantly challenging and questioning our decisions is important. Ruthlessly killing customers or projects that aren't the best of the best. We serve the most pressing industry need, capacity, and can push customers to what makes sense for us rather than hurt ourselves or take excessive risk to help them. That will change. Energy companies will (and are) coming into our sector. We need to build more moats of technology.  We need to build more long term assets on our balance sheet. Land. BTC. IP.

On culture I think we need to expand our DNA to a culture where saying "no" is valued instead of a pure entrepreneurial culture of saying yes to everything now and figuring it out later. We should Be vigilant about questioning the skills and experiences of the people we hire, not defaulting only to people we know or people that we thing are aggressive go-getters.  We should surround ourselves with experienced people and executives or if we haven't identified the best person, default to independent consultants that know the industry and can guide us. We should continue to strive for more knowledge, more connections, more leadership and be number one. Not just let the public companies command all the respect. We should be willing to re-invent ourselves constantly because our world changes several times in a year. We should not play catch up to mistakes we have made in the past which only perpetuates  issues long term decisions. We should cut our losses quickly. We should Analyze decisions carefully and seek the best expertise that money can buy.

Tangibly speaking, we need more sophistication in capital formation / capital markets. We need more experience in commodity risk management. We need more expertise in power procurement. We need more expertise in new market/new technology formation. I think we are too quick to give C level titles to people too new in their field because it doesn't give any room for people to prove themselves into and doesn't leave enough competitive tension for others to work themselves toward. It creates empires that invent people to not bring in the best talent that could potentially top them.

We are the OG in the sector. We are smart and experienced and have momentum.  We have a great team but it can and should be better. We need to be careful in challenging markets which is not a sign of weakness but a sign of intelligence. We are (you are) bold and daring. That is to our credit.

70.     In April 2022, Defendant Lee sent Defendant Perrill another email commenting on

Compute North's culture:

> All executives and employees look to you, the CEO, for the pace, culture and direction of the firm. They are eager to please you. I think you personally need to have clarity of thought on what we need to be rather than take on too many projects across too many fuel types with too many Bitcoin miners. I think you need to instill a culture of more careful thinking, strategy and measured risk (even caution) given the market changes, slower than expected pace of execution and capital formation, rising competition and lack of experience from the leadership team in energy, development and financial markets.

Good changes are happening with the team but they take time to recognize whereas some of the near misses that we have had and could still have could prove devastating. We need to humbly look at the failures of many projects (SD, Tenaska, North Carolina, King Mountain, potentially others) in terms of returns, margin, deposits: regulatory and timing and study and learn from them. How do we course correct, educate ourselves for the next batch and not commit potentially fatal mistakes again. How are we getting better to think through customer contracts, risk management, hedging, managing aggressive and sophisticated energy and funding partners? We need to always make money.

Pleasing customers is very important but we always need to make money. Being more greedy to take more value in market dislocations and recognize the pole position in market that we currently have is not a bad thing. Frequency and rigor of meetings on big financial decisions and challenging ALL assumptions is what is needed to make us better and give our capital providers comfort that we know what we are doing so we can raise more money. Diversify immediately as it is the clear way to say we can do something else besides be yet another Bitcoin only player. Don't expect our team, regardless of how much you like them or how dedicated they are, to learn overnight the complexities of finance, energy or development. It takes people years to learn and more important build networks and experience here. Instead take those roles out of their control and find someone else or encourage them to find smart experienced people to make them better (inside or outside). Make sure we assign "quarterbacks" to projects who are responsible and all knowledgeable for everything big and small. They need to know commercial and financial and legal. They need to be the one source of wisdom on projects. Financially incentivize them if you must to get the best people. The current approach is painful as no one is driving all members to outcomes and knowledge.

71.    In this April 2022 email, Defendant Lee gave the following advice to Defendant

Perrill:

1) have realistic plans based on available cash, expected delays and timing for fund raising. I just don't see ability to do both Horse and BS at same time. I get frustrated because I don't see others having same critical mind set.

2) make someone in charge of a project start to finish. I see everyone making some inputs in some things no one reviews entire model and oversees all contract negotiation. No quarterback. While no one is qualified in my opinion to be quarterback, we need someone to chase down answers, own the model, delegate the requirements, chase the answers, see it to the end. Be paranoid, be right or be fired. Someone is better than no one and better than a committee. Hire a consultant if needed. Make Jack or Nathan the leader in the vacuum. This is probably deeper in the commercial function as we might have wide net origination but need someone who selects best projects and wills them to happen. Pipeline of 6 GW is meaningless. Nathan sources high level, then what? Who decides best projects and drives to completion. Is there incentive? Is their depth of experience/talent to do?

17

Who owns national grid deal.  Arguably the best that I know. Have a dozen contract developers.

3) more frequent executive meetings like we had yesterday to iron out binary issues with more incentive and culture to say no.  Still reckless on spending ahead of de-risking imo. I almost don't want to know the answer on how much cost we sunk into this project blindly without having a real model or answers to basic questions on risk management.

4) now is the time to rethink EVERYTHING on customer contracts. Nothing is sacred on what we did in past. Is it 4 month deposit instead of 2? Straight pass through power? The world is changing massively and we need to save ourselves to save our customers. We need to show Great (not average) project returns to raise more money.

5) I still question why so many marketing sales people and so few finance, power and development people.

6) be greedier. Customer is important but there is more arbitrage available in this market that we can take. How to get more. How to incentivize more?

72.     Defendants, with the "prevailing mind set" "to LFG every step along the way", engaged in actions that ultimately jeopardized the very survival of Compute North.

73.     Defendant Lee's warning about the dire consequences that would occur if Defendants continued to promulgate a company culture of "saying yes to everything now and figuring it out later" came to fruition when Compute North became insolvent, unable to raise additional capital, defaulted on existing financing arrangements, and ultimately filed for bankruptcy.

**C.     Defendants Attempted to Address Compute North's Liquidity Problem by Raising at Least $246 Million Dollars in Connection with Reckless Bet-the-Company Financing Arrangements**

74.     In an attempt to address Compute North's liquidity issues while continuing to aggressively grow Compute North's business, the Defendants raised at least $246 million in connection with four risky financing arrangements:  (i) the Foundry Financing, (ii) the Marathon Note, (iii) the Generate Credit Agreement, and (iv) the NextEra Note.

75.     As of the Petition Date, Compute North's consolidated long-term debt obligations totaled approximately $128.3 million.  (First Day Decl. ¶ 47.)

### i.   *Foundry Financing*

76.     Compute North entity CN Borrower, LLC and Foundry Digital LLC ("Foundry") entered into an Equipment Finance and Security Agreement, dated as of December 31, 2020 (the "Foundry Financing Agreement").   Under the Foundry Financing Agreement, Foundry provided equipment financing for certain of Compute North's digital currency mining equipment.

77.     The Foundry Financing Agreement was executed by Defendants Perrill and Johnson.

78.     As of the Petition Date, $7,466,005.26 remained outstanding under the Foundry Financing Agreement.  (First Day Decl. ¶ 50.)

### ii.  *Marathon Note*

79.     On July 1, 2021, Compute North entity Compute North TX06 LLC borrowed $30,000,000 from Marathon Digital pursuant to a Senior Secured Promissory Note (the "Marathon Note").  Marathon provided financing to Compute North under the Marathon Note to fund the expansion of Compute North's Facilities, which Marathon was interested in as one of Compute North's biggest customers.

80.     The Marathon Note was executed by Defendant Piper.

81.     On the Petition Date, $21,013,027.03 remained outstanding under the Marathon Note.  (First Day Decl. ¶ 51.)

### iii. *Generate Credit Agreement*

82.     In approximately mid-2021, Defendants Perrill and Lee began to speak with representatives of Generate to discuss a potential financing arrangement to assist with further

development of two of Compute North's largest and most valuable facilities: (i) the Kearney Facility, and (ii) the Wolf Hollow Facility.

83.     Throughout the summer and fall of 2021, Generate and Compute North engaged in negotiations.  Defendant Lee was Compute North's lead negotiator with Generate during this time.

84.     Compute North entered into a Credit and Guaranty Agreement with Generate (the "Generate Credit Agreement") on February 7, 2022.  CN Borrower LLC executed the Generate Credit Agreement as the "Borrower."  The Generate Credit Agreement was guaranteed by Compute North, LLC and CN Holdings, through the Guaranty Agreement entered into between these two entities and Generate (the "Generate Guaranty Agreement") on February 7, 2022.  Defendant Perrill signed both the Generate Credit Agreement and the Generate Guaranty Agreement on behalf of the respective Compute North entities.

85.     The Generate Credit Agreement consisted of a Tranche A of Loans in the original principal amount of $21,541,441.68, and a Tranche B of Loans in the original principal amount of $92,273,637.50.

86.      Tranche A of the Generate Credit Agreement consisted of certain loans used to expand the Kearney Facility, with such loans maturing on February 7, 2026.

87.     Tranche B consisted of certain loans used to finance the Wolf Hollow Facility, with such loans maturing on October 28, 2026.

88.     The Generate Credit Agreement was secured by 100% of the equity of CN Borrower LLC, which is the entity that fully owned both the Kearney Facility and the Wolf Hollow Facility.   It was further secured by a lien on substantially all assets of CN Borrower LLC, the Wolf Hollow Facility, and the Kearney Facility.

89.     Accordingly, in the event of default, Generate would be given control of CN Borrower LLC and receive all assets of CN Borrower LLC, including the Wolf Hollow Facility and Kearney Facility.   In other words, by having Compute North execute the Generate Credit Agreement, Defendants agreed to bet two of Compute North's most valuable assets if Compute North were to default.

90.     The Generate Credit Agreement and Generate Guaranty Agreement set forth certain obligations that had to be met to avoid default, including a requirement that Compute North provide audited and unaudited financial statements to Generate according to certain specified timelines.

91.     Section 7(b)(i) of the Generate Guaranty Agreement required CN Holdings to provide Generate with quarterly unaudited financial statements.  Specifically, this section stated:

> As soon as available but no later than sixty (60) days after the close of each one of the first three (3) quarterly periods of its fiscal year, CN Holdings shall deliver to the Beneficiary unaudited Financial Statements of CN Holdings (on a consolidated and consolidating basis with each Subsidiary) as of the end of such period, in each case setting forth in comparative form the figures for the corresponding quarterly period of the previous fiscal year and the corresponding portion of the previous fiscal year, by the chief financial officer of CN Holdings as fairly presenting in all material respects the financial condition, results of operations, members' equity and cash flows of CN Holdings in accordance with GAAP consistently applied, subject only to normal year-end audit adjustments and the absence of notes.

92.     Section 6.01(a)(i) of the Generate Credit Agreement also required CN Borrower to provide Generate with quarterly unaudited financial statements.  Specifically, this section stated:

> As soon as available but no later than sixty (60) days after the close of each one of the first three (3) quarterly periods of its Fiscal Year, the Borrower shall deliver to the Administrative Agent and each Lender unaudited Financial Statements of the Borrower (on a consolidated and consolidating basis with each Subsidiary Guarantor) as of the end of such period, in each case setting forth in comparative form the figures for the corresponding quarterly period of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, certified by the chief financial officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, members' equity and cash flows of the

21

Obligors in accordance with GAAP consistently applied, subject only to normal year-end audit adjustments and the absence of notes.

93.     Section 7(b)(ii) of the Generate Guaranty Agreement required CN Holdings to provide Generate with audited annual financial statements.  Specifically, this section stated:

As soon as available but no later than one hundred twenty (120) days after the close of each applicable fiscal year, CN Holdings shall deliver to the Beneficiary audited Financial Statements of CN Holdings  (on a consolidated and consolidating basis with each Subsidiary), in each case setting forth in comparative form the figures for the previous fiscal year, all prepared in accordance with GAAP and accompanied by an opinion of Deloitte US or any other independent certified public accountant of recognized national standing stating that such financial statements fairly present in all material respects the financial condition, results of operations, members' equity and cash flows of CN Holdings as at the end of, and for, such fiscal year in accordance with GAAP (and such opinion shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit).

94.     Section 6.01(a)(ii) of the Generate Credit Agreement also required CN Borrower to provide Generate with audited annual financial statements:

As soon as available but no later than one hundred twenty (120) days after the close of each applicable Fiscal Year, the Borrower shall deliver to the Administrative Agent and each Lender unaudited Financial Statements of the Borrower (on a consolidated and consolidating basis with each Subsidiary Guarantor), in each case setting forth in comparative form the figures for the previous Fiscal Year, certified by the chief financial officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, members' equity and cash flows of the Obligors in accordance with GAAP consistently applied.

95.     Breach and failure to adequately remedy breach of the above conditions of the Generate Credit Agreement and the Generate Guaranty Agreement placed Compute North in default.

### iv. NextEra Note

96.     On April 8, 2022, Compute North entity Compute North Member LLC ("CN Member") executed a Senior Secured Promissory Note (the "NextEra Note") in favor of TZ Capital Holdings, LLC ("TZ Capital").  (First Day Decl. ¶ 49.)

97.     CN Member has made draws, to date, under the NextEra Note in the amount of $94,850,676.50.  (First Day Decl. ¶ 49.)  A total of $99,809,696.27, including accrued PIK interest, remained outstanding under the NextEra Note as of the Petition Date.  (*Id.*)

98.     The NextEra Note was issued in connection with the member loan made by TZ Capital as set forth in that certain Limited Liability Company Agreement of TZRC LLC, which was secured by CN Member's membership interest in TZRC LLC.  (First Day Decl. ¶ 49.)  CN Holdings is a party to that certain Guaranty Agreement, dated as of April 8, 2022 (the "NextEra Parent Guaranty"), in favor of TZ Capital by which CN Holdings provided an unsecured guaranty to TZ Capital for the obligations under the NextEra Note.  (*Id.*)

99.     The Next Era Note was executed by Drake Harvey, Compute North's former Chief Operating Officer ("Mr. Harvey").

100.    CN Member owned 50% of TZRC LLC, a non-Debtor joint venture entity also known as the King Mountain Facility (the "NextEra Joint Venture Facility"). (First Day Decl. ¶ 28.)   NextEra Energy ("NextEra") owns the other 50% of the NextEra Joint Venture Facility.  (*Id.*)  CN Member operated and managed the King Mountain Facility through a project management agreement (the "King Mountain PMA").  (*Id.*)

101.    To avoid default, Compute North had to satisfy certain obligations, including providing audited financial statements pursuant to the King Mountain PMA according to certain specified timelines.

102.    On the Petition Date, CN Member owed a total of $99,809,696.27 under the Next Era Note.  (First Day Decl. ¶ 49.)

**D.**     **In December 2021, Defendants Perrill and Piper Recklessly Caused Compute North to Execute Two Purchase Orders For a Total Order Value of More Than $86 Million For Crypto Mining Containers Which Greatly Exacerbated Compute North's Liquidity Crisis**

103.     In or around December 2021, Compute North was in discussions with vendor RK Mission Critical to purchase crypto mining containers for Compute North's Facilities, including Compute North's Bootstrap Facility.  Crypto mining containers, also known as mining farms or mobile mining units, are modular units that are designed to house, operate, and power cryptocurrency mining rigs.

104.     Upon information and belief, on or around December 17, 2021, RK Mission Critical recommended to Mr. Harvey that Compute North execute a purchase order for 124 crypto mining containers and execute a second purchase order for 247 crypto mining containers.  On or around December 18, 2021, RK Mission Critical informed Mr. Harvey that Compute North needed to urgently execute these purchase orders by December 21, 2021, or otherwise RK Mission Critical may not be able to provide Compute North with enough crypto mining containers to support Compute North's 2022 growth plan.

105.     On or around December 21, 2021, Compute North and RK Mission Critical agreed to the terms of two purchase orders:

> i.     Compute North and RK Mission Critical agreed to pay $9,280,160 for 124 crypto mining containers.  This purchase order required a 50% down payment of $4,640,080 that had to be paid to RK Mission Critical by December 27, 2021.

SCOPE: The scope and terms of this work is defined by Exhibit A dated 12/21/2021

SCHEDULE: Material orders will be placed for immediate production and just in time delivery

**Mk II**

| # units | | Description | Price/Unit | Sub-total |
|---|---|---|---|---|
| 124 | | Base Price - Full Order | $74,840 | $9,280,160 |
| 124 | Units | | Total Order Value: | $9,280,160 |
| | | | Down payment: 50% | $4,640,080 |

ii.  Compute North and RK Mission Critical separately agreed to pay $76,894,600 for 247 crypto mining containers.  This purchase order required a 10% down payment of $6,337,300 to be paid to RK Mission Critical by January 5, 2022.

**A- LAYOUT**

| # units | | Description | Price/Unit | Sub-total |
|---|---|---|---|---|
| 124 | Base Price | | $325,000 | $40,300,000 |
| | | | $325,000 | |

**B- LAYOUT**

| # units | | Description | Price/Unit | Sub-total |
|---|---|---|---|---|
| 123 | Base Price | | $325,000 | $39,975,000 |
| | | | $325,000 | |
| 247 | Units | | Container Subtotal | $80,275,000 |
| | | Pre-Purchase Container Deduct (100  Units) | | -$3,380,400 |
| | | | Total Order Value | $76,894,600 |
| | | Down Payment Less Deposit from 100 Unit PPO:   10% | | $6,337,300 |

106.    On or around December 22, 2021, Mr. Harvey approached Defendant Piper and Mark Bader ("Mr. Bader"), Compute North's former Controller, at Compute North's offices to discuss the execution of these two purchase orders.  Mr. Harvey told Defendant Piper and Mr. Bader that these purchase orders needed to be executed to ensure RK Mission Critical would be able to provide Compute North with the crypto mining containers that were needed for Compute North to accomplish its Q3 and Q4 2022 earnings targets.

107.    Upon information and belief, Defendant Piper was uncomfortable when Mr. Harvey brought up executing these purchase orders with RK Mission Critical but agreed with Mr. Harvey that these purchases were needed to meet Compute North's revenue goals.  Mr. Bader

expressed to Defendant Piper and Mr. Harvey that these purchase orders were not ideal from a cash perspective and then recused himself from the conversation.

108.    On or around December 23, 2021, Defendant Piper was asked to sign the purchase orders.  Defendant Piper agreed to execute the $9,280,160 purchase order with RK Mission Critical for 124 crypto mining containers.



109.    Upon information and belief, Defendant Piper refused to sign the $76,894,600 purchase order for 247 crypto mining containers because he thought the purchase order was too financially risky for Compute North, particularly since the purchase order was in part for crypto mining containers that would be used at Facilities that had not yet received financing approval from Compute North's lenders.

110.    Because Defendant Piper refused to sign the $76,894,600 purchase order for 247 crypto mining containers, Defendant Perrill overrode him and signed the purchase order himself on or around December 23, 2021.



111.    Upon information and belief, Defendant Piper did not present the $9,280,160 purchase order for 124 crypto mining containers to the Board for its review and approval prior to executing it.  Defendant Piper also did not flag his financial risk concerns to the Board about executing the $76,894,600 purchase order for 247 crypto mining containers.

112.    Defendant Perrill did not present the $76,894,600 purchase order for 247 crypto mining containers to the Board for its review and approval prior to executing it.

113.    On or around December 23, 2021, Ahsan Faiz ("Mr. Faiz"), Compute North's former Vice President of Engineering, Procurement, and Construction, informed Mr. Bader and Jeff Jackson ("Mr. Jackson"), Compute North's former VP of Site Development, via text that Mr. Harvey had shared at least one of the executed purchase orders with him.  Mr. Bader responded to Mr. Faiz's text:  "We're betting the farm again.  If debt and equity don't close in early Jan, shit is going to get real…like can't make payroll real…"  Mr. Bader further replied that he "didn't know this was for projects that [haven't] been greenlit and was [management] override of controls."  Mr. Jackson responded to both Mr. Faiz and Mr. Bader's text messages:  "WTF":



114.     Later in the day, Mr. Faiz texted Mr. Bader and Mr. Jackson about the purchase orders: "We only needed additional 110 to cover our current greenlight projects.  This order covers Bootstrap, Horse Hollow and additional future NextEra projects."  Mr. Bader responded to Mr. Faiz's text "Yup.  So I agree in context.  But buying before we have realistic sites."  Mr. Jackson responded to both Mr. Faiz and Mr. Bader's texts: "Better ger these [f][*]cking investors through the door and get some permits and power arrangements.":



115.    On or around December 27, 2021, upon information and belief, Compute North paid the 50% down payment of $4,640,080 to RK Mission Critical.

116.    On or around January 5, 2022, upon information and belief, Compute North paid the 10% down payment of $6,337,300 to RK Mission Critical.

117.    Upon information and belief, in or around December 2021, Officer Defendants, including Defendants Perrill and Piper, had baselessly believed that additional funds for the Bootstrap Facility had been "pre-approved" by Generate and that Compute North would receive

these funds sometime after the Generate Credit Facility was executed despite no explicit agreement with Generate concerning these alleged "pre-approved" funds.

118.    Compute North and Generate did not execute the Generate Credit Agreement until February 7, 2022.  Under the Generate Credit Agreement, Generate agreed to loan money to Compute North for the development of Compute North's Kearney Facility and, through an amendment executed by the parties in April 2022, the Wolf Hollow Facility – not the Bootstrap Facility.  The terms of the Generate Credit Agreement allowed Compute North to draw additional funds from the line of credit provided by Generate should those projects meet Generate's requirements for funding an additional project.

119.    In or around mid-February 2022, Mr. Bader, Brian Haak ("Mr. Haak"), and Jack D'Angelo ("Mr. D'Angelo"), all members of Compute North's finance team, had a meeting at Compute North's office to discuss a 13-week cash flow forecast which indicated that Compute North was experiencing liquidity issues caused, in large part, by the execution of the purchase orders with RK Mission Critical in December 2021.

120.    Defendant Lee walked into the room while this meeting was taking place and asked Mr. Bader, Mr. Haak, and Mr. D'Angelo what they were reviewing.  Mr. Bader, Mr. Haak, and Mr. D'Angelo showed Defendant Lee the 13-week cash flow forecast.

121.    Upon information and belief, Defendant Perrill learned about the liquidity issues presented in the 13-week cash flow forecast relatively soon after Defendant Lee reviewed it because Defendant Lee would have been expected to share cash flow and liquidity issues with Defendant Perrill.

122.     Upon information and belief, Defendant Perrill and Defendant Lee also would have shared these liquidity issues with other Director Defendants because Defendant Perrill and Defendant Lee would have been expected to share liquidity issues with other Director Defendants.

123.     In or around April 2022, Compute North requested a draw for funds for the Bootstrap Facility from Generate, some or all of which was to be used to pay for the remaining balance of the purchase orders with RK Mission Critical.   Generate denied Compute North's request.

124.     Generate told Defendants Perrill and Lee that Compute North needed to provide Generate with the proper documentation required under the terms of the Generate Credit Agreement before Generate could make a decision about whether to fund an additional facility like the Bootstrap Facility.  Upon information and belief, Defendants Perrill and Lee told Generate they would provide Generate with the appropriate documentation, but no one at Compute North ever provided Generate with the requested information.

125.     According to Andrew Marino, a Senior Managing Director and Head of Strategy at Generate,[6] "I don't think [Compute North] frankly ever got close to complying [with the information requests]."   (Transcript of the Marino Interview ("Marino Tr.") 28:11-29:12.) Mr. Marino said, "we [Generate] never received any information in the appropriate format to fund it" and the Bootstrap Facility "was powered by a coal-fired power plant, which is solidly outside of the things we like to finance."  (Marino Tr. 53:24-54:5.)

---

[6]  Mr. Marino was interviewed by representatives of the Official Committee of Unsecured Creditors of Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) on February 8, 2023 (the "Marino Interview").

126.    Defendants' inability to obtain funds from Generate for the Bootstrap Facility greatly exacerbated Compute North's liquidity crisis as Compute North had only paid about 30-40% of the amount it owed to RK Mission Critical pursuant to the purchase orders.

**E.    Defendants Failed to Hire, Train, or Supervise Individuals With The Expertise Needed to Successfully Operate and Manage Compute North**

127.    Defendants failed to hire, train, or supervise individuals with the experience and competencies needed to successfully manage and operate Compute North, such as individuals with sufficient experience in crypto mining, energy, project development, power management, real estate, construction, commodity trading, risk management, hedging, and/or debt financing. Instead, Defendants routinely hired friends and longtime business associates of Defendant Perrill who lacked the experience and competencies needed to successfully manage and operate the company.

128.    Defendants entered into complicated lending agreements to raise more than $245 million in financing, bettering some of Compute North's most valuable assets in the process, despite individuals at Compute North not having had the requisite experience and competencies to negotiate and ensure compliance with these agreements.

129.    For example, in 2021 and 2022, Defendant Lee was tasked with negotiating with potential lenders to secure additional funding for Compute North.  In a January 15, 2022 email to Defendant Perrill, Defendant Lee observed the following about the Defendants' failure to hire people with relevant experience and competencies:

> Before laying into Tad about delays on closing, you need to be aware [of] the massive issue that came up past 24 hours with Generate and Mercuria and the problem of trying to negotiate three major commercial contracts with sophisticated energy parties who are likely taking advantage of our naivete and lack of in house experience.  The latest is Generate requiring that a Mark to Market on our power hedges be factored in the loan to cost draws pushing massive risk our way.  Cleverly Mercuria has figured out a way to put ALL this risk on us AND get their revenue share.  We can't do it and need to fight back with one or both of these

groups. Possibly insert some type of cash sweep and reserve of revenues ahead of the profit split with Mercuria, say no to Generate on the latest covenant demand or something. This is likely to create more delay and drama. I worry we are outgunned . . . .

130.    In another email to Defendant Perrill later that day, Defendant Lee stated:

We really need to assess hiring more talent in the energy field. At the executive level. I am very worried that we don't have the necessary sophistication here (contractually and financially) to not get played by the big boys. We are at risk of finding ourselves in un-financeable (ie can't grow) projects with bad contracts supply/Offtake contracts. We are already stuck with mostly fixed priced or revenue share customer contracts and variable rate power hedge contracts that make financing hard and expose us to a lot of commodity risk and volatility. I am concerned we won't be able to secure the level of financing our plan needs. Let's take this very seriously. Maybe the new GC comes from an energy background. Maybe we hire a more sophisticated commodity risk manager either as a dedicated hire or a consulting firm. Cargill provides this service and I am sure there are others.

131.    In March 2022, Defendant Lee emailed Defendant Perrill again after speaking with "highly sophisticated investor[s]":

I frequently feel outgunned from a sophistication level at our firm and see it as a glaring need more and more. Peter is great but junior. Kyle and Drake and most everyone else at the company has no commodity trading/hedging experience. Tad is too overloaded with reports and responsibilities and still has hard time juggling too many balls thrown his way. Jack too unproven and lacks experience/confidence. I understand these things at a high level but I also know what I don't know. I think we need someone like the guy we interviewed last week in a bad way to take over more commercial responsibilities on pricing/hedging. We are educating the market to compete with us if we don't portray sophistication to close commercial transactions with sophisticated investors.

132.    Defendant Perrill responded to Defendant Lee's email, in part, that "[e]veryone is in agreement we need to up our game on the capital, risk, and energy side."

133.    In a March 2022 email, Defendant Perrill asked Defendant Lee if Compute North "should pivot the GC search to put energy before capital". Defendant Lee responded:

It would be good to have some candidates for GC role that have some familiarity. Yes it will limit us so don't think it is essential. I don't know if it needs to be C level, I think we were a bit too quick to hand out C titles, but do think executive level energy person / people are sorely needed in leadership. Currently we don't

33

have any and some would say that energy is our biggest differentiator[,] but I feel like we have a lot of blind spots. In all humility, I am not the type of energy person needed. I have [n]ever done any hedging, power management, risk management, etc. this goes beyond just development or construction.

134.    Despite the need for individuals with the requisite experience and expertise to successfully manage and operate Compute North, Defendants Perrill and Barron prioritized hiring people that they knew or people who they felt would fit in with Defendant Perrill's "LFG culture". In March 2022, Defendant Lee observed the following:

> We should Be vigilant about questioning the skills and experiences of the people we hire, not defaulting only to people we know or people that we think are aggressive go-getters. We should surround ourselves with experienced people and executives or if we haven't identified the best person, default to independent consultants that know the industry and can guide us. We should continue to strive for more knowledge, more connections, more leadership and be number one. . . . Tangibly speaking, we need more sophistication in capital formation / capital markets. We need more experience in commodity risk management. We need more expertise in power procurement. We need more expertise in new market/new technology formation. I think we are too quick to give C level titles to people too new in their field because it doesn't give any room for people to prove themselves into and doesn't leave enough competitive tension for others to work themselves toward. It creates empires that invent people to not bring in the best talent that could potentially top them.

135.    In late April 2022, Defendant Lee sent another email to Defendant Perrill observing that Compute North "[s]till do[esn]'t have experience and sophistication we need to be successful[.]  We are so exposed financially and almost all of the team has no idea (hedging, leverage, inflation, BTC exposure)[.]  Where is the financial arbitrage to what we are doing?  Are our assets a depleting oil well or a cash cow asset once depreciated?"  Defendant Lee also said that the Officer Defendants' "need to expand financial literacy": "[We] Are exposed now more than ever and that will increase 10x[.]  Financial hedging and risk management has to be in our DNA[.] Executives needs to know this is a void h[e]re and replace their lieutenants to get there and importantly need to learn more.  [N]ever miss numbers has to be in DNA.  Team needs to understand arbitrage[.]  What are long term assets? Focus on growing appreciating assets."

34

136.     Defendant Perrill responded to Defendant Lee by asking, "[b]eyond these people moves, what other specific actions do you think I (we) need to take?"  Defendant Lee stated, in part:

> My quick reaction to your question is that I don't feel safe with the leadership in place now. Not because they are not capable (the opposite) but because they are not deeply experienced in the field of energy or project development, real estate and construction. They are learning on the job and they will naturally make mistakes as they learn. Everyone does. They are not connected in our industry and will take more risks than they need to or give away money to people that are happy to take our lunch and gouge us.  They are hiring people that they think are experienced in the industry but what [I] see is hiring junior talent that are not better than they are.

137.     Defendant Lee also warned Defendant Perrill, "Capital support will come but only if the money is convinced that the leadership has the right experience and the right connections to be successful. We don't yet, IMO."

138.     Defendant Wenzel is an example of an individual who, upon information and belief, was a longtime friend and business associate of Defendant Perrill prior to being hired at Compute North to serve as Vice President of Sales and CCO.

139.     Prior to working at Compute North, Defendant Wenzel had no prior experience in the energy or crypto mining industries given his former roles as:  (i) a Demand Planning Analyst at the electronics retailer Best Buy; (ii) an Account Executive at ImageTrend, a company providing software for EMS, fire departments, hospitals, & healthcare organizations; (iii) a Director of Sales at WAND Corporation; and (iv) a Senior Director of Sales at SAP Concur, a travel expense management company.

140.     Compute North faced significant issues with the integrity of its sales contracts, which was a responsibility of Defendant Wenzel and his team.  Upon information and belief, Defendant Wenzel moved too quickly, did not appreciate the risks he was taking with respect to customer contracts, and failed to provide the accounting and finance teams with information

Case 22-90273   Document 1466   Filed in TXSB on 12/31/24   Page 36 of 110

necessary to reconcile inconsistencies relating to customer contracts, which was necessary to complete Compute North's audits.

141.    In May 2022, Defendant Perrill wrote the following in Defendant Wenzel's performance review: "Learn Energy. Learn Power. Learn Equity. Hire people smarter in all areas. Energy specifically we need to continue to topgrade."

142.    Defendant Barron is another example of an individual who, upon information and belief, was a longtime friend and business associate of Defendant Perrill prior to being hired to serve as Compute North's Chief People Officer.

143.    Defendant Barron failed to recruit and to hire people with the necessary expertise to successfully operate Compute North's business. Defendant Barron did not have enough time to adequately oversee Compute North's human resources and recruiting given that he was simultaneously serving as CFO of WAND Corporation and of PerrillCo.

144.    In Defendant Barron's performance review from the first quarter of 2022, Defendant Perrill observed that "a few processes in HR/recruiting" overseen by Defendant Barron "have been half baked." Defendant Perrill also urged Defendant Barron to "get involved in learning the more strategic areas of project finance and the capital raise" and to "put processes in place to ensure that managers need to make the right and informed decisions."

## F.    Defendants Failed to Remedy Compute North's Inadequate Internal Controls, Recordkeeping, and Financial Oversight Despite Explicit Internal and External Warnings

145.    Defendants, by reason of their positions as officers, directors, and fiduciaries of Compute North and because of their ability to control the business and corporate affairs of Compute North, owed a duty to Compute North to implement and maintain effective internal controls, recordkeeping, and financial reporting.

146.   Yet Defendants failed to remedy Compute North's deficient internal controls, recordkeeping, and financial oversight despite explicit internal and external warnings about the harm that could befall Compute North if these deficiencies were not addressed.   Defendants prioritized company growth and taking the company public over remedying severe deficiencies with respect to Compute North's internal processes and controls.

147.   Amanda Piff ("Ms. Piff"), Compute North's former Director of Finance, expressed that, in her opinion, the primary cause of Compute North's bankruptcy was management override of efforts to prioritize implementing adequate internal controls and processes. For example, Ms. Piff believed that her job at Compute North was in jeopardy because she was a point of frustration with Defendants who thought she pushed back a lot with management to improve Compute North's internal controls and processes.   Ms. Piff felt that Defendants were frustrated by her efforts to improve internal controls and processes because they viewed her efforts as slowing things down.

148.   Mr. Bader, Compute North's former Controller, has characterized remedying Compute North's internal controls and processes as a heavy lift.   Upon information and belief, Mr. Bader alerted Defendants early on in his tenure at Compute North that the company needed to prioritize time, resources, and human capital to remedy deficient internal controls and processes before Compute North would realistically be ready for an IPO.   However, the Defendants never prioritized remedying these deficiencies and instead prioritized Compute North's completion of an IPO in the fourth quarter of 2022 ("Q4 2022").

149.   Upon information and belief, Defendants Perrill and Lee's championing of the completion of an IPO by Q4 2022 had a trickle-down effect on other Defendants' actions and priorities.

150.   Defendants routinely made decisions quickly without adequately considering or mitigating risks to Compute North pursuant to the "LFG mindset."  For example, Defendants Perrill and Lee expected things to get done quickly without understanding "how the sausage was made" or fully appreciating the time and resources that would be needed to accomplish a goal. Defendants Perrill and Lee would fail to adequately mitigate risk when negotiating contracts and financings on behalf of Compute North due to a belief that such efforts would slow the process down.

151.   Outside auditors and consultants explicitly alerted Defendants about the harm that could befall Compute North if it did not remedy its deficient internal controls and processes, including the risk that Compute North would default on its financing arrangements if it was unable to provide audited financial statements within certain specified timelines.

152.   Compute North hired Deloitte, an independent auditor, to perform audits of its consolidated financial statements as of, and for the years ending in, December 31, 2019 and December 31, 2020, in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards").[7]  Defendants hired Deloitte because Defendants wanted "to obtain reasonable assurance about whether [Compute North's] financial statements are free from material misstatement, whether caused by error or fraud."

153.   In connection with Deloitte's audits of Compute North's consolidated financial statements as of, and for the years ending in, December 31, 2019 and December 31, 2020, Compute North's management provided Deloitte with written representations signed by Defendants Perrill and Piper ("Management Representations to Deloitte").

---

[7]   As discussed in more detail below, Defendants re-hired Deloitte in 2022 to perform an audit of Compute North's 2021 financial statements, but Deloitte was unable to complete this audit.

154.    Deloitte concluded that there were "certain matters involving the Company's internal control over financial reporting that [they] consider[ed] to be significant deficiencies under generally accepted auditing standards."  Specifically, Deloitte identified areas of significant risk concerning Compute North's risk management measures, financial oversight, and internal controls.

155.    In the Final Written Communication to Those Charged with Governance Audit Results, dated August 20, 2021 (the "<u>Deloitte Audit Results</u>"), Deloitte observed the following "significant deficiencies" in Compute North's "internal control over financial reporting" concerning "resource adequacy and segregation of duties":

- "As [Compute North] continued to grow both in revenues and accounting complexities throughout 2019 and 2020, the [Debtors] accounting and finance department was not sufficiently staffed to facilitate proper segregation of duties, resulting in the same preparer and reviewer across various controls."

- "In addition, [Compute North] did not have sufficient resources to formalize certain processes and controls, including the preparation and review of general ledger account reconciliations.  For some accounts, reconciliations were completed but not reviewed. For other accounts, reconciliations were not completed in a timely manner."

156.    The Deloitte Audit Results defined "significant deficiency" as "a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness yet important enough to merit attention by those charged with governance."

157.    In the "Final Written Communication to Those Charged with Governance – Audit Plan", dated August 20, 2021 (the "<u>Deloitte Audit Plan</u>"), Deloitte identified "certain significant risks, including fraud risks."  The Deloitte Audit Plan defined a "significant risk" as "a risk of material misstatement of the financial statements that requires special audit consideration".

158.    Deloitte identified the significant risk of "management override of controls" and described it as follows:  "The risk of management override of controls is pervasive.  Because of

the unpredictable nature of this risk, it poses a risk of material misstatement resulting from fraud and is thus an area of audit focus."

159.    Both the Deloitte Audit Results and the Deloitte Audit Plan were addressed to "Members of the Audit Committee" and copied "The Management of Compute North Holdings, Inc." The Independent Auditors' Report issued in connection with the audited consolidated 2019 and 2020 financial statements was also addressed to "the Audit Committee of Compute North Holdings, Inc. and its Subsidiaries". However, Compute North did not have an Audit Committee at that time the audited consolidated 2019 and 2020 financial statements, the Deloitte Audit Results and the Deloitte Audit Plan were issued, which in and of itself, underscored the issues that Deloitte identified.

160.    On August 20, 2021, Mr. Bader circulated the Deloitte Audit Results, the Deloitte Audit Plan, and Compute North's audited consolidated 2019 and 2020 financial statements (collectively, the "Deloitte Audit Materials") to Defendants Kieffer, Johnson, Lima, Lee, Perrill, Scher, and Piper. Mr. Bader instructed Defendants Kieffer, Johnson, Lima, Lee, Perrill, Scher, and Piper to "Please let Tad [Piper] or me know if you have any questions or would like to discuss further."

161.    Upon information and belief, Mr. Bader routinely had conversations with Officer Defendants about how they needed to take company audits seriously because Compute North was entering into credit agreements, all of which had or would have requirements for audited financials.

162.    Upon information and belief, some or all of the Defendants, including Defendants Perrill and Lee, attended an off-site meeting during which representatives from Ernst & Young LLP explained the importance of audited financials to Defendants.

163.    As sophisticated businessmen, Defendants Piper, Kieffer, Johnson, Lima, Lee, Perrill, and Scher knew or should have known that the significant deficiencies and significant risks identified by Deloitte posed significant risks to Compute North's financial health and business if not remedied.

164.    As Directors of the Board and/or as Officers of Compute North, Defendants Piper, Kieffer, Johnson, Lima, Lee, Perrill, and Scher had an obligation to review the Deloitte Audit Materials and should have addressed significant deficiencies and significant risks identified in the Deloitte Audit Materials.  But Defendants Piper, Kieffer, Johnson, Lima, Lee, Perrill, and Scher failed to remedy the significant deficiencies and significant risks set forth in the Deloitte Audit, and instead focused efforts on taking Compute North public.

165.    In 2021, Compute North hired consulting firm RSM US LLP ("RSM") to conduct an IPO readiness assessment.

166.    On December 14, 2021, RSM sent Defendant Piper and Mr. Bader an IPO Readiness Assessment for Compute North.  In the report, RSM identified the following issues requiring a high degree of attention before Compute North would be prepared to go public:

i.    Only "[t]hree, possibly four" members of the Compute North's board "may meet the requirement to be considered independent."

ii.    "Management should establish a formal internal control structure with segregated processes within critical functions – e.g., accounting, finance, human resources, legal and compliance, etc."

iii.    The Debtors' management did not present financials to the Board in accordance with GAAP, so "Management should consider developing the required infrastructure to facilitate such reporting and transition to preparing" monthly reports on financial performance to the Board "consistent with GAAP financial statements."

iv.    "Management should undertake a data governance assessment focusing on the key financial processes to develop a data and systems roadmap in order to identify and resolve any data integrity and completeness issues."

41

167.    Despite knowledge of deficiencies with the financial oversight, internal controls, and risk mitigation measures at Compute North, the Defendants did not make any serious effort to remedy them until it was too late.

168.    For example, Defendant Perrill did not initiate discussions with Defendant Lee about restructuring the Board until January 2022.

169.    The Defendants also waited too long to create subcommittees that would address these issues.  Defendant Perrill did not initiate discussions with Defendant Lee about creating Audit, Technology, Energy, and Capital Markets subcommittees until January 2022.   The first draft committee charters for an Audit Committee, Compensation/Nominating Committee, and Finance Committee were not circulated to the Board for review until June 2022.

170.    In April 2022, Defendant Lee sent Defendant Perrill the following observations concerning Compute North's internal controls:

### Advice on immediate actions



PJ Lee
To ○ Dave Perrill

[Follow up]

Reply   Reply All   Forward   ...

Sat 4/9/2022 2:13 PM

(Immediate) I think you need a company wide announcement telling people of new processes that all risk will be passed to customers before any new contract is signed.

If I were you, I would find a way to remind any C level person (in your nice way) that while they are doing a good job at some things they are part of the problem if they aren't thinking economics all the way through and slowing things down as necessary until they get are better understood. We ALL need to get up the learning curve.

(Immediate) I would choose a "fixer" to put out the major fires right now. I say with all humility as I feel like I am partly to blame, but I say very frankly, the situation we are in right now could kill our company. Maybe Drake as a temporary stop gap?  I don't think he is very smart on either finance or commodity markets but he is good at process and managing a process.

(April) I would also highly recommend a weekly committee of decision makers including members of the board (me and who?) to review projects  A process educates and refines  Gives everyone a chance to poke holes, understand risks and approve advancing major projects. Multiple committees before a green light.

At the moment I Hate ALL Texas projects until I understand how we are avoiding and structuring around risk and capital so am signaling how I will vote BUT part of the fund raise will be solving that problem.

(Immediate) If I were you I would task someone immediately with owning the modeling process for every project so we have one throat to choke. Probably Jack and if we sniff out that he isn't up to the task, fire him or find another role and let Barry fill that seat with a guy he selects.

(Immediate) I would also make very clear (in connection with your Fixers suggestion) who is in charge of hedging strategy and execution for now. See they are up to the task or fire or cap them on other someone that Barry selects.

(April) I will lead capital formation with Jack or whoever replaces Jack (we have the junior guy who can continue to update models with Pratt as a back-up) and update PitchBooks, data room sets.  Capital formation needs to have clear economics on project models with someone who can run modifications and sensitivities before we get too far in fund raiser process otherwise it will be chaos.

171.    In December 2021, four months after Deloitte first identified that Compute North's internal controls posed a significant risk to Compute North, Defendants reached out to RSM to "kickoff the internal controls SOW".

172.    In April 2022, RSM provided Compute North with an internal controls assessment indicating that Compute North was still lacking adequate internal controls.    This was approximately eight months after the Deloitte Audit Report was issued, approximately four months after the RSM IPO Readiness Assessment was provided to Compute North, and approximately two months after Compute North executed the Generate Credit Agreement and pledged two of its most valuable facilities as security.

173.    RSM identified some of the following internal controls as those that most needed improvement:

   i.    "Key roles and responsibilities across several financial-business processes are not segregated";

   ii.   "Management does not maintain a repository of accounting and finance policies and procedures"; and

   iii.  "[T]here is no process for regularly reviewing and updating policies and procedures to ensure they are current."

174.    RSM also identified the following internal control deficiencies:

   i.    Management has not established a process to review the accounting treatment for new or modified contracts as contracts are executed. Additionally, management does not have a routine process to review that revenue is being recognized in line with ASC 606.

   ii.   Upon invoice generation by MinerSentry, the invoice is automatically booked into the general ledger through a connection to Sage Intacct. The initial journal entry is booked as the baseline 70% contracted rate, regardless of actual performance. The accounting manager then manually publishes journal entries to adjust for actual performance above the 70% contracted minimum rate; however, there is no independent review of the manual performance calculations/adjusting entries for co-location revenue.

iii.   There is no review of the completeness and accuracy of co-location revenue, which is based on calculations performed by the MinerSentry software.

iv.   There is no independent review of the spreadsheets involved in computing self-mining revenue or realized gain/loss on sale of digital assets.

v.   There is no independent review of the spreadsheets involved in computing profit-sharing mining revenue.

vi.   There is a lack of documented review and approval of key account reconciliations (e.g., accounts receivable, accounts payable, fixed assets, bank reconciliations, equity/stock-based awards) leading to potential financial misstatement. In addition, thresholds (dollar or percentage targets) have not been defined for variances/discrepancies identified during key account reconciliations, and investigations of discrepancies are made judgmentally, leading to the risk that variances are not appropriately supported or explained in a timely manner.

vii.   Accounts payable accrual controls have not been implemented. There is a process in place whereby the accountant will monitor invoices that come in during the first week of the month and determine if the invoice should be accrued for in the prior month. The accountant will establish an informal cutoff date for monitoring invoices and accruing them.

viii.   Management does not have a vendor management process in place to review vendor additions or changes upon entry into Intacct or on a regular basis through the review of a vendor master file change report.

ix.   Nonrecurring transactions and journal entries follow the same process as manual journal entries with the exception that there could be more levels of review. The definition of nonroutine transactions, how to handle them and the additional levels of review required are not defined in a policy.

x.   The financial statement disclosure process is being developed. Disclosures are being prepared by the SEC reporting manager, reviewed by the controller and approved by the CFO. Detailed discussions are held with review of all applicable schedules. As such, reviews either occur verbally or via email.

xi.   Executive management has not signed 302(a)(5) certifications to certify that internal control significant deficiencies, material weaknesses and fraud has been disclosed to the external auditors and audit committee. The certification templates have been drafted and Compute North is evaluating key processes, procedures and controls before certifying 302(a)(5).

175.   RSM also observed that there was still "no documented audit committee charter at Compute North that outlines the purpose and authority, composition and meeting expectations, and roles and responsibilities of the audit committee."

176.    Deloitte's and RSM's findings make it undisputable that Defendants were on notice of Compute North's inadequate internal controls, financial oversight, and recordkeeping practices. Yet, Defendants failed to remedy these issues which put Compute North at risk of being unable to obtain audited financial statements, defaulting on its financing arrangements, becoming insolvent, breaching customer agreements, and suffering reputational harm.

177.    Defendants only started to discuss the need to implement effective internal controls in earnest when they realized it was necessary for an IPO.  As stated by Alex Lindeman, an Accounting Manager at Compute North, in a June 2022 email:  "As part of IPO readiness and general process improvements, the controllership function is in the process of kicking off a process level controls implementation company wide, in which we need your help to own and design/implement applicable controls. In early 2022, we had third party consultants perform a full Internal Controls Assessment which identified key controls. . . . This time will serve as a kick off to go over the high level plan, answer questions, etc."

178.    In June 2022, Sunil Divakaruni ("Mr. Divakaruni"), Compute North's newly-hired VP of Financial Planning and Analysis, prepared an assessment of Compute North's Financial Planning and Analysis ("FP&A") practices.  He shared the following critiques about Compute North's approach to FP&A:



## Initial Observations of Current State

**Opportunity to reset organizational disciplines with the new market reality and organizational growth**
- Define and educate organization on FP&A scope
- Build calendar to align and coordinate across organization
- Focus on seamlessly executing recurring processes and deliverables to calendar
- Proactive, continuous improvement from this foundation
- Project Prioritization Mechanism and Transparency

*Preliminary Interview Feedback:*

*"Organizational financial processes and governance mechanisms are unclear to broader organization"*

*"Rock Hazards: Team too Reactive, Not Proactive and Unable to Focus on Rocks"*

*"Scope Management: Finance is a catch all"*

*"Models and Resources Not Ready to Scale and Support New Sites and Products coming online or for Going Public"*

*"Greenfield Projects Consuming Finance Resource"*

*"Constantly flying too close to the sun"*

*"Everyday gets thrown off"*

*"Banking Leadership operating in Corporate America could result in morale issues and burnout"*

*"Lots of Big Thinkers; Not Enough Worker Bees – Converges on team"*

4

179.    Despite Mr. Divakaruni's recommendations that formal FP&A processes and routines be implemented as part of Compute North's business operations, the Defendants continued to drag their feet on taking any meaningful action to correct risk management, internal controls, and financial oversight deficiencies at Compute North.

**G.    Defendants Failed to Maintain Accurate Records or Implement Adequate Controls Concerning Compute North's Liquidity and Deferred Revenue**

180.    Although Compute North's revenue increased each year from its founding, Compute North operated at significant net losses in 2018, 2019, and 2020.

181.    Defendants failed to maintain accurate records or implement adequate controls concerning Compute North's liquidity and deferred revenue.

182.    For example, Compute North's statements of cash flows for the 2021 fiscal year contained inconsistent numbers with respect to liquidity.

183.    Compute North held a board meeting on March 7, 2022 (the "March 7 Board Meeting"). The pre-read materials for the March 7 Board meeting (the "March Board Meeting

Pre-Read"), dated March 3, 2022, stated that Compute North had $62,050,490 in cash available as of December 31, 2021.

184.    On March 24, 2022, draft financial statements circulated by Matt Rice, Compute North's Accounting and Reporting Manager, indicated that Compute North had $57,160,000 in cash available as of December 31, 2021.

185.    Ledger cash is an accounting calculation of the end-of period bank balance minus any check float or ACH files that have not been settled.  The nearly $5,000,000 variation in the two Compute North financial statements circulated in March 2022 suggests that the underlying documentation with respect to Compute North's cash as of December 31, 2021, was inadequate.

186.    A way to measure a company's liquidity is to calculate the change in net working capital from the prior fiscal year-end.

187.    In the March Board Meeting Pre-Read, Compute North's net working capital had swung from a positive $924,068 as of December 31, 2020, to a *negative* $21,253,112 as of December 31, 2021, resulting in a negative variance of $22,177,180 over the 2021 fiscal year.

188.    A negative working capital swing of this magnitude should have provided Defendants with significant concerns about the company's near-term liquidity.  Yet, Defendants failed to meaningfully discuss or address Compute North's liquidity issues.

189.    Defendants also failed to maintain accurate records or implement adequate controls concerning Compute North's deferred revenue despite heavily relying on it.

190.    According to Compute North's 2018, 2019 and 2020 consolidated income statements, Compute North's business strategy shifted to rapidly prioritize its Colocation Service business segment:

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Self-Mining | 1,011,704 | 846,273 | 195,880 |
| Colocation | 496,587 | 2,751,803 | 11,330,116 |
| All Other Revenue | 168,429 | 409,575 | 1,056,016 |
| Total Revenue | 1,676,720 | 4,007,651 | 12,582,012 |

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Self-Mining | 60.3% | 21.1% | 1.6% |
| Colocation | 29.6% | 68.7% | 90.1% |
| All Other Revenue | 10.0% | 10.2% | 8.4% |
| Total Revenue | 100.0% | 100.0% | 100.0% |

191.     As Compute North began to expand its Colocation Service business segment, Compute North's deferred revenue liability also started to sharply increase:

|  | 2020 | 2021 |
|---|---|---|
| Deferred Revenue - Current | 8,214,890 | 103,818,516 |
| Deferred Revenue - Long Term | 810,477 | 44,444,497 |
| Total Deferred Revenue | 9,025,367 | 148,263,013 |

192.     Defendants arranged for Colocation Service customers to pay Compute North in advance for services that Compute North would provide in the future.  These advance payments were accounted for as deferred revenue on Compute North's financial statements.

193.     Defendants' reliance on front-end loaded customer payments masked the true state of Compute North's financial health and liquidity.

194.     According to Compute North's 2020 consolidated statements of cash flows contained in the March Board Meeting Pre-Read, Compute North had $715,942 in net cash from operating activities.  However, the reason the net cash from operating activities was positive was because Compute North accounted for $5,922,621 in deferred revenue payments in 2020.  If Compute North had not accounted for $5,922,621 in deferred revenue payments, Compute North's net cash from operating activities would have been *negative* $5,206,679 in 2020.

48

195.     Similarly, Compute North's 2021 consolidated statements of cash flows contained in the March Board Meeting Pre-Read indicated that, as of December 31, 2021, Compute North had $81,658,568 in net cash from operating activities.  However, the reason the net cash from operating activities was positive was because Compute North accounted for $139,237,646 in deferred revenue payments in 2021.  If Compute North had not accounted for $139,237,646 in deferred revenue payments, Compute North's net cash from operating activities would have been *negative* $57,579,078 in 2021.

196.     Compute North's positive cash flow was thus skewed by substantial deferred revenue accounting.  Yet, Defendants failed to meaningfully discuss and address Compute North's growing dependance on deferred revenue and how to manage and/or minimize the associated risks.

197.     For example, the March 7 Board Meeting was attended by Director Defendants Perrill, Lee, Johnson, Lima, Kieffer, and Scher.  Officer Defendants Piper, Wenzel, and Mjolsnes were also present.  The March Board Meeting Pre-Read included Compute North's 2020 and 2021 unaudited financial statements, which indicated that Compute North's deferred revenue increased from $5,922,621 in 2020 to $139,237,646 in 2021.

198.     Despite this drastic increase in deferred revenue from 2020 to 2021 and its potential implications for the business, the reliance on deferred revenue for liquidity and associated risks were not mentioned anywhere else in the pre-read materials, in the board meeting agenda, or the board meeting minutes.

199.     Defendants' dependence on deferred revenue also posed significant risks to the solvency of Compute North since Defendants did not implement adequate internal controls, risk management measures, or recordkeeping to accurately monitor the deferred revenue, which made

it difficult for Defendants to determine how much of the deferred revenue recorded in Compute North's cash flow statements could be realized.

200.    For example, it was critical for the Colocation Service business segment to have a standardized filing system with respect to its project management to ensure that it could easily locate contracts, amendments, invoices, and other documents relevant to each crypto mining project being managed for various customers.   Yet Defendants failed to implement internal controls to ensure that accurate records were kept relating to customers' advance payments for services and Compute North's corresponding obligations to provide these services.

201.    This failure became apparent when Defendants were unable to provide auditors with information they requested relating to deferred revenue that was necessary for reconciliation with the underlying data.   This information gap and inadequate record keeping put Compute North at risk of not being able to obtain audited financials that were necessary to prevent Compute North from defaulting on its debt financing arrangements.

## H.    Defendants Failed to Adequately Mitigate Market Industry Risks

202.    Crypto mining is a volatile business that is dependent on the continued rise of BTC's price to offset the price volatility of electricity and the cost of computing power.

203.    BTC to the U.S. Dollar ("USD") has significant price risk.   Applying conventional value at risk modeling, the absolute daily price movement for BTC had a median change of 2.08% per day and a 95th percentile daily price change of 8.27% from November 2, 2020 (CN Holding's founding) to September 22, 2022 (the Petition Date).   These metrics are substantially higher than those of more traditional currencies like the USD and the Euro.   The absolute daily price movement for the USD and Euro found a median change of .26% per day and a 95th percentile daily change of 0.91%.

50

204.   BTC was also designed with scarcity as a central feature. Consistent with this notion of scarcity and to guard against inflation, the BTC network is designed to execute a periodic Bitcoin-halving event ("Bitcoin Halving").   Bitcoin Halving occurs each time that 210,000 BTC blocks have been mined, which recently has amounted to roughly once every four years.   Once this occurs, the reward for mining one block is reduced by half while mining expenses remain the same.   Thus, BTC mining is subject to diminishing returns unless a company can increase the computing power of its miners, furthering a BTC miners' need for electricity.   Compute North experienced a Bitcoin Halving event in May 2020, which reduced the reward from successfully mining one block from 12.5 BTC to 6.25 BTC.

205.   Mining BTC requires a significant amount of electricity, which has one of the highest price volatilities of any commodity.   Electricity's volatility is largely due to the inability to economically store large amounts of electricity.   Unplanned power outages, growing reliance on intermittent wind and solar resources, overseas conflicts involving significant energy producers, and severe heat waves and cold spells further the volatility of electricity.

206.   Defendants acknowledged the volatility of electricity pricing.   For example, in a July 25, 2022 email, Defendant Wenzel explained how, as of that date, "Approximately half of the[] units (~3,018) are currently deployed at our Big Spring facility which doesn't have a hedge in place, this, is presently experiencing extremely volatile energy pricing within ERCOT" and acknowledged that "[s]ite economics (power costs) cause miner up-time/profitability to take a significant hit."

207.   The computing power needed to mine BTC also has substantially increased over time due to the increasing difficulty BTC miners face validating BTC transactions and obtaining a block.   The more BTC that is mined, the more difficult the complex cryptographic puzzles needed

to obtain a block become to solve.  Thus, more computing power is required to obtain a block and its corresponding BTC reward.  Given that computing power requires electricity, the electricity needed to mine BTC also increases as the cryptographic puzzles become more complex.

208.    Defendants were aware of BTC mining's volatility risk, as highlighted in the below "Market Update" slide of a "Customer & Market Risk Management Plan" that Defendant Johnson circulated in March 2020:

MARKET COMMENTARY
## Market Update
───

- Current BTC price volatility is pushing smaller and less efficient miners out of the market
- Miners who have delayed or decided not to upgrade equipment will be forced out of the market by this summer (post halving)
- Low cost power is a key competitive advantage, extending the profitable life of miner equipment
    - If customers do exit, Compute North can continue to mine at profitable levels even if BTC were to drop to prices not seen since summer 2017
- With BTC halving in May, hashrates are expected to fall in low price environment as miners with higher power costs shut down their unprofitable operations. This will increase profitability for miners who continue to mine.
    - Hashrate has dropped 16% in the past 7 days as of 3/19/20
- New customers coming online in NE will have a competitive advantage with new equipment

This same "Customer & Market Risk Management Plan" was also circulated by Defendant Lee to a potential investor via email, copying Defendant Lima, in June 2020.

209.    From its founding in late 2017 through the Petition Date, Compute North's operating costs grew exponentially in large part due to increasing electricity costs.

210.    According to Compute North's 2018 consolidated income statement, Compute North incurred $3,878,400 in operating expenses in 2018.  During this period, Compute North's electricity costs increased from $18,011 in Q1 2018 to $284,290 in Q4 2018.  In total, Compute North's electricity expenses were $664,482 in FY 2018.

211.    According to Compute North's 2019 consolidated income statement, Compute North incurred $4,972,496 in operating expenses in 2019.  During this period, Compute North's electricity costs increased from $390,458 in Q1 2019 to $776,870 in Q4 2019.  In total, Compute North's electricity expenses were $2,081,197 in FY 2019.

212.    According to Compute North's 2020 consolidated income statement, Compute North incurred $11,812,283 in operating expenses in 2020.  During this period, Compute North's electricity costs increased from $1,306,670 in Q1 2020 to $2,064,831 in Q4 2020.  In total, Compute North's electricity expenses were $6,801,515 in FY 2020.

213.    Despite being aware of the price volatility risks impacting Compute North's business and its increasing operating expenses, Defendants did not proactively take steps that would minimize and address these market fluctuations.  Upon information and belief, Defendants failed to implement adequate risk management strategies and capital controls, did not regularly assess the impact of price volatility in the crypto and electricity markets on Compute North's viability as a company, and failed to make decisions aimed at reducing downside risk so that Compute North could weather market fluctuations.

I.    **Defendants Failed to Implement Adequate Internal Controls or Risk Management Measures with Respect to Hedging Customer Contracts and Power Trading Decisions, Causing Compute North to Take on Excessive Risk**

214.    Defendants also failed to implement adequate internal controls and risk management measures with respect to capitalizing hedges for Compute North's Colocation Service customer contracts, which caused Compute North to take on excessive risk.

215.    In March 2022, Defendant Lee emailed Defendant Wenzel and Peter Liska, Director of Energy at Compute North, with Defendants Perrill and Piper copied, observing the following:

We are taking much of the burden to fund and capitalize hedges for our customers (unless it is priced in and completely passed through to the customer through a contract). Of course there is the period of time between signing and starting which should probably have some type of insurance or collar out in place. Have you guys spoken to third parties who are NOT conflicted, (like constellation or Mercuria might be) about pricing hedges to pass to our customers and what balance sheet support they may need? I continue to think the balance sheet of our customers is stronger than ours in many ways IF the hedge provider is willing to accept Bitcoin risk and IF customer is willing to encumber their Bitcoin for hedging purposes.

216.    Defendant Piper responded:  "I agree with you and think we need to begin to structure new alternative contract arrangements."

217.    In April 2022, Defendant Lee e-mailed Defendant Wenzel in response to an email he was forwarded about certain customer contracts, emphasizing the risks to Compute North due to inadequate risk management with respect to hedging customer contracts:

There is no mention of any pass through power, power hedging, risk sharing etc.  my opinion is there is an Enova problem that 90% of the organization is not focused or worried about it. Someone else is on top of it. It is someone else's problem. That needs to change. . . . At the moment I Hate ALL Texas projects until I understand how we are avoiding and structuring around risk and capital so am signaling how I will vote BUT part of the fund raise will be solving that problem. . . . I would also make very clear (in connection with your Fixers suggestion) who is in charge of hedging strategy and execution for now. See they are up to the task or fire or cap them on other someone that Barry selects.

218.    In March 2022, Peter Liska emailed Defendants Lee, Perrill, Wenzel, and Piper to inform them that one of his employees had secured low electricity prices at the Wolf Hollow Facility overnight, which saved the Debtors approximately $26,000.  Defendant Lee's response emphasized his concern that there was not a risk management plan in place concerning power trading decisions: "I actually interpret this with more concern that we have any discretion on making power trading decisions of any magnitude without a risk management plan in place. Isn't this the job of Shell/MP2 or Mercuria?  Getting a trade right is gratifying but we are not a commodity trader with a large balance sheet and advanced systems. We will not get all trades right.

What exposures are we taking and does management know the potential volatility upside and downside?"

**J.      The Officer Defendants Received Large Bonuses Despite Compute North's Liquidity Issues**

219.    Despite Compute North's liquidity issues, the Officer Defendants continued to receive large bonuses.

220.    Certain Officer Defendants received no less than $1,047,786.42 in total bonus compensation from January 2022 through the Petition Date (collectively, the "Bonus Transfers").

221.    Defendant Perrill received a $300,000.00 bonus payment from Compute North on March 4, 2022.

222.    Defendant Barron received at least $109,445.82 in bonus compensation from Compute North in 2022, including:

- $29,445.82 bonus payment on February 15, 2022;

- $50,000.00 bonus payment on March 4, 2022; and

- $30,000.00 bonus payment on August 30, 2022.

223.    Defendant Piper received at least $288,950.19 in bonus compensation from Compute North in 2022, including:

- $240,322.50 bonus payment on March 4, 2022;

- $14,012.31 bonus payment on July 1, 2022; and

- $34,615.38 bonus payment on August 19, 2022.

224.    Defendant Wenzel received at least $259,390.41 in bonus compensation from Compute North in 2022, including:

- $189,390.41 bonus payment on March 4, 2022;

- $20,000.00 bonus payment on August 5, 2022; and

- $50,000.00 bonus payment on August 30, 2022.

225.    Defendant Mjolsnes received at least a $90,000.00 bonus payment from Compute North on March 4, 2022.

226.    Plaintiff is continuing to investigate asset transfers that were not documented or were structured to avoid detection and reserve the right to amend this pleading to include and avoid any such transfers made to the Defendants.

**K.    Compute North's Bank Accounts**

227.    From at least 2021 through the Petition Date, Compute North's bank of record was BMO Bank, N.A. ("BMO").

228.    Prior to BMO, Compute North's bank of record was Fidelity Bank, N.A. ("Fidelity").  Compute North had initially selected Fidelity as its bank of record because Defendant Perrill had a longstanding relationship with Fidelity.

229.    Compute North's Fidelity account (the "Fidelity Account") was not closed when Compute North moved its banking relationship to BMO.  Instead, Compute North continued to use the Fidelity Account in conjunction with its account at BMO (the "BMO Account").

230.    From Compute North's inception until early 2022, Compute North used SONAR as its Customer Relationship Management ("CRM") platform.  Compute North handled customer accounts payable and accounts receivables through SONAR.

231.    Funds that customers paid to Compute North through the SONAR platform were deposited into the Fidelity Account even after BMO became Compute North's bank of record.

232.    Compute North's SONAR platform was deactivated in early 2022, when the company moved its customer accounts payable and accounts receivable functions to Bill.com.

233.    Funds that customers paid to Compute North through Bill.com were deposited into the Fidelity Account.

234.    Pursuant to Defendant Barron's direction and control, customer funds that were paid to Compute North and deposited into the Fidelity Account could be transferred to the BMO Account.

235.    Members of Compute North's finance team had read access to the Fidelity Account, but not administrative authority over the Fidelity Account.  The only individuals who had administrative authority over the Fidelity Account at all relevant times were Defendants Perrill and Barron.

236.    Members of Compute North's finance team had administrative authority over the BMO Account.

**L.    Defendant Perrill Was Reimbursed with Compute North Funds for $986,000 of Travel and Entertainment Expenses, Including Exorbitant Charges to Steakhouses and Strip Clubs, in Violation of Compute North's Values and Policies**

237.    As Compute North was struggling with liquidity to keep its business afloat, Defendant Perrill, with the help of Defendant Barron, incurred hundreds of thousands of dollars in travel and entertainment expenses, including exorbitant steakhouse and strip club charges, in flagrant violation of Compute North's values and policies.

238.    Reimbursement of Defendant Perrill's extravagant expenses with Compute North funds was either undetected or unchallenged by the other Defendants due to deficient internal controls, inadequate financial oversight, and/or management override of controls.

239.    Compute North had marketed to investors and potential recruits its four core values: Integrity, Commitment, Drive and Positive Attitude.  Compute North defined its core value of Integrity as "[b]uilding a foundation of trust through honesty and integrity."  Compute North defined its core value of Commitment as "[t]o our customers, our team, and our company."

240.     Prior to 2021, Compute North did not have a formal expense reimbursement policy. According to Defendant Barron, the company's approach and philosophy with respect to expenses was to "spend the company's money as if it's your own."

241.     This philosophy with respect to expense reimbursement was memorialized in policies of some of Defendant Perrill's other companies – PerrillCo and WAND Corporation.

242.     From as early as 2015, WAND Corporation's Fiscal Policy required WAND Corporation employees to "Act in WAND's best interest, which means:  Expense only what you would otherwise not spend; and is worthwhile for work" and to "[t]ravel and spend money as if it were your own."

243.     From as early as 2020, PerrillCo's Fiscal Policy required PerrillCo employees to "[e]xpense only what you would otherwise not spend; and is worthwhile for work" and to "[t]ravel and spend money as if it were your own."

244.     As CFO of PerrillCo, Defendant Barron oversaw the implementation of PerrillCo's Fiscal Policy.

245.     In August 2020, Defendant Barron sent PerrilCo's Fiscal Policy to Defendant Perrill by email.  Approximately 10 minutes later, Defendant Perrill forwarded PerrillCo's Fiscal Policy to Defendant Piper and Ms. Piff, telling them both:  "You can file this for future use…but we will need to get something published on this eventually":

Date:        Wed, 26 Aug 2020 2:28:00 PM -0500
Sent:        Wed, 26 Aug 2020 2:27:58 PM -0500
Subject:     FW: Fiscal Policy
From:        Dave Perrill <dave.perrill@perrillco.com>
To:          Tad Piper <tad.piper@computenorth.com>; Amanda Piff <amanda.piff@computenorth.com>;
Attachments: Fiscal Policy - Perrill.docx
You can file this for future use...but we will need to get something published on this eventually.

**From:** Spencer Barron <spencer.barron@wandcorp.com>
**Sent:** Wednesday, August 26, 2020 2:12 PM
**To:** Dave Perrill <dave.perrill@perrillco.com>
**Subject:** Fiscal Policy

Dave – Does the attached fiscal policy look good to you?  If so, I'll send to the Leadership team for their feedback.

Background:  I had a finance department rock to publish this policy.  I borrowed much of it from WAND, simplified, and made sure it was one page.  Open to any and all feedback.

Thanks!

-Spencer


**Spencer Barron**
CFO
sbarron@perrill.com
952.279.2364

246.    From as early as June 2020, Compute North's Employee Handbook (the "Employee Handbook") contained a section on "Business and Travel Expenses."  This policy stated, in relevant part, that "[r]eimbursement is allowed for ordinary travel and necessary business meal and entertainment expenses for employees who have an influence on Compute North business. Expenses must be directly related to the business and obtained under circumstances related to a business discussion."

247.    The "Business and Travel Expenses" policy of the Employee Handbook also required employees to report the following with respect to each business expense:

When reporting expenditures for entertainment, provide the following:

- Date;
- Name and address or location of restaurant or other facility;
- Name, title and company of the person(s) involved;
- Business reason; and
- Amount of each separate expense.

248.    On September 27, 2021, Compute North implemented a Purchasing and Fiscal Policy, which covered "all types of spend, including purchase orders, invoices, company credit cards, employee, and contractor expense reimbursement" (the "Purchasing and Fiscal Policy").

249.    Prior to the Purchasing and Fiscal Policy being formally implemented, Compute North had a Compute North Fiscal Policy (the "Fiscal Policy"), which contained similar language and guidance.

250.    The Purchasing and Fiscal Policy, the Fiscal Policy, and the Employee Handbook all emphasized "Integrity".  They each contained variations of the following statement set forth in the Purchasing and Fiscal Policy: "Integrity is one of Compute North's four Core Values. Please use integrity and fiscal responsibility when committing to and using company resources to perform your job duties with **commitment, drive** and a **positive attitude.**"  (Emphasis in original).

251.    The Purchasing and Fiscal Policy, the Fiscal Policy, and the Employee Handbook also each contained variations of the following directions set forth in the Purchasing and Fiscal Policy: "Expense only what you would otherwise not spend; and is worthwhile for work" and "Travel and spend money as if it were your own."

252.    The Purchasing and Fiscal Policy contained the following guidance about pre-approval that was needed for certain expenses:

Specific Pre-Approval Levels **

- Travel and Expense Reports (in aggregate or individually) – All department travel budgets should be pre-approved during the annual budgeting process. Prior to travel, please obtain written approval based on total estimated trip spend as follows:

   o Total cost up to $1,000 – Director of Department

   o Total cost between $1,001 and $10,000 – VP of Department

   o Total cost between $10,001 and $30,000 – CFO

   o Total cost exceeding $30,000 – CEO

- Purchasing Approval Matrix (Capital Projects Must Be Approved Separately)

   o Total cost up to $25,000 – Head of Department (VP/Chief of Department CTO etc.)

   o Total cost between $25,001 and $100,000 – Corporate Controller

   o Total cost between $100,001 and $500,000 – COO

   o Total cost between $500,001 and $5,000,000 – CFO

   o Total cost exceeding $5,000,000 – CEO

   o Total cost exceeding $15,000,000 – CEO + Board Approval

253.     The Purchasing and Fiscal Policy was drafted and approved by the Defendants so that Defendant Perrill would not have to receive pre-approval for expenses that would be reimbursed with Compute North funds.

254.     Prior to September 2021, Compute North used Zoho Expense, which was an expense management software.  The Fiscal Policy stated:  "Expense reports with itemized receipts over $25 should be submitted to Zoho within 14 days of trip/expense."

255.     Upon information and belief, Defendant Perrill did not submit his expenses through Zoho.

256.     In or around September 2021, Compute North formally replaced Zoho Expense with RAMP.  RAMP is another expense management software.

257.     The Purchasing and Fiscal Policy stated that "expenses and reimbursements with itemized receipts over $75 should be submitted to [RAMP] within 7 days of trip/expense."

258.     Compute North also implemented a corporate credit card program with RAMP (the "RAMP Program").  Through the RAMP Program, each Compute North manager-level and director-level employee and above was given a RAMP Visa credit card (the "RAMP Card").

Following the RAMP Program's implementation in September 2021, all Compute North directors and officers were required to charge their business expenses to the RAMP Card. Compute North received a 1.5% credit back from RAMP for charges to RAMP Cards.

259. The Purchasing and Fiscal Policy contained the following Ramp Card Transaction and Expense Requirements, which required RAMP Card Holders to submit a memo "briefly describing what is being purchased and/or where the purchase is for" prior to initiating a transaction and submitting that transaction for reimbursement through the RAMP app. The RAMP Card and Reimbursement Policy also required RAMP Card holders to obtain and submit itemized receipts prior to reimbursement.

Transaction Requirements

- All transactions require a memo briefly describing what is being purchased and/or where the purchase is for, e.g., Meal for Sales Team or Supplies for NE05.
- Transactions over $75 require a receipt. Per IRS guidelines, expenses less than $75 do not require a receipt.
- Purchasers are responsible for entering the Category (expense account) for their purchases. Categories have been limited to only applicable categories based on the department of the purchaser.
- Requirements can be entered using a computer or a phone via text messages from Ramp.

Expense Reimbursements

- Reimbursements have the same requirements that Ramp card transactions do (Receipt, Memo, and Category).
- We require itemized receipts for all reimbursements.
- Reimbursements via ACH is The Company's preferred method of reimbursement. Alternatively, we can pay by check, but please expect 7-14 day delay for reimbursements by check.
- *Reiminder* to be paid by ACH, you will need to enter your bank information on the Ramp site.
- Starting 10/31/2021 – we will no longer use Zoho for expense reports and reimbursements.

260. On September 27, 2021, Mr. Bader sent an email entitled "Announcing the New and Improved Purchasing Process" to "All Executives" and "All Supervisors and Managers." The email announced Compute North's formal implementation of the RAMP Program and the Purchasing and Fiscal Policy. Both Defendants Perrill and Barron were recipients of this email.

261. The Employee Handbook was also revised to contained directions about RAMP expenses, stating that: "Expense reports with itemized receipts should be submitted to Ramp within 2 weeks of the trip/expense." The Employee Handbook set forth the following Ramp Card Transaction Requirements:

**Transaction Requirements**

- All transactions require a memo briefly describing the business context for the purchase.
- The Project field is required for each transaction.
  - Choose "Non-Project Related" if not applicable.
- All transactions require an attached receipt.
- Purchasers are responsible for entering the Category (expense account) for their purchases.
- Requirements can be entered using a computer or a phone via text message.
- If transactions over 14 days old do not have the required receipt, memo and Project identified, Ramp will automatically lock the user's card.
- Ramp sends out weekly reminders of any transactions that are missing any requirements.

The Employee Handbook also set forth Expense Reimbursement guidance:

**Expense Reimbursements**

- All reimbursements must have a receipt.
- Reimbursements can be paid by ACH or check.  If you would like to be paid by ACH, you will need to enter your bank information on the Ramp site.
- Reimbursements have the same requirements as Ramp card transactions (receipt, memo, and category)
- For those traveling abroad, please be sure to check which currency you paid in and do any conversions, if necessary, before submitting expenses.

262.    Defendant Perrill possessed a RAMP Card since the RAMP Program's inception.

263.    However, until August 2022, Defendant Perrill continued to use an American Express credit card in the name of 7575 Management LLC (the "AMEX Card") for Compute North expenses, including vendor, travel, and entertainment expenses, instead of using his RAMP Card.

264.    7575 Management LLC is a company affiliated with Defendant Perrill and the landlord for Compute North's Eden Prairie Office.

265.    The AMEX Card was personally guaranteed by Defendant Perrill.  At all relevant times, Defendant Perrill possessed the AMEX Card and was the only person able to charge expenses on the AMEX Card.

266.    Upon information and belief, Defendant Perrill claimed he did not use the RAMP Card until August 2022 because it was a "pain in the ass."

267.    Defendant Perrill received credit card points through purchases made on the AMEX Card, which he would convert to Delta SkyMiles for personal flights.

268.    Defendant Perrill's wife, Maggie, also received credit card points through purchases made on the AMEX Card.  Defendant Perrill emailed Defendant Barron about the AMEX Card in May 2021, asking Defendant Barron:  "You still on track to hit the spending numbers for the Amex reserve for the year?"  Defendant Barron responded "[r]egarding Amex Reserve spending . . . we'll get there.  Low spending limits on your card make it a little difficult, but we can prepay some balances to free up spend to get to the $250k. So short answer . . . we'll get there."  Defendant Barron also notified Defendant Perrill that Defendant Perrill's wife, Maggie, "should have gotten her 2nd boost" on her Delta SkyMiles account resulting from the spending of $60,000 of credit card charges.

269.    Defendant Perrill's use of the AMEX Card instead of the RAMP Card deprived Compute North of earning 1.5% credit back on the expenses incurred and instead allowed Defendant Perrill to receive reward points that he used for his and his wife's personal benefit.

270.    From January 2021 to April 2022, approximately 800 separate transactions relating to recurring and non-recurring vendor expenses were charged to the AMEX Card.  The vendors included, among others, Amazon, Amazon Web Services, Brinks Home Security, Federal Express, the internet service provider Longlines, SONAR, and Waste Management.  These vendor expenses totaled approximately $578,000 and were paid using Compute North's Fidelity Account funds.

64

271.    From January 2021 to April 2022, Defendant Perrill incurred approximately $263,000 in charges to the AMEX Card relating to his travel and entertainment expenses.  These expenses were paid using Compute North's Fidelity Account funds.

272.    From January 2021 to April 2022, Defendant Perrill charged approximately $42,000 in meal expenses to the AMEX Card, including, among others:

- $2,071.16 in charges relating to a visit to the Bottled Blonde, a restaurant and nightclub in Scottsdale, Arizona, on February 19, 2021;

- $1,634.53 charge to Flagler Steakhouse, a restaurant in Palm Beach, Florida, on September 7, 2021;

- $4,469.82 charge to Komodo, a restaurant and nightclub in Miami, Florida, on January 20, 2022; and

- $3,908.87 in charges relating to visits to Sass Café, a restaurant and nightclub in Monte Carlo, Monaco, on April 26 and 27, 2022.

273.    From January 2021 to April 2022, Defendant Perrill charged approximately $62,000 in adult entertainment transactions to the AMEX Card, including, among others:

- $18,384.97 charge relating to a single visit to the Mynt Lounge, a popular night club in Miami Beach, Florida, on June 6, 2021;

- $7,223.68 in charges relating to visits to Tootsie's Cabaret, a strip club in Miami Gardens, Florida, on July 2, 2021 and April 8, 2022;

- $3,403.20 charge relating to a visit to Velvet Club, a strip club in Geneva Switzerland, on November 7, 2021;

- $12,371.56 in charges relating to visits to Headquarters, a strip club in New York, New York, on October 7, 2021 and March 10, 2022;

- $14,428.50 charge relating to a visit to the 23 Club, a night club in Miami Beach, Florida, on April 8, 2022; and

- $3,213.90 in charges relating to a visit to Star Club, a strip club in Beausoleil, France, on April 27, 2022.

274.    Upon information and belief, Defendants Lee, Wenzel, and Mjolsnes each accompanied Defendant Perrill during one or more of his visits to an adult entertainment club that was charged to the AMEX Card and reimbursed by Compute North's company funds.

275.    From January 2021 to April 2022, Defendant Perrill charged approximately $159,000 on other travel and entertainment-related expenses to the AMEX Card, including, among others, a $11,113.57 charge for a Delta Airlines passenger ticket on March 24, 2022, and a $5,147.45 charge relating to a stay at Le Méridien Beach Plaza, a 4-star resort in Monte Carlo, Monaco, on April 28, 2022.

276.    Defendant Perrill also incurred approximately $145,000 in miscellaneous or unidentifiable charges to the AMEX Card.  The identifiable charges include, among others, charges to restaurants and bars close to Compute North's Eden Prairie Office and charges to a Costco in San Francisco, California.

277.    Plaintiff is continuing to investigate additional charges to the AMEX Card and reserves the right to amend this pleading to include and avoid any such transfers made to Defendant Perrill concerning these charges.

278.    Defendant Perrill was able to charge elaborate travel and entertainment expenses to the AMEX Card knowing that he would be reimbursed for these expenses without having to submit itemized receipts or justification for these expenses.

279.    Defendants Perrill and Barron, as the only individuals who had administrative authority over the Fidelity Account at all relevant times, were responsible for reviewing and approving the approximately $986,000 of expenses charged to the AMEX Card.

280.     Upon information and belief, Defendant Barron always approved reimbursement of Defendant Perrill's charges to the AMEX Card using Compute North funds and never rejected an expense he submitted for reimbursement.

281.     Upon information and belief, at some point, Defendant Barron arranged to have the monthly AMEX Card statement paid by "autopay" from Compute North's Fidelity account.

282.     Upon information and belief, Defendant Perrill did not submit adequate documentation and itemized receipts for significant travel and entertainment expenses he charged to the AMEX Card, including strip club expenses.

283.     This lack of documentation deprived anyone at Compute North and auditors from investigating whether expenses incurred by Defendant Perrill were made for legitimate business purposes.   It also placed Compute North at an audit and financial risk.

284.     Defendant Barron would provide Compute North's finance and accounting team with the monthly statements for the AMEX Card so that the accounting and finance team could reconcile funds from the Fidelity Account used to pay for the AMEX Card.

285.     Upon information and belief, Defendant Barron informed members of Compute North's finance and accounting team that itemized receipts for the AMEX Card expenses were not provided because Defendant Perrill "would not buy in to doing so."

286.     Upon information and belief, members of Compute North's finance and accounting team characterized the approval process of Defendant Perrill's expenses as a "black box".  When they objected to certain of the AMEX Card charges incurred by Defendant Perrill, they were directed to "just pay the bills" as there was no real approval process for Defendant Perrill's corporate expenses since they were just automatically approved by Defendant Barron.

287.    For example, Defendant Piper objected to a significant Florida meal and entertainment expense charged to the AMEX Card in 2021.  Defendant Piper told Defendants Perrill and Wenzel that the charge was not acceptable and that there was no connection between this expense and obtaining customers for Compute North.  Defendants Perrill and Wenzel told Defendant Piper that they disagreed and, upon information and belief, Defendant Barron approved the expense and reimbursed Defendant Perrill using Compute North's Fidelity Accounts funds.

288.    Upon information and belief, Defendant Barron did not question Defendant Perrill's expenses and instead had a "yes man mentality" when it came to matters relating to Defendant Perrill.

289.    Defendant Barron's judgement over whether expenses incurred by Defendant Perrill were in the best interest of Compute North was clouded due to his longtime affiliation with Defendant Perrill and Defendant Perrill's other businesses.  Defendant Barron served as WAND Corporation's Director of Finance and Controller from June 2014 to July 2016 and its VP of Finance from July 2016 to December 2019.  Defendant Barron has served as WAND Corporations' Chief Financial Officer from December 2019 to the present day.  Defendant Barron also has served as PerrillCo's Chief Financial Officer from May 2020 to the present day.

**M.    Defendant Perrill Routinely Caused Compute North to Transact With Other Entities He Owned or Controlled for His Own Personal Benefit, Without Independent Review and Approval of These Transactions or Pushback From Other Defendants**

290.    Defendant Perrill routinely caused Compute North to transact with other entities he owned or controlled for his personal benefit, without having these transactions independently reviewed and approved.

291.    Upon information and belief, there was no pushback from the other Defendants concerning Compute North transactions with entities owned or controlled by Defendant Perrill.

292.    The transactions between Compute North and other Defendant Perrill owned or controlled entities were recorded on Compute North's general ledger.  Several of these transactions were recorded without proper supporting documentation.

293.    Defendants' failure to implement an independent review and approval process of Compute North's transactions with Defendant Perrill owned or controlled entities meant that Compute North engaged in certain transactions that benefited Defendant Perrill without an independent assessment of whether these transactions were for fair market value or in Compute North's best interest.

294.    Defendant Perrill has been CEO of PerrillCo since January 2009.  PerrillCo is the holding company of WAND Corporation.

295.    Defendant Perrill was President of WAND Corporation from January 2009 to July 2017.  WAND Corporation is a company focused on the sale of digital menu software, hardware, and menu design for restaurants.

296.    Upon information and belief, Defendant Perrill holds substantial ownership stakes in both PerrillCo and WAND Corporation.

297.    Defendant Perrill owned his shares of Compute North through PerrillCo.

298.    Compute North's financial records were often kept within WAND Corporation's files.

299.    For example, in May 2020, Defendant Barron, using his WAND Corporation email, told Defendant Johnson and Ms. Piff that he had been working with a CPA to formalize Compute North's "debt cleanup".  Defendant Barron asked where he could find "a current copy of the CN cap table", and Ms. Piff responded that she made a copy of the cap table and placed it in WAND

Corporation's Sharepoint in the following folder: "WAND>Finance>Corporate>Equity 'Cap Table_2019".

300.    In May 2020, Defendant Barron emailed Defendant Johnson and Ms. Piff, using his WAND Corporation email address, about how they could access documents relating to Compute North promissory notes in a "WAND Corporation Team Site – Compute North" folder on the "[W]and [C]orporation" OneDrive.

301.    At all relevant times, Defendant Perrill caused Compute North to share an office space with another entity he controlled at a location he owned.

302.    Defendant Perrill is the organizer, manager, and agent of 7575 Management LLC, which owned offices at 7575 Corporate Way, Eden Prairie, Minnesota (the "Eden Prairie Office").

303.    Both Compute North and WAND Corporation were headquartered and had their offices at the Eden Prairie Office.  On January 1, 2020, Compute North entered into a sublease with WAND Corporation to rent office space at the Eden Prairie Office (the "Sublease"). The sublease was subject to a master lease agreement between 7575 Management, LLC and WAND Corporation, dated February 1, 2016.

304.    Defendant Perrill also caused Compute North to transact with PerrillCo for various services without submitting proper documentation and/or documentation about whether the services provided by PerrillCo were for fair market value.

305.    For example, PerrillCo billed Compute North $8,200 for "[d]igital advertising management" each month from February through December 2021.

306.     PerrillCo also billed Compute North $8,000 for "Website Programming" on July 26, 2021.

307.    Defendant Perrill caused Compute North to transact with WAND Corporation without submitting proper documentation and/or documentation about whether the services provided by WAND Corporation were for fair market value.

308.    For example, on April 18, 2021, WAND Corporation billed Compute North $3,739.66 for "[c]onstruction labor for new Lab Build."  WAND Corporation also billed Compute North $1,273.80 for "[c]harges for labor related to – CN Warehouse Move and Standing Desk Addition."   Upon information and belief, these WAND Corporation charges were posted to Compute North's general ledger by Compute North's accounting and finance team without an invoice or corresponding documentation also being posted on Compute North's system of record, Intacct.

309.    From January 2022 to March 2022, WAND Corporation charged Compute North a total of $14,321.70 for "hours-background checks, phones, [and] HireRight setup" performed by Cindy Doyle, a Finance and Human Resources Assistant for WAND Corporation.   Upon information and belief, these charges for Ms. Doyle's services were posted to Compute North's general ledger by Compute North's accounting and finance team without an invoice or corresponding documentation also being posted on Compute North's system of record, Intacct.

310.    WAND Corporation also routinely billed Compute North for its sale of equipment to Compute North.

311.    For example, on February 14, 2022, WAND Corporation charged Compute North $45,322.17 for "LED Displays."  On May 11, 2022, WAND Corporation charged Compute North $2,197.65 for "chairs and file cabinets for CN."  Upon information and belief, these WAND Corporation charges were posted to Compute North's general ledger by Compute North's

accounting and finance team without an invoice or corresponding documentation also being posted on Compute North's system of record, Intacct.

312.   In June 2021, WAND Corporation's accounts receivable department emailed CN LLC's accounts payable department an invoice ordering CN LLC to pay $20,160 for Defendant Perrill's YPO annual membership fee.

313.   When this invoice was flagged to Defendant Piper for approval, Defendant Piper emailed Defendant Barron stating: "We pay for all of Dave's YPO annual membership? Do the other companies pay a portion of this? . . . Can you provide some color here?"  Defendant Piper also remarked that "[i]t seems odd to have this invoice come through W[AND]."

314.   The next day, Defendant Barron emailed Cindy Doyle, a finance and human resource specialist at WAND Corporation, to add the following description about the expense: "$20,160 total cost for Dave's YPO membership; 25% allocated to WAND, 75% to Compute North.  This invoice is for Compute North's 75% portion."

315.   Defendant Barron also wrote to Defendant Piper:  "Total cost is $20,160.  Per Dave's direction, 25% to WAND; 75% to CN, which aligns with his focus."

316.   Compute North had a conflict of interest policy, which provided:

> In all situations, you are expected to conduct your activities with integrity, ethically and in accordance with applicable laws and regulations. Employees should not engage in any work activity, practice or conduct which appears to be a conflict of interest for the company, its customers, suppliers, contractors, competitors or any person doing or seeking to do business with Compute North . . . . You are to act in the best interests of the company, regardless of personal preference, and must not create the perception of personal advantage.  An actual or potential conflict of interest occurs when an employee is in a position of influence a decision that may result in a personal gain for that employee or for a relative (related by blood or marriage, or a similar relationship. . . . [I]f you have any influence on transactions involving purchases, contracts, or leases, you must disclose the existence of the relationship to your supervisor as soon as possible.

317.     Defendant Perrill violated Compute North's conflict of interest policy by routinely having Compute North engage in transactions with other entities he owned or controlled as this caused, or at least appeared to be, a conflict of interest and created the perception of a personal advantage for Defendant Perrill.

318.     Defendant Barron violated Compute North's conflict of interest policy by approving Compute North's transactions with other entities that he worked at as an officer and by not flagging that these transactions should be independently reviewed and approved despite requests for interested transactions information from the accounting and finance team.   As discussed above, Defendant Barron was the CFO of both WAND Corporation and PerrillCo at the time of Compute North's transactions with these entities.   Defendant Barron was also the VP of Finance and/or the Chief People Officer of Compute North at all relevant times.

319.     Upon information and belief, it was known throughout Compute North that Defendant Barron was a proxy for Defendant Perrill.   This caused employees, such as Mr. Bader, the former Controller of Compute North, to fear further attempts to get Defendant Barron to disclose interested transactions because they did not want to anger Defendants Perrill and Barron.

320.     The Management Representations to Deloitte signed by Defendants Perrill and Piper stated, in relevant part: "We have made available all relevant information regarding financial interests and contractual arrangements, if any, with related parties, de facto agents, and other entities, including but not limited to, their governing documents, equity and debt instruments, contracts, leases, guarantee arrangements, other financial contracts and arrangements, unwritten understandings, and written and oral side agreements."

321.     But Deloitte did not identify all the transactions between Compute North and other Defendant Perrill owned or controlled entities in the audited consolidated 2019 and 2020 financial

statements because Defendants failed to disclose all interested transactions.  Deloitte identified only the following related party transactions:  "The Company holds loans and personal guarantees from related parties with interest rates between 10-15%.  See Note 4 for more information concerning loans and guarantees.  The Company also leases its headquarters office from a related party, see Note 9 for more information."

322.    In addition to the transactions between Compute North and other Defendant Perrill owned or controlled entities, Defendant Perrill had employees from other entities he owned or controlled (such as WAND Corporation) simultaneously work for Compute North.

323.    These individuals not only were unable to fully devote their time and attention towards their roles at Compute North, but also certain of these individuals intermingled their WAND Corporation and Compute North responsibilities and/or were told to prioritize their WAND Corporation responsibilities over their Compute North responsibilities to the detriment of Compute North.

324.    Defendant Barron, for example, served as Compute North's VP of Finance (from January 2018 through August 2019) at the same time as he served as WAND Corporation's VP of Finance (from July 2016 to December 2019).

325.    During this time when Defendant Barron was serving as VP of Finance for both Compute North and WAND Corporation, Deloitte identified "significant risks" in Compute North's internal control over financial reporting.  Deloitte found that Compute North's "accounting and finance department was not sufficiently staffed to facilitate proper segregation of duties" and that Compute North "did not have sufficient resources to formalize certain processes and controls, including the preparation and review of general ledger account reconciliations."

326.     Defendant Barron served as Chief People Officer ("CPO") of Compute North (from November 2021 until October 2022) at the same time as he served as WAND Corporation's CFO (from December 2019 to present) and Perrill Co.'s CFO (from May 2020 to present).  Defendant Barron would sometimes use his WAND Corporation email address to conduct work for Compute North.

327.     Andrew Prosser, as another example, was hired to be Compute North's Lead Software Engineer in or around January 2018.  Prosser served as Compute North's Software Engineering Manager from approximately July 2020 to July 2022 and as Compute North's Director of Software Engineering from approximately August 2022 to December 2022.  At the same time, Andrew Prosser also worked as a WAND Corporation Software Developer (from June 2010 to present).  Upon information and belief, Andrew Prosser still works at WAND Corporation.

328.     In 2021, WAND Corporation hired Versique, a Minnesota-based recruiting firm, to assist WAND Corporation in its search to hire a new software developer.  WAND Corporation ultimately hired a software developer with the assistance of Versique.

329.     Versique charged WAND Corporation a $17,187.50 search fee for its assistance placing this software developer.  On June 21, 2021, WAND Corporation billed 50% of the cost of Versique's search fee to Compute North, charging Compute North $8,593.75.  The justification for this charge was that the software developer placed at WAND Corporation was hired so that Andrew Prosser could be made available to work both for Compute North and WAND Corporation.

330.     Defendants Perrill and Barron instructed Compute North employees who also worked for WAND Corporation to prioritize their WAND Corporation obligations over their Compute North obligations despite Deloitte's explicit warnings, including that Compute North's

"accounting and finance department was not sufficiently staffed" and that Compute North "did not have sufficient resources to formalize certain processes and controls."

331.    An April 2021 email from Defendant Barron to Defendant Perrill and Dave Kemp, WAND Corporation's Chief Operating Officer, exemplifies these instructions:

Date:    Tue, 20 Apr 2021 4:34:45 PM -0500
Sent:    Tue, 20 Apr 2021 4:34:42 PM -0500
Subject: Prosser incentive framework
From:    Spencer Barron <spencer.barron@wandcorp.com>
To:      Dave Perrill <dave.perrill@perrillco.com>;
CC:      Dave Kemp <dave.kemp@wandcorp.com>;

Dave – Here's my simplified framework to provide Prosser to share in the incremental value he creates.  If he makes more time to do more, he captures the value of it.

Framework:
  • Meet WAND commitments, estimated to be approximately 75% of a normal work week (30 hours), leaving 10 hours per week for Compute North.
       ○ "I have to work on Compute North" can't be a reason to not achieve WAND commitments.
  • Hours in excess of 40 in a given month (10 hours x 4 weeks) billed to Compute North goes to Andrew at $55/hour (W2 equivalent hourly rate) added as a monthly bonus

From a financial perspective, Compute North continues to pay for what they use him for at the same rates.  It's simply if Andrew allocates more time, he makes more money.

If you are good with this, I think Dave K & I can present this to him.

-Spencer

Spencer Barron
CFO
WAND Corporation
P: 952-361-6200 | D: 952-279-2364 |
E: spencer.barron@wandcorp.com



332.    WAND Corporation charged Compute North a disproportionate share of services provided by employees who worked for both WAND Corporation and Compute North.

333.    For example, on November 1, 2021, WAND Corporation charged Compute North $2,629.17 for "Maddy Perrill's front desk/admin monthly Compute North allocation of 75%." Maddy Perrill is Defendant Perrill's sister-in-law who was employed at Compute North and also employed at WAND Corporation as an administrative assistant.

**N.    The Deloitte FY 2021 Audit Could Not Be Completed Due to Defendants' Inability to Provide Requested Financial Information and Defendants' Failure to Remedy Compute North's Deficient Internal Controls and Recordkeeping**

334.    In or around early 2022, Compute North retained Deloitte to conduct an audit of its FY 2021 financial statements ("Deloitte FY 2021 Audit").

335.    Compute North was seeking to raise additional funds through a capital raise, which required an audit of Compute North's 2021 financial statements to be conducted.

336.    Compute North also had to provide Generate and NextEra with audited financial statements to avoid defaulting under the Generate Credit Agreement and the NextEra Note.

337.    Defendants were unable to timely provide certain financial information to Deloitte that it had requested while working on the Deloitte FY 2021 Audit, including financial data that was needed for Deloitte to reconcile revenue with the underlying data, information concerning the recorded deferred revenue and customer deposits, and internal controls information.  These areas of concern were previously flagged as significant deficiencies by Deloitte in the Deloitte Audit Results and Deloitte Audit Plan.

338.    Deloitte also requested a going concern memo, which Defendants were unable to issue due to Compute North's significant liquidity issues, including the liquidity issued caused by the execution of the over $86 million of purchase orders for crypto mining containers with RK Mission Critical in December 2021.

339.    Mr. Bader, in May 2022, forwarded an update to Defendant Piper (among others) that he had received about the Deloitte FY 2021 Audit from Matt Rice, the Director of Accounting at Compute North, summarizing some of the issues that were delaying completion of the audit:

- **DT Valuation of Stock Compensation**: DT valuation specialists working through their audit of the EY valuation, utilized in our accounting for stock compensation.
- **Revenue**: DT's testing of revenue has been very arduous and extensive. This testing has also been delayed due to the difficulty associated with reconciling our underlying data.
  - *Colocation Revenue*: DT made over 50 detailed selections to test our colocation revenue, which includes our recalculation/reconciliation of all data necessary to  invoice a customer. This is taking substantial time to accumulate and reconcile the data (30+ minutes per selection).
  - *Mining Revenue*: DT is requesting detailed accounts of all mining transactions, broken out by pool and comparing to recalculated expectations of revenue based on relative difficulty throughout the year. This requires that we help reconcile MinerSentry data to the overall BTC network to reconcile expected BTC mined by 2-week period.
- **Deferred Revenue/Customer Deposits**: DT requesting roughly 50 detailed selections and had trouble obtaining final, signed contracts (including all relevant amendments), then reconciling back to invoices/cash transactions. Other troubles include obtaining evidence of delivery to determine when revenue can be recognized (specific to hardware).
- **Internal Controls Assessment**: Long, outstanding items from the IT team to obtain the relevant support for ITGCs.

340.    In the agenda for a May 5, 2022 call to discuss the status of the Deloitte FY 2021 Audit, Deloitte described the overall status of the audit as "at risk."  The agenda also stated that

Compute North needed to provide the following documents and information "as soon as possible": information about stock compensation valuation, "remaining invoices requested for revenue testing," "breakout between self-mining and other activities", and "14 open requests for" information about "Sonar, Intacct, and MinerSentry."

341.    MinerSentry is a program that was created by Compute North to manage its customer data.  Compute North's accounting and finance team discovered that data input into MinerSentry was only 50% accurate.  As a result, Ms. Piff was tasked with reviewing customer contracts and data to verify or reconcile information needed to recognize revenue from customer contracts.  Verification and reconciliation of MinerSentry data was an arduous process because each customer contract was different and, for some customer agreements, Compute North executed more than a dozen amendments.

342.    Moreover, the accounting and finance team had a difficult time obtaining information from Defendant Wenzel that was necessary to reconcile data.  The substantial amount of time and effort spent by Compute North's accounting and finance team on addressing issues relating to MinerSentry also diverted limited time and resources that the accounting and finance team could have spent improving Compute North's deficient internal controls and processes and ensuring the timely completion of audits.

343.    To avoid defaulting under the Generate Credit Agreement and NextEra Note, which required Compute North to provide audited financial statements, the Officer Defendants sought extensions to provide audited financial statements to tits lenders.  In requesting these extensions, the Officer Defendants did not tell their lenders why the Deloitte FY 2021 Audit was delayed.

344.    As of early June 2022, Deloitte still was unable complete its audit of Compute North's FY 2021 financial statements.

345.     In June 2022, Mr. Bader sent an email to Dan Cooley, Compute North's Director of Mining Operations, asking for urgent help because "[w]e need to get our audit complete, and this is one of the key areas still open. We must issue our audited financials to Generate and NextEra and already asked for an extension.  For Deloitte to accept us as an audit client, their national office is making the audit team do a complete revenue proof of mining.  The difference in the outlined periods is greater than our materiality threshold and would be a  passed audit adjustment, potentially leading to a significant deficiency or material weakness. A material weakness is reported on our financial statements."

346.     Deloitte never completed the Deloitte FY 2021 Audit.

**O.     Defendants Waited Until June 2022 to Inform Compute North's Lenders and Independent Board Directors that Compute North Had Only Three Weeks Left of Cash and No Readily Available Financial Records**

347.     Defendants, by reason of their positions as officers, directors, and fiduciaries of Compute North and because of their ability to control the business and corporate affairs of Compute North, owed a duty to properly oversee information about the financial condition of Compute North at all relevant times and knew or should have known about Compute North's dire liquidity issues.  Yet Defendants chose to conceal Compute North's liquidity issues from newer, independent members of the Board and its lenders.

348.     In February 2022, following Compute North's execution of the Generate Credit Agreement, Andrew Marino, a Senior Managing Director and Head of Strategy at Generate, was appointed to the Board as an independent director and the Board representative for Generate.

349.     According to meeting minutes from the Board meeting held on March 7, 2022  (the "March 7 Board Meeting"), topics of discussion were Compute North's pursuit of additional financing through Series C investments, the Generate Credit Agreement, potential financing

arrangements with Mercuria Energy Group, Ltd. ("Mercuria"), a multinational commodity trading company, and potential SPAC sponsors.

350.    There was no discussion about Compute North's liquidity issues during the March 7 Board Meeting, as confirmed by Mr. Marino in the Marino Interview.

351.    On or around June 21, 2022, Defendants Perrill, Lee, and Piper had a call with Generate representatives to inform them that "Compute North had run out of money and had only 3 weeks left of cash". (Marino Tr. 29:25-30:01.) According to Mr. Marino, this news came as a "complete surprise" to Generate. (Marino Tr. 30:16-31:20.)

352.    Upon learning about Compute North's liquidity issues, Generate immediately asked Defendants Perrill, Lee, and Piper for documents and records concerning Compute North's financial condition to analyze how Compute North suddenly lacked sufficient liquidity to continue operating. (Marino Tr. 32:8-35:7.)

353.    Defendants Perrill, Lee, and Piper informed Generate that they did not have such documents and financial records readily available. (Marino Tr. 32:8-17.)

354.    The Defendants ultimately provided financial documents and records to the Board's independent directors, but these documents and records proved to be inconsistent.

355.    For example, according to Mr. Marino:   "We received many different cash projections that were inconsistent with only having 3 weeks left of cash. Some had 6 months left of cash. Some had other cash balances and other thing. So it could be easily that they just didn't know." (Marino Tr. 34:9-20.)

356.    The Board's independent directors could not confidently ascertain Compute North's cash balance or liabilities due to the inconsistent and inadequate financial documentation and records.

357.    In June 2022, shortly after Compute North's liquidity issues were disclosed to the Board, Defendant Piper was terminated from his position as Compute North's CFO.  Harold Coulby was hired to replace Defendant Piper as CFO.

358.    The Officer Defendants did not seek approval from the Board prior to terminating Defendant Piper and hiring Mr. Coulby.

359.    Defendants Perrill and Lee tried to shift the blame for Compute North's liquidity issues on Defendant Piper's incompetence.  Defendants Perrill and Lee claimed that they fired Defendant Piper because he had lost control of overseeing Compute North's finances and internal controls.

360.    Defendant Perrill did not take responsibility for the fact that Defendant Piper directly reported to him from March 2021 to June 2022.  He also failed to acknowledge that other Officer Defendants oversaw Compute North's finances, operations, and liquidity in addition to Defendant Piper.

361.    On or around June 23, 2022, certain of Compute North's independent directors requested that Compute North hire independent experts to assess Compute North's financial condition.  One independent director requested that Compute North hire an independent forensic accountant to do a quality of earnings analysis.  A different independent director requested Compute North hire independent financial advisors and restructuring advisors to generate a report on Compute North's financial condition.

362.    The Director Defendants rejected these requests.  The Director Defendants voted against the independent directors' request that an external expert perform a quality of earnings analysis claiming that it would be too expensive and that Compute North did not have the resources

for an independent forensic report. The Director Defendants claimed they had the ability to do such an analysis internally, so an opinion from a third party was not needed.

**P.      The Defendants Did Not Meaningfully Attempt to Save the Company**

363.    After Compute North's liquidity issues were disclosed to the Board, Compute North and Generate started to engage in discussions about a forbearance agreement regarding the Generate Credit Agreement.

364.    Despite Compute North's financial issues, Mr. Marino said that Generate believed in Compute North's vision as a company in the cryptocurrency mining space and "like[d] the nature of [Compute North's] projects." (Marino Tr. 51:3-23.)

365.    Generate informed the Defendants that it was amenable to supporting Compute North through its liquidity issues, including by entering into new financing arrangements and by helping Compute North better understand its financial issues. In exchange, Generate wanted more authority over and insight into Compute North's operations and finances.

366.    Generate sent a draft forbearance agreement to Compute North.

367.    Compute North responded with heavy proposed revisions, including striking provisions from the agreement that would protect Generate and provide Generate with greater oversight of Compute North's business.   Upon information and belief, Defendants Perrill, Scher, and Lima, among others, were responsible for Compute North's response to Generate's proposed forbearance agreement.

368.    The provisions in Generate's draft forbearance agreement that Compute North sought to strike were standard in the industry given Compute North's financial circumstance and the fact that it was unable to obtain FY 2021 audited financial statements. It was not a reasonable business decision for the Defendants to refuse to enter the forbearance agreement based primarily on a dispute over these provisions.

369.     Compute North attempted to obtain additional funding from lenders other than Generate.  Upon information and belief, Defendants Perrill, Lee, and Piper, among others, were engaged in discussions with lenders other than Generate to obtain additional funding for Compute North.  These efforts were unsuccessful primarily given Compute North's financial condition and the fact that it was unable to obtain FY 2021 audited financial statements.

370.     During this time, certain of the Defendants conceded that their actions were akin to "driving a motorcycle drunk without headlights or a helmet".  In July 2022, Defendant Lee sent Defendant Perrill an email stating:

> Don't get confused with one metric (ebitda). It is often a terrible metric that leads to trouble. We made that major mistake with an LFG culture that didn't understand math or economics. Never again.
>
> Our Return on invested capital is horrible on projects. So many of our projects are terrible on this metric and not profitable yet they may be good ebitda.
>
> We need to open our eyes to the crypto market and perception of mining companies. It sucks. Let me say it again. It sucks. Generate said our equity is worthless. Very few buyers for projects and assets. Probably zero project lenders today. It may change but we are recovering from some major head wounds because we were driving a motorcycle drunk without headlights or a helmet. Let's be smart. Let's change the narrative. Look at how Lancium positions themselves. Brilliant. Let's really try to work on the optimization and diversification plan. Asking for more money from third party investors for the same thing may be very hard. I think we change our perspective. Next to NO builds that we own and operate. Only develop and flip for a margin. Determine what is acceptable IRR for a buyer (12% levered for example) and then take the rest as development margin and collect a management fee [s]hare with RK perhaps.
>
> Be extremely thoughtful of greenfield development when our return on invested capital might be better buying distressed assets or diversifying the existing stuff that we have.
>
> Joint ventures and partnerships. Maybe minden is a perfect deal to do with a data center company and build a hybrid campus if there is Dark fiber. See an old email from aligned I am Re forwarding.

**Q.      The Defendants Were Responsible for Compute North Defaulting Under the Generate Credit Agreement, Causing Compute North to Lose Two of its Most Valuable Assets and Ultimately File for Bankruptcy**

371.    On July 22, 2022, Generate served a Notice of Default and Events of Default on Compute North (the "Notice of Default"). The Notice of Default is attached hereto as Exhibit B.

372.    In the Notice of Default, Generate informed Debtors that "[c]ertain Defaults and Events of Default have occurred and are continuing under the Credit Agreement and the Guaranty Agreement as of the date hereof".

373.    The Notice of Default listed 19 Designated Events of Default.

***i.   Designated Events of Default 1***

374.    Generate's Designated Event of Default 1 pertains to "Defaults and Events of Default Relating to the Property Management Agreement and Operating Reserve Requirement."

375.    Designated Event of Default 1 stated:

> Any Defaults or Events of Default arising out of Section 9.01(d)(ii) of the Credit Agreement arising out of the Operator's breach of its obligations under the Property Management Agreement, dated February 7, 2022, between the Operator and the Kearney Project Company related to (i) Operator's failure to provide prompt notice of matters adverse to the development, construction or operation of the Kearney Project, (ii) Operator's comingling of its funds with funds of the Kearney Project Company, and (iii) Operator's authorization of an assignment of the UCC-1 filing listing the Kearney Project Company as the secured party in mining equipment owned by CN Mining, LLC.

376.    According to Mr. Marino, Generate suspected Compute North comingled its customer funds with Kearney Project Company funds after Generate performed due diligence on funds flow financial models it received from Compute North. (Marino Tr. 103:3-104:5.)

377.    According to Mr. Marino, Generate verbally raised Generate's concerns about the comingling of funds to Defendant Piper but Defendant Piper failed to respond to Generate's concerns. (Marino Tr. 104:6-105:1.)

### *ii. Designated Events of Default 3 through 6*

378.    Generate's Designated Events of Default 3 through 6 pertain to "Defaults and Events of Default related to Financial Statements, Reporting and Financial Situation of the Sponsors."

379.    Specifically, Designated Event of Default 3 stated:

CN Holdings' failure to deliver its unaudited quarterly Financial Statements for the first fiscal quarter of 2022 by no later than May 30, 2022 (60 days after the end of the fiscal quarter) in accordance with Section 7(b)(i) of the Guaranty Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

380.    Designated Event of Default 4 stated:

CN Holdings' failure to deliver its audited annual Financial Statements by no later than April 30, 2022 (120 days after the close of the 2021 fiscal year) accompanied by an opinion of Deloitte US or any other independent certified public accountant of recognized national standing in accordance with Section 7(b)(ii) of the Guaranty Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

381.    Designated Event of Default 5 stated:

The Borrower's failure to deliver its unaudited quarterly Financial Statements for the first fiscal quarter of 2022 by no later than May 30, 2022 (60 days after the end of the fiscal quarter) in accordance with Section 6.01(a)(i) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

382.    Designated Event of Default 6 stated:

[The] Borrower's failure to deliver its audited Financial Statements by no later than July 14, 2022 (as extended by agreement from the original deadline of May 30, 2022 (one hundred fifty (150) days after the close of the 2021 fiscal year)) in accordance with Section 6.01(a)(ii) of the Credit Agreement, which failure constitutes a Default under Section 9.01(d)(i) of the Credit Agreement and if not remedied within the time period required under Section 9.01(d)(i) will become an Event of Default.

383.    Generate never received audited financial statements or unaudited financial statements from Compute North for FY 2021 or the first quarter of 2022 despite its repeated

requests because Defendants were unable to provide financial information to Deloitte that it needed to complete its audit.

384.     According to Mr. Marino, the Defendants never sent these financial statements to Generate nor provided a legitimate excuse as to why Compute North was delayed in providing them.  Mr. Marino recalled Defendant Perrill or Defendant Piper telling Generate: "We're just too busy on all these other things, do you really need this stuff?"  (Marino Tr. 106:23-107:5.)

### iii. Designated Events of Default 7 through 9

385.     Generate's Designated Events of Default 7 through 9 pertain to "Defaults and Events of Default related to Financial Statements, Reporting and Financial Situation of the Sponsors."

386.     Designated Event of Default 7 stated:

CN Holdings and CN's failure to cause the Borrower to deliver a Quarterly Operating Report by no later than May 30, 2022 (60 days after the close of the first quarterly period of its 2022 fiscal year) in accordance with Section 7(b)(v) of the Guaranty Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement, and Borrower's failure to deliver such Quarterly Operating Report by no later than May 30, 2022 in accordance with Section 6.01(b)(iii) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

387.     Designated Event of Default 8 stated:

The Borrower's failure to deliver an updated Base Case Model for the Kearney Project no later than April 30, 2022 (30 days after the close of the first quarterly period of its 2022 fiscal year) in accordance with Section 6.01(b)(iv) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

388.     According to Mr. Marino, Compute North did not timely deliver operating reports or an updated Base Case Model for the Kearney Project.

389.    Mr. Marino did not recall receiving any excuse for Compute North's delay in providing these materials.  Mr. Marino recalled that Defendants told Generate that Compute North was "too busy" to timely provide this information to Compute North.  (Marino Tr. 109:9-14.)

390.    Designated Event of Default 9 stated:

The Borrower's failure to deliver prompt written notice of the occurrence of events and circumstances that, individually or in the aggregate, have, or could reasonably be expected to have a Material Adverse Effect, in connection with the deterioration of the liquidity and overall financial situation of the Sponsors, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

391.    According to Mr. Marino, Event of Default 9 referred to Defendants Perrill, Lee, and Piper's June 21, 2022 meeting with Generate during which they informed Generate that Compute North only had 3 weeks left of cash.  Compute North's sudden liquidity issues were a "Materially Adverse Event" under the Generate Credit Agreement.

392.    Defendants' failure to provide Generate with adequate written notice of Compute North's liquidity issues caused Compute North to default under the Generate Credit Agreement.

393.    Generate requested a written explanation of the "occurrence of events and circumstances that, individually or in the aggregate, have, or could reasonably be expected to have" led to Compute North's sudden liquidity issues.  According to Mr. Marino, Defendants never provided Generate with such an explanation.  (Marino Tr. 110:6-17.)

*iv.  Designated Events of Defaults 10 and 18*

394.    Generate's Designated Events of Default 10 and 18 pertain to "Defaults and Events of Default Related to Customer Contracts."

395.    Generate's Designated Event of Default 10 stated:

Any Defaults or Events of Default arising under Section 9.01(b) of the Credit Agreement as a result of Borrower's breach of certain representations included in certifications delivered in connection with the Closing Date that the Administrative Agent had received true, correct and complete copies of Material Project Documents and compete copies of Customer Contracts, Accommodation

Agreement and Profit Sharing Agreements for each Qualified Customer Contract completed by the Base Case Model.

396.   According to Mr. Marino, the Defendants never delivered the customer mining contracts for the Kearney Facility as was required under the Generate Credit Agreement prior to the issuance of the Notice of Default.  (Marino Tr. 111:23-112:2.)

397.   Defendants' failure to provide Generate the Kearney customer mining contracts caused Compute North to default under the Generate Credit Agreement.

398.   Generate's Designated Event of Default 18 stated:

The Borrower's failure to comply with the requirement under Section 7.17 of the Credit Agreement that it may not own bitcoin or other cryptocurrency except to the extent approved in writing by the Administrative Agent, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

399.   According to Mr. Marino, an informal Compute North financial disclosure provided to Generate indicated that Compute North had owned BTC.  (Marino Tr. 122:11-25.) Mr. Marino said that none of the Defendants sought Generate's approval for Compute North to own Compute North's self-mined Bitcoin.  (Marino Tr. 123:4-20.)

400.   Defendants' failure to seek such approval from Generate caused Compute North to default under the Generate Credit Agreement.

### v.  *Designated Event of Default 19*

401.   Generate's Designated Event of Default 19 stated:

The Borrower's failure to provide proper and timely notice of the foregoing Defaults and Events of Default, which failure is an Event of Default under Section 9.01(c) of the Credit Agreement.

402.   According to Mr. Marino, the Defendants did not provide Generate with adequate notice of any of the above Events of Default.  Mr. Marino believed that Defendants' failure to provide notice was the result of "sloppiness or moving too fast or incompetence." (Marino Tr. 129:10-25.)

403.     Defendants' failure to provide such notice with respect to the above Events of Default caused Compute North to default under the Generate Credit Agreement.

404.     Compute North was unable to cure its defaults under the Generate Credit Agreement.  As a result, Generate seized control of the Kearney Facility and Wolf Hollow Facility.

405.     Compute North declared Chapter 11 bankruptcy on September 22, 2022.

**R.     Defendants Subjected Compute North to a Risk of a Multi-Million Dollar Lawsuit By Recklessly Executing a Multi-Million Dollar Customer Contract Without Disclosing Compute North's Default Under the Generate Credit Agreement or Compute North's Impending Bankruptcy When Compute North Was on the Verge of Bankruptcy**

406.     On August 15, 2022, Compute North entered into a Master Agreement and Order Form ("Master Agreement and Order Form") with BitNile, Inc. ("BitNile") for BitNile to utilize Compute North's Colocation Services at the Wolf Hollow Facility.  Defendant Wenzel executed the Master Agreement and Order Form on behalf of Compute North.

407.     Compute North's Master Agreement and Order form with BitNile required BitNile to pay Compute North a deposit of more than $2 million and prompted BitNile to send over $40 million worth of BitNile's crypto mining equipment to the Wolf Hollow Facility.

408.     When negotiating the Master Agreement and Order form with BitNile, Defendants Perrill and Wenzel repeatedly represented to BitNile that Compute North would be able to host, support, and bring BitNile's mining equipment online at the Wolf Hollow Facility no later than October 1, 2022.

409.     Defendants Perrill, Wenzel, and Mjolsnes all failed to tell BitNile that Compute North had defaulted under the Generate Credit Agreement, that the Wolf Hollow Facility was collateral to the Generate Credit Agreement, and that Generate took control of the Wolf Hollow Facility on August 12, 2022, three days prior to Compute North and BitNile's execution of the

Master Agreement and Order Form.  Defendants Perrill, Wenzel, Mjolsnes also failed to tell BitNile that Compute North was insolvent and on the verge of bankruptcy.

410.    Defendants Perrill and Wenzel recklessly caused Compute North to enter into the Master Agreement and Order Form with BitNile, subjecting Compute North to a risk of a multi-million-dollar lawsuit on the eve of Compute North's bankruptcy.

411.    On August 15, 2022, Defendant Mjolsnes engaged in email communications with BitNile about its announcement of the Compute North transaction.  Defendant Mjolsnes approved edits to a press release stating that BitNile believed that its agreement with Compute North will enable BitNile "to install roughly 6,500 s19k pro miners in the third quarter of this year."

412.    Following Compute North's bankruptcy and failure to perform under the Master Agreement and Order Form, BitNile filed a lawsuit against Defendants Perrill, Wenzel and other former Compute North employees in the U.S. District Court for the District of Minnesota titled *BitNile, Inc. v. David Perrill, et al.*, No. 22-cv-02911 (the "BitNile Lawsuit").

**S.    Defendants Failed to Adequately Safeguard Compute North's Physical Assets, Causing Compute North to Sustain Additional Losses**

413.    Defendants failed to safeguard Compute North's physical assets, causing Compute North to sustain additional losses.

414.    On March 31, 2023, the Plan Administrator began marketing Compute North's remaining assets following the occurrence of the Plan's effective date.

415.    During this process, the Plan Administrator discovered that 62 containers which were in Compute North's possession had not been physically maintained or secured.  These containers were stored in yards in Granbury, Texas and Greenville, North Carolina.

416.    The Plan Administrator visited the Granbury, Texas and Greenville, North Carolina yards on April 13, 2023 and April 17, 2023, respectively, to inspect Compute North's remaining containers.

417.    Upon inspection, the Plan Administrator observed that the containers had shrink-wrap around various portals that would be used for cooling the crypto mining equipment inside of them.   The shrink-wrap on many of the containers was breached, allowing water to intrude into the containers and damage the assets stored within them.

418.    The Plan Administrator also observed that the original manufacturer, RK Mission Critical, inspected the containers and found that certain ancillary equipment, including expensive specialized fuses, was missing from these containers.

419.    Assets stored in the containers were being sold as-is and where-is, so prospective buyers were performing inspections prior to executing purchase agreements for the assets. Following inspection of these assets, prospective buyers provided feedback indicating that they were submitting lower bids to purchase the assets because of the damage to the assets caused by water intrusion and because the assets had missing fuses.

420.    Damage to these assets due to Defendants' failure to adequately safeguard Compute North's containers caused Compute North to recover only 20.5% on the original cost of the containers.

## VII.  THE DEFENDANTS' FIDUCIARY DUTIES

421.    Despite the clear duties owed by the Defendants to Compute North, it is evident from the foregoing allegations of substantial misconduct that Defendants abdicated their responsibilities as Officers and Directors of Compute North.

422.    By reason of their positions as Officers and/or Directors of Compute North and because of their ability to control the business, corporate, and financial affairs of Compute North, the Defendants owed Compute North and its creditors the fiduciary obligations of loyalty, due care, good faith, and oversight.

423.    Each of the Directors and Officers of Compute North was required to act in furtherance of the best interests of Compute North so as to benefit the company rather than their own personal interests.

424.    Each of the Directors and Officers of Compute North was required to refrain from unduly benefitting themselves and other Compute North insiders at the expense of Compute North.

425.    Each of the Directors and Officers of Compute North owed to Compute North not only the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Compute North and in the use and preservation of Compute North's property and assets, but also the highest obligations of fair dealing.

426.    To discharge their duties, the Directors and Officers of Compute North were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Compute North.  By virtue of such duties, the Directors and Officers of Compute North were required to, among other things:

   a.  be responsible for maintaining adequate internal controls, risk management measures, financial oversight, and recordkeeping for Compute North;

   b.  ensure that Compute North's financial statements were based on accurate research and financial and operational information;

   c.  ensure that Compute North's financial statements were not presented in an inaccurate or misleading manner;

   d.  remain informed regarding Compute North's operations and, upon receiving notice or information of imprudent or unsound practices, take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls; and

    e.    supervise the preparation and dissemination of any audits, financial statements, financial reports, or other information of Compute North.

427.    Directors and Officers of Compute North also owed fiduciary duties as key managerial personnel who ran divisions of the company, supervised tiers of employees, participated in strategic planning and execution of the Debtors' objectives, and/or participated in Compute North's financial decisions.

428.    Directors and Officers of Compute North further owed duties pursuant to principles of agency law as agents of Compute North privy to matters of interest and significance.

429.    The Defendants, because of their positions of control and authority as Directors and/or Officers of Compute North, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein and in violation of their fiduciary duties.

## CAUSES OF ACTION

### COUNT I
**Breach of Fiduciary Duties and Waste**
**(Against the Officer Defendants)**

430.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

431.    At all times material hereto, Defendants Perrill, Lee, Johnson, Barron, Wenzel, Mjolsnes, and Piper (*i.e.*, the Officer Defendants) were each officers of Compute North, and, as such, owed Compute North and its creditors' fiduciary duties, including the duties of due care, loyalty, good faith, and oversight.

432.    Each of the Officer Defendants had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of Compute North and its creditors, and to consider all material information reasonably available in making business decisions.

433.    Each of the Officer Defendants exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of Compute North and its creditors.  In their capacities as officers of Compute North, the Officer Defendants each breached their fiduciary duties owed to Compute North and its creditors.  The Officer Defendants each failed to discharge his duties as officers with the degree of care, skill, prudence, and diligence required of each them and their conduct constituted an extreme departure from the ordinary standard of care, including, by among other things, their:

a.      approving material and risky financial, transactional, and/or strategic decisions that imperiled Compute North's liquidity and its key assets;

b.      failing to hire, train, and supervise individuals with sufficient expertise and competencies to manage and to operate Compute North;

c.      failing to implement and maintain effective internal controls, risk mitigation measures, recordkeeping, and financial oversight;

d.      failing to oversee and manage Compute North's operations and financial reporting;

e.      prioritizing Compute North's expansion and preparation for an IPO to the detriment of the company;

f.      failing to remedy deficiencies identified internally and by external experts, including deficiencies concerning Compute North's internal controls, record keeping, and financial oversight;

g.      failing to maintain accurate records necessary for auditors to reconcile deferred revenue and complete an audit of Compute North's FY 2021 financial statements;

h.      permitting Compute North to transact with other entities owned or controlled by Defendant Perrill without an assessment of fair market value;

i.      permitting inappropriate and excessive travel and entertainment expenses incurred by Defendant Perrill to be approved and reimbursed with company funds;

j.      consciously disregarding glaring issues in Compute North's financial information or lack thereof;

k.    consciously disregarding known risks to Compute North's solvency and liquidity and failure to stay adequately apprised of Compute North's liquidity;

l.    causing Compute North to default on key financing agreements;

m.    failing to seek written approval from Generate for Compute North to own bitcoin as required under the Generate Credit Agreement;

n.    failing to approve remedial measures that would have helped Compute North during its liquidity crisis; and

o.    failing to adequately safeguard Compute North's physical assets;

p.    otherwise failing to discharge their duties as officers with the degree of care, skill, prudence, and diligence required of them and acting with negligence, gross negligence and reckless indifference.

The Officer Defendants' actions and omissions were not done in good faith or by means of the exercise of their business judgment, but evidenced a wholesale abdication of their responsibility to Compute North and its creditors and were adverse to the best interests of Compute North and its creditors.

434.    As a direct and proximate result of the Officer Defendants' breaches of fiduciary duties, the Debtors suffered at least $115 million in damages.

435.    Due to the foregoing acts and omissions, the Officer Defendants breached the fiduciary duties they owed to the Debtors and are thus liable to account for their conduct and to pay damages resulting from loss and waste of corporate assets.  This relief includes, but is not limited to, an accounting and disgorgement of all unlawful gains the Officer Defendants have realized by reason of their breaches of fiduciary duty.

## COUNT II
### Breach of Fiduciary Duties and Waste
### (Against the Director Defendants)

436.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

437.     At all times material hereto, Defendants Perrill, Lee, Johnson, Lima, Scher, and Kieffer (*i.e.*, the Director Defendants) were each directors on Compute North's Board and, as such, owed Compute North and its creditors' fiduciary duties, including the duties of due care, loyalty, good faith, and oversight.

438.     Each of the Director Defendants had an obligation to discharge his or her duties in good faith with the care an ordinarily prudent director in a like position would exercise and in a manner reasonably believed to be in the best interests of the Compute North and its creditors, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill their duty to monitor the activities of management.

439.     Each of the Director Defendants exhibited a conscious, grossly negligent and/or reckless disregard for the best interests of Compute and its creditors.  In their capacities as directors of Compute North, the Director Defendants each breached their fiduciary duties owed to Compute North and its creditors.  The Director Defendants each failed to discharge his duties as directors with the degree of care, skill, prudence, and diligence required of each of them and their conduct constituted an extreme departure from the ordinary standard of care, including, by among other things, their:

  a.     approving material and risky financial, transactional, and/or strategic decisions that imperiled Compute North's liquidity and its key assets;

  b.     failing to ensure competent individuals with sufficient expertise and competencies were managing and operating Compute North;

  c.     failing to make a change in Compute North's leadership when it was clear the Officer Defendants were not competent in managing and operating Compute North's business activities;

  d.     knowingly ignoring and/or failing to adequately remedy significant deficiencies in Compute North's internal controls, risk mitigation measures, record keeping, and financial oversight that had been brought to their attention by external experts;

e.      failing to properly oversee and monitor the Officer Defendants' operation and management of Compute North's business;

f.      permitting prioritization of Compute North's expansion and preparation for an IPO to the detriment of the company;

g.      failing to remedy deficiencies identified by external experts, including deficiencies with Compute North's internal controls, record keeping, and financial oversight;

h.      permitting Compute North to transact with other entities owned or controlled by Defendant Perrill without an assessment of fair market value;

i.      permitting inappropriate and excessive travel and entertainment expenses incurred by Defendant Perrill to be approved and reimbursed with company funds;

j.      consciously disregarding glaring issues in Compute North's financial information or lack thereof;

k.      consciously disregarding known risks to Compute North's solvency and liquidity and failure to stay adequately apprised of Compute North's liquidity;

l.      failing to approve remedial measures that would have helped Compute North during its liquidity crisis; and

m.      otherwise failing to discharge their duties as directors with the degree of care, skill, prudence, and diligence required of them and acting with negligence, gross negligence and reckless indifference.

The Director Defendants' actions and omissions were not done in good faith or by means of the exercise of their business judgment, but evidenced a wholesale abdication of their responsibility to Compute North and its creditors and were adverse to the best interests of Compute North and its creditors.

440.    As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, the Debtors suffered at least $115 million in damages.

441.    Due to the foregoing acts and omissions, the Director Defendants breached the fiduciary duties they owed to the Debtors and are thus liable to account for their conduct and to pay damages resulting from loss and waste of corporate assets.

<u>**COUNT III**</u>
**Aiding and Abetting Breach of Fiduciary Duties and Waste**
**(Against Defendants Perrill, Lee, Piper, Johnson, Barron, Wenzel, Mjolsnes, Lima, Scher**
**and Kieffer)**

442.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

443.    At all material times hereto, Defendants Perrill, Lee, Piper, Johnson, Wenzel, Mjolsnes, Lima, Kieffer and Scher were officers and/or directors of Compute North and owed fiduciary duties to Compute North by virtue of their positions as officers and/or directors of Compute North.   As such, Defendants Perrill, Lee, Piper, Johnson, Wenzel, Mjolsnes, Lima, Kieffer and Scher were obliged to discharge their duties in good faith, with the care an ordinarily prudent officer or director in a like position would exercise, in a manner reasonably believed to be in Compute North's best interest, and to seek out information reasonably necessary to fulfill their duty to monitor the actions of Compute North's officers and employees.

444.    Defendants Perrill, Lee, Piper, Johnson, Wenzel, Lima, Kieffer, Mjolsnes and Scher, breached their fiduciary duties owed to Compute North.   Defendants Perrill, Lee, Piper, Johnson, Wenzel, Mjolsnes, Lima, Kieffer, and Scher did not discharge their fiduciary duties in good faith and failed to seek out information reasonably necessary to fulfill their duties to monitor the actions of Compute North's officers and employees.

445.    Defendants Perrill, Lee, Piper, Johnson, Wenzel, Mjolsnes, Lima, Kieffer, and Scher, had actual knowledge of the facts and circumstances alleged in support of Counts I and II of the Complaint and rendered substantial assistance to the beaches of fiduciary duty committed by Compute North's officers and directors, thereby aiding and abetting breaches of fiduciary duties to Compute North and its creditors.

446.     As a direct and proximate result of the foregoing, the Debtors were damaged in an amount to be determined at trial.

**COUNT IV**
**Unjust Enrichment**
**(Against Defendant Perrill)**

447.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

448.     Throughout his tenure at Compute North, Defendant Perrill received excess payments from funds in Compute North's Fidelity Account for excessive travel and entertainment expenses he charged to the AMEX Card that were not justified or properly documented, including expenses for strip clubs and night clubs.

449.     Throughout his tenure at Compute North, Defendant Perrill also personally benefited from reward points he earned on the AMEX Card for expenses he should have charged to the RAMP Card pursuant to company policy.  This practice prevented Compute from earning 1.5% credit back on the expenses that it would have accrued had Defendant Perrill used the RAMP Card instead of the AMEX Card.

450.     Defendant Perrill's reimbursement of unjustified and undocumented travel and entertainment expenses with Compute North funds enriched Defendant Perrill at the Debtors' expense.  Equity and good conscience militate against permitting Defendant Perrill to retain these amounts.  Accordingly, Defendant Perrill should disgorge the value of the amounts he received from the Debtors in connection with these expense reimbursements from January 2021 to April 2022.

<u>COUNT V</u>
**Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B)
and Applicable State Law
(Against Defendant Perrill)**

451.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

452.   Under Bankruptcy Code section 544(b)(1), Plaintiff may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an allowable unsecured claim.

453.   Under Bankruptcy Code section 548(a)(1)(B), Plaintiff may avoid any transfer (including to or for the benefit of an insider under an employment contract) of an interest in the debtor in property that was made or incurred on or within 2 years before the date of the filing of the petition if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer.

454.   Within two years of the Petition Date, Compute North made transfers to or on behalf of Defendant Perrill in the form of Defendant Perrill's salary, bonus, and benefits, which include, without limitation, Compute North's reimbursement of Defendant Perrill's business, travel, and entertainment expenses (the "<u>Salary and Benefits Transfers</u>").

455.   Under applicable state law, including, without limitation, Delaware's Uniform Fraudulent Transfer Act, Del. Code Title 6 §§ 1301–1312 ("<u>DUFTA</u>"), a creditor may avoid a transfer made or obligation incurred by a debtor within four years before the action was brought if the debtor made the transfer or incurred the obligation: (i) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (ii) the debtor was (a) insolvent at that time or became insolvent as a result of the transfer or obligation, (b) engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably

100

small in relation to the business or transaction, or (c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the debtor's ability to pay as they became due.

456.    Within four years of the Petition Date, Compute North made transfers to or on behalf of Defendant Perrill in the form of the Salary and Benefits Transfers.

457.    Compute North's payment of the Salary and Benefits Transfers to Defendant Perrill constituted transfers of property of Compute North.

458.    Defendant Perrill was an "insider" within the meaning of Bankruptcy Code section 101(31).

459.    Compute North was: (i) insolvent on the date that the Salary and Benefits Transfers were made or became insolvent as a result of such transfers, (ii) engaged in business or a transaction, or was about to engage in business or a transaction, for which any remaining property constituted unreasonably small capital, or (iii) intended to incur, or believed it would incur, debts that would be beyond its ability to repay as such debts matured.

460.    Compute North received less than reasonably equivalent value in exchange for the Salary and Benefits Transfers because, among other things, the Salary and Benefits Transfers were not reflective of Compute North's financial performance, as Compute North was experiencing significant financial issues at the time the Salary and Benefits Transfers were made.

461.    The Salary and Benefits Transfers were made pursuant to employment contracts and/or Compute North's executive compensation programs.

462.    The Salary and Benefits Transfers were made outside the ordinary course because, among other things, they were, upon information and belief, made in exchange for conduct in

which Defendant Perrill was a "faithless servant" or which was a breach of Defendant Perrill's fiduciary duties owed to Compute North.

463.    Accordingly, the Salary and Benefits Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(B) and/or applicable state law because they were: (i) made for less than reasonably equivalent value, and (ii) both (a) made at a time when Compute North was insolvent and (b) paid to insiders under employment contracts outside the ordinary course.

<u>**COUNT VI**</u>
**Actual Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(A) and Applicable State Law**
**(Against Defendant Perrill)**

464.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

465.    Under Bankruptcy Code section 544(b)(1), Plaintiff may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an allowable unsecured claim.

466.    Pursuant to Bankruptcy Code Section 588(a)(1)(A), Plaintiff may avoid any transfer made or obligation incurred by a debtor within two years before the action was brought if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud the debtor.

467.    Within two years of the Petition Date, Compute North made transfers to or on behalf of Defendant Perrill in the form of the Salary and Benefits Transfers.

468.    Pursuant to applicable state law, including, without limitation, DUFTA, Plaintiff may avoid any transfer made or obligation incurred by a debtor within four years before the action was brought if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

469.    Within four years of the Petition Date, Compute North made transfers to or on behalf of Defendant Perrill in the form of the Salary and Benefits Transfers.

470.    The Salary and Benefits Transfers constituted transfers of property of Compute North.

471.    The Salary and Benefits Transfers were made with actual intent to hinder, delay, or defraud creditors because, among other things, the Salary and Benefits Transfers were prepaid in full in an effort to avoid (i) Court and creditor scrutiny of Defendant Perrill in the form of the Salary and Benefits Transfers and (ii) the provisions of the Bankruptcy Code governing payments to insiders.

472.    Further, multiple badges of fraud permeate the Salary and Benefits Transfers, including that (i) the transfers in the form of the Salary and Benefits Transfers were made to Defendant Perrill, an insider of Compute North, (ii) the value of the consideration received by Compute North was not reasonably equivalent to the value of the Salary and Benefits Transfers, (iii) the Salary and Benefits Transfers were made shortly after Compute North incurred substantial debts, (iv) the Salary and Benefits Transfers were made while Defendant Perrill was a "faithless servant" or while Defendant Perrill was in breach of his duty of loyalty to Compute North, and (iv) several the Salary and Benefits Transfers were made after Compute North had been notified of its defaults under the Generate Credit Agreement.

473.    Accordingly, the Salary and Benefits Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(A) and 544(b)(1) and applicable state law, including DUFTA.

<u>COUNT VII</u>
**Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and Applicable State Law**
**(Against Defendants Perrill, Barron, Wenzel, Mjolsnes, and Piper)**

474.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

475.     Under Bankruptcy Code section 544(b)(1), Plaintiff may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an allowable unsecured claim.

476.     Under Bankruptcy Code section 548(a)(1)(B), Plaintiff may avoid any transfer (including to or for the benefit of an insider under an employment contract) of an interest in the debtor in property that was made or incurred on or within 2 years before the date of the filing of the petition if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer.

477.     Within 2 years of the Petition Date, Compute North made transfers to or on behalf of certain Officer Defendants in the form of the Bonus Transfers.

478.     Under applicable state law, including, without limitation, DUFTA, a creditor may avoid a transfer made or obligation incurred by a debtor within 4 years before the action was brought if the debtor made the transfer or incurred the obligation (i) without receiving a reasonably equivalent value in exchange for the transfer or obligation and (ii) the debtor was (a) insolvent at that time or became insolvent as a result of the transfer or obligation, (b) engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the debtor's ability to pay as they became due.

479.    Within four years of the Petition Date, Compute North made transfers to or on behalf of certain Officer Defendants in the form of the Bonus Transfers.

480.    The Bonus Transfers constituted transfers of property of Compute North.

481.    Each of the Officer Defendants was an "insider" within the meaning of Bankruptcy Code section 101(31).

482.    Compute North was (i) insolvent on the date that the Bonus Transfers were made or became insolvent as a result of such transfers, (ii) engaged in business or a transaction, or was about to engage in business or a transaction, for which any remaining property constituted unreasonably small capital, or (iii) intended to incur, or believed it would incur, debts that would be beyond its ability to repay as such debts matured.

483.    Compute North received less than reasonably equivalent value in exchange for the Bonus Transfers because, among other things, the Bonus Transfers were not reflective of the Compute North's financial performance, as Compute North was experiencing significant financial issues at the time the Bonus Transfers were made.

484.    The Bonus Transfers were made pursuant to employment contracts and/or Compute North's executive compensation programs.

485.    The Bonus Transfers were made outside the ordinary course because, among other things, they were, upon information and belief, (i) paid in contemplation of Compute North's bankruptcy filing, a non-ordinary course event, (ii) paid when there was no holistic key employee retention plan in place, (iii) paid where the recipient was already obligated to render services to Compute North under existing employment agreements, and (iv) were not formally approved by Compute North's Board.

486.     Accordingly, the Bonus Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(B) and/or applicable state law because they were (i) made for less than reasonably equivalent value, and (ii) both (a) made at a time when Compute North was insolvent and (b) paid to insiders under employment contracts outside the ordinary course.

<u>**COUNT VIII**</u>
**Actual Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(A) and Applicable State Law (Against Defendants Perrill, Barron, Wenzel, Mjolsnes, and Piper)**

487.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

488.     Under Bankruptcy Code section 544(b)(1), Plaintiff may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an allowable unsecured claim.

489.     Pursuant to Bankruptcy Code Section 588(a)(1)(A), Plaintiff may avoid any transfer made or obligation incurred by a debtor within 2 years before the action was brought if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud the debtor.

490.     Within 2 years of the Petition Date, Compute North made transfers to or on behalf of the Officer Defendants in the form of the Bonus Transfers.

491.     Pursuant to applicable state law, including, without limitation, DUFTA, Plaintiff may avoid any transfer made or obligation incurred by a debtor within 4 years before the action was brought if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

492.     Within 4 years of the Petition Date, Compute North made transfers to or on behalf of the Officer Defendants in the form of the Bonus Transfers.

493.     The Bonus Transfers constituted transfers of property of Compute North.

494.     The Bonus Transfers were made with actual intent to hinder, delay, or defraud creditors because, among other things, the Bonus Transfers were prepaid in full in an effort to avoid (i) Court and creditor scrutiny of the Bonus Transfers and (ii) the provisions of the Bankruptcy Code governing payments to insiders.

495.     Further, multiple badges of fraud permeate the Bonus Transfers, including that (i) the Bonus Transfers were made to insiders of Compute North, (ii) the value of the consideration received by Compute North was not reasonably equivalent to the value of the Bonus Transfers, (iii) the Bonus Transfers were made shortly after Compute North incurred substantial debts, and (iv) several Bonus Transfers were made after Compute North had been notified of its defaults under the Generate Credit Agreement.

496.     Accordingly, the Bonus Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(A) and 544(b)(1) and applicable state law, including DUFTA.

## COUNT IX
### Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550
### (Against Defendants Perrill, Barron, Wenzel, Mjolsnes, and Piper)

497.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

498.     Plaintiff is entitled to avoid the Bonus Transfers as constructive and/or actual fraudulent transfers pursuant to Bankruptcy Code sections 544 and 548 and applicable state law.

499.     The Officer Defendants were the initial transferees of the Bonus Transfers, or the immediate or mediate transferees of the initial transferee, or the person for whose benefit the Bonus Transfers were made.

500.    Accordingly, Plaintiff is entitled to recover from the Officer Defendants the Bonus Transfers or the value thereof, plus attorneys' fees, costs and expenses, and interest under Bankruptcy Code section 550(a).

## COUNT X
### Disallowance of Claims Pursuant to 11 U.S.C. § 502(d)
### (Against Defendant Perrill)

501.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

502.    On September 30, 2022, Defendant Perrill filed Proof of Claim #10002 in the amount of $300,000 for employee wages, benefits, and severance (the "Perrill Claim").

503.    As alleged above, Defendant Perrill is a transferee of transfers avoidable under Bankruptcy Code sections 544 and 548 and applicable state law and is a person from whom property is recoverable under Bankruptcy Code section 550.

504.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the Perrill Claim should be disallowed unless and until Defendant Perrill relinquishes to Plaintiff the property transferred or has paid to Plaintiff the value of such transferred property.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against the Defendants and grant the following relief:

(a)    Award Plaintiff compensatory damages in an amount to be determined at trial;

(b)    Order Defendant Perrill to disgorge all amounts received from the Debtors to reimburse the expenses he charged to the AMEX Card from January 2021 to April 2022, together with interest;

(c)    Avoid the fraudulent transfers to or for the benefit of each of Defendants Perrill, Barron, Wenzel, Mjolsnes, and Piper, and direct each of Defendants Perrill, Barron, Wenzel,

Mjolsnes, and Piper to return to Plaintiff the transferred property or the value thereof, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

(d)     Award Plaintiff punitive damages in an amount to be determined at trial resulting from Defendants' conscious, willful, wanton, and malicious conduct, which exhibits a reckless disregard for the interests of Plaintiff and its creditors;

(e)     Award Plaintiff pre-judgment and post-judgment interest at the maximum permitted by law or equity;

(f)     Award Plaintiff reasonable and necessary attorney's fees and expenses, together with all costs of court, and investigation expenses; and

(g)     Grant Plaintiff such other and further relief as this Court may deem just and proper.

Dated:  December 31, 2024                    Respectfully submitted,

                                             MCDERMOTT WILL & EMERY LLP

                                             /s/ Charles R. Gibbs
                                             Charles R. Gibbs (TX Bar No. 7846300)
                                             2501 North Harwood Street, Suite 1900
                                             Dallas, Texas 75201-1664
                                             Telephone: (214) 295-8000
                                             Facsimile: (972) 232-3098
                                             crgibbs@mwe.com

                                             - and -

                                             Kristin K. Going (admitted *pro hac vice*)
                                             Darren Azman (admitted *pro hac vice*)
                                             Stacy A. Lutkus (admitted *pro hac vice*)
                                             Jessica Greer Griffith (admitted *pro hac vice*)
                                             Natalie Rowles (admitted *pro hac vice*)
                                             Christopher J. Whalen (admitted *pro hac vice*)
                                             One Vanderbilt Avenue
                                             New York, New York 10017-5404
                                             Telephone: (212) 547-5400
                                             Facsimile: (212) 547-5444

kgoing@mwe.com
dazman@mwe.com
salutkus@mwe.com
ggriffith@mwe.com
nrowles@mwe.com
chwhalen@mwe.com

*Counsel to the Mining Project Wind Down
Holdings, Inc. Litigation Trust and the
Plan Administrator*