# EXHIBIT B

**(Generate's Notice of Default to Compute North)**

July 22, 2022

Compute North Holdings, Inc.
7575 Corporate Way
Eden Prairie, MN 55344
Attn: Legal Department
Email: legal@computenorth.com

Compute North LLC
7575 Corporate Way
Eden Prairie, MN 55344
Attn: Legal Department
Email: legal@computenorth.com

CN Borrower LLC
7575 Corporate Way
Eden Prairie MN 55344
Attn: Legal Department
Email: legal@computenorth.com

With a copy to:

Generate Lending, LLC
as Shared Collateral Agent for the Wolf Hollow Project
c/o Generate Capital, PBC
Attn: Loan Operations
461 5th Avenue, 8th Floor
New York, NY 10017
Email: credit.notice@generatecapital.com

**VIA EMAIL AND FEDERAL EXPRESS**

Re:   Notice of Defaults and Events of Default; Reservation of Rights

Gentlemen:

      Reference is made to (i) that certain Credit and Guaranty Agreement, dated as of February 7, 2022 (as amended by that certain Consent and Amendment No. 1 to Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement, dated as of April 28, 2022, as supplemented by that certain Waiver No. 1 to Credit and Guaranty Agreement, dated as of June 1, 2022, and as further amended by that certain Consent and Amendment No. 2 to Credit and Guaranty Agreement, dated as of June 17, 2022, and as further amended, amended and restated,

restated, waived, modified or supplemented as of the date hereof, the "Credit Agreement"), entered into by and among CN BORROWER LLC, a Delaware limited liability company (the "Borrower"), each of the Guarantors from time to time party thereto, GENERATE LENDING, LLC, as administrative agent (in such capacity, the "Administrative Agent"), and as collateral agent (in such capacity, the "Collateral Agent") and the lenders from time to time party thereto (collectively, the "Lenders"); and (ii) that certain Guaranty Agreement, dated as of February 7, 2022 (as the amended, amended and restated, restated, waived, modified or supplemented as of the date hereof, the "Guaranty Agreement"), entered into by and among COMPUTE NORTH LLC ("CN") and COMPUTE NORTH HOLDINGS, INC. ("CN Holdings", and together with CN, each a "Sponsor" and together, the "Sponsors") in favor of the Administrative Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Credit Agreement or, if not defined in the Credit Agreement, in Appendix I to the Guaranty Agreement.

Certain Defaults and Events of Default have occurred and are continuing under the Credit Agreement and the Guaranty Agreement as of the date hereof, including, without limitation, each of the Defaults and Events of Default, listed in Exhibit A attached hereto (such existing Defaults and Events of Default, collectively, the "Designated Events of Default" and each, a "Designated Event of Default"). Accordingly, as a result of the Designated Events of Default, as well as any other Defaults or Events of Default that may exist, the Administrative Agent, Collateral Agent, Shared Collateral Agent, and the Lenders are entitled to exercise any and all default-related rights and remedies under the Credit Agreement, the Guaranty Agreement, and the other Loan Documents and applicable law.

Nothing in this letter or in any ongoing discussions or negotiations between the Administrative Agent and any one or more of the Lenders and any of their respective officers, partners, directors, employees or agents, on the one hand, and the Loan Parties and their respective affiliates, officers, partners, directors, employees or agents, on the other hand (if any), nor any delay on the part of Administrative Agent, the Collateral Agent, the Shared Collateral Agent, or the Lenders in exercising any of their respective rights and remedies under the Credit Agreement, the other Loan Documents or applicable law, shall directly or indirectly: (i) create any obligation to forbear from taking any enforcement action, or to make any further extensions of credit, unless otherwise agreed to in writing by the Lenders, (ii) constitute a consent to or waiver of any past, present or future Default or Event of Default (including the Designated Events of Default) or other violation of any provisions of the Credit Agreement or any other Loan Documents, (iii) amend, modify or operate as a waiver of any provision of the Credit Agreement or any other Loan Documents or any right, power, privilege or remedy of the Administrative Agent, Collateral Agent, Shared Collateral Agent, or any one or more of the Lenders thereunder or under applicable law or constitute an agreement to forbear or to restructure the Obligations in any respect or otherwise modify the capital structure of the Loan Parties, unless otherwise agreed to in writing by the Lenders, or (iv) constitute a course of dealing or other basis for altering any rights or obligations of Administrative Agent, Collateral Agent, Shared Collateral Agent, or the Lenders under the Loan Documents or any Obligations of the Loan Parties under the Credit Agreement, the Guaranty Agreement, the other Loan Documents or any other contract or instrument. Nothing contained in

this letter shall confer on the Loan Parties any right to notice or cure periods with respect to any Event of Default.

This letter confirms that the Administrative Agent and the Lenders have not waived the Designated Events of Default, and each of the Administrative Agent, Collateral Agent, Shared Collateral Agent, and the Lenders expressly reserves all of its rights, powers, privileges and remedies under the Credit Agreement, the Guaranty Agreement and the other Loan Documents and applicable law, including, without limitation, its right at any time, as applicable, (i) to incur further obligations under the Credit Agreement as a result of any Designated Event of Default, (ii) to accelerate the Obligations, (iii) to charge the default rate of interest in respect of the Obligations (as of any date from and after the date on which the first Designated Event of Default first occurred), (iv) to commence any legal or other action to collect any or all of the Obligations from the Loan Parties, and any other person liable therefor and any Collateral, (v) to foreclose or otherwise realize on any or all of the Collateral and as appropriate, set-off or apply to the payment of any or all of the Obligations, any or all of the Collateral, (vi) to take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, the Guaranty Agreement and the other Loan Documents or applicable law, and (vii) to reject any forbearance, financial restructuring or other proposal made by or on behalf of the Borrower, the Loan Parties, or any creditor or equity holder.  Each of the Administrative Agent, Collateral Agent, Shared Collateral Agent, and the Lenders may exercise their respective rights, powers, privileges and remedies, including those set forth in (i) through (vii) above at any time in its sole and absolute discretion without further notice.  No oral representations or course of dealing on the part of the Administrative Agent, Collateral Agent, Shared Collateral Agent, any Lender, or any of its officers, employees or agents, and no failure or delay by the Administrative Agent, Collateral Agent, Shared Collateral Agent, or any Lender with respect to the exercise of any right, power, privilege or remedy under any of the Credit Agreement, the Guaranty Agreement, the other Loan Documents, or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

[*Signature pages to follow*]

Very truly yours,

**GENERATE LENDING, LLC**
as Administrative Agent

By: _____
    Name: Andrew Marino
    Title: Manager

[*Signature Page*]

# EXHIBIT A

## Designated Events of Default

<u>Defaults and Events of Default Related to the Property Management Agreement and Operating Reserve Requirement</u>

1. Any Defaults or Events of Default arising out of Section 9.01(d)(ii) of the Credit Agreement arising out of the Operator's breach of its obligations under the Property Management Agreement, dated February 7, 2022, between the Operator and the Kearney Project Company related to (i) Operator's failure to provide prompt notice of matters adverse to the development, construction or operation of the Kearney Project, (ii) Operator's comingling of its funds with funds of the Kearney Project Company, and (iii) Operator's authorization of an assignment of the UCC-1 filing listing the Kearney Project Company as the secured party in mining equipment owned by CN Mining, LLC.

2. Any Defaults or Events of Default arising under Section 9.01(b) of the Credit Agreement as a result of Borrower's breach of certain representations included in certifications delivered in connection with the Designation Date for the Wolf Hollow Project that the Operating Reserve Requirement for the Wolf Hollow Project had been satisfied as of the Designation Date for the Wolf Hollow Project, as required pursuant to Section 5.03(u) of the Credit Agreement.

<u>Defaults and Events of Default related to Financial Statements, Reporting and Financial Situation of the Sponsors</u>

3. CN Holdings' failure to deliver its unaudited quarterly Financial Statements for the first fiscal quarter of 2022 by no later than May 30, 2022 (60 days after the end of the fiscal quarter) in accordance with Section 7(b)(i) of the Guaranty Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

4. CN Holdings' failure to deliver its audited annual Financial Statements by no later than April 30, 2022 (120 days after the close of the 2021 fiscal year) *accompanied by an opinion of Deloitte US or any other independent certified public accountant of recognized national standing* in accordance with Section 7(b)(ii) of the Guaranty Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

5. The Borrower's failure to deliver its unaudited quarterly Financial Statements for the first fiscal quarter of 2022 by no later than May 30, 2022 (60 days after the end of the fiscal quarter) in accordance with Section 6.01(a)(i) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

6. Borrower's failure to deliver its audited Financial Statements by no later than July 14, 2022 (as extended by agreement from the original deadline of May 30, 2022 (one hundred fifty (150) days after the close of the 2021 fiscal year)) in accordance with Section 6.01(a)(ii)

of the Credit Agreement, which failure constitutes a Default under Section 9.01(d)(i) of the Credit Agreement and if not remedied within the time period required under Section 9.01(d)(i) will become an Event of Default.

7. CN Holdings and CN's failure to cause the Borrower to deliver a Quarterly Operating Report by no later than May 30, 2022 (60 days after the close of the first quarterly period of its 2022 fiscal year) in accordance with Section 7(b)(v) of the Guaranty Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement, and Borrower's failure to deliver such Quarterly Operating Report by no later than May 30, 2022 in accordance with Section 6.01(b)(iii) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

8. The Borrower's failure to deliver an updated Base Case Model for the Kearney Project no later than April 30, 2022 (30 days after the close of the first quarterly period of its 2022 fiscal year) in accordance with Section 6.01(b)(iv) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

9. The Borrower's failure to deliver prompt written notice of the occurrence of events and circumstances that, individually or in the aggregate, have, or could reasonably be expected to have a Material Adverse Effect, in connection with the deterioration of the liquidity and overall financial situation of the Sponsors, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

Defaults and Events of Default Related to Customer Contracts

10. Any Defaults or Events of Default arising under Section 9.01(b) of the Credit Agreement as a result of Borrower's breach of certain representations included in certifications delivered in connection with the Closing Date that the Administrative Agent had received true, correct and complete copies of Material Project Documents and compete copies of Customer Contracts, Accommodation Agreement and Profit Sharing Agreements for each Qualified Customer Contract completed by the Base Case Model.

11. Any Defaults or Event of Default arising under Section 9.01(b) of the Credit Agreement as a result of the Borrower's breach of its representation made under Section 4.20(c) of the Credit Agreement in connection with the June 21, 2022 Wolf Hollow Borrowing with respect to defaults under the Qualified Customer Contract with Atlas Technology Group ("Atlas") (the "Atlas Customer Contract").

12. Any Defaults or Events of Default arising under Section 9.01(d)(ii) of the Credit Agreement as a result of Atlas' failure to fund deposits and prepayments under the Atlas Customer Contract.

13. The Borrower's failure to deliver to the Administrative Agent, promptly following receipt thereof, copies of the Change Order / Order Form with Deal ID 8189528170 entered into with Bit Digital on March 25, 2022 in accordance with Section 6.01(c)(viii) of the Credit

        Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

14. The Borrower's failure to cause the insurance coverages listed on Schedule 6.26(b) of the Credit Agreement to be obtained for the Kearney Project and the Wolf Hollow Project within 30 days of the Amendment Effective Date (i.e., by May 28, 2022) in accordance with Section 6.26(b) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

15. The Kearney Project Company's failure to obtain the prior written consent of the Required Lenders in connection with the entry into: (a) the Demand Response Service Agreement, dated February 9, 2022, by and between the Nebraska Public Power District, a public corporation and political subdivision of the State of Nebraska ("NPPD"), and the Kearney Project Company (the "NPPD DRS Agreement"); and (b) the Agreement for Construction, Ownership, and Ongoing Operation and Maintenance of Data over Fiber at NPPD's Kearney NE and Tech One Substations Agreement, dated February 15, 2022, entered into by and between NPPD and the Kearney Project Company (the "NPPD Fiber Agreement"), in each case in accordance with Section 7.09(a) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

16. The Borrower's failure to deliver to the Administrative Agent and the Lenders copies of the NPPD DRS Agreement and the NPPD Fiber Agreement promptly upon entry into such Material Project Documents in accordance with Section 6.01(c)(vii) of the Credit Agreement, which failure constitutes an Event of Default under Section 9.01(d)(i) of the Credit Agreement.

17. The Kearney Project Company's (i) failure to comply with obligations not to incur Capital Expenditures other than in accordance with the Operating Budget and permitted variances as required pursuant to Section 7.15 of the Credit Agreement and (ii) if applicable, the Kearney Project Company's failure to obtain the prior written consent of the Required Lenders in connection with the entry into any Construction Contracts or Equipment Supply Agreements in connection with such Capital Expenditures, which failures constitute an Events of Default under Section 9.01(c) of the Credit Agreement.

18. The Borrower's failure to comply with the requirement under Section 7.17 of the Credit Agreement that it may not own bitcoin or other cryptocurrency except to the extent approved in writing by the Administrative Agent, which failure constitutes an Event of Default under Section 9.01(c) of the Credit Agreement.

<u>Failure to Provide Notice of Defaults and Events of Default</u>

19. The Borrower's failure to provide proper and timely notice of the foregoing Defaults and Events of Default, which failure is an Event of Default under Section 9.01(c) of the Credit Agreement.