IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MINING PROJECT WIND DOWN HOLDINGS, INC. (f/k/a Compute North Holdings, Inc.), *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 22-90273 (MI)<br><br>(Jointly Administered)<br><br>Re: Docket No. 1451 |

**OBJECTION OF THE PLAN ADMINISTRATOR AND LITIGATION TRUSTEE TO THE MOTION OF RELM INSURANCE LTD. AND BANYAN RISK LTD. TO LIFT STAY TO PERMIT PROCEEDS OF INSURANCE TO PAY DEFENSE COSTS RELATING TO OFFICER AND DIRECTOR LIABILITY CLAIMS**

Tribolet Advisors LLC, in its capacity as plan administrator and litigation trustee (the "Plan Administrator"), hereby objects (the "Objection") to the motion (the "Motion")[2] filed by Relm Insurance Ltd. and Banyan Risk Ltd. (together, the "Insurers") requesting relief from the stay so that they can advance payment and/or reimburse defense fees and costs of counsel for 14

---

[1] On September 28, 2023, the Court entered the *Final Decree Closing Certain Cases and Amending Caption of Remaining Cases* [ECF No. 1287], closing the chapter 11 cases of the following sixteen entities: Mining Project Wind Down Atoka LLC (f/k/a CN Atoka LLC) (4384); Mining Project Wind Down BS LLC (f/k/a CN Big Spring LLC) (4397); Mining Project Wind Down Colorado Bend LLC (f/k/a CN Colorado Bend LLC) (4610); Mining Project Wind Down Developments LLC (f/k/a CN Developments LLC) (2570); Mining Project Wind Down Equipment LLC (f/k/a CN Equipment LLC) (6885); Mining Project Wind Down King Mountain LLC (f/k/a CN King Mountain LLC) (7190); Mining Project Wind Down MDN LLC (f/k/a CN Minden LLC) (3722); Mining Project Wind Down Mining LLC (f/k/a CN Mining LLC) (5223); Mining Project Wind Down Pledgor LLC (f/k/a CN Pledgor LLC) (9871); Mining Project Wind Down Member LLC (f/k/a Compute North Member LLC) (8639); Mining Project Wind Down NC08 LLC (f/k/a Compute North NC08 LLC) (8069); Mining Project Wind Down NY09 LLC (f/k/a Compute North NY09 LLC) (5453); Mining Project Wind Down STHDAK LLC (f/k/a Compute North SD, LLC) (1501); Mining Project Wind Down Texas LLC (f/k/a Compute North Texas LLC) (1883); Mining Project Wind Down TX06 LLC (f/k/a Compute North TX06 LLC) (5921); and Mining Project Wind Down TX10 LLC (f/k/a Compute North TX10 LLC) (4238). The chapter 11 cases of the remaining three Reorganized Debtors: Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.) (4534); Mining Project Wind Down LLC (f/k/a Compute North LLC) (7185); and Mining Project Wind Down Corpus Christi LLC (f/k/a CN Corpus Christi LLC) (5551), shall remain open and jointly administered under the above caption. The Reorganized Debtors' service address for the purposes of these chapter 11 cases is 2305A Elmen Street, Houston, TX 77019.

[2] ECF No. 1451. Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion. Certain Officers & Directors filed joinders to the Motion. ECF Nos. 1462; 1458.

former officers and directors (the "Officers & Directors") of the debtors in the above-captioned cases (collectively, the "Debtors" and, following the effective date of the Debtors' Plan, the "Reorganized Debtors").  In support of the Objection, the Plan Administrator respectfully states as follows:

## PRELIMINARY STATEMENT

1. By the Motion, the Insurers request relief from the stay so that they may distribute proceeds of the Debtors' D&O insurance policies to pay legal fees and costs incurred by the Officers & Directors.  For the reasons below, this relief should be denied.

2. The Insurers contend that the proceeds of the Debtors' D&O insurance policies are not estate property and therefore not subject to any stay.  Contrary to the Insurers' assertion, however, the proceeds are estate property.  First, the relevant policies provide coverage to both the Officers & Directors as well as the Debtors themselves, which gives the Debtors a legal interest in the policy proceeds.  Second, case law establishes that when proceeds of a debtor's insurance policies are insufficient to satisfy all claims, as is the case here, the estate obtains an equitable interest in the proceeds.  These legal and equitable interests became property of the Debtors' estates upon their bankruptcy filings.

3. Because the proceeds are estate property, the Insurers must demonstrate "cause" for lifting the stay.  As an initial matter, the Insurers have not submitted any evidence in support of the Motion and, accordingly, have not carried their initial burden of making a prima facie case for cause existing.  Moreover, applying the relevant factors, cause does not exist to grant this relief because lifting the stay would harm the Debtors' estates and creditors and impede the successful resolution of the bankruptcy cases.

4. Finally, if the Court is inclined to grant the Motion and lift the stay, the Plan Administrator requests that the Court do what other courts have done and implement procedures for requesting payment of defense costs. Such procedures would be consistent with a bankruptcy court's duty to marshal estate assets and ensure that as many claims as possible are satisfied. Absent appropriate safeguards, the reimbursement of defense costs will deplete a valuable estate asset and directly reduce a meaningful source of recovery for unsecured creditors.

## BACKGROUND

### I. Case Background

1. The Debtors commenced their chapter 11 cases on September 22, 2022 (the "Petition Date"). On February 16, 2023, the Court entered an order confirming the Debtors' Plan (the "Confirmation Order").[3] The effective date of the Debtors' Plan occurred on March 31, 2023 (the "Effective Date").[4]

5. Pursuant to the Debtors' Plan and Confirmation Order, the Plan Administrator became the sole manager, director, and officer of the Reorganized Debtors.[5] On the Effective Date, all remaining estate assets vested in the Reorganized Debtors to be administered, liquidated, and distributed by the Plan Administrator in accordance with the Debtors' Plan and the Plan Administrator Agreement.[6] The Plan Administrator's responsibilities include making all disbursements and distributions required under the Debtors' Plan and the Plan Administrator Agreement.[7]

---

[3] ECF No. 1005.

[4] ECF No. 1082.

[5] Debtors' Plan § 4.2.5; Confirmation Order ¶ 30.

[6] Debtors' Plan § 4.2.3; Confirmation Order ¶¶ 59; 88.

[7] Plan Administrator Agreement § 1.1.

3

6.       The Plan permanently enjoins all entities from, among other things, "enforcing, attaching, collecting, or recovering by any manner or means" a claim against the Reorganized Debtors.[8] Likewise, all persons and entities are precluded from "asserting against the Reorganized Debtors or the Litigation Trust, or any of their respective assets or properties, any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan."[9] The Debtors' Plan provides that the Court retains jurisdiction to "issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan."[10]

7.       The Plan Administrator also serves as trustee for the Mining Project Wind Down Holdings, Inc. Litigation Trust, which was established under the Debtors' Plan (the "<u>Litigation Trust</u>"). On the Effective Date, pursuant to Bankruptcy Code section 1123(b), certain retained claims and causes of action (the "<u>Retained Causes of Action</u>") were transferred and vested in the Litigation Trust.[11] The Retained Causes of Action include any and all causes of action related to the Reorganized Debtors' insurance policies. The Debtors' Plan expressly reserved all causes of action against any party that provided insurance coverage to the Reorganized Debtors for claims arising under or related to any applicable policy.[12]

8.       After the Effective Date, the Plan Administrator began an investigation into the Retained Causes of Action and the circumstances leading to the Debtors' bankruptcy filings.

---

[8]    Debtors' Plan § 9.6.

[9]    *Id.* § 9.1.

[10]   *Id*. § 12.1.10.

[11]   The Retained Causes of Action are described in the *Schedule of Retained Causes of Action*. ECF No. 818.

[12]   *Id*.

4

This investigation revealed serious breaches of fiduciary duty and other acts of malfeasance by the Officers & Directors.  On June 27, 2024, the Plan Administrator sent a demand letter and draft complaint (the "D&O Complaint") to the Officers & Directors.  The claims set forth in the D&O Complaint (collectively, the "Estate D&O Claims") include claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, corporate waste, and others.  On December 31, 2024, the Plan Administrator filed the D&O Complaint, commencing the adversary proceeding captioned *Tribolet Advisors LLC, v. Perrill et al.*, Adv. Pro. No. 24-03278.

**II.     The D&O Policies**

9.     Prior to the Petition Date, the Debtors obtained the following insurance policies from the Insurers (collectively, the "D&O Policies"):  (i) Policy No. RILPDO5992022 from Relm Insurance Ltd., with a policy period from March 21, 2022 to September 21, 2028, and a combined aggregate limit of liability for all coverage parts of $2,500,000.00; (ii) Excess Insurance Policy No. 101-XDO-1030-101 from Banyan Risk Ltd., with a policy period from August 4, 2022 through September 22, 2028, and a maximum aggregate liability of $2,500,000.00; and (iii) Policy No. RILPDOA5992022 from Relm Insurance Ltd., with a policy period from September 22, 2022 to September 22, 2029, and a combined aggregate limit of liability for all coverage parts of $5,000,000.00.  The D&O Policies therefore collectively provide, at most, $10 million in coverage.

10.    The D&O Policies provide the following coverage: (i) "Side A – Insured Person Liability" that covers losses by the Officers & Directors; (ii) "Side B – Company Reimbursement" that reimburses the Debtors for indemnifying losses of the Officers & Directors; and (iii) "Side C – Company Liability" that covers direct losses by the Debtors.  The D&O Policies constitute "wasting" policies—i.e., because each Side shares equally in the policy

5

limit, any proceeds disbursed under Side A directly reduces the coverage available under Sides B and C.

### III. Claims Against the Officers & Directors

11. As discussed, on December 31, 2024, the Plan Administrator filed the D&O Complaint. The Estate D&O Claims described therein implicate the D&O Policies. If a negotiated settlement of the Estate D&O Claims cannot be reached, the Plan Administrator intends to pursue the Estate D&O Claims to judgment. The D&O Complaint seeks to recover damages in excess of $100 million on behalf of the Debtors' creditors, which far exceeds the limits of the D&O Policies.

12. A subset of the Officers & Directors is also subject to other litigation that implicates the D&O Policies. On November 15, 2022, one of the Debtors' creditors, Sentinum, Inc. (f/k/a BitNile Inc.) ("BitNile"), commenced an action against certain Officers & Directors in the United States District Court for the District of Minnesota (such action, the "Minnesota Action").[13] In a three-count complaint, BitNile alleges that those defendants are liable to BitNile for (i) fraud, (ii) fraudulent concealment, and (iii) civil conspiracy.[14] BitNile seeks to recover monetary damages in an amount to be determined at trial, plus expenses, costs, and fees (including attorney's fees).

13. The Plan Administrator understands that, as of the date hereof, approximately $2–3 million has either been paid out already or is pending to be paid out from the D&O Policies.

---

[13] The Minnesota Action is captioned *BitNile, Inc. v. Perrill, et al.*, Case No. 0:22-cv-02911-WMW-DLM (D. Minn.).

[14] Notably, the claims for which BitNile seeks to recover in the Minnesota Action—claims for fraud and conspiracy to commit fraud—are excluded from coverage under the D&O Policies.

The Plan Administrator further believes that the payments made to date have been in connection with the claims alleged in the Minnesota Action.[15]

## OBJECTION

14. The Motion should be denied because (i) the proceeds of the D&O Policies are estate property and (ii) the Insurers have not demonstrated cause for lifting the stay. If the Motion is not denied, the Court should, in the alternative, impose procedures for the payment of defense costs from the proceeds of the D&O Policies.

**I.     The D&O Policies' Proceeds Are Estate Property**

15. The proceeds of the D&O Policies are estate property because the Debtors' have both legal and equitable interests in the proceeds.

16. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Due to the breadth of a debtor's estate, "courts are generally in agreement that an insurance policy will be considered property of the estate." *In re Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993) (collecting cases). Despite insurance policies belonging to the estate, the proceeds of those policies are not always estate property.

17. Whether the proceeds are property of the estate depends on "the language and scope of the specific policies at issue." *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) (citing *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del 2010)). It is only "when the debtor has no legally cognizable claim to the insurance proceeds [that] those proceeds are not property of the estate." *Edgeworth*, 993 F.2d at 55; *see also In re Louisiana*

---

[15] The Plan Administrator notes that the Insurers have already disbursed proceeds of the D&O Policies in connection with the Minnesota Action. These disbursements were made prior to the Insurers filing the Motion seeking stay relief. The Plan Administrator intends to file a separate motion seeking the appropriate sanctions against the Insurers for any disbursements made without the Court's authorization.

7

*World Exposition, Inc.*, 832 F.2d 1391, 1401 (5th Cir. 1987) (holding that "proceeds [of D&O insurance policies], **which belong only to the directors and officers**, are not part of the estate") (emphasis added). However, the D&O Policies in this case provide coverage not only to the Officers & Directors but also to the Debtors themselves. As the Motion acknowledges, "[t]he 'Insureds' under the above-described insurance policies **are the Debtors** and its [sic] officers and directors."[16]

18. "Faced with the typical situation in which a debtor corporation's liability policies provide the debtor and thus the estate with direct coverage against third party claims, virtually every court to have considered the issue has concluded that the policies—and clearly the proceeds of those policies—are part of debtor's bankruptcy estate, irrespective of whether those policies also provide liability coverage for the debtor's directors and officers." *In re Vitek, Inc.*, 51 F.3d 530, 534 (5th Cir. 1995); *see also In re Archdiocese of Saint Paul & Minneapolis*, 579 B.R. 188, 201 (Bankr. D. Minn. 2017) (explaining that "when a liability insurance policy provides direct coverage to the debtor as well as the directors and officers, since the proceeds may be payable to the debtor[,] they are property of the debtor's estate") (citing *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 509–511 (Bankr. D. Del. 2004)); *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 420 (Bankr. E.D. Pa. 1995) (where "the Debtor's own liability exposure is also covered by the D & O Policy" and the "Proceeds available for the Debtor's liability exposure are not segregated from the Proceeds available to the directors and officers," the Debtor "is indeed an insured and has a sufficient interest in the Proceeds as a whole to bring them into the estate" (citing *Vitek*, 51 F.3d at 534 n. 17)). Because the D&O Policies provide

---

[16] Motion at 2 (emphasis added).

coverage to the Debtors, the Debtors undoubtedly had a legal interest in the policy proceeds, making the proceeds property of their estates.

19. The estates also have an equitable interest in the proceeds under well-established Fifth Circuit law. In *In re OGA Charters*, the Fifth Circuit made "official what [its] cases [had] long contemplated"—that where "a siege of tort claimants threaten the debtor's estate over and above the policy limits," the court would "classify the proceeds as property of the estate." 901 F.3d 599, 604 (5th Cir. 2018); *see also L. Off. of Rogelio Solis PLLC v. Curtis*, 83 F.4th 409, 412–13 (5th Cir. 2023), *cert. denied*, No. 23-1236, 2024 WL 4426605 (U.S. Oct. 7, 2024) (reaffirming the rule of *OGA Charters*). This Court has twice applied *OGA Charters* in similar situations involving post-confirmation claims against insufficient D&O policies. *See In re GWG Holdings, Inc.*, No. 22-90032, 2024 WL 3418190 (Bankr. S.D. Tex. July 15, 2024); *In re Alta Mesa Res., Inc.*, No. 19-35133, 2022 WL 17586710 (Bankr. S.D. Tex. Dec. 12, 2022). Moreover, the estate's interest in the proceeds may be superior to the interest of other claimants. *Alta Mesa*, 2022 WL 17586710, at *15 (citing *Fisher v. Apostolou*, 155 F.3d 876, 881 (7th Cir. 1998)).

20. Under *OGA Charters*, not only does the estate have an equitable interest in the policies, "oversight by the court is necessary to assure an equitable distribution of the available assets." 901 F.3d at 604 (quoting 3 Collier on Bankruptcy ¶ 362.03 (16th ed.)). Collier, which the Fifth Circuit cited favorably in *OGA Charters*, explains this rule's rationale:

> Application of the automatic stay to the recovery of policy proceeds enables the bankruptcy court to assure that available assets are being distributed in an equitable fashion among creditors. When there are multiple claimants to the policy proceeds, the court should be able to oversee the allocation of the proceeds among claimants. . . . The automatic stay assures that the court will be able to determine the sufficiency of the policy proceeds before any particular claimant seeks to recover those funds.

Collier ¶ 362.03[5][b].

21.     For these reasons, the Debtors had legal and equitable interests in both the D&O Policies *and* their proceeds, which rendered the proceeds property of the estate.

## II.     The Insurers Have Not Demonstrated "Cause" to Lift the Stay

22.     "Property of the estate is protected by an automatic stay which is imposed as of the petition date and stays 'any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.'" *Allied Digital*, 306 B.R. at 509 (quoting 11 U.S.C. § 362(a)(3)).  Because the proceeds of the D&O Policies belong to the Debtors' estates, the Insurers must seek stay relief.[17]

23.     Bankruptcy Code section 362(d) provides that relief from the automatic stay can be granted only "for cause."  11 U.S.C. § 362(d)(1).  Because the statute does not offer guidance as to what constitutes "cause," courts have considered twelve factors when determining whether cause exists (often called the "*Curtis*" or "*Sonnax*" factors).  *See, e.g.*, *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014) (citing *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984); *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2nd Cir.1990); *In re United*

---

[17]   The term "stay" is a misnomer because, following confirmation of the Debtors' Plan, the stay was superseded by the plan's injunctive provisions.  The Debtors' Plan provides that on the Effective Date, "the assets of the Debtors … shall vest in the Reorganized Debtors."  Debtors' Plan § 4.2.3.  The Debtors' Plan further enjoins all entities from, among other things, "enforcing, attaching, collecting, or recovering by any manner or means" a claim against the Reorganized Debtors and "asserting against the Reorganized Debtors or the Litigation Trust, or any of their respective assets or properties, any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan."  Debtors' Plan §§ 9.1; 9.6.

In these circumstances, courts treat motions for relief from the "stay" as motions for relief from the plan's injunctive provisions.  *See, e.g.*, *In re Town Sports Int'l*, No. BR 20-12168 (CTG), 2023 WL 8827193, at *4 (D. Del. Dec. 21, 2023), *aff'd sub nom.*, *Town Sports Int'l, LLC v. Moreno-Cuevas*, No. 24-1020, 2024 WL 3963680 (3d Cir. Aug. 28, 2024) (bankruptcy court's treatment of stay relief motion "as a motion for relief from the Plan Injunction, as the Automatic Stay had terminated," was "in line with similar cases." (citing *In re SquareTwo Fin. Servs. Corp.*, 2017 WL 4012818, at *1 (Bankr. S.D.N.Y. Sept. 11, 2017) (treating a request for stay relief as a request for relief from plan injunction); *In re WorldCom, Inc.*, 2006 WL 2255071, at *7 (S.D.N.Y. Aug. 4, 2006) (treating "request to lift the automatic stay as a request to lift the Plan Injunction, as it had become effective after [movant's] motion was filed.")).

*States Brass Corp.*, 176 B.R. 11, 13 (Bankr. E.D. Tex.1994); *In re Fowler*, 259 B.R. 856 (Bankr. E.D. Tex. 2001)).[18] "Not all factors may be relevant to each case." *Id*. In this case, only two of the factors are relevant: (i) whether there is a lack of any connection with or interference with the bankruptcy case and (ii) the impact of the stay on the parties and the balance of harms.

24. As a threshold matter, the Motion suffers from a fatal defect that requires it to be denied—the Insurers have failed to make a prima facie case for the existence of cause. "The burden is on the moving party to make an initial showing of 'cause' for relief from the stay." *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999) (citing *Sonnax*, 907 F.2d at 1285). "A party moving to lift the stay under section 362(d)(1) 'must initially produce *evidence* establishing "cause" for the relief he requests.'" *In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (quoting *In re Touloumis*, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994)) (emphasis added); *see also In re Spencer*, 568 B.R. 278, 280 (Bankr. W.D. Mich. 2017) (explaining the requirement that "the party seeking relief from stay under § 362(d)(1) introduce a certain quantum of evidence sufficient to establish a prima facie case" (quoting *In re Planned Sys., Inc.*, 78 B.R. 852, 860 (Bankr. S.D. Ohio 1987))).

25. Where "the movant fails to make an initial showing of cause," the court "should deny relief without requiring any showing from the debtor that it is entitled to continued

---

[18] The twelve factors are:

(1) whether relief would result in a partial or complete resolution of the issues;
(2) lack of any connection with or interference with the bankruptcy case;
(3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
(5) whether the debtor's insurer has assumed full responsibility for defending it;
(6) whether the action primarily involves third parties;
(7) whether litigation in another forum would prejudice the interests of other creditors;
(8) whether the judgment claim arising from the other action is subject to equitable subordination;
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and economical resolution of litigation;
(11) whether the parties are ready for trial in the other proceeding; and
(12) impact of the stay on the parties and the balance of harms.

protection." *Project Orange*, 432 B.R. at 103 (quoting *Sonnax*, 907 F.2d at 1285); *Spencer*, 568 B.R. 278, 280 ("Unless the quantum of proof on the issue of cause under § 362(d)(1) reaches a certain threshold, no prima facie case is established and the debtor is not required to introduce evidence to meet and rebut the prima facie case." (quoting *Planned Sys.*, 78 B.R. at 860)).

26. Very recently, in the FTX bankruptcy, Judge Dorsey denied a similar motion filed by the debtors' former CEO. *See In re FTX Trading Ltd.*, Case No. 22-11068. April 12, 2023 Hr'g Tr. (Bankr. D. Del. 2023) [ECF No. 1284]. There, the officer sought relief from the automatic stay to allow the insurers to advance or reimburse defense costs under the debtors' D&O policies. The court acknowledged that "the burden is on the Movant to prove cause." *Id*. 52:16-24. The officer, however, had offered "zero evidence to establish cause" because the officer "did not put on any evidence whatsoever as to . . . what harm is going to occur to him . . . , what other insurance policies he has access to . . . , what other assets he has access to privately that would allow him to cover these costs and then recover them later under this policy." *Id*. at 52:16–24. In the absence of such evidence, there was "nothing to show that there was any cause" to lift the stay. *Id*. at 52:25. As a result, the court had "no choice[] but to deny the motion for lack of evidence." *Id*. 53:7-8. The same outcome is required here.

27. Relying primarily upon the mistaken argument that the proceeds are not estate property, the Insurers have failed to offer any evidence demonstrating that cause exists. In support of lifting the stay, the Insurers rely solely upon a single paragraph of legal argument.[19] "Arguments in a brief do not constitute evidence, however." *Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 131 (S.D.N.Y. 2015) (citing *Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) ("defendants' memorandum of law . . . is not evidence at all"). Because the Insurers have

---

19   Motion at 6–7.

failed to make a prima facie case for cause existing, the Motion must be denied on this basis alone. *See, e.g.*, *Spencer*, 568 B.R. at 280 (denying motion to lift the stay where "the Motion is supported only by legal argument, which is not evidence").

28. Setting the evidentiary issue aside, the Motion also does not demonstrate that the relevant *Sonnax* factors support lifting the stay. As mentioned, the only two factors that are relevant here are (i) whether there is a lack of any connection with or interference with the bankruptcy case and (ii) the impact of the stay on the parties and the balance of harms. Neither factor supports lifting the stay.

29. ***First***, there is a significant connection between the D&O Policies and these bankruptcy cases. As shown above, the D&O Policies and their proceeds are estate assets—in fact, they may be the most valuable remaining assets in these bankruptcy estates. Accordingly, the estates have a significant interest in preserving the policies and the proceeds thereof. Based upon their current and unreasonable rates of expenditure, the Officers & Directors would, if permitted, almost undoubtedly exhaust the entirety of the proceeds in the near term. Modifying the automatic stay to grant the Officers & Directors unfettered access to the D&O Policies would therefore eliminate coverage available to fund recoveries to unsecured creditors in the event that the Plan Administrator prevails on the Estate D&O Claims. That would, in turn, further complicate the path to a successful conclusion of these chapter 11 cases.

30. ***Second***, the balance of harms favors keeping the stay in place. On one hand, the Insurers have provided only generalized and conclusory statements about potential harm to the Officers & Directors, and those statements are not supported by any evidence. On the other hand, substantial harm to the estates would result if the stay were lifted, thereby allowing the proceeds of the D&O Policies to dissipate. Every dollar consumed in payment of incurred and

advanced legal fees leaves one dollar less to fund creditor recoveries. Further, if it were later determined that the Officers & Directors were not entitled to coverage under the policies' terms, any proceeds that were already expended would be virtually unrecoverable by the estates. In that way, the proceeds would be irretrievably squandered by the same individuals whose stewardship of the Debtors has already resulted in enormous losses to creditors, thereby prejudicing creditors yet again. Simply put, access to the D&O Policies would be substantially prejudicial to the Debtors' creditors, as it would deprive them of any relief arising out of those proceeds, which are critical assets subject to protection as part of the bankruptcy estate. The stay was intended to prevent such an inequitable result and should be enforced in this case to prevent further harm to the Debtors' creditors.

### III. The Court Should Monitor the Officers' & Directors' Defense Costs

31. The Plan Administrator also opposes the relief sought in the Motion to the extent that it would permit unsupervised and unlimited disbursements from the D&O Policies, without court approval of professional fees. For this reason, if the Court is inclined to lift the stay, the Plan Administrator requests, in the alternative, that the Court impose certain notice and objection procedures to govern payments of the Officers' & Directors' legal fees. Any reimbursement should be limited to *reasonable* defense costs through the submission of periodic requests for payment.

32. As courts, including the Fifth Circuit, recognize, "bankruptcy courts have the plastic powers to modify or condition an automatic stay so as to fashion the appropriate scope of relief." *McConathy v. Found. Energy Fund IV-A, L.P.*, 111 F.4th 574, 584 (5th Cir. 2024) (quoting *E. Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998)). "The flexibility of section 362 is underscored by the language of subsection (d), which provides

that relief may be granted by 'terminating, annulling, modifying, or conditioning' the stay." 3 Collier on Bankruptcy ¶ 362.07[1] (16th ed. 2024) (quoting 11 U.S.C. § 362(d)). "The effect is to permit the court to fashion the relief to the particular circumstances of the case." *Id*.

33. Courts have found further support for imposing payment protocols in Bankruptcy Rule 2016, which establishes procedures for seeking compensation from the estate for professionals' fees. *See In re Arter & Hadden, L.L.P.*, 335 B.R. 666, 674 (Bankr. N.D. Ohio 2005) (lifting the stay to disburse D&O insurance proceeds but imposing the condition that "the payment of attorney's fees is subject to approval of an application for compensation or reimbursement, as provided by Federal Rule of Bankruptcy Procedure 2016"); *see also* Fed. R. Bank. P. 2016(a) (establishing procedures for when "an entity seeks from the estate interim or final compensation for services or reimbursement of necessary expenses").

34. By continuing to monitor expenditures from the proceeds of the D&O Policies, the Court can ensure that the Officers & Directors are adequately represented while also protecting the interests of creditors, whose potential recoveries continue to dwindle as defense costs mount. In particular, the Court should require the Officers & Directors to file applications for payment of defense costs, and the Court should limit the amount of the proceeds that may be paid to the Officers & Directors to their reasonable, documented and actual defense costs. Courts granting stay relief under similar circumstances have imposed these types of protocols. *See, e.g.*, *In re Beach First Nat. Bancshares, Inc.*, 451 B.R. 406, 411–12 (Bankr. D.S.C. 2011) (requiring insurer to review fees and expenses requested by defense counsel for necessity and reasonableness and notify the trustee of the amounts being paid and further cautioning the parties that the recipient of any defense costs that are unreasonable or unnecessary could be subject to disgorgement); *In re Laminate Kingdom*, LLC, No. 07-10279-BKC-AJC, 2008 WL 1766637, at

*5 (Bankr. S.D. Fla. Mar. 13, 2008) (lifting the stay but requiring defense counsel to file a fee application in conformity with Bankruptcy Rule 2016); *Arter & Hadden*, 335 B.R. at 674 (same). Without such protocols, there is a substantial risk that the estates will suffer further harm as a result of the actions of the Officers & Directors.

## RESERVATION OF RIGHTS

35. The Plan Administrator reserves all its rights with respect to the Motion and the relief requested therein, including, without limitation, the right to amend, modify, or supplement the Objection, to seek discovery, and to raise additional objections at the hearing to consider the Motion. The Plan Administrator further reserves the right to seek the appropriate sanctions against the Insurers for any prior disbursements of policy proceeds without Court authorization.

# CONCLUSION

WHEREFORE, the Plan Administrator respectfully requests that the Court sustain the Objection and deny the Motion, or, in the alternative, condition the Motion's approval upon the imposition of payment procedures as requested herein.

Dated: January 3, 2025

Respectfully submitted,

*/s/ Charles R. Gibbs*
Charles R. Gibbs
Texas State Bar No. 7846300
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, TX 75201-1664
Tel:   (214) 295-8000
Fax:   (972) 232-3098
Email: crgibbs@mwe.com

*- and -*

Kristin K. Going (admitted *pro hac vice*)
Darren Azman (admitted *pro hac vice*)
Stacy A. Lutkus (admitted *pro hac vice*)
Jessica Greer Griffith (admitted *pro hac vice*)
Natalie Rowles (admitted *pro hac vice*)
Christopher J. Whalen (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-5404
Tel:   (212) 547-5400
Fax:   (212) 547-5444
Email: kgoing@mwe.com
       dazman@mwe.com
       salutkus@mwe.com
       ggriffith@mwe.com
       nrowles@mwe.com
       chwhalen@mwe.com

*Counsel to the Mining Project Wind Down Holdings, Inc. Litigation Trust and the Plan Administrator*

## **CERTIFICATE OF SERVICE**

      I certify that on January 3, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                /s/ *Charles R. Gibbs*
                                                Charles R. Gibbs